# EXHIBIT B

1           UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
2
   **************************
3  IN RE: ROUNDUP PRODUCTS      MDL No.
   LIABILITY LITIGATION         3:16-md-02741-VC
4
                                Case No. MDL No.
5  This document relates to:  3:16-md-02741-VC

6  Gerald and Lynne Nelson
   v. Monsanto
7  Case No. 3:19-cv-04576-VC

8        and

9  Richard Canning and
   Shirley Canning v.
10 Monsanto Company, et al
   Case No. 3:19-cv-04230-VC
11
   **************************
12

13          Remote Videotaped Deposition of

14  ROBERT F. HERRICK, MS, ScD, CIH, FAIHA, held at

15  the location of the deponent, commencing at

16  10:41 a.m., on the 23rd of October, 2023,

17  before Maureen O'Connor Pollard, Registered

18  Diplomate Reporter, Realtime Systems

19  Administrator, Certified Shorthand Reporter,

20  Notary Public.

21                  - - -

22

23          GOLKOW LITIGATION SERVICES
                877.370.DEPS
              deps@golkow.com
24

1    REMOTE APPEARANCES:

2

     THORNTON LAW FIRM, LLP
3    BY:   DAVID BRICKER, ESQ.
           9595 Wilshire Blvd., Suite 900
4          Beverly Hills, California 90212
           310-282-8676
5          dbricker@tenlaw.com
           Representing the Plaintiffs
6

7    THORNTON LAW FIRM, LLP
     BY:   CHRISTIAN F. UEHLEIN, ESQ.
8          101 Hyalite Ranch Lane
           Bozeman, Montana 59718
9          888-491-9726
           cuehlein@tenlaw.com
10         Representing the Plaintiffs

11

     NELSON MULLINS RILEY & SCARBOROUGH LLP
12   BY:   JAE LEE, ESQ.
           750 B Street, Suite 2200
13         San Diego, California 92101
           619-489-6187
14         jae.lee@nelsonmullins.com
           Representing the Defendants
15

16   Videographer:  Phillip Todd

17

18

19

20

21

22

23

24

1                          INDEX

2     EXAMINATION                                      PAGE

3     ROBERT F. HERRICK, MS, ScD, CIH, FAIHA

4     BY MR. LEE                                        8

5

6

7                      E X H I B I T S

8      NO.              DESCRIPTION                    PAGE

9     Herrick 1         Defendant Monsanto
                         Company's Notice of
10                       Videotaped Deposition of
                         Robert F. Herrick, MS,
11                       ScD, CIH, FAIHA............    19

12     Herrick 2         Dr. Herrick's Curriculum
                         Vitae....................     35
13
       Herrick 3         Dr. Herrick's July 14,
14                       2022 Report relating to
                         Gerald Nelson, et al v
15                       Monsanto Co...............     65

16     Herrick 4         Excerpt of Gerald
                         Nelson's April 6, 2022
17                       deposition transcript......    90

18     Herrick 5         Excerpt of Gerald
                         Nelson's April 7, 2022
19                       deposition transcript......    93

20     Herrick 6         Excerpt of Gerald
                         Nelson's April 7, 2022
21                       deposition transcript......   122

22     Herrick 7         Excerpt of Gerald
                         Nelson's April 7, 2022
23                       deposition transcript......   125

24

1

   Herrick 8        Excerpt of Gerald
2                    Nelson's April 8, 2022
                     deposition transcript......   135
3

   Herrick 9        Excerpt of Robert F.
4                    Herrick, Sc.D's September
                     6, 2022 deposition
5                    transcript................   150

6  Herrick 10        Third Amended Plaintiff
                     Fact Sheet................   157
7

   Herrick 11        Defendant Monsanto
8                    Company's Notice of
                     Videotaped Deposition of
9                    Robert F. Herrick, M.S.,
                     Sc.D., CIH, FAIHA.........   159
10

   Herrick 12        Dr. Herrick's July 14,
11                   2022 Expert Report
                     related to the Canning
12                   case......................   163

13 Herrick 13        Excerpt of Richard
                     Canning's November 23,
14                   2021 deposition
                     transcript................   176
15

   Herrick 14        Excerpt of Richard
16                   Canning's November 23,
                     2021 deposition
17                   transcript................   187

18 Herrick 15        Excerpt of Richard
                     Canning's November 23,
19                   2021 deposition
                     transcript................   199
20

   Herrick 16        Document titled
21                   Depositions and testimony
                     in the past 5 years........   226
22

   Herrick 17        Excerpt of Robert
23                   Herrick's October 13,
                     2014 deposition
24                   transcript................   229

Robert F. Herrick, MS, ScD, CIH, FAIHA

1

2   Herrick 18    Excerpt of Robert F.
                  Herrick, Sc.D's September
                  6, 2022 deposition
3                 transcript.................   231

4   Herrick 19    April 20, 2022 Invoice.....   236

5   Herrick 20    Invoices in the
                  Constantine case...........   239
6

    Herrick 21    May 19, 2022 invoice.......   241
7

    Herrick 22    February 21, 2022 invoice..   243
8

    Herrick 23    Andreotti, et al article,
9                 Glyphosate Use and Cancer
                  Incidence in the
10                Agricultural Health Study..   244

11  Herrick 24    First Amended Plaintiff
                  Fact Sheet, Richard
12                Canning....................   251

13  Herrick 25    Eriksson, et al article,
                  Pesticide exposure as
14                risk factor for
                  non-Hodgkin lymphoma
15                including
                  histopathological
16                subgroup analysis..........   252

17

18

19

20

21

22

23

24

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
1                    -  -  -
                DEPOSITION SUPPORT INDEX
2                    -  -  -

3

    Direction to Witness Not to Answer
4   PAGE  LINE
    None.
5

6

7

8   Request for Production of Documents
    PAGE  LINE
9   None.

10

11

    Stipulations
12  PAGE  LINE
    None.
13

     9          4
14   9          12
    256         1
15

    Questions Marked Highly Confidential
16  PAGE  LINE
    None.
17

18

19

20

21

22

23

24
```

1            P R O C E E D I N G S

2

3            THE VIDEOGRAPHER:  Good

4       morning.  We are now on the record.

5       My name is Phillip Todd, I'm a

6       videographer for Golkow Litigation

7       Services.

8            Today's date is October 23rd,

9       2023, and the time is 10:41 a.m.

10      Eastern.

11           This remote video deposition is

12      being held in the matter of Roundup

13      Products Liability Litigation,

14      referring to the case of Richard

15      Canning and Shirley Canning versus

16      Monsanto Company, et al, and Gerald

17      and Lynne Nelson versus Monsanto

18      Company, et al, MDL Number 2741, in

19      the United States District Court,

20      Northern District of California.

21           The deponent is Dr. Robert F.

22      Herrick.

23           All parties to this deposition

24      are appearing remotely and have agreed

1    to the witness being sworn in

2    remotely.

3         Due to the nature of remote

4    reporting, please pause briefly before

5    speaking to ensure all parties are

6    heard completely.

7         Counsels' appearances will be

8    noted on the stenographic record.

9         The court reporter, Maureen

10   Pollard, will now swear in the

11   witness.

12                *    *    *

13   Whereupon,

14        ROBERT F. HERRICK, MS, ScD, CIH, FAIHA,

15   being first duly identified and sworn to

16   testify to the truth, the whole truth, and

17   nothing but the truth, was examined and

18   testified as follows:

19                EXAMINATION

20   BY MR. LEE:

21        Q.    Dr. Herrick, my name is Jae

22   Lee.  I'm from the Nelson Mullins law firm.

23   I represent the defendant, Monsanto Company.

24             Before we begin today, I would

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    like to read a couple of stipulations that

2    your counsel have agreed to, and at the end

3    I'll be asking you if you also agree to it.

4              MR. LEE:  Speaking with counsel

5         prior to the beginning of this

6         deposition, we have agreed that there

7         will be one transcript for today's

8         deposition for both the Richard

9         Canning and Shirley Canning and Gerald

10        and Lynne Nelson versus Monsanto

11        matters.

12             In addition, the second

13        stipulation is that the single

14        transcript will be able to be utilized

15        in both matters.

16        Q.    Dr. Herrick, do you agree to

17   those stipulations?

18        A.    Yes, I do.

19             MR. LEE:  Counsel, do you agree

20        to those stipulations?

21             MR. BRICKER:  Yeah, that's

22        fine.

23   BY MR. LEE:

24        Q.    Dr. Herrick, could you please

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    spell your name in full, please?

2         A.    Sure.

3               It's Robert, R-O-B-E-R-T;

4    middle name Foster, F-O-S-T-E-R; last name

5    Herrick, H-E-R-R-I-C-K.

6         Q.    Dr. Herrick, do you understand

7    that you are under oath today?

8         A.    I do.

9         Q.    And do you understand that

10   being under oath means that you need to be

11   complete and truthful in your testimony?

12        A.    I do.

13        Q.    Do you further understand that

14   you may be asked to testify in a future

15   proceeding in these two litigation matters?

16        A.    I do.

17        Q.    Do you further understand that

18   if your testimony in such future proceedings

19   differs from what you say today, the

20   difference in your testimony could be used to

21   challenge your truthfulness?

22        A.    I do.

23        Q.    Are you aware of any reason or

24   circumstances why you cannot provide complete

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
1    and truthful testimony today?

2         A.    No, I don't.

3         Q.    Dr. Herrick, this deposition is

4    being taken remotely.

5               Where are you currently

6    located?

7         A.    I'm in my home, which is in

8    Marblehead, Massachusetts.

9         Q.    And in what room are you in

10   your home?

11        A.    Oh, I'm in an office that my

12   wife and I share.

13        Q.    Is there anyone else in the

14   room with you?

15        A.    No.

16        Q.    Are you participating in this

17   deposition via a laptop or desktop computer?

18        A.    A laptop, yes.

19        Q.    Now, in addition to the video

20   as well as the marked exhibit folder, do you

21   have any other programs currently open on

22   your laptop computer?

23        A.    Let's look.  I've got -- my

24   e-mail is open.  And, let's see, it looks
```

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    like Word is open.

2         Q.     Would you and your counsel --

3    would you be agreeable to closing your e-mail

4    program?

5              MR. BRICKER:  You know, Jae,

6         I'm not going to play this game.

7         Dr. Herrick has been deposed many,

8         many times.  His credibility is not to

9         be questioned.  Just let's go on with

10        the depo and not play the e-mail

11        program computer games.  He can have

12        open whatever he wants open, whatever

13        he needs to have open.

14             MR. LEE:  Will you stipulate

15        that you won't be sending Dr. Herrick

16        any e-mail during the course of this

17        deposition?

18             MR. BRICKER:  No, I won't,

19        because should --

20             (Cross-talking.)

21             MR. BRICKER:  You know, you

22        asked me -- hey, Jae, stop.

23             MR. LEE:  Let me --

24             MR. BRICKER:  You asked me a

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
1        question, and let me finish my

2        response.

3               I'm not going to stipulate that

4        I'm not going to send him anything,

5        because, for example, you're going to

6        ask for invoices for time spent on

7        this case, which I received this

8        morning, and I'm going to forward them

9        to him and you.

10              If you're concerned about me

11       sending him answers to questions or

12       guidance on how he should testify, I

13       will agree I won't do that.

14              MR. LEE:  Well, if you had

15       allowed me to just finish my question,

16       that's exactly what I wanted to ask

17       you to stipulate to, that you would

18       not send him any e-mail without

19       informing me during the course of this

20       deposition when we are on the record.

21              MR. BRICKER:  That's fine.

22              MR. LEE:  Counsel, Christian,

23       Mr. Counsel, do you agree as well?

24              MR. UEHLEIN:  That's fine.
```

1    BY MR. LEE:

2         Q.    And, Dr. Herrick, will you

3    notify me if anyone sends you any -- well,

4    let me rephrase that.

5              Will you notify me if either of

6    your two counsel on the record here send you

7    e-mail while we are still on the record?

8         A.    Okay.

9         Q.    Now, you have a Word program

10   open as well, is that correct, Dr. Herrick?

11        A.    Let's see here.  Yeah.  I can

12   close that out if you think that's better.

13        Q.    Thank you.

14        A.    Just give me a second here.

15   Hang on.  I have a couple things open.

16              Okay.  Word is shut down.

17        Q.    Dr. Herrick, you have been

18   deposed before, correct?

19        A.    I have.

20        Q.    Approximately how many times

21   have you been deposed?

22        A.    You mean in total?

23        Q.    Yes.

24        A.    I'm going to guess maybe 20.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Q.    Have you ever testified at

2  trial?

3    A.    I have.

4    Q.    And how many times have you

5  testified at trial?

6    A.    Once.

7    Q.    And when did you testify at

8  trial?

9    A.    Well, let's see, I did it

10 virtually, so it was during COVID.  I'm going

11 to say maybe four years ago.

12    Q.    And was that -- did you testify

13 in a trial involving the Monsanto Company?

14    A.    No, it wasn't involving

15 Monsanto.

16    Q.    When was the last time you were

17 deposed?

18    A.    It was about a year ago, I

19 think.  It was in the Cotter case.

20    Q.    And, Dr. Herrick, did you

21 prepare for this deposition today?

22    A.    I did.

23    Q.    And did you review any

24 documents in preparation for today's

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    deposition?

2        A.    Right.  I went back through the

3    two reports for Canning and Nelson.

4        Q.    Did you review any other

5    documents in preparation for this deposition?

6        A.    I went back through the

7    articles that I had included in those

8    reports.  There were one set of footnotes

9    about the environmental monitoring that

10   people have done in the past for glyphosate.

11   And then I also reviewed some of the studies

12   that I had referenced that dealt with the

13   exposure assessment for epidemiology.

14            So those -- and those are all

15   included in the reports in the footnotes.

16       Q.    Did you review any documents in

17   preparation for this deposition that are not

18   included in the footnotes of either of your

19   two reports for Canning or Nelson?

20       A.    Yeah, there was one that came

21   up when we did the Cotter deposition.  In one

22   of those epidemiology studies, they have a

23   footnote to another article.  The author's

24   name is Covle, C-O-V-L-E.  And I refreshed

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    myself on that article, too.

2         Q.    Any other documents that we

3    have not discussed that you have reviewed in

4    preparation for this deposition?

5         A.    No.  I think that covers it.

6         Q.    Did you speak with anyone in

7    preparation for today's deposition?

8         A.    Last week I had a phone call

9    with the counsel.

10         Q.    And, Dr. Herrick, I don't want

11    you to tell me about the substance of your

12    conversations with counsel, but who were the

13    two -- who were the counsel that you spoke

14    with last week in preparation for this

15    deposition?

16         A.    Oh, it was Mr. Bricker and

17    Mr. Uehlein.

18         Q.    The two counsel who are

19    currently participating in the deposition

20    today?

21         A.    Yeah.  I see Bricker.  Is

22    Christian on as well?

23              MR. BRICKER:  He's here.

24              THE WITNESS:  So, yep, that's

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
 1          the two of them.

 2                  MR. LEE:  Mr. Videographer,

 3          Dr. Herrick's voice is cutting in and

 4          out a little bit.  Are you hearing the

 5          same thing?

 6                  THE VIDEOGRAPHER:  Yes, I am.

 7          Could we go off the record to solve

 8          the technical issue?

 9                  MR. LEE:  Yes.

10                  THE VIDEOGRAPHER:  We're off

11          the record at 10:52 a.m.

12                  (Whereupon, a recess was

13          taken.)

14                  THE VIDEOGRAPHER:  We're back

15          on the record at 10:57 a.m.

16     BY MR. LEE:

17          Q.    Dr. Herrick, we were discussing

18     your discussion with the two counsel on

19     the -- participating in the deposition today.

20                  How long did you meet with them

21     last week?

22          A.    I think it was about 90 minutes

23     altogether.

24          Q.    Other than your two counsel,
```

Robert F. Herrick, MS, ScD, CIH, FAIHA

1   was there anyone else on the videoconference

2   or telephone?

3           A.    No, there wasn't.

4           Q.    Did you discuss this deposition

5   with any other individuals?

6           A.    No, I didn't.

7           Q.    Did you discuss this deposition

8   with any other plaintiff expert witnesses in

9   either case?

10          A.    No, I didn't.

11          Q.    Did you prepare in any other

12  way that we haven't already discussed for

13  this deposition?

14          A.    No.  It's just pretty much your

15  normal day.

16          Q.    Dr. Herrick, I'd like to

17  introduce Exhibit 1, which should be in your

18  folder.

19                (Whereupon, Exhibit Herrick 1

20      was marked for identification.)

21  BY MR. LEE:

22          Q.    And just let me know when you

23  have opened the file.

24          A.    Okay.  Help me through here.

1    Where am I going to actually find the folder?

2    Is that on share screen?

3         Q.    It should be in your marked

4    exhibit folder.  There was a link sent to you

5    via Chat that you can open in order to see

6    the marked exhibit folder.

7              The marked exhibit folder has

8    your name, Robert F. Herrick, and your

9    degrees and the words "Marked Exhibits" next

10   to a folder icon.

11        A.    So this is the one that I

12   looked at before?  This is Exhibit 1, which

13   is the notice?

14             MR. BRICKER:  Yeah, that's it,

15        Bob.  It's the notice in the Nelson

16        case.

17             THE WITNESS:  I have it right

18        here.  Yep, I'm in it.

19   BY MR. LEE:

20        Q.    Dr. Herrick, do you see this

21   document that I've marked as Exhibit 1, which

22   has the header United States District Court,

23   Northern District of California?

24        A.    Yes, I do.  I'm looking at it.

1    Q.    And do you see where it states,

2    "This document relates to:  Gerald and Lynne

3    Nelson versus Monsanto Company."

4         Do you see that?

5    A.    Yes, I do.

6    Q.    There's a header beneath that,

7    Defendant Monsanto Company's Notice of

8    Videotaped Deposition of Robert F. Herrick.

9         Do you see that, sir?

10   A.    Yes, I do.

11   Q.    Do you recognize this document?

12   A.    Yeah.  I got this on Friday.

13   Q.    Can you turn to the second page

14   of this document marked Exhibit 2?  And do

15   you see where it states, "Please take further

16   notice that, pursuant to Rules 30 and 34 of

17   the Federal Rules of Civil Procedure,

18   Defendant Monsanto Company requests that

19   Robert F. Herrick produce the documents

20   identified in the attached Exhibit A by the

21   time of the deposition"?

22        Do you see that?

23   A.    Yes, I do.

24   Q.    And on the third page of this

1    document marked as Exhibit 1, do you see the

2    header Exhibit A?

3          A.     Yes, I do.

4          Q.     On the fourth page, do you see

5    a header Requests For Production?

6          A.     Yes, I do see that.

7          Q.     And do you see underneath that

8    header are 22 requests for document

9    production?

10         Do you see that?

11         A.     Let me just scroll down.  It

12   looks -- yes, I do see that.

13         Q.     And, Dr. Herrick, just for a

14   clean record, we'll need -- in general, we'll

15   need a yes-or-no answer instead of mm-hmm and

16   that kind of thing.

17         Do you understand, sir?

18         A.     Yes.

19         Q.     Did you review these requests

20   for production?

21         A.     I did, yes.

22         Q.     And I'll represent to you that

23   the requests for production are similar for

24   the Richard Canning case which you are also

1    being deposed upon for today.

2            Do you have any documents that

3    you are going to produce today in response to

4    any of these requests for production?

5        A.    I don't have anything ready

6    right at this moment, no.

7        Q.    But you've reviewed these

8    requests?

9        A.    Yes, I did.

10       Q.    Do you have any documents

11   responsive to request number 1?

12       A.    This is "All documents provided

13   to you," etcetera?

14       Q.    Yes.

15       A.    Well, those would all be

16   documents that are in the share file.  I

17   think it was a share file or Dropbox that I

18   got from Thornton.

19       Q.    And, Doctor, request number 2

20   relates to studies and literature.  I think

21   we've already discussed that.

22            Are there any studies or

23   literature or articles that you have relied

24   on for your two reports that are either not

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    the -- I believe the Covle article or those

2    that are listed in your reports?

3         A.    No.  That's -- that's the

4    universe of stuff.  It was, you know, those

5    articles that I included in the footnotes.

6         Q.    Regarding number 3, I'll

7    represent to you that we've received a copy

8    of your curriculum vitae.

9              Going to number 4, do you have

10   any billing records or invoices for either

11   the Canning matter or Nelson matter that you

12   will be producing?

13             MR. BRICKER:  I do have billing

14        records that I got Friday night that I

15        can e-mail you.

16             MR. LEE:  Thank you, Counsel.

17        If you could just e-mail those during

18        a break, that would be much

19        appreciated.

20   BY MR. LEE:

21        Q.    Dr. Herrick, do you see request

22   number 5, any retainer letter, or contract,

23   or agreement?  Do you have any documents in

24   that category that you plan to produce?

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          A.     You know, I know there's --

2     because this came up in the Cotter case,

3     there is a letter that I -- you know, I don't

4     actually remember where I might have

5     collected that, but I'm sure the attorney has

6     it.

7               MR. LEE:  Counsel, would you be

8          producing a copy of documents

9          responsive to number 5?

10              MR. BRICKER:  I don't think

11         there is any such letter, not in these

12         cases.

13    BY MR. LEE:

14         Q.     Dr. Herrick, do you see number

15    6, a list of all organizations which you have

16    entered into consulting agreements within the

17    past ten years?

18              Do you see that?

19         A.     Yes, I do.

20         Q.     Will you be producing a list in

21    response to request for production number 6?

22              MR. BRICKER:  He's not going to

23         produce anything in response to number

24         6.  It's privileged, it's

1          confidential, and it's not relevant to

2          this case.

3                    MR. LEE:  I disagree.  I

4          certainly object to that objection.

5     BY MR. LEE:

6          Q.    Number 7 requests a copy of all

7     abstracts, etcetera, which you are an author,

8     which has all or part of the subject matter,

9     cancer causation, methodologies for

10    determining cancer causation, non-Hodgkin's

11    lymphoma, glyphosate, IARC, and/or Roundup.

12                    Do you see that, sir?

13         A.    Yes, I do.

14         Q.    Now, are all of your

15    publications listed in your curriculum vitae?

16         A.    They are, right.

17         Q.    Are there any articles,

18    abstracts, book chapters, or anything like

19    that that are not listed in your curriculum

20    vitae?

21                    MR. BRICKER:  The only thing

22         I'm going to object to is your request

23         for draft articles.  Drafts are not

24         discoverable, they're privileged, and

Robert F. Herrick, MS, ScD, CIH, FAIHA

1         they're not a matter of public record.

2             So he will not be producing any

3         drafts of anything that he may be

4         working on currently.

5    BY MR. LEE:

6         Q.    Dr. Herrick, is your curriculum

7    vitae complete with respect to published

8    articles and book chapters?

9         A.    Yes, it is.

10        Q.    Number 8 requests a copy of all

11   handouts, PowerPoint presentations, or other

12   documents used by you at any lecture

13   regarding non-Hodgkin's lymphoma, glyphosate,

14   IARC, and Roundup.

15            Do you see that?

16        A.    Yes, I do.

17        Q.    Do you have any documents

18   responsive to item number 8, request number

19   8?

20        A.    No, I don't.

21        Q.    Number 9 requests all documents

22   and communications regarding glyphosate,

23   non-Hodgkin's lymphoma, Roundup, IARC sent to

24   or received on after January 1st, 2013.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          Do you see that?

2     A.     Yes, I do.

3     Q.     Are you going to be producing

4 any documents in response to request number

5 9?

6     A.     No, I'm not.

7     Q.     Do you have any documents in

8 response to that -- responsive to item number

9 9?

10     A.     No, I don't.

11     Q.     Number 10 requests any device,

12 equipment, or other item used by you in

13 connection with your report.

14          Do you have anything -- any

15 device or equipment or other item that's

16 responsive to number 10?

17     A.     No.  The only thing I've used

18 is my laptop computer.

19     Q.     Request number 11 asks for any

20 notes or recordings of interviews you have

21 had with any potential witnesses for Gerald

22 Nelson or Lynne Nelson, and I'm going to also

23 include Richard Canning and Shirley Canning.

24          Do you have any documents, any

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    notes or recordings that are responsive to

2    request number 11?

3         A.    No, I don't.

4         Q.    You performed an interview of

5    Gerald Nelson, correct, Dr. Herrick?

6         A.    You know, I don't recall that.

7    I don't really -- I don't have a recollection

8    that I actually did.

9         Q.    You have no recollection that

10   you performed an interview of the Plaintiff

11   Gerald Nelson?

12        A.    I'm trying to think.  I

13   don't -- no, I don't recall speaking to

14   Nelson.

15        Q.    Do you have any notes of any

16   interview with Gerald Nelson?

17        A.    No, and that's -- you know,

18   because I did, you know, think through that

19   because I, you know, saw that this was one of

20   the questions, and I don't find in my file

21   any notes from a discussion with Nelson, no.

22        Q.    Did you make any recordings of

23   your -- of an interview with Gerald Nelson?

24        A.    No.  I don't remember that --

1    you know, I don't recall having an interview

2    with Nelson.

3            Q.    Did you perform an interview

4    with Plaintiff Richard Canning?

5            A.    No.  I don't recall doing that

6    either.

7            Q.    Do you have any notes of any

8    interview that you performed with Richard

9    Canning?

10           A.    No, I don't.

11           Q.    Did you make any recordings of

12   an interview with Plaintiff Richard Canning?

13           A.    No, I didn't.

14           Q.    Do you have any items

15   responsive to request number 12?

16           A.    Let me just read it over

17   carefully.

18                 No, I don't have anything that

19   would be responsive to that.

20           Q.    How about request number 13?

21           A.    Let's see.  Photographs,

22   videotapes.  No, I don't have anything like

23   that.

24           Q.    How about anything responsive

1    to request number 14?

2         A.    Let's see.  Notes,

3    correspondence.  No, this is -- you know, I

4    don't have any other -- you know, the only

5    thing I have is the version of the report

6    that you guys have.

7         Q.    How about items responsive to

8    request number 15?

9         A.    The only thing here would be,

10   you know, those -- what's it called, the

11   Plaintiff Fact Statements?  I have a couple

12   of those where they -- you know, there were

13   questions in there about the exposures and

14   the use of chemicals.  But that would be the

15   only thing that might fall into this

16   category.

17        Q.    Any other document that may

18   fall under request number 15?

19        A.    No.  No.

20        Q.    And with respect to request

21   number 16, Dr. Herrick, you stated earlier

22   that you have not performed a deposition or

23   had your deposition taken since the Cotter

24   deposition last year?

Robert F. Herrick, MS, ScD, CIH, FAIHA

1      A.      That's my recollection, yep.

2    Yes.

3      Q.      And do you have any documents

4    responsive to request number 17?

5      A.      I had -- you know, I put this

6    together, I put a list of that together for

7    Cotter.  It would be, you know, the same set

8    of depositions and testimony that were there,

9    you know, except we would add Cotter to it.

10      Q.      Okay.  Any documents responsive

11    to number 18?

12      A.      Let's see.  Signed reports.

13    Just the two that were -- that are in play

14    right now, I think.  That would be the two

15    reports.

16      Q.      Any other documents responsive

17    to request 18?

18      A.      No.

19      Q.      How about request number 19?

20      A.      I'd have -- I can look, you

21    know, because I'm just trying to recall what

22    I had going on.  Oh, well, there was, you

23    know, the one -- and I should, you know,

24    correct what I just said about 18, because I

1    think within the last four years I also had

2    that report on Constantine, so that would be,

3    you know, responsive to 18 and 19.

4         Q.      Constantine.  And that is the

5    case involving Monsanto, is that correct?

6         A.      Right, yeah.

7         Q.      Any items responsive to request

8    20?

9         A.      All communications between

10   you... let me just take a look at the list of

11   people here.

12              The only person in this list

13   that I have had contact with, although it

14   wasn't regarding anything around Monsanto or

15   anything, is discussion with John Meeker, so

16   I have spoken with him.

17        Q.      Dr. John Meeker?

18        A.      Right, yes.

19        Q.      And when did you speak with

20   Dr. John Meeker?

21        A.      I think it was probably two

22   years ago, at least two years ago.

23        Q.      And you stated that it did not

24   involve any litigation involving Monsanto

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Company, is that correct?

2         A.    That's correct, right.

3         Q.    Do you recall what the

4    conversation was about?

5         A.    Yeah.  I was talking to Meeker

6    because I was making a donation to the

7    University of Michigan to set up a

8    scholarship fund, and it's for students that

9    are in his department, so that was the topic

10   of our conversation.

11        Q.    Did you ever discuss with

12   Dr. John Meeker the Monsanto litigation in

13   any form or manner?

14        A.    No, I didn't.

15        Q.    Have you had any communications

16   with any other plaintiffs' experts even if

17   they are not listed under request 20?

18        A.    No, I haven't.

19        Q.    Do you have any documents

20   responsive to request 21, Dr. Herrick?

21        A.    I'm just reading through this.

22   No, I don't.

23        Q.    Do you have any documents

24   responsive to request 22?

1        A.       No, no.

2        Q.       Dr. Herrick, let me introduce a

3    document that I'll mark as Exhibit 2.

4                 (Whereupon, Exhibit Herrick 2

5        was marked for identification.)

6    BY MR. LEE:

7        Q.       And please let me know when you

8    are able to access that document.

9        A.       Okay.  Are we done with this

10   one?

11       Q.       Yes.

12       A.       Okay, I'll just close it out.

13                Oh, Exhibit 2?

14       Q.       Yes.

15       A.       Okay.  Hang on.  I'm opening

16   it.

17                Okay.

18       Q.       Dr. Herrick, do you see this

19   document I've marked as Exhibit 2 that has

20   the header Robert F. Herrick?  Do you see

21   that?

22       A.       Yes, I do.

23       Q.       And it's 21 pages, and it has

24   underneath your name "Senior Lecturer on

1    Industrial Hygiene [retired]."

2              Do you see that?

3      A.      Yes, I do.

4      Q.      Do you recognize this document?

5      A.      I do.  This is my CV.  I think

6    this was from 2021.  Let me just see if I've

7    got a date at the bottom here.

8              Yeah, this is from 2021.  I do

9    recognize this.

10     Q.      Did you prepare this document?

11     A.      I did, yes.

12     Q.      Did anyone assist you in

13   preparing this document?

14     A.      Well, the document that I

15   prepared wasn't as nicely formatted as this.

16   So when I prepared this as a Word document, I

17   sent it to the production people at

18   Environmental Health & Engineering, or EH&E,

19   and they reformatted it and cleaned up, you

20   know, the spacing and stuff like that.

21              So there was, you know, another

22   party involved in the formatting.

23     Q.      Other than the formatting, did

24   anyone change the substance of this document

1    marked as Exhibit 2?

2         A.    No.  This is -- the content and

3    substance is what I sent them.  They just

4    made it easier on the eyes.

5         Q.    Do you have any more up-to-date

6    curriculum vitae than this document that is

7    dated October 2021?

8         A.    Yes, I do.  I updated this, I

9    think it was in June of 2023.

10        Q.    Dr. Herrick, can you tell me,

11   do you have a copy of the updated CV?

12        A.    Yeah, I do.

13             MR. LEE:  Counsel, are you able

14        to send me a copy of that updated CV

15        at some break during this deposition?

16             MR. BRICKER:  Sure.

17             MR. LEE:  Thank you, Counsel.

18   BY MR. LEE:

19        Q.    Dr. Herrick, to your knowledge,

20   are there any corrections or any errors to be

21   noted on this document I've marked as

22   Exhibit 2, in addition to the updating?

23        A.    Oh.  No.  No, the information

24   in here is accurate.  It's just, in the

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    updated version I added some committee work

2    and some new publications.

3         Q.    Do any of your new publications

4    have subject matter related to the Monsanto

5    litigation?

6         A.    No.  They're a different --

7    they're on take-home exposures from dust, so

8    they're not really Monsanto related.

9         Q.    Do any of the committees that

10   have been added to your curriculum vitae, do

11   they concern any subject matter related to

12   the Monsanto litigation?

13        A.    No.  It's a committee of the

14   EPA that's looking at asbestos.

15        Q.    Dr. Herrick, do you see

16   Background Summary on the first page of

17   Exhibit 2?

18        A.    Yes, I do, mm-hmm.

19        Q.    And it states that you are

20   currently a principal scientist at

21   Environmental Health & Engineering,

22   Incorporated, is that correct?

23        A.    That is correct, yes.

24        Q.    Are you still a principal

1    scientist at Environmental Health &

2    Engineering, Incorporated?

3          A.     Yes, I am.

4          Q.     And what is Environmental

5    Health & Engineering, Incorporated?

6          A.     It's a consulting firm that was

7    founded here in Massachusetts by two people

8    from Harvard who I knew.  One was a professor

9    and the other was a student.  And when the

10   student graduated, they opened this firm.

11              And so that would have been, I

12   think, in the late 1980s, and they've been in

13   business ever since.

14         Q.     And you've been with

15   Environmental Health & Engineering,

16   Incorporated since 2018, is that correct?

17         A.     Right.  I started, you know,

18   this role with them when I retired from

19   Harvard.

20         Q.     Is Environmental Health &

21   Engineering, Incorporated the entity through

22   which you perform your expert witness work in

23   the Monsanto litigation?

24         A.     It is, yes.

1      Q.      Do you perform any other

2    non-Monsanto-related consulting work through

3    Environmental Health & Engineering,

4    Incorporated?

5      A.      Yeah, I have in the past.  Yes.

6      Q.      Are you still a teaching fellow

7    at the Harvard School of Public Health?

8      A.      No, I'm not.  That was a one --

9    you know, that was -- see, I'm looking here.

10   Like, that was back in 1983, so, no, that was

11   just a one-year appointment.

12     Q.      How much of your professional

13   time -- well, let me ask you this.

14             Your title is described as

15   principal scientist for Environmental Health

16   & Engineering, Incorporated.  Can you please

17   describe what you do as a principal

18   scientist?

19     A.      Well, my activity, you know,

20   really has been limited to litigation

21   support, so that's my, you know, main

22   activity that I'm associated with EH&E with.

23     Q.      And by "litigation support,"

24   does that include your expert witness work?

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    A.    Yeah, it does.  Yes.

2    Q.    What other litigation support

3  work related to the Monsanto litigation do

4  you perform as a principal scientist at

5  Environmental Health & Engineering,

6  Incorporated?

7             MR. BRICKER:  Form.

8  BY MR. LEE:

9    Q.    You can answer.

10   A.    Oh, sure.

11            Can I get -- just to clarify,

12 though, you know, over the years I was

13 involved in PCB work, which would -- you

14 know, is linked to Monsanto.  So just so I

15 understand the question, are you interested

16 uniquely in the Roundup activity, or more

17 generally?

18   Q.    Any litigation against

19 Monsanto, including PCB and Roundup.

20   A.    Okay.  Well, the work has

21 been --

22            MR. BRICKER:  Bob, hold on.

23       Let me caution you, there may be

24       litigation retained in your scope as

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
1          an expert, and so though you've
2          been --
3                  [Zoom interference].
4                  MR. BRICKER:  -- been disclosed
5          as an expert, sir, but you --
6                  COURT STENOGRAPHER:  I'm sorry,
7          Mr. Bricker.  You are really cutting
8          up.  I can't understand what you're
9          saying.
10                 MR. BRICKER:  Okay.  I'll start
11         over.
12                 You --
13                 [Zoom interference]
14                 THE WITNESS:  Yeah, you're
15         still chopped up a bit, for me anyway.
16                 MR. BRICKER:  I don't know what
17         to tell you.
18                 MR. LEE:  Counsel, I believe
19         it's important for you to state your
20         objection, so can we go off the record
21         and correct your audio issue?
22                 MR. BRICKER:  Sure.
23                 THE VIDEOGRAPHER:  We're off
24         the record at 11:26 a.m.
```

1          (Whereupon, a recess was

2     taken.)

3          THE VIDEOGRAPHER:  We're back

4     on the record at 11:30 a.m.

5          MR. BRICKER:  All right.  So

6     let's start this over.

7          Bob, you were asked about

8     matters that you're consulting on in

9     litigation where Monsanto is involved,

10    and there may be matters where you've

11    been asked to consult that -- where

12    your identity as an expert has not

13    been disclosed yet.  Those matters are

14    privileged, and I would just caution

15    you, you should not be disclosing

16    privileged relationships that you have

17    with counsel in matters where you

18    haven't yet been disclosed.

19          Other than that, any matters

20    where you have been disclosed where

21    your identity as an expert is public

22    is fine, but I just don't want you

23    disclosing anything that's currently

24    privileged.

 1                THE WITNESS:  Gotcha.  Okay.

 2                MR. BRICKER:  So you can go

 3        ahead and respond to him.

 4    BY MR. LEE:

 5        Q.    Dr. Herrick, did you want the

 6    question read back to you by the court

 7    reporter?

 8        A.    Sure.  Yeah, that would be

 9    helpful.  Thank you.

10                MR. LEE:  Madam Court Reporter,

11        can you read back the question,

12        please?

13                THE STENOGRAPHER:  I think I

14        have to read back two because the last

15        one, "Any litigation against Monsanto,

16        including PCB and Roundup," so I'll

17        read the one before that.

18                (Whereupon, the reporter read

19        back the following:

20                "QUESTION:  What other

21        litigation support work related to the

22        Monsanto litigation do you perform as

23        a principal scientist at Environmental

24        Health & Engineering, Incorporated?

1          "ANSWER:  Can I get -- just to

2      clarify, though, you know, over the

3      years I was involved in PCB work,

4      which would -- you know, is linked to

5      Monsanto.  So just so I understand the

6      question, are you interested uniquely

7      in the Roundup activity, or more

8      generally?

9          "QUESTION:  Any litigation

10      against Monsanto, including PCB and

11      Roundup.

12          "THE WITNESS:  Okay.  Well, the

13      work has been --")

14      A.     Okay.  Well, then I would say,

15  to answer the question, I have been involved

16  in litigation on both those topics through my

17  role at EH&E.

18  BY MR. LEE:

19      Q.     Dr. Herrick, do you know how

20  many cases in which you have been disclosed

21  as an expert witness concern Roundup and

22  Monsanto Company?

23      A.     Ooh.

24          MR. BRICKER:  Object.  Let me

1          just object to form.

2     BY MR. LEE:

3          Q.     You can answer.

4          A.     Oh, sure.  Just thinking, I

5     mean, I'm sure about Constantine, I'm sure

6     about Cotter, and these two.  So to the best

7     of my knowledge, they would be those four.

8          Q.     How about cases in which you

9     have been disclosed as an expert witness

10    involving PCB and Monsanto Company?

11         A.     That, I don't really know.  I'm

12    afraid I don't have a sense of a good number

13    on that because there were, you know --

14    there's a number of cases apparently going

15    on, and I don't know which of them I would

16    have been disclosed in and which I wasn't.

17         Q.     Dr. Herrick, how much of

18    your -- well, let me ask you this.  Let me

19    rephrase it.

20              Since 20- -- you retired from

21    your position at Harvard School of Public

22    Health in 2018, is that correct?

23         A.     That is, yes.  That's right.

24         Q.     And you have been a principal

1    scientist at Environmental Health &

2    Engineering, Incorporated since 2018, is that

3    correct?

4          A.     Correct, yes.

5          Q.     Since 2018, how much of your

6    professional time has been taken up by your

7    work as a principal scientist for

8    Environmental Health & Engineering,

9    Incorporated?

10         A.     Can I -- in terms of a

11   clarification, as far as professional time,

12   would you include my work on committees and

13   reviewing for scientific journals, things

14   like that?  Is that considered professional

15   time?

16         Q.     Yes.

17         A.     Oh, okay.  I'll say 25 percent

18   over the arc of, you know, the time since I

19   retired.  I would put a number around

20   25 percent working in the litigation support.

21         Q.     Dr. Herrick, what percent --

22   since 2018, what percentage of your

23   professional income has come from your work

24   as principal scientist for Environmental

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Health & Engineering, Incorporated?

2        A.    Oh, income.  Well, let's see.

3    The great majority of it, because most of the

4    committee work that I do is unpaid, and

5    obviously the journal reviews are unpaid, you

6    know, that's all pro bono stuff, so...

7              You know, I guess to try to,

8    you know, answer your question, I would say

9    maybe 80 percent, you know, of what I had for

10   professional activity was my work through

11   EH&E.

12       Q.    What has your income from

13   Environmental Health & Engineering,

14   Incorporated been annually since 2018?

15       A.    You know, I'm afraid I'm not

16   real good at putting a specific number to it,

17   partly just because it's been so variable.

18   You know, there were years when some projects

19   were much more active than others, and then

20   there was a period of time during COVID when,

21   you know, virtually nothing was going on.

22             So I'm afraid I'm a little in

23   the dark as to try to come up with a good

24   estimate of that value.

1    Q.    Are you able to give an

2    estimate at all?

3    A.    Could you just repeat the

4    question?  I want to make sure I give you a

5    good answer here.

6    Q.    Let me ask you this.

7          Have you -- has your income

8    from Environmental Health & Engineering,

9    Incorporated exceeded $100,000 in any year

10   since 2018?

11   A.    No.  I don't think it has, no.

12   Q.    Can you give me a range of your

13   annual income from Environmental Health &

14   Engineering, Incorporated since 2018?

15        MR. BRICKER:  I'm just going to

16        object.

17        Bob, if you're comfortable

18        giving him income numbers, that's

19        fine.  He's entitled to income numbers

20        from litigation.  But for your other

21        activities with the company, he's

22        pushing an invasion of your privacy

23        rights, and I don't think you're

24        obligated to give that.

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
 1              But I can't tell you not to

 2        answer, and I can just advise you that

 3        you have privacy rights that you don't

 4        need to give up in the context of

 5        these questions.

 6              MR. LEE:  I object to that

 7        speaking objection.

 8   BY MR. LEE:

 9        Q.    You can answer, Dr. Herrick.

10        A.    Okay, sure.  You know, this is

11   going to sound kind of naive, but my wife

12   handles the finances for our household and so

13   she, you know, keeps track of things.  She

14   shows me our taxes, which of course I have to

15   sign, but I really don't, you know, feel

16   comfortable trying to quantify -- you know,

17   to give you a quantitative response to that

18   question.

19        Q.    What is your billing rate for

20   your work for Environmental Health &

21   Engineering, Incorporated?

22        A.    Well, the company bills 450 an

23   hour, as I recall.  I think that's their

24   billing rate for my time.
```

Robert F. Herrick, MS, ScD, CIH, BAIHA

1      Q.     Does that include testimony

2   work like your deposition today?

3      A.     Yeah.  The way, you know, we

4   set it up, it's a flat rate regardless of

5   what the particular activity is.

6      Q.     So it's $450 per hour for any

7   work that you perform for Environmental

8   Health & Engineering, Incorporated, is that

9   correct?

10      A.     That is correct, yeah.

11      Q.     Has that been your rate for

12   Environmental Health & Engineering,

13   Incorporated since 2018?

14      A.     I think it has, yeah.  Yes.

15      Q.     And your rate for testifying in

16   today's deposition is $450 per hour, is that

17   correct?

18      A.     That is correct, yeah.

19      Q.     Dr. Herrick, you have a doctor

20   of science in environmental health sciences,

21   is that correct?

22      A.     Yes, it is.

23      Q.     And you are a certified

24   industrial hygienist, is that correct?

1    A.    Yeah.  I was certified

2    originally in, I think it was 1988 -- I think

3    I've got it on here -- 1980, and I'm now in a

4    retired status as far as the CIH is

5    concerned.

6    Q.    So you were certified by the

7    American -- you had board certification in

8    industrial hygiene from the American Board of

9    Industrial Hygiene, is that correct?

10   A.    That is correct, yep.

11   Q.    But now your board

12   certification in industrial hygiene is in

13   retirement status, is that correct?

14   A.    That is correct, yes.

15   Q.    What is the difference between

16   active and retirement status with respect to

17   your board certification?

18   A.    Well, my dues went down by

19   several hundred dollars a year, so that was a

20   plus for me.

21        But, also, in order to maintain

22   your certification, you need to, you know,

23   recertify or apply for recertification every

24   five years, and so when you go into retired

1    status you don't participate in that

2    recertification program anymore.

3         Q.     So if I understand you

4    correctly, Dr. Herrick, you are no longer

5    participating in any recertification process

6    for your board certification in industrial

7    hygiene, correct?

8         A.     Right.  Yes, that's what going

9    into retired status signifies.

10        Q.     Can you describe what an

11   industrial hygienist is?

12        A.     Well --

13        Q.     With respect to your own

14   particular career.

15        A.     Oh, sure.

16               Well, it's a little bit of an

17   old-fashioned term.  As you can tell, a lot

18   of the people refer to themselves as

19   occupational hygienists now, which is

20   actually more accurate.

21               But in answer to your question,

22   the whole point of this profession is to

23   recognize, evaluate, and control hazards in

24   the workplace and in the environment.

1        Q.      Dr. Herrick, do you have a

2    degree in epidemiology?

3        A.      No, I don't.

4        Q.      Are you an epidemiology expert?

5        A.      No.  I don't consider myself to

6    be that, no.

7        Q.      Do you have a degree in

8    biostatistics?

9        A.      No, I don't.

10       Q.      Do you consider yourself to be

11   an expert in biostatistics?

12       A.      No, I wouldn't claim that.

13       Q.      Do you have a medical degree,

14   Dr. Herrick?

15       A.      No, I don't.

16       Q.      And you don't consider yourself

17   an expert in clinical medicine, is that

18   correct?

19       A.      That's correct, I'm not an

20   expert in that.

21       Q.      And you don't have expertise in

22   medical oncology, is that correct?

23       A.      That is correct, yes.

24       Q.      Do you recall what

Robert F. Herrick, MS, ScD, CIH, PAIHA

1    Mr. Canning's -- Richard Canning's diagnosis

2    was?

3         A.    My recollection, although I

4    didn't really try to focus on it, was that it

5    was non-Hodgkin lymphoma.

6         Q.    Do you consider yourself a

7    clinical expert in non-Hodgkin's lymphoma?

8         A.    No, I don't.

9         Q.    I'll represent to you that

10   Mr. Richard Canning was diagnosed with a

11   B-cell lymphoma.  Do you consider yourself a

12   clinical expert in B-cell lymphoma?

13        A.    No, I don't.

14        Q.    Have you ever diagnosed an

15   individual with non-Hodgkin's lymphoma in

16   your professional career?

17        A.    No, I haven't.

18        Q.    Have you ever diagnosed someone

19   with B-cell lymphoma in your professional

20   career?

21        A.    No, I have not.

22        Q.    Do you recall the diagnosis

23   given to Mr. Gerald Nelson with respect to

24   this litigation?

1    A.    Again, I didn't really focus on

2    it, but I think I remember that it was

3    non-Hodgkin lymphoma.

4    Q.    I'll represent to you that he

5    was diagnosed with chronic lymphocytic

6    leukemia.  Do you consider yourself a

7    clinical expert in chronic lymphocytic

8    leukemia?

9    A.    No, I don't.

10    Q.    Have you ever diagnosed an

11    individual with chronic lymphocytic leukemia?

12    A.    I have not.

13    Q.    Have you ever treated a --

14    participated in the treatment of an

15    individual with non-Hodgkin's lymphoma?

16    A.    No, I haven't.

17    Q.    Have you ever participated in

18    the treatment of an individual with B-cell

19    lymphoma?

20    A.    No, I have not.

21    Q.    Have you ever participated in

22    the treatment of someone with chronic

23    lymphocytic leukemia?

24    A.    No.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Q.    Have you ever performed a

2  clinical differential diagnosis?

3    A.    No, I haven't.

4    Q.    Do you consider yourself an

5  expert in medical causation?

6    A.    No.  I mean, I've studied

7  causation generally, but I don't think I

8  would claim myself to be an expert on it.

9    Q.    Are you offering in this

10  litigation any medical causation opinions for

11  Plaintiff Gerald Nelson?

12    A.    No, I'm not.

13    Q.    In this litigation, are you

14  going to offer any medical causation opinion

15  for Richard Canning?

16    A.    No, I'm not.

17    Q.    Are you an expert on the --

18  well, let me ask you this.

19         Have you heard of the Bradford

20  Hill criteria?

21    A.    I have.

22    Q.    Do you consider yourself an

23  expert on the Bradford Hill criteria?

24    A.    Well, I've used them in

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    teaching and in my research, so I do have

2    some -- I don't know if I'd go so far as to

3    claim I'm exactly an expert, but I have tried

4    to understand them and use them in my own

5    practice, yeah.

6         Q.    Well, that wasn't my question.

7               Do you consider yourself an

8    expert in the Bradford Hill criteria?

9         A.    I would have to say --

10              MR. BRICKER:  Form.

11   BY MR. LEE:

12        Q.    You can answer.

13        A.    No, I don't consider that to be

14   an area of my -- where I would claim to be an

15   expert.

16        Q.    Dr. Herrick, are you a

17   toxicologist?

18        A.    No, I am not.

19        Q.    Do you have board certification

20   in toxicology?

21        A.    No, I don't.

22        Q.    Do you consider yourself an

23   expert in toxicology?

24        A.    I don't, no.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          Q.     Dr. Herrick, have you ever

2    heard of the term "genotoxicity"?

3          A.     Yes, I have.

4          Q.     Do you consider yourself an

5    expert in genotoxicity?

6          A.     No, I don't.

7          Q.     Have you ever heard of the term

8    "mutagenicity"?

9          A.     Yes, I have.

10          Q.     Do you consider yourself an

11    expert in mutagenicity?

12          A.     No, I am not.

13          Q.     Have you heard of

14    carcinogenicity?

15          A.     Yes, I have.

16          Q.     Do you consider yourself an

17    expert in clinical human carcinogenicity?

18          A.     No, I don't.

19          Q.     Dr. Herrick, have you ever

20    performed any research on chronic lymphocytic

21    leukemia?

22          A.     I'm thinking.

23                 I personally in my own

24    research, I have not.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          Q.     Have you ever performed any

2     research on B-cell lymphomas?

3          A.     No, I haven't.

4          Q.     Have you published any papers

5     on lymphocytic leukemia?

6          A.     No, I have not.

7          Q.     Have you published any papers

8     on B-cell lymphomas?

9          A.     No.

10          Q.     Do you understand what the term

11     "pharmacokinetics" refers to?

12          A.     I do understand the term, yeah.

13          Q.     Do you consider yourself an

14     expert in clinical pharmacokinetics?

15          A.     No, I don't.

16          Q.     Dr. Herrick, are you familiar

17     with the term "clinical risk assessment"?

18          A.     Clinical risk assessment, yes.

19          Q.     Do you consider yourself an

20     expert in clinical risk assessment?

21          A.     No, I don't.

22          Q.     Dr. Herrick, you offer an

23     opinion -- in your report for Gerald Nelson,

24     you offer some information on an exposure

1    assessment, is that correct?

2         A.     It is, yes.

3         Q.     And you also offer an exposure

4    assessment for Richard Canning, is that

5    correct?

6         A.     It is correct, yes.

7         Q.     Are you providing any -- well,

8    let me ask you this.

9                What is the difference -- do

10   you have an understanding of the difference,

11   Dr. Herrick, between exposure and dose?

12        A.     I do.  I think I understand the

13   difference, yeah.

14        Q.     You think or you do?

15        A.     I do.

16        Q.     What is your understanding of

17   the difference between exposure and dose?

18        A.     Well, my use of the term

19   "exposure" refers to the presence of an

20   agent, usually a chemical but it could be

21   biological or radiation or some form of

22   energy, but the point is that it's the

23   presence of that outside the body, external

24   to the body.  That's what I refer to as the

1    exposure.

2         Q.     So exposure is presence of a

3    chemical outside the body, is that correct?

4         A.     Right.  Or the agent, you know,

5    radiation or something else.  But the point

6    being it's external to the body.

7         Q.     Dr. Herrick, what is your

8    understanding of dose versus exposure?  How

9    is dose different from exposure?

10        A.     Yeah, well, I've always viewed

11   them as related concepts, the connection

12   being that the dose is the portion or the

13   characteristic of exposure that can reach a

14   site in the body and have some effect.

15        Q.     Dr. Herrick, is it reasonable

16   to say that the dose is the amount of a

17   chemical or an agent that is inside the body?

18             MR. BRICKER:  Form.

19             THE WITNESS:  It is inside the

20        body, and, you know, could even go a

21        little further and say it's the

22        characteristic of the exposure that is

23        pharmacologically active.

24             ///

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
 1    BY MR. LEE:
 2         Q.    If a chemical impacts
 3    lymphocytes, where does the chemical have to
 4    be inside the body?  Do you have an
 5    understanding of that?
 6              MR. BRICKER:  Form.  And it's
 7         beyond his designation in this matter.
 8    BY MR. LEE:
 9         Q.    Is that correct, Dr. Herrick,
10    it's beyond your designation in this matter?
11         A.    It is, and I don't feel like I
12    really can give that a confident answer.  I
13    don't really know the answer to that.
14         Q.    Dr. Herrick, are you going to
15    provide a quantitative estimate of the dose
16    of glyphosate in Mr. Gerald Nelson?
17              MR. BRICKER:  Form.
18              THE WITNESS:  No, I don't
19         really have -- you know, I wasn't
20         planning on, you know, making any
21         comment about his dose.
22    BY MR. LEE:
23         Q.    You weren't planning or you're
24    not going to?
```

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
 1          A.      I'm not going to.

 2          Q.      Are you going to make any

 3   quantitative estimate of a glyphosate-based

 4   herbicide in the body of Gerald Nelson?

 5                  MR. BRICKER:  Form.

 6                  THE WITNESS:  No, I'm not.

 7   BY MR. LEE:

 8          Q.      Are you going to offer any

 9   quantitative estimate of the dose of Roundup

10   in the body of Mr. Gerald Nelson?

11                  MR. BRICKER:  Form.

12                  THE WITNESS:  No, I'm not.

13   BY MR. LEE:

14          Q.      I have really the same

15   questions for Mr. Richard Canning.  Are you

16   going to be offering any quantitative

17   estimate of dose for Mr. Richard Canning?

18                  MR. BRICKER:  Form.

19                  THE WITNESS:  No.

20   BY MR. LEE:

21          Q.      I'm sorry, what was your

22   answer, Dr. Herrick?

23          A.      Sorry.  The answer is, no, I'm

24   not.
```

1      Q.    Dr. Herrick, do you consider

2   yourself an expert on the quantitative

3   estimation of a chemical inside a human?

4            MR. BRICKER:  Form.

5            THE WITNESS:  No.  That would

6        actually, I think, you know, put us

7        into the realm of dose, and so I would

8        answer, no, I don't feel like I'm an

9        expert on that.

10           Are we still connected?

11   BY MR. LEE:

12      Q.    Yes.  I'm just getting another

13   exhibit for you, Dr. Herrick.  Thank you.

14      A.    I just wanted to make sure I

15   didn't have some electronic meltdown here.

16      Q.    No.  That's been an issue

17   today, but I promise you there won't be an

18   issue here.

19           Let me just introduce a new

20   exhibit for you, sir.

21           (Whereupon, Exhibit Herrick 3

22        was marked for identification.)

23   BY MR. LEE:

24      Q.    Dr. Herrick, I've introduced a

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    document marked as Exhibit 3.  Please let me

2    know when you are able to access it.

3         A.    Okay.  Let me just get over

4    into it here.  I'm having so much trouble

5    with this.  Just give me a second.

6              Oh, here we go.  Exhibit 3?

7         Q.    Yes.

8         A.    Got it.

9         Q.    Dr. Herrick, do you see this

10   document I've marked as Exhibit 3, it has in

11   the header, "This document relates to:

12   Gerald Nelson, et al, v. Monsanto Company"?

13             Do you see that?

14        A.    I do.

15             If we're going to shift gears

16   and go into that, could we just take five

17   minutes before we get into this document?

18        Q.    Yes.

19             MR. LEE:  Why don't we go off

20   the record.

21             THE VIDEOGRAPHER:  We're off

22   the record at 11:55 a.m.

23             (Whereupon, a recess was

24   taken.)

Robert F. Herrick, MS, ScD, CIH, FAIHA

 1             THE VIDEOGRAPHER:  We're back

 2       on the record at 12:01 p.m.

 3  BY MR. LEE:

 4       Q.    Dr. Herrick, do you see this

 5  document I've marked as Exhibit 3 which has

 6  the header "This document relates to:  Gerald

 7  Nelson, et al v. Monsanto Company"?

 8             Do you see that, sir?

 9       A.    I do, yes.

10       Q.    And underneath that is a header

11  "Roundup Exposure History."

12             Do you see that?

13       A.    Yes, I do.

14       Q.    And your name is underneath

15  that with the date July 14th, 2022.

16             Do you see that?

17       A.    I do, yes.

18       Q.    I'm sorry.  Do you recognize

19  this document, Dr. Herrick?

20       A.    Yes, I do.

21       Q.    What is this document?

22       A.    This is the report that I

23  prepared on Mr. Nelson's history of using

24  Roundup.

Robert F. Herrick, MS, ScD, CIH, PAIHA

1          Q.     And is there -- is this the

2    most up-to-date version of your report for

3    Mr. Nelson?

4          A.     It is, yes.

5          Q.     As you sit here today, are you

6    aware of any errors in this report or any

7    corrections that need to be made to this

8    report?

9          A.     No, I'm not aware of any.

10         Q.     Are all of the opinions that

11   you have to offer in Mr. Nelson's case for

12   Mr. Nelson, are they included in this report

13   marked as Exhibit 3?

14         A.     Yes, they are.

15         Q.     Are there any opinions that you

16   plan to offer in Mr. Nelson's case that are

17   not in Exhibit 3?

18         A.     No, they're not.

19         Q.     Dr. Herrick, can you turn to

20   the second page, please, of your report for

21   Mr. Gerald Nelson?

22         A.     The Introduction and

23   Background?

24         Q.     Yes.

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
1        A.      Okay.  I'm there.
2        Q.      You state that when people use
3   Roundup, they can be exposed in two ways, is
4   that correct?
5        A.      That's what I said, yes.
6        Q.      And one is inhale some of the
7   small liquid droplets, is that correct?
8        A.      That is correct, yeah.
9        Q.      And the other is on their skin
10  both from the droplet spray and from leaks
11  and spills when they handle the Roundup
12  solutions.
13              Do you see that?
14       A.      Yes, I do see that.
15       Q.      And you state that in Gerald
16  Nelson's case, he was exposed both ways.
17              Do you see that?
18       A.      Yes, I do.
19       Q.      So is it your opinion that
20  Mr. Nelson was exposed both with the
21  inhalation route and the -- on their skin, is
22  that correct?
23       A.      I believe he was, yes.
24       Q.      So that's inhalation exposure
```

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    and dermal exposure, is that correct?

2        A.    Yes, that's right.

3        Q.    Dr. Herrick, you also mention

4    in the third paragraph that "both Roundup

5    skin contact and inhalation contribute to

6    blood levels of glyphosate."

7              Do you see that?

8        A.    Yes, I do.

9        Q.    Just to be clear, in preparing

10   your report and your opinions, did you ever

11   take any -- or measure any blood levels of

12   glyphosate in Mr. Gerald Nelson?

13       A.    No, I didn't.

14       Q.    And you're not relying on any

15   blood levels of glyphosate for your opinions

16   in Mr. Gerald Nelson's case, is that correct?

17       A.    Oh.  No.  And actually, I'm

18   sorry, you know, I should have mentioned this

19   a couple questions ago when we were talking

20   about that third paragraph.

21              What I concluded from that

22   Pierce study was that both inhalation and

23   dermal exposure contributed to the urinary

24   levels.  You know, I didn't specifically

1    mention blood, although the fact that it

2    wound up in the urine, you know, it had to

3    have been in the blood at some point.

4              But just so the record is

5    right, you know, what I said in that third

6    paragraph had to do with the urinary

7    glyphosate, not the blood levels.

8    Q.    Well, that wasn't really my

9    question, Dr. Herrick.

10             My question was, did you rely

11   on any glyphosate blood-level measurements in

12   forming your opinions for Mr. Gerald Nelson?

13   A.    No, I did not.

14   Q.    Now, did you measure any urine

15   levels of glyphosate for Mr. Gerald Nelson?

16   A.    No.

17   Q.    In formulating your opinions

18   for Mr. Gerald Nelson, did you rely on any

19   measurements of glyphosate in his urine?

20   A.    No, I didn't.

21   Q.    Now, in the second paragraph of

22   your report marked as Exhibit 3, Dr. Herrick,

23   you state that, in the second sentence,

24   "Mr. Nelson used two types of Roundup

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    sprayers in his commercial landscaping

2    business, and his residences."

3              Do you see that?

4         A.    I do see that, yeah.

5         Q.    What is the source of your

6    information for that statement?

7         A.    Can we go to the next page?

8    Because I think what I tried to do, and I can

9    double-check it here, is when I had that kind

10   of information, I tried to footnote where he

11   mentioned that in the -- in his deposition.

12        Q.    So you reviewed Mr. Nelson's

13   deposition transcript?

14        A.    Right.

15              And so, are we going to

16   continue?  I'm on my page 4 now where he

17   talked about using the 1-gallon ready mix,

18   and then he also used 5-gallon containers of

19   the concentrate.

20        Q.    Well, so one of your sources

21   for your exposure assessment was the

22   deposition testimony of Mr. Gerald Nelson, is

23   that correct, Dr. Herrick?

24        A.    Yes.  That is correct, yeah.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1      Q.     What other sources of
2    information did you use for your exposure
3    assessment for Gerald Nelson?
4      A.     Well, he had that Plaintiff
5    Fact Sheet which, you know, I think I have.
6    Yeah, this was -- this table that I have on
7    page 3, that little table there with the two
8    rows in it, that's from his Plaintiff Fact
9    Sheet.
10      Q.     Other than Mr. Nelson's
11    deposition transcript and his Plaintiff Fact
12    Sheet, did you rely on any other source of
13    information in writing his exposure
14    assessment?
15      A.     I don't think so.  I'd have to
16    double-check on Nelson.  On some of these
17    cases, there's also been a form that I've
18    seen that is the Complaint form, and
19    sometimes there's information, you know, in
20    there, but I actually don't remember if I had
21    that for Nelson or not.
22      Q.     So as you sit here today, you
23    don't have any specific recollection of
24    reviewing his legal Complaint, is that

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    correct?

2         A.    Well, you know, I don't

3    remember.  I'd have to double-check.  I

4    could -- you know, I could do it, but the

5    information that I've put in here I would say

6    was from his Plaintiff Fact Sheet and his

7    deposition.  Those were the primary sources.

8         Q.    Now, you stated earlier in

9    your -- in this deposition that you did not

10   interview Mr. Gerald Nelson in preparing this

11   exposure assessment for him, is that correct?

12        A.    That is correct, yeah.

13        Q.    And do you still stand by that

14   testimony that you did not interview

15   Mr. Gerald Nelson in preparing his exposure

16   assessment?

17        A.    You know, I don't believe I

18   did.  You know, my recollection could be --

19   could be false if we're, you know, going back

20   a year or so, but I don't have that

21   recollection that I actually spoke to him,

22   no.

23        Q.    Did you ever perform a site

24   visit on any of the properties on which he

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    purportedly was exposed to Roundup?

2         A.    No, I didn't.

3         Q.    Did you review any photographs

4    or any other documentary evidence of

5    Mr. Nelson's use of Roundup in preparing your

6    exposure assessment for him?

7         A.    There were photos -- you know,

8    I'm going to have to try to make sure I stay

9    with Nelson here.  I'm thinking about

10   Canning, too.

11             No.  But in terms of, like,

12   photos that I directly used in the exposure

13   assessment for Nelson, I did not.

14        Q.    Did you review any receipts or

15   any other documents concerning his purchase

16   of Roundup in performing your exposure

17   assessment for him?

18        A.    No, I didn't.

19        Q.    Dr. Herrick, you go on to

20   summarize his employment history in your

21   exposure assessment, is that correct?

22        A.    Yeah, that's right.

23        Q.    And you seem to state in the

24   first sentence under the heading Employment

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
1    History that you based your employment

2    history summary on his Plaintiff Fact Sheet,

3    is that correct?

4          A.     That and the deposition, right,

5    those two things.

6          Q.     And then you go on to summarize

7    his employment history on the following page,

8    which I believe is page 3 of your exposure

9    assessment for Mr. Gerald Nelson.

10              Do you see that?

11         A.     Yes, I do see that.  Right.

12         Q.     Now, you state in your exposure

13   assessment report from Mr. Nelson that he

14   worked at Sandler Shoe Company.

15              Do you see that?

16         A.     Yes, I do.  Right.

17         Q.     Now, did Mr. Nelson have any

18   exposure to glyphosate when he worked for

19   Sandler Shoe Company?

20         A.     I don't believe he did.  I'm

21   just trying to think about whether anyone --

22   whether he was specifically asked that in the

23   deposition, which I don't remember.

24              But I would say that, you know,
```

1    given the way he described this job of boxing

2    shoes, I wouldn't consider that to be an

3    activity that would have been likely to

4    expose him to glyphosate.

5         Q.    Did his work at Sandler Shoe

6    Company expose him to Roundup?

7         A.    I think it would be unlikely.

8         Q.    Did his employment at Sandler

9    Shoe Company expose him to any

10   glyphosate-based herbicide?

11        A.    Again, I think that would be

12   unlikely.

13        Q.    How about for his employment at

14   Gabriel Electronics, did he -- was he exposed

15   to any glyphosate or glyphosate-based

16   herbicides in that work?

17        A.    My reading of the way he

18   described his activities would make me think

19   he was not exposed to glyphosate or Roundup.

20        Q.    How about his employment at

21   Factory Mutual, was he exposed to any

22   glyphosate or Roundup?

23        A.    Again, I think it would be

24   unlikely.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1      Q.      Now, he was also a student at

2  Northeastern Institute Industrial Technology.

3  As you sit here today, are you aware of any

4  exposure to glyphosate or Roundup in his role

5  as a student at Northeastern Institute

6  Industrial Technology?

7      A.      No, I'm not aware of any

8  exposure during his time as a student.

9      Q.      Next he was employed, as you

10 state in your report, as a mechanical

11 contractor.

12             Do you see that?

13     A.      I do, yes.

14     Q.      As you sit here in the

15 deposition, to your knowledge, was Mr. Nelson

16 exposed to any glyphosate or Roundup as a

17 mechanical contractor?

18     A.      Not to my knowledge.  I don't

19 think he would have been exposed.

20     Q.      From 1962 to 1964, he worked

21 for Boston Filter Company.  To your

22 knowledge, was he exposed to any glyphosate

23 or Roundup when he was working for Boston

24 Filter Company?

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
 1        A.    Not to my knowledge.

 2        Q.    Mr. Nelson also worked for

 3   Honeywell Corporation.  To your knowledge,

 4   was he exposed to any glyphosate or Roundup

 5   during his work for Honeywell Corporation?

 6        A.    Not to my knowledge.  I don't

 7   believe he was exposed, no.

 8        Q.    During his employment for

 9   Digital Equipment Corporation, to your

10   knowledge, was he exposed to any glyphosate

11   or Roundup?

12        A.    No, I don't believe he was.

13        Q.    Now, in your table on page 3 of

14   your report, you state that he worked as a

15   process engineer and a mechanical engineer

16   for Charles T. Main, M-A-I-N.

17              Do you see that?

18        A.    Yeah.  Let me just...

19              Right.  Yes, that is right.

20        Q.    And his job duty is described

21   as a desk Job.

22              Do you see that?

23        A.    I do see that, yeah.

24        Q.    To your knowledge, was he
```

1    exposed -- I'm sorry, to your knowledge, was

2    Mr. Gerald Nelson exposed to glyphosate or

3    Roundup during his employment at Charles T.

4    Main?

5         A.    I don't believe he was, no.

6         Q.    Next you state that Mr. Nelson

7    started his landscaping business in 1997,

8    which he operated until 2014, is that

9    correct?

10        A.    That's correct, yep.

11        Q.    To your knowledge, did

12   Mr. Gerald Nelson have any occupational

13   exposure to glyphosate or Roundup prior to

14   1997?

15        A.    I don't believe he did, no.

16        Q.    Now, you also state in the

17   chart toward the bottom of page 3 of your

18   exposure assessment that his exposure to

19   Roundup was related to IT&O, which you

20   describe as "Industrial, Turf, and

21   Ornamental."

22             Do you see that?

23        A.    I do, right.

24        Q.    What are you referring to

Robert F. Herrick, MS, ScD, CIH, FAIHA

1   there, "Industrial, Turf, and Ornamental"?

2       A.     Well, this is the terminology

3   that was in the Plaintiff Fact Sheet, and in

4   footnote 1 there, you know, this is their

5   definition of ITO.  It includes using the

6   product in areas such as golf courses,

7   nurseries, roadsides, turf management, or

8   landscaping.

9               So that's their definition.

10      Q.     You're relying on the

11  plaintiff's definition of industrial, turf,

12  and ornamental, is that correct?

13      A.     Well, the fact sheet -- I had

14  the impression, you know, this wasn't

15  something just generated by Nelson.  This is

16  a standard form, apparently, that is being

17  used in these cases, and so this is the

18  definition that they've applied to it.

19      Q.     Do you have any independent

20  expertise in herbicide exposures on

21  industrial, turf, and ornamental

22  environments?

23      A.     Well, I see people using it all

24  the time, you know, landscapers.  You know,

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    I've never really been a landscaper myself,

2    but I do know people who are in that line of

3    work, and so I've seen their activities.

4         Q.    Do you consider yourself an

5    expert on industrial, turf, and ornamental

6    exposures to herbicides?

7         A.    I wouldn't claim that I'm an

8    expert on that.

9         Q.    Dr. Herrick, are all -- is

10   all -- well, let me rephrase it, Dr. Herrick.

11            Dr. Herrick, you have

12   summarized Mr. Gerald Nelson's employment

13   history and his exposure to Roundup on page 3

14   of your report, is that correct?

15        A.    Are we still in that same

16   table?

17        Q.    Yes.

18        A.    Yeah, that's what I included

19   here under the Frequency and Usage.

20        Q.    Now, are you relying only on

21   Mr. Gerald Nelson's recollection of his job

22   history?  Is that correct?

23        A.    Well, in this case --

24            MR. BRICKER:  Form.

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
 1                  THE WITNESS:  -- yeah, it is
 2          his recollection in that, you know, he
 3          described it, you know, orally in the
 4          deposition, and then this information
 5          that's here is what he -- the way he
 6          responded in filling out this
 7          Plaintiff Fact Sheet.
 8                  So, yes, he is the source of
 9          this information.
10   BY MR. LEE:
11          Q.    Is Mr. Gerald Nelson also --
12   well, let me rephrase that.
13                  In terms of Mr. Gerald Nelson's
14   occupational exposure to Roundup, are you
15   also relying on Mr. Gerald Nelson's
16   recollection?
17          A.    I'm sorry, could you repeat
18   that?  I want to make sure I give you a good
19   answer here.
20                  MR. LEE:  Madam Court Reporter,
21          can you repeat the question, please?
22                  (Whereupon, the reporter read
23          back the following:
24                  "QUESTION:  In terms of
```

Robert F. Herrick, MS, ScD, CIH, FAIHA

1           Mr. Gerald Nelson's occupational

2           exposure to Roundup, are you also

3           relying on Mr. Gerald Nelson's

4           recollection?")

5           A.      This is based on his

6     recollection.  You know, he reported the

7     frequency of use and how he used it, so the

8     answer is yes.

9     BY MR. LEE:

10          Q.      Dr. Herrick, are you familiar

11    with the term "recall bias"?

12          A.      I am.

13          Q.      What is your understanding of

14    the term "recall bias"?

15          A.      Well, if someone were asked a

16    question about something that occurred or

17    some practice that they had engaged in in the

18    past and their response was influenced by

19    another factor that, say, that they had in

20    mind at the time, that recollection that they

21    reported could be biased by the presence of

22    this other information.

23          Q.      Dr. Herrick, do you have an

24    understanding of how recall bias can impact

1    an individual's recollection of their

2    exposure to a certain chemical?

3            MR. BRICKER:  Objection.  Form.

4        It's beyond the scope of his

5        designation here.

6    BY MR. LEE:

7        Q.    Is that correct?  Is that

8    beyond your designation here, Dr. Herrick?

9        A.    Well, I would say it is.  You

10   know, I don't really -- I'm trying to think

11   of -- you know, my understanding is that, you

12   know, I clearly recognize that recall bias

13   can take place, but I don't really have a

14   good sense of, you know, how it might fit or

15   how it, you know, would play into the

16   information from Nelson.

17       Q.    Dr. Herrick, do you have an

18   understanding of whether recall bias -- or

19   let me rephrase that.

20           Do you have an understanding of

21   how recall bias can impact -- potentially

22   impact an individual's recollection of their

23   exposure to a certain chemical?

24           MR. BRICKER:  I'm going to

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          object to form, and beyond the scope

2          of his designation here.

3     BY MR. LEE:

4          Q.     You can answer, if you know.

5          A.     Well, sure.  You know, again,

6     we've established I'm not an epidemiologist,

7     but I have worked in, you know, epidemiology

8     studies over the years.

9                And, you know, frequently what

10    you see in epidemiology -- if people relied

11    on questionnaires, for example, for the

12    source of their information on exposures,

13    what you frequently see in the discussion of

14    their results, you know, the authors will say

15    something to the effect that, you know,

16    recall bias can't be ruled out, or something

17    like that.

18                Because, I mean, I think people

19    who do epidemiology and study epidemiology

20    recognize that recall bias is possible.

21         Q.     Dr. Herrick, when you prepared

22    this report for Mr. Gerald Nelson, did you

23    have an understanding of whether recall bias

24    could increase Mr. Nelson's estimate of his

1    exposure to Roundup?

2              (Cross-talking.)

3              MR. BRICKER:  Same objection.

4    BY MR. LEE:

5        Q.    You can answer.

6        A.    Sure.

7              And, you know, the recall bias,

8    you know, could operate, you know, in either

9    direction, you know, too, as far as him

10   overestimating or possibly underestimating

11   the extent of his exposure.  So, you know, to

12   say it's -- recall bias is, you know,

13   potentially present when you do these kinds

14   of questionnaire-based research.

15       Q.    When you were preparing

16   Mr. Gerald Nelson's exposure assessment, did

17   you have an understanding that recall bias

18   generally increases an individual's estimate

19   of their own exposure to the chemical of

20   interest?  Did you have that understanding?

21              MR. BRICKER:  Form, and beyond

22         the scope.

23              THE WITNESS:  Well, you know, I

24         haven't really thought about it, you

1          know, as to whether -- you know, how

2          likely it is that the bias operates in

3          one direction or the other.

4                    I would just say, you know, in

5          any of these kinds of projects where

6          you're, you know, establishing

7          information based on people's

8          recollection, you know, one always has

9          to have in mind that, you know, that

10         recall bias is possible.

11    BY MR. LEE:

12         Q.    Dr. Herrick, do you consider

13    yourself an expert on recall bias?

14         A.    No.  I've been involved in

15    projects where, you know, people were

16    grappling with it or were aware of its

17    possibility, but I don't consider myself to

18    be an expert, no.

19         Q.    Dr. Herrick, did you adjust

20    your exposure assessment for Mr. Gerald

21    Nelson in any way to account for a potential

22    recall bias by Mr. Nelson himself?

23         A.    No, I didn't.

24         Q.    Dr. Herrick, did you rely on

1    the deposition testimony of any of

2    Mr. Nelson's family members in preparing your

3    exposure assessment for him?

4         A.    No, I didn't.

5         Q.    Dr. Herrick, on page 4 of your

6    exposure assessment for Mr. Nelson, you

7    state, "In his landscaping business from 1997

8    to 2017, Mr. Nelson recalled that he used

9    Roundup 3 or 4 days a week."

10             Do you see that?

11        A.    I do, yes.

12        Q.    Now, was it -- did he end his

13   use of Roundup in 2014 or 2017?  Did that

14   ever become clear to you?

15        A.    Well, yeah.  There were

16   discussions, you know, back and forth within

17   his deposition which -- I think I'm

18   remembering this right.  He was deposed over

19   three days, I think, and so at one point, you

20   know, he had, you know, cited 2014 as his

21   year that he stopped, and then I think he

22   came back later and qualified that, that he,

23   you know, had thought about it further and

24   that he actually was using it up to 2017.