Robert F. Herrick, MS, ScD, CIH, FAIHA

1            That's what I recall, you know,

2    kind of the source of that discrepant

3    information.

4        Q.    Dr. Herrick, I've marked an

5    exhibit as Exhibit 4.  Can you take a look at

6    that, please?

7            (Whereupon, Exhibit Herrick 4

8        was marked for identification.)

9        A.    Yeah, sure.  Let me get into it

10   here.

11           Okay.  Is this his deposition?

12   BY MR. LEE:

13       Q.    Yes.  I've marked this document

14   Exhibit 4.  And do you see the title on the

15   first page, Videotaped Deposition Of:  Gerald

16   Nelson, Appearing Remotely, with a date of

17   April 6, 2022?

18       A.    Let me just make sure I've got

19   the right...

20           April 6th?

21       Q.    Yes.

22       A.    Yep, I have it.

23       Q.    And I will represent to you,

24   Dr. Herrick, that this is actually an excerpt

1    from his full deposition transcript.  And the

2    reason I'm providing excerpts is that this

3    remote platform tends to have some

4    difficulties when documents are too large, so

5    I've basically taken an excerpt from his

6    deposition transcript.

7                  And if you could turn to

8    page 82 of this document I've marked as

9    Exhibit 4.  And that's page 82 at the bottom

10   right-hand corner.

11        A.    Yeah.  Okay.  I'm heading down.

12   Let me get to it here.  Okay, here is 83.

13                  Okay.  82.

14        Q.    And do you see beginning on

15   page 82, line 16, the question is, "Here in

16   your fact sheet, which we just discussed a

17   moment ago, you talk about your frequency of

18   exposure three to four days a week, from

19   1997, which has now been corrected to 2014.

20   Is that your recollection of how frequently

21   you would use Roundup in that time frame,

22   from '97 to 2014?"

23                  And then he answers, "Probably

24   true."

Robert F. Herrick, MS, ScD, CIH, FAIHA

1                    Do you see that?

2          A.      Yes, I do see that.  Right.

3          Q.      And let's see.  And you stated

4     that he wasn't initially clear during his

5     deposition regarding whether he stopped using

6     it in 2014 or 2017, is that correct?

7                    MR. BRICKER:  Form.

8                    THE WITNESS:  I may have --

9            yeah, now that I see this, I don't --

10           I'm not 100 percent sure that I

11           remembered exactly which of the dates

12           were, you know, in question or in

13           dispute.  But I see now that, you

14           know, it apparently was from '97 to

15           2014.

16                    And then this may come up

17           later, but I thought I also remembered

18           that when he was in business with --

19           in the landscaping business with

20           somebody else, he used it up until

21           2017.

22     BY MR. LEE:

23          Q.      Well, I've marked another

24     exhibit as Exhibit 5.

1          (Whereupon, Exhibit Herrick 5

2      was marked for identification.)

3    BY MR. LEE:

4      Q.     Can you take a look at that,

5    please?  Just let me know when you are able

6    to open it, Dr. Herrick.

7      A.     Yeah, sure.

8             Okay.  I'm in 5.

9      Q.     And do you see again there is

10   this header -- I'm sorry, I've marked this

11   document as Exhibit 5.  It says, Continued

12   Videotaped and Videoconference Deposition of

13   Gerald Nelson.  This time it has a date of

14   April 7th, 2022.

15            Do you see that?

16     A.     I do, yes.  Yes, I have it.

17     Q.     Now, just to be clear,

18   Dr. Herrick, you relied upon the deposition

19   transcripts from both April 6th and

20   April 7th, 2022 in preparing your exposure

21   assessment for Mr. Nelson, is that correct?

22     A.     Right, I did.  And then I

23   thought I remembered there was actually a

24   third one.

1        Q.     Now, if you go down to

2   page 122.  Well, let me take you back to

3   page 121.  My apologies, Dr. Herrick.

4        A.     Okay.  I'm on 121.

5        Q.     Now, do you see on line 17

6   Mr. Gerald Nelson is testifying, and he

7   states, "Another landscaper took over.  I

8   worked for him for a year 2012."

9               Do you see that?

10       A.     Yes, I do see that.

11       Q.     Then there's another question

12  that follows, "So during the year that you

13  worked for the other landscaper to whom you

14  sold your business there was no spraying

15  going on through 2012?"

16               And then Mr. Nelson answers,

17  "Not for me, no."

18               Do you see that?

19       A.     I do see that, yep.

20       Q.     Was it your understanding that

21  Mr. Nelson didn't spray Roundup for a year

22  when someone else purchased that business?

23       A.     That is, I believe, what he was

24  describing in this part of his deposition,

1    yes.

2         Q.      And then in line 24 on

3    page 121, there is mention of -- Mr. Nelson

4    testifies, "In 2012 to 2017 my son had it and

5    I worked with them spraying and helping

6    them."

7              Do you see that?

8         A.      I do see that, yep.

9         Q.      So, and then further down on

10   page 122, on line 10, there's a question,

11   "Yes, you stopped using Roundup in 2014?"

12             And then Mr. Nelson answers,

13   "Well, let's clarify that a little bit if I

14   may.  I slowed down using it but I did

15   continue to use it until 2017."

16             Do you see that?

17        A.      I do see that, yeah.

18        Q.      Does that refresh your

19   recollection about Mr. Nelson's testimony

20   about whether he stopped in 2014 or 2017?

21        A.      Yeah, this is where the

22   discrepancy between 2014 and 2017 came up.

23        Q.      Was it your understanding when

24   you prepared his exposure assessment that

1    sometime after 2011 he had a -- there was a

2    year where he did not spray Roundup, but then

3    afterwards when he resumed spraying Roundup,

4    he did so but less frequently?

5            MR. BRICKER:  Form.

6            THE WITNESS:  Yes.  That is my

7       understanding, yeah.

8    BY MR. LEE:

9       Q.    Now, if you can go to page 124

10   of this deposition transcript that I've

11   marked as -- or deposition excerpt that I've

12   marked as Exhibit 5.  Can you go to page 124

13   and down to line 23?

14      A.    Okay, I'm there.

15      Q.    And there's a question, "So

16   about five times?"

17            And then Mr. Gerald Nelson

18   answers, "I didn't make any kind of a

19   categorized list of how many times I did what

20   per day."

21            Do you see that?

22      A.    I do see that, yeah.

23      Q.    Now, when you were preparing

24   Mr. Nelson's exposure assessment, was it your

1    understanding that Mr. Nelson didn't keep any

2    written records about how many times he used

3    Roundup or how many times he sprayed Roundup?

4              MR. BRICKER:  Form.

5    BY MR. LEE:

6         Q.    You can answer.

7         A.    Sure.

8              Yeah, I don't believe -- I'm

9    trying to remember if I remember if he was

10   specifically asked that in the deposition,

11   which I can't remember.  But I can't remember

12   him mentioning, you know, that he kept

13   written records, so I would say I don't have

14   any, you know, reason to think, or I don't

15   have any familiarity with any written records

16   he would have had.

17        Q.    So, and you don't have any

18   specific recollection of reviewing any

19   written records of Mr. Nelson's use of

20   Roundup when preparing your exposure

21   assessment for him, correct?

22             MR. BRICKER:  Form.

23             THE WITNESS:  No.  I don't

24        recall that those records existed.

1    BY MR. LEE:

2         Q.    So as far as you know,

3    Mr. Nelson was relying on his memory in order

4    to provide an estimate of how frequently he

5    used Roundup, is that correct?

6              MR. BRICKER:  Form.

7              THE WITNESS:  I think that's --

8         you know, I see -- I'm just looking

9         here in this deposition.  You know,

10        that's what the attorney asked him,

11        you know, I'm just looking for your

12        best recollection, and he said, That's

13        all I can give you.

14             So, yeah, this is his best

15        recollection.

16   BY MR. LEE:

17        Q.    And he was relying only on his

18   recollection to provide information about how

19   frequently he used Roundup, correct?

20        A.    That's -- you know, again, I

21   don't remember that he was asked about

22   written records, but he didn't seem to be

23   relying on written records.  He just -- you

24   know, his answer was, you know, he's

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    answering to the best of his recollection.

2        Q.    Now, Dr. Herrick, you state in

3    your report on page -- I believe it is page 4

4    of your exposure assessment for Mr. Nelson --

5        A.    Okay, hang on.  I'm headed back

6    to it.

7        Q.    That would be great.  Just let

8    me know when you have that open again.

9        A.    Yeah, it's -- hang on.  It's

10   just -- here, page 4.  Okay.

11       Q.    Now, you write in the second

12   paragraph on page 4 of your exposure

13   assessment for Mr. Nelson that, "The

14   frequency of his Roundup use was

15   approximately 15 times a year from 2012 to

16   2017 for about the same time periods as it

17   had been before (could have been as little as

18   five to 10 minutes or as much as 30 to

19   40 minutes)."

20             Do you see that?

21       A.    I do see that.

22       Q.    Can you tell me how you work

23   with that uncertainty about the time periods

24   when you were providing your exposure

1    assessments for Mr. Nelson?

2         A.    Yeah.  If we want to, maybe the

3    best way is just go down into one of the

4    tables here, because that's where he -- you

5    know, he tended to report these things in

6    ranges, you know, when people asked him, and

7    so, you know, his response would be, you

8    know, he used it between five and 40 minutes

9    each time, and so what I tried to do then is

10   say, Okay, well, that's the range of his

11   exposures.

12              And so if we look in the table

13   here -- let's see if I can -- okay.  I'm on

14   page 8.  What I did was I tried to, you know,

15   recognize this range that he was reporting in

16   terms of, say, the hours that he used it per

17   day.

18              So if we look, say, in his --

19   let's just take residential use.  That's that

20   first row in the table.  He said he used

21   these things between five and 40 minutes each

22   time, so that's translated into that column

23   you see there where it says "Hours Used per

24   Day."  That's just converting those minutes

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    to hours.  And then you multiply those

2    together to get his total hours over the

3    course of his lifetime.

4              And so that's presented as a

5    range as well, you know, to try to

6    accommodate the fact that he used it for

7    varying periods of time each day.

8        Q.    All right.  You're using that

9    range also because his recollection was

10   uncertain about how long he may have used it

11   per day?

12             MR. BRICKER:  Argumentative.

13        Form.

14             MR. LEE:  Well, I'm asking him.

15             THE WITNESS:  You know, I mean,

16        I don't -- you know, I think what he

17        was trying to do, you know, was answer

18        the question, you know, honestly.

19             And so, you know, some days he

20        used it, it would have been five

21        minutes.  Other times he used it, it

22        was 40 minutes.  And that was, you

23        know -- he was trying to, you know,

24        capture the variability in the amount

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    of time that he used it.

2   BY MR. LEE:

3       Q.    And again, he was just relying

4   only on his memory, his recollection,

5   correct?

6           MR. BRICKER:  Form.

7           THE WITNESS:  Yeah, he was, you

8       know, giving that information to the

9       best of his recollection.

10  BY MR. LEE:

11      Q.    Now, you -- in your assessment,

12  exposure assessment, for Mr. Nelson, you

13  provide a non- -- I'm sorry, a

14  non-time-weighted exposure estimate for

15  Mr. Nelson, is that correct?

16      A.    I have, you know, the time

17  weighted and the non-time weighted, right.

18  I've put them both in there.

19      Q.    Can you explain your

20  methodology for estimating a

21  non-time-weighted exposure for Mr. Nelson?

22  Can you explain your methodology there?

23      A.    Yeah.  It would be a matter of

24  saying, okay, you know, when the person

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    reported that they used Roundup or used the

2    glyphosate product, without trying to

3    consider how long they used it, we just

4    counted the number of days per season that

5    they reported any use, and then multiplied

6    that by the number of seasons, and that's

7    what gives you your non-time-weighted

8    exposure days.

9         Q.    So "per season," are you

10   referring to years or...

11        A.    Yes, right, I'm using "season"

12   and "year" synonymously.

13        Q.    So based solely on Mr. Nelson's

14   recollection, he provides you the number of

15   days that he can recall that he used Roundup

16   for over a year, is that correct?

17             MR. BRICKER:  Form.

18             THE WITNESS:  Right.  That was

19        the way, you know, he responded to the

20        question, is, you know, How many days

21        per year or per season did you use it?

22        And like in this one case we're

23        looking at here, his response was,

24        Between five and ten days per season.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    BY MR. LEE:

2        Q.    And so you picked the number of

3    days per year that he provides to you, and

4    then you multiply it by the number of years

5    that he used Roundup, is that correct?

6        A.    That's it, yes.  That's

7    correct.

8        Q.    And the number of -- under the

9    non-time-weighted methodology, when it came

10   to the number of days that he used Roundup,

11   did it matter whether he used the Roundup for

12   1 minute or 23 hours and the 59 minutes when

13   you were counting the number of days under

14   the non-time-weighted methodology?

15           MR. BRICKER:  Form.

16           THE WITNESS:  Yeah, you're

17       conveying it correctly.  I mean,

18       basically this approach counts any day

19       of exposure as being a day regardless

20       of the duration.

21   BY MR. LEE:

22       Q.    So under the non-time-weighted

23   methodology, a day which Mr. Nelson used

24   Roundup or sprayed Roundup for 1 minute

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    counts the same as hypothetically if he was

2    spraying Roundup for 23 hours and 59 minutes?

3    You would just count both as one day, is that

4    correct?

5        A.    That's correct.  Under this

6    approach, a day is a day.

7        Q.    So in order to perform the

8    estimate for non-time-weighted exposure, you

9    just use addition and multiplication, is that

10   correct?

11       A.    Yeah.

12            MR. BRICKER:  Form.

13            THE WITNESS:  Yes.  It's a

14       matter of just really multiplying the

15       number of seasons by the days used per

16       season, so it's a multiplication.

17   BY MR. LEE:

18       Q.    Did you use subtraction for any

19   of your calculations for non-time-weighted

20   exposure estimate?

21       A.    I don't think so.  No, I don't

22   believe I did.

23       Q.    Did you make any other

24   adjustments with respect to non-time-weighted

1    exposure assessment that we haven't already

2    discussed?

3          A.     No.  The only thing -- I mean,

4    just, you know, looking at this table here on

5    page 8, you know, I didn't include the year

6    2012, you know, in his commercial landscaping

7    because, remember, that was the year that he

8    said he was, you know, doing the landscaping

9    but he wasn't spraying.  So, you know, 2012

10   was excluded from these calculations.

11         Q.     Now, Dr. Herrick, can you --

12   you also provide a time-weighted exposure

13   assessment for Mr. Gerald Nelson, is that

14   correct?

15         A.     That is correct, right.

16         Q.     Can you describe your

17   methodology for providing a time-weighted

18   exposure assessment for Mr. Gerald Nelson?

19         A.     Sure.

20                Again, it's a process of

21   multiplication.  The difference here is that

22   you add in another factor, and that's the

23   hours that were used per day, so that a day

24   when he, you know, used something for 5

Robert F. Herrick, MS, ScD, CIH, FAIHA

1  minutes is counted differently than a day

2  when he used it for 40 minutes, because you

3  multiply in that hours used per day, and that

4  gives you the total hours, which you then

5  divide by 8 to convert it to days, you know,

6  to full days.

7           And that's the essence of the

8  time weighting, is that, you know, you are

9  including the effect of the actual amount of

10  time that it was used each day.

11      Q.    So if I understand you

12  correctly, Dr. Herrick, based solely on

13  Mr. Nelson's recollection, you estimated the

14  total number of hours per year that he

15  used -- sprayed Roundup, is that correct?

16      A.    Well --

17           MR. BRICKER:  Form.

18           THE WITNESS:  Excuse me.

19           Yeah, it was more like the

20      total hours over his lifetime, you

21      know, over the years that he was

22      reporting, and then divide that by 8

23      to convert that into full days.

24           ///

1    BY MR. LEE:

2         Q.    And a full day in this

3    methodology, your methodology, was defined as

4    an 8-hour day, is that correct?

5         A.    That's right.  And I think

6    that's -- you know, that's pretty

7    conventional in industrial hygiene, you know,

8    a full workday is considered 8 hours.

9         Q.    So essentially you added up all

10   of his hours over a lifetime spraying Roundup

11   and then divided that by an 8-hour day in

12   order to provide an estimate of the total

13   number of days that he was spraying Roundup,

14   is that correct?

15        A.    Yes, that is correct.

16        Q.    So for the time-weighted

17   methodology you used addition,

18   multiplication, and then division, is that

19   correct?

20        A.    That's correct, yep.

21        Q.    Dr. Herrick, did you account at

22   all for dermal absorption rate when

23   calculating non-time-weighted exposure for

24   Mr. Nelson?

1        A.      I didn't, no.

2        Q.      Did you use a dermal absorption

3    rate when you were estimating his

4    time-weighted exposure assessment?

5        A.      I did not, no.

6        Q.      So you did not make any

7    adjustment at all for dermal absorption rate,

8    is that correct?

9              MR. BRICKER:   Form.

10             THE WITNESS:   That's correct.

11       Right.

12   BY MR. LEE:

13       Q.      Dr. Herrick, did you describe

14   in your exposure assessment for Mr. Gerald

15   Nelson any of the personal protective

16   equipment he used while spraying Roundup?

17       A.      I did.  Let's just roll back

18   here.  I'm trying to just kind of scan this

19   document to see where I talked about that,

20   because he was asked about that in the

21   deposition.  Oh, gosh, where are we here?

22       Q.      Let me refer you to -- let's

23   see, it's page 1, 2, 3 -- the fourth page of

24   this document that I've marked as -- I think

1    it's Exhibit 3.

2         A.    Let's see.  Because I also just

3    found it in my report, too.

4              Which one is Exhibit 3?

5         Q.    That's your report for

6    Mr. Nelson.

7         A.    Yeah, okay.  That's where I

8    was.  Hang on.  I'll go back.

9              Yeah, he usually wore

10   loose-fitting clothing, he tried to keep it

11   off his skin.  He stated that there was

12   carryover from small droplets that he thought

13   went through things.  He said he wore gloves,

14   and to his knowledge, he never got Roundup on

15   his skin.

16        Q.    And again, that's from

17   Mr. Nelson's recollection, correct?

18        A.    Yeah.  Right.  You know, you

19   can see the paragraph, my first paragraph on

20   page 5 where he talked about, you know, if he

21   got at all wet he would go find a garden hose

22   and wash it off.

23        Q.    Now, in the paragraph where you

24   describe what he wore, he stated that he

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    wore, "heavy work clothes," is that correct?

2         A.    Let me just get up to my --

3    where I talked about that.

4              Oh, here we are.  "Mr. Nelson

5    recalled that when he mixed Roundup he wore

6    heavy work clothes, a long sleeved shirt,

7    gloves, waterproof work boots, and probably

8    goggles from time to time or most of the

9    time."

10             Right.

11        Q.    And he stated he used the same

12   precautions when spraying Roundup, is that

13   correct?

14        A.    That's what he said.  Yes, he

15   did.

16        Q.    So he basically wore the same

17   protective equipment when he was mixing

18   Roundup and spraying Roundup, was that your

19   understanding?

20        A.    I believe that's what he was

21   saying, yeah, in that part of his deposition,

22   right.

23        Q.    Now, Dr. Herrick, by wearing

24   "heavy work clothes," did Mr. Nelson

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    potentially reduce his dermal exposure to

2    Roundup?

3        A.    Well, I think it's certainly

4    possible.  It would be -- you know, there

5    would be -- you'd want more detail about, you

6    know, what the nature of the work clothes

7    were.  You know, was it a cotton shirt or was

8    it, you know, like a chemical-resistant suit

9    or something like that?

10            But, you know, I think it's

11   safe to say that in general, you know, if he

12   had some sort of work clothes, that that

13   could have reduced his dermal exposure.

14       Q.    Now, in general, would wearing

15   a, "long sleeved shirt," would that also

16   potentially reduce his dermal exposure to

17   Roundup?

18            MR. BRICKER:  Form.

19            THE WITNESS:  You know, I

20        think, again, you'd want to know a

21        little more about the nature of the

22        fabric, you know, whether it was a

23        chemical-protective clothing or a

24        regular old cotton shirt.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1                But, you know, in general you

2        would expect that, you know, having

3        the skin covered by clothing would

4        reduce the dermal contact.

5   BY MR. LEE:

6        Q.    And he also wore gloves.  In

7   general, would gloves reduce Mr. Nelson's --

8   potentially reduce Mr. Nelson's dermal

9   exposure to Roundup?

10               MR. BRICKER:  Form.

11               THE WITNESS:  Again, not to,

12        you know, be -- you know, put too fine

13        a point on it, but you would like to

14        know what the type of gloves were.

15               You know, certain gloves like

16        leather gloves or cotton gloves

17        probably wouldn't make a huge amount

18        of difference against, you know, a

19        liquid that's splashed.  If, on the

20        other hand, they were

21        chemical-resistant gloves, you know,

22        you might expect that there would be

23        greater protection.

24               ///

1    BY MR. LEE:

2         Q.    Do you recall what kind of

3    gloves Mr. Nelson wore when he mixed or used

4    Roundup?

5         A.    I don't, you know.  And I was

6    just, you know, thinking about this in terms

7    of the way the question was asked in the

8    deposition, I don't think -- you know, this

9    was his answer, and I don't think there was

10   any, you know, follow-up, you know, to try

11   to, you know, probe for more information.

12        Q.    Did you -- when you were

13   preparing Mr. Nelson's exposure assessment,

14   did you write -- provide any written

15   questions that were to be asked of

16   Mr. Nelson?

17        A.    No.  This was all -- you know,

18   everything that I had to work with, you know,

19   was done -- was collected, you know, before I

20   started working on the case, so no.

21        Q.    Now, you also note in your

22   report that Mr. Nelson recalled using

23   "waterproof work boots" when mixing or

24   spraying Roundup.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1              Do you see that?

2        A.    Let me just -- are we on the

3    same page here?

4        Q.    Yes.

5        A.    Gosh.  Yeah.  Heavy work

6    clothes, long-sleeved shirt, gloves,

7    waterproof work boots, yep.

8        Q.    Now, would waterproof work

9    boots in general reduce -- potentially reduce

10   Mr. Nelson's dermal exposure to Roundup?

11             MR. BRICKER:  Form.

12             THE WITNESS:  Potentially, I

13       think they could, yes.

14   BY MR. LEE:

15       Q.    Is it important that the work

16   boots be waterproof?

17       A.    Well, yeah, I think that's a

18   useful, you know, bit of additional

19   information, you know, compared to just plain

20   old leather, you know, work boots or

21   something.  The fact that they're waterproof,

22   you know, would, you know, increase the

23   protection compared to just, you know, plain

24   old leather boots.

Robert F. Herrick, MS, ScD, CIH, PAIHA

```
 1          Q.      Dr. Herrick, do you have an
 2    understanding of whether Roundup is a
 3    water-based herbicide?
 4          A.      It is delivered in a water
 5    solution, yes.
 6          Q.      Do you have an understanding of
 7    whether glyphosate is -- well, let me ask you
 8    this.
 9               Dr. Herrick, do you have an
10    understanding of the term "hydrophilic"?
11          A.      Yes, I do.
12          Q.      What is your understanding of
13    hydrophilic?
14          A.      Well, it basically dissolves in
15    water or is water soluble or is carried in
16    water, or it can be absorbed into water.
17          Q.      Do you have an understanding of
18    whether glyphosate is hydrophilic?
19               MR. BRICKER:  Objection.  Form,
20          and beyond the scope.
21               THE WITNESS:  Yeah, my -- in
22          just reading about the properties of
23          glyphosate, my recollection is it is
24          hydrophilic.
```

Robert F. Herrick, MS, ScD, CIH, PAIHA

1              The only caveat I would, you

2        know, include in that is that, you

3        know, in the situations like

4        Mr. Nelson, you know, the Roundup

5        contains glyphosate but also includes

6        other chemicals like surfactants.

7              So, you know, the properties of

8        glyphosate alone aren't going to be,

9        you know, necessarily the only factor

10       in play.

11   BY MR. LEE:

12       Q.    Would a waterproof work boot

13   reduce dermal exposure to a water-based

14   product like Roundup?

15       A.    I think --

16             MR. BRICKER:  Form, and beyond

17       the scope.

18   BY MR. LEE:

19       Q.    You can answer.

20       A.    Sure.

21             Potentially, I think it could,

22   yes.

23       Q.    Now, you also state that

24   Mr. Nelson recalled using goggles from time

Robert F. Herrick, MS, ScD, CIH, FAIHA

1   to time when mixing or using -- spraying

2   Roundup, is that correct?

3        A.    Yeah, I do remember him

4   mentioning that.  Probably goggles from time

5   to time or most of the time, right, that's

6   what he said.

7        Q.    Did you have an understanding

8   what kind of goggles he was referring to?

9        A.    You know, I didn't.  And, you

10  know, there was no follow-up to, you know,

11  kind of probe for more information, so I

12  don't really know of any details about the

13  goggles.

14       Q.    For plastic goggles, would that

15  have the potential to reduce Mr. Nelson's

16  dermal exposure to Roundup?

17       A.    Well, I think in general, you

18  know, we find that, you know, the amount of

19  skin surface that goggles actually cover is

20  pretty small, you know, so the goggle was

21  more, you know, an eye protective device, you

22  know, for splashes of the liquid or

23  something.

24            So, you know, there could be

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    some, you know, small protection there, but

2    that, I don't think, would be the reason for

3    wearing the goggles.

4         Q.     Now, you also report, "He also

5    stated that he usually wore a mask."

6              Do you see that?

7         A.     I do see that, yep.

8         Q.     Now, what kind of mask -- well,

9    let me ask you this.

10             What was your understanding of

11   the type of mask that was being referred to

12   there?

13        A.     Yeah, again, it was one of

14   those questions that, you know, there wasn't

15   really any follow-up on it.

16             You know, it would be important

17   to know if it were, you know, like a surgical

18   mask as opposed to a real respirator like an

19   N95.  You know, that makes a huge difference

20   in the amount of protection that is provided.

21   You know, it's just one of the sad lessons

22   from COVID, right, that everybody, I think,

23   now understands the difference between a

24   surgical mask and a respirator.

1    But in any case, you know, he

2    didn't really specify, so there isn't any

3    more detail than what we have here.

4         Q.    Now, so was it your

5    understanding that Mr. Nelson was referring

6    to a face mask that covered his nose and

7    mouth?

8         A.    Yeah, I -- you know, I wouldn't

9    want to -- I'd have to be speculating, you

10   know, if -- you know, you may have had this

11   experience.  You can walk down the aisle in a

12   Home Depot and there's all kinds of devices

13   there that are, you know, face masks, some of

14   which, you know, wouldn't be very effective,

15   and then others like an N95, you know,

16   actually are more like real respirators.

17        So, you know, without having

18   any more information from Nelson about, you

19   know, the particular type, I don't really

20   feel like I could give you a good answer to

21   that question.

22        Q.    Would an N95 face mask reduce

23   inhalational exposure to Roundup?

24        A.    I think especially if you were,

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    you know, spraying it from a backpack, the

2    N95 would reduce the inhalation exposure,

3    yes.

4        Q.    Could even a regular surgical

5    mask reduce inhalational exposure to Roundup?

6            MR. BRICKER:  Form.

7            THE WITNESS:  By a much smaller

8        extent.

9            And I think, you know, that's

10       why, you know, I tried to reference it

11       back to what's going on with COVID,

12       that people, you know, are beginning

13       to appreciate that the surgical mask,

14       you know, is actually meant to keep

15       droplets from being released from the

16       exhaled breath of the person who is

17       wearing it, not to filter particles in

18       the air out, which is why it's such a

19       controversy now about whether the

20       surgical mask is good protection from

21       COVID.  And, you know, the data

22       indicates that it really isn't because

23       it's not designed to filter out those

24       particles.

BY MR. LEE:

        Q.      Dr. Herrick, did you make any
adjustments to your non-time-weighted
exposure assessment for Mr. Nelson based on
the personal protective equipment that he
stated he used while mixing and spraying
Roundup?

        A.      No, I didn't.

        Q.      Dr. Herrick, did you make any
adjustments to your time-weighted exposure
assessment for Mr. Nelson based on the
personal protective equipment that he stated
he used while mixing and spraying Roundup?

        A.      I didn't, no.

        Q.      Let me mark another exhibit for
you, Dr. Herrick.

                (Whereupon, Exhibit Herrick 6
        was marked for identification.)

        A.      Is this Number 5?

BY MR. LEE:

        Q.      I'll tell you in a moment.

                MR. BRICKER:  No.  It will be
        6.

                THE WITNESS:  Okay.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    BY MR. LEE:

2         Q.    Yes, it's Exhibit 6.

3         A.    Okay.  I'm not seeing it yet.

4    Let me refresh the page.  Maybe that will

5    bring it up.

6               There it is.  Hang on.

7               Okay.  This is more deposition?

8         Q.    Yes.  And I'll -- this is

9    Exhibit 6.  And do you see, Dr. Herrick, on

10   the first page Continued Videotaped and

11   Videoconference Deposition of Gerald Nelson,

12   this time with a date of April 7th, 2022?

13              Do you see that?

14        A.    Yeah.  Let me just scan down

15   here.

16              Yes, I see it.

17        Q.    And again, I'll represent to

18   you that this is an excerpt simply because of

19   the technical issues with this remote

20   platform.

21              And can you go to page 135 of

22   the deposition transcript?

23        A.    Okay.  Let me scroll down here.

24        Q.    And do you see line 8, there's

1    a question on page 135, line 8?

2         A.    I see it.  Right.

3         Q.    Now, the question is, "Do you

4    have any recollection of getting Roundup or

5    any herbicide on your skin at any time?"

6              And then Mr. Nelson answers, "I

7    don't have any recollection of that at all,

8    no."

9              And then the question is,

10   "Okay.  And is that because you took all of

11   the precautions that we just discussed?"

12             And Mr. Nelson answers, "Yes."

13             Do you see that?

14        A.    I do see that, right.

15        Q.    Now, did you make any

16   adjustments to your non-time-weighted

17   exposure assessment for Mr. Nelson based on

18   the fact that he doesn't have any

19   recollection of getting Roundup or any

20   herbicide on his skin at any time?

21             MR. BRICKER:  Form.

22             THE WITNESS:  No, I didn't do

23        any adjustments.

24             ///

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    BY MR. LEE:

2         Q.     Did you make any adjustments to

3    your time-weighted exposure assessment for

4    Mr. Nelson based on his testimony under oath

5    that he did not recall getting any Roundup or

6    any herbicide on his skin at any time?

7                MR. BRICKER:  Form.

8                THE WITNESS:  Again, no, I

9         didn't do an adjustment.

10   BY MR. LEE:

11        Q.     Let me mark another exhibit for

12   you, which I'll mark as Exhibit 7.

13                (Whereupon, Exhibit Herrick 7

14        was marked for identification.)

15   BY MR. LEE:

16        Q.     Just let me know when you get

17   that, Dr. Herrick.

18        A.     Okay.  Another -- this is still

19   deposition?

20        Q.     Yes.  And again, this is

21   another excerpt from the April 7th, 2022

22   transcript.

23                Do you see that?

24        A.     I do, yes.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1       Q.      And you had testified earlier

2    that the April 7th, 2022 deposition

3    transcript for Mr. Nelson was one of the

4    documents that you had relied upon when

5    preparing his exposure assessment, correct?

6       A.      That's correct, yes.

7       Q.      If you go to page 132, and

8    beginning on line 13, do you see where

9    Mr. Nelson begins talking about the heavy

10   clothes that he washed -- I'm sorry, that he

11   wore?

12              MR. BRICKER:  Form.

13              THE WITNESS:  I do remember

14       this, right.

15   BY MR. LEE:

16       Q.      And this is -- is it the basis

17   of the passage in your report, this testimony

18   from Mr. Nelson?

19       A.      Yeah, I think so.  I'd have to,

20   you know, double-check my footnotes, but off

21   the top of my head, I think this is the text

22   that I was referring to.

23       Q.      Now, you also on -- well, let

24   me get you back to Exhibit 3 of your

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    report -- I'm sorry, Exhibit 3, your report

2    for Mr. Nelson, and if you can go back to

3    page 4.

4         A.    Let's see.  Is that my report?

5         Q.    Yes.

6         A.    Hang on.

7               Okay.  Page 4?

8         Q.    Yes, the fourth page of this

9    exhibit.

10              And then you -- in the last

11   paragraph on the fourth page of Exhibit 3,

12   you write, "When asked about instances when

13   he got Roundup on himself, Mr. Nelson stated

14   that he washed his hands after every time he

15   used Roundup regardless of whether he got it

16   on his skin or not."

17              Do you see that?

18        A.    I do, yeah.

19        Q.    Now, with a water-based product

20   like Roundup, is washing hands effective in

21   getting -- reducing dermal exposure to

22   Roundup?

23        A.    You know, I'd have -- you know,

24   I think potentially -- you know, I haven't

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    really tried to look at that specifically,

2    so, you know, I don't feel like I can, you

3    know, give you a real good answer to that.

4         Q.    Now, if Mr. Nelson had any

5    Roundup on his hands, would washing his hands

6    remove whatever Roundup was still on his

7    skin?

8              MR. BRICKER:  Form.

9              THE WITNESS:  You know, again,

10        I don't know that I'm really in a

11        great position to try to give you a

12        good answer to that, I mean, partly

13        because as we, you know, talked about

14        earlier, Roundup has several

15        ingredients, and I don't know that I

16        could really generalize about, you

17        know, how effective handwashing with

18        water would be at removing all of

19        those.

20   BY MR. LEE:

21        Q.    Is that beyond your area of

22   expertise, Mr. Herrick -- I'm sorry,

23   Dr. Herrick?

24              MR. BRICKER:  Certainly beyond

1          his designation in this case.

2     BY MR. LEE:

3          Q.    Well, my question is whether

4     that issue is beyond your expertise,

5     Dr. Herrick.

6          A.    Yeah, I --

7               MR. BRICKER:  Then it's not

8          relevant.

9               THE WITNESS:  Should I answer?

10    BY MR. LEE:

11         Q.    Yes, you can answer.

12              MR. BRICKER:  Sure.  Go ahead.

13              THE WITNESS:  Yeah, I wouldn't

14         really claim that I have any special

15         expertise in, you know, this

16         particular aspect of decontamination

17         by handwashing.  It's really not

18         something that I've looked into in any

19         detail.

20    BY MR. LEE:

21         Q.    You didn't look into that issue

22    in detail when you were preparing your

23    exposure assessment for Mr. Nelson, is that

24    correct?

1       A.      No, I didn't.  It was, you

2  know, outside the scope of, you know, the

3  question that I was addressing.

4       Q.      Dr. Herrick, can you summarize

5  the question that you were addressing when

6  you prepared Mr. Nelson's exposure

7  assessment?  What question specifically were

8  you addressing?

9       A.      Oh, well, yeah --

10              MR. BRICKER:  Form.

11              THE WITNESS:  -- it was pretty

12         simple.  It was that they -- you know,

13         the question was could I prepare a

14         lifetime exposure history for Nelson

15         for both the time-weighted and the

16         non-time-weighted days of lifetime

17         exposure, so that was the question I

18         was responding to.

19  BY MR. LEE:

20       Q.      You weren't asked to provide a

21  quantitative dose estimate for Mr. Nelson?

22       A.      I was not, no.

23       Q.      And you mentioned in your

24  report that Mr. Nelson was also exposed to

1    Roundup by the inhalational route, is that

2    correct?

3         A.    That is correct, yes.

4         Q.    Dr. Herrick, are you familiar

5    with a methodology called the advanced

6    research tool, or ART, A-R-T, methodology?

7         A.    I am, yes.

8         Q.    And do you have an

9    understanding whether the ART methodology is

10   a methodology for estimating inhalational

11   exposure to a chemical?

12        A.    Yes, it is.  That's what it's

13   designed for.

14        Q.    Were you asked to provide a

15   quantitative estimate of inhalational

16   exposure for Mr. Nelson using the ART

17   methodology, A-R-T methodology?

18        A.    No, I wasn't.

19        Q.    When you were preparing this

20   exposure assessment for Mr. Nelson, did you

21   have an understanding of the input variables

22   that you would need in order to provide a

23   quantitative assessment using the ART

24   methodology?

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          MR. BRICKER:  Form and scope.

2          THE WITNESS:  The answer is,

3      yes, I've used the ART approach in the

4      past, and so I have an understanding

5      of what the inputs are.

6  BY MR. LEE:

7      Q.    What inputs are there for the

8  ART methodology?

9          MR. BRICKER:  Objection.  Form,

10      beyond the scope.

11          THE WITNESS:  It depends on the

12      particular exposure scenario that, you

13      know, you're trying to develop the

14      estimate for.  The model has inputs

15      for the nature of the material, how

16      it's being handled, if it's being

17      sprayed, you know, what sort of

18      pressure is being used for the

19      spraying.  If it's spraying, is it

20      indoors or outdoors, the ambient

21      temperature.

22          There's probably a couple

23      others that I'm not thinking of right

24      off the top of my head, but those are

Robert F. Herrick, MS, ScD, CIH, PATHA

1          the kinds of -- oh, the volume that's

2          being sprayed, whether it's, you know,

3          low volume or something of a higher

4          volume in terms of the amount sprayed

5          per minute.

6               Those are the main inputs that

7          you need to be able to feed to the

8          model.

9     BY MR. LEE:

10         Q.    Did you have that input

11    information available to you for Mr. Nelson

12    when you were preparing his exposure

13    assessment?

14              MR. BRICKER:  Form, and beyond

15         the scope.

16              THE WITNESS:  No, I didn't have

17         it.  And, you know, given the question

18         I was responding to, I didn't need it.

19    BY MR. LEE:

20         Q.    If you had all the necessary

21    input information, would the ART methodology

22    have provided a more precise inhalational

23    exposure assessment for Mr. Nelson?

24              MR. BRICKER:  Form, beyond the

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          scope, argumentative.

2    BY MR. LEE:

3          Q.    You can answer.

4          A.    Sure.

5                I don't think I would use the

6    word "precise," but I think, you know, we

7    could say that the ART model would give you a

8    more quantitative assessment of his exposure.

9          Q.    Have you ever described in the

10   past, in your past testimony in Monsanto

11   litigation, these time-weighted and

12   non-time-weighted exposure day estimates as

13   semi-quantitative?  Have you ever described

14   it that way?

15               MR. BRICKER:  Form, calls for

16        speculation.

17               THE WITNESS:  I was just trying

18        to remember.  The only other time, you

19        know, I used this approach was on

20        Cotter, and, you know, I don't

21        actually remember using the term

22        "semi-quantitative."  I don't think I

23        used that term.

24               We could check Cotter, for

1          sure, but, you know, just as I sit

2          here, I don't remember characterizing

3          him that way.

4      BY MR. LEE:

5          Q.    Dr. Herrick, did you make any

6      adjustments to your non-time-weighted

7      exposure assessment for Mr. Nelson based on

8      his stated habit of washing his hands after

9      every time he used Roundup?

10         A.    No, I didn't.

11                MR. LEE:  I've marked an

12         exhibit which is now Exhibit 8.

13                (Whereupon, Exhibit Herrick 8

14         was marked for identification.)

15     BY MR. LEE:

16         Q.    And just let me know when you

17     see Exhibit 8.

18         A.    Sure.  I'm looking.

19                Okay.  I have it.

20         Q.    And do you see on the first

21     page the title is Zoom Deposition of Gerald

22     Nelson with a date April 8th, 2022?

23         A.    I do.

24         Q.    And the deposition transcript

Robert F. Herrick, MS, ScD, CIH, PAIHA

1    from April 8th, 2022 was one of the documents

2    that you reviewed and relied upon when you

3    were preparing your exposure assessment for

4    Mr. Nelson, correct?

5         A.    That is correct, yep.

6         Q.    And can you go to page 238 of

7    this document I've marked as Exhibit 8?

8         A.    Sure.  Let me just get down to

9    it here.

10              Okay.

11        Q.    Now, do you see on line 11

12   there's a question, "Okay.  And you mentioned

13   just a moment ago about splash-back when you

14   were filling the jug.  Did you ever get

15   splash-back on your hands or on your body or

16   your skin?"

17              Do you see that?

18        A.    I do, yeah.

19        Q.    And then Mr. Nelson answers,

20   "Well, again, I had gloves on so that

21   back-splash was at a minimum of anywhere near

22   me."

23              Do you see that?

24        A.    I do see that, yep.

1    Q.    And then he goes on --

2    Mr. Nelson goes on to say, "And usually it

3    didn't touch me."

4              Do you see that?

5    A.    I do.

6    Q.    And then on line 23, the

7    question is again, "Okay.  You have no

8    specific recollection of ever getting Roundup

9    on you while you were --"

10             And then Mr. Nelson quickly

11   answers, "No."

12             Do you see that?

13   A.    I do see that, yes.

14   Q.    Now, did you take that

15   testimony into account at all when providing

16   your non-time-weighted exposure assessment

17   for Mr. Nelson?

18   A.    No, I didn't.

19   Q.    Did you take that into account

20   when you were providing your time-weighted

21   exposure assessment for Mr. Nelson?

22   A.    No, I didn't.

23   Q.    And then on line 5 of page 239,

24   do you see -- I'm sorry, line 7, Mr. Nelson

1    goes on to state, "I think maybe if -- I'd

2    like to add this.  If I got at all wet, it

3    could have been like a -- just a tad between

4    my glove and my shirt.  I'd take my shirt

5    sleeve up and go find a garden hose and wash

6    it off immediately."

7              Do you see that?

8         A.    I do.

9         Q.    And was it your understanding

10   that Mr. Nelson made it a point to quickly

11   wash off any part of his body when it was

12   potentially exposed to Roundup?

13        A.    That was something that he

14   reported in his deposition at a couple of

15   different points, yeah.

16        Q.    And then in line 13 on

17   page 239 -- I believe you quote this in your

18   report -- Mr. Nelson states, "And that

19   happened maybe one half of one trillionth

20   percent."

21             Do you see that?

22        A.    I do see that, yes.

23        Q.    So was it your understanding

24   that Mr. Nelson believed that getting Roundup

Robert F. Herrick, MS, ScD, CIH, PAIHA

1   on his skin was a fairly rare event?  Was

2   that your understanding when you prepared his

3   exposure assessment?

4             MR. BRICKER:  Form.

5             THE WITNESS:  Yeah, he, you

6        know, referred to it as something that

7        happened, what did he say here, one

8        half of a trillionth of a percent, so

9        I would say that would be rare.

10  BY MR. LEE:

11       Q.    Going back to your report,

12  page 5 of your report marked as Exhibit 3.

13       A.    I'm looking.  Hang on a sec.

14             Okay.  I'm there.

15       Q.    Now, in the last paragraph on

16  page 5 of your report -- now, I'm referring

17  to the page 5 that is at the right lower-hand

18  corner.

19       A.    Yes, got it.

20       Q.    You wrote that, "Mr. Nelson

21  recalled using pre-mixed Roundup at his

22  residence."

23             Do you see that?

24       A.    I do see that, yes.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Q.    What are you referring to

2    there, "pre-mixed"?

3    A.    Oh, if I remember it, this

4    would be when he bought the, what is it, you

5    know, sort of the Windex size -- or, no,

6    actually it may have been the larger size.

7    Let me just see if I can refresh my memory

8    here.  This was the stuff he bought over the

9    counter.

10              I'm sorry, I'm kind of blanking

11   on the size of the container, whether it was

12   the, you know, sort of two-and-a-half gallon

13   size sprayer or if it was the little Windex

14   bottle size.  And actually, it's possible he

15   didn't even mention that.  I just don't

16   remember it.

17              But this is, you know, what he

18   said about buying the premix.

19   Q.    So with premix Roundup,

20   Mr. Nelson didn't have to mix the Roundup

21   with water, is that correct?

22   A.    Yeah, exactly right.  That's

23   correct.

24   Q.    Now, does using a premixed

Robert F. Herrick, MS, ScD, CIH, FAIHA

1   version of Roundup, does that potentially

2   reduce the risk of dermal exposure to

3   Roundup?

4       A.      I think you could say that

5   potentially, yeah, because it doesn't require

6   that you, you know, mix the concentrate with

7   the water and so it's -- you know, there's

8   one less step there involved in the

9   preparation.

10      Q.      And could using a premixed

11  Roundup potentially reduce the risk of

12  inhalational exposure to Roundup?

13      A.      That wouldn't be -- you know, I

14  think we'd have to look at that a little more

15  carefully, because, you know, you are

16  generating the liquid spray, you know, the

17  aerosol, whether you'd mix it up and put it

18  in the backpack or whether you, you know, use

19  the premix.  I think we'd have to, you know,

20  drill down on that a little bit further

21  before we could, you know, draw any real good

22  conclusion about the inhalation.

23      Q.      Now, Dr. Herrick, are you

24  familiar with the term "spot-spraying,"

1    S-P-O-T, spot spraying?

2         A.     I've seen it used in some of

3    these cases.  Yeah, I have.

4         Q.     Now, do you have -- what was

5    your understanding with respect to

6    Mr. Nelson's residential use of Roundup?  Was

7    he spot-spraying Roundup around his

8    residence?

9         A.     You know, he didn't use the

10   term "spot-spraying," but, you know, if I

11   remember correctly, the way he described, you

12   know, what he was trying to kill, he was

13   after poison ivy, and so, you know, compared

14   to the way he might have been using it in the

15   landscaping, this was a more, you know, kind

16   of defined or a more finite application just

17   to spray the poison ivy vine.

18        Q.     So if he saw a weed that he

19   wanted to eliminate, he would simply spray

20   the Roundup, the premixed Roundup, is that

21   correct?

22             MR. BRICKER:  Form.

23             THE WITNESS:  Yeah, I think

24        that's, you know, generally.  Again,

1          it would, I think, depend a little bit

2          on where the weed was that he wanted

3          to kill.

4                  You know, if it were, like, in

5          a flower bed or up against a wall or

6          something, you know, he might take a

7          different approach than if it was, you

8          know, right out there in the middle of

9          his lawn.

10                 But, you know, that would be

11         the idea, you were just trying to, you

12         know, apply it to that very restricted

13         area.

14     BY MR. LEE:

15         Q.    Now, Dr. Herrick, on page 6 of

16     your exposure assessment for Mr. Nelson, you

17     have a statement regarding six epidemiologic

18     studies.

19                 Do you see that?

20         A.    Yes, I do, right.

21         Q.    As you testified earlier you're

22     not providing any opinions on whether Roundup

23     caused Mr. Nelson's cancer, is that correct?

24         A.    That is correct, I'm not

1    providing that kind of opinion.

2         Q.    On page 7 of your exposure

3    assessment, you cite a paper by Eriksson et

4    al.

5              Do you see that?

6         A.    Let me just get down to it

7    here.

8              Yes, I do.

9         Q.    And I believe in the Cotter

10   deposition you mentioned that the Eriksson

11   paper had the basic methodology for the

12   exposure assessment that you used for

13   Mr. Nelson's exposure assessment, is that

14   correct?

15        A.    For the time-weighted estimate,

16   yeah, that's the approach I used, was what

17   Eriksson followed.

18        Q.    Now, if you go to, I believe

19   it's page 8 of your exposure assessment for

20   Mr. Nelson, you have two charts, I believe.

21        A.    Right.

22        Q.    Now, can you -- I believe you

23   touched upon this earlier, but can you

24   explain what you're referring to when you are

1    talking about Minimum Exposure Days versus

2    Midpoint Exposure Days and Maximum Exposure

3    Days?

4         A.    Yeah.  Because the way Nelson

5    replied to these questions, he tended to put

6    it in, you know, in the form of a range.  You

7    know, so he would say -- you know, when he

8    was asked how long he used the stuff, it was,

9    you know, say, between five and 40 minutes

10   each time.

11              And then, similarly, when he

12   was asked about, say, the number of days he

13   used it per season, you know, the answer

14   would be, Well, you know, between, you know,

15   five and ten, you know, which I think, you

16   know, he was kind of trying to reflect the

17   variability in the way he used the stuff.

18              So what I did was I took -- for

19   example, in the Days Used per Season in his

20   residential, you know, he said he used it

21   between five and ten days per season, and so

22   I took those to be the high and the low-end

23   values.  And then I picked the midpoint, 7.5,

24   you know, to kind of represent, you know,

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    what's probably the value in the middle.

2              And then the same thing with

3    the Hours Used per Day, you know, it was

4    between five and 40 minutes, so that's what

5    you see there if you look at Hours Used per

6    Day, from .08 to .67, and the middle of that

7    range is .38.

8              So if you take his minimum,

9    that would be the lowest of the low, right?

10   That would be the shortest number of hours

11   per day times the smallest number of days per

12   season, and that would give you his minimum

13   exposure days.

14             And then for maximum, it's the

15   other end of the range.  It's the high end of

16   the number of days per season, the high end

17   of the hours used per day, and that's your

18   maximum exposure days.

19             And then the midpoint value is

20   the value in the middle.

21             So you have, you know, kind of

22   a range of his lifetime exposure days, the

23   lowest of the low, the highest of the high,

24   and the value that's in between in the

1    middle.  That's the approach I took.

2         Q.    Dr. Herrick, can you take a

3    look at the last page of your exposure

4    assessment for Mr. Nelson marked as

5    Exhibit 3?

6         A.    Let me just -- is this the one,

7    the Exposure Breakdown?

8         Q.    Yes.

9         A.    Yeah, okay.

10        Q.    And you have -- towards the

11   bottom of the page you have three exposure

12   estimates combining both residential and

13   commercial, and it looks like there's a

14   minimum, midpoint, and maximum estimate

15   exposure.  Is that correct?

16        A.    That's correct, yep.

17        Q.    And at the bottom of the page,

18   that appears to be the time-weighted

19   estimate, is that correct?

20        A.    Mm-hmm, yep.  Mm-hmm, yes.

21        Q.    So the time-weighted minimum

22   total exposure days over a lifetime for

23   Mr. Nelson, residential and commercial, is

24   12.55 days, is that correct?

Robert F. Herrick, MS, ScD, CIH, FAIHA

1        A.      Well, that would be the low end

2    of the range.

3        Q.      Minimum?

4        A.      Minimum.  I'm sorry, yeah,

5    that's what I said.  Minimum total exposure

6    days lifetime, yep.

7        Q.      Now, the minimum total

8    non-time-weighted exposure days estimate over

9    a lifetime is provided in the right

10   upper-hand corner, 1,255 days, is that

11   correct?

12       A.      Right.  That's not factoring in

13   the amount of time per day.  That's just

14   based on the number of days.

15       Q.      So your minimum exposure,

16   depending on whether you're using

17   time-weighted or non-time-weighted estimate

18   methodology, the range for minimum total

19   exposure days over a lifetime is 12.55 days

20   to 1,255 days, is that correct?

21               MR. BRICKER:  Form.

22               THE WITNESS:  No.  It's from

23       12.55 to 115.99.  That's the maximum

24       time-weighted days.

1    BY MR. LEE:

2         Q.    No.  I'm talking just about the

3    minimum total exposure days over lifetime.

4    Using the two methodologies --

5         A.    Oh.

6         Q.    -- 12.55 days is for the

7    time-weighted estimate, and the

8    non-time-weighted estimate is 1,255 days, is

9    that correct?

10        A.    I'm sorry.  I misunderstood

11   your question.  Yes, it's correct.

12        Q.    And the midpoint total exposure

13   days per lifetime, the time-weighted estimate

14   is 62.7 days, while the non-time-weighted

15   estimate is 1,320 days, is that correct?

16        A.    That is correct, yes.

17        Q.    And for the maximum total

18   exposure days lifetime, the estimate using

19   the time-weighted methodology is

20   approximately 116 days, whereas using the

21   time non-weighted exposure days methodology

22   it's 1,385 days, is that correct?

23        A.    That is correct, yes.

24              MR. LEE:  I think this is a

Robert F. Herrick, MS, ScD, CIH, FAIHA

1        good time for a break.  Should we take

2        a ten-minute break?

3                    THE WITNESS:  Fine for me.

4                    MR. BRICKER:  That's fine.

5                    THE VIDEOGRAPHER:  We're off

6        the record at 1:43 p.m.

7                    (Whereupon, a recess was

8        taken.)

9                    THE VIDEOGRAPHER:  Back on the

10       record at 1:58 p.m.

11   BY MR. LEE:

12       Q.    Dr. Herrick, let me give you

13   another document which I will introduce as

14   Exhibit 9.

15                    (Whereupon, Exhibit Herrick 9

16       was marked for identification.)

17   BY MR. LEE:

18       Q.    And just let me know when you

19   are able to open it.

20       A.    Okay.  Let me refresh my page

21   here.

22                    This is Cotter?

23       Q.    Yes.  This is a document marked

24   as Exhibit 9.  It has the title Videotaped

1    Deposition of:  Robert F. Herrick, Doctor of

2    Science, and the date September 6, 2022, is

3    that correct?

4          A.    It is.

5          Q.    And you testified or referred

6    to earlier in this deposition about

7    testifying in the Cotter matter, C-O-T-T-E-R,

8    is that correct?

9          A.    It is.

10         Q.    Is this the deposition

11   testimony that you were referring to earlier,

12   Dr. Herrick?

13         A.    Yes, it looks like it.

14         Q.    Okay.  I'll represent to you

15   again, this is an excerpt from that

16   transcript just to facilitate ease of use on

17   this remote platform.

18         A.    Okay.

19         Q.    If you could take a -- go to

20   page 82, and I'm referring to the -- I'm

21   sorry -- yes, page 82, and I'm referring to

22   the lower right-hand corner page number of

23   Exhibit 9.

24         A.    Okay.  I'm on it.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1     Q.     Now, you'd been asked a

2  question, and if you go to line 16, you were

3  answering, "Like, just to take an example,

4  you know, you might use lifetime exposure

5  days to lead because lead tends to accumulate

6  whereas if something is much more short-lived

7  in the body and tends to be excreted quickly,

8  the exposure days, you know, might not be

9  such a meaningful exposure variable."

10            And then -- do you see that?

11     A.     I do, yep.

12     Q.     And then there's a further

13  question, "Okay.  And is glyphosate a

14  compound that's excreted quickly from the

15  body?"

16            And then you answer, "Yeah,

17  that was actually one I was thinking of that

18  it's -- it doesn't really tend to accumulate.

19  So, you know, you might not find that the

20  exposure day metric relates very well to the

21  biological level."

22            Do you see that, Dr. Herrick?

23     A.     I do, yes.

24     Q.     Now, is it still your

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    understanding today that glyphosate is a

2    compound that's excreted quickly from the

3    body?

4                    MR. BRICKER:  Form.  It lacks

5         foundation, misstates his testimony.

6                    THE WITNESS:  Well, that's my

7         recollection.  And in particular, what

8         I was thinking of when we had that

9         conversation was that study by Pierce

10        where they did consecutive urine

11        samples after exposure and they

12        tracked the elimination of the

13        glyphosate from the body.

14   BY MR. LEE:

15        Q.    And, Dr. Herrick, why do you

16   state in this testimony that for a compound

17   like glyphosate, you might not find that

18   exposure day metric relates very well to the

19   biological level?  Can you explain what

20   you're talking about there?

21                    MR. BRICKER:  Well, I'm going

22        to object.  This is a completely

23        improper use of deposition testimony.

24                    You've given him an excerpt,

Robert F. Herrick, MS, ScD, CIH, PAIHA

1          you focused him on one thing.  The

2          discussion that was being had in this

3          deposition was on biomonitoring, not

4          on exposure day assessment.

5                So if you want to give him the

6          whole deposition to review in another

7          case, that's fine.  Otherwise, this is

8          entirely improper.

9     BY MR. LEE:

10          Q.    You can answer the question,

11    Dr. Herrick.

12          A.    Okay.  Well, to try to, like,

13    put a little bit of point on it, the way the

14    Pierce study was done, if you were to take a

15    look at the biological level, say, on day 5

16    after exposure, what's left after day 5 might

17    not relate very well to what the exposure was

18    on day 1 because this particular compound

19    tends to be mobilized and leave the body.

20                So it doesn't really track the

21    exposure day and the biological level.  They

22    can be quite different because the chemical

23    doesn't really persist.

24          Q.    And by "biological level," what

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    are you referring to there, Dr. Herrick?

2         A.    Well, like in this case, the

3    biological level --

4              MR. BRICKER:  Bob, I'm sorry,

5         let me just object to form, and that

6         this is beyond the scope of your

7         designation in this case.

8              Go ahead.

9              THE WITNESS:  Okay.

10             Well, in this case what they

11        were looking at was the excretion of

12        the glyphosate in the urine, so that's

13        the biological level that we were

14        talking about, you know, in this

15        deposition.

16   BY MR. LEE:

17        Q.    And was the glyphosate level in

18   the urine, is that a -- was that a proxy for

19   the glyphosate level in the blood?

20        A.    You know, they --

21             MR. BRICKER:  Form.

22             THE WITNESS:  I'm sorry.

23             Yeah, sure.  They didn't try

24        to, you know, directly make that

Robert F. Herrick, MS, ScD, CIH, PAIHA

1              connection, but there is clearly a

2              linkage between the two.  The

3              glyphosate, you know, is in the blood.

4              It winds up getting processed, you

5              know, I'm thinking, through the liver

6              and kidneys and excreted in the urine.

7    BY MR. LEE:

8         Q.    And so when you testified here

9    in the Cotter deposition that, "you might not

10   find that the exposure day metric relates

11   very well to the biological level," you're

12   stating that the exposure day metric may not

13   correlate very well with the level of

14   glyphosate in the urine, is that correct?  Am

15   I understanding that correctly?

16        A.    Yeah, that's what this

17   conversation in this deposition was engaging,

18   and so what you just described, you know,

19   essentially restating the point I was trying

20   to make here.

21        Q.    Dr. Herrick, let me give you

22   another document that I'll mark as

23   Exhibit 10.

24              ///

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          (Whereupon, Exhibit Herrick 10

2     was marked for identification.)

3   BY MR. LEE:

4     Q.     Just let me know when you can

5   open Exhibit 10.

6     A.     Hang on a second.  I'm

7   scrolling down to it.

8          Okay.  This is a Plaintiff Fact

9   Sheet?

10     Q.     Yes.

11          Do you see this document I've

12   marked as Exhibit 10, and it has the Third

13   Amended Plaintiff Fact Sheet as a header, and

14   then towards the bottom it has the name

15   Gerald Nelson?

16          Do you see that, Dr. Herrick?

17     A.     Yes, I do.

18     Q.     Now, you testified earlier that

19   you had relied upon a Plaintiff Fact Sheet

20   for Mr. Nelson when you prepared your

21   exposure assessment, is that correct?

22     A.     Yeah, I do remember looking at

23   these.

24     Q.     And you -- I just wanted to

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    make sure, was it this Third Amended

2    Plaintiff Fact Sheet that you relied upon

3    when preparing your exposure assessment, or

4    was it an earlier one?

5              MR. BRICKER:  Form.

6              THE WITNESS:  As I recall,

7         there were three of them, and I

8         remember reading them all.  Just as

9         I'm sitting here today, I don't

10        remember where they were similar and

11        where they were different, but I do

12        remember seeing all of them.

13   BY MR. LEE:

14        Q.    And so this Third Amended

15   Plaintiff Fact Sheet as well as the first --

16   the other versions are among the documents

17   that you reviewed and relied upon when you

18   were preparing the exposure assessment for

19   Mr. Nelson?

20        A.    That's true.  I looked at these

21   three documents, these three Plaintiff Fact

22   Sheets, yes.

23        Q.    Dr. Herrick, let me mark a

24   document as Exhibit 11.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          (Whereupon, Exhibit Herrick 11

2      was marked for identification.)

3      A.      This page is getting a little

4  full.  Let me get back here.

5          Okay.  This is -- what am I

6  looking at here?

7  BY MR. LEE:

8      Q.      Yeah, this is --

9      A.      We went to Canning?

10     Q.      Yes.

11         Dr. Herrick, this is an

12  Exhibit 11 that I've marked and has the title

13  Defendant Monsanto Company's Notice of

14  Videotaped Deposition of Robert F. Herrick,

15  and in the left upper-hand corner it states,

16  "This document relates to:  Richard Canning

17  and Shirley Canning versus Monsanto Company."

18         Do you see that?

19     A.      I do, right.

20     Q.      Have you reviewed this --

21         MR. BRICKER:  So hold on.

22         MR. LEE:  Go ahead.

23         MR. BRICKER:  Are you done with

24  Nelson?

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          MR. LEE:  Well, his report,

2     yes.  But as we stipulated to earlier,

3     you know, this is just one transcript.

4     But I am focusing now on Canning.

5          MR. BRICKER:  Okay.  Well, I

6     need, then, a time on the record and

7     how much time you think you're going

8     to spend on the record on Canning.

9          THE WITNESS:  I believe the

10    videographer at our break estimated

11    the time at two hours and 47 minutes.

12         THE VIDEOGRAPHER:  That's

13    correct.  We're now at three hours.

14         MR. BRICKER:  So now we're at

15    three hours?

16         THE VIDEOGRAPHER:  Yes.

17         MR. BRICKER:  Okay.  And how

18    much time do you think you're going to

19    need on the Canning portion?

20         MR. LEE:  Well, that's a bit

21    like estimating exposure, I guess, but

22    I think probably we'll need maybe two

23    hours, I think, a rough estimate.

24         MR. BRICKER:  Okay.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          MR. LEE:  Can we continue?

2          MR. BRICKER:  So let me just

3     state an objection here that this

4     notice for the deposition of

5     Dr. Herrick in the Canning matter was

6     not served on us, it was served

7     improperly on the Lynch & Lynch firm.

8     We didn't get this until late on

9     Friday, and as an accommodation,

10    agreed to produce Dr. Herrick here

11    today.

12         So he had a last-minute

13    opportunity to review it, as did we,

14    since your office or the Shook Hardy

15    firm served it on the wrong attorneys

16    and didn't get it to us until well

17    after hours on Friday night.

18         But he's here, so go ahead.

19         MR. LEE:  Well, certainly,

20    Counsel, if the notice was served on

21    the law firm, we certainly regret

22    that.

23         By the way, Counsel, just to

24    give you an opportunity to put

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          something on the record regarding

2          these notices, did you ever serve any

3          written objections to either this

4          notice or the notice for general

5          Canning?

6                    MR. BRICKER:  Well, certainly

7          not to this one, not to the Canning

8          notice, because we didn't get it until

9          Friday night.  So, no, we didn't.

10                    I honestly don't know about

11          whether we served an objection to the

12          Nelson document, but that wasn't given

13          to me until Friday night either.

14                    But regardless, he's here, so

15          let's move forward.

16                    MR. LEE:  Thank you, Counsel.

17     BY MR. LEE:

18          Q.    Dr. Herrick, have you seen this

19     document marked as Exhibit, I believe it's

20     11?  Yes.

21          A.    Yes, I see it.

22          Q.    Did you have a chance to review

23     this prior to the deposition?

24          A.    Yeah, I did.  I got this at the

Robert F. Herrick, MS, ScD, CIH, FAIHA

1  same time I got the document on Nelson, so I

2  looked at both of them on Friday.

3      Q.    And as you may note on page 4

4  of this document marked as Exhibit 11, there

5  are 22 requests for production, just as in

6  the notice for Mr. Nelson.

7          Do you see that?

8      A.    Yeah, I do, mm-hmm.  Yes.

9      Q.    Now, with respect to

10  Mr. Richard Canning, are your responses that

11  we went through for the request for

12  production, are they the same as you

13  testified earlier for Mr. Nelson's notice?

14      A.    Yes, they are.

15      Q.    Let me give you another

16  document that I'll mark as Exhibit 12.

17          (Whereupon, Exhibit Herrick 12

18      was marked for identification.)

19      A.    Let me just close -- I need to

20  create a little space on my desktop here just

21  so I can get everybody open at the same time.

22  BY MR. LEE:

23      Q.    Certainly.

24      A.    Hang on.  I have to refresh

1    this.

2              Here we go, 12.

3         Q.    Dr. Herrick, do you see this

4    document I've marked as Exhibit 12, which has

5    in the left upper-hand corner, Richard

6    Canning and Shirley Canning, Plaintiffs, vs.

7    Monsanto Company?

8              Do you see that?

9         A.    I do, yes.

10        Q.    And the title page also has

11   "Roundup Exposure History" and your name

12   beneath it.

13             Do you see that?

14        A.    I do see that, yes.

15        Q.    And is the date -- it has the

16   date July 14th, 2022.

17             Do you see that?

18        A.    I do, yes.

19        Q.    Do you recognize this document?

20        A.    Yeah.  This is the report on

21   the lifetime exposure for Mr. Canning.

22        Q.    And is this the most current

23   version of your Roundup exposure history for

24   Mr. Richard Canning?

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    A.    Yes, it -- hold on a second.

2    What's this?  Yes, it is.

3    Q.    And did you prepare this

4    report, Dr. Herrick?

5    A.    I did, yes.

6    Q.    Did anyone assist you in

7    preparing this report?

8    A.    Just the -- you know, the same

9    production at EH&E that we described earlier

10   where they took my Word document and, you

11   know, did a professional job of preparing it

12   and reformatting it and making sure the

13   footnotes were in the right place and that

14   kind of thing.

15   Q.    Other than formatting, did

16   anyone assist you in preparing the

17   substantive matter in this exposure history

18   for Mr. Canning?

19   A.    No, they didn't.

20   Q.    To your knowledge, as you sit

21   here in this deposition, are there any errors

22   or corrections that need to be addressed in

23   this report for Mr. Canning?

24   A.    No.  I'm not aware of any.

1      Q.    Does this report marked as

2   Exhibit 12 contain all of your opinions

3   regarding Mr. Richard Canning's exposure

4   history?

5      A.    Yes, that's true, they do.

6      Q.    Are there any opinions

7   regarding Mr. Richard Canning that you have

8   to offer in this litigation that is not

9   contained in your report marked as

10  Exhibit 12?

11     A.    No.

12     Q.    Dr. Herrick, can you turn to

13  page -- the second page of your report marked

14  as Exhibit 12?

15     A.    Sure.  Let me just scroll down

16  here.

17           Okay.

18     Q.    Now, in your second paragraph,

19  you state, "In Richard Canning's case, he was

20  exposed both ways."

21           Do you see that?

22     A.    Oh, sorry, I went too far.

23  You're on page 2?

24     Q.    Yes.  Page 2, first sentence of

1    second paragraph.

2         A.    Yes, I see it.  That is what I

3    said.

4         Q.    And when you refer to "exposed

5    both ways," you are talking about dermal

6    exposure and inhalational exposure, is that

7    correct?

8         A.    That's correct, yes.

9         Q.    And what documents did you

10   review in order to prepare your opinions in

11   your report marked as Exhibit 12?

12        A.    This would have been the

13   Canning deposition and the Plaintiff Fact

14   Sheet.  And again, I don't remember if there

15   was a Complaint document that was in the

16   package that I looked at for this one.  If

17   there was, I used that as well.  But those

18   would be the sources of information.

19        Q.    So other than the Richard

20   Canning deposition transcript, the Plaintiff

21   Fact Sheet for Mr. Richard Canning, and

22   possibly the Complaint, did you rely upon any

23   other documents in preparing this exposure

24   assessment for Mr. Canning?

1    A.    No.  Just those studies that we

2    had talked about earlier for Nelson, those

3    studies that talked about the methods of

4    calculating the time-weighted and the

5    non-time weighted lifetime exposures, you

6    know, I relied on their methods, but that was

7    all.

8    Q.    Are all the articles and

9    publications that you relied upon to prepare

10   your exposure history for Mr. Canning, are

11   they listed in your report marked as

12   Exhibit 12?

13   A.    Yeah, they are, with, again,

14   the same exception as we talked about

15   earlier.  I also refreshed my memory on that

16   Covle report that's referenced in the

17   Andreotti article.

18   Q.    Did you interview Mr. Richard

19   Canning in order to prepare his exposure

20   history?

21           MR. BRICKER:  Form.

22           THE WITNESS:  I didn't.

23   BY MR. LEE:

24   Q.    You did not?

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    A.    I did not, no.

2    Q.    Did you interview any family

3    members of Mr. Richard Canning in preparing

4    your report marked as Exhibit 12?

5    A.    No, I did not.

6    Q.    Did you rely on any

7    documents -- well, let me rephrase that.

8         Did you primarily -- well, let

9    me rephrase that.

10        Did you rely on Mr. Richard

11   Canning's recollection of his exposure to

12   Roundup as -- in preparing his exposure

13   assessment?

14   A.    Right, I did.  I used the same

15   approach as Nelson, where I relied on what

16   Canning had reported about the frequency and

17   the duration of his use of Roundup.

18   Q.    So you relied on Mr. Richard

19   Canning's recollection as reflected in his

20   deposition transcript, correct?

21   A.    Correct, and then also what he

22   had in the Plaintiff Fact Sheet.

23   Q.    Which was also based on

24   Mr. Richard Canning's recollection with

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    respect to his exposure, correct?

2              MR. BRICKER:  Form.

3              THE WITNESS:  Yes.

4    BY MR. LEE:

5         Q.    Now, in your report for

6    Mr. Richard Canning marked as Exhibit 12, you

7    mention in the third paragraph on page 2

8    blood levels of glyphosate.

9              Do you see that?

10        A.    I'm looking here.  Oh, that

11   first sentence, "Research has shown,"

12   etcetera?

13        Q.    Yes.

14        A.    Yes.

15        Q.    Did you rely on any

16   measurements of blood levels of glyphosate in

17   Mr. Richard Canning to prepare his exposure

18   history?

19        A.    I did not.

20        Q.    Did you rely on any urine

21   levels of glyphosate in preparing

22   Mr. Canning's exposure history?  And I'm

23   talking about measurements of Mr. Canning's

24   urine.

1      A.      Right, I understand.

2              No, I didn't.

3      Q.      You prepared an employment

4  history for Mr. Richard Canning, is that

5  correct?

6      A.      I did, yes.

7      Q.      And this is based on a

8  Plaintiff Fact Sheet for Mr. Richard Canning?

9      A.      Let me take a look.  I think

10 the -- yeah, this table that we're looking at

11 here on page 3, that was reported in his

12 Plaintiff Fact Sheet.

13     Q.      Now, you also relied on

14 Mr. Richard Canning's November 23rd, 2021

15 deposition for his employment history, is

16 that correct?

17     A.      I did.

18     Q.      Did you rely on any other

19 sources of information to compile Mr. Richard

20 Canning's employment history?

21     A.      No, I don't believe I did.  The

22 only thing -- as I mentioned before, I can't

23 remember if there was a Complaint document in

24 this package or not, but what I relied on

1    primarily was the deposition and the

2    Plaintiff Fact Sheet.

3         Q.    You see on page 3 of your

4    exposure history for Mr. Richard Canning

5    there is an employer listed, R.F. Morse and

6    Son, Incorporated.

7              Do you see that?

8         A.    I do see that, yes.

9         Q.    And the job duties was,

10   "Administration of financial aspects of

11   business."

12             Do you see that?

13        A.    I do, yes.

14        Q.    Now, to your knowledge, did

15   Mr. Canning have any exposure to Roundup or

16   glyphosate as an employee of R.F. Morse and

17   Son, Incorporated?

18        A.    I don't believe he did, because

19   to elaborate, I mean, he talked about what

20   products Morse dealt in, and so there were

21   agricultural chemicals that the company sold,

22   basically, I guess, or distributed, but he

23   wasn't directly using them, and if I remember

24   correctly he said they were in sealed

1    containers.

2              So I didn't have the feeling

3    that that was a substantial source of

4    exposure.

5         Q.    Dr. Herrick, for Mr. Richard

6    Canning's exposure history, you provided a

7    non-time-weighted exposure estimate, is that

8    correct?

9         A.    That is correct, yeah.

10        Q.    And you also provided a

11   time-weighted estimate of his exposure, is

12   that correct?

13        A.    Yes.

14        Q.    Is the methodology that you

15   used for the exposure assessment for

16   Mr. Richard Canning, is that the same as the

17   methodology that you described for

18   Mr. Nelson's exposure assessment?

19        A.    It is, yes.

20        Q.    Are there any differences

21   between the methodologies that you employed

22   for Mr. Richard Canning's exposure assessment

23   versus Mr. Gerald Nelson's?

24        A.    No, the methods and approach

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    were the same.  There were some differences

2    in, you know, the way they tended to report

3    their patterns of use, but the methods were

4    the same.

5         Q.    Dr. Herrick, for Mr. Richard

6    Canning's exposure assessment, you did not

7    quantitate a dose estimate, is that correct?

8         A.    That's correct, I didn't --

9               MR. BRICKER:  Form.

10              THE WITNESS:  -- quantitate

11       those.

12   BY MR. LEE:

13        Q.    Were you asked to provide a

14   quantitative dose estimate for Mr. Richard

15   Canning?

16        A.    No, I wasn't.

17        Q.    Do you recall our earlier

18   discussion of the ART method for inhalational

19   exposure?

20        A.    I do recall that, yes.

21        Q.    Were you asked to perform a

22   quantitative estimate of inhalational

23   exposure for Mr. Richard Canning using the

24   ART methodology?

1    A.    No, I wasn't asked to do that.

2    Q.    Based on your report marked as

3  Exhibit 12 -- I believe it's 12 -- what

4  employment was -- what part of his employment

5  history was the main exposure to Roundup?

6            MR. BRICKER:  Form.

7            THE WITNESS:  Well, mainly

8        it's, if we go back to that table in,

9        I guess it's page 2, that Scorton

10       Cranberry Company, East Sandwich,

11       Mass, that was his business.  That's

12       what he did as far as

13       cranberry-growing, and that's where he

14       applied the Roundup.

15  BY MR. LEE:

16   Q.    And he started the Scorton

17  Cranberry Company in 1984, is that correct?

18   A.    Yeah, that's what my -- I

19  recall from the deposition, I think it was,

20  or maybe it was the fact sheet, that he

21  bought 15 acres in 1984, and that's how he

22  got started.

23   Q.    To your knowledge, was

24  Mr. Richard Canning exposed to Roundup or

1    glyphosate products before 1984?

2         A.    Let me just check and see.  I

3    want to just verify what his residential use

4    was here.  Let me just see if I can call that

5    up quickly.

6              Let's see.  No, it looks to me

7    like the 1984 would be the start date both

8    for the cranberry operation and then also for

9    his residential use would be 1984.

10        Q.    And to your knowledge, that is

11   based on Mr. Richard Canning's recollection?

12        A.    Yeah, this is -- yes.

13        Q.    When did Mr. Richard Canning

14   last use Roundup, to your knowledge?

15        A.    As I recall, he was using it

16   through 2009.  I think he used it in 2009,

17   and it was at that point that he basically

18   got out of the cranberries.

19             MR. LEE:  Let me mark an

20        exhibit as Exhibit 13.

21             (Whereupon, Exhibit Herrick 13

22        was marked for identification.)

23        A.    Okay.

24             ///

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    BY MR. LEE:

2        Q.    Dr. Herrick, do you see this

3    document I've marked as Exhibit 13?  It has

4    Richard Canning and Shirley Canning vs.

5    Monsanto Company, and underneath that

6    Audiovisual Deposition of Richard Canning,

7    dated November 23rd, 2021.

8              Do you see that?

9        A.    I do.

10       Q.    Now, is this deposition

11   transcript something that you relied upon in

12   order to prepare Mr. Richard Canning's

13   exposure assessment marked as Exhibit 12?

14       A.    I'm just looking down.

15             Yep, yes.

16       Q.    And again, I'll represent to

17   you that this is an excerpt, just to make it

18   easier to use on this remote deposition

19   platform.

20             Can you go down to page 195?

21       A.    Okay.  I'm going down.

22             Okay.  I'm there.

23       Q.    And do you see that there is a

24   question on line 1, "So when you put down on

1    this affidavit 2009, you were just going

2    based on your memory, right?"

3                    And Mr. Canning answers,

4    "Yeah."

5                    And then there's a question on

6    line 5, "Because there are no documents that

7    show when you --"

8                    And then Mr. Canning responds,

9    "No, no, no, no."

10                   And then the questioning

11   resumes, "-- were using it, right?"

12                   And then Mr. Canning answers,

13   "There is not a concrete document.  It's a

14   conflict between my ears."

15                   Do you see that?  Did I read

16   that correctly?

17        A.    Yes, you did.  I see it.

18        Q.    And was it your understanding

19   that Mr. Canning didn't have any documents

20   showing -- documenting his Roundup use per se

21   in terms of when he was using it, but he was

22   relying on his memory, is that correct?

23                   MR. BRICKER:  Form.

24                   THE WITNESS:  Yeah, I'm just

```
 1          trying to remember.  I mean, in this

 2          discussion he, you know, basically

 3          said it was a ballpark estimate,

 4          something between his ears, but he

 5          didn't make reference to any written

 6          documentation here.

 7               And what I don't remember

 8          was -- you know, you remember there

 9          was some conversation around when

10          this -- when he got out of this

11          business, and it was because of the

12          bank collapse and that kind of thing,

13          so, you know, I do remember there was

14          a fair bit of discussion, but I don't

15          remember that he had, you know, like

16          written documentation about when he

17          stopped using Roundup.

18     BY MR. LEE:

19          Q.    Dr. Herrick, let's go back to

20     Exhibit 12, your report for Mr. Canning.

21          A.    Okay.  Let me just scroll back

22     here.

23               Okay.

24          Q.    And if you go to page 4 of your
```