1    report for Mr. Canning.

2          A.     Okay.  I'm there.

3          Q.     Now, in the paragraph on page 4

4    you mention a number of different methods

5    that Mr. Canning reportedly used to spray

6    Roundup.

7                 Do you see that?

8                 MR. BRICKER:  Form.

9                 THE WITNESS:  Yes, I do.

10   BY MR. LEE:

11         Q.     And in the second sentence of

12   your paragraph on page 4 of your report for

13   Mr. Canning, you write, "He used a sprayer

14   like the Tomahawk Pro Series 5 Gallon Gas

15   Power."

16                Do you see that?

17         A.     I do see that, yes.

18         Q.     When you prepared this report,

19   did you have an understanding of what kind of

20   sprayer the Tomahawk Pro Series 5 Gallon Gas

21   Power sprayer was?

22         A.     I'm trying to remember.  I

23   don't know if I tried to Google this.  I just

24   can't remember actually if I Googled, you

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    know, this to see if I could get a -- you

2    know, kind of get a visual image of what he

3    was using.  I don't remember.  I don't

4    remember it.

5         Q.    As you sit here in the

6    deposition today, are you able to describe

7    the Tomahawk Pro Series sprayer at all?

8         A.    I -- you know, I didn't

9    really -- I don't have a recollection of

10   finding, and truthfully I can't remember if

11   I, you know, tried to Google it and see.

12              I have a -- you know, I have

13   seen gas-powered 5-gallon backpack sprayers.

14   I can't generalize as to, you know, how

15   representative that would be of what the

16   Tomahawk looked like, I'm afraid.

17        Q.    So as you sit here today, you

18   have no specific recollection of reading a

19   description of the Tomahawk Pro Series 5

20   Gallon Gas Power sprayer, is that correct?

21        A.    That's correct.  I don't

22   remember -- if I found it, I don't remember

23   what it said about it.

24        Q.    In the next sentence you write

1    that Mr. Canning used, "a small hand pump

2    sprayer as well."

3              Do you see that?

4    A.        Right.  I do, yep.

5    Q.        Can you describe what you were

6    referring to by "small hand pump sprayer"?

7    A.        Yeah, because he talked about

8    it -- I don't have it in my footnote here,

9    but as I recall, you know, he was asked about

10   the different types of sprayers, and

11   sometimes when he was working in the ditches,

12   you know, he needed something that was

13   smaller and lighter that he could, you know,

14   hold in his -- just in one hand and spray

15   with the other, and so that was what he used

16   the little hand pump sprayer for.

17   Q.        Did you have an understanding

18   when you prepared this report of whether the

19   small hand pump sprayer provided spot

20   spraying or continuous spraying, or both?

21   A.        You know, he didn't -- again,

22   he didn't use the term "spot-spraying," if I

23   remember correctly.  But, you know, just

24   given the size of the little hand pump

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    sprayer, you know, it would be more likely

2    that he used that for more targeted spraying

3    rather than, you know, the more, sort of,

4    broadcast spraying like you would with the

5    Tomahawk power sprayer.  It's a different

6    sort of target area.

7         Q.    So if I understand you

8    correctly, the small hand pump sprayer may be

9    a shot of Roundup rather than a continuous

10   spray of Roundup?

11        A.    Yeah, you know, because I've

12   used these little sprayers myself, and so

13   you, you know, have a handle on the top, and

14   you pump it, you know, 20 times or something

15   and it pressurizes the tank, and so you've

16   got, you know, some period of time or number

17   of times you can spray before you have to

18   stop and pump it up again.

19             So, you know, it isn't really

20   designed for, you know, a wide area of

21   broadcast spraying.  It's more a matter of

22   spraying a particular targeted area.

23        Q.    If you go to page 5 of your

24   report for Mr. Canning, in the first sentence

1    you note, "When he used Roundup in the bog

2    itself, he applied it with a wiper"...

3              Do you see that?

4        A.     I do, yes.

5        Q.     And then you specify, "a Drift

6    Free Red Devil Weed Wiper."

7              Do you see that?

8        A.     I do, yes.

9        Q.     Are you able to describe what a

10   wiper applicator is, or sprayer?

11       A.     Yeah.  Well, this device, he

12   didn't -- maybe he did.

13             Some people refer to it as a

14   hockey stick, and some models do tend to look

15   like a hockey stick in the sense that they

16   have a handle.  And then the area that

17   corresponds to where the blade of the hockey

18   stick would be is kind of a sponge-type

19   device, and the solution that you're applying

20   is in the handle.  It's a hollow-tube handle.

21             And it flows down the handle,

22   it comes out through this sponge, and if

23   you're using it to kill weeds, you wipe the

24   foliage, you know, the leaves and the stems

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    of the weed with the sponge, and it deposits

2    whatever your agent, your chemical you're

3    trying to apply, is on the vegetation, so

4    that's how the wiping is done.

5           Q.    I see.

6                 So the wiper doesn't actually

7    spray Roundup, it saturates a sponge with

8    which you can then wipe it on a weed?

9           A.    That's a fair explanation, I

10   think, yeah.

11          Q.    Does the use of such a wiper

12   decrease the potential for inhalational

13   exposure?

14          A.    You know, I think --

15          Q.    With a sprayer.

16                MR. BRICKER:  Let me object to

17         form, and it's beyond the scope of his

18         designation.

19   BY MR. LEE:

20          Q.    You can answer, if you can.

21          A.    Okay.  Well, I've never really

22   seen any data that would directly, you know,

23   answer that question, but I think, you know,

24   it's certainly plausible that because the

1    wiper, you know, isn't generating spray like

2    a sprayer does, you could definitely have

3    less inhalation from the use of the wiper.

4        Q.    Now, you report that, in the

5    middle of that paragraph on page 5, "When he

6    sprayed, he did it for two or three hours at

7    a time."

8            Do you see that?

9        A.    I do see that, yeah.

10       Q.    Now, when you write "he did it

11   for two or three hours at a time," could you

12   clarify what you meant?  Did you mean that he

13   was continuously spraying Roundup for two or

14   three hours, or was it -- was he applying

15   Roundup intermittently during a two to

16   three-hour period?  Can you clarify that,

17   please?

18           MR. BRICKER:  Form.

19           THE WITNESS:  You know, maybe

20       we should -- you know, sitting here

21       looking at it, I mean, I did reference

22       the point in his deposition where he

23       made the statement.

24           Is that something we can take a

1          look at?  I mean, because, you know,

2          I'd like to give you a good answer,

3          but just sitting here, I'm not sure I

4          could, you know, parse it quite out

5          that way.  It's on page 102 of his

6          deposition.  Is that something we

7          have?

8     BY MR. LEE:

9          Q.     Let me -- I've marked an

10    Exhibit 14.

11         A.     Oh, okay.

12                (Whereupon, Exhibit Herrick 14

13         was marked for identification.)

14         A.     Yeah, because he may have

15    actually said -- you know, he may have

16    explained it a little bit differently.  Then

17    maybe we can answer that, because I don't --

18    BY MR. LEE:

19         Q.     So let me know when you can

20    open Exhibit 14, Dr. Herrick.

21         A.     Okay.  I'm on the way right

22    now.

23                Okay.  Where do I go?

24         Q.     Do you see -- again this is an

1    excerpt from Richard Canning's November 23rd,

2    2021 deposition transcript which you earlier

3    testified you relied upon, is that correct?

4          A.     That is, yeah.

5          Q.     Then if you go to page 102.

6          A.     Okay.  I'm scrolling down.

7    101.

8                 All right.  Yeah, okay.

9          Q.     Does this refresh your memory

10   of what Mr. Canning meant by two to three

11   hours?

12         A.     Yeah, I got the impression --

13   you know, I'm just looking at the sentence

14   here, you know, in line 18 and 19.  He said,

15   you know, "I make sure I spray for two or

16   three hours, and then I'd get bored and do

17   something else and then come back the next

18   day."

19                So I got the feeling from the

20   way he phrased this that that was two or

21   three hours of continuous spraying, and then

22   he'd get bored so he would go do something

23   else.

24         Q.     Dr. Herrick, did you make any

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    adjustments to any of your exposure estimates

2    for Mr. Canning for his use of a wiper versus

3    a sprayer?

4         A.    No, I didn't.

5         Q.    On page 5 of your report for

6    Mr. Canning, end of the first paragraph, you

7    write, "Overall, including spraying and

8    wiping with Roundup, Mr. Canning recalled

9    that he used Roundup five times per week for

10   10 weeks per year from 1984 to 2009."

11             Do you see that?

12        A.    Hang on.  I'm just -- page 5?

13        Q.    Yes.

14        A.    Yeah.

15        Q.    Did you have an understanding

16   of what percentage of his Roundup application

17   was spraying versus wiping?

18        A.    I don't.  You know, that's an

19   interesting question.  And he wasn't asked

20   that, so I don't have a good feel for that.

21        Q.    Did you submit any written

22   questions for Mr. Richard Canning in

23   preparing this exposure report for him?

24        A.    No, I didn't.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1       Q.      And then you provide a

2    description of basically his clothing and

3    personal protective equipment, is that

4    correct, in the second paragraph of page 5 of

5    your report?

6       A.      Right, that's correct.

7       Q.      Did the fact that Mr. Canning

8    wore jeans, not shorts, did that have the

9    potential to reduce his dermal exposure to

10   Roundup when he was applying Roundup?

11             MR. BRICKER:  Form.

12             THE WITNESS:  I think it could.

13        He definitely would have less skin

14        exposed when he was wearing the jeans,

15        so it potentially could.

16   BY MR. LEE:

17       Q.      And then you write that

18   Mr. Canning recalled "total body protection."

19             Do you see that?

20       A.      I do see that, yeah.

21       Q.      When you were preparing this

22   report for Mr. Canning, what was your

23   understanding of the term "total body

24   protection"?

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          A.      Well, I think in the context of

2     the way he was answering the question in

3     deposition, he was referring to the fact that

4     his -- you know, his arms and his legs, feet

5     were covered because he was wearing jeans and

6     a long-sleeved shirt.

7          Q.      Does wearing a long-sleeved

8     shirt also potentially reduce his dermal

9     exposure to Roundup?

10              MR. BRICKER:  Form.

11              THE WITNESS:  Yeah.  Again, you

12         have less skin, you know, available to

13         be directly in contact because it's

14         covered by the long-sleeved shirt.

15     BY MR. LEE:

16          Q.      Then you list work boots.  Can

17     work boots also reduce potentially the risk

18     of dermal exposure to Roundup?

19              MR. BRICKER:  Form.

20              THE WITNESS:  Yep, potentially

21         they can.

22     BY MR. LEE:

23          Q.      How about a hat, which you list

24     next?

1      A.      I think you could to some small

2    extent.  You know, the amount of surface

3    area, skin surface area, under a hat is, you

4    know, not large, but, you know, same argument

5    as before, you have less skin directly

6    exposed.

7      Q.      Next you list chemical-proof

8    gloves, which was based on Mr. Canning's

9    recollection.  When you were preparing this

10   report for Mr. Canning, did you have an

11   understanding of what was being referred to

12   by chemical-proof gloves?

13     A.      You know, he didn't elaborate

14   on that.  But I think I maybe should have put

15   this in, that those were the gloves that they

16   sold through the Morse company.  You know,

17   through his business, they sold protective

18   gloves, and so those were the gloves he used.

19             But he didn't specify what they

20   were actually made of or anything.

21     Q.      Have you personally seen

22   anything referred to as chemical-proof

23   gloves?

24             MR. BRICKER:  Form.

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
1                THE WITNESS:  I'm sorry, I
2        don't think I quite followed the
3        question.  Have I -- you mean in the
4        context of this case or in general?
5    BY MR. LEE:
6        Q.     In general.  Have you ever
7    heard of chemical-proof gloves?
8        A.     I have, yes.
9        Q.     And what is your understanding
10   of what chemical-proof gloves are, just based
11   on your personal experience?
12               MR. BRICKER:  Form, and beyond
13       the scope of his designation.
14               THE WITNESS:  Okay.
15   BY MR. LEE:
16       Q.     If have you an understanding.
17       A.     Yeah, it's -- you know, so it's
18   kind of a catchall characterization of
19   gloves, you know, that are intended to
20   restrict the penetration of some particular
21   chemical.
22               And usually the -- to get a
23   little further on it, you know, it's the kind
24   of information that manufacturers frequently
```

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    supply on the safety data sheets.  You know,

2    they'll have a recommended type of glove for

3    the product that they're selling.

4              So that's how I would

5    characterize chemical-proof gloves.

6         Q.    Do you know what the material

7    such chemical-proof gloves may typically be

8    made of?

9         A.    Well, you know, it would

10   depend --

11             MR. BRICKER:  Objection.

12             Bob, hold on.

13             Form and beyond the scope.

14             Go ahead.

15             THE WITNESS:  Sure.

16             Well, you know, again, it would

17        depend on the nature of what you're

18        trying to protect against.  And if you

19        have something that, say, is an

20        oil-based material, the recommendation

21        for a type of glove, you know, would

22        be very different from something

23        that's, let's just say, a water-based

24        material.

1          So not to try to, you know, be

2      evasive about it, but, you know, you

3      have to sort of have a good

4      understanding of what you're trying to

5      protect against before you can make

6      the decision about what the right

7      glove material is.

8  BY MR. LEE:

9      Q.     In your next sentence you

10  record his recollection that he would take a

11  shower at the end of the day, or if he quit

12  earlier he would wash his hands and face and

13  neck and ears and arms.  Is that correct?

14      A.     That's what he said, yep.  I

15  remember that.

16      Q.     And with Roundup being a

17  water-based product, would taking a shower or

18  washing his body as he recalled, would that

19  have at least reduced the amount of dermal

20  exposure or dermal contact time?

21          MR. BRICKER:  Form.

22          THE WITNESS:  Yeah.  Again, I

23      haven't really, you know, looked at it

24      specifically for Roundup, you know,

1          and as we said earlier, you know,

2          Roundup can be a mixture of several

3          ingredients, and so washing like you

4          would conventionally in a shower with

5          water and soap, you know, I don't feel

6          like I could make a good judgment of

7          how well that type of washing

8          procedure would influence or affect

9          the different ingredients that are in

10         Roundup.

11    BY MR. LEE:

12         Q.     Did you take -- when you were

13    preparing your exposure estimates for

14    Mr. Richard Canning, did you take into

15    account the protective -- the personal

16    protective equipment or clothing that he

17    described?  Did you take that into account?

18         A.     No, I didn't.

19         Q.     And you made no adjustments to

20    your quantitative estimates -- I'm sorry,

21    your numerical estimates based on his

22    personal protective equipment, is that

23    correct?

24         A.     That is correct, right.

1    Q.    Did you make any adjustments to

2    your exposure estimates for Mr. Richard

3    Canning based on the fact that he would take

4    a shower or wash his hands after applying

5    Roundup?  Did you take that into account?

6    A.    No, I didn't.

7         MR. LEE:  Can we take a five or

8    ten-minute break?

9         THE WITNESS:  Sure.

10        MR. BRICKER:  Sure.  Whatever

11    you need.

12        MR. LEE:  Let's do a ten-minute

13    break.

14        THE VIDEOGRAPHER:  We're off

15    the record at 2:56 p.m.

16        (Whereupon, a recess was

17    taken.)

18        THE VIDEOGRAPHER:  We're back

19    on the record at 3:07 p.m.

20    BY MR. LEE:

21    Q.    Dr. Herrick, I'd like you to

22    take a look at page 5 of your report marked

23    as Exhibit 12.

24    A.    Okay.  Let me just get into

1    that.

2              Okay.  Page 5?

3         Q.     Yes.

4         A.     Okay.  I'm there.

5         Q.     Now, on page 5, do you see the

6    section of your report with the header

7    Residential Use of Roundup and Related

8    Products?

9         A.     I do.

10        Q.     I believe you testified earlier

11   that he began his residential use in 1984.

12   Is that correct?

13        A.     That's what I recall, yes.

14        Q.     And he ended his residential

15   use in 2009, is that correct?

16        A.     That's what he said, yes.

17        Q.     And this is confirmed by the

18   chart on the sixth page of your report, isn't

19   that correct?

20        A.     Let's go down here.

21              Uh-huh, yes.

22        Q.     Now, if you -- and in both that

23   chart on page 6 and in your text on page 5,

24   you mention that Mr. Canning used a "hand

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    sprayer" in applying Roundup for his

2    residential use, is that correct?

3        A.    That is, yes.

4        Q.    When you were preparing your

5    exposure assessment for Mr. Canning, what was

6    your understanding of the hand sprayer that

7    was used by Mr. Canning?

8        A.    I'd have to go back to the --

9    you know, his deposition here on page 183.

10   It was either one of the little Windex bottle

11   type sprayers, or it was one of the hand

12   pump, you know, with the little handle on top

13   that you pump up and pressurize and then

14   spray it out through a little nozzle.

15            You know, I'd have to go --

16   just sitting here right now, I don't remember

17   if he even said exactly which type of hand

18   sprayer he was using.

19            MR. LEE:  I've marked an

20        exhibit as 15.

21            (Whereupon, Exhibit Herrick 15

22        was marked for identification.)

23   BY MR. LEE:

24        Q.    Well, before we go there, in

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    your report you state -- report his

2    recollection that each time he sprayed it

3    took about one hour.  This is page 5 of your

4    report for Mr. Canning.

5         A.    Right, that's what he said.

6         Q.    Now, did you have an

7    understanding about whether it was spot

8    spraying or continuous spraying over an hour

9    at his residence?

10             MR. BRICKER:  Form.

11             THE WITNESS:  I think my

12        impression is that he was using this

13        on the driveway and so -- again, he

14        didn't use the word "spot spraying,"

15        but it would have been more of the

16        sort of targeted, you know, focused

17        spraying on weeds as opposed to, you

18        know, broad spraying across a larger

19        area.

20             So that would be how -- that's

21        how I understood what he was

22        describing.

23    BY MR. LEE:

24        Q.    Let me -- I've marked an

```
 1    exhibit as Exhibit 15, Dr. Herrick.

 2         A.     Okay.

 3         Q.     Let me know when you're able to

 4    open it.

 5         A.     Okay.  It will just be a sec.

 6                Okay, I'm in.

 7         Q.     As you can see, this is again

 8    another excerpt from Richard Canning's

 9    November 23rd, 2021 deposition transcript.

10                Do you see that?

11         A.     I do, yes.

12         Q.     And again, I represent that an

13    excerpt is being used just to make it easier

14    to load and view on this remote deposition

15    platform.

16                If you can go to page 183.

17         A.     Oops.  Hang on.  I just rolled

18    right past it.

19                Okay.  I'm here.

20         Q.     And can you see where he starts

21    describing applying Roundup to his residence

22    primarily along the driveway?  Do you see

23    that?  He mentions that, for example, in line

24    8.
```

Robert F. Herrick, MS, ScD, CIH, FAIHA

1        A.      I do see that, yes.

2        Q.      And do you see -- if you go to

3    page 184 -- well, I'm sorry, 183, line 23, do

4    you see where the questioner asks how long

5    the driveway was?

6        A.      I do see that, yeah.

7        Q.      And on the next page, on line

8    1, Mr. Canning responds, ..."a few hundred

9    feet."

10       A.      Right, I see that.

11       Q.      And then on page 184, line 24,

12   do you see where the Roundup is described as,

13   ..."the product had already been mixed in the

14   sprayer when you brought it home, right?"

15               And then he answers, "Yes."

16               Do you see that?

17       A.      I do see that, yes.

18       Q.      So was it your understanding

19   that Mr. Canning used premixed Roundup when

20   he was using it at his residence?

21       A.      That's the impression I get

22   from the way he described this, yes.

23       Q.      And based on your earlier

24   testimony, you stated that using premixed

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Roundup could potentially reduce both dermal

2    and inhalational exposure, is that correct?

3         A.    I think I remember saying, you

4    know, when we talked about this that it, you

5    know, could certainly reduce the dermal

6    exposure because you're not, you know,

7    pouring things from one container to the

8    other.

9              I wouldn't be quite so sure

10   that it had much effect on the inhalation

11   exposure, because you're still spraying it.

12        Q.    And then if you go to page 186,

13   line 18.

14        A.    Okay.  I'm rolling down.

15              Yep, I have it.

16        Q.    And there's a question, "Were

17   you spot spraying the driveway or were you

18   broadcast spraying the driveway?"

19              Do you see that?

20        A.    I do see that, yes.

21        Q.    Did you have an understanding

22   of the term "broadcast spraying" when you

23   were preparing Mr. Canning's report?

24        A.    I do have an understanding of

1    that, yeah.

2        Q.    And what was your understanding

3    of broadcast spraying when you were preparing

4    this report for Mr. Canning?

5        A.    Well, it would be, you know,

6    more -- I don't think Canning really did

7    this, but in some of these reports I've

8    looked at where people were -- for the

9    landscapers, for example, when they were

10   using the backpack sprayer, you know, they

11   would spray, let's say, like all of a flower

12   bed, you know, or the entire length of a

13   stone wall, or something like that, and that

14   was what was termed "broadcast spraying."

15            Whereas in the case like this,

16   in the crushed stone in the driveway, he was

17   spraying them -- spraying the weeds directly

18   when he spotted them, as he could see them,

19   as opposed to, you know, spraying it more

20   generally.

21       Q.    Okay.  And that appears --

22   would you agree that that appears to be

23   confirmed by his response in line 20 on

24   page 186 of this Exhibit 15 --

```
1                    MR. BRICKER:  Form.
2       BY MR. LEE:
3            Q.      -- when Mr. Canning stated,
4       "No, I didn't want to waste it"?
5                    MR. BRICKER:  Form.
6       BY MR. LEE:
7            Q.      You can answer.
8            A.      Oh, yeah.  He said, you know,
9       if he got into an area, he just "boom, boom,"
10      shoots it.
11                   So, you know, that, I guess,
12      would, you know, be consistent with the
13      question when he was asked about spot
14      spraying versus broadcast spraying, he was
15      clearly describing a spot spraying where he
16      just shoots the weeds.
17           Q.      And compared to broadcast
18      spraying, spot spraying in general reduces
19      the potential for dermal exposure, isn't that
20      correct?
21                   MR. BRICKER:  Form.
22                   THE WITNESS:  Let me think
23           about that for a second.  I don't know
24           if I could -- anyway, it would be a
```

Robert F. Herrick, MS, ScD, CIH, PAIHA

1          little hard to generalize about the

2          dermal exposure.  I don't know if I've

3          ever really seen any data that

4          would -- I don't think I can come up

5          with a good answer for that.  I don't

6          think I've ever really seen any data

7          one way or the other.

8     BY MR. LEE:

9          Q.     When you were preparing

10    Mr. Canning's exposure estimates, did you

11    take into account spot spraying versus

12    continuous spraying?

13         A.     No, I didn't.

14         Q.     Now, as you may recall, in your

15    report you noted that each time at his

16    residence he was spraying for about "one

17    hour."  Based on what you see in Exhibit 15,

18    the deposition transcript, is it reasonable

19    to say that Mr. Canning was not continuously

20    spraying Roundup for one hour but, rather,

21    spot spraying Roundup during a one-hour

22    period?

23         A.     I think that's probably fair.

24    He didn't really describe his spraying

Robert F. Herrick, MS, ScD, CIH, PAIHA

1    activities as being a continuous thing.  It

2    was more a matter of him, you know, going up

3    and down or across the driveway, and when he

4    spotted a weed, he sprayed it.

5         Q.    Dr. Herrick, let's go back to

6    Exhibit 12, your report for Mr. Canning.

7         A.    Okay.  Let me get -- need to

8    find it here.

9              Okay.  Okay.  I'm there.

10        Q.    Now, if you'd go to page 9 of

11   your report for Mr. Canning.

12        A.    Okay.

13        Q.    You see where you write in the

14   second -- end of the second paragraph, "He

15   recalled using the following products in his

16   cranberry growing business"?

17             Do you see that?

18        A.    Yes, I do.

19        Q.    And you have a list of, it

20   appears to be, eight different chemicals, I

21   believe, is that correct?

22        A.    Let me just real quick -- one,

23   two, three, four, five, six, seven -- yes,

24   eight.

1      Q.      Dr. Herrick, did you -- did

2  you -- were you asked to -- well, let me

3  rephrase this.

4              Did you estimate exposures for

5  any of those eight chemicals listed in the

6  chart on page 9?

7      A.      No, I didn't.

8      Q.      Were you asked to provide

9  exposure estimates for any of the eight

10  chemicals in the chart on page 9?

11     A.      No, I wasn't asked to do that.

12     Q.      Dr. Herrick, is it reasonable

13  to state that you didn't adjust or account

14  for any of these chemicals when you were

15  providing the Roundup exposure assessments

16  for Mr. Canning?  Is that correct?

17             MR. BRICKER:  Form.

18             THE WITNESS:  Yes, that is

19        correct.

20  BY MR. LEE:

21     Q.      Dr. Herrick, are you familiar

22  with the term "observer bias"?

23     A.      I am.

24     Q.      What is your understanding of

1    observer bias?

2              MR. BRICKER:  Form, and outside

3         the scope.

4    BY MR. LEE:

5         Q.    If you know.

6         A.    I do, sure.

7              I'll give you a -- sort of a

8    non-epidemiologist view of it is that if some

9    observation is being made, whether it's

10   looking at some kind of work practice or

11   maybe in a more clinical setting looking at

12   some medical condition, if the person who is

13   making that observation, you know, has some

14   knowledge of some factor that may be

15   associated with the event or the condition or

16   the exposure that they're looking at, you

17   know, the concern is always that that

18   knowledge could influence the nature of the

19   observation that the person is making.

20        Q.    Dr. Herrick, did you perform

21   any research on whether any of the eight

22   chemicals listed in the chart on page 9 could

23   potentially cause cancer?

24              MR. BRICKER:  Form, and beyond

1          the scope of his designation in this

2          matter.

3    BY MR. LEE:

4          Q.     You can answer, Dr. Herrick.

5          A.     Sure.

6                 No.  I didn't dig into that for

7    any of these chemicals, no.

8          Q.     So you didn't investigate

9    whether any of the eight chemicals in the

10   chart on page 9 could cause more specifically

11   the B-cell lymphoma that Mr. Canning was

12   diagnosed with?

13         A.     Correct.  I didn't look into

14   that at all.

15         Q.     Based on your understanding of

16   observer bias, could the lack of exposure

17   estimates for these eight chemicals, could

18   that potentially be considered evidence of

19   observer bias?

20                MR. BRICKER:  Form, and exceeds

21         the scope of his designation.

22   BY MR. LEE:

23         Q.     If you know.

24         A.     Could you -- actually, I'd like

1    to give you a good answer if I can, but could

2    you repeat the question?

3              MR. LEE:  Madam Court Reporter,

4         can you repeat the question, please?

5              (Whereupon, the reporter read

6         back the following:

7              "QUESTION:  Based on your

8         understanding of observer bias, could

9         the lack of exposure estimates for

10        these eight chemicals, could that

11        potentially be considered evidence of

12        observer bias?")

13   A.     I don't see how it could,

14   really.  You know, if someone were -- if

15   there were biased in someone's observation of

16   Mr. Canning's medical condition, let's say,

17   not knowing anything more about these

18   chemicals than the fact that they were

19   present and he used them, I have a hard time

20   imagining how that could introduce, you know,

21   any sort of substantial bias.

22   BY MR. LEE:

23   Q.     When you were preparing the

24   exposure estimates for Mr. Richard Canning,

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    did you make any adjustments for the

2    possibility of observer bias?

3              MR. BRICKER:  Same objection.

4              THE WITNESS:  No, I didn't.

5    BY MR. LEE:

6         Q.    On page 9, Dr. Herrick, you

7    also describe some of this -- Mr. Canning's

8    employment outside his cranberry business.

9              Do you see that?

10        A.    Yeah, right, I do, mm-hmm.

11        Q.    Now, one job was delivering

12   milk for Whiting's Milk.

13             Do you see that?

14        A.    Yes, I do.

15        Q.    To your knowledge, was there --

16   did Mr. Canning have any exposure to

17   glyphosate or Roundup in that job for

18   Whiting's Milk?

19        A.    I don't have any indication

20   that he was exposed to glyphosate, no.

21        Q.    Then you describe Mr. Canning's

22   employment for a company that was a "grain

23   business delivering grain, animal feed and

24   selling it."

Robert F. Herrick, MS, ScD, CIH, FAIHA

1              Do you see that?

2         A.    I do.

3         Q.    To your knowledge, do you have

4    any evidence that Mr. Canning was exposed to

5    glyphosate or Roundup in that job?

6         A.    No, I have no indication that

7    he was exposed.

8         Q.    And then Mr. Canning, as you

9    state in your report, was "a county agent for

10   the State of New York for about six months."

11             Do you see that?

12        A.    I do, yes.

13        Q.    To your knowledge, did

14   Mr. Canning have any exposure to Roundup or a

15   glyphosate product in that job?

16        A.    No.  He mentions, you know, and

17   I said this a couple sentences later, that

18   they -- he was involved in selling

19   herbicides, but he didn't use them or mix

20   them, and they were in sealed containers.  So

21   I don't really see that as being a likely

22   exposure source.

23        Q.    And then he -- Mr. Canning

24   managed a beef farm for about six months.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1              Do you see that?

2       A.     I do, right.

3       Q.     And then you note, "He did not

4    use any herbicides as part of that work."

5              Do you see that?

6       A.     Yeah.  I believe that that's

7    pretty much exactly what he said in his

8    deposition.

9       Q.     To your knowledge, did

10   Mr. Canning have any exposure to Roundup or

11   glyphosate products in that job?

12      A.     I don't believe that he did,

13   no.

14      Q.     Then you mention a job for a

15   cranberry production company, A.D. Makepeace

16   Company.

17             Do you see that?

18      A.     I do, yes.

19      Q.     And then you note in the next

20   sentence, "He did not use any herbicides in

21   this position."

22             Do you see that?

23      A.     I do, yes.

24      Q.     To your knowledge, did

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Mr. Canning have any exposure to Roundup or

2    any glyphosate product in that job for A.D.

3    Makepeace Company?

4         A.    I don't believe he did.  It was

5    something he mentioned in the deposition that

6    he didn't have any exposure in that position.

7         Q.    And then I think we already

8    discussed his job for R.F. Morse, is that

9    correct?

10        A.    Right.

11        Q.    Mr. Canning sold farm chemicals

12   and equipment, but I think you report his

13   recollection that he sold herbicides in

14   sealed containers but did not handle them, is

15   that correct?

16        A.    Right.  That's what he said.

17        Q.    So to your knowledge,

18   Mr. Canning had no exposure to glyphosate or

19   Roundup when working for R.F. Morse, correct?

20        A.    That is correct, yes.

21        Q.    What about Mr. Canning's work

22   for Canning Service Center?

23              Do you see that?

24        A.    I do see that, yeah.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Q.    And then you write in the last

2    sentence of your report, "Mr. Canning did not

3    report using any chemicals at the Canning

4    Service Center."

5          Do you see that?

6    A.    I do, yes.

7    Q.    To your knowledge, did

8    Mr. Canning have any exposure to Roundup or

9    glyphosate products at Canning Service Center

10   specifically?

11   A.    I don't have any indication

12   that he did, no.

13   Q.    Dr. Herrick, can you direct me

14   to where you provided the time-weighted

15   estimates for exposure for Mr. Canning in

16   your report?  Is that on page 7?

17   A.    Let me just go back quickly

18   here.  We'll see if I can find my table.

19        Right.  I'm on page 7.  It's

20   that table near the bottom.

21   Q.    Yes.

22   A.    That's it.

23   Q.    So that's the time-weighted

24   estimates?

1    A.    Right.

2    Q.    So looks like for residential,

3  you have just one number, 6.5 days with a

4  midpoint exposure days for residential, is

5  that correct?

6    A.    Yeah, you know, this was one of

7  those where, you know, when he answered the

8  question, he was very -- you know, he didn't

9  put a range on it.  He just said, you know,

10  two days per season, one hour per day, so I

11  didn't try to put a border around that.  I

12  just used that value that he reported.

13    Q.    Dr. Herrick, do you recall our

14  discussion that Mr. Canning wasn't really

15  spraying continuously for one hour a day?  Do

16  you recall that?  In terms of residential

17  use, do you recall that?

18    A.    I do, yes.

19    Q.    Did you make any -- you list

20  Hours Used per Day there as 1.0.

21    Do you see that?

22    A.    I do, right.

23    Q.    Did you make any -- well, let

24  me rephrase it.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1              Dr. Herrick, you did not make
2    any adjustments for the fact that Mr. Canning
3    was spot spraying in his residential use
4    versus continuously spraying, isn't that
5    correct?
6              MR. BRICKER:  Form.
7              THE WITNESS:  Yeah, I didn't
8         really, you know, have any real detail
9         as to within that one hour per day
10        that he was out there spraying the
11        driveway, you know, what portion of
12        that time he actually had his hand on
13        the trigger actively, you know,
14        generating spray as opposed to the
15        amount of time he was spending walking
16        between -- you know, from one weed to
17        the other or one side of the driveway
18        to the other.  I didn't really have
19        that sort of detail to come up with a
20        more refined number here.
21   BY MR. LEE:
22        Q.    Would it be reasonable to infer
23   that because Mr. Canning was spot spraying
24   during that one-hour period that the actual

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    hours used per day was less than 1.0?  Isn't

2    that reasonable?

3              A.    I think you could --

4                    MR. BRICKER:  Just let me

5          object to form.  It's argumentative.

6    BY MR. LEE:

7              Q.    You can answer.

8              A.    Sure.

9                    Well, I think that's the kind

10   of thing, you know, there could be more

11   information, you know, that Canning could

12   provide that would let -- you know, let me

13   refine that estimate a little bit, yeah.

14             Q.    But you didn't use deposition

15   testimony that he was spot spraying on his

16   residence to adjust that 1.0 hours used per

17   day?  You didn't make that adjustment,

18   correct?

19             A.    No, I didn't.

20                   MR. BRICKER:  Form.

21                   THE WITNESS:  I didn't adjust

22         it.

23   BY MR. LEE:

24             Q.    So based on the fact that

1    Mr. Canning wasn't continuously spraying for

2    1.0 hours per day on his residence, that

3    midpoint exposure estimate of 6.5 days is an

4    overestimate, isn't that reasonable to

5    surmise?

6              MR. BRICKER:  Form.  It's

7         argumentative.

8              THE WITNESS:  Yeah, I would --

9         again, I'd have to go back to using

10        the information that Canning provided,

11        so I don't really have a way to

12        quantify how he was spending his time,

13        you know, within that one-hour period

14        per day.

15             So I can't really, you know,

16        come up with a different calculation

17        than what's here.

18   BY MR. LEE:

19        Q.    But you do agree that his

20   actual spraying time on his residence was

21   actually less than 1.0 hours per day,

22   correct?

23        A.    Well, I --

24             MR. BRICKER:  Foundation,

1          argumentative.

2                    THE WITNESS:  I would say it

3          could be, but I can't really quantify

4          how much less than an hour it would

5          be.

6     BY MR. LEE:

7          Q.    And I believe you testified the

8     reason that you don't have a minimum and

9     maximum time-weighted estimate for his

10    residential use is because he was -- you only

11    provided that 1.0 number, is that correct?

12         A.    Yeah.  I mean, that was, you

13    know, the way he answered the question in his

14    deposition.  That's where it came from.

15         Q.    Then you make a -- then you

16    provide minimum, maximum, and midpoint

17    time-weighted exposure estimates for his

18    commercial application of Roundup right below

19    that, isn't that correct?

20         A.    That is correct, yeah.

21         Q.    So the minimum is 162.5 days

22    and the maximum is 650 days, is that correct?

23         A.    That is correct, yeah.

24         Q.    And the midpoint time-weighted

1    number of exposure days is 325, is that

2    correct?

3        A.    That is correct, yeah.

4        Q.    On page 8, if you can go there,

5    of your report marked as Exhibit 12.

6        A.    Okay.

7        Q.    You provide midpoint

8    non-time-weighted exposure days estimates.

9              Do you see that?

10        A.    This is -- yes, I do.

11        Q.    But you don't provide a

12    maximum/minimum there for non-time-weighted

13    lifetime exposure, is that correct?

14        A.    That is correct, yeah.

15        Q.    Can you explain again why you

16    didn't provide a minimum and maximum on

17    the -- for the chart on page 8?

18        A.    Oh, yeah.  It kind of goes back

19    to what ingredients you use to do this

20    calculation.  And so in this case, you know,

21    the only variables that you have are the

22    number of seasons, which for him is 26, and

23    then the number of days that he used per

24    season, without regard to the duration.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1              Remember, in the

2      non-time-weighted calculation, duration

3      doesn't come in, it's not a factor, so the

4      numbers would be -- for his residential, he

5      used it two days per season, 26 seasons.  For

6      the commercial, 50 days per season, 26

7      seasons again.

8              So that's where -- and those

9      were the only two numbers, you know, he

10     provided.  Unlike -- who were we just talking

11     about earlier -- Nelson, Canning didn't

12     necessarily provide the same kind of range

13     around his numbers, so that's why you just

14     see the one value there.

15         Q.    Now, Mr. Canning provided just

16     one number instead of a range, but that was

17     completely based on his recollection,

18     correct?

19         A.    I believe that's true.  I

20     think, you know, my recollection was that

21     he -- you know, he didn't provide written

22     records or anything like that.  This was

23     based on his recollection.

24         Q.    And if you consider together

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    the time-weighted and non-time-weighted

2    exposure days estimates for his residential

3    use, that ranges from his time-weighted

4    estimate of 6.5 days to his non-time-weighted

5    exposure estimate of 52 days, is that

6    correct?

7          A.     That is right, yes.

8          Q.     And again, if you consider his

9    time-weighted exposure estimate with his

10   non-time-weighted exposure estimate for his

11   commercial use of Roundup for his cranberry

12   business, that ranges from a minimum exposure

13   of 162.5 days to 1,300 days, is that correct?

14         A.     That is correct, yes.

15         Q.     Dr. Herrick, on page 7 of your

16   report, you describe the time-weighted

17   estimate of lifetime exposure as

18   "conservative."

19                Do you see that?

20         A.     Let me get -- where are we

21   here?

22         Q.     Sorry.  Page 7, the second

23   paragraph, last sentence.

24         A.     Yeah, I do see it.

1    Q.    And so can you summarize for us

2    why you're calling the time-weighted estimate

3    of lifetime exposure as "conservative"?

4    A.    Well, it's making an effort to

5    adjust this estimate based upon what we know

6    about the actual duration of exposure each

7    day, and then so that is why I would consider

8    that to be a more conservative approach than

9    just counting up the number of days, which is

10   what you do in the non-time-weighted

11   approach.

12   Q.    Let's move on from Exhibit 12,

13   Dr. Herrick, and let me -- I'm sorry, let's

14   go back to Exhibit 12.  If we can go to the

15   last page of Exhibit 12.

16   A.    Okay.

17   Q.    Dr. Herrick, do you see the

18   last page of Exhibit 12 there is a header

19   Deposition and Testimony in the Past Five

20   Years?

21        Do you see that?

22   A.    Oh, we're not in my report

23   anymore, are we?

24   Q.    We are, I think.

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
 1          A.     Really?

 2          Q.     Yeah.  If you go to -- we're

 3     not in your report, but I -- well, let me

 4     see.

 5                  MR. BRICKER:  It's --

 6                  [Zoom interference]

 7                  MR. BRICKER:  -- the report.

 8                  MR. LEE:  It's a different copy

 9          of your report, I think, yeah.

10     BY MR. LEE:

11          Q.     Okay.  Let me give you another

12     exhibit then.

13          A.     Okay.

14          Q.     Same information in a different

15     exhibit.

16          A.     Okay.

17                  MR. LEE:  Let me introduce an

18          exhibit that I'll mark as Exhibit 16.

19                  (Whereupon, Exhibit Herrick 16

20          was marked for identification.)

21          A.     I'm looking.

22                  Okay, I'm there.

23     BY MR. LEE:

24          Q.     And, Dr. Herrick, do you see
```

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    this document with the header Depositions and

2    testimony in the past 5 years?

3              Do you see that?

4    A.    I do see that, yeah.

5    Q.    And it looks like the last

6    entry is from 2022 in the Cotter matter.

7              Do you see that?

8    A.    Yeah, I do.

9    Q.    Now, to your knowledge as you

10   sit here, are there any errors --

11              MR. BRICKER:  Hold on, hold on.

12              MR. LEE:  Go ahead.

13              MR. BRICKER:  Can I have the

14        last question read back, please?

15              (Whereupon, the reporter read

16        back the following:

17              "QUESTION:  And it looks like

18        the last entry is from 2022 in the

19        Cotter matter.  Do you see that?")

20              MR. BRICKER:  Okay.  I

21        misunderstood.

22   BY MR. LEE:

23   Q.    Dr. Herrick, to your knowledge,

24   is this an accurate list of your depositions

1   and testimony in the past five years?

2       A.     Yeah.  Let me just scan down

3   here.  I think this covers it.  I must have

4   put this together.  Oh, gosh, let's see,

5   depositions -- yeah, I believe it is

6   accurate.

7       Q.     And I believe you testified

8   earlier that you haven't had any additional

9   depositions since the Cotter deposition, is

10  that correct?

11      A.     It is, yeah.

12      Q.     Dr. Herrick, do you recall when

13  you were first retained as an expert

14  witness -- I'm sorry, retained and disclosed

15  as an expert witness in the Monsanto

16  litigation?  I'm talking about both PCB and

17  Roundup-related litigation.

18      A.     Gee, let's see.  PCB, it was

19  more than five years ago.  It was a case that

20  was brought -- the firm was Kennedy &

21  Madonna.  Oh, gee.  I'm a little bit blank on

22  exactly the year, though.  I mean, it was a

23  long time ago.  It could have been 15 years

24  ago.  No.  It's more.  It's in my -- I'm

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
 1    sorry, go ahead.
 2         Q.    My apologies, Dr. Herrick.
 3               I've marked as an exhibit
 4    Exhibit 17.  Do you want to take a look at
 5    that?
 6               (Whereupon, Exhibit Herrick 17
 7         was marked for identification.)
 8         A.    Oh, sure.  Hang on.  Let me get
 9    into the -- yeah.  This is the Lexington PCB
10    case?
11    BY MR. LEE:
12         Q.    Well, you can tell me,
13    Dr. Herrick.  Were you a disclosed expert
14    witness in this Town of Lexington vs.
15    Pharmacia Corporation and Monsanto Company
16    case?
17               MR. BRICKER:  Form.
18               THE WITNESS:  Well, you know,
19         this is clearly the deposition, and
20         I'm pretty sure I wrote a report on
21         this one.
22               You know, I actually don't
23         remember.  You know, I really don't
24         remember if I was considered a
```

1    disclosed witness or not.

2    BY MR. LEE:

3         Q.    Well, you're right, you were

4    deposed in this, so I suspect that you were

5    disclosed as an expert witness.  Is that

6    reasonable to say?

7         A.    Yeah, I guess so.  I mean, you

8    guys know this better than I do if that is

9    the designation they would have given me.

10   You know, because I wrote a report and had

11   this deposition, you know, so that is

12   definitely true.

13        Q.    Are you able to tell me whether

14   you performed any disclosed expert witness

15   work in any Monsanto-related litigation

16   earlier than 2014, the date of -- the year of

17   this deposition, if you can recall?

18        A.    Well, yeah, I think that case

19   that I referred to with Kennedy & Madonna, I

20   think that predates the Lexington case.  You

21   know, it would have been before 2014.

22             I'm just -- you know, I don't

23   remember even exactly what the -- I mean, it

24   was a school, but I can't remember what the

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    school was.

2                   What I do remember was that,

3    you know, the case was thrown out, and it --

4    from what they told me, it had something to

5    do with the statute of limitations.

6         Q.    Is it reasonable to say that

7    you've been serving as an expert witness

8    against Monsanto Company for over a decade?

9         A.    Well, I think that's probably

10   true, yeah.

11        Q.    Dr. Herrick, let me introduce

12   another exhibit, which I have marked as

13   Exhibit 18.

14                   (Whereupon, Exhibit Herrick 18

15        was marked for identification.)

16        A.    Yeah, I'm here.  Okay.

17   BY MR. LEE:

18        Q.    Now, I'll represent to you,

19   Dr. Herrick, that this is an excerpt from

20   your September 6, 2022 deposition in the

21   Cotter matter.

22                   Do you see that?

23        A.    I do, yeah.  Yes.

24        Q.    And if you go to page 21 of

1   this excerpt.

2        A.     I'm scrolling down.  Hang on.

3   22?

4        Q.     Yes.

5        A.     Okay.  Hang on.

6               21, yes, I'm there.

7        Q.     And if you go to line 16, there

8   is a question that you were asked during the

9   Cotter case deposition where the questioner

10  asked, "And for the other cases you've

11  prepared reports on, is it typical to bill

12  approximately $15,000 preparing your report

13  in one of these cases?"

14              And then you answered, "I think

15  that's probably fair."

16              Do you see that?

17       A.     I do see that, yep.

18       Q.     Is that $15,000 estimate also

19  fair for each of your reports that we've

20  discussed today for Mr. Nelson and

21  Mr. Canning?

22       A.     Yeah.  You know, I haven't

23  really tried to tally it up that way, but,

24  you know, I think as rough estimates go, you

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    know, that's probably reasonable.

2         Q.    So is a reasonable rough

3    estimate, the typical bill for these two

4    reports today that we discussed is $30,000,

5    is that correct?

6         A.    I think so.  I haven't really,

7    you know, gone back.  I could go dig out the

8    time sheets and see.  I haven't really

9    tallied it up, but I wouldn't think that

10   that's an unreasonable estimate, no.

11             MR. LEE:  Counsel, were you

12        able to send me the invoices that we

13        discussed earlier in this deposition?

14             MR. BRICKER:  No.  I could, but

15        I --

16             MR. LEE:  If you could.

17             MR. BRICKER:  What's your

18        e-mail address?

19             MR. LEE:

20        jae.lee@nelsonmullins.com.

21   BY MR. LEE:

22        Q.    While we wait for that,

23   Dr. Herrick, can you estimate for me or tell

24   me how many expert reports you have prepared

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    in litigation against Monsanto Company?

2         A.    Well, let's go back to that

3    list.  Is this it?  Here we go.  On this

4    deposition, you know, the last five years, so

5    of these, there was Hartford, that's one.

6    Let's see.  This one in King County, that's

7    two.  In Roundup, there's Cotter and

8    Constantine, so that's three and four.  And

9    then I said there's that one case we were

10   just looking at on Lexington, so that would

11   make it five.

12              I'm going to say five.

13        Q.    Plus the two that we discussed

14   today?

15        A.    No.  I included those two,

16   Nelson and Canning.  Oh, no, I'm sorry, I

17   didn't.  So that's five.  That included

18   Constantine and Cotter.  Add these two today,

19   that brings us to seven.  Seven.

20        Q.    So if my math is correct,

21   that's $105,000 just for the expert reports

22   in those seven matters, is that correct?

23        A.    Sounds pretty -- yeah, sounds

24   pretty close.  That goes back to before 2014,

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    so that's over a, what, eight or nine -- nine

2    or ten-year period.

3         Q.    And you have -- did you produce

4    any reports -- expert reports prior to 2014

5    that you can recall?

6         A.    Well, see, that's the one I --

7    I was just sitting here blanking on that, the

8    case that, you know, I don't remember what

9    the -- you know, what the town was or who the

10   building was, but the firm was Kennedy &

11   Madonna, and that was the first one that I

12   worked on.  So I think I had a report on that

13   before 2014.  But that would be the only

14   other one.

15        Q.    So another $15,000 or so for

16   that report?

17        A.    I suppose.  I actually don't

18   remember.  You know, that's before I was

19   working with EH&E, so I can't -- I wouldn't

20   be able to look into their records.

21        Q.    Can you provide me an estimate

22   of how many depositions you have testified in

23   in litigation against Monsanto?  I believe

24   you may have provided that estimate earlier,

1    but was it about ten or so, fewer?

2         A.     Well, I think it's roughly the

3    same number as these cases we just were

4    counting on, so, you know, somewhere between

5    eight and ten if we include, you know, these

6    two that we're talking about today.

7         Q.     Are you able to provide me with

8    an estimate of your total income from working

9    as an expert witness in litigation against

10   Monsanto?

11        A.     Again, I -- you know, I don't

12   keep the -- I don't keep the books in the

13   Herrick household, and so I don't want to

14   just, like, come up with some guess without

15   being able to, you know, base it in

16   something.  So I'm afraid I'm not feeling

17   like I can really give you a good answer to

18   that.

19        Q.     Dr. Herrick, I have marked a

20   document as Exhibit 19.  Could you take a

21   look at that, please?

22        A.     Sure.

23               (Whereupon, Exhibit Herrick 19

24        was marked for identification.)

Robert F. Herrick, MS, ScD, CIH, FAIHA

1      A.      Okay.

2   BY MR. LEE:

3      Q.      Dr. Herrick, do you see this

4   document that I've marked as Exhibit 19,

5   which has at the top Environmental Health &

6   Engineering, Incorporated, and then has

7   beneath that Robert Cotter versus Monsanto

8   beneath the dotted line?

9              Do you see that?

10     A.      I do, yes.

11     Q.      Do you recognize this?

12     A.      Well, you know, I don't

13   normally see these.  I send in a time sheet

14   on these projects that I'm working on, but I

15   normally don't get this document, no.

16     Q.      Do you have any reason to

17   believe that any of these -- well, let me ask

18   you this.

19              Do you recognize this as an

20   invoice to Environmental Health &

21   Engineering?

22     A.      That's sure what it looks like.

23   I don't get copied on these invoices, but it

24   certainly looks like it's on the EH&E

1    letterhead, and it's sent to Thornton.

2         Q.    Are you -- by the way, with

3    respect to only the matters in which you have

4    been disclosed as an expert witness, have you

5    worked for any other law firm other than

6    Thornton Law Firm in litigation against

7    Monsanto?

8         A.    Help me understand the

9    question.  You're just wondering about like

10   any litigation I was ever involved in?

11        Q.    No.  In any litigation against

12   Monsanto Company where you have been

13   disclosed as a expert witness, have you

14   worked for any other plaintiff law firm other

15   than Thornton Law Firm?

16        A.    Oh.  Yeah, there were some

17   cases -- this is going back a few years.  The

18   firm that I was working with then was Baron &

19   Budd.

20        Q.    Any other law firms?

21        A.    Well, the only other one is

22   this -- you know, the one case that I don't

23   have any real distinct recollection about was

24   that the case with Kennedy & Madonna.  But I

1    think that covers it.

2        Q.    Have you ever done any

3    consulting work for Monsanto Company?

4        A.    I haven't, no.

5        Q.    Regarding these invoices in

6    Exhibit 19, as you sit here today, do you

7    have any reason to doubt the accuracy or

8    completeness of these invoices?

9        A.    No.  I'm just scrolling down

10   through these.  I mean, these look, you know,

11   reasonable to me.

12             Although, I see -- I think I

13   was wrong when we were talking earlier.  It

14   looks like the EH&E is billing my time at 400

15   an hour.  I think I told you 450.  So I was

16   wrong there.

17             No, here it is.  Looks like I

18   got a raise in July of 2022, because this one

19   is up to 450, so I guess I got promoted or a

20   raise or something.

21             MR. LEE:  Okay.  Marking

22        another document as Exhibit 20.

23             (Whereupon, Exhibit Herrick 20

24        was marked for identification.)

1    A.    And I'm just scrolling down

2    here.  Okay.

3            Okay.

4    BY MR. LEE:

5    Q.    Dr. Herrick, do you see this

6    document I've marked as Exhibit 20?  And I

7    believe this was Exhibit 2 in another

8    deposition of yours, but it has Thornton Law

9    Firm at the top, and then it has -- the case

10   description lists Plaintiff Timothy

11   Constantine.

12            Do you see that?

13   A.    Yes, I do.

14   Q.    Do you recognize this document?

15   A.    Well, you know, now that you

16   mention it, I mean, you know, I think this

17   was something that came up in one of my

18   earlier depositions, so, you know, I think I

19   probably have seen it before.

20   Q.    As you sit here today, do you

21   have any reason to doubt the accuracy or

22   completeness of these invoices in Exhibit 20?

23   A.    Let me just take a look.

24            No, I don't.

1      Q.     Dr. Herrick, let me mark

2    another document as Exhibit 21.

3              (Whereupon, Exhibit Herrick 21

4        was marked for identification.)

5      A.     Okay.

6    BY MR. LEE:

7      Q.     Dr. Herrick, do you see this

8    document I've marked as Exhibit 21 with

9    Environmental Health & Engineering at the

10   top, and then it has Canning versus Monsanto

11   underneath the dotted line?

12              Do you see that?

13     A.     I do, yes.

14     Q.     Do you recognize this document?

15     A.     Well, as I said before, I don't

16   normally, you know, see the document that

17   goes between EH&E and Thornton, so I can't

18   say that I have actually seen this before.

19     Q.     And do you have any reason to

20   doubt the accuracy or completeness of these

21   invoices?

22     A.     Let me just take a look down.

23              No, I don't.  These are, you

24   know, about -- this is the time when I was

Robert F. Herrick, MS, ScD, CIH, FAIHA

1   working on Canning, so I think these are the

2   real deal.

3        Q.    And you have additional billing

4   for -- do you have additional billing for

5   Canning that will be eventually put in an

6   invoice, including, for example, this

7   deposition?

8        A.    Oh, yeah, because, you know, I

9   have a little bit of time this month that I

10  spent, you know, just preparing and getting

11  ready for this deposition, so there will be

12  some additional time, yeah.

13       Q.    Can you give an estimate of how

14  much additional time you spent this month in

15  preparing for this deposition?

16       A.    Let me think about it for a

17  minute, you know, because I was doing Canning

18  and Nelson, you know, kind of side by side.

19             You know, it would be maybe

20  five or six hours on each one of these two

21  cases, you know, just reviewing documents, my

22  report, and then we had a phone call with

23  Uehlein and Bricker.

24             So, yeah, you know, say five or

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    six hours on each of the cases.

2         Q.    Reasonable to say that

3    approximately $5,000 to prepare for the

4    deposition today for these two cases,

5    approximately?

6         A.    Well, if we're billing out at

7    400 an hour, although I think I'm up to 450

8    now.  Yeah, that's in the ballpark.

9              MR. LEE:  Let me mark a

10        document as Exhibit 22.

11             (Whereupon, Exhibit Herrick 22

12        was marked for identification.)

13        A.    I'm getting it.  Okay.

14   BY MR. LEE:

15        Q.    Doctor -- I'm sorry.

16        A.    No, I'm in there.

17             Oh, okay.  These are the

18   invoices on Nelson?

19        Q.    Yes.

20             Do you see this document I've

21   marked as Exhibit 22 with Gerald Nelson

22   versus Monsanto?

23        A.    I do.

24        Q.    Do you have any reason to

1    believe that these invoices are either

2    incomplete or in error?

3          A.    Let me just scroll down here.

4                No.  I think these are

5    accurate.

6          Q.    Dr. Herrick, let me introduce a

7    23rd exhibit.

8                (Whereupon, Exhibit Herrick 23

9          was marked for identification.)

10         A.    Okay.

11   BY MR. LEE:

12         Q.    Dr. Herrick, do you see this

13   document I've marked as Exhibit 23 with the

14   title Glyphosate Use and Cancer Incidence in

15   the Agricultural Health Study, and it's

16   authored by Gabriella Andreotti and others?

17               Do you see that?

18         A.    I do, yeah.

19         Q.    And do you recognize this

20   article?

21         A.    I do, yes.

22         Q.    And did you rely -- review and

23   rely on this article in preparing your

24   exposure estimates for Mr. Canning and

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Mr. Nelson?

2          A.    I did review it, yes.

3          Q.    I believe in the Cotter

4    deposition you were asked about something

5    called the intensity score.

6          A.    Right.

7          Q.    Do you have an understanding of

8    what the intensity score is?

9          A.    Yeah.  This was -- when we

10   talked about Cotter, this was the reference

11   to this article by Covle, and Covle's article

12   described this process where they took the

13   lifetime exposures and they developed a

14   weighting factor, in so many words, that

15   reflected their rating of what the likely

16   intensity of exposure was.

17               And so that was one of the

18   additional analyses that Andreotti used.

19         Q.    If you go to the second page of

20   this article, Dr. Herrick, there's a section

21   that starts with the header Exposure

22   Assessment.

23         A.    Yeah, hang on.

24               Okay, yes, I'm there.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          Q.     And under that section, they

2     discuss the various inputs for the intensity

3     score.  Do you see that in the top of the

4     second column?

5          A.     Yeah.  Let me just get myself

6     to it here.

7                 Oh, I'm looking under

8     Statistical Analysis.  That's not the right

9     place, is it?

10         Q.     No.  The paragraph right above

11    that.

12         A.     Yeah, I've got it.  "The

13    intensity score was derived from an

14    algorithm"?

15         Q.     Yes.

16         A.     Yes.

17         Q.     The authors listed a number of

18    inputs for the intensity score.

19                Do you see "whether the

20    participant mixed or applied pesticides"?

21                Do you see that?

22         A.     I do, yes.

23         Q.     Now, your reports for

24    Mr. Nelson and Mr. Canning included some

```
 1    information on mixed or applied pesticides,

 2    is that correct?

 3         A.    It did, yes.

 4         Q.    And then there is a second

 5    input factor, "repaired pesticide-related

 6    equipment."

 7              Do you see that?

 8         A.    I do.

 9         Q.    Now, did you collect any

10    information for either Mr. Nelson or

11    Mr. Canning related to repaired

12    pesticide-related equipment?

13         A.    Well, I didn't collect anything

14    beyond what was included in the deposition,

15    and, you know, there were some occasional

16    mentions in there of repairs that they made

17    to equipment, for example, when it leaked and

18    things like that, but it really didn't probe

19    for any details about, you know, major

20    repairs that they did.

21         Q.    You did include some

22    information regarding personal protective

23    equipment, the next input factor, correct?

24         A.    I did, yes.
```

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Q.    And you also included in your

2    reports some information on the application

3    method used, correct?

4    A.    That's correct.  I did, yes.

5    Q.    Now, did you -- were you asked

6    to calculate an exposure assessment using the

7    intensity-weighted lifetime days, the

8    intensity score?

9    A.    No, I wasn't.

10    Q.    Do you have an understanding of

11    whether you would have been able to provide a

12    more quantitative exposure assessment if you

13    had used an intensity score?

14         MR. BRICKER:  Form, lacks

15         foundation, calls for speculation.

16         THE WITNESS:  Well, you know, I

17         remember when I read -- you know,

18         because this Covle article came out in

19         '18, you know, I remember -- or, no,

20         I'm sorry, the Covle article actually

21         came out long before this one.  I'm

22         trying to remember.  I thought it was

23         like, you know, in 2011 or something.

24         In any case, I remember when I

1        read the Covle article, and then I was

2        interested in, you know, the whole

3        concept of these intensity factors.

4              But in reading the Covle

5        article, I really didn't feel like I

6        could apply this approach to the

7        information that I had for Nelson and

8        Canning, in part because from reading

9        Covle, I can't really entirely see how

10       they took this algorithm and applied

11       it to the lifetime exposure number.

12       It's not really described all that

13       clearly in Covle, frankly.

14              So I would have needed more

15       information, I guess is my answer.

16  BY MR. LEE:

17       Q.    My apology, my phone is going

18  off for some reason.

19              Dr. Herrick, have you ever

20  performed a calculation using the intensity

21  score?

22       A.    No.  That's kind of what I was

23  thinking about, because at the time, I

24  remember -- well, actually, I have, because

Robert F. Herrick, MS, ScD, CIH, FAIHA

1   this goes way back to my NIOSH days, but in

2   some of the exposure assessments we did

3   there, we would adjust the exposure level for

4   intensity factors.

5            You know, we didn't necessarily

6   call them that, but if there were evidence

7   that, for example, there was a ventilation

8   system that was, you know, likely to reduce

9   the exposure, we tried to incorporate that

10  information in the exposure value, and in a

11  case like that you would reduce it by some

12  factor based on the presence of a ventilation

13  system.

14            So I know that's kind of a long

15  answer, but to directly answer your question,

16  yes, I have used scores like this.  There's

17  things that are similar in concept in the

18  intensity score.

19       Q.    Do you consider yourself an

20  expert on using intensity scores to provide

21  -- calculate exposure estimates?

22       A.    Well, I use them.  I would

23  broaden that out a little and say, you know,

24  I consider my expertise to be an exposure

1    assessment generally, but, you know, I have

2    experience at using things like intensity

3    scores to adjust the exposure estimates.

4         Q.    But do you consider yourself an

5    expert in using intensity scores for

6    calculating exposure assessments?

7              MR. BRICKER:  Form.

8              THE WITNESS:  I wouldn't claim

9         that to be a primary area, you know,

10        in which I hold myself out as an

11        expert, no.

12   BY MR. LEE:

13        Q.    Dr. Herrick, I'm marking an

14   exhibit as Exhibit 24.

15             (Whereupon, Exhibit Herrick 24

16        was marked for identification.)

17        A.    Okay.

18   BY MR. LEE:

19        Q.    Dr. Herrick, have you seen this

20   document I've marked as Exhibit 24 with the

21   header First Amended Plaintiff Fact Sheet,

22   and the name is -- of the individual is

23   Richard Canning?

24             Do you see that?

1        A.      I do see that, yeah.

2        Q.      Your voice is cutting out a

3    little bit.

4        A.      Sorry.

5        Q.      That's better.  Thank you.

6                Is this the Plaintiff Fact

7    Sheet that you relied upon when performing

8    the exposure assessment for Richard Canning?

9        A.      I believe it was.  I had -- you

10   know, between Canning and Nelson now, I want

11   to make sure I'm right.  I remember there

12   being several different fact sheets, and I

13   think that was the Canning case.

14               So, you know, I think there

15   were three of them, and I remember reading

16   them all.

17       Q.      Dr. Herrick, I believe this

18   will be the last exhibit.  Let me give you

19   Exhibit 25.

20               (Whereupon, Exhibit Herrick 25

21        was marked for identification.)

22       A.      Hang on just a second here.  I

23   need to get to it.  My screen is full.

24               Okay.  I've got it.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    BY MR. LEE:

2         Q.    Dr. Herrick, do you see this

3    document I've marked as Exhibit 25 with the

4    title Pesticide Exposure as Risk Factor for

5    Non-Hodgkin Lymphoma Including

6    Histopathological Subgroup Analysis?

7              Do you see that?

8         A.    I do, yes.

9         Q.    And the name of the first

10   author is Mikael Eriksson with a year of

11   publication 2008.

12             Do you see that?

13        A.    I do, yeah.

14        Q.    If you go to Assessment of

15   Exposure, that's on the second page of this

16   exhibit.

17             Well, first, do you recognize

18   this article, Dr. Herrick?

19        A.    Yeah.  This is one of my

20   references that I included in these two

21   reports.

22        Q.    And I believe you've testified

23   in other depositions that the method that you

24   use for some of your exposure assessments is

1    contained in this article.  Is that correct?

2         A.     Right, because Eriksson was the

3    one who developed these time-weighted average

4    estimates of lifetime exposure.

5         Q.     If you go to the second page of

6    this article, there is a section titled

7    Assessment of Exposure.

8               Do you see that?

9         A.     I do, right.

10        Q.     Dr. Herrick, is that the

11   section of the Methods section that includes

12   the methodology that you used for the Canning

13   and Nelson reports that we discussed earlier

14   today?

15        A.     Let me just -- yeah, because,

16   you know, about halfway down the paragraph he

17   says, "For all pesticides not only the number

18   of years and numbers of days per year, but

19   also the approximate length of exposure per

20   day were questioned."

21              So the answer is, yes, that's

22   the, you know, step in this procedure that I

23   followed.

24        Q.     Did you use any other exposure

1  assessment methodologies that we have not yet

2  discussed today in preparing the Canning and

3  Nelson reports, Dr. Herrick?

4        A.     No.   There are really just the

5  two.  You know, there's this one that we're

6  looking at now where the duration on each day

7  was a factor, and then the other approach,

8  the non-time-weighted approach, where all the

9  days basically count alike, so regardless of

10  how long you used the material, a day is a

11  day.

12             So the short answer is, there

13  were only two approaches, and no others.

14        Q.     Dr. Herrick, other than the

15  opinions that are contained in your two

16  reports that we discussed today, are there

17  any other opinions that you plan to offer in

18  these two litigation matters that we have not

19  yet discussed?

20        A.     No.   This is pretty much what

21  I'm prepared to talk about.

22             MR. LEE:  I have no further

23        questions for you, Dr. Herrick, at

24        this time.

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
 1              MR. BRICKER:  All right.  I

 2       have nothing.

 3              Let's -- he'll read and sign,

 4       and we'll conclude.

 5              THE VIDEOGRAPHER:  The time is

 6       now 4:24 --

 7              MR. LEE:  Yeah, thank you,

 8       Dr. Herrick.  Thank you, Counsel.

 9              THE WITNESS:  Okay.  Good day.

10              THE VIDEOGRAPHER:  The time is

11       now 4:24 p.m.  This concludes today's

12       testimony from Dr. Robert F. Herrick.

13       We are now off the record.

14              (Whereupon, the deposition was

15       concluded.)

16

17

18

19

20

21

22

23

24
```

Robert F. Herrick, MS, ScD, CIH, PAIHA

```
 1    COMMONWEALTH OF MASSACHUSETTS   )

 2    SUFFOLK, SS.                    )

 3              I, MAUREEN O'CONNOR POLLARD,

 4    Registered Diplomate Reporter and Notary

 5    Public in and for the Commonwealth of

 6    Massachusetts, do certify that on the 23rd

 7    day of October, 2023, at 10:41, the person

 8    above-named was duly remotely sworn to

 9    testify to the truth of their knowledge, and

10    examined, and such examination reduced to

11    typewriting under my direction, and is a true

12    record of the testimony given by the witness.

13    I further certify that I am neither attorney,

14    related or employed by any of the parties to

15    this action, and that I am not a relative or

16    employee of any attorney employed by the

17    parties hereto, or financially interested in

18    the action.

19

20

21

22    _____    _____

23    MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC

24    CSR #149108
```

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
 1              INSTRUCTIONS TO WITNESS

 2

 3         Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8         After doing so, please sign the errata

 9    sheet and date it.  It will be attached to

10    your deposition.

11         It is imperative that you return the

12    original errata sheet to the deposing

13    attorney within thirty (30) days of receipt

14    of the deposition transcript by you.  If you

15    fail to do so, the deposition transcript may

16    be deemed to be accurate and may be used in

17    court.

18

19

20

21

22

23

24
```

1                          – – – – – –
                         E R R A T A
2                          – – – – – –

3      PAGE   LINE   CHANGE

4      _____  _____  _____

5         REASON: _____

6      _____  _____  _____

7         REASON: _____

8      _____  _____  _____

9         REASON: _____

10     _____  _____  _____

11        REASON: _____

12     _____  _____  _____

13        REASON: _____

14     _____  _____  _____

15        REASON: _____

16     _____  _____  _____

17        REASON: _____

18     _____  _____  _____

19        REASON: _____

20     _____  _____  _____

21        REASON: _____

22     _____  _____  _____

23

24

Robert F. Herrick, MS, ScD, CIH, PAIHA

```
 1

 2                    ACKNOWLEDGMENT OF DEPONENT

 3

 4        I, _____, do
      Hereby certify that I have read the foregoing
 5    pages, and that the same is a correct
      transcription of the answers given by me to
 6    the questions therein propounded, except for
      the corrections or changes in form or
 7    substance, if any, noted in the attached
      Errata Sheet.
 8

 9
      _____
10    WITNESS NAME                DATE

11

12

13

14

15

16
      Subscribed and sworn
17    To before me this
      _____ day of _____, 20_____.
18
      My commission expires: _____
19

20    _____
      Notary Public
21

22

23

24
```

```
 1                    LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____   _____

 4      _____  _____   _____

 5      _____  _____   _____

 6      _____  _____   _____

 7      _____  _____   _____

 8      _____  _____   _____

 9      _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19      _____  _____   _____

20      _____  _____   _____

21      _____  _____   _____

22      _____  _____   _____

23      _____  _____   _____

24      _____  _____   _____
```