Pages 1 - 165

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

| | |
|---|---|
| KAREN DELORME-BARTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   NO. C 18-01427-VC |
| | ) |
| MONSANTO COMPANY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

San Francisco, California
Tuesday, December 12, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:

          WEITZ & LUXENBERG PC
          700 Broadway
          New York, New York  10003
   BY: **JERRY M. KRISTAL, ATTORNEY AT LAW**
      **ROBIN L. GREENWALD, ATTORNEY AT LAW**

          WAGSTAFF LAW FIRM
          940 Lincoln Street
          Denver, Colorado 80203
   BY: **AIMEE WAGSTAFF, ATTORNEY AT LAW**

For Defendant:

          GOLDMAN, ISMAIL, TOMASELLI, BRENNAN
           & Baum LLP
          564 West Randolph Street - Suite 400
          Chicago, Illinois  60661
   BY: **SHAYNA S. COOK, ATTORNEY AT LAW**
      **SARAH KINTER, ATTORNEY AT LAW**

    **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
          Official Reporter, CSR No. 12219

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant:

3                                WILKINSON STEKLOFF LLP
                                 2001 M Street NW - 10th Floor,
                                 Washington, D.C. 20036

4                          BY:   **BRIAN L. STEKLOFF, ATTORNEY AT LAW**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## I N D E X

Tuesday, December 12, 2023 - Volume

**DEFENDANTS' WITNESSES**                                    **PAGE**  **VOL.**

**TOMASETTI, CRISTIAN**
(SWORN)                                                        11      0
Direct Examination by Ms. Cook                                 11      0
Cross-Examination by Mr. Kristal                               84      0
Redirect Examination by Ms. Cook                              147      0
Recross-Examination by Mr. Kristal                            156      0

## E X H I B I T S

| **EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 36 | | 147 | 0 |
| 37 | | 147 | 0 |
| 49 | | 147 | 0 |
| 51 | | 147 | 0 |
| 55 | | 147 | 0 |
| 101 | | 68 | 0 |
| 104 | | 12 | 0 |
| 106 | | 22 | 0 |
| 107 | | 56 | 0 |
| 111 | | 68 | 0 |
| 113 | | 51 | 0 |
| 119 | | 57 | 0 |

| | |
|---|---|
| 1 | **Tuesday - December 12, 2023**                    **10:06 a.m.** |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  All rise.  Court is now in session.  The |
| 5 | Honorable Vince Chhabria presiding. |
| 6 | (Pause in proceedings.) |
| 7 | **THE CLERK:**  Please be seated. |
| 8 | **THE COURT:**  Feels likes a reunion. |
| 9 | **MS. GREENWALD:**  I know. |
| 10 | **THE CLERK:**  Now calling Civil Case 16-2741, In Re: |
| 11 | Roundup Products Liability Litigation, and 18-1427, |
| 12 | Delmore-Barton v. Monsanto Company. |
| 13 | Will counsel please come forward and state your |
| 14 | appearances for the record starting with the plaintiff. |
| 15 | **MR. KRISTAL:**  Good morning, Your Honor.  My name is |
| 16 | Jerry Kristal from the law firm of Weitz & Luxenberg. |
| 17 | Nice to meet you. |
| 18 | **THE COURT:**  Nice to meet you. |
| 19 | **MS. GREENWALD:**  Good morning, Your Honor.  Robin |
| 20 | Greenwald.  Good to see you again. |
| 21 | **THE COURT:**  Good to see you. |
| 22 | **MS. WAGSTAFF:**  Good morning, Your Honor.  Aimee |
| 23 | Wagstaff on behalf of MDL plaintiffs. |
| 24 | **MR. STEKLOFF:**  Good morning, Your Honor.  Nice to see |
| 25 | you again.  Brian Stekloff on behalf of Monsanto.  My |

**PROCEEDINGS**

 1   colleagues, Shayna Cook and Sarah Kinter, from Goldman Ismail

 2   are also present.  And Ms. Cook will be leading the examination

 3   of Dr. Tomasetti today.

 4             **THE COURT:**  Great.

 5             **MS. COOK:**  Good morning.

 6             **THE COURT:**  Thank you.  One question, I think this is

 7   for the plaintiffs for leadership counsel.  You know, I was

 8   thinking back to the Daubert hearings we had just a few weeks

 9   ago.

10        How much do you guys insert yourselves into, you know,

11   Daubert hearings on -- in individual cases, where you don't

12   have the case?

13        You know, I was sort of wondering if I should have been

14   expecting you to be involved in the Daubert hearings.  And I

15   can't remember the name of the case anymore that we just --

16   where we just excluded a couple of experts -- right? -- and the

17   plaintiff lost at summary judgment as a result.

18        Now, I don't know if you could have saved those experts.

19   There's one that you definitely could not have saved.  The

20   other one, you might have saved.  I don't know.  But what

21   should my expectation be of lead counsel in this MDL, you know,

22   given when it comes to motions to exclude new experts on the

23   plaintiff's side.

24             **MS. GREENWALD:**  Your Honor, I guess, speaking for --

25             **THE CLERK:**  Her mic is not on.

1          MS. GREENWALD:  Oh, I'll come up.  Do you want me to

2     come up?

3          THE COURT:  I don't care.  Whatever is easiest for

4     you.

5          MS. GREENWALD:  On the specific causation side, we

6     oftentimes don't have any involvement, and if we should, we can

7     get involved.  But up until now, sometimes counsel will call us

8     and ask us for some suggestions of general -- of specific

9     causation.

10          But other than that, we don't get copies of expert

11     reports.  We don't, oftentimes, know who they're hiring, and we

12     learn about the hearing when we see your notice.

13          And even when they're exchanged, Monsanto does not share

14     the general causation expert reports with -- I'm sorry --

15     specific causation expert reports with us.  They take the

16     position they're not -- we don't have access to them because we

17     don't represent that plaintiff.

18          So we would have to change some of the rules and

19     procedures, but we're certainly open to the Court's suggestions

20     on that.

21          THE COURT:  Well -- and I don't know what the right

22     answer is.  I mean, that may all be correct, but I was just

23     thinking, you know, there are a lot of, you know, individual

24     plaintiffs' lawyers who are not, you know, who maybe don't

25     quite have the experience or the expertise or the, you know,

**PROCEEDINGS**

1    the general knowledge of the issues.  And it could be that a

2    decision to exclude a specific causation expert in one

3    individual case could have significant ramifications for the

4    MDL.

5         So, you know, I do wonder if -- you know, I do wonder if

6    lead counsel should be involved in that stuff; right?

7         I don't -- again, I don't know what the right answer is,

8    and you know, obviously, you can't do everything for every

9    plaintiff.  But you know, there are some stuff that, you know,

10   we would all agree you should be involved in.  There's some

11   stuff we would all agree you shouldn't be involved in, and I

12   don't know exactly what the line is.

13        **MS. GREENWALD:**  So I think that this conversation

14   makes me think that a communication with the plaintiffs'

15   lawyers in the waves is necessary for us to do immediately and

16   maybe give our views on what's needed for a specific causation

17   report to pass Daubert.  And maybe even put together like a

18   template of things that must be in there.

19        I appreciate you raising that.  I think that -- I don't

20   know.  I'll defer to Aimee here, but I think that's something

21   that we will and should do.

22        Anyway, I'll let Aimee --

23        **MS. WAGSTAFF:**  I mean, I agree with Ms. Greenwald, and

24   I think part of the problem is that we don't know; right?

25   Because these are filed in individual dockets, not the master

1    docket.

2         **THE COURT:**  But they're supposed to be filed on both,

3    aren't they?

4         **MS. WAGSTAFF:**  A lot of the times we don't -- yeah, we

5    don't find out in the reports, and so we wait for case counsel

6    to call us.  And so we're really responsive when they call us,

7    but we probably, you know, over the six years this has been

8    going on, haven't done the best outreach in the last year or

9    so.  We wait for people to call us with questions on

10   case-specific things.

11        We're still making general causation experts available to

12   all case counsel.  We're still handling all of that and doing

13   that.  But we can take your comments to heart.

14        **THE COURT:**  Yeah.  I mean, I guess I would encourage

15   you to do a little more just -- and I think maybe the dividing

16   line is, you know, is a ruling in a particular case going to

17   have a ripple effect throughout the MDL?

18        And if it is, I think you guys need to be involved on some

19   level at least.  You know?  And it may be that a particular

20   plaintiff's lawyer, you know, doesn't want to have anything to

21   do with you or whatever, but I think you need to make

22   yourselves available.

23        And I -- you know, I could even imagine a scenario, right,

24   where a plaintiff's lawyer is just sort of not capable of

25   putting on a witness.  I'm not saying this was the case with

1  the two experts who I recently excluded, but -- and as I said,

2  with one of them, I mean, there was -- you know, Perry Mason

3  couldn't have saved him.

4       But -- but, you know, even if a particular lawyer doesn't

5  want your help, you know, to the extent that lawyer is not

6  capable of putting on a witness, I might want your help; right?

7  Because the ruling has, you know, an impact on, you know,

8  broader impact on the MDL.

9       So, you know, there may be other scenarios where that

10  issue comes up.  But I would think that specific causation

11  would be one of those issues.  To the extent -- and you may

12  say -- you know, I may -- you may say, well, this specific

13  causation expert is only being offered up in this case.

14       And so, you know, it's not a -- you know, there's -- the

15  stakes aren't very high, and we don't need to get involved, and

16  that's fine.  But I would encourage you to make that assessment

17  for yourself and report to me whenever there's -- you know, if

18  there's a motion to exclude a specific causation expert,

19  I guess I want to hear at least something from you about

20  whether you think you should be involved and how.

21       Is that fair?

22       **MS. GREENWALD:**  Yes.  And we'll pay more attention to

23  it, and we'll work with Monsanto, perhaps, to make sure that

24  we're notified in realtime when these issues are arising.  I

25  don't mean whether an expert is not up to snuff or not, but

 1  just so we know when it's happening in realtime and we respond

 2  and let the Court know if we think we should get involved.  And

 3  if you, obviously, think we should get involved --

 4          **THE COURT:**  I'll reach out.

 5          **MS. GREENWALD:**  -- we're here.  We're here.

 6          **THE COURT:**  All right.  Sounds good.

 7       Now, for the purposes of this hearing, let me just say

 8  that I've read the report.  I've read the briefs.  And so,

 9  you know -- and of course, I come with my own background

10  knowledge of the issue.  And so I feel pretty confident in

11  saying that I don't need to hear anything about the witness's

12  qualifications.

13       I think it's obvious that the witness is qualified, and

14  I've read about his qualifications.  I don't think that it's

15  necessary for him to explain his opinion about the inadequacies

16  of the epidemiology studies that the plaintiffs rely on and the

17  animal studies and the mechanistic stuff.  I can get all that.

18       I think the -- you know, the reason I scheduled this

19  hearing is to hear about kind of the new take -- or at least

20  new as it relates to my experience -- the new take that he

21  offers on the, you know, the mutations and randomness and sort

22  of how that affects -- how that would be helpful to a jury.

23          And with that, we can bring him up.

24          (Christian Tomasetti steps forward to be sworn.)

25          **MS. COOK:**  Thank you, Your Honor.

1          In terms of the logistics, Your Honor should have received

2     a copy of our exhibits.  I have another binder of them if your

3     clerk --

4          **THE COURT:**  You can go ahead and come up here, and

5     Bhavna will swear you in.

6          **MS. COOK:**  Your Honor, should I hand another copy to

7     your clerk?

8          **THE COURT:**  Sure.  That would be great.  Thank you.

9          **THE WITNESS:**  Good morning.  Good morning, Your Honor.

10         **MS. COOK:**  In addition, we do have some slides, and

11    I'll hand out copies of those as well.

12         **THE COURT:**  Okay.  Great.

13         **THE CLERK:**  Please raise your right hand.

14                    <u>**CRISTIAN TOMASETTI**</u>,

15    called as a witness for the Defendants, having been duly sworn,

16    testified as follows:

17         **THE WITNESS:**  Yes.

18         **THE CLERK:**  Thank you.

19         Please be seated and state and spell your full name for

20    the record.

21         **THE WITNESS:**  Cristian Tomasetti.  C-R-I-S-T-I-A-N,

22    T-O-M-A-S-E-T-T-I.

23                    <u>**DIRECT EXAMINATION**</u>

24    BY MS. COOK:

25    Q.   Good morning, Dr. Tomasetti.

**TOMASETTI - DIRECT / COOK**

1    **A.**   Good morning.

2    **Q.**   Just for the record, can you please turn to Exhibit 104

3  and identify whether or not that's your CV.

4    **A.**   Yes, it is.

5        **MS. COOK:**  And, Your Honor, I'd offer Exhibit 104 into

6  the record.  I'm not going to spend time on the doctor's

7  background based on your comments, but I would like it to be in

8  the record.

9        **THE COURT:**  No objection, I assume?

10        **MR. KRISTAL:**  No objection.

11        **THE COURT:**  Admitted.

12    (Defendants Exhibit 104 received in evidence.)

13  **BY MS. COOK:**

14    **Q.**   Dr. Tomasetti, I'm going to skip through the first couple

15  of slides that talk about your background and where you got

16  your PhD, but I do want to ask you some questions about the

17  areas of research on cancer that you've done that are the kind

18  of underlying research that led to what you'll be talking about

19  today.

20    So can you please describe for the Court the areas of

21  cancer research that you focus on.

22    **A.**   Yes.  So there are four.  The first one is cancer

23  evolution, essentially understanding how you go from a healthy

24  tissue to a cancer, and that's probably the oldest of the

25  fields of research for me.

 1        And then cancer etiology, which is essentially the causes

 2   of cancer, and cancer early detection.  So trying to find

 3   cancer early -- earlier than what we find it today.

 4        And then, finally, monitoring.  And that is essentially

 5   following patients with cancer; for example, wanting to try to

 6   check if there is a recurrence coming and so, you know, trying

 7   to catch it as early as possible or determine if someone needs

 8   treatment or not.

 9   Q.   Have you published in the peer-reviewed literature in all

10   four of the areas of your cancer research?

11   A.   Yes.

12   Q.   And with respect to -- I know that you mentioned cancer

13   monitoring.  Do you work alongside oncologists when you do that

14   research?

15   A.   Oh, yeah.  That is the only way to do it.  So, yes, of

16   course.

17        MS. COOK:  And I will not spend time, Your Honor, on

18   this slide about his work with the National Cancer Institute

19   and presentations.

20   BY MS. COOK:

21   Q.   We'll just move on to your research in cancer etiology.

22        So at a high level, what has your research found in terms

23   of what causes cancer?

24   A.   Yes.  Before a series of papers, the understanding in the

25   field in terms of cancer causation was that cancer was caused

TOMASETTI - DIRECT / COOK

1    by inherited factors and environmental factors.  You could look

2    anywhere; that was the description.

3        And the discovery we made is that there is a major

4    important player in terms of cancer causation, which is due to

5    endogenous or intrinsic processes, essentially, mutations that

6    occur in our body because of just the proper function of our

7    organs and cell division and the role that that plays and how

8    large that is.

9        That is, I think, the main thing that I -- that we will be

10   discussing as of today, I think.

11   **Q.**   Will you please describe the process by which these, I

12   think you called them, mutations form as part of the natural

13   process of our bodies replicating the cells?

14   **A.**   Yes.  So here I will describe the simplest -- but I want

15   to clarify, even in all of my research, when I say "mutations,"

16   I mean mutations in the most general sense.

17       Mutations are -- go from point mutations, which is the

18   example I give now, to deletion/insertions, chromosomal

19   translocations, chromosomal loss, even, epigenomics events and

20   so on.

21       So in this case, just for simplicity, here it's shown as

22   just DNA.  And DNA is two strands.  So we see two columns of

23   letters.  D, C, J are the letters of the genome.  I'm sure

24   everyone is familiar with that.

25       And there are some rules, and so Gs go -- are always

**TOMASETTI - DIRECT / COOK**

1  paired with Cs, and Ts are always paired with As.  And when a

2  cell undergoes cell division, the DNA needs to -- you know, you

3  have one copy, and you need to make a second copy.

4      And so the DNA opens, and the strands open and,

5  essentially, you are copying those letters.  And according to

6  the rule that I just described, the T goes with the A, and C

7  with G.  You are reproducing that original strand.  And now you

8  have two copies DNA.

9      And -- yeah.

10 **Q.**  So how good are our bodies at making copies of DNA, or are

11 there errors at times?

12 **A.**  Yes.  So the -- the DNA -- the machinery that copies the

13 DNA is actually very, very incredibly good.  However, because

14 there are about 3.1 billion letters, if you count, you know,

15 one copy -- we have two copies, so it's really like 6.2 billion

16 letters.

17     But in any case, after those, we estimate there are

18 probably a few thousand errors -- in this case -- of this point

19 mutations -- that are made every time a cell is, you know,

20 duplicating its DNA.  And, again, this is just a point

21 mutation, so here we have an example.

22     There should be a C, and instead, a T was attached.  And

23 we call it point mutation because it's at one specific point of

24 the DNA strand.  But you can imagine, it's very simple to

25 explain what -- so we call it deletion.

 1          Deletion would be -- imagine losing a few of these letters
 2     at once, or insertion, if you, instead, get some of these
 3     letters inserted into the normal strand.  And so all the
 4     meaning of the sequence of letters changes completely.  So
 5     those are insertion-deletions which are all also "indels."
 6     "In" for insertions and "del" for deletions.
 7          And then, of course, you have even larger events like
 8     chromosomal loss or loss of a chromosomal arm.  So those are
 9     really big, big pieces of chromosomes that get lost.
10          Chromosomal translocations, which are very relevant for
11     NHL -- so, you know, pieces of two different chromosomes that
12     are switched, and so on.  And I could go on, but that's --
13     those are -- this is the simplest example that I can give.
14     Q.   Do all of these mutations that happen from copying errors
15     lead to cancer?
16     A.   No.
17     Q.   So how do some go on to lead to cancer and others do not?
18     A.   Yeah.  So it's important to understand that, out of
19     3 billion or so letters of the DNA, as I mentioned before --
20     first of all, let's say there are a few thousands of cell
21     division.  During cell division, they are made as mistakes if
22     we're talking about, in this case specifically, point
23     mutations, but the same applies to the other types of
24     mutations.
25          And then we have machineries that will look at the DNA

1   after this process and check whether what was copied was

2   correct or not.  Mismatched repair mechanisms.  And thanks to

3   those, then the other rate goes down drastically, and we

4   estimate that there are about three to six actual -- in case of

5   point mutations -- error left after these repair mechanisms do

6   their job.

7        So from 3 billion, we go down to three in terms of errors

8   which is very impressive.  And -- but once you request -- so

9   some -- many of them are -- almost all of them are eliminated

10  from the, you know, this machinery.

11  **Q.**  And the machinery you're talking about, is that inside our

12  bodies, we have --

13  **A.**  Correct.

14  **Q.**  Okay.

15  **A.**  Every cell has it.  And, in fact, those are temporary

16  mutations, the one that are temporary there.  In general, when

17  I talk about mutations in the rest of what I think we will

18  discuss, I don't even refer to them.  When I refer to

19  mutations, I'm referring to the leftover because that's what

20  remains; right?  So I'll focus on that.

21       So of those three to six errors, what is important to

22  understand is that, first of all, not all regions of the genome

23  are equal in terms of importance.  One particular region which

24  is all over the genome.  It's broken up in pieces.  It's called

25  exome, and -- E-X-O-M-E, and the exome is about 1 percent of

TOMASETTI - DIRECT / COOK

1   all the genome.

2        And the exome is where all the codes of the proteins are.

3   So those are, let's say, a much more important area.  In fact,

4   in the field sometimes we call the left- -- the rest, the

5   99 percent, we call it junk DNA.  We are actually understanding

6   now that it's not so junky as someone may have thought.

7        So on the exome, which is this 1 percent, you have the

8   proteins.  So -- I'm sorry this answer is very long.  But if

9   the mutations happen on the junk DNA part, as of today, we

10  think there is not going to be a major effect in terms of

11  cancer.  But even if it hits the exome, which is where the code

12  for all the proteins is, it depends on where.

13       Not all genes of relevant for cancer.  And so, you know,

14  one ballpark estimate is, say, about 1 percent of the exome is

15  really relevant in terms of cancer causation.

16  Q.   And is there a name for those mutations that then go on to

17  lead to cancer?

18  A.   Correct.  Those are called driver mutations.  And by the

19  way, I should also mention that, I think, for example, if a

20  cell gets too many mutations, the cell will decide to die,

21  committing a process so called -- apoptosis is the process.

22       But, yeah.  So if these mutations in the cell survive and

23  if they are driver mutations, those are the key elements for

24  getting from a normal tissue to cancer.

25  Q.   Okay.  Now, the concept that you just described, that

**TOMASETTI - DIRECT / COOK**

1   replication errors when your cells copy themselves and copy

2   their DNA can lead to cancer, is that something that you

3   discovered anew?

4   **A.**   No.   I should add that Dr. Vogelstein, who is my

5   colleague, it's actually one of the probably most famous people

6   in terms of those discoveries.

7        But, you know, the idea that mutations -- key driver

8   mutations are important to get to cancer, it's been there for

9   decades.   For example, Dr. Vogelstein has the well-known -- in

10  any oncology textbook, you should find something that's called

11  Vogelgram.   "Vogel" for Vogelstein, "gram" for figure.

12       And it shows for the specific case of colorectal cancer,

13  where the typical steps -- colorectal is a solid cancer, and we

14  estimate it takes about three of these driver mutations to get

15  to cancer.   And so it -- you know, it made those discoveries

16  essentially.

17       But yes.   Personally, if the question is to me personally,

18  no.   This was none.   Even though it's been -- when I mentioned

19  tumor evolution earlier, that's really what it's about.   It's

20  understanding how you get from no mutations to a full-blown

21  cancer.

22  **Q.**   Okay.   So let's turn to some of your published papers

23  about replication errors and cancer etiology.

24       And we have a timeline here.   Your 2013 publication, what

25  was the main finding of that paper?

**TOMASETTI - DIRECT / COOK**

1          **MS. COOK:**  And by the way, Your Honor, I believe,

2    that's Exhibit 105.

3          **THE COURT:**  Okay.

4          **THE WITNESS:**  Yes.  This is a very important paper for

5    me because it's what started it all in this particular --

6    you know, for what I did afterwards.

7          To explain it intuitional, the result, essentially, if you

8    asked, in 2013, to an oncologist, here is a cancer, I'm going

9    to sequence the cancer, and I ended up -- there are some

10   mutations in this cancer.  Why are those mutations there?

11         The answer would have been:  They are there because it's

12   cancer.

13         And so the thinking at that time was healthy tissues did

14   not have many mutations.  And the mutations that we found in

15   cancers were because of cancer.

16         In that paper, for the first time we showed that actually

17   the majority of the mutations in that tissue that was cancer

18   would have been there even without cancer.  And so in that

19   paper, I think we made the critical discovery that our healthy

20   tissues actually end up being full of mutations, and the more

21   we age, the more mutations we have.  So they are cumulating in

22   time.

23   **BY MS. COOK:**

24   **Q.**  Did that finding lead you to do further research on DNA

25   replication errors?

**TOMASETTI - DIRECT / COOK**

1    **A.**    I'm sorry.  I didn't understand the question.

2    **Q.**    Did the finding in your 2013 paper lead you to a

3    hypothesis that led to further research on replication errors

4    and cancer?

5    **A.**    Yes.  As I said, this paper provided the foundation for

6    everything that came afterwards here in this timeline because

7    once I saw how important was this accumulation of mutations in

8    healthy tissues that -- and, in general, was not necessarily

9    due to exposures.  That led me to the next hypothesis which was

10   then that is why we have certain tissues getting more cancer

11   than others because since -- you know, I was aware of the idea

12   that when there is cell division you get mutations.

13       I thought, what if the reason why we get more cancer than

14   others is that certain tissues have more cells and more cell

15   divisions.  And you may be surprised but up until the

16   2015 paper, if you asked anyone in the field why we get more

17   colorectal cancer than bone cancer, there was absolutely no

18   answer for that.

19       The only answer was that we know that we get lung cancer

20   because of smoking -- or skin -- it's definitely sun -- you

21   know, it's associated to that.  But we didn't have a general

22   picture for -- across the board, for why cancers, certain

23   cancers, occur more than others.  So that was the hypothesis.

24   **Q.**    Okay.  Well, let's look at that paper.  Did it end up

25   being published?

**TOMASETTI - DIRECT / COOK**

 1   **A.**   Yes.

 2   **Q.**   Okay.  So let's turn to Exhibit 106.

 3        And I'll ask you to identify this article.

 4   **A.**   Yes.

 5   **Q.**   Is this the article that you're discussing that you

 6   published?

 7   **A.**   Yes.

 8   **Q.**   Where was it published?

 9   **A.**   In the Journal of Science, yeah.

10   **Q.**   Is Science a reputable journal?

11   **A.**   Yeah.  I would say, yeah, definitely.  Together with

12   Natural, I think they are the top two in science, and

13   New England, probably the top in, you know, clinical medicine.

14   **Q.**   Was this article peer-reviewed?

15   **A.**   Of course.

16        **MS. COOK:**  Your Honor, I'll offer Exhibit 106.

17        **MR. KRISTAL:**  No objection, Your Honor.

18        **THE COURT:**  Admitted.

19        (Defendants' Exhibit 106 received in evidence.)

20   **BY MS. COOK:**

21   **Q.**   So what were you looking at in this study?

22   **A.**   So the idea of the study is what I just explained.  The

23   idea was to essentially see if tissues that had more cells and

24   divisions that were more frequent in those cells ended up with

25   more cancer than tissues that had fewer divisions and fewer

**TOMASETTI - DIRECT / COOK**

 1    cells.

 2         You know, it's both number of cells and frequency of

 3    division.  You may have a lot of cells, but they may never

 4    divide, and you may have very few cells but they divide like

 5    crazy.  So you need to take into account both of those things,

 6    and I wanted to see if that correlated.  So I calculated that

 7    number.

 8         So for each tissue, I looked at the lifetime number of

 9    cell divisions, the total, and it's -- to give you a ballpark

10    idea, it's just multiplication, really.  It's a little bit more

11    complicated than that, but it's basically multiplication

12    between how many cells and how frequently they divide, and I

13    compared that to the risk of cancer in those tissues.

14    **Q.**   Okay.  So let's take a look at Figure 1 in the paper,

15    which is on the third page, and I'll ask you to describe what

16    you ended up finding in this as reflected in this diagram.

17    **A.**   Yes.  What we found is a very strong correlation, and as

18    you can see, where organs with more total number of cell

19    divisions in this specific case, stem cells -- and I think I'll

20    explain later why stem cells -- but were having more cancer

21    than --

22         So, for example, if you look at colorectal cancer here on

23    this figure -- yes, there.  Thank you.

24         That cancer -- so the colon self-renew on average every

25    four days or so.  So the old lining of our colon is gone every

1    four days.  So that's an enormous amount of divisions, and

2    there are 10 to the 8th stem cells, so it's very large, if I

3    remember correctly from the paper.

4        I should -- it's a very large number of divisions in the

5    lifetime of a person.  When you compare that to, say,

6    osteosarcoma, which is bone cancer, in osteosarcoma the number

7    of cells is less, and importantly, the rate at which they

8    divide is much, much slower.  So, you know, in our bones,

9    unless of an injury, the division rate, it's in the order of 10

10   to 15 years.

11   **Q.**   So where did you get the data for the lifetime risk that's

12   reflected in your paper?

13   **A.**   Yeah.  For the lifetime risk, it's just the SEER data from

14   the United States.

15   **Q.**   What is SEER data again?

16   **A.**   It's basically the cancer registry.  You know, probably

17   the best in the world, but it's the cancer registry for the

18   United States.

19        **THE COURT:**  Question:  Is breast cancer on there?  I

20   just -- you know, the stat pops into my mind of one in

21   eight women getting breast cancer during their lifetimes.

22   You know, one would expect that to be way in the upper right, I

23   would assume.

24        **THE WITNESS:**  Yes, Your Honor.  That's a great

25   question.  In fact, that was one of the questions I was asked

1    once this paper was published, because it's not there.  And

2    it's the same with prostate.  It was added in the 2017

3    follow-up paper.

4         And it took a bit longer to obtain the proper estimates,

5    and that's why it wasn't -- this paper didn't mean to be

6    comprehensive.  I think that the result -- you know, this is

7    across five orders of magnitude, so the result was, I think,

8    very clear and convincing.

9         But, yeah.  So breast wasn't there initially.

10         **THE COURT:**  Okay.

11   **BY MS. COOK:**

12   **Q.**   In terms of the data for just total stem cell divisions,

13   first of all, why -- what are stem cells, and why did you look

14   at those in this paper?

15   **A.**   Yeah.  So what's important to understand is that in

16   tissues, whether it's the colon or blood, the true engine in

17   terms of cells is the stem cell.  The stem cell has

18   two properties that are very important.  They are long lived.

19   Okay?  So many blood cells have a lifespan of a few days or a

20   few weeks.  Here we're talking about years.

21         And so hematopoietic stem cells, those are the stem cells

22   of the blood system.  And so they are long-lived, and in fact,

23   more importantly, they have a property which is called the

24   stemness property.  Stemness property, that's why we called

25   them stem cells.

**TOMASETTI - DIRECT / COOK**

1    The stemness property is that they can make copies of

2   themself.  And so what happens is that if you get a driver

3   mutation, any of the mutations that we discussed before, in a

4   stem cell, that mutation is going to stay there.  And it's

5   going to be carried across decades, in fact, in terms of the

6   lineage of that stem cell.

7    If, instead, I get a driver mutation, say, in a final, you

8   know, terminal differentiator blood cell, after a few days,

9   that cell is going to be gone anyway; right?  So that's why the

10  focus in this paper was on stem cells.  But, in fact, I can

11  transfer -- I can scale this to all cells, and overall, the

12  picture would be the same.

13  **Q.**   And how do you know that?

14  **A.**   Because there are numbers on the, you know, in the back of

15  the paper.  It's part of the paper.

16   You know, stem cells typically scale in the order of 1,000

17  to 10,000 per -- well, I should be -- more like 100 to 10,000

18  of cells, of the total cells, frequency.  And so I can tell you

19  that, statistically, it's obvious that -- in fact, I guess I'll

20  discuss the sensitivity analysis.

21   So I already proved that to be the case because this

22  correlation across five orders of magnitude is not going to

23  change if you scale everything up.  And instead of looking at

24  stem cells, you look at all cells.

25  **Q.**   Well, let's take a look at what the correlation that you

**TOMASETTI - DIRECT / COOK**

1    found was.

2        Did you report that in the paper?

3    **A.**    Yes.

4    **Q.**    Let's see if I can pull it up here.  And what was the

5    correlation between stem cell divisions and lifetime risk?

6    **A.**    Yes.  It was 0.81 according to the Spearman correlation,

7    which is the better one -- 0.81 and with a P value, as you can

8    see, was 10 to the negative 8 in terms of the order.

9    **Q.**    What's the significance of having a P value of 10 to the

10   negative 8?

11   **A.**    Well, the correlation, 0.81 is a very strong correlation.

12   In fact, not very common in any medicine biology paper that you

13   find a correlation that high.

14       The P value, so to give you a sense, usually, a result

15   would be considered statistically significant if you have a

16   result that's 5 times 10 to the negative 2.

17       So this is a million times smaller, so it means that the

18   probability that this was by chance and it's not a real result,

19   it's a million times smaller than what is the usual bar that's

20   been set in science to call things, you know, that we trust,

21   that we believe are real.

22   **Q.**    Okay.  Back to this figure, do you have NHL on this figure

23   anywhere?

24   **A.**    No.

25   **Q.**    Do you have any subtype of NHL?

1   **A.**   There is one subtype, CLL.

2   **Q.**   What did you find in terms of CLL in terms of the

3   relationship between stem cell divisions and lifetime risk?

4   **A.**   Yeah.  You can see, I think, from the figure that if you

5   had to draw a line, CLL would be, you know, at the line -- in

6   fact, it'd be lower, I would say, than the line.  So as --

7   you know, the purpose here was a correlation.  It was not to

8   measure the exact amount of deviations from the line.

9   Actually, that's a wrong thing to do.  There are some other

10   authors that have attempted that in a paper, and it's not --

11   mathematically, it's not right.  I can explain why.

12        But so -- but let me put it this way.  If you look at lung

13   smokers, which is in the middle and, like, very high, or HPV

14   head and neck -- no.  The other one.  That's non-smokers.

15   **Q.**   Oops.  We're looking at lung smokers?

16   **A.**   Yeah.  So if you look at lung smoker -- and, actually, the

17   point of lung nonsmoker is also helpful here.  So that is the

18   risk if you don't smoke.  When you smoke, you jump to that much

19   higher value.

20        So as you can see, the lung smokers, I would say, fit

21   along the -- you know, if you had to make a regression line

22   that passes through those points, it fits pretty nicely with

23   what you would expect due to the cell division, mechanism, when

24   you look at the effect of smoking, that makes lung cancer jump

25   by, you know, 20, 25, or so times.  Much higher than what it

**TOMASETTI - DIRECT / COOK**

1    should be.

2        So the fact that CLL is below, I would say, the line or --

3    yeah, below the line, it's -- I would interpret it as there is

4    no evidence of any major environmental effect.  That's the

5    minimum conclusion that you can draw from this, I would say.

6    **Q.**   With respect to colorectal cancer, are there other types

7    of colorectal cancer on this graph that show the impact of

8    something other than replication errors?

9    **A.**   Oh, yeah.  If you look at FAP and Lynch, both of those, so

10   you can think of -- those are, you know, say, inherited

11   conditions.  And Lynch syndrome patients end up all essentially

12   dying of colorectal cancer.  Typically, in their 30, 40s, and

13   by age 50, it's very rare to find a person with Lynch syndrome

14   alive.

15       And the reason, it's actually very simple given what I

16   explained before.  I was mentioning the mismatched repair

17   mechanisms.  Their mechanisms are broken because of a mutation.

18   And so because of that defect, what happens to them is they

19   accumulate about -- mutation about a rate that's 10 times

20   higher than normal.  And that's why they're -- the colorectal

21   cancer incidence is so high.

22   **Q.**   And is that inherited condition, the higher risk from

23   that, is that reflected in the data that you found as well?

24   **A.**   Yeah.  As I said, if you drew a line -- again, you can't

25   hear -- measure distances and consider that distance the exact

1    estimate by any means.  That's not the right thing to do, as I

2    already said.  But if you look at the overall picture, you can

3    tell that, say, for HPV, head and neck, there are some

4    exposures whether viruses or inherited conditions or smoking

5    that have some important effect.

6    Q.   So with respect to the total stem cell divisions here, is

7    that data something that you calculated as part of this paper?

8    A.   Yes.

9    Q.   Did you describe your calculations in that peer-reviewed

10   published paper?

11   A.   Yes.

12   Q.   So let's turn -- I know there were some questions in the

13   briefing about this, so let's turn to the supplemental

14   materials.  And, again, do the supplemental materials -- or

15   supplementary materials for your publication go through the

16   peer-review process as well?

17   A.   Oh, I would say it's probably the most important part of

18   the paper.  The way it works in these papers is that they --

19   you know, you're allowed to -- five to six pages usually, and

20   so there, you pretty much just report the results.  But how you

21   obtained them and how you, you know, how you justify all of

22   those methodologies is very often in the supplement.

23   Q.   Okay.

24   A.   So, yes.  It's an integral part of the paper.

25   Q.   Okay.  So just to get us oriented here, we have the

1   materials and methods on the first page, and it says (as read):

2        "The parameters listed in Table S1 correspond to

3        the average size of the relevant normal tissues and

4        were obtained from the literature directly or

5        calculated using values from the literature."

6        And it says (as read):

7        "The references are provided below in the

8        sections describing each cancer type."

9        So for the -- for the subtype of NHL that was on the

10  graph, CLL, do you include a subject that talks about how you

11  calculated those numbers?

12  **A.**   Yes.

13  **Q.**   Okay.  So let's take a look at that just briefly.

14        The lifetime risk we talked about, that's from the

15  National Cancer Institute, where did the information come from

16  about the total number of stem cells, hematopoietic stem cells?

17  **A.**   Yes.  So you will have to look at -- I don't remember the

18  reference.  We will have to -- but it's -- Reference 32 is a

19  paper -- if I remember correctly, it's a paper that reports on,

20  you know, number of cells, so different organs in humans.

21        And so that's the Reference 32.  It may be Bianconi, if I

22  remember but --

23  **Q.**   Did you also include a reference about a percentage of

24  those that are hematopoietic stem cells?

25  **A.**   Correct.  And that is in Reference 34, because that

TOMASETTI - DIRECT / COOK

1  provided the best estimate for the frequency of stem cells

2  within the population of blood cells.

3  Q.   And then, also, it includes an estimate that the

4  hematopoietic stem cells divide every 30 days, and where are

5  the references for that?

6  A.   Yes.   It says, as you see there, it says to look at the

7  section for acute myeloid leukemia.

8  Q.   Why is that?   What's the -- why would you include that

9  information in the acute myeloid leukemia section?

10  A.   Because hematopoietic stem cells, which are the stem cells

11  of the blood system, are the stem cells for all cells in the

12  blood system.   So it doesn't really matter if you're looking at

13  CLL or AML or any type of other leukemia.

14       So that's why it was reported -- I guess, AML came before

15  in alphabetic order, so it reported there.

16  Q.   Okay.   And there was some question in the briefing about

17  the use of animal data.

18       What did you use animal data for in this paper?

19  A.   Yes.   First of all, I would like to clarify that almost

20  all data in this paper were coming from humans.   They were

21  liter rating to -- our soft tissues for which some estimate

22  because there are -- as you can see, for each tissue there are

23  multiple estimates that are required.

24       Some estimates that came from mouse data because we

25  couldn't find human information, you know, human data at the

1    time that we thought was proper, and that we could use.  So

2    that's Point Number 1.  So that was the -- human data was

3    almost all tissues.  There were a few -- there's two

4    exceptions.  One of them was in blood.

5         The second point I would like to make is it's very common

6    in the field to -- that's why all these papers that you see are

7    published because even though it's in mice, the system is very

8    similar to humans.  And so we think there are lots of things

9    that we can learn, and they are going to be very similar in

10   humans that you can measure here.  It's not always the case.

11   It depends on what you look for in a mouse, but anyway -- so

12   these were papers coming from mouse data.

13        And that's what everyone was using at that time when they

14   were looking at divisions, with exception of one or two that

15   I'm happy to comment later if needed.  And in any case, so

16   that's Point 2.

17        And Point 3, one thing that I think it's very important to

18   understand, because this was asked after this publication

19   multiple times, but unfortunately, many people comment without

20   reading the full paper.  So there was a question of how good

21   these estimates were.

22        We performed so-called sensitivity analysis for that, and

23   I'm happy to describe that, too, if needed.

24   Q.   Yeah.  Let's look at where -- do you describe the

25   sensitivity analysis here in the materials and methods section?

1    **A.**    Yes.  It's right there.  Yeah.

2    **Q.**    And what does that mean?

3    **A.**    Yeah.  So just to explain what that means, as I said, and

4    this was missed by almost everyone, even in the field

5    initially.

6         I was the first one that didn't fully trust the estimates.

7    You know, they are estimates; they can be wrong.  In fact they

8    are certainly wrong.  The question is how wrong they are;

9    right?

10        And I'm saying that by being really, really precise

11   meaning, you know, if I tell you the division frequency is

12   13.2 days, the probability it is exactly 13.2 days, it's almost

13   zero; right?  The question is how close you are to that value,

14   how good of an estimate that is.

15        So in the field, not just in this field, in general, what

16   you can do to assess that question is so-called sensitivity

17   analysis.  And in that analysis, you try to understand, if I

18   change the values, how it's going to change overall the result?

19   Okay?  So -- if I'm a little bit off with my estimates.

20        Now, usually, sensitivity analysis are performed by, as I

21   said, by saying what if I'm a little bit off on these

22   estimates?  Because their result was so striking, it was clear

23   that it was very robust even to very large deviations in terms

24   of estimates.

25        And to prove that, we performed the sensitivity analysis

1  where we allowed any estimate on the cell, the number of

2  divisions, to be off by a factor of hundred in both directions.

3  And so, say, for example, if the estimate was that, you know,

4  the number was, say, a million, the sensitivity analysis -- and

5  we repeated this, I believe, 10,000 times, but we can confirm

6  if needed.

7      So every time, instead of picking the value that

8  communicated in the paper, I would pick a different value.  So

9  assuming that's wrong.  And the same for every tissue of these

10  31.  Where the value could be -- say, if it was a million, the

11  original value, it could be all the way to hundred millions and

12  all the way down to 10,000.

13      So a factor of hundred in each direction, two orders of

14  magnitude in each direction.  And the results were that the

15  results didn't -- you know, was not changed.  Was confirmed.

16  That is probably the strongest sensitivity analysis I can think

17  of to -- so, yeah.

18      The point is, I don't -- yeah.  I don't see -- I don't see

19  it -- I think this confirms that this was a very solid result,

20  essentially independently of some estimate not being

21  particularly precise.  And in any case, as I said, and I can --

22  I'm happy to discuss later and if asked -- even some papers

23  that have some claims, some cell division in humans for blood,

24  the estimates are not very far, you know, maybe an order by two

25  or three instead of a hundred.

1      So it's -- it's from a mathematical point of view, it's

2   almost a -- it's not relevant.  You know, it doesn't -- it's

3   not going to change anything significant.

4   **Q.**   Okay.  And we talked about the hematopoietic stem cells.

5   One of the issues raised in the briefing is that you should

6   have looked at B cells instead.

7      And do you have a slide that describes the difference

8   between stem cells and B cells?

9   **A.**   Yes.

10  **Q.**   Okay.  So that's Slide 10.

11     Can you tell us what we're looking at here?

12  **A.**   Yes.  So here we are looking at the very big

13  simplification of the blood system and all the -- and the cell

14  types in that blood system.

15     In fact, you see here one, two, three -- four layers.  It

16  sounded like the pyramid hierarchy.  There are many, many more.

17  In some estimates, there are about 30 steps to go from the top

18  down to the bottom.

19     In any case -- so as I was mentioning, at the top, there

20  are the hematopoietic stem cells, and what is powerful of

21  them -- and some are similarly for lymphoid and myeloid stem

22  cells -- is that they can make a copy of themselves.

23     For example, so one of the daughter or both of them can be

24  identical to the mother, essentially.  Okay?  They may have

25  accumulated mutation because of the deviation, but they are

1   still stem cells.  And that means that they can become

2   anything.  You know, I like to think about this as, like, a

3   newborn child that has the potential to become an astronaut, a

4   fireman, you know, anything.

5       The more you go down the line, the more you're making the

6   decision in your life and the fewer, you know, the narrower is

7   the range of what you can still become; right?

8       So, in fact, already at the lymphoid stem cells, they are

9   called stem cells, properly so, because they have the special

10  property that they can make a copy identical to themself still.

11  But they cannot be a blood stem cell, in general.  They can be

12  a lymphoid stem cell daughter.  Okay?

13      Once you leave that realm there, all the others actually

14  start a process where the daughters are not -- a process where

15  the daughters are not the same type.  The parents are not

16  identical.  Okay?

17      They start the process, so-called differentiation, which

18  brings them to become something, whether it's a B cell, T cell,

19  red blood cell, platelets, and so on.  Okay?

20      So I understand the question, so this was a long answer.

21  I understand the question of a B cells because when a doctor,

22  an oncologist, a hematologist, specifically, looks at where NHL

23  is, they will look at, say, you know, B cells or T cells, if

24  it's one of those cell types, as the origin.  And that's a

25  proper way to say that that's where NHL originated in the same

1    way that I can say the COVID originated in Asia.  That's a

2    proper way to do it.

3        But that's -- that's an empirical -- it's a definition

4    based on the fact that I can take a microscope, look at all

5    kinds of cells, and identify that the disease is in the B cells

6    or in the T cells, and that's the meaning of origination.

7        But another meaning is, where, as I explained, cancer to

8    occur needs two, three of these key driver events, mutational

9    events.  The question is, where do they originate?

10       And so, as I was saying, you need cells that are

11   long-lived and that can carry the signal in the progeny, and

12   that is because it's -- typically, it's a very long process to

13   get to cancer of many, many, many years.

14   **Q.**   And so with respect to the B cells, are they long-lived,

15   and do they replicate themselves and their DNA the way that

16   hematopoietic stem cells do?

17   **A.**   No.  They -- there is a subset of the B cells that are

18   called memory cells, and they have a special property, which is

19   they stay there as a memory to remember the invasion so that if

20   an invasion comes again, they will start again clonal

21   expansion.

22       But those expansions are -- but those expansions are

23   temporary, and their typical state is to be quiescent.  And if

24   you're quiescent, you don't have to -- if you're quiescent,

25   it's a way to say that you don't undergo divisions.  They are

**TOMASETTI - DIRECT / COOK**

1  there to be memories, and so they have, typically, very little

2  divisions, actually; and that's their typical mode of

3  operation.

4      And if an invasion occurs, then they will, you know,

5  recognize the invader and explode creating a clonal expansion,

6  but even in that case, those clonal expansions and all those

7  divisions are very brief.  You know, you get a flu, and you

8  have a week you feel sick, and then all of those cells are

9  washed out, eliminated.  And you remain typically, again, with

10  a very few memory cells that will remember that particular

11  invasion.

12  **Q.**  Okay.  Let's go back to the paper and figure -- Figure 3

13  here or Figure 1, here, on page 3.

14      So we talked about how CLL is a subtype of NHL that is

15  something that you calculated in the paper.

16      Since publishing the paper, have you also looked into

17  where NHL overall would be on this figure?

18  **A.**  Yes.

19  **Q.**  And where would it be?

20  **A.**  Well, not just me.  Anyone can do this.  You just go to

21  online SEER database.  It's available.  You Google it, and you

22  can see that it's about 2 percent NHL, the rate in the United

23  States, I believe, or something like that.

24      And so I believe CLL is 0.5, so it's about four --

25  four times higher.  The number of stem cell divisions is the

TOMASETTI - DIRECT / COOK

```
 1   same because, as I explained, the stem cell of the blood system
 2   are all the same.  So you don't need anything.  You just take
 3   the SEER number for the incidence of NHL overall, the lifetime
 4   risk, and you place it on the figure.
 5        And it's right -- it's -- you know, this is a log scale
 6   figure, so you may think that something that's four times
 7   higher is much farther away.  It's actually very small,
 8   you know, distance from where CLL is.
 9              MS. COOK:  And I think you can actually draw or put a
10   point on this screen, if I'm correct, Your Honor.  I'm not sure
11   if the witness --
12              THE COURT:  I think so.
13   BY MS. COOK:
14   Q.   So do you want to draw where it would be, or can you with
15   your finger?
16   A.   With my finger, I can.
17        Yeah.  So let's say it should be somewhere right, you
18   know, there.
19        (Indicating.)
20        Or slightly lower.  Something like that, I would say.
21   Right on the, you know, vertical value -- sorry.  On the
22   vertical axis, but the X axis value, so the X coordinate is the
23   same of CLL and AML.
24   Q.   Okay.  So let's go back to your timeline of literature.
25              MS. COOK:  Your Honor, I'm going to move on to the
```

1  next paper unless you have additional questions about -- about

2  this one.

3          THE COURT:  Nope.

4          MS. COOK:  Okay.

5  BY MS. COOK:

6  Q.  So overall, just in your sort of overall finding in the

7  2015 paper, can you just describe that?

8  A.  The 2015 paper did, I would say, two things.  The first

9  one is provided an explanation for why certain cancer --

10 certain organs get a lot more cancer than others.  So why

11 certain cancer types are more frequent than others.  And also

12 provide a strong indication that the cell divisions and the

13 mutations that normally accumulate, as I already have described

14 in the 2013 paper, somehow seem to play a major role in cancer

15 causation.

16     It wasn't, by any means, the final proof of that, but

17 you know, it's like a -- you probably are familiar with the

18 concept of dose/response curves.  And so the more you give --

19 you know, the higher the dose of substance and you see the

20 greater the effect, then that implies that has something, you

21 know, that's a part of the process of what you are studying,

22 whatever that is.

23     So to see that, you know, just this -- this two-thirds, in

24 fact -- I don't think I mentioned -- two-thirds of -- so the

25 result is that two-thirds of the variation in cancer risk can

1    be explained by number of stem cell divisions.

2        And if you -- what that means is that the variation that

3    you observed on the Y axis which is about five orders of

4    magnitude, so the difference in cancer risk of different

5    organs, two-thirds of that variation can be explained by the

6    difference in how many stem cell divisions those organs have.

7    That's basically the core of the result.

8    Q.   Okay.  So let's look at the 2017 paper.  That's

9    Exhibit 107 in your binder.

10        Do you recognize Exhibit 107 as the paper that you

11    published in 2017?

12   A.   Yes.

13   Q.   Where was that one published?

14   A.   Again, in Science, yes.

15   Q.   Was it peer-reviewed?

16   A.   Yes.  Of course.

17   Q.   And your coauthor Bert Vogelstein, I know you've mentioned

18   him a couple times.  What is his specialty?

19   A.   This.  Meaning -- well, Dr. Vogelstein is one of most

20   famous oncologists, you know, researchers in the world.  He's

21   also an MD, by the way, but, yes.  His -- his research has been

22   about understanding the process of carcinogenesis, as I

23   described before, the Vogelgram is an example.

24        Once the human genome had been read for the first time in

25   a series of science papers, Dr. Vogelstein was among the ones

1    that led many papers finding key driver mutations of many

2    different cancer types.  So the discovery of which genes,

3    whether it's a TP53 or KRAS or any -- many of those were in his

4    papers in the 2000 to 2010 years.

5         He's now also very focused on finding cancer early, in

6    fact, in part, because of these very results that we're

7    discussing today.

8    Q.   Okay.  This is 2017.  Had you been retained by Monsanto as

9    a consultant or having anything to do with the litigation,

10   Roundup litigation at that point?

11   A.   No.  The very first contact for me with the lawyers, who

12   initially just asked me for -- to see what was my opinion about

13   the subject, by the way, was at the end of 2019.

14   Q.   Okay.  So in terms of your findings in 2017, let's just

15   look at the abstract here.  It talks about studying the

16   relationship between the number of normal cell divisions and

17   the risk of 17 cancer types in 69 countries throughout the

18   world.

19        What was it that led you to do this analysis?

20   A.   Yes.  So in 2015, about 10 days after I published that

21   paper, the World Health Organization, specifically IARC,

22   released a press release -- in fact, I think it's Number 231,

23   but I may be wrong -- where for the first time in the history,

24   actually, my understanding is, they published a press release

25   to communicate that they strongly disagreed with scientific

TOMASETTI - DIRECT / COOK

1   publication.

2        And I would say probably the most important point that

3   they were making in that paper in that press release was that

4   because cancer incidence varies across the world -- what we did

5   in 2015 had been done in United States, but their claim was, if

6   you did the same analysis in other countries, you will find

7   very different results.

8        And that is based on this large variation in -- in a, you

9   know, across the world in terms of incidence and which,

10  actually -- and this is another topic, but a lot of that, it's

11  strongly associated with just their quality, you know.  You

12  have countries that don't report cancer.  There are no

13  registries.  There are no doctor cell systems that are able to

14  identify things.

15       In any case, of course, there are some.  There is some

16  variation, so what we did is we did in the first part of

17  the 2017 paper we wanted to do an analysis to test that,

18  whether there was going to be a difference if we performed the

19  same analysis in other countries.

20       And so we took a GLOBOCAN data, which is the database

21  provided by IARC, by WHO, and analyzed all the countries for

22  which at that time there were cancer registry data available.

23  So these are all the countries of the world for which you can

24  do an analysis.

25       And the result, as you can see, is -- was the same, that,

**TOMASETTI - DIRECT / COOK**

1    in fact, we think the confidence interval that we provided for

2    United States, that was 0.81.  This is 0.80.  The correlation

3    across tissues for all these different countries.

4    **Q.**   And the correlation was between what?

5    **A.**   The correlation is 0.8 --

6    **Q.**   Okay.

7    **A.**   -- which in 2015 was 0.81.

8    **Q.**   And that's the correlation between cancer incidence and

9    cell divisions, stem cell divisions?

10   **A.**   Yes.  Oh, I see what -- yes.  Right.

11   **Q.**   Okay.  And then you said that that was one of the

12   analyses.  What was the other analyses?

13   **A.**   So as I said before, and even though some others authors

14   attempted to measure the amount of, you know, the -- for the

15   potential of environment by using my 2013 -- '15 results, for

16   example, paper by Wu, et al., that approach is -- it's not

17   correct because -- precisely because of the noise in the

18   estimates.  As I showed you, very little noise.  It won't make

19   any difference in the correlation that we found.

20        So for the result I was looking for, it doesn't really

21   matter.  But if you're trying to measure how distant is a

22   tissue from where you think it should be in that figure, you're

23   playing a very dangerous game if you don't have exact estimates

24   for that tissue, because if you're off by a factor of 10,

25   you're now going to -- anyway, so since we couldn't do that in

**TOMASETTI - DIRECT / COOK**

1    that way, we decided that we wanted, though, to try to

2    understand in a different way -- we're using a different

3    approach -- again, what was the role of this normal -- normally

4    occurring errors -- we called them R, replication errors -- the

5    R factor, as opposed to E, the E factor, and H, the hereditary

6    factor, E for environment.

7        And so we developed a methodology to essentially estimate

8    when you look at all cancers of a given type and then across

9    all cancers, too, how many of the mutations can be attributed

10   to heredity, environment, and this third factor, the R factor?

11   **Q.**   Okay.  So in terms of the two analyses, the Slide 13, are

12   these both -- there's a table and a figure.

13       Are those both from that 2017 paper?

14   **A.**   Yes.

15   **Q.**   And then we talked about updating the 2015 paper with

16   global data.  In terms of the finding about the proportion of

17   mutations due to replicative errors, what was your overall

18   finding there?

19   **A.**   Yes.  And this was done based on the best epidemiological

20   data available at that time that, essentially, a little bit

21   less than a third of the mutational load found in cancers

22   across all cancer types could be attributed to the environment

23   as of 2017, when it was published.

24       And the only -- about 5 percent or so -- actually, don't

25   remember the exact number -- but a very small proportion due to

1    hereditary factors.

2        And about two-thirds of those mutations -- they were not

3    explained by neither of those two -- could therefore be

4    attributed to this normal factor, which -- which we show the

5    presence in the 2015 paper, and the 2017, its importance.

6    Yeah, so that was the overall.

7    **Q.**   And there were some -- there were some discussion in the

8    briefing about papers that talked about your finding as being

9    that two-thirds of cancer cases are due to bad luck.

10       In fact, what was your finding?  Was your finding about

11   cancer cases, or was it about something else?

12   **A.**   Yeah.  I -- you will not find any paper by me saying that

13   cancer cases, that two-thirds of cancer cases are due to bad

14   luck.  There was never my report.  There is no publication by

15   me saying that.

16       That was -- there were some journalists that its

17   variation, its statistical concepts, so some journalists

18   struggle with that and reported it in the wrong way.  We had

19   to, you know, then communicate further to try to clarify that.

20       Unfortunately, what was more surprising is that many

21   scientists made the same mistake.  So, in fact, I always

22   invite -- if you see any paper attacking, criticizing my 2015

23   or '17 papers saying two-thirds of cancer cases -- if you see

24   that expression as if that was said by me and then they go and

25   attack that statement as wrong, first of all, I completely

TOMASETTI - DIRECT / COOK

1  agree with them.  The statement is wrong, and it cannot be

2  supported by what I did in that way.

3      So it's a strawman argument that we say.  Essentially,

4  they are -- they -- it's a misinterpretation of my result, and

5  in fact, I would say it shows a lack of understanding of those

6  authors of what really -- you know, of the mathematical content

7  and the results in my papers, which instead claim whereabout

8  variation in cancer risk two-thirds and proportional mutations,

9  the two-thirds.  Those were, you know, as this slide says,

10  those were the results that we communicated.

11  Q.   Okay.  And there were also some questions raised in the

12  brief about whether the paper included the description of how

13  you calculated the percentage of mutations due to cancer risks,

14  so can we turn to the supplemental tables of Exhibit 107?

15          THE COURT:  Ms. Cook, can I ask you roughly how long

16  you think your direct will last?

17          MS. COOK:  I think probably about maybe 15 more

18  minutes.

19          THE COURT:  Okay.  We can take a break after that.

20          MS. COOK:  Okay.

21  BY MS. COOK:

22  Q.   What are we looking at here, Dr. Tomasetti?

23  A.   This is a table in that 2017 paper reporting the

24  proportional mutations that were attributable to environment,

25  hereditary factor, and R.

**TOMASETTI - DIRECT / COOK**

1  Q.   Do you -- did you calculate that data for non-Hodgkin's

2  lymphoma?

3  A.   Yes.

4  Q.   What did you find in terms of the proportion of the

5  mutations in non-Hodgkin's lymphoma that were due to

6  environmental factors?

7  A.   Yes.  So about 4 percent, 3.9, was the proportion

8  attributable to environmental factors, using conservative

9  estimates, by the way.

10 Q.   And what -- go ahead.

11 A.   And then about, you know, half a percentage point due to

12 heredity, which left the rest as attributable to just internal

13 processes.

14 Q.   And when you made these calculations, did you rely on

15 published epidemiological data?

16 A.   Yes.

17 Q.   And where did you get that from?

18 A.   Probably the most important source was a paper by Parkin.

19 This was -- there were, at that time, two largest studies in

20 the world about all cancer -- all factors, you know, associated

21 to cancer and across all cancer types.

22      Parkin was the European, the English one.  They had a bit

23 more details than the American one, so we end up using them.

24 And Cancer Research UK was another major source.

25 Q.   Okay.  So Parkin, was that publication -- which by the

1   way, let's look at it, Exhibit 113.

2        Was that data from the UK Cancer Research Institute or

3   UK -- Cancer UK?

4   **A.**   Yes.

5   **Q.**   Cancer Research UK.  Sorry.

6   **A.**   Oh, the data, Cancer Research UK.

7   **Q.**   Yes.

8   **A.**   No.  This is a study from researchers that -- where,

9   you know, I'm assuming are part of also Cancer Research UK, or

10  responsible, but this was a study of, essentially,

11  epidemiologists, British epidemiologists, analyzing all causes

12  of cancer.

13  **Q.**   Okay.  Now, you mentioned Cancer Research UK earlier, and

14  I know your paper talks about it.

15       Why is it that you used data from that database?

16  **A.**   Yeah.  Cancer Research UK, as I said, was very useful at

17  that time because it broke down, you know, the inference of

18  different factors.  And, in fact, for the majority of it, it

19  was reporting the results of Parkin, but it also had sections

20  on hereditary factors, and so it enabled us to, you know, to do

21  the full analysis, basically.

22            **MS. COOK:**  Okay.  So in terms of the data from the

23  Parkin paper and, Your Honor, I'll offer Exhibit 113, the

24  Parkin publication.

25            **MR. KRISTAL:**  No objection.

1          **THE COURT:**  Admitted.

2          (Defendants' Exhibit 113 received in evidence.)

3     **BY MS. COOK:**

4     **Q.**   There's a reference in here to the proportion or the

5     discussion of the proportion of avoidable cancers known as the

6     population attributable fraction.

7          My first question is:  What does that mean?

8          And the second question is:  Did you use that population

9     avoidable fraction in your paper?

10    **A.**   So first question, population attributable fraction is a

11    simple number that tells you, say, for example, if you look at

12    lung cancer, how many lung cancers can be attributed to

13    smoking.  So say it's 90 percent.  Okay.  That would be the

14    population attributable fraction.

15         And then -- and then to your second question, which now I

16    forgot --

17    **Q.**   Did you use their data or their calculations in this

18    epidemiological paper --

19    **A.**   Of course.

20    **Q.**   -- of PAF in your 2017 paper?

21    **A.**   Yes.  We -- yes.

22    **Q.**   Okay.  Did the Parkin paper calculate a population

23    attributable fraction, meaning attributable to environmental

24    causes, for NHL?

25    **A.**   Yeah.

**TOMASETTI - DIRECT / COOK**

1   Q.   What was that percentage of NHL?

2   A.   The proportion attributable, I think, was something like

3   6 percent.

4   Q.   Okay.  And the -- the Parkin paper talks about how they

5   selected the risk factors that they used in their calculation.

6        In general, what were the types of environmental factors

7   that they considered?

8   A.   Well, they obviously were referring to IARC when they say,

9   you know, sufficient evidence.  And but not -- so it was,

10  you know, Category 1, but not only.  They looked at other

11  criterias, too, as you can see here.

12             MR. KRISTAL:  Your Honor, may I just ask Dr. Tomasetti

13  to keep his voice up?  I'm having a little --

14             THE WITNESS:  I'm sorry.  Yes.

15  BY MS. COOK:

16  Q.   Were there categories of environmental factors like

17  occupational infection, things like that?

18  A.   Yes.  I believe it was a total of 14, if I remember

19  correctly.

20        By the way, this number, as well as my 6 percent, should

21  be double-checked.  I hope my memory serves me right, but...

22  Q.   Okay.  So let's look back at your paper, and these are

23  your supplemental -- part of your supplemental tables.

24        When you looked at the population attributable factor for

25  different cancers, were you relying on the same environmental

1  factors that the Parkin 2011 publication used?

2  A.   Yes.   Correct.

3  Q.   Okay.   And did you have different tables that considered

4  occupational factors and infection factors?

5  A.   Correct.   Yes.

6  Q.   Okay.   Now, one of the issues raised in the briefing was

7  that your -- your calculation or your consideration of

8  environmental factors did not include all risk factors

9  including glyphosate.

10      How would you respond to that criticism?

11  A.   Glyphosate -- at that time, glyphosate was not included in

12  my analysis because glyphosate was not included in these

13  epidemiologists' work who I relied upon.   They were the

14  specialists that provided the list of factors and the

15  estimates.   So they went through that analysis.   In fact, you

16  can see also what happened afterwards, obviously, after 2015,

17  an IARC decision.

18      So these are -- these were decisions that -- you know, so

19  these were the factors were selected by those specialists.   And

20  I just literally just applied -- used them for this

21  calculation.   So I relied upon their analysis.   So that would

22  be -- that is my answer for why glyphosate was not included at

23  that time.

24  Q.   And in terms of the -- I wanted to point you to a portion

25  of your paper where you talk about something that you did to be

1    conservative in terms of environmental factors.

2         And can you explain what it means to say that to be

3    conservative, environmental factors for which epidemiological

4    information was not fully available, such as secondhand

5    smoking, were assumed to have the same large effect on the

6    mutation rate as smoking has on lung cancer.

7         Why did you do that?

8    **A.**   Yes.  So I wanted to be conservative and make sure that

9    our estimate, if they were erring, they were erring in favor of

10   the environment.  And so any time there was no -- you know, an

11   available estimate for, say, for example, the increasing

12   mutation rate.  We used, essentially, a very extreme number.

13   We assumed that, you know, the effect of lack of breastfeeding

14   or secondhand smoking was treated like full smoking.

15   Occupational exposure, same thing.

16        So you can imagine, obviously, this is -- this is an

17   overestimate of the true effect of these factors.  But we did

18   it on purpose because those estimates were not available, and

19   we wanted reviewers, and anyone that read the paper, to be

20   convinced that, certainly, the environment could not possibly

21   be stronger than what is indicated in this paper.

22        And we did the same thing -- since you mentioned about

23   occupational exposures as well as infections, I want to

24   clarify, also, there just to explain the -- when you have an

25   infection, for example, HPV in cervical cancer in women, what

1    the virus does is it gives -- it enters in the cells of the

2    body and it modifies the DNA and it causes one of the driver

3    mutations.

4         That's the infection result.  It goes and causes one of

5    the driver mutations.  So because cervical cancer is a solid

6    tumor, we think it's about three drivers needed to get to

7    cancer.  We wanted to be conservative, and instead of giving --

8    so one out of three would be one-third.  We were giving

9    two-thirds of all the mutations found to the effect of this

10   environment -- of the infection.

11        So, yes.  We were, I think, quite extreme in those

12   estimates to -- against R.

13   Q.   Okay.  And so when you say that you were conservative and,

14   if anything, overestimated the role of environmental factors,

15   would that -- would that conservative view of environmental

16   factors -- does that actually end up factoring into what you

17   calculated in these final calculations about the -- the

18   percentage of mutations due to environmental, hereditary, and

19   replicative errors?

20   A.   Yes.  Correct.

21   Q.   Okay.

22        MS. COOK:  Your Honor, I'm not sure that I offered

23   107, which is his 2017 publication into evidence, but I'd like

24   to do that now.

25        MR. KRISTAL:  No objection, Your Honor.

**TOMASETTI - DIRECT / COOK**

 1          **THE COURT:**  Admitted.

 2          (Defendants' Exhibit 107 received in evidence.)

 3  **BY MS. COOK:**

 4  **Q.**   So we're talking about -- we looked at the Parkin paper.

 5          **THE COURT:**  Let me ask you again, how much time do you

 6  think you have left?

 7          **MS. COOK:**  Well --

 8          **THE COURT:**  I just want to be -- it's a tough job for

 9  the court reporter with all these terms.

10          **MS. COOK:**  Yeah.  I know.  You know, this is probably

11  a good time to take a break.  Things are going a little slower

12  than expected.  I would say, hopefully, 10 minutes, but --

13          **THE COURT:**  Okay.  Well, yeah.  I would -- and maybe

14  you can use -- let's see.  How will we -- why don't we take a

15  10-minute break now, and then we'll come back.  You'll wrap up.

16  Hopefully, you can use the break to sort of streamline the

17  remainder of your presentation.

18      We'll begin with cross, and we'll see how far we get

19  before lunch with cross-examination.  So --

20          **MS. COOK:**  Okay.

21          **THE COURT:**  -- and let's resume at 11:40.  Thanks.

22          **MS. COOK:**  Thank you.

23          **THE CLERK:**  Court is in recess.

24                  (Recess taken at 11:30 a.m.)

25                  (Proceedings resumed at 11:42 a.m.)

 1              **THE CLERK:**  Remain seated.  Come to order.  Court is

 2   back in session.

 3              **THE COURT:**  Okay.  You can resume.

 4              **MS. COOK:**  Thank you, Your Honor.

 5   **BY MS. COOK:**

 6   **Q.**   Dr. Tomasetti, we were talking about your 2017 publication

 7   which concluded in part that some 95 percent or so of the

 8   mutations in NHL were due to replicative errors.

 9        Since 2017, have other scientists confirmed that

10   replicative errors are a major component of mutations related

11   to cancer?

12   **A.**   Yes.  Many papers.  Yes.

13   **Q.**   Are you aware of any major cancer organizations that have

14   also recognized that replicative errors play an important role

15   in cancer causation?

16   **A.**   Yes.

17   **Q.**   And I'll ask you to look at Exhibit 119.  And let us know

18   whether that is from the American Cancer Society website.

19   **A.**   Yes.

20              **MS. COOK:**  Your Honor, I'd offer Exhibit 119.

21              **MR. KRISTAL:**  No objection, Your Honor.

22              **THE COURT:**  Admitted.

23        (Defendants' Exhibit 119 received in evidence.)

24   **BY MS. COOK:**

25   **Q.**   And on page 4, there's a discussion of the difference

**TOMASETTI - DIRECT / COOK**

1  between inherited and acquired mutations.  And does the

2  American Cancer Society web page also talk about the process by

3  which replicative errors happen leading to cancer?

4  **A.**   Yes.  In fact, I would highlight the fact that it says

5  right above, it says (as read):

6        "Sometimes they happen, you know, because of

7     exposure, but often" -- so there is some type of

8     quantification -- "often these mutations occur

9     randomly without having an outside cause."

10        So it's specifically referring to my results.

11 **Q.**   Another -- another point that you made while discussing

12 the Parkin paper that you relied on in your 2017 paper was the

13 PAF, or the population attributable fraction, meaning

14 attributable to environmental cancers.

15        Has there been other publications since Parkin that looks

16 at the population attributable fraction for cancer?

17 **A.**   Yes.

18 **Q.**   And are we looking at some of those here?

19 **A.**   Yes.

20 **Q.**   Now, this is all cancers.  Do these publications also talk

21 about the population attributable fraction for NHL?

22 **A.**   Yes.  And as you can see, the estimates, you know, were

23 decreased in -- with respect to the original one that I used.

24 **Q.**   And how does -- how do these additional publications

25 showing 3.5 percent or 8.8 percent or 4.3 percent of NHL

1  attributable to environmental factors, how do those support

2  your opinions?

3  A.    Well, I was asked many times what would happen if some new

4  factors are discovered and the importance in environment

5  increases, and I often reply saying that, of course, I cannot

6  exclude that, you know, that there are some new things

7  discovered.  Of course, that's normal.  But given how

8  conservative the estimates were, if I had to make a guess, I

9  would have actually expected the other direction.  In fact, if

10 I had to do this analysis today, the numbers applied --

11 attributable to the environment would be even smaller than

12 what -- when I did in it in 2017.

13 Q.    And you say that it would be even smaller of an -- of a

14 person as attributable to environmental factors, do you mean if

15 you would have relied on one of these published epi studies

16 instead of Parkin?

17 A.    Yeah.  Brown is the update.  If we stick with the United

18 Kingdom, just to say Brown is the update of Parkin.  As you can

19 see, for NHL, it went from 6 to 3.5, so that would be the

20 number that I would be using today.

21      And if you look across all cancer types, which, I think,

22 was the slide before, it was 42 percent in Parkin, and I

23 believe it's either 38 or 39 -- 38 -- so 43 almost in 2011, 38

24 in 2018 in the update by Brown.

25 Q.    Okay.

**TOMASETTI - DIRECT / COOK**

1   A.    So things can be discovered but, actually, estimates can

2   also decrease.  It's an important point.

3   Q.    Now, since 2017, have you published on the topic of the

4   role of replication errors leading to cancer mutations?

5   A.    Yes.

6   Q.    And let's go through these briefly.  In 2020, what did

7   your research find in that published paper?

8   A.    2020 was a paper where what we showed was that, in fact,

9   in the majority of the other cases, you don't need anything

10  else but R factors to get to cancer.  And there were some

11  previous reports saying that that was not the case, in fact,

12  the paper by Wu, et al., in nature criticizing us.  So this

13  paper show that, in fact, that is not true and you can very

14  well explain causation just with R.

15      And so that was the main result in 2020.

16  Q.    And in 2021, in your Afsari publication, what did you find

17  in that paper?

18  A.    This was a very important one, and I hope it's clear what

19  I'm going to say because, you know, we have described already

20  two, three different approaches, kind of tending to not go in

21  and reach very similar conclusions.  Here is another approach

22  by Afsari.  What we do here is -- I would call it the new wave

23  in epidemiology which is instead of just -- you know, you can

24  look at the population level studies, but there are such things

25  called mutational signatures.

 1        So mutational signatures are basically fingerprints that

 2   different factors leave on the genome.  For example, it's known

 3   that if I look at smoking, smoking will tend to do -- to change

 4   Cs into As in a particular way.

 5        So if I look at the genome of a smoker in lung cancer, I

 6   can tell and even measure the effect of smoking on that patient

 7   because of this signature that smoking left on that patient.

 8   So we use that and -- to measure and develop, you know, many

 9   different signatures of different factors and -- but most

10   importantly here for this case, we looked at the R factor.

11        And so this is a completely different methodology

12   from 2017.  And it does not require any knowledge of the

13   outside world in terms of epidemiology because just the age of

14   the patients, and the results were about two-thirds of all the

15   mutations were explained by a signature, which is typical of

16   the R factor -- the agency -- there I think we called it the

17   agent signature.

18        So it was essentially the same numbers but with a very

19   different -- you know, we say orthogonal, completely orthogonal

20   methodology.

21   Q.   In 2022, do you also have a publication that looks at what

22   the variation in cancer risk that's due to the natural DNA

23   replication errors is?

24   A.   Yeah.  Across different organs, yes.

25   Q.   And what did you find in that paper?

**TOMASETTI - DIRECT / COOK**

1  **A.**    So this paper was maybe a fifth, I guess, a different way

2  to relook at the same problem where what we did there is we

3  compared the mutations that you would attribute to R factors,

4  and so we called that the predictor number just because of the

5  age of the patient and the organ type, versus how many were

6  actually found in the patient.

7       So this is tens of thousands of patients sequenced, cancer

8  patients.

9       And this is a very important point which is, you know,

10  because the fundamental question that I've been asked many

11  times how do you know that there is something that still needs

12  to be discovered?  And one answer is Afsari, mutation of

13  signature.  We know the role of R, just by the signature of R.

14       But another way to do that is we look at how much R should

15  be there and then we look at how many are actually found in the

16  patients, and the DNA of the patients doesn't care if we have

17  discovered the effect of smoking or not.  DNA records what

18  happens, the damage that happens, independent of what we know

19  today in the field.  And so this analysis allows you to see if

20  what you see and experiment to R is good enough to explain what

21  you see in the actual data of the patients.

22  **Q.**    And what did you find in -- what was your ultimate finding

23  in the Penisson 2022 paper?

24  **A.**    That overall, the majority -- the majority of the tissues

25  for which we had data that we analyzed, we didn't observe any

1  major effects of the environment.  The exceptions were two

2  well-known outliers.

3  Q.  And let's just look -- this is our last exhibit that we're

4  going to look at.  It's Exhibit 111.  Is that the Penisson 2022

5  publication?

6  A.  Yes.

7  Q.  And is that --

8  A.  Oh, sorry --

9  Q.  Is that peer-reviewed?

10  A.  Yes.

11  Q.  Okay.  Let's look at Figure 1, which is on page 3.  And

12  I'll just make this bigger.  Can you describe what it is that

13  we're looking at here?

14  A.  Yeah.  So each point in this figure is a patient.  It's a

15  cancer patient, and each color it's a different cancer type.

16      For example, red is colorectal cancer.  And for it to put

17  a patient on this figure, you need two numbers.  One is given

18  the age of the patient and the cancer type, how many mutations

19  normally should have accumulated in that patient due to R.  So

20  that's the X axis value.

21      And the Y axis is, instead, how many were actually found

22  in that cancer of the patient by sequencing.

23      And the gray line, even if may not look like, it's the

24  45-degree line.  So points that are along that line show a very

25  good, you know, correlation, essentially, between what R

 1    contributes or is suspected to contribute versus what was

 2    found.

 3         And as you can see, as I was mentioning before, in

 4    general, the tissues are along that line.  And, of course,

 5    there are -- there are exposures; right?  But if you look at

 6    the general clouds of different cancer types, they are

 7    typically centered along that line.  The major two exceptions

 8    are -- in fact, I would say there is a little bit of a third --

 9    I'll explain.

10         But the major two exceptions are the yellow ones which is

11    smoking, I believe.  Sorry.  If I can look at the legend.

12         One is smoking and one is lung cancer -- yeah.  So the

13    smoking -- so yellow is lung cancer.  So as you can see, DNA

14    doesn't care about what we know.  Let's say WHO -- let's say we

15    had not discovered tobacco's effect on lung cancer.

16         This analysis, just sequencing the DNA would tell us that

17    there is something really wrong in lung that's not normal, and

18    so there must be some exposures that is causing that -- those

19    points to be much higher than normal.

20         The same thing if you look at the light blue.  That's skin

21    cancer.  Again, same thing there is something -- and, in fact,

22    in both cancers we know that the majority of those cancers are

23    caused by the environment.

24         Now, I would like to point just two more observe -- small

25    observations.

TOMASETTI - DIRECT / COOK

1  **Q.**   Keep going.

2  **A.**   If you look at the green, you may say it's a little bit

3  above the line.  Well, that's head and neck, and it's still a

4  very important effect of smoking, not as big as in lung cancer,

5  but smoking affects --

6          **THE COURT:**  You said it's what?  What is green?

7          **THE WITNESS:**  Head and neck.  So the effect of smoking

8  still.  Also head and neck cancer as a major component of -- in

9  fact, to be precise the two measures, you know, smoking and the

10 other is viruses.

11         For example, HPV causes also the neck cancers.  So again,

12 no surprise in there, a bit of both.  Not as much as smoking or

13 sun exposure but a bit of both.

14         And then, if you look at colorectal cancer, I would say

15 it's along the line, in fact, a bit lower.  You can see that

16 those points are very high.  If you look at what those patients

17 are, those patients are the ones that was discovered before

18 with Lynch syndrome with FAP.

19         So those are the patients that were born with mismatched

20 repair mechanisms broken, so they accumulate, you know, say,

21 10 times more mutations or more than normal, and so not

22 surprisingly, they are much higher.

23 **BY MS. COOK:**

24 **Q.**   What color is colorectal?

25 **A.**   The red ones.

**TOMASETTI - DIRECT / COOK**

1  **Q.**   And is NHL on this chart?

2  **A.**   No.

3  **Q.**   Do you know where NHL would be on this chart?

4  **A.**   Yes.

5  **Q.**   And how do you know that?

6  **A.**   Anyone can know that.  You just look at papers reporting

7  on sequencing data of NHL patients, and you can place it on

8  this figure.

9  **Q.**   And where would it be?

10  **A.**   Well, if you look at the -- I don't know what to call it.

11  It's a weird green.  But it's a below -- yeah, the AML.  It's

12  acute myeloid leukemia.  That color -- right.  It's below the

13  line.  It's the light green.

14      But if you look at the center of that cloud, you know,

15  it's somewhat below the gray line.  For NHL, sequencing data

16  indicate about a factor of four in terms of mutations with

17  respect to AML, so I would place it -- it's above AML, and so I

18  would say below the line or at most at the line.

19      So, again, the purpose of this analysis was can you see

20  any measured effect, even if we didn't know it today?  And the

21  answer is with this analysis you can tell if there is something

22  major affecting patients.  And I don't -- I don't see it.

23  **Q.**   And when you say if there's some major effect, if Roundup

24  was having a major effect as an environmental factor, would you

25  be able to see that in this type of an analysis?

```
1              MR. KRISTAL:  Objection.  There's nothing in his
2    report about that question.
3              THE COURT:  Well, I mean, it's directly relevant to
4    your attack on his presentation, so that objection is
5    overruled.
6              THE WITNESS:  Yes.  The answer is yes.
7    BY MS. COOK:
8    Q.   And has that been shown in any of the -- any of your
9    research or in any of the literature related to observed
10   numbers of mutations in NHL?
11   A.   So if you're asking about what the sequencing data are,
12   there have been multiple studies, yes, on NHL and the number of
13   mutations found.  And as I said we can calculate what should
14   be.
15   Q.   And has any of that published research shown that there's
16   an environmental factor acting on NHL such as Roundup?
17   A.   Not to my knowledge.  It's -- this is -- you know, this --
18   by the way, this was like the first time that this approach was
19   used, so it's a, you know...
20   Q.   Okay.  Just before wrapping up, I want to point you to
21   Exhibit 101 and ask if that's your expert report in this case.
22   A.   101?
23   Q.   Yes, 101.
24   A.   Yes.
25             MS. COOK:  And I'd offer Exhibit 101, Your Honor?
```

1          **MR. KRISTAL:**  No objection.

2          **THE COURT:**  Admitted.

3     (Defendants' Exhibit 101 received in evidence.)

4          **MS. COOK:**  And I cannot remember if I offered the

5    Penisson paper, 111, but I'll do so now.

6          **MR. KRISTAL:**  I stand on the same objection.  That's

7    already been overruled, Your Honor.

8          **THE COURT:**  Admitted.

9     (Defendants' Exhibit 111 received in evidence.)

10   **BY MS. COOK:**

11   **Q.**   Dr. Tomasetti, do you hold all the opinions that you've

12   offered to a reasonable degree of scientific certainty?

13   **A.**   Yes.

14   **Q.**   Thank you.

15         **MS. COOK:**  Your Honor, I'll pass the witness.

16         **THE COURT:**  Could I ask you a question?

17    I mean, the answer to this question might be obvious.

18   What -- what are the implications of your findings for cancer

19   prevention?  There's something -- you're the head of -- I can't

20   remember the name.

21         **THE WITNESS:**  City of Hope.

22         **THE COURT:**  City of Hope.  But it's --

23         **THE WITNESS:**  Prevention and early detection.

24         **THE COURT:**  The title of it has "cancer prevention" in

25   it.  So what are the implications of your findings for cancer

1    prevention?

2         THE WITNESS:  So that's a good question.

3         The -- before 2015, when we thought that all cancers were

4    due to the environment, with exception to some inherited ones,

5    the goal was to find all these environmental exposures and

6    hopefully avoid them -- which is very important.

7         And for the factors that -- like smoking and sun exposure

8    and many others, obviously, that's what we want to do.  That is

9    the best thing to do.  It's called primary prevention because

10   you are avoiding -- you're avoiding that person to get to

11   cancer.  The person will not get to cancer because it's not

12   been exposed to, you know, smoking or whatever that is.

13        What this analysis brought to the field is the fact that

14   there are many cancers for which you can't -- for which there

15   is not an external factor, and so you can't prevent them from

16   occurring.

17        And so the best thing that you can do is go secondary

18   prevention.  With secondary prevention, it's still prevention,

19   but what it means is, "I'm not going to be able to avoid to get

20   to cancer, but I can avoid the person to die from that cancer."

21   And the way to do that -- and we have lots of data to show that

22   that is the case, is that cancer kills us when it's found late

23   stages, where there is only a small proportion of people that

24   survive those metastasized cancer.

25        If you look at breast cancer, prostate cancer diagnosed as

1    Stage I, the numbers are very clear.  99 percent of the

2    patients five-years later are alive and typically have

3    solved -- you know, the cancer has been removed.  So that's a

4    major implication for the medical field.

5          Of course, it also means -- sorry, I may be long, but this

6    is very important.  I think it's a very important question.

7          There is, in fact, some primary prevention that we can do

8    thanks to these results which is, for example, we can -- and

9    that's one of things that NIHS funded for my research -- we can

10   find polyps before they become cancer and -- through blood

11   testing.  And if you do that, then, actually, that is primary

12   prevention because you remove -- it's like colonoscopy.  You

13   remove the polyp, and you don't get to colorectal cancer.

14         Anyway, so that's an implication for medicine and in

15   medicine.  Of course, early detection is -- was important also

16   before in the sense that even before we, you know, we always

17   wanted to find cancer as early as possible.  It's just that

18   this highlighted even more the importance to focus on that

19   component, given how much of cancer is just normal due to

20   internal processes.

21         And then there are implications for patients where I

22   receive many, many e-mails of patients and families actually

23   thanking me for these results because of the guilt that, at

24   that time, you know, when you went online, it was either they

25   exposed themself or their child to something, or it was passed

1    from parents to child.  So to know that there is something that

2    it wasn't their fault, that's one implication.

3         And then finally, which I think is the most important --

4    so this arrives at the end, but I think it's the most important

5    of all.  And even more for this specific -- for here today is

6    the following implication:

7         Up to 2015, given that perspective, if a person had

8    cancer, the idea was it must have been an expose- -- unless it

9    was something inherited, it must have been an exposure.  And

10   so, again, the line assumption is that if you had even the

11   smallest suspicion of something, probably that was going to end

12   up being the cause of that.

13        And I think the argument is the general causation argument

14   that I'm making here is that, in fact, we have discovered a big

15   elephant in the room.  And in general, unless you find some

16   specific and proven factor, the reality is that the default

17   assumption should be that it was just the natural process of

18   our body that yielded that cancer, and that's what we see in

19   our patients.

20        And I think that has implications in terms of general

21   causations when trying to understand, when trying to make a

22   decision on whether something caused something or not.

23        And it's -- I'm a mathematician.  It's very different

24   scenario where before R has essentially zero role, and so you

25   are scraping for some answer.  As a patient -- I mean, I'm not

1  talking in the legal setting necessarily as a patient.  It's a

2  much different scenario when you say it looks like, you know,

3  two-thirds using signatures are just normal in your body and

4  nothing you did wrong.

5       **THE COURT:**  It's interesting in this last part of your

6  answer you used the phrase "general causation" a few times.

7       But you were speaking in terms of how to think about an

8  individual's -- individual person's cancer, right?  A --

9  you know, an individual, you know, sort of feeling relief that

10  they weren't the -- you know, some exposure that they,

11  you know, created wasn't the cause of the cancer and it wasn't

12  hereditary.

13       I mean, that sounds more like what we call specific

14  causation, looking at -- trying to figure out the cause of a

15  particular person's cancer.  And so I'm curious why you kept

16  using the term "general causation" as you were describing that.

17       **THE WITNESS:**  I love your question.

18       **THE COURT:**  You've been instructed to say that, so

19  I'll --

20       **THE WITNESS:**  I promise you, I've not been instructed.

21       **THE COURT:**  I'll assume you love every question that I

22  ask.

23       **THE WITNESS:**  No, no.  I promise you I've not been

24  instructed to say that.  Well, you don't know, but I promise

25  that.

PROCEEDINGS

1        I testified.  I'll say always the truth, so that's the

2    truth.

3        Here is the answer.  So two parts.  One is what is very

4    exciting about molecular epidemiology, which is the new wave

5    in -- it's the new epidemiology and it's coming -- is that

6    instead of -- I think I mentioned before, instead of looking

7    at, you know, you have to do large studies where you look at

8    large populations and you control everything for every other

9    factor that's a cofactor in causing cancer.

10       And you're doing a good job, and then you see if one group

11   has more cancer than the other.  This new process -- which has

12   become the standard today in genomic analysis.  Any paper

13   published in genetic data typically will now perform a

14   mutational signature analysis too -- is able to actually look

15   at the individual patient and see what is the -- did they see

16   on the DNA of that person.

17       In fact, we -- in one case, I guess, didn't go to court,

18   but I was asked to do that and we did that for a specific

19   individual.

20       So Point Number 1 is you are absolutely correct.  We are

21   today at a point where we can do -- we're, you know, we are

22   starting to do some significant work in terms of individual

23   causation, which I think you see more and more in coming years

24   even in courts.

25       And then -- and the other part of the answer is, yes, as

 1    I -- I'm always asked this question at the beginning when I

 2    testify, you know, "Are you here to testify specifically about

 3    the patient, the individual?"  And because I'm not an MD, I --

 4    you know, that's not specifically unless I'm provided with the

 5    DNA, in which case I would.

 6         In one case that was what was going to happen.  Then the

 7    case didn't go to trial, but -- so I stay as a general

 8    causation, I guess, expert, but I always say -- I think I

 9    always say that, obviously, as you infer very quickly,

10    obviously, you know, when you say two-thirds, 90 percent --

11    when you give assessment on what causes a cancer, that has

12    implications also for the individual cancer of that patient,

13    right.

14         Because if, for example, I have in a population

15    estimate -- these are not the true numbers.  Doesn't matter.

16    Say, I have a population estimate where 3 percent is something

17    from the environment that as we know today, and 97 percent is

18    normal R.  Then -- and, say, a patient comes to me and says,

19    "What do you think caused my cancer?"  I'll give you the

20    general -- the general explanation for the population level,

21    and I'll say, "Until when I don't look at your DNA, I cannot

22    really say because I don't have -- you know, I don't have the

23    mutational signature of your specific cancer.  But at the

24    population level, the fact that those are the numbers, the

25    probability that your individual case was just due to normal

 1   replicative mutations is extremely high."

 2        So, yeah, I think there are important implications.

 3        THE COURT:  On the issue of looking at their DNA, I

 4   want to make sure I understand what you're saying, and I know

 5   you're not proposing to do that in this case.  But what I've

 6   heard over the last seven years now -- six years, is that

 7   there's no biomarker for NHL.  Or at least, I think, that's

 8   what I've heard, if I'm remembering it correctly.

 9        So there's no way of looking at an NHL patient and sort of

10   distinguishing between different causes of the NHL based on,

11   you know, I guess, looking at their DNA.  It sounds like you

12   may be saying something different here.

13        THE WITNESS:  Yeah.  I don't think that is correct,

14   actually.  First of all, we have biomarkers for NHL.  The

15   simplest way to answer the question is:  If we didn't have

16   biomarkers for NHL, as NHL is a cancer type --

17        THE COURT:  I think I may not have said that properly.

18   But there's no biomarker for NHL caused by a particular thing?

19   I think, that's what I meant to say.

20        THE WITNESS:  Yeah.  So, yeah, and my answer is that

21   there are biomarkers.

22        And by the way, when you said, you know, I'm not proposing

23   this in this case, I'm not -- I will -- I actually tell my

24   lawyers every time if this -- it's available in this case, I

25   would love to do that analysis because I think it's -- at the

1   end of the day ends up being the most convincing.  And in the

2   case where we did it, even if it didn't go to court, the signal

3   of R was even above what I would have predicted in -- so I --

4   there are biomarkers.  Let me explain you why I can say that

5   for sure.

6        They've not been applied to this cases in patients, but in

7   the Afsari paper, for example, we have a signature for R in

8   blood.  Okay?

9        That is the signature of R.  That's the biomarker for one

10  of the causative factors of NHL; right?

11       We don't have a signature for glyphosate.  I'm personally

12  not surprised, but that's a different issue.

13       If we are looking at infections, there are mutation

14  signatures for some infections.  You know, I don't think the

15  field has still arrived to a point where it's caught up with

16  what is needed in the legal field where -- so for NHL,

17  analyzing all the different components and having a signature

18  for all of those.  But we definitely have biomarkers, at least

19  some of those factors.

20       **THE COURT:**  Okay.  And let me just make sure I

21  understand your answer about the -- your 95 percent number and

22  not -- not including glyphosate as a risk factor when

23  conducting that analysis.

24       So forget about glyphosate for a moment, and let's pretend

25  that -- Let's say I -- I have the ability to predict the future

PROCEEDINGS

1    and I tell you that five-years from now, red wine will be

2    classified as a Group 1 carcinogen by the IARC, and everybody

3    will agree that it causes -- it's a cause of NHL.

4              **THE WITNESS:**  Yeah.

5              **THE COURT:**  What does that do today to your confidence

6    level in your 95 percent number?

7              **THE WITNESS:**  I won't say that's a great question.

8    But -- so that goes to the core of the issue.

9         So every approach has some limitation until they -- almost

10   all approaches, I would say.

11        So the analysis in 2017 has the limitation that it can

12   only apply for things that you know of.

13        Which, by the way, is a limitation pretty common in

14   science.  Like I know very few things that you can do where you

15   can say, "Well, can I predict what is going to happen in the

16   future with new substances or" -- you know, it's -- so I would

17   say it's not weird of my approach in 2017.  It's very typical.

18        But it is -- you are absolutely correct.  It is a

19   limitation.  If there was such a thing discovered in the

20   future, then for that estimate, the estimate of R will decrease

21   because there will be this other -- you know, this other

22   factor.

23        I think -- I think what is important, though, is that two

24   things:

25        One is we have answers and, you know, in the absence of

 1   something that we don't know, we rely on those answers as of

 2   now.  And, by the way, if we are specifically wondering about

 3   glyphosate, of course, we have to look at the literature for

 4   glyphosate.

 5       But we have answers.  And more importantly, in science

 6   usually is when you have a -- when you have a result or when

 7   you -- I call it a theory, and sometimes I'm -- that wording is

 8   used against me.  I mean it in the most general sense, like

 9   Einstein's theory of relativity.  Okay.

10       So when you have your paradigm, your current paradigm, the

11   way we have the paradigm is not because of one paper, not

12   because of one approach. It's because of many, many papers

13   approaching the problem from different point of views and

14   finding, confirming again and again the overall conclusions.

15       So that's why, to me, with respect to this particular

16   argument, looking at the body of work there are, as I said,

17   say, five different ways to look at the problem where at least

18   two of them -- so the one on -- actually, three.  The one on

19   mutational signatures, doesn't need to have knowledge of this

20   factor to measure the role of R.

21       See, in the 2017, it was essentially subtraction, as you

22   mentioned, right?  And so you subtract all the environment and

23   what is left over.  But that was just that paper.

24       In the mutational signature approach, you identified the

25   signature of R.  Now you know what R works.  That doesn't care.

1  If in five years wine turns out to be, you know -- well, it's

2  already known to increase some cancer risk.  But if there is a

3  new substance, that will not change anything about the

4  signature for R and how important, how much of an effect it has

5  on the patients that we see.

6      So that's -- and the fact that you find the same number

7  that you find with the 2017, it's, you know, puts me in a place

8  where -- and, again, and then the Penisson paper in 2022 where

9  again you don't see anything measured, it all points to kind of

10 like the same answer.

11     But, again, to me, the most important -- that's why

12 mutational signatures, to me, are the future is because -- and

13 this prediction in Penisson is because they, as you saw in that

14 figure for the Penisson paper, it doesn't matter if we know

15 about smoking and sun exposure.  You just -- you just sequence.

16 You put the numbers.  You don't do any analysis.  You just put

17 the numbers, and it's clearly there is something there.  We may

18 not know for another hundred years, but you can tell.

19     **THE COURT:**  Let me ask you one other question.  It's

20 not really directly relevant to this case, but you mentioned at

21 some point that, you know, you're often asked at the beginning,

22 "Are you giving a general causation or a specific causation

23 opinion?"

24     And your answer is "Well, I'm not a doctor.  I'm not

25 giving a specific causation opinion."  Why does it need to be a

1    doctor to give a specific causation opinion?

2        I mean, I've seen a number of specific causation opinions

3    given, and it doesn't seem like it has anything to do with

4    examining the patient or what you learned at med school.  It

5    seems very different from what doctors do on a day-to-day

6    basis.

7            THE WITNESS:  Okay.  I love this question.  This is my

8    favorite question.

9        Actually, really, it's an amazing question.

10       So, I think the reason -- so the reason why, you know --

11           THE COURT:  I mean, the answer might be that courts

12   intone that it should be a doctor giving this --

13           THE WITNESS:  No, no.  I agree, yes.  There is an

14   historic -- there is, right, what we are used to; right?

15       And this is, again, usually used against me; right?  "Oh,

16   you are an applied mathematician and you're not" -- so sorry

17   for -- it's very important question.

18       So just two, three parts.  One is something that needs to

19   be understood by society is that medicine has had this, you

20   know, I call this three revolutions.  The first one in

21   Renaissance, when we finally decided to open a body and look at

22   the organs and suddenly everything changed in medicine because

23   we actually knew how it looked, an organ, and what it was

24   doing.  And so that started the whole field of medicine,

25   pathology in Renaissance.  In Italy, actually.

1    The second revolution was with a microscope.  Now we can

2  look at cells.  And so as always in science, the deeper you can

3  go and see things, the better you understand the phenomenon.

4  So in 2000 or so we now got the human genome.  It's the

5  3 billion letters.  What that means is this is a huge

6  mathematical object.  Okay?

7    So the argument that "Oh, you're just a mathematician" is

8  completely flawed because I can tell you I work in a cancer

9  center.  I'm a director.  I interact with all the professors

10  there.  In many ways, they all depend from the type of work I

11  do because to identify the subtype today has become not

12  something that you do anymore from a microscope.  That's like

13  old century stuff at this point.

14    You can identify different subtypes of breast cancer, of

15  blood cancer by looking at the mutations, and those analyses

16  are done by people like me.

17    And that's why cancer centers today invest a lot of money

18  and have professors of the type like me because it has become

19  very mathematical.  These are huge data sets, huge objects.

20  And, you know, it's like the New England Journal of Medicine --

21  I think we showed briefly at the beginning.  If the patient

22  needs chemotherapy, it's actually my number that will make the

23  decision.  The doctor will essentially execute whatever number

24  I give him.

25    So now, to conclude, you know, the doctors -- let's now

 1    talk specific -- this is general.

 2         Now, specific about causation.  What is the reality here?

 3    The reality is that when an MD comes and give a specific

 4    causation opinion, what that doctor is really doing, in

 5    general, is just referring to epidemiological studies.  That's

 6    all the doctor is doing.

 7         There is nothing about his specialty that prepared him

 8    more than me.  In fact, I'm much more prepared to evaluate the

 9    epidemiological studies.  My degree is -- I was professor of

10    statistics up until two years ago -- to evaluate that evidence.

11         But traditionally, doctors are the ones that are expected

12    to come in court and give their opinion.  Okay?  So that's

13    the -- that's today the reality.

14         That is -- from my point of view, that will change

15    significantly in the future, and that's why I'm saying -- and

16    that assessment that the doctor gives is population-based.  In

17    fact, just to clarify one more criticism that I always receive

18    is "Oh, but you are here to testify just about general

19    patients.  You cannot say anything about the patient."

20         Well, guess what?

21         In general, even the doctor is not really saying anything

22    about this specific patient in terms of causation.  It's

23    epidemiological studies, and those epidemiological studies are

24    based on populations.  So what is going to change that and is

25    changing that is this analysis of DNA and mutational

 1 | signatures.

 2 |      Those can tell you what you see in that very patient and

 3 | that is, as I said, the future and that's what you will see

 4 | more and more in court and more and more of people like me that

 5 | don't come with an MD degree.

 6 |      **THE COURT:**  Okay.  Why don't we -- it's now almost

 7 | 12:30.  So sorry that I've taken a chunk of time, but why don't

 8 | we break for lunch and resume at 1:15.

 9 |      Do you have an estimate of how long your cross-examination

10 | will be?  I know it's hard to --

11 |      **MR. KRISTAL:**  I'm hoping it will be around the same as

12 | the direct, something along those lines.  In other words, I

13 | don't think but, again --

14 |      **THE COURT:**  I would urge you to really focus over the

15 | lunch break of sort of getting right to the point.

16 |      **MR. KRISTAL:**  That's what I intend to do.  I have a

17 | lot of material.  Given your preliminary statement, much of it

18 | is being eliminated.

19 |      **THE COURT:**  Okay.  All right.  We'll resume at 1:15.

20 |      **MR. KRISTAL:**  Thank you.

21 |      **THE COURT:**  Thank you.

22 |      **THE CLERK:**  Court is in recess.

23 |              (Recess taken at 12:25 p.m.)

24 |             (Proceedings resumed at 1:19 p.m.)

25 |      **THE CLERK:**  Remain seated.  Come to order.  Court is

TOMASETTI - CROSS / KRISTAL

1    back in session.

2             **THE COURT:**  All right.  Take it away, Mr. Kristal.

3             **MR. KRISTAL:**  Thank you, Your Honor.

4        Your Honor, we had, I think, passed up two binders --

5             **THE COURT:**  Yep.  I see them.

6                        **CROSS-EXAMINATION**

7    **BY MR. KRISTAL:**

8    **Q.**  Good afternoon, Dr. Tomasetti.

9    **A.**  Good afternoon.

10   **Q.**  How are you?

11   **A.**  I'm good.  Thank you.

12   **Q.**  Good to see you.  Hope you and your family are well and

13   have a good holiday season.

14   **A.**  Thank you.  Same for you.  Thank you.

15   **Q.**  I'd like to start by following up on Judge Chhabria's

16   hypothetical about red wine, sometime in the future, being

17   determined to cause NHL.  Let's go back to 2011, when Parkin

18   was done.  Parkin only looked at 14 environmental factors;

19   correct?

20   **A.**  I think that's correct, yeah.

21   **Q.**  Okay.  And that's certainly not all of the causes of

22   cancer that exist; correct?

23   **A.**  That -- I guess no.  There must be some that, you know,

24   didn't make the cutoff for which there was not enough evidence

25   or...

**Q.**   Well, you said that Parkin was a study on all causes for all cancers?

**A.**   That -- that's, I think, was their intention what they did to the best of their abilities.  I'm just saying they're scientist, they tried their best, I suspect.  Nothing is perfect.

**Q.**   I don't want to get off on a divergence because we're going to look at Parkin and spend some time with those studies.

If at the time Parkin was done, there were environmental factors that did, in fact, cause NHL, but they were not included in the 14 that he used.  When you basically took his numbers and applied them to your formula, you would attribute those actual causes to random error; correct?

**A.**   Let me be precise.  It's the -- the answer is, probably not depending -- you have to tell me how big of an effect.

**Q.**   I -- I'm not talking about the effect of those things.  If they existed, but they weren't included by Parkin, you did not include it?  You wouldn't have included it?

**A.**   That's your question, yes.  No, it would not have been included.

**Q.**   So by not including it, the default position, so to speak, was it would have been included by you as random; correct?

**A.**   You mean that part would not have been taken by an environmental factor, which I didn't know, so we go to random. And that's why I was continuing my answer to say because of the

1  conservative estimate, there was a big margin, safety margin.

2      So it depends on the fact.  To tell you that it was

3  actually going to detract from R or not, I have to see how big

4  of an effect you are assuming.  If it was a big effect, then

5  yes.  The answer to your question is yes, that would have

6  happened.

7  **Q.**  Well, your model -- and we're going to get into it a

8  little more deeply.  You subtracted from a hundred the sum of

9  what you considered environmental factors and heritable

10 factors; correct?

11 **A.**  No.  That's exactly the point I'm trying to make.  I

12 didn't subtract environment and hereditary factors.  I

13 subtracted, in many cases, very conservative estimates of

14 those.  So in many cases -- in fact, in NHL itself, the effects

15 were probably two, three times what was real.

16 **Q.**  You determined what was attributable, driver gene mutation

17 proportions for E; right?

18 **A.**  Again --

19 **Q.**  In 2017?

20 **A.**  Again, a conservative against our estimate of that.

21 **Q.**  And you determined what you considered H, the heritable

22 factors; correct?

23 **A.**  Again, a conservative estimate.  There is an important

24 difference there, yeah.

25 **Q.**  You added those two together?

1    A.    Right.

2    Q.    And you subtracted from a hundred?

3    A.    That's correct, yes.

4    Q.    And the remainder was attributed to random?

5    A.    Correct.

6    Q.    And you can't tell us here whether that's -- because of

7    your conservative estimates -- higher, lower, the same as what

8    you actually got for random; correct?

9    A.    In this hypothetical scenario?

10   Q.    Yes.

11   A.    Yeah.  You would have to tell me how big of an effect you

12   think this carcinogen is, yes.

13   Q.    Now, the proportion of driver gene mutations that are

14   attributable to E, environmental factors, is different than the

15   proportion of cancer cases attributable to environmental

16   factors; correct?

17   A.    Yes, very important point.

18   Q.    Very important distinction; right?

19   A.    Yes.

20   Q.    I can see by our able court reporter's face we're talking

21   over each other, so I'll try to stop and would ask you to try

22   to do the same.

23        The world's leading cancer institutions misunderstood what

24   you were saying about the random mutations; correct?

25   A.    Did you say "institutions"?  Was it plural?

1    Q.   IARC, for example, you said misunderstood what you were

2    actually saying?

3    A.   Yes.  IARC, well, in the press release, it's not my

4    opinion.  You can just read that.  They make a clear statement

5    about, you know, two-thirds of cancer or the majority of cancer

6    cases, which is definitely nowhere to be found in my paper.

7    Q.   And you have said IARC is one of the gold standards in

8    cancer research; correct?

9    A.   Yes.

10   Q.   And they misunderstood what you were saying; correct?

11   A.   Correct.

12   Q.   The Ramazzini Institute, you're familiar with, from Italy,

13   they also had a criticism of you and also misunderstood what

14   you were saying; right?

15   A.   They reported almost word by word in some cases the IARC

16   statement, so yes -- yes.  They did not report -- they didn't

17   understand the -- what the paper stated.  At least from what I

18   can -- from what you can tell from the -- from what they wrote.

19   Q.   And you would agree there were dozens of other reputable

20   scientists who published critiques, and they also misunderstood

21   what you were saying; correct?

22   A.   Yes.  I would like to specify either misunderstood or in

23   some cases, I guess, they wanted to remark that that

24   misunderstanding that was out there was, you know, wrong.  So

25   it wasn't always necessarily an attack to my research, but

1   maybe as to just wanting to clarify that that's not what we

2   were saying.

3   Q.   Fair to say, many scientists who dedicate their career to

4   cancer and cancer etiology misunderstood what you were saying

5   about random mutations?

6   A.   Yes.  I would just specify when you say "many," still a

7   very, very small minority of the scientists.  But, yes, in

8   absolute numbers, not -- 50 people, a hundred people are many.

9   It's correct to say many.  But out of, say, 100,000 or 10,000

10  scientists, it's a small proportion.

11  Q.   Right.  And we don't know the scientists who didn't write

12  critiques, whether they understood or didn't understand what

13  you were saying; right?  We just don't know one way or the

14  other?

15  A.   Well, we know if they cite my work in the positive and to

16  refer it properly, we do know.  And there are many citations

17  that those papers have received.

18  Q.   Your opinion regarding the proportion of driver gene

19  mutations that are attributable to environmental factors relies

20  solely on the mathematical model that you used in your 2017

21  paper; is that correct?

22  A.   No.  It relies on epidemiological data and not really on a

23  model.  It's -- unless you -- you know, there are formulas.

24  It's -- it's when you say -- sorry, I want to be specific,

25  you know, when you say a "model," usually you mean that I

**TOMASETTI - CROSS / KRISTAL**

1 create a model reality that someone may agree or not.  Those

2 formulas are just arithmetic, so there is no disagreement on

3 the proportions.

4 **Q.** Let me change the question.

5  You're relying on the mathematical formulas that you put

6 forth in the 2017 paper to calculate the proportion of driver

7 gene mutations that were attributable to environmental factors?

8 **A.** Yes; correct.

9 **Q.** Those formulas, you developed; correct?  You say that in

10 the 2017 paper; right?

11 **A.** Yeah.  I -- again, I would say more I calculated them.

12 Like anyone could do it.  There's nothing -- I didn't have to

13 make -- I want to make clear that, you know, one thing is if I

14 come up with the model which has novelty in itself.  Another

15 thing is to just calculate proportion and formulas to be able

16 to calculate proportions based on epidemiological data.  I

17 think I would put that paper more in that category in terms of

18 what we did.

19 **Q.** You had never used those formulas for that purpose before

20 the 2017 paper; right?

21 **A.** No.  That was the first time.

22 **Q.** And you have not used it since; correct?

23 **A.** I'm not sure, actually.  I would have to -- because,

24 you know, we have some papers in the process of being

25 submitted.  I do know that anywhere that is used.  But for now,

1   I would say there are no other publications with those

2   formulas; correct.

3   **Q.**   And as far as you know, no other scientist has used those

4   formulas in the 2017 paper to calculate the proportion of

5   driver gene mutations attributable to E; correct?

6   **A.**   Not in that way, I guess, no, because it was published by

7   me.  Yeah; correct.

8   **Q.**   Okay.  And your opinion regarding the proportion of cancer

9   cases attributable to environmental factors for non-Hodgkin's

10  lymphoma is entirely relying on Parkin; right?

11  **A.**   No.  My opinion -- so if you're talking just about

12  the 2017 --

13  **Q.**   Yes, that's what I'm talking about.

14  **A.**   Yes, of course.  My opinion about -- more generally about

15  the environmental factors are definitely not based just on

16  Parkin.  But if you're talking about the paper, 2017, that was

17  based on Parkin and Cancer Research UK and the references

18  therein.

19  **Q.**   And you deferred to those scientists to tell you what

20  environmental factors to include or not include in your 2017

21  paper; correct?

22  **A.**   Correct.

23  **Q.**   You did not conduct a critical analysis of the Parkin

24  papers or the Cancer Research UK data to see whether they were

25  valid or not.  You just accepted them as they were; correct?

1   **A.**   At that time, yes, we -- I have a student with her PhD

2   dissertation about to submit a paper that will do that, but

3   yes.  As of now, there is not yet a published paper.  It's

4   coming.

5   **Q.**   At the time the 2017 paper was written, which is the basis

6   for your proportion of attributable driver gene mutations and

7   cancer cases for environmental factors, you took what they had

8   and you just input it in your formula; correct?

9   **A.**   Correct.  As I said, yes.

10  **Q.**   Okay.  Do you in the methodology section -- the

11  supplemental section of the 2017 paper, ever inform the readers

12  what formulas you used to determine for NHL the proportion of

13  driver gene mutations related to environmental factors?

14  **A.**   Oh, yes, of course.  I wouldn't have published if I

15  didn't.

16  **Q.**   No, no.  I'm asking if you actually say somewhere "This is

17  the formula I am using for NHL"?

18  **A.**   The formula is the same for all cancer types.

19  **Q.**   Okay.

20  **A.**   And then -- and then, when there is a lack of certain

21  data, we specify that you also have to -- for example, I think

22  we mentioned before secondhand smoking because we didn't have

23  reliable estimates for the risk.  We just assumed they were

24  smokers.

25  **Q.**   Okay.  Would you kindly take out Exhibit 34 in our binder.

1          MR. KRISTAL:  Your Honor, it's the same as 107 in the

2    defendants', and I apologize.  Unfortunately, we didn't

3    coordinate using the same numbers, but it's the same document.

4          THE COURT:  What was the number in your binder?

5          MR. KRISTAL:  34.

6          THE COURT:  Okay.

7    BY MR. KRISTAL:

8    Q.   You ready?

9    A.   Yes.

10   Q.   Okay.  Am I correct that beginning on page 5 of

11   Exhibit 34, the 2017 supplemental material, through page 15 you

12   have a series of mathematical formulas; correct?

13   A.   Through page 15?

14   Q.   Yes, sir.

15   A.   I -- you want me to precisely tell you where the

16   mathematical -- I don't see any in page -- on page 15.

17   Q.   My point is --

18   A.   There are mathematical formulas, yes.

19   Q.   -- there a number of different formulas for a number of

20   different circumstances in those pages; correct?

21   A.   No.  As I said, there is a general formula for all cases

22   and then, because the formula requires multiple parameters,

23   multiple estimates, when some of those were missing, then you

24   have to add an extra, you know, piece of information.  But the

25   formulas are the same across the board for all cancer types.

TOMASETTI - CROSS / KRISTAL

1   Q.   Let's do it this way:  Please tell us and the Court --

2   A.   Yeah.

3   Q.   -- what -- where we can find the specific formula or

4   formulas you used for NHL to calculate the attributable portion

5   of driver gene mutations for environmental factors?

6   A.   Yeah, that's page -- so depending if we want by sex or

7   not, it's three to five or 6.7.

8   Q.   I don't mean to interrupt.  If you could give us the

9   page --

10  A.   I apologize.

11  Q.   -- where the formula is or formulas are.

12  A.   Yes.

13  Q.   So we can follow along and try to ask some intelligent

14  questions.  It won't be as great as Judge Chhabria's, I'm sure.

15  A.   So -- sorry, I didn't hear the last part.

16  Q.   What page --

17          **THE COURT:**  The worst part about being a judge.

18          **THE WITNESS:**  So on page 10 --

19  BY MR. KRISTAL:   --

20  Q.   Okay.

21  A.   -- you will see Formula Number 5, and right below the

22  formula it says:  Equations 3 to 5, so 3, 4, and 5 can be used

23  for obtaining sex-specific estimates.  It is also possible to

24  contain estimates combining both sexes, and those are 6 and

25  7 -- it's basically 7.  You can use 7.

**TOMASETTI - CROSS / KRISTAL**

1   Q.   Okay.  So which formula or formulas did you use?  3, 4, 5,

2   6, and 7; is that what you're saying?

3   A.   Right.  So if you look at the -- the one that's not

4   gender-specific, it's only seven.

5   Q.   Okay.  And could you explain what seven is.  Did you say

6   the one that was --

7   A.   Formula 7.

8   Q.   -- not gender-specific is Formula Number 7?

9   A.   7, correct.

10  Q.   And it's got a lot of mathematical notation, which I have

11  no idea what that is.

12      So could you explain that for a layperson exactly what

13  that formula is, and then we'll look at the data that you input

14  into that formula.

15  A.   It's a bit hard to explain to the -- you know, to a lay

16  audience, as you said.  If the -- I can try.  So there are two

17  sums across J and S.  And --

18  Q.   What does "cross J" mean?

19  A.   So that's a symbol in mathematics for a summation.  So

20  means that you are adding terms across an index, J.

21  Q.   And what is -- I really want to break this down because

22  I've been looking at this.  As you know, we go back a ways, and

23  I'm trying to understand your methodology.

24      So what is J?

25  A.   I'm happy to -- to -- so -- to share the steps.

1        So J is an index.

2   **Q.**   What does that mean?

3   **A.**   You know, an index is something that you use to -- in

4   notation to make a shorter because when you have a summation.

5   For example, I have to remember what is J, which one is S.

6   But, say, yeah, for example, J is the intensity of an exposure.

7   Okay.  I think is J -- no, that's I.  Sorry.  Where is J?

8        Oh.  As you can see on page 9, it says that age group J,

9   so --

10  **Q.**   Would you be able to be a little more specific on --

11  **A.**   On page 9, line 5, 6, 7, 8, 9 -- so page 9, line 9 it

12  says, "age group J."

13       Do you see that?  Line 9 -- I think it's 9.  1, 2, 3, 4,

14  5, 6, 7, 8, 9.

15  **Q.**   It says "let."  There's a certain symbol, "let."  What is

16  that symbol before J in that sentence?

17  **A.**   No, no, that's, I think, line 8.  Oh, sorry.  Because if

18  you count the space in between as a line, which you're right,

19  then it would be line 10.  Below the line afterwards, it says,

20  "In the age group J."

21  **Q.**   Okay.  So the first symbol in equation 7 is the sum of the

22  age groups?

23  **A.**   Correct.

24  **Q.**   And what age groups are you talking about?

25  **A.**   All age groups.  So I think your question is more what are

TOMASETTI - CROSS / KRISTAL

1   these age groups.

2        So it's --

3   Q.   That's what I was trying to ask.

4   A.   Yeah.  So the age groups are -- when you think about

5   population, you want to break -- and you're doing this

6   calculation, you need to break down exposures by age group,

7   you know, for example, zero to 10 years old don't -- are not

8   smokers.  They may be secondhand smokers, but non-smokers.  So

9   the exposure and the intensity of the exposure depends on the

10  ages.

11       And the data can be broken down by age.  And to be

12  accurate, you have to do that by age and by sex and by cancer

13  type and exposure.  So this is why you get all that summation.

14  So you're adding across all different age groups.

15  Q.   Where -- what was the source of the age groups for NHL so

16  that you could sum J?  What was the source of that?

17  A.   Yeah, it's -- so the age group has nothing to do just with

18  NHL.  It's for the population of relevance; right?  In this

19  case, this was done on the -- I see that you have a question.

20  I'll stop with my answer.

21  Q.   I don't want to waste time.  I'm only trying to find out

22  what formula you used for NHL.  Whether it was used for other

23  cancers or not is fine; I just want to know NHL.

24  A.   Yeah, and I'm answering.  It's -- yeah, formula 7.

25  Q.   So for NHL, what was the source of the age groups that you

**TOMASETTI - CROSS / KRISTAL**

1   summed which is the first part of this formula?

2   **A.**   We have to look at the references.  I don't remember.

3        So if you give me a second, I can tell you is -- it's

4   obviously came from the population breakdown in England, and we

5   just had to find -- I'm sure it's referenced in the paper, if

6   you want to save time; otherwise, I'll look for it.

7   **Q.**   Are you saying Parkin?

8   **A.**   I don't know.  I don't remember.  That was six,

9   seven years ago.

10  **Q.**   I'd like to know what the source is, and if you have some

11  way of doing that, I'd appreciate it.

12  **A.**   Then I'll look into it.  I'll try to find the reference.

13  **Q.**   While you're doing that, we both may have had too much

14  coffee at lunch.  I'll try to pause after you're done, and I'd

15  ask you to do the same because it's not fair.

16  **A.**   I apologize.

17       Okay.  So it's in Table 2 of the paper -- of our paper.

18       Where it says sex -- you find that information on --

19  sorry, not Table 2.  Tab 2.  So it's on page 19.  Table S.

20           **THE COURT:**  Of the supplement?

21           **THE WITNESS:**  Of the supplement.  Yes, of the

22  supplement, table -- page 19, Table S5.

23  **BY MR. KRISTAL:**

24  **Q.**   Okay.  I have Table S5.  We're going to look at that.

25  **A.**   Yeah.

**TOMASETTI - CROSS / KRISTAL**

1   **Q.**   So you're telling us that Table S5 for NHL provided you

2   with the age groups that you could sum?

3   **A.**   Correct.

4   **Q.**   Why don't we look at Table 5 now.

5   **A.**   Table S5, Tab 2.

6                       (Pause in proceedings.)

7   BY MR. KRISTAL:

8   **Q.**   Okay.  If you look at Exhibit 36 in your binder --

9   **A.**   36?  Yes.

10  **Q.**   -- which is Table 5 of the supplemental material.

11           **MR. KRISTAL:**  Your Honor, this -- I didn't three-hole

12  punch it because I thought we might be looking at this table

13  and it would be easier.

14           **THE COURT:**  Okay.

15           **MR. KRISTAL:**  I tabbed it on the right because it's

16  not paginated, so I'll try to direct folks.

17           **THE COURT:**  Okay.

18  BY MR. KRISTAL:

19  **Q.**   Okay.  It's the document with tabs.

20  **A.**   Yeah, I'm just -- it doesn't say Tab 2 so -- okay.  So I

21  guess it's the one that you labeled -- well, I don't know what

22  it says.  It's in handwriting.  It's something like, I think,

23  C-R-U-K.

24  **Q.**   Right.  Cancer Research UK.

25  **A.**   Yeah.

TOMASETTI - CROSS / KRISTAL

1  Q.   Let me digress for a moment.  The very first pages that

2  we're looking at are called "incidents all"; correct?

3  A.   Yeah.

4  Q.   And in the left-hand column, you have age groups and then

5  you have different types of cancers.  And then you have -- are

6  those incidents data in the third and fourth columns for male

7  and female?

8  A.   Yeah.

9  Q.   On the tab that says "NHL," there's NHL broken down by age

10 groups and has incidents; correct?

11 A.   That's right.

12 Q.   Okay.  And the source of that was a website of Cancer

13 Research UK.  Is that what you're telling us?

14 A.   No.  What I'm telling you is, these are the incidences.

15 We are still talking about J and the proportional people in

16 each age group, and so that is the -- at CRUK.  In fact, it

17 says it's called "age weight."  So you need to go a few pages

18 forward, and I don't know if it's --

19 Q.   Okay.  So the tab that says -- I think I put A-G-E-W-T,

20 age weight, and that's a way for you to weight the ages of the

21 population in the UK; is that correct?

22 A.   Correct.

23 Q.   All right.

24 A.   And the source, since you were asking -- you wanted to

25 have the sources, it's written right there.

1   Q.   Okay.

2   A.   And it's provided by the UK government.

3   Q.   All right.  And was that used for NHL?

4   A.   Yes, of course.

5   Q.   All right.  The next -- so if I'm understanding you, what

6   you did is you added the columns?

7   A.   No.

8   Q.   No.  When you summed J, what did you do?

9   A.   Well, for each one of these entries, you have to look at

10  the incidence for that age group and that sex.

11  Q.   All right.

12  A.   Right?  So there are multiplications.  That's what you see

13  in the formula, the Formula 7.

14  Q.   Okay.

15  A.   There are multiplications that you need to do, too.

16  Q.   Okay.

17  A.   And where the weights are, this age weights that you see

18  here.

19  Q.   So you take the numbers in the age weights?

20  A.   Correct.

21  Q.   And you multiply them by the incidents which is the first

22  tab?

23  A.   The incidents is the first tab.  I -- we need to go back

24  to the formula because it's not that simple.  In fact, I can

25  tell you that that formula, the only way that you calculate it

 1   is in really you need to do it using a computer.  And I'm happy

 2   to explain why.

 3   **Q.**   I just -- I'm really interested in what were the inputs.

 4   You have the age weight input.  And what do you do with that?

 5   Do you multiply that by something?

 6   **A.**   Yeah.  I answered that question, yes.

 7   **Q.**   What do you multiply it by?

 8   **A.**   By -- so -- sorry, let me go back to the formula.  It's

 9   right there.

10        Which was the paper?  You know, my 2017, what tab is that?

11             **THE COURT:**  The supplemental material is 34.

12             **THE WITNESS:**  34, yes.

13        So if you go back to 34, you see exactly by where it is

14   multiplied.  It's multiplied -- so I just want to be precise, I

15   see that -- so it's multiplied by a sum because do you see

16   there is another sum symbol inside?

17   **BY MR. KRISTAL:**

18   **Q.**   Yes.

19   **A.**   So that's the sum with respect to K which is another

20   index.

21   **Q.**   It says "S"?

22   **A.**   No, the sum -- I'm talking about now inside the

23   parentheses.

24   **Q.**   We're getting further -- when you sum J --

25             **THE COURT:**  I'm going cut this off and -- you've been

**TOMASETTI - CROSS / KRISTAL**

1  trying to explain this formula.  Why don't you go ahead and

2  explain the formula, and then he can ask you some follow-up

3  questions after you've given your explanation.

4         **THE WITNESS:**  Yeah.  This form -- really formula is

5  basically you have to break down things by sex, age, gender,

6  exposure, cancer type.  So imagine breaking down all of these

7  data into these pieces.

8         **THE COURT:**  What was the last thing you said?

9         **THE WITNESS:**  It's for different cancer types.

10        **THE COURT:**  Cancer type.

11        **THE WITNESS:**  And then you have to multiply and then

12 add all those pieces properly.  So, for example, if the

13 incidence in a certain age group -- we're making the example

14 with smoking -- is different from the -- sorry -- if the

15 exposure incidence is different for an age group than another,

16 obviously, you need to weight those accordingly depending on

17 how many children you have, how many adults you have and so on.

18 Right?

19        So you have to do all this breaking down, and then the

20 sums are going to put the sums -- multiplications with

21 incidents and prevalence and, you know, the weights of age

22 which are this W -- all together combined provide you the final

23 result.

24 **BY MR. KRISTAL:**

25 **Q.**   Okay.  Do you need to have incidence data to do that

1  calculation?

2  **A.**    Yes.

3  **Q.**    Do you need to have prevalence data to do that

4  calculation?

5  **A.**    Yes.

6  **Q.**    What else do you need?  We have the age weights.

7  **A.**    So you mentioned incidence, prevalence.  It's actually --

8  let's see.

9       So it's prevalence and relative risk, and the proportional

10  attributable factor -- fraction, which is -- or it's called PAF

11  or PAR, depending on who you read in this paper.  It's usually

12  indicated as P-A-R, PAR, proportional attributable risk.  So

13  you need those -- all those things I mentioned.  So

14  prevalence -- right? -- relative risk, proportional

15  attributable risk.

16  **Q.**    For the incidence for NHL, the source was the website for

17  Cancer Research UK?

18       That's the first tab on Table 5.  The incidence tab.

19  **A.**    Yeah, it looks like it was the -- it was -- it was Cancer

20  Research UK, yeah.

21  **Q.**    And it says here the incidence data was for the years 2012

22  to 2014, from Cancer Research UK; is that correct?

23  **A.**    Yeah; correct.

24  **Q.**    That is different incidence data than Parkin used;

25  correct?

1  A.    Yeah.   I guess Parkin had probably the older data than

2  that since it was published in 2011.

3  Q.    Parkin was written in 2011, and the last incidence data

4  Parkin had was 2007, and they projected what the incidence

5  would be for 2010; correct?

6  A.    I -- you probably remember better than me.   I don't

7  remember that detail.   I'm sure you are mentioning that right.

8  Q.    In any event, whatever incidence Parkin used, this is not

9  it because it was after Parkin was already written?

10  A.    Yeah.   As it's very well annotated, I would say.   It's the

11  incidence we wanted to do based on the most current incidence

12  data that we could have.

13  Q.    Did you mix Parkin data from pre-2011 with the incidence

14  data from 2012 to 2014?

15  A.    Pre-Parkin data -- sorry -- Pre-Parkin data what -- of

16  incidence?

17  Q.    Prevalence for NHL, where did you get that from?

18  A.    The prevalence, we have to look at where that came from.

19  Q.    Okay.

20  A.    It should be annotated.   I don't remember all the details.

21  Q.    If you look at the fourth tab on the right.

22  A.    Thank you.

23  Q.    Alcohol, right?

24  A.    Yeah.

25  Q.    And it has a list of level, grams per day of alcohol,

 1  gender, cancer, and then age breakdowns?

 2  A.   Yeah.

 3  Q.   And is PPE the prevalence data you're talking about?

 4  A.   PPE is -- stands for -- you can look at page --

 5  Q.   Proportion of the population exposed?

 6  A.   Let me put it this way.  It's not the prevalence.  I guess

 7  I can answer just no, that's not a prevalence.

 8  Q.   So for alcohol, where is the prevalence data you need?

 9  A.   So the prevalence -- in this summary table, I already --

10  I'm reporting the PPE value which is obtained from prevalence.

11  Q.   Okay.  And where did you get the prevalence data from?

12  A.   I'm sure I cite it.  It's either Cancer Research UK or

13  Parkin.

14  Q.   Okay.

15       Now, if you look at Tab 37 for a minute while we're

16  mentioning Cancer Research UK.

17  A.   37?

18  Q.   Yes, sir.

19  A.   Yes.

20  Q.   This is from the website that you went to to get the data;

21  correct?

22  A.   Yeah.  This is Cancer Research UK website.  I mean, this

23  is taken from Cancer Research website.

24  Q.   That's where you took the data from?

25  A.   Yeah, that and Parkin.

1  Q.   Okay.  And the terms and conditions, Number 5, says (as

2  read):

3       "Reliance on information on this website."

4       Do you see that?

5  A.   Yes.

6  Q.   It says, quote, the content on this website should be --

7  is provided for general information only.  It is not intended

8  to amount to advice on which you should rely.  Although we make

9  reasonable efforts to update the information on our website, we

10 make no representations, warranties, or guarantees that the

11 content on our website is accurate, complete, or up to date,

12 end quote.

13      That's what Cancer Research said; correct?

14 A.   Yeah.  You read that correctly, yes.

15 Q.   Did you do anything when you got the data from Cancer

16 Research UK to check as to whether or not it was reliable or

17 accurate?

18 A.   As I said, it's one of the most reliable and accurate

19 source of information we have.  I believe this is just a

20 general statement, maybe for also legal reasons so that,

21 you know, they probably want to protect themself from -- I

22 don't know -- a patient making decision and -- I really don't

23 know.  I think this is more of a legal question, then, to me.

24 Q.   My question was --

25 A.   Yes.

**TOMASETTI - CROSS / KRISTAL**

1 **Q.** -- did you do anything to check the reliability or

2 accuracy of the data you were getting from the website that was

3 saying, "We make no warranties or guarantees about that"?

4 **A.** Yeah, that's absolutely.   The answer is, yes.

5 **Q.** Okay.

6 **A.** For example, a lot of information coming from Cancer

7 Research UK was coming from Parkin.   So you could check whether

8 the numbers reported were matching what was in the actual

9 papers that they were reporting.

10  Another way to check, which we did, is there was an

11 American study with very comparable results, and we check

12 whether anything looked weird with respect to what we were

13 provided.

14  Overall, however, this is the source of data for research

15 in general.   And as I said, I consider it one of the most

16 reasonable sources you can find.

17 **Q.** Well, we know the incidence data that you relied on could

18 not have come from Parkin because it's dated after Parkin was

19 published; correct?

20 **A.** Oh, I -- I think we saw the results.   It was Cancer

21 Research UK, yes.

22 **Q.** So you're saying to check the accuracy of the British

23 incidence of all of these cancers, you went to some American

24 study?

25 **A.** No.   I said that we -- one of things we did, we compared

**TOMASETTI - CROSS / KRISTAL**

 1  with the American paper -- there is basically an equivalent

 2  paper in this the United States doing those type of analysis.

 3  But maybe something I didn't understand -- I didn't explain, I

 4  should say, is Cancer Research UK is essentially in many ways

 5  the equivalent of NIH in United States.

 6      So what you're asking me is, you know -- it would be like

 7  it's essentially SEER data.  I think you would agree SEER data

 8  is the most reliable source in the United States.  I would

 9  claim Cancer Research UK for incidence data in England is the

10  most reliable source.

11  **Q.**   NIH is a government agency of the United States; correct?

12  **A.**   Yes.

13  **Q.**   Cancer Research UK is a charity that raises money and

14  distributes money for cancer research; correct?

15  **A.**   They have it slightly differently organized in England,

16  yes.

17  **Q.**   So my question is it's a charity?  It's not any sort of --

18  any sort of governmental agency; right?

19  **A.**   It's -- yeah, it's a charity.  You're correct.

20  **Q.**   Okay.  What American study did you go to to check the

21  British incidence data on the Cancer Research UK website?

22  **A.**   I don't remember now the name of the authors.  Of course,

23  this is like six, seven years ago, but I'm happy to provide you

24  afterwards with references to American studies that were doing

25  essentially the equivalent of what Parkin was doing in England.

**TOMASETTI - CROSS / KRISTAL**

1  Q.  Was there a protocol for this portion of the 2017 paper?

2  A.  I don't understand the question.

3  Q.  Before you did this study, did you write a design of the

4  study?

5  A.  The design of the study is part of the paper.  It's --

6  that's usually when you write -- when you write the paper, you

7  are -- in the -- at the beginning, the first part is you are

8  explaining what is the design of the study, and we did.  Yes.

9  Q.  Who decided to rely on Parkin and Cancer Research UK if

10  you had an American study that was just as good?

11  A.  I didn't say it was just as good.  That's exactly the

12  problem.  In the American study -- and I think I mentioned in

13  my direct -- there were a few -- it was a bit less detailed,

14  slightly less detailed.  And I think the reason is very simple.

15  In England in the United Kingdom, the health system is public,

16  and so they -- you know, they had very good annotations with

17  respect to this type of data.

18  Q.  Do you know where Cancer Research UK got the incidence

19  data that you used as one of the inputs for your formula?

20      Do you know where they got it from?

21  A.  I'm sure at that time I checked if it was -- you know, how

22  was the -- how it was obtained.  I don't remember now.  It's --

23  I would suspect, as I said, that these are because cancer

24  research is the equivalent, essentially, of NCI in America, I

25  would claim.  Then, you know, directly from the registries,

 1   that's -- that would be my guess, from the Government

 2   registries, and they report it on the website to make,

 3   you know, to make available to everyone.

 4   **Q.**   Did you need all of the inputs on the alcohol page we were

 5   looking to calculate each of the cancers?

 6   **A.**   I -- sorry.  You --

 7   **Q.**   You have a formula.

 8   **A.**   Yeah.

 9   **Q.**   And you have to put inputs into that formula to come out

10   with your answer.

11   **A.**   Right.

12   **Q.**   Did you need for NHL the prevalence input, the PPE input,

13   the incidence input, the relative risk input -- did you need

14   all of those for NHL?

15   **A.**   First of all, some of those are calculated from each

16   other, so you don't need all of those.  There are formulas that

17   show you that you need two out of three.  But for prevalence

18   and PPE and relative risk -- but, yes.  I needed all those

19   estimates.

20        And as I mentioned before, in cases where we didn't have

21   the available estimates, we made conservative assumptions.  For

22   example, this applies also to NHL -- right? -- for infections.

23   I mentioned that we -- instead of assuming one virus or one of

24   drivers out of three, we assumed it was two-thirds to make it

25   conservative.  So in some cases, we used an upper bound.

1   Q.   Around a third of the way from the back, there's a little
2   tab that says "NHL" which has the data for infections.
3        Do you see where it says -- go to the infection.  It says
4   "infect," and then the next page has a number of cancers that
5   were relevant to infections including, it says, non-Hodgkin;
6   correct?
7   A.   Yes.
8   Q.   Okay.  The only information you have is a population
9   attributable fraction for non-Hodgkin's; correct?
10  A.   Correct.
11  Q.   And it says 4.  Is that 4 percent, 0.04?
12  A.   Yes.  Correct.
13  Q.   Where did that come from?
14  A.   You mean this table?
15  Q.   No.  Where did the 0.4 population attributable fraction
16  for non-Hodgkin's lymphoma come from that you used in your
17  calculation?
18  A.   I think this was -- I have to relook.  I mean, this is --
19  I think this was coming from Parkin.
20  Q.   Well, you told us earlier, the population attributable
21  fraction for Parkin was 6; right?
22  A.   Well, that's all combined.  This is just infection.  There
23  is also -- there is also the occupational.
24  Q.   Did you have the prevalence data, the incidence data, the
25  PPE, population proportion of exposure, and the relative risk

**TOMASETTI - CROSS / KRISTAL**

1  for NHL for infections?

2  **A.**   Okay.  As I just said, yes.  We had all information

3  necessary, and it's even here in the table that you are showing

4  me.  We make it very clear that the one thing we were missing

5  here was the so-called MR, which is another estimate that's

6  needed.  And that one, we made an upper bound conservative

7  estimate instead of the number because it wasn't provided.

8  **Q.**   Why is the N -- why is the infection sheet that has NHL

9  different than the other sheets that have all of the inputs

10  across the top and the actual data?

11     Why does infections only have a population attributable

12  fraction?

13  **A.**   If you look at -- if you look at -- well, because --

14  essentially, because of this assumption, the MR.  You know, so

15  when you look at -- when you look at the table, for example,

16  the following one on occupation, you have PAF, you have RR, and

17  then MR.  Okay?

18     And so you need those to get what you need in the formula.

19  Because we made this conservative assumption on MR, that's what

20  we needed to get the real PAF.

21  **Q.**   MR is mutation rate?

22  **A.**   Yeah.

23  **Q.**   Are you saying for infections for non-Hodgkin lymphoma you

24  could not calculate the MR?  You just assumed two-thirds of the

25  drivers are due to infection; correct?

1  **A.**   Correct.

2  **Q.**   Now, for NHL, it's your opinion that you only need

3  two drivers; correct?

4  **A.**   No.  Here is drivers.  But it's really a proportion.  You

5  know, this is also something important to understand.  These

6  proportions are of all mutations and therefore reflected as so

7  for the drivers.  So two-thirds of the drivers are -- we

8  were -- we gave them to infections.  Two-thirds of the

9  mutational load in those, for example, in NHL or in any of

10 these cancers where there was an exposure, you know, to an

11 infection, we gave two-thirds of those mutations -- we gave it

12 to infections.

13 **Q.**   So if I'm understanding you, you didn't have data to

14 calculate a mutational rate, and therefore, you assumed

15 something?

16 **A.**   Let me be very precise.  There is a whole section in my

17 paper -- I apologize -- which is called -- which is called

18 page 13.

19 **Q.**   Of the supplemental material?

20 **A.**   Yes.  On the supplement.  My apologies.

21      So on page 13, we have -- I have a section that explains

22 what you do when you don't have available sequencing data.  So

23 if you read this section, it's explained, I think, very

24 carefully what is that -- it's done.

25      But to answer your question, you can read it.  It's a bit

 1  long, but you can read it and go through all the details.  But

 2  to short -- to give a short answer, for specifically since you

 3  are asking about infections, we made it even simpler, and it's

 4  there.  We indicate that.

 5      We just gave two-thirds to infection which is completely

 6  unrealistic, but we wanted to be conservative.

 7  **Q.**   So if I'm understanding you, you didn't have the

 8  information to calculate what you needed to calculate.  You

 9  made an assumption?

10  **A.**   For this particular value, yes.  Correct.

11  **Q.**   Okay.

12  **A.**   And we -- actually, I don't agree with the -- I guess you

13  can theoretically define it as an assumption.  I wouldn't call

14  it an assumption.  I would say it's a -- we -- because we

15  didn't have an estimate, we picked an upper bound.  Upper bound

16  is not an assumption.

17  **Q.**   On the infection page that we've been looking at, you say,

18  "In our calculation, we assumed."  You used the word "assumed."

19  I'm not using it; is that right?

20  **A.**   Yeah.  I used the word but doesn't mean that -- doesn't

21  mean that -- it doesn't mean that it's an assumption.

22  You know, when you make -- when you say assumption -- or

23  I guess, it depends on what you mean.  I didn't mean it the way

24  that you are reading it.

25      When we say "assumption," you can mean something of which

**TOMASETTI - CROSS / KRISTAL**

1   we don't know, and so I'm going to come up with a best estimate

2   I can.  That's not what we did.

3       And another way to do this is to say, because we don't

4   know, we're going to use an estimate that's 10 times higher

5   than what it's actually going to be, and no one is going to

6   disagree with this.  That's what we did.

7       So maybe you're right.  Maybe to eliminate the confusion,

8   I should have used something that was not assumption as the

9   verb.

10  **Q.**   If you don't know what the actual number is by

11  calculation, how do you know that what you assumed is 10 times

12  greater?

13  **A.**   Oh, it's very simple.  Let me give you two examples.  I

14  think you'll understand --

15  **Q.**   I'm just talking about NHL.

16  **A.**   I'm here to explain the --

17          **THE COURT:**  Let him answer the question.

18          **THE WITNESS:**  First -- well, for NHL, this is the

19  assumption.  So I have to explain you the logic.  So let me

20  first give you an example with smoking.

21      If a person is a secondhand smoker, would you agree with

22  me that a secondhand smoker will not have a stronger effect

23  than if that person was an actual smoker?

24          **THE COURT:**  Well, you don't -- you're not really

25  supposed to ask questions.

1              **THE WITNESS:**  Oh, sorry.  I apologize.  Yeah, yeah.

2              **THE COURT:**  You're supposed to just answer.

3    BY MR. KRISTAL:

4    **Q.**   I can answer if you you'd like, but --

5    **A.**   Okay.  So let's say I think you should agree with me.

6         Now, getting to NHL, the way virus infections work,

7    especially in this case, it's very simple.  The virus comes in,

8    enters in the DNA, and causes a mutation.  A major driver

9    mutation.  Okay?  That's one of however number you want.

10        So let's say we don't know how many drivers are needed,

11   the point is it's one.  Okay?  I'm going to the reasoning.  So

12   the point is one.  So let's say it's two, the total.  That

13   would one-half.  So by assuming one-third -- two-thirds, we are

14   being conservative.  If the number was three, that would be

15   one-third.  So you see, we can guarantee that two-thirds is

16   above any possible reasonable value.

17        Did I make -- I'm happy to re-explain it.  This is very

18   important.

19   **Q.**   On both the infection page which has NHL, and the

20   occupation page which has NHL, you report a population

21   attributable fraction; correct?

22   **A.**   Yes.

23   **Q.**   Do you do that on any other page for any other of the

24   factors, environmental factors; right?  There's none for

25   alcohol.  There's none for smoking.

1    A.    In general, on the other -- I don't know.  I would have to

2    look at each one of them, maybe -- yeah.

3    Q.    I want to talk about, generally, about population

4    attributable fraction.

5        You would agree that it's used mainly for public health

6    purposes to determine what percent of cancers you could avoid

7    by eliminating exposures that you're looking at; correct?

8    A.    That's one use.  Actually, I used it for a different

9    reason, but yes.  That's one use, yeah.

10   Q.    And a population attributable fraction is a snapshot in

11   time.  You'd agree with that; correct?

12   A.    Of course.  If exposure change in time, then the

13   population attributable fraction.

14   Q.    So it depends on the population you're looking at,

15   correct, and what their exposures are?

16   A.    Correct.

17   Q.    It depends on the time frame and what was considered to be

18   an environmental factor; correct?

19   A.    At that time; correct.

20   Q.    Okay.  And it also depends on what factors you're looking

21   for; right?

22   A.    That's the most important thing.  Population attributable

23   fraction is associated to a factor.

24   Q.    Okay.

25   A.    And all of these numbers, just to be very clear, are

1  dynamics in time, so there are changes.  And we saw the -- from

2  Parkin to Brown, for example, an example of that.

3  Q.   Well, we're going to talk about that in a little while,

4  but you would agree that the only two factors that you used for

5  your NHL calculations and that Parkin used for the population

6  attributable fractions were -- for NHL were infections and

7  certain occupations; correct?

8  A.   Yeah.  That's --

9  Q.   None of the other 14 factors had anything to do with NHL;

10  correct?

11  A.   They were not reported as having an impact on NHL,

12  correct, by Parkin and Cancer Research UK.  So yes.  We didn't

13  use them.

14  Q.   I've heard you say it before.  You like to be precise;

15  right?

16      So it would be more precise to say that when you

17  calculated the proportion of driver gene mutations attributable

18  to E, you're talking about the proportion of driver gene

19  mutations attributable at 2011 for only infections and only

20  occupation; correct?

21  A.   That's what we did.

22  Q.   Okay.

23  A.   If you go through the details of the paper, that's exactly

24  what we are saying.

25  Q.   But when you say, "I attributed to environment -- to

1   environmental factors 3.9 percent for NHL," you're not talking

2   about all of the environmental factors for NHL.  You're just

3   talking about those two?

4   **A.**   Correct.  And those are the ones that were reported by the

5   studies as the only one to include.  So that's what we did.

6   **Q.**   Okay.  It's the only one that they -- the only ones that

7   they chose to include; correct?

8   **A.**   Yeah.  Correct.

9   **Q.**   And you did not do your own analysis for NHL at that

10  time, 2017, or at any time for what are the universe of

11  environmental factors.  So I can come to court and say, "For

12  NHL, the proportion of driver gene mutations for all known E

13  for NHL is X."

14       You haven't done that; correct?

15  **A.**   No.  I disagree.  When you say for all non-E --

16  **Q.**   For NHL.

17  **A.**   For NHL; right.

18       First of all, I -- I always make clear, I believe, that

19  these estimates are based on papers by Parkin and Cancer

20  Research UK, which are based on listing -- certain list of

21  factors, risk factors, and the estimates are based on those.

22       I think we said, maybe even this morning in the direct --

23  I mean, it's clear everywhere.  It's written everywhere, and I

24  say it every time.

25  **Q.**   Do you say anywhere in the paper that, "My calculation for

1   E in terms of the proportional attribution of driver gene

2   mutations for NHL is only related to two factors"?

3   A.   Absolutely.

4   Q.   Where do you say that?

5   A.   I say so clearly that, in fact, even you were able to find

6   it.  It's -- you know, I don't -- are you asking if I should

7   have a table that for each cancer type reported which ones of

8   the factors ended up into it?  Maybe that would have been

9   helpful.  At that time I didn't think about it.

10  Q.   Okay.

11  A.   The point is, we provided an Excel file, which all the

12  cancer types and, for each one of them, tabs with which factors

13  were included.  So more -- it's a table, I believe.  So it's

14  pretty easy to find it, I think.

15  Q.   At the time you wrote the 2017 paper, you did not do any

16  analysis of the literature for all of the known environmental

17  factors that caused NHL; correct?

18  A.   As I said, I relied on Parkin and so -- correct.

19  Q.   Okay.

20  A.   I relied on Parkin, Cancer Research UK, and what I saw in

21  the American studies, too.

22  Q.   And you accepted those numbers uncritically?

23  A.   I don't agree with that.  As a scientist, I don't think I

24  do anything uncritically.  I critically evaluated the source of

25  my information.  And I decided there was the most reliable --

 1   not decided by me.  In fact, by IARC and others -- and that's

 2   what I used.  So I think that's a critical -- that's critically

 3   done decision.

 4   **Q.**   You have testified -- and I can get the transcripts,

 5   unless you agree -- that what you included is what Parkin

 6   decided to include.  Is that a correct statement?

 7   **A.**   Yes.  I think I said it more than one time, that the

 8   things that were included that were relied upon Parkin because

 9   I determined as a scientist that Parkin and Cancer Research UK

10   were the established, in fact, the most established, sources in

11   the world for this type of data together with the study from

12   United States.

13   **Q.**   Is IARC one of those institutions?

14   **A.**   Yes.  IARC is one of the reliable institutions, yes.

15   **Q.**   If you would go to Tab 49.

16       Now, Parkin used IARC Category 1 and 2A in their analysis;

17   right?

18   **A.**   Something along those lines.  They have, actually -- it's

19   written the specific requirements of what they did, but it

20   wasn't just one.

21   **Q.**   One of the criteria was Category 1 or Category 2A from

22   IARC?

23   **A.**   Correct.

24   **Q.**   All right.  So Exhibit 49 is from the IARC website, and

25   the title is "List of Classifications by Cancer Sites with

 1    Sufficient or Limited Evidence in Humans, IARC Monographs,"

 2    Volume 1 through 134.

 3         Do you see that?

 4    A.   Yeah.

 5    Q.   So that is 1 and 2A categories; correct?

 6    A.   Yes.

 7    Q.   And if you go to page 12 down at the bottom, it has

 8    non-Hodgkin lymphoma all combined; correct?

 9    A.   Page 12?

10    Q.   Yes, sir.

11    A.   Yes.

12    Q.   Okay.  And for Category 1, azathioprine is listed by IARC

13    as a Category 1 environmental factor for NHL; correct?

14    A.   Yes.

15    Q.   Not included by Parkin; correct?

16    A.   No.  I don't think so.  I would have to see exactly what

17    that is, first of all.  I don't remember.

18    Q.   Do you know what it is?

19    A.   You can tell me.  I don't remember.

20    Q.   It's an immunosuppressant drug.

21         Would you agree with that?

22    A.   It sounds like it would be.  So, yeah.  So probably, lack

23    of, you know, data, I would suspect, but from Parkin.

24    Q.   Parkin didn't use it.

25    A.   Correct.

1   Q.   You didn't consider it.

2   A.   Correct.  Which here is this, by the way, this list that

3   you are showing me now.  So I recognize questions.

4   Q.   Cyclosporine.  Do you know what that is?  It's another

5   immunosuppressant drug.

6   A.   Yeah.  Yeah.  It's another immuno- -- yeah.

7   Q.   Parkin didn't consider it.

8   A.   Correct.

9   Q.   You didn't consider it?

10  A.   Again, when you say -- yeah.  I guess they didn't include

11  it.  I don't -- I think it's unfair to say "consider."  I think

12  you should say they didn't include it.

13  Q.   They didn't include it?

14  A.   Yes.

15  Q.   You didn't include it?

16  A.   Correct.

17  Q.   All right.  Immunodeficiency virus, that's HIV.  Parkin

18  included it.  You included it.

19  A.   Viruses were included, yes.

20  Q.   Lindane, which is an insecticide and antiparasitic, Parkin

21  didn't include it.  That's another Category 1, IARC; right?

22  A.   I don't know.  I would have to see what they put into

23  occupational hazard.  Probably not.  I don't know.  Actually,

24  we should check.

25  Q.   We're going to check.

1  **A.**   Okay.

2  **Q.**   All right.  Pentachlorophenol.  That's a pesticide and a

3  disinfectant.  Parkin didn't include it.  You didn't include

4  it; right?

5  **A.**   Correct.

6  **Q.**   All right.  So five out of the six Category 1s were not

7  part of your calculation in terms of what proportion of driver

8  gene mutations were related to environmental factors; right?

9  **A.**   Yes.  If I can know the year of this and when this was

10  published, but yes.

11  **Q.**   Well, let me take a step back.

12       You don't have a current opinion then, is that what you're

13  saying, as to what the proportion of driver gene mutations are

14  related to E, because your opinion is from your 2017 article,

15  which was from the 2011 paper; right?  So you don't have a

16  current opinion?

17  **A.**   No, that's not right.

18       I have a current opinion.  It's based on the fact that

19  after Parkin there was a paper by Brown they updated.  And, in

20  fact, the numbers are even smaller there.

21  **Q.**   And we're going to look at Brown.

22  **A.**   Okay.

23  **Q.**   But you know that one of reasons Brown was smaller in 2018

24  was that Brown only used Category 1 IARC factors; correct?

25  **A.**   That's what they decided to do.

TOMASETTI - CROSS / KRISTAL

1    Q.    That's right.  So when you use a Category 1 as opposed to

2    a Category 1 and 2A, by definition, you're going to have a

3    lower number?

4    A.    That's one of reasons for sure.

5    Q.    Okay.

6    A.    It doesn't have to be the only one.

7    Q.    And I didn't say it was the only one.

8    A.    Okay.  It's one of the reasons, yes.

9    Q.    Let's look at the 2A environmental factors from IARC for

10   non-Hodgkin lymphoma.

11         Benzene; correct?

12         THE COURT:  Well, hold on a second.  He's already

13   established that he didn't include any of those, so I'm

14   concerned about wasting time.

15         MR. KRISTAL:  Fair enough, Your Honor.  Sometimes

16   attorneys beat dead horses, so I appreciate your direction.

17         THE COURT:  It's 2:25, and so you want to make sure to

18   hit your main points.

19         MR. KRISTAL:  Yes, sir.

20         THE COURT:  We all get it that he didn't include the

21   2A stuff and some of these 1A things from this 2023

22   publication.

23   BY MR. KRISTAL:

24   Q.    Now, one way to calculate a population attributable

25   fraction is to select a particular cancer.  Then look at all of

1    the risk factors for that cancer and calculate a population

2    attributable fraction; correct?

3    A.    Yeah.

4    Q.    And you've never done that?

5    A.    We actually -- well, we are doing that.  As I said, that's

6    in part of this dissertation that we're about to submit.  We

7    are doing exactly that.  So I've done that before and -- and

8    even in this paper in some cases we had to -- you know, one way

9    that you get population attributable fraction is if you have

10   prevalence and relative risk, you can calculate.  So I actually

11   calculated in this 2017 paper, also, that.

12   Q.    In the 2017 paper, you isolated non-Hodgkin's lymphoma,

13   looked at all of the environmental factors for that, and

14   calculated a population attributable fraction?

15   A.    For non-Hodgkin lymphoma was given to me, but you were

16   asking if I ever done this type of analysis.

17   Q.    For NHL.

18   A.    Oh, for NHL.  No, I haven't done it because it was

19   provided to me, so I didn't.

20   Q.    I apologize for not being more precise in my question.

21         Let's look at Parkin then.

22             MR. KRISTAL:  I have broken it out, Your Honor, as

23   opposed to putting it all together, so this introductory.  Let

24   me take a step back.

25   \\\

TOMASETTI - CROSS / KRISTAL

1   BY MR. KRISTAL:

2   Q.   Parkin had 16 sections in their paper plus a forward;

3   correct?

4   A.   Yes, I think so.

5   Q.   So there was a forward, an introduction, 14 papers, one

6   for each of the factors that they considered, and then a

7   summary paper.

8   A.   Right.

9   Q.   All right.  So if we look at 44, which is the summary

10  section.  So here they explain in the study that they selected

11  14 lifestyle and environmental risk factors.

12       Do you see that in the abstract?  It's also in the first

13  paragraph in the paper.

14  A.   Yes.  Yes.

15  Q.   And they say in the second paragraph in the abstract that

16  those 14 factors were responsible for 42.7 percent of the

17  cancers; correct?

18  A.   Correct.

19  Q.   All right.  So they did not look at risk factors that made

20  up the balance of the 57.3 cancer incidence in the UK; correct?

21  A.   They didn't look at risk factors.  Yeah.  They didn't

22  have -- they didn't have data to find those risk -- to find

23  that balance, apparently.  Otherwise, they would have; right?

24  Q.   Well, we can only go by what they said.  They don't say,

25  "We looked for and couldn't find for the balance."  They just

1   don't do it.

2       They chose these 14; correct?

3   A.   No.  I disagree.  The purpose of this paper was to find

4   fraction of cancer attributable for any lifestyle environmental

5   factor.  That's the purpose of the paper.  They were not just

6   doing a selective few just to provide the paper for interest of

7   the general public.  They were trying to assess all causes of

8   cancer across all cancer types and provide an estimate for

9   that.

10  Q.   They don't say that, do they?

11  A.   I think it's -- I think they said in the very first

12  sentence, admitting at the same time, of course, the

13  sub-optimal because they don't have the full -- full

14  information, but they say, the very first sentence, they say,

15  "In this study, we have estimated the fraction of cancers

16  occurring in the UK in 2010 that can be attributed to

17  sub-optimal past exposures of this lifestyle factor."

18      That's what they can do.  That's what they have.  But I

19  would have to look.  It's understood that it would be -- it

20  would be absolutely illogical if there was a factor like

21  smoking or alcohol to -- of them to leave it out if they are

22  doing a series of papers for the risk factors for which they

23  can do analysis.

24  Q.   And the risk factors they looked at were smoking; correct?

25  A.   Yes.  Of course.

TOMASETTI - CROSS / KRISTAL

1   **Q.**   Alcohol?

2   **A.**   Yes.

3   **Q.**   Lack of exercise; correct?

4   **A.**   Yes.

5   **Q.**   Overweight and obesity; correct?

6   **A.**   Yep.

7   **Q.**   They looked at four dietary factors:  Eating meat,

8   including red meat and processed meat; correct?

9   **A.**   Yep.

10  **Q.**   Salt.

11  **A.**   Yep.

12  **Q.**   Fiber intake?

13  **A.**   Yes.

14  **Q.**   Fruit and vegetable intake?

15  **A.**   Correct.

16  **Q.**   And then there were two -- ionizing radiation was one, and

17  UV solar radiation was another; right?

18  **A.**   Yeah.

19  **Q.**   And then two factors that only applied to women:

20  reproductive factors and use of hormones; correct?

21  **A.**   Yep.

22  **Q.**   And then the infection and occupations that we've been

23  talking about for NHL --

24  **A.**   Correct.

25  **Q.**   -- those are the factors?

1    **A.**    Those are -- those are the largest factors that as, in my

2    expertise, are the ones that are included even currently in

3    studies.   It's our -- the great -- you know, what everyone

4    considers the well-known factors, established factors, in

5    cancer causation.

6    **Q.**    At the time there were 165 factors that IARC considered

7    Category 1 and 2A; correct?

8    **A.**    I don't know.   I'm sure you're reporting correctly.   I

9    trust you.

10   **Q.**    Let's look at the occupation paper which is Tab 46.

11   **A.**    46?

12   **Q.**    Yes, sir.

13   **A.**    Yes.

14   **Q.**    And on the first paragraph, I could read it, but it

15   basically says there were 107 Category 1s and 58 Category 2As;

16   correct?

17   **A.**    Yes.   That's what it says, and those were included as

18   occupation exposure for the part that --

19   **Q.**    My point is there were 165 environmental factors at that

20   time that were either 1 or 2A, and Parkin considered 14; right?

21   **A.**    No.   I think -- here they are talking -- I think -- no.   I

22   think these are two different things.   They are, here, talking

23   about carcinogens that are found in occupational settings.

24   **Q.**    Like asbestos?

25   **A.**    Like asbestos or cadmium or things like that.

**TOMASETTI - CROSS / KRISTAL**

1    **Q.**   You could have non-occupational exposure to asbestos that

2    causes cancer; right?

3    **A.**   Yes.  And, in fact, I think -- well, I don't know.  I

4    would have to review.  And maybe in that case they didn't look

5    at that because it's, you know, more rare or something.  But

6    yes.

7    **Q.**   If we look at the occupations considered on the next page

8    by Parkin.

9    **A.**   Next page, yes.

10   **Q.**   Okay.  There were no -- the occupation of being a farmer

11   is not included; correct?

12   **A.**   Outdoor occupation is, I think, a farmer.

13   **Q.**   Say that again?  I missed it.

14   **A.**   Outdoor occupation.

15   **Q.**   Outdoor occupations.

16   **A.**   So there is that.

17   **Q.**   But where is that?

18   **A.**   That's on there.  What is it?  UV radiation.

19   **Q.**   Right.  So if they included farmers in outdoor

20   occupations, they weren't including it for pesticides or

21   insecticides; correct?  Or herbicides?  They're talking about

22   sunlight; right?

23   **A.**   I don't know.  For anything here that's included, that

24   they included, that's what it -- you know, that's what they

25   considered.  I'm sorry.  I'm still reading the -- I see

TOMASETTI - CROSS / KRISTAL

1   pesticides.

2   Q.   Right.   But not in farming or landscaping; correct?

3   They're talking about the production of pesticides; right?

4   A.   It says -- (witness examines document.)

5        Yes.   So it seems like it's more the production, yeah.

6   And then -- yeah.   I don't see specific reference to farmers

7   here.

8   Q.   Or landscapers?

9   A.   Or landscapers.   And yeah.   I don't see it.

10  Q.   Do you have an opinion as to what the minimum latency

11  period for NHL is, meaning from first exposure to the

12  development of NHL, how many years, or do you have an opinion?

13  A.   Yes.   It can be -- it can be many decades.

14  Q.   I'm talking about a minimum exposure.

15  A.   Oh, minimum.

16  Q.   Yes, sir.

17  A.   Minimum exposure or latency period?

18  Q.   I'm sorry.   Minimum latency period.

19  A.   I would have to review to be sure.

20  Q.   Best estimate.

21  A.   My best guess, it's going to be -- so first of all,

22  depends on exposure, the intensity of the exposure; right?   For

23  example, you give a person the Hiroshima bomb, that exposure

24  can cause almost instantly certain leukemias and things of that

25  type.   So depends on intensity, your question.

1        So you're talking about normal exposure to what?

2    **Q.**    To an environmental factor related to NHL.

3    **A.**    So, for example, if it's viral; right?  The two I can talk

4    are the viral, since I see numbers, viral infections.  Just

5    infections in general.  I would say, you know, at the very

6    minimum, 5, 10 years.

7    **Q.**    Okay.  And you know that Parkin for hematopoietic cancers

8    used a 0- to 20-year latency period, correct, for the

9    occupational environmental factor analysis?

10   **A.**    I would have to review.  I don't remember that

11   particular --

12   **Q.**    Okay.  Look at the first page of the article.

13   **A.**    Yeah.

14   **Q.**    First full paragraph in the right-hand column.

15   **A.**    First paragraph.

16   **Q.**    It says (as read):

17           "For solid tumors, a latency of 10 to 50 years

18           was assumed.  For hematopoietic neoplasms, it was 0

19           to 20 years."

20           Correct?

21   **A.**    I'm sorry.  I don't -- oh, yes.  I found it now.

22           Yes.  Correct.

23   **Q.**    Okay.  So if you were critically analyzing this paper,

24   that would be a significant criticism of yours, correct, to

25   have a zero latency period for NHL?

**TOMASETTI - CROSS / KRISTAL**

1  **A.**   Again, it depends on the type of exposures and how intense

2  they are.

3  **Q.**   What exposure that causes NHL would have a zero latency?

4  **A.**   Obviously, zero, it's impossible, essentially, right,

5  unless it's atomic bomb.

6      I think here what they mean to do, which is very -- I

7  think it's reasonable is that because blood cancers have --

8  tend to be typically fewer drivers than solid cancers, they

9  made the latency period shorter.  And so they -- you know,

10  instead of 10 to 50, they go down to zero.  Obviously, I don't

11  think they mean, really, zero, but...

12  **Q.**   So that means -- and you know they ended what they call

13  the relevant exposure period of 2005; correct?

14  **A.**   I'm sure you're reading it right.  I don't remember that

15  detail.

16  **Q.**   So an exposure that happened in 2005, they would include

17  the next day in terms of whether that exposed person got the

18  cancer, correct, with a zero latency?

19  **A.**   Right.

20  **Q.**   That's not good science, is it?

21  **A.**   Apparently, it is.  It was published by a -- by a very

22  reputable journal.  I think I trust more that than someone

23  else's opinion.  I think it's actually -- I don't have any

24  particular problem with that.

25  **Q.**   Okay.  And if you look at the population attributable

1   fraction for -- that's on the second page is a table, Table 2.

2   A.   Yeah.

3   Q.   It's 2.1 percent for men and 1.1 percent for women --

4   females; correct?

5   A.   Yes.

6   Q.   Okay.  Now, if you'd go to the infection paper which is

7   45.  If you turn three pages from the back, Table 3 has the

8   population attributable fractions which include NHL.

9        Do you have that page?

10  A.   Yes.

11  Q.   Okay.  And for non-Hodgkin lymphoma for males, it's

12  20 percent; correct?  (0.20)?

13  A.   For non-Hodgkin -- are you talking male?

14  Q.   Yes.  That's what it says.

15  A.   It doesn't seem right to me.  I wonder if it's a typo.  We

16  can --

17  Q.   I'm just asking if it's right or not.  That's what it

18  says.

19  A.   It's easy to calculate.  That's what it states, yes.  But

20  it doesn't seem right to me.

21  Q.   And for females, it says 13 percent for non-Hodgkin

22  lymphoma due to infections; correct?

23  A.   Sorry.  Let me understand this parentheses because --

24  Q.   It says (PAF), and it's not expressed as a percent.

25  A.   I see that.

**TOMASETTI - CROSS / KRISTAL**

1  Q.   So 0.20 is 20 percent.

2                    (Pause in proceedings.)

3  A.   That's what it says.  I still -- I still -- I would have

4  to look at those numbers.  There is something that doesn't seem

5  right to me.

6  Q.   And then for persons, combining the male and female,

7  population attributable fraction that Parkin reports for

8  infections for non-Hodgkin's lymphoma is 16 percent; correct?

9  A.   Yes.  So that's why I'm confused because it's 513 out

10  of -- what is the total?  I don't think the total is -- so

11  let's see.

12      (Witness examines document.)

13      To do the calculation, this says -- so the number that

14  I believe seems correct is this 513.  Whether that is

15  16 percent of the PAF, as I said, I don't -- I need to see the

16  total.  I don't see the total here.

17  Q.   Okay.  But in any event --

18  A.   But that's what they report.  I agree.  Yeah.

19  Q.   Okay.  So you can't explain, as you sit here, why you say

20  it's 6 percent total between infections, 4 percent and

21  2 percent for occupation; right?

22      It's not explainable by the numbers that they report?

23  A.   I think that is a typo.  I think that -- I'm pretty sure.

24  Q.   Okay.  You did not critically evaluate it at the time to

25  see if it was a typo or not; correct?

1  **A.**    Oh, I don't -- obviously, I did not use the parentheses

2  number.

3  **Q.**    Okay.  On the Table 5 for NHL, there is a PAF of

4  4 percent.

5  **A.**    Right.

6  **Q.**    Okay.  You said that number came from Parkin?

7  **A.**    Yeah.  Parkin.  I think --

8  **Q.**    Right.

9  **A.**    -- either Parkin or Cancer Research UK.  I think,

10  you know, whatever was the reference there.

11  **Q.**    There was no reference there.

12  **A.**    Okay.  Whatever was the reference for infections.  It's in

13  the supplement.  I referenced everything.

14  **Q.**    Okay.  In any event, what we're looking at reported by

15  Parkin from the paper on infections, does not square with the

16  4 percent that was in Table 5 of your supplemental materials;

17  correct?

18  **A.**    The PAF that they report, the 16, yes.  I think the number

19  is correct.  The 573, as I said, I think it's a typo.  And I

20  remember something like that, but I don't remember now.  I

21  would have to -- I'm happy, without wasting any more time, I'm

22  happy to report on this, if it's possible, afterwards.

23  **Q.**    That would be up to the judge.

24      If you look at Tab 47, which are the rest of the chapters

25  from Parkin, not including the summary chapter, the infection

 1   chapter, and the occupation chapter, if you would go to Tab 47.

 2   A.   Yes.

 3   Q.   And if you look at the introduction section which is

 4   the -- starts on the second page of the -- do you see that

 5   Chapter 1 introduction?

 6   A.   Yes.

 7   Q.   All right.  And Parkin says on the third page in the --

 8   not the full paragraph, but the paragraph up top.  It says (as

 9   read):

10           "For several exposures, they chose arbitrary

11        latency periods".

12           Correct, arbitrary?

13   A.   Sorry.  Which page are you?  You're still on the first

14   page or the third page?

15   Q.   It's the third page on the left.

16   A.   Upper left.

17   Q.   About midway through the top paragraph.  It says (as

18   read):

19           "Therefore, for several exposures, an arbitrary

20        latent period was included, which is the average

21        interval between exposure and the appropriate

22        increase in risk from the cancers concerned."

23           Do you see that?

24   A.   Yeah.  Well, arbitrary, that the period was good, which is

25   the average between exposure and increase in risk of the cancer

 1   concern.  So there was a --

 2   **Q.**    I apologize.  Were you done?

 3   **A.**    It's arbitrary.  But with some reasoning on the choice.  I

 4   mean, it's a choice.  So I think arbitrary may sounds like it

 5   was completely arbitrary.  There was logic behind how that

 6   latent period was chosen, included.

 7   **Q.**    If you go to their Tab 51, the Brown paper.

 8   **A.**    51.  Oh, it's another folder.

 9   **Q.**    Yeah.

10   **A.**    Okay.  Yes.  I'm there.

11   **Q.**    And in the Brown paper, on the second page, "Materials and

12   Methods."

13   **A.**    Yes.

14   **Q.**    That's where it says that part of their analysis as to

15   which environmental factors to look at were the sufficient IARC

16   which you know to be Category 1; correct?

17   **A.**    Yeah.  Sufficient or convincing evidence because there

18   were two institutions, IARC and WCRF.

19   **Q.**    And if you look on page -- that same page, the second full

20   paragraph, it says (as read):

21          "International versions of Parkin work

22       demonstrate how nations differ markedly in the

23       population attributable fractions, PAFs, for specific

24       cancer types and risk factors and for all cancers and

25       risk factors combined."

**TOMASETTI - CROSS / KRISTAL**

1          Do you see that sentence?

2    **A.**   Yes, I see it.

3    **Q.**   You would agree with that; correct?

4    **A.**   Yeah.  I mentioned before, if you, like, take the cancer

5    registries' data without correcting for the quality, you get

6    very, very different values.

7          And then there are also differences which, I think, it's

8    what they are mentioning here.  They are, you know -- some

9    differences are real, and a lot of them are better quality.

10   Since you asked me if I agree or not with the statement, I want

11   to specify.

12   **Q.**   And if you look at page 1137, the left-hand column,

13   third paragraph up, that's where it says (as read):

14           "This study has built on Parkin, et al., risk

15           factors with probable/limited evidence for

16           associations with specific cancer types were included

17           by Parkin, et al., but have not been included in this

18           study.

19           "The difference in inclusion criteria for risk

20           factor cancer-type combinations partly explains the

21           lower PAFs seen here compared with Parkin, et al.'s

22           work, though this effect is reduced by the addition

23           of new combinations which have been classified as

24           sufficient/convincing over the last six years."

25           Do you agree with that?

1   **A.**   This is what they did.  Of course, I agree with that, that

2   that's what they did.  And the question is why they made that

3   choice.

4   **Q.**   And it's a demonstration of why population attributable

5   fractions change depending on what the selection criteria are;

6   correct?

7   **A.**   Yes.  Of course.

8   **Q.**   Are you aware it talks about international population

9   attributable fractions?  Are you aware of the Azevedo E.

10  Silva -- A-Z-E-V-E-D-O, middle initial E, Silva, S-I-L-V-A --

11  the Fraction of Cancer Attributable to Ways of Life,

12  Infections, Occupation, and Environmental Agents in Brazil in

13  2020?

14       Have you ever read that study?

15  **A.**   I might -- the name doesn't sound new to me.  I don't

16  remember now.  I apologize.

17  **Q.**   If you go to Tab 55.

18  **A.**   55?  Tab 55?

19  **Q.**   Yes, sir.  Exhibit 55.

20  **A.**   Yes.

21  **Q.**   To try to cut to the chase, and you can look at it if you

22  turn to Table 2, which is in the right-hand corner, page 7 of

23  13, is their table with a population attributable fractions.

24       Do you see that?

25            **THE COURT:**  What page?

1          **MR. KRISTAL:**  7 out of 13 on the lower right, Table 2.

2          **THE WITNESS:**  Yes.  I see that.

3     BY MR. KRISTAL:

4     **Q.**   So in this study from 2020 in Brazil for the risk factors

5     that they chose, the population attributable fraction for NHL

6     is 71 percent; correct?

7     **A.**   Yeah.  That's the report, 71 percent.

8     **Q.**   Okay.  Were you unaware of that?

9     **A.**   As I said, I don't remember the study.  It's plus -- yeah.

10    So, yeah.  I don't remember the study.

11    **Q.**   Okay.

12         **MR. KRISTAL:**  Your Honor, I'm going to be switching

13    gears.  Do you want to take a 10-minute break, and I'm trying

14    to --

15         **THE COURT:**  Switching gears?  I thought you were going

16    to say, "Your Honor, I'm wrapping up."

17         **MR. KRISTAL:**  Well, after the break, I may have

18    switched gears that far, Your Honor.

19         **THE COURT:**  Okay.

20         **MR. KRISTAL:**  I just really would like -- and I'll do

21    whatever the Court wants, obviously.  But if I have a chance to

22    regroup at a break, I might be able to pare it -- I should be

23    able to pare it down.

24         **THE COURT:**  Okay.  What we'll do is we'll break until

25    3:05.  You'll have -- I'm going to put you on the clock --

 1  20 more minutes of cross.

 2          **MR. KRISTAL:**  Hopefully, I'll make that.

 3          **THE COURT:**  And then you can do some redirect, and

 4  then, you know, I'm -- then we can talk about how to proceed

 5  from there.

 6          **MR. KRISTAL:**  Thank you.

 7          **MR. STEKLOFF:**  Your Honor, I hate to do this, but I

 8  have a meeting tomorrow morning and might need to leave for a

 9  flight.  Is that -- okay.  I just want to make sure you're okay

10  with that.

11          **THE COURT:**  No problem.

12          **MR. STEKLOFF:**  Okay.  Thank you, Your Honor.

13                  (Recess taken at 2:53 p.m.)

14              (Proceedings resumed at 3:17 p.m.)

15          **THE CLERK:**  Remain seated.  Come to order.  Court is

16  back in session.

17          **THE COURT:**  Sorry about that.  I was in a meeting that

18  went a little longer than I expected.

19          **MR. KRISTAL:**  Good news is I'll be done very shortly.

20          **THE COURT:**  All right.  Take it away.

21  BY MR. KRISTAL:

22  **Q.**   One last series of question, Dr. Tomasetti.

23       The 2017 proportion attributable to driver gene mutations

24  and the PAF is completely different from and has no

25  relationship to the stem cell portion of the 2017 paper; is

TOMASETTI - CROSS / KRISTAL

1   that correct?

2   A.   Correct.  Yeah.  Those are two different parts.

3   Q.   Okay.  And they would also be totally different and

4   unrelated to the 2015 paper, since that was stem cell paper as

5   well?

6   A.   You're talking about a second part of the 2017 -- the

7   proportion of mutations.

8   Q.   Yes, sir.

9   A.   Okay.  When you mean "unrelated," you are saying in terms

10  of -- I just want to make clear I understand the question.

11  Q.   I understand.

12       The 2017 portion which was an extension of 2017 -- 2015 is

13  unrelated to the calculation of the driver gene attributable

14  fractions; right?

15  A.   Those are two different analyses, yes.

16  Q.   So because the 2017 analysis of the driver genes is

17  totally different than the extension of 2015, I'm assuming it's

18  also totally different and unrelated to what was done in 2015.

19  A.   Different analysis.  I wouldn't say -- I don't

20  particularly find "unrelated" that -- maybe the right word, but

21  I would say different analysis, yes.

22  Q.   Well --

23  A.   They are related because they are both assessing the role

24  of R and the role of the environment, so that's why I say

25  they're definitely related to each other if that's what --

 1   Q.   It is in June 10 of 2022.

 2          MR. KRISTAL:  To shorten it, I have copies.  Can I

 3   read it and show the witness, or should I --

 4          THE COURT:  Read what?

 5          MR. KRISTAL:  What he testified in June of 2022, at a

 6   trial on this very specific point.

 7          THE COURT:  You can -- you can read it, I guess.

 8          MR. KRISTAL:  Okay.

 9   BY MR. KRISTAL:

10   Q.   You were asked on page 1751 of the *Johnson* trial, June 10,

11   2022, and this is the one where you're trying to calculate the

12   percentage of each type of cancer that's due to R, E, and H;

13   right?

14          And you said (as read):

15          "Yes.  But it has nothing to do with the stem

16      cell part.  In this paper, there were two major

17      results.  One is about stem cell division, and the

18      other is about proportion of mutations.  So these are

19      completely separate parts of the paper.  There's no

20      relationship between the two."

21   A.   In terms of analysis, that's what I meant, obviously.  In

22   terms of the topic, I think it's obvious that they are related.

23          MR. KRISTAL:  Your Honor, I would move into evidence,

24   and I have spoken to counsel and there's no objection,

25   Exhibit 36 which is the full Table 5 from the 2017 supplement

 1    because that had not been introduced.

 2                THE COURT:  Admitted.

 3         (Plaintiff's Exhibit 36 received in evidence.)

 4         MR. KRISTAL:  Exhibit 37, which is the Cancer

 5    Research UK terms and conditions.  Exhibit 49 which is the IARC

 6    classifications of 1 and 2A.  The 2018 Brown paper that we've

 7    been discussing, and the -- which is Exhibit 51, and

 8    Exhibit 55, which is the Brazilian paper.

 9                THE COURT:  Any objection?

10                MS. COOK:  No objection, Your Honor.

11                THE COURT:  Admitted.

12         (Plaintiff's Exhibits 37, 49, 51, and 55 received in

13    evidence.)

14         MR. KRISTAL:  With that, Your Honor, I have no further

15    questions pending redirect, and pending on your Court's

16    position on any recross.

17                THE COURT:  Okay.

18         MR. KRISTAL:  Thank you.

19                THE COURT:  Any redirect?

20                MS. COOK:  Very, very briefly, Your Honor.

21                THE COURT:  Okay.

22                          **REDIRECT EXAMINATION**

23    BY MS. COOK:

24    Q.   Good afternoon, Dr. Tomasetti.

25    A.   Good afternoon.

**TOMASETTI - REDIRECT / COOK**

1    Q.   I wanted to follow up on some of the questions about the

2    Parkin paper.  And what's easiest for me on my computer is just

3    looking at the version that we admitted, which is Exhibit 113.

4         Do you have that in front of you?

5         And I'm showing it on the screen.

6    A.   Yeah, yeah.  I have it in front of me.

7    Q.   You were asked questions about this table here, Table 3.

8    And specifically, about this line and the excess attributable

9    cases in the right-hand column.

10        Do you remember those questions?

11   A.   Yes.  I actually figured out where there is a typo, as I

12   think I recall.

13   Q.   Well, okay.  Tell us.

14   A.   Well, if you look at the -- okay.  Let's see if I can --

15   if you look at Table -- so that's Exhibit 47 on their side of

16   the exhibits.

17        **THE COURT:**  Okay.

18        **THE WITNESS:**  On page 53 -- is it 53?  No.  I'm sorry.

19   Page S --

20   **BY MS. COOK:**

21   Q.   Which table is it?

22   A.   It's Table 2 on that.

23        **MR. KRISTAL:**  I don't think it's Exhibit 47.  That's

24   sort of the collection of --

25        **THE WITNESS:**  Yeah.  But I need that number because

TOMASETTI - REDIRECT / COOK

1   that's the total number of --

2          **MR. KRISTAL:**  Oh, I'm sorry.  I apologize.

3          **THE COURT:**  All right.  Exhibit 47.  Page 53.

4   Table 2.

5          **THE WITNESS:**  If you see it, non-Hodgkin lymphoma,

6   it's a phrased and put -- depending on which one you use, 2007

7   or 2010 -- no, that's not the right table.

8       This is -- this is the first of the paper by Parkin, the

9   first one.  The fraction of cancer typical of lifestyle.

10      I'm just saying, the one on the screen, it doesn't show

11  the table I'm --

12         **THE COURT:**  Exhibit 44?

13         **THE WITNESS:**  No.  As I said, it's Exhibit 47, the one

14  that's --

15         **MS. COOK:**  Oh, I see.

16         **MR. KRISTAL:**  Your Honor, I think he's talking about

17  Chapter 1, the introduction section.

18         **THE WITNESS:**  Yeah.  That's the right table.

19  BY MS. COOK:

20  **Q.**   Table 2 here?

21  **A.**   Yeah.

22  **Q.**   Okay.

23  **A.**   So now when you look at non-Hodgkin lymphoma, it says that

24  for male it's 6,297 cases, and for female it's 5,305.  So those

25  are all the non-Hodgkin lymphomas that were diagnosed.  Okay?

 1         And similarly, if you use the 2007, I mean, we are about
 2    at 11,000 cases when you add those two together.  Now, if we go
 3    back to the table that was shown -- oops.  Now I lost it.
 4         The one that you have, yeah, if you go down for
 5    non-Hodgkin lymphoma, yeah.  So when you look at 316 cases,
 6    that is definitely not 20 percent of 10,000, 11,000 cases.
 7    Q.   Okay.
 8    A.   So I think it's a typo.
 9    Q.   Well, I was going to ask you that.  So if you look at the
10    table, and you know, I don't know if it's a typo or what, but
11    do you see that the -- there is a percentage of all cancers
12    here at the bottom that is 2.5 percent?
13    A.   Yeah.
14    Q.   Clearly stated -- oops.  That does not need to be that
15    big.  Clearly stated as a percent.
16    A.   Yeah.
17    Q.   And then down below with females, do you see there's a
18    percent -- or there's a parentheses of 1.73?
19    A.   For cervix --
20    Q.   Yes.
21    A.   Yeah, yeah.
22    Q.   And could that possibly be a percentage 1.73?  In other
23    words, 173?
24              MR. KRISTAL:  Objection.
25              THE COURT:  Overruled.

TOMASETTI - REDIRECT / COOK

1       **THE WITNESS:**  Yeah.  It could be.  As I said, I have

2  to, you know, look carefully.  I'm not going to do it here on

3  the stand.  But based on the two numbers I showed you, the

4  report and overall number of non-Hodgkin lymphoma, so about

5  10,000, 11,000, as I showed you in the first paper.  So I

6  think -- I think, clearly, that when you then compare that

7  there are 513 total when we combine.

8       So if we look at Table 3 of -- how do you call this? --

9  45?  Exhibit 45.  So Table 3, reports for non-Hodgkin lymphoma,

10  all people combined 513 cases which are attributable, right, to

11  infectious agents.  So 513.  But we have about 11,000 cases

12  total, so that's about the 4 or 5 percent or so that I -- in my

13  estimate in my papers.

14  **BY MS. COOK:**

15  **Q.**   Okay.

16  **A.**   Anyway, I'm not saying that this is -- you know, I'm just

17  mentioning how these numbers, when you compare the two,

18  actually, you get to the proportion that makes sense to me.

19  **Q.**   Okay.  So when you used this data in your paper, were you

20  using the overall number of cases attributable to infections

21  for NHL, which was 513, or are you using whatever the number is

22  that's in the parentheses?

23  **A.**   Yeah, yeah.  We actually used the numbers, and we checked

24  the PAFs and all that.  We didn't just rely on a number in a

25  parentheses.

1    Q.   Okay.  Now, you were also asked a question about whether

2    or not Parkin considered insecticides as one of the

3    occupational exposures.

4         Do you recall being asked that?

5    A.   Yeah.

6    Q.   Okay.  And I'm going to -- again, I'm on Exhibit 113, and

7    I just want to go to the beginning of that paper of the Parkin

8    paper.

9              MS. COOK:  Excuse me.  I'm sorry, Your Honor.

10   BY MS. COOK:

11   Q.   Actually, I think it's easier just to look at Plaintiff's

12   Exhibit 46.

13   A.   Okay.

14   Q.   So this is what you were shown, the Parkin paper, that

15   relates to occupational exposures; right?

16   A.   Yes.

17   Q.   Okay.  And do you see here where it says that the Parkin

18   authors got the PAFs for the occupational cancers from a paper

19   called Rushton 2010?

20   A.   Yes.

21   Q.   And in order to know whether the PAFs for occupational

22   exposures actually did include insecticide, would you want to

23   look to the Rushton paper?

24   A.   Correct.

25             MS. COOK:  And, Your Honor, this was not one of our

**TOMASETTI - REDIRECT / COOK**

 1   exhibits, the Rushton paper, because I, frankly, didn't know

 2   this would come up.  May I show it --

 3          **THE COURT:**  Sure.

 4          **MS. COOK:**  -- to the Court?

 5          **MR. KRISTAL:**  I have no objection.

 6          **MS. COOK:**  Okay.  Thank you.

 7   BY MS. COOK:

 8   Q.   This is -- do you see, on the screen here, we have the

 9   Rushton 2010 paper about of occupation and cancer in Britain?

10   A.   Yes.

11   Q.   And I'll go to page 5 here which is Table 2, "Cancer

12   Registrations in 2004 Attributable to Occupation by Exposure

13   and Cancer Sites."

14        Do you see this table?

15   A.   Yes.

16   Q.   Okay.  And here there is an entry for non-arsenical

17   insecticides that includes 33 cases for NHL.

18        Do you see that?

19   A.   Yes.

20   Q.   And looking at Table 2, does it appear that the source

21   that Parkin relied on did actually include insecticides?

22   A.   Yes.  That's how it looks like, yeah.

23   Q.   Okay.  Now, finally, you were asked some questions about

24   whether -- whether IARC -- some questions about different --

25   the Cancer UK estimate of population attributable risk -- or

 1  population attributable factors and as to whether if the IARC

 2  categorizations were included, would be different?

 3      Do you recall those questions?

 4  **A.**   Yes.

 5  **Q.**   And have you seen information on IARC's website that would

 6  indicate what IARC finds to be the percentage of population

 7  attributable factors?

 8  **A.**   Yes, at least what they report.

 9  **Q.**   And I'm showing a slide on the screen.  Are you familiar

10  with this?

11      **MR. KRISTAL:**  I object.  A, it's not in the report.  I

12  don't think this was something that was provided to us as an

13  exhibit.

14      **MS. COOK:**  No, it wasn't, actually.  It's -- but I can

15  give you a copy of this slide.

16      **MR. KRISTAL:**  Yeah.  But I don't have the underlying

17  information, I don't have anything.

18      **THE COURT:**  Well, I mean, I think your objection is

19  partially sustained.  If you could take this off for a second.

20      I -- I don't have any concern with the witness testifying

21  about what the IARC says about this.  I do, though, have a

22  concern about you feeding it to him --

23      **MS. COOK:**  Okay.

24      **THE COURT:**  -- which is what seems to be happening

25  here.

TOMASETTI - REDIRECT / COOK

1          MS. COOK:  Okay.  I will not do that.

2          THE COURT:  So you can ask him non-leading questions

3    without feeding information to him about this topic.

4          MS. COOK:  Okay.  Sure.

5    BY MS. COOK:

6    Q.   Dr. Tomasetti, do you know what the IARC's website says

7    about the percentage of NHL cases attributable to environmental

8    factors?

9    A.   Yes.  Yes, Your Honor.

10         I was aware of that page of that information on their

11   website.

12   Q.   What is the percentage?

13   A.   I actually -- I don't remember the exact number.

14   Q.   Okay.

15   A.   Sorry.

16   Q.   Let me ask you this:  Do you know how it compared to the

17   Cancer UK papers that we looked at?

18   A.   Right.  It compares -- it compares very well with all the

19   rest of the papers that, you know, we -- that we have

20   considered and the ones that are available today.

21   Q.   Okay.

22   A.   So there is no extra -- yeah.

23   Q.   Okay.

24         MS. COOK:  Your Honor, I have no further questions.

25         THE COURT:  Okay.

PROCEEDINGS

1          MR. KRISTAL:  Less than 2 minutes.

2          THE COURT:  All right.  I'll hold you do to that.

3                    RECROSS-EXAMINATION

4  BY MR. KRISTAL:

5  Q.   Exhibit 46, Parkin Occupation Table.  We were looking at

6  Table 1.  Are you there?

7  A.   Yes.

8  Q.   Okay.  It lists arsenical pesticides; correct?  And it

9  talks about pesticide production.

10     We went over that; right?

11 A.   Yes.

12 Q.   Okay.

13         MR. KRISTAL:  That's all I have, Your Honor.

14         THE COURT:  Okay.  All right.

15     You can step down, and congratulations.

16     Let me -- I really -- you know, I really have only one

17 question, I think.

18                 (Witness excused.)

19         THE COURT:  I really have only one question, I think.

20 And I think it's probably for you, Ms. Cook, initially.  And it

21 relates to the discussion that I had with the witness at the

22 end of his direct.

23     When I think about this witness's testimony, it strikes me

24 that it could be quite helpful to the jury, you know, and

25 thinking -- but it -- is it helpful on the issue of general

 1  causation or specific causation?  That's what I'm struggling

 2  with a little bit.

 3       Feel free to come up.

 4       Because when I think about it, I think about:  Okay.

 5  Well, why does Monsanto like this witness?  And why does

 6  Monsanto want to put this witness on at trial?

 7       The answer to me, it seems, is obvious; right?  You have

 8  these specific causation experts who are doing a very sketchy

 9  job of differential diagnosis or differential etiology.  And

10  basically, what they are saying is, well, you know, there are

11  these four risk factors for NHL, and the patient didn't have

12  these three risk factors.

13       The only risk factor was exposure to Roundup.  Therefore,

14  the Roundup caused the patient's NHL; right?  I mean, that

15  is -- I'm oversimplifying a little bit.  I mean, they're

16  finessing it a little bit.  But effectively, that seems to be

17  what the -- that's the message from these specific causation

18  experts.

19       That type of testimony is obviously quite sketchy, and

20  you know, Tomasetti's testimony helps a juror understand why

21  the testimony of these specific causation experts is so

22  sketchy; right?

23       But you designated him as a general causation expert, and

24  so I'm just trying to sort out in my mind, is that a problem?

25  Is it a problem that you merely designated him as a general

1    causation expert as opposed to, say, a rebuttal expert on the

2    issue of specific causation?

3         I know there's a huge overlap between general and

4    specific, and you can't really -- it's hard to untangle the

5    two, but you get my question?

6              MS. COOK:  Yes.  Absolutely.  And we designate him as

7    a general causation expert.  He does not look at the files of

8    the plaintiffs, and he does not talk about -- he does not give

9    an opinion about the particular plaintiff.

10        And what our specific -- what our -- so in part, it is

11   helpful to the jury in our minds to rebut the plaintiff's

12   specific causation experts who say, "Well, if it's not HPV and

13   it's not whatever else, it must be Roundup.  We have to find

14   something.  Otherwise, why would this person have cancer?"

15             THE COURT:  Right.

16             MS. COOK:  So it's sort of setting the table --

17             THE COURT:  And what it's been up until now, I think,

18   is, well, the high percentage of NHL cases are idiopathic.  And

19   that's a very abstract concept for the jurors, and you know,

20   it's easy for the plaintiff's experts to sort of wave that

21   away; right?

22             MS. COOK:  Yes.

23             THE COURT:  And you're putting meat on the bones of

24   what you've said previously which is that such a high

25   percentage of NHL cases are idiopathic.

1        **MS. COOK:**  Right.  Which is sort of a different -- and

2   I know that in their brief they said it's a sea change.  It is

3   in a certain sense because we're actually going into the

4   granularity of what's actually happening behind the word

5   "idiopathic," but even in, I think it was, the *Hardeman* trial,

6   Dr. Levine talked about the idiopathic concept.  And the way

7   she talked about it was about these mutations that happened

8   because of these errors.

9        The idiopathic part is we don't know why they're

10   happening, when they're happening, and all those things.  And

11   so this is kind of a table setting about -- it's sort of this

12   is the way we understand cancer now.  It's not the way that

13   people used to understand it.

14        And he knows firsthand from all this peer-reviewed,

15   published research.  And then we also have a specific causation

16   expert who underscores that research and comes in because they

17   also are familiar with this from their oncology work, and they

18   understand about how the mutations happen.  And then they --

19   they kind of underscore that in their specific causation

20   opinion.

21        And they say, "Yes, my opinion is that this plaintiff's

22   NHL was caused by random replication -- or rep -- DNA

23   replication errors."

24        So it's -- we don't intend to rely on his testimony for

25   that, but it --

PROCEEDINGS

1              THE COURT:  So you have specific causation experts who

2       are going to testify in this particular case that they think

3       it's -- the likely cause of the NHL was DNA replication errors?

4              MS. COOK:  Yes, Your Honor.

5              THE COURT:  Okay.

6              MS. COOK:  And that's how we've done it in the other

7       trials where Dr. Tomasetti has testified as well.  It's just

8       that with him being able to talk about his firsthand

9       involvement with the research and involvement in the field, it

10      is helpful for the jury to understand because, as you'd expect,

11      many oncologists don't spend their time thinking about the kind

12      of ins and outs of DNA and mutations.

13             THE COURT:  And of course, he also has his opinion

14      that I instructed you all not to get into, which is just the

15      general opinion about the shortfalls of the epidemiology

16      studies that the plaintiffs are relying on and all of that.

17             MS. COOK:  Correct.

18             MR. KRISTAL:  Your Honor, may I at some point address

19      it?

20             THE COURT:  Yeah.

21             MR. KRISTAL:  Thank you.

22             THE COURT:  Just curious, in the trials that

23      Dr. Tomasetti has testified in, what's the record been?

24             MS. COOK:  Well, if you had invited me here a month

25      ago, I would have a different answer to that question.

1      So there -- I believe that the company had won nine in a

2  row -- and I don't know how many of those included

3  Dr. Tomasetti, but a number of them.  And then starting with my

4  most recent trial, actually, in October, November, I think

5  we've lost maybe five in a row.  And not -- I don't believe

6  Dr. Tomasetti testified in every single one of them, but -- so

7  it's not a -- it's not batting a thousand or anything.

8          THE COURT:  Okay.  Go ahead.

9          MR. KRISTAL:  Thank you, Your Honor.

10     Your Honor, to address your first point -- and

11  Dr. Tomasetti is still here, so I don't know if you'd consider

12  asking him one question -- but he has stated both in deposition

13  and trial, no matter how much randomness there is in a cancer,

14  if he believes that the person was exposed to an established

15  carcinogen, he would attribute that cancer 100 percent to the

16  environmental carcinogen.  So it's not an either/or.

17     So that, if I understood your first initial sort of

18  dialogue, it's not as if he comes in and says, "It's all

19  random, regardless of the environmental exposure."  So if in a

20  differential diagnosis --

21          THE COURT:  He's just saying you can attribute

22  94 percent of --

23          MR. KRISTAL:  Right.  But if he believed that person,

24  that specific person, also had an established environmental

25  carcinogenic carcinoma, he would say it's 100 percent

PROCEEDINGS

1   attributable to the --

2          **THE COURT:**  I don't know if he would say that or not,

3   but what is your point as it relates to a motion to exclude

4   him?

5          **MR. KRISTAL:**  My point is, it's not his --

6          **THE COURT:**  As it relates to the motion to exclude

7   him, what's your point?

8          **MR. KRISTAL:**  I was addressing -- I guess it's the fit

9   analysis because the random nature and the stem cell stuff I

10   don't think really relates.  I think the nub of the matter and

11   why Monsanto calls him and why we're opposing him is

12   the 2017 percent of random mutations.

13        First of all, the jury is never asked to consider whether

14   or not the person had a proportion of random mutations.  It's

15   more the cancer cases which is the PAF Parkinson stuff.  And

16   I believe it's not reliable.

17        So it doesn't fit a question that the jury is being asked

18   to answer.  In terms of the population attributable

19   fractions -- in other words, what's the difference --

20          **THE COURT:**  I don't under- -- I guess I don't

21   understand your point.  I mean, why isn't it very helpful to

22   the jury to hear -- I mean, assuming -- assuming the opinion is

23   reliable, why isn't it very helpful for the jury to hear that

24   X percent of -- were high -- even if there's no number attached

25   to it -- a high percentage of the, you know, cancer and a high

**PROCEEDINGS**

 1  percentage of NHL, you know, as is -- is -- can be attributed

 2  simply to these replication errors without regard to

 3  environmental factors, and here's how it works.

 4       **MR. KRISTAL:**  Because that's not what Dr. Tomasetti is

 5  saying, which is the whole misleading portion.  There's a

 6  difference between --

 7       **THE COURT:**  I mean, he just spent the day on the stand

 8  saying that.

 9       **MR. KRISTAL:**  No.  Maybe I -- if we had a chance,

10  perhaps, to have some supplemental briefing after the

11  transcript.

12       There's a difference between saying a certain proportion

13  of random driver gene mutations are attributable to R, which is

14  not the same as saying there's a certain proportion of random

15  mutations that are cancer case causers.

16       So one is the calculation that we just went over.  The

17  other is the population attributable fraction.  The confusion

18  between the two random driver gene mutations and the

19  attributable portion of cancer cases is what IARC was confused

20  about, Ramazzini was confused about, other scientists were

21  confused about, and I believe what an average juror, if they

22  were confused about it, they're not getting the distinction.

23       And sometimes -- I have examples -- where the question was

24  asked by the attorney, "Based on your research, what percent of

25  cancer, NHL cancer cases, are caused by environmental factors?"

1          And Dr. Tomasetti, being honest, answers with the words

2     "mutations."

3          But those are two different things.  That's part of what I

4     was trying to show, and maybe by the look on Your Honor's face,

5     I didn't succeed.  But perhaps, if we have a transcript and

6     supplemental briefing, it's -- I don't think the issue of the

7     proportion of driver gene mutations being attributed to E is a

8     question that the jury has ever asked to answer.  Has nothing

9     to do with causation.

10         And so it doesn't fit, Number 1, and then the Number 2 is

11    the question.

12         **THE COURT:**  Okay.  I think I understand your argument.

13         And I'll let you know if I think supplemental briefing

14    would be helpful.

15         But by the way, in this case, I mean, there are -- I

16    assume there are other experts who would testify on general

17    causation other than Tomasetti; right?

18         **MS. COOK:**  Yes.  So -- yes.  We have other experts,

19    and often, the specific causation oncologist will address the

20    general causation epi issues as well.

21         **THE COURT:**  Got it.  Okay.  Thanks.  I'll let you all

22    know if we need further briefing and will issue a ruling.  If

23    not, I'll issue a ruling shortly.

24         **MR. KRISTAL:**  Thank you.

25         **MS. COOK:**  Thank you, Your Honor.

**PROCEEDINGS**

```
 1           MS. GREENWALD:  Thank you.

 2           THE CLERK:  Court is adjourned.

 3           (Proceedings adjourned at 3:47 p.m.)

 4                        ---o0o---

 5


 6              CERTIFICATE OF REPORTER

 7           I certify that the foregoing is a correct transcript

 8    from the record of proceedings in the above-entitled matter.

 9


10    DATE:   Wednesday, December 20, 2023

11

12

13

14
      _____
15       Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
           Official Reporter, U.S. District Court
16

17

18

19

20

21

22

23

24

25
```