**NACHAWATI LAW GROUP**
5489 Blair Rd.
Dallas, TX 75231
Telephone: (214) 890-0711
Facsimile: (214) 890-0712
Gibbs C. Henderson
Illinois Bar No.: 6314687
Texas Bar No.: 24041084
*Pro Hac Vice*
Erin M. Wood
Texas Bar No.: 24073064
*Pro Hac Vice*
ghenderson@ntrial.com
ewood@ntrial.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 3:16-md-02741-VC |
| This document relates to: | **PLAINTIFF'S RESPONSE TO MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF DR. RICHARD DEGRANDCHAMP** |
| *Angelo Bulone v. Monsanto Co.,* Case No. 3:20-cv-03719 | |
| | Hearing: Date: March 1, 2024 Time: 10:00am Place: San Francisco, Courthouse Courtroom 4 -17th Floor |

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

i

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND ............................................................................................................ 1

   A. Dr. DeGrandchamp's Opinions ............................................................................. 1

      1. Background ...................................................................................................... 1

      2. Dr. DeGrandchamp's RU Report ..................................................................... 2

      3. Dr. DeGrandchamp's Supplemental Report .................................................... 3

   B. Monsanto's Motion ................................................................................................ 3

III. STANDARD OF REVIEW ........................................................................................... 4

IV. ARGUMENTS & AUTHORITIES ............................................................................... 5

   A. Dr. DeGrandchamp's Opinions Regarding the Contaminants in Roundup are Relevant to General Causation. .................................................................................................. 5

   B. Dr. DeGrandchamp Should be Allowed to Note That Others Have Concluded that the EPA Did Not Follow Its Own Guidelines in Assessing Glyphosate. ............................. 8

   C. Dr. DeGrandchamp is Qualified to Discuss the Appropriateness and Adequacy of the Testing Relied Upon by the EPA in Reaching Its Regulatory Rulings on Roundup. ........ 8

   D. Dr. DeGrandchamp's Key Hallmarks Analysis is Not Novel; It is Drawn Straight from the Peer-Reviewed Literature. ................................................................................... 9

      1. Background ...................................................................................................... 9

      2. Dr. DeGrandchamp developed his opinion in an orderly, systematic manner. ............... 11

      3. Dr. DeGrandchamp's Key Hallmarks all come from the peer-reviewed literature and Monsanto does not challenge any of them individually. .................................................... 12

      4. Monsanto's efforts to make Dr. DeGrandchamp's approach seem novel are specious. .. 14

      5. Dr. DeGrandchamp's decision to rely solely upon publicly available, peer-reviewed science is consistent with IARC's approach. ................................................................. 14

V. CONCLUSION ............................................................................................................ 15

CERTIFICATE OF SERVICE ................................................................................................. 16

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

ii

## TABLE OF AUTHORITIES

*Alaska Rent-a-Car, Inc. v. Avis Budget Group*, 738 F.3d 960, 969 (9th Cir. 2013) ........................ 14

*City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014).............. 14, 15

*Clausen v. M/V New Carissa*, 339 F.3d 1049, 1055 (9th Cir. 2003) ........................................... 4, 13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 599 U.S. 579 (1993) ............................................. 5

*Hardeman v. Monsanto*, 997 F.3d 941, 960 (9th Cir. 2021).............................................................. 5

*In re Hanford Nuclear Rsrv. Litig.*, 292 F.3d 1124, 1133 (9th Cir. 2002)......................................... 7

*Nat. Res. Def. Council v. EPA*, 38 F.4th 34 (9th Cir. 2022)............................................................... 9

*NRDC v. U.S. EPA*, 38 F.4th 34 (9th Cir. 2022) ............................................................................... 4

*Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) ...................................................................... 6

*Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007)....................................... 6, 7

*United States v. Bighead*, 128 F.3d 1329, 1335 (9th Cir. 1997) ....................................................... 7

*Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017)…………………..4, 5, 12

**Rules**

Rule  702................................................................................................................................. 4, 5, 7

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

iii

COMES NOW Plaintiff, by and through his undersigned counsel, and hereby files this Response to Monsanto Company's ("Monsanto") Motion to Exclude Testimony of Dr. Richard DeGrandchamp, and would show as follows:

## I.   INTRODUCTION

Defendant Monsanto Company's ("Monsanto") Motion to Exclude Testimony of Dr. Richard DeGrandchamp ("Defendant's Motion") makes various unfounded allegations against the opinions of Plaintiff's expert, Dr. Richard DeGrandchamp ("Dr. DeGrandchamp"). As set out below, Monsanto's arguments lack merit and Defendant's Motion should be denied in its entirety.

## II.   BACKGROUND

**A.   Dr. DeGrandchamp's Opinions**

**1.   Background**

Dr. DeGrandchamp has been a practicing toxicologist for over 30 years. *See* Declaration of Gibbs C. Henderson ("Henderson Decl.") at **Exhibit A**, Curriculum Vitae of Dr. Richard L. DeGrandchamp ("Dr. DeGrandchamp CV") at 1. He holds a B.S. in Biochemistry from Eastern Michigan University and a Ph.D. in Toxicology from the University of Michigan School of Public Health. *Id*.

Dr. DeGrandchamp has held a graduate faculty appointment at the University of Colorado Denver/Anschutz Medical Campus for the past 16 years. *Id*. at 4. Prior to that appointment, Dr. DeGrandchamp taught at the University of Colorado Medical School, School of Pharmacy from 1998 to 2009 and at the Naval Civil Engineering Corps Officers School from 1996 to 2002. *Id*. at 1. In addition to his teaching responsibilities, Dr. DeGrandchamp has served on numerous scientific review panels and has been a toxicological consultant for the U.S. Environmental Protection Agency (EPA); Department of the Navy; Department of Energy; Department of Defense; Navy Bureau of Medicine; U.S. Department of Justice; National Institute for Occupational Safety and Health

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

1

(NIOSH); and many state health agencies. Henderson Decl. at Ex. A, Dr. DeGrandchamp CV at 3.

Dr. DeGrandchamp has served as president and principal toxicologist of his own toxicological consulting business, Scientia Veritas, L.L.P., since 1997. *Id*. at 1. In the course of his academic and professional work, he has "conducted extensive research and analysis on the molecular etiology of NHL (as well as other lymphomas)." Henderson Decl. at **Exhibit B**, Roundup Expert Report of Richard L. DeGrandchamp, Ph.D. ("Dr. DeGrandchamp RU Report"), at 1.

Dr. DeGrandchamp has produced two reports on Roundup: (1) Roundup Expert Report ("RU Report"); and (2) Roundup Supplemental Opinions and Reliance Materials ("Supplemental Report"). *See* Henderson Decl. at Ex. B, Dr. DeGrandchamp RU Report; and **Exhibit C**, Roundup Supplemental Opinions and Reliance Materials of Dr. Richard L. DeGrandchamp, dated Apr. 9, 2023 ("Dr. DeGrandchamp Supplemental Report").

### 2. Dr. DeGrandchamp's RU Report

Dr. DeGrandchamp's RU Report deals with the issue of general causation and contains two main parts. In one part of his report, Dr. DeGrandchamp explains the origin of IARC's key characteristics ("KC") of carcinogens framework and then uses those KCs to analyze the existing science on glyphosate. *See* Henderson Decl. at Ex. B, Dr. DeGrandchamp RU Report at 3-4. Based on that analysis, he concluded that, "the IARC 10 [KC] criteria provides strong and compelling evidence that [glyphosate/Roundup] compounds should be considered a *probable* human carcinogen." *Id*. at 4 (emphasis in original).

The additional portion of Dr. DeGrandchamp's RU Report identifies "9 key molecular mechanisms that have been established as NHL mechanistic hallmarks based on numerous published studies" and then analyzes the existing science on glyphosate using those nine NHL mechanistic hallmarks ("Key Hallmarks"). *See id*. at 3. Based on this analysis, Dr. DeGrandchamp concluded that, "[glyphosate/Roundup] compounds produce many of the same carcinogenic effects"

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

2

as the Key Hallmarks.  *Id*.

### 3. Dr. DeGrandchamp's Supplemental Report

Dr. DeGrandchamp's Supplemental Report deals primarily with two topics: (1) the "evidence that Monsanto either knew or could be reasonably certain that at least two impurities, namely 1,4-dioxane and ethylene oxide (EtO) contaminated Roundup formulations"; and (2) that Monsanto was "well warned by the extensive published toxicological literature that these carcinogenic impurities could pose unacceptable cancer risk."  Henderson Decl. at Ex. C, Dr. DeGrandchamp Supplemental Report at xii.  Dr. DeGrandchamp also discusses Monsanto internal documents showing the presence of two additional impurities in formulated Roundup: formaldehyde and N-nitrosoglyphosate (NNG).  *See* Henderson Decl. at Ex. C, Dr. DeGrandchamp Supplemental Report at 37.

Dr. DeGrandchamp explained the significance of the presence of these four impurities in Roundup at a recent Roundup trial involving Monsanto:

> A. Well, as I mentioned before, **it is the totality of all the carcinogens**.  We are all dealing with low levels of DNA damage and carcinogenic effects.  Then you add on the glyphosate to that.  **Then you add on all these impurities.  Now you've got this cumulative risk and it may push you over the threshold of the equilibrium between damage and repair**.  So it is my opinion when you exceed that, you are -- you are exceeding the ability of the cell or the lymphocyte to control cell division and, thus, it can become carcinogenic.

Henderson Decl. at **Exhibit D**, Trial Transcript in *Durnell v. Monsanto Company*, dated October 11, 2023 ("10.11.23 *Durnell* Trial Tr."), at 1547:21-1548:13 (emphasis added).

### B. Monsanto's Motion

Monsanto filed its Motion to Exclude Testimony of Dr. Richard DeGrandchamp ("Motion") on December 14, 2023.  Monsanto's Motion contains four bases for excluding Dr. DeGrandchamp's testimony.  First, Monsanto argues that "Dr. DeGrandchamp should not be permitted to discuss or refer to any inactive ingredient or trace impurity in Roundup" on the basis of relevance.  Def.'s Mot.

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

3

at 1. Second, Monsanto contends that "Dr. DeGrandchamp should not be permitted to discuss or refer to, much less opine on, the Ninth Circuit's opinion in *NRDC v. U.S. EPA*, 38 F.4th 34 (9th Cir. 2022)" because he "lacks the expertise and qualifications to testify regarding the NRDC decision." *Id*. Third, Monsanto insists that "DeGrandchamp should not be permitted to give a slanted account of the regulatory history of Roundup, Monsanto's corporate conduct, or Monsanto's purported state of mind" because such testimony would not be "proper expert testimony . . . ." *Id*. Fourth, Monsanto argues that "Dr. DeGrandchamp should not be permitted to offer an opinion glyphosate is capable of causing NHL in humans based upon his list of 'Key Hallmarks' of NHL" on the grounds that such testimony is unreliable. *Id*. at 11-12.

### III.  STANDARD OF REVIEW

Plaintiff Angelo Bulone's ("Mr. Bulone") case is part of the MDL alleging that the carcinogenic qualities of the glyphosate-based herbicide (GBH) Roundup cause NHL. In this MDL, the Court has held that "for questions of federal law, such as the admissibility of expert testimony under *Daubert*, Ninth Circuit law will govern regardless of where a case originated." Doc. 4549, Pretrial Order No. 158: *Daubert* Choice of Law, MDL No. 2741, July 10, 2019, at. 1. Consistent with this pretrial order, Plaintiff focuses his response on relevant Ninth Circuit precedent. *See id*.

Rule 702 supplies the standard for the admissibility of scientific evidence. *See Clausen v. M/V New Carissa*, 339 F.3d 1049, 1055 (9th Cir. 2003). Further, in *Daubert*, the Supreme Court charged district courts with a gatekeeping role to ensure that such scientific evidence is relevant and reliable. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 599 U.S. 579 (1993). The inquiry under Rule 702 and *Daubert* "is flexible and should be applied with a 'liberal thrust' favoring admission." *Hardeman v. Monsanto*, 997 F.3d 941, 960 (9th Cir. 2021) (quoting *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017). Ultimately, "the interests of

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

4

justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system . . . to 'attack[] shaky but admissible evidence.'" *Wendell*, 858 F.3d at 1237 (quoting *Daubert*, 509 U.S. at 596 (alteration in original)).

A key principle of Rule 702 and *Daubert* is that they were intended to relax traditional barriers to admission of expert opinion testimony. *Daubert*, 509 U.S. at 588. Courts are accordingly in agreement that Rule 702 mandates a liberal standard for the admissibility of expert testimony. As the Advisory Committee to the 2000 amendments to Rule 702 note, with apparent approval, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702 advisory committee note (2000).

### IV.   ARGUMENTS & AUTHORITIES

**A.   Dr. DeGrandchamp's Opinions Regarding the Contaminants in Roundup are Relevant to General Causation.**

As noted in section II.A.3., *supra*, Dr. DeGrandchamp's Supplemental Report discusses four separate carcinogens found in formulated Roundup apart from glyphosate: 1, 4-dioxane, EtO, formaldehyde and NNG. Monsanto argues that Dr. DeGrandchamp should be precluded on relevance grounds from discussing "any inactive ingredient or trace impurity in Roundup . . . [because he] has not offered any opinion that any plaintiff was injured by any inactive ingredient or trace impurity in Roundup." Def.'s Mot. at 3. There are multiple problems with that argument.

First, the argument begins with a false and *wholly unsupported* premise – that for an expert to discuss the components of a carcinogenic product, the expert must also opine that each individual component caused the Plaintiff's injury, independent of the rest of the product. Under that logic, if this were a tobacco trial, for example, Monsanto would be requesting the Court to exclude evidence of every chemical found in cigarette smoke except nicotine, the active ingredient. Such a position would be untenable, as cigarettes contain dozens of toxic chemicals and scientific studies of smoking are not limited to one chemical. The same is true for Roundup, as Dr. DeGrandchamp's testimony

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

5

establishes. Monsanto's argument would also mean that Plaintiff's experts would not be permitted to discuss surfactants because no expert has ever contended that surfactants, standing alone, cause cancer. Of course, evidence regarding Roundup's surfactants has been routinely admitted in this Court and others.

Second, "[r]eliable expert testimony . . . **need not establish every element that the plaintiff must prove**, in order to be admissible." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citing *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007)) (emphasis added). "The chain necessary to prevail on a claim may be weakened by the absence of other evidence . . . but that does not undermine the admissibility of Rule 702 evidence." *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007)). Accordingly, the fact that Dr. DeGrandchamp does not specifically link contaminants to Mr. Bulone's NHL does not, by itself, render his testimony concerning the presence of contaminants in formulated Roundup inadmissible.

Third, Dr. DeGrandchamp's testimony regarding the contaminants in formulated Roundup meets the actual relevance standard for expert opinions. In assessing whether expert testimony will be helpful to the jury, "the court must determine whether there is 'a link between the expert's testimony and the matter to be proved.'" *Stilwell*, 482 F.3d at 1192 (quoting *United States v. Bighead*, 128 F.3d 1329, 1335 (9th Cir. 1997)). In the instant matter, there is a direct link between Dr. DeGrandchamp's opinions about the carcinogenicity of the contaminants in formulated Roundup and the issue of general causation.

"Causation in toxic tort cases is typically discussed in terms of generic and specific causation." *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1133 (9th Cir. 2002) (citation omitted). Generic or general causation "has been defined by courts to mean whether the substance at issue had the capacity to cause the harm alleged." *Id*. (citation omitted). Here, Dr. DeGrandchamp will testify that Roundup – *the formulated product, which includes all its constituent*

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

*ingredients* – has the capacity to cause cancer:

> Q. **As a formulated product as a whole**, what is your opinion on whether Roundup causes and contributes to cause non-Hodgkin's lymphoma? And whenever I say as a whole, I mean in addition to glyphosate alone. . . .
>
> THE WITNESS: Yes, I think it poses an unacceptable risk and poses a threat to someone developing cancer. Yes.

Henderson Decl. at Ex. D, 10.11.23 *Durnell* Trial Tr. at 1549:6-17 (emphasis added).

In reaching that opinion, Dr. DeGrandchamp relies on studies that look at the genotoxicity and carcinogenicity of glyphosate-based formulations, not just glyphosate alone. *See* Henderson Decl. at **Exhibit E**, Deposition Transcript of Dr. Richard DeGrandchamp, dated July 8, 2022 ("7.8.22 Dr. DeGrandchamp Dep. Tr."), at 50-51; and Ex. B, DeGrandchamp RU Report at 37 (citing, *e.g.*, 2011 Paz-y-Mino, *et al*. study). As noted above, Dr. DeGrandchamp opines that the "totality of all the carcinogens" in Roundup adds up to a "cumulative risk" that can make the difference between a cell being able to repair itself or being permanently damaged; once that threshold is passed, "you are exceeding the ability of the cell or the lymphocyte to control cell division and, thus, it can become carcinogenic." Henderson Decl. at Ex. D, 10.11.23 *Durnell* Trial Tr. at 1548:2-13. This potential for a synergistic or cumulative effect between carcinogens is referenced multiple times in Dr. DeGrandchamp's Supplemental Report. *See* Henderson Decl. at Ex. C, Dr. DeGrandchamp Supplemental Report at 18-19, 45.

In addition to that general causation opinion, Plaintiff's specific causation expert, Dr. Marc Braunstein ("Dr. Braunstein"), identified "Roundup exposure" – not merely glyphosate exposure – as a significant contributory cause of Mr. Bulone's NHL. Henderson Decl. at **Exhibit F**, Report of Dr. Marc Braunstein, dated Oct. 23, 2023 ("Dr. Braunstein Report"), at 11. In reaching his opinion, Dr. Braunstein relied upon, *inter alia*, epidemiology studies that examine the effect of formulated glyphosate-based formulations in increasing NHL. *See* Henderson Decl. at Ex. F, Dr. Braunstein Report at 8-9.

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

7

In sum, the subject of this lawsuit is the entire formulated Roundup product. Accordingly, testimony regarding the entire formulation of Roundup is relevant as it makes the contested issue of whether formulated Roundup is capable of causing cancer more probable.

**B.     Dr. DeGrandchamp Should be Allowed to Note That Others Have Concluded that the EPA Did Not Follow Its Own Guidelines in Assessing Glyphosate.**

Monsanto next argues that Dr. DeGrandchamp cannot testify that the Ninth Circuit's recent opinion in *Natural Resources*, *supra*, parallels his own because he is not a lawyer. Dr. DeGrandchamp reads judicial opinions frequently for their scientific content, particularly when they are based on science and regulations that are of interest to him. *See* Henderson Decl. at Ex. E, 7.8.22 Dr. DeGrandchamp Dep. Tr. at 34:7-16. Dr. DeGrandchamp testified that any reference he would make to the Ninth Circuit opinion would be focused on the fact that the EPA deviated from its own guidance: "I was just going to opine that prior to the Ninth Circuit's opinion being issued . . . I reached the same conclusion, that EPA deviated from their own guidance, and that was – that's what I was going to testify to." Henderson Decl. at Ex. E, 7.8.22 Dr. DeGrandchamp Dep. Tr. at 28:15 – 29:9.

Dr. DeGrandchamp is not basing his opinion on his interpretation of *Natural Resources*. Rather, he is simply noting that the Ninth Circuit reached the same conclusion he did: "despite EPA's repeated invocation of its Cancer Guidelines, its interim decision failed to abide by those Guidelines." *Natural Resources*, 38 F.4th at 34. The jury will be well informed that Dr. DeGrandchamp is not a lawyer or a judge, and he is not interpreting the Ninth Circuit's opinion.

**C.     Dr. DeGrandchamp is Qualified to Discuss the Appropriateness and Adequacy of the Testing Relied Upon by the EPA in Reaching Its Regulatory Rulings on Roundup.**

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

8

Dr. DeGrandchamp is not going to testify about Monsanto's "intent" or "motives" or "state of mind," and his report does not purport to do so. He cites relevant Monsanto internal documents that support his opinions, and his discussion of them will aid the jury in understanding his opinions. To the extent Monsanto objects to a specific document, that objection is best taken up in the context of a trial objection not a motion to exclude expert testimony.

Dr. DeGrandchamp does plan to offer opinions regarding the adequacy and appropriateness of testing the EPA considered when determining Roundup's carcinogenicity. As a toxicologist, he certainly is qualified to discuss this testing. Further, his opinions regarding that testing – and the conclusions drawn from it by the EPA – are relevant because Monsanto's defense is largely predicated upon hiding behind the EPA's findings.

**D.    Dr. DeGrandchamp's Key Hallmarks Analysis is Not Novel; It is Drawn Straight from the Peer-Reviewed Literature.**

### 1. Background

Historically, when determining if a chemical is carcinogenic on a cellular level, scientists focused on whether the chemical could cause two specific mechanisms within cells: genotoxicity and mutagenicity. *See* Henderson Decl. at Ex. B, Dr. DeGrandchamp RU Report at 3. As discussed in Dr. DeGrandchamp's RU Report, that focus among toxicologists began to change in the early 2010s:

> Starting about a decade ago, toxicologists shifted away from simply considering cancer as an endpoint triggered by a singular molecular event like "genotoxicity or "mutagenicity" . . . . **Toxicologists began to consider all the mechanisms that contribute to cancer** and are necessary for a cell to transition from a normal function cell to a dysfunctional transformed cancer cell. **The next step was to identify the collective mechanisms** reported in different studies for diverse compounds. This led to establishing the core mechanisms of carcinogens . . . .

*Id*. at 108 (emphasis added).

This broader, more holistic approach to assessing carcinogenic mechanisms has become known as the "Key Characteristics" ("KC") of carcinogens, which "are the cancer mechanisms that

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

9

are common among chemical carcinogenesis. . . . These KC categories capture the key mechanisms that are considered the most important of the diverse molecular events that lead to transforming normal cells into cancer cells." *Id*. at 107.   Reflective of its widespread acceptance within the scientific community, "IARC formally adopted the KC strategy in its 2019 updated Monograph Preamble . . . [and] has identified 10 categories of the consensus KCs of carcinogens . . . ." Henderson Decl. at Ex. B, Dr. DeGrandchamp RU Report at 109.  IARC further verified its usefulness in establishing the mechanisms of carcinogens by applying it to 86 known carcinogens. Henderson Decl. at **Exhibit G**, Deposition Transcript of Dr. Richard DeGrandchamp, dated March 24, 2022 ("3.24.22 Dr. DeGrandchamp Dep. Tr."), at 56:11-24, 110:8-23.

Dr. DeGrandchamp utilized the KC framework in his assessment of the cancer-causing potential of glyphosate in two ways, as he explained back in 2022:

> **First**, I will use the key characteristic paradigm that was developed by IARC, used by EPA and the NTP, as a framework to systematically characterize the ten key characteristics of carcinogens. . . .
>
> [**Second**], I will discuss the molecular mechanisms that are known to occur in NHL, and then I will cross-reference those two analyses to determine whether or not there's sufficient evidence of the molecular mechanisms involved in the published studies for glyphosate; do those fit the categories for NHL.

*Id*. at 30:17-31:6 (emphasis added).

Accordingly, the first part of Dr. DeGrandchamp's analysis, contained in pp. 141-174 of his RU Report, involved taking the widely recognized list of 10 KCs and reviewing the scientific literature to determine whether there is evidence that glyphosate or glyphosate-based herbicides possess each of those characteristics.  Monsanto does not challenge this part of Dr. DeGrandchamp's analysis.[1]

---

[1] Monsanto does not directly challenge Dr. DeGrandchamp's 10 KC analysis in its Motion and has previously admitted in court that the KCs are "something . . . that recognized scientists know and talk about."  Henderson Decl. at **Exhibit H**, Pre-Trial Hearing Transcript in *Allegrezza*, dated

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

10

The second part of Dr. DeGrandchamp's analysis involved taking IARC's KCs, which deal with cancer generally, and adapting the list specifically for lymphomas. *See* Henderson Decl. at Ex. E, 7.8.22 Dr. DeGrandchamp Dep. Tr. at 104:1-9. This work involved reviewing peer-reviewed, published studies of humans with lymphoma to compile a list of mechanistic characteristics of lymphoma within those studies. *See* Henderson Decl. at Ex. B, Dr. DeGrandchamp RU Report at 3. Through this research, Dr. DeGrandchamp identified nine key mechanisms by which lymphocyte cells are transformed into cancer cells ("Key Hallmarks") and then reviewed the mechanistic studies on glyphosate/Roundup compounds to determine if those compounds act through those same mechanisms. *See* Henderson Decl. at Ex. E, 7.8.22 Dr. DeGrandchamp Dep. Tr. at 50:15-51:1, 103:16-20; *see also* Ex. B, Dr. DeGrandchamp RU Report at 1. He ultimately concluded that the weight of the evidence indicates glyphosate compounds cause nine Key Hallmarks of lymphomas. *See* Henderson Decl. at Ex. B, Dr. DeGrandchamp RU Report at 3-4.

### 2. Dr. DeGrandchamp developed his opinion in an orderly, systematic manner.

Monsanto purposely distorts the record when it suggests "Dr. DeGrandchamp's opinions in recent Roundup litigation have gone through **a dramatic transformation**." Def.'s Mot. at 11 (emphasis added). In fact, there was nothing dramatic about the process by which Dr. DeGrandchamp developed his opinions regarding Roundup. At his deposition on March 24, 2022, Dr. DeGrandchamp explained that he had begun – but not yet completed – his review of all the relevant documents and literature regarding Roundup: "I haven't finished my analysis yet, but I am accumulating evidence that suggests" Roundup causes NHL. *See* Henderson Decl. at Ex. G, 3.24.22 Dr. DeGrandchamp Dep. Tr. at 11:16-19. However, subsequent to that deposition, Dr.

---

Aug. 29, 2023, at 73:21-74:6.

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

11

DeGrandchamp completed his literature review, finalized his opinions, and issued a lengthy report that was produced to Monsanto in this case and prior related cases. *See generally* Henderson Decl. at Ex. B, Dr. DeGrandchamp RU Report.

### 3. Dr. DeGrandchamp's Key Hallmarks all come from the peer-reviewed literature and Monsanto does not challenge any of them individually.

"Scientific evidence is reliable 'if the principles and methodology used by an expert are grounded in the methods of science.'" *Wendell*, 858 F.3d at 1232 (quoting *Clausen*, 339 F.3d at 1056). One factor courts consider in determining an expert's reliability is whether the expert's theories have been subjected to peer review and publication. *In re Roundup Prod. Liab.*, 390 F. Supp. 3d 1102, 1112 (N.D. Cal. 2018). Here, it is critical to note that Dr. DeGrandchamp did not come up with any of the Key Hallmarks on his own; each hallmark comes directly from the published peer-reviewed literature. *See* Henderson Decl. at Ex. B, Dr. DeGrandchamp RU Report at 3. Indeed, Dr. DeGrandchamp was highly selective in compiling his list of Key Hallmarks, as he explained in his Report:

> While many complex lymphoma mechanisms have been described in detail, **I will focus on those mechanisms that are generally accepted as the key mechanism[s]**. These are the most well-researched and describe the specific etiological mechanisms involved in the complex sequelae of transforming a normal lymphocyte to a clone of cancerous cells that become lymphomas.

Henderson Decl. at Ex. B, Dr. DeGrandchamp RU Report at 28 (emphasis added).

Given their origin in the published literature, Monsanto tellingly does not challenge the scientific basis of any of the individual Key Hallmarks. For example, Dr. DeGrandchamp cites to three published studies to support his assertion that, "[c]hromosomal translocations are one of the key hallmarks of NHL because the genes that are translocated are called antiapoptotic genes or oncogenes . . . ." Henderson Decl. at Ex. B, Dr. DeGrandchamp RU Report at 29-35 (citing studies by J. Zheng, *et al.*; C.M. Adams, *et al.*; and E. Galteland, *et al.*). Monsanto at no point argues that these studies are an inadequate basis for Dr. DeGrandchamp's contention that chromosomal

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

12

translocation is a key mechanistic hallmark of lymphomas. Nor does it challenge Dr. DeGrandchamp's citations to 13 different published studies[2] showing that glyphosate or glyphosate-based herbicides can cause these chromosomal translocations.

Instead, Monsanto falls back on the specious argument that Dr. DeGrandchamp's whole list of Key Hallmarks is unreliable because no one has ever compiled these well-established characteristics into a single list. *See* Def.'s Mot. at 12. Under *Daubert*, "[t]he judge is 'supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.'" *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (quoting *Alaska Rent-a-Car, Inc. v. Avis Budget Group*, 738 F.3d 960, 969 (9th Cir. 2013)). Monsanto did not identify any specific errors regarding mechanisms of his Key Hallmarks; however, insofar as Monsanto believes Dr. DeGrandchamp improperly included certain mechanisms or incorrectly applied them to the relevant literature, those assertions are fodder for cross-examination or impeachment, not a basis for excluding Dr. DeGrandchamp's opinions. "Simply put, '[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to the jury.'" *City of Pomona*, 750 F.3d at 1044 (quoting *Alaska Rent-a-Car*, 738 F.3d at 969-70). Here, Monsanto does not challenge the substance of Dr. DeGrandchamp's Key Hallmarks analysis, and they cannot because each of the hallmarks comes straight from the published peer-reviewed literature. Accordingly, this Court should deny Monsanto's Motion and allow the jury to determine the weight of Dr. DeGrandchamp's opinions.

---

[2] *See* Henderson Decl. at Ex. B, Dr. DeGrandchamp RU Report at 35-54.

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

13

### 4. Monsanto's efforts to make Dr. DeGrandchamp's approach seem novel are specious.

Monsanto selectively cites portions of Dr. DeGrandchamp's deposition testimony to attempt to "muddy the waters" and make his approach seem novel. For example, Monsanto makes much of the fact that Dr. DeGrandchamp cannot point to a single document that contains all of Dr. DeGrandchamp's NHL-specific Key Hallmarks. *See* Def.'s Mot. at 12. In making that argument, though, Monsanto fails to include Dr. DeGrandchamp's logical explanation that the characteristics he identified are drawn from *several different studies* rather than *a single one*: "I can point to many documents that list these particular mechanisms as being associated with NHL cancers, leukemias, myelomas and so forth. Can I point to one document that lists all of these? No . . . ." Henderson Decl. at Ex. E, 7.8.22 Dr. DeGrandchamp Dep. Tr. at 103:4-8.

Similarly, Monsanto attempts to cast doubt on the reliability of Dr. DeGrandchamp's application of the Key Hallmarks framework by claiming he "arbitrarily" cited nine characteristics, as opposed to ten. *See* Def.'s Mot. at 13. However, Dr. DeGrandchamp has previously explained that he dropped micronuclei as a characteristic caused by glyphosate because, "when [he] looked at some of the micronuclei studies, either they didn't look at it or I thought the conditions of the experiment were insufficient." Henderson Decl. at Ex. E, 7.8.22 Dr. DeGrandchamp Dep. Tr. at 106:21-23.

### 5. Dr. DeGrandchamp's decision to rely solely upon publicly available, peer-reviewed science is consistent with IARC's approach.

Monsanto also contends that Dr. DeGrandchamp's methodology is unreliable because he based his opinions solely upon the publicly available, peer-viewed scientific literature and disregarded any internal Monsanto studies. *See* Def.'s Mot. at 12. Again, this approach is not unique to Dr. DeGrandchamp. IARC, the world's foremost cancer research body, takes this approach as well and has provided a rational explanation for why it only considers publicly available

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

14

scientific literature:

> In general, for cancer in humans, cancer in experimental animals, and mechanistic evidence, **only studies that have been published or accepted for publication in the openly available scientific literature are reviewed**. . . . The reliance on published and publicly available studies promotes transparency and protects against citation of premature information.

Henderson Decl. at **Exhibit I**, IARC *Monographs* Preamble (2019) at 8-9 (emphasis added).

Given this fact, there is nothing "arbitrary" about what Dr. DeGrandchamp chose to rely upon in forming his opinions, and Monsanto's argument should therefore be rejected.

## V. CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that the Court deny Defendant Monsanto Company's Motion to Exclude Testimony of Dr. Richard DeGrandchamp. Plaintiff further requests all other relief to which he may be entitled.

Date:   January 8, 2024

Respectfully submitted,

**NACHAWATI LAW GROUP**

By:   */s/Gibbs C. Henderson*
Gibbs C. Henderson
Illinois Bar No.: 6314687
Texas Bar No.: 24041084
*Pro Hac Vice*
Erin M. Wood
Texas Bar No.: 24073064
*Pro Hac Vice*
**NACHAWATI LAW GROUP**
5489 Blair Rd.
Dallas, TX 75231
Telephone: (214) 890-0711
Facsimile: (214) 890-0712
ghenderson@ntrial.com
ewood@ntrial.com
litigation@ntrial.com
*Attorney for Plaintiff*

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

**CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2024, a true and correct copy of Plaintiff's Response to Monsanto's Motion to Exclude Testimony of Dr. Richard DeGrandchamp, was served on all counsel of record via email.

By: /s/Gibbs C. Henderson
Attorney for Plaintiff

Pl.'s Resp. to Def.'s Mot. to Excl. Dr. DeGrandchamp, Case Nos. 3:16-MD-02741 & 3:20-CV-03719

16