# EXHIBIT E

```
 1           IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                   COUNTY DEPARTMENT, LAW DIVISION
 2
 3                                      |
      MICHAEL EVARD, SUE                |
 4    WIECHMANN, MICHAEL ORREL,         |
      SONIA MARTIN-AHMED, and           |
 5    RONALD E. BRYAN,                  | Case No.  2019-L-011574
                                        |
 6              Plaintiffs,             | (Consolidated with
                                        |  2019 L 010612)
 7    v.                                |
                                        | Honorable Kathy M. Flanagan
 8    MONSANTO COMPANY,                 |
                                        |
 9              Defendants.             |
      _____
10
11                         July 8, 2022
      _____
12
13            Remote Oral deposition of RICHARD
14    DEGRANDCHAMP, Ph.D., conducted with all participants
15    appearing via videoconference (Zoom) and the witness
16    appearing in Evergreen, Colorado, commencing at 9:06
17    a.m., on the above date, before Cindy Elliott, RPR, CSR,
18    and Notary Public in and for the State of Colorado.
19
20
21
                      GOLKOW LITIGATION SERVICES
22
              877.370.3377 ph | 917.591.5672 fax
23
                         deps@golkow.com
24
25
```

Richard DeGrandchamp, Ph.D.

```
 1                 A P P E A R A N C E S
 2
     For the Plaintiff:
 3
            ALLEN M. STEWART, ESQ.
 4          Allen M. Stewart, P.C.
            1700 Pacific Avenue Suite 2750
 5          Dallas, Texas 75201
            Phone: 214.965.8700
 6          Email: Astewart@allenstewart.com
 7
     For the Defendant:
 8
            JOHN M. KALAS, ESQ.
 9          Hollingsworth LLP
            1350 I Street, NW
10          Washington, D.C. 20005
            Phone: 202.898.5848
11          Email: Jkalas@hollingsworthllp.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1   preparing to write my Book Four, I intended to include a
 2   section where I focused on the early Monsanto mice
 3   studies that were submitted to the government in the
 4   1980s pertaining to the tests themselves, EPA's
 5   critiques of those tests, and how in my opinion EPA
 6   erred and essentially arrived at conclusions that were
 7   contradictory to their own guidance documents.
 8        Q    Okay.  So that section is not in Book
 9   Four, right?
10        A    It's not, no.
11        Q    Okay.  And it's not in either Book One,
12   Two or Three, right?
13        A    That's correct.
14        Q    Okay.  And so I guess you told me what
15   you intended to do in Book Four.  You did not do it.  So
16   are you going to tell the jury anything else about the
17   Ninth Circuit opinion beyond the fact that this
18   opinion's about what I intended to put in my book or --
19        A    No.  No.  I'm sorry.  I didn't mean to
20   interrupt you.
21        Q    No, or is there something else?  That's
22   all I was going to ask.
23        A    No, I was just going to (inaudible) that
24   my opinion --
25             THE REPORTER:  I'm sorry.
```

Richard DeGrandchamp, Ph.D.

```
 1            Q    (By Mr. Kalas)  Can you repeat that
 2   answer?  You froze for a sec.
 3            A    Oh, I'm sorry.  Yeah, I just want to make
 4   sure my Internet is working correctly.
 5                 I was just going to opine that prior to
 6   the Ninth Circuit's opinion being issued, I concluded
 7   the same -- the same -- I had come -- I reached the same
 8   conclusion, that EPA deviated from their own guidance,
 9   and that was -- that's what I was going to testify to.
10            Q    Okay.  Now, Book Four does not contain
11   that conclusion.  That was served on April 8th, that EPA
12   deviated from their own guidance on the rodent studies
13   in the context of glyphosate.  Sitting here today, are
14   there any other opinions you can think of, anything that
15   is not in Book Four that you intend to tell the jury
16   about Roundup?
17                 MR. STEWART:  This is beyond the Ninth
18   Circuit opinion?  Is that what you mean, John?
19                 MR. KALAS:  Yes, yes, that's what I mean.
20            A    Oh, beyond that, yeah.
21                 No, not unless you ask me questions today
22   that require that I answer the question with new
23   knowledge and documents that I did not include in my --
24   in any of the Books One through Four; so if you ask me
25   questions today about certain topics, I will answer them
```

```
 1   EPA to this court?
 2         A    As I said, I don't know -- I didn't read
 3   any trial transcripts.  I don't know what reliance
 4   materials were presented to the court.  I don't know how
 5   they made their decision.  All that I know is contained
 6   in that -- in that ruling.
 7         Q    Okay.  And just to be crystal clear, and
 8   then we'll move on from this, it's not your typical
 9   practice as a toxicologist to read judicial decisions to
10   inform your opinions, right?
11         A    Oh, I read judicial decisions all the
12   time with regard to the scientific content.  I don't
13   care who the attorneys were.  I don't really care who
14   the judges are or were.  I'm only concerned with the
15   outcome, the decision, and if it's based on science and
16   that's it.  But I read many rulings.
17         Q    All right.  You're not a lawyer, though,
18   correct?
19         A    That's correct.
20         Q    And you don't know the legal basis upon
21   which the judges came to their decision, correct?
22         A    I do not.
23         Q    Okay.  Now, a few more housekeeping
24   questions.  Based on the four books I looked at that are
25   Exhibits 2 through 5, you'll be offering testimony in
```

```
 1   Roundup.  I have looked at human epidemiology studies
 2   with regard to the mechanism of NHL in lymphomas and
 3   multiple myelomas.
 4           Q    Okay.  Okay.  So let's make sure then
 5   that we're crystal clear.  It is my understanding based
 6   on that answer, and I want to make sure that it's --
 7   it's your understanding as well, that the opinion you
 8   intend to offer regarding Roundup at the Evard trial is
 9   that the mechanistic data is consistent with glyphosate
10   and glyphosate-based herbicides being capable of causing
11   NHL in people, correct?
12           A    That's part -- yes, that is correct.
13   Again, let me just restate from my standpoint.
14           Q    Okay.
15           A    I looked at the mechanism described for
16   Roundup, the molecular mechanisms, under the key
17   characteristics of NHL that had been established or have
18   been established over many years of research to see if
19   they matched what we know about human lymphomas and
20   myelomas.  So that's -- so I -- I identified the key
21   characteristics of NHL are part of my report.  I
22   identified the key characteristics that have been
23   reported for a variety of lymphomas and myelomas,
24   leukemias, and identified those hallmarks to see if
25   studies conducted on Roundup matched those.  That's what
```

Richard DeGrandchamp, Ph.D.

```
 1   I did.
 2            But those human studies, some of them
 3   were in vitro studies.  Some were epidemiology studies.
 4   So to say that I didn't rely on epidemiology studies, I
 5   just wanted to clarify.  I --
 6       Q   Now, I --
 7            MR. STEWART:  Let him finish and then you
 8   can go ahead, John.
 9            MR. KALAS:  Yeah.
10       A   I just want to clarify that point.  I
11   have not looked at or relied on the Roundup epidemiology
12   study, because that's not pertinent to my opinion.
13       Q   All right.  So let me march through it.
14   I think I've got it now.  You looked at epidemiology
15   studies of people with lymphoma to identify mechanistic
16   hallmarks of lymphoma within those epidemiology studies,
17   right?
18       A   Some of them, yes.
19       Q   Okay.  And in those epidemiology studies
20   where you identified mechanistic hallmarks of lymphoma,
21   they weren't looking to see if people used Roundup or
22   didn't use Roundup, right?
23       A   Sitting here, I would have to look at my
24   report and some of the supporting documents to see if
25   any of them did look at Roundup, but sitting here now, I
```

Richard DeGrandchamp, Ph.D.

```
 1   mechanistic hallmarks of NHL?
 2              MR. STEWART:  Form objection.
 3              You can answer.
 4         A    I can point to many documents that list
 5   these particular mechanisms as being associated with NHL
 6   cancers, leukemias, myelomas and so forth.  Can I point
 7   to one document that lists all of these?  No, because
 8   studies don't look at all of these.
 9         Q    (By Mr. Kalas)  Okay.  Now, you call
10   these mechanistic hallmarks of NHL as opposed to
11   mechanistic characteristics of NHL.  I'm sorry, did you
12   hear me?
13         A    Yes.
14              MR. STEWART:  I'm sorry for the coughing.
15              MR. KALAS:  Let me start over.
16         Q    You call these mechanistic hallmarks of
17   NHL as opposed to mechanistic characteristics of NHL; is
18   that correct?
19         A    Those two words are synonymous in my
20   vernacular.
21         Q    Okay.  So there's no intent in calling it
22   a hallmark versus a characteristic in your opinion?
23         A    No, you can call them pathognomonic
24   characteristics.  You can call them, you know, steps in
25   the etiology.  There are many ways to describe it.
```

```
 1   These -- I use the key characteristics that were

 2   presented in the 2019 key characteristic section of the

 3   upgraded monograph or updated monograph preamble and

 4   identified those nine characteristics that are

 5   associated with NHL, the molecular mechanisms, and

 6   followed the same kind of framework and went -- you

 7   know, based on my research over the years.  These are

 8   the most frequently described and established

 9   characteristics of NHL at the molecular level.  So there

10   was no intent for me to parse any words.  I'm not --

11   there was no intention -- hallmarks and characteristics

12   are synonymous to me.

13           Q    Okay.  Do you agree that hallmarks

14   describe the environment in which a cancer develops?

15                MR. STEWART:  Form objection.

16           A    No, no.  It -- the environment that most

17   of these hallmarks or characteristics are observed is in

18   a Petri dish.  Is that what you're -- that's the

19   environment that they're described.  I don't really -- I

20   don't know how to answer your question.

21           Q    (By Mr. Kalas)  That's fine.

22           A    We'll --

23           Q    That's fine.  If you don't know how to

24   answer it, then it's a bad question.

25                Now, going down in your report to page --
```

Richard DeGrandchamp, Ph.D.

```
 1   I mentioned that I didn't see consistency, it was in the
 2   Roundup literature.  So some investigators found
 3   micronuclei; some didn't.  And I didn't think the
 4   evidence was that -- as strong as it should be for my
 5   report.
 6           Q    Wait a second.  So I want to make sure I
 7   understand that.  So there were ten key mechanistic
 8   hallmarks for NHL, including micronuclei.  But because
 9   then after the fact you went to the Roundup literature
10   and said that the Roundup literature didn't support it
11   being an NHL hallmark, you took it off your NHL hallmark
12   list?  Is that how that worked?
13                MR. STEWART:  Form objection.
14           A    No.  Mr. Kalas, I could add probably two
15   or three more characteristics to this.  And just as the
16   IARC key characteristics have evolved since Guyton first
17   published in 2009.  So if you look at the Guyton
18   characteristics, then to the Smith characteristics, I
19   think it was 15, then it was narrowed down to 10 and
20   then it evolves.  My opinion had to be fairly narrow.
21   And when I looked at some of the micronuclei studies,
22   either they didn't look at it or I thought the
23   conditions of the experiment were insufficient.
24           Q    (By Mr. Kalas)  Okay.  But I want to -- I
25   want to understand the timeline.  Originally there were
```

CERTIFICATE OF DEPOSITION OFFICER

I, Cindy Elliott, RPR, CSR, and Notary Public within and for the State of Colorado, commissioned to administer oaths, do hereby certify that previous to the commencement of the examination, the deponent was duly sworn by me to testify the truth in relation to matters in controversy between the said parties; that the said deposition was taken in stenotype by me at the time and place aforesaid and was thereafter reduced to typewritten form by me; and that the foregoing is a true and correct transcript of my stenotype notes thereof.

That I am not an attorney nor counsel nor in any way connected with any attorney or counsel for any of the parties to said action nor otherwise interested in the outcome of this action.

__X__ Reading and Signing was requested.

_____ Reading and Signing was not requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

*Cindy Elliott*
_____

Cindy Elliott, RPR, CSR, Notary Public
(Notary ID 20034011464)
My commission expires: April 7, 2023.