# EXHIBIT O

**IN THE CIRCUIT COURT OF ST. LOUIS COUNTY**
**STATE OF MISSOURI**

MARK MCCOSTLIN and )
KAREN MCCOSTLIN, )
          )
    Plaintiffs, )
          )    Cause No. 19SL-CC03421
v. )
          )    Division No. 1
MONSANTO COMPANY, )
          )    September 5, 2023
    Defendant. )

> **FILED**
> 09/05/23
> JOAN M. GILMER
> CIRCUIT CLERK
> ST. LOUIS COUNTY, MO

## <u>ORDER CONCERNING DEFENDANT MONSANTO COMPANY'S</u>
## <u>MOTIONS TO EXCLUDE EXPERTS</u>

Presently before the Court are Defendant Monsanto Company's ("Monsanto") Motions to Exclude the Testimony of four of Plaintiffs' designated expert witnesses: Dr. Kristan Aronson, Dr. Barry Boyd, Dr. James Clark, and Dr. Richard DeGrandchamp.

On August 29, 2023, the Court conducted a hearing on Monsanto's Motions to Exclude and other dispositive motions.  The Court reviewed the pleadings, legal briefs, and exhibits filed, heard arguments of counsel, and took the Motions to Exclude and other dispositive motions under submission.

After careful consideration of the legal briefs, exhibits, and oral arguments, the Court makes the decisions explained below concerning these Motions to Exclude.

1

**LEGAL STANDARD**

Section 490.065, RSMo, governs admissibility of expert testimony:

> (1) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> > (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) The testimony is based on sufficient facts or data;
> > (c) The testimony is the product of reliable principles and methods; and
> > (d) The expert has reliably applied the principles and methods to the facts of the case . . . .

Sec. 490.065.2, RSMo.  Expert testimony is therefore admissible only if the expert's knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue." *Id.*  The testimony must also be the product of reliable methods that are reliably applied to the case's facts.

"Under section 490.065.2, trial courts must act as gatekeepers to ensure that the testimony sought to be admitted ... is not only relevant, but reliable." *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 700 (Mo. App. E.D. 2020) (internal quotation marks omitted) (quoting *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 317 (Mo. App. E.D. 2018); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).

Since this amended version of section 490.065 came into effect in 2017, Missouri courts have used a three-part standard to determine the admissibility of expert opinion testimony: "(1) whether the expert is qualified, (2) whether the testimony is relevant, and (3) whether the testimony is reliable." *State v. Suttles*, 581 S.W.3d 137, 147 (Mo. App. E.D. 2019) (quoting *Jones v. City of Kansas City*, 569 S.W.3d 42, 54 (Mo. Ct. App. 2019), *overruled on other grounds by Wilson v. City of Kansas City*, 598 S.W.3d 888 (Mo. banc 2020)) (citing *State ex rel. Gardner v. Wright*, 562

S.W.3d 311, 319 (Mo. App. E.D. 2018); *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 561

(8th Cir. 2014)).

> As noted by the Supreme Court of Missouri:

> Section 490.065.2 is identical to the Rule 702 of the Federal Rules of Evidence. Where Missouri law adopts language from the Federal Rules of Evidence, federal cases applying those rules are persuasive – though not binding – authority. *State v. Williams*, 548 S.W.3d 275, 285 (Mo. banc 2018). The leading case on Rule 702 is *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which stressed that Rule 702 is intended to broaden the scope of admissible expert testimony.

*State v. Carpenter*, 605 S.W.3d 355, 361 n.4 (Mo. banc 2020).   "[R]eliability, under section

490.065.2, is determined by many factors, including those set out in *Daubert*."   *Ingham*, 608

S.W.3d at 700 (internal quotation marks omitted) (quoting *State v. Boss*, 577 S.W.3d 509, 517

(Mo. App. W.D. 2019)).   Specifically, courts consider the following factors from *Daubert* when

determining the reliability of an expert's testimony:

> (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known potential error rate of the technique or theory when applied and the existence and maintenance of standards and controls; and (4) whether the technique or theory has been generally accepted in the scientific community.

*Id.* (quoting *Boss*, 577 S.W.3d at 517; citing *Daubert*, 509 U.S. at 593-94).   While caselaw

applying these factors "provide relevant and useful guidance, the *Daubert* factors themselves are

not controlling."   *Suttles*, 581 S.W.3d at 147.

> The *Daubert* Court described the inquiry trial courts must engage in as "flexible" and cautioned that courts should focus on relevance and reliability while being mindful of the other applicable rules of evidence, including weighing possible prejudice against probative force. *Id.* at 594-95, 113 S.Ct. 2786. The trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 595, 113 S.Ct. 2786. This is consistent, the Court said, with the "liberal thrust" of the rules and their "general

approach of relaxing the traditional barriers to opinion testimony." *Id.* at 588, 113
S.Ct. 2786 (internal quotation marks and citations omitted).

*State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 317–18 (Mo. App. E.D. 2018).  "The proponent
of the expert testimony must prove its admissibility by a preponderance of the evidence."  *Lauzon
v. Senco Prod., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (citing *Daubert*, 509 U.S. at 592).

ANALYSIS

### 1.  Dr. Kristan Aronson

Dr. Aronson is an epidemiologist whom Plaintiffs have designated to "provide testimony

on general causation based on her expertise in the areas of epidemiology and biostatistics."

Plaintiff's Designation of Expert Witnesses at 2, Feb. 27, 2023.  Plaintiffs' designation of

Dr. Aronson further provides:

> More specifically, Dr. Aronson will opine, based on her training, experience, and
> review of the medical and scientific literature, that glyphosate and glyphosate-
> based formulations can cause non-Hodgkin's lymphoma in humans. She will also
> offer testimony and opinions concerning the existing epidemiological studies
> regarding the relationship between glyphosate and/or glyphosate-based
> formulations and non-Hodgkin's lymphoma.
>
> Dr. Aronson will also offer testimony and opinions regarding the review,
> evaluation, and assessment of glyphosate and glyphosate-based formulations as
> cancer hazards by the International Agency for Research on Cancer (IARC). Based
> on her experience serving on other IARC Monograph Working Groups,
> Dr. Aronson will testify about the process and methodology used by IARC
> Working Groups in producing their monographs and evaluations of carcinogenic
> risks. Dr. Aronson will also testify concerning the "three pillars" of causation –
> epidemiology, animal studies, and mechanistic studies – utilized by the IARC
> Working Group on glyphosate in reaching its determination about the potential
> carcinogenicity of glyphosate, and will discuss and assess the studies and
> information analyzed as to each of those "pillars."
>
> Dr. Aronson will also offer testimony concerning the scientific evidence
> about the carcinogenicity of glyphosate that has been published in the peer-
> reviewed literature since the publication of IARC's March 2015 monograph.

*Id.* at 2-3.

Monsanto moves to exclude Dr. Aronson's opinions in their entirety. Although Dr. Aronson has asserted in testimony that epidemiologic studies, animal studies, and mechanistic studies are necessary to determine carcinogenicity, she claims to be an expert in only the first field: epidemiology. While conceding Dr. Aronson is qualified in the field of epidemiology, Monsanto contends she should not be permitted to testify about the ultimate issue regarding the alleged carcinogenicity of glyphosate in Roundup as Dr. Aronson herself believes such determination requires analysis of materials outside her expertise. *See Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (holding that that trial court erred in allowing an expert hydrologist to testify about matters "beyond the scope of his expertise," namely "what specific efforts and specific levels of protection are consistent with good warehousing practices"). Alternatively, Monsanto argues the Court should limit her testimony to the area of epidemiology.

Monsanto next argues Dr. Aronson should be precluded from offering testimony about certain articles authored by Dr. Cristian Tomasetti (referred to as the "Tomassetti studies". Monsanto argues Dr. Aronson lacks the expertise required to interpret, analyze, and testify regarding mechanistic causes of cancer. Rather, Monsanto contends she parrots one article she reviewed that criticizes the Tomasetti studies "from a philosophical point of view." Monsanto's Ex. D, Aronson's *Buttry* Dep. 240:12-13, Apr. 26, 2022.[1]

---

[1] As used herein, citations to exhibits refer to the exhibits attached to each respective motion to exclude or related response or reply brief.

Monsanto argues that Dr. Aronson should be precluded from testifying about IARC's process for determining whether an agent is carcinogenic. Monsanto cites testimony in which Dr. Aronson admits to not having a general expertise in IARC and its process for determining whether an agent is carcinogenic.

Monsanto next argues Dr. Aronson should be precluded from opining on Monsanto's or general "industry" conduct, which she claims includes the propriety of ghostwriting articles. She further attempts to opine on alleged industry strategies to decrease the number of statistically significant causation test results and bias in scientific studies and literature caused by industry funding, including Monsanto. Monsanto contends these are not proper subjects for expert testimony. Because Dr. Aronson is not an expert on corporate conduct, Monsanto concludes the Court should exclude these topics of her testimony.

Monsanto next argues Dr. Aronson should be precluded from offering testimony regarding U.S. or Canadian law or criticisms of the U.S. Environmental Protection Agency ("EPA"). It cites portions of Dr. Aronson's April 3, 2023, report titled *General cancer causation for exposure to glyphosate and glyphosate-based formulations* (Monsanto's Ex. A) in which she allegedly gives regulatory or legal opinions. Monsanto argues she is not qualified to give such opinions and such topics invade the province of the court to instruct the jury on the law. *Howard v. City of Kansas City*, 332 S.W.3d 772, 785 (Mo. banc 2011) ("Generally, 'the opinion of an expert on issues of law is not admissible.' This is because such testimony 'encroaches upon the duty of the court to instruct on the law.'") (citations omitted). Accordingly, Monsanto seeks to prohibit Dr. Aronson from giving any such opinions.

Plaintiffs oppose Monsanto's motion to exclude or limit Dr. Aronson's testimony.  They note she has a Master of Science degree and Ph.D. in epidemiology and biostatistics, and she has focused her career in academia and public health institutions on cancer epidemiology.  Plaintiffs reject Monsanto's suggestion that Dr. Aronson "admitted" she lacks expertise in animal studies, mechanism studies, and genotoxicity rests.

While she stated she is "not an expert in conducting, nor necessarily interpreting, animal studies," Dr. Aronson concludes her statement by explaining "that's why we do have these interdisciplinary working groups at IARC, so we can cover all the disciplines."  Plaintiffs' Ex. 2, Aronson's *Buttry* Dep. 267:10-17, Apr. 26, 2022.  Dr. Aronson also testified "I understand the concept and I understand how the evidence can be assessed to contribute mechanistic evidence to the assessment of carcinogenicity."  *Id.* at 250:8-17.  Monsanto argues these positions are similar to those of Monsanto's own expert epidemiologist.

Plaintiffs next argue Dr. Aronson is qualified to discuss the Tomasetti studies.  They assert her knowledge and experience as a cancer epidemiologist qualify her to opine "(1) why she disagrees with Dr. Tomasetti's opinions from a historical perspective, why she believes his analysis is an oversimplification of cancer causation; (2) why she disagrees that internal replication events can be ruled out as 'bad luck'; and (3) why Dr. Tomasetti's inferences regarding cancer causation are inadequate for overall cancer prevention."  Plaintiffs' Opposition at 18-19 (citing Plaintiffs' Ex. 1, Aronson, *General cancer causation for exposure to glyphosate and glyphosate-based formulations* at 26-29 (Apr. 3, 2023)).

Plaintiffs argue Monsanto's criticisms go to the weight of her testimony that may be addressed in cross-examination rather than outright exclusion. *Kivland v. Columbia Orthopaedic Grp., LLP*, 331 S.W.3d 299, 311 (Mo. banc 2011) ("So long as the expert is qualified, any weakness in the expert's knowledge is for the jury to consider in determining what weight to give the expert.").

Plaintiffs contend Dr. Aronson has relevant expertise and direct experience to testify about IARC's processes based on her postdoctoral fellowship at IARC and decades' worth of work on multiple IARC working groups identifying carcinogens. They reject Monsanto's claim that Dr. Aronson simply parrots IARC and argue she may properly rely on IARC in forming her ultimate opinions. *See* sec. 490.065.1(3), RSMo ("The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be *of a type reasonably relied upon by experts in the field in forming opinions* or inferences upon the subject and must be otherwise reasonably reliable[.]") (emphasis added).

Plaintiffs assert IARC's data was only one of a variety of reliable sources Dr. Aronson relied on in her methodology that included employing what are known as the Bradford Hill criteria[2] in her review of evidence.

---

[2] As explained by the Eastern District of Missouri:

> Developed by Sir Bradford Hill in the 1960s, the criteria are nine factors which researchers often consider when judging whether an observed association is truly causal. The Bradford Hill criteria are: 1) strength of association; 2) consistency; 3) specificity of the association; 4) temporality; 5) dose-response curve; 6) biological plausibility; 7) coherence (with other knowledge): 8) experiment; and 9) analogy.

*In re Celexa & Lexapro Prod. Liab. Litig.*, 927 F. Supp. 2d 758, 765 n.13 (E.D. Mo. 2013) (quoting *In re Neurontin Marketing, Sales Practices, and Prods. Liability Litig.*, 612 F.Supp.2d 116, 132–33 (D. Mass. 2009)).

Plaintiffs reject Monsanto's characterization of certain of Dr. Aronson's opinions as being about corporate conduct.  Rather, they argue she mentions Monsanto's corporate conduct in her overall determination that *scientific* bias is affected by various corporate influences, including Monsanto and others.  Specifically, Dr. Aronson opines on the conduct of scientists who research the carcinogenicity of glyphosate despite claimed conflicts and competing interests.  Plaintiffs state she should be permitted to opine about this topic as a fellow scientist.

Lastly, Plaintiffs reject Monsanto's assertion that Dr. Aronson offers legal and regulatory opinions.  They contend her analysis is of the effects that legal and regulatory standards have upon the epidemiological discipline and rates of cancer incidence generally, which Plaintiffs argue she is qualified to do.

The Court concludes that Dr. Aronson may testify to general causation based on epidemiology.  While she is not an expert on animal and mechanistic studies, her testimony and report show she reviewed such studies in preparation for this case as well as generally in her career.

In Missouri, "[e]xpert opinion partially based on other expert opinion is not necessarily inadmissible."  *Otwell v. Treasurer of Missouri*, 634 S.W.3d 850, 859 (Mo. App. E.D. 2021) (quoting *Garrett v. Treasurer of State of Mo. as Custodian for Second Injury Fund*, 215 S.W.3d 244, 249 (Mo. App. S.D. 2007)).  "Merely because an expert relied on information and opinions of others does not automatically disqualify his [or her] testimony[;] [a]s long as such sources serve only as a background for his [or her] opinion and are not offered as independent substantive evidence … he [or she] should not be precluded from testifying."  *Id.* (omission in original) (quoting *Peterson v. Nat'l Carriers, Inc.*, 972 S.W.2d 349, 354 (Mo. App. W.D. 1998)).

Dr. Aronson may opine regarding her general causation opinion based on epidemiology. To the extent her opinion relies on animal or mechanistic studies of others, she may cite those studies but not interpret them or form her own opinion about them.  Dr. Aronson may say animal and mechanistic studies are routinely used by epidemiologists in determining causation based on epidemiology, but she cannot agree with or bless any opinion of the general causation experts.

The Court finds that Dr. Aronson should be precluded from offering testimony regarding Monsanto's or other industry member's alleged fraud or its intent, motives, or state of mind, including any interpretation of documents that allegedly infer knowledge or intent.  Additionally, she should be precluded from offering opinions on general industry conduct and Monsanto's corporate conduct.  This includes any opinions about alleged scientific biases or the causes of such biases.  Ghostwriting will be addressed in motions *in limine*.

Dr. Aronson may offer her opinions on the Tomasetti studies based on epidemiology.  She may not, however, comment on the underlying data or materials in the Tomasetti studies which she did not independently analyze.  *See* Monsanto's Ex. D, Aronson's *Buttry* Dep. 234:20-236:2, Apr. 26, 2022 ("[I]t wasn't data that I could analyze myself, or even critique myself. . . .  So you're specifically asking me if I reviewed the supplementary tables.  And you know what, I think I tried to, but I couldn't get access to them, to be honest.").

Regarding the following issues, an epidemiological foundation and/or relevance should be established: (1) any opinion regarding her historical perspective that the Tomasetti studies are an oversimplification; (2) how her disagreement with Dr. Tomasetti regarding "bad luck" is related to epidemiology; and (3) testimony regarding cancer prevention.

The Court finds that Dr. Aronson is not an expert on IARC with respect to its decision on glyphosate but, nevertheless, finds that her experiences with IARC may provide useful background information to the jury.

Specifically, Dr. Aronson may testify that she was on IARC working groups but may not mention the subjects of those working groups.  She may testify that she was or was not satisfied with IARC's determinations in working groups.  She may state IARC's ultimate decision regarding carcinogenicity if necessary to her opinion.  The doctor may not opine on IARC's manner or process with respect to glyphosate because she was not involved in that work and may not opine or comment on procedures used in IARC determination or investigation or other matters pertaining to glyphosate or Roundup.

The Court finds that Dr. Aronson should be precluded from testifying about any legal or regulatory decisions or impact of such decisions.  Any proposed analysis of the *effects* of any legal and regulatory standards have upon the epidemiological discipline would necessarily require analysis of the *substance* of the relevant legal and regulatory decisions.  Dr. Aronson is not an expert on either topic.

For these reasons, Monsanto's Motion to Exclude the Testimony Dr. Aronson is **GRANTED IN PART AND DENIED IN PART** to prohibit her from offering testimony and to allow her testimony as follows:

- Dr. Aronson may opine regarding general causation opinion based on epidemiology.  To the extent her opinion relies on animal or mechanistic studies of others, she may cite those studies but not interpret them or form her own opinion about them.  Dr. Aronson may say animal and mechanistic studies are routinely used by epidemiologists in determining

causation based on epidemiology, but she cannot agree with or bless any opinion of the general causation experts.

- Dr. Aronson is precluded from offering testimony regarding Monsanto's or other industry's alleged fraud or its intent, motives, or state of mind, including any interpretation of documents that allegedly infer knowledge or intent.  She is precluded from offering opinions on general industry conduct and Monsanto's corporate conduct.  This includes any opinions about alleged scientific biases or the causes of such biases.  Ghostwriting will be addressed in motions *in limine*.

- Dr. Aronson is precluded from offering testimony regarding any legal or regulatory decisions or impact of such decisions.

Dr. Aronson may only testify about the following topics and no others:

- Dr. Aronson may testify about her opinions with respect to general causation based on epidemiology.

- Dr. Aronson may testify that she was on IARC working groups but may not mention the subjects of those working groups.  She may testify that she was or was not satisfied with IARC's determinations in working groups.  She may state IARC's ultimate decision regarding carcinogenicity if necessary to her opinion.  She may not opine on IARC's manner or process with respect to glyphosate because she was not involved in that work and may not opine or comment on procedures used in IARC determination or investigation or other matters pertaining to glyphosate or Roundup.

- Dr. Aronson may offer her opinions on the Tomasetti studies based on epidemiology. She may not, however, comment on the underlying data or materials in the Tomasetti studies she did not independently analyze. Regarding the following issues, an epidemiological foundation and/or relevance should be established: (1) any opinion regarding her historical perspective that the Tomasetti studies are an oversimplification; (2) how her disagreement with Dr. Tomasetti regarding "bad luck" is related to epidemiology; and (3) testimony regarding cancer prevention.

## 2. Dr. Barry Boyd

Dr. Boyd is a clinical oncologist whom Plaintiffs have designated "in the areas of human cancers; causes of cancer; causes of non-Hodgkin's lymphoma, including the cancer risk following exposure to glyphosate and glyphosate-based formulations; cancer diagnosis; cancer effects; cancer treatments; and the clinical practice of hematology and oncology generally." Plaintiff's Designation of Expert Witnesses at 3-4, Feb. 27, 2023. Plaintiffs' designation of Dr. Boyd further provides:

> Dr. Boyd will testify on issues of *general and specific causation with respect to Plaintiff [Mark McCostlin]*, including rendering an opinion to a reasonable degree of medical certainty regarding the cause of [Mr. McCostlin's] non-Hodgkin's lymphoma. He will further provide testimony concerning the bases of those opinions, including but not limited to the application of the Bradford Hill criteria to the facts of [Mr. McCostlin's] case. Additionally, Dr. Boyd will testify regarding the general background of non-Hodgkin's lymphoma; the sub-types of non-Hodgkin's lymphoma; the reasonableness of [Mr. McCostlin's] treatment and care; the reasonableness and necessity of [Mr. McCostlin's] medical treatment and expenses; and [Mr. McCostlin's] clinical course and prognosis.

*Id.* at 4 (emphasis added).[3]

---

[3] The original Petition in this case was filed on August 14, 2019, on behalf of 90 named Plaintiffs. Pursuant to the governing Case Management Order, Plaintiffs chose Mark McCostlin as the sole trial plaintiff in this case and later sought and obtained leave to file an Amended Petition to, among other things, add derivative claims for the loss of services, society, and companionship allegedly

Monsanto moves to exclude Dr. Boyd's opinions in their entirety.  It argues Dr. Boyd cannot reliably "rule in" glyphosate as a cause of Mr. McCostlin's diffuse large B-cell lymphoma ("DLBCL"), a subtype of non-Hodgkin's lymphoma ("NHL"), because Dr. Boyd has no quantitative understanding of Mr. McCostlin's internal glyphosate dose; rather, it states Dr. Boyd's opinion is that Roundup exposure can cause cancer in individuals who are exposed to it more than two days per year.

Monsanto claims Dr. Boyd's opinions are based primarily on three epidemiological data points reported in three studies: McDuffie 2001, Eriksson 2008, and Pahwa 2019.[4]  Monsanto argues Dr. Boyd cherry-picked data to support his opinions and notes that Judge Vince Chhabria of the Northern District of California, who oversaw the multidistrict litigation ("MDL") case concerning Roundup, precluded experts from testifying based on McDuffie 2001 and Eriksson 2008, in part, for failing to adjust for other confounders like exposure to other pesticides.  *See* Monsanto's Ex. G, Pretrial Order No. 85: Denying Monsanto's Motion for Summary Judgment on Specific Causation, *In re Roundup Prod. Liab. Litig.*, No. 16-md-02741-VC (N.D. Cal. Feb. 24, 2019) ("Dr. Nabhan may not testify that the McDuffie and Eriksson studies stand for the proposition that if someone uses Roundup more than two days per year or more than ten days in their lifetime, their risk of developing NHL doubles.  Because those studies did not adjust for the

---

suffered by Mr. McCostlin's wife, Karen McCostlin.  Herein, the Court refers to all Plaintiffs named in the Amended Petition collectively as "Plaintiffs" and makes specific references to Mr. and Mrs. McCostlin where appropriate.

[4] "McDuffie 2001" refers to McDuffie, *et al.*, *Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health*, 10 Cancer Epidemiology, Biomarkers & Prevention 1155 (2001), attached as Monsanto's Ex. H.  "Eriksson 2008" refers to Eriksson *et. al.*, *Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis*, Int. J. of Cancer 123:1657:63 (2008), attached as Monsanto's Ex. F.  The study referred to as "Pahwa 2019" was not attached.

use of other pesticides, that statement is inaccurate, misleading, and untethered to any sound scientific method.") (citation omitted).

Monsanto also argues Dr. Boyd offers no evidence that Mr. McCostlin's residential spraying of Roundup is comparable to the professional and agricultural spraying in those epidemiological studies.

Monsanto also argues Dr. Boyd should be excluded because he failed to "rule out" other potential alternative causes of Mr. McCostlin's cancer, including the following: his body mass index; exposure to other chemicals from work with fertilizers, nutrients, and pesticide products; a family history of cancer; his age and gender; as well as the risk of sporadic mutations leading to the development of NHL or DLBCL.

Monsanto further seeks to limit Dr. Boyd's testimony to preclude any testimony concerning the reasonableness of Mr. McCostlin's treatment, care, and expenses because Dr. Boyd did not articulate such opinions in a report or in his deposition.

Plaintiffs oppose Monsanto's motion to exclude or limit Dr. Boyd's testimony.  They note he is board certified in internal medicine and medical oncology and currently serves as an attending hematology/oncology physician and assistant clinical professor at Yale University School of Medicine.

Plaintiffs argue Dr. Boyd's prior reports and depositions in other Roundup-related litigation show he formulated his general causation opinions based on his review of the relevant medical and scientific literature and his application of the Bradford Hill criteria.  Monsanto notes in its Reply Brief, however, that Plaintiffs' designation of Dr. Boyd in this case did not expressly incorporate any past reports.

Plaintiffs argue Dr. Boyd reached his specific causation opinions concerning Mr. McCostlin's cancer based on a differential diagnosis after reviewing Mr. McCostlin's medical records, fact sheet, sworn deposition testimony, as well as the plaintiff-specific toxicology report of Dr. James Clark. Plaintiffs assert Dr. Boyd identified Mr. McCostlin's risk factors for NHL based on the relevant medical and scientific literature and his training, education, and experience before determining which risk factors were significant and ultimately concluding that Mr. McCostlin's cumulative exposure to Roundup caused his NHL.

Plaintiffs state Dr. Boyd considered more than just the three studies Monsanto criticizes (McDuffie 2001, Eriksson 2008, and Pahwa 2019) and ultimately concluded Mr. McCostlin had between 13 and 33 total 8-hour exposure days, and as many as 18 days per year of exposure (events per year). Plaintiffs further reject Monsanto's suggestion that only epidemiology studies of comparable spraying habits and exposure are admissible and note other courts have permitted expert testimony concerning a wide range of medical and scientific literature.

Plaintiffs cite to specific portions of Dr. Boyd's deposition in this case addressing each of the risk factors Monsanto claims he failed to rule out: Mr. McCostlin's only claimed family history of cancer was his grandmother's brain tumor, which is unknown whether it was malignant or benign; Dr. Boyd concluded Mr. McCostlin's exposure to nutrients, fertilizers, and pesticide products, including benzene, was not a high level to have played a significant role in his cancer; Dr. Boyd did not believe Mr. McCostlin's "obesity" was a major contributor; and Dr. Boyd acknowledged Mr. McCostlin's age and gender may play a role. Plaintiffs further note Dr. Boyd has considered the possible effect of random mutations and cell replication errors on the causation of NHL, but he nevertheless concluded Roundup exposure caused Mr. McCostlin's DLBCL.

Lastly, Plaintiffs argue the Court should reject Monsanto's request to preclude Dr. Boyd from testifying about the reasonableness and necessity of Mr. McCostlin's medical treatment and expenses because he was properly designated on those topics.  Plaintiffs further cite to albeit limited examples of questions asked during Dr. Boyd's deposition in this case concerning Mr. McCostlin's treatment.

Consequently, Plaintiffs argue the Court should not preclude Dr. Boyd from testifying about the reasonableness and necessity of Mr. McCostlin's medical treatment and expenses because Monsanto did not choose to ask more detailed questions during its deposition of Dr. Boyd.

The Court concludes that Dr. Boyd is qualified to offer opinions in this case based on his education and experience in clinical settings and academia.  Plaintiffs have shown that Dr. Boyd used a differential diagnosis to reach his specific causation opinions as to Mr. McCostlin's cancer.

> "In performing a differential diagnosis, a[n expert] begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury. The [expert] then 'rules out' the least plausible causes of injury until the most likely cause remains." *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001). "The final result of a differential diagnosis is the expert's conclusion that a defendant's product caused (or did not cause) the plaintiff's injury." *Id.* "[A] medical opinion about causation, based upon a proper differential diagnosis, is sufficiently reliable to satisfy *Daubert*." *Turner v. Iowa Fire Equip. Co.,* 229 F.3d 1202, 1208 (8th Cir. 2000). "Because a differential diagnosis is presumptively admissible, ... a ... court may exercise its gatekeeping function to exclude only those diagnoses that are scientifically invalid." *Glastetter*, 252 F.3d at 989.

*Ingham*, 608 S.W.3d at 709.  The Missouri Court of Appeals, Eastern District, has clearly stated:

> "A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999). "However, '[a] medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness.' " *Id.*

*Id.* at 710.

The Eighth Circuit has similarly explained:

> [A] factor commonly applied to the determination of admissibility of an expert opinion is the ability to rule out other possibilities. *Claar,* 29 F.3d at 503 (discussing whether the expert accounts for obvious alternative explanations); *cf. Ambrosini v. Labarraque,* 101 F.3d 129 (D.C.Cir.1996) (stating that the existence of causes not eliminated pertains to weight and not admissibility). Yet, this requirement cannot be carried to a quixotic extreme. Exemplifying this limitation, the U.S. Court of Appeals for the Third Circuit concluded that an " 'expert's causation conclusion should not be excluded because he or she has failed to rule out *every* possible alternative cause." ' *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 265 (4th Cir.1999) (quoting *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 156 (3rd Cir.1999)) (emphasis added).

*Lauzon*, 270 F.3d at 693 (footnote omitted).

Consequently, whether Dr. Boyd sufficiently "ruled in" or "ruled out" Roundup as a cause of NHL generally or Mr. McCostlin's DLBCL specifically seems to be properly for the jury to decide.

The Court also concludes that Dr. Boyd may testify that Mr. McCostlin's exposure to Roundup was above the threshold values in the dose-metric studies placing him at an increased risk of developing NHL. Dr. Boyd may not testify about the McDuffie 2001, Eriksson 2008, and Pahwa 2019 studies for the unreliable proposition that exposure to Roundup on more than two days per year increases the risk of developing NHL.

The Court further concludes Dr. Boyd may testify about his opinions that Mr. McCostlin's medical expenses and treatments were reasonable and necessary. Medical expenses submitted must follow section 490.525, RSMo. Unlike the Federal Rules of Civil Procedure, Missouri does not require expert witnesses prepare reports detailing the opinions they intend to offer at trial.[5]

---

[5] *Compare* Fed. R. Civ. P. 26(a)(2)(B) ("Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony."), *with* Rule 56.01(b)(6) ("Discovery of facts known and opinions held by experts, otherwise discoverable under the

Plaintiffs' designation of Dr. Boyd on February 27, 2023, expressly stated his testimony would include "the reasonableness of [Mr. McCostlin's] treatment and care; the reasonableness and necessity of [Mr. McCostlin's] medical treatment and expenses; and [Mr. McCostlin's] clinical course and prognosis." Plaintiff's Designation of Expert Witnesses at 4, Feb. 27, 2023. Monsanto asked some questions concerning Mr. McCostlin's treatment could have chosen to more fully examine Dr. Boyd on this topic when he was deposed in this case on April 14, 2023, but it chose not to do so.

For these reasons, Monsanto's Motion to Exclude the Testimony Dr. Boyd is **DENIED** and the Court will allow his testimony as follows:

- Dr. Boyd may testify that Mr. McCostlin's exposure to Roundup was above the threshold values in the dose-metric studies placing him at an increased risk of developing NHL. Dr. Boyd may not testify about the McDuffie 2001, Eriksson 2008, and Pahwa 2019 studies for the unreliable proposition that exposure to Roundup on more than two days per year increases the risk of developing NHL.

- Dr. Boyd may testify about his opinions that Mr. McCostlin's medical expenses and treatments were reasonable and necessary. Medical expenses submitted must follow section 490.525, RSMo.

---

provisions of Rule 56.01(b)(1) and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows: (A) A party may require through interrogatories, any other party to identify each person whom the other party expects to call as an expert witness at trial by providing such expert's name, address, occupation, place of employment, and qualifications to give an opinion or, if such information is available on the expert's curriculum vitae, such curriculum vitae may be attached to the interrogatory answers as a full response to such interrogatory, and to state the general nature of the subject matter on which the expert is expected to testify and the expert's hourly deposition fee. (B) A party may discover by deposition the facts and opinions to which the expert is expected to testify. Unless manifest injustice would result, the court shall require that the party seeking discovery from an expert pay the expert a reasonable hourly fee for the time such expert is deposed.").

### 3. Dr. James Clark

Dr. Clark is a toxicologist whom Plaintiffs' have designated "in the areas of toxicology, exposure, dermal absorption, and risk assessment."  Plaintiff's Designation of Expert Witnesses at 1, Feb. 27, 2023.  Plaintiffs' designation of Dr. Clark further provides:

> Dr. Clark will testify on issues concerning the mechanism of absorption of glyphosate and/or glyphosate-based formulations through the skin and other exposure pathways; the role of surfactants on dermal absorption; toxicology and animal studies on dermal absorption, including his analysis of the data and the interpretation and methodology related to that data; human exposure studies and data relating to glyphosate and/or glyphosate-based formulations; and the effect of wearing personal protective equipment (PPE) on exposure levels. He will also offer testimony concerning the mechanism through which glyphosate and glyphosate-based formulations induce oxidative stress and cause genotoxicity.
>
> Dr. Clark will testify regarding the total exposure of Plaintiff to Roundup, including the comparability of Plaintiff's exposure with the exposure data from applicators in studies on glyphosate and/or glyphosate-based formulations.

*Id.* at 1-2.

Monsanto moves to exclude specific areas of Dr. Clark's testimony.  It argues he is an inhalation toxicologist whose opinions in this case have been narrowed by Plaintiffs' counsel to only the following two topics: (1) Mr. McCostlin's alleged exposure to glyphosate; and (2) Mr. McCostlin's alleged systemic dose of glyphosate.

Monsanto argues Dr. Clark was not designated as a causation expert and points to portions of Dr. Clark's deposition in this case in which Plaintiffs' counsel stated he was not offering medical causation opinions in this case.  *See* Monsanto's Ex. C, Clark Dep. 10:19-24, Apr. 13, 2023 ("[Plaintiffs' counsel objecting to a question as] beyond the scope of Dr. Clark's designation and his testimony is not providing a medical causation opinion.  He's providing his dose assessment and those opinions contained within his report."); *id.* at 29:10-16 ("MS. WOOD: Just to be clear, plaintiffs are not going to be offering or eliciting a medical causation, specific or general, opinion

from Dr. Clark.   MR. KALAS: Okay.   We stipulate to that now?   MS. WOOD: Yes.").
Accordingly, Monsanto requests the Court prohibit Dr. Clark from testifying about general or
specific causation.  *See Shallow v. Follwell*, 554 S.W.3d 878, 881–82 (Mo. banc 2018) (noting that
unfair surprise "could happen 'when an expert witness suddenly has an opinion where he had none
before, renders a **substantially different** opinion than the opinion disclosed in discovery, uses
new facts to support an opinion, or newly bases that opinion on data or information not disclosed
during the discovery deposition.'") (emphasis in original) (quoting *Sherar v. Zipper*, 98 S.W.3d
628, 634 (Mo. App. W.D. 2003)).

Monsanto also argues Dr. Clark should be precluded from testifying on several topics for
which he was designated because of his deposition testimony Monsanto asserts disclaimed such
opinions.  It argues he should be prohibited from testifying that Roundup exposure increases the
risk of developing NHL generally or for Mr. McCostlin specifically.  *See* Monsanto's Ex. C, Clark
Dep. 205:18-21, Apr. 13, 2023 ("I calculated a dose.  I did not calculate the risk.  This is outside
the scope of what my opinions are going to be.  I just want to make that plain.").

Monsanto also argues Dr. Clark disclaimed offering opinions on the following: oxidative
stress and genotoxicity, *see id.* at 61:14-17 ("Q. But you're not offering an opinion on whether or
not Roundup or glyphosate are genotoxic or cause oxidative stress; correct?  A. No. My function
is to calculate dose."); whether the presence of any surfactants in Roundup increase the dermal
absorption of glyphosate, *see id.* at 105:3-11 ("Q. The presence of surfactants in Roundup, do they
appreciably increase the dermal absorption of the glyphosate based on the data you've reviewed?
A. I don't think I evaluated that."); and testifying generally about Roundup drift or that Mr.
McCostlin experienced Roundup drift, *id.* at 119:5-8 ("You're not offering any opinion on the
accuracy of Mr. McCostlin's recollection of the drift at that time; right?  A. That's correct.").

Monsanto next argues Dr. Clark's "exposure days" opinions are unscientific and unreliable. It criticizes Dr. Clark basing his opinions on his review of Mr. McCostlin's deposition testimony and a single interview to determine the number of hours per day and days per week that Mr. McCostlin claims he sprayed Roundup.  Monsanto further contend Dr. Clark unjustifiably included higher numbers in his estimates and arbitrarily "rel[ied] primarily on the midrange." *Id.* at 108:23-109:3 ("Summing that altogether, I've come up with a total number of hours that he would have been exposed . . ., I've the total number of hours, assuming the minimum amount and then the maximum amount, and I'm relying primarily on the midrange of this.").  In support, Monsanto cites a federal case from Louisiana in which that district court excluded Dr. Clark's opinions in a non-Roundup case.  *Sadler v. Int'l Paper Co.*, No. CIV.A. 09-1254, 2014 WL 4925178, at *5 (W.D. La. Sept. 30, 2014) ("Dr. Clark's exposure testimony simply is not reliable, and he will not be permitted to offer his opinions at trial.").  According to Monsanto, Dr. Clark's exposure days assessment based on simple math and speculative assumptions about Mr. McCostlin's credibility regarding the amount of time he spent spraying Roundup is unreliable, unscientific, and should be excluded.

Plaintiffs oppose Monsanto's motion to exclude or limit Dr. Clark's testimony.  They argue he is qualified to give his toxicology opinions based on his degrees in biophysical, biochemical, and environmental sciences and his decades-long career conducting environmental modeling and human health risk assessments for public and private clients.

Plaintiffs assert they will not elicit from Dr. Clark – and he will not offer – opinions that Roundup or glyphosate cause cancer generally or that Roundup or glyphosate caused Mr. McCostlin's cancer.  However, they argue he should be permitted to testify how he reviewed some of the epidemiology studies related to glyphosate-based herbicides as background for his

dose and exposure assessments.  Plaintiffs state Dr. Clark will not discuss epidemiology relating to glyphosate in depth, but he should be allowed to state his methodology in selecting the metrics he used to come to his dose and exposure calculations in this case.

Plaintiffs also argue Dr. Clark should be permitted to offer his opinions concerning potential confounding toxicology factors relevant to Mr. McCostlin (including radiological exposures, family history, pharmacological history, and smoking history), which Monsanto has not expressly moved to preclude.

On pages 10-11 and 15-16 of Plaintiffs' Response Brief, they concede they will not elicit from Dr. Clark – and he will not offer – opinions on several of the specific topics Monsanto seeks to preclude: that Roundup or glyphosate exposure increases the risk of NHL generally or did so for Mr. McCostlin specifically; oxidative stress or genotoxicity; surfactants; and herbicide crop drift.  Plaintiffs, however, argue Dr. Clark should not be precluded from testifying on alleged drift from Mr. McCostlin's personal usage of Roundup.

Plaintiffs distinguish the federal non-Roundup case from Louisiana cited by Monsanto that excluded certain opinions from Dr. Clark by noting that district court struck some of Dr. Clark's opinions as untimely disclosed and others for being based on hypothetical model of emission output.  *See Sadler*, 2014 WL 4925178, at *2.  Here, on the other hand, Dr. Clark's opinions were timely disclosed and Plaintiffs contend his opinions in this case are based on reliable underpinnings.

Plaintiffs also argue Dr. Clark properly formed his opinions after reviewing Mr. McCostlin's sworn deposition transcript and conducting an interview.  They note Monsanto does not cite authority for its suggestion that such testimony from a plaintiff is an improper basis for toxicology opinions like Dr. Clark's.

Plaintiffs also argue Dr. Clark should be permitted to offer his exposure and dose calculations, including his exposure days calculations, and to compare the dose calculations of Mr. McCostlin to studies of applicators in the peer-reviewed literature. They again note Monsanto does not cite authority for its position that Dr. Clark's opinions based in part on the maximum exposure amount or relying on a midrange warrant exclusion.

Plaintiffs also argue Dr. Clark's calculations are reliable and based on recognized methodologies, including the Application Exposure Model ("AEM") to determine Mr. McCostlin's dose applied at the skin surface and the UK Predictive Operator Exposure Model ("UK POEM") to determine Mr. McCostlin's systemic dose. Further, Plaintiffs contend Dr. Clark used the UK POEM not to establish a threshold dose for cancer *causation*, but rather to compare whether Mr. McCostlin's exposure to glyphosate was similar to that of professional users assessed in peer reviewed literature.

Additionally, Plaintiffs argue Dr. Clark's exposure testimony is critical to their case because Dr. Boyd bases his specific causation opinion, in part, on Dr. Clark's calculations.

The Court concludes that Dr. Clark is qualified to offer opinions in this case based on his education and experience in environmental health science and academia. He used reliable methods to formulate his opinions, including his review of Mr. McCostlin's sworn deposition testimony and interview. Consequently, Dr. Clark may testify that Mr. McCostlin's exposure to Roundup was above the threshold values in the dose-metric studies but not that such dosage causes cancer.

The Court agrees Dr. Clark should be precluded from offering opinions on several specific topics Monsanto targeted and which Plaintiffs concede on pages 10-11 and 15-16 of their Response Brief they will not elicit. These precluded topics include that Roundup or glyphosate exposure increases the risk of NHL generally or did so for Mr. McCostlin specifically; oxidative stress or

genotoxicity; surfactants; and herbicide crop drift.  The Court agrees with Plaintiffs, however, that Dr. Clark should be permitted to testify on alleged drift from Mr. McCostlin's personal usage of Roundup.

Monsanto's other arguments go to the weight of Dr. Clark's testimony, not its admissibly. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  *Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005) (quoting *Hose v. Chicago NW Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)).  "Any weakness in the factual underpinnings of the expert's opinion or in the expert's knowledge goes to the weight that testimony should be given and not its admissibility."  *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 246 (Mo. banc 2001), *overruled on other grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. banc 2013).

For these reasons, Monsanto's Motion to Exclude the Testimony Dr. Clark is **GRANTED IN PART AND DENIED IN PART** to prohibit him from offering testimony and to allow his testimony as follows:

- Dr. Clark may testify that Mr. McCostlin's exposure to Roundup was above the threshold values in the dose-metric studies but not that such dosage causes cancer.

- Dr. Clark is precluded from offering opinions regarding general or specific causation, which Plaintiffs have conceded on pages 10-11 of their Response Brief.  To the extent his opinion relies on epidemiology studies of others, he may cite those studies and can testify how those studies affected his methodology and opinions about dosage only and not refer to causation nor interpret them or form his own opinion about them.  Dr. Clark may say

epidemiology studies are routinely used by toxicologists in determining dose and exposure assessments, but he cannot agree with or bless any opinion of the general causation experts.

- Dr. Clark is precluded from offering opinions concerning potential confounding toxicology factors relevant to Mr. McCostlin.

- Dr. Clark is precluded from offering opinions that Roundup or glyphosate exposure increases the risk of NHL generally or did so for Mr. McCostlin specifically, which Plaintiffs have conceded on pages 10 and 15 of their Response Brief.

- Dr. Clark is precluded from offering opinions about oxidative stress or genotoxicity, which Plaintiffs have conceded on pages 10 and 15 of their Response Brief.

- Dr. Clark is precluded from offering opinions about surfactants, which Plaintiffs have conceded on pages 10 and 15 of their Response Brief.

- Dr. Clark is precluded from offering opinions about herbicide crop drift, which Plaintiffs have conceded on pages 11 and 15-16 of their Response Brief; however, he shall be permitted to testify about alleged drift from Mr. McCostlin's personal usage of Roundup.

### 4. Dr. Richard DeGrandchamp

Dr. DeGrandchamp is a toxicologist whom Plaintiffs have designated "in the areas of toxicology, exposure, dermal absorption, animal studies, and risk assessment."   Plaintiff's Designation of Expert Witnesses at 4, Feb. 27, 2023.  Plaintiffs' designation of Dr. DeGrandchamp further provides:

> Dr. DeGrandchamp will testify on issues concerning the mechanism of absorption of glyphosate and/or glyphosate-based formulations through the skin and other exposure pathways; the role of surfactants on dermal absorption; toxicology and animal studies on dermal absorption, including his analysis of the data and the interpretation and methodology related to that data; animal studies relating to glyphosate and/or glyphosate-based formulations; human exposure studies and data relating to glyphosate and/or glyphosate-based formulations; and the effect of wearing personal protective equipment (PPE) on exposure levels. He will also offer

testimony concerning the mechanisms through which glyphosate and glyphosate-based formulations induce oxidative stress and cause genotoxicity.

Dr. DeGrandchamp is also expected to discuss dioxane contamination in formulated Roundup and the cancer risks that contamination poses to applicators of Roundup. He will testify as to what chemicals constitute the ingredients of Roundup. He will also testify regarding the Material Safety Data Sheet ("MSDS") and product labels of Roundup.

*Id.* at 4-5.

Monsanto moves to exclude specific areas of Dr. DeGrandchamp's testimony. First, Monsanto argues the Court should preclude him from offering any testimony he did not disclose at the time of his deposition. For example, Dr. DeGrandchamp disclaimed any opinion concerning whether inhalation or dermal absorption of trace impurities of ethylene oxide in Roundup are capable of any toxicological effects. *See* Monsanto's Ex. C, DeGrandchamp Dep. 30:14-31:20, Apr. 28, 2023.

He also had no opinion as to whether any medical studies have found a connection between 1, 4-dioxane occupational exposure and cancer (*Id.* at 122:12-16) or connecting N-nitrosoglyphosate to carcinogenicity (*Id.* at 72:6-12). Because Dr. DeGrandchamp did not disclose any final conclusion on these and several other topics, Monsanto argues it was denied any opportunity to probe into the nature of his testimony and, accordingly, he must be precluded from offering them at trial.

Second, Monsanto argues Dr. DeGrandchamp should be precluded from testifying about any alleged inactive ingredient or trace impurity that may be present in Roundup. Dr. DeGrandchamp and Dr. Boyd both have disclaimed offering opinions on alleged inactive ingredients or trace impurities in Roundup. Accordingly, Monsanto argues testimony about such impurities is irrelevant to this case and should be precluded because neither Dr. DeGrandchamp

nor any other expert in this case has opined that such impurities caused or substantially contributed to Mr. McCostlin's cancer.

Third, Monsanto argues Dr. DeGrandchamp should not be permitted to refer to, opine on, or interpret the recent opinion from the U.S. Court of Appeals for the Ninth Circuit's opinion in *Natural Resources Defense Council* (*NRDC*) *v. U.S. Environmental Protection Agency*, 38 F.4th 34 (9th Cir. 2022).

According to Monsanto, Dr. DeGrandchamp intends to opine that the Ninth Circuit's opinion "parallels" his own and will lead to the EPA changing its decision regarding glyphosate. Monsanto's Ex. F, DeGrandchamp's *Evard* Dep. at 45:12-14, 69:20-23, July 8, 2022.  Monsanto, however, notes that the Ninth Circuit's opinion in *NRDC* concerned whether the EPA's Interim Registration Review Decision for glyphosate met the legal requirements under the federal Administrative Procedure Act and did not purport to decide any issue related to the science concerning glyphosate in Roundup.

Furthermore, Monsanto argues this topic is beyond the scope of admissible expert testimony, let alone a toxicologist like Dr. DeGrandchamp without a law degree.

Fourth, Monsanto argues Dr. DeGrandchamp should be precluded from testifying about the regulatory history of glyphosate.  Dr. DeGrandchamp was not designated on this topic in this case yet Monsanto asserts he nevertheless intends to opine on Monsanto's corporate conduct and regulatory reviews of glyphosate and Roundup.  Monsanto's Ex. H, DeGrandchamp's *Luke* Dep. 32-33, Aug. 30, 2022.

Monsanto argues Dr. DeGrandchamp is not an expert on corporate ethics.  Monsanto also notes that Dr. DeGrandchamp testified he had not reviewed underlying documents and studies submitted to the EPA related to glyphosate.  Monsanto concludes Dr. DeGrandchamp simply reading or summarizing documents for the jury is not providing helpful testimony because the jury is capable of reading those documents and reaching conclusions about them on its own.  *See Clinton v. Mentor Worldwide LLC*, No. 4:16-CV-00319 (CEJ), 2016 WL 7491861, at *11 (E.D. Mo. Dec. 30, 2016) ("Recitation of defendant's own corporate documents does not fall within the purview of expert testimony under Federal Rule of Evidence 702.").

And fifth, Monsanto argues any testimony about Dr. DeGrandchamp's proposed "nine key mechanistic hallmarks of NHL" should be precluded.  In his deposition in the prior *Alesi* case in this circuit, Dr. DeGrandchamp admitted he "[had not] finished [his] analysis yet" and "would have no supporting evidence" that Roundup causes NHL.  Monsanto's Ex. J, DeGrandchamp's *Alesi* Dep. 11:9-12:10, Mar. 24, 2022.  Since then, however, he has developed a list of nine factors he believes contribute to cause NHL, which he calls "NHL Hallmarks."  Dr. DeGrandchamp's report makes clear that he developed these "hallmarks" himself:

> For this litigation, I have also been requested to review the extensive published scientific literature on the molecular mechanisms for glyphosate, glyphosate-based herbicides (i.e., Roundup formulations), and aminomethylphosphonic acid (AMPA; a metabolite of glyphosate) – which I refer to in this report as glyphosate/Roundup compounds (G/R compounds) – to form an opinion as to whether sufficient evidence exists to conclude G/R compounds produce NHL. As I discuss in this report, there is no single key mechanism or silver bullet that links a compound to NHL. *I made my final determination* based on the totality of the weight of the mechanistic evidence and for this report *I have identified nine key mechanistic hallmarks of NHL* which are:
>
> - NHL HALLMARK: DNA Strand Breaks
> - NHL HALLMARK: Chromosomal Gene Translocations
> - NHL HALLMARK: Mechanism of DNA Breaks
> - NHL HALLMARK: Sister Chromatid Exchanges (SCE)
> - NHL HALLMARK: Upregulation of BCL-2 Oncogene

- NHL HALLMARK: Downregulated Tumor Suppressor Gene *P53*
- NHL HALLMARK: Gammopathy (Increased IgG Antibodies)
- NHL HALLMARK: Inflammation
- NHL HALLMARK: Immortality (Telomere Lengthening)

> In this report, *I first explain what the ten key NHL mechanistic hallmarks are and how they contribute to the etiology of NHL*.

Monsanto's Ex. K, DeGrandchamp Report, Book 4 at 1 (emphasis added).

Monsanto argues there are significant issues with Dr. DeGrandchamp's "NHL Hallmarks" and, regardless, should be excluded as there is no evidence to suggest this new theory is generally accepted to meet the threshold requirements for admissibility. *See State v. Antle*, No. WD 83333, 2021 WL 1880945, at \*10 (Mo. App. W.D. May 11, 2021), *transfer denied* (Oct. 5, 2021) (holding that the trial court did not abuse its discretion in excluding expert's testimony regarding a system "entirely of her own creation").

Plaintiffs oppose Monsanto's motion to exclude or limit Dr. DeGrandchamp's testimony. They assert he is qualified in light of his Ph.D. in toxicology from the University of Michigan School of Public Health, his work in academia at the University of Colorado Medical School, and his over 30 years of experience practicing toxicology.

Plaintiffs also cite Dr. DeGrandchamp's work on multiple scientific review panels for various governmental entities, including the EPA and U.S. Department of Justice. They further note that Dr. DeGrandchamp has provided a 186-page report on his opinions regarding Roundup and glyphosate (although not required to do so under Missouri's rules), and he has been deposed at least five times about those opinions. *See* Plaintiff's Ex. 2.

On page 10 of their Response Brief, Plaintiffs expressly agree that Dr. DeGrandchamp will not offer any opinions on the following topics:

1. concerning any epidemiological data linking possible impurities in Roundup with cancer;

2. on what amount of a Roundup applicator's daily 1, 4-dioxane intake would come from applying Roundup as opposed to other products;

3. on the epidemiological studies examining a connection between glyphosate and NHL; or

4. on specific causation.

Plaintiffs, however, argue Dr. DeGrandchamp should be permitted to testify concerning the carcinogenicity of *formulated* Roundup that will necessarily entail testimony about all of Roundup's ingredients, including dioxane. Plaintiffs note they expressly designated him on this topic. *See* Plaintiff's Designation of Expert Witnesses at 5, Feb. 27, 2023 ("Dr. DeGrandchamp is also expected to discuss dioxane contamination in formulated Roundup and the cancer risks that contamination poses to applicators of Roundup. He will testify as to what chemicals constitute the ingredients of Roundup."). He also created and produced a report analyzing dioxane in formulated Roundup. *See* Plaintiffs' Ex. 5.

Furthermore, Plaintiffs contend the subject of this case is the entire formulated Roundup product. They state Dr. Boyd's specific causation opinion links Mr. McCostlin's NHL to formulated Roundup rather than just glyphosate. Plaintiffs also note many of the studies on which Dr. DeGrandchamp relies analyzed the entire formulated Roundup product, including all ingredients, contaminants, and impurities.

Plaintiffs also argue Dr. DeGrandchamp may properly opine on the Ninth Circuit's opinion in *NRDC*. They claim he would not interpret the opinion but, rather, would explain how the Ninth Circuit reached the same conclusion he had previously reached that the EPA deviated from its own guidelines in approving Roundup.

Plaintiffs concede on page 15 of their Response Brief that Dr. DeGrandchamp is not going to testify about Monsanto's intent, motives, or state of mind. Plaintiffs contend, however, that his proposed testimony concerning Monsanto's internal corporate documents would aid the jury in understanding his opinions. To the extent Monsanto has an objection to specific corporate documents, Plaintiffs contend the proper recourse is an objection at trial and not a pre-trial motion to exclude an expert.

Lastly, Plaintiffs reject Monsanto's characterization of Dr. DeGrandchamp's methodology as "novel." Dr. DeGrandchamp explains in his report that his methodology used a widely accepted framework in the field of toxicology:

> The framework and methodology I applied in this analysis is similar to the mechanistic framework developed by the International Agency for Research on Cancer (IARC) in which 10 Key Characteristics (KC) of carcinogens are used to classify chemicals as carcinogens. As I discuss in this report, this KC methodology has been adopted by the National Toxicology Program (discussed in the 15th edition of the Report on Carcinogens) and has been applied by US EPA in its carcinogenic assessment of ethylene oxide. The only difference between my analysis of G/R compounds is that I have focused specifically on one cancer lymphoma for general causation.

Plaintiffs' Ex. 2, DeGrandchamp Report, Book 4 at 1-2 (endnotes omitted).

According to Plaintiffs, Dr. DeGrandchamp took IARC's ten key characteristics of carcinogens dealing with cancer generally and adapted that list specifically for lymphomas to conclude glyphosate compounds appear to cause nine of the ten changes that are hallmarks of NHL.

The Court concludes that Dr. DeGrandchamp may not testify about any opinion he did not disclose during his deposition in this case.  Once an expert has been disclosed, Rule 56.01(b)(6)(B) permits the opposing party to "discover by deposition the facts and opinions to which the expert is expected to testify."

Monsanto argues the main purpose of this rule is to avoid unfair surprise at trial.  As the Supreme Court of Missouri has explained:

> "[W]hen an expert witness has been deposed and he later changes his opinion before trial or bases that opinion on new or different facts from those disclosed in the deposition, it is the duty of the party intending to use the expert witness to disclose that new information to his adversary." *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 622 (Mo. banc 1995) (quoting *Gassen v. Woy*, 785 S.W.2d 601, 604 (Mo. App. 1990) ). This principle "is not intended as a mechanism for contesting every variance between discovery and trial testimony [because] [i]mpeachment of the witness will accomplish that goal." *Sherar v. Zipper*, 98 S.W.3d 628, 634 (Mo. App. 2003). Rather, its purpose is to relieve a party "who is genuinely surprised at trial." *Id.* This could happen "when an expert witness suddenly has an opinion where he had none before, renders a **substantially different** opinion than the opinion disclosed in discovery, uses new facts to support an opinion, or newly bases that opinion on data or information not disclosed during the discovery deposition." *Id.* (emphasis added).

*Shallow*, 554 S.W.3d t 881–82 (bold in original).

This reasoning plainly applies to preclude Dr. DeGrandchamp from testifying about any opinions he did not disclose during his deposition in this case.

Dr. DeGrandchamp may not opine about any trace impurities in Roundup because, in this case, neither he nor any other designated expert has opined that such impurities caused or substantially contributed to Mr. McCostlin's development of NHL.  Nor may he use the term "impurities" to refer to any ingredients in Roundup.

Dr. DeGrandchamp is further precluded from testifying in any way about the Ninth Circuit's opinion in *NRDC*.  "[E]xpert testimony on legal matters is not admissible.  Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them."  *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) (citation omitted).  Nor may he testify concerning his opinion or interpretation of EPA rules.

The Court will permit Dr. DeGrandchamp's testimony concerning his proposed nine key mechanistic indicators of NHL but may not refer to them as "key mechanistic hallmarks of NHL."

The Court notes that this is a close call and that another judge may find these opinions inadmissible; nevertheless, Dr. DeGrandchamp will be permitted to testify about these indicators and will be subject to full cross-examination.  While the precise enumeration may be of his own creation, his testimony and report maintain he complies with generally accepted methodologies.  This admissibility issue may be reviewed after his testimony by motion, on appeal, or withdrawal instruction.

For these reasons, Monsanto's Motion to Exclude the Testimony of Dr. DeGrandchamp is **GRANTED IN PART AND DENIED IN PART** to prohibit him from offering testimony and to allow his testimony as follows:

- Dr. DeGrandchamp is precluded from offering any opinion concerning any epidemiological data linking possible impurities in Roundup with cancer, which Plaintiffs have conceded on page 10 of their Response Brief.  Nor may he use the term "impurities" to refer to any ingredients in Roundup.

- Dr. DeGrandchamp is precluded from offering any opinion on what amount of a Roundup applicator's daily 1, 4-dioxane intake would come from applying Roundup as opposed to other products, which Plaintiffs have conceded on page 10 of their Response Brief.

- Dr. DeGrandchamp is precluded from offering any opinion on the epidemiological studies examining a connection between glyphosate and NHL, which Plaintiffs have conceded on page on page 10 of their Response Brief.

- Dr. DeGrandchamp is precluded from offering any opinion on specific causation, which Plaintiffs have conceded on page 10 of their Response Brief.

- Dr. DeGrandchamp is precluded from offering testimony regarding Monsanto's alleged fraud or its intent, motives, or state of mind, which Plaintiffs have conceded on page 15 of their Response Brief. This includes any interpretation of documents that allegedly infer knowledge or intent.

- Dr. DeGrandchamp is further precluded from testifying in any way about the Ninth Circuit's opinion in *NRDC*. Nor may he testify concerning his opinion or interpretation of EPA rules.

Dr. DeGrandchamp may only testify about the following topics:

- Dr. DeGrandchamp may testify about his proposed nine key mechanistic indicators of NHL but may not refer to them as "key mechanistic hallmarks of NHL."

CONCLUSION

For the reasons stated above, the Court makes the following rulings:

1.      Monsanto's Motion to Exclude the Testimony of Dr. Kristan Aronson is **GRANTED IN PART AND DENIED IN PART** to prohibit her from offering testimony and to allow her testimony as follows:

- Dr. Aronson may opine regarding general causation opinion based on epidemiology.  To the extent her opinion relies on animal or mechanistic studies of others, she may cite those studies but not interpret them or form her own opinion about them.  Dr. Aronson may say animal and mechanistic studies are routinely used by epidemiologists in determining causation based on epidemiology, but she cannot agree with or bless any opinion of the general causation experts.

- Dr. Aronson is precluded from offering testimony regarding Monsanto's or other industry's alleged fraud or its intent, motives, or state of mind, including any interpretation of documents that allegedly infer knowledge or intent.  She is precluded from offering opinions on general industry conduct and Monsanto's corporate conduct.  This includes any opinions about alleged scientific biases or the causes of such biases.  Ghostwriting will be addressed in motions *in limine*.

- Dr. Aronson is precluded from offering testimony regarding any legal or regulatory decisions or impact of such decisions.

Dr. Aronson may only testify about the following topics and no others:

- Dr. Aronson may testify about her opinions with respect to general causation based on epidemiology.

- Dr. Aronson may testify that she was on IARC working groups but may not mention the subjects of those working groups. She may testify that she was or was not satisfied with IARC's determinations in working groups. She may state IARC's ultimate decision regarding carcinogenicity if necessary to her opinion. She may not opine on IARC's manner or process with respect to glyphosate because she was not involved in that work and may not opine or comment on procedures used in IARC determination or investigation or other matters pertaining to glyphosate or Roundup.

- Dr. Aronson may offer her opinions on the Tomasetti studies based on epidemiology. She may not, however, comment on the underlying data or materials in the Tomasetti studies she did not independently analyze. Regarding the following issues, an epidemiological foundation and/or relevance should be established: (1) any opinion regarding her historical perspective that the Tomasetti studies are an oversimplification; (2) how her disagreement with Dr. Tomasetti regarding "bad luck" is related to epidemiology; and (3) testimony regarding cancer prevention.

2.     Monsanto's Motion to Exclude the Testimony of Dr. Barry Boyd is **DENIED** and the Court will allow his testimony as follows:

- Dr. Boyd may testify that Mr. McCostlin's exposure to Roundup was above the threshold values in the dose-metric studies placing him at an increased risk of developing NHL. Dr. Boyd may not testify about the McDuffie 2001, Eriksson 2008, and Pahwa 2019 studies for the unreliable proposition that exposure to Roundup on more than two days per year increases the risk of developing NHL.

- Dr. Boyd may testify about his opinions that Mr. McCostlin's medical expenses and treatments were reasonable and necessary.  Medical expenses submitted must follow section 490.525, RSMo.

3.     Monsanto's Motion to Exclude the Testimony of Dr. James Clark is **GRANTED IN PART AND DENIED IN PART** to prohibit him from offering testimony and to allow his testimony as follows:

- Dr. Clark may testify that Mr. McCostlin's exposure to Roundup was above the threshold values in the dose-metric studies but not that such dosage causes cancer.

- Dr. Clark is precluded from offering opinions regarding general or specific causation, which Plaintiffs have conceded on pages 10-11 of their Response Brief.  To the extent his opinion relies on epidemiology studies of others, he may cite those studies and can testify how those studies affected his methodology and opinions about dosage only and not refer to causation nor interpret them or form his own opinion about them.  Dr. Clark may say epidemiology studies are routinely used by toxicologists in determining dose and exposure assessments, but he cannot agree with or bless any opinion of the general causation experts.

- Dr. Clark is precluded from offering opinions concerning potential confounding toxicology factors relevant to Mr. McCostlin.

- Dr. Clark is precluded from offering opinions that Roundup or glyphosate exposure increases the risk of NHL generally or did so for Mr. McCostlin specifically, which Plaintiffs have conceded on pages 10 and 15 of their Response Brief.

- Dr. Clark is precluded from offering opinions about oxidative stress or genotoxicity, which Plaintiffs have conceded on pages 10 and 15 of their Response Brief.

- Dr. Clark is precluded from offering opinions about surfactants, which Plaintiffs have conceded on pages 10 and 15 of their Response Brief.

- Dr. Clark is precluded from offering opinions about herbicide crop drift, which Plaintiffs have conceded on pages 11 and 15-16 of their Response Brief; however, he shall be permitted to testify about alleged drift from Mr. McCostlin's personal usage of Roundup.

4.      Monsanto's Motion to Exclude the Testimony of Dr. Richard DeGrandchamp is **GRANTED IN PART AND DENIED IN PART** to prohibit him from offering testimony and to allow his testimony as follows:

- Dr. DeGrandchamp is precluded from offering any opinion concerning any epidemiological data linking possible impurities in Roundup with cancer, which Plaintiffs have conceded on page 10 of their Response Brief.  Nor may he use the term "impurities" to refer to any ingredients in Roundup.

- Dr. DeGrandchamp is precluded from offering any opinion on what amount of a Roundup applicator's daily 1, 4-dioxane intake would come from applying Roundup as opposed to other products, which Plaintiffs have conceded on page 10 of their Response Brief.

- Dr. DeGrandchamp is precluded from offering any opinion on the epidemiological studies examining a connection between glyphosate and NHL, which Plaintiffs have conceded on page on page 10 of their Response Brief.

- Dr. DeGrandchamp is precluded from offering any opinion on specific causation, which Plaintiffs have conceded on page 10 of their Response Brief.

- Dr. DeGrandchamp is precluded from offering testimony regarding Monsanto's alleged fraud or its intent, motives, or state of mind, which Plaintiffs have conceded on page 15 of their Response Brief. This includes any interpretation of documents that allegedly infer knowledge or intent.

- Dr. DeGrandchamp is further precluded from testifying in any way about the Ninth Circuit's opinion in *NRDC*.  Nor may he testify concerning his opinion or interpretation of EPA rules.

Dr. DeGrandchamp may only testify about the following topics:

- Dr. DeGrandchamp may testify about his proposed nine key mechanistic indicators of NHL but may not refer to them as "key mechanistic hallmarks of NHL."

**SO ORDERED**:

September 05, 2023

_____

Hon. Brian H. May
Circuit Judge, Division 1