```
 1              UNITED STATES DISTRICT  COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   IN RE:  ROUNDUP PRODUCTS        )
     LIABILITY LITIGATION            )
 6                                   )
     This document relates to:       )MDL No.:
 7                                   )3:16-md-02741-VC
     Lois Rolish v. Monsanto Co.,    )
 8   Case No. 3:20-cv-01421-VC       )
     _____ )
 9

10

11

12

13

14

15

16              REMOTE DEPOSITION OF

17              RICHARD BAKST, M.D.

18         Wednesday, December 20, 2023

19                  Volume I

20

21

22   Reported by:
     CARLA SOARES
23   CSR No. 5908
24   Job No. 6376604
25   Pages 1 - 141
```

Page 1

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3

4

5      IN RE:  ROUNDUP PRODUCTS         )

       LIABILITY LITIGATION             )

6                                       )

       This document relates to:        )MDL No.:

7                                       )3:16-md-02741-VC

       Lois Rolish v. Monsanto Co.,     )

8      Case No. 3:20-cv-01421-VC        )

       _____)

9

10

11

12

13

14

15

16              REMOTE DEPOSITION OF RICHARD BAKST, M.D.,

17      Volume I, taken on behalf of Plaintiff, beginning  at

18      12:01 p.m., and ending at 3:24 p.m., on Wednesday,

19      December 20, 2023, before CARLA SOARES, Certified

20      Shorthand Reporter No. 5908.

21

22

23

24

25

                                                    Page 2

```
 1    APPEARANCES VIA VIDEOCONFERENCE:

 2

 3    For the Plaintiff:

 4         STEVEN WILLIAMS LAW, PC

 5         BY:  STEVEN N. WILLIAMS, Attorney at Law

 6         201 Spear Street, Suite 1100

 7         San Francisco, California 94105

 8         415.500.6800

 9         swilliams@stevenwilliamslaw.com

10

11

12    For the Defendant:

13         ARNOLD & PORTER KAYE SCHOLER LLP

14         BY:  AARON H. LEVINE, Attorney at Law

15         250 West 55th Street

16         New York, New York 10019

17         212.836.8000

18         aaron.levine@arnoldporter.com

19

20

21                       --o0o--

22

23

24

25
```

Page 3

```
1                        INDEX
2    WITNESS
3    RICHARD BAKST, M.D.                    EXAMINATION
     Volume I
4
5              BY MR. WILLIAMS                      6
6
7                       EXHIBITS
8    NUMBER              DESCRIPTION              PAGE
9    Exhibit 1                                    135
10          Document headed "Expert Report -
11          Richard Bakst, MD"
12
13                      --o0o--
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4



```
1                    REFERENCED  EXHIBITS

2                         (None)

3

4

5            SECTIONS  MARKED  BY  COUNSEL

6                  PAGE        LINE

7                   32           9

8

9                     --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1              Witness Location:  New York, New York
 2                  Wednesday, December 20, 2023
 3                  12:01 p.m.
 4

 5                  P R O C E E D I N G S
 6              THE REPORTER:  Counsel, please state your
 7      appearances, and then I'll swear the witness.
 8              MR. WILLIAMS:  My name is Steve Williams.  My
 9      firm is Steven Williams Law, PC, and I'm counsel for  the
10      plaintiff, Lois Rolish.
11              MR. LEVINE:  Aaron Levine, from Arnold &
12      Porter, representing Monsanto.
13                  RICHARD BAKST, M.D.,
14      having been administered an oath, was examined  and
15      testified as follows:
16                          EXAMINATION
17      BY MR. WILLIAMS:
18          Q   Good morning.  Can you please state your  name
19      for the record?
20          A   Dr. Richard Bakst.
21          Q   Thank you, Doctor.  We met briefly off the
22      record.  My name is Steve Williams.  I'm here for  your
23      deposition today.
24              Can you tell me, where are you right  now?
25          A   So I'm at the office of Arnold & Porter  in
```

Page 6

1    Midtown Manhattan.

2        Q   And what is the address of that office?

3        A   Off the top of my head, I don't know, but

4    somewhere -- North 57th and Broadway.

5        Q   Is it 250 West 55th Street?

6        A   It sounds about right.

7        Q   It is, correct?

8            Counsel, can you confirm that?

9            MR. LEVINE:  I will stipulate to that.

10           MR. WILLIAMS:  Does anyone have any objection

11   if I come there?  Because I am in that same building

12   right now.  And I had thought everyone would be remote.

13   But so long as you're with counsel, I could just -- we

14   could go off the record for a minute, and I could meet

15   you there.

16           MR. LEVINE:  No objection, really.

17           MR. WILLIAMS:  Okay.  Do I need a pass or

18   anything, or can I just come?

19           MR. LEVINE:  You do.  I need to work this out

20   with security.  I don't want to extend the length of the

21   deposition, but I can --

22           MR. WILLIAMS:  How about this?  How about we

23   go, and at first break -- if you can maybe do the

24   logistics, and then at the first break, we'll use that

25   time for me to come meet you all in person.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1          MR. LEVINE:  Sure.

2          MR. WILLIAMS:  Okay.  Great.

3          MR. LEVINE:  I will see what I can do.

4    There's not many people here; so I'll see what I can do

5    about getting --

6          MR. WILLIAMS:  Thank you.  I appreciate it.

7      Q   Doctor, would you please state your name for

8    the record?

9      A   Dr. Richard Bakst.

10     Q   What do you do for a living?

11     A   I'm a radiation oncologist.

12     Q   Who is your employer?

13     A   I work for Mount Sinai School of Medicine.

14     Q   Do you have any other employers other than

15   Mount Sinai School of Medicine?

16     A   No.  Mount Sinai School of Medicine is my only

17   employer.

18     Q   I'm sorry.  I missed the last few words.  If

19   you could speak up maybe just a little bit.

20     A   Mount Sinai School of Medicine is my only

21   employer.

22     Q   Is Mount Sinai School of Medicine the only

23   source of income you've had in the last two years?

24     A   So Mount Sinai is my W-2 income.  I do have

25   consulting income from my LLC.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1          Q     Okay.   What's the name of that LLC?

2          A     Bakst Consulting, LLC.

3          Q     And what type of consulting services does

4     Bakst consulting, LLC, provide?

5          A     Medical consulting in the form of, you know,

6     medical/legal work.

7          Q     Does that mean expert witness work?

8          A     Expert witness work falls into the category of

9     medical-legal work, yes.

10         Q     Other than consulting lawyers or acting as an

11    expert witness for lawyers, does Bakst Consulting, LLC,

12    provide any other type of consulting services?

13         A     Bakst Consulting does not provide any other

14    form of consulting services.

15         Q     In the last two years, proportionally, how

16    much of your income came from Bakst Consulting and how

17    much came from Mount Sinai?

18              I'm not asking for numbers, just an estimate,

19    so I can get a sense of how much time you spend with

20    that work.

21              MR. LEVINE:   Can I just ask, are you asking

22    for a percentage?

23              MR. WILLIAMS:   Just like sort of a rough

24    estimate.   Like 90 percent of my income comes from my

25    practice and 10 from expert witness work or 50/50 or

1     some other such thing.

2              MR. LEVINE:   Understood.

3              THE WITNESS:   I mean, I would say it probably

4     changes year to year, but roughly, off the top of my

5     head, probably less than 5 to 10 percent comes  from

6     consulting.

7     BY MR. WILLIAMS:

8         Q   You've had your deposition taken before,

9     correct?

10        A   I have been deposed before.

11        Q   And you prepared with counsel to be  deposed

12    today, correct?

13        A   I have met with counsel prior to  today.

14        Q   So rather than going through the normal  things

15    the lawyers say, I'm just going to say, I will  probably

16    not ask great questions all day because you have  a

17    specialty and I'm not a doctor, so that would  typically

18    be because I don't understand  something.

19             If I ask you a question that doesn't  make

20    sense, don't hold back.  Just tell me it doesn't  make

21    sense, and I'll ask it again.  Okay?

22        A   Understood.

23        Q   You're offering testimony in the case  against

24    Monsanto brought by my client Lois Rolish; is  that

25    correct?

```
 1      correct?
 2           A    Again, I don't recall my exact testimony for
 3      that deposition.  I don't recall the exact type of
 4      non-Hodgkin lymphoma he had.
 5               As I said before, certain forms of non-Hodgkin
 6      lymphoma do have a gender preference, and it is quite
 7      possible that he had one of those types of non-Hodgkin
 8      lymphomas.  I just don't recall at the time.
 9           Q   So I got your deposition testimony last night,
10      and I read it.  And I'll represent to you, you did say
11      that his gender was part of an increased risk factor for
12      him.
13               Do you have any reason to think that I'm not
14      being honest?
15           A    No.
16           Q    Okay.  When you say something like the gender
17      is an increased risk factor, is there a way that you
18      quantify that in a given case?
19           A    I do not quantify gender as a risk factor.
20           Q    When you consider other risk factors in
21      relationship to non-Hodgkin's lymphoma, do you quantify
22      them, meaning relative to each other?
23           A    So I think it's important for us to define
24      "risk factors."
25               In my opinion, the risk factors need to be
```

Page 13

1    turn to an assessment of Helen Rolish's case, correct?

2         A    That is correct.

3         Q    That continues on pages 14, 15, 16, and 17.

4    That is your section of your report specific to

5    Ms. Rolish, correct?

6         A    That is correct.

7         Q    Do you dispute whether or not Ms. Rolish had

8    non-Hodgkin's lymphoma?

9         A    I do not dispute whether Ms. Rolish had

10   non-Hodgkin lymphoma.

11        Q    Okay.  And in looking at her report, can you

12   tell me what type of non-Hodgkin's lymphoma she had?

13        A    So based on the information that was available

14   to me, she had a B-cell non-Hodgkin lymphoma.

15        Q    That was B-cell non-Hodgkin's?

16        A    B-cell non-Hodgkin lymphoma.

17        Q    And you say based on the information given to

18   you.

19             Whatever the information is that you have, all

20   of your opinions in terms of her specific case are

21   premised on her having B-cell non-Hodgkin's, correct?

22        A    All of the opinions that I have are premised

23   on her having a B-cell non-Hodgkin lymphoma.

24        Q    Thank you.

25             If you then go back to page 6 where you listed

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    those factors, you say, "For NHL, risk factors vary by

2    subtype."

3            Do you see that, just before the list of 13?

4       A   Yes.

5       Q   Can you tell me, for any of those risk

6    factors, whether or not -- or how they vary by the type

7    of non-Hodgkin's that Ms. Rolish had?

8       A   Sure.

9            So the first thing I just wanted to say about

10   her non-Hodgkin lymphoma was that the subtype for B-cell

11   non-Hodgkin lymphoma was not provided, meaning it was

12   not clear whether she had a follicular lymphoma or a

13   diffuse large B-cell lymphoma or a Burkitt lymphoma

14   based on the information that I have.  So I think that's

15   important to note.

16      Q   May I follow up on that point real quick

17   before --

18      A   Sure.

19      Q   You listed in your report everything that you

20   considered for the purpose of your opinions in this

21   case, right?

22      A   Sorry.  Can you repeat that?

23      Q   Your report in this case identifies the

24   materials you considered, correct?

25      A   It was in the "Materials Considered" list

                                        Page 18

```
 1    provided.  Yes.
 2               (Reporter interruption due to technical
 3         issues.)
 4               (Recess, 9:16 a.m. - 9:17 a.m.)
 5    BY MR. WILLIAMS:
 6         Q    So, Doctor, your report, Exhibit A --
 7    actually, why don't you first do this:  Turn to page 18,
 8    if you would, just for one moment.  Let me know when
 9    you're there.
10         A    I'm at page 18.
11         Q    Great.  That's your signature on this report,
12    correct?
13         A    That is my signature.
14         Q    Okay.  Exhibit A is the next page, correct?
15         A    Exhibit A is the next page.
16         Q    And it says, quote, "Dr. Richard Bakst
17    Materials Considered List," correct?
18         A    That is correct.
19         Q    You prepared this -- what I'm looking at  and
20    you're looking at right now, that page I just  quoted
21    from, did you prepare that yourself?
22         A    Sorry.  Which page are you quoting?
23         Q    The one I just quoted that says, "Dr.  Richard
24    Bakst Materials Considered List."
25         A    Yes, I prepared that.
```

1     Q    Okay.   On your own computer yourself?

2     A    So the report I generated on my own  computer.

3     And the "Materials Considered" list was -- I generated

4     as well.

5     Q    I'm being very specific just to this page.

6          Did you yourself prepare this page from

7     beginning to end?

8          You sat down with a blank Word document  or

9     from a document you'd had in another case, you  deleted

10    everything else, and you typed stuff on this  page?

11    A    So the original "Materials Considered" list

12    was derived from my work on the case that we  were

13    discussing before.   I did not create a de novo  document

14    for Ms. Rolish's case.

15    Q    Right.

16         But you deleted, presumably, something that,

17    in that case, said "Mr. Lamb Materials," and you  then

18    typed -- you yourself personally -- typed, quote,  "Lois

19    Rolish Materials"; is that correct?

20    A    No.

21         MR. LEVINE:   Objection.   Misstates.

22         THE WITNESS:   So I did not delete nor type

23    "Lois Rolish Materials."

24    BY MR. WILLIAMS:

25    Q    Who did?   You said a little bit ago you

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    created this, and I think you're now saying you didn't

2    create it.

3              Who created this document, Doctor?

4         A    So what I had said was this document was a

5    derivative from the case that we discussed prior from, I

6    believe, 2019.

7         Q    You did say that, but you said some other

8    stuff, too.  The record will say whatever you said.

9              But I'm just asking you right now, can you

10   tell me who prepared the page we have been talking about

11   for the last five minutes?

12        A    So this page was a collaborative effort

13   between counsel and I.

14        Q    Okay.  So counsel prepared it, correct?

15        A    This page was a collaborative effort between

16   counsel and I.

17        Q    Okay.  I'm being pretty focused on my

18   question, right?  You're offering opinions on how cancer

19   gets caused, and I'm just asking you how this sheet of

20   paper got caused.

21              So can you just tell me, whose fingers touched

22   the keyboard to cause the letters on this page to be on

23   this page, Doctor?

24              MR. LEVINE:  Objection.  Asked and answered.

25              MR. WILLIAMS:  Not answered yet.  Thank you.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1              THE WITNESS:   This document represents a
 2      collaborative effort between counsel and I.
 3              MR. WILLIAMS:   I move to strike.
 4         Q   You told me you did not prepare it, Doctor,
 5      okay?  I just want to know physically who typed it, and
 6      that's a question I'm allowed to know the answer to.
 7              If you don't know, you can say you don't know.
 8              MR. LEVINE:   Objection.   Asked and answered.
 9      BY MR. WILLIAMS:
10         Q   Do you not know?
11         A   This document originated in 2019, and the
12      subsequent version, which is in front of us today, was a
13      collaborative effort between counsel and I.
14         Q   Okay.  So you can't answer the question who
15      typed this page, yes or no?
16         A   This specific page, I do not recall who typed
17      this specific page that says "Lois Rolish Materials."
18         Q   But you can tell the jury how cancer is
19      caused; that's what you're telling us here today; is
20      that correct?
21         A   So I am an oncologist, and I have expertise in
22      the care, diagnosis, origins of cancer as part of my
23      job.
24         Q   Okay.  Now, when this was prepared, as it says
25      on the page before with your -- your signature here --
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
1          A    Well, I don't know what I don't have.  So I
2     received records.  There were additional records sent
3     after my report was issued.  But I don't know what else
4     is out there.
5          Q    Why didn't you specify what those records
6     were?  Why did you use such a high-level description
7     such as "Medical Records of Lois Rolish"?
8          A    Sorry.  I don't understand your question.
9          Q    Why is your -- why did you not give a
10     description of the specific medical records you were
11     given?  They're from different -- let me step back.
12               How many pages of medical records
13     comprise No. 1 in your report, quote, "Medical Records
14     of Lois Rolish"?  How many pages?  Give me your best
15     estimate.
16          A    I mean, I would need to go back and look at
17     all of them, but there were thousands.   I just don't
18     recall exactly how much.
19          Q    Tens of thousands?
20          A    I don't think tens of thousands, but
21     thousands.
22          Q    Okay.  And is that thousands of unique pages
23     or pages that were copies of other pages?  Do you know?
24          A    I guess I'm not sure what you mean.
25          Q    I mean, are those thousands of pages that are
```

Page 25

1      all different from each other, or are some of those

2      records duplicative of other records?

3              A    Well, in any medical record, there are always

4      duplicates.   So it's hard to say.   But I would say

5      mostly, you know, as a rough estimate, they were not

6      duplicated medical records.

7              Q    Okay.   And you read those thousands of pages

8      beginning to end yourself; is that correct?

9              A    I did.

10             Q    Okay.   And how many different medical

11     providers do you recall Ms. Rolish having had as

12     reflected in those medical records?

13             A    I mean, without sort of looking at the records

14     right now, it's hard to say.

15                 I would estimate, off the top of my head,

16     somewhere between, you know, five to ten.   But without

17     looking at the records, I don't fully recall.

18             Q    Okay.   And it's your testimony then that in

19     looking at those thousands of pages, nowhere in those

20     thousands of pages was there any indication of what

21     subtype of NHL Ms. Rolish had?

22             A    Well, I think it's important to sort of define

23     "subtype."

24                 I mean, we do know she had a B-cell lymphoma.

25     It seems that it was low-grade because she enrolled in a

                                                    Page 26

1    the book, and you can't figure out what's going on.

2            And that kind of replicative error, you know,

3    I think was highlighted proportionally by the work that

4    Tomasetti did in 2017 and thereafter in demonstrating,

5    you know, what fraction of NHL may be related to

6    replicative error.

7        Q    If you turn to your "Materials Considered"

8    list, at No. 97, there's a reference to Tomasetti there.

9            When you have a chance to find that, can you

10   just confirm that that is the article that you referred

11   to in the parenthetical on page 4?

12       A    Sorry.  What number?

13       Q    Take your time.  I think it's No. 97.

14           I take that back.  I think it was 96.  But you

15   should tell us.

16       A    So that specific reference was the 2017

17   reference.

18       Q    Okay.  And that's the article entitled "Stem

19   cell divisions, somatic mutation, cancer etiology and

20   cancer prevention"; is that correct?

21       A    That's referenced in that sentence.  Obviously

22   my opinion is derived from not just that work but his

23   other work as well.  But yes, that specific line refers

24   to that paper.

25       Q    And does that specific paper refer to NHL?

Page 49

1      A    That is a paper that refers to cancer -- a

2   number of different cancers, and also, you know,

3   hematological malignancies like NHL.

4      Q    Well, does it say, as you say, before you cite

5   it specifically, that "random DNA replication errors are

6   a key contributor to NHL development"?   Does that paper

7   make that statement?

8      A    We could take a look at the paper if you want.

9   I don't want to speak without looking at the paper.

10     Q    Well, I presume you would not have said -- you

11  would not have cited to it if it didn't say that, would

12  you have?

13     A    Well, the reference, that point refers to

14  replicative error and cancer risk.   You're asking a very

15  specific question; so I just want to make sure that I

16  give you the best answer that I can.

17     Q    Well, it specifically refers to NHL, not just

18  cancer risk, right?

19     A    Again --

20     Q    Your report.

21     A    Oh, yes.   My report refers to NHL.   Correct.

22     Q    Specifically, the last sentence on page 4 just

23  before you cite to this article that's No. 96, your

24  words that you wrote and signed say, quote, "DNA

25  replication errors are a key contributor to NHL

Page 50

1    development."

2           And my question to you is, can you tell us

3    right now -- I understand you may not have it with

4    you -- but was it your intention to communicate to us

5    that that citation at No. 96 supports that specific

6    proposition about NHL in your report?

7       A   So I think it's the collective work of

8    Tomasetti that spans a number of different papers that

9    support that.  Work from the 2017 paper certainly does

10   in terms of lifetime risk and numbers.

11      Q   Can you point me -- I'm sorry.

12      A   If you're going to ask specific details about

13   the paper, I would just like to see it in front of me.

14   That's all.

15      Q   So this report is when you tell me what you

16   think and why you think it.  And the only citation you

17   give for this is Tomasetti 2017, at least in the text.

18          What would be the other citations that you

19   would send me to specific to this point about random DNA

20   replication errors being a key contributor to NHL

21   development, that very focused point you've written in

22   the report?

23      A   So I would say 96 to 98.

24      Q   Okay.  Is it your recollection that those

25   specifically address NHL development?

                                              Page 51

1    where others have other opinions to that effect, but

2    that's definitely not my opinion.  I do not believe it

3    is a carcinogen, and, you know, I don't doubt that.

4        Q    Is it your view that a medical professional

5    could hold the opinion that glyphosate is a carcinogen?

6        A    Well, I want to acknowledge that there are --

7    there is medical literature where people have that

8    opinion.  I don't agree with that opinion.

9             But since you're asking the question, I just

10   want to acknowledge that there are professionals that

11   hold that opinion that have been published in the

12   medical literature.

13       Q    Understood.

14            But my question is a little different, which

15   is, is it your view that those opinions are unsound

16   because no medical professional could hold the opinion

17   that glyphosate can cause cancer?

18            MR. LEVINE:  Objection.  Asked and answered.

19            THE WITNESS:  I mean, my opinion is that it is

20   not a carcinogen.  I believe on the data that we have

21   available to us at the moment, that that is the

22   reasonable conclusion to come to.  And I do

23   acknowledge that others hold opinions that are different

24   from that.

25   ///

```
 1    BY MR. WILLIAMS:

 2         Q   I understand that.

 3             For those others who hold that opinion, is it

 4    your view that that is not a reasonable opinion for a

 5    medical professional like those people to hold?

 6         A   Yeah, I don't believe that is the correct

 7    conclusion to come to based on the data that we have.

 8    And so I would disagree with that opinion.

 9         Q   You disagree with their opinion.  I

10    understand.

11             But is it your opinion that they are not, in

12    fact, reasonable medical professionals because that

13    opinion is so fundamentally wrong that no reasonable

14    medical professional could hold that opinion?

15             MR. LEVINE:  Objection.  Asked and answered.

16             THE WITNESS:  Well, look, I would say that I

17    have colleagues that I disagree with all the time on

18    various clinical issues as it comes to patient care, to

19    research, to academia.  And just because we don't agree,

20    I don't consider them unreasonable medical

21    professionals.  I really don't like to use that term.

22             So I would just simply say that this is not

23    unlike other, you know, areas of debate in medicine

24    where I hold a certain opinion.  I believe it.  I

25    believe it to be true.  But I don't form a negative
```

Page 61

1    opinion about those colleagues that don't share my view.

2    BY MR. WILLIAMS:

3        Q   Do you believe that a reasonable medical

4    professional could hold the opinion that there is a link

5    between glyphosate and an increased risk of

6    non-Hodgkin's lymphoma?

7            MR. LEVINE:  Objection.  Asked and answered.

8            THE WITNESS:  So as a medical professional, I

9    do not come to that conclusion; so I don't see how

10   another medical professional would.  But I wouldn't

11   classify them as an "unreasonable medical professional."

12   BY MR. WILLIAMS:

13       Q   You're aware that other medical professionals

14   do hold the opinion that there's a link between

15   glyphosate and non-Hodgkin's lymphoma, correct?

16           MR. LEVINE:  Objection.  Asked and answered.

17           THE WITNESS:  I'm aware of literature that --

18   to that effect, yes.

19           MR. WILLIAMS:  Okay.  And again, let me know

20   if you want to take a break, or I'll keep going.

21           THE WITNESS:  Should we take a five-minute

22   break?

23           MR. LEVINE:  Sure.

24           MR. WILLIAMS:  Sure.

25           Let's go off the record.

1              (Recess, 1:15 p.m. - 1:25 p.m.)

2      BY MR. WILLIAMS:

3          Q    Doctor, you understand you're still under

4      oath?

5          A    I understand.

6          Q    Thank you.

7              In a deposition you gave in your prior -- a

8      prior case, you had indicated that before February of

9      2019, you had done some general research on pesticides

10     and lymphoma, and I'm curious if you would be able to

11     describe what type of work you had done concerning

12     pesticides and lymphoma before February of 2019.

13         A    Again, I would sort of need to see the context

14     of that statement in my deposition.

15             But what I can say, you know, in general is

16     that, you know, some of my work was sort of involved in

17     etiology and general risk factors of lymphoma.

18             Again without kind of seeing the context --

19         Q    Okay.  If it helps, the context had been that

20     February 2019 was when you first began to work as a

21     consultant with the defendant, and prior to that had

22     been your only independent work before that engagement.

23         A    Yeah.  Again, I'm not aware where that

24     statement comes from.

25             But I will say that there's part of kind of

Page 63

1    research I've done in lymphoma looking at risk factors.

2    Whether they're breast implants or not, you know, we've

3    looked at a number of different kind of risk factors

4    associated with hematological and malignancies in

5    general.

6              So I'm not sure if that's where that

7    statement -- if that's what that statement was referring

8    to.

9         Q   And when you use the word "we" in your answer,

10   who is "we"?

11        A   Sorry.  It's a colloquial "we."  I.  But I

12   should also say that obviously research is never done by

13   one person.

14        Q   Of course.

15        A   It's a team.  And over the course of years,

16   I've had a number of collaborators for various different

17   projects.  I always give them credit, too.

18        Q   Before you did any work for Monsanto, had you

19   prepared any writings about the relationship, if any,

20   between pesticide use and cancer?

21        A   So as I sit here today, you know, to the best

22   of my knowledge, I don't recall writing about risks

23   between pesticides and cancer.

24             Obviously I've written a lot about non-Hodgkin

25   lymphoma and other malignancies, but not specifically

Page 64

1    writing about pesticides.

2         Q   In your writings about non-Hodgkin's lymphoma,

3    are any of them writings focused on the causes of

4    non-Hodgkin's lymphoma?

5         A   Some are, yes.

6         Q   Okay.  And the question I had was focused on

7    the causes of.

8             Which ones would you identify, if they're on

9    your list of writings in your report, as being focused

10   on causes of non-Hodgkin's lymphoma?

11            And I think after Exhibit B or as part of

12   Exhibit B on page 9 of 25 begins a listing of

13   publications of yours.

14        A   On page 20 of 25, 12 and 13.

15        Q   Do you have -- I'm sorry.

16        A   I looked through the others, but those are the

17   ones that came to mind when you asked that question.

18   There might be others.

19        Q   What's the difference between a case report

20   and a publication?  Is it the peer review?

21        A   No, these are all peer-reviewed.

22        Q   Okay.  Then what's the difference in the

23   terminology between case reports and publication?

24        A   So unfortunately the -- not unfortunately.

25        Q   Sorry.  May I withdraw the question?  I mixed

                                              Page 65

1      terms up, and it didn't make sense.

2              What's the difference between a peer-reviewed

3      original contribution and a case report?

4          A   Right.  So the way Mount Sinai has us do our

5      CV, it has to break them down into different categories

6      purely for kind of academic promotion purposes, you

7      know.

8              So they're -- all my publications are

9      peer-reviewed.  A case report refers to sort of research

10     that originated from seeing one patient and research you

11     do kind of thereafter, but they're all kind of

12     peer-reviewed in the literature themselves.

13         Q   Okay.  I think that helps.  Yeah.

14             Are there any writings in these lists attached

15     to your report you can identify that discuss the

16     relationship, if any, between pesticides and

17     non-Hodgkin's lymphoma?

18         A   To the best of my knowledge as I sit here

19     today, I don't recall a publication that mentions

20     pesticides and the risk of non-Hodgkin lymphoma.

21         Q   To the best of your recollection as you sit

22     here today, do you think you've ever written a

23     publication about the relationship, if any, between

24     pesticides and non-Hodgkin's lymphoma?

25         A   To the best of my knowledge today, I don't

                                                    Page 66

 1    recall a publication regarding pesticide use and

 2    non-Hodgkin lymphoma.

 3         Q    To the best of your recollection as you sit

 4    here today, can you recall any publication you're

 5    responsible for concerning the link, if any, between

 6    pesticides and cancer?

 7         A    To the best of my knowledge, I actually don't

 8    have any published work that cites pesticide and cancer

 9    risk.

10         Q    Okay.  Thank you.

11              I'm just going to scroll a little bit to the

12    next question I had from your prior deposition; so

13    that's why I'm looking away for a moment.

14              I want to follow up.  You gave answers

15    previously about how much time you spend treating

16    patients and how much time you spend doing research and

17    testimony.  Doing research.  I'll skip testimony.

18              I think you said it was about 80 percent

19    treatment, 20 percent research.  Does that still sound

20    about right?

21         A    Yeah.  I would say it definitely sort of

22    evolves year to year sort of depending on clinical needs

23    and potential sort of funding I get for more time.

24              But I think that's a rough rule of thumb:

25    somewhere between 70 to 80 percent clinical and 20 to 30

                                                    Page 67

1           Most of the records occurred after her

2    diagnosis and through treatment where I think the  weight

3    issue is less of an issue as it relates to being a  risk

4    factor.

5           Q    Do you know who Dr. Jack Jacoub  is?

6           A    Yes, I know who Dr. Jack Jacoub  is.

7           Q    Who is Dr. Jack Jacoub?

8           A    It looks like Dr. Jack Jacoub -- sorry -- is  a

9    hematologist, I believe, that she sees after  her

10   hematologist oncologist, Dr. Panda, leaves.

11          Q    Have you reviewed Dr. Jacoub's deposition  in

12   this case?  You can look at your materials  considered

13   and relied on.  I don't see it there, but it  was

14   relatively late.  So it's possible that it may be.   I

15   don't know.

16          A    Off the top of my head, as I sit here today,  I

17   don't recall reviewing it.  I reviewed a lot of

18   different depositions.  It is possible that I looked  at

19   it, but it's not standing out right now.

20          Q    If Dr. Jacoub testified that he  believed

21   Ms. Rolish's NHL was caused by her exposure to  Roundup,

22   would that have any impact on your opinions in  this

23   case?

24          A    That would have no impact on my opinion  in

25   this case.

                                        Page 100

```
 1          Q    No matter why he thought that; is  that
 2     correct?
 3          A    That would have no impact on my opinion,  no
 4     matter why he thought that.
 5          Q    No matter what his basis was, correct?
 6          A    That would have no impact on my opinion
 7     regardless of the basis.
 8          Q    Even though he examined her, she was  his
 9     patient, and you've never met Ms. Rolish, have  you?
10          A    So I've never met Ms. Rolish, but I did  review
11     all of her records.  And I would disagree with  that
12     conclusion.
13          Q    And there's no possible reason that Dr.  Jacoub
14     could give to you as another medical professional  that
15     would ever cause you to change your mind about  the
16     development of Ms. Rolish's NHL; is that  correct?
17          A    So I don't believe Roundup or glyphosate is  a
18     carcinogen.  So I don't believe it could cause  cancer.
19     So there's nothing that he could tell me that  would
20     influence my decision.
21               And I'd also just highlight that I think  --
22     even having examined her, I think there's nothing on  an
23     exam that could sort of say if something was caused  by
24     X or Y just by looking at the  patient.
25          Q    Is your rate for deposition still 10,000  per
```

Page 101

1   extensive exposure to benzene, is there a test you could

2   perform at that moment to find out, did benzene cause

3   this person's cancer, non-Hodgkin's?

4       A   So, again, I'm not aware of a specific test

5   that I could perform that shows that benzene caused a

6   non-Hodgkin lymphoma.

7       Q   And if that same patient presented to you,

8   would there be any way for you to determine the extent

9   to which that patient's non-Hodgkin's lymphoma was

10  caused by benzene exposure as distinguished from random

11  DNA replication errors?

12      A   So, again, I think you need to sort of put it

13  in the context of the patient themself, their age, their

14  histology, et cetera.

15          But I'm not aware of a specific, for instance,

16  blood test that you could do to -- to identify one cause

17  over the other.

18      Q   And in this question, I'm actually asking if

19  you can weight them:  How much was because of benzene

20  exposure and how much because of random DNA replication

21  errors?  Is there any test you're aware of that would do

22  that?

23      A   So, you know, when we talk about tests, we're

24  talking about blood tests that you could do, scans that

25  you could do, physical exams.

Page 121

```
 1    involving Roundup?

 2              MR. LEVINE:  Object to form.

 3              THE WITNESS:  What do you mean, my "client"?

 4    BY MR. WILLIAMS:

 5         Q   You have materials for -- your client in  this

 6    case is Monsanto or Bayer.  It's Bayer now.  It  was

 7    Monsanto, I guess, right?  So far are you with  me?

 8         A   I think I understand you.

 9         Q   Okay.  Did you ask -- I'm sorry.  Let me  go

10    back.

11              Is there anything -- in your "Materials

12    Considered" list here, is there a single document  that

13    came from Monsanto?

14         A   I mean, there are 104 documents in  here.  I

15    can't recite all the origins on all of them as I  sit

16    here right now.  But to the best of my knowledge,  I'm

17    not sure that one is directly from  Monsanto.

18         Q   If I were to tell you not one of them is  from

19    Monsanto, you would have no reason to disagree  with

20    that, right?

21              MR. LEVINE:  Object to form.

22              THE WITNESS:  I mean, I have no basis  to

23    disagree with that, but there are a number of  articles

24    there, and I can't cite the origin on all of them.

25    ///
```

1           MR. WILLIAMS:  Okay.  Doctor, I want to thank

2      you.  I don't have any more questions for you.

3           I thank Counsel and Madam Court Reporter for

4      helping us get through today.

5           And as I said, I don't have any further

6      questions for you.

7           MR. LEVINE:  I don't have any further

8      questions, either.  Thank you very much.

9           THE REPORTER:  Mr. Levine, do you want a copy

10     of the transcript?

11          MR. LEVINE:  Yes.

12               (TIME NOTED:  3:24 p.m.)

13               --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1

2

3

4

5

6

7

8            I, RICHARD BAKST, M.D., do hereby declare

9     under penalty of perjury that I have read the  foregoing

10    transcript; that I have made any corrections as  appear

11    noted, in ink, initialed by me, or attached hereto;  that

12    my testimony as contained herein, as corrected, is  true

13    and correct.

14            EXECUTED this _____ day of _____ ,

15    2024, at _____, _____ _.

16              (City)                (State)

17

18

19                      _____

20                      RICHARD BAKST, M.D.

21

22

23

24

25

                                  Page 137

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4     before me at the time and place herein set forth; that

5     any witnesses in the foregoing proceedings, prior to

6     testifying, were administered an oath; that a record of

7     the proceedings was made by me using machine shorthand

8     which was thereafter transcribed under my direction;

9     that the foregoing transcript is a true record of the

10    testimony given.

11         Further, that if the foregoing pertains to the

12    original transcript of a deposition in a Federal Case,

13    before completion of the proceedings, review of the

14    transcript [ ] was [X] was not requested.

15         I further certify I am neither financially

16    interested in the action nor a relative or employee of

17    any attorney or any party to this action.

18         IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20    Dated: January 3, 2024

21

22

23

24                    *Carla Soares*

                      CARLA SOARES

25                    CSR No. 5908

                                        Page 138