# EXHIBIT Q

1              UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
2
     **************************
3    IN RE: ROUNDUP PRODUCTS      MDL No.
     LIABILITY LITIGATION         3:16-md-02741-VC
4
                                  Case No. MDL No.
5    This document relates to:    3:16-md-02741-VC

6    Gerald and Lynne Nelson
     v. Monsanto
7    Case No. 3:19-cv-04576-VC

8         and

9    Richard Canning and
     Shirley Canning v.
10   Monsanto Company, et al
     Case No. 3:19-cv-04230-VC
11
     **************************
12

13           Remote Videotaped Deposition of

14   ROBERT F. HERRICK, MS, ScD, CIH, FAIHA, held at

15   the location of the deponent, commencing at

16   10:41 a.m., on the 23rd of October, 2023,

17   before Maureen O'Connor Pollard, Registered

18   Diplomate Reporter, Realtime Systems

19   Administrator, Certified Shorthand Reporter,

20   Notary Public.

21                      - - -

22

23           GOLKOW LITIGATION SERVICES
                  877.370.DEPS
                deps@golkow.com
24

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
 1    REMOTE APPEARANCES:

 2

      THORNTON LAW FIRM, LLP
 3    BY:   DAVID BRICKER, ESQ.
            9595 Wilshire Blvd., Suite 900
 4          Beverly Hills, California 90212
            310-282-8676
 5          dbricker@tenlaw.com
            Representing the Plaintiffs
 6

 7    THORNTON LAW FIRM, LLP
      BY:   CHRISTIAN F. UEHLEIN, ESQ.
 8          101 Hyalite Ranch Lane
            Bozeman, Montana 59718
 9          888-491-9726
            cuehlein@tenlaw.com
10          Representing the Plaintiffs

11

      NELSON MULLINS RILEY & SCARBOROUGH LLP
12    BY:   JAE LEE, ESQ.
            750 B Street, Suite 2200
13          San Diego, California 92101
            619-489-6187
14          jae.lee@nelsonmullins.com
            Representing the Defendants
15

16    Videographer:  Phillip Todd

17

18

19

20

21

22

23

24
```

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    notes or recordings that are responsive to

2    request number 11?

3          A.    No, I don't.

4          Q.    You performed an interview of

5    Gerald Nelson, correct, Dr. Herrick?

6          A.    You know, I don't recall that.

7    I don't really -- I don't have a recollection

8    that I actually did.

9          Q.    You have no recollection that

10   you performed an interview of the Plaintiff

11   Gerald Nelson?

12         A.    I'm trying to think.  I

13   don't -- no, I don't recall speaking to

14   Nelson.

15         Q.    Do you have any notes of any

16   interview with Gerald Nelson?

17         A.    No, and that's -- you know,

18   because I did, you know, think through that

19   because I, you know, saw that this was one of

20   the questions, and I don't find in my file

21   any notes from a discussion with Nelson, no.

22         Q.    Did you make any recordings of

23   your -- of an interview with Gerald Nelson?

24         A.    No.  I don't remember that --

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    you know, I don't recall having an interview

2    with Nelson.

3         Q.    Did you perform an interview

4    with Plaintiff Richard Canning?

5         A.    No.  I don't recall doing that

6    either.

7         Q.    Do you have any notes of any

8    interview that you performed with Richard

9    Canning?

10        A.    No, I don't.

11        Q.    Did you make any recordings of

12   an interview with Plaintiff Richard Canning?

13        A.    No, I didn't.

14        Q.    Do you have any items

15   responsive to request number 12?

16        A.    Let me just read it over

17   carefully.

18              No, I don't have anything that

19   would be responsive to that.

20        Q.    How about request number 13?

21        A.    Let's see.  Photographs,

22   videotapes.  No, I don't have anything like

23   that.

24        Q.    How about anything responsive

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    BY MR. LEE:

2        Q.    If a chemical impacts

3    lymphocytes, where does the chemical have to

4    be inside the body?  Do you have an

5    understanding of that?

6                MR. BRICKER:  Form.  And it's

7        beyond his designation in this matter.

8    BY MR. LEE:

9        Q.    Is that correct, Dr. Herrick,

10   it's beyond your designation in this matter?

11       A.    It is, and I don't feel like I

12   really can give that a confident answer.  I

13   don't really know the answer to that.

14       Q.    Dr. Herrick, are you going to

15   provide a quantitative estimate of the dose

16   of glyphosate in Mr. Gerald Nelson?

17                MR. BRICKER:  Form.

18                THE WITNESS:  No, I don't

19       really have -- you know, I wasn't

20       planning on, you know, making any

21       comment about his dose.

22   BY MR. LEE:

23       Q.    You weren't planning or you're

24   not going to?

**Exhibit Q Page - 5**

Robert F. Herrick, MS, ScD, CIH, FAIHA

```
 1          A.      I'm not going to.

 2          Q.      Are you going to make any

 3   quantitative estimate of a glyphosate-based

 4   herbicide in the body of Gerald Nelson?

 5                  MR. BRICKER:  Form.

 6                  THE WITNESS:  No, I'm not.

 7   BY MR. LEE:

 8          Q.      Are you going to offer any

 9   quantitative estimate of the dose of Roundup

10   in the body of Mr. Gerald Nelson?

11                  MR. BRICKER:  Form.

12                  THE WITNESS:  No, I'm not.

13   BY MR. LEE:

14          Q.      I have really the same

15   questions for Mr. Richard Canning.  Are you

16   going to be offering any quantitative

17   estimate of dose for Mr. Richard Canning?

18                  MR. BRICKER:  Form.

19                  THE WITNESS:  No.

20   BY MR. LEE:

21          Q.      I'm sorry, what was your

22   answer, Dr. Herrick?

23          A.      Sorry.  The answer is, no, I'm

24   not.
```

**Exhibit Q Page - 6**

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    sprayers in his commercial landscaping

2    business, and his residences."

3              Do you see that?

4         A.    I do see that, yeah.

5         Q.    What is the source of your

6    information for that statement?

7         A.    Can we go to the next page?

8    Because I think what I tried to do, and I can

9    double-check it here, is when I had that kind

10   of information, I tried to footnote where he

11   mentioned that in the -- in his deposition.

12        Q.    So you reviewed Mr. Nelson's

13   deposition transcript?

14        A.    Right.

15              And so, are we going to

16   continue?  I'm on my page 4 now where he

17   talked about using the 1-gallon ready mix,

18   and then he also used 5-gallon containers of

19   the concentrate.

20        Q.    Well, so one of your sources

21   for your exposure assessment was the

22   deposition testimony of Mr. Gerald Nelson, is

23   that correct, Dr. Herrick?

24        A.    Yes.  That is correct, yeah.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Q.    What other sources of

2    information did you use for your exposure

3    assessment for Gerald Nelson?

4    A.    Well, he had that Plaintiff

5    Fact Sheet which, you know, I think I have.

6    Yeah, this was -- this table that I have on

7    page 3, that little table there with the two

8    rows in it, that's from his Plaintiff Fact

9    Sheet.

10    Q.    Other than Mr. Nelson's

11    deposition transcript and his Plaintiff Fact

12    Sheet, did you rely on any other source of

13    information in writing his exposure

14    assessment?

15    A.    I don't think so.  I'd have to

16    double-check on Nelson.  On some of these

17    cases, there's also been a form that I've

18    seen that is the Complaint form, and

19    sometimes there's information, you know, in

20    there, but I actually don't remember if I had

21    that for Nelson or not.

22    Q.    So as you sit here today, you

23    don't have any specific recollection of

24    reviewing his legal Complaint, is that

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    correct?

2         A.    Well, you know, I don't

3    remember.  I'd have to double-check.  I

4    could -- you know, I could do it, but the

5    information that I've put in here I would say

6    was from his Plaintiff Fact Sheet and his

7    deposition.  Those were the primary sources.

8         Q.    Now, you stated earlier in

9    your -- in this deposition that you did not

10   interview Mr. Gerald Nelson in preparing this

11   exposure assessment for him, is that correct?

12        A.    That is correct, yeah.

13        Q.    And do you still stand by that

14   testimony that you did not interview

15   Mr. Gerald Nelson in preparing his exposure

16   assessment?

17        A.    You know, I don't believe I

18   did.  You know, my recollection could be --

19   could be false if we're, you know, going back

20   a year or so, but I don't have that

21   recollection that I actually spoke to him,

22   no.

23        Q.    Did you ever perform a site

24   visit on any of the properties on which he

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          The only caveat I would, you

2      know, include in that is that, you

3      know, in the situations like

4      Mr. Nelson, you know, the Roundup

5      contains glyphosate but also includes

6      other chemicals like surfactants.

7          So, you know, the properties of

8      glyphosate alone aren't going to be,

9      you know, necessarily the only factor

10     in play.

11  BY MR. LEE:

12      Q.    Would a waterproof work boot

13  reduce dermal exposure to a water-based

14  product like Roundup?

15      A.    I think --

16          MR. BRICKER:  Form, and beyond

17     the scope.

18  BY MR. LEE:

19      Q.    You can answer.

20      A.    Sure.

21          Potentially, I think it could,

22  yes.

23      Q.    Now, you also state that

24  Mr. Nelson recalled using goggles from time

1    to time when mixing or using -- spraying

2    Roundup, is that correct?

3         A.    Yeah, I do remember him

4    mentioning that.  Probably goggles from time

5    to time or most of the time, right, that's

6    what he said.

7         Q.    Did you have an understanding

8    what kind of goggles he was referring to?

9         A.    You know, I didn't.  And, you

10   know, there was no follow-up to, you know,

11   kind of probe for more information, so I

12   don't really know of any details about the

13   goggles.

14        Q.    For plastic goggles, would that

15   have the potential to reduce Mr. Nelson's

16   dermal exposure to Roundup?

17        A.    Well, I think in general, you

18   know, we find that, you know, the amount of

19   skin surface that goggles actually cover is

20   pretty small, you know, so the goggle was

21   more, you know, an eye protective device, you

22   know, for splashes of the liquid or

23   something.

24             So, you know, there could be

1    some, you know, small protection there, but

2    that, I don't think, would be the reason for

3    wearing the goggles.

4         Q.    Now, you also report, "He also

5    stated that he usually wore a mask."

6              Do you see that?

7         A.    I do see that, yep.

8         Q.    Now, what kind of mask -- well,

9    let me ask you this.

10             What was your understanding of

11   the type of mask that was being referred to

12   there?

13        A.    Yeah, again, it was one of

14   those questions that, you know, there wasn't

15   really any follow-up on it.

16             You know, it would be important

17   to know if it were, you know, like a surgical

18   mask as opposed to a real respirator like an

19   N95.  You know, that makes a huge difference

20   in the amount of protection that is provided.

21   You know, it's just one of the sad lessons

22   from COVID, right, that everybody, I think,

23   now understands the difference between a

24   surgical mask and a respirator.

1    But in any case, you know, he

2    didn't really specify, so there isn't any

3    more detail than what we have here.

4         Q.    Now, so was it your

5    understanding that Mr. Nelson was referring

6    to a face mask that covered his nose and

7    mouth?

8         A.    Yeah, I -- you know, I wouldn't

9    want to -- I'd have to be speculating, you

10   know, if -- you know, you may have had this

11   experience.  You can walk down the aisle in a

12   Home Depot and there's all kinds of devices

13   there that are, you know, face masks, some of

14   which, you know, wouldn't be very effective,

15   and then others like an N95, you know,

16   actually are more like real respirators.

17            So, you know, without having

18   any more information from Nelson about, you

19   know, the particular type, I don't really

20   feel like I could give you a good answer to

21   that question.

22        Q.    Would an N95 face mask reduce

23   inhalational exposure to Roundup?

24        A.    I think especially if you were,

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    you know, spraying it from a backpack, the

2    N95 would reduce the inhalation exposure,

3    yes.

4         Q.    Could even a regular surgical

5    mask reduce inhalational exposure to Roundup?

6              MR. BRICKER:  Form.

7              THE WITNESS:  By a much smaller

8         extent.

9              And I think, you know, that's

10        why, you know, I tried to reference it

11        back to what's going on with COVID,

12        that people, you know, are beginning

13        to appreciate that the surgical mask,

14        you know, is actually meant to keep

15        droplets from being released from the

16        exhaled breath of the person who is

17        wearing it, not to filter particles in

18        the air out, which is why it's such a

19        controversy now about whether the

20        surgical mask is good protection from

21        COVID.  And, you know, the data

22        indicates that it really isn't because

23        it's not designed to filter out those

24        particles.

**Exhibit Q Page - 14**

1       A.      No, I didn't.  It was, you

2   know, outside the scope of, you know, the

3   question that I was addressing.

4       Q.      Dr. Herrick, can you summarize

5   the question that you were addressing when

6   you prepared Mr. Nelson's exposure

7   assessment?  What question specifically were

8   you addressing?

9       A.      Oh, well, yeah --

10          MR. BRICKER:  Form.

11          THE WITNESS:  -- it was pretty

12      simple.  It was that they -- you know,

13      the question was could I prepare a

14      lifetime exposure history for Nelson

15      for both the time-weighted and the

16      non-time-weighted days of lifetime

17      exposure, so that was the question I

18      was responding to.

19  BY MR. LEE:

20      Q.      You weren't asked to provide a

21  quantitative dose estimate for Mr. Nelson?

22      A.      I was not, no.

23      Q.      And you mentioned in your

24  report that Mr. Nelson was also exposed to

1    Deposition of:  Robert F. Herrick, Doctor of

2    Science, and the date September 6, 2022, is

3    that correct?

4          A.    It is.

5          Q.    And you testified or referred

6    to earlier in this deposition about

7    testifying in the Cotter matter, C-O-T-T-E-R,

8    is that correct?

9          A.    It is.

10         Q.    Is this the deposition

11   testimony that you were referring to earlier,

12   Dr. Herrick?

13         A.    Yes, it looks like it.

14         Q.    Okay.  I'll represent to you

15   again, this is an excerpt from that

16   transcript just to facilitate ease of use on

17   this remote platform.

18         A.    Okay.

19         Q.    If you could take a -- go to

20   page 82, and I'm referring to the -- I'm

21   sorry -- yes, page 82, and I'm referring to

22   the lower right-hand corner page number of

23   Exhibit 9.

24         A.    Okay.  I'm on it.

1          Q.      Now, you'd been asked a

2   question, and if you go to line 16, you were

3   answering, "Like, just to take an example,

4   you know, you might use lifetime exposure

5   days to lead because lead tends to accumulate

6   whereas if something is much more short-lived

7   in the body and tends to be excreted quickly,

8   the exposure days, you know, might not be

9   such a meaningful exposure variable."

10             And then -- do you see that?

11          A.      I do, yep.

12          Q.      And then there's a further

13   question, "Okay.  And is glyphosate a

14   compound that's excreted quickly from the

15   body?"

16             And then you answer, "Yeah,

17   that was actually one I was thinking of that

18   it's -- it doesn't really tend to accumulate.

19   So, you know, you might not find that the

20   exposure day metric relates very well to the

21   biological level."

22             Do you see that, Dr. Herrick?

23          A.      I do, yes.

24          Q.      Now, is it still your

1    understanding today that glyphosate is a

2    compound that's excreted quickly from the

3    body?

4              MR. BRICKER:  Form.  It lacks

5         foundation, misstates his testimony.

6              THE WITNESS:  Well, that's my

7         recollection.  And in particular, what

8         I was thinking of when we had that

9         conversation was that study by Pierce

10        where they did consecutive urine

11        samples after exposure and they

12        tracked the elimination of the

13        glyphosate from the body.

14   BY MR. LEE:

15        Q.    And, Dr. Herrick, why do you

16   state in this testimony that for a compound

17   like glyphosate, you might not find that

18   exposure day metric relates very well to the

19   biological level?  Can you explain what

20   you're talking about there?

21             MR. BRICKER:  Well, I'm going

22        to object.  This is a completely

23        improper use of deposition testimony.

24             You've given him an excerpt,

Robert F. Herrick, MS, ScD, CIH, #AIHA

1        you focused him on one thing.  The

2        discussion that was being had in this

3        deposition was on biomonitoring, not

4        on exposure day assessment.

5             So if you want to give him the

6        whole deposition to review in another

7        case, that's fine.  Otherwise, this is

8        entirely improper.

9   BY MR. LEE:

10       Q.    You can answer the question,

11  Dr. Herrick.

12       A.    Okay.  Well, to try to, like,

13  put a little bit of point on it, the way the

14  Pierce study was done, if you were to take a

15  look at the biological level, say, on day 5

16  after exposure, what's left after day 5 might

17  not relate very well to what the exposure was

18  on day 1 because this particular compound

19  tends to be mobilized and leave the body.

20            So it doesn't really track the

21  exposure day and the biological level.  They

22  can be quite different because the chemical

23  doesn't really persist.

24       Q.    And by "biological level," what

Robert F. Herrick, MS, ScD, CIH, PAIHA

1    are you referring to there, Dr. Herrick?

2          A.     Well, like in this case, the

3    biological level --

4                 MR. BRICKER:  Bob, I'm sorry,

5          let me just object to form, and that

6          this is beyond the scope of your

7          designation in this case.

8                 Go ahead.

9                 THE WITNESS:  Okay.

10                Well, in this case what they

11         were looking at was the excretion of

12         the glyphosate in the urine, so that's

13         the biological level that we were

14         talking about, you know, in this

15         deposition.

16   BY MR. LEE:

17         Q.     And was the glyphosate level in

18   the urine, is that a -- was that a proxy for

19   the glyphosate level in the blood?

20         A.     You know, they --

21                MR. BRICKER:  Form.

22                THE WITNESS:  I'm sorry.

23                Yeah, sure.  They didn't try

24         to, you know, directly make that

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          connection, but there is clearly a

2          linkage between the two.  The

3          glyphosate, you know, is in the blood.

4          It winds up getting processed, you

5          know, I'm thinking, through the liver

6          and kidneys and excreted in the urine.

7     BY MR. LEE:

8          Q.    And so when you testified here

9     in the Cotter deposition that, "you might not

10    find that the exposure day metric relates

11    very well to the biological level," you're

12    stating that the exposure day metric may not

13    correlate very well with the level of

14    glyphosate in the urine, is that correct?  Am

15    I understanding that correctly?

16         A.    Yeah, that's what this

17    conversation in this deposition was engaging,

18    and so what you just described, you know,

19    essentially restating the point I was trying

20    to make here.

21         Q.    Dr. Herrick, let me give you

22    another document that I'll mark as

23    Exhibit 10.

24              ///

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    second paragraph.

2         A.     Yes, I see it.  That is what I

3    said.

4         Q.     And when you refer to "exposed

5    both ways," you are talking about dermal

6    exposure and inhalational exposure, is that

7    correct?

8         A.     That's correct, yes.

9         Q.     And what documents did you

10   review in order to prepare your opinions in

11   your report marked as Exhibit 12?

12        A.     This would have been the

13   Canning deposition and the Plaintiff Fact

14   Sheet.  And again, I don't remember if there

15   was a Complaint document that was in the

16   package that I looked at for this one.  If

17   there was, I used that as well.  But those

18   would be the sources of information.

19        Q.     So other than the Richard

20   Canning deposition transcript, the Plaintiff

21   Fact Sheet for Mr. Richard Canning, and

22   possibly the Complaint, did you rely upon any

23   other documents in preparing this exposure

24   assessment for Mr. Canning?

1    A.    No.  Just those studies that we

2    had talked about earlier for Nelson, those

3    studies that talked about the methods of

4    calculating the time-weighted and the

5    non-time weighted lifetime exposures, you

6    know, I relied on their methods, but that was

7    all.

8    Q.    Are all the articles and

9    publications that you relied upon to prepare

10   your exposure history for Mr. Canning, are

11   they listed in your report marked as

12   Exhibit 12?

13   A.    Yeah, they are, with, again,

14   the same exception as we talked about

15   earlier.  I also refreshed my memory on that

16   Covle report that's referenced in the

17   Andreotti article.

18   Q.    Did you interview Mr. Richard

19   Canning in order to prepare his exposure

20   history?

21        MR. BRICKER:  Form.

22        THE WITNESS:  I didn't.

23   BY MR. LEE:

24   Q.    You did not?

1          A.      I did not, no.

2          Q.      Did you interview any family

3    members of Mr. Richard Canning in preparing

4    your report marked as Exhibit 12?

5          A.      No, I did not.

6          Q.      Did you rely on any

7    documents -- well, let me rephrase that.

8                  Did you primarily -- well, let

9    me rephrase that.

10                 Did you rely on Mr. Richard

11   Canning's recollection of his exposure to

12   Roundup as -- in preparing his exposure

13   assessment?

14         A.      Right, I did.  I used the same

15   approach as Nelson, where I relied on what

16   Canning had reported about the frequency and

17   the duration of his use of Roundup.

18         Q.      So you relied on Mr. Richard

19   Canning's recollection as reflected in his

20   deposition transcript, correct?

21         A.      Correct, and then also what he

22   had in the Plaintiff Fact Sheet.

23         Q.      Which was also based on

24   Mr. Richard Canning's recollection with

1    were the same.  There were some differences

2    in, you know, the way they tended to report

3    their patterns of use, but the methods were

4    the same.

5           Q.    Dr. Herrick, for Mr. Richard

6    Canning's exposure assessment, you did not

7    quantitate a dose estimate, is that correct?

8           A.    That's correct, I didn't --

9                 MR. BRICKER:  Form.

10                THE WITNESS:  -- quantitate

11          those.

12   BY MR. LEE:

13          Q.    Were you asked to provide a

14   quantitative dose estimate for Mr. Richard

15   Canning?

16          A.    No, I wasn't.

17          Q.    Do you recall our earlier

18   discussion of the ART method for inhalational

19   exposure?

20          A.    I do recall that, yes.

21          Q.    Were you asked to perform a

22   quantitative estimate of inhalational

23   exposure for Mr. Richard Canning using the

24   ART methodology?

Robert F. Herrick, MS, SCD, CIH, FAIHA

1    know, this to see if I could get a -- you

2    know, kind of get a visual image of what he

3    was using.  I don't remember.  I don't

4    remember it.

5         Q.    As you sit here in the

6    deposition today, are you able to describe

7    the Tomahawk Pro Series sprayer at all?

8         A.    I -- you know, I didn't

9    really -- I don't have a recollection of

10   finding, and truthfully I can't remember if

11   I, you know, tried to Google it and see.

12             I have a -- you know, I have

13   seen gas-powered 5-gallon backpack sprayers.

14   I can't generalize as to, you know, how

15   representative that would be of what the

16   Tomahawk looked like, I'm afraid.

17        Q.    So as you sit here today, you

18   have no specific recollection of reading a

19   description of the Tomahawk Pro Series 5

20   Gallon Gas Power sprayer, is that correct?

21        A.    That's correct.  I don't

22   remember -- if I found it, I don't remember

23   what it said about it.

24        Q.    In the next sentence you write

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    that Mr. Canning used, "a small hand pump

2    sprayer as well."

3              Do you see that?

4    A.       Right.  I do, yep.

5    Q.       Can you describe what you were

6    referring to by "small hand pump sprayer"?

7    A.       Yeah, because he talked about

8    it -- I don't have it in my footnote here,

9    but as I recall, you know, he was asked about

10   the different types of sprayers, and

11   sometimes when he was working in the ditches,

12   you know, he needed something that was

13   smaller and lighter that he could, you know,

14   hold in his -- just in one hand and spray

15   with the other, and so that was what he used

16   the little hand pump sprayer for.

17   Q.       Did you have an understanding

18   when you prepared this report of whether the

19   small hand pump sprayer provided spot

20   spraying or continuous spraying, or both?

21   A.       You know, he didn't -- again,

22   he didn't use the term "spot-spraying," if I

23   remember correctly.  But, you know, just

24   given the size of the little hand pump

1          and as we said earlier, you know,

2          Roundup can be a mixture of several

3          ingredients, and so washing like you

4          would conventionally in a shower with

5          water and soap, you know, I don't feel

6          like I could make a good judgment of

7          how well that type of washing

8          procedure would influence or affect

9          the different ingredients that are in

10          Roundup.

11     BY MR. LEE:

12          Q.     Did you take -- when you were

13     preparing your exposure estimates for

14     Mr. Richard Canning, did you take into

15     account the protective -- the personal

16     protective equipment or clothing that he

17     described?  Did you take that into account?

18          A.     No, I didn't.

19          Q.     And you made no adjustments to

20     your quantitative estimates -- I'm sorry,

21     your numerical estimates based on his

22     personal protective equipment, is that

23     correct?

24          A.     That is correct, right.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Q.    Did you make any adjustments to

your exposure estimates for Mr. Richard

Canning based on the fact that he would take

a shower or wash his hands after applying

Roundup?  Did you take that into account?

6    A.    No, I didn't.

7         MR. LEE:  Can we take a five or

    ten-minute break?

9         THE WITNESS:  Sure.

10        MR. BRICKER:  Sure.  Whatever

    you need.

12        MR. LEE:  Let's do a ten-minute

    break.

14        THE VIDEOGRAPHER:  We're off

    the record at 2:56 p.m.

16        (Whereupon, a recess was

    taken.)

18        THE VIDEOGRAPHER:  We're back

    on the record at 3:07 p.m.

20   BY MR. LEE:

21   Q.    Dr. Herrick, I'd like you to

take a look at page 5 of your report marked

as Exhibit 12.

24   A.    Okay.  Let me just get into

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    that.

2                Okay.  Page 5?

3        Q.      Yes.

4        A.      Okay.  I'm there.

5        Q.      Now, on page 5, do you see the

6    section of your report with the header

7    Residential Use of Roundup and Related

8    Products?

9        A.      I do.

10       Q.      I believe you testified earlier

11   that he began his residential use in 1984.

12   Is that correct?

13       A.      That's what I recall, yes.

14       Q.      And he ended his residential

15   use in 2009, is that correct?

16       A.      That's what he said, yes.

17       Q.      And this is confirmed by the

18   chart on the sixth page of your report, isn't

19   that correct?

20       A.      Let's go down here.

21               Uh-huh, yes.

22       Q.      Now, if you -- and in both that

23   chart on page 6 and in your text on page 5,

24   you mention that Mr. Canning used a "hand

1    sprayer" in applying Roundup for his

2    residential use, is that correct?

3          A.     That is, yes.

4          Q.     When you were preparing your

5    exposure assessment for Mr. Canning, what was

6    your understanding of the hand sprayer that

7    was used by Mr. Canning?

8          A.     I'd have to go back to the --

9    you know, his deposition here on page 183.

10   It was either one of the little Windex bottle

11   type sprayers, or it was one of the hand

12   pump, you know, with the little handle on top

13   that you pump up and pressurize and then

14   spray it out through a little nozzle.

15               You know, I'd have to go --

16   just sitting here right now, I don't remember

17   if he even said exactly which type of hand

18   sprayer he was using.

19               MR. LEE:  I've marked an

20         exhibit as 15.

21               (Whereupon, Exhibit Herrick 15

22         was marked for identification.)

23   BY MR. LEE:

24         Q.     Well, before we go there, in

Robert F. Herrick, MS, SCD, CIH, FAIHA

1    your report you state -- report his

2    recollection that each time he sprayed it

3    took about one hour.  This is page 5 of your

4    report for Mr. Canning.

5         A.    Right, that's what he said.

6         Q.    Now, did you have an

7    understanding about whether it was spot

8    spraying or continuous spraying over an hour

9    at his residence?

10              MR. BRICKER:  Form.

11              THE WITNESS:  I think my

12         impression is that he was using this

13         on the driveway and so -- again, he

14         didn't use the word "spot spraying,"

15         but it would have been more of the

16         sort of targeted, you know, focused

17         spraying on weeds as opposed to, you

18         know, broad spraying across a larger

19         area.

20              So that would be how -- that's

21         how I understood what he was

22         describing.

23    BY MR. LEE:

24         Q.    Let me -- I've marked an

1    exhibit as Exhibit 15, Dr. Herrick.

2         A.    Okay.

3         Q.    Let me know when you're able to

4    open it.

5         A.    Okay.  It will just be a sec.

6               Okay, I'm in.

7         Q.    As you can see, this is again

8    another excerpt from Richard Canning's

9    November 23rd, 2021 deposition transcript.

10              Do you see that?

11        A.    I do, yes.

12        Q.    And again, I represent that an

13   excerpt is being used just to make it easier

14   to load and view on this remote deposition

15   platform.

16              If you can go to page 183.

17        A.    Oops.  Hang on.  I just rolled

18   right past it.

19              Okay.  I'm here.

20        Q.    And can you see where he starts

21   describing applying Roundup to his residence

22   primarily along the driveway?  Do you see

23   that?  He mentions that, for example, in line

24   8.

Robert F. Herrick, MS, ScD, CIH, #APHA

1          A.     I do see that, yes.

2          Q.     And do you see -- if you go to

3    page 184 -- well, I'm sorry, 183, line 23, do

4    you see where the questioner asks how long

5    the driveway was?

6          A.     I do see that, yeah.

7          Q.     And on the next page, on line

8    1, Mr. Canning responds, ..."a few hundred

9    feet."

10         A.     Right, I see that.

11         Q.     And then on page 184, line 24,

12   do you see where the Roundup is described as,

13   ..."the product had already been mixed in the

14   sprayer when you brought it home, right?"

15                And then he answers, "Yes."

16                Do you see that?

17         A.     I do see that, yes.

18         Q.     So was it your understanding

19   that Mr. Canning used premixed Roundup when

20   he was using it at his residence?

21         A.     That's the impression I get

22   from the way he described this, yes.

23         Q.     And based on your earlier

24   testimony, you stated that using premixed

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    Roundup could potentially reduce both dermal

2    and inhalational exposure, is that correct?

3         A.    I think I remember saying, you

4    know, when we talked about this that it, you

5    know, could certainly reduce the dermal

6    exposure because you're not, you know,

7    pouring things from one container to the

8    other.

9              I wouldn't be quite so sure

10   that it had much effect on the inhalation

11   exposure, because you're still spraying it.

12        Q.    And then if you go to page 186,

13   line 18.

14        A.    Okay.  I'm rolling down.

15              Yep, I have it.

16        Q.    And there's a question, "Were

17   you spot spraying the driveway or were you

18   broadcast spraying the driveway?"

19              Do you see that?

20        A.    I do see that, yes.

21        Q.    Did you have an understanding

22   of the term "broadcast spraying" when you

23   were preparing Mr. Canning's report?

24        A.    I do have an understanding of

1    that, yeah.

2         Q.    And what was your understanding

3    of broadcast spraying when you were preparing

4    this report for Mr. Canning?

5         A.    Well, it would be, you know,

6    more -- I don't think Canning really did

7    this, but in some of these reports I've

8    looked at where people were -- for the

9    landscapers, for example, when they were

10   using the backpack sprayer, you know, they

11   would spray, let's say, like all of a flower

12   bed, you know, or the entire length of a

13   stone wall, or something like that, and that

14   was what was termed "broadcast spraying."

15             Whereas in the case like this,

16   in the crushed stone in the driveway, he was

17   spraying them -- spraying the weeds directly

18   when he spotted them, as he could see them,

19   as opposed to, you know, spraying it more

20   generally.

21        Q.    Okay.  And that appears --

22   would you agree that that appears to be

23   confirmed by his response in line 20 on

24   page 186 of this Exhibit 15 --

1              MR. BRICKER:  Form.

2    BY MR. LEE:

3        Q.     -- when Mr. Canning stated,

4    "No, I didn't want to waste it"?

5              MR. BRICKER:  Form.

6    BY MR. LEE:

7        Q.     You can answer.

8        A.     Oh, yeah.  He said, you know,

9    if he got into an area, he just "boom, boom,"

10   shoots it.

11              So, you know, that, I guess,

12   would, you know, be consistent with the

13   question when he was asked about spot

14   spraying versus broadcast spraying, he was

15   clearly describing a spot spraying where he

16   just shoots the weeds.

17       Q.     And compared to broadcast

18   spraying, spot spraying in general reduces

19   the potential for dermal exposure, isn't that

20   correct?

21              MR. BRICKER:  Form.

22              THE WITNESS:  Let me think

23       about that for a second.  I don't know

24       if I could -- anyway, it would be a

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          little hard to generalize about the

2          dermal exposure.  I don't know if I've

3          ever really seen any data that

4          would -- I don't think I can come up

5          with a good answer for that.  I don't

6          think I've ever really seen any data

7          one way or the other.

8     BY MR. LEE:

9          Q.     When you were preparing

10    Mr. Canning's exposure estimates, did you

11    take into account spot spraying versus

12    continuous spraying?

13         A.     No, I didn't.

14         Q.     Now, as you may recall, in your

15    report you noted that each time at his

16    residence he was spraying for about "one

17    hour."  Based on what you see in Exhibit 15,

18    the deposition transcript, is it reasonable

19    to say that Mr. Canning was not continuously

20    spraying Roundup for one hour but, rather,

21    spot spraying Roundup during a one-hour

22    period?

23         A.     I think that's probably fair.

24    He didn't really describe his spraying

1  activities as being a continuous thing.  It

2  was more a matter of him, you know, going up

3  and down or across the driveway, and when he

4  spotted a weed, he sprayed it.

5       Q.    Dr. Herrick, let's go back to

6  Exhibit 12, your report for Mr. Canning.

7       A.    Okay.  Let me get -- need to

8  find it here.

9            Okay.  Okay.  I'm there.

10      Q.    Now, if you'd go to page 9 of

11  your report for Mr. Canning.

12      A.    Okay.

13      Q.    You see where you write in the

14  second -- end of the second paragraph, "He

15  recalled using the following products in his

16  cranberry growing business"?

17            Do you see that?

18      A.    Yes, I do.

19      Q.    And you have a list of, it

20  appears to be, eight different chemicals, I

21  believe, is that correct?

22      A.    Let me just real quick -- one,

23  two, three, four, five, six, seven -- yes,

24  eight.

1        Q.    Dr. Herrick, did you -- did

2    you -- were you asked to -- well, let me

3    rephrase this.

4              Did you estimate exposures for

5    any of those eight chemicals listed in the

6    chart on page 9?

7        A.    No, I didn't.

8        Q.    Were you asked to provide

9    exposure estimates for any of the eight

10   chemicals in the chart on page 9?

11       A.    No, I wasn't asked to do that.

12       Q.    Dr. Herrick, is it reasonable

13   to state that you didn't adjust or account

14   for any of these chemicals when you were

15   providing the Roundup exposure assessments

16   for Mr. Canning?  Is that correct?

17            MR. BRICKER:  Form.

18            THE WITNESS:  Yes, that is

19       correct.

20   BY MR. LEE:

21       Q.    Dr. Herrick, are you familiar

22   with the term "observer bias"?

23       A.    I am.

24       Q.    What is your understanding of

1    observer bias?

2            MR. BRICKER:  Form, and outside

3       the scope.

4    BY MR. LEE:

5       Q.    If you know.

6       A.    I do, sure.

7            I'll give you a -- sort of a

8    non-epidemiologist view of it is that if some

9    observation is being made, whether it's

10   looking at some kind of work practice or

11   maybe in a more clinical setting looking at

12   some medical condition, if the person who is

13   making that observation, you know, has some

14   knowledge of some factor that may be

15   associated with the event or the condition or

16   the exposure that they're looking at, you

17   know, the concern is always that that

18   knowledge could influence the nature of the

19   observation that the person is making.

20      Q.    Dr. Herrick, did you perform

21   any research on whether any of the eight

22   chemicals listed in the chart on page 9 could

23   potentially cause cancer?

24            MR. BRICKER:  Form, and beyond

1          the scope of his designation in this

2          matter.

3     BY MR. LEE:

4          Q.     You can answer, Dr. Herrick.

5          A.     Sure.

6                 No.  I didn't dig into that for

7     any of these chemicals, no.

8          Q.     So you didn't investigate

9     whether any of the eight chemicals in the

10    chart on page 9 could cause more specifically

11    the B-cell lymphoma that Mr. Canning was

12    diagnosed with?

13         A.     Correct.  I didn't look into

14    that at all.

15         Q.     Based on your understanding of

16    observer bias, could the lack of exposure

17    estimates for these eight chemicals, could

18    that potentially be considered evidence of

19    observer bias?

20                MR. BRICKER:  Form, and exceeds

21         the scope of his designation.

22    BY MR. LEE:

23         Q.     If you know.

24         A.     Could you -- actually, I'd like

1   to give you a good answer if I can, but could

2   you repeat the question?

3                   MR. LEE:  Madam Court Reporter,

4           can you repeat the question, please?

5                   (Whereupon, the reporter read

6           back the following:

7                   "QUESTION:  Based on your

8           understanding of observer bias, could

9           the lack of exposure estimates for

10          these eight chemicals, could that

11          potentially be considered evidence of

12          observer bias?")

13      A.      I don't see how it could,

14  really.  You know, if someone were -- if

15  there were biased in someone's observation of

16  Mr. Canning's medical condition, let's say,

17  not knowing anything more about these

18  chemicals than the fact that they were

19  present and he used them, I have a hard time

20  imagining how that could introduce, you know,

21  any sort of substantial bias.

22  BY MR. LEE:

23      Q.      When you were preparing the

24  exposure estimates for Mr. Richard Canning,

1    did you make any adjustments for the

2    possibility of observer bias?

3              MR. BRICKER:  Same objection.

4              THE WITNESS:  No, I didn't.

5    BY MR. LEE:

6         Q.    On page 9, Dr. Herrick, you

7    also describe some of this -- Mr. Canning's

8    employment outside his cranberry business.

9              Do you see that?

10        A.    Yeah, right, I do, mm-hmm.

11        Q.    Now, one job was delivering

12   milk for Whiting's Milk.

13             Do you see that?

14        A.    Yes, I do.

15        Q.    To your knowledge, was there --

16   did Mr. Canning have any exposure to

17   glyphosate or Roundup in that job for

18   Whiting's Milk?

19        A.    I don't have any indication

20   that he was exposed to glyphosate, no.

21        Q.    Then you describe Mr. Canning's

22   employment for a company that was a "grain

23   business delivering grain, animal feed and

24   selling it."

1          Do you see that?

2     A.     I do.

3     Q.     To your knowledge, do you have

4  any evidence that Mr. Canning was exposed to

5  glyphosate or Roundup in that job?

6     A.     No, I have no indication that

7  he was exposed.

8     Q.     And then Mr. Canning, as you

9  state in your report, was "a county agent for

10 the State of New York for about six months."

11          Do you see that?

12    A.     I do, yes.

13    Q.     To your knowledge, did

14 Mr. Canning have any exposure to Roundup or a

15 glyphosate product in that job?

16    A.     No.  He mentions, you know, and

17 I said this a couple sentences later, that

18 they -- he was involved in selling

19 herbicides, but he didn't use them or mix

20 them, and they were in sealed containers.  So

21 I don't really see that as being a likely

22 exposure source.

23    Q.     And then he -- Mr. Canning

24 managed a beef farm for about six months.

1                    Do you see that?

2         A.    I do, right.

3         Q.    And then you note, "He did not

4    use any herbicides as part of that work."

5                    Do you see that?

6         A.    Yeah.  I believe that that's

7    pretty much exactly what he said in his

8    deposition.

9         Q.    To your knowledge, did

10   Mr. Canning have any exposure to Roundup or

11   glyphosate products in that job?

12        A.    I don't believe that he did,

13   no.

14        Q.    Then you mention a job for a

15   cranberry production company, A.D. Makepeace

16   Company.

17                    Do you see that?

18        A.    I do, yes.

19        Q.    And then you note in the next

20   sentence, "He did not use any herbicides in

21   this position."

22                    Do you see that?

23        A.    I do, yes.

24        Q.    To your knowledge, did

Robert F. Herrick, MS, ScD, CIH, PATHA

1    Mr. Canning have any exposure to Roundup or

2    any glyphosate product in that job for A.D.

3    Makepeace Company?

4         A.    I don't believe he did.  It was

5    something he mentioned in the deposition that

6    he didn't have any exposure in that position.

7         Q.    And then I think we already

8    discussed his job for R.F. Morse, is that

9    correct?

10        A.    Right.

11        Q.    Mr. Canning sold farm chemicals

12   and equipment, but I think you report his

13   recollection that he sold herbicides in

14   sealed containers but did not handle them, is

15   that correct?

16        A.    Right.  That's what he said.

17        Q.    So to your knowledge,

18   Mr. Canning had no exposure to glyphosate or

19   Roundup when working for R.F. Morse, correct?

20        A.    That is correct, yes.

21        Q.    What about Mr. Canning's work

22   for Canning Service Center?

23             Do you see that?

24        A.    I do see that, yeah.

Robert F. Herrick, MS, ScD, CIH, #AIHA

1    Q.    And then you write in the last
2    sentence of your report, "Mr. Canning did not
3    report using any chemicals at the Canning
4    Service Center."
5         Do you see that?
6    A.    I do, yes.
7    Q.    To your knowledge, did
8    Mr. Canning have any exposure to Roundup or
9    glyphosate products at Canning Service Center
10   specifically?
11   A.    I don't have any indication
12   that he did, no.
13   Q.    Dr. Herrick, can you direct me
14   to where you provided the time-weighted
15   estimates for exposure for Mr. Canning in
16   your report?  Is that on page 7?
17   A.    Let me just go back quickly
18   here.  We'll see if I can find my table.
19        Right.  I'm on page 7.  It's
20   that table near the bottom.
21   Q.    Yes.
22   A.    That's it.
23   Q.    So that's the time-weighted
24   estimates?

1          A.      Right.

2          Q.      So looks like for residential,

3    you have just one number, 6.5 days with a

4    midpoint exposure days for residential, is

5    that correct?

6          A.      Yeah, you know, this was one of

7    those where, you know, when he answered the

8    question, he was very -- you know, he didn't

9    put a range on it.  He just said, you know,

10   two days per season, one hour per day, so I

11   didn't try to put a border around that.  I

12   just used that value that he reported.

13         Q.      Dr. Herrick, do you recall our

14   discussion that Mr. Canning wasn't really

15   spraying continuously for one hour a day?  Do

16   you recall that?  In terms of residential

17   use, do you recall that?

18         A.      I do, yes.

19         Q.      Did you make any -- you list

20   Hours Used per Day there as 1.0.

21              Do you see that?

22         A.      I do, right.

23         Q.      Did you make any -- well, let

24   me rephrase it.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          Dr. Herrick, you did not make

2    any adjustments for the fact that Mr. Canning

3    was spot spraying in his residential use

4    versus continuously spraying, isn't that

5    correct?

6              MR. BRICKER:  Form.

7              THE WITNESS:  Yeah, I didn't

8         really, you know, have any real detail

9         as to within that one hour per day

10        that he was out there spraying the

11        driveway, you know, what portion of

12        that time he actually had his hand on

13        the trigger actively, you know,

14        generating spray as opposed to the

15        amount of time he was spending walking

16        between -- you know, from one weed to

17        the other or one side of the driveway

18        to the other.  I didn't really have

19        that sort of detail to come up with a

20        more refined number here.

21    BY MR. LEE:

22    Q.    Would it be reasonable to infer

23    that because Mr. Canning was spot spraying

24    during that one-hour period that the actual

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    hours used per day was less than 1.0?  Isn't

2    that reasonable?

3           A.    I think you could --

4                 MR. BRICKER:  Just let me

5           object to form.  It's argumentative.

6    BY MR. LEE:

7           Q.    You can answer.

8           A.    Sure.

9                 Well, I think that's the kind

10   of thing, you know, there could be more

11   information, you know, that Canning could

12   provide that would let -- you know, let me

13   refine that estimate a little bit, yeah.

14          Q.    But you didn't use deposition

15   testimony that he was spot spraying on his

16   residence to adjust that 1.0 hours used per

17   day?  You didn't make that adjustment,

18   correct?

19          A.    No, I didn't.

20                MR. BRICKER:  Form.

21                THE WITNESS:  I didn't adjust

22          it.

23   BY MR. LEE:

24          Q.    So based on the fact that

Robert F. Herrick, MS, ScD, CIH, #ANM

1    Mr. Canning wasn't continuously spraying for

2    1.0 hours per day on his residence, that

3    midpoint exposure estimate of 6.5 days is an

4    overestimate, isn't that reasonable to

5    surmise?

6              MR. BRICKER:  Form.  It's

7         argumentative.

8              THE WITNESS:  Yeah, I would --

9         again, I'd have to go back to using

10        the information that Canning provided,

11        so I don't really have a way to

12        quantify how he was spending his time,

13        you know, within that one-hour period

14        per day.

15             So I can't really, you know,

16        come up with a different calculation

17        than what's here.

18   BY MR. LEE:

19        Q.    But you do agree that his

20   actual spraying time on his residence was

21   actually less than 1.0 hours per day,

22   correct?

23        A.    Well, I --

24             MR. BRICKER:  Foundation,

Robert F. Herrick, MS, ScD, CIH, FAIHA

1        argumentative.

2              THE WITNESS:  I would say it

3        could be, but I can't really quantify

4        how much less than an hour it would

5        be.

6   BY MR. LEE:

7        Q.    And I believe you testified the

8   reason that you don't have a minimum and

9   maximum time-weighted estimate for his

10  residential use is because he was -- you only

11  provided that 1.0 number, is that correct?

12       A.    Yeah.  I mean, that was, you

13  know, the way he answered the question in his

14  deposition.  That's where it came from.

15       Q.    Then you make a -- then you

16  provide minimum, maximum, and midpoint

17  time-weighted exposure estimates for his

18  commercial application of Roundup right below

19  that, isn't that correct?

20       A.    That is correct, yeah.

21       Q.    So the minimum is 162.5 days

22  and the maximum is 650 days, is that correct?

23       A.    That is correct, yeah.

24       Q.    And the midpoint time-weighted

Robert F. Herrick, MS, ScD, CIH, #AIHA

```
1    COMMONWEALTH OF MASSACHUSETTS   )

2    SUFFOLK, SS.                    )

3              I, MAUREEN O'CONNOR POLLARD,

4    Registered Diplomate Reporter and Notary

5    Public in and for the Commonwealth of

6    Massachusetts, do certify that on the 23rd

7    day of October, 2023, at 10:41, the person

8    above-named was duly remotely sworn to

9    testify to the truth of their knowledge, and

10   examined, and such examination reduced to

11   typewriting under my direction, and is a true

12   record of the testimony given by the witness.

13   I further certify that I am neither attorney,

14   related or employed by any of the parties to

15   this action, and that I am not a relative or

16   employee of any attorney employed by the

17   parties hereto, or financially interested in

18   the action.

19

20

21

22   _____

23   MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC

24   CSR #149108
```

Robert F. Herrick, MS, ScD, CIH, MAIHA

```
 1              INSTRUCTIONS TO WITNESS

 2

 3         Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8         After doing so, please sign the errata

 9    sheet and date it.  It will be attached to

10    your deposition.

11         It is imperative that you return the

12    original errata sheet to the deposing

13    attorney within thirty (30) days of receipt

14    of the deposition transcript by you.  If you

15    fail to do so, the deposition transcript may

16    be deemed to be accurate and may be used in

17    court.

18

19

20

21

22

23

24
```