# EXHIBIT P

1              UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
2
    **************************
3   IN RE: ROUNDUP PRODUCTS      MDL No.
    LIABILITY LITIGATION         3:16-md-02741-VC
4
                                 Case No. MDL No.
5   This document relates to:   3:16-md-02741-VC

6   Gerald and Lynne Nelson
    v. Monsanto
7   Case No. 3:19-cv-04576-VC

8        and

9   Richard Canning and
    Shirley Canning v.
10  Monsanto Company, et al
    Case No. 3:19-cv-04230-VC
11
    **************************
12

13          Remote Videotaped Deposition of

14   ROBERT F. HERRICK, MS, ScD, CIH, FAIHA, held at

15   the location of the deponent, commencing at

16   10:41 a.m., on the 23rd of October, 2023,

17   before Maureen O'Connor Pollard, Registered

18   Diplomate Reporter, Realtime Systems

19   Administrator, Certified Shorthand Reporter,

20   Notary Public.

21                    - - -

22

23          GOLKOW LITIGATION SERVICES
                 877.370.DEPS
                deps@golkow.com
24

```
 1   REMOTE APPEARANCES:

 2
     THORNTON LAW FIRM, LLP
 3   BY:   DAVID BRICKER, ESQ.
           9595 Wilshire Blvd., Suite 900
 4         Beverly Hills, California 90212
           310-282-8676
 5         dbricker@tenlaw.com
           Representing the Plaintiffs
 6

 7   THORNTON LAW FIRM, LLP
     BY:   CHRISTIAN F. UEHLEIN, ESQ.
 8         101 Hyalite Ranch Lane
           Bozeman, Montana 59718
 9         888-491-9726
           cuehlein@tenlaw.com
10         Representing the Plaintiffs

11
     NELSON MULLINS RILEY & SCARBOROUGH LLP
12   BY:   JAE LEE, ESQ.
           750 B Street, Suite 2200
13         San Diego, California 92101
           619-489-6187
14         jae.lee@nelsonmullins.com
           Representing the Defendants
15

16   Videographer:  Phillip Todd

17

18

19

20

21

22

23

24
```

**Exhibit P Page - 2**

1    being deposed upon for today.

2              Do you have any documents that

3    you are going to produce today in response to

4    any of these requests for production?

5         A.    I don't have anything ready

6    right at this moment, no.

7         Q.    But you've reviewed these

8    requests?

9         A.    Yes, I did.

10        Q.    Do you have any documents

11   responsive to request number 1?

12        A.    This is "All documents provided

13   to you," etcetera?

14        Q.    Yes.

15        A.    Well, those would all be

16   documents that are in the share file.  I

17   think it was a share file or Dropbox that I

18   got from Thornton.

19        Q.    And, Doctor, request number 2

20   relates to studies and literature.  I think

21   we've already discussed that.

22              Are there any studies or

23   literature or articles that you have relied

24   on for your two reports that are either not

1          A.      You know, I know there's --

2     because this came up in the Cotter case,

3     there is a letter that I -- you know, I don't

4     actually remember where I might have

5     collected that, but I'm sure the attorney has

6     it.

7                  MR. LEE:  Counsel, would you be

8          producing a copy of documents

9          responsive to number 5?

10                 MR. BRICKER:  I don't think

11         there is any such letter, not in these

12         cases.

13    BY MR. LEE:

14         Q.      Dr. Herrick, do you see number

15    6, a list of all organizations which you have

16    entered into consulting agreements within the

17    past ten years?

18                 Do you see that?

19         A.      Yes, I do.

20         Q.      Will you be producing a list in

21    response to request for production number 6?

22                 MR. BRICKER:  He's not going to

23         produce anything in response to number

24         6.  It's privileged, it's

1    confidential, and it's not relevant to

2    this case.

3            MR. LEE:  I disagree.  I

4    certainly object to that objection.

5  BY MR. LEE:

6        Q.    Number 7 requests a copy of all

7  abstracts, etcetera, which you are an author,

8  which has all or part of the subject matter,

9  cancer causation, methodologies for

10 determining cancer causation, non-Hodgkin's

11 lymphoma, glyphosate, IARC, and/or Roundup.

12            Do you see that, sir?

13       A.    Yes, I do.

14       Q.    Now, are all of your

15 publications listed in your curriculum vitae?

16       A.    They are, right.

17       Q.    Are there any articles,

18 abstracts, book chapters, or anything like

19 that that are not listed in your curriculum

20 vitae?

21            MR. BRICKER:  The only thing

22       I'm going to object to is your request

23       for draft articles.  Drafts are not

24       discoverable, they're privileged, and

1      A.      No, no.

2      Q.      Dr. Herrick, let me introduce a

3   document that I'll mark as Exhibit 2.

4              (Whereupon, Exhibit Herrick 2

5         was marked for identification.)

6   BY MR. LEE:

7      Q.      And please let me know when you

8   are able to access that document.

9      A.      Okay.  Are we done with this

10  one?

11     Q.      Yes.

12     A.      Okay, I'll just close it out.

13             Oh, Exhibit 2?

14     Q.      Yes.

15     A.      Okay.  Hang on.  I'm opening

16  it.

17             Okay.

18     Q.      Dr. Herrick, do you see this

19  document I've marked as Exhibit 2 that has

20  the header Robert F. Herrick?  Do you see

21  that?

22     A.      Yes, I do.

23     Q.      And it's 21 pages, and it has

24  underneath your name "Senior Lecturer on

Robert F. Herrick, MS, ScD, CIH, FAIHA

1  Health & Engineering, Incorporated?

2      A.    Oh, income.  Well, let's see.

3  The great majority of it, because most of the

4  committee work that I do is unpaid, and

5  obviously the journal reviews are unpaid, you

6  know, that's all pro bono stuff, so...

7            You know, I guess to try to,

8  you know, answer your question, I would say

9  maybe 80 percent, you know, of what I had for

10  professional activity was my work through

11  EH&E.

12      Q.    What has your income from

13  Environmental Health & Engineering,

14  Incorporated been annually since 2018?

15      A.    You know, I'm afraid I'm not

16  real good at putting a specific number to it,

17  partly just because it's been so variable.

18  You know, there were years when some projects

19  were much more active than others, and then

20  there was a period of time during COVID when,

21  you know, virtually nothing was going on.

22            So I'm afraid I'm a little in

23  the dark as to try to come up with a good

24  estimate of that value.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          Q.      Are you able to give an

2     estimate at all?

3          A.      Could you just repeat the

4     question?  I want to make sure I give you a

5     good answer here.

6          Q.      Let me ask you this.

7                  Have you -- has your income

8     from Environmental Health & Engineering,

9     Incorporated exceeded $100,000 in any year

10    since 2018?

11         A.      No.  I don't think it has, no.

12         Q.      Can you give me a range of your

13    annual income from Environmental Health &

14    Engineering, Incorporated since 2018?

15                 MR. BRICKER:  I'm just going to

16         object.

17                 Bob, if you're comfortable

18         giving him income numbers, that's

19         fine.  He's entitled to income numbers

20         from litigation.  But for your other

21         activities with the company, he's

22         pushing an invasion of your privacy

23         rights, and I don't think you're

24         obligated to give that.

1    I've never really been a landscaper myself,

2    but I do know people who are in that line of

3    work, and so I've seen their activities.

4        Q.    Do you consider yourself an

5    expert on industrial, turf, and ornamental

6    exposures to herbicides?

7        A.    I wouldn't claim that I'm an

8    expert on that.

9        Q.    Dr. Herrick, are all -- is

10   all -- well, let me rephrase it, Dr. Herrick.

11           Dr. Herrick, you have

12   summarized Mr. Gerald Nelson's employment

13   history and his exposure to Roundup on page 3

14   of your report, is that correct?

15       A.    Are we still in that same

16   table?

17       Q.    Yes.

18       A.    Yeah, that's what I included

19   here under the Frequency and Usage.

20       Q.    Now, are you relying only on

21   Mr. Gerald Nelson's recollection of his job

22   history?  Is that correct?

23       A.    Well, in this case --

24           MR. BRICKER:  Form.

1          THE WITNESS:  -- yeah, it is

2      his recollection in that, you know, he

3      described it, you know, orally in the

4      deposition, and then this information

5      that's here is what he -- the way he

6      responded in filling out this

7      Plaintiff Fact Sheet.

8          So, yes, he is the source of

9      this information.

10  BY MR. LEE:

11      Q.    Is Mr. Gerald Nelson also --

12  well, let me rephrase that.

13          In terms of Mr. Gerald Nelson's

14  occupational exposure to Roundup, are you

15  also relying on Mr. Gerald Nelson's

16  recollection?

17      A.    I'm sorry, could you repeat

18  that?  I want to make sure I give you a good

19  answer here.

20          MR. LEE:  Madam Court Reporter,

21      can you repeat the question, please?

22          (Whereupon, the reporter read

23      back the following:

24          "QUESTION:  In terms of

1           That's what I recall, you know,

2    kind of the source of that discrepant

3    information.

4         Q.     Dr. Herrick, I've marked an

5    exhibit as Exhibit 4.  Can you take a look at

6    that, please?

7              (Whereupon, Exhibit Herrick 4

8         was marked for identification.)

9         A.     Yeah, sure.  Let me get into it

10   here.

11             Okay.  Is this his deposition?

12   BY MR. LEE:

13        Q.     Yes.  I've marked this document

14   Exhibit 4.  And do you see the title on the

15   first page, Videotaped Deposition Of:  Gerald

16   Nelson, Appearing Remotely, with a date of

17   April 6, 2022?

18        A.     Let me just make sure I've got

19   the right...

20             April 6th?

21        Q.     Yes.

22        A.     Yep, I have it.

23        Q.     And I will represent to you,

24   Dr. Herrick, that this is actually an excerpt

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    sometime after 2011 he had a -- there was a
2    year where he did not spray Roundup, but then
3    afterwards when he resumed spraying Roundup,
4    he did so but less frequently?
5              MR. BRICKER:  Form.
6              THE WITNESS:  Yes.  That is my
7         understanding, yeah.
8    BY MR. LEE:
9         Q.    Now, if you can go to page 124
10   of this deposition transcript that I've
11   marked as -- or deposition excerpt that I've
12   marked as Exhibit 5.  Can you go to page 124
13   and down to line 23?
14        A.    Okay, I'm there.
15        Q.    And there's a question, "So
16   about five times?"
17              And then Mr. Gerald Nelson
18   answers, "I didn't make any kind of a
19   categorized list of how many times I did what
20   per day."
21              Do you see that?
22        A.    I do see that, yeah.
23        Q.    Now, when you were preparing
24   Mr. Nelson's exposure assessment, was it your

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    assessments for Mr. Nelson?

2         A.    Yeah.   If we want to, maybe the

3    best way is just go down into one of the

4    tables here, because that's where he -- you

5    know, he tended to report these things in

6    ranges, you know, when people asked him, and

7    so, you know, his response would be, you

8    know, he used it between five and 40 minutes

9    each time, and so what I tried to do then is

10   say, Okay, well, that's the range of his

11   exposures.

12             And so if we look in the table

13   here -- let's see if I can -- okay.  I'm on

14   page 8.  What I did was I tried to, you know,

15   recognize this range that he was reporting in

16   terms of, say, the hours that he used it per

17   day.

18             So if we look, say, in his --

19   let's just take residential use.  That's that

20   first row in the table.  He said he used

21   these things between five and 40 minutes each

22   time, so that's translated into that column

23   you see there where it says "Hours Used per

24   Day."  That's just converting those minutes

Robert F. Herrick, MS, ScD, CIH, PAIHA

1    to hours.  And then you multiply those

2    together to get his total hours over the

3    course of his lifetime.

4              And so that's presented as a

5    range as well, you know, to try to

6    accommodate the fact that he used it for

7    varying periods of time each day.

8    Q.    All right.  You're using that

9    range also because his recollection was

10   uncertain about how long he may have used it

11   per day?

12             MR. BRICKER:  Argumentative.

13        Form.

14             MR. LEE:  Well, I'm asking him.

15             THE WITNESS:  You know, I mean,

16        I don't -- you know, I think what he

17        was trying to do, you know, was answer

18        the question, you know, honestly.

19             And so, you know, some days he

20        used it, it would have been five

21        minutes.  Other times he used it, it

22        was 40 minutes.  And that was, you

23        know -- he was trying to, you know,

24        capture the variability in the amount

1             But, you know, in general you

2        would expect that, you know, having

3        the skin covered by clothing would

4        reduce the dermal contact.

5   BY MR. LEE:

6        Q.     And he also wore gloves.  In

7   general, would gloves reduce Mr. Nelson's --

8   potentially reduce Mr. Nelson's dermal

9   exposure to Roundup?

10            MR. BRICKER:  Form.

11            THE WITNESS:  Again, not to,

12        you know, be -- you know, put too fine

13        a point on it, but you would like to

14        know what the type of gloves were.

15            You know, certain gloves like

16        leather gloves or cotton gloves

17        probably wouldn't make a huge amount

18        of difference against, you know, a

19        liquid that's splashed.  If, on the

20        other hand, they were

21        chemical-resistant gloves, you know,

22        you might expect that there would be

23        greater protection.

24            ///

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    BY MR. LEE:

2        Q.     Do you recall what kind of

3    gloves Mr. Nelson wore when he mixed or used

4    Roundup?

5        A.     I don't, you know.  And I was

6    just, you know, thinking about this in terms

7    of the way the question was asked in the

8    deposition, I don't think -- you know, this

9    was his answer, and I don't think there was

10   any, you know, follow-up, you know, to try

11   to, you know, probe for more information.

12       Q.     Did you -- when you were

13   preparing Mr. Nelson's exposure assessment,

14   did you write -- provide any written

15   questions that were to be asked of

16   Mr. Nelson?

17       A.     No.  This was all -- you know,

18   everything that I had to work with, you know,

19   was done -- was collected, you know, before I

20   started working on the case, so no.

21       Q.     Now, you also note in your

22   report that Mr. Nelson recalled using

23   "waterproof work boots" when mixing or

24   spraying Roundup.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1              Do you see that?

2      A.     Let me just -- are we on the

3  same page here?

4      Q.     Yes.

5      A.     Gosh.  Yeah.  Heavy work

6  clothes, long-sleeved shirt, gloves,

7  waterproof work boots, yep.

8      Q.     Now, would waterproof work

9  boots in general reduce -- potentially reduce

10  Mr. Nelson's dermal exposure to Roundup?

11              MR. BRICKER:  Form.

12              THE WITNESS:  Potentially, I

13      think they could, yes.

14  BY MR. LEE:

15      Q.     Is it important that the work

16  boots be waterproof?

17      A.     Well, yeah, I think that's a

18  useful, you know, bit of additional

19  information, you know, compared to just plain

20  old leather, you know, work boots or

21  something.  The fact that they're waterproof,

22  you know, would, you know, increase the

23  protection compared to just, you know, plain

24  old leather boots.

1      Q.     Dr. Herrick, do you have an

2   understanding of whether Roundup is a

3   water-based herbicide?

4      A.     It is delivered in a water

5   solution, yes.

6      Q.     Do you have an understanding of

7   whether glyphosate is -- well, let me ask you

8   this.

9            Dr. Herrick, do you have an

10  understanding of the term "hydrophilic"?

11     A.     Yes, I do.

12     Q.     What is your understanding of

13  hydrophilic?

14     A.     Well, it basically dissolves in

15  water or is water soluble or is carried in

16  water, or it can be absorbed into water.

17     Q.     Do you have an understanding of

18  whether glyphosate is hydrophilic?

19           MR. BRICKER:  Objection.  Form,

20       and beyond the scope.

21           THE WITNESS:  Yeah, my -- in

22       just reading about the properties of

23       glyphosate, my recollection is it is

24       hydrophilic.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1           The only caveat I would, you

2      know, include in that is that, you

3      know, in the situations like

4      Mr. Nelson, you know, the Roundup

5      contains glyphosate but also includes

6      other chemicals like surfactants.

7           So, you know, the properties of

8      glyphosate alone aren't going to be,

9      you know, necessarily the only factor

10     in play.

11  BY MR. LEE:

12     Q.    Would a waterproof work boot

13  reduce dermal exposure to a water-based

14  product like Roundup?

15     A.    I think --

16          MR. BRICKER:  Form, and beyond

17     the scope.

18  BY MR. LEE:

19     Q.    You can answer.

20     A.    Sure.

21          Potentially, I think it could,

22  yes.

23     Q.    Now, you also state that

24  Mr. Nelson recalled using goggles from time

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    to time when mixing or using -- spraying

2    Roundup, is that correct?

3         A.    Yeah, I do remember him

4    mentioning that.  Probably goggles from time

5    to time or most of the time, right, that's

6    what he said.

7         Q.    Did you have an understanding

8    what kind of goggles he was referring to?

9         A.    You know, I didn't.  And, you

10   know, there was no follow-up to, you know,

11   kind of probe for more information, so I

12   don't really know of any details about the

13   goggles.

14        Q.    For plastic goggles, would that

15   have the potential to reduce Mr. Nelson's

16   dermal exposure to Roundup?

17        A.    Well, I think in general, you

18   know, we find that, you know, the amount of

19   skin surface that goggles actually cover is

20   pretty small, you know, so the goggle was

21   more, you know, an eye protective device, you

22   know, for splashes of the liquid or

23   something.

24               So, you know, there could be

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    some, you know, small protection there, but

2    that, I don't think, would be the reason for

3    wearing the goggles.

4         Q.    Now, you also report, "He also

5    stated that he usually wore a mask."

6              Do you see that?

7         A.    I do see that, yep.

8         Q.    Now, what kind of mask -- well,

9    let me ask you this.

10              What was your understanding of

11   the type of mask that was being referred to

12   there?

13        A.    Yeah, again, it was one of

14   those questions that, you know, there wasn't

15   really any follow-up on it.

16              You know, it would be important

17   to know if it were, you know, like a surgical

18   mask as opposed to a real respirator like an

19   N95.  You know, that makes a huge difference

20   in the amount of protection that is provided.

21   You know, it's just one of the sad lessons

22   from COVID, right, that everybody, I think,

23   now understands the difference between a

24   surgical mask and a respirator.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1              But in any case, you know, he

2    didn't really specify, so there isn't any

3    more detail than what we have here.

4         Q.    Now, so was it your

5    understanding that Mr. Nelson was referring

6    to a face mask that covered his nose and

7    mouth?

8         A.    Yeah, I -- you know, I wouldn't

9    want to -- I'd have to be speculating, you

10   know, if -- you know, you may have had this

11   experience.  You can walk down the aisle in a

12   Home Depot and there's all kinds of devices

13   there that are, you know, face masks, some of

14   which, you know, wouldn't be very effective,

15   and then others like an N95, you know,

16   actually are more like real respirators.

17              So, you know, without having

18   any more information from Nelson about, you

19   know, the particular type, I don't really

20   feel like I could give you a good answer to

21   that question.

22        Q.    Would an N95 face mask reduce

23   inhalational exposure to Roundup?

24        A.    I think especially if you were,

Robert F. Herrick, MS, ScD, CIH, FAIHA

1   you know, spraying it from a backpack, the

2   N95 would reduce the inhalation exposure,

3   yes.

4        Q.    Could even a regular surgical

5   mask reduce inhalational exposure to Roundup?

6              MR. BRICKER:  Form.

7              THE WITNESS:  By a much smaller

8        extent.

9              And I think, you know, that's

10       why, you know, I tried to reference it

11       back to what's going on with COVID,

12       that people, you know, are beginning

13       to appreciate that the surgical mask,

14       you know, is actually meant to keep

15       droplets from being released from the

16       exhaled breath of the person who is

17       wearing it, not to filter particles in

18       the air out, which is why it's such a

19       controversy now about whether the

20       surgical mask is good protection from

21       COVID.  And, you know, the data

22       indicates that it really isn't because

23       it's not designed to filter out those

24       particles.

1    a question on page 135, line 8?

2         A.    I see it.  Right.

3         Q.    Now, the question is, "Do you

4    have any recollection of getting Roundup or

5    any herbicide on your skin at any time?"

6              And then Mr. Nelson answers, "I

7    don't have any recollection of that at all,

8    no."

9              And then the question is,

10   "Okay.  And is that because you took all of

11   the precautions that we just discussed?"

12             And Mr. Nelson answers, "Yes."

13             Do you see that?

14        A.    I do see that, right.

15        Q.    Now, did you make any

16   adjustments to your non-time-weighted

17   exposure assessment for Mr. Nelson based on

18   the fact that he doesn't have any

19   recollection of getting Roundup or any

20   herbicide on his skin at any time?

21             MR. BRICKER:  Form.

22             THE WITNESS:  No, I didn't do

23        any adjustments.

24             ///

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    are you referring to there, Dr. Herrick?

2         A.    Well, like in this case, the

3    biological level --

4              MR. BRICKER:  Bob, I'm sorry,

5         let me just object to form, and that

6         this is beyond the scope of your

7         designation in this case.

8              Go ahead.

9              THE WITNESS:  Okay.

10             Well, in this case what they

11        were looking at was the excretion of

12        the glyphosate in the urine, so that's

13        the biological level that we were

14        talking about, you know, in this

15        deposition.

16   BY MR. LEE:

17        Q.    And was the glyphosate level in

18   the urine, is that a -- was that a proxy for

19   the glyphosate level in the blood?

20        A.    You know, they --

21             MR. BRICKER:  Form.

22             THE WITNESS:  I'm sorry.

23             Yeah, sure.  They didn't try

24        to, you know, directly make that

1    Q.    Does this report marked as

2    Exhibit 12 contain all of your opinions

3    regarding Mr. Richard Canning's exposure

4    history?

5    A.    Yes, that's true, they do.

6    Q.    Are there any opinions

7    regarding Mr. Richard Canning that you have

8    to offer in this litigation that is not

9    contained in your report marked as

10   Exhibit 12?

11   A.    No.

12   Q.    Dr. Herrick, can you turn to

13   page -- the second page of your report marked

14   as Exhibit 12?

15   A.    Sure.  Let me just scroll down

16   here.

17         Okay.

18   Q.    Now, in your second paragraph,

19   you state, "In Richard Canning's case, he was

20   exposed both ways."

21         Do you see that?

22   A.    Oh, sorry, I went too far.

23   You're on page 2?

24   Q.    Yes.  Page 2, first sentence of

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    second paragraph.

2           A.      Yes, I see it.   That is what I

3    said.

4           Q.      And when you refer to "exposed

5    both ways," you are talking about dermal

6    exposure and inhalational exposure, is that

7    correct?

8           A.      That's correct, yes.

9           Q.      And what documents did you

10   review in order to prepare your opinions in

11   your report marked as Exhibit 12?

12          A.      This would have been the

13   Canning deposition and the Plaintiff Fact

14   Sheet.  And again, I don't remember if there

15   was a Complaint document that was in the

16   package that I looked at for this one.  If

17   there was, I used that as well.  But those

18   would be the sources of information.

19          Q.      So other than the Richard

20   Canning deposition transcript, the Plaintiff

21   Fact Sheet for Mr. Richard Canning, and

22   possibly the Complaint, did you rely upon any

23   other documents in preparing this exposure

24   assessment for Mr. Canning?

Robert F. Herrick, MS, ScD, CIH, FAIHA

1          and as we said earlier, you know,

2          Roundup can be a mixture of several

3          ingredients, and so washing like you

4          would conventionally in a shower with

5          water and soap, you know, I don't feel

6          like I could make a good judgment of

7          how well that type of washing

8          procedure would influence or affect

9          the different ingredients that are in

10         Roundup.

11    BY MR. LEE:

12         Q.    Did you take -- when you were

13    preparing your exposure estimates for

14    Mr. Richard Canning, did you take into

15    account the protective -- the personal

16    protective equipment or clothing that he

17    described?  Did you take that into account?

18         A.    No, I didn't.

19         Q.    And you made no adjustments to

20    your quantitative estimates -- I'm sorry,

21    your numerical estimates based on his

22    personal protective equipment, is that

23    correct?

24         A.    That is correct, right.

Robert F. Herrick, MS, ScD, CIH, FAIHA

1    COMMONWEALTH OF MASSACHUSETTS   )

2    SUFFOLK, SS.                    )

3             I, MAUREEN O'CONNOR POLLARD,

4    Registered Diplomate Reporter and Notary

5    Public in and for the Commonwealth of

6    Massachusetts, do certify that on the 23rd

7    day of October, 2023, at 10:41, the person

8    above-named was duly remotely sworn to

9    testify to the truth of their knowledge, and

10   examined, and such examination reduced to

11   typewriting under my direction, and is a true

12   record of the testimony given by the witness.

13   I further certify that I am neither attorney,

14   related or employed by any of the parties to

15   this action, and that I am not a relative or

16   employee of any attorney employed by the

17   parties hereto, or financially interested in

18   the action.

19

20

21

22   _____    _____

23   MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC

24   CSR #149108