**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel: 202-847-4030 | Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843 | Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400 | Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
Linda C. Hsu (CA Bar No. 239880)
(linda.hsu@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel: 310-576-2100 | Fax: 310-576-2200

*Attorneys for Defendant Monsanto Company*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC |
| *Gerald Nelson, et al. v. Monsanto Co.,*<br>Case No. 3:19-cv-04576-VC | **DEFENDANT MONSANTO COMPANY'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE TESTIMONY OF DR. D. BARRY BOYD**<br><br>Hearing:<br>Date:  March 1, 2024<br>Time:  10:00 a.m.<br>Place: San Francisco Courthouse,<br>            Courtroom 4 – 17th Floor |

I.   **INTRODUCTION**

Plaintiff's opposition ("Opposition") largely ignores the core points of Monsanto's Motion, or else reaffirms the aspects of Dr. Boyd's opinions that render them unreliable. Plaintiff contends that because Dr. Boyd said he performed a differential diagnosis, his opinions are beyond reproach. However, claiming to apply a differential diagnosis does not equate to a properly conducted differential diagnosis. Dr. Boyd's differential diagnosis strays far from any conventionally accepted method as his process does not reliably rule-in Roundup, but instead is merely designed to lead to his pre-ordained conclusion. Engaging in a flawed "always Roundup" methodology, Dr. Boyd determines Roundup to be the cause while not seriously considering Plaintiff's numerous and substantial non-Roundup risk factors for NHL. As such, Dr. Boyd's specific causation opinion must be excluded. *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1311 (11th Cir. 2014) (affirming exclusion of expert witness who "failed to consider obvious alternative causes for [plaintiff's condition]").

II.   **ARGUMENT**

**A.   Dr. Boyd Fails to Reliably Rule In Roundup**

As an initial matter, Monsanto does not dispute that a differential diagnosis is an admissible and generally accepted technique. (*See* Opp. at 3-4.) Instead, Monsanto disputes that Mr. Boyd's opinions are grounded on a *properly* conducted differential diagnosis.

Plaintiff claims that Dr. Boyd properly ruled in Roundup based on his "exposure days" methodology. But Dr. Boyd fails to calculate the specific dose that Plaintiff experienced. Ex. P, Boyd (*Nelson*) Dep. at 47:15-18 ("I didn't measure how much glyphosate he got on his skin – the exact amount he received."). Yet, dose must be considered when "evaluating whether an alleged exposure caused a specific adverse effect." *See, e.g., McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) ("Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect."). Plaintiff's Opposition also fails to squarely address Monsanto's argument that courts have routinely excluded experts who fail to establish dose and instead rely only on exposure. *See, e.g., McClain*, 401 F.3d at 1239 (excluding expert as unreliable as the expert "neglect[ed] the hallmark of the

science of toxic torts—the dose-response relationship."); *In re Denture Cream Prod. Liab. Litig.*, 795 F. Supp. 2d 1345, 1353 (S.D. Fla. 2011) (excluding expert testimony where "there is no dose-response evidence which Plaintiffs' experts may use to reliably infer what type of exposure level" would cause the injury).

Plaintiff's Opposition also misconstrues Monsanto's argument that Dr. Boyd's opinions are unreliable because he improperly relied on the opinions of another expert, Dr. Herrick. (Opp. at 4.) Monsanto does not dispute that experts can rely on another expert's opinions. Instead, Monsanto contends that any such reliance must be based on opinions that are *reliable*. Here, Plaintiff does not address any of Monsanto's contentions that the expert opinion that is the cornerstone of Dr. Boyd's opinions – Dr. Herrick's "exposure days" analysis – is unreliable.

First, Dr. Herrick's analysis does not measure dose or even the actual amount of Roundup to which Plaintiff was exposed. (*See* Ex. K, Herrick (*Nelson*) Dep. at 108:21-109:11.) Instead, Dr. Herrick simply read Plaintiff's testimony and counted the number of days Plaintiff claimed to spray Roundup. *See* Ex. Q, Herrick (*Nelson*) Dep. at 99:22-102:9. Critically, Dr. Herrick testified that he only provided a range for exposure numbers for Plaintiff because Plaintiff's testimony was uncertain. *Id*. But the number of days a person claims to have sprayed Roundup says nothing about the amount of Roundup in that person's body – especially where, as here, Dr. Herrick did not consider crucial metrics of dose, such as method of application, the PPE used by Plaintiff, or even the concentration of Roundup that Plaintiff used. For this reason, Dr. Herrick admits, as he must, that his exposure days methodology does not relate to the actual biological level in humans. *See id.* at 151:5-156:5. Furthermore, Dr. Herrick admitted that he did not consider, or make adjustments for, Plaintiff's use of personal protective gear in his analysis, *id*. at 122:2-14, despite acknowledging that such factors may reduce a person's exposure to Roundup. *See id.* at 117:23-121:3, 196:12-24; *see also id.* at 117:23-119:3 (goggles), 120:4-121:8 (respirator mask reduces inhalation exposure to Roundup), 121:4-24 (surgical mask). Still, Dr. Herrick did not make any adjustments for the Plaintiff's use of protective gear. *Id.* at 122:2-14.; *see id.* at 111:23-113:4 (heavy work clothes), 113:6-23 (gloves); 114:21-115:24 (waterproof boots).

Dr. Herrick also admits that he did not consider various factors that he admits would reduce exposure, and *that Plaintiffs testified were present when they sprayed and/or mixed* Roundup. For example:

- Dr. Herrick admits that Mr. Nelson testified he does not recall getting Roundup on his skin because of all the precautions he took. *Id*. at 124:3-14.  However, Dr. Herrick made no adjustments to his exposure assessment of Mr. Nelson based on his testimony that he did not recall getting any Roundup or any herbicide on his skin at any time. *Id*. at 124:15-125:9.

- Dr. Herrick admits that Mr. Nelson testified he washed his hands after every time he used Roundup. *Id*. at 127:10-128:19. However, Dr. Herrick did not make any adjustments to his exposure estimates based on this testimony. *Id*. at 135:5-14.

- Dr. Herrick admits that Mr. Nelson used premixed Roundup, which he admits could reduce the risk of exposure to Roundup. *Id*. at 139:20-141:22. However, Dr. Herrick does not account for the type of Roundup used by Mr. Nelson.

Accordingly, Dr. Herrick's opinions are unreliable, and because Dr. Boyd relies entirely on Dr. Herrick's opinions to rule in Roundup, there are no additional grounds upon which Dr. Boyd's specific-causation opinions can stand.[1]

Plaintiff also contends that Dr. Boyd properly "ruled-in" Roundup as a cause of Plaintiff's NHL because of Plaintiff's "substantial exposure to Roundup[.]" (Opp. at 7). But this argument is entirely circular. Dr. Boyd cannot rule in Roundup simply because Plaintiff used it. Instead, he must establish that Plaintiff was exposed to an amount of Roundup sufficient to cause NHL. *See McClain*, 401 F.3d at 1244 (holding that an expert must "show that Plaintiffs had sufficient individual exposure [] to cause the medical problems"); *see also Mitchell v. Gencorp Inc.,* 165 F.3d 778, 781 (10th Cir. 1999). And he cannot do this, as he fails to consider dose and instead relies on an exposure days methodology, which is insufficient. *See Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1246 (11th Cir. 2018) (affirming exclusion of expert where expert "never conducted an independent dose calculation" and "failed to demonstrate a scientific basis for concluding that those exposure levels would likely produce, contribute to, or exacerbate [plaintiff's] conditions.")

---

[1] Monsanto has filed a motion to exclude Dr. Herrick's opinions on this very basis. *See* Dkt. No. 17,617.

Finally, Monsanto's argument that "Dr. Boyd's use of certain studies and datapoints violates the weight of the evidence of review he purports to be applying" is not an argument as to the weight (rather than admissibility of Dr. Boyd's opinions), as Plaintiff suggests. (Opp. at 5.) Instead, as stated in Monsanto's opening brief, Dr. Boyd cherry-picked literature and data points in reaching his opinions, in the face of the near totality of literature finding that Roundup does not cause NHL. Such cherry-picking renders Dr. Boyd's opinions wholly unreliable. *See In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, 524 F.Supp.2d 1166, 1175–76, 1179 (N.D.Cal.2007) (holding that experts may not "cherry -pick[ ]" studies to support a conclusion that is contradicted by others); *see also In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 634 (4th Cir. 2018) ("Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion. Courts have consistently excluded expert testimony that cherry-picks relevant data") (internal quotation marks and citation omitted). Rather under *Daubert*, Dr. Boyd's opinions must be excluded because they do not reliably rule-in Roundup as a cause of Plaintiff's NHL. *See Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp. 2d 1347, 1371 (N.D. Ga. 2001) (excluding expert witness for failure to reliably rule in product).

**B. Dr. Boyd Fails to Reliably Rule Out Alternative Causes**

Plaintiffs' argument that Dr. Boyd's handling of alternative causes goes to weight and not admissibility is fundamentally incorrect. Where, as here, an expert fails to *meaningfully* rule out alternative causes, his opinions should be excluded. *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d. 1245, 1254 (11th Cir. 2010) ("A differential diagnosis that fails to take **serious account** of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation") (emphasis added).

Here, as part of his differential diagnosis, Dr. Boyd fails to take serious account of several known alternative causes of Plaintiff's NHL – (1) Plaintiff's age, gender and ethnicity; (2) exposure to other chemicals; (3) family history of cancer; and (4) naturally-occurring genetic mutations due to replication errors. Although such alternative causes are clear risk factors for

Plaintiff's NHL, Dr. Boyd summarily rules them out, simply stating that his analysis is predicated on the "essential exclusion of other potential risk factors [] that could be causative[.]" (Ex. C, Boyd Rpt. at 30.) However, a properly conducted differential diagnosis requires the expert to "systematically rul[e] out causes that would not apply to the patient" to arrive "at what is the likely cause of the ailment." *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010); *see Guinn*, 602 F.3d at 1253 (holding that an expert's opinion was properly excluded where the differential diagnosis failed to consider alternative causes and was deemed unreliable).

Dr. Boyd's failure to meaningfully consider Plaintiff's risk factors demonstrates that he has employed a flawed, results-driven "always Roundup" methodology—precisely the type of unconventional approach that should be excluded.

### 1. *Age, gender, and ethnicity.*

Plaintiff is a Caucasian male who was diagnosed with NHL at 69 years old. Dr. Boyd testified that Plaintiff's age, gender, and ethnicity put him at an increased risk of developing NHL. *See* Ex. B, Boyd (*Nelson*) Dep. at 57:18-58:23. Yet, Dr. Boyd did not reliably consider those risk factors. Plaintiff's Opposition makes no attempt to address Dr. Boyd's cursory dismissal of such risk factors and simply reiterates Dr. Boyd's vague statements that he did consider all risk factors. Dr. Boyd's failure to take serious account of these factors – which he admits are risk factors for NHL – renders his opinions unreliable. *Guinn*, 602 F.3d at 1253.

### 2. *Exposure to other chemicals and herbicides.*

Plaintiff argues that Dr. Boyd considered and ruled out Plaintiff's exposure to other chemicals and herbicides as an alternative cause of Plaintiff's NHL. Plaintiff claims that Dr. Boyd ruled out Plaintiff's exposures to other chemicals as a cause of Plaintiff's NHL because Plaintiff's exposures to other chemicals was "minimal in comparison to his exposure to Roundup[.]" (Opp. at 6.) However, Dr. Boyd relies entirely on Dr. Herrick's exposure analysis, which, as discussed above, is unreliable. Therefore, Dr. Boyd's assessment of Plaintiff's exposure to Roundup in comparison to Plaintiff's exposure to other chemicals is foundationally untenable.

### 3. *Family history of cancer.*

Plaintiff has a family history of cancer, including a father who had B-cell lymphoma and a grandmother with lymphoma. *See* Ex. B, Boyd (*Nelson*) Dep. at 59:15-60:14. Dr. Boyd testified that he ruled out Plaintiff's family history of cancer as an alternative cause of his NHL because "family history represents a higher risk when the onset of the disease occurs at a younger age" and "the predictor of risk of a familial gene causing a cancer is younger age at onset." *Id*. at 60:15-25. But confusingly, Dr. Boyd relies on literature contradicting such testimony in his report. For instance, Boyd relies on the McDuffie study, and cites to it in his report, which found an increased risk of NHL when a first-degree relative had any type of cancer. *See* Ex. C, Boyd Rpt. at 22, n. 51; *see also* Ex. I, McDuffie, *et al.*, *Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health*, 10 Cancer Epidemiology, Biomarkers & Prevention 1155, 1160 (2001). Plaintiff's Opposition does not address the contradiction but simply reiterates the Boyd Report. (*See* Opp. at 6.)

### 4. *Naturally-Occurring Mutations.*

Dr. Boyd offers no basis to rule out idiopathic causes (including naturally-occurring genetic mutations) as the cause of Plaintiff's NHL. Plaintiff contends that Dr. Boyd reliably ruled out naturally-occurring mutations because "differential diagnoses are appropriate even when there is a high rate of unknown causes" and where "the expert cannot completely rule out idiopathic causes." (Opp. at 7.) But Plaintiff's argument misunderstands the relevant science. Naturally-occurring genetic mutations are themselves a cause of NHL. As this Court has recognized, Monsanto's evidence regarding naturally-occurring genetic mutations is offered to rebut the testimony of Plaintiffs' specific causation experts who, like Dr. Boyd, simply rule-in Roundup based on their conclusion that a plaintiff did not have other risk factors:

> THE COURT: . . . why does Monsanto want to put this witness on at trial? The answer to me, it seems, is obvious; right? You have these specific causation experts who are doing a very sketchy job of differential diagnosis or differential etiology. And basically, what they are saying is, well, you know, there are these four risk factors for NHL, and the patient didn't have these three risk factors. The only risk factor was exposure to Roundup. Therefore, the Roundup caused the patient's NHL; right? I mean, that is – I'm oversimplifying a little bit. I mean, they're

>finessing it a little bit. But effectively, that seems to be what the – that's the message from these specific causation experts.
>
>That type of testimony is obviously quite sketchy, and you know, Tomasetti's testimony helps a juror understand why the testimony of these specific causation experts is so sketchy; right?

*See* Hsu Decl., Ex. O, 12/12/23 *Daubert* Hr'g. Tr. re: Dr. Christian Tomasetti in *Delorme-Barton* ("Tomasetti *Daubert* Hr'g.") at 157:7-22. The Court has also recognized that evidence regarding naturally-occurring genetic mutations explains causation of NHL without regard to environmental factors:

>THE COURT: And what it's been up until now, I think, is, well, the high percentage of NHL cases are idiopathic. And that's a very abstract concept for the jurors, and you know, it's easy for the plaintiff's experts to sort of wave that away; right?
>…
>And you're putting meat on the bones of what you've said previously which is that such a high percentage of NHL cases are idiopathic.

*Id*. at 158:17-25.

>THE COURT: why isn't it very helpful for the jury to hear that X percent of -- were high -- even if there's no number attached to it -- a high percentage of the, you know, cancer and a high percentage of NHL, you know, as is -- is -- can be attributed simply to these replication errors without regard to environmental factors, and here's how it works.

162:21-163:3.

 Here, Dr. Boyd admits that spontaneous mutations may initiate cancer (*see* Ex. P, Boyd (*Nelson*) Dep. at 46:15-47:2.), and that he cannot rule out that Mr. Canning's NHL was caused by natural replication errors. *Id*. Thus, this is not a case where, as Plaintiff suggests, Dr. Boyd "cannot completely rule out idiopathic causes." (Opp. at 7.) Rather, it is a case where Dr. Boyd admits that one potential cause of Plaintiff's NHL is natural replication errors—a cause that experts have testified causes approximately 95% of NHL in the population (*see* Hsu Decl., Ex. O, Tomasetti *Daubert* Hr'g. at 49:4-16; 57:6-16)—and where Dr. Boyd does not meaningfully consider and rule out this alternative cause. Ex. P, Boyd (*Nelson*) Dep. at 46:15-47:2.

 Plaintiff's reliance on *Wendell v. GlaxoSmithKline LLC* does not save Dr. Boyd's opinions. First, the expert's opinions in *Wendell* were predicated on a quantitative understanding

of a decedent's dose of certain prescription drugs. *Wendell v. GlaxoSmithKline* LLC, 858 F.3d 1227 (9th Cir. 2017). Here, by contrast, Dr. Boyd's opinions are based on an "exposure days" analysis that wholly do not account for dosage. Moreover, the *Wendell* court held that although the expert was unable to entirely rule out the possibility that plaintiff's NHL might have been idiopathic, "[h]e did not base that assumption on pure conjecture." *Wendell*, 858 F.3d at 1235. But Dr. Boyd does not do the same. Here, Dr. Boyd testified that he could not rule out replication errors, which he admits can cause NHL, *see* Ex. P, Boyd (*Nelson*) Dep. at 46:15-47:2, and which explain a significant number of NHL cases that would previously have been classified as idiopathic. *See* Ex. O, Tomasetti *Daubert* Hr.g' at 158:17-25. And Dr. Boyd ignores extensive epidemiology data that shows no increased risk or no dose-response for NHL due to glyphosate exposure while admitting that he cannot rule out that Plaintiff's NHL was caused by replication errors. *See id.*

As such, Dr. Boyd offers no reliable method in ruling out naturally-occurring genetic mutations, and therefore, his opinion must be excluded. *See, e.g.*, *Guinn*, 602 F.3d at 1253.

### III. CONCLUSION

For the foregoing reasons, the Court should grant Monsanto's motion to exclude Plaintiff's specific causation expert Dr. Boyd.

Dated:  January 22, 2024          Respectfully submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**

*/s/ Linda C. Hsu*
Linda C. Hsu
Attorneys for Defendant Monsanto Company

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of January 2024, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system, which sent notice of the filing to all appearing parties of record.

*/s/ Linda C. Hsu*
Linda C. Hsu