**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel: 202-847-4030
Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400 | Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
Linda C. Hsu (CA Bar No. 239880)
(linda.hsu@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel: 310-576-2100 | Fax: 310 -576-2200

*Attorneys for Defendant Monsanto Company*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION, | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC |
| *Beckfield v. Monsanto Company*, 3:21-cv-05322-VC | **DEFENDANT MONSANTO COMPANY'S REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF DR. KEVIN KNOPF**<br><br>**Hearing:**<br>Date: March 1, 2024<br>Time: 10:00 a.m.<br>Place: Courtroom 4 |

## INTRODUCTION

This is a new era of expert testimony. The December amendments to Rule 702 of the Federal Rules of Evidence empower this Court to exclude the "shaky" testimony of plaintiff's experts that it has been compelled to admit under the now-obsolete Ninth Circuit presumption favoring expert admissibility. Under the old standard, Dr. Knopf's testimony should have been inadmissible, but under the new standard, it is clearly so.

Dr. Knopf's failures are myriad. In ruling in glyphosate as a potential cause of Plaintiff's mantle cell lymphoma ("MCL"), he ignored both Plaintiff's dose and his specific disease. In ruling out other causes, he ignored Plaintiff's exposure to known carcinogenic pesticides and other herbicides, Plaintiff's age and family history, and naturally-occurring mutations. These defects in applying the differential etiology methodology are sufficient to render his opinion unreliable under the traditional *Daubert* standard, and more so under the recently amended Rule 702.

## ARGUMENT

### A. The amended Rule 702 of the Federal Rules of Evidence requires this Court to find experts' methodology *and conclusions* are more likely than not reliable.

Plaintiff's opposition applies an obsolete legal standard for expert admission. He argues, for example, that "Monsanto simply disagrees with Dr. Knopf's conclusions and is therefore attacking his methodology." Opp. at 11. Disagreeing with an expert's conclusions is squarely within the scope of Rule 702, amended effective December 1, 2023, to "more clearly empower the court to pass judgment on the conclusion that the expert has drawn." September 2022 Report of the Judicial Conference, Committee on Rules of Practice and Procedure. Rule 702 now requires that Plaintiff demonstrate "to the court that it is more likely than not that" a witness qualified as an expert satisfies the four reliability requirements in Rule 702(a)–(d), including that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Rule 702(d).

The amended Rule 702 language "was designed to reject the view of some courts that the reliability requirements set forth in Rule 702(b) and (d)…are questions of weight and not admissibility, and more broadly that expert testimony is presumed to be admissible." September 2022 Report of the Judicial Conference, Committee on Rules of Practice and Procedure. Therefore, this

Court must revisit its rulings on expert admissibility across the board. In 2018, the Court found it a "close question" whether to admit plaintiff's general causation experts, but concluded that their opinions "while shaky, are admissible." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1151 (N.D. Cal. 2018). At the time, the Court correctly focused "on the principles and methodology an expert uses in forming her opinions rather than the expert's conclusions," *id*. at 1112, resulting in "deference to experts in close cases," *id.* at 1113. Further, this Court's opinion admitting plaintiff's specific causation experts, *In re Roundup Prod. Liab. Litig.*, 358 F. Supp. 3d 956 (N.D. Cal. 2019), relied on Ninth Circuit precedent requiring district courts "be more tolerant of borderline expert opinions than in other circuits." *Id.* at 959. In particular, *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1198 (9th Cir. 2014)—relied on by this Court in both its earlier rulings—no longer stands as precedent for interpreting the amended Rule 702. Under the expanded gatekeeping role required by the amended Rule, excluding testimony of a specific causation expert who cannot distinguish between multiple causative factors is no longer necessarily "an unduly exacting standard." *Id.* at 1199. Nor can *Messick*'s rejection of "issues regarding the correctness of [an] opinion" as being "a matter of weight, not admissibility" be considered good law. *Id.*

"Shaky" expert testimony no longer has a free pass in federal court. Plaintiff in this case cannot rely on this Court's earlier opinions on expert admissibility, nor Ninth Circuit cases finding expert testimony is presumptively admissible. Without that presumption, Plaintiff's experts' opinions—and Dr. Knopf's testimony in particular—fail to meet the standard for admissibility.

### B. Plaintiff fails to show, by a preponderance of the evidence, that Dr. Knopf reliably ruled in Roundup as a potential cause of Plaintiff's NHL.

This Court earlier held that, "[u]nder a strict interpretation of *Daubert*," the absence of a biomarker or genetic signature associated with NHL caused with glyphosate, "perhaps [] would be the end of the line for the plaintiffs and their experts." *In re Roundup Prod. Liab. Litig.*, 358 F. Supp. 3d at 959. Nevertheless, this Court was constrained by Ninth Circuit precedent that biased the scale toward expert admissibility. That is no longer the case under Rule 702. Whether or not this Court exercises its discretion to adopt a strict interpretation of *Daubert*, it is no longer constrained from making an independent determination about the admissibility of Plaintiff's experts' conclusions.

Therefore, as a preliminary matter, Plaintiff's admission that Dr. Knopf ruled in glyphosate as a cause of Plaintiff's MCL by relying on Plaintiff's general causation experts' opinions, Opp. at 5–6, confirms that his opinion is derivative and must be excluded if Plaintiff's general causation experts are excluded from testifying. In addition, Dr. Knopf's failure to account for Plaintiff's actual systemic dose of glyphosate and his rare NHL subtype make his opinion unreliable, even if Plaintiff's general causation experts are permitted to testify.

**1. Dr. Knopf's use of exposure days to evaluate specific causation is not reliable.**

Plaintiff asserts "exposure days" is the widely recognized exposure dose methodology. No citations or other authority are directly cited for this proposition. Plaintiff cannot seriously dispute that his absorbed dose of glyphosate is the only biologically relevant measure for his theory of causation. His theory is that glyphosate damaged cells in the mantle zone of his lymph nodes, the area where tumor cells in MCL originate. For that to happen, glyphosate would, at a minimum, need to be absorbed into Plaintiff's body. According to EPA, "Dermal exposure assessment is a two-step process that considers the contact between contaminant and receptor as well as absorption of the contaminant into the body through the skin. The amount of contaminant absorbed represents what is available for interaction with target tissues or organs." EPA, Exposure Assessment Tools by Routes – Dermal, available at: https://www.epa.gov/expobox/exposure-assessment-tools-routes-dermal. Exposure days cannot be anything more than a proxy for absorbed dose. Plaintiff, therefore, bears the burden of showing "to the court that it is more likely than not that" exposure days are a valid and reliable proxy for absorbed dose. Fed. R. Evid. 702.

Contrary to Plaintiff's assertions, "exposure days" is not widely accepted, except as one factor in dose estimation models. *See* EPA, Guidelines for Human Exposure Assessment (2019)[1] and Exposure Factors Handbook (Nov. 2011)[2]. "Dose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect." *See, e.g., McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005). "Exposure is a poor surrogate for

[1] *available at* https://www.epa.gov/risk/guidelines-human-exposure-assessment

[2] *available at* https://www.epa.gov/expobox/about-exposure-factors-handbook

systemic dose for many pesticides, including glyphosate." Acquavella 2023.[3]. Skin contact is the "primary route of exposure that may be internalized," with experimental evidence showing less than 2% of glyphosate on human skin is absorbed. *Id.* Contrary to Dr. Knopf's testimony, "glyphosate systemic dose from an application can be reliably estimated through urine biomonitoring of the parent compound." *Id.* Regulatory agencies have established an acceptable daily intake or chronic reference dose for glyphosate ranging from 0.3 to 1 mg/kg/day. *Id.* Across all glyphosate biomonitoring studies, the highest estimated systemic dose from an agricultural application was 0.004 mg/kg. *Id.* Researchers from the Federal Institute of Risk Assessment in Germany reviewed data on glyphosate doses using human urine samples and concluded "that no health concern was revealed because the resulting exposure estimates were by magnitudes lower than the ADI [acceptable daily intake] or the AOEL [acceptable operator exposure level]." Niemann 2015.[4] Thus, "dietary intake as well as occupational exposure is unlikely to present a public health concern." *Id.* More recently, the European Food Safety Authority (EFSA) found: "Based on the EFSA model predictions for tractor-mounted and hand-held application techniques, the operator exposure estimates are below the (A)AOEL [acute acceptable and acceptable operator exposure level] for all representative uses, for an operator wearing workwear and no further personal protective equipment (PPE)." Álvarez 2023.[5]

Many of the variables that affect systemic dose can be measured—at least roughly—for Plaintiff, including whether he used protective equipment, how long he spent applying herbicides on each alleged day of exposure, and even the thickness of his skin (which changes with age). These are case-specific facts that Dr. Knopf should have investigated as a specific causation expert. His failure

---

[3] Acquavella J. Epidemiologic studies of glyphosate and non-Hodgkin's lymphoma: A review with consideration of exposure frequency, systemic dose, and study quality. Glob Epidemiol. 2023 Feb 25;5:100101. doi: 10.1016/j.gloepi.2023.100101. PMID: 37638378; PMCID: PMC10445963. Full disclosure: John Acquavella is a former Monsanto employee. Bayer funded his research.

[4] Niemann, L., Sieke, C., Pfeil, R. et al. A critical review of glyphosate findings in human urine samples and comparison with the exposure of operators and consumers. J. Verbr. Lebensm. 10, 3–12 (2015). https://doi.org/10.1007/s00003-014-0927-3

[5] Álvarez, F., Arena, M., Auteri, D., Binaglia, M., Castoldi, A. F., Chiusolo, A., Crivellente, F., Egsmose, M., Fait, G., Ferilli, F., Gouliarmou, V., Nogareda, L. H., Ippolito, A., Istace, F., Jarrah, S., Kardassi, D., Kienzler, A., Lanzoni, A., … Villamar-Bouza, L. (2023). Peer review of the pesticide risk assessment of the active substance glyphosate. EFSA Journal, 21(7), 1–52.

to do so renders his opinions inadmissible. Regardless, even if Dr. Knopf were correct that measuring Plaintiff's absorbed dose was impossible, there is no rule in logic or evidence whereby an unreliable methodology becomes admissible in the absence of a reliable one.

**2. Mantle Cell Lymphoma is not like other NHL subtypes; Dr. Knopf's conflation of MCL with NHL renders his opinion unreliable.**

MCL is an extremely rare lymphoma that comprises approximately 3–5% of NHL cases. Plaintiff argues Dr. Knopf reasonably relied on generic NHL studies because Monsanto has not shown evidence that the "cancer risk caused by glyphosate or Roundup is somehow *different* for MCL than for other types of NHL." (Opp. at 7.) To start with, glyphosate and Roundup do not pose a cancer risk. Regardless, it is not Monsanto's burden to show MCL is different from NHL generally, but Plaintiff's burden to show they are the same for the purposes of evaluating causation. FRE 702.

NHL is a classification of cancers that affect the lymphatic system. It comprises at least 86 different cancers. The subtypes are defined by the World Health Organization (WHO) classification. *See* Alaggio 2022.[6] The WHO classification rests on tissue-type and aggressiveness; etiology is not factored into consideration. According to WHO: "The IGH::CCND1 fusion associated with t(11;14)(q13;q32) is the genetic hallmark of mantle cell lymphoma (MCL)" *Id*. That chromosomal translocation is not associated with other lymphomas.

Plaintiff points to Dr. Knopf's testimony that MCL is similar to other NHLs because they respond to similar treatments. The primary treatment for NHL—Rituximab—attaches to the CD20 protein found on the surface of blood cells. Hanif 2022.[7] In other words, Dr. Knopf's "evidence" says nothing more than that MCL and other subtypes of NHL are hematopoietic (blood) cancers. And the similarity of treatment theory is further undercut by the fact Rituximab is also approved to treat rheumatoid arthritis, microscopic polyangiitis, pemphigus vulgaris, immune thrombocytopenic

---

[6] Alaggio, R., Amador, C., Anagnostopoulos, I. et al. The 5th edition of the World Health Organization Classification of Haematolymphoid Tumours: Lymphoid Neoplasms. Leukemia 36, 1720–1748 (2022). https://doi.org/10.1038/s41375-022-01620-2.

[7] Hanif N, Anwer F. Rituximab. 2022 Sep 26. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2023 Jan–. PMID: 33232044.

purpura, and Rasmussen encephalitis. *Id*. Dr. Knopf offers no real explanation to bridge the analytical gap between treatment and cause.

Finally, Plaintiff argues that if this Court excludes his experts for failing to rely on evidence specific to MCL then the Court must also exclude Monsanto's experts for the same reason. Plaintiff needs expert testimony to meet his burden of proof; Monsanto does not.

**C. Dr. Knopf fails to reliably rule out other risk factors for Plaintiff's MCL.**

In the second part of the differential diagnosis, Dr. Knopf simply ignores potential risk factors that could explain Plaintiff's MCL. These omissions render his opinions unreliable and his testimony inadmissible.

**1. Other Pesticides**

While Plaintiff asserts Dr. Knopf considered "proximity to major environmental hazards or rehabilitation sites," "viral infections," "family history," and "age," Opp. at 8–9, he glaringly omits his exposure to other pesticides. Plaintiff was exposed to Atrazine, Lasso, and Dual. Mot. at 9. Dr. Knopf did not consider any of them. *Id.* Plaintiff's opposition offers no response.

Even under Plaintiff's obsolete "sole cause" standard, Plaintiff's exposure to these other pesticides and herbicides would have to be ruled out. The fact Dr. Knopf did not do so shows Plaintiff cannot show "to this court that it is more likely than not" that Dr. Knopf's opinion "reflects a reliable application of the principles and methods to the facts of the case." FRE 702.

**2. Age**

Plaintiff was diagnosed at 56. The median age for NHL diagnoses is 60 (including MCL). Plaintiff correctly points out that 56 is younger than 60, but completely ignores that Dr. Knopf has not shown that difference is meaningful. Assuming the distribution of diagnoses falls on a normal curve—an assumption Dr. Knopf should have confirmed or denied—for those four years to represent a meaningful difference, Dr. Knopf would need to show 56 fell beyond one standard deviation from the average. Otherwise, from a statistical perspective, 56 and 60 are indistinguishable.

**3. Family History**

Plaintiff asserts family history is a risk factor "he does not have." Opp. at 9. This is quite different from Dr. Knopf's testimony that he "will maybe do more epidemiologic research about that

part." Plaintiff offers no justification for Dr. Knopf not forming an opinion on this risk factor at the time of his expert report or deposition.

**4. Naturally-Occurring Mutations**

Plaintiff makes no effort to defend Dr. Knopf's circular reasoning in ruling out naturally occurring mutations. Mot. at 10 (quoting Ex. C, 8/5/22 Knopf Dep. at 120:10–20). His opposition relies entirely on case law holding that it is not necessary to rule out idiopathic causes. That case law is no longer controlling or persuasive under Rule 702 as amended.

As this Court has recognized, Monsanto's evidence regarding naturally-occurring genetic mutations is offered to rebut the testimony of Plaintiffs' specific causation experts who, like Dr. Knopf, simply rule-in Roundup:

> THE COURT: . . . why does Monsanto want to put this witness on at trial? The answer to me, it seems, is obvious; right? You have these specific causation experts who are doing a very sketchy job of differential diagnosis or differential etiology. And basically, what they are saying is, well, you know, there are these four risk factors for NHL, and the patient didn't have these three risk factors. The only risk factor was exposure to Roundup. Therefore, the Roundup caused the patient's NHL; right? I mean, that is – I'm oversimplifying a little bit. I mean, they're finessing it a little bit. But effectively, that seems to be what the – that's the message from these specific causation experts.
>
> That type of testimony is obviously quite sketchy, and you know, Tomasetti's testimony helps a juror understand why the testimony of these specific causation experts is so sketchy; right?

Hsu Decl., Ex. 1, 12/12/23 *Daubert* Hr'g. Tr. re: Dr. Christian Tomasetti in *Delorme-Barton* at 157:5–22. The Court has also recognized that naturally-occurring genetic mutations explain NHL causation without regard to environmental factors:

> THE COURT: And what it's been up until now, I think, is, well, the high percentage of NHL cases are idiopathic. And that's a very abstract concept for the jurors, and you know, it's easy for the plaintiff's experts to sort of wave that away; right?
>
> …
>
> And you're putting meat on the bones of what you've said previously which is that such a high percentage of NHL cases are idiopathic.

*Id*. at 158:17–25.

> THE COURT: why isn't it very helpful for the jury to hear that X percent of -- were high -- even if there's no number attached to it -- a high

> percentage of the, you know, cancer and a high percentage of NHL, you know, as is -- is -- can be attributed simply to these replication errors without regard to environmental factors, and here's how it works.

*Id.* at 162:21–163:3. In other words, even under the "sole cause" line of cases, Dr. Knopf must provide a scientifically-valid explanation for ruling out naturally-occurring mutations. *See id*. at 49:4–16; 57:6–16 (naturally-occurring mutations cause approximately 95% of NHL). His failure to do so requires exclusion of his testimony.

Plaintiff's reliance on *Wendell v. GlaxoSmithKline LLC* does not save Dr. Knopf's opinions. First, *Wendell* was premised on the Ninth Circuit's permissive understanding that Rule 702 was only meant to exclude "junk science." 858 F.3d 1227, 1237 (9th Cir. 2017). That presumption of expert admissibility is no longer good law. *See* FRE 702 adv. comm. n. 1. Second, the expert's opinions in *Wendell* were predicated on a quantitative understanding of a decedent's dose of certain prescription drugs. *Wendell*, 858 F.3d at 1230. Here, by contrast, Dr. Knopf's opinions are based on an "exposure days" analysis that does not account for dosage. Third, the *Wendell* court held that although the expert was unable to entirely rule out the possibility that plaintiff's disease might have been idiopathic, "[h]e did not base that assumption on pure conjecture." *Id.* at 1235. But Dr. Knopf's only basis for ruling out naturally-occurring mutations was that he considered Roundup the most likely cause of Plaintiff's NHL, putting the cart before the horse. Mot. at 10 (quoting Ex. C, 8/5/22 Knopf Dep. at 120:10–20).

Thus, Dr. Knopf's method for ruling out naturally-occurring genetic mutations is unreliable and consequently his opinion must be excluded.

**CONCLUSION**

For the reasons set forth above, the Court should grant Monsanto's Motion to Exclude Testimony of Dr. Kevin Knopf.

Dated: January 22, 2024

Respectfully submitted,

/s/ *Linda C. Hsu*
Linda C. Hsu
Attorneys for Defendant Monsanto Company

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of January, 2024, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/ Linda C. Hsu*
Linda C. Hsu