**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 Case No. 16-md-02741-VC |
| This document relates to: | Hon. Vince Chhabria |
| ALL ACTIONS | |

## FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS

The Roundup Fee Committee hereby issues its proposed allocation of common benefit funds pursuant to Special Master William A. Foster's October 6, 2023 Order setting the process to apply for disbursements of the common benefit fund (CBF).[1]

### I.        History of the Litigation[2]

Beginning in late 2015, plaintiffs began filing cases against Monsanto Company and other defendants in different federal and state courts throughout the country. The first plaintiffs to file lawsuits were represented by the law firms that ultimately were appointed to serve as leadership in this MDL. Even before this MDL was formed, the leadership firms were coordinating efforts with the goal of establishing a national litigation and developing a filing strategy to support coordinated litigation in a federal MDL and multiple state court venues.[3]

On October 6, 2016, the Court entered Pretrial Order (PTO) No. 1 [Dkt. No. 2], seeking applications from attorneys interested in being appointed lead counsel and directing plaintiffs' counsel to seek consensus on the selection of liaison counsel. *Id.* On December 7, 2016, after

---

[1] The term "common benefit" will be referred to as "CB" throughout this memorandum.
[2] The history of the litigation and the MDL proceedings are set forth in the Plaintiffs' Leadership firms' application for a CB award. [Dkt. No. [12394]
[3] In July 2016, the leadership firms moved the United States Judicial Panel on Multidistrict Litigation (JPML) to centralize pretrial proceedings before a single court. Over Monsanto's objection, the JPML issued a coordination order. JPML Coordination Order (Oct. 3, 2016).

receiving only a few applications, the Court appointed only six attorneys to lead the federal case, giving them "the "authority and the duty" to, among other things, determine plaintiffs' legal strategy, coordinate and conduct discovery, retain experts, file motions, and negotiate a settlement.  [Dkt. No. 62 at 1–2].  The court also appointed two liaison counsel.

The leadership team coordinated across MDL lines to plan the litigation strategy and develop procedures to bear the substantial costs and divide the labor necessary to develop the general liability case against Monsanto. The leadership structure enabled coordinated development of litigation strategy and theories and allowed the general liability work product to be utilized in all cases regardless of state or jurisdiction. The number of law firms willing to assist in this MDL prior to a favorable jury verdict was negligible. Therefore, the time, effort, and expense of pursuing and developing the legal theories in this case was largely shouldered by the three Co-Lead Counsel and, to a lesser extent, members of the PEC.

With no guaranty of repayment, and for the benefit of all federal plaintiffs, the leadership firms expended millions of dollars to prosecute this litigation; contributing $3.3 million in common benefit assessments to fund the litigation by July 2020. These funds were used to pay common benefit costs associated with general expert fees, special master fees, document repository fees, and general management fees.

Co-Leads and the PEC had to develop the case from nothing and do it within strict time restrictions implemented by the Court. These responsibilities include conducting fact discovery[4] identifying and retaining experts, taking and defending expert depositions, defending *Daubert* challenges against each one of their experts, and so much more. Monsanto made clear that it had no interest in settlement, at least not without first trying multiple cases. This necessitated the preparation of numerous cases for trial within the MDL. The Court ordered that the four cases filed in the Northern District of California before September 26, 2018 would be considered "Group 1" and set

---

[4] Monsanto produced 2,551,131 documents representing more than 16,806,396 pages.

FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS

deadlines for the completion of case-specific discovery. The parties eventually agreed that *Hardeman v. Monsanto* would be the first bellwether trial. The other Group 1 cases were still required to complete discovery and be trial-ready.

Preparing a case for trial in this litigation was an expensive and difficult undertaking due to the complexity of the issues involved and the number of fact and expert witnesses. A team led by MDL co-lead counsel Aimee Wagstaff represented Mr. Hardeman at trial. Hardeman won on all counts. The jury awarded him roughly $5 million in compensatory damages and $75 million in punitive damages. [Dkt. 4576 at 1].[5] The *Hardeman* verdict resulted in appeals to the Ninth Circuit and the United States Supreme Court, all of which were briefed, argued, and funded by Andrus Wagstaff, PC.

After the *Hardeman* verdict, the court decided not to go forward with the two remaining MDL bellwether trials, instead ordering the parties into mediation. [Dkt. 3325 at 1–2]. The Court explained that, "pressing ahead immediately with the other two bellwether trials would not be the best way to manage the MDL," [Dkt. 13192 at 6] and appointed Special Master Kenneth Feinberg to mediate the MDL cases. [Dkt. 3896 at 10:9-16, Dkt. 4453 at 73:12–22].

The number of plaintiffs grew sharply. In mid-2018, before the MDL *Daubert* ruling, approximately 8,000 cases were filed, nearly all of which had a lawyer among the MDL leadership. By July 2019, the filed cases grew from 18,400 plaintiffs to 42,700 four months later. *See* Bayer, *Address by Werner Baumann* (Oct. 30, 2019). The number of cases subsequently swelled to more than 125,000. *See* Bayer, *Bayer Announces Agreements to Resolve Major Legacy Monsanto Litigation* (June 24, 2020).

The parties negotiated settlement over the next two years. The negotiations, in Special Master Feinberg's words, led to "a robust framework that will enable the parties to bring closure to the current Roundup™ litigation." Bayer, *Bayer Announces Agreements*, *supra*. Under that framework,

---

[5] The Court reduced the punitive damages award to $20 million. [Dkt. 4576 at 8].

FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS

many MDL-connected lawyers from across the country reached settlements with Monsanto. Bayer ultimately agreed to pay more than $10 billion to settle close to 100,000 cases nationwide. *See* Bayer, *Bayer Announces Five-Point Plan to Effectively Address Potential Future Roundup$^{TM}$ Claims* (May 27, 2021).[6]

The court's denial of Monsanto's pretrial motions, including *Daubert* motions and motions on preemption, proved to be seminal rulings that impacted all MDL and state court cases around the country. These critical rulings spurred a litany of related motions and appeals in Roundup cases throughout the country. Leadership's briefing serves as the template for defeating *Daubert* and FIFRA preemption challenges across the country. Leadership also compiled a trial package that is available to all MDL counsel.

## II.     Common Benefit Fee and Formation of the Fee Committee

On February 22, 2017, the Court entered Pretrial Order No. 12 establishing a CBF, noting its "inherent power … to create a common fund from any and all judgments or settlements resulting from this litigation to reimburse the expenses and fees for legal services incurred in the creation of such Fund." [Dkt. 161 at 3]. PTO 12 provided guidelines regarding the submission and compensability of CB time and expenses. Eligible counsel would only recover CBFs for activity that was: (a) for the common benefit; (b) at the direction of and appropriately authorized by leadership; (c) timely submitted; and (d) approved by this Court. All counsel were instructed to submit contemporaneous time records each month to MDL Leadership.

The Court appointed William A. Foster as Special Master to make recommendations to the Court regarding disbursement of CBFs. [PTO 284; ECF No. 16696]. On October 6, 2023, Special Master Foster entered an Order establishing the process for attorneys to submit applications for compensation from the CBF, and the Court required Co-Lead counsel to appoint three individuals to

---

[6] Settlement mediations are still ongoing in the MDL. Certain Co-Lead Counsel continued to pay Mr. Feinberg's fees on behalf of MDL plaintiffs through December 2023 to support his court-endorsed settlement program, even though leadership firms do not participate in that program.

FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS

the Fee Committee to make a proposal for the allocation of CBFs. [Dkt. No. 17367]. Being the attorneys most familiar with the work conducted in the MDL for the common benefit of all MDL Plaintiff, Co-Lead Counsel appointed themselves as the 3-member Roundup Fee Committee ("RFC"). In total, only 7 law firms applied for CB compensation.

The total contributions to the CBF for all MDL firms was $19,900,700.98 as of January 11, 2024. With interest, the total available amount for distribution is $20,233,837.35.

### III.    RFC'S Procedure for Reviewing Common Benefit Applications

The Special Master's October 6th Order required the RFC to propose allocations that would "set forth the percentage of common benefit funds that the Committee believes each applicant should receive for the common benefit work that they performed and an explanation of each proposed allocation." [Dkt. No. 17367 at 1-2]. In doing so, the RFC was responsible for verifying that all requests for disbursements of CBFs were solely for MDL work. *Id*.

The RFC met on several occasions to develop a process to review each CB application, including all time and expense submissions submitted by the applicants. The RFC initially assigned each application to a RFC member for a review of time submissions to assure that they complied with the Special Master's Order. No RFC member was assigned to review its own application.

Applying the Special Master's requirements to the individual time entries proved more difficult than anticipated. It was evident that applicants who submitted CB time undertook a self-audit to exclude work performed in state court proceedings. Nonetheless, questions arose about whether specific time entries truly constitute "work performed in the context of this MDL." For example, if an applicant deposed an expert named by Monsanto in the MDL, would that be considered common benefit work if the deposition was noticed in a state court proceeding? What if another applicant attended that state court deposition to prepare for cross-examination of that same general expert in an action pending in the MDL? One applicant, The Miller Firm, represented the plaintiff in the first state court litigation (as well as one of the Wave 1 MDL bellwether plaintiffs)

and spent hundreds of hours researching and briefing motions and oppositions in their expedited state trial case. That work was, in large part, replicated in the later MDL bellwether trial and Wave 1 cases. Should the time spent on those motions be excluded because the motions were first drafted for a state court case?[7] Weitz & Luxenberg took a deposition of Dr. Portier in a state court proceeding because he was not well enough to testify at an upcoming state court trial. The MDL court later ruled that an MDL preservation deposition was unnecessary because it had been taken in state court. Should time related to Dr. Portier's preservation deposition be considered?

These are just a few examples of questions that arose during the review of time submissions. In the end, the RFC eliminated from consideration any time entry that was more directly related to a state court proceeding regardless of whether there was a direct benefit conferred on MDL plaintiffs. This was true even though the general work performed by the applicant was ultimately made part of the MDL trial package.

The RFC continued to meet periodically to ensure that the handling of each applicant's submissions was consistent and reach consensus on any deficient time entries. Examples of deficient time entries were instances of block billing[8], entries that were too vague to identify the general subject matter of the time expenditure and entries that appeared to be related to work on behalf of individual MDL cases rather than for the common benefit of all claimants. Deficient time entries were brought to the attention of the submitting attorney either to supplement the information or provide an explanation.

The RFC also evaluated the nature of the work reflected in time submissions, considering whether the work was performed by attorneys or non-attorney staff, the attorney's experience and seniority, the overall impact/benefit to the MDL, and when in the litigation the work was performed.

---

[7] These hours were excluded as they were first done as part of a state court proceeding.

[8] Block billing refers to time entries where the attorney or staff enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks. *Welch v. Metro Life Ins. Co.*, 480 F.3d 942, 945 n.2 (9th Cir 2007). In some instances, the time entries identified specific tasks but grouped both MDL and non-MDL related activities.

FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS

The RFC considered each firm's overall commitment to the MDL from inception to 2024, including each firm's financial and human resource commitment to the MDL proceedings. The RFC had detailed discussions about the nature of the work and the applicant firm's role as reflected in the time submissions. The RFC also had multiple conversations with each applicant about the proposed allocations.

In short, the RFC recognized that not all hours are created equal. Hours spent deposing critical fact witness or actively trying an MDL case were considered more valuable than hours on administrative tasks. Or as the Special Master noted, "Work performed on key factual and legal issues will likely be the best determiner of a firm's contribution to the advancement of the MDL." [Dkt. 17367 at 4]. In making this evaluation, the RFC relied not only on the time submissions but also their direct knowledge of which firms substantially contributed to the common benefit of this MDL. While the RFC analyzed the time entries, the dollar-specific allocations recommended by the RFC are not derived from the application of a mathematical formula, any more than they are based on the total number of qualified attorney hours. Rather, the proposed allocation is largely dependent on an analysis of the amount, nature, and significance of the work of each counsel and how it relates to the work of the other applicants.

### IV.    Proposed Common Benefit Allocations

### A.  Baum Hedlund Aristei & Goldman/Wisner Baum, LLP (WB)

The threshold question when considering WB's application is whether the timely submission of time records is a prerequisite for receiving compensation from the CBF.[9] WB admits in its application that it "did not contemporaneously submit hours for common benefit work pursuant to PTO 12," purportedly because the firm's focus was on "pushing the litigation forward," – not tracking its time. WB asserts that no one can dispute that the scope and quality of its work contributed

---

[9] The CB Order provides, "Absent extraordinary circumstances, only time records submitted in compliance with Pretrial Order No. 12 will be eligible for compensation." [Dkt. No. 17367 at 2].

FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS

to the CB of the MDL and, therefore, this should qualify as one of the "extraordinary circumstances" where strict compliance with PTO 12's timekeeping requirements should not preclude compensation from the CBF. The problem is that other leadership firms, with the same focus, submitted hours timely. WB was the exception. Even so, the RFC agrees that WB's contribution to the CB of the MDL is undeniable and does not take a position on whether WB's reason for not submitting contemporaneous time records constitutes "extraordinary circumstances."

The failure to submit time records could in and of itself preclude recovery by WB. *See In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 386 F. App'x 584, 585 (9th Cir. 2010) (finding court's decision to strike common benefit fees recommended by the Special Master was justified where the attorney failed to timely provide time records); *In re Volkswagen "Clean Diesel" Mktg.., Sales Pracs., & Prod. Liab. Litig.*, MDL 2672, 2017 WL 2438645 (N.D. Cal. June 6, 2017) (same). In the view of the RFC, however, a complete preclusion of a fee award to WB for failing to submit time records would be inequitable. *In re Juul Labs, Inc., Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 19-MD-02913, 2023 WL 8717495 at *1 (N.D. Cal. Dec. 18, 2023) (discounting a firm's award for noncompliance with the reporting requirements). But that is a decision for the Special Master and the Court to make.

The RFC recommends that WB receives a percentage of the CB fee, even in the absence of contemporaneous time records, albeit reduced. WB performed substantial work that provided a direct benefit to all plaintiffs in the MDL: it was one of few firms that coordinated with Co-Lead Counsel from the outset and undertook critical aspects of the litigation, such as (1) taking liability and expert depositions; (2) assisting in document review; (3) presenting written and oral arguments before the Court; and (4) setting litigation strategy. Nevertheless, its failure to provide any time records prevents the RFC, Special Master, and the Court from knowing what work was performed by WB in the MDL versus state court proceedings.

FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS

WB's application does provide an estimate of the total hours that each attorney worked. Courts have found that because a lodestar cross-check does not require mathematical precision, "courts may rely on summaries submitted by the attorneys and need not review actual billing records." *Abadilla v. Precigen, Inc*., No. 20-cv-06936, 2023 WL 7305053 at *14 (N.D. Cal. Nov. 6, 2023); *see also In re Ethicon Physiomesh Flexible Composite Hernia Mesh Prod. Liab. Litig*., No. 1:17-MD-02782, 2022 WL 17687425 at *12 (N.D. Ga. Nov. 14, 2022).

The estimated hours provided by WB in its Application, however, are dubious. By way of example, Mr. Wisner estimates that he personally worked 2,500 hours on MDL-related work in both 2018 and 2019. To reach 2,500 MDL-related hours, he would have had to work approximately twelve hours a day, five days a week, for fifty weeks of the year on MDL work alone,[10] an unlikely scenario considering that he was co-lead counsel for the California JCCP proceedings and for two multi-week state-court Roundup trials in 2018 and 2019. And while WB's application provides insight for their estimated time[11], it highlights the fundamental problem with not having time records; there is simply no way to properly evaluate the estimated WB hours. In sum, while the lack of WB time records limits the ability to test the reasonableness of a percentage award using a lodestar crosscheck, the RFC cannot ignore WB's contribution to this MDL. The more appropriate action would be to discount the percentage of CBF not exclude recovery altogether.

The RFC proposes that WB receive 10% of the CBF.

**B. Andrus Anderson LLP**

Andrus Anderson LLP ("AA") seeks compensation from the CBF primarily for the work of Lori Andrus (and other attorneys and staff at AA) in her role as Co-Liaison Counsel. Ms. Andrus identified the primary tasks that AA completed for the benefit of all plaintiffs in the MDL: (1) liaising

---

[10] Amanda Pilon, The Billable Hour: Critiques of the System and Two Potential Solutions, 15 U St. Thomas J.L. & Pub. Pol'y 852 (2022); The Truth About the Billable Hour, Yale L. Sch., https://law.yale.edu/sites/default/files/area/department/cdo/document/billable_hour.pdf

[11] WB apparently included time spent in state court cases as the work was "co-extensive" with the MDL.

FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS

with plaintiffs' attorneys with cases in the MDL; (2) fielding questions from MDL cases on the Court's orders, practices and procedures, and discovery; (3) assisting with research and briefing on MDL motion; (4) assisting Co-Lead Counsel on discovery matters; (5) preparing the Participating Case Lists for submission to the Court; and (6) communicating with pro se claimants.. In total, AA spent 989.3 hours on MDL-related tasks.

As Co-Liaison Counsel, Ms. Andrus and her colleagues served an important role in this MDL. That role, however, as evidenced in AA's time submissions, consisted primarily of administrative tasks. Indeed, this is consistent with the responsibilities that Ms. Andrus was appointed to fulfill in CMO 1.

In considering what percentage AA should receive for its work, the firm's role needs to be compared to other applicants. Comparatively, AA's work was not focused on the "key factual and legal issues" in the litigation; it did not retain or prepare expert witnesses, conduct extensive document review, or take or defend depositions (nor was it asked to). Instead, its litigation-related activities were focused on general matters that did not involve the complex legal and scientific aspects of the case. For these reasons, the application of Special Master Foster's criteria to AA is especially difficult. The tasks assigned to AA were not typically results-driven, yet the time and labor AA contributed on administrative tasks allowed leadership to primarily focus on litigating the cases. The RFC took these facts into consideration when evaluating the value of AA's work to this MDL.

Additionally, AA's contribution to the payment of litigation costs was significantly less than Co-Lead Counsel and members of the PEC. As such, AA's financial risk was minimal compared to the other applicants.

The RFC proposes that AA receive 1% of the common benefit funds.

FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS

### C. Lockridge Grindal Nauen PLLP

Lockridge Grindal Nauen PLLP ("LGN") seeks CB compensation primarily for work on behalf of MDL plaintiffs from December 2015 to November 2019.[12] Yvonne Flaherty, an attorney with LGN, was a member of the PEC and, in association with this role, contributed $450,000 for costs associated with MDL-related activities. LGN submitted a total of 924 hours of CB time. Of this time, 86% (798 hours) occurred before the first trial in the Roundup litigation. The risk to attorneys performing CB work in these early stages was significant as there was no guarantee of a positive outcome. Accordingly, the RFC placed more value on work completed prior to 2019.

The RFC assessed the value and quality of LGN's contribution to the overall litigation using the Special Master's criteria. As a PEC member, LGN participated in the early litigation strategy meetings regarding document platforms, expert witnesses, corporate witness depositions and overall coordination. The LGN attorneys assisted with privilege logs, document review, and some deposition preparation. But LGN was more passively involved than other common benefit firms. It was not primarily involved in arguing critical motions, nor did it take or defend depositions. By way of example, LGN submitted over 156 hours of common benefit time dedicated to the deposition of Monsanto's employee Susan Martino-Catt. These hours were for deposition *preparation* and document review. It did not take this deposition, nor did the deposition serve as a cornerstone of plaintiffs' case against Monsanto.

In summary, LGN as a member of the PEC provided direct assistance to Co-Lead Counsel in the early stages of the litigation, including preparation for the critical *Daubert* hearings. But its contributions to the common benefit was far less extensive than other common benefit attorneys.

The RFC proposes that LGN receive 2% of the common benefit funds.

---

[12] LGN did have 2 hours of common benefit time between July 16, 2022 and August 4, 2022.

FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS

### D.  Moore Law Group, PLLC

The Moore Law Group ("Moore Law") seeks a portion of the CBF as compensation for the firm's work in the *Hardeman* trial as well as "substantial work surrounding settlement negotiations for thousands of cancer victims including clients of multiple court-appointed leadership firms in the MDL." Moore Law submitted a total of 1,022.4 attorney hours for Jennifer Moore and 454.6 junior associate and paralegal hours in support of its CB application.

Jennifer Moore, together with Co-Lead Counsel Aimee Wagstaff, served as trial counsel in *Hardeman*. All but approximately 5 hours of Moore Law's total time submissions are related to *Hardeman* trial work performed between November 2018 and July 2019.[13]

There is no question that the *Hardeman* verdict was critical to the success of the litigation and greatly benefited all MDL plaintiffs. As the only bellwether trial in the MDL, the *Hardeman* trial proceedings served as a guidepost for future federal trials and resulted in substantial work product, including critical evidentiary and admissibility rulings from the Court. There was undoubtedly a "salutary rippling effect" that the *Hardeman* verdict had on the other MDL cases. *See In re Vioxx*, 802 F. Supp.2d at 773.

Application of the Special Master's criteria favor a common benefit award to Moore Law because (1) *Hardeman* resulted in an $80 million verdict; a defense verdict would have been detrimental to securing any reasonable settlement of MDL cases; (2) Monsanto mounted a robust defense and were represented by some of the best attorneys in the country; (3) obtaining a plaintiffs' verdict required trial skill and substantial preparation; (4) Moore Law dedicated a vast majority of its time to the *Hardeman* trial between November 2018 and March 2019; and (5) Moore Law's contribution in *Hardeman* unquestionably advanced this litigation.

---

[13] In allocating CB fees to trial counsel "it is important to determine when the trial occurred, whether the work was shared with other counsel, whether the work was helpful in other cases or just in that one case." *In re Vioxx Prod. Liab. Litig.*, 802 F. Supp. 2d 740, 773 (E.D. La. 2011).

The RFC considered Moore Law's CB work in context of *when* the work took place compared to other common benefit firms. Its involvement came after November 2018 when much of the pre-trial work was complete. Significantly, by this time, the critical documents/trial exhibits had been identified, the general fact and expert depositions were completed, expert witnesses were retained, the Court had denied Monsanto's *Daubert* motions, and the first Roundup NHL trial was completed in state court resulting in a substantial plaintiff's verdict.

While much of the game plan was already in place prior to Moore Law's involvement in the MDL proceedings, that plan needed modification as the court bifurcated causation and liability. The substantial hours required by Ms. Moore and Ms. Wagstaff during trial speaks to the myriad of complex legal, organizational, scientific, and factual issues to present the case to the jury. Moore Law's work dedicated to *Hardeman* was crucial to the advancement of this litigation, even if the overall scope of Moore Law's CB work was limited. After the post-trial motions were determined in *Hardeman*, Ms. Moore no longer participated in the MDL litigation.

Finally, because Moore Law was not a leadership firm, it did not pay any litigation assessments to help fund the general litigation costs. Thus, the financial risk faced by Moore Law was limited in comparison to other applicants.

The RFC recommends that Moore Law is allocated 6% of the common benefit fund.

**E.  Co-Lead Counsel**

The overwhelming majority of CB work was completed by the three firms appointed as Co-Lead Counsel: Weitz & Luxenberg, Andrus Wagstaff/Wagstaff Law Firm and the Miller Firm. These three firms alone accounted for more than 93% of the CB time for law firms submitting CB applications.[14]

Co-Lead Counsel took on the tasks for all plaintiffs to develop not only the law and evidence to prove general causation, but also the law and facts inherent to establish Monsanto's liability and

---

[14] This percentage does not account for any of the estimated time submitted by WB for the reasons cited above.

FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS

prove specific causation in *Hardeman* and other bellwether and trial cases. Co-Lead Counsel had to learn the complex and extensive science underlying these claims and to find experts in the scientific, regulatory, and clinical specialties required to educate, inform, and testify on behalf of all plaintiffs. These efforts were daunting, especially given the truncated deadlines, the small number of attorneys involved, and the few firms sharing in the financial burden.

Co-Lead Counsel's work resulted in a comprehensive trial package that provides all MDL counsel access to liability documents, discovery, evidentiary motions, deposition transcripts, deposition outlines, deposition summaries, deposition designations, trial theme summaries, strategy documents, briefing on motions, trial motions, and rulings and orders of the Court. The RFC cannot catalogue the myriad contributions of Co-Lead Counsel to the outcome of this litigation in the pages allotted but summarizes the highlights below.

### 1. Andrus Wagstaff, PC/ Wagstaff Law Firm (AW)

Andrus Wagstaff PC/Wagstaff Law Firm ("AW") has been at the center of the federal Roundup litigation since its inception. Since the beginning of the litigation, AW dedicated 16 attorneys and 11 paralegals to work on CB issues. From the inception of this MDL though 2022, Aimee Wagstaff and several of her colleagues spent nearly all of their professional time working on the Roundup litigation. AW submitted a total of 26,282.20 hours of CB work for consideration.

Prior to the formation of this MDL, AW successfully opposed Monsanto's motion to dismiss on preemption grounds in *Hardeman* resulting in a favorable order from this Court. AW was instrumental in retaining and preparing expert witnesses on behalf of all plaintiffs, including Dr. Ritz (epidemiology); Dr. Weisenburger (pathology); Dr. Jameson (toxicology/IARC); and Dr. Shustov (oncology – specific causation). AW spent thousands of hours working with these experts in preparing expert reports, deposition preparation, *Daubert* hearings and the *Hardeman* trial. Aimee Wagstaff was tasked with drafting and arguing crucial motions before the Court, including a central role in the *Daubert* hearings. She also engaged in hundreds of negotiations and discovery disputes

with Monsanto's counsel on a wide range of issues including deposition procedures, privilege logs and other discovery matters AW prepared for and took general liability depositions of key fact witnesses including Mark Martens, Matthew Ross, Stephen Adams, and Susan Martino-Catt.

Ms. Wagstaff was lead trial counsel in *Hardeman*. The importance of the Hardeman trial to the common benefit of all plaintiffs in the MDL was detailed in the section addressing Moore Law's Application, and while the factors apply to AW, they are weighted heavier toward AW because, unlike Moore Law, AW developed *Hardeman* from the outset, including the selection of *Hardeman* as a bellwether case, and absorbed 100% of the trial expenses and financial risk. AW handled the case-specific discovery in *Hardeman*, retained the *Hardeman* experts, and was primarily responsible for trial strategy, including the decision to retain Jennifer Moore to serve as co-lead trial counsel. AW partner, David Wool, was the lead author of the *Hardeman* appellate briefing and successfully argued the appeal before the Ninth Circuit Court of Appeals. In sum, AW took on all tasks critical to this litigation and their work resulted in defendants paying more than $10 billion to resolve Roundup claims.

The RFC recommends that Wagstaff Law receives 30% of the common benefit fund.

### 2. Weitz & Luxenberg

Weitz & Luxenberg (W&L) has been a leader in the Roundup litigation since the inception of this MDL. It filed the first Roundup case in federal court, and that complaint template has been employed by counsel across the country. Robin Greenwald was appointed Co-Lead Counsel and, during much of the past 7 years, dedicated nearly 100% of her time to the Roundup litigation. Other W&L attorneys have likewise devoted nearly all their time to the litigation since its inception. W&L submitted a total of 11,224.60 CB hours for consideration.

W&L was critical in developing the liability case against Monsanto from the ground floor. A report produced by Crivella West, the document vendor for plaintiffs, shows that W&L dedicated

more than 4,000 hours reviewing documents.[15] This work helped build the liability story that resulted in the substantial punitive damages award in *Hardeman* and other trials. W&L also prepared for and conducted key depositions of corporate witnesses, including James Guard, Todd Rands, Rick Reiss, and Ty Vaughn. Ms. Greenwald and other W&L attorneys negotiated and argued countless discovery disputes, including disputes on plaintiff fact sheets, privilege log challenges, confidentiality designations, and motions to compel.

W&L was also crucial in retaining expert witnesses that have defined the successes of the Roundup litigation. For example, W&L retained Dr. Portier and was primarily responsible for working with Dr. Portier in preparation for depositions and trial testimony. The breadth of W&L's knowledge and the time and money spent preparing the experts resulted in plaintiffs' passing defendants' *Daubert* challenges.

W&L's application notes that the firm incurred $3,553,360.11 in out-of-pocket costs exclusively for the CB of plaintiffs in this MDL. The Court addressed litigation costs in PTO 236. Specifically, in denying plaintiffs request to holdback .25% of each plaintiff's share of their gross recovery for the purpose of redistributing litigation costs, the Court reasoned that "it is not obvious why lead counsel's MDL clients, who are already no doubt being compensated more handsomely than the typical MDL plaintiff, need to be reimbursed for those litigation costs." Dkt. No. 13192, PTO 236 at 30. In light of this ruling, W&L is not entitled to recover all of its out-of-pocket costs.[16]

There are payments made by W&L, however, that require a more exacting review. Special Master Feinberg billed Co-Lead Counsel for administering the MDL settlement program. The RFC determined that W&L paid Special Master Feinberg a total of $1,988,927.77 ***after*** W&L resolved most of their Roundup cases and, thus, its clients did not participate in or benefit from the program.

---

[15] This does not account for the thousands of hours spent reviewing and analyzing critical liability documents outside of the Crivella West database.

[16] These costs are relevant to the analysis of whether the common benefit fee awarded to W&L is reasonable.

Similarly, Co-Lead Counsel became aware of a December 2020 opinion from the Southern District of Georgia where the Court granted Monsanto's motion for judgment on the pleadings, in part, finding that plaintiff's failure to warn claims were preempted under FIFRA. See *Carson v. Monsanto Company*, 508 F.Supp.3d 1369 (S.D. Ga. 2020).[17] The case was appealed to the Eleventh Circuit. The plaintiff's attorney in that case was a solo practitioner, did not represent any other Roundup clients, and had not previously handled appeals involving FIFRA preemption. Due to the threat of an adverse decision to MDL Plaintiffs, Co-Lead Counsel assisted Carson's counsel in retaining experienced appellate counsel, David Frederick of Kellogg Hansen Todd Figel & Frederick PLLC ("Kellogg Hansen"), to handle the appeal. W&L ultimately paid Kellogg Hansen $382,294.04 for their fees handling the *Carson* appeal. These payments were made ***after*** W&L entered into a settlement agreement and the firm was not reimbursed for these MDL payments.

Finally, W&L took a trial preservation deposition of Plaintiffs' expert Christopher Portier in 2022. This deposition was incorporated into this MDL for use by all MDL plaintiffs. The RFC determined that approximately two-thirds of the costs related to that deposition should be considered as MDL work product, but it was not reimbursed. This amounts to a total of $50,641.61.

The RFC submits that these payments should factor into the allocation determination. The payments to Special Master Feinberg and Kellogg Hansen essentially represent attorneys' fees for work conducted on behalf of all MDL plaintiffs. Such associated work and expenses are appropriate for consideration; for equitable reasons, expenses that cannot be reimbursed to CB counsel from their own claimants should be factored into the final CB fee determination.

For its contributions to the common benefit, and the value and quality of the work it performed, the RFC recommends that W&L receives 26.5% of the common benefit fund.

---

[17] The plaintiff in *Carson* alleged that his exposure to Roundup caused malignant fibrous histiocytoma. Because the case did not involve NHL it was not transferred to this MDL.

FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS

### 3.  The Miller Firm

The Miller Firm (TMF) filed its first case in federal court on November 5, 2015. Since that time, TMF has devoted enormous resources and manpower to the Roundup litigation. Michael Miller, the founding partner of TMF, dedicated nearly 100% of his time to Roundup matters from the time he was appointed Co-Lead Counsel until his untimely death in 2021.[18] Other Miller Firm attorneys also spent thousands of hours dedicated to common benefit work on behalf of all MDL Plaintiffs. In total, TMF submitted 10,795.85 CB hours for consideration.[19]

TMF was crucial to negotiating discovery protocols, identifying Monsanto's corporate representatives for document production, and negotiating search terms. In the early litigation stages, TMF played an essential role in building the liability case against Monsanto. It was TMF that located the majority of liability documents that were introduced at deposition and trial; and ultimately cited by this Court and the Ninth Circuit as supporting punitive damages.[20]

TMF took lead on most of the early depositions taken in the MDL. These depositions included Donna Farmer, William Heydens, Daniel Goldstein, John Acquavella, David Saltmiras, Hugh Grant, David Heering, Aaron Blair and Jess Rowland. It was through these early depositions that most of the critical liability documents were introduced into evidence.

TMF was heavily involved in scientific research and briefing; were primary liaisons in preparing experts for the *Daubert* hearings, assisted in the preparation of Plaintiffs' experts, and took

---

[18] TMF attorney David Dickens was appointed as Co-Lead Counsel following Mr. Miller's death.

[19] Many of TMF's time entries were considered overly vague by the RFC. These vague entries were generally related to entries for e-mail correspondence that only identified the recipient/sender. There were also multiple entries that provided block-billed hours for email correspondence. The vague entries totaled 177.6 hours. The RFC did not further reduce TMF's total time for the vague entries, however, because there was evidence that TMF underreported CB time on other MDL matters. Specifically, the document vendor, Crivella West, provided the RFC with a report showing the exact amount of time spent reviewing Roundup documents in the platform. The Crivella West report shows that one TMF attorney spent a total of 1,196 hours reviewing documents, however, the submitted time records only account for a total of 70.4 hours of document review for that attorney.

[20] Crivella West's report shows that TMF spent more than 3,760 hours reviewing liability documents -- TMF attorneys' Jeffrey Travers and David Dickens spent more time reviewing documents in the Crivella West platform than any other attorney in the litigation. The RFC weighs heavily the value of that review.

---

lead in the depositions of MDL causation experts: Dr. Mucci, Dr. Rider, and Dr. Pharoah (epidemiology), and Dr. Fleming (oncology). TMF attorneys learned the complex and extensive science underlying these claims and their expertise provided exceptional value to the litigation.[21]

TMF has also incurred millions of dollars in out-of-pocket costs exclusively for the common benefit of plaintiffs in this MDL. Like W&L, TMF made substantial payments to Special Master Feinberg and Kellogg Hansen after the settlement of their individual Roundup claims. TMF paid $1,571,344.53 to Special Master Feinberg for administering the MDL settlement program and $195,537.98 to David Frederick for his retention as appellate counsel. For the reasons cited above relating to W&L, these expenses should be factored into any allocation determination.

The RFC recommends that TMF receives 24.5% of the common benefit fund.

**V.      A Lodestar Cross-Check Confirms That the Recommended Payment Amounts are Reasonable.**

"Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award." *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1050 (9th Cir. 2002). To "determin[e] the amount of a reasonable fee" under the lodestar method, a court takes "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424,433 (1983).

When the lodestar is used only as a cross-check of a fee award based on a percentage of the common fund, "courts may do a rough calculation 'with a less exhaustive cataloging and review of counsel's hours." *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *16 (N.D. Cal. Aug. 17, 2018); *Senne v. Kansas City Royals Baseball Corp.*, No. 14-CV-00608 JCS, 2023 WL 2699972, at *15 (N.D. Cal. Mar. 29, 2023). Under the percentage of fund

---

[21] The RFC submits that no other attorney involved in the Roundup litigation has a more thorough understanding of the science and liability documents than TMF's attorney Jeffrey Travers. Co-Lead Counsel and the PEC often relied on Mr. Travers' extensive knowledge of the case in preparing for hearings, depositions and other litigation matters.

FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS

method, "the focus is not on the attorneys' billing records, but on whether the percentage awarded and the resulting fee are reasonable under the circumstances of the case." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. 1486, 2013 WL 12387371, at *11 (N.D. Cal. Nov. 5, 2013).

To undergo the lodestar cross-check, the RFC was first required to determine a reasonable hourly rate to apply to approved time entries. It undertook a thorough review of rates approved by courts in this district as well as similar MDLs. For the purposes of a cross-check, courts typically adopt a blended hourly rate to be applied for all hours billed. In approving a recent class action, this Court held that a blended rate of $609 per hour was reasonable. *In re: Facebook, Inc. Consumer Privacy User Profile Litigation*, Case No. 3:18-MD-028843-VC, 2023 WL 8445812 at *2 (N.D. Cal. Oct. 10, 2023). The court determined that this blended rate was "somewhat below the mean and median rates for class actions in this District" based on empirical research of Professor William Rubenstein.[22] Indeed, courts in this District have routinely approved hourly rates between $650 and $1,200 for partners and $400 to $675 for associates. See *In re Lyft Inc. Sec. Litig.*, No. 19-CV-02690-HSG, 2023 WL 5068504, at *12 (N.D. Cal. Aug. 7, 2023)(finding rates between $900 to $1,200 for partners, $375 to $605 for associates, and $250 to $300 for paralegals "is in line with prevailing rates in this district for personnel of comparable experience, skill, and reputation."); *Chang v. Wells Fargo Bank, N.A.*, No. 19-CV-01973-HSG, 2023 WL 6961555, at *8 (N.D. Cal. Oct. 19, 2023)(approving billing rates of $825 to $1275 for partners, $550 to $700 for associates and $325 for paralegals).

Accordingly, the RFC used an hourly rate of $609 in calculating the lodestar cross-check. The RFC estimated the total recovery to be received by each firm under the proposed percentage allocation and compared that to each firm's lodestar. For each of the applicants, except the Moore

---

[22] The RFC reviewed Professor Rubenstein's Declaration submitted in the *In re Facebook* litigation in determining an appropriate hourly rate to be applied in this case. *In re Facebook*, Case No. 3:18-md-028430VC; ECF No. 1140-6, filed June 21, 2023.

Law Group who is almost 2x loadstar, this resulted in a negative lodestar multiplier.[23] This alone "is virtually sufficient to satisfy the cross-check requirement." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. 1486, 2013 WL 12387371 at *12 (N.D. Cal. Nov. 5, 2013); *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at *16 (N.D. Cal. Nov. 26, 2007) (finding that a negative multiplier suggests that "the requested percentage[-]based fee is fair and reasonable").

**VI.      Allocation Adjustments if the Court Excludes Wisner Baum for Failing to Properly Submit Time Records**

As stated above, the RFC recommends that WB receive 10% of the common benefit fund. If the Court determines that WB's failure to comply with the reporting and record-keeping requirements of PTO 12 disqualifies it from receiving common benefit compensation, the RFC recommends that each of the other applicants receive a pro rata share of the amount recommended to WB.

**VII.     Consideration of Whether Common Benefit Applicants Have Already Received Ample Compensation Through Recovery of Legal Fees**

The Special Master's Common Benefit Order provides:

As explained in Pretrial Order No. 236, while several attorneys stepped up and performed common benefit work in this MDL, . . . it may be the case that the attorneys who performed common benefit work have already received ample compensation from the recovery of their own clients' cases and that disbursement of additional compensation through the common benefit fund may not be warranted. To the extent attorneys who performed common benefit work in this MDL seek disbursements of common benefit funds, it will likely be appropriate for their applications to address why they should receive additional compensation beyond that which they have received from resolution of their MDL cases.

The RFC recommends a CB fee allocation regardless of the amount each applicant received from the settlement of its own clients' cases. The CB firms were undoubtedly compensated through

---

[23] The RFC used the total submitted time for each firm in calculating the lodestar. Co-Lead Counsel would still have a negative lodestar even if the time submissions were discounted by 10% due to discrepancies.

FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS

those contingency fees.[24] But it is not appropriate to only consider the lead attorneys success, in hindsight, without also taking into account the considerable risk of funding and litigating the case. The opportunity costs and time limitations imposed by this MDL were onerous and potentially devastating to firms that shouldered the burden of litigation. The time and effort necessary to develop this litigation required counsel to forego their involvement in other cases and potential fees that could be achieved in those litigations. *See In re Xarelto Prod. Liab. Litig*., Case No., MDL No. 2592, 2020 WL 1433923 at (E.D. La. Mar. 24, 2020)(finding that 12% common benefit fee was justified, in part, because common benefit counsel was forced to forego other cases and potential fees to focus on the MDL); *In re Ethicon Physiomesh Flexible Composite Hernia Mesh Prod. Liab. Litig.*, No. 1:17-md-02782-RWS, 2022 WL 17687425 at *9 (N.D. Ga. Nov. 14, 2022).

One cannot argue that because lead counsel recovered more in fees from their own individual case settlements they should not receive a CB allocation without recognizing that lead counsel also risked losing millions of dollars. While some cases result in high attorney fees, those fees mitigate losses incurred in other litigations and provide capital to ensure that the firm can continue to open the doors of the courthouse to future clients injured by corporate misdeeds.

The Eleventh Circuit recently rejected arguments that lead counsel should not recover common benefit fees where they "have already been heavily compensated for their common benefit work." *Amorin v. Taishan Gypsum Co*., 861 F. App'x 730, 733 (11th Cir. 2021). The Eleventh Circuit noted that the CB doctrine is rooted in quasi-contractual principles of unjust enrichment which operate independent of the contingency fees received by clients of common benefit counsel and preventing appointed counsel from recovering common benefit awards "would make it harder for courts to find capable and competent lawyers to take on work in the future." *Amorin v. Taishan Gypsum Co*., 861 F. App'x 730, 735 (11th Cir. 2021); *In re Diet Drugs*, 582 F. 3d 524, 543-44 (3d

---

[24] As evidenced by the contributions to the CBF, common benefit counsel will not be "buying islands" from the fees recovered in this MDL. See PTO 236 at 26-27.

FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS

Cir. 2009)(finding that the "potentially billions of dollars in fees" to be received by Class Counsel is irrelevant to a common benefit fee award).

It would be unprecedented for the Court to compare settlement agreements among firms as a basis for determining a CB fee. There would be no effective means to compare individual settlement agreements due to the confidentiality of the terms. Even if a comparison could be made, there is no simple answer to the question of whether CB counsel received "significantly more for their clients." Would this measure be based on total gross settlement value, per-case average settlement, or individual settlement amounts based on similar factual scenarios? CB counsel may have received a higher average settlement amount because they retained stronger cases but the settlement amount for weaker cases were consistent with what was recovered by attorneys who did not take an active role in this MDL. Some non-leadership firms may have received more in total attorneys' fees than CB firms due to the number of plaintiffs they represented even if the average settlement value per claimant was lower. Neither the RFC nor the Court should engage in these side-by-side comparisons.

The CB allocation in this case is limited to attorneys' fees. No individual MDL *plaintiff* is required to pay any portion of her/his settlement to pay CB counsel. This is important in analyzing whether a CB disbursement is warranted. An attorney who settles a case without ever issuing discovery, reviewing documents, taking depositions, or retaining expert witness is only able to settle a case (and receive a fee) because of the benefit conferred upon their clients by MDL counsel. In other words, there would be no fee if leadership counsel was not successful.[25]

The lodestar cross-check is relevant to the question of whether CB counsel should receive fees beyond that received from their individual MDL clients. The RFC was not provided with details regarding the total contingency payments received by each firm from their clients. The RFC expects, however, that even if those amounts were added to the CB distributions recommended for each

---

[25] Notably, if a case was settled through Special Master Feinberg's mediation program, it was Co-Lead Counsel that paid the mediator's expenses even though they did not represent the plaintiff.

FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS

applicant, the total compensation received by CB counsel would be on par with, and in most cases below, lodestar multipliers routinely approved by courts in similar size cases.

This Court in *In re Facebook* cites Professor Rubenstein's Declaration in noting that a multiplier of 1.99 is below average in settlements of comparable size. *In re Facebook*, 2023 WL 8445812 at *2. The empirical data compiled by Professor Rubenstein and relied on by the Court shows that in larger settlement cases (between $44.6 million and $175.5 million) the average lodestar multiplier was between 2.39 and 4.5. Rubenstein Declaration at ¶¶ 42-43. See also *In re Syngenta AG Mir 162 Corn Litig.*, No. 14-MD-2591, 2019 WL 1278413 at *3 (D. Kan. Mar. 20, 2019)(awarding lead counsel a multiplier of 3.14); *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 07-MD-01871, 2012 WL 6923367 at *10 (E.D. Pa. Oct. 19, 2012)(collecting cases and concluding a multiplier of roughly 3.4 is either below or near the average multiplier in mega-fund cases).

"A contingent fee must be higher than a fee for the same legal services paid as they are performed." *Ketchum v. Moses*, 24 Cal.4th 1122, 1132, 17 P.3d 735, 742 (Cal. 2001). "This mirrors the established practice in the private legal market of rewarding attorneys for taking the risk of nonpayment by paying them a premium over their normal hourly rates for winning contingency cases." *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1051 (9th Cir. 2002). The risk of nonpayment was substantially higher for the common benefit attorneys. The time submissions in support of common benefit applications do not account for the thousands of hours spent by each of the firms on their own individual cases in the MDL. If those hours are factored into the fee calculation, the fees received by plaintiffs' leadership from their own individual clients' settlement awards would not result in a "windfall" or ample compensation, it would amount to something more akin to a straight lodestar award. The common benefit recovery properly accounts for the risk of nonpayment and transfers a portion of fees to those that undertook the greater risk.  In this case, the common benefit attorneys.

## VIII.   Conclusion

For the reasons detailed above, the RFC proposes that the following percentages be allocated to common benefit counsel for their work on behalf of all plaintiffs in the MDL:

| Applicant | Percent of the Common Benefit Fund |
|---|---|
| Andrus Anderson: | 1% |
| Lockridge Grindal Nauen: | 2% |
| Moore Law Group | 6% |
| Wisner Baum | 10% |
| Wagstaff Law Firm: | 30% |
| Weitz & Luxenberg: | 26.5% |
| The Miller Firm | 24.5% |

Respectfully submitted,

/s/ Robin Greenwald
Robin Greenwald
rgreenwald@weitzlux.com
Weitz & Luxenberg, PC
700 Broadway
New York, NY 10003

/s/ Aimee Wagstaff
Aimee Wagstaff
awagstaff@wagstafflawfirm.com
Wagstaff Law Firm
940 Lincoln Sreet
Denver, CO 80203

/s/ David Dickens
David Dickens
ddickens@millerfirmllc.com
The Miller Firm LLC
108 Railroad Ave
Orange, VA 22960

*Co-Lead Counsel and Roundup Common Benefit Fee Committee*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of January 2024, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

_____/s/_____Robin Greenwald_____

FEE COMMITTEE'S PROPOSED ALLOCATION OF COMMON BENEFIT FUNDS