# Exhibit 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCT LIABILITY LITIGATION | MDL No. 2741<br>Case No. 3:16-md-02741-VC |
| REBECCA DIETRICH f/k/a REBECCA GEBO, as the Personal Representative of THE ESTATE OF RONALD GEBO, deceased,<br><br>    Plaintiff,<br><br>v.<br><br>Monsanto Company,<br><br>    Defendant. | Case No. 3:17-cv-00168-VC<br><br><br>JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

The Plaintiff, REBECCA DIETRICH f/k/a REBECCA GEBO, as the Personal Representative of the ESTATE OF RONALD GEBO, deceased (hereinafter "Mrs. Dietrich"), sues the Defendant, MONSANTO COMPANY (hereinafter "Monsanto"), and alleges the following:

## NATURE OF THE CASE

1.      This is a survival action pursuant to Section 46.021, *Florida Statutes*, or in the alternative, a wrongful death action brought pursuant to Section 768.16 through 768.26, *Florida Statutes*, in relation to the death of Ronald Gebo, deceased, as a direct and proximate result of Monsanto's negligent, willful, reckless and wrongful conduct in connection with the design, development, manufacture, failure to test, packaging, promotion, marketing, advertising, distribution, labeling, and/or sale of glyphosate-based herbicides, primarily but not exclusively,

1

Roundup®, which, as used throughout refers to all formulations of Roundup® products and all of Defendant's glyphosate-based herbicides.[1]

2.      Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.      Plaintiff and Decedent Ronald Gebo's injuries and/or death, like the injuries and/or deaths striking thousands of similarly situated victims across the country, was avoidable.

## JURISDICITON AND VENUE

4.      Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiff is a citizen of Florida, a different state than the Defendant's states of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      This Court has personal jurisdiction over Monsanto because Monsanto knows or should have known that its Roundup® products are sold throughout the State of Florida, and, more specifically, caused Roundup® to be sold to Decedent and/or Decedent's employers in the State of Florida.

---

[1] Roundup® refers to all formulations of Defendant's Roundup® products, including but not limited to Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fender and Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Pro Dry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Preventer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Weed & Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use 1, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

6.     In addition, Monsanto maintains sufficient contacts with the State of Florida such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

7.     Venue is proper within this District under 28 U.S.C. § 1391(b)(2) because Decedent lived in and was diagnosed in this District. Further, Monsanto, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

8.     Venue is proper within the United States District Court, Middle District of Florida, Fort Myers Division, pursuant to 28 U.S.C. § 1391, in that Monsanto conducts business in Port Charlotte, Charlotte County, Florida, and is subject to personal jurisdiction in the district. Furthermore, Monsanto sells, markets, and/or distributes Roundup® within the Middle District of Florida, including within Port Charlotte, Charlotte County, Florida. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within the Middle District of Florida.

## THE PARTIES

### Plaintiff Rebecca Dietrich f/k/a Rebecca Gebo as the Personal Representative of the Estate of Ronald Gebo

9.     Mrs. Dietrich f/k/a Rebecca Gebo is the duly appointed Personal Representative of the Estate of Ronald Gebo, deceased.

10.    Plaintiff brings this survival action for injuries until the date of Decedent Ronald Gebo's death on June 21, 2020, or alternatively this action for the wrongful death of Decedent Ronald Gebo, sustained by exposure to Roundup® containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, Decedent Ronald Gebo developed Non-Hodgkin Lymphoma ("NHL").

3

*Defendant Monsanto Company*

11.     Monsanto is a Delaware corporation, with a principal place of business in St. Louis, Missouri.

12.     Monsanto advertises and sells goods, specifically Roundup®, in the State of Florida, and in Port Charlotte, Charlotte County in particular.

13.     Monsanto transacted and conducted business within the State of Florida, and within Port Charlotte, Charlotte County in particular, that relates to the allegations in this *Complaint*.

14.     Monsanto derived substantial revenue from goods and products used in the State of Florida, and in Port Charlotte, Charlotte County, in particular.

15.     Monsanto expected or should have expected its acts to have consequences within the State of Florida, and in particular, in Port Charlotte, Charlotte County, and derived substantial revenue from interstate commerce.

16.     Monsanto engaged in the business of designing, developing, manufacturing, failure to test, packaging, promotion, marketing, advertising, distributing, labeling, and/or selling of glyphosate-based herbicides, primarily, but not exclusively Roundup®.

17.     Monsanto is authorized to do business in the State of Florida,  did and does derive substantial income from doing business in the State of Florida, including in Port Charlotte, Charlotte County, Florida.

18.     Upon information and belief, Monsanto purposefully availed itself of the privilege of conducting activities with the State of Florida, thus invoking the benefits and protections of its laws.

4

19.     Upon information and belief, Monsanto did design, sell, advertise, manufacture, and/or distribute Roundup®, with full knowledge of its dangerous and defective nature.

20.     In 2018, Bayer, a multinational pharmaceutical and chemical company, acquired Monsanto for $63 billion.

## FACTS AND ALLEGATIONS COMMON TO ALL COUNTS

21.     In 1970, Monsanto discovered the herbicidal properties of glyphosate. It subsequently began to design, research, manufacture, sell and distribute glyphosate-based herbicides, including, but not exclusively, under the name Roundup®.

22.     Glyphosate-based herbicides, such as Roundup®, are broad-spectrum, non-selective herbicides used in a wide variety of settings around the world, including agricultural, landscaping, public maintenance, and residential uses.

23.     "Non-selective" herbicides kill plants indiscriminately. Glyphosate works by inhibiting a plant enzyme, 5-enolpyruvyshikimate-3-phosphate synthase, thereby interfering with the "shikimic pathway", resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

24.     Roundup® sprayed on plants is absorbed through their leaves and translocates throughout the plant where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling crops on which it had been sprayed or by milling, baking, or brewing grains.

25.     In addition to glyphosate, to be efficacious, Roundup® contains a surfactant, POEA, which both facilitates glyphosate's absorption into the plant and has herbicidal properties of its own, as well as other adjuvants.

26.     When used in its intended and/or a reasonably foreseeable manner, Roundup®
aerosolizes and contaminates the ambient air.

27.     Each year, approximately 280 million pounds of glyphosate-based products are
sprayed on crops, commercial nurseries, lawns, parks, and golf courses. This usage has been driven
largely by and is inextricably intertwined with the proliferation of genetically engineered
glyphosate-resistant crops beginning in the mid-1990s.

28.     As of 2009, Monsanto was the world's leading producer of seeds, accounting for
27% of the world seed market.[2] The majority of these seeds are "Roundup® Ready" glyphosate-
resistant seeds. Defendant was and is directly involved in the development, design, manufacture,
marketing, sale, and/or distribution of genetically modified organism (GMO) crops, many of which
are "Roundup® Ready." The stated advantage of Roundup® Ready crops is that they allow
Roundup®/glyphosate to be sprayed on and over crops in the fields during the growing season
without harming the crops. In 2010, an estimated 70% of corn and cotton and 90% of soybean
fields in the United States used Roundup® Ready seeds.[3] Monsanto had been and is currently able
to secure its dominant market position in the glyphosate-based herbicide market through a
marketing strategy that couples proprietary Roundup® Ready seeds with continued sales of
Roundup®.

29.     Monsanto introduced and first marketed Roundup® in 1974. Today, glyphosate-
based herbicides products are among the world's most widely used herbicides. Monsanto's
glyphosate-based herbicides are registered in 130 countries and are used on over 100 different

---

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at*
http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.
[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010,
*available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

crops.[4] Glyphosate is, thereby, ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.[5] It has been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

30.     On March 20, 2015, the International Agency for Research on Cancer (IARC), an agency of the World Health Organization (WHO), issued an evaluation of several herbicides, including glyphosate, classifying glyphosate as a "probable human carcinogen." That evaluation was based, in part, on epidemiological studies of human exposures to glyphosate in several countries around the world and also included reviews of animal studies and cellular studies.

31.     On July 29, 2015, IARC issued its formal "monograph" related to glyphosate. In that monograph, the IARC Working Group provided a thorough review of the numerous studies and data relating to glyphosate, including glyphosate exposure in humans and classified glyphosate as a Group 2A carcinogen, which means that it is ***probably carcinogenic to humans***.

32.     The IARC Working Group concluded that the cancers most associated with glyphosate exposure are NHLs and other hematopoietic cancers, including lymphocytic

---

[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.
[5] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.
[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.
[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.
[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

lymphoma/chronic lymphocytic leukemia, and B-cell lymphoma.[9]

33.     The IARC evaluation is significant to public health as it confirms that glyphosate is a probable human carcinogen.

34.     Nevertheless, Monsanto, since it began selling Roundup® in 1974, and even after the IARC monograph, has represented that its Roundup® products are safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to U.S. consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

35.     Despite IARC's classification of glyphosate as a Class 2A probable carcinogen, Defendant continues to withhold that information from consumers and continues to represent and maintain that glyphosate and/or Roundup® is safe, non-carcinogenic, non-genotoxic, and falsely warrants to consumers that objective scientists and regulatory agencies agree that there is an absence of evidence establishing carcinogenicity or genotoxicity of glyphosate and Roundup®.

36.     Defendant's misrepresentations are consistent with Defendant's insouciant approach to ensuring the safety of its products, the safety and well-being of the general public and the safety of Decedent, despite its public pledge that the safety of its products is its highest priority.

37.     For nearly 50 years, consumers across the world have used Roundup® without being warned of the dangers of its use. That is because, since Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill weeds without causing harm to people or to the environment. Scientific evidence has revealed this to be patently false.

38.     Monsanto has repeatedly, for decades, claimed, advertised, and marketed Roundup® as being harmless to the public. To support these false claims, Monsanto has acted

---

[9] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

negligently, willfully and recklessly, including through actions such as seeding the scientific literature with ghostwritten publications and repeatedly and consistently attacking legitimate studies that reveal Roundup®'s dangerous properties. Monsanto has conducted an extensive and targeted campaign of misinformation to convince government agencies, users of Roundup® and the general population that Roundup® is safe.

*Registration of Herbicides Under Federal Law*

39.     The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA or Act), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency (EPA or Agency) prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

40.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA, as part of the registration process, requires, among other things, the manufacturer to conduct a variety of tests to evaluate the potential risks from exposure, including toxicity to people and other potential non-target organisms, and other adverse effects on the environment. EPA does not require a human health study because testing a pesticide on a human being to determine its toxicity would be unethical.

41.     Registration by the EPA is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

42.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and

environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted, or a pesticide allowed to continue to be sold in commerce once its dangers become suspected or known.

43.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States in 1974.

44.     FIFRA requires the registrant, Monsanto in the case of Roundup®, to conduct health and safety testing of pesticides, primarily of the supposed "active" ingredient, on rodents. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. Each registrant must submit to the EPA for review and evaluation all data generated from testing. Data and information obtained after registration involving the safety of an already registered herbicide, must be provided, under FIFRA, by the registrant to the EPA. The government is not required to and does not perform its own tests on pesticides/herbicides. At all times, such obligation is the registrant's, here Monsanto.

45.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time.

46.     In 1974, when Roundup® was first approved for registration by the EPA, EPA's decision was premised upon rodent studies of glyphosate. Monsanto hired a testing laboratory called Industrial Bio-Test Laboratories (IBT) to conduct the required animal oncogenicity studies. Oncogenicity studies required for herbicide registration are long-term (usually 18-24 month) feeding studies conducted on two different animal species (normally mice and rats). These studies assess the development of both malignant and non-malignant tumors (considered as precursors to

10

malignant tumors) in control groups compared to groups fed low, medium and high doses of the herbicide under study. An herbicide, including Roundup®, could not be registered without such valid oncogenicity studies.

47.     In 1976, the U.S. Food and Drug Administration (FDA) inspected IBT and revealed discrepancies between the raw data and the final reports relating to the toxicological impacts of pesticides and other chemicals it had studied. This included the studies IBT had performed for Monsanto on glyphosate. The EPA subsequently audited IBT and determined that many of the toxicology studies conducted for Monsanto on glyphosate and/or the Roundup® were invalid.[10]

48.     An EPA reviewer stated, as to IBT's testing generally, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[11]

49.     Several IBT executives and personnel were indicted and convicted in 1983 for their fraudulent laboratory practices. One of those convicted was toxicologist Paul Wright. Mr. Wright was Monsanto's chief toxicologist at the time Monsanto hired IBT to conduct the studies on glyphosate, and he left Monsanto to work at IBT shortly thereafter. Mr. Wright was at IBT while IBT performed the glyphosate studies, and returned to Monsanto soon after. Although Mr. Wright did not work at or for Monsanto at the time, Monsanto paid for Mr. Wright's legal defense in connection with his indictment, prosecution, and conviction for fraud for his activities while

---

[10] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.
[11] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

employed at IBT.

50.      In 1978, EPA informed Monsanto that many studies on glyphosate conducted by IBT on behalf of Monsanto, including both of the required long-term oncogenicity studies, were invalid and that IBT had committed rampant fraud. EPA also informed Monsanto that Monsanto was required to repeat those, and other, studies immediately because of the fraudulent test results. As a result, as of 1978, Monsanto knew that Roundup®'s registration had been based on invalid cancer studies and that there were no valid cancer studies to support Roundup®'s registration or to represent to the public that it was safe.

51.      Monsanto had several options upon learning that its glyphosate cancer studies were invalid, including voluntarily suspending the sale Roundup® until such studies were completed and the EPA had an opportunity to evaluate the results, or warning consumers that there were no valid cancer studies for glyphosate. Instead, Monsanto continued to sell Roundup® without cancer warnings of any kind, despite the fact that, by that point, Monsanto was marketing Roundup® in 115 countries.

52.      At that time, the EPA could not suspend Roundup®'s registration because it would have had the burden to demonstrate that Roundup® was not safe – an impossible task, given Monsanto's invalid testing and the fact that EPA does not test manufacturers' products.

53.      In 1981, Monsanto finally completed the first required, repeat oncogenicity study on rats. In 1983, Monsanto finally completed the required repeat oncogenicity study on mice.

54.      At no time between 1978 through 1983 did Monsanto suspend Roundup® sales and remove it from the market until such studies were completed. Nor did Monsanto ever inform customers, such as Decedent, via requesting label changes, press releases, advertisements, or any other means, that there were no valid cancer studies supporting Roundup®'s purported safety.

55.     These continued failures to disclose and warn demonstrate Monsanto's reckless indifference to the health and safety of their customers and the general public.

56.     In 1985, the EPA classified glyphosate as *possibly carcinogenic to humans* (Group C) based on the required repeat oncogenicity study on mice, which showed a statistically significant increase of renal tumors in mice. This classification would have had a devastating effect on Roundup®'s sales because it could classify Roundup® as a "restricted use" pesticide (requiring certification to apply Roundup®), require a warning on the Roundup® label, and/or prohibit Roundup®'s use on food crops under the "Delaney Clause" of the Food, Drug and Cosmetics Act.

57.     Monsanto was well aware of these consequences and immediately strategized how to fight that EPA classification.

58.     After substantial pressure on and a lengthy battle with EPA, Monsanto convinced EPA to find the mouse study "equivocal" and, in 1986, required Monsanto to conduct another oncogenicity study on mice.

59.     At the same time in 1986, the EPA also required Monsanto to conduct a second repeat rat oncogenicity study as Monsanto's first repeat rat oncogenicity study had used woefully low glyphosate doses, making the study meaningless to evaluate glyphosate's cancerous potential. Despite these required repeat-studies, at no point during this time did Monsanto pull Roundup® from the market or warn consumers of its risks.

60.     Monsanto refused to conduct the second repeat mouse oncogenicity study on glyphosate and, to date, Defendant has not conducted such a study.

61.     Thus, from the time of its initial registration in 1974 through 1986, Roundup® was not supported by acceptable oncogenicity studies.

62.     Once again, Monsanto did not inform customers and the general public of the truth

13

that Roundup®'s purported safety was not supported by valid, adequate cancer studies. These failures demonstrate Defendant's reckless indifference to the health and safety of their customers, the general public, and Plaintiff.

63.     In 1986, the EPA also required Monsanto to place certain worker safety protection instructions and information on its Roundup® labels.

64.     Monsanto refused to label Roundup® with the worker safety protection information sought by the EPA.

65.     In 1985, the United Nations Food and Agricultural Organization (FAO) promulgated an international pesticide industry standard of conduct that the U.S. pesticide industry association and Monsanto adopted. The FAO periodically amended this international code of conduct with the cooperation of the pesticide industry, including Monsanto. This voluntary industry code of conduct was another standard, in addition to the FIFRA statutory regulatory requirements, by which Monsanto agreed to be bound and by which Monsanto's conduct is to be measured. Monsanto repeatedly violated the FAO standard of conduct.

66.     A third standard which Monsanto was required to abide by and by which its conduct is to be measured is its own public pledge that the safety of its products was its highest priority. As the evidence above and below demonstrates, Monsanto routinely violated and continues to violate that pledge.

67.     In the mid-1980s, Monsanto used the profits from its Roundup® sales to fund biotechnical research, which bore fruit a decade later with the development of genetically modified seeds resistant to glyphosate and Roundup®. The sale and use of such seeds dramatically increased the use of Roundup® and the amount of Roundup® sprayed in the U.S. and worldwide agricultural communities. Again, the development of these seeds allowed Roundup® users to spray Roundup®

14

directly on the crops to kill the weeds without also killing the crops. All the while, Monsanto never informed customers or the general public about the absence of valid cancer studies.

68.     In 1991, based primarily on the second required repeat rat oncogenicity study on glyphosate, the EPA eventually changed its glyphosate classification to *evidence of non-carcinogenicity in humans* (Group E). In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

69.     In a second incident of pesticide testing data falsification, in 1991, Monsanto hired Craven Laboratories to perform herbicide studies, including for glyphosate. That same year, the Craven Laboratories' owner and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in pesticides and herbicides testing.[13]

### *Roundup®'s Importance to Monsanto's Market Dominance and Profits*

70.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division outperformed its chemicals division's operating income, and that gap increased yearly. With its patent for glyphosate expiring in the United States in 2000, Monsanto needed a strategy to maintain its Roundup® market dominance.

71.     In response, Monsanto, as noted above, completed the development of and began sales of genetically engineered Roundup® Ready seeds in 1996. Since Roundup® Ready crops are

---

[12]   U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.
[13]   Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

resistant to glyphosate, farmers can spray Roundup® onto their fields and over their crops during the growing season without harming the crops. This allowed Monsanto to further expand its market for Roundup®. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup® Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup® Ready seeds with continued sales of Roundup®.

72.     Through a three-pronged strategy of increasing production, decreasing prices, and selling Roundup® Ready seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[14] Today, Roundup® remains one of the world's largest herbicides by sales volume.

### *Monsanto Has for Decades Falsely Advertised Roundup®'s Safety*

73.     In 1996, the New York Attorney General (NYAG) filed a lawsuit against Monsanto for its false and misleading advertising of Roundup®. Specifically, the lawsuit challenged Monsanto's general representations that Roundup® was "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations that the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

> a) "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences . . ."

---

[14] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

b) "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

c) "Roundup® biodegrades into naturally occurring elements."

d) "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

g) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

h) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

i) "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[15]

74.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance

with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing

or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

---

[15] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

17

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

75.     Monsanto did not alter its advertising in the same manner in any state other than New York. Monsanto has not changed its marketing and advertisements to the present day.

76.     What is more, Monsanto did not even stop their misleading advertising in New York. In June 2023, the NYAG announced that Bayer (Monsanto's parent company) will pay $6.9 million for falsely advertising in New York that Roundup® is safe and non-toxic.

77.     Another example of such false advertising occurred in France. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised Roundup® as "biodegradable" and that it "left the soil clean."[16]

78.     Defendant continues to falsely and misleadingly represent that glyphosate works on an enzyme found in plants but not in humans.

79.     Defendant continues to falsely and misleadingly promote Roundup®'s purported safety in violation of FIFRA, the FAO code of conduct, and its own self-imposed safety standard, including by comparing Roundup®'s safety to that of other common household products such as

---

[16] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

chocolate, apple cider vinegar, and coffee. Such conduct evidences Monsanto's reckless indifference to the health and safety of its customers and the general public.

### *Monsanto Deliberately Withheld Its Own Negative Genotoxicity Findings from the EPA, Violating FIFRA's Requirements*

80.     Starting in the early 1990s, peer-reviewed published scientific studies demonstrating that glyphosate and Roundup® were genotoxic – *i.e.*, capable of causing DNA damage – began proliferating.

81.     In response, Monsanto hired genotoxicologist Dr. James Parry, who it considered to be world-renowned, to review those studies, evaluate glyphosate's and Roundup®'s potentials for genotoxicity, and make safety recommendations.

82.     Dr. Parry provided Monsanto with a report that concluded that the studies provide evidence that glyphosate is capable of "producing genotoxicity."

83.     Dr. Parry also recommended to Monsanto that it conduct genotoxicity studies on glyphosate and Roundup®. Monsanto subsequently fired Dr. Parry, and Defendant never conducted the studies he recommended.

84.     FIFRA required Monsanto to provide EPA with Dr. Parry's reports. Monsanto never did so. Nor did Defendant conduct the testing Dr. Parry recommended. Such conduct evidences Defendant's reckless indifference to the health and safety of its customers and the general public and their breach of duty.

### *Monsanto Commits Academic Fraud in "Ghostwriting" Articles Touting Glyphosate's and Roundup®'s Safety*

85.     Beginning in the late-1990s, Monsanto formulated a plan to develop positive public relations material regarding glyphosate and Roundup® by ghostwriting favorable articles.

86.     Ghostwriting is when a company with a financial interest in a study, like Monsanto,

writes a favorable manuscript (or portion of a manuscript) about one of its products to be submitted for publication, and then finds individuals to read the manuscript and agree to be listed as authors without any attribution that the real author is actually the company. This practice is unequivocally unethical.

87.    Monsanto ghostwrote a comprehensive assessment of the human health aspects of glyphosate/Roundup® in a 2000 publication called "Safety evaluation and risk assessment of the herbicide Roundup® and its active ingredient, glyphosate, for humans" by Williams, Kroes, and Munro. Monsanto formulated the public relations plan to ghostwrite this article years earlier and the "Acknowledgment" of the article (written by Monsanto) does not inform the reader that Monsanto wrote it in whole or in part.

88.    After the article's publication, the ghostwriting participants were hailed inside Monsanto for their tremendous years' worth of work, and all were assured that the hard work by the Monsanto public affairs group in utilizing the ghostwritten article would begin. The purpose of the article was "in defending or building Roundup® sales." Even one of Monsanto's top executives Hugh Grant told the ghostwriting team, "This is very good work, well done to the team, please keep me in the loop as you build the PR info to go with it."

89.    For many years after publication, Monsanto used this ghostwritten article for public relations, promotional purposes, and regulatory agencies.

90.    The ghostwriting, publication, and promotional uses of this article were entirely consistent with Monsanto President and CEO Henrik Verfaillie's admonition in Monsanto's 2000 Annual Report that, "Next to defending the growth of *Roundup®,* rejuvenating the growth of products improved through biotechnology is our highest priority."

91.    Falsely maintaining Roundup®'s safety façade was critical to Monsanto's existence

as Roundup® was Monsanto's best-selling product, accounting for 48% of total company sales. As Monsanto stated in the same Annual Report, "Monsanto's *success depends on our ability to sustain growth* for a product that has been a market leader for three decades."

92.     Throughout the years, Monsanto also ghostwrote other "scientific" articles, as well as popular press articles, particularly to combat IARC's 2015 classification of glyphosate as a probable human carcinogen, discussed below.

***Monsanto Withheld Dermal Absorption Studies from the EPA in Violation of FIFRA***

93.     Individuals, such as Decedent, are exposed to glyphosate/Roundup® through various routes, all of which lead to glyphosate/Roundup® translocating into their circulatory system. These routes include dermal absorption, inhalation, ocular absorption, and ingestion. The primary route of exposure is dermal absorption – the movement of glyphosate through the skin and into the bloodstream. Roundup® includes a surfactant, or surface acting, chemical agent, that breaks down the surface of skin and thus acts to facilitate Roundup®'s penetration of the skin. Since initial sale of Roundup®, Monsanto knew of these pathways of exposure.

94.     A "risk assessment" is a process used to identify potential hazards of a substance, such as a herbicide like glyphosate and Roundup®. The risk assessments of glyphosate were dependent on several factors, one of the critical ones being the percent of dermal absorption that occurred when Roundup® got on and remained on one's skin. Generally, an absorption level above 3% demonstrates a significant risk.

95.     In late-2000/early-2001, the European authorities required Monsanto to update its glyphosate risk assessment. To do so, Monsanto retained TNO, a laboratory that had previously performed its dermal absorption studies, to conduct absorption studies using glyphosate and Roundup® on both rat and human skin.

21

96. In early 2002, Monsanto received preliminary test results from TNO for the rat skin portion of the glyphosate/Roundup® studies. These results demonstrated a much higher than 3% dermal absorption rate and sent shockwaves of concern through Monsanto.

97. Rather than addressing the results, Monsanto terminated the study, expressing concern about the "potential for this work to blow Roundup® risk evaluations," and buried the TNO study results in its archives.

98. Monsanto also refused TNO's offer to repeat the study for fear of similar results.

99. Although Monsanto was well aware of FIFRA's requirement to provide EPA promptly with information, including preliminary results, regarding adverse health effects of glyphosate/Roundup®, Monsanto never provided EPA with any information regarding the TNO dermal absorption studies. Such conduct, once again, highlights Defendant's reckless indifference to the health and safety of consumers such as Decedent.

100. Over the next decades, Defendant continued to market Roundup® in false and misleading ways, including failing to inform users, such as Decedent, and the general public via the Roundup® label, packaging, or any other means, of genotoxicity or dermal absorption concerns. In fact, concentrated Roundup® containers have a prominent color graphic on the front of the label showing a bare hand pouring the concentrate into a spray bottle. Commercials showed home users spraying Roundup wearing, for example, shorts, short sleeve shirts, no gloves. Defendant never disclosed the information about dermal absorption, and they did not warn consumers like Decedent to wear chemically resistant gloves or protective equipment.

### Classifications and Assessments of Glyphosate

101. The IARC process for evaluating whether a chemical is a carcinogen follows stringent procedures. IARC followed those procedures when it evaluated glyphosate. Over time,

the IARC Monograph program has reviewed 980 chemical agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic. Glyphosate is classified by IARC as a Group 2A probable human carcinogen.

102.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[17] Panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest, perform the evaluations.

103.    In advance of the IARC meeting, when the experts get together in person to evaluate agents, the panel members are provided data and other materials about the chemicals subject to evaluation, and each subgroup discusses their topic and drafts their sections. At the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Following the Monograph meeting, the summary of the Working Group findings is published in *The Lancet Oncology*, and within a year after the meeting, the final Monograph is published.

104.    In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

105.    In March 2015, IARC assessed glyphosate and determined it to be a Group 2A agent, *i.e.*, probably carcinogenic to humans.

---

[17] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

106.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

107.    The IARC Working Group found an increased risk between exposure to glyphosate and NHL.

108.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study of community residents reported increases in blood markers of chromosomal damage (micronuclei) after spraying glyphosate formulations.

109.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

110.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

111.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[18] Essentially, glyphosate inhibits the biosynthesis of aromatic

---

[18] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra* at 77.

amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

### *Earlier Findings About Glyphosate's Dangers to Human Health*

112.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[19]

113.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.[20]

---

[19] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *supra*.
[20] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

***The Toxicity of Other Ingredients in Roundup®***

114.    In addition to the toxicity of the purported "active" ingredient, glyphosate, several studies show that the glyphosate-based formulation in Defendant's Roundup® is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[21]

115.    In 2002, a study by Julie Marc, entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[22]

116.    In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[23]

117.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural

---

[21] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

[22] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

[23] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation.

recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[24]

118.    Monsanto had and has access to these studies at all times, including through the present.

119.    Monsanto's chief toxicologist for Roundup®, Donna Farmer, has admitted that she cannot say that Roundup® does not cause cancer because Monsanto has not performed carcinogenicity studies with Roundup®, the very product that caused Decedent's NHL.[25] Specifically, Dr. Farmer wrote an internal email cautioning "you cannot say that Roundup is not a carcinogen . . . we have not done the necessary testing on the formulation to make that statement." She further admitted that in the 35 years that Monsanto has marketed Roundup® to the public, Monsanto has not conducted a chronic carcinogenicity study on the formulated Roundup® product.[26]

120.    Defendant thus knew, or should have known, that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect consumers.

---

[24] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.
[25] *See* Plaintiff's Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.
[26] *See id*.

121.   Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continues to promote Roundup® as safe and never conducted long-term cancer studies using Roundup®. This was and is in clear violation of the FAO code of conduct which at all times required safety testing on both the "active" ingredient and the formulated product. This failure also violates Monsanto's pledge that the safety of its products was and is its highest priority.

### *The EPA's Review of Glyphosate*

122.   In April 2016, personnel within the EPA's Office of Pesticides Program (OPP) leaked and posted on the internet a draft report on glyphosate carcinogenicity, entitled Cancer Assessment Review Committee (CARC) report, dated October 2015. The EPA removed the documents by May 2, 2016, within days of initially posting it online. An EPA spokesperson subsequently issued a statement on the Agency's glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's docket. These documents have now been taken down because our assessment is not final. EPA has not completed our cancer review. We will look at the work of other governments as well as work by HHS's Agricultural Health Study as we move to make a decision on glyphosate. Our assessment will be peer reviewed and completed by end of 2016.[27]

123.   On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans' at doses relevant to human health risk assessment."[28] There are no authors listed on this issue paper, which reiterates and adopts the conclusions of the October 2015

---

[27] Carey Gillam, *What Is Going On With Glyphosate? EPA's Odd Handling of Controversial Chemical*, HUFFINGTON POST, May 2, 2016, *available at* http://www.huffingtonpost.com/carey-gillam/what-is-going-on-with-gly_b_9825326.html; *see also* P.J. Huffstutter, *EPA takes offline report that says glyphosate not likely carcinogenic*, REUTERS, May 2, 2016, available at http://www.reuters.com/article/us-usa-glyphosate-epa-idUSKCN0XU01K.
[28] *See* EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016), *available at* https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf.

leaked assessment. The issue paper is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered formulated Roundup® rather than studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."[29]

124.    From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel (SAP) meetings to consider issues raised by the OPP's evaluation of glyphosate. Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product. In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA [SAP] on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[30]

125.    On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between *glyphosate* exposure and NHL.[31] The EPA has since withdrawn that decision.

126.    In June 2022, the Ninth Circuit Court of Appeals issued a decision invalidating EPA's 2020 glyphosate finding and ordering EPA to reevaluate its determination that glyphosate was not likely to cause cancer. The Court ruled that the EPA's conclusion was inconsistent with its own epidemiological evidence that shows a link between glyphosate exposure and the risk of

---

[29] *Id.*
[30] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, available at, https://www.epa.gov/sites/production/files/2016-11/documents/glyphosate_sap_charge_questions_-final.pdf.
[31] FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's Evaluation of the Carcinogenic Potential of Glyphosate, *available at* https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf.

NHL. The Court ruled that the EPA did not properly follow its scientific guidelines when it determined glyphosate was not carcinogenic: "EPA's errors in assessing human-health risk are serious. Moreover, no disruptive consequences will result from vacating the human-health portion of the interim decision because that portion simply maintained the status quo."[32]

127.    In September 2022, in response to the Ninth Circuit decision, the EPA withdrew the remaining portion of its 2020 decision regarding glyphosate. That means that the only current EPA decision on glyphosate's toxicity is from 1993.

***Monsanto's Industry Ties***

128.    Documents produced in prior litigations reveal the extent to which Monsanto has been able to leverage its contacts within the EPA to shield glyphosate and Roundup® from scrutiny and review.

129.    Internal Monsanto documents, including email communications, demonstrate that Jess Rowland – former Deputy Division Director, Health Effects Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016) – repeatedly and directly intervened on Monsanto's behalf. These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

130.    To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the EPA's glyphosate review. In one April 27, 2015 email, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and … ask if there is anything that would help them defend the situation?" His colleague Dan Jenkins responded: "I think you and I could get on the

---

[32] *Natural Resources Defense Council, et al v. U.S. Environmental Protection Agency*, 38 F.4th 34, 52 (9th Cir. 2022).

phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."[33]

131.    The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 email. He reported that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi . . . I am the chair of the CARC, and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June."[34] Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier – in April 2015.

132.    Mr. Rowland also intervened to halt another agency's review of glyphosate. When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public health agency of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, Mr. Rowland helped Monsanto stop the ATSDR's investigation. In the same April 28, 2015 email discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop the ATSDR's investigation concerning glyphosate's carcinogenicity.[35]

133.    Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland bragged: "If I can kill this I should get a medal."[36]

134.    Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt

---

[33] *See* Plaintiff's Motion to Compel the Deposition of Jess Rowland, Ex. D, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-4.
[34] *Id*.
[35] *See id*.
[36] *Id*.

EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA."[37]

135.    Further, the released documents reveal Monsanto's confidence that its allies within the EPA would continue to support glyphosate. In an internal memorandum on glyphosate, Monsanto executives wrote: "We know, *but cannot say*, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months."[38] Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observer for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."[39]

### Worldwide Bans and Restrictions on Roundup®/Glyphosate

136.    Defendant's own documents establish that the use of Roundup® and/or glyphosate-based herbicides have been restricted and/or banned entirely in multiple countries across the world.

137.    The sale and/or use of Roundup® and/or glyphosate-based herbicides have been restricted in many countries around the world including:

   a.   France;

   b.   the Netherlands;

   d.   Belgium;

   e.   Portugal;

   f.   Denmark;

---

[37] *Id.*
[38] *See* Plaintiff's Motion to Compel the Deposition of Jess Rowland, Ex. E, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-5 (emphasis in original).
[39] *See* Plaintiff's Motion to Compel the Deposition of Jess Rowland, Ex. G, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-7.

g.  Austria;

h.  Italy;

i.  Thailand;

j.  certain regions of India.

138.    The sale and/or use of Roundup® and/or glyphosate-based herbicides have been banned in Vietnam and certain regions of India.

139.    Roundup® and/or glyphosate-based herbicides are set to be banned by 2024 in Mexico.

140.    Roundup® and/or glyphosate-based herbicides are set to be banned by 2024 in Germany.

141.    Defendant's own documents establish that the use of Roundup® and/or glyphosate-based herbicides has been restricted in, *inter alia*, France, the Netherlands, Belgium, Portugal, Denmark, Austria, Italy, Thailand, and parts of India.

142.    Defendant's own documents establish that Roundup® and/or glyphosate-based herbicides have been banned entirely in Vietnam and parts of India. Roundup® and/or glyphosate-based herbicides are set to be banned by 2024 in Mexico and Germany.

***California Proposition 65 Listing***

143.    On September 4, 2015, California's Office of Environmental Health Hazard Assessment (OEHHA) published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.[40] California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Prop 65") requires the state to maintain and, at

---

[40] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.

least once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[41] The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.[42]

144. The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") triggered the listing.

145. On March 28, 2017, OEHHA posted Notice on its website that glyphosate would be added to the list of chemicals known to cause cancer for purposes of Prop 65. It remains on the list to this day.

146. On April 13, 2022, EPA stated it would approve the modified Prop 65 warnings for glyphosate. The new Prop 65 warnings shall state: "Using this product can expose you to glyphosate. The International Agency for Research on Cancer classified glyphosate as probably carcinogenic to humans. US EPA has determined that glyphosate is not likely to be carcinogenic to humans; other authorities have made similar determinations. A wide variety of factors affect your potential risk, including the level and duration of exposure to the chemical."

### Statement of Concern Regarding Glyphosate-Based Herbicides

147. On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks

---

[41] *Frequently Asked Questions*, STATE OF CAL. DEP'T OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, http://oag.ca.gov/prop65/faq (last visited April 19, 2016).
[42] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.

associated with exposures: a consensus statement," assessed glyphosate-based herbicides' (GBHs) safety.[43] The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[44] The researchers drew seven factual conclusions about GBHs:

1. GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2. Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3. The half-life of glyphosate in water and soil is longer than previously recognized;

4. Glyphosate and its metabolites are widely present in the global soybean supply;

5. Human exposures to GBHs are rising;

6. Glyphosate is now authoritatively classified as a probable human carcinogen; and

7. Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[45]

148. The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[46]

149. The paper attributed uncertainties in current assessments of glyphosate

---

[43] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.
[44] *Id.*
[45] *Id.*
[46] *Id.*

formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argued, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[47]

150.    Among various implications, the researchers concluded that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, they noted that "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concluded that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[48]

151.    The researchers also critiqued the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[49]

152.    The researchers also called for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be

---

[47] *Id.*
[48] *Id.*
[49] *Id.*

> undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[50]

153.    The researchers suggested that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[51]

154.    Despite these stated concerns, Monsanto, to date, has failed to test its Roundup® products.

### *LPT Fraud in Glyphosate Testing*

155.    Laboratory of Pharmacology and Toxicology (LPT) in Hamburg produced studies that were part of the study package for the EU-wide approval of glyphosate in December 2017. These studies fall under the Good Laboratory Practice (GLP) system. One in seven GLP certified studies in this package, which was the basis to grant re-approval for glyphosate, came from LPT.

156.    In 2020, LPT was found to have committed fraud in a series of regulatory tests.[52]

---

[50] *Id*.

[51] *Id*.

[52] Press Release, *Fraud in German Laboratory Casts Additional Doubts on the 2017 Re-Approval of Glyphosate and on the Entire EU Pesticide Safety Evaluation Procedure*, PESTICIDE ACTION NETWORK (Feb. 11, 2020),

157.    The EU's classification of glyphosate as 'non-carcinogenic' and 'not genotoxic' is based in part on the European authorities' confidence in the GLP system. In the EU's assessment process, GLP studies are automatically classified as reliable. On the other hand, non-GLP studies from university research, which are peer reviewed and published, were disqualified by the authorities as "unreliable." Most of these disqualified studies have reported evidence of a genotoxic effect and an increased risk of lymphatic cancer.[53]

158.    Bayer AG (Monsanto's parent company) commissioned chemical safety studies to LPT for agrochemicals.

## RONALD GEBO'S EXPOSURE TO ROUNDUP®

159.    Decedent Ronald Gebo began using Roundup® in the late 1990's.

160.    For at least 19 years, Ronald Gebo was exposed to Roundup® in and around Port Charlotte, both residentially and occupationally. Mr. Gebo sprayed Roundup® at his residence year-round, on a monthly basis. He sprayed Roundup® year-round, at least multiple times per month in the course of his many employments. Mr. Gebo followed all safety and precautionary warnings during the course of use.

161.    From 1994 to 2012, Mr. Gebo sprayed Roundup® around his home in Port Charlotte, Florida, to kill weeds in his yard and along the sidewalk in front of his yard. His yard is approximately 80 feet by 120 feet, and he sprayed biweekly in the summer and monthly during the other seasons to control weeds.

---

*available at* https://www.pan-europe.info/press-releases/2020/02/fraud-german-laboratory-casts-additional-doubts-2017-re-approval-glyphosate.
[53] Helmut Burtscher et. al, *Dangerous Confidence in "Good Laboratory Practice,"* CORPORATE EUROPE OBSERVATORY (2020), *available at* https://www.global2000.at/sites/global/files/2020-GoodLaboratoryPractice-en.pdf.

162.    From 1994 to 1999, Mr. Gebo worked as a maintenance man for Bird Bay Village in Venice, Florida, and used Roundup® on a monthly basis. The ground maintenance lawn crew also sprayed Roundup® on the same property.

163.    From 1998 to 1999, Mr. Gebo worked for Rays Plumbing in and around Port Charlotte, Florida. During this time period, he was exposed to Roundup® on construction sites on a weekly, if not daily, basis because Roundup® was used to control weeds in newly developed portions of the construction sites.

164.    From 1999 to January 2011, Mr. Gebo worked in condominium construction at Heritage Oaks Park and Heritage Lakes Park in Port Charlotte, Florida. During this time period, he was exposed to Roundup® on construction sites on a daily basis because Roundup® was used to control weeds in newly developed portions of the condominium complexes.

165.    From October 18, 2010, to December 26, 2012, Mr. Gebo worked as the maintenance supervisor for the Promenades East Condominium Association, Inc., in Port Charlotte, Florida. During this time period, he handled and sprayed Roundup® every day. He wore a thin paper dust mask over his mouth and nose, which often became soaked with overspray. He spent the majority of his time in the maintenance office, where Roundup® was stored. He even ate his lunches in this room. During this time Mr. Gebo also maintained the irrigation system for the Promenades East Condo and was digging into the ground to repair and replace irrigation and irrigation heads. The ground around the sprinkler heads and near the irrigation system were consistently sprayed with Roundup® on a weekly basis. Mr. Gebo was performing irrigation maintenance on a daily basis and was directly exposed to Roundup®.

166.     On December 5, 2012, Mr. Gebo was diagnosed with an undifferentiated malignant neoplasm. On December 27, 2012, he was diagnosed with large B-cell lymphoma, a type of NHL. Mr. Gebo stopped using Roundup® after he was diagnosed with NHL.

167.     During the entire time that Mr. Gebo was exposed to Roundup®, he did not know that exposure to Roundup®  was injurious to his health or the health of others.

168.     Mr. Gebo first learned that exposure to Roundup® can cause NHL and other serious illnesses sometime after July 29, 2015, when IARC first published its evaluation of glyphosate.

169.     As a result of his exposure to Roundup® products, Ronald Gebo was injured, causing significant economic and non-economic damages to himself until the date of his death on June 21, 2020, or alternatively Ronald Gebo died, causing significant economic and non-economic damages to his estate and to the beneficiary of his estate, Rebecca Dietrich f/k/a Rebecca Gebo.

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Discovery Rule Tolling*

170.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

171.     Decedent Ronald Gebo has suffered an illness (cancer) that has a latency period and does not arise until years after exposure. Decedent Ronald Gebo had no way of knowing about the risks of serious illness associated with the use of and/or exposure to Roundup® until Decedent Ronald Gebo was made aware that his NHL could be caused by his use of and/or exposure to Roundup®. Consequently, the discovery rule applies to this case, and the statute of limitations has been tolled until the day that Decedent Ronald Gebo knew that his NHL was linked to his use of and/or exposure to Roundup®.

172.     Within the time period of any applicable statutes of limitations, Decedent Ronald

Gebo could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

173.    Decedent Ronald Gebo did not discover and did not know of facts that would cause a reasonable person to suspect the risks associated with the use of or exposure to Roundup®, nor would a reasonable and diligent investigation by him have disclosed that Roundup® would cause his NHL.

174.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

*Fraudulent Concealment*

175.    The statute of limitations has been equitably tolled by reason of Monsanto's fraudulent concealment and conduct, as alleged above. Through its affirmative misrepresentations and omissions, Monsanto actively concealed and continues to conceal from Decedent Ronald Gebo and Plaintiff Mrs. Dietrich the true risks associated with use of or exposure to Roundup®.

176.    The statute of repose has been equitably tolled by reason of Monsanto's fraudulent concealment and conduct, as alleged above. Through its affirmative misrepresentations and omissions, Monsanto actively concealed and continues to conceal from Decedent Ronald Gebo and the public the true risks associated with use of or exposure to Roundup®.

177.    As a result of Monsanto's actions, Decedent Ronald Gebo was unaware, and could not reasonably know or have learned through reasonable diligence, that Decedent Ronald Gebo had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Monsanto's acts and omissions.

178.    Monsanto is estopped from relying on any statute of limitations or statute of repose because of its concealment of the truth regarding the safety of Roundup®. Monsanto was under a

duty to disclose the true character, quality, and nature of Roundup® because this was non-public information over which Monsanto continues to have exclusive control. Monsanto knew that this information was material and not available to Decedent Ronald Gebo, his medical providers, and/or his health facilities, yet it failed to disclose the information to the public.

179.    Monsanto had the ability to and did spend enormous amounts of money in furtherance of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Decedent Ronald Gebo could not have afforded to conduct nor could have possibly conducted studies to determine the nature, extent, and identity of health risks associated with pesticide exposure, including Roundup® and, therefore, Decedent Ronald Gebo relied upon Monsanto's representations.

### *Estoppel*

180.    Monsanto was and is under a continuous duty to disclose to consumers, users and other persons coming into contact with their products, including Decedent Ronald Gebo, accurate safety information concerning its glyphosate-based products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

181.    Instead, Monsanto knowingly, affirmatively, and actively concealed and continues to conceal safety information concerning Roundup® and the serious risks associated with the use of and/or exposure to their products.

182.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

### COUNT ONE: NEGLIGENCE
### F.S. §46.021

183.    Plaintiff re-alleges and incorporated by reference paragraphs 1 through 175.

184.    Defendant, directly or indirectly, caused Roundup® products to be sold, distributed,

packaged, labeled, marketed, promoted, and/or used by Decedent Ronald Gebo.

185.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonable dangerous to consumers, users, and other persons coming into contact with the product.

186.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

187.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and danger of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

188.   Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Decedent's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Decedent.

189.   Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Decedent

43

from Roundup®.

190.    Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

191.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

192.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonable dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

193.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and inert ingredients, and/or the surfactant POEA to protect Decedent from Roundup®.

194.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

195.    Defendant's negligence included:

    a. Manufacturing, producing, promoting, formulating, creating, developing,

designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d.  Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients or adjuvants were safe for use;

e.  Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup® /glyphosate as an herbicide;

f.  Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.  Failing to provide adequate instructions, guidelines, and safety precautions to those

45

persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

h. Failing to disclose to Plaintiff, Decedent, users, consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i. Failing to warn Plaintiff, Decedent, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safe and effective alternative herbicides available to Plaintiff, Decedent, and other users or consumers;

j. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

k. Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

l. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

m. Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

n. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural,

horticultural industries, and/or home use; and

o.   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

196.    Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Decedent, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

197.    Decedent did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

198.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff and Decedent suffered, and will continue to suffer, as described herein.

199.    Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Decedent, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Decedent. Defendant's reckless conduct therefore warrants an award of punitive damages.

200.    Monsanto under-reported, underestimated, and downplayed the serious dangers of Roundup®.

201.    Monsanto negligently and deceptively compared the safety risks and/or dangers of Roundup® with common everyday foods such as table salt, and other forms of herbicides.

202.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate and/or Roundup®, Mr. Gebo developed NHL

suffered bodily injury and has been injured catastrophically and has been caused severe and permanent pain, physical and mental suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages, including significant expenses for medical care and treatment.  These losses continued until the date of his death on June 21, 2020.

203.    WHEREFORE, the Plaintiff, REBECCA DIETRICH f/k/a REBECCA GEBO, as the Personal Representative of THE ESTATE OF RONALD GEBO, deceased, respectfully demands judgment against the Defendant, MONSANTO COMPANY, for compensatory and punitive damages, together with interest, costs, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a trial by jury on all issues so triable.

**COUNT TWO: NEGLIENCE
WRONGFUL DEATH**

204.    Plaintiff re-alleges and incorporated by reference paragraphs 1 through 175.

205.    Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Decedent.

206.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

207.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its

48

active ingredient glyphosate.

208.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and danger of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

209.   Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Decedent.

210.   Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Decedent from Roundup®.

211.   Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

212.   Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

213.   As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know

that a user's or consumer's exposure to the products created a significant risk of harm and unreasonable dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

214.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and inert ingredients, and/or the surfactant POEA to protect Decedent from Roundup®.

215.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

216.    Defendant's negligence included:

a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d.  Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the

propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients or adjuvants were safe for use;

e.  Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

f.  Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonable foresee would use and/or be exposed to its Roundup® products;

h.  Failing to disclose to Plaintiff, Decedent, users, consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i.  Failing to warn Plaintiff, Decedent, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safe and effective alternative herbicides available to Plaintiff, Decedent, and other users or consumers;

j.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-

containing products;

k.   Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

l.   Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

m.   Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

n.   Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

o.   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

217.   Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Decedent, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

218.   Decedent did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

219.   Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff and Decedent suffered, and will continue to suffer, as described

herein.

220.    Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Decedent, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff and Decedent. Defendant's reckless conduct therefore warrants an award of punitive damages.

221.    Monsanto under-reported, underestimated, and downplayed the serious dangers of Roundup®.

222.    Monsanto negligently and deceptively compared the safety risks and/or dangers of Roundup® with common everyday foods such as table salt, and other forms of herbicides.

223.    Monsanto's violations of law and/or negligence were the proximate cause of Decedent Ronald Gebo's death, and the economic and non-economic damages to his estate and the beneficiary of his estate, Mrs. Dietrich.

224.    As a direct and proximate result of Defendant's conduct, Plaintiff and Decedent's beneficiaries have been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, loss of companionship, loss of consortium, loss of guidance and counsel, loss of financial support, loss of affection, economic damages, pecuniary losses suffered by reason of the death, medical expenses, and funeral and burial expenses.

225.    As a direct and proximate result of the foregoing acts and/or omissions by Monsanto, Plaintiff seeks wrongful death damages on behalf of herself and Decedent's estate for

the following:

      a.  Compensatory damages;

      b.  The value of lost support and services;

      c.  Lost companionship and protection;

      d.  Mental pain and suffering;

      e.  Medical expenses and funeral expenses;

      f.  Punitive damages;

      g.  The costs of suit; and

      h.  Attorneys' fees.

226.    WHEREFORE, the Plaintiff, REBECCA DIETRICH f/k/a REBECCA GEBO, as the Personal Representative of THE ESTATE OF RONALD GEBO, deceased, respectfully demands judgment against the Defendant, MONSANTO COMPANY, for compensatory and punitive damages, together with interest, costs, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a trial by jury on all issues so triable.

## COUNT THREE: STRICT LIABILITY
## DESIGN DEFFECT

227.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 175.

228.    Plaintiff brings this strict liability claim against Defendant for defective design.

229.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers and users and other persons coming into contact them, including Decedent, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured,

produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Decedent, and/or to which Decedent was exposed, as described above.

230.    At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Decedent.

231.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Florida and throughout the United States, including Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

232.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

233.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

234.    Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketing by Defendant, were defective in design and formulation, in one of more of the following ways:

        a.    When placed in the stream of commerce, Defendant's Roundup® products were defective

55

in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.  When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.  When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.  Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e.  Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

f.  Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illness and injuries.

g.  Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h.  Defendant could have employed safer alternative designs and formulations.

235.    At all times relevant to this litigation, Decedent used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

236.    Decedent could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

237.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

238.    At the time Roundup® products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup® herbicides.

239.    Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

240.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Decedent and Plaintiff.

241.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Decedent's grave injuries, and, but for Defendant's misconduct and omissions, Decedent would not have sustained his injuries.

242.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Decedent Ronald Gebo suffered grave injuries, and has endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Mr. Gebo suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred expense of hospitalization, medical and nursing care and treatment. These losses continued until the date of his death on June 21, 2020.

243.    In the alternative, defects in Monsanto's Roundup® products were the cause of or a substantial factor in causing Decedent Ronald Gebo's death.

244.    As a direct and proximate result of the defects in Monsanto's Roundup®, Ronald Gebo died.

245.    As a direct and proximate result of defects in Monsanto's Roundup®, Plaintiff seeks wrongful death damages on behalf of herself and Decedent's estate for the following:

      a.  Compensatory damages;

      b.  The value of lost support and services;

      c.  Lost companionship and protection;

      d.  Mental pain and suffering;

      e.  Medical expenses and funeral expenses;

      f.  Punitive damages;

      g.  The costs of suit; and

      h.  Attorney's fees.

246.    WHEREFORE, the Plaintiff, REBECCA DIETRICH f/k/a REBECCA GEBO, as the Personal Representative of THE ESTATE OF RONALD GEBO, deceased, respectfully demands judgment against the Defendant, MONSANTO COMPANY, for compensatory and punitive damages, together with interest, costs, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a trial by jury on all issues so triable.

## COUNT FOUR: STRICT LIABILITY
## FAILURE TO WARN

247.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 175.

248.    Plaintiff brings this strict liability claim against Defendant for failure to warn.

249.    At all times relevant to this litigation, Defendant engaged in the business of testing,

58

developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Decedent, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

250.    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Decedent, Decedent's employers, Decedent's co-workers, and persons responsible for consumers (such as employers), and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products.

251.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Decedent of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

252.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

253.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its Roundup® products

and to those who would foreseeably use or be harmed by Defendant's herbicides, including Decedent.

254.    Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Decedent's employers.

255.    Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

256.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

257.    At all times relevant to this litigation, Decedent used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

258.    Decedent could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Decedent's exposure.

Decedent relied upon the skill, superior knowledge, and judgment of Defendant.

259.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

260.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Decedent to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

261.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

262.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Decedent.

263.    Defendant is liable to Decedent and Plaintiff for injuries caused by its failure, as described

above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

264.     The defects in Defendant's Roundup® products were substantial and contributing factors in causing Decedent's injuries, and, but for Defendant's misconduct and omissions, Decedent would not have sustained his injuries.

265.     Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Decedent could have avoided the risk of developing injuries as alleged herein and Decedent's employers could have obtained alternative herbicides.

266.     To this day, Monsanto has failed to adequately warn of the true risks of Decedent Ronald Gebo's injuries and death associated with the use of and exposure to Roundup®.

267.     As a result of its inadequate warnings, Monsanto's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed by Monsanto, and used by Decedent Ronald Gebo.

268.     Defendant is liable to Plaintiff for injuries caused its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup®  products and the risks associated with the use of or exposure to Roundup® and glyphosate.

269.     The defects in Defendant's Roundup® products were substantial and contributing factors in causing Decedent's grave injuries, and, but for Defendant's misconduct and omissions, Decedent would not have sustained his injuries.

270.     Had Defendant provided adequate warnings and instructions and properly disclosed

and disseminated the risks associated with its Roundup® products, Decedent could have avoided the risk of developing injuries as alleged herein and Decedent's employers could have obtained alternative herbicides.

271.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce and failing to warn Decedent of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Decedent developed NHL and was injured catastrophically and was caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including for medical care and treatment. These losses continued until the date of his death on June 21, 2020.

272.    In the alternative, as a direct and proximate result of the foregoing acts and/or omissions by Monsanto, Plaintiff seeks wrongful death damages on behalf of herself and Decedent's estate for the following:

    a. Compensatory damages;

    b. The value of lost support and services;

    c. Lost companionship and protection;

    d. Mental pain and suffering;

    e. Medical expenses and funeral expenses;

    f. Punitive damages;

    g. The costs of suit; and

    h. Attorneys' fees.

273.    WHEREFORE, the Plaintiff, REBECCA DIETRICH f/k/a REBECCA GEBO, as the Personal Representative of THE ESTATE OF RONALD GEBO, deceased, respectfully

demands judgment against the Defendant, MONSANTO COMPANY, for compensatory and punitive damages, together with interest, costs, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a trial by jury on all issues so triable.

## JURY TRIAL DEMAND

274.    Plaintiff demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

275.    WHEREFORE, Plaintiff requests that the Court enter judgement in Plaintiff's favor and against Monsanto, awarding as follows:

a.  Compensatory damages in an amount to be proven at trial;

b.  Punitive damages;

c.  Costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

d.  Any other relief referenced herein and/or that the Court may deem just and proper.

Dated: March 19, 2024                     Respectfully submitted,

*/s/ Robin L. Greenwald*
Robin L. Greenwald, Esq. (*Pro Hac Vice*)
**WEITZ & LUXENBERG, PC**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5802
Facsimile: (212) 344-5461
rgreenwald@weitzlux.com

*Attorney for Plaintiff*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March, 19, 2024, a true and correct copy of the foregoing has been filed through the Court's CM/ECF case management system, which will serve a notice of electronic filing to all counsel of record.


*/s/ Robin L. Greenwald*