**NACHAWATI LAW GROUP**
Gibbs Henderson (*pro hac vice*)
ghenderson@ntrial.com
Erin Wood *(pro hac vice)*
ewood@ntrial.com
John Raggio (CA Bar No. 338261)
jraggio@ntrial.com
5489 Blair Road
Dallas, TX 75231
Tel: 214-890-0711
Fax: 214-890-0712

*Attorneys for Plaintiff Angelo Bulone*

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION<br><br>*Angelo Bulone v. Monsanto Company,*<br>*3:20-cv-03719-VC* | MDL No. 2741<br><br>Case No. 3:16-md-02741-VC<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO EXCLUDE THE TESTIMONY OF DR. LUOPING ZHANG** |

Pursuant to this Court's Order dated April 25, 2024, Plaintiff Angelo Bulone respectfully

submits this response to Defendant Monsanto Company's Supplemental Brief in Support of its

Motion to Exclude the Testimony of Dr. Luoping Zhang, Ph.D.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

## TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................... 1

II.  BACKGROUND ..................................................................................................... 2

III.  ARGUMENT & AUTHORITIES .......................................................................... 5

A.  Dr. Zhang's Opinions Satisfy "the Principal Ways" of Establishing Reliability, As Well As Possessing Other Indicia of Reliability. ........................................................................ 5

1.  Independent Pre-Litigation Research ................................................................. 5

2.  Peer Review ......................................................................................................... 7

3.  Other Factors ...................................................................................................... 7

4.  Other Indicia of Reliability ............................................................................... 9

B.  Dr. Zhang's Methodology is Logically Sound. .................................................... 9

C.  Monsanto's Arguments Challenging the Reliability of Dr. Zhang's Opinions Fail. .......... 11

1.  It is not scientifically unsound to mix "high exposure" groups with "ever exposed" groups in a meta-analysis. .......................................................... 12

2.  It is not scientifically unsound to mix adjusted data with unadjusted data. ............. 16

D.  Dr. Zhang's Opinions "Fit" the Case. .............................................................. 17

E.  "Other Issues" Do Not Warrant the Exclusion of Dr. Zhang's Testimony ......................... 17

IV.  Conclusion ............................................................................................................. 18

PLAINTIFF'S RESPONSE TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION  TO EXCLUDE THE TESTIMONY OF DR. LUOPING ZHANG

# TABLE OF AUTHORITIES

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013)........... 18

*Cage v. City of Chicago*, 979 F. Supp. 2d 787, 810 (N.D. Ill. 2013). ............................................. 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir.1995).................... 1, 5, 6, 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 599 U.S. 579 (1993) .................................. passim

*DiCarlo v. Keller Ladders, Inc.*, 211 F.3d 465, 468 (8th Cir. 2000 ..................................................... 5

*In re: Silicone Gel Breasts Implants Prod. Liab.Litig.*, 318 F.2d 879, 902 (C.D. Ca. 2004) ....... 8, 9

*Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012) ................................................................... 19

*Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 841 (9th Cir. 2001) ........................................ 6, 7

*Murray v. S. Route Mar., S.A.*, 870 F.3d 915, 923 (9th Cir. 2017) ........................................... 6, 7, 8

*Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)). ...................................................... 19

*Roeder v. Am. Med. Sys., Inc.*, Case No. 20-1051-JWB, 2021 WL 4819443, at *8 (D. Kan. Oct. 15,
2021)................................................................................................................................................ 10

*See, e.g., In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 783 (8th
Cir. 2021) ......................................................................................................................................... 5

*West Tenn. Chapter of Assoc. Builders and Contractors, Inc. v. City of Memphis*, 300 F. Supp. 2d
600, 605 (W.D. Tenn. 2004) ......................................................................................................... 18

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ....................... 1, 9

**Rules**

Federal Rule of Evidence 702 ("Rule 702") ............................................................................. 2, 5, 7

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

PLAINTIFF'S RESPONSE TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL BRIEF IN
SUPPORT OF MOTION  TO EXCLUDE THE TESTIMONY OF DR. LUOPING ZHANG

# I.    <u>INTRODUCTION</u>

"Judges asked to determine whether an approach is 'reliable' by the standards of science encounter the problem that we are lawyers rather than scientists." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir.1995)).  Tellingly, the only persons who have challenged Dr. Luoping Zhang's ("Zhang") peer-reviewed, published meta-analysis methodology – on which she has been cited by scientists hundreds of times and asked to present by both national and international scientific societies – are lawyers, not scientists.  Indeed, the internal Environmental Protection Agency ("EPA") memorandum that served as *the entire substantive basis* for Monsanto's Motion to Exclude Dr. Luoping Zhang ("Motion to Exclude") did not even criticize the aspects of Dr. Zhang's meta-analysis methodology that the Court and now Monsanto suggest render that methodology "junk science."

Specifically, Monsanto did not initially challenge Dr. Zhang's *a priori* decision to mix "highest possible exposure" data sets and "never-ever" data sets in her meta-analysis for the same reason the internal EPA memorandum did not seek to "debunk" Dr. Zhang's meta-analysis on that ground: that methodology is routinely used by  scientists examining potential associations between different environmental exposures and various forms of cancer.  Likewise, Monsanto did not move to exclude Dr. Zhang's meta-analysis on the grounds that it included both data adjusted for other pesticide usage and unadjusted data for the same reason the internal EPA memorandum did not even mention Dr. Zhang's decision to include both data sets: the mixing of adjusted/unadjusted data in meta-analyses is an accepted practice by scientists performing meta-analyses.  In fact, the internal EPA memorandum that served as the basis for Monsanto's Motion to Exclude acknowledges that Dr. Zhang and her co-authors included the same six epidemiological studies that the EPA used in its own meta-analysis examining an association between glyphosate and non-Hodgkin's lymphoma

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

(NHL), including the McDuffie and Orsi studies that did *not* adjust for other pesticide exposure. *See* Dckt. No. 70, Pl.'s Resp. to Monsanto Co.'s Mot. to Exclude the Testimony of Dr. Luoping Zhang ("Pl.'s Resp.") at Ex. D, EPA Internal Mem. from D. Miller to C. Olinger, dated Jan. 6, 2020 ("2020 Miller Mem."), at 2-3.

As set out below, the meta-analysis Dr. Zhang published in 2019 checks almost every box for reliability identified by *Daubert* and its progeny.  Namely, that meta-analysis: (a) arose out of research conducted outside litigation; (b) was subjected to peer review; (c) has been presented on in front of national and international scientific societies; (d) utilizes the same methodology used in other peer-reviewed papers; and (e) generated results that have been reproduced by other scientists. Accordingly, excluding Dr. Zhang's opinions arising out of that meta-analysis would violate controlling Ninth Circuit precedent and constitute an abuse of discretion.  Moreover, doing so would have the effect of elevating the scientific analysis of lawyers over distinguished scientific journals such as THE LANCET, which is clearly not what *Daubert* intended.

## II.     BACKGROUND

On March 6, 2024, Monsanto filed its Motion to Exclude, which asked the Court to exclude the testimony of Dr. Zhang on the basis of Federal Rule of Evidence 702 ("Rule 702").  *See* Dkt. No. 68, Monsanto Co.'s Mot. to Exclude the Testimony of Dr. Luoping Zhang, dated March 6, 2024 ("Def.'s Mot. to Exclude") at 1-2.  Monsanto's arguments focused almost exclusively on the meta-analysis included in Dr. Zhang's peer-reviewed published article, *Exposure to glyphosate-based herbicides and risk for non-Hodgin Lymphoma: A meta-analysis and supporting evidence*, MUTATION RESEARCH-REVIEWS IN MUTATION RESEARCH 781:186-206 (2019) ("2019 Paper"). More specifically, Monsanto argued that Dr. Zhang's testimony based on her 2019 Paper should be excluded on two substantive grounds: (1) the testimony is unreliable because the meta-analysis in the 2019 Paper been "debunked by the EPA" in a the January 6, 2020 Memorandum by EPA

employee David J. Miller ("Dr. Miller") (hereinafter, "2020 Miller Memo"); and (2) her opinions do not "fit the facts of the case because [they] do not address the specific sub-type of lymphoma that Mr. Bulone alleges he developed as a result of using Roundup." *Id*. at 3, 5.[1]

Plaintiff's Response to Monsanto Company's Motion to Exclude the Testimony of Dr. Luoping Zhang ("Plaintiff's Response") was filed on March 27, 2024.  *See* Dckt. No. 70, Pl.'s Resp.  Plaintiff's Response directly addressed each of the arguments raised in Defendant's Motion to Exclude.  *See* Dckt. No. 70, Pl.'s Resp. at 7-15.  Plaintiff's Response also noted that the "2020 Miller Memo contains only two substantive criticisms of the methodology used by Dr. Zhang and her co-authors in the meta-analysis portion of Dr. Zhang's 2019 Paper": (1) "that Dr. Zhang's meta-analysis would have produced 'lower and non-statistically significant meta-estimates . . . if the Andreotti, et al. (2018) study [had been] more properly incorporated' into the meta-analysis"; and (2) that Dr. Zhang's "focus[] on the results from a fixed effect meta-analyses (instead of random effects) for this kind of data [was] incorrect."  Pl.'s Resp. at 8-9 (quoting Ex. D, 2020 Miller Mem. at 13).

Plaintiff was subsequently ordered to appear with Dr. Zhang for an in-person *Daubert* hearing to occur on April 24, 2024.  The morning of April 24, 2024, Dr. Zhang left her home in Berkeley, California in time for the scheduled 10 a.m. hearing.  At 7:56 a.m. that morning, barely two hours before the hearing, the Court entered a notice on the MDL docket converting that morning's in-person hearing to Zoom.  *See* Dckt. No. 18281.  The parties also received an email from the Courtroom Deputy at roughly the same time informing them that Plaintiff would not be permitted to conduct a direct examination of Dr. Zhang; instead, the Court would "begin with a few

---

[1] Alternatively, Monsanto made a procedural argument that Dr. Zhang's testimony "should be limited to her discussion of her 2019 Paper, her 2020 Paper and the 2016 EPA Final Report" because "Dr. Zhang did not produce an expert report and Plaintiff's expert disclosure did not specify Dr. Zhang's opinions . . . ."  Def.'s Mot. to Exclude at 7.

PLAINTIFF'S RESPONSE TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION  TO EXCLUDE THE TESTIMONY OF DR. LUOPING ZHANG

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

questions for [Dr.] Zhang, and then we will go straight to cross examination." **Exhibit B**, Email from VC CRD to All Counsel of Record, dated Apr. 24, 2024.  Once Dr. Zhang was reached with this news, she turned her car around and headed back to her home in Berkeley.

At the hearing that morning, consistent with the Courtroom Deputy's email, Plaintiff was not permitted to begin with a direct examination of Dr. Zhang.  Instead, the Court started the examination of Dr. Zhang by asking her to answer detailed questions "off the top of [her] head"[2] about the studies included in her 2019 Paper and quizzing her at length on two issues that were not raised in Monsanto's Motion to Exclude: (1) the decision of her and her co-authors to use "highest exposure" data sets from studies that define "highest exposure" differently and then mix that data with "ever-never use" data sets;[3] and (2) the decision of her and her co-authors to mix data sets that adjusted for other pesticide usage with data sets that were not adjusted for other pesticide usage.[4]

On May 2, 2024, Monsanto filed its Supplemental Brief in Support of Motion to Exclude the Testimony of Dr. Luoping Zhang ("Supplemental Brief").  *See* Dckt. No. 83, Def.'s Supplemental Br. in Support of Mot. to Exclude the Testimony of Dr. Luoping Zhang ("Def.'s Supplemental Br.").  In its Supplemental Brief, Monsanto argues for the first time that Dr. Zhang's opinions based on her 2019 Paper are unreliable because: (1) her "meta-analysis . . . mixed and cherry-picked dose-response data with never-ever use data"; and (2) her meta-analysis . . . mixed data that was adjusted for other pesticides with data that was not."  Def.'s Supplemental Br. at 4. Monsanto also argues – again, for the first time – that Dr. Zhang's opinions based on her 2019 Paper do "not 'fit' the question posed to the jury" because it does not include data from post-2019

---

[2] Tr. at 65:11-66:4.  Defendant has not cited any authority, under the *Daubert* standard, requiring an expert to complete a "closed book" pop quiz on their own work.

[3] Tr. at 80:8-81:17.

[4] Tr. at 82:22-84:2.

PLAINTIFF'S RESPONSE TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION  TO EXCLUDE THE TESTIMONY OF DR. LUOPING ZHANG

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

epidemiological studies.  Def.'s Supplemental Br. at 7.  For the reasons discussed below, these arguments should be rejected and Monsanto's Motion to Exclude should be denied.

### III.    ARGUMENT & AUTHORITIES

**A.    Dr. Zhang's Opinions Satisfy "the Principal Ways" of Establishing Reliability, As Well As Possessing Other Indicia of Reliability.**

There are two prongs to the Rule 702 analysis set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 599 U.S. 579 (1993): (1) reliability and (2) relevance.  *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (hereinafter, "*Daubert II*").  "Establishing **that an expert's proffered testimony grows out of pre-litigation research** or **that the expert's research has been subjected to peer review** are the **two principal ways** the proponent of expert testimony can show that the evidence satisfies the first prong of Rule 702."  *Id*. at 1318 (emphasis added).  Expert testimony can satisfy the reliability requirement when just one of these two indicia is present.  *See, e.g., In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 783 (8th Cir. 2021) ("In these circumstances—where a 'hired gun' expert's work has been peer reviewed and published, and the developed-for-litigation concern is the only remaining reason for excluding the testimony—we conclude that lingering questions of reliability and objectivity go to weight rather than admissibility.") (citing *DiCarlo v. Keller Ladders, Inc.*, 211 F.3d 465, 468 (8th Cir. 2000)).  Here, of course, it is undisputed that Dr. Zhang's opinions based on her 2019 Paper satisfy *both* of "the two principal ways" a party can show that an expert's opinions are reliable – that is, the 2019 Paper arose out of her independent pre-litigation research and the research was subjected to peer review.

#### 1.    Independent Pre-Litigation Research

As far back as *Daubert II*, the Ninth Circuit "noted that a 'very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have

developed their opinions expressly for purposes of testifying.'" *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 841 (9th Cir. 2001) (quoting *Daubert II*, 43 F.3d at 1317). Indeed, "when research is begun pre-litigation, it may be reliable without peer review." *Id*. at 843 (citing *Daubert II*, 43 F.3d at 1317).

The Ninth Circuit considers the fact that an expert's opinions and/or methodology were not developed for purposes of litigation "a 'very significant fact' that 'provides important, objective proof that the research comports with the dictates of good science.'" *Murray v. S. Route Mar., S.A.*, 870 F.3d 915, 923 (9th Cir. 2017) (quoting *Daubert II*, 43 F.3d at 1317). The rationale for this view is straightforward. First, "experts whose findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration; when an expert prepares reports and findings before being hired as a witness, that record will limit the degree to which he can tailor his testimony to serve a party's interests." *Daubert II*, 43 F.3d at 1317. Second, "independent research carries its own indicia of reliability, as it is conducted, so to speak, in the usual course of business and must normally satisfy a variety of standards to attract funding and institutional support." *Id*. Third, given that "there is usually a limited number of scientists actively conducting research on the very subject that is germane to a particular case . . . [the fact] that the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were 'derived by the scientific method.'" *Id*.

As Dr. Zhang explained at the *Daubert* hearing, her research on the association between glyphosate and NHL began when she was asked by the EPA to be the team leader for a scientific advisory panel of scientists examining the existing epidemiology on this subject. Tr. at 123:8-15. Moreover, her 2019 Paper was written, subjected to peer review, and published prior to her retention as an expert in the Roundup litigation. *See id*. at 123:5-7. As such, her 2019 Paper satisfies what

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

the Ninth Circuit has deemed "the most persuasive basis for concluding the opinions [she] expresses were 'derived by the scientific method.'" *Daubert II*, 43 F.3d at 1317.

### 2. Peer Review

If, unlike Dr. Zhang's opinions arising out of her 2019 Paper, the proposed opinion testimony "is not based upon independent research, the district court must determine whether there exists any 'other objective, verifiable evidence that the testimony is based on scientifically valid principles.'" *Metabolife Int'l*, 264 F.3d at 841 (quoting *Daubert II*, 43 F.3d at 1317-18).  According to the Ninth Circuit, "[**p]eer review is the chief way of satisfying this** requirement . . . ." *Id.* (emphasis added).  "[S]ubmission to the scrutiny of the scientific community" is a strong indicator of reliability "because it increases the likelihood that substantive flaws in methodology will be detected." *Murray*, 870 F.3d at 923 (*Daubert*, 509 U.S. at 593, 113 S.Ct. 2786).

As further explained in *Daubert II*:

> Peer review and publication do not, of course, guarantee that the conclusions reached are correct; much published scientific research is greeted with intense skepticism and is not borne out by further research.  But the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology. [].  That the research is accepted for publication in a reputable scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is taken seriously by other scientists, *i.e.*, that it meets at least the minimal criteria of good science.

*Daubert II*, 43 F.3d at 1317 (internal citation and citation omitted).

Here, it is undisputed that Dr. Zhang's 2019 Paper was peer-reviewed and published.  As such, her 2019 Paper satisfies what the Ninth Circuit has deemed "the chief way of satisfying" the reliability requirement other than establishing that the research originated outside of litigation (which her 2019 Paper also satisfies, as discussed *supra*).

### 3. Other Factors

In addition to satisfying the "two principal" ways of establishing reliability under Rule 702, Dr. Zhang's opinions arising out of her 2019 Paper possess several other indicia of reliability under

PLAINTIFF'S RESPONSE TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION  TO EXCLUDE THE TESTIMONY OF DR. LUOPING ZHANG

the *Daubert* standard.

First, a showing that an expert has been asked to present on her at-issue opinions at national and international scientific conferences is another indicator that the expert's work is reliable. *See Silong v. U.S.*, No. CV F 06-0474 LJO DLB, 2007 WL 2535126, at *3 (E.D. Ca. Aug. 31, 2007). Dr. Zhang's 2019 Paper checks that box as well, as she has been asked to present on her 2019 Paper by both American and international scientific societies. *See* Tr. at 114:114:12-23. Given that fact, it is not surprising that Dr. Zhang's 2019 Paper has been cited approximately 340 times in the peer-reviewed literature. *See id.* at 114:5-11.

Second, the reliability of an expert's methodology can be buttressed by the submission of examples of other scientists utilizing the same methodology in the peer-reviewed literature.[5] *See Murray*, 870 F.3d at 923. With respect to her 2019 Paper, Dr. Zhang confirmed this to be the case at the *Daubert* hearing and attaches to her Affidavit four separate peer-reviewed papers she was not involved in that, as discussed in depth *infra*, included "highest possible exposure" data sets with "never-ever" data sets in meta-analyses examining associations between environmental exposures and forms of cancer. *See* Tr. at 116:5-19; and **Exhibit A**, Affidavit of Luoping Zhang, Ph.D., dated May 8, 2024 ("Dr. Zhang Aff.") at ¶ 9.a., d.-e., h.

Regarding those papers, she notes in her Affidavit that:

> Every one of these meta-analysis publications mentioned above were reviewed by the editorial staff at each journal and by usually at least 3 outside independent anonymous peer-reviewers considered experts in the field. If anyone thought the relevant methods applied, including *a priori* hypothesis and mixed exposure categories, were invalid they could have written a letter to the editor saying so. But nobody has done it (most likely because they know they would be wrong) even though many of them have been published for several years (1998 – 2021).

---

[5] Conversely, the fact that a party "can point to contrary studies" to an expert's "published, peer-reviewed study . . . is not sufficient to render [the expert's] testimony inadmissible." *In re: Silicone Gel Breasts Implants Prod. Liab.Litig.*, 318 F.2d 879, 902 (C.D. Ca. 2004).

PLAINTIFF'S RESPONSE TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO EXCLUDE THE TESTIMONY OF DR. LUOPING ZHANG

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

Ex. B, Dr. Zhang Aff. at ¶ 10.[6]

Third, a party can establish the reliability of an expert's methodology by showing the results he or she reaches are "testable" – *i.e.*, that "[s]omeone else using the same data and methods must be able to replicate the result." *Zenith Elec. Corp.*, 395 F.3d at 419; *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1046 (9th Cir. 2014). Here, Dr. Zhang confirmed that the Kabat 2021 paper was able to reproduce the results of her 2019 Paper and reach an identical 41% increase in risk of NHL. *See* Tr. at 114:24-115:7.

### 4. Other Indicia of Reliability

In sum, Dr. Zhang's 2019 Paper does not just satisfy the "two principal ways" to establish reliability under *Daubert*, it also carries three additional indicia of reliability. Moreover, all of these factors were established in the original round of briefing and/or at the *Daubert* hearing. Despite carrying all of these established signs of reliability, the Court at the *Daubert* hearing suggested Dr. Zhang's work was "junk science" and requested a "substantive explanation for why [her work is] not misleading." Tr. at 131:11-12, 20-21. The requested substantive explanation, as well as additional supporting materials, is set out in the sections below.

### B. Dr. Zhang's Methodology is Logically Sound.

As noted above, the issues Dr. Zhang was questioned about for several hours at the April 24 hearing were not even tangentially raised in Monsanto's Motion to Exclude. Certainly, there have been trial courts in other who have "reminded the parties that *Daubert* hearings are limited in scope" and instructed the parties not "to delve into substantive matters having nothing to do with the [*Daubert*] motions presently before the Court." *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 810

---

[6] Indeed, as noted above, the 2020 Miller Memo does not even challenge Dr. Zhang's 2019 Paper on these grounds. To date, the only persons that have suggested these methods are "invalid" are lawyers, not scientists.

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

(N.D. Ill. 2013).  Trial courts have also denied *Daubert* motions on discrete issues because those issues were not raised in the initial briefing.  *See, e.g., Roeder v. Am. Med. Sys., Inc.*, Case No. 20-1051-JWB, 2021 WL 4819443, at *8 (D. Kan. Oct. 15, 2021) (denying defendant's *Daubert* motion on issue "[b]ecause issue was not raised in the initial briefing and it has not been fully addressed . . . .").

This Court obviously took a much more expansive view of the appropriate scope of the *Daubert* inquiry at the April 24 hearing in this matter, repeatedly overruling Plaintiff's scope objections. *See* Tr. at 95:17-21, 105:6-13.  Allowing the parties to provide this supplemental briefing on the new issues raised *sua sponte* by the Court may have mitigated any prejudice to Plaintiff, but it did not make Dr. Zhang's job any easier at the April 24 hearing.  Not only was she instructed by the Court to answer questions on topics that were beyond the scope of Monsanto's Motion to Exclude, but she was also instructed by the Court at one point to answer questions "off the top of [her] head." *Id*. at 50:19-23.  Additionally, as she informed the Court, due to the last-minute shift from an in-person hearing to a Zoom hearing,[7] Dr. Zhang did not have the benefit of having a printed copy of her 2019 Paper in front of her and was suffering from connectivity issues that made scrolling the PDF version very slow.  *See id*. at 86:15-87:7.

Despite those challenging circumstances, Plaintiff maintains that Dr. Zhang established the reliability of her opinions through her responses at the hearing – including a showing of the indicia of reliability enumerated in the previous section, *supra*.  Nevertheless, at the conclusion of the *Daubert* hearing, the Court expressed a lack of understanding for "why it would ever be appropriate mix high-exposure datasets with ever-exposure datasets" and requested a substantive explanation. *Id*. at 130:9-14.

---

[7] Plaintiff's counsel had printed copies prepared for the Court and witness.

PLAINTIFF'S RESPONSE TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION  TO EXCLUDE THE TESTIMONY OF DR. LUOPING ZHANG

Consistent with that request, Dr. Zhang provides the following explanation, which has satisfied many peer review panels, in her Affidavit:

3.   In occupational epidemiology it rarely happens that every study on a given topic measures and categorizes exposure the same way.  If one were to only use studies that assessed exposure the same way, then very few, if any, occupational meta-analyses would ever be done.

4.   More commonly, exposure methods vary from study to study.  Importantly though, many of these different exposure assessment methods can be used to provide valid measures of association.  This includes studies that categorize exposure as "never vs. ever" and studies that look at high exposure groups.

5.   Studies looking at high exposures can have a particular advantage.  That is, if a true causal association exists then higher exposures generally lead to higher relative risks, and higher relative risks are less likely to be impacted by minor study errors.  This is a core principle of causal inference and epidemiology (Bradford Hill A. 1965. The environment and disease: Association or causation? Proc R Soc Med 58:295-300).

6.   Some "never vs. ever" studies could offer this advantage if many of those in the "ever" group are highly exposed.  In many instances, however, this is unknown, either because the researcher did not collect detailed exposure data or because the researchers simply did not report these data.  Given this unknown, a logical approach is to include both the "never vs. ever" and the high exposure category studies together, at least initially.  If the meta-analyst is then concerned that the "never vs. ever" studies will give a much different answer than the high exposure studies, then one can simply do a sensitivity analysis in which the two groups of studies are looked at separately to see if they give dramatically different results (*i.e.*, do both sets indicate an association exists or not?).

7.   Further, the "ever" exposed group in "never vs. ever" studies include various or mixed levels of exposure and can be very different from one "never vs. ever" study to another.

8.   The underlying premise here is that one should not automatically rely on unjustified assumptions regarding "apples and oranges."  Rather, a more scientific and thorough examination like the one described above is usually a much more informative and justifiable approach.

Ex. A, Dr. Zhang Aff. at ¶¶ 3.-8.

As set out below, this methodology has been utilized by Dr. Zhang and other scientists to assess a multitude of potential associations between environmental exposures and diseases.

**C.    Monsanto's Arguments Challenging the Reliability of Dr. Zhang's Opinions Fail.**

PLAINTIFF'S RESPONSE TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION  TO EXCLUDE THE TESTIMONY OF DR. LUOPING ZHANG

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

**1.      It is not scientifically unsound to mix "high exposure" groups with "ever exposed" groups in a meta-analysis.**

First, Monsanto contends that the meta-analysis in Dr. Zhang's 2019 Paper is unreliable because it "mixed and cherry-picked dose-response data with ever-never use data . . . ." Def.'s Supplemental Br. at 4.  That argument displays a total lack of understanding for how meta-analyses incorporating epidemiological studies are commonly structured.  As the authors of *Chromium VI and stomach cancer: a meta-analysis of the current epidemiological evidence*, which was published in the peer-reviewed journal OCCUPATIONAL AND ENVIRONMENTAL MEDICINE in 2015 ("Chromium/Stomach Cancer Meta-Analysis"), explained: "Some studies gave RR estimates for several different metrics of Cr(VI) exposure, such as average exposure, peak exposure or exposure duration.  **In observational epidemiology, it is uncommon for all, or even most, studies to report findings using the same exposure metric.  As a consequence, meta-analyses frequently involve combining data on different metrics**.  This meta-analysis is no different." Ex. A, Dr. Zhang Aff. at Ex. 4, Welling R, Beaumont JJ, Petersen SJ, Alexeeff GV, Steinmaus C (2015). Chromium VI and stomach cancer: a meta-analysis of the current epidemiological evidence. Occup Environ Med. 72(2):151-9. PMID: 25231674 ("Chromium/Stomach Cancer Meta-Analysis") at 152 (emphasis added).

As that passage indicates, the practice of mixing data sets using different exposure groups is not unique to Dr. Zhang's work nor is it a recent development in the field of epidemiological meta-analysis.  For example, in a 1998 meta-analysis entitled *Diesel Exhaust Exposure and Lung Cancer*, which was published in the peer-review journal EPIDEMIOLOGY ("Diesel Exhaust/Lung Cancer Meta-Analysis"), the authors used, where available, the subgroup from an epidemiological study "with the longest exposure stratum." Ex. A, Zhang Aff. at Ex. 1, Bhatia R, Lopipero P, Smith AH (1998). Diesel exhaust exposure and lung cancer. Epidemiology. Jan;9(1):84-91. PMID: 9430274 ("Diesel Exhaust/Lung Cancer Meta-Analysis"), at 85.  The authors of that study conceded that

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

"exposure duration categories were defined differently in the various studies" and the study selection table reflects that the authors included several studies for which no exposure duration at all was defined. *Id.* at 85-86, Table 1 (showing use of "no exposure duration" studies in, for example, Ahlberg et al, 1981 and Boffetta et al, 1988).

Similarly, in *2,4-dichlorophenoxyacetic (2,4-D) and risk of non-Hodgkin lymphoma: a meta-analysis accounting for exposure levels*, which was published in the peer-review journal ANNALS OF EPIDEMIOLOGY in 2017 ("2,4-D/NHL Meta-Analysis"), the authors explained their mixing of "highest exposure" groups with "ever exposed" groups in their meta-analysis:

> Most studies we identified gave RRs for **several different metrics of 2,4-D exposure**, including cumulative exposure, exposure intensity, duration of exposure, exposure with and without personal protective equipment (PPE), and time since first exposure. When this occurred, we attempted to identify the metric with the most comprehensive evaluation of exposure and **the metric most likely to capture the highest exposure group**. As such, when RRs were given for multiple exposure metrics, we selected a single RR for the metric in the following order: cumulative exposure (intensity x duration), exposure intensity (usually expressed as the number of days used, mixed, or applied 2,4-D per year), the longest duration (expressed as number of years using, mixing, or applying 2,4-D per year), and **ever exposed to 2,4-D versus never exposed to 2,4-D**. This order was determined *a priori*.

Ex. A, Dr. Zhang Aff. at Ex. 5, Smith AM, Smith MT, La Merrill MA, Liaw J, Steinmaus C (2017). 2,4-dichlorophenoxy-acetic acid (2,4-D) and risk of non-Hodgkin lymphoma: a meta-analysis accounting for exposure levels. Ann Epidemiol. 27(4): 281-289.e4. PMID: 28476329 ("2,4-D/NHL Meta-Analysis") at 282 (emphasis added).

Consistent with this common practice, Dr. Zhang has published meta-analyses in the peer-reviewed literature using mixed exposure data sets – including "high exposure" groups with "ever exposed" groups – on numerous occasions. In *Benzene exposure and non-Hodgkin lymphoma: a systematic review and meta-analysis of human studies*, which was published in the prestigious[8] peer-

---

[8] *See Baze v. Rees*, 553 U.S. 35, 108, 128 S. Ct. 1520, 1564, 170 L. Ed. 2d 420 (2008) (identifying "the Lancet, [as] an eminent, peer-reviewed medical journal.").

PLAINTIFF'S RESPONSE TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION  TO EXCLUDE THE TESTIMONY OF DR. LUOPING ZHANG

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

review journal LANCET PLANETARY HEALTH in 2021 ("Benzene/NHL Meta-Analysis"), Dr. Zhang

and her co-authors structured their meta-analysis similarly to Dr. Zhang's glyphosate meta-analysis.

Critically, for present purposes, "when multiple RRs or odds rations (ORs) were presented in the

original [epidemiological] studies," they used the "highest exposed category."  Ex. A, Dr. Zhang

Aff. at Ex. 7, Rana I, Dahlberg S, Steinmaus C, Zhang L (2021). Benzene exposure and non-

Hodgkin lymphoma: a systematic review and meta-analysis of human studies. Lancet Planet Health.

5(9): e633-e643. PMID: 34450064 ("Benzene/NHL Meta-Analysis") at 3.  As the study selection

table makes plain, the meta-analysis mixed together "highest exposed" groups from certain studies

with epidemiological studies that only looked at "ever exposed" groups.  *See id*. at Table 1 (showing

use of "ever exposed" group in, for example, Rinsky et al (2002) and Sorahan et al (2005)).

Similarly, in *Formaldehyde and Brain Disorders: A Meta-Analysis and Bioinformatics

Approach*, which was published in the peer-review journal NEUROTOXICITY RESEARCH in 2021

("Formaldehyde/Brain Disorder Meta-Analysis"), Dr. Zhang and her co-authors provided the

following scientific justification for an *a priori* hypothesis that focused on groups with high

formaldehyde exposure:

> **Our focus on groups with high formaldehyde exposure is based on the principle that, in general, if a true association exists, *higher* exposures are likely to yield *higher* relative risk estimates** (Rom and Markowitz 2007). . . . All else being equal, higher relative risks are associated with greater statistical power and are less likely to be due to relatively minor biases or confounding (Hill 1965). **Since our main goal is to evaluate the potential association of the exposure and risk of the disease outcomes and not to conduct a precise dose-response assessment or to evaluate risks in people with low exposures, our focus was on the groups with the highest available formaldehyde exposure.**

Ex. A, Dr. Zhang Aff. at Ex. 6, Rana I, Rieswijk L, Steinmaus C, Zhang L (2021). Formaldehyde

and Brain Disorders: A Meta-Analysis and Bioinformatics Approach. Neurotox Res. 39(3): 924-

948. PMID: 33400181 ("Formaldehyde/Brain Disorder Meta-Analysis") at 930 (emphasis added).

The authors of the Formaldehyde/Brain Disorder Meta-Analysis also noted that their "*a*

*priori* approach has been previously employed to estimate meta-risks for benzene (Steinmaus et al. 2008), formaldehyde (Zhang et al. 2009; Duong et al. 2011), and other agents (Welling et al. 2015; Zhang et al. 2019; Smith et al. 2017)." *Id*.  The study selection table in Formaldehyde/Brain Disorder Meta-Analysis also reflects that the meta-analysis mixed together "highest exposed" groups with "ever exposed" groups.  *See id*. at Table 1 (showing use of "ever exposed" group in, for example, Hall et al (2002) and Levin et al (2005)).  *See also* Ex. A, Dr. Zhang Aff. at Ex. 2, Zhang L, Steinmaus C, Eastmond DA, Xin XK and Smith MT (2009). Formaldehyde exposure and leukemia: a new meta-analysis and potential mechanisms. Mutat Res Rev, 681(2-3):150-168. PMID: 18674636 at 157 ("The studies in our meta-analysis used many different metrics of exposure. For example, one study gave relative risks (RR) for peak exposure [98], and others presented RRs only for an 'exposed' group defined solely by job title or work in a particular."); and Ex. A, Dr. Zhang Aff. at Ex. 3, Schwilk E, Zhang L, Smith MT, Smith AH, and Steinmaus C (2010). Formaldehyde and leukemia: an updated meta-analysis and evaluation of bias. JOEM, 52(9):878-886. PMID: 20798648 at 879-880, Table 1 (noting that "in many of the studies included in this meta-analysis, different types of exposure metrics were used" and mixing "highest exposure" groups (e.g., the Pinkerton study) and "ever exposed" groups (e.g., the Andjelkovich study) in the meta-analysis).

The authors of Formaldehyde/Brain Disorder Meta-Analysis further explained that, insofar as the mixing of data sets impacts RR estimates, it generally does so in a downward direction:

> **Combining different exposure metrics can impact RR estimates, but the likely direction of the impact would be to reduce the ability to determine true associations**.  This is because, if formaldehyde does cause leukemia, some exposure metrics are likely to be more strongly associated with leukemia risks than others.[] In this meta-analysis, we may have included some metrics that are less strongly associated or unassociated with leukemia than others.  **Including less relevant metrics will dilute summary RR estimates toward 1.0**.  If every study in this meta-analysis had reported data on the same single metric that was most strongly associated with leukemia risk, it is possible that the true RRs in people with high formaldehyde exposure are even greater than the ones reported here.

Ex. A, Dr. Zhang Aff. at Ex. 6, Formaldehyde/Brain Disorder Meta-Analysis at 883 (emphasis

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

added).

**2.**   **It is not scientifically unsound to mix adjusted data with unadjusted data.**

Second, Monsanto argues that Dr. Zhang's meta-analysis in her 2019 Paper is unreliable because it "mixed . . . data that was adjusted for other pesticides with data that was not." Def.'s Supplemental Br. at 4. Like Monsanto's argument about mixing data sets with different exposure metrics, addressed above, this contention is specious and does not withstand scrutiny. Most significantly, that argument overlooks the fact that: (a) several other published meta-analyses examining the association between glyphosate and NHL, including IARC's meta-analysis, combined unadjusted data from McDuffie and Orsi studies with data from studies that did adjust for other pesticide use;[9] and (b) the 2020 Miller Memo acknowledges that "[t]he Zhang et al. (2019) authors conducted their own literature search and used the same six studies [including McDuffie and Orsi] that EPA used in its evaluation."[10]

The usage of both data adjusted for potential confounders and unadjusted data in a meta-analysis is neither uncommon nor unscientific. For example, in the Chromium/Stomach Cancer Meta-Analysis, discussed *supra*, the authors noted that "[s]ome studies [included in the meta-analysis] reported RR estimates adjusted for variables such as smoking" and that these adjusted RRs were used when available. Ex. A, Dr. Zhang Aff. at Ex. 4, Chromium/Stomach Cancer Meta-Analysis at 152. *See also* Ex. A, Dr. Zhang Aff. at Ex. 1, Diesel Exhaust/Lung Cancer at 85 ("We always used smoking-adjusted effect measures **when present**.") (emphasis added).

Nor is there anything unscientific about including the data set most likely to capture the

---

[9] **Exhibit C**, Zhang L, Rana I, Shaffer RM, Taioli E, Sheppard L (2019). *Exposure to glyphosate-based herbicides and risk for Non-Hodgkin lymphoma: a meta-analysis and supporting evidence.* Mutat Res Rev. 781: 186-206. PMID: 31342895. PMCID: PMC6706269 at 196, Table 4 (showing Schinasi and Leon, IARC, and Chang and Delzell all incorporated the unadjusted data from the McDuffie and Orsi studies in their meta-analyses).

[10] Pl.'s Resp. at Ex. D, 2020 Miller Mem. at 13.

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

PLAINTIFF'S RESPONSE TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION  TO EXCLUDE THE TESTIMONY OF DR. LUOPING ZHANG

highest exposure group when adjusted and unadjusted data are available, provided this preference is clearly stated *a priori*.  For example, in the 2,4-D/NHL Meta-Analysis, discussed *supra*, the authors stated that, based on their *a priori* focus on evaluating the groups with the highest 2,4-D exposures, "[i]f separate RRs were provided for subjects using or not using PPE, the results for subjects not using PPE were selected."  Ex. A, Dr. Zhang Aff. at Ex. 5, 2,4-D/NHL Meta-Analysis at 282.  As the authors explained, "[b]ecause the primary purpose of this work was to evaluate whether the current literature supports an association between 2,4-D and NHL, rather than attempt to define specific response relationships, our focus here was on evaluating those groups with the highest 2,4-D exposure." *Id*.

**D.      Dr. Zhang's Opinions "Fit" the Case.**

Lastly, Monsanto argues that Dr. Zhang's opinions do not "fit" the case because "she has not updated [her] 2019 paper, despite other relevant papers coming out since that time."  Def.'s Supplemental Br. at 6.  This argument is stated in a conclusory fashion and Monsanto not surprisingly can cite to no authority for the notion that a published study directly addressing general causation in a case can no longer be used by a party because subsequent studies have been published.  Monsanto, of course, seeks to rely on several studies that are older than Dr. Zhang's 2019 Paper, including the EPA's 2017 evaluation, which is discussed at length in the 2020 Miller Memo.

Furthermore, Monsanto's "fit" argument ignores the fact that Dr. Zhang's research into whether glyphosate exposure causes NHL did not stop with the publication of her 2019 Paper.  As noted in Plaintiff's Response, the paper Dr. Zhang co-authored in 2023, *Mapping the key characteristics of carcinogens for glyphosate and its formulations: A systematic review*, and which was published in the peer-reviewed journal, CHEMOSPHERE, also directly addresses the issue of general causation in this case.  *See* Dckt. No. 70, Pl.'s Resp. at 4-5, 12.

**E.      "Other Issues" Do Not Warrant the Exclusion of Dr. Zhang's Testimony**

The Ninth Circuit has instructed trial courts that, in the context of a *Daubert* inquiry, "the

17

PLAINTIFF'S RESPONSE TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL BRIEF IN
SUPPORT OF MOTION  TO EXCLUDE THE TESTIMONY OF DR. LUOPING ZHANG

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

NACHAWATI LAW GROUP
5489 BLAIR ROAD
DALLAS, TX 75231

judge is supposed to screen the jury from **_unreliable nonsense opinions_**, but not exclude opinions merely because they are impeachable. The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013). Given the scrutiny Dr. Zhang's meta-analysis methodology has been subjected to, both in her own peer-reviewed studies and peer-reviewed studies generated by other scientists, her opinions cannot be credibly labeled "unreliable nonsense."  Indeed, as she noted in her *Daubert* hearing testimony, the EPA continues to ask her to serve on scientific advisory panels examining associations between chemical exposures and cancer.  *See* Tr. at 124:16-125:2.

For these reasons, the fact that certain statements may have been stated more clearly in Dr. Zhang's 2019 Paper do not warrant the wholesale exclusion of her testimony.  For example, while the Court expressed concerns about the wording of the sentence, "we observed a meta-RR of 1.41 . . . following high cumulative GBH exposure[,]"[11] the Court later conceded that this finding was better stated in the abstract.  *See* Tr. at 79:17-25.  Certainly, one poorly-worded sentence does not render the entirety of her published, peer-reviewed work unreliable – especially when it is stated clearly elsewhere in the paper.

## IV.    CONCLUSION

"The legal standard for reliability is aimed at excluding outlying evidence from experts without expertise near the arena of focus—*not* eliminating one of many viable opinions on a topic." *West Tenn. Chapter of Assoc. Builders and Contractors, Inc. v. City of Memphis*, 300 F. Supp. 2d 600, 605 (W.D. Tenn. 2004). As set out in the prior briefing, Dr. Zhang's hearing testimony and above, Dr. Zhang has expertise in the field of meta-analysis, and neither the methodology nor the

---

[11] *See* Tr. at 67-70.

PLAINTIFF'S RESPONSE TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION  TO EXCLUDE THE TESTIMONY OF DR. LUOPING ZHANG

results she published in her 2019 Paper were outliers; to the contrary, they constitute viable opinions on the topic of whether glyphosate exposure causes NHL.  These factors warrant the denial of Monsanto's Motion to Exclude.  Meanwhile, whether the conclusions stated in that paper are correct is for the jury to decide. *See Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012) (""The standard for judging the evidentiary reliability of expert evidence is 'lower than the merits standard of correctness.'") (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)).

Dated: May 9, 2024

/s/Gibbs Henderson
Gibbs Henderson
Attorney for Plaintiff Angelo Bulone

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing (NEF) to all counsel of record who are CM/ECF participants.

/s/Gibbs Henderson
Gibbs Henderson

PLAINTIFF'S RESPONSE TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION  TO EXCLUDE THE TESTIMONY OF DR. LUOPING ZHANG