# EXHIBIT A

Joseph R. Saveri (SBN 130064)
Christopher K.L. Young (SBN 318371)
Itak K. Moradi (SBN 310537)
David Lerch (SBN 229411)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1505
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email:     jsaveri@saverilawfirm.com
           cyoung@saverilawfirm.com
           imoradi@saverilawfirm.com
           dlerch@saverilawfirm.com

Robert L. Lieff (SBN 37568)
P.O. Box A
Rutherford, CA 94573
Telephone: (415) 250-4800
Email:     rlieff@lieff.com

David Strouss (*pro hac vice forthcoming*)
Evan Hoffman (*pro hac vice forthcoming*)
**THORNTON LAW FIRM LLP**
84 State Street, Fourth Floor
Boston, MA 02109
Telephone: (617) 720-1333
Email:     dstrouss@tenlaw.com
           ehoffman@tenlaw.com

David Bricker (SBN 158896)
**THORNTON LAW FIRM LLP**
2121 Avenue of the Stars, Suite 800
Los Angeles, CA 90067
Telephone: (310) 282-8676
Facsimile: (310) 388-5316
Email:     dbricker@tenlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JONAS PEREZ-HERNANDEZ and ISABEL PAZ-HERNANDEZ,** individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>**BAYER AKTIENGESELLSCHAFT**, a German joint-stock company; **BAYER CORPORATION**, an Indiana corporation; and **MONSANTO COMPANY**, a Delaware corporation,<br><br>*Defendants*. | Civil No.: 3:24-cv-01736-VC<br>MDL: 3:16-md-02741-VC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Jonas Perez-Hernandez and Isabel Paz-Hernandez ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through undersigned class counsel allege as follows, based on information and belief, personal knowledge, and investigation of counsel:

## I.   **INTRODUCTION**

1.      This is a class action brought on behalf of a class of agricultural workers, landscapers, and groundskeepers who (a) have significant occupational exposure to the herbicide Roundup, which contains the carcinogen glyphosate linked to the development of Non-Hodgkin's Lymphoma ("NHL"); (b) because of their exposure to glyphosate are at increased risk of developing NHL, but (c) are not diagnosed as suffering from NHL or under the care of a physician for suspected NHL as of the date of any relief obtained in this action.

2.      The relief sought by Plaintiffs is equitable in nature and discrete in focus. Plaintiffs wish to compel Defendants Bayer Aktiengesellschaft ("Bayer AG"), Bayer Corporation ("Bayer US") (together, "Bayer"), and Monsanto Company ("Monsanto") to provide medical monitoring for the early detection of NHL and surveillance of development of NHL through a program supervised by this Court.

3.      Monsanto is the defendant in tens of thousands of personal injury cases, brought primarily by individuals who have used residential lawn and garden Roundup products and allege that such use has caused their existing cancer diagnoses. When Bayer purchased Monsanto for $63 billion in June 2018, these suits were well under way, and more were being filed everyday nationwide.

4.      Bayer, which boasted of its thorough due diligence in purchasing Monsanto, cannot claim ignorance of Monsanto's extensive history of concealing the known risks associated with Roundup from consumers and from regulators. Perversely, and given its unique posture as an international conglomerate, Bayer stands to profit handsomely from its decision to continue selling products including: (1) Roundup; (2) Roundup Ready seeds for glyphosate-based Roundup; and (3) medications

and therapies to treat the non-Hodgkins Lymphoma caused by the Roundup. Pharmaceuticals is Bayer's second largest division (behind only Crop Science, the division encompassing Monsanto's business) and Bayer is "counting on its growing oncology business to deliver one third of the $30 billion in pharmaceuticals sales it has committed to generating by 2030."

5.      Like Monsanto before it, Bayer maintains to the public and regulators that Roundup is safe, and specifically that "[t]here is an extensive body of research on glyphosate and glyphosate-based herbicides, including more than 800 scientific studies submitted to U.S. or other worldwide regulators … that confirm that glyphosate and our glyphosate-based formulated products can be used safely and do not cause cancer." But as Bayer is aware, many such studies have been discredited as ghostwritten by Monsanto or have been otherwise deemed invalid. Bayer continues to cite these discredited studies, including a 2020 EPA evaluation of the carcinogenicity of glyphosate that the United States Court of Appeals for the Ninth Circuit has vacated for including "serious" errors in "assessing human-health risk" and defying the EPA's own Cancer Guidelines.

6.      Defendants knew or should have known that Roundup is associated with an increased risk of developing NHL, but took active steps to conceal, and failed to adequately inform and warn Plaintiffs and the Class of, the serious risks associated with the use of and exposure to glyphosate-based formulations, including Roundup. In the pursuit of massive profit and at the expense of public health and public access to information, Defendants have promoted and funded falsified data; attacked legitimate studies revealing the dangers of Roundup; mounted a campaign of misinformation to delegitimize the work of scientists attempting to reveal the dangers of Roundup; and made and continue to make representations suggesting that Roundup was, and is, safer than ordinary household items (including even table salt) despite decades of research in their possession indicating otherwise.  These statements and misrepresentations have been made with the intent of inducing the purchase and use of Roundup for

Defendants' pecuniary gain, and with disregard for and reckless indifference to the safety of those exposed to Roundup.

7.     At the very least, Defendants have failed to inform and have deceived consumers that there is an ongoing scientific dispute over the carcinogenicity of Roundup.

8.     As a result of Monsanto's decades-long deceit and obfuscation, well over one hundred thousand Roundup users have NHL diagnoses and other serious health conditions.

9.     So far, Bayer has resolved many of the tens of thousands of claims that have been filed or that were set to be filed, for billions of dollars. They have also publicly committed to paying billions more in settlements related to Roundup. But as noted above, these claims were virtually all brought by individuals who purchased Roundup for residential garden and lawn use. In 2023, rather than reformulate Roundup for all users (which it is capable of doing), Bayer instead decided to phase out its glyphosate-based Roundup product in the residential lawn and garden market only, which it describes as a "relatively small or very small part of the Roundup business" but the source of "over 90% of all claims" filed.

10.     As such, the settlements to date have done nothing to help Plaintiffs or the proposed Class of hundreds of thousands of agricultural workers, landscapers, and groundskeepers with significant occupational exposure to Roundup. These workers have not only fallen through the cracks of this MDL and of litigation across the country—they constitute a particularly vulnerable population for several reasons. Roundup products that Defendants sell for commercial and industrial use are often in a concentrated form that contain more elevated levels of glyphosate compared to products sold for residential garden and lawn use. Because approximately 90% of the glyphosate produced is applied in agricultural settings, it follows that occupationally exposed persons comprise an overwhelmingly large proportion of those exposed to the dangers of Roundup. These individuals, including Plaintiffs, have

ingested and been exposed to Roundup over sustained and prolonged periods of time. These individuals are part of a diffuse group, often undocumented, face language barriers, and can harbor a distrust or fear of public agencies or institutions.

11.     The fact that Roundup and the glyphosate contained therein leads to NHL is now well known, even to workers such as Plaintiffs and Class members. The likelihood of developing NHL as a result of exposure to glyphosate, especially over a sustained or prolonged period of time, has been repeatedly corroborated by reliable medical and scientific opinion. This has led Plaintiffs and those similarly situated to develop a real fear and anxiety that they will develop NHL as a result of their sustained and prolonged exposure to Roundup.

12.     In other words, Defendants, with the knowledge that Roundup is dangerous and/or with reckless disregard for its danger, continue to subject agricultural workers, landscapers, and groundskeepers to the risk of developing a deadly blood cancer simply because this population has proven less litigious.

13.     Defendants' concealment and omission of material facts in connection with their promotion, marketing, advertising, distribution, labeling, and sale of Roundup, including their continued endorsement of discredited studies and failure to provide the public with complete information regarding their product, constitutes negligence and violates California's Unfair Competition Law ("UCL"), Section 17200 of the California Business and Professions Code.

14.     This lawsuit thus seeks to obtain equitable relief to save lives. Because early detection, intervention, and diagnosis can greatly increase survivability of NHL, and because of the nature of the underserved and vulnerable population at issue, the relief requested by Plaintiffs include medical monitoring and other prophylactic relief that will be disseminated through extraordinary outreach

efforts, aimed at workers with significant occupational exposure to Roundup who are at increased risk of developing NHL.

## II.   <u>JURISDICTION AND VENUE</u>

15.    This Court has subject matter jurisdiction over Defendants and the proposed class action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act. Defendants are incorporated and operate their principal places of business outside of the State of California, where Plaintiffs reside. There are more than 100 Class Members. The amount in controversy exceeds $5 million.

16.    This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as they form part of the same case or controversy as the claims within the Court's original jurisdiction.

17.    This Court has personal jurisdiction over Defendants because the conduct at issue arises out of Defendants' contacts with this District. Defendant has, at all times relevant, individually or through its agents, subsidiaries, and representatives engaged in business in this State; marketed, advertising, distributed, and/or sold products in this State; committed statutory violations related to the allegations set forth herein in this State; and caused injuries to Plaintiffs and Class members that arose out of acts and omissions that occurred in in this State.

18.    Venue is proper within this district pursuant to 28 U.S.C. § 1391. Defendants, through their business conduct, purposefully avail themselves of the markets in this District and have sufficient minimum contacts with this District, and a substantial part of the acts and/or omissions giving rise to these claims occurred in this State.

## III.   <u>PARTIES</u>

19.     Plaintiff Jonas Perez-Hernandez was and is a resident of the State of California. Plaintiff Perez-Hernandez was employed as an agricultural worker and exposed to Roundup products over a

period of approximately 19 years in San Luis Obispo and Santa Barbara, California. As a result of Plaintiff Perez-Hernandez's sustained and prolonged exposure to Roundup, Plaintiff Perez-Hernandez has a fear of developing NHL because of his ingestion and/or exposure to Roundup. On information and belief, Plaintiff's exposure is ongoing due to his occupation.

20.    Plaintiff Isabele Paz-Hernandez was and is a resident of the State of California. Plaintiff Paz-Hernandez was employed as an agricultural worker and exposed to Roundup products over a period of approximately 19 years in San Luis Obispo and Santa Barbara, California. As a result of Plaintiff Paz-Hernandez's sustained and prolonged exposure to Roundup, Plaintiff Paz-Hernandez has a fear of developing NHL because of her ingestion and/or exposure to Roundup. On information and belief, Plaintiff's exposure is ongoing due to her occupation.

21.    Defendant Bayer AG is a joint-stock company incorporated in the Federal Republic of Germany with its headquarters and principal place of business at Bayerwerk, Gebäude W11, Kaiser-Wilhelm-Allee, 51368 Leverkusen, Germany. On June 7, 2018, Bayer became the sole owner of Defendant Monsanto in the largest acquisition in Bayer's history for a total purchase price of $63 billion. Bayer took out $57 billion in financing to make the acquisition and remains $43 billion in debt as a result. Since acquiring Monsanto, Bayer AG, along with its US subsidiary, has persisted in designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup despite knowing that Roundup is unsafe and causes NHL and other dangerous cancers.

22.    Defendant Bayer US is an Indiana corporation, with its headquarters and principal place of business in Whippany, New Jersey. Bayer US is a wholly owned subsidiary of Bayer AG and the direct parent of Defendant Monsanto.

23.    Defendant Monsanto is a Delaware corporation, with its headquarters and principal place of business in St. Louis, Missouri. At all times relevant to this First Amended Class Action Complaint

("FAC"), Monsanto was the entity that discovered and promoted the herbicidal properties of glyphosate and is engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup. Since June 7, 2018, Monsanto has been wholly owned, indirectly, by Bayer AG.

24.    "Roundup" refers to all formulations of Defendants' Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready- to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, and any other formulation containing the active ingredient glyphosate.

25.    Defendants derive substantial revenue from goods and products used in California and nationwide. Defendants expected or should have expected their acts to have consequences within this District and California, as well as nationwide. Upon information and belief, Defendants did design, sell, advertise, manufacture and/or distribute Roundup with full knowledge of its dangerous and defective nature.

IV.    **FACTS**

A.    **Monsanto's Discovery of Glyphosate**

26.    Monsanto was the first company to recognize potential in the chemical glyphosate. It discovered glyphosate to be an herbicide in 1970 and brought it on the market as Roundup in 1974.

27.    All Roundup products at issue contain glyphosate. Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses around the world. It is a "non-selective" herbicide that inhibits plant growth by inhibiting the production of a specific enzyme, with causes an accumulation of acids and ultimately plant death. In addition to glyphosate, Roundup includes surfactants, which are chemicals that increase penetration of other chemicals (in this case, glyphosate) into both plant and human tissue. Surfactants have been shown to exacerbate the absorption of glyphosate and thus substantially increase the toxicity and danger to human health.

28.    Today, glyphosate is the most-used herbicide in the world. Each year, approximately 127,000 tons of glyphosate-based products are sprayed on crops, school campuses, commercial nurseries, lawns, parks, and golf courses in the United States alone; approximately 700,000 tons of glyphosate-based products are sprayed on such areas worldwide. Over 90% of glyphosate is applied in agricultural settings on field crops.

B.    **Status of Monsanto's Federal Registration of Roundup**

29.    The manufacture, formulation, and distribution of herbicides such as Roundup are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136, et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA, 7 U.S.C. § 136a(a).

30.    The EPA requires as part of its registration process the submission of studies examining the effects of and potential toxicity associated with exposure to the proposed pesticide of people,

animals, and/or the environment. Registration by the EPA is not an assurance or finding of safety. Rather, the determination the EPA makes in registering or re-registering a product is not that the product is "safe," but that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, considering the economic, social, and environmental costs and benefits of the use of any pesticide." FIFRA thus requires the EPA to make a risk-benefit analysis in determining whether to grant registration or allow continued sale of a product.

31.     To comply with federal law, a registrant must submit to the EPA all relevant data it produces. The government is neither required nor able to perform product testing of pesticides.

32.     To obtain initial registration and approval from the EPA to sell Roundup in the United States, Monsanto submitted results of studies examining the effects of glyphosate on animals, including animal cancer studies. These studies were subsequently deemed invalid, but only after Roundup was released into the marketplace.

33.     The data necessary for registration of a pesticide with the EPA then changed over time. The EPA has been re-evaluating all pesticide products through a Congressionally mandated process called "re-registration." To re-evaluate these pesticides, the EPA demands the completion and submission of additional tests and data for review and evaluation.

34.     In the case of glyphosate and Roundup, the EPA planned to release its preliminary risk assessment in relation to the re-registration process by July 2015. It delayed release of that assessment in light of a finding published by the International Agency for Research on Cancer ("IARC"), an intergovernmental government agency within the United Nations' World Health Organization ("WHO"). In March 2015, the IARC convened a working group of 17 experts from 11 countries to evaluate and

coordinate research into causes of cancer as they pertained to several herbicides, including glyphosate. The evaluation was based on a cumulative review of all publicly available and pertinent scientific studies, some of which pertained to people exposed to glyphosate because of their occupation, including farmers.

35.     In the resulting July 2015 report, the IARC identified glyphosate as <u>probably carcinogenic to humans</u>. It also found that glyphosate caused DNA and chromosomal damage in humans.

36.     On January 30, 2020, the EPA released its re-registration decision on glyphosate, which concluded that "there are no risks to human health from the current registered uses of glyphosate and that glyphosate is not likely to be carcinogenic to humans." This conclusion does not comport with the IARC's findings and, as explained below, was based on a body of scientific literature that has been manipulated by Defendants for decades.

37.     Indeed, in 2022, the United States Court of Appeals for the Ninth Circuit ordered the EPA to reconsider its decision regarding glyphosate after reviewing the science and determining EPA shirked its duties in reviewing glyphosate. The Court found that "EPA's errors in assessing human-health risk are serious" and noted that the agency deemed glyphosate unlikely to cause cancer despite most studies reviewed showing that glyphosate caused an increased risk of NHL, and thus that EPA's determination was not supported by substantial evidence.

38.     The Ninth Circuit ordered the EPA to complete its re-registration review by October 2022. Instead, in September 2022, EPA issued a withdrawal of its registration review decision, and advised it anticipates issuing a final registration review for glyphosate in 2026.

### C.    Decades of Research Has Concluded Glyphosate and Roundup Are Harmful to Human Health

39.    As early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties, alone and as formulated in glyphosate-based herbicides like Roundup.

40.    Glyphosate has long been associated with carcinogenicity and the development of NHL. Many studies have evidenced the carcinogenicity of glyphosate and/or Roundup, and that formulated Roundup is even more toxic than glyphosate alone, including, *inter alia*:

    a)    A 1983 study conducted Monsanto that revealed mice exposed to glyphosate developed malignant lymphomas and rare kidney tumors at increased rates;[1]

    b)    A 1985 review by the EPA's Toxicology Branch, based on the 1983 mouse study, that initially classified glyphosate as a "Category C oncogen," meaning a possible human carcinogen (though EPA later changed its findings);

    c)    A 1997 published study which showed that tadpoles exposed to various herbicides including Roundup "showed significant DNA damage" when compared with unexposed animals;[2]

    d)    A 1999 published case-control study in Sweden encompassing 442 cases of exposure and twice as many controls indicated that exposure to glyphosate yielded increases risk of NHL;[3]

---

[1] Knezevich AL, Hogan GK, *A chronic feeding study of glyphosate in mice: Monsanto*. (1983) Report No. 77—2011 East Millstone: Bio/Dynamic Inc.

[2] Clements C, Ralph S, Petras M, *Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay*. (1997) Environ Mol Mutagen.

[3] Hardell L, Eriksson M, *A case-control study of non-Hodgkin lymphoma and exposure to pesticides*. (1999 Mar.) Cancer.

e)      A 2003 published study that concluded from pooled data the use of glyphosate increased incidence of NHL;[4]

f)      A 2004 published study that determined "glyphosate-based pesticides are clearly of human health concern, by inhalation in the vicinity of spraying" given the molecular link between glyphosate and cell cycle dysregulation;[5]

g)      A 2005 published study suggested the harmful effects of Roundup are the result of its specific combination of chemicals and the interaction of glyphosate with surfactants used;[6]

h)      A 2008 published case-control study concluding that glyphosate exposure is a risk factor for NHL;[7]

i)      A 2009 published study that examined the effect on human cells of four Roundup formulations, at dilution levels far below agricultural recommendations, and found the formations caused cell death, caused DNA damages, and inhibited cell respiration, and that surfactants used in Roundup amplify the toxicity of glyphosate;[8]

---

[4] De Roos AJ, Zahm SH, Cantor KP, Weisenburger DD, Holmes FF, Burmeister LF, Blair A, *Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma among men.* (2003 Sep.) Occup Environ Med.

[5] Marc J, Mulner-Lorillon O, Bellé R, *Glyphosate-based pesticides affect cell cycle regulation.* (2004 Apr.) Biol Cell.

[6] Peixoto F, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation.* (2005 Dec.) Chemosphere.

[7] Eriksson M, Hardell L, Carlberg M, Akerman M, *Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis.* (2008 Oct.) Int J Cancer.

[8] Benachour N, Séralini GE, *Glyphosate formulations induce apoptosis and necrosis in human umbilical, embryonic, and placental cells.* (2009 Jan.) Chem Res Toxicol.

j)      A 2017 literature review concluding that "some of the most compelling studies in human populations suggest associations" between glyphosate-based herbicides and NHL;[9] and

k)      A 2021 literature review concluding that glyphosate causes NHL and that formulated glyphosate-based herbicides are more acutely toxic than glyphosate alone.[10]

41.     These results were confirmed in published peer-reviewed studies and were always available and/or known to Defendants. Indeed, Monsanto publicly claims to review in detail every study published about their products. Defendants knew or should have known that glyphosate is carcinogenic, that Roundup is more toxic than glyphosate alone, and that further safety studies on Roundup and its formulations, including surfactants, were necessary to protect Plaintiffs and members of the Class from potential injury.

**D.      Roundup is Banned Throughout the World, and Glyphosate is Classified in California as a Carcinogen**

42.     Following the IARC's report on glyphosate, several countries and country-states issued bans or restrictions on glyphosate herbicides, including Roundup:

a)      The Netherlands banned all non-commercial use of glyphosate in May 2015;

b)      Italy prohibited the use of glyphosate for use in pre-harvest agricultural treatment and in areas frequented by the public or vulnerable groups in 2016;

c)      The Flemish government approved a ban on individual use of glyphosate in 2017;

---

[9] Vandenberg et al., *"Is it time to reassess current safety standards for glyphosate-based herbicides?"* (2017) 71 J. Epidemiological Community Health 613, 614.

[10] D. Weisenburger, *"A Review and Update with Perspective of Evidence that the Herbicide Glyphosate (Roundup) is a Cause of Non-Hodgkin Lymphoma."* (2021) 21 Clinical Lymphoma, Myeloma and Leukemia, 621.

d)      Two Indian states, Punjab and Kerala, banned the sale of glyphosate in 2018 and 2019 respectively;

e)      France banned the sale of Roundup in January 2019, and in April 2019, a French appeals court ruled Monsanto was liable for the health problems of a farmer who inhaled Roundup;

f)      The Czech Republic's agricultural ministry imposed a ban on the blanket use of glyphosate as a weed killer in 2019; and

g)      Luxembourg issued a total ban on glyphosate in 2020.

43.     The State of California considers glyphosate a carcinogen, and several United States municipalities have banned glyphosate herbicides.

### E.      For Decades, Monsanto Actively Concealed Evidence that Glyphosate and Roundup Are Harmful to Human Health

44.     Rather than meaningfully investigate the safety of Roundup as formulated, Monsanto instead continued to sell Roundup to millions of consumers in the United States each year, while dedicating itself to undermining the scientific community's efforts to conclusively establish the health risks posed by Roundup. Indeed, as one court has already found by clear and convincing evidence, "Monsanto made 'continuous efforts to impede, discourage, or distort the scientific inquiry about glyphosate and those actions were reprehensible and showed a conscious disregard for health.'"

45.     As studies evidencing a link between Roundup and NHL became public in the 1990s (*supra* ¶ 40), Monsanto hired world-renowned genotoxicologist Dr. James Parry to create reports that would help Monsanto undermine those studies and convince the scientific community and the public that glyphosate was safe.

46.     Monsanto's plan backfired. Dr. Parry's review of the scientific evidence did not support the desired conclusion. Dr. Parry instead advised Monsanto that glyphosate appeared genotoxic, that

Roundup as formulated was more genotoxic than glyphosate alone, and that prior studies Monsanto performed were deficient and unsound. He recommended that Monsanto undertake further research and offered to undertake the research himself.

47.     Because Monsanto's goal was not to actually determine whether glyphosate-based herbicide causes cancer but instead to find a scientific expert that could manipulate regulators, Monsanto not only failed to commission further research or accept Dr. Parry's offer to conduct it—it failed to submit Dr. Parry's findings to the EPA, in violation of reporting requirements under 40 C.F.R.§ 159.158.

48.     While Monsanto has attempted to cast its disregard for Dr. Parry's findings as a mere disagreement of reasonable scientific minds, in reality, Monsanto has built its claims of safety on studies that were invalid, if not criminally fraudulent. Many of the studies Monsanto commissioned and relied on to suggest glyphosate and Roundup were safe were actually performed by a laboratory that was later discredited after an EPA audit revealed scientific fraud and falsified research data, which resulted in the federal convictions of three Industrial Bio-Test Laboratories ("IBT Labs") executives in 1983. One of those executives was Paul Wright, a scientist who worked at Monsanto before joining IBT Labs then returning to Monsanto following his federal convictions for mail fraud and making false statements.

49.     An EPA audit subsequently—and unsurprisingly—found that toxicology studies Monsanto procured from IBT Labs in seeking EPA approval of Roundup were invalid. Afterward, Monsanto did nothing to warn the public that its safety testing had been invalidated and did nothing to change its marketing of Roundup, conduct which the California First District Court of Appeal noted in 2021 "shows conscious disregard for public health and safety" when it upheld a substantial award of punitive damages against Monsanto for related conduct.

50.     Monsanto also engaged in a pervasive ghostwriting campaign. Internal company emails evidence that Monsanto employees repeatedly penned studies, signed by purportedly independent

scientists with whom Monsanto had contracted, in order to publish findings that Roundup poses little to no health risk to humans. Monsanto then used those studies to both "build Roundup sales" and later to undermine the IARC 2015 announcement that glyphosate was a probable carcinogen.

51.     Indeed, when Monsanto learned as early as 2014 that the IARC was critically reviewing glyphosate as a probable human carcinogen, it doubled down on its ghostwriting and other unethical practices to seize control of the public narrative, flood the scientific literature with reports of glyphosate's safety, and smear the IARC.

52.     Monsanto hired a Canadian firm, Intertek, to coordinate four "independent expert panels" of fifteen researchers to publish five studies in a journal called *Critical Reviews in Toxicology* in 2016 as part of Monsanto's efforts to battle IARC's announcement. The researchers concluded unanimously that glyphosate was not a carcinogen. Those papers proved persuasive to regulators. For example, in defending its decision to re-approve use of glyphosate in 2017 until 2032, despite the IARC's 2016 warning, Health Canada cited the papers generated by the researchers coordinated by Intertek, which Monsanto bought and paid for. A 2016 EPA panel charged with reviewing the safety of glyphosate also recommended that the EPA study "relevant papers," including two of the papers generated as part of the Intertek project.

53.     All authors associated with the Intertek project ultimately signed "corrections," disclosing belatedly that Monsanto reviewed preliminary and final drafts of their articles that criticized the IARC assessment and apologized for any "errors or omissions."

54.     Still, Monsanto's strategy of ghostwriting and paying off scientists to flood the literature with reports that glyphosate was safe was successful. In addition to the Intertek papers, the EPA also cited other "studies" by Monsanto collaborators, including a 2015 study and a 2020 study later identified as ghostwritten.

55.     Monsanto also quietly funded lobbying groups to undermine public statements calling into question the safety of glyphosate or Roundup. As just one example, in 2017, a group called "Campaign for Accuracy in Public Health Research" ("CAPHR") was formed with the purpose of discrediting the IARC's determination that glyphosate was a probable human carcinogen. CAPHR was funded by CropLife America, which was in turn funded by Monsanto. CAPHR lobbied Congress to defund the IARC in response to its determination. Internal Monsanto emails also reveal that Monsanto funded the American Council on Science and Health ("ACSH") in exchange for the group promoting glyphosate and deriding its critics under the guise of an "independent" group of scientists.

56.     Monsanto understood that the IARC's review posed a major threat to its ability to continue selling Roundup. As written in an internal Monsanto email: "If there is a force working against glyphosate, there is ample fodder to string together to help the case even though it is not scientifically justified in its purest form." In other words, Monsanto understood that there was plenty of scientific evidence available to support a finding of human carcinogenicity, absent application of the kind of hyper-technical arguments Monsanto and its army of researchers on payroll were willing to make to discount it. Monsanto undertook a smear campaign against the IARC when it learned it was reviewing glyphosate, including by creating an internal document on "strategies and tactics" for responding to the IARC. One such tactic was "Orchestrate Outcry with IARC Decision."

57.     Bayer has continued Monsanto's campaign against the IARC, inaccurately critiquing the IARC's conclusion as "inconsistent" with experts.

### F.      **For Decades, Despite Knowledge of the Dangers of Glyphosate Exposure, Monsanto Continued to Advertise Roundup as Safe for Humans**

58.     Despite Monsanto's knowledge of extensive evidence of the dangers of glyphosate and Roundup, Roundup products did not contain a warning label telling consumers or workers to use protective equipment or notifying them of the cancer risks of exposure. Rather, product labels

inaccurately inform consumers that Roundup "targets an enzyme found in plants, but not in people or pets."

59.     For years, Monsanto produced commercials that depicted people using Roundup without protective equipment. Monsanto even implicitly supported a narrative that Roundup is safe enough to drink. Thus, many agricultural workers, landscapers, and groundskeepers have used Roundup without adequate protective equipment, because Defendants did not instruct them to do so. At the same time, Monsanto was warning its own employees who worked with Roundup to wear protective bodysuits, gloves, and face masks.

60.     Many such workers reported believing Roundup is safe. The public relies on Defendants to offer quality, safe products, and to inform them of any potential health risks. Defendants instead manufactured, labeled, marketed, distributed, and sold a deadly product without any warning, and while distorting other public-facing information, all for illicit financial gain.

61.     This focus on financial gain at the expense of public health and safety is evidenced by Defendants' active concealment of evidence from the public and the failure to submit information to EPA evidencing a link between Roundup and NHL.

62.     Defendants could and can notify consumers of the potential health risks by, among other things, providing information on its webpages for Roundup, in television and radio commercials, in-store signage, such as point-of-sale or shelf tags, posters, or press releases—yet have not done so.

63.     Plaintiffs and members of the Class were not warned and did not know at the time of their exposure to Roundup that they were being exposed them to chemicals that are hazardous and likely carcinogenic. Defendants failed, at the very least, to warn consumers that there is a vigorous scientific dispute about Roundup's potential to cause NHL in humans. Knowledge of the existence of this debate regarding the association of Roundup exposure to the development of NHL is valuable information to

members of the public, including agricultural workers, landscapers, and groundskeepers, in deciding whether to use Roundup.

64.     Roundup's development of its genetically modified seeds, i.e., Roundup Ready seeds for agricultural crops that are immune to Roundup, has only incentivized and allowed agricultural workers to use even more Roundup, as the product can be applied directly to crops without damaging them. In 2010, an estimated 70% of corn and 90% of soybean fields in the United States contained Roundup Ready seeds. Defendants were thus able to secure their dominant position in the glyphosate and herbicide market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of Roundup herbicide.

65.     The success of Defendants' marketing tactics has made glyphosate omnipresent in the United States and puts agricultural workers and other occupational workers at heightened risk. By definition, members of the Class were exposed to glyphosate over periods of time sufficient to establish an exposure level that is considered to be hazardous to health, and that is considered to be sufficient to cause cancer or increase the risk of developing cancer. As a proximate result of Defendants' acts and omissions, the Class is at an increased risk of developing cancer above the normal base-level risk.

### G.     <u>Medical Monitoring of the Development of NHL</u>

66.     NHL is a deadly blood cancer that affects the body's lymphatic system, which fights infection and disease, and often spreads to other areas of the body, including the liver, brain, and bone marrow. One in four people diagnosed with NHL die within five years. Survivors of NHL suffer from a diminished quality of life due to treatment-related toxicities, lasting physical pain, fatigue, financial difficulties, post-traumatic stress, and fear of relapse.

67.     Though NHL is pernicious, the science and research shows that early detection, intervention, and diagnosis can greatly increase survivability. Early detection of NHL in patients is one

of the best, and sometimes the only, means of treating cancer, as it can possibly prevent the risk of permanent injury, illness, or death. In advanced clinical stages, NHL is usually not curable, but early-stage NHL can be.

68.     Early detection necessarily allows patients to avail themselves of myriad forms of prompt and effective treatment, each of which is capable of altering the course of the illness or significantly decreasing a Class Member's risk of severe injury, e.g., by bringing cancer into remission or allowing for removal of any malignant tumors. Simply put, needed treatment can begin sooner. Early detection can provide great benefit to patients who are developing NHL by reducing the amount of chemotherapy necessary for treatment and remission.

69.     If a diagnosis of NHL is suspected, further evaluation and monitoring includes laboratory testing, imaging, and biopsy. Laboratory testing is often the initial step.

70.     Because NHL can be treated more effectively and with a better result if it is detected early, and given that NHL can be detected in a general practice setting with a clinically noted set of symptoms, increased visits to a medical clinician necessarily reduces the risk of mortality from NHL. Thus, determining the medical status of hundreds of thousands of potentially at-risk agricultural workers and landscapers is the initial and most important benefit of the proposed program.

71.     In addition, and separate from treatment of those who already have symptoms of NHL which are detectable by general practitioners, technology, analytical tools, and monitoring procedures exist and are readily available to provide for detecting signs of the development of NHL for Class Members who may not present with readily observable NHL symptoms but who may nevertheless be at a significantly increased risk of developing the disease. These technologies and monitoring procedures are accepted and widely used by the scientific and medical community and include but are not limited to blood and genetic tests which predict increased risks of developing NHL.

72.     Available tests are a culmination of several nested case-control studies of populations at risk for NHL, which examined pre-diagnosis markers involving immunological and genetic changes. The most recent and comprehensive analysis of immune marker studies was conducted by the National Cancer Institute ("NCI"). The NCI-led investigation pooled together eight peer-reviewed studies in different cohorts to confirm that tests of serum for certain immune market concentrations provide robust evidence of an association between elevated immune marker concentrations and the risks of developing subtypes of NHL. These serum markers were especially good at predicting the development of NHL within the next two to seven years.

73.     Another study by NCI investigators within the Agricultural Health Study cohort examined the association between genetic changes involving the mosaic loss of certain chromosomes and lifetime occupational glyphosate use. They found through testing the blood DNA of farmers who used Roundup that there were significant changes in the DNA sequence within chromosome Y, which indicated a genotoxic effect  and which are early indicators of future cancer risk. With the assistance of medical experts implementing testing based upon these and other peer-reviewed studies, the first step of an effective medical monitoring program—reliable early detection—is achievable.

74.     Positive results in the specific medical tests identified above, as well as more general screening for NHL-associated symptoms, such as lumps or pain in the neck or abdominal region, will identify eligible class members most in need of follow-up medical monitoring for the purpose of detecting NHL at its earliest stage.

75.     The tests and treatments for the early detection and treatment of NHL must be prescribed by a qualified clinician and can primarily be conducted by clinics specially funded under the Diagnostic Assistance Grant Program ("DAGP"), a federally funded program aimed at servicing agricultural

workers and which serves 28 geographic areas where over 90% of agricultural workers and landscapers in the United States reside.

76.     Because Roundup-associated cancer screenings may not otherwise be conducted with the frequency necessary to identify cancer for individuals who are at heightened risk of developing NHL such as Plaintiffs and the Class, the prescribed monitoring regime is different from that normally recommended in the absence of exposure. Plaintiffs and Class Members require more frequent screenings not within the purview of routine medical exams. Existing DAGP clinics around the country already engage in outreach efforts to provide general medical services to thousands of farmworkers, and these efforts could be amplified and augmented through the provision of a specific NHL medical monitoring program tailored to the above testing mechanisms.

**H.      Plaintiffs' Use of and Exposure to Roundup**

77.     Plaintiffs have resided and have worked in California at all relevant times.

78.     Plaintiffs have been significantly exposed to Roundup products in the course of their employment and as part of their occupational duties, in San Luis Obispo and Santa Barbara, California, for a sustained and prolonged period of time, and at least for 19 years.

79.     Plaintiffs did not know, when applying Roundup at work, that Roundup had the potential to cause NHL, or at the very least, that there was an ongoing scientific dispute concerning its potential carcinogenicity.

80.     Had Plaintiffs known, they would not have used Roundup. Plaintiffs learned that Roundup has the potential to cause cancer after prolonged exposure to Roundup and now harbor serious fear that the ingestion or exposure of Roundup was of such a magnitude and proportion as to likely result in NHL. Plaintiffs are now aware that ingestion and exposure to Roundup and the glyphosate contained therein, particularly over a sustained and prolonged period of time, leads to a significantly

increased risk of developing NHL. On information and belief, Plaintiffs's exposure is ongoing due to their occupations.

81.     Defendants' concealment and omission of material facts, and failure to adequately warn Plaintiffs of the dangers associated with use of Roundup, is material because Plaintiffs and the Class used a product that they believed to be safe when it in fact has known associated links with the development of cancer.

## V.      <u>EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATION</u>

82.     Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiffs and Class members the true risks associated with Roundup and glyphosate. At all relevant times, Defendants have maintained that Roundup is safe, non-toxic, and non-carcinogenic.

83.     As of March 2023, Bayer continues to represent to the public that: "There is an extensive body of research on glyphosate and Bayer's glyphosate-based herbicide . . . that confirms these products can be used safely and that glyphosate does not cause cancer."

84.     Even after a jury found in 2019 that "Roundup's design was defective," "Roundup lacked sufficient warning of the risk of NHL," and "Monsanto was negligent by not using reasonable care to warn about Roundup's NHL risk," Defendants continue to make false and misleading assertions regarding the safety of Roundup, including that the product "can be used safely and . . . glyphosate does not cause cancer."

85.     As a result of Defendants' actions, Plaintiffs were unaware, and could not reasonably have known or have learned through reasonable diligence, that contact with Roundup and/or glyphosate exposed them to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

86.     Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality, and nature of Roundup. Defendants were under a duty to disclose the true character, quality, and nature of Roundup, as this was non-public information unavailable to Plaintiffs and over which Defendants had and continue to have exclusive control. Defendants are also estopped from relying on any statute of limitations because of their intentional concealment of the immediately foregoing facts, e.g., their exclusive control and Plaintiffs' lack of access.

87.     Plaintiffs did not know that Defendants were engaged in the wrongdoing alleged herein and could not have reasonably discovered the wrongdoing at any time prior. Defendants had the ability to and did spend enormous amounts of money in furtherance of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known, reasonably knowable risks. Plaintiffs and the medical professionals who treated them could not have afforded and could not have conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on Defendants' false representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## VI.    CLASS ALLEGATIONS

88.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein. Plaintiffs bring this action as a class action pursuant to Rule 23(a) and Rule 23(b) of the Federal Rules of Civil Procedure on behalf of themselves and all members of the following Class:

> Agricultural workers, landscapers, and groundskeepers who: (1) were exposed to Roundup as part of their occupational duties in California for ten or more lifetime exposure days prior to June 21, 2024, (2) are not diagnosed as suffering from NHL or under the care of a physician for suspected NHL as of the date of any relief obtained in this action, and (3) have not commenced a lawsuit or retained counsel for the pursuit of any

personal injury, other tort, or class action claim arising from or relating to Roundup exposure prior to June 21, 2024 (the "Exposure Criteria").

89.     "Significant," as used in this complaint, means ten or more lifetime exposure days.

90.     The following are excluded from the Class: The judicial officers, appointees, and designees assigned to this action, and any member of their immediate families; Defendants, any of their past, present, or future officers, directors, trustees, agents, representatives, employees, principals, trusts, partners, joint ventures or controlled entities; and successors, assigns, heirs or other persons or entities related to or affiliated with Defendants as of June 21, 2024; and, all those otherwise in the Class who timely and properly exclude themselves therefrom in such manner as the Court may direct.

91.     Plaintiffs bring this action on behalf of the Class for equitable and injunctive relief for a court-supervised medical monitoring program as described herein. Alternatively, Plaintiffs seek to certify important common questions for class-wide determination on an "issues class" basis.

92.     **Numerosity.** Roundup is the best-selling herbicide in the United States. The members of the Class are so numerous as to render their individual joinder impracticable. Although the precise number of Class members is unknown, based on information and belief, Plaintiff allege the Class contains hundreds of thousands to millions of members.

93.     Members of the Class may be notified of the pendency of this action by techniques and forms commonly used in class actions, such as by published notices in publications and on flyers and posters in clinics, including DAGP clinics; laborer hiring and employment resources offices; community centers (including on agricultural, landscaping, and groundskeeping jobsites); radio; television; e-mail notice; website notice; social media; first class mail; or combinations thereof, or by other methods suitable to the Class and deemed necessary by the Court.

94.    **Commonality.** Plaintiffs' claims raise significant common questions, i.e., questions with answers not dependent upon the particular circumstances of Class members, and the answers to which are the same for everyone in the Class. These common questions include but are not limited to:

a.    whether Roundup can cause NHL in humans (general causation);

b.    whether Defendants were aware of the risks posed by use of or exposure to their Roundup products, or reasonably should have known of the risks posed;

c.    whether Defendants misrepresented, omitted, concealed, or failed to warn of or disclose material facts regarding the risks of use or exposure to Roundup, including in their advertising and marketing;

d.    whether Defendants' practices related to the funding of research and marketing and sale of Roundup were unlawful, unfair, or fraudulent.

95.    Common questions regarding Defendants' Roundup products, their knowledge of associated risks (including the increased risk of developing NHL from exposure), and their conduct thereafter, are inquiries salient to all claims. Resolving them on a class-wide basis would itself significantly advance the resolution or determination of all Class Members' claims, would save millions of dollars for the Class, and would save thousands of hours of judicial time and resources.

96.    **Typicality.** Plaintiffs' claims are typical of those held by other members of the Class in that each were exposed to Roundup through the course of employment and as part of their occupational duties, none are diagnosed with NHL or under the care of a physician for suspected NHL, and none have commenced an individual lawsuit against Defendants or retained counsel with the intention of filing a lawsuit against Defendants related to the facts alleged in this First Amended Complaint.

97.    **Adequacy.** Plaintiffs and other class representatives will fairly, adequately, and vigorously protect the interests of the Class. Plaintiffs have retained trial counsel highly experienced in

complex litigation, including complex class action litigation involving toxic exposures, and Plaintiffs intend to vigorously prosecute this action. Plaintiffs have no interests in this action that are adverse or antagonistic to the interests of the Class.

98.     **Predominance and Superiority**. The common questions of law and fact raised in this First Amended Complaint predominate over those affecting only individual Class members. Under these circumstances, class action litigation is superior to all other available means for the fair and efficient adjudication of common questions because these common questions are key to the advancement of the litigation by Class members.

99.     Further, individualized litigation would create the danger of inconsistent or contradictory results arising from an identical factual predicate.

100.    By contrast, litigation of common questions as a class action in a single, unitary proceeding will materially advance the disposition of the litigation because it will provide substantial economies of scale, allow comprehensive supervision of this issue raised herein by a single court, and presents no unusual management difficulties under the circumstances presented.

## VII.    CLAIMS FOR RELIEF

### COUNT I

### Negligence/Negligent Misrepresentation

101.    Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

102.    Defendants owed Plaintiffs and the Class a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup, including a duty to avoid that the product would put users at an increased risk of suffering unreasonable and dangerous side effects, conditions, or harm.

103.     Defendants breached that duty. Defendants manufactured, marketed, advertised, and sold Roundup as a "weed killer," but failed to disclose to users material information regarding the link between exposure to and the likelihood of developing NHL, despite the fact that Defendants knew or should have known of Roundup's propensity to cause NHL.

104.     The risk of NHL is serious, and sustained and prolonged exposure to Roundup and the known and suspected carcinogens therein (e.g., glyphosate) leads to a significantly increased risk of developing NHL.

105.     Defendants also failed to disclose, concealed, suppressed, and omitted material information concerning both Roundup and the various studies that Defendants have cited, and studies that the Defendants have suppressed, resulting in a misrepresentation to both the Plaintiffs, and regulators such as the EPA, as to the true risk of Roundup.

106.     Defendants intended that Plaintiffs and the Class rely upon their material misrepresentations and omissions.

107.     Defendants' negligent conduct, as alleged in herein, exposed Plaintiffs to an increased risk of developing NHL from their use of Roundup, rendering Defendants responsible for preventing or mitigating that risk of harm through payment for a program providing for medical monitoring and surveillance programs, or other programmatic remedies according to proof and as approved by the Court and administered under its ongoing supervision.

108.     As a result of this violation, Plaintiffs and members of the Class ingested various known and suspected carcinogens contained in Roundup due to exposure over a sustained and prolonged period of time.

109.     Plaintiffs and members of the Class now know that sustained and prolonged exposure to Roundup leads to a significantly increased likelihood that they will develop NHL. This increased

likelihood of developing NHL as a result of sustained and prolonged exposure to the carcinogens contained in Roundup is corroborated by medical and scientific studies and opinions, some of which are referenced herein.

110.     As a result of Plaintiffs' sustained and prolonged exposure to Roundup, Plaintiffs and members of the Class harbor serious fear that the ingestion or exposure of Roundup was of such a magnitude and proportion as to likely result in NHL.

111.     Defendants' breach proximately caused Plaintiffs and the Class to suffer damages, injury in fact and/or ascertainable loss in amounts to be determined. Defendants are liable to Plaintiffs and Class Members for fair compensation of the resulting injuries, including the costs of administering medical monitoring and surveillance intended to prevent the development of debilitating or deathly forms of NHL.

112.     The determination of the common questions on a class-wide basis will advance the resolution of this claim for individual Class members.

## COUNT II

### Violation of The California Unfair Competition Law,

### Cal. Bus. & Prof. Code § 17200, et. seq.

113.      Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

114.     Defendants' actions and omissions described herein were likely to mislead the general public and therefore constitute unlawful, unfair, or fraudulent business acts within the meaning of the California Unfair Competition Law, codified as Business and Professions Code section 17200 ("UCL").

115.     Defendants' unlawful, unfair, or fraudulent business acts in violation of UCL include but are not limited to the following:

a.      Failing to report data and information to EPA in compliance with federal law set forth in 40 C.F.R. § 159 et seq.;

b.      Failing to disclose to the public material information regarding the link between exposure to and the likelihood of developing NHL, despite the fact that Defendants knew or should have known of Roundup's propensity to cause NHL;

c.      Knowingly making false representations to the public as to the characteristics of Roundup products; and

d.      Knowingly manipulating scientific evidence for purposes of financial gain and with reckless disregard for public safety.

116.    Plaintiffs and the Class bring this action on behalf of themselves and all similarly situated persons for the equitable and declaratory relief requested; to promote the public interests in the provision of truthful, non-deceptive information to allow consumers to make informed purchasing decisions; and to protect Plaintiffs, the Class, and the public from Defendants' unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful practices. Defendants' wrongful conduct has had a widespread impact on the public at large and caused serious injuries to Plaintiffs and the Class members.

117.    Defendants' unlawful, unfair, or fraudulent business acts significantly impacted agricultural workers, landscapers, and groundskeepers, including Plaintiffs and Class Members, who are a vulnerable population at particularly heightened risk of exposure to glyphosate-based Roundup. These acts were material as they were likely to deceive reasonable users of Roundup products, including Plaintiffs and Class Members, and induce them to expose themselves to Roundup products without being aware that they were unsafe to use and thereby be at increased risk of developing a deadly cancer.

118.     As a direct and proximate result of Defendants' unfair methods of competition and unfair, deceptive, fraudulent, unconscionable, and/or unlawful acts or practices, Plaintiffs and the Class have suffered. Defendants' conduct, as alleged herein, placed Plaintiffs and the Class at increased risk of contracting NHL through exposure to glyphosate and formulated Roundup, and Defendants should pay for the costs of medical screening, diagnostic and/or surveillance programs and services to be provided to Plaintiffs and the Class, to prevent or mitigate the injury otherwise resulting from Roundup exposure, as appropriate and according to proof, through an appropriate program approved by the Court and administered under its ongoing supervision.

119.     Defendants have long had notice of the underlying allegations, claims and demands in this First Amended Complaint, including from internal audits, field testing, online complaints, and direct complaints regarding Roundup.

120.     The determination of the common questions on a class-wide basis will advance the resolution of this claim for individual Class members.

## COUNT III

## Claim for Declaratory Relief

121.     Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

122.     Defendants have acted and refused to act with respect to their misrepresentations and omissions concerning the safety of Roundup in a manner that has affected all Class members, and the declaratory, injunctive and equitable relief sought herein will provide relief to all members of the Class.

123.     An actual case and controversy exists as between Plaintiffs and Defendants as to:

    a.     whether Roundup is unfit for its ordinary purpose;

b.      whether Defendants marketed Roundup but omitted material health information regarding its use;

c.      whether Defendants' marketing of Roundup was false, deceptive, and/or misleading;

d.      whether Roundup is carcinogenic, genotoxic, and/or linked to NHL;

e.      whether and when Defendants discovered that Roundup was carcinogenic, genotoxic and/or linked to NHL;

f.      whether Defendants misrepresented, omitted, concealed or failed to disclose material facts regarding the risks of use or exposure to Roundup;

g.      whether Defendants intended that Plaintiffs and the Class rely upon their material misrepresentations and omissions;

h.      whether Defendants engaged in fraudulent, unfair, or deceptive practices; and

i.      whether Defendants are financially responsible for providing corrective notice to the Class regarding Roundup.

124.    Under principles of common law tort and as a matter of equity, Defendants should pay for the costs of medical screening, diagnostic and or surveillance programs and services to be provided to Plaintiffs and the Class, to prevent or mitigate the injury otherwise resulting from Roundup exposure, as appropriate and according to the requisite proof, through an appropriate program approved by the Court and administered under its ongoing supervision.

125.    The requested declaratory relief set forth herein will produce answers to the common questions that lie at the heart of this litigation and that will allow Plaintiffs and the Class to obtain relief that directly redresses the injuries suffered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request the Court to enter judgment against the Defendants, as follows:

126.    An order certifying an appropriate Class and Subclasses for the determination of common questions of law and fact regarding Defendants' product, knowledge, conduct, and duty, and to provide programmatic relief as alleged and requested herein; and designating Plaintiffs and their undersigned counsel as Class and Subclass Representatives and counsel as appropriate;

127.    Costs of medical screening, diagnostic and/or surveillance programs and services to be provided to Plaintiffs and the Class, to prevent or mitigate the injury otherwise resulting from Roundup exposure, as appropriate and according to proof, through an appropriate program approved by the Court and administered under its ongoing supervision;

128.    An award of reasonable attorneys' fees and costs incurred in this action; and

129.    Such other and further relief as the Court deems just and proper.

**VIII.    JURY DEMAND**

Plaintiffs and the Class hereby demand a trial by jury on all matters so properly triable.

Dated: June 21, 2024

Respectfully Submitted,

By:  */s/ Joseph R. Saveri*

Joseph R. Saveri

Joseph R. Saveri (SBN 130064)
Christopher K.L. Young (SBN 318371)
Itak K. Moradi (SBN 310537)
David Lerch (SBN 229411)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1505
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email:     jsaveri@saverilawfirm.com
           cyoung@saverilawfirm.com
           imoradi@saverilawfirm.com
           dlerch@saverilawfirm.com

Robert L. Lieff (SBN 37568)
P.O. Box A
Rutherford, CA 94573
Telephone: (415) 250-4800
Email:     rlieff@lieff.com

David Strouss (*pro hac vice forthcoming*)
Evan Hoffman (*pro hac vice forthcoming*)
**THORNTON LAW FIRM LLP**
84 State Street, Fourth Floor
Boston, MA 02109
Telephone: (617) 720-1333
Email:     dstrouss@tenlaw.com
           ehoffman@tenlaw.com

David Bricker (SBN 158896)
**THORNTON LAW FIRM LLP**
2121 Avenue of the Stars, Suite 800
Los Angeles, CA 90067
Telephone: (310) 282-8676
Facsimile:  (310) 388-5316
Email:     dbricker@tenlaw.com

*Attorneys for Plaintiffs*