**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>ALL ACTIONS | MDL No. 2741<br><br>Case Nos.: 3:16-md-02741-VC<br><br>**JOINT STATUS REPORT** |

Pursuant to the Courts July 8, 2024 Order, the Parties submit the below responses:

**I.        Creation of MDL Wave 9 Schedule**

The Parties propose that the Court create a Wave 9 and that Wave 9 be the last Wave in the MDL.  This MDL was created on October 6, 2016.   Over the past eight years, over 5,200 cases have been resolved or dismissed.  Further, over the past eight years, this Court has conducted oversight of common discovery, decided dispositive issues common to many cases in the MDL, tried the *Hardeman* case to verdict, and decided dispositive issues during the Wave process.

This Court has successfully managed this large MDL.  At its height, this MDL had over 5,500 cases.  Filings in the MDL have reduced over the past several years.  In 2019, the MDL had over 2,300 cases filed or transferred to the MDL.  Last year, just 195 cases were filed or transferred to the MDL.

Today, there are less than 500 cases in the MDL.  Based on the history of this MDL, only a fraction of these 500 cases will be remain after dismissals, resolutions and motion practice in Waves 7 and 8.  For example, Wave 6 began with 310 cases and ended with just four cases.  Wave 7 began with 345 cases and currently has 83 cases in it.

On August 30, 2023, the Court entered an Order Granting Joint Request for Revised Schedule for Wave 6-7 Cases and Adding Wave 8 Schedule ("August 30, 2023 CMO"). (MDL Dkt. 17234). At the time of the August 30, 2023 CMO, Wave 7 contained a total of 345 cases and was broken into seven sub-Waves, Waves 7A-7G. Also, at the time of the August 30, 2023 CMO, Wave 8 contained a total of 206 cases and was broken into three sub-Waves, Waves 8A-8C.

Since the Court's entry of the August 30, 2023 CMO, the total number of cases in Wave 8 has grown from 206 to approximately 377 total cases. Of these 376 cases in Wave 8, 193 cases are originally from Wave 8 or are transfers from previous Waves. The remaining 183 cases are new to the MDL or were moved off of the inactive docket since the entry of the CMO entered on August 30, 2023. Those 183 cases currently have no sub-wave assignments and plaintiffs' counsel for those cases have no way of ascertaining what, if any, Wave 8 deadlines apply to their clients.

Under the Parties Proposed Order (Ex. A), the Wave 8 deadlines would be unchanged. However, a Wave 9 would be created and those remaining 183 cases would be placed in Wave 9, split evenly over four sub-waves. Last, a MDL Wave 9(e) would be created and any cases added to the MDL or moved off the inactive docket[1] after the date of this Order would be placed into MDL Wave 9(e).

The Parties also propose the MDL begin the winding down process and that Wave 9(e) be the last sub-wave in the MDL. Any cases moved from the inactive docket or added to the MDL on or before October 4, 2024 would be placed into Wave 9(e). The Parties propose that

---

[1] Any cases moved off of the inactive docket after October 4, 2024 would be remanded with Wave 9 cases. Those cases would not be worked up in the Wave process.

after October 4, 2024, no further cases can be added to the MDL or moved off of the inactive docket into the MDL.

This MDL is now in a similar situation as the California state Roundup JCCP which began winding down in August 2021. The JCCP found that it served its purpose of managing common historical discovery, resolving key legal issues, addressing common evidentiary issues, and providing a template for counsel and trial courts to litigate Roundup cases in the future. Indeed, the JCCP recognized that the primary remaining issues related to the Roundup litigation were case-specific and could be managed by individual trial courts and counties in California.

Further, the Roundup litigation is being litigated in several jurisdictions outside of the MDL. 98% of the new Roundup cases filed in 2023 and 2024 were filed into various state courts across the country and only 2% are being filed in federal courts. Since the *Hardeman* trial, Roundup cases have gone to verdict in five separate counties in California, four separate counties in Missouri, Oregon state court, Illinois state court, Pennsylvania state court, Delaware state court, and Arkansas state court.

Parties are largely litigating case-specific issue through the Wave process and little to no common issues remain with the cases left in the MDL. Thus, the Parties believe a Wave 9 should be created and that Wave 9 be the last Wave in the MDL.

II. **How to Identify Whether Plaintiffs' Counsel Are Taking on More Cases Than They Can Actually Litigate**

A. **Plaintiffs' Position**

It would be near impossible to identify whether any single plaintiffs' firm has more Roundup clients than they can effectively litigate. To make that assessment, one would need to know specific information about each firm, including, at a minimum, the number of Roundup clients they represent nationwide, the law firm's perceived and actual leverage in the Roundup litigation, the status of each Roundup case, the other litigations the firm is involved in, the

number of cases they have in each of the other litigations, the status of each of those other litigations, and the experience and number of attorneys and staff at their offices. Further, one would also need to know the work ethic, risk tolerance, stress tolerance, and ability to multi-task of each employee in a particular firm, as well as the firm's financial stability.  But even with this information, it would still be difficult for the Court or MDL Leadership to make a definitive conclusion regarding whether plaintiffs' counsel has taken on too many cases without analyzing specifics regarding the firm's representation of their Roundup clients. It is our belief that such a general inquiry of all firms would be improper and an undue burden on plaintiffs' counsel at this stage of the litigation.

"[T]he difficult and sometimes contradictory demands posed by mass torts make case management both challenging and critical." Manual for Complex Litigation, Fourth § 22.1 at 582. This mass tort reportedly involved 100,000 claimants nationwide with a finite number of law firms (and expert witnesses) willing to, or adequately equipped to, represent plaintiffs. Accordingly, the nature of the litigation itself necessitates that law firms represent a larger volume of claimants.

This is, of course, not to say that each firm does not owe a duty to its clients to provide adequate representation. There may be certain firms that have taken on more cases than they can reasonably litigate. If the Court suspects that an individual law firm is not representing its clients in accordance with the Rules of Professional Responsibility, the Court has the authority to make an inquiry of that law firm.

**B. Monsanto's Position**

Monsanto has no position on this issue.

### III. Does Lead Plaintiffs' Counsel Wish to Request Termination Of The Settlement Program?

**A. Plaintiffs' Position**

Yes, lead counsel believes the settlement program, in its current iteration, should be terminated. The settlement program only allows the Special Master to make offers based on the dollar amount per case authorized by Monsanto; it does not allow for a negotiation among the parties and the Special Master. Even though the Court's orders are explicit that a plaintiff is free to reject the settlement offer, the fact that the offer is being relayed by a prominent well-known Special Master through a court-mandated program suggests, to certain plaintiffs at least, that they should simply accept the terms. Based on feedback from case counsel, the offers made through the settlement program are shockingly low.

We do not believe, however, that the settlement program should cease altogether. Rather, we propose that the current program be replaced with a mediation program that allows either party to request a mediation with the Special Master. The parties would then retain the Special Master and actively negotiate with the Special Master serving as the mediator. Upon information and belief, as of January 2024, Monsanto is fully funding the settlement program. Under the mediation program, the parties should split the cost of the mediation.

**B. Monsanto's Position**

Not at this time, given the success of the Feinberg program, Monsanto believes the Feinberg Program should remain in place until at least six months after this Court stops accepting new cases into the MDL which will further assist in reducing the amount of cases in the MDL and ultimately reduce the number of cases remanded back to their respective courts.

Contrary to plaintiffs' suggestion, the Feinberg Program makes an independent evaluation of each plaintiff's claim and provides a determination based on an objective set of criteria. Plaintiffs are under no obligation to accept the determination. Indeed, the long-term

success of the program undermines Plaintiffs' arguments that the values are "shockingly low." If that were true, the program would not have achieved the levels of success outlined below.

In Wave 6, the Feinberg program resolved over 130 cases out of 310 cases. In Wave 7, the Feinberg program resolved over 150 cases out of 345 cases. And in Wave 8, the Feinberg program resolved over 100 cases to date. As of July 8, 2024, the majority of the active cases in the MDL (291 cases) had already received a determination or been found ineligible under the Feinberg Program, 141 cases were in the process of submitting materials for evaluation or being evaluated by the Feinberg Program and 58 newly filed cases had not yet submitted materials to the Feinberg Program. Thus, Monsanto does not believe a formal comprehensive mediation program with the Special Master is an efficient way to ultimately reduce the number of cases in the MDL.

### IV. Should Plaintiffs' Lead Counsel Be More Involved in *Daubert* Motions That Could Have Big Consequences For The MDL, Like The One For Dr. Zhang?

**A. Plaintiffs' Position**

To date, Plaintiffs' leadership has designated general causation experts for every single Wave case and remained involved in any expert discovery/*Daubert* challenges related to those experts. The question posed by the Court seems to be whether lead plaintiffs' counsel should be involved when case counsel designates an additional general causation and/or specific causation expert. While such involvement would depart from common MDL management, lead counsel is not opposed in principle to a greater participation in *Daubert* motions that have MDL-wide consequences. However, lead counsel have concerns about the scope of that participation and the number of active leadership firms we would need to fulfill this responsibility.

First, it is often too late to become involved at the Daubert stage, after the exchange of expert reports and the completion of expert depositions. But at the same time, it would likely be unwieldly for leadership to actively participate in all MDL cases through case-specific

discovery, retention of expert witnesses, and the drafting of expert reports. Indeed, to our knowledge, such a responsibility for non-bellwether cases is unprecedented. *See Casey v. Denton*, 2018 WL 4205153 at *6 (S.D.Ill. Sept. 4, 2018) (leadership counsel of a MDL could not fathomably be held responsible for the minute details of hundreds or in this case, thousands, of individual cases. The proposition is unworkable.)

While the purpose of the MDL is to create efficiencies and avoid unnecessary duplication in the management of pretrial proceedings, all cases within the MDL "retain their separate identities." *In re National Prescription Opiate Litig.*, 956 F. 3d 838, 845 (6th Cir. 2020); *Cannon v. Armstrong Containers, Inc.*, 92 F.4th 688 (7th Cir. 2024) (finding that the day-in-court ideal does not diminish in consolidated, multi-party litigation). Every plaintiff in this MDL has the right to present its own evidence and legal theories in support of its claims. To be certain, lead counsel cannot dictate how an individual plaintiff chooses to litigate their individual claim.

Finally, we believe that if leadership's role is expanded to the expert work of all MDL cases, the number of firms involved in leadership would need to expand. Of the six firms appointed to leadership back in 2016 when this MDL was formed, only two firms still litigate Roundup cases and each of those two firms have a large, active docket of cases. It would be impossible for only two firms to handle their own cases and also be responsible for the expert work up of other firms' cases in the MDL. And it would be unfair for those two firms to carry those common expenses as well (there is currently no common benefit expense assessment). Thus, if the Court is inclined to have leadership participate in the expert workup in MDL non-bellwether cases, we respectfully request that we be allowed to increase the number of firms in leadership. We would also need to consider creating a common benefit expense assessment on unresolved cases to fund the expert's and other common expenses.

**B. Monsanto's Position**

Monsanto has no position on this issue.

**V.** *Gonzalez* **Issues**

**A. Monsanto's Position**

Federal Rule of Civil Procedure 5(b) allows for service of pleadings via the Court's electronic filing system. The Federal Rules of Civil Procedure do not require Monsanto to individually serve each plaintiff's counsel with pleadings in the MDL. Further, plaintiff's counsel have the responsibility to monitor both the MDL docket and the docket for their individual cases when they file a case into the MDL.

Indeed, on December 14, 2023, counsel for *Gonzalez* was notified of Monsanto's motion to exclude on both the MDL docket and the individual docket for *Gonzalez*. Further, on February 21, 2024, the Court notified counsel for *Gonzalez* that it would rule on Monsanto's motion based on motions and responsive briefs. Next, on February 23, 2024, the Court issued an Order related to Wave 6 *Daubert* hearings. Thus, on at least three separate occasions, counsel for *Gonzalez* was notified of the motion to exclude in the *Gonzalez* case.

Despite this, Monsanto recognizes that dismissal can be a harsh penalty. Thus, Monsanto recommends that the Court allow counsel for *Gonzalez* to file its opposition to Monsanto's motion to exclude within 30 days of this hearing and that Monsanto file its reply within 14 days of being served with the *Gonzalez* opposition.

**B. Plaintiffs' Position**

Lead counsel agrees that service via ECF is appropriate and also agrees that Monsanto's proposal to allow counsel for *Gonzalez* to file its opposition to Monsanto's motion to exclude within 30 days of this hearing is fair and reasonable.

### VI. Can Plaintiff *Beckfield* Call a General Causation Expert?

**A. Plaintiffs' Position**

The *Beckfield* case was a Wave 4 case. On June 23, 2022, Plaintiffs leadership timely served general causation expert disclosures for all Wave 4 case, disclosing Drs. Portier, Ritz, Jameson, and Weisenburger. As such, the *Beckfield* case properly disclosed Drs. Portier, Ritz, Jameson, and Weisenburger as general causation experts, and, therefore Plaintiff *Beckfield* can call those experts to testify on general causation matters. To the extent Plaintiff *Beckfield's* case proceeds to trial and one or more of those experts are unavailable, *Beckfield's* counsel can move the trial court pursuant to relevant law and the rules of procedure related to unavailable witnesses.

**B. Monsanto's Position**

Although Dr. Christoph F. A. Vogel was disclosed as a specific causation expert in Plaintiff Brett Beckfield's ("Plaintiff") Rule 26 expert disclosure, Dr. Vogel offered broader opinions on general causation. Monsanto addressed these general causation issues in its *Daubert* motion to exclude Dr. Vogel's opinion testimony. Plaintiff did not mention other general causation experts in his opposition, and Dr. Vogel's report did not suggest he was relying on any other general cause expert. However, Plaintiffs' steering committee served general Wave 4 expert disclosures on June 23, 2022 that identified Drs. Portier, Ritz, Weisenburger, and Jameson in Wave 4. Thus, because Plaintiff *Beckfield* was a Wave 4 plaintiff, to the extent Plaintiff can call any general causation expert, it should be limited to Drs. Portier, Ritz, Weisenburger, and Jameson.

Plaintiff now claims that he intends to call other unspecified general causation experts based on a boilerplate statement in his Rule 26 expert disclosure that "incorporates by reference the general causation and other expert reports served by lead counsel in connection with Waves

1, 2, 3, and 4 and reserves the right to call the author of any such report as an expert witness at trial." This broad reference fails to adequately disclose these unnamed experts under Rule 26. Rule 26(a)(2)(A) requires a party to "disclose to the other parties *the identity* of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26 (emphasis added). "By its plain terms, the Rule requires that a party disclose the identity of the witness, not simply a potential category of individuals from which a party can later select an expert." *Green Earth Wellness Center LLC v. Atain Specialty Insurance Co.*, 2016 WL 632051 at *2 (D. Colo. Feb. 17, 2016). "Merely referring the opposing party to unidentified experts that third parties have retained in other litigation is clearly not sufficient." *Hardin v. Wal-Mart Stores, Inc.*, 2010 WL 3341897, at *3 (E.D. Cal. Aug. 25, 2010), *report and recommendation adopted,* 2010 WL 3745197 (E.D. Cal. Sept. 16, 2010).

Plaintiff's catchall reference incorporating not only prior general causation experts, but also "other expert reports" in an attempt to "reserve the right to call" every possible expert ever previously identified by lead counsel in Waves 1, 2, 3, and 4 does not meaningfully "identify," by name, the general causation or "other experts" he actually plans to use to offer expert opinions at trial. Monsanto should not be required to guess which of the opinions of the numerous experts that were previously disclosed in other waves will be used to try to establish causation in Plaintiff's case. Thus, Monsanto objects to the use of any experts who were not specifically disclosed in Wave 4, particularly other unnamed experts outside of Drs. Portier, Ritz, Jameson, and Weisenburger.

### VII. Status of the *Hochstein* Resolution

The *Hochstein* case has resolved and will be dismissed once settlement is finalized. Plaintiffs' lead counsel were unable to reach lead counsel for plaintiff *Hochstein*.

Dated: July 15, 2024                              Respectfully submitted,

/s/ Anthony R. Martinez
**SHOOK HARDY & BACON LLP**
Anthony R. Martinez (*pro hac vice*)
(amartinez@shb.com)
2555 Grand Blvd.
Kansas City, MO 64108
Tel: 816-474-6550
Fax: 816-421-5547


**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel: 202-847-4030
Fax: 202-847-4005

*Attorneys for Defendant Monsanto Company*


/s/ Aimee H. Wagstaff
**Wagstaff Law Firm**
Aimee Wagstaff
*Aimee.wagstaff@wagstafflawfirm.com*
940 N. Lincoln Street
Denver, CO, 80203

**Weitz & Luxenberg**
Robin Greenwald
*RGreenwald@weitzlux.com*
700 Broadway
New York, NY 10003

| | |
|---|---|
| 1 | |
| 2 | **The Miller Firm LLC** |
|   | David Dickens |
| 3 | *ddickens@millerfirmllc.com* |
|   | 108 Railroad Ave. |
| 4 | Orange, VA 22960 |
|   | *Co-Lead Counsel for Plaintiffs in MDL No. 2741* |