**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel: 202-847-4030 | Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843 | Fax: 202-682-1639

*Attorneys for Defendant Monsanto Company*

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400 | Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
Linda C. Hsu (CA Bar No. 239880)
(linda.hsu@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel: 310-576-2100 | Fax: 310-576-2200

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION, | MDL No. 2741 |
| *Kay v. Monsanto Company*, 3:21-cv-00175-VC | Case No.: 3:16-md-02741-VC |
| *Glassman v. Monsanto Company*, 3:20-cv-00024-VC | **DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF MARTYN SMITH, PH.D.** |
| *Iona v. Monsanto Company*, 3:20-cv-02404-VC | Hearing: |
| *Berenfeld v. Monsanto Company*, 3:18-cv-01428-VC | Date: September 26, 2024<br>Time: 10:00 a.m.<br>Place: San Francisco Courthouse, Courtroom 4 – 17th Floor |
| *Proctor v. Monsanto Company*, 3:21-cv-00172-VC | |
| *Belfleur v. Monsanto Company*, 3:20-cv-00621-VC | |
| *Thompson v. Monsanto Company*, 3:20-cv-08851-VC | |
| *Holmes v. Monsanto Company*, 3:20-cv-03363-VC | |
| *Ginkel v. Monsanto Company*, 3:22-cv-00358-VC | |

- 1 -
MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF MARTYN SMITH, PH.D.

*Romano v. Monsanto Company*,
3:20-cv-06194-VC

*Daulton v. Monsanto Company*,
3:20-cv-08518-VC

*Vander Groef v. Monsanto Company*,
3:19-cv-07858-VC

*El-Hakam v. Monsanto Company*,
3:21-cv-09937-VC

*Harris v. Monsanto Company*,
3:16-cv-05786-VC

|   |   |   |
|---|---|---|
| 1 | **TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:** | |
| 2 | **PLEASE TAKE NOTICE THAT** on September 26, 2024 at 10:00 a.m., in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Motion to Exclude Testimony of Martyn Smith Ph.D. Monsanto seeks an order excluding opinions of this witness under Federal Rule of Evidence 702. | |

Dated: August 9, 2024

Respectfully submitted,

By: /s/ *Linda C. Hsu*
    Linda C. Hsu
    Attorneys for Defendant Monsanto Company

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................1

II.    BACKGROUND .....................................................................................................2

III.   LEGAL STANDARD ..............................................................................................3

IV.    ARGUMENT ...........................................................................................................4

       A.    Dr. Smith's "Key Characteristics" Methodology is Neither Reliable Nor Helpful..................................................................................................................4

       B.    Dr. Smith's Opinion Relating to "Trace Impurities" Should be Excluded. ................7

             1.   Dr. Smith's Opinion Regarding Trace Impurities is Not Grounded in Science. ..............................................................................................................7

             2.   Dr. Smith's Opinion Regarding Alleged Impurities is Nothing More than His Ipse Dixit. ................................................................................................8

       C.    Dr. Smith's Remaining Opinions Should be Excluded.................................................9

             1.   Dr. Smith's Opinion Regarding Monsanto's "Notice" is Unscientific and Unhelpful. ...........................................................................................................9

             2.   Dr. Smith's Opinion Regarding the Foreseeability of Harm to "the Microbiome" is Unscientific, Unsupported, and Impermissible....................11

V.     CONCLUSION ......................................................................................................12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aguilar v. Int'l Longshoremen's Union Loc. No. 10*,
   966 F.2d 443 (9th Cir. 1992) ................................................................................................ 11

*Aya Healthcare Servs. v. AMN Healthcare, Inc.*,
   2020 WL 2553181 (S.D. Cal. May 20, 2020) ....................................................................... 10

*Barillas v. City of Los Angeles*,
   2021 WL 4434977 (C.D. Cal. Apr. 12, 2021) ....................................................................... 10

*Cabrera v. Cordis Corp.*,
   134 F.3d 1418 (9th Cir. 1998) ................................................................................................ 5

*Claar v. Burlington Northern R. Co.*,
   29 F.3d 499 (9th Cir. 2004) .................................................................................................... 8

*Daubert*,
   509 U.S. at 590 .............................................................................................................. 4, 7, 8, 9

*Diaz-Gomez v. W.M. Barr & Co., Inc.*,
   2015 WL 12734788 (C.D. Cal. Dec. 21, 2015) .................................................................... 11

*Doe v. AE Outfitters Retail Co.*,
   2015 WL 9255325 (D. Md. Dec. 17, 2015) .......................................................................... 11

*Domingo ex rel. Domingo v. T.K.*,
   289 F.3d 600 (9th Cir. 2002) ......................................................................................... 4, 8, 11

*Fujifilm Corp. v. Motorola Mobility LLC*,
   2015 WL 757575 (N.D. Cal. Feb. 20, 2015) ......................................................................... 10

*Gonzalez v. Valenzuela*,
   2001 WL 36387147 (C.D. Cal. Nov. 26, 2001) .................................................................... 10

*Hardeman v. Monsanto Co.*,
   997 F.3d 941 (9th Cir. 2021) .............................................................................................. 5, 6

*Metabolife Int'l v. Wornick*,
   264 F.3d 832 (9th Cir. 2001) ............................................................................................ 7, 10

*In re Roundup Prods. Liab. Litig.*,
   390 F. Supp. 3d at 1115 .................................................................................................. 5, 6, 7

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*,
   318 F. Supp. 2d 879 (C.D. Cal. 2004) .................................................................................... 6

*Taylor v. Evans*,
    1997 WL 154010 (S.D.N.Y. Apr. 1, 1997) .................................................................................. 10

*United States v. Pac. Gas & Elec. Co.*,
    2016 WL 1640462 (N.D. Cal. Apr. 26, 2016) ........................................................................... 10

**Other Authorities**

Fed. R. Evid. § 403 .................................................................................................................... 8

Fed. R. Evid. § 702 ............................................................................................................ 2, 3, 4

Fed. R. Evid. § 702(d) ................................................................................................................ 3

Pretrial Order No. 288 .............................................................................................................. 11

DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF MARTYN SMITH, Ph.D.

I.  INTRODUCTION

Plaintiffs in fourteen Wave 7 cases disclosed Martyn Smith, Ph.D., as an expert to testify regarding general causation. Dr. Smith's opinions should be excluded in their entirety for the reasons set forth in Monsanto Company's Omnibus Motion to Exclude Plaintiffs' Wave VII General Causation Experts and for Summary Judgment (the "Omnibus Motion"). Here, Monsanto moves to exclude Dr. Smith's testimony for additional reasons not raised in the Omnibus Motion.

***First*,** Dr. Smith's general causation opinion should be excluded because his "Key Characteristics" ("KCs") methodology is a hazard assessment—not a real-world risk assessment. Moreover, the KCs methodology is unreliable and lacks acceptance in the scientific community. Indeed, Dr. Smith's KCs approach has been criticized as lacking validation, failing to predict a cancer hazard with any greater accuracy than mere chance, and likely to yield false positive results.

***Second*,** Dr. Smith's report contains a single footnote wherein he appears to opine that alleged impurities and surfactants in formulated Roundup products may enhance the alleged toxicity of glyphosate. This opinion, too, should be excluded because it is entirely untethered to scientific methodology. Dr. Smith does not cite a single study in support of this opinion, and indeed, has testified that most or all of the alleged impurities identified in his report are either not known causes of non-Hodgkin's lymphoma ("NHL"), or that he has not investigated whether they can cause NHL. His contemplated testimony is little more than an attempt to inflame the passions of the jury and should be excluded. Dr. Smith's opinion relating to alleged impurities may also be excluded because there is simply too great an analytical gap between his "data" and his conclusion. Dr. Smith cannot quantify any alleged impurity present in the Roundup products that the plaintiffs allegedly used. Nor can he opine as to the threshold level of exposure to these alleged impurities necessary to cause NHL, or whether those exposure thresholds may be met by spraying Roundup.

***Third*,** in throwaway fashion, Dr. Smith opines at the end of his 100-plus-page report that: 1) in 1999, Dr. James Parry provided notice to Monsanto scientists that glyphosate-based herbicides are genotoxic; and 2) that it was foreseeable that Roundup could harm intestinal micro-organisms, and implicitly, the broader "microbiome." Both of these opinions (which consist of a handful of paragraphs each) should be excluded because they are unscientific and unhelpful to the jury. Dr. Smith's opinion

relating to the "microbiome" is also inadmissible because he can only link the purported "data" on which he relies to his conclusion through his own *ipse dixit*. Finally, in opining that harm was "foreseeable," Dr. Smith attempts to provide improper expert testimony on a legal conclusion. Plaintiffs cannot show by a preponderance of evidence—particularly under the new, more exacting standard set forth in Rule 702—that Dr. Smith's opinions satisfy the conditions for admissibility. Accordingly, Monsanto respectfully requests that the Court exclude Dr. Smith's testimony in each case in which he has been disclosed as an expert.

## II. BACKGROUND

Plaintiffs disclosed Dr. Smith, a toxicologist, to "provide opinions and testimony consistent with those set forth in [his] expert report[]." *See, e.g.*, Ex. 1, *Kay* Expert Disclosure at 3.[1,2] While Plaintiffs' disclosures do not describe the subject matter of Dr. Smith's contemplated testimony, Dr. Smith's report indicates that he intends to testify in relevant part that:

- Carcinogens "have properties that cause the hallmarks of cancer to develop," and those "properties" have been "organized into a set of 10 key characteristics that are the known properties of established human carcinogens;"

- "[T]here is strong evidence that glyphosate and [glyphosate-based formulations] possess FIVE key characteristics of carcinogens" meaning that they are "probable human carcinogens;" and

- "[Glyphosate-based formulations], including Roundup, are human carcinogens and are a cause or significant contributing factor towards the development of NHL."

Ex. 2, Smith *Kay* Rpt. at ¶¶ 22-23, 26, 29, 32. In reaching these opinions, Dr. Smith relies "upon [his] knowledge and experience in the field of toxicology and molecular epidemiology, especially with regard to the causes of lymphoma." *Id.* at ¶ 15. Yet Dr. Smith's report includes other opinions that do

---

[1] All exhibits are attached to the concurrently filed declaration of Linda C. Hsu.

[2] While the form of designation varies, the plaintiffs in *Glassman*, *Iona*, *Berenfeld*, *Proctor*, *Belfleur*, *Thompson*, *Holmes*, and *Ginkel* incorporated by reference Dr. Smith's report and opinion produced in *Kay*. *See* Exs. 3-10, *Glassman*, *Iona*, *Berenfeld*, *Proctor*, *Belfleur*, *Thompson*, *Holmes*, and *Ginkel* Expert Disclosures. On the other hand, while the plaintiffs in *Romano*, *Daulton*, *Vander Groef*, *El-Hakam*, and *Harris* also disclosed Dr. Smith as an expert, their designations did not incorporate Dr. Smith's expert report from *Kay*. Exs. 11-15, *Romano*, *Daulton*, *Vander Groef*, *El-Hakam*, and *Harris* Expert Disclosures. Rather, these plaintiffs generally aver that "Dr. Smith will also testify consistent with his prior expert reports, depositions, and trial testimony."

DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF MARTYN SMITH, Ph.D.

not relate to this purported expertise:

- "I also conclude that Professor James Parry, an expert in genetic toxicology, provided information to Monsanto that in his assessment glyphosate and [glyphosate-based formulations] were probably genotoxic and produced oxidative stress in 1999;" and
- "Further, information and data were available to Monsanto in the 1970s that exposure of humans or animals to glyphosate was bound to affect micro-organisms present in their intestines producing harmful effects on their health."

Ex. 1, Smith *Kay* Rpt. at ¶ 33.

### III. LEGAL STANDARD

Federal Rule of Evidence 702, which was amended effective December 1, 2023, sets forth the standard for the admission of expert opinion testimony. Under that Rule, a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" may present opinion testimony to the jury only if "the proponent demonstrates to the court" that each of four criteria is "more likely than not" satisfied. Fed. R. Evid. 702. *First*, that the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue." *Id*. at. 702(a). *Second*, that the expert's "testimony is based on sufficient facts and data." *Id*. at 702(b). *Third*, that the expert's testimony "is the product of reliable principles and methods." *Id*. at 702(c). *Fourth*, and finally, that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." *Id*. at 702(d).

The advisory committee's note to the 2023 amendments make clear that "the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology" are *not* "questions of weight" for the jury. Fed. R. Evid. 702 advisory committee's note to 2023 amendments. Rule 702(d) in particular requires "that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id*. In other words, the Rule "does not permit the expert to make claims that are unsupported by the expert's basis and methodology." *Id*.

## IV. ARGUMENT

### A. Dr. Smith's "Key Characteristics" Methodology is Neither Reliable Nor Helpful.

Dr. Smith claims that the "methodology" he used to reach his general causation opinion is IARC's 10 "key characteristics of carcinogens." This method was first used in IARC's 2015 glyphosate monograph. Ex. 16, Smith *Meyer* Dep. at 81:6–13. The next year, Dr. Smith co-authored the first published article on the KCs. Ex. 17, Smith 2016 at 713. In 2023, Dr. Smith co-authored a review article applying the KCs to glyphosate, which argues that glyphosate studies "can be evaluated for cancer hazard identification with the *newly described* ten key characteristics (KC) of carcinogens approach." Ex. 18, Smith 2023 at 1 (emphasis added). Dr. Smith is, in fact, still refining the KCs; he is considering dropping oxidative stress because noncarcinogens "[are] also known to produce oxidative stress." Ex. 16, Smith *Meyer* Dep. at 95:3–8; *see* Ex. 19, Smith 2018 at 2. This Court should exercise its gatekeeping role and exclude Dr. Smith's general causation opinion because it is a hazard assessment that does not help the jury determine causation, and further, his methodology is junk science lacking general acceptance in the scientific community. *See Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002) ("Under *Daubert*, the district court ats as a 'gatekeeper,' excluding 'junk science' that does not meet the standards of reliability required under Rule 702.")

While Dr. Smith alleges that the KCs methodology has been applied by certain bodies for the purpose of conducting a *hazard* assessment, *see* Ex. 2, Smith *Kay* Rpt. at ¶¶ 121; *see also id*. 122 (specifying that IARC employed the KCs methodology in conducting its hazard assessment of glyphosate), the KCs have not been generally accepted by cancer researchers as a predictive technique for *risk* assessments. As Dr. Smith acknowledges, a hazard assessment merely investigates whether an "agent" "has the potential to cause cancer in humans." Ex. 20, Smith *Adams* Dep. I at 100:17-23. A risk assessment, on the other hand, looks at "the potency of the hazard combined with a level of the exposure." *Id.* at 101:4–6. Dr. Smith admits that in a hazard assessment, real-world exposure is irrelevant. *See* Ex. 21, Smith *Constantine* Dep. at 121:17–122:9 ("when you are looking for a chemical for its ability to produce a hazard . . . you would look at something that would produce effects at noncytotoxic doses . . . *so the fact that they are not within the range of what you think is present in people is irrelevant*.") (emphasis added). An agent can be a hazard, but not a risk. Ex. 20, Smith *Adams*

Dep. I at 103:1–4. The KCs are a method for "classifying agents with regard to carcinogenic *hazard*"; Dr. Smith leaves to future scientists "to consider whether key characteristics of carcinogens are apparent *upon exposures that are relevant to human health.*" Ex. 17, Smith 2016 at 719 (emphasis added). In fact, in his five years as a plaintiffs' expert on glyphosate, Dr. Smith has not determined the glyphosate dose he believes necessary to cause NHL. Ex. 16, Smith *Meyer* Dep. at 9:22–10:8 ("And I focused really on does glyphosate pose a cancer hazard. . .").

Both this Court and the Ninth Circuit have held that an expert opining on general causation must do more than provide a hazard assessment. *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d at 1115 ("A 'hazard assessment,' as IARC and other public health bodies define that inquiry, is not what the jury needs to conduct when deciding whether glyphosate actually causes NHL in people at past or current exposure levels."); *Hardeman*, 997 F.3d at 963 ("To establish general causation, Hardeman's experts needed to show that glyphosate can cause NHL at exposure levels people realistically may have experienced.") This Court should exclude Dr. Smith's general causation opinion because it lacks acceptance in the scientific community for the purpose of assessing real-world exposures. *See Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1422 (9th Cir. 1998) (affirming district court's exclusion of expert testimony where the expert tested the plaintiff's blood for silicone antibodies, there was no such generally accepted blood test, and no one else in the field had before used the test that the expert used).

Further, there is no credible evidence that the KCs are reliable predictors of carcinogenicity. The only published "validation" of the KCs is an article Dr. Smith co-authored finding 12 out of 16 agents that IARC classified as Group 1 or 2A carcinogens showed multiple KCs. *See* Ex. 19, Smith 2018 at 2; Ex. 22, Goodman 2018 at 1089. This evidence is tautological. The KCs were defined by evaluating agents IARC previously classified as carcinogens; evaluating those same agents cannot validate the KCs: "simply counting how many KCs known or probable carcinogenic agents possess is not informative regarding whether the approach is useful and accurate, on the whole. Rather, external validation of the methodology is needed, and in particular, it must be shown that these KCs can differentiate carcinogens from non-carcinogens." Ex. 22, Goodman 2018 at 1089. Before Dr. Smith may testify, he must demonstrate that the KCs are capable of such discernment—and his continued doubts about oxidative stress alone show they are not. Further, scientists who tested the KCs, using

IARC's ToxCast/Tox21 data, found "the ability to predict cancer hazard for each key characteristic, alone or in combination, was found to be no better than chance." Ex. 23, Becker 2017 at 188. Worse, the "proposed characteristics are so broad that their use will lead to an increase in the current unacceptably high rate of false positives." Ex. 24, C. Smith 2021 at 2883. Efforts to extend the KCs to the field of endocrine disrupting chemicals were recently criticized because the "KC approach is not amenable to empirical testing or validation, is fungible and ensures inconsistent and unreliable results . . . lacks a means to reach a negative conclusion . . . and provides no means for developing a valid consensus among experts nor provides a means of resolving conflicting interpretations of data." Ex. 25, Borgert 2023 at 2019.

Further, Dr. Smith's KCs methodology is a poor fit for the required conclusion that glyphosate can cause NHL in humans based on real-world exposures, because it doesn't answer that question. *See United States v. Kankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (in determining whether to exclude an expert opinion, the court may consider "[w]hether the methodology or technique the expert uses 'fits' the conclusions.'"); Ex. 20, Smith *Adams* Dep. I at 359:12-16 ("Q: And it's your opinion that the data is sufficient to determine that glyphosate is a risk factor for non-Hodgkin's lymphoma? . . . . A: Not on its own").

Dr. Smith admits that there is insufficient epidemiological evidence to reliably link glyphosate exposure to NHL. Smith *Kay* Rpt. at ¶ 78 ("the epidemiological evidence is positive but limited in nature and not convincing on its own."). As this Court has observed, "epidemiology is central to the general causation inquiry." *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d at 1116. Dr. Smith must explain why it is appropriate to ignore this contrary evidence in favor of rodent and cell studies. *See id*. at 1127 ("where animal studies provide the best available evidence of causation, the experts seeking to rely upon such evidence must explain why the results in animals are relevant to humans."); *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 891 (C.D. Cal. 2004) ("Animal studies are not generally admissible where contrary epidemiological evidence in humans exists."); *Hardeman v. Monsanto Co.*, 997 F.3d 941, 963 (9th Cir. 2021) ("animal and cell studies can help show causation so long as there is evidence of an association between glyphosate and NHL in humans within the epidemiological literature."). He fails to do so here.

Moreover, even if Dr. Smith's KCs were sufficient to reliably assess whether glyphosate is generally capable of causing cancer, it is too far afield from the issue presented in these cases: whether glyphosate is capable of causing *NHL*. Dr. Smith's KCs assess whether glyphosate is genotoxic, causes oxidative stress, is immunosuppressive, etc. Ex. 2, Smith *Kay* Rpt. at ¶¶ 124-229. While the majority of these characteristics may relate to cancer in some fashion, they are not tethered to NHL specifically. As this Court has observed, "it is not enough for the evidence in this case to go merely to the causal relationship between glyphosate and cancer in general; it must go to the relationship between glyphosate and NHL in particular." *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d at 1115. Dr. Smith's general causation opinions should be excluded for the additional reason that they do not distinguish between substances that are capable of causing cancer generally and substances that are capable of causing NHL specifically.

### B. Dr. Smith's Opinion Relating to "Trace Impurities" Should be Excluded.

Dr. Smith's report contains a single footnote opining that the formulated Roundup product is more "toxic" than glyphosate alone because it includes various surfactants and trace impurities "such as n-Nitrosoglyphosate ("NNG"), formaldehyde, and arsenic." Ex. 2, Smith *Kay* Rpt. at ¶ 97 fn.1. This opinion should be excluded because it is untethered to any scientific study or information, and further, because Dr. Smith has not and cannot calculate the quantities of these substances in any Roundup formulation that Plaintiffs allegedly used.

#### 1. Dr. Smith's Opinion Regarding Trace Impurities is Not Grounded in Science.

"'*If scientific*, technical, or other specialized *knowledge will assist the trier of fact* to understand the evidence or to determine a fact in issue' an expert 'may testify *thereto*.'" *Daubert*, 509 U.S. at 590 (emphases in original). "The subject of an expert's testimony must be 'scientific . . . knowledge.'" *Id.* at 589-90. "Scientific evidence is reliable if it is based on an assertion that is grounded in methods of science—the focus is on principles and methodology, not conclusions." *Metabolife Int'l v. Wornick*, 264 F.3d 832, 841 (9th Cir. 2001). "Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. *These considerations warrant exclusion because Dr. Smith's opinion is not founded in **any** science*. There are no "studies or other information"

for the Court to investigate to determine whether Dr. Smith's opinion sits on a solid foundation. Dr. Smith does not point to any scientific evidence connecting any alleged impurity in any Roundup-branded herbicide to NHL or any of its subtypes. Indeed, Dr. Smith has admitted either that these chemicals are not known hazards for NHL, *see* Ex. 16, Smith *Meyer* Dep. at 12:9-12, 12:19-22 (formaldehyde); 17:23-18:1 (1,4-dioxane); 18:5-17 (arsenic), or that he has not investigated whether they may be a cause of NHL, *id*. at 15:1-3, 15:8-12 (NNG). Without any scientific foundation, Dr. Smith's opinions are based only on his own *ipse dixit*, rendering them inadmissible. *Domingo*, 289 F.3d at 607 ("[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (internal quotation omitted).[3]

### 2. Dr. Smith's Opinion Regarding Alleged Impurities is Nothing More than His *Ipse Dixit*.

"Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Domingo*, 289 F.3d at 607 (internal quotation omitted). "A trial court may exclude evidence when it finds that 'there is simply too great an analytical gap between the data and the opinion proffered.'" *Id*. (citation omitted). An expert opinion based on "subjective beliefs or unsupported speculation" is inadmissible. *Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 502 (9th Cir. 2004).

Here, Dr. Smith does not set forth the quantity of any alleged impurity because, as he admits, "[t]he amounts of these impurities vary by formulation and can vary considerably (in the case of NNG) based on storage and atmospheric conditions." Ex. 2, Smith *Kay* Rpt. at ¶ 97. Nor has Dr. Smith determined the threshold exposure to these alleged impurities required to cause NHL, or whether those exposure thresholds may be met by spraying Roundup. Ex. 16, Smith *Meyer* Dep. at 22:18-23, 22:25-23:8 (formaldehyde); 23:13-18 (arsenic); 23:25-24:6, 25:23-26:14 (ethylene oxide); 27:11-18 (NNG). Accordingly, a massive analytical chasm exists because Dr. Smith seeks to offer opinions related to trace impurities in a number of cases, while there is no evidence whatsoever about which impurities, if

---

[3] Dr. Smith's unsupported opinion regarding trace impurities is also inadmissible because it is irrelevant, unduly prejudicial, and would mislead the jury. *See* Fed. R. Evid. § 403. If necessary, Monsanto will raise this argument in a motion *in limine* at the appropriate time.

any, were in the Roundup formulated products that the plaintiffs allegedly used. At various times, over 90 different Roundup products were registered in California alone, and most, if not all, had different formulations/ingredients, labels, and use instructions, including formulations that do not even contain glyphosate. Ex. 26, (California Department of Pesticide Regulation database search for Roundup).

Dr. Smith cannot *identify*, let alone *quantify*, any impurity or non-glyphosate component in any Roundup product used by a particular plaintiff. Because he offers no evidence about which impurities, if any, were in the Roundup products that the plaintiffs allegedly used, the quantity of such impurity, or whether exposure to that alleged impurity through spraying Roundup is sufficient to increase the risk of NHL (or any of its subtypes), any opinion Dr. Smith seeks to offer regarding these impurities would be entirely speculative, and there is no way to bridge the resulting analytical gap. Therefore, Dr. Smith's opinion related to alleged impurities should be excluded.

### C. Dr. Smith's Remaining Opinions Should be Excluded.

Appended to the end of Dr. Smith's 107-page report are two additional opinions that stray far beyond the boundaries of his designation as a causation expert. First, based on his apparent review of two documents, Dr. Smith seeks to opine that Dr. James Parry provided notice to Monsanto in 1999 that Roundup was likely genotoxic. Ex. 2, Smith *Kay* Rpt. at ¶¶ 248-251. Second, Dr. Smith opines that as of the 1970s, it was foreseeable that glyphosate-based herbicides would affect micro-organisms present in human intestines. *Id.* at ¶¶ 252-255. Dr. Smith's "Summary and Conclusions" reference neither opinion. *Id.* at ¶ 256. Both opinions should be excluded because they are not grounded in the methods of science or other specialized knowledge and are not helpful to the jury. Dr. Smith's opinion regarding the foreseeability of harm to "the microbiome" should be excluded for the additional reasons that there is too great an analytical gap between the data and his opinion, and because it is an improper legal conclusion.

#### 1. Dr. Smith's Opinion Regarding Monsanto's "Notice" is Unscientific and Unhelpful.

As described above, to be helpful to the trier of fact, expert testimony must be based on "*scientific*, technical, or other specialized knowledge." *Daubert*, 509 U.S. at 590. Scientific evidence, in turn, is inadmissible unless it is based on "an assertion that is grounded in methods of science."

*Metabolife*, 264 F.3d at 841. Dr. Smith's opinion that Dr. Parry provided notice to Monsanto that glyphosate-based herbicides were genotoxic in 1999—apparently for the purpose of laying a factual predicate for the recovery of punitive damages—rests on his review and summarization of two documents produced by Monsanto. Ex. 2, Smith *Kay* Rpt. at ¶¶ 249-251. However, "expert testimony is not helpful to the trier of fact and is thus inadmissible when it does not rely on scientific, technical, or other specialized knowledge." *Barillas v. City of Los Angeles*, 2021 WL 4434977, at *9 (C.D. Cal. Apr. 12, 2021); *Aya Healthcare Servs. v. AMN Healthcare, Inc.*, 2020 WL 2553181, at *6 (S.D. Cal. May 20, 2020) ("Expert testimony is inadmissible if it addresses lay matters with a jury is capable of understanding and deciding without the expert's help."). Thus, "expert testimony that 'simply rehash[es] otherwise admissible evidence about which [the expert] has no personal knowledge . . . is inadmissible.'" *United States v. Pac. Gas & Elec. Co.*, 2016 WL 1640462, at *2 (N.D. Cal. Apr. 26, 2016) (citation omitted).

Here, Dr. Smith's opinion does not involve the application of any scientific principles or methodology whatsoever, let alone principles or methodology implicating his qualifications as a toxicologist. Rather, Dr. Smith merely narrates two documents produced by Monsanto and instructs the jury about the allegedly proper inference to be drawn from those documents, i.e., that Dr. Parry had "warned" Monsanto scientists that glyphosate-based herbicides were genotoxic. Ex. 2, Smith *Kay* Rpt. at ¶ 251. The plaintiffs cannot demonstrate that Dr. Smith's characterization of this evidence "will provide more than 'simple inferences drawn from uncomplicated facts,' . . . [or] a factual narrative which 'a lay juror is equally capable of constructing.'" *Fujifilm Corp. v. Motorola Mobility LLC*, 2015 WL 757575, at *27 (N.D. Cal. Feb. 20, 2015) (citing *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004)) and *Taylor v. Evans*, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997)); *Gonzalez v. Valenzuela*, 2001 WL 36387147, at *4 (C.D. Cal. Nov. 26, 2001) ("Neither witness can testify 'as to what . . . people did, or what they said to each other. That evidence must come from the trial testimony of the individuals concerned. . . .") The jury is more than capable of interpreting Dr. Parry's correspondence with Monsanto scientists without assistance from a toxicologist. Dr. Smith's opinion should be excluded because it is unscientific and unhelpful.

### 2. Dr. Smith's Opinion Regarding the Foreseeability of Harm to "the Microbiome" is Unscientific, Unsupported, and Impermissible.

Dr. Smith opines that it was foreseeable that glyphosate would negatively impact intestinal micro-organisms when Roundup was first manufactured and distributed in the 1970s. Ex. 2, Smith *Kay* Rpt. at ¶¶ 252-255 (section titled "THE EFFECTS OF GLYPHOSATE ON THE MICROBIOME WERE PREDICTABLE"). Dr. Smith cites to two publications: Herrmann (1995), which is descriptive of the "shikimate pathway," and Farré-Maduell and Casals-Pascual 2019 for the conclusory statements that: 1) gut microflora were first discovered in the 19th century; and 2) the gut bacteria *Escherichia coli* were known to "antagonize . . . harmful intestinal bacteria" in the early 20th century. *Id.* at ¶¶ 253, 255. This cursory analysis falls far short of the level of engagement required for an expert opinion to be admissible. *See* Pretrial Order No. 288 at 2-5 (providing that an expert must engage with the relevant literature, assess conflicting evidence, and "articulate how they reached their conclusion" in the face of this contrary evidence).

As described above, the Court may exclude opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. *Domingo*, 289 F.3d at 607. Dr. Smith's opinion regarding foreseeability is nothing more than *ipse dixit*. For example, while Dr. Smith describes a theoretical process by which glyphosate-based herbicides may harm intestinal micro-organisms in humans, he provides no evidence that they *actually* have been found to do so. Nor does Dr. Smith even attempt to demonstrate that real-world exposures to glyphosate from spraying Roundup are sufficient to trigger the alleged harms to intestinal micro-organisms in humans, let alone that Monsanto was on notice of such alleged risks. Nor, moreover, does Dr. Smith describe any theoretical harm to any micro-organism other than *Escherichia coli*, or state that the inhibition of amino acid synthesis in *Escherichia coli* alone is sufficient to adversely affect the broader "microbiome" in humans.

Dr. Smith's contemplated testimony regarding foreseeability is an "inappropriate subject[] for expert testimony." *See Aguilar v. Int'l Longshoremen's Union Loc. No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (expert testimony on "reasonableness" and "foreseeability" was inadmissible); *Diaz-Gomez v. W.M. Barr & Co., Inc.*, 2015 WL 12734788, at *4 (C.D. Cal. Dec. 21, 2015) (excluding expert testimony that a "'fatal accident was foreseeable'"); *Doe v. AE Outfitters Retail Co.*, 2015 WL

9255325, at *5 (D. Md. Dec. 17, 2015) ("Further, that Stern's opinion testimony embraces a legal conclusion (foreseeability) lessens its helpfulness."). Accordingly, Dr. Smith's opinions regarding the foreseeability of harm to the gut microbiome in humans should be excluded.

## V. CONCLUSION

For the foregoing reasons, the Court should grant Monsanto's Motion to Exclude Testimony of Dr. Martyn Smith, Ph.D.

Dated: August 9, 2024

Respectfully submitted,

By: /s/ *Linda C. Hsu*
       Linda C. Hsu
       Attorneys for Defendant Monsanto Company

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of August 2024, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/ Linda C. Hsu*
Linda C. Hsu