**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel: 202-847-4030
Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400 | Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
Linda C. Hsu (CA Bar No. 239880)
(linda.hsu@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel:  310-576-2100 | Fax: 310 -576-2200

*Attorneys for Defendant Monsanto Company*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC |
| This document relates to:<br><br>All Wave VII Cases[1] | **DEFENDANT MONSANTO COMPANY'S OMNIBUS MOTION TO EXCLUDE PLAINTIFFS' WAVE VII GENERAL CAUSATION EXPERTS AND CORRESPONDING MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing date: September 26, 2024<br>Time: 10:00 a.m.<br>Place: San Francisco Courthouse, Courtroom 4 – 17th Floor |

---

[1]     This motion seeks to exclude Wave VII general causation experts who have been designated in nearly all of the 72 remaining Wave VII cases.  As a result, Monsanto is filing this motion in the master docket pursuant to Pretrial Order No. 1.  Should the Court request Monsanto to file this motion in each individual Wave VII case, Monsanto will do so.

---

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on September 26, 2024, at 10:00 a.m. in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Omnibus Motion to Exclude Plaintiffs' Wave VII General Causation Experts and Corresponding Motion for Summary Judgment. Monsanto seeks an order excluding the opinions of these witnesses under Federal Rule of Evidence 702. Monsanto also seeks summary judgment on all of Plaintiffs' claims because Plaintiffs have failed to produce at least one admissible expert opinion establishing causation.

Dated: August 9, 2024

Respectfully submitted,

_____*/s/ K. Lee Marshall*_____
K. Lee Marshall
Attorneys for Defendant Monsanto Company

MONSANTO'S OMNIBUS MOTION TO EXCLUDE GENERAL CAUSE EXPERTS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iv

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................ 2

I.    FRE 702 has been amended to correct the erroneous Ninth Circuit precedent on which this Court relied in PTO 45. ............................................................................................ 2

II.   Four of Plaintiffs' experts should be excluded for failing to take new science into account. ................................................................................................................................ 6

III.  Plaintiffs' experts should be excluded because they continue to rely on Dr. Zhang's "junk science" meta-analysis. ........................................................................................... 7

IV.  Plaintiffs' experts rely on studies that do not adjust for confounding factors or rely on unadjusted data when adjusted data are available. ............................................................ 8

      A.    McDuffie (2001): Data unadjusted for other pesticide use. ..................................... 9

      B.    Hardell (2002): Adjusted data showed no statistically significant association between NHL and glyphosate. ................................................................................ 12

      C.    Eriksson (2008): Adjusted data showed no statistically significant association between NHL and glyphosate. ................................................................................ 13

      D.    Pahwa (2019): Adjusted data showed no statistically significant association between NHL and ever-use of glyphosate. ........................................................... 16

      E.    Meloni (2021): Unadjusted data showed no statistically significant association between ever use of glyphosate and NHL. ........................................................... 18

      F.    De Roos (2022): Adjusted data show no association overall between glyphosate and NHL. ........................................................................................... 20

      G.    Hardell (2023): Did not adjust for other pesticides. ............................................. 21

V.    Plaintiffs' general-causation experts misapply epidemiological principles. ..................... 23

      A.    Plaintiffs' experts continue to parrot IARC Monograph 112, even though it does not consider human-relevant doses and would not be statistically significant if it included subsequently published studies. ..................................... 23

      B.    Plaintiffs' experts rely on case-control studies that fail to account for multiple statistical tests, leading to spurious associations. .................................................. 25

MONSANTO'S OMNIBUS MOTION TO EXCLUDE GENERAL CAUSE EXPERTS

1

2

C.     The Court should exclude expert testimony that an association exists absent statistically significant epidemiological findings....................................................28

3

VI.     Plaintiffs' experts misconstrue the AHS and its results...................................................... 30

4

A.     De Roos (2005) and Andreotti (2018): found no association between glyphosate and NHL. .........................................................................................30

5

6

B.     Leon (2019): Despite methodological problems with the study's design, meta-analysis of cohort data found no association between glyphosate and NHL.........35

7

CONCLUSION ......................................................................................................................... 37

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MONSANTO'S OMNIBUS MOTION TO EXCLUDE GENERAL CAUSE EXPERTS

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

*In re Abilify (Aripiprazole) Prod. Liab. Litig.*,
    299 F. Supp. 3d 1291 (N.D. Fla. 2018).......................................................................8

*Alivecor, Inc. v. Apple, Inc.*,
    2024 WL 591864 (N.D. Cal. 2024) ...........................................................................5

*Boyer v. City of Simi Valley*,
    2024 WL 993316 (C.D. Cal. 2024)........................................................................3, 6

*City of Pomona v. SQM North America Corp.*,
    750 F.3d 1036 (9th Cir. 2014) ...........................................................................3, 4, 5

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)...............................................................................................3, 4

*Frye v. United States*,
    293 F. 1013 (D.C. Cir. 1923) ....................................................................................3

*In re High-Tech Emp. Antitrust Litig.*,
    2014 WL 1351040 (N.D. Cal. 2014) .......................................................................28

*Hilao v. Est. of Marcos*,
    95 F.3d 848 (9th Cir. 1996) .......................................................................................3

*In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*,
    2024 WL 1914881 (D.N.J. 2024) ..............................................................................3

*Jones v. United States*,
    933 F. Supp. 894 (N.D. Cal. 1996) ...........................................................................9

*In re Kirkland*,
    75 F.4th 1030 (9th Cir. 2023) ....................................................................................3

*Messick v. Novartis Pharmaceuticals Corp.*,
    747 F.3d 1193 (9th Cir. 2014) ...............................................................................3, 5

*Nat'l Ass'n of Wheat Growers v. Bonta*,
    85 F.4th 1263 (9th Cir. 2023) ..................................................................................24

*Off. Depot Inc. v. Zuccarini*,
    596 F.3d 696 (9th Cir. 2010) .....................................................................................3

MONSANTO'S OMNIBUS MOTION TO EXCLUDE GENERAL CAUSE EXPERTS

*In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prod. Liab. Litig.*,
93 F.4th 339 (6th Cir. 2024) ........................................................................6

*In re Roundup Prod. Liab. Litig.*,
2024 WL 3074376 (N.D. Cal. 2024) ......................................................7, 8, 12, 21

*In re Roundup Prod. Liab. Litig.*,
358 F. Supp. 3d 956 (N.D. Cal. 2019), ...............................................................2

*In re Roundup Prod. Liab. Litig.*,
390 F. Supp. 3d 1102 (N.D. Cal. 2018) ....................................................... *passim*

*In re Roundup Prod. Liab. Litig.*,
No. 3:16-md-02741-VC (May 2, 2024) ...............................................................1

*United States v. Rhodes*,
62 F.3d 1449 (D.C. Cir. 1995) .........................................................................3

*Wendell v. GlaxoSmithKline LLC*,
858 F.3d 1227 (9th Cir. 2017) .......................................................................3, 5

*In re Zantac (Ranitidine) Prod. Liab. Litig.*,
644 F. Supp. 3d 1075 (S.D. Fla. 2022) ..............................................................29

**Statutes and Rules**

28 U.S.C. § 2072(b) ......................................................................................3

28 U.S.C. § 2074 .........................................................................................3

Fed. R. Evid. 702 ................................................................................. *passim*

**Other Authorities**

ASA President's Task Force Statement on Statistical Significance and
Replicability, Harvard Data Science Review Issue 3.3 (Summer 2021) ...................9

Fed. Jud. Ctr., Reference Manual on Scientific Evidence (3d ed. 2011).......................8, 21, 25, 29

David E. Bernstein & Eric G. Lasker, *Defending Daubert: It's Time to Amend
Federal Rule of Evidence 702*, 57 Wm. & Mary L. Rev. 1 (2015)...........................4

EPA, Memorandum from D. Miller to C. Olinger, *Glyphosate: Epidemiology
Review of Zhang et al. (2019) and Leon et al. (2019) publications for Response
to Comments on the Proposed Interim Decision* (Jan. 6, 2020) ............................35

L. Sheppard & R.M. Shaffer, *Re: Glyphosate Use and Cancer Incidence in the
Agricultural Health Study*, J. Nat'l Cancer Inst. 214 (2019)....................................33

S.L. Heltshe *et al*., *Using Multiple Imputation to Assign Pesticide Use for Non-Responders in the Follow-Up Questionnaire in the Agricultural Health Study* Journal of Exposure Science & Environmental Epidemiology 1 (2012).........................32, 33

Thomas D. Schroeder, *Toward A More Apparent Approach to Considering the Admission of Expert Testimony*, 95 Notre Dame L. Rev. 2039 (2020) ....................................4

MONSANTO'S OMNIBUS MOTION TO EXCLUDE GENERAL CAUSE EXPERTS

## INTRODUCTION

In 2018, Monsanto moved to exclude Plaintiffs' general-causation experts, arguing that their opinions were unreliable and therefore inadmissible under Federal Rule of Evidence 702. Ruling on Monsanto's motion in PTO 45, this Court found it "a very close question" but, relying on then-prevailing Ninth Circuit precedent, ultimately "conclude[d] that the opinions of these experts, while shaky, are admissible." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1108, 1151 (N.D. Cal. 2018), *aff'd sub nom. Hardeman v. Monsanto Co.*, 997 F.3d 941 (9th Cir. 2021). In PTO 290, issued earlier this year, the Court challenged Monsanto to explain "why" the Court's "past decisions should be revisited." ECF 18320, at 7 n.4, *In re Roundup Prod. Liab. Litig.*, No. 3:16-md-02741-VC (May 2, 2024). This brief endeavors to provide that explanation.

As this Court noted in PTO 45, then-controlling Ninth Circuit precedent seemed to command the admission of expert opinions that would be excluded in other circuits. But that precedent has been undercut by the recent amendments to Rule 702, which were enacted in 2023 to rectify the Ninth Circuit's previously "incorrect application" of Rule 702. *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendments. Now, under Rule 702 as amended, Plaintiffs must demonstrate to the Court by a preponderance of the evidence that their experts' opinions not only rest on sufficient data and reliable scientific principles, but also reflect a reliable application of those principles to that data.

In PTO 45, this Court found that "[t]he evidence, viewed in its totality, seems too equivocal to support any firm conclusion that glyphosate causes NHL." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1109. That is truer today than ever.

This motion challenges the opinions of Plaintiffs' current crop of general-causation experts: Kristin Aronson; Martyn Smith; Irving Allen; Christopher Portier; Charles Jameson; Beate Ritz; and Dennis Weisenburger. Their opinions are plagued by the same methodological flaws as existed in 2018: they cherry-pick perceived favorable data while ignoring contrary data; they place principal reliance on studies that do not account for confounding factors; they cite unadjusted data while ignoring adjusted data because it does not support their opinions; and they disregard bedrock scientific principles by relying on results that lack statistical significance. But those defects have

become even more profound in the intervening period. Confronted by an ever-growing body of epidemiological evidence showing that there is no association between glyphosate and NHL overall, Plaintiffs' experts have become even more selective in the data they cite, systematically relying on isolated, unadjusted results that suffer from confounding while ignoring final, adjusted results that do not. At the same time, these experts rely on the Zhang meta-analysis this Court found is "junk science." Plaintiffs cannot meet their burden of demonstrating that these experts' opinions rest on a reliable application of scientific principles as required by amended Rule 702.

Lacking admissible evidence of general causation, Plaintiffs cannot establish an essential element of their claims and Monsanto is therefore entitled to summary judgment.

**ARGUMENT**

**I.     FRE 702 has been amended to correct the erroneous Ninth Circuit precedent on which this Court relied in PTO 45.**

In PTO 45, issued in 2018, this Court noted that then-prevailing Ninth Circuit case law extended greater "deference to experts in close cases than might be appropriate in some other Circuits" and that the Ninth Circuit's looser interpretation of Rule 702 made "a difference that could matter in close cases." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1112–13.[2] That difference mattered in this case.

In PTO 45, the Court found that there were "significant problems" with the opinions of Plaintiffs' general-causation experts, and that those flaws "combine[d] to make" their admissibility "a very close question." 390 F. Supp. 3d at 1108; *accord id.* at 1136, 1139, 1141, 1151.[3] When resolving that "close question" in Plaintiffs' favor, the Court relied heavily on a trio of Ninth Circuit

---

[2]     The Court made similar observations in 2019 in PTO 85, remarking that it was "impossible to read" then-controlling Ninth Circuit precedent "without concluding that district courts in the Ninth Circuit must be more tolerant of borderline expert opinions than in other circuits." *In re Roundup Prod. Liab. Litig.*, 358 F. Supp. 3d 956, 959 (N.D. Cal. 2019) (PTO 85), *aff'd sub nom. Hardeman v. Monsanto Co.*, 997 F.3d 941 (9th Cir. 2021); *see also id.* at 960 ("a wider range of expert opinions (arguably much wider) will be admissible in [the Ninth C]ircuit" than elsewhere under pre-amendment Ninth Circuit case law).

[3]     In PTO 85, the Court found it "again a close question," but ultimately admitted the opinions of Plaintiffs' specific-causation experts after finding that they had "inched over the line," albeit "barely." *In re Roundup Prod. Liab. Litig.*, 358 F. Supp. 3d at 957.

decisions—*Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227 (9th Cir. 2017), *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036 (9th Cir. 2014), and *Messick v. Novartis Pharmaceuticals Corp.*, 747 F.3d 1193 (9th Cir. 2014). *Cf.* 390 F. Supp. 3d at 1112–13, 1134, 1138, 1141–42.

Those decisions, however, have since been abrogated in relevant part by the 2023 amendments to Rule 702.[4] Now, because of those amendments, "[t]he Court is required to analyze the expert's data and methodology at the admissibility stage more critically than in the past." *Boyer v. City of Simi Valley*, 2024 WL 993316, at *1 (C.D. Cal. 2024); *see also In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 2024 WL 1914881, at *3 (D.N.J. 2024) ("In light of [the 2023] amendments, it is self-evident that Defendants should be allowed to contest previous *Daubert* holdings.").

Alluding in part to the Ninth Circuit precedent on which this Court relied in PTOs 45 and 85, the committee that drafted the 2023 amendments explained that they were "made necessary by the courts that have failed to apply correctly [Rule 702's] reliability requirements." Fed. R. Evid. 702 advisory committee notes to 2023 amendments; *cf. e.g.*, Adv. Comm. on Evidence Rules, Agenda Book for Committee Meeting 93–94 (April 26–27, 2018).[5] Publicly advocating an amendment to correct "faulty application" of the standard, Judge Schroeder of the Middle District of North Carolina—who was at the time a member of the Judicial Conference's Advisory Committee on the Federal Rules of Evidence and the chair of its Subcommittee on Rule 702—took

---

[4]     Congressionally approved and authorized (*see* 28 U.S.C. § 2074), federal rules, including the rules of evidence, "have the force and effect of federal statutes." *Off. Depot Inc. v. Zuccarini*, 596 F.3d 696, 701 (9th Cir. 2010) (quoting *Schneider v. Nat'l R.R. Passenger Corp.*, 72 F.3d 17, 19 (2d Cir.1995)); *accord, e.g.*, *Hilao v. Est. of Marcos*, 95 F.3d 848, 852 (9th Cir. 1996). Under the Rules Enabling Act, they displace "[a]ll laws in conflict with such rules." 28 U.S.C. § 2072(b). Accordingly, as the Supreme Court held in *Daubert*, they displace prior decisional law. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587 (1993) (holding *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), "was superseded by the adoption of the Federal Rules of Evidence."); *United States v. Rhodes*, 62 F.3d 1449, 1454 (D.C. Cir. 1995) (*Daubert* "teach[es] that the Federal Rules of Evidence displace common-law precedents to the extent that the two are inconsistent"), *judgment vacated on other grounds*, 517 U.S. 1164 (1996).

[5]     The Court "may look to the advisory committee's notes because they 'provide a reliable source of insight into the meaning of a rule.'" *In re Kirkland*, 75 F.4th 1030, 1043 (9th Cir. 2023) (quoting *United States v. Vonn*, 535 U.S. 55, 64 n.6 (2002)).

the Ninth Circuit to task for having "set its own standard for assessing admissibility of expert opinion apart from Rule 702," identifying its decisions "as evidence that courts are abdicating their gatekeeper role." Thomas D. Schroeder, *Toward A More Apparent Approach to Considering the Admission of Expert Testimony*, 95 Notre Dame L. Rev. 2039, 2044, 2051 (2020).[6] As Judge Schroeder noted (*id.* at 2044 n.27) and the drafting history reflects (*see, e.g.*, Adv. Comm. on Evidence Rules, Agenda Book for Committee Meeting 93–94 (April 26–27, 2018); Adv. Comm. on Evid. Rules, Agenda Book for Comm. Mtg. 17 (April 30, 2021)), the Committee relied heavily on a law review article—David E. Bernstein & Eric G. Lasker, *Defending Daubert: It's Time to Amend Federal Rule of Evidence 702*, 57 Wm. & Mary L. Rev. 1 (2015).[7] That article sharply criticized the Ninth Circuit's application of Rule 702, characterizing its decision in *City of Pomona* as "the poster child for judicial disregard" of the rule's admissibility standard. 57 Wm. & Mary L. Rev. at 28. Simply put, Rule 702 was amended in large part to remedy the Ninth Circuit's unduly lax application of Rule 702's reliability standard.

The rule was amended in two respects. First, it was amended to rectify "an incorrect application of Rule 702" under which "courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." Fed. R. Evid. 702 advisory committee notes to 2023 amendments. Second, it was "amended to emphasize that each expert opinion must stay within the bounds of what can be

---

[6]    To be sure, the Ninth Circuit in *Hardeman* denied being "more permissive than others in admitting" expert testimony, rejecting the suggestion that *City of Pomona* "reveal[ed] a more flexible *Daubert* approach in this circuit." 997 F.3d at 962. The Advisory Committee clearly disagreed. For his part, Judge Schroeder described the Ninth Circuit's *City of Pomona* decision as "illustrative" of the "decisions from that circuit that set it apart from most others." 95 Notre Dame L. Rev. at 2050. Ironically, despite disclaiming a divergent path, the Ninth Circuit in *Hardeman* embraced the very precedents that set its pre-amendment case law apart from that of other circuits, holding that this Court "employed the correct legal standard for reliability" when it afforded "deference to experts" with "borderline ... opinions," left "difficult issues in the hands of the jury," and relied "on the safeguards of the adversary system ... to 'attack[] shaky but admissible evidence.'" 997 F.3d 941, 962 (quoting *Wendell*, 858 F.3d at 1237). In light of the 2023 amendments, *Hardeman's* affirmation of the very cases the Rules Committee sought to abrogate through the 2023 amendment can no longer be considered good law.

[7]    Regardless of their initial impetus, the amendments received "unanimous support" from the Rules Committee. Advisory Committee on Evidence Rules, Agenda Book for Committee Meeting 60 (April 30, 2021).

concluded from a reliable application of the expert's basis and methodology." *Id.* These amendments vitiate, among other errant holdings, the Ninth Circuit's declaration that Rule 702 "was meant to exclude" only "junk science" (*Wendell*, 858 F.3d at 1237); that "issues regarding the correctness of [an expert] opinion … are a matter of weight, not admissibility" (*Messick*, 747 F.3d at 1199); and that an expert's "shaky conclusions" should "be attacked by cross examination, … not exclusion" (*City of Pomona*, 750 F.3d at 1049).

In short, the 2023 amendments to Rule 702 abrogated essential aspects of the Ninth Circuit case law on which this Court relied when it issued PTO 45 in 2018.[8]

Indeed, the amendments directly implicate the Court's analysis in PTO 45. For example, the Court recognized that the opinion of one of Plaintiffs' experts, Dr. Portier, was "far from unassailable" given the "legitimate concerns about the reliability of the data" that he relied on. 390 F. Supp. 3d at 1134. Despite this, the Court deemed his opinion admissible, stating that Monsanto could "cross-examine Dr. Portier on the apparent weaknesses in his analysis, and there is little reason to think that a jury will not understand those weaknesses." *Id.* That approach, which leaves it to jurors to determine the reliability of an expert's conclusions, is no longer tenable after the 2023 amendments. Now, an expert opinion is inadmissible unless "the proponent demonstrates **to the court** that it is more likely than not that … the testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702 (emphasis added). The Advisory Committee has explained why Rule 702(d) was amended to

---

[8]     Another court in this district has said that "[b]ecause the rule change was a clarification, and not a change in the standard, the new language does not materially alter the admissibility of expert testimony." *Alivecor, Inc. v. Apple, Inc.*, 2024 WL 591864, at *3 n.2 (N.D. Cal. 2024). The court's conclusion does not follow from its premise. The rule was "amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets" each of "the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee notes to 2023 amendments. That clarification was necessary to rectify certain courts' "incorrect application of Rules 702 and 104(a)." *Id.* As discussed above, the amendments were in large measure directed at Ninth Circuit case law in particular. Thus, while the changes to the rule's text were intended to reaffirm the rule's preexisting admissibility **standard**, those changes were designed to—and did—materially alter **application** of that standard within the Ninth Circuit and elsewhere where in the view of the Rules Committee those standards were not being correctly applied.

emphasize that an expert opinion cannot be admitted unless its proponent proves to the court by a preponderance of the evidence that the expert's ultimate conclusions are reliable:

> Judicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support.

Fed. R. Evid. 702 advisory committee notes to 2023 amendments. Thus, what might previously have been left to the jury in the Ninth Circuit is now clearly a question for the Court.[9]

Not only is the reliability—and thus admissibility—of an expert's conclusions now a question strictly for the Court, but when resolving that question, the Court "is required to analyze" the expert's opinion "more critically than in the past." *Boyer*, 2024 WL 993316, at \*1. The Court must examine the science underlying an expert's opinion and "***how***" the expert uses that science "in forming his general causation opinion." *In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prod. Liab. Litig.*, 93 F.4th 339, 346 n.5, 348 n.7 (6th Cir. 2024) (citing 2023 amendments). As explained below, the opinions offered by Plaintiffs' general-causation experts do not satisfy Rule 702 as amended.

## II. Four of Plaintiffs' experts should be excluded for failing to take new science into account.

In its opinion excluding Dr. Zhang's meta-analysis, this Court observed that "an expert

---

[9]   As Judge Schiltz of the District of Minnesota, the then-Chair of the Advisory Committee on Evidence Rules, explained when the 2023 amendments were drafted:

> It is clear that a judge should not allow expert testimony without determining that all requirements of Rule 702 are met by a preponderance of the evidence. … It is not appropriate for these determinations to be punted to the jury, but judges often do so. For example, in many cases expert testimony is permitted because the judge thinks that a reasonable jury ***could*** find the methods are reliable. There is unanimous support in the Evidence Rules Committee for moving forward with an amendment to Rule 702 that would clarify that expert testimony should not be permitted unless the judge finds by a preponderance of the evidence that each of the prerequisites are met.

Advisory Committee on Evidence Rules, Agenda Book for Committee Meeting 60 (April 30, 2021) (emphasis in original).

testifying in 2024 couldn't reliably opine that glyphosate is carcinogenic if they only considered epidemiological evidence published before 2019." *In re Roundup Prod. Liab. Litig*., 2024 WL 3074376, at \*5. Yet four of Plaintiffs' experts in Wave VII of this MDL—Drs. Jameson, Ritz, Weisenburger, and Portier—do precisely that. These experts have not disclosed new expert reports in years.  Dr. Ritz's latest report, for example, is from 2017, and Dr. Weisenburger's most recent general-causation report is from 2019. As a consequence, they do not engage with any of the later epidemiological studies—like Leon (2019), Pahwa (2019), Meloni (2021), De Roos (2022), and Hardell (2023).

Rather than provide reports from these experts that take the latest science into consideration, Plaintiffs' Wave VII Rule 26 disclosures have simply incorporated by reference these experts' prior reports. But such outdated reports cannot be reliable, as this Court has held. These experts should therefore be excluded.

### III.   Plaintiffs' experts should be excluded because they continue to rely on Dr. Zhang's "junk science" meta-analysis.

In June, this Court determined that the 2019 meta-analysis by Dr. Zhang (which purports to show that glyphosate is capable of causing NHL) was "junk science" with "deep methodological problems." *In re Roundup Prod. Liab. Litig*., 2024 WL 3074376, at \*1. The Court highlighted that Dr. Zhang's meta-analysis only "examines an arbitrary selection of the available data." *Id.* That fundamental methodological defect cannot "be cured by intoning that the paper was peer-reviewed," because "a court can't wave junk science through the *Daubert* gate simply because it survived some prepublication peer-review process." *Id.*

Plaintiffs' experts continue to embrace Dr. Zhang's "junk science" as a foundation of their opinions. Dr. Allen, for example, proclaims that the Zhang meta-analysis "shows that glyphosate exposure is probably associated with NHL." Ex. 1, Expert Report of Dr. Irving Allen at 116-117, *Hayden v. Monsanto Co*., No. 3:19-cv-05600-VC ("Allen *Hayden* Report").[10] Dr. Aronson spends nearly four pages boasting that the Zhang meta-analysis is a "very detailed" and "high-quality meta-analysis clearly demonstrating that glyphosate exposure increased NHL risk." Ex. 2, Expert Report

---

[10]    All exhibits are attached to the concurrently filed declaration of Linda C. Hsu.

MONSANTO'S OMNIBUS MOTION TO EXCLUDE GENERAL CAUSE EXPERTS

of Dr. Kristan Aronson at 86, *Hayden v. Monsanto Co.*, No. 3:19-cv-05600-VC ("Aronson *Hayden* Report"). Dr. Smith points to Dr. Zhang's meta-analysis to support his opinion that the Andreotti (2018) paper, detailed below, has "several major flaws," which he claims the Zhang meta-analysis "extensively documented." Ex. 3, Expert Report of Dr. Martyn Smith at 27, *Kay v. Monsanto Co.*, No. 3:21-cv-00175-VC ("Smith *Kay* Report"); *see also id.* at 30 (describing the Zhang meta-analysis as "showing that exposure to [glyphosate] caused a modest, but statistically significant increase in risk of NHL in humans"). These experts' continued reliance on the Zhang meta-analysis cannot satisfy the standard of Rule 702 as amended.

## IV. Plaintiffs' experts rely on studies that do not adjust for confounding factors or rely on unadjusted data when adjusted data are available.

"When assessing the reliability of an epidemiological study, a court must consider whether the study adequately accounted for confounding factors." *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1322 (N.D. Fla. 2018). A study that does not account for confounders could show a purported "association of a factor and a disease" that "is actually the result of an association with a third, confounding factor." Fed. Jud. Ctr., Reference Manual on Scientific Evidence 591 (3d ed. 2011) ("Reference Manual"); *accord In re Roundup Prods. Liab. Litig.*, 390 F. Supp. at 1117 ("Confounding arises where a factor not accounted for by the study wholly or partially explains an apparent association between the agent under study and the outcome.").

Here, "exposure to other pesticides is the major confounder" that might undermine the reliability of any study purporting to show an association between glyphosate and NHL. *In re Roundup Prods. Liab. Litig.*, 2024 WL 3074376 at *4. Indeed, "[t]he possibility of confounding arising from exposure to other pesticides is a serious consideration and one that must be accounted for in a reliable expert report assessing the epidemiology evidence." *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d at 1123.

Despite this bedrock methodological requirement, Plaintiffs' experts place principal reliance on epidemiological studies that did not adjust for the use of other pesticides, without adequately accounting for the risk of confounding inherent in those studies' unadjusted results. Worse, Plaintiffs' experts often cherry-pick unadjusted data from studies despite those very studies

reporting that seeming associations between NHL and glyphosate are not statistically significant when adjusted for exposure to other pesticides. "This tactic does not qualify as good science." *Jones v. United States*, 933 F. Supp. 894, 898 (N.D. Cal. 1996) (expert opinions that "took data from articles that found no statistically significant correlation" of alleged drug interactions but nonetheless "used the data to reach a conclusion contrary to the articles' own authors" are inadmissible). To the extent Plaintiffs' experts rely on unadjusted data, their methodologies and conclusions are unreliable and must be excluded under Rule 702 as amended.

### A.   McDuffie (2001): Data unadjusted for other pesticide use.

*None* of the results reported in McDuffie (2001) were adjusted for other pesticide exposure. Indeed, "there was no adjustment for other pesticide exposure" even though "[r]isk was only increased in men exposed to more than one herbicide (or more than one pesticide)." Ex. 4, Expert Report of Dr. Robert D. Langer at 29, *In re Roundup Prod. Liab. Litig.*, MDL No. 2741 (Wave VII) ("Langer Report"). The authors of the study admitted that "[d]elineating the putative relationship between exposure to pesticides and NHL is complicated … by the subject's exposure to a variety of different pesticides." Ex. 5, Helen H. McDuffie, *et al*., *Non-Hodgkin's Lymphoma and Specific Pesticide Exposure in Men: Cross-Canada Study of Pesticides and Health*, 10 Cancer Epidemiology, Biomarkers & Prevention, 1155, 1162 (2001). That is perhaps why their "final models" did not associate NHL and exposure to glyphosate. *Cf.* McDuffie (2001) at 1162 ("In our final models, NHL was associated with a personal history of cancer; a history of cancer in first-degree relatives; and exposure to dicamba-containing herbicides, to mecoprop, and to aldrin.")

A later analysis of the McDuffie (2001) data—Hohenadel (2011)—focused specifically on "the potential effects of exposure to multiple pesticides." Langer Report at 32. It found that "***[f]or glyphosate only, there was no association with NHL***," reporting an odds ratio of 0.92 with a 95% confidence interval of 0.54–1.55. *Id.* (emphasis added); *cf.* Ex. 6, Karin Hohenadel, *et al*., *Exposure to Multiple Pesticides and Risk of Non-Hodgkin Lymphoma in Men from Six Canadian Provinces*, 8 Int'l J. Env't Rsch. and Pub. Health 2320, 2326 (2011). Indeed, only when glyphosate was "considered as a ***joint exposure*** with malathion" did the study find that "there was a [statisically] significant association." Langer Report at 32 (emphasis added); *cf.* Hohenadel (2011) at 2326.

Thus, any putative association between NHL and glyphosate gleaned from McDuffie (2011) is explained by association with a confounding factor—an entirely different pesticide. *Id.*

Plaintiffs' experts make no serious effort to address this fundamental problem, and the manner in which many of them simply ignore the issue (or worse, misstate it) does not reflect the dispassionate work of a good scientist.

**Aronson.**  Dr. Aronson has admitted that McDuffie (2001) "did not" adjust "for exposure to other pesticides." Ex. 7, Aronson *Buttry* Dep. 213:24–214:2. In her report, relying on nothing more than her own say-so, she says that "there was no evidence of confounding" in McDuffie (2001) "and therefore no need to adjust for other pesticides." Aronson *Hayden* Report at 57. Dr. Aronson's report, however, fails to address Hohenadel (2011)'s finding that any association McDuffie (2001) found between NHL and greater than 2-days-per-year exposure to glyphosate *is* explained by a confounding factor, namely co-exposure with malathion.

**Smith.**  Dr. Smith cites McDuffie (2001) in his report without acknowledging, let alone accounting for, the fact that none of the data in the study were adjusted. Smith *Kay* Report at 23. And despite asserting that he has personally "studied the mechanisms of toxicity of the pesticide malathion" (*id.* at 5), Dr. Smith never addresses Hohenadel (2011) and its determination that the putative association between glyphosate and NHL reported in McDuffie (2001) can be explained by co-exposure with malathion.

**Portier.**  Dr. Portier states that McDuffie (2001) "controlled for significant medical variables" but omits that it failed to control for the most important potential confounder—exposure to other pesticides. Ex. 8, Expert Report of Dr. Christopher Portier at 42, *In re Roundup Prod. Liab. Litig.*, MDL No. 2741 ("Portier Report"). And despite accurately reciting the adjusted figures in Hohenadel (2011), Dr. Portier does not grapple with the fact that the purported association between glyphosate and NHL reported in McDuffie (2001) is explained by co-exposure to malathion. *Id.* To the contrary, he asserts that because Hohenadel (2011) "was specifically targeted to interactions of various pesticides," *i.e.*, was designed to account for potential confounding in McDuffie (2001), it "does not substantively contribute to an evaluation of glyphosate." *Id.* That gets it exactly backwards.

**Ritz.**  For her part, Dr. Ritz argues that Hohenadel (2011) somehow means that malathion co-exposure exacerbates glyphosate's purportedly independent health effects. *See* Ex. 9, Expert Report of Dr. Beate Ritz at 18, *In re Roundup Prod. Liab. Litig.*, MDL No. 2741 ("Ritz Report"). She asserts that "[p]esticides sometimes exert stronger health effects when mixed (co-exposure) with other pesticides than when used alone" (*id.*) but cites nothing in support of that speculative contention, let alone anything specific to glyphosate. And although she acknowledges Hohenadel (2011)'s adjusted figures for glyphosate-only exposure (*id.*), she refuses to acknowledge what any fair scientist looking at the available data would conclude—that McDuffie (2001) does not support the proposition that glyphosate is associated with NHL.

**Jameson.**  Referring to the association it found between NHL and greater than 2-days-per-year exposure to glyphosate, Dr. Jameson states that "McDuffie (2001) reported a positive association between glyphosate exposure and NHL for those case subjects with more than two days/year of exposure." Ex. 10, Expert Report of Dr. Charles Jameson at 17, *In re Roundup Prod. Liab. Litig.*, MDL No. 2741 ("Jameson Report"). Notably, however, Jameson does not account for the fact that the overall odds ratio reported by McDuffie (2001) was not statistically significant; the fact that the data in McDuffie (2001) are not adjusted for exposure to other pesticides; or the fact that, as demonstrated in Hohenadel (2011), the purported association between NHL and greater than 2-days-per-year exposure to glyphosate disappears after adjusting for malathion exposure.

**Weisenburger.**  Dr. Weisenburger relies on McDuffie (2001)'s unadjusted data. He says that McDuffie (2001) "adjusted for significant medical variables," but neither acknowledges that it failed to adjust for the use of other pesticides nor explains why reliance on its unadjusted figures is reliable. Ex. 11, Expert Report of Dr. Dennis Weisenburger at 5, *In re Roundup Prod. Liab. Litig.*, MDL No. 2741 ("Weisenburger Report"). And despite listing Hohenadel (2011) on his materials-considered list (Wiesenburger Report, Other Literature Reviewed at 4), Weisenburger's report does not address the fact that Hohenadel (2011) found no association between glyphosate and NHL once malathion co-exposure was adjusted for.

**B.     Hardell (2002): Adjusted data showed no statistically significant association between NHL and glyphosate.**

Although Hardell (2002)'s unadjusted univariate analysis purported to show a statistically significant association between glyphosate and NHL, its multivariate analysis, which was adjusted for exposure to other pesticides, did not. *See generally* Ex. 12, Lennart Hardell, *et al*., *Exposure to Pesticides as Risk Factor for Non-Hodgkin's Lymphoma and Hairy Cell Leukemia: Pooled Analysis of Two Swedish Case Control Studies*, 43 Leukemia & Lymphoma 1043 (2002). In other words, Hardell (2002) shows that once one takes "the major confounder" (*In re Roundup Prods. Liab. Litig*., 2024 WL 3074376 at *4) into consideration, there is no statistically significant association between NHL and glyphosate exposure.  Again, Plaintiffs' experts do not grapple with this fact.

**Allen.**  Dr. Allen acknowledges that the purported association between glyphosate and NHL suggested by Hardell (2002)'s unadjusted univariate analysis lost statistical significance in the study's adjusted multivariate analysis. *See* Allen *Hayden* Report at 110. But he then simply disregards the implication of this fact, declaring that "[d]espite the findings from the multivariate analysis, … the univariate analysis … supports [his] opinion" that "glyphosate exposure is probably associated with NHL." *Id*.  Notably, Dr. Allen offers no justification—let alone one based in science—for prioritizing the unadjusted univariate analysis, which fails to take a known confounding factor into account, over the adjusted multivariate analysis, as scientists outside of a courtroom would.

**Aronson.**  Dr. Aronson erroneously suggests that Hardell (2002) showed a "statistically significant association" between NHL and glyphosate when "[o]ther pesticides are adjusted for." Aronson *Hayden* Report at 27. In fact, when Hardell (2002) adjusted for exposure to other pesticides, the putative association was not statistically significant. Indeed, elsewhere in her report, Dr. Aronson concedes that when Hardell (2002) "control[led] for other pesticides," the odds ratio for glyphosate exposure "was 1.85 (95% CI 0.55–6.20)," *i.e.*, not statistically significant. *Id*. at 54. She does not explain why Hardell (2002) should be read as establishing a statistically significant association between NHL and glyphosate despite its multivariate analysis.

1      **Smith.**   For his part, Dr. Smith broadly asserts that Hardell (2002) found a "significant

2   association" between glyphosate and NHL. Smith *Kay* Report at 22. Smith supports his assertion

3   by citing the study's univariate analysis, never acknowledging that the univariate analysis was not

4   adjusted for exposure to other pesticides or that the study's adjusted multivariate analysis found no

5   statistically significant association.

6      **Portier.**   Dr. Portier concedes that the study's multivariate analysis, unlike its univariate

7   analysis, "controlled for other pesticides." Portier Report at 41. And he accurately recites the results

8   of the multivariate analysis—an odds ratio of 1.85 with a 95% confidence interval of 0.55–6.20.

9   *Id*. But he neither acknowledges that the odds ratio lacks statistical significance nor explains how

10  it could be a reliable basis for concluding glyphosate causes NHL.

11     **Ritz.**   Dr. Ritz says that Hardell (2002)'s univariate analysis demonstrated a "threefold

12  increased risk of any NHL," Ritz Report at 18 & n.36, without mentioning—let alone confronting—

13  the fact that the univariate analysis rests on unadjusted data.

14     **Jameson.**   Similarly, Dr. Jameson claims that Hardell (2002)'s univariate analysis showed

15  a "significant positive association" between NHL and glyphosate exposure without acknowledging

16  that the purported association rests entirely on non-adjusted data that do not account for exposure

17  to other pesticides. Jameson Report at 13. And although he concedes that the results of the study's

18  multivariate analysis were not statistically significant, he erroneously attributes that lack of

19  statistical significance to having controlled for "study area" and "vital status" rather than having

20  controlled for exposure to other pesticides. *Id*.

21     **Weisenburger.**   Finally, Dr. Weisenburger flatly claims that Hardell (2002) "showed

22  statistically-significant increases in the risk for NHL," which is inaccurate given the study's

23  multivariate analysis, which found no statistically significant association when the data were

24  adjusted for exposure to other pesticides. Weisenburger Report. at 4.

25     **C.      Eriksson (2008): Adjusted data showed no statistically significant association
            between NHL and glyphosate.**

26

27     When discussing Eriksson (2008) in PTO 45, this Court rightly recognized that a "possible

28  cause for concern" with the study's univariate analysis is that it, unlike the study's multivariate

---

13

analysis, "is not adjusted for use of other pesticides" inasmuch as "[t]he authors used as the control group for this part of the analysis people who were not exposed to any of the pesticides included in the study." 390 F. Supp. 3d  at 1120 (citing Ex. 13, Mikael Eriksson, *et. al.*, Pesticide exposure as a risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis, 123 Int'l J. Cancer 1657, 1658 (2008)). Moreover, the putative association between NHL and glyphosate found in the univariate analysis "may represent confounding" because "many" of the subjects who had contracted NHL had "prior exposure to 4-chloro-2-methyl phenoxyacetic acid (MCPA)," which, according to the univariate analysis, had a higher odds ratio than glyphosate. Langer Report at 31; *see also* Eriksson (2008) at 1661–62 (reporting that "many individuals that used MCPA earlier are now also exposed to glyphosate" and that MCPA had an unadjusted univariate odds ratio of 2.81 with a 95% confidence interval of 1.27–6.22, as compared to glyphosate, which had an unadjusted univariate odds ratio of 2.02 with a 95% confidence interval of 1.10–3.71).

Plaintiffs' experts fail to adequately grapple with these issues when relying on the unadjusted results of Eriksson (2008)'s univariate analysis.

**Allen.**  According to Dr. Allen, Eriksson (2008) found that "exposure to glyphosate … resulted in increased risk" of cancer, but he cites only its unadjusted univariate analysis in support of that assertion. Allen *Hayden* Report at 111. Moreover, he concedes that the results of the study's adjusted, multivariate analysis were statistically "nonsignificant." *Id.* Without offering any explanation for why it is appropriate to rely on unadjusted data when adjusted data is available, Dr. Allen proclaims that study's "the univariate analysis" supports the conclusion that glyphosate exposure is probably associated with NHL "[d]espite the findings of the multivariate analysis." *Id.*

**Aronson.**  As she did when describing Hardell (2002), Dr. Aronson suggests that Eriksson (2008) shows a "statistically significant association" when "[o]ther pesticides are adjusted for." Aronson *Hayden* Report at 27. But, as she implicitly concedes elsewhere in her report, that is simply wrong—when Eriksson (2008) adjusted for other pesticides, the results were ***not*** statistically significant. *See* Eriksson (2008) at 1661 (reporting multivariate odds ratio of 1.51 with a 95% confidence interval of 0.77–2.94); *cf.* Aronson *Hayden* Report at 54 (acknowledging that when "[a]djusted for other pesticides, the OR for 'ever' glyphosate exposure and NHL was 1.51 (95% CI

1    0.77–2.94)"). In addition to mischaracterizing Erickson (2008)'s multivariate results, Aronson fails

2    to address the possible confounding of its univariate results by prior exposure to MCPA.

3           **Smith.**  Dr. Smith quotes Eriksson (2008) as showing "a statistically significant increased

4    OR for lymphoma," but the figure he cites for that proposition was not adjusted for other pesticide

5    use. Smith *Kay* Report at 23. Indeed, Dr. Smith himself notes that the numbers he cites were

6    "adjusted for age, sex and year" and nothing else. *Id.* And, like Dr. Aronson, Dr. Smith does not

7    confront the possibility that exposure to MCPA confounded the univariate results on which he

8    relies.

9           **Portier.**  Dr. Portier reports that Eriksson (2008)'s "univariate analysis, adjusting for age,

10   sex and year of diagnosis (cases) or enrollment (control) yielded an OR of 2.02 (1.10–3.71)," but

11   fails to acknowledge that those findings were unadjusted for other pesticide use. Portier Report at

12   41. He also reports that the study's "multivariate analysis of glyphosate controlling for other

13   agents" showed "an OR of 1.51 (0.77–2.94)," but simply ignores that these adjusted findings are

14   not statistically significant. *Id.* Nor does Portier address exposure to MCPA and the risk of

15   confounded univariate results.

16          **Ritz.**  Dr. Ritz says that Eriksson (2008) demonstrated a "twofold increase in NHL risk with

17   glyphosate exposure," but she relies exclusively on the study's univariate results to support that

18   assertion. Ritz Report at 17 (citing univariate results of "OR=2.02, 95% CI 1.10–3.71"); *cf.*

19   Eriksson (2008) at 1661. She does so without disclosing that those data are unadjusted for exposure

20   to other pesticides and without discussing the possibility that they are confounded by prior exposure

21   to MCPA.

22          **Jameson.**  For his part, Dr. Jameson admits that the "association … for exposure to

23   glyphosate to NHL was positive and significant at 2.02 (95% CI, 1.10–3.71) compared to controls,

24   but positive and non-significant at 1.51 (95% CI, 0.77–2.94) when confounders that included

25   exposure to other pesticides … were included in the analysis." Jameson Report at 14. Despite this,

26   or perhaps because of it, Jameson relies solely on the study's unadjusted univariate analysis when

27   he says that Eriksson (2008) found a statistically significant association between NHL and

28   "exposure to glyphosate for more than 10 days per year." *Id.* (citing unadjusted odds ratio of "2.36

(95% CI, 1.04–5.37)"); *cf.* Eriksson (2008) at 1659. He offers no justification for relying on unadjusted results, especially unadjusted results that might be confounded by exposure to MCPA, when adjusted results are available.

**Weisenburger.**  Dr. Weisenburger claims that Eriksson (2008) "showed statistically-significant increases in the risk for NHL." Weisenburger Report at 4. But Dr. Weisenburger has previously conceded that "the only odds ratio" in Eriksson (2008) "that is adjusted for exposure to other pesticides is the multivariate" analysis, and that the multivariate odds ratio is "not statistically significant." Ex. 14, Weisenburger *MDL* Dep. 182:20–183:24 (Sept. 11, 2017).

### D.      Pahwa (2019):  Adjusted data showed no statistically significant association between NHL and ever-use of glyphosate.

Pahwa (2019), published after PTO 45 was issued, was a "report pooling data" from two prior studies—De Roos (2003) and McDuffie (2001)—"along with additional data from the underlying study populations." Langer Report at 33; *see also* Ex. 15, Manisha Pahwa, *et al.*, *Glyphosate use and associations with non-Hodgkin lymphoma major histological sub-types: findings from the North American Pooled Project*, Scandinavian J. Work, Env't & Health, June 2019 at 1, 2. Although it found a "significant association" between NHL and "ever use" of glyphosate "in crude analysis"—an odds ratio of 1.43 with a 95% confidence interval of 1.11–1.83—that apparent association, which was based on data that was not adjusted for exposure to other pesticides, was "attenuated and no longer statistically significant when further adjusted for ever use" of other pesticides, with an adjusted odds ratio of 1.13 with a 95% confidence interval of 0.84–1.51. Pahwa (2019) at 4–5. The study concluded that the "association between glyphosate and NHL overall appears to be confounded by exposure to other pesticides." Pahwa (2019) at 4.

Despite this, Plaintiffs' experts insist that Pahwa (2019) shows a meaningful association between glyphosate and NHL.

**Allen.**  Dr. Allen, for example, writes that "this study shows that glyphosate exposure is probably associated with NHL." Allen *Hayden* Report at 116 (emphasis omitted). But he reaches that conclusion only by focusing on certain results while ignoring others. For example, when discussing the supposed association between ever-use of glyphosate and NHL overall, he cites the

1    statistically significant odds ratio that is not adjusted for use of other pesticides while disregarding

2    the statistically insignificant odds ratio that is adjusted for such use. *Compare id*. with Pahwa (2019)

3    at 5. Similarly, he points to an odds ratio suggesting that handling glyphosate more than two days

4    per year is associated that NHL overall while ignoring the contrary results showing no statistically

5    significant association between NHL overall and either use of glyphosate more than 3.5 years (an

6    odds ratio of 0.94 when adjusted for use of other pesticides with a 95% confidence interval of 0.62–

7    1.42) or use of glyphosate for more than 3.5 lifetime-days (an odds ratio of 1.08 when adjusted for

8    use of other pesticides with a 95% confidence interval of 0.66–1.77). *Compare* Allen *Hayden*

9    Report at 116 *with* Pahwa (2019) at 6–7.

10   **Aronson.**   Dr. Aronson misuses Pahwa (2019) in similar ways, cherry-picking isolated

11   results while ignoring contrary results. For example, to support her claim that Pahwa (2019)

12   "showed that exposure to glyphosate was associated with increased NHL risk," Dr. Aronson relies

13   on the odds ratio that is unadjusted for other pesticide use while disregarding, without explanation,

14   the overall odds ratio that is adjusted for other pesticide use and shows no statistically significant

15   association between NHL overall and "ever use" of glyphosate. *Compare* Aronson *Hayden* Report

16   at 78 (citing odds ratio unadjusted for other pesticide use of 1.4 with a 95% confidence interval of

17   1.11–1.83) *with* Pahwa (2019) at 5 (adjusted odds ratio of 1.13 with a 95% confidence interval of

18   0.84–1.51). Indeed, Dr. Aronson repeatedly cites odds ratios that are not adjusted for use of other

19   pesticides despite Pahwa providing odds ratios that are adjusted for such, presumably because the

20   adjusted odds ratios, which lack statistical significance, do not support her opinion. Dr. Aronson is

21   forced to rely on an unadjusted odds ratio for five years of glyphosate use (1.21 with a 95%

22   confidence interval of 1.02–1.44) rather than the odds ratio that is adjusted for other pesticide use

23   (1.09 with a 95% confidence interval of 0.91–1.31), and on an unadjusted odds ratio for greater

24   than 3.5 lifetime days of use (1.55 with a 95% confidence interval of 0.99–2.44) rather than the

25   adjusted odds ratio (1.08 with a 95% confidence interval of 0.66–1.77), because—as she admits—

26   Pahwa (2019) shows "no statistically significant increased risk in the adjusted data." Ex. 16,

27   Aronson *Frank* Dep. 179:3–9 (Jan. 28, 2022).

28

MONSANTO'S OMNIBUS MOTION TO EXCLUDE GENERAL CAUSE EXPERTS

**Smith.** Dr. Smith cites Pahwa (2019) for the proposition that "subjects who ever used glyphosate had an excess of NHL overall," but relies on the odds ratio that is not adjusted for other pesticide use to support that assertion even while acknowledging the existence of an overall adjusted odds ratio that finds no statistically significant association. Smith *Kay* Report at 25. Citing the odds ratio for handling glyphosate more than two days per year, Dr. Smith opines that glyphosate is "specifically associated" with DLBCL in particular. *Id.* But he does not explain why the more-than-two-days-per-year odds ratio is a reliable basis for his opinion when Pahwa (2019) finds no statistically significant association between DLBCL and either duration or lifetime-days of glyphosate use. *Compare* Smith *Kay* Report at 25 (relying on DLBCL odds ratio for handling glyphosate more than 2 days per year of 2.14 with a 95% confidence interval of 1.07–4.28) *with* Pahwa (2019) at 6 (reporting no statistically significant odds ratios for any duration of glyphosate use when adjusted for other pesticide use) *and id.* at 7 (reporting no statistically significant odds ratios for any number of lifetime-days of glyphosate use).

These experts do not confront the implications of Pahwa (2019)'s adjusted results; the inconsistency in its results depending on whether risk is analyzed in terms of ever-use, duration of use, frequency of use, or lifetime-days of use; or the study's conclusion that its unadjusted results were likely a product of confounding. Their failure to do so is especially remarkable given that Dr. Weisenburger, a co-author of the study and another of Plaintiffs' experts, has testified that the study's adjustments for co-exposures was one of the study's "important attributes" (Ex. 17, Weisenburger *Lamb* Dep. Vol. 1, 20:8–12 (July 1, 2019)) because "data is more reliable if they adjust for other pesticides." Ex. 18, Weisenburger *Armstrong* Dep. 60:9–12 (Feb. 24, 2023).

### E. Meloni (2021): Unadjusted data showed no statistically significant association between ever use of glyphosate and NHL.

Meloni (2021), another study that did not exist when PTO 45 was decided, was an "Italian case-control study published in 2021" that "collected 462 cases of NHL at six centers between 2011 and 2017." Langer Report at 33; *see also* Ex. 19, Federico Meloni, *et al*., *Occupational exposure to glyphosate and risk of lymphoma: results of an Italian multicenter case-control stud*y, Env't Health, Apr. 2021 at 1, 2.  The study is clear about its results: it "did ***not*** find an association" of

NHL "with exposure to glyphosate." Meloni (2021) at 5 (reporting odds ratio of 1.4 with a 95% confidence interval of 0.62–2.94) (emphasis added); *accord id.* at 1 ("There was no association with risk of lymphoma (any subtype), Non Hodgkin Lymphoma, B-cell lymphoma, or the major lymphoma subtypes other than [follicular lymphoma]").[11] Notably, the data in the study were adjusted for "age, gender, education, and study centre," but not exposure to other pesticides. Meloni (2021) at 1; *id.* at 6 ("[W]e only assessed exposure to glyphosate, but not to any other pesticides."). Thus, Meloni (2021) found no association between "ever use" of glyphosate and NHL overall, even using data unadjusted for exposure to other pesticides.

Despite this—and despite its authors' admission that the "study suffered from low statistical power to detect associations and from a higher probability of chance findings due to small numbers, which are major interpretative limitations" (Meloni (2021) at 6)—two of Plaintiffs' experts, Drs. Allen and Aronson, say that Meloni (2021) somehow ***supports*** a connection between NHL and glyphosate.  Their opinions are advocacy, not science.

**Allen.**   Dr. Allen, for example, acknowledges that "the study did not find significant associations between glyphosate and … NHL" but nonetheless opines that it "shows that glyphosate exposure may be associated with NHL" given its finding with respect to follicular lymphoma. Allen *Hayden* Report at 118. Allen never explains why that lone finding, based on unadjusted data, trumps the authors' own conclusion that the study "did not find an association" of NHL "with exposure to glyphosate." Meloni (2021) at 5.

**Aronson.**   Dr. Aronson, for her part, asserts that Meloni (2021) showed "increased risks … for lymphoma as a whole." Aronson *Hayden* Report at 79. But, as noted, the study's authors said exactly the opposite. Meloni (2021) at 1. Moreover, the specific result that Aronson cites in support of her broad assertion with respect to "lymphoma as a whole" involves only B-cell lymphoma, not total NHL. The corresponding result for NHL lacked statistical significance, with an odds ratio of 2.2 with a 95% confidence interval of 0.90–5.31. *Compare* Aronson *Hayden* Report at 79 *with* Meloni (2021) at 6. Like Plaintiffs' other experts, she addresses neither the fact that Meloni (2021)

---

[11]     The "isolated significant finding for follicular lymphoma is likely [a] random association, especially given the very small sample size and wide confidence intervals." Langer Report at 33. Only four cases of follicular lymphoma were exposed to glyphosate. *Id.*

1    used data that were not adjusted for exposure to other pesticides nor any of the "major interpretative

2    limitations" identified by the study's authors. Meloni (2021) at 6.

3         **Smith.** Drs. Allen and Aronson's conclusions are impeached by Plaintiffs' own expert.  Dr.

4    Smith recognizes, as he must, that Meloni (2021) found "no association with risk of lymphoma."

5    Smith *Kay* Report at 25. He further concedes that "[t]he low number of participants ever exposed

6    to glyphosate in the study lowers confidence in both the positive and negative findings in this

7    study." *Id.*

8         **F.    De Roos (2022): Adjusted data show no association overall between glyphosate
              and NHL.**

9

10        De Roos (2022), which also post-dates PTO 45, "pooled data from 10 case-control studies

11   participating in the International Lymphoma Epidemiology Consortium, including 9229 cases and

12   9626 controls from North America, the European Union and Australia." Ex. 20, Anneclaire De

13   Roos, *et al.*, *Herbicide use in farming and other jobs in relation to non-Hodgkin's lymphoma (NHL)*

14   *risk*, 79 Occupation & Env't Med. 795, 795 (2022). The study, based on data adjusted for exposure

15   to other pesticides, "found little evidence of an association between glyphosate use and all NHL."

16   *Id.* & Supp. Table 2. While it did find an association between ever-use of glyphosate and follicular

17   lymphoma, that result was not statistically significant. *Id.* at 795 (odds ratio of 1.48 with a 95%

18   confidence interval of 0.98–2.25). Thus, the study's authors explain, "[g]lyphosate use was not

19   associated with all NHL in our main analysis." *Id.* at 802 (reporting odds ratio of 1.03 with a 95%

20   confidence interval of 0.83–1.29).

21        And although De Roos (2022) did report a statistically significant association between

22   follicular lymphoma and the use of glyphosate for less than eight years (an odds ratio of 1.66 with

23   a 95% confidence interval of 1.12 to 2.45), it found no such association between follicular

24   lymphoma and the use of glyphosate for greater than eight years, reporting a statistically

25   insignificant odds ratio of 1.04 with a 95% confidence interval of 0.67 to 1.59 for use between eight

26   and fifteen-and-a-half years, and a statistically insignificant odds ratio of 0.78 with a 95%

27   confidence interval of 0.36 to 1.69 for use greater than fifteen-and-a-half years. De Roos (2022) at

28   800. These results are inconsistent with a dose response. In general, "higher exposures" to a

purportedly injurious substance "should increase the incidence (or severity) of disease." Reference Manual at 603. Thus, if glyphosate did in fact cause follicular lymphoma, one would expect the odds ratios to increase as the years of exposure increase. *See In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1116 (dose response is one of the "Bradford Hill criteria"). Any analysis that "doesn't grapple" with the absence of a "dose response relationship between glyphosate exposure and NHL" is inherently unreliable. *In re Roundup Prod. Liab. Litig.*, 2024 WL 3074376, at *2 (excluding Dr. Zhang and granting summary judgment to Monsanto).

Despite the study principally concluding that glyphosate "was ***not*** associated with all NHL" (De Roos (2022) at 802 (emphasis added)), Plaintiffs' expert Dr. Allen insists De Roos (2022) "shows that glyphosate exposure ***is*** probably associated with NHL." Allen *Hayden* Report at 120 (emphasis altered). In support of that assertion, he points to the study's supposedly statistically significant finding of "an association between glyphosate use and follicular lymphoma was observed … when a lag of 10 years was used, claiming that the study found the odds ratio to be 1.48 with a 95% confidence interval of 1.03–2.25. *Id.* ("OD=1.48, 95% CI 1.03–2.25"). But that is wrong. In fact, the purported association was not statistically significant; contrary to what Allen reports, the study found an odds ratio of 1.48 with a 95% confidence interval of "***0.98*** to 2.25." De Roos (2022) at 795 (emphasis added); *accord id.* at 802.

In contrast to Dr. Allen, Dr. Aronson and Dr. Smith each concede that De Roos (2022) found no association between glyphosate exposure and overall NHL risk. *See* Aronson *Hayden* Report at 80 (study "showed that … overall glyphosate exposure was not associated with overall NHL risk"); Smith *Kay* Report at 25 (study "found no substantial association of all NHL risk with ever-use of any herbicide").

## G.      Hardell (2023): Did not adjust for other pesticides.

Hardell (2023), another study that did not exist when PTO 45 was decided, is "a pooled analysis of three Swedish case-control studies." Ex. 21, Lennart Hardell, et al., *Exposure to phenoxyacetic acids and glyphosate as risk factors for non-Hodgkin lymphoma–pooled analysis of three Swedish case-control studies including the sub-type hairy cell leukemia*, 64 Leukemia & Lymphoma 997, 997 (2023). Specifically, the "case-control populations" from Hardell (2002) and

Eriksson (2008) "were combined with the cases and controls from a third study of hairy cell leukemia (HCL) published by Nordstrom in 1998." Langer Report at 34; *see also* Hardell (2023) at 998. Thus, there is no new data in this study; it is simply a re-analysis of data previously evaluated.

Hardell (2023) claims to find an association between glyphosate and NHL (including HCL), reporting an odds ratio of 2.2 with a 95% confidence interval of 1.3–3.8. Hardell (2023) at 997. Significantly, however, that result was "yielded … in the [study's] ***univariate analysis***." *Id.* at 999 (emphasis added). In fact, "no multivariate models were reported for glyphosate." Langer Report at 43. Thus, in contrast to the underlying Hardell (2002) and Eriksson (2008) studies, which performed multivariate analyses adjusted for exposure to other pesticides, "[t]he effects of co-exposure were ignored." *Id.* Indeed, the authors state that "[a]djustment was made for age, gender, and year of diagnosis," not other pesticide use. Hardell (2023) at 999. Thus, "[i]n the calculations of risk estimated for different pesticides the exposure to other types were not included." *Id.*

The risk of confounding in Hardell (2023) is particularly high given a salient difference between the exposed and unexposed subjects in the study. As the study acknowledges, subjects in the unexposed group had "no exposure to ***any*** type of pesticides." Hardell (2023) at 999 (emphasis added). That, obviously, is not true of subjects in the exposed group, many of whom were exposed to pesticides other than glyphosate, including MCPA, 2,4-D, and 2,4,5-T. *See id.* at 1001. Because the unexposed group was exposed to no pesticides of any kind while the exposed group was exposed to various pesticides in addition to glyphosate, it is impossible to know whether an apparently higher risk of NHL in the exposed group is attributable to glyphosate or other pesticides.[12]

Notwithstanding these serious limitations, Plaintiffs' experts claim that Hardell (2023) is "high-quality research" that "shows clear increased NHL risk associated with glyphosate." Aronson *Hayden* Report at 81; *accord* Allen *Hayden* Report at 121 (study "shows that glyphosate exposure is probably associated with NHL"); Smith *Kay* Report at 26 (study "'confirmed an association

---

[12]    The results in Hardell (2023) are also likely confounded by other factors as well, in particular "heterogeneous methods, obsolete diagnoses, failure to preserve case-control matching … [and] failure to account for multiple testing." Langer Report at 33–34.

between NHL … and exposure to certain herbicides,' including glyphosate"). Notably, none of these experts account for the fact that the purported association between glyphosate and NHL found in the study is based entirely on a univariate regression that did not control for exposure to other pesticides. Nor do any of the experts account for the potentially confounding discrepancy between the study's exposed and unexposed subjects.

## V.    Plaintiffs' general-causation experts misapply epidemiological principles.

In PTO 45, the Court admitted the testimony of Plaintiffs' general-causation experts Drs. Portier, Ritz, and Weisenburger, despite recognizing that the admissibility of their "shaky" opinion testimony was "a close question." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1151. The Court thought Plaintiffs' experts had "identified at least a few statistically significant elevated odds ratios from case-control studies and meta-analyses." *Id*. at 1151–52. The Court also relied on the fact that Plaintiffs' experts had "identified what they deem to be a pattern of odds ratios above 1.0 from the case-control studies, even if not all are statistically significant." *Id*. at 1152. What might have been a close question then is no longer close given the amendments to Rule 702 and the body of epidemiological evidence that has accumulated since PTO 45 was decided.

### A.    Plaintiffs' experts continue to parrot IARC Monograph 112, even though it does not consider human-relevant doses and would not be statistically significant if it included subsequently published studies.

In 2018, the Court held that IARC's conclusion that glyphosate was a "probable carcinogen" was by itself insufficient to support general causation because IARC's "hazard assessment"— which considers only whether a substance could be carcinogenic under some hypothetical set of circumstances—did not constitute evidence that glyphosate could "cause NHL at human relevant doses." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1115.

Indeed, there is far less to IARC's classification than might appear at first glance. As the Ninth Circuit has explained:

> No agency or regulatory body (including IARC) has concluded that glyphosate poses a carcinogenic risk, which is distinct from a carcinogenic hazard. *See Monsanto Co. v. OEHHA*, 22 Cal. App. 5th 534, 231 Cal. Rptr. 3d 537, 542 (2018) (noting that IARC only determines "whether an agent is capable of causing cancer but do[es] not consider the likelihood cancer will occur"). … [T]he distinction between hazard and risk is significant. In

> this context, a hazard indicates that at some theoretical level of exposure, the chemical is capable of causing cancer. Risk, on the other hand, is the likelihood that cancer will occur at a real-world level of exposure.

*Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1269 (9th Cir. 2023). Moreover, although it found "limited" evidence of a "positive association" between glyphosate and cancer, IARC acknowledges that "chance, bias or confounding could not be ruled out with reasonable confidence" as the source of the purported association. Ex. 22, IARC, Some Organophosphate Insecticides and Herbicides, 112 IARC Monographs at 27, 298 ("IARC Monograph").

For these reasons, this Court has excluded—or signaled that it would exclude—experts who parrot IARC's hazard assessment. For example, although the Court did not in the first instance exclude Dr. Jameson's opinion that "glyphosate is an NHL 'hazard' in the sense IARC defines that term," it concluded that this opinion "may not be admissible in this case at all, because it involves too different an inquiry from the one a jury would be required to undertake." *Id.* at 1146–47. And inasmuch as Jameson went further, opining that "exposure to glyphosate not only can cause [NHL], but it is currently doing so, at current exposure levels today," this Court excluded that opinion altogether, holding that "'there is simply too great an analytical gap between' his analysis, which effectively duplicates IARC's as to human studies but goes further as to the animal studies, and his new conclusion regarding glyphosate's effects on humans at current exposure levels." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1147 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Similarly, the Court excluded the opinions of another expert, Dr. Nabhan, given his "uncritical reliance on IARC's conclusions." *Id.* at 1148. Such "deference to IARC," said the Court, "is not a reliable way to reach a general causation opinion." *Id.*[13]

Regardless, even if general-causation opinions based on IARC's analysis were admissible when PTO 45 was issued in 2018, they no longer are. The most recent study included in the monograph's meta-analysis dates from 2016. The monograph does not consider more recent studies. Thus, as one of Plaintiffs' experts, Dr. Aronson, admits, "[n]o meta-analysis to date" has

---

[13]     Despite this, Plaintiffs' experts continue to treat the IARC Monograph as if it were direct evidence of general causation. For example, Dr. Aronson devotes 35 pages of her expert report to essentially restating IARC's conclusions. Aronson *Hayden* Report at 45–90.

1  included Meloni (2021), De Roos (2022), or Hardell (2023). Aronson *Hayden* Report at 89.

2        Given the monograph's failure to account for more recent studies, any opinion based on the

3  monograph is now inherently unreliable. The meta-risk ratio reported by IARC—a relative risk of

4  1.3, with a 95% confidence interval of 1.03 to 1.65 (IARC Monograph at 350)—was barely

5  significant even then. *See* Langer Report at 38. But almost a decade has passed since, and "an

6  analysis conducted today using updated data would show no association between glyphosate and

7  NHL." Langer Report at 38 (citing EPA 2020; Donato 2020; Boffetta 2021; Kabat 2021).

8        **B.     Plaintiffs' experts rely on case-control studies that fail to account for multiple
              statistical tests, leading to spurious associations.**
9

10       A statistically significant result might still be the product of random sampling error. This is

11  because the more times that one samples a population, the more likely it is that a random sampling

12  error will yield a spurious albeit statistically significant association.[14] Thus, "[i]f enough

13  comparisons are made, random error almost guarantees that some will yield 'significant' findings,

14  even when there is no real effect." Reference Manual at 256. Because "[a]rtifacts from multiple

15  testing are commonplace" when researchers have run multiple statistical tests, "courts should not

16  be overly impressed with claims that estimates are significant." *Id*. at 256–57.

17       Many of the case-control studies cited by Plaintiffs' general-=causation experts are flawed

18  because the study authors did multiple statistical tests—usually, about 100 of them—without

19  properly employing "statistical methods for dealing with multiple looks at the data." Reference

20  Manual at 256. The use of conventional significant thresholds while failing to account for the

21

22  _____

   [14]      To illustrate how "[r]epeated testing complicates the interpretation of significance levels,"
23  the Reference Manual offers the following example:

24       [C]onsider the problem of deciding whether a coin is biased. The probability that a
         fair coin will produce 10 heads when tossed 10 times is $(1/2)10 = 1/1024$. Observing
25       10 heads in the first 10 tosses, therefore, would be strong evidence that the coin is
         biased. Nonetheless, if a fair coin is tossed a few thousand times, it is likely that at
26       least one string of ten consecutive heads will appear. Ten heads in the first ten tosses
         means one thing; a run of ten heads somewhere along the way to a few thousand
27       tosses of a coin means quite another. A test—looking for a run of ten heads—can be
         repeated too often.

28  Reference Manual at 255.

MONSANTO'S OMNIBUS MOTION TO EXCLUDE GENERAL CAUSE EXPERTS

1    multiple-testing issue greatly increases the probability that a "significant" finding resulted from

2    chance. *Id.* at 256. In virtually all cases, neither the study authors nor Plaintiffs' experts have done

3    anything to account for the multiple-testing problem.

4           ***McDuffie (2001).*** As Dr. Langer's report explains, the risk estimate for glyphosate in

5    McDuffie (2001) was not statistically significant, with an odds ratio of 1.2 and a 95% confidence

6    interval of 0.93–1.74. Langer Report at 29. Despite this ultimate finding, Plaintiffs' general-

7    causation experts cherry pick isolated statistically significant findings from the study to suggest the

8    opposite. For instance, Dr. Smith claims that the study showed "a significant dose response"

9    because an elevated, statistically significant odds ratio was identified for subjects with over two

10   days of exposure per year. Smith *Kay* Report at 23; *see also* Aronson *Hayden* Report at 53 (citing

11   the same odds ratio). Yet as Dr. Langer points out, the authors of McDuffie (2001) "publish[ed]

12   more than 100 statistical tests" without "address[ing] … the problem of multiple comparisons."

13   Langer Report at 29. Thus, at a conventional 0.05 significance threshold, one would expect at least

14   five "statistically significant" results in McDuffie that are actually a product of random error. *See*

15   *id.* at 8. Plaintiffs' experts make no effort to account for this problem.

16          ***Hardell (2002).*** Based on an adjusted multivariate analysis, Hardell (2002) reported a non-

17   significant result for glyphosate exposure and NHL—an odds ratio of 1.85 with a 95% confidence

18   interval of 0.55–6.20. Langer Report at 30. Undeterred, Plaintiffs' general-causation experts pluck

19   a barely significant result from the study's univariate (*i.e.*, unadjusted) analysis—one showing an

20   odds ratio of 3.04 with a 95% confidence interval of 1.08–8.52—to assert that "a significant

21   association was found for glyphosate." Smith *Kay* Report at 23; Allen *Hayden* Report at 109–110.

22   Cherry-picking aside, the experts' reliance on Hardell (2002) is unreliable because the study's

23   "authors gave no consideration" to the problem of "multiple testing and multiple outcomes despite

24   reporting 121 statistical tests—a number that should give rise to 6 spurious results at conventional

25   levels of significance." Langer Report at 30. *Id.*[15] Plaintiffs' experts make no effort to address the

26   multiple testing problem.

27   ─────────────

28   [15]     The study's statistical power is, moreover, limited because of the 515 cases of NHL included in the study, only eight individuals had ever been exposed to glyphosate. Hardell (2002) at 1044.

***De Roos (2003).*** In this study, the hierarchical logistic regression model that "accounts for other potential influences" showed no statistically significant association for glyphosate, while the non-hierarchical model that only partially accounts for confounding factors was "marginally significant." Langer Rep. at 30; *see* Ex. 23, Anneclaire De Roos, *et al*., *Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma among men*, Occupational & Env't Med. Sept. 2003 at 5 (adjusted odds ratio of 1.60 with a 95% confidence interval of 0.9–2.8 versus an unadjusted odds ratio of 2.1 with a 95% confidence interval of 1.1–4.0). The study's authors conducted "94 statistical tests" and "4 of the comparisons were statistically significant." Langer Report at 31. As Dr. Langer explains, at a conventional statistical significance threshold of 0.05, "those findings are consistent with random error." *Id.* Nevertheless, Plaintiffs' experts repeatedly cite the only-partially adjusted result from De Roos (2003) as evidence of an association between glyphosate and NHL without addressing the multiple-testing problem. *See* Aronson *Hayden* Report at 52–53; Allen *Hayden* Report at 110–11; Smith *Kay* Report at 22.

***Eriksson (2008).*** This study's unadjusted univariate analysis yielded two statistically significant results suggesting an association between NHL and glyphosate, reporting an odds ratio of 2.02 with a 95% confidence interval of 1.10–3.71 for any exposure to glyphosate, and an odds ratio of 2.26 with a 95% confidence interval of 1.16–4.40 for exposure to glyphosate more than 10 years in the past. Eriksson (2008) at 1658–59; *see also* Langer Rep. at 31. But, as in Hardell (2002) and De Roos (2003), Eriksson (2008) showed no statistically significant association between glyphosate and NHL "in the multivariate analysis accounting for exposure to other agents." Langer Report at 31; *see* Eriksson (2008) at 1661 (reporting odds ratio of 1.51 with a 95% confidence interval of 0.77–2.94). Moreover, although "[a] total of 199 statistical tests were reported, with 36 statistically significant," the authors made "no adjustment for multiple testing." Langer Report at 31. And, as with many of the case-control studies cited by Plaintiffs' general-causation experts, its statistical power was low given its small size: "[o]nly 3% (29 of 910) of cases had exposure to glyphosate," and the "wide confidence intervals imply poor precision." *Id.* Nonetheless, Plaintiffs' experts once again ignore the multiple-testing problem, and cherry-pick from the statistically significant univariate findings to assert that this study shows "glyphosate exposure is probably

associated with NHL." Allen *Hayden* Report at 111; Smith *Kay* Report at 23 (citing a statistically result for hairy-cell leukemia only).

In 2018, the Court admitted Plaintiffs' general causation evidence because their experts had "identified at least a few statistically significant elevated odds ratios" that supported an association between glyphosate and NHL. *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1151–52. But, as explained above (*see supra* at 25), that is not hard to do: if you run hundreds of statistical tests, you will eventually turn up "at least a few statistically significant" results. Indeed, at a 0.5 significance threshold, you would, on average, find five spuriously significant results for every hundred tests you run. Because Plaintiffs' experts fail to account for this statistical reality, their opinions should be excluded.

### C.   The Court should exclude expert testimony that an association exists absent statistically significant epidemiological findings.

The Court previously admitted Plaintiffs' "shaky" general-causation evidence partly because Plaintiffs' experts had "surveyed the significant body of epidemiological literature relevant to this question" and "identified what they deem to be a pattern of odds ratios above 1.0 from the case-control studies, even if not all are statistically significant." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1134. In finding this type of evidence admissible, the Court characterized Plaintiffs' experts' "read of the evidence" as "far from unassailable" but—citing *City of Pomona*, one of the very cases that sparked the recent amendments to Rule 702, for the proposition that a "district court is not tasked with deciding whether the expert is right or wrong"—concluded that it could not exclude the experts' opinions just because it was "not persuaded that the experts' read of the evidence is the best one." *Id*. Or, as another court in this district held before the rule was amended, a lack of statistical significance "goes to the weight, not the admissibility" of an expert opinion. *In re High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040, at *15 (N.D. Cal. 2014). But that is no longer the applicable standard. Under Rule 702 as amended, Plaintiffs must now "demonstrate **to the court** that it is **more likely than not**" that each opinion they proffer "reflects a **reliable** application" of the relevant scientific "principles and methods." Fed. R. Evid. 702(d) (emphasis added); *see supra* at 2–6.

Plaintiffs cannot satisfy that standard. They cannot prove by a preponderance of the evidence that drawing causal inferences from results that are not statistically significant is a reliable application of epidemiological principles and methods.[16] Indeed, although various courts held that opinions based on results that lacked statistical significance were not categorically subject to exclusion under Rule 702 before the 2023 amendments, "many federal courts" nonetheless observed that "'if an expert places undue emphasis on statistically insignificant evidence, it may indicate that the expert's methods are unreliable.'" *In re Zantac (Ranitidine) Prod. Liab. Litig*., 644 F. Supp. 3d 1075, 1205 (S.D. Fla. 2022) (quoting *In re Prempro Prods. Liab. Litig.*, 738 F. Supp. 2d 887, 892 (E.D. Ark. 2010)). So it is here. Plaintiffs' experts' methodology—relying on statistically insignificant results plucked from a study that ultimately finds no statistically significant relationship between glyphosate and NHL to conclude that glyphosate does in fact cause NHL—is analogous to relying on a baseball game's first-inning score to determine who won the game even after it is over and the final result is known.

To the extent that "[t]he line delineating what constitutes a statistically significant result is necessarily somewhat arbitrary" (*In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1117), the evidence here shows that a statistical significance threshold of $p = 0.05$ is, if anything, arbitrarily high.[17] By combing through studies that performed hundreds of statistical tests based on small sample sizes, Plaintiffs' experts are able to identify a few isolated results that appear to be statistically significant. But *no* published study to date has found a statistically significant association between ever-use of glyphosate and NHL after adjusting for the use of other pesticides.

---

[16]     Dr. Aronson claims that "distorting epidemiological studies" by "using statistical significance at the .05 level of probability as a strict decision criterion" is a recognized "technique" used by "industry to dismiss science." Aronson *Hayden* Report at 41. That's nonsense. Even if it is not the only consideration in epidemiology, statistical significance cannot be dismissed as an "old-fashioned" corporate ploy. *Id.* at 22. In response to the suggestion that "the use of '$p < 0.05$' and 'statistically significant'" be "eliminat[ed] in statistical analysis," the American Statistical Association convened a task force to address the issue. The members of the task force "unanimously agreed" that, contrary to what Dr. Aronson asserts, "P-values and significance tests, when properly applied and interpreted, increase the rigor of the conclusions drawn from data" and "are important tools that should not be abandoned," ASA President's Task Force Statement on Statistical Significance and Replicability, Harvard Data Science Review Issue 3.3 (Summer 2021), *available at* https://tinyurl.com/345uh8f6.

[17]     "When a p-value is high, findings are not significant." Reference Manual at 253.

1   Langer Rep. at 35–36. Moreover, the most accurate and well-designed studies fail to show even an

2   elevated odds ratio, let alone a statistically significant association. *Id*. (citing Andreotti (2018),

3   Leon (2019); De Roos (2022)).  It is inherently unreliable for an expert to fixate on a few isolated,

4   non-significant findings while ignoring the broader scientific landscape.

5   **VI.      Plaintiffs' experts misconstrue the AHS and its results.**

6          As this Court knows, the AHS is a prospective cohort study that "began over 30 years ago

7   and has been continuously managed by scientists at the U.S. National Institutes of Health to the

8   present day." Langer Report at 25. Indeed, the AHS "has remained active continuously since its

9   inception" and "continues to engage with participants to this day." *Id*. at 26. The AHS is a very

10  large study: it studied "more than 57,000 licensed pesticide applicators from Iowa and North

11  Carolina" who were surveyed "about their use of 50 pesticides, including glyphosate." *In re

12  Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1123; Langer Report at 25. "Participants were asked

13  not only about years of use and days of use per year, but also about other features of their pesticide

14  application that could affect the intensity of their exposure, including use of personal protective

15  equipment and application method." *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d at 1123;

16  Langer Report at 25. "Cancer outcomes for members of the cohort were determined through cancer

17  registries," *i.e.*, did not depend on the participants' self-reporting. *In re Roundup Prods. Liab. Litig.*,

18  390 F. Supp. 3d at 1123.

19         The AHS's data has been interpreted and applied in numerous studies. Yet Plaintiffs'

20  general-causation experts regularly misrepresent those studies' findings and conclusions. They fail

21  to accurately acknowledge the findings arising from AHS data, and they fail to reliably explain how

22  their causation opinions can be reconciled with that science. Because these experts cannot

23  demonstrate that their opinions are the product of a reliable application of scientific methods, their

24  opinions should be excluded under amended Rule 702.

25         **A.      De Roos (2005) and Andreotti (2018): found no association between glyphosate
                     and NHL.**

26

27         De Roos (2005) was "the first report based on data from the AHS." Langer Report at 26.

28  Andreotti (2018), also based on AHS data, was an "update" to De Roos (2005). *In re Roundup*

*Prods. Liab. Litig.*, 390 F. Supp. 3d at 1123.

In De Roos (2005), "[a]fter a median follow-up interval of 6.7 years there were 92 cases of NHL" out of 57,311 study participants. Langer Report at 26; *see* Ex. 24, Anneclaire De Roos, *et al.*, *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Env't Health Perspectives 49, 51 (2005). Of those 92 cases, approximately 77% of the subjects had been exposed to glyphosate. De Roos (2005) at 51. The study found that the adjusted relative risk for NHL in participants ever exposed to glyphosate was 1.1 with a 95% confidence interval of 0.7–1.9. *Id.* Thus, as Dr. Langer explains: "The analysis testing ever/never exposure found no statistically significant relationships for glyphosate and cancer overall, or for glyphosate and any of the 13 cancers evaluated, including NHL." Langer Report at 26. "Additional analyses were conducted to test associations with cumulative exposure days and intensity-weighted exposure days," but, once again, the "[r]esults for NHL were nowhere near statistical significance, at $p = 0.73$ and $p = 0.99$, respectively, with point estimates suggesting reduced, not increased, risks with increasing exposure." *Id.*; *see also In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d at 1123; De Roos (2005) at 52.

Andreotti (2018) "focused exclusively on glyphosate." Langer Report at 26. When examining the relative risk of contracting lymphohematopoietic cancers such as NHL, the study adjusted for exposure to ten other pesticides (atrazine, alachlor, metolachlor, trifluralin, 2,4-D, lindane, DDT, diazinon, terbufos, and permethrin) as well as for occupational exposure to solvents, gasoline, x-ray radiation, and engine exhaust. Ex. 25, Gabriella Andreotti, *et al.*, *Glyphosate Use and Cancer Incidence in the Agricultural Health Study*, 110 J. Nat'l Cancer Inst. 509, 510–11 (2018); *id.* at 515 ("We controlled for the use of correlated pesticides."). Andreotti (2018) "observed no associations between glyphosate use and NHL overall or any of its subtypes." *Id.* at 515; *accord In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d at 1124 ("like the [De Roos (2005)] study, Andreotti (2018) reported no association between glyphosate use and NHL.").

Andreotti (2018) considered data on 54,251 participants, 44,932 of whom reported ever using glyphosate; of 575 NHL cases, 440 were exposed to glyphosate. Andreotti (2018) at 510–13. "The study broke the cohort into quartiles based on how intensively the study participants had used

glyphosate, using a formula that included number of days of use, lifetime years of use, use of protective equipment, and other factors to determine the 'intensity-weighted lifetime days of use' for each participant." *In re Roundup Prods. Liab. Litig*., 390 F. Supp. 3d at 1124; *see also* Andreotti (2018) at 513; Langer Report at 26. "Compared to no exposure, lifetime exposure to glyphosate in the first through fourth quartiles was associated with non-significant RRs for NHL of 0.83, 0.83, 0.88 and 0.87, respectively, demonstrating no support for a dose-response relationship." Langer Report at 26; *see also* Andreotti (2018) at 513. "Additional tests assessing lag-time to the appearance of NHL, using 5-, 10-, 15-, and 20-year intervals, also demonstrated no relationship" between glyphosate exposure and NHL. Langer Report at 26; *see also* Andreotti (2018) at 515 & Supp. Tables 1–3.

Participants in the AHS were enrolled between 1993 and 1997. Andreotti (2018) at 509. At the time of their enrollment, each member of the cohort completed a questionnaire in which they provided information about (among many other things) their exposure to various pesticides. *Id.* at 510. Follow-up questionnaires seeking information on pesticide exposure (and other matters) were distributed to participants between 1999 and 2005. *Id.* Only 63% of participants returned the follow-up questionnaire. *Id.* For the 37% of "participants who did not complete the follow-up questionnaire …, a data-driven multiple imputation procedure was used to impute pesticide use since enrollment." *Id.*; *see also* Langer Rep. at 26–27. "Concerns that" such imputation "could introduce error were addressed by conducting [sensitivity] analyses for the entire cohort, and excluding those for whom data were imputed." Langer Report at 27; *see* Andreotti (2018) at 511 (describing sensitivity analysis).[18]

In 2019—***after*** this Court issued PTO 45—Andreotti (2018)'s authors published a follow-up article, Andreotti (2019), in response to questions regarding the validity of the imputation

---

[18]    Even before Andreotti (2018) was published, a member of the research team published an article describing the imputation process in detail. *See* S.L. Heltshe *et al*., *Using Multiple Imputation to Assign Pesticide Use for Non-Responders in the Follow-Up Questionnaire in the Agricultural Health Study*, 22 Journal of Exposure Science & Environmental Epidemiology 1 (2012) (cited in Andreotti (2018) at 510 & n.9). Citing various examples, Heltshe (2012) explains that "[m]ultiple imputation has been widely accepted and has been used to account for missing data in large national surveys and studies." *Id.* at 2.

process posed by L. Sheppard & R.M. Shaffer, *Re: Glyphosate Use and Cancer Incidence in the Agricultural Health Study*, 111(2) J. Nat'l Cancer Inst. 214 (2019).[19] In that response, they "demonstrate[d] that [their] imputation likely did not materially impact risk estimates." Ex. 26, Gabriella Andreotti, *et al.*, *Response to Sheppard and Shaffer*, 111 J. Nat'l Cancer Inst. 216, 216 (2019). In particular, they showed that "when analyses are restricted to exposure reported at enrollment, the rate ratios are similar to the estimates for the total data set including the imputed exposure data"; that "the patterns of risk are similar for those who completed the follow-up questionnaire … and those who did not"; and there was "no statistically significant interaction between glyphosate use and completion of the follow-up questionnaire." *Id.*

Put simply, Andreotti (2018) "employ[ed] the best available design, and appl[ied] well validated methodology." Langer Report at 27. Indeed, it is "reasonabl[e]" to consider Andreotti (2018) "to be the most powerful evidence regarding the relationship between glyphosate and NHL." *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d at 1126.

The efforts of Plaintiffs' experts to argue around Andreotti (2018) do not reflect a reliable application of scientific principles.

*First*, According to Plaintiffs' experts, the imputation and sensitivity analyses that Andreotti (2018)'s authors conducted to compensate for the 37% of participants who did not complete the follow-up questionnaire is nothing more than "guessing" about the "exposure data for these participants." Ex. 27, Supplemental Expert Report of Dr. Beate Ritz at 6, *In re Roundup Prod. Liab. Litig.*, MDL No. 2741; *see also, e.g.*, Aronson *Hayden* Report at 74–75 ("imputed values could be seriously underestimating the real exposures"); Ex. 28, Supplemental Expert Report of Dr. Charles Jameson at 12, *In re Roundup Prod. Liab. Litig.*, MDL No. 2741 ("Jameson Suppl. Report") (imputation method "speculative"). In support of these assertions, Plaintiffs' experts cite L. Sheppard & R.M. Shaffer, *Re: Glyphosate Use and Cancer Incidence in the Agricultural Health Study*, 111(2) J. Nat'l Cancer Inst. 214 (2019), and S.L. Heltshe *et al.*, *Using Multiple Imputation to Assign Pesticide Use for Non-Responders in the Follow-Up Questionnaire in the Agricultural*

---

[19]    Despite its stated reservations, Sheppard (2019) acknowledged that Andreotti (2018) "used a well-respected approach to fill in missing data." Sheppard (2019) at 214.

*Health Study*, 22 Journal of Exposure Science & Environmental Epidemiology 1 (2012). *See, e.g.*, Aronson *Hayden* Report at 74–75; *see also In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1126 n.25.

But Plaintiffs' experts generally ignore Andreotti (2019), which directly addressed the issues raised by Sheppard (2019) and demonstrated through sensitivity analysis (*see supra* at 32) that their "imputation analysis ***did not materially impact*** risk estimates." Andreotti (2019) at 216 (emphasis added); *see also* Langer Report at 27. Dr. Smith's report simply ignores Andreotti (2019), as does Dr. Allen's. *Cf.* Smith *Kay* Report at 26–29, 108; Allen *Hayden* Report at 114–15, 183–91.

For her part, Dr. Aronson takes issue with Andreotti (2019)'s defense of Andreotti (2018)'s sensitivity analysis. According to Dr. Aronson, the process for imputing exposure data to participants who did not complete the follow-up questionnaire "underestimate[d]" glyphosate use because it derived the imputed data from exposure data collected when members of the cohort were first enrolled. Aronson *Hayden* Report at 75. This, says Dr. Aronson, is problematic because "glyphosate use was rapidly increasing and displacing use of other agricultural pesticides in the US in the timeframe between the first and second questionnaires." *Id.*; *see also* Smith *Kay* Report at 28 ("exposure misclassification issues were … compounded … because right in the middle of the enrollment period there was a dramatic increase in glyphosate use"); Jameson Suppl. Report at 1–2 ("Another important fact that severely compromises exposure estimates in the AHS … is the striking increase ….in the use of glyphosate in agriculture."). But this critique misses the mark. Andreotti, who acknowledges that "some misclassification of exposure undoubtedly occurred," explains that given the study's prospective design, "any misclassification should be nondifferential and lead to attenuated risk estimates." Andreotti (2018) at 515. In other words, when cohort participants were initially enrolled, they were as likely to have mistakenly reported not using glyphosate as they were to have mistakenly reported using it, such that the impact of any misclassification would be symmetric, increasing odds ratios observed to be less than 1.0 to the same degree it decreased odds ratios observed to be greater than 1.0. Thus, absent misclassification, the odds ratios that Andreotti reported for lifetime exposure to glyphosate—all of which were less

than 1.0 (*see* Andreotti (2018) at 513, 515, Supp. Tables 1–3)—would have been even *lower*.

Notably, neither Dr. Aronson nor any of Plaintiffs' other general-causation experts address the conclusion of EPA scientists that the imputation methodology used by Andreotti (2018) is the "state-of-the-science practice for dealing with missing data." EPA, Memorandum from D. Miller to C. Olinger, *Glyphosate: Epidemiology Review of Zhang et al. (2019) and Leon et al. (2019) publications for Response to Comments on the Proposed Interim Decision*, at 5 (Jan. 6, 2020), *available at* https://tinyurl.com/ypx6pfuj. Plaintiffs' experts do not acknowledge this endorsement. Nor do they mention that the EPA scientists concluded that "[i]mportantly, Andreotti et al. (2018) conducted a number of sensitivity analyses that suggest the results of the data analysis of imputed data were reasonable and close to that of data analysis which would have resulted using only complete data." *Id*. 5.

*Second*, Plaintiffs' experts argue that Andreotti (2018)'s imputation analysis underestimated cancer outcomes. For example, Dr. Aronson denounces Andreotti (2018)'s imputation methodology as one that "has been criticized for not taking into account each cancer outcome." Aronson *Hayden* Report at 75. But this criticism ignores that "[c]ancer outcomes for members of the cohort were determined through *cancer registries*," not self-reporting, and that there was therefore no need for imputation of cancer outcomes in the first place. *In re Roundup Prods. Liab. Litig*., 390 F. Supp. 3d at 1123 (emphasis added).

**B.      Leon (2019): Despite methodological problems with the study's design, meta-analysis of cohort data found no association between glyphosate and NHL.**

Leon (2019) is a meta-analysis post-dating PTO 45 that combined "some of the data from the AHS reported" in Andreotti (2018) with "two European cohorts." Langer Report at 27; Leon (2019) at 3. The study's conclusion is unambiguous:  it "did *not* observe an association between risk of NHL overall and ever use of glyphosate." Ex. 29, Maria Leon, *et al*., *Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway and the USA: a pooled analysis from the AGRICOH consortium*, Int'l J. of Epidemiology, 2019 at 1, 11 (emphasis added). Specifically, it found a "hazard ratio" (which is closely related to a risk ratio) of 0.95 with a 95% confidence interval of 0.77 to 1.18. *Id.* at 8.

Despite this clear result, Plaintiffs' experts cite Leon (2019) as evidence that glyphosate causes NHL. Dr. Aronson, for example, admits that "[n]o increased risk was apparent for any glyphosate use and NHL overall" yet nonetheless asserts that use of glyphosate "was associated with statistically significant increased NHL risk." Aronson *Hayden* Report at 77. Similarly, notwithstanding his acknowledgement that "most analyses" in Leon (2019) found "no association" with NHL, Dr. Smith says the study "shows that glyphosate exposure is probably associated with NHL." Allen *Hayden* Report at 115.

Plaintiffs' experts attempt to square this contradiction by pointing to a lone result in the paper. Specifically, Plaintiffs' experts cite Leon (2019)'s finding of an association between glyphosate and Diffuse large B-cell lymphoma (DLBCL). With respect to DLBCL, the study reported a hazard ratio of 1.36 with a 95% confidence interval of 1.00 to 1.85. Leon (2019) at 8. Because the bottom range of the confidence interval was 1.00 rather than 0.99, the purported association was statistically significant, if at all, by only the smallest of margins.[20]

The isolated DLBCL finding is undermined by the number of statistical tests that were conducted. *Cf. supra at* 25 (discussing reliability issues created by multiple testing). Indeed, the authors of the study acknowledge that "false-positive associations among our findings may have occurred, given the large number of comparisons (14 chemical groups and 33 active ingredients with five cancer outcomes)." Leon (2019) at 14. But, "[w]hile noting the issue of multiple comparisons, they did not adjust for them." Langer Report at 28.[21] Plaintiffs' experts simply ignore this acknowledged "limitation" of the study. Leon (2019) at 14.

---

[20]    Apart from DLBCL, Leon (2019) found no association between glyphosate and any NHL subtype. *See* Leon (2019) at 8 (reporting a hazard ratio of 0.92 with a 95% confidence interval of 0.69 to 1.24 for chronic lymphocytic leukemia/small lymphocytic lymphoma, and a hazard ratio of 0.79 with a 95% confidence interval of 0.52 to 1.21 for follicular lymphoma).

[21]    Multiple testing is only one of the problems with Leon (2019). To start, it did not use all of the data available in the AHS: it excluded 4,916 of AHS's 52,394 cohort members; it used outcome data through only 2011 while Andreotti (2018) included outcome data through 2013; and, unlike Andreotti (2018), "did not adjust for cigarette smoking, alcohol intake, or family history of any cancer." Leon (2018) at 3, 12. Furthermore, as one of its co-authors reported, Leon (2018) relied on two European cohorts whose imputed exposure data "appeared to overestimate exposure." Brouwer (2016) at 366.

MONSANTO'S OMNIBUS MOTION TO EXCLUDE GENERAL CAUSE EXPERTS

1

\*\*\*

2          In sum, Plaintiffs cannot carry their burden of demonstrating that their experts' opinions,

3   which fixate on helpful snippets of evidence while ignoring unhelpful evidence, reflect a reliable

4   application of scientific principles to the data.

5   **CONCLUSION**

6          The Court should exclude the general causation opinions of Drs. Aronson, Allen, Smith,

7   Ritz, Portier, Jameson, and Weisenburger, and grant summary judgment to Monsanto.

8

9   Dated:  August 9, 2024                    Respectfully submitted,

10                                            **BRYAN CAVE LEIGHTON PAISNER LLP**

11

12                                            _____*/s/ K. Lee Marshall*_____
                                             K. Lee Marshall
13                                            Attorneys for Defendant Monsanto Company

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MONSANTO'S OMNIBUS MOTION TO EXCLUDE GENERAL CAUSE EXPERTS

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on this day a true and correct copy of the foregoing document was filed

3

with the Court's electronic filing system, which served a copy on all counsel of record.

4

This 9th day of August, 2024.

5

Respectfully submitted,

6

**BRYAN CAVE LEIGHTON PAISNER LLP**

7

8

*/s/ K. Lee Marshall*

K. Lee Marshall

9

Attorneys for Defendant Monsanto Company

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MONSANTO'S OMNIBUS MOTION TO EXCLUDE GENERAL CAUSE EXPERTS