1

**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel: 202-847-4030
Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

*Attorneys for Defendant Monsanto
Company*

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400 | Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
Linda C. Hsu (CA Bar No. 239880)
(linda.hsu@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel:  310-576-2100 | Fax: 310 -576-2200

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

17

18

IN RE: ROUNDUP PRODUCTS
LIABILITY LITIGATION

19

*Kenneth Eilmes, Jr.*,
3:19-cv-05345

20

*Jason Gannon*,
3:19-cv-08064

21

*Garfield Gordon*,
3:19-cv-06423

22

*Caryl Ann Haase*,
3:19-cv-05957

23

*Neal Hayden*,
3:19-cv-05600

24

*Carol Huntley*,
3:19-cv-06407

25

*Paula Pinheiro*,
20-cv-08173

26

*Eduino Pinheiro*,
21-cv-00041

27

28

MDL No. 2741

Case No.: 3:16-md-02741-VC

**DEFENDANT MONSANTO COMPANY'S
AMENDED MOTION TO EXCLUDE THE
EXPERT TESTIMONY OF DR. KRISTAN
ARONSON**

Hearing:
Date: September 26, 2024
Time: 10:00 a.m.
Place:  San Francisco Courthouse,
Courtroom 4 – 17th Floor

iii

MOTION TO EXCLUDE TESTIMONY OF DR. KRISTAN ARONSON

*George Aldoupolis*,[1]
20-cv-03433
*Robert Drons*,
20-cv-08167
*Susan Fox*,
20-cv-08847
*Michael McDermott*,
20-cv-07219
*Jorge Penalver*,
20-cv-08801
*Joel Rubin*,
20-cv-05870
*Barbara Skonicki*,
20-cv-08053
*Patrick Sullivan*,
22-cv-00092
*Steven Tudal*,
3:20-cv-05871

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on September 26, 2024, at 10:00 a.m. in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Motion to Exclude Testimony of Dr. Kristan Aronson. Monsanto seeks an order excluding opinions of this witness under Federal Rule of Evidence 702.

Dated: August 9, 2024                     Respectfully submitted,

                                          **BRYAN CAVE LEIGHTON PAISNER LLP**
                                          */s/ K. Lee Marshall*
                                          K. Lee Marshall
                                          Attorneys for Defendant Monsanto Company

---

[1]     Monsanto's original Motion to Exclude the Expert Testimony of Dr. Kristan Aronson (Dkt. No. 18988) inadvertently did not include nine plaintiffs who also disclosed Dr. Aronson as an expert.  This Amended Motion adds those nine plaintiffs

iv

MOTION TO EXCLUDE TESTIMONY OF DR. KRISTAN ARONSON

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiffs in 17 Wave VII cases (*Eilmes*, *Gannon*, *Gordon*, *Hayden*, *Haase*, *Huntley*, *E. Pinheiro*, *P. Pinheiro, Aldoupolis, Drons, Fox, McDermott, Penalver, Rubin, Skonicki, Sullivan,* and *Tudal,*) disclosed Dr. Kristan Aronson, an epidemiologist, to testify about general causation—that is, whether Roundup or its active ingredient, glyphosate, is capable of causing plaintiffs' illness, non-Hodgkin's lymphoma ("NHL"). The reasons that Dr. Aronson's epidemiological opinions and conclusions are unreliable are set forth separately in Monsanto's Omnibus Motion to Exclude Plaintiff's Wave VII General Causation Experts and Motion for Summary Judgment. This motion focuses on Dr. Aronson's non-epidemiological opinions that are not the subject of Monsanto's omnibus motion.

*First*, Dr. Aronson should be precluded from testifying about the research conducted by Dr. Cristian Tomasetti. As this Court knows, Dr. Tomasetti is a cancer researcher at City of Hope Cancer Center who in his groundbreaking research has estimated that a majority of cancer-causing mutations in humans are not due to external factors at all but instead are due to genetic errors that occur naturally when cells replicate. Here, many of Dr. Aronson's critiques of Dr. Tomasetti are the product of basic factual misrepresentations about his work that were already addressed by this Court in Wave V of this MDL, months before Dr. Aronson issued her current Wave VII reports.

*Second*, this Court should preclude Dr. Aronson from straying outside her stated expertise of epidemiology. Dr. Aronson spends multiple pages discussing "strategies used by industry to dismiss evidence." Ex. A, Expert Report of Dr. Kristan Aronson at 39-44, *Hayden v. Monsanto*, No. 3:19-cv-05600 ("Aronson *Hayden* Report").[2,3] That section of her report essentially concludes that the EPA should not have approved glyphosate for sale because, according to Dr. Aronson, the EPA relied too heavily on "industry-conducted" scientific research. *Id*. But what the EPA should or should not have done is well beyond the scope of Dr.

---

[2] Dr. Aronson's reports are substantively identical across cases; accordingly, Monsanto will rely on Dr. Aronson's *Hayden* report for purposes of this motion.

[3] All exhibits are attached to the concurrently filed declaration of Linda C. Hsu.

1

MOTION TO EXCLUDE TESTIMONY OF DR. KRISTAN ARONSON

1    Aronson's stated expertise of epidemiology. And in any event, this testimony would be unfairly

2    prejudicial:  this opinion is simply an attempt to score points with the jury by (incorrectly)

3    painting Monsanto as a general bad actor who exerted undue influence on its own regulators.

4    Dr. Aronson's opinions about "industry strategies," and about what the EPA should or should

5    not have considered when evaluating glyphosate, should be excluded.

6         *Third*, Dr. Aronson should be precluded from comparing Monsanto to the "tobacco,

7    lead" or "asbestos" industries, as she does in her report. Aronson *Hayden* Report at 39.  This

8    Court has previously excluded comparisons to the tobacco industry in Roundup litigation. *In re*

9    *Roundup Prod. Liab. Litig*., 2019 WL 1371806, at *1 (N.D. Cal. Feb. 18, 2019). It should do so

10   again.

11        *Fourth*, Dr. Aronson should be precluded from testifying about Monsanto's alleged

12   "suppression of the science" concerning PCBs, a product Monsanto used to manufacture. This

13   evidence, among other things, violates Rule 404(b)'s prohibition on propensity evidence. The

14   only purpose it could serve in this litigation is to invite jurors to conclude that because Monsanto

15   supposedly employed "strategies" to "dismiss evidence" concerning PCBs, Monsanto did the

16   same thing with respect to glyphosate. That is the precise inference Rule 404(b) prohibits.

17        **I.    Dr. Aronson should not be permitted to testify about Dr. Tomasetti's work.**

18        As this Court knows, Dr. Tomasetti is a cancer researcher and Director of the Center for

19   Cancer Prevention and Early Detection at City of Hope, one of the world's best cancer centers.

20   CRISTIAN TOMASETTI, PH.D., https://www.cityofhope.org/cristian-tomasetti. Dr. Tomasetti's

21   research, conducted together with renowned oncologist Dr. Bert Vogelstein, is groundbreaking,

22   showing that differences in the number of stem cell divisions between tissues can explain why

23   certain human tissues are more susceptible to cancers than other human tissues. *See* Ex. B,

24   Cristian Tomasetti & Bert Vogelstein, *Variation in cancer risk among tissues can be explained*

25   *by the number of stem cell divisions*, 347 (6217) SCIENCE 78, Jan. 2, 2015. Drs. Tomasetti and

26   Vogelstein found that human tissues that experience more stem cell divisions over the course of

27   a lifetime are, in general, more likely to develop cancer than human tissues that experience fewer

28   stem cell divisions. *Id.* The correlation that Drs. Tomasetti and Vogelstein identified between

MOTION TO EXCLUDE TESTIMONY OF DR. KRISTAN ARONSON

1    stem cell divisions and cancer risk suggests that a large proportion of cancer is caused by

2    mutations that occur naturally as part of the cell replication process—as opposed to hereditary

3    or environmental factors.

4         Building on this research in a subsequent study, Drs. Tomasetti and Vogelstein also

5    calculated the percentage of cancer-causing mutations that can be attributed to naturally

6    occurring errors compared to the percentage of cancer-causing mutations that result from

7    exposure to environmental factors, or from inherited genes. *See* Ex. C, C. Tomasetti, L. Li, and

8    B. Vogelstein, *Stem cell divisions, somatic mutations, cancer etiology, and cancer prevention*,

9    355 SCIENCE 6331, Mar. 24, 2017. Drs. Tomasetti and Vogelstein concluded that roughly 95%

10   of NHL-causing mutations are due to these natural copy errors. *Id.*

11        As this Court knows, these two papers—along with Dr. Tomasetti's other published

12   research and some additional analyses he conducted in his expert report—undergird Dr.

13   Tomasetti's opinions in this litigation. *See generally* Ex. D, Expert Report of Cristian Tomasetti,

14   Ph.D., *In re Roundup Prod. Liab. Litig.*, MDL No. 2741 (Wave VII). And Dr. Tomasetti

15   conducted and published this research years before he was retained (in 2019) to offer opinions

16   in any Roundup litigation. Ex. E, *Alesi* Aug. 30, 2022 Trial Tr. at 4390:15-4391:7.

17        Dr. Aronson gets basic facts wrong about Dr. Tomasetti's research—errors that were

18   already addressed by this Court in Wave V of this MDL. Dr. Aronson's mistakes, detailed

19   below, render her opinions about Dr. Tomasetti's research unreliable. Fed. R. Evid. 702(d)

20   (requiring that the expert's opinion "reflect a reliable application of [the expert's] principles and

21   methods to the facts of the case"); *see also* Fed. R. Evid. 702 advisory committee's note to 2023

22   amendments (the Rule "does not permit the expert to make claims that are unsupported by the

23   expert's basis and methodology").

24        *First*, Dr. Aronson inaccurately describes Dr. Tomasetti's 2015 and 2017 papers as

25   mouse studies. Dr. Aronson asserts: "*Based on* mathematical models of *mouse data* and the

26   resulting 0.65 correlation between DNA replication events in selected tissues and incidence of

27   various cancer sites, this correlative research concludes that about 65% of human cancer and

28   95% of NHL is attributable to random internal replication events labeled 'chance.'" Aronson

MOTION TO EXCLUDE TESTIMONY OF DR. KRISTAN ARONSON

1    *Hayden* Report at 34 (emphasis added). She repeats this assertion elsewhere in her report. *Id*. at

2    38 ("The simplistic approach in the publications by Drs. Tomasetti and colleagues *selects data*

3    *from mouse models* to … contend that the correlation between the replication rate of mutations

4    for and the relative incidence of human cancers explains the etiology of human cancers."

5    (emphasis added)).

6        But as Dr. Tomasetti himself explained in the Wave V *Daubert* hearing, "almost all data"

7    in his research came "from humans." Ex. F, 12/12/23 Hr'g Tr. at 32:19-20. Although "[s]ome

8    estimates" in Dr. Tomasetti's research (including the rate of cell division in blood) "came from

9    mouse data" that was only because human data was not available for that tissue type. *Id*. at

10   32:24-25. And, moreover, Dr. Tomasetti noted that it is "very common in the field" to rely on

11   mouse data when human data is not available. *Id*. at 33:5-6. Dr. Aronson leaves all of this out,

12   falsely asserting that Dr. Tomasetti's research as a whole was based on mice. *E.g.*, Aronson

13   *Hayden* Report at 34 (asserting that Dr. Tomasetti's conclusion that "65% of human cancer"

14   was "[b]ased on mouse data" when it was not).

15       *Second*, Dr. Aronson inaccurately asserts that the "focus of [Dr. Tomasetti's] research is

16   stem cell point mutations, a change affecting one base letter within a pair in DNA." Aronson

17   *Hayden* Report at 34. She then goes on to argue that his "research on point mutations in solid

18   tumors lacks relevance to NHL where non-random chromosomal translocations occur in

19   response to exogenous toxic agents." *Id*. at 34-35. But as this Court already explained months

20   before Dr. Aronson issued her Wave VII reports, Dr. Tomasetti "offered a reasonable response

21   to the argument that his theory fails to account for the importance of chromosomal translocations

22   in NHL. Tomasetti testified that his research uses the term 'mutation' in the most general sense,

23   such that it encompasses *both point mutations and translocations*." *In re Roundup Prod. Liab.*

24   *Litig*., 2024 WL 348811, at *4 n.7 (N.D. Cal. Jan. 30, 2024). (citing 12/12/23 Hrg. Tr. at 14:14-

25   20).    Indeed, Dr. Tomasetti has explained elsewhere that "[m]y analysis did include

26   chromosomal translocations" in addition to point mutations. Ex. G, 6/30/23 *Allegrezza*

27   Tomasetti Dep. at 82:23-83:3.

28

MOTION TO EXCLUDE TESTIMONY OF DR. KRISTAN ARONSON

1    *Third*, Dr. Aronson asserts that "[h]undreds of papers from cancer researchers all over

2    the world have been published criticizing Drs. Tomasetti and colleagues' research." Aronson

3    *Hayden* Report at 36. But as this Court already explained months before Dr. Aronson issued her

4    Wave VII reports, this argument "gives only a partial, and therefore misleading, picture of the

5    reaction to Tomasetti's research. It is certainly true that the 2015 paper was the target of a critical

6    response. However, in subsequent years Tomasetti accounted for these methodological

7    critiques, beginning with the 2017 paper." *In re Roundup Prod. Liab. Litig*., 2024 WL 348811,

8    at *4. This Court went on to note that "it is telling that nearly 85% of the critical publications

9    cited by [the Wave V plaintiff] date from the period between Tomasetti's 2015 paper and his

10    2017 paper." *Id*. Dr. Aronson does the same thing—of the twelve articles she cites as critical of

11    Dr. Tomasetti's research, ten of them are from either 2015 or 2016. Aronson *Hayden* Report at

12    36 (citing Ashford (2015), Giovannucci (2016), Gotay (2015), O'Callaghan (2015), Potter and

13    Prentice (2015), Rozhok (2015), Song and Giovannucci (2015), Wensink (2016), Wild (2015),

14    Wu (2016), Wu (2018) and Jassim, (2023)).

15    To be clear: it is true that "the implications of Tomasetti's research have been a subject

16    of serious debate." *In re Roundup Prod. Liab. Litig*., 2024 WL 348811, at *4. And, of course,

17    Dr. Aronson's opinions are not inadmissible merely because this Court correctly held that Dr.

18    Tomasetti's opinions were admissible. The point is not that *any* criticism of Dr. Tomasetti makes

19    a plaintiffs' expert's critiques inadmissible. The point is that Dr. Aronson fundamentally

20    misstates basic facts about Dr. Tomasetti's research. And she did so months after these issues

21    were aired out in this Court. "[W]hether an expert's approach lines up with the basic facts of the

22    case goes to the relevance and admissibility of the testimony itself." *Owens v. Auxilium Pharms.,*

23    *Inc*., 895 F.3d 971, 973 (7th Cir. 2018). Dr. Aronson's opinions about Dr. Tomasetti should be

24    excluded.

25    II.    **Dr. Aronson should be precluded from testifying about "strategies used by**
**industry to dismiss evidence" or about what the EPA should or should not**
26    **have considered when evaluating glyphosate.**

27    This Court should preclude Dr. Aronson from testifying about Monsanto's corporate

28

5

1    conduct, industry conduct generally, or what the EPA should or should not have considered

2    when evaluating glyphosate. Despite her stated area of expertise being epidemiology, she seeks

3    to offer opinions far afield of that area, including opinions regarding "[s]trategies used by

4    industry to dismiss evidence," "Monsanto's staff hav[ing] ghost-written articles," and an alleged

5    "industry of consultants…who pose as undertaking a valid scientific review process" whose

6    reports are (according to Dr. Aronson) "always pro-industry." Aronson *Hayden* Report at 39,

7    40. Dr. Aronson's ultimate opinion in this regard is that the EPA relied too heavily on "industry-

8    conducted" scientific research; therefore, Dr. Aronson implies, the EPA should not have

9    approved glyphosate for sale. *Id.* at 39-40. None of this is proper.

10        Dr. Aronson's opinions about Monsanto's corporate conduct are not a proper subject of

11    testimony the first place. "[O]pinions of [expert] witnesses on the intent, motives, or states of

12    mind of corporations, regulatory agencies and others have no basis in any relevant body of

13    knowledge or expertise." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531. 546 (S.D.N.Y.

14    2004).  Indeed, "musings as to [Monsanto's] motivations would not be admissible if given by

15    any witness—lay or expert." *Taylor v. Evans*, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997);

16    *see also Valladon v. City of Oakland*, 2009 WL 890449 at *1 (N.D. Cal. Apr. 1, 2009)

17    ("[D]efendant's motivations … are not appropriate subjects for expert testimony.").

18        And Dr. Aronson's testimony in this regard would not "help the trier of fact to

19    understand" the central issue concerning liability in this case: whether exposure to Roundup

20    causes NHL. Fed. R. Evid. 702(a). Indeed, "[c]ourts routinely exclude as impermissible expert

21    testimony as to intent, motive, or state of mind."  *Oracle Am. Inc. v. Hewlett Packard Enter.*

22    *Co.*, 2018 WL 6511146, at *3 (N.D. Cal. Dec. 11, 2018) (citation and quotation marks omitted).

23    The reason why is obvious: "[e]xpert testimony as to intent, motive, or state of mind offers no

24    more than the drawing of an inference from the facts of the case," and "the jury is sufficiently

25    capable of drawing its own inferences regarding intent, motive, or state of mind from the

26    evidence." *Id*. (citation and quotation marks omitted). Thus, "permitting expert testimony on

27    this subject would be merely substituting the expert's judgment for the jury's and would not be

28    helpful to the jury." *Id*. (citation and quotation marks omitted)

MOTION TO EXCLUDE TESTIMONY OF DR. KRISTAN ARONSON

1    Even if corporate conduct were a proper subject, Dr. Aronson is not qualified to offer it.

2    Dr. Aronson is an epidemiologist, not an expert on corporate conduct, ethics, the regulatory

3    standards for the EPA approval of pesticides, or "ghostwriting." Indeed, Dr. Aronson admits she

4    is "not an expert" in "corporate conduct, corporate intent …corporate state of mind," or

5    "pesticide regulation." Ex. H, 4/26/22 *Buttry* Aronson Dep. at 179:16-23. Because she has no

6    experience on these improper topics, her opinions are doubly improper. And it is this improper

7    opinion that her ultimate conclusion relies on—that the EPA relied too heavily on "industry-

8    conducted" scientific research and therefore should not have approved glyphosate for sale.

9    To reach this ultimate conclusion, Dr. Aronson relies on the work of Dr. Tracey

10    Woodruff, parroting Dr. Woodruff's conclusions in her own expert report. *E.g.*, Aronson

11    *Hayden* Report at 40 (citing Woodruff (2023)'s proposed reforms to EPA review process). But

12    Dr. Woodruff *actually served* as a senior scientist and policy advisor for the EPA's Office of

13    Policy.    Dr.    Aronson    did    not.    TRACEY    WOODRUFF,    PHD,    MPH,

14    https://profiles.ucsf.edu/tracey.woodruff. In her expert report, Dr. Aronson draws the sweeping

15    conclusion that because other experts, like Dr. Woodruff, have concluded that the EPA may

16    have relied too heavily on industry-conducted scientific research in *other* settings having

17    nothing to do with any chemical at issue in this case, so too has it with glyphosate. Dr. Aronson

18    has no expertise in EPA policy and should not be allowed to opine on what that agency should

19    or should not have considered when evaluating glyphosate. Nor should she be permitted to

20    simply regurgitate the opinions of others.

21    This case is much like *In re Mirena IUD Products Liability Litigation*, 169 F. Supp. 3d

22    396, 487-88 (S.D.N.Y. 2016). There, just as here, the plaintiffs' expert was an epidemiologist.

23    There, just as here, the plaintiffs' expert wanted to testify about a regulatory agency's decision

24    to approve a product—there, the agency was "the German regulatory equivalent of the FDA,"

25    the "BfArM." *Id.* at 487. The plaintiffs' expert wanted to tell the jury that the BfArM "sought

26    some insight" into the product and expressed "concerns" that the defendant, Bayer, "did not

27    investigate" the issue. *Id.* But the court excluded that testimony because the expert was "not a

28    regulatory expert" and because an expert "cannot opine on the state of mind of BfArM, because

7

MOTION TO EXCLUDE TESTIMONY OF DR. KRISTAN ARONSON

1    any such testimony would be purely speculative and is impermissible." *Id.* The court explained:

2    "To the extent Bayer's interactions with BfArM cast light on what Bayer knew and when it

3    knew it, direct evidence of those interactions may be introduced to the extent relevant, but not

4    under the guise of expert opinion and not via an epidemiologist." *Id.* at 487-88. The same result

5    is required here.

6           **III.     Dr. Aronson should be precluded from comparing Monsanto to the tobacco,**

7                    **lead, or asbestos industries.**

8         In her report, Dr. Aronson specifically identifies "lead, tobacco" and "asbestos" as the

9    industries who deploy "strategies … to dismiss evidence." Aronson *Hayden* Report at 39; *see*

10   *also id.* at 44 ("These tactics to dismiss scientific evidence have occurred for many decades with

11   regard to tobacco, … asbestos … and many other products …, and continue with regard to

12   glyphosate.").

13        Even putting aside the reasons, explained above, why this testimony would be improper

14   under Rule 702, it is also irrelevant under Rule 401 and unfairly prejudicial under Rule 403. The

15   tobacco, lead, and asbestos industries have absolutely no relevance to Monsanto, glyphosate, or

16   any other issues present in these cases. And even if these industries were somehow relevant, any

17   comparison would be extremely prejudicial because it invites the jury to unfairly infer that

18   Monsanto committed wrongdoing based on irrelevant conduct by other companies. Plaintiffs

19   should not be permitted to invoke the well-publicized stigma against these big companies to

20   dissuade the jury from dispassionate evaluation of Monsanto and the facts of this case. The jury

21   must decide whether use of Roundup products causes cancer based on the facts of these

22   plaintiffs' cases. Recognizing that risk of prejudice, this court has precluded references to the

23   tobacco industry before, holding: "Even if this evidence were marginally relevant, it would be

24   excluded under Rule 403." *In re Roundup Prod. Liab. Litig.*, 2019 WL 1371806, at \*1. The

25   Court should do so again.

26          **IV.     Dr. Aronson's proposed testimony about Monsanto's PCBs is inadmissible.**

27        Dr. Aronson also asserts that PCBs—a product manufactured decades ago by

28   Monsanto—are a product about which Monsanto, specifically, has suppressed scientific

MOTION TO EXCLUDE TESTIMONY OF DR. KRISTAN ARONSON

1    evidence. Aronson *Hayden* Report at 40 ("Specific to Monsanto's PCBs, there are many

2    examples of omissions, misinformation, obfuscation, and denial about … cancer effects ... that

3    persisted in aid of defence litigation."). This proposed testimony is inadmissible because it

4    violates Rule 404(b)'s prohibition on propensity evidence. Rule 404(b) states, in relevant part,

5    that evidence of a "wrong" or "act" is "not admissible to prove a person's character in order to

6    show that on a particular occasion the person acted in accordance with the character." "Rule 404

7    is regularly applied to corporations" as well as natural persons. *Feighan v. Resource Sys. Grp.,*

8    *Inc.*, 2023 WL 4623123, at *9 (D.D.C. July 19, 2023) (collecting cases).

9         Here, the way in which Dr. Aronson's proposed testimony about PCBs advances

10   Plaintiffs' cause is obvious:  Plaintiffs would use this testimony to try and convince a jury that

11   Monsanto supposedly "suppressed the science" when it comes to PCBs, which makes it more

12   likely that Monsanto "suppressed the science" when it comes to glyphosate. That is precisely

13   the propensity inference that Rule 404(b) prohibits.

14        Because Dr. Aronson's opinion about Monsanto's conduct regarding the science around

15   PCBs is a presumptively inadmissible propensity inference, plaintiffs bear the burden to show

16   that Dr. Aronson's testimony is admissible for a non-propensity purpose; Rule 404(b)(2)

17   enumerates a list of "permitted," non-propensity purposes. But is not enough for plaintiffs to

18   assert in a conclusory manner that Dr. Aronson's PCB opinions are admissible for a non-

19   propensity purpose; they must do the work and articulate with precision *why* Dr. Aronson's

20   testimony is admissible for a non-propensity purpose. *United States v. Caldwell*, 760 F.3d 267,

21   276 (3d Cir. 2014) ("We stress that a proponent's incantation of the proper uses of [prior act]

22   evidence ... does not magically transform inadmissible evidence into admissible evidence."

23   (citation omitted)); *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc) (the

24   issue is "not just … whether the proposed other-act evidence is relevant to a non-propensity

25   purpose but *how exactly the evidence is relevant to that purpose*—or more specifically, how the

26   evidence is relevant without relying on a propensity inference. Careful attention to these

27   questions will help identify evidence that serves no permissible purpose" (emphasis added)).

28

MOTION TO EXCLUDE TESTIMONY OF DR. KRISTAN ARONSON

1      Put simply, for Dr. Aronson's testimony about PCBs to be admissible, plaintiffs must

2 identify a "propensity-free chain of reasoning" linking it to one of their claims. *United States v.*

3 *Charley*, 1 F.4th 637, 6340 (9th Cir. 2021). They will be unable to do. This litigation is about

4 Roundup, not PCBs. The only thing Roundup and PCBs have in common is that Monsanto

5 manufactured them both. The only reason plaintiffs want Dr. Aronson to testify about

6 Monsanto's supposed conduct about the science around PCBs is to suggest to the jury that

7 Monsanto acted the same way with regard to the science around glyphosate.

8      Nor will it be sufficient for plaintiffs to invoke their claims for punitive damages as a

9 basis for this testimony's admissibility. The Supreme Court has placed constitutional limitations

10 on punitive damages—and its analysis tracks closely with Rule 404(b) and its underlying

11 purpose. The Supreme Court has held:  "A defendant's *dissimilar acts*, *independent from the*

12 *acts upon which liability was premised*, may not serve as the basis for punitive damages. A

13 defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory

14 individual or business." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422–23

15 (2003) (emphasis added); *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 797 (8th Cir. 2004)

16 (under *State Farm*, "evidence of other acts need not be identical to have relevance in the

17 calculation of punitive damages, but the conduct must be closely related" (cleaned up)). Thus,

18 the animating principles behind the Supreme Court's rationale in *State Farm* and Rule 404(b)

19 are fundamentally the same—defendants should be punished based on the facts giving rise to

20 the case at bar, not for conduct *not* at issue in the case at bar.

21 **CONCLUSION**

22      This Court should exclude Dr. Aronson entirely for the reasons stated in Monsanto's

23 Omnibus Motion to Exclude Plaintiff's Wave VII General Causation Experts and Motion for

24 Summary Judgment. Regardless, the court should preclude Dr. Aronson from testifying about

25 Dr. Tomasetti's research, "industry strategies used to dismiss evidence," comparisons to other

26 industries (like lead, tobacco, and asbestos), and PCBs.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  August 9, 2024

Respectfully submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**
*/s/ K. Lee Marshall*
K. Lee Marshall
Attorneys for Defendant Monsanto Company

11

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 9th day of August, 2024, a copy of the foregoing

was filed with the Clerk of the Court through the CM/ECF system which sent notice of the

filing to all appearing parties of record.


*/s/ K. Lee Marshall*
K. Lee Marshall
Attorneys for Defendant Monsanto Company

12

MOTION TO EXCLUDE TESTIMONY OF DR. KRISTAN ARONSON