JOHN J. ROSENTHAL
Winston & Strawn LLP
jrosenthal@winston.com
1901 L Street NW
Washington, DC 20036
Tel: (202) 282-5000
Fax: (202) 282-5100

JEFF WILKERSON
Winston & Strawn LLP
jwilkerson@winston.com
300 S. Tryon Street, 16th Floor
Charlotte, NC 28202
Tel: (704) 350-7714
Fax: (704) 350-7800

*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Roundup Products Liability Litigation*<br><br>This Document Relates To:<br><br>*Ramirez v. Monsanto Co.*<br><br>*Sheller v. Monsanto Co.*<br><br>*Perez-Hernandez v. Monsanto Co.* | MDL No. 2741<br>Case No. 3:19-CV-02224-VC<br>Case No. 3:19-CV-07972-VC<br>Case No. 3:24-CV-01736-VC<br><br>**Monsanto's Reply to the Court's Order to Show Cause (D.E. 19268)**<br><br>Date:   October 31, 2024<br>Time:   2:00 p.m.<br>Place:  Zoom<br>Judge:  Hon. Vince G. Chhabria |

**TABLE OF CONTENTS**

Table of Contents ................................................................................................................. i

Introduction ....................................................................................................................... 1

Argument ........................................................................................................................... 2

      I.       To plead Article III standing, each plaintiff had to allege facts showing a credible, non-conjectural risk of developing NHL traceable to Monsanto's conduct and redressable by medical monitoring ...................................................... 2

      II.      Injury: The Complaints do not allege facts showing an increased risk that is more than speculative ................................................................................... 4

      III.     Traceability: The Complaints do not plausibly allege that Monsanto's conduct caused Plaintiffs' alleged injuries ............................................................. 9

      IV.     Redressability: The Complaints do not plausibly allege that a clinically available test can detect NHL prior to the onset of symptoms .............................. 11

Conclusion ....................................................................................................................... 14

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Allgood v. Gen. Motors Corp.*,
  2006 WL 2669337 (S.D. Ind. Sept. 18, 2006) ...................................................................3, 5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...............................................................................................................11

*Barnes v. Am. Tobacco Co.*,
  161 F.3d 127 (3d Cir. 1998) ..................................................................................................11

*Bowen v. Energizer Holdings, Inc.*,
  2024 WL 4352496 (9th Cir. Oct. 1, 2024) ...........................................................................3, 4

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .........................................................................................................3, 5, 7

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) .................................................................................................2

*In re Google Referrer Header Priv. Litig.*,
  465 F. Supp. 3d 999 (N.D. Cal. 2020) .....................................................................................2

*In re Hanford Nuclear Res. Litig.*,
  292 F.3d 1124 (9th Cir. 2002) .................................................................................................7

*Hyatte v. Yee*,
  871 F.3d 1067 (9th Cir. 2017) .................................................................................................7

*Johnson v. Abbott Labs.*,
  2004 WL 3245947 (Ind. Cir. Ct. Dec. 31, 2004) ....................................................................5

*Kamal v. Eden Creamery, LLC*,
  88 F.4th 1268 (9th Cir. 2023) ................................................................................................14

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) .................................................................................................6

*Krottner v. Starbucks Corp.*,
  628 F.3d 1139 (9th Cir. 2010) .................................................................................................3

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .....................................................................................................2, 11, 12

*Mehr v. Fédération Internationale de Football Ass'n*,
    115 F. Supp. 3d 1035 (N.D. Cal. 2015)..................................................................2, 3, 5

*Monsanto Co. v. OEHHA*,
    231 Cal. Rptr. 3d 537 (2018) .............................................................................................6

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024)...............................................................................................9, 10

*Nat'l Ass'n of Wheat Growers v. Bonta*,
    85 F.4th 1263 (9th Cir. 2023)........................................................................................6, 7

*Neilson v. Union Bank of Cal., N.A.*,
    290 F. Supp. 2d 1101 (C.D. Cal. 2003)...........................................................................10

*No. 84 Emp'r Teamster Joint Council Pension Tr. Fund v. Am. W. Hldg. Corp.*,
    320 F.3d 920 (9th Cir. 2003) ............................................................................................6

*Perez v. Nidek Co.*,
    711 F.3d 1109 (9th Cir. 2013) ..........................................................................................2

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
    32 F.4th 824 (9th Cir. 2022)............................................................................................12

*Potter v. Firestone Tire & Rubber Co.*,
    863 P.2d 795 (Cal. 1993)...............................................................................5, 6, 11, 12

*Riva v. Pepsico, Inc.*,
    82 F. Supp. 3d 1045 (N.D. Cal. 2015) ..................................................................... *passim*

*In re Roundup Prods. Liab. Litig.*,
    2024 WL 3074376 (N.D. Cal. June 20, 2024) ..................................................................9

*In re Roundup Prods. Liab. Litig.*,
    390 F. Supp. 3d 1102 (N.D. Cal. July 10, 2018).........................................................7, 8, 9, 10

*Salameh v. Tarsadia Hotel*,
    726 F.3d 1124 (9th Cir. 2013) ........................................................................................14

*Steel Co. v. Citizens for a Better Env.*,
    523 U.S. 83 (1998)............................................................................................................4

*Thole v. U.S. Bank N.A.*,
    590 U.S. 538 (2020).......................................................................................................5, 7

*Trujillo v. Ametek, Inc.*,
    2015 WL 7313408 (S.D. Cal. Nov. 18, 2015)..................................................................3

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ........................................................................................ 10

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
   592 F.3d 954 (9th Cir. 2010) ............................................................................................ 7

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ......................................................................................................... 3

*Winsor v. Sequoia Benefits & Ins. Servs., LLC*,
   62 F.4th 517 (9th Cir. 2023) ............................................................................................ 2

*Yetter v. Ford Motor Co.*,
   428 F. Supp. 3d 210 (N.D. Cal. 2019) ........................................................................... 10

## Other Authorities

Fed. R. Civ. P. 9(b) ............................................................................................................. 10

Fed. R. Civ. P. 12(b)(1) .................................................................................................... 2, 4

Fed. R. Civ. P. 12(b)(6) ....................................................................................................... 2

Fed. R. Civ. P. 201(b) ......................................................................................................... 7

Int'l Agency for Rsch. on Cancer, *Some Organophosphate Insecticides and Herbicides*, IARC M<small>ONOGRAPHS ON THE</small> E<small>VALUATION OF</small> C<small>ARCINOGENIC</small> R<small>ISKS TO HUMANS</small> (2017) .......................................................................................... 7

Jonguen Rhee et al., *Circulating Immune Markers and Risks of Non-Hodgkin Lymphoma Subtypes: A Pooled Analysis*, 152 Int'l J. of Caner 865 (2023) ..................... 13

Mikael Eriksson et al., *Pesticide Exposure as Risk Factor for Non-Hodgkin Lymphoma Including Histopathological Subgroup Analysis*, 123 Int'l J. of Cancer 1657 (2008) ........................................................................................................ 8

U.S. Const. art. III ........................................................................................................... 1, 2

Vicky C. Chang et al., *Glyphosate Use and Mosaic Loss of Chromosome Y Among Male Farmers in the Agricultural Health Study*, E<small>NVT'L</small> H<small>EALTH</small> P<small>ERSPECTIVES</small> (Dec. 2023) ............................................................................................ 13

# INTRODUCTION

The *Perez-Hernandez*, *Ramirez*, and *Sheller* plaintiffs' ("Plaintiffs") responses to the Court's show-cause order avoid the Court's core question: did Plaintiffs plausibly allege facts showing that their alleged exposure to glyphosate-based Roundup® products caused an increased risk of developing NHL significant enough to be a concrete injury for Article III standing to seek medical monitoring?[1] The answer is no. Plaintiffs instead argue that they bear only a minimal burden at the pleading stage. But the law is clear, including the Supreme Court's holdings on pleading future injuries and this District's prior standing analyses in medical-monitoring cases: Plaintiffs must plead *facts* plausibly showing that they meet each of the constitutional prerequisites for standing. Plaintiffs simply do not plausibly allege a credible, non-conjectural risk of developing NHL as a result of their alleged exposure to Roundup® sufficient to seek medical monitoring. Nor do Plaintiffs' responses show how their respective Complaints alleged traceability or redressability, the other elements of standing. In fact, only the *Perez-Hernandez* plaintiffs even *attempt* to demonstrate that medical monitoring would redress their alleged injuries. But a closer look at their allegations shows that they have not alleged a clinically available test capable of diagnosing NHL prior to the onset of symptoms. Because Plaintiffs do not plausibly allege standing, the Court should dismiss their Complaints.

---

[1] For *Ramirez*, the Court's show-cause order implicates only the claims of Plaintiff Dexter Owens, who seeks a medical-monitoring remedy based on his alleged exposure. Sept. 9, 2024, Hr'g Tr. at 14:19-15:2 (the Court stating that the present jurisdictional question affects only the plaintiffs who do not have NHL). The other plaintiff—Robert Ramirez—was diagnosed with NHL and thus does not seek medical monitoring. No. 3:19-CV-0224-CV, D.E. 92 ("*Ramirez* Complaint") at ¶ 10. While the response in *Ramirez* defends Mr. Ramirez's standing, Monsanto does not address that issue here because it is outside the scope of the show-cause order.

## ARGUMENT

I. **TO PLEAD ARTICLE III STANDING, EACH PLAINTIFF HAD TO ALLEGE FACTS SHOWING A CREDIBLE, NON-CONJECTURAL RISK OF DEVELOPING NHL TRACEABLE TO MONSANTO'S CONDUCT AND REDRESSABLE BY MEDICAL MONITORING**

The Court's show-cause order required Plaintiffs to demonstrate why their Complaints, on their face, "adequately allege standing."[2] Dkt. No. 19268. Plaintiffs' responses instead focus on what they claim are minimal jurisdictional pleading burdens. Dkt. No. 19467 ("*Perez-Hernandez* Response") at 4-10; Dkt. No. 19468 ("*Ramirez* Response") at 4-10; Dkt. No. 19465 ("*Sheller* Response") at 4-10. But Plaintiffs' position contradicts Supreme Court precedent on the requirements to plead standing and this District's precedent on the application of those requirements to medical monitoring.

Standing is "an indispensable part of the plaintiff's case." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs thus must "allege the elements of standing with at least as much specificity as is required in pleading the elements of a cause of action." *Mehr v. Fédération Internationale de Football Ass'n*, 115 F. Supp. 3d 1035, 1058 (N.D. Cal. 2015) (citing *Perez v. Nidek Co.*, 711 F.3d 1109, 1113 (9th Cir. 2013)); *see also Lujan*, 504 U.S. at 561 ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof."). Standing has three elements: (i) injury in fact that is concrete, particularized, and actual or imminent; (ii) traceability to the defendant's conduct; and (iii) redressability by available judicial relief. *Winsor v. Sequoia Benefits & Ins. Servs., LLC*, 62 F.4th 517, 523 (9th Cir. 2023). Additionally, because the medical monitoring Plaintiffs seek equitable relief in advance of a future injury—they do not claim they have NHL, only that they are at risk of developing it in the future—they also must allege facts showing that the "threatened

---

[2] A challenge to the facial adequacy of jurisdictional allegations under Rule 12(b)(1) requires the court to "consider[] whether the allegations in the complaint are sufficient on their face to invoke federal jurisdiction." *In re Google Referrer Header Priv. Litig.*, 465 F. Supp. 3d 999, 1005 (N.D. Cal. 2020) (Rule 12(b)(6) standard applies to Rule 12(b)(1) facial attacks). The Court accepts well-pleaded factual allegations, but it cannot "accept as true allegations that contradict matters properly subject to judicial notice" or that "are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

2

injury [is] certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Courts in this District have applied these standing principles to requests for medical monitoring by requiring plaintiffs to allege facts showing that a risk of injury or disease is "credible and not conjectural." *Riva v. Pepsico, Inc.*, 82 F. Supp. 3d 1045, 1052 (N.D. Cal. 2015). Speculative "inferences of increased risk of harm" do not suffice. *Id.* at 1053; *accord Mehr*, 115 F. Supp. 3d at 1058 ("As pled in the complaint, the alleged 'risk' of latent brain injuries is speculative and nebulous, rather than being 'certainly impending' such that it constitutes a real and immediate injury-in-fact."). Plaintiffs try to circumvent *Riva* and *Mehr* by relying on an unpublished order in *Trujillo v. Ametek, Inc.*, 2015 WL 7313408, at *2 (S.D. Cal. Nov. 18, 2015). *See Perez-Hernandez* Resp. at 5-7; *Ramirez* Resp. at 8-10. But even *Trujillo* required the plaintiffs to show a "credible and not conjectural" increased risk of injury and to "quantif[y] the increased cancer risk they allege." 2015 WL 7313408, at *6. In short, Plaintiffs must allege facts showing that they each have a credible, non-conjectural risk of developing NHL as a result of their alleged use of Roundup® products.[3]

Plaintiffs' argument—citing the Ninth Circuit's recent decision in *Bowen v. Energizer Holdings, Inc.*, 2024 WL 4352496, at *5 (9th Cir. Oct. 1, 2024)—that resolving standing now would improperly consider merits issues at the pleading stage is misplaced. *See Sheller* Resp. at 7-8 (citing *Bowen*); *Ramirez* Resp. at 9 (same). *Bowen* clarified the different standards that apply

---

[3] Neither *Krottner* nor *Allgood*, on which Plaintiffs rely, suggests a lower burden at the pleading stage. *See Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1140–43 (9th Cir. 2010); *Sheller* Resp. Ex. B (*Allgood* Complaint); *Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at *2 (S.D. Ind. Sept. 18, 2006). In both cases, the plaintiffs alleged specific facts establishing a real, immediate threat of harm—for *Krottner*, actual theft of individuals' unencrypted, sensitive data, and an instance of identity theft, and for *Allgood*, demonstrated risk of illness from a chemical and documented, excessive levels of that chemical in the plaintiffs' groundwater. *Krottner*, 628 F.3d at 1140–43; *Sheller* Resp. Ex. B ¶¶ 54-60, 105-27. These specific factual allegations are a far cry from an undefined, unquantifiable "increased risk" of illness.

3

to a Rule 12(b)(1) factual attack when jurisdictional issues are intertwined with the merits.[4] 2024 WL 4352496, at *5. It did not alter the standard for evaluating *facial* challenges to the sufficiency of jurisdictional allegations. *See id.* at *11 (applying facial standard to redressability element, which defendants challenged on the pleadings). *Bowen* thus does not lessen Plaintiffs' burden to plausibly allege facts demonstrating a credible, non-conjectural risk of harm.

*Bowen* aside, Plaintiffs must also plausibly allege facts demonstrating the remaining standing elements, which are traceability and redressability. For traceability in connection with a claim seeking medical monitoring, Plaintiffs must allege facts showing that Monsanto's conduct "more likely than not" caused the alleged increased risk. *Riva*, 82 F. Supp. 3d at 1062. For redressability, Plaintiffs must allege facts showing that a program of clinically available medical monitoring would actually monitor for NHL. *See Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."). As shown below, Plaintiffs have not alleged facts showing either.

## II.   INJURY: THE COMPLAINTS DO NOT ALLEGE FACTS SHOWING AN INCREASED RISK THAT IS MORE THAN SPECULATIVE

Plaintiffs have not alleged facts showing the credible, non-conjectural risk of harm necessary for standing to bring a claim seeking medical monitoring. Because Plaintiffs premise the claim on the risk of developing NHL in the future, they must plausibly allege "the relative increase in the chance of onset of disease in [the plaintiffs] as a result of exposure, when compared to (a) the plaintiff[s'] chances of developing the disease had [they] not been exposed; and (b) the chances of the members of the public at large of developing the disease."[5] *Potter v. Firestone Tire*

---

[4] *Bowen* also did *not* address the degree of risk necessary to establish a "credible and not conjectural" risk of future injury. 2024 WL 4352496, at *8. Rather, *Bowen* held that the plaintiff had adequately shown "economic harm" and declined to address the district court's holding that the plaintiff failed to "establish[] standing under an 'increased health risk' theory." *Id.* at *4, *9.

[5] *Potter* defines five factors for assessing whether a plaintiff is entitled to a medical-monitoring remedy under California law. The "relative increase" factor is most relevant to the common question of whether Plaintiffs alleged a credible increased risk of harm.

4

*& Rubber Co.*, 863 P.2d 795, 824-25 (Cal. 1993) (defining the factors for assessing entitlement to a medical-monitoring remedy under California law); *see also Riva*, 82 F. Supp. 3d at 1052 (applying *Potter* factors to standing inquiry); *Mehr*, 115 F. Supp. 3d at 1058 (same).[6] These pleading requirements stem from the Supreme Court's directive that plaintiffs asserting probabilistic injuries allege a "substantially increased" risk of harm that is "certainly impending." *Clapper*, 568 U.S. at 409; *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 546 (2020).

Consistent with this standard, the Court, in the case-management conference that led to the show-cause order, directed Plaintiffs to demonstrate their risk of harm by posing the following question:

> [M]y question is, you know, assuming significant exposure to Roundup, assuming that they don't have NHL, and even assuming sort of the—that the studies most favorable to the plaintiffs are correct—you know, and we all know there are very serious questions about those studies—but even assuming that the studies most favorable to the plaintiffs are correct, **what percentage increase is there in the chances of them getting NHL?**

Sept. 9, 2024, Hr'g Tr. at 17:13-20 (emphasis added).

Plaintiffs' Responses cannot answer this standing question because their Complaints simply do not plead facts that provide an answer (much less one that would show Plaintiffs have standing). Plaintiffs' Responses address neither "the chances of the members of the public at large of developing" NHL nor Plaintiffs' individual "chances of developing [NHL] had [they] not been exposed" to glyphosate. *See Potter*, 863 P.2d at 824-25. Ignoring the Court's directions, the

---

[6] *Potter* directly governs the claims for medical monitoring under California law in *Perez-Hernandez* and *Ramirez*. *Sheller* primarily involves claims under Indiana law. *See Sheller* Resp. at 4-6. There is a split of authority over whether Indiana permits medical monitoring as a remedy *at all*. *Compare, e.g., Johnson v. Abbott Labs.*, 2004 WL 3245947 (Ind. Cir. Ct. Dec. 31, 2004) ("Indiana does not recognize medical monitoring as a cause of action, . . . nor have Moving Plaintiffs referred to a single Indiana case in which such relief was granted."), *with, e.g., Allgood*, 2006 WL 2669337, at *2 ("Indiana law would probably recognize such a claim for medical monitoring damages, at least in a proper case."). And even in *Allgood*, the plaintiffs sought medical monitoring in the form of damages (the "costs of a lifetime program") rather than "medical monitoring itself." *Id.* Even assuming that medical monitoring is available as equitable relief under Indiana law, Sheller offers no standards for assessing entitlement to medical monitoring. The Court therefore should borrow the standards from *Potter* and *Riva* in assessing whether Sheller has plausibly alleged an injury for purposes of standing.

Responses also do not discuss the "relative increase in the chance of" developing NHL "when compared to" these baselines. *Id.* Instead, the Responses attempt to generally link glyphosate to NHL by relying on the International Agency for Research on Cancer ("IARC") Monograph and, for *Ramirez*, the 2008 Eriksson study.[7] *Perez-Hernandez* Resp. at 6; *Ramirez* Resp. at 6; *Sheller* Resp. at 2-3. But as this Court well knows, the IARC Monograph did not address "risk," and the 2008 Eriksson study found no statistically significant increase in risk when isolating glyphosate from other pesticides.

First, the IARC Monograph does not assess "risk," much less quantify it. Rather, as the Ninth Circuit has explained, IARC assessed the "hazard" posed by "some theoretical level of exposure" to glyphosate. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1269 (9th Cir. 2023). And "the distinction between hazard and risk is significant." *Id.* "[H]azard indicates that at some theoretical level of exposure, the chemical is capable of causing cancer. Risk, on the other hand, is the likelihood that cancer will occur at a real-world level of exposure." *Id.* (citing *Monsanto Co. v. OEHHA*, 231 Cal. Rptr. 3d 537, 542 (2018));[8] *see also* J. Wilkerson Decl., Ex. A[9]

---

[7] Each of the Responses repeatedly assures the Court that additional "studies" provide the factual basis for an increased risk. *Perez-Hernandez* Resp. at 6 ("the studies Plaintiffs have cited," "while this Court has specifically rejected some of those same studies"); *Ramirez* Resp. at 6, 7, 8 ("studies demonstrating danger of glyphosate," "[n]umerous studies," "[s]everal of the studies have been alleged"); *Sheller* Resp. at 2 ("numerous studies," "[n]umerous other studies"). But Plaintiffs never explain what these studies say or how they support a credible, non-conjectural, and certainly impending risk of harm.

[8] Though the *Perez-Herandez* Response claims that "California and the IARC have concluded glyphosate poses a significant risk to humans," the Ninth Circuit has made clear that "[n]o agency or regulatory body (including IARC) has concluded that glyphosate poses a carcinogenic risk." *Compare Perez-Hernandez* Resp. at 6, *with Wheat Growers*, 85 F.4th at 1269.

[9] All exhibits cited herein are exhibits to the Wilkerson Declaration filed concurrently herewith. As shown in that declaration, each of these exhibits was referenced in Plaintiffs' Complaints and relied upon in Plaintiffs' Responses. Wilkerson Decl. ¶¶ 2-5. These exhibits can thus be considered "under the incorporation by reference doctrine." *No. 84 Emp'r Teamster Joint Council Pension Tr. Fund v. Am. W. Hldg. Corp.*, 320 F.3d 920, 925 n.2 (9th Cir. 2003); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (a complaint incorporates by reference a document on which it relies, even if the document is not attached to the complaint). Even if these exhibits were not incorporated by reference, they are each subject to judicial notice as publicly available documents, the

at 10 (International Agency for Research on Cancer, *Some Organophosphate Insecticides and Herbicides*, IARC MONOGRAPHS ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS, VOL. 112 (2017)) ("A cancer 'hazard' is an agent that is capable of causing cancer under some circumstances, while a cancer 'risk' is an estimate of the carcinogenic effects expected from exposure to a cancer hazard. The *Monographs* are an exercise in evaluating cancer hazards, despite the historical presence of the word 'risks' in the title."). Plaintiffs cannot just plead that "some theoretical level of exposure" could theoretically cause NHL; they have to plead facts showing that *their* level of exposure "substantially increased" the risk that they will develop NHL to a degree that they have a "certainly impending" risk of injury. *Thole*, 590 U.S. at 546; *Clapper*, 568 U.S. at 409; *cf. In re Hanford Nuclear Res. Litig.*, 292 F.3d 1124, 1133 (9th Cir. 2002) (the basic question of causation of harm is whether the substance, "at the level of exposure alleged by plaintiffs, is capable of causing a particular injury or condition in the general population").

The IARC Monograph suffers from additional shortcomings that this Court has observed. IARC's conclusion that glyphosate is "probably" carcinogenic "has 'no quantitative significance.'" *In re Roundup Products Liab. Litig.*, 390 F. Supp. 3d 1102, 1115 (N.D. Cal. July 10, 2018) (quoting IARC Monograph at 10); *see* Ex. A at 10. Plaintiffs cannot rely on it to quantify their alleged increased risk. The Monograph likewise cautioned that "chance, bias, or confounding could not be ruled out with reasonable confidence." 390 F. Supp. 3d at 1115 (quoting IARC Monograph at 27, 398); *see* Ex. A at 27, 398.

In addition, the IARC Monograph fails to establish risk in humans because it relied primarily on animal studies for its hazard analysis. The Group 2A designation is "based on 'limited evidence' in humans and 'sufficient evidence' in experimental animals." *Wheat Growers*, 85 F.4th at 1269; *see* Ex. A at 30, 398-99. IARC's conclusion relied primarily on its review of studies

---

authenticity of which cannot reasonably be questioned. Fed. R. Civ. P. 201(b); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010). And as the Ninth Circuit has expressly held, this Court may take judicial notice of such documents when considering a facial attack to jurisdiction. *Hyatte v. Yee*, 871 F.3d 1067, 1071 n.15 (9th Cir. 2017).

investigating exposure in mice, rats, and non-mammalian aquatic organisms. Ex. A at 389, 396, 398-99. The reliance on animal studies further weakens the basis for claiming a credible increased risk in Plaintiffs, much less an increase sufficient to pose a non-conjectural and "certainly impending" risk of injury sufficient to seek medical monitoring. *See Riva*, 82 F. Supp. 3d at 1059 ("[T]he Riva Plaintiffs are not mice."). All told, the IARC Monograph does not suffice to establish the increased risk necessary to Plaintiffs' theory of standing. *Cf. In re Roundup Products Liab. Litig.*, 390 F. Supp. 3d at 1115 (holding that the IARC Monograph did not suffice to create a genuine issue of material fact on general causation).

The *Ramirez* Response's reliance on the 2008 Eriksson study fares no better.[10] That study found ***no statistically significant correlation between glyphosate exposure and NHL when adjusting for exposure to other pesticides***. *See* Ex. B at 1160-61 & Table VII (Mikael Eriksson et al., *Pesticide Exposure as Risk Factor for Non-Hodgkin Lymphoma Including Histopathological Subgroup Analysis*, 123 INT'L J. OF CANCER 1657 (2008)).[11]

The *Ramirez* Response ignores this result and instead relies on the study's univariate odds ratio, seeking to take advantage of its confounding glyphosate with other pesticides. *See Ramirez* Resp. at 8. But the Court has already identified as a "cause for concern" the Eriksson study's "choice of the control group for the univariate analysis, that is, the analysis [is] not adjusted for use of other pesticides." 390 F. Supp. 3d at 1120. Likewise, this Court has noted that "exposure to other pesticides is the major confounder, and people with high exposure to glyphosate (who tend

---

[10] Though the *Ramirez* Response declines to identify or attach the "2008 study" it references, the citation to *In re Roundup Products Liability Litigation*, 390 F. Supp. 3d 1102 (Pretrial Order No. 45), reveals that the study is the Eriksson study. *See* 390 F. Supp. 3d at 1119-20 & n.15 (citing Eriksson, 123 Int'l J. of Cancer 1657).

[11] Because some non-glyphosate pesticides are associated with an increased risk of contracting NHL, Eriksson calculated a multivariate odds ratio adjusted for exposure to other pesticides to factor out the influence of other pesticides on the results. *Id.* at 1660. With that adjustment, Eriksson found ***no statistically significant association between glyphosate and NHL***—indeed, the confidence interval included the possibility that those exposed to glyphosate-based herbicides are more than 20% *less* likely to get NHL. Eriksson found a statistically significant association with NHL only in its univariate analysis—i.e., only when the model confounded exposure to glyphosate with exposure to other pesticides. *Id.*

to be agricultural workers or landscapers) are likely to have more exposure to other pesticides, not less." *In re Roundup Products Liab. Litig.*, 2024 WL 3074376, at *4 (N.D. Cal. June 20, 2024) (Pretrial Order No. 293: Order Granting Mot. to Exclude Dr. Luoping Zhang & Granting Summ. J. to Monsanto).

Plaintiffs here are all agricultural workers or landscapers, and thus the confounding error is particularly problematic. Yet the *Ramirez* Response relied on the univariate odds ratio with its confounding error because the alternative was to admit that there is no statistically significant association between glyphosate use and NHL when properly adjusted. As a result, Plaintiffs have identified no factual allegations supporting the assertion that glyphosate—separate from other pesticides—credibly increases the risk of developing NHL. And even if they had, they have utterly failed to show how this presents a risk to them of "certainly impending" injury when considering their own baseline risk, their exposure to non-glyphosate pesticides, and the available science. This is fatal to their increased-risk-of-harm theory of standing to seek medical monitoring.

### III. TRACEABILITY: THE COMPLAINTS DO NOT PLAUSIBLY ALLEGE THAT MONSANTO'S CONDUCT CAUSED PLAINTIFFS' ALLEGED INJURIES

Plaintiffs do not plausibly allege that an increased risk of developing NHL was caused by Roundup® rather than other chemicals. They thus have failed to meet their burden that the alleged harm on which they predicate their claim seeking medical monitoring is fairly traceable to Monsanto's conduct, rather than the conduct of other actors. *See Murthy v. Missouri*, 144 S. Ct. 1972, 1993 (2024) (injury must be fairly traceable to the conduct of the particular defendants before the court).

As this Court has recognized, professional users of Roundup®—such as Plaintiffs—use other chemicals alongside Roundup®, including other glyphosate-based products and "many other pesticides." *In re Roundup Products Liab. Litig.*, 390 F. Supp. 3d at 1123; *In re Roundup Products Liab. Litig.*, 2024 WL 3074376, at *4 ("[P]eople with high exposure to glyphosate (who tend to be agricultural workers or landscapers) are likely to have more exposure to other pesticides, not less."). The Court has previously explained that some of these other pesticides may "be associated

with elevated incidences of NHL." *In re Roundup Products Liab. Litig.*, 390 F. Supp. 3d at 1123. As a result, studies that examine agricultural or professional exposure present a traceability problem, in addition to the confounding error discussed above. *See, supra*, Section II. Plaintiffs cannot plausibly allege that their increased risk is fairly traceable to Monsanto—rather than absent third parties—without alleging facts ruling out exposure to other sources of glyphosate or other pesticides. *See Murthy*, 144 S. Ct. at 1993-96 (concluding that plaintiffs did not trace their alleged injuries to the defendants they sued); *Riva*, 82 F. Supp. 3d at 1062 ("Where the pleadings reveal so many commonly-consumed foods with similar levels of 4-MeI, it is implausible to conclude that any alleged increased risk of cancer is 'more likely than not' caused by drinking Pepsi One or Diet Pepsi.").

Plaintiffs do not allege facts plausibly ruling out the "many other pesticides" as the source of the alleged increased risk. *In re Roundup Products Liab. Litig.*, 390 F. Supp. 3d at 1123. They do not allege that they have not encountered other pesticides that are associated with an increased risk of developing NHL. They also do not allege that they have encountered glyphosate only in Roundup® products—as this Court knows, dozens of other companies have manufactured and sold competing glyphosate-based herbicides. Without such allegations, they do not plausibly allege an increased risk that is fairly traceable to Monsanto and not other pesticide producers.[12]

---

[12] Plaintiffs likewise do not plausibly allege that they encountered or relied on specific misleading statements by Monsanto regarding glyphosate's safety. Each of the Complaints advances claims for negligent misrepresentation. *See* No. 3:24-CV-01736, D.E. 62 ("*Perez-Hernandez* Compl.") at ¶¶ 101-12; *Ramirez* Compl. ¶¶ 163-70; No. 3:19-CV-07972-VC, D.E. 1 ("*Sheller* Compl.") at ¶¶ 103-12 (alleging misrepresentations and omissions). Negligent-misrepresentation claims are grounded in fraud and thus are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1141 (C.D. Cal. 2003) ("It is well-established in the Ninth Circuit that both claims for fraud and negligent misrepresentation must meet Rule 9(b)'s particularity requirements."). Despite this requirement, none of the Complaints alleges "the who, what, when, where, and how" of alleged statements or omissions that Plaintiffs encountered and upon which they relied. *Yetter v. Ford Motor Co.*, 428 F. Supp. 3d 210, 220 (N.D. Cal. 2019) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).

## IV. REDRESSABILITY: THE COMPLAINTS DO NOT PLAUSIBLY ALLEGE THAT A CLINICALLY AVAILABLE TEST CAN DETECT NHL PRIOR TO THE ONSET OF SYMPTOMS

For medical monitoring to redress any claimed injury, Plaintiffs must allege "the clinical value of early detection and diagnosis." *Potter*, 863 P.2d at 825. And logically, for a medical-monitoring program to redress the increased risk of contracting a disease, there must be a clinically available medical test capable of leading to such early detection and diagnosis. *See id.* (the effectiveness of a medical-monitoring remedy depends on the existence of a "specific monitoring" method); *see also Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 139 (3d Cir. 1998) (the availability of medical monitoring depends on whether "a monitoring procedure exists that makes the early detection of the disease possible"). Here, Plaintiffs each ask for a program of periodic testing to catch NHL in its early stages. *Perez-Hernandez* Compl. ¶¶ 14, 66-76, 91, 107, 111, 127; *Ramirez* Compl. ¶¶ 107-111, Prayer ¶¶ iv, vi; *Sheller* Compl. ¶¶ 9, 111, Prayer ¶ (c). But Plaintiffs have failed to plead facts showing any of this.

The *Ramirez* and *Sheller* Complaints contain *no* allegations regarding tests for NHL. On that basis alone, the Court should hold that both have failed to allege facts supporting redressability.

The *Sheller* Response attempts to imply that because medical monitoring is a recognized legal remedy, Sheller has necessarily pleaded facts supporting redressability. *See Sheller* Resp. at 4-6 (discussing basis for recognizing medical monitoring under Indiana law).[13] But even if a legal remedy exists, a plaintiff must allege facts showing that the legal remedy would redress the injuries alleged in order to have standing. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (a plaintiff must plead facts showing entitlement to relief); *Lujan*, 504 U.S. at 561 (a plaintiff bears the burden of establishing the elements of standing). That is not possible if the relief—here a test to pre-detect NHL—does not exist. The *Ramirez* Response similarly punts by saying that the "'trier-of-fact' may determine, with the help of 'medical testimony,' what exactly and in what 'given situation

---

[13] Sheller is not even necessarily correct that a medical-monitoring remedy exists under Indiana law. *See supra* note 6.

11

justifies future periodic medical monitoring.'" *Ramirez* Resp. at 10 (quoting *Potter*, 863 P.2d at 825). That puts the cart before the horse. Before getting to a trier of fact, a plaintiff must plead facts supporting the elements of his claim. *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 838 (9th Cir. 2022) ("Since these are elements of the claim, the plaintiff must plead facts that, when accepted as true, show they are satisfied."). This includes the "indispensable" elements of standing. *Lujan*, 504 U.S. at 561. The *Ramirez* and *Sheller* Plaintiffs' failure to allege any facts showing redressability, therefore, requires dismissal for lack of standing.

Only the *Perez-Hernandez* Complaint contains any allegations regarding testing for NHL, but these allegations do not plausibly show redressability. *Perez-Hernandez* Compl. ¶¶ 72-75. The *Perez-Hernandez* Response proposes that the requested program monitor for "symptoms of cancer" using the existing clinics funded by the Diagnostic Assistance Grant Program ("DAGP"). *Perez-Hernandez* Resp. at 9; *Perez-Hernandez* Compl. ¶¶ 74-76. But a medical-monitoring program that tests for symptoms is not helpful, because the symptoms themselves would cause the person to go to the doctor. At that point, any claim would be for personal injury, not medical monitoring. Moreover, because the *Perez-Hernandez* Plaintiffs contend that any symptom-based checkup could be conducted through already existing DAGP-funded clinics, there is no role for Monsanto-funded medical monitoring.[14]

Because symptom-based monitoring does not redress Plaintiffs' increased-risk injuries, the core question is the one the Court previously asked the *Perez-Hernandez* plaintiffs: "Can doctors discover NHL before symptoms of NHL appear?" Feb. 15, 2024, Hr'g Tr. at 16:19-20. At the time, the *Perez-Hernandez* Plaintiffs responded, "I don't believe so," *id.* at 16:21-22, and they have not changed that answer since. Instead, the *Perez-Hernandez* Response says that a monitoring program would allow Plaintiffs to be "tested for whether they have biological markers that indicate an

---

[14] In their Complaint, the *Perez-Hernandez* Plaintiffs contend that they require "more frequent screenings not within the purview of routine medical exams." *Perez-Hernandez* Compl. ¶ 76. They do not allege the frequency of screenings they require or the frequency of screenings currently available, and thus they do not allege what role court-ordered medical monitoring would play in redressing the alleged injuries. *See id.*

*increased risk* of NHL and require an individualized care plan." *Perez-Hernandez* Resp. at 9 (emphasis added). Plaintiffs claim that "these methods will test for chromosomal changes indicating genotoxic effects and for elevated immune marker concentrations, which are early indicators of *cancer risk*." *Id.* at 10 (emphasis added) (citing *Perez-Hernandez* Compl. ¶¶ 72-73). That is, Plaintiffs suggest only that their proposed tests would indicate a cancer *risk*—not that they would detect NHL. That is entirely circular—the increased risk is the injury Plaintiffs claim in the first place. Testing for increased risk does not redress increased risk. Indeed, Plaintiffs alleged they already *know* they are at increased risk for NHL. Testing for risk would thus only confirm what Plaintiffs already claim to know.

A closer look at the studies the *Perez-Hernandez* Plaintiffs cite demonstrates why they hedge their arguments. Though neither the Response nor the Complaint expressly names the studies relied on, the descriptions in the Complaint indicate that they are a 2023 study by Vicky C. Chang and 2023 study by Jonguen Rhee. Ex. C (Vicky C. Chang et al., *Glyphosate Use and Mosaic Loss of Chromosome Y Among Male Farmers in the Agricultural Health Study*, ENVT'L HEALTH PERSPECTIVES, Dec. 2023); Ex. D (Jonguen Rhee et al., *Circulating Immune Markers and Risks of Non-Hodgkin Lymphoma Subtypes: A Pooled Analysis*, 152 Int'l J. of Cancer 865 (2023)). Neither plausibly supports the *Perez-Hernandez* Plaintiffs' arguments.

The Chang article observed a correlation between glyphosate exposure and mosaic loss of the Y-chromosome ("mLOY") in tested male farmers. Ex. C at 1, 3. The article noted that mLOY occurs naturally with age. *Id.* at 3. The article further noted that prior research into a connection between mLOY and various cancers has been "inconclusive." *Id.* Critically, the article did *not* claim any connection between mLOY and NHL. Indeed, the article cautioned that "[f]uture research is needed to confirm our novel findings and to further explore specific mechanisms or bio-markers through which glyphosate exposure may contribute to mLOY, other [mosaic chromosomal alterations], and cancer risk." *Id.* At best, then, the Chang article says that testing of mLOY might someday be used to assess cancer risk generally—it does not say that an mLOY test currently exists to detect the presence of NHL.

13

The Rhee article likewise does not propose a test for detecting NHL. The article conducted a pooled analysis of data drawn from samples of serum plasma and observed "statistically significant associations between increased NHL *__risk__* and elevated circulating levels of" specific immune activation markers. Ex. D at 1, 7 (emphasis added). The article does not claim that collecting serum plasma samples could be used as a means of diagnosing NHL or that doctors should use plasma samples to test for NHL in a clinical setting. *See id.* Indeed, the Rhee article excluded from its dataset samples from individuals diagnosed with cancer less than two years after blood collection to filter out potential changes to blood markers resulting from the presence of cancer. Ex. D at 5. That is, the Rhee article *avoided* studying the diagnostic potential of serum plasma tests. And like the Chang article, the Rhee article cautioned that "[s]tudies with larger sample sizes are needed to confirm and extend these findings." Ex. D at 11. The article simply does not speak to a clinically available method for detecting NHL prior to the onset of symptoms.

None of the Plaintiffs has alleged the existence of a clinically available test for early detection of NHL, prior to the onset of symptoms—much less NHL caused by glyphosate exposure. They have thus not alleged that any relief from this Court would redress their alleged injuries. The Court should dismiss.

## **CONCLUSION**

For the reasons set forth above, the Court should dismiss for lack of standing the Complaints in *Perez-Hernandez* and *Sheller* and Plaintiff Owens's claims in *Ramirez*.[15]

---

[15] Each of the Plaintiffs requests the opportunity to amend their Complaints to add jurisdictional facts, but none articulates what jurisdictional facts they could add to cure the defects. *See Perez-Hernandez* Resp. at 10; *Ramirez* Resp. at 10; *Sheller* Resp. at 10. Given that the *Perez-Hernandez* and *Ramirez* Plaintiffs have already amended their Complaints and given that the *Ramirez* and *Sheller* cases have been pending for five years, the Court should exercise its discretion to deny leave to amend. *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) ("A district court's discretion to deny leave to amend is 'particularly broad' where the plaintiff has previously amended. . . . A plaintiff may not in substance say 'trust me,' and thereby gain a license for further amendment when prior opportunity to amend had been given."); *Kamal v. Eden Creamery, LLC*, 88 F.4th 1268, 1279 (9th Cir. 2023) (affirming denial of leave to amend when plaintiff delayed for five months).

Dated: October 17, 2024                    By: */s/ John J. Rosenthal*

                                                    JOHN J. ROSENTHAL  
Winston & Strawn LLP  
jrosenthal@winston.com  
1901 L Street NW  
Washington, DC 20036

JEFF WILKERSON  
Winston & Strawn LLP  
jwilkerson@winston.com  
300 S. Tryon Street, 16th Floor  
Charlotte, NC 28202

*Counsel for Defendant*