UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to: *ALL CASES* | **ORDER RE SPECIAL MASTER'S REPORT AND RECOMMENDATION** |

      Attached as Appendix A to this order is Special Master William Foster's Report and Recommendation regarding distributions from the common benefit fund. The Court did not collaborate with the Special Master on this recommendation, did not know what the recommendation would be until receiving the report, and remains open to arguments for why there should be a redistribution (particularly if lead counsel can propose a redistribution that accounts for the fact that some non-lead lawyers did a lot of work before reaching settlements while others did very little). Any objections are due within 14 days. In terms of what can be redacted from the objections, the parties should use this Report and Recommendation as a guide.

      **IT IS SO ORDERED.**

Dated: January 15, 2025

_____
VINCE CHHABRIA
United States District Judge

# APPENDIX A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to: *ALL ACTIONS* | **REPORT AND RECOMMENDATION OF THE SPECIAL MASTER REGARDING DISTRIBUTION OF COMMON BENEFIT FUNDS** |

I.      <u>**Introduction**</u>

In this MDL, the Court approved the creation of a common benefit fund.  All attorneys who obtain a financial recovery from an MDL case are required to pay 8% of the total recovery into the fund, with the amount paid coming out of the attorneys' fees portion of the recovery. The monies in the common benefit fund may be redistributed to law firms in this MDL that performed work that provided a common benefit to other law firms in the MDL.  The Court appointed the Special Master to provide a recommendation regarding the distribution of monies in the common benefit fund.

Pursuant to the Special Master's order, all firms in the MDL were invited to submit applications for a disbursement of common benefit funds.  Seven firms have applied for disbursement: Andrus Anderson, Wagstaff Law Firm, Lockridge Grindal Nauen, Moore Law Group, The Miller Firm, Weitz & Luxenberg, and Wisner Baum.  With the exception of Moore

1

Law Group—which was brought in as co-counsel for the *Hardeman* bellwether trial—each firm seeking distribution of common benefit funds was appointed to a leadership position in this MDL.  All seven firms will collectively be referred to as lead counsel.

This report sets forth the Special Master's findings and recommendations regarding how the money in the fund should be disbursed.  The Special Master recommends that the Court not reallocate money in the fund to lead counsel and instead order that the deposits be returned to each of the depositing firms.  The purpose of a redistribution of common benefit funds would be to compensate lead counsel for the work that they performed that provided a common benefit to non-lead firms.  But to take money from one firm and give it to another, there should be some assurance that the money is appropriate compensation for the common benefit work that was performed.  *See, e.g.*, *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-79 (1980).  In this MDL, there does not appear to be an equitable way of ensuring that the amount of money taken from non-lead firms is fair and proportionate to the work that lead counsel performed.  This is partly due to the inherent challenge of defining what constitutes common benefit work in the context of this MDL, partly due to the challenge of tracing the benefits that lead counsel's work provided to non-lead firms, and partly due to the significant recoveries that lead counsel have obtained from settling their own cases relative to the recoveries of non-lead firms.  A redistribution of common benefit funds may be appropriate in certain MDLs, but this does not appear to be one of them.

## II.   Background

For nearly a decade, plaintiffs have been filing lawsuits against Monsanto in state and federal courts across the country, alleging that Monsanto's Roundup weed killer causes non-Hodgkin lymphoma.

In 2016, the Judicial Panel on Multidistrict Litigation created this MDL to centralize pretrial proceedings for federal court cases.  Approximately 5,600 cases have been transferred to the MDL to date.  This is only a small fraction of the total number of claims made against Monsanto.  Widely reported estimates put the total number of claims—including those in the

MDL, state court, and unfiled cases—in the ballpark of 140,000 to 150,000. Some estimates put the number closer to 200,000. Only about 4% of these cases have ended up in the MDL.

In this MDL, the initial heavy lifting was performed by several law firms that the Court appointed as lead counsel in late 2016. At the time of their appointment as lead counsel, many of these firms had already invested heavily in bringing claims against Monsanto, including filing the first case against Monsanto in September 2015. These firms had cases in state and federal court, they had served discovery, established document repositories, begun developing experts, and briefed key legal issues. Some of these firms were also well along in amassing large inventories of clients. *See, e.g.*, Dkt. Nos. 10, 11 & 16. In other words, investments in the prosecution of claims against Monsanto had been made before the MDL was formed.

After their appointment, lead counsel took on significant responsibilities directing the course of the MDL. The strategic decisions that these firms made had the potential to affect the outcome of the cases for all MDL plaintiffs. Significant sums of money went into managing and pursuing the litigation, and lead counsel worked for years without any guarantee of compensation. Their responsibilities were many, including discovery, expert development, taking positions on key legal issues, litigating pretrial motions, preparing and trying bellwether trials, and engaging in settlement negotiations.

By many indicators, lead counsel succeeded in captaining the MDL. They achieved important victories on key legal issues that provided benefits to all MDL plaintiffs. One such issue was general causation—that is, establishing that there was admissible evidence capable of proving that Roundup can cause non-Hodgkin lymphoma at exposure levels plaintiffs might have experienced. Another was whether FIFRA preempted plaintiffs' claims. A third was whether there was admissible evidence to establish that Roundup was the specific cause of non-Hodgkin lymphoma in the bellwether plaintiffs.

As these issues were being litigated in the MDL, they were simultaneously being litigated in state court. Since the outset of the MDL, there has been an overlap in the firms representing plaintiffs in state and federal proceedings. Discovery in state court was used in

3

federal court, and federal court plaintiffs confronted the same issues (*e.g.* general causation and preemption) as state court plaintiffs. Law firms with state and federal court cases coordinated strategies, shared documents, and worked in tandem to pursue claims against Monsanto. These across-the-board efforts were successful and culminated in a series of cases set for bellwether trials.

The bellwether cases were tried from 2018 to 2019, two in California state court and one in this MDL. The bellwethers served as indicators for whether the claims against Monsanto could withstand the tests of trial. The results of the bellwether would provide plaintiffs an evaluation of their claims and allow Monsanto to better assess its potential liability. Early on in the litigation, Monsanto "made it clear that it had no interest in settlement, at least not without first trying multiple cases." Dkt. No. 17817 at 2.

The three bellwethers resulted in major defeats for Monsanto. The first case that went to trial was the *Johnson* case in California state court, where the jury awarded the plaintiff $289 million in compensatory and punitive damages. Eight months later, lead counsel tried and won the *Hardeman* case in the MDL, where the jury awarded the plaintiff $80 million in compensatory and punitive damages. The third bellwether trial, in the *Pilliod* case, also took place in California state court, with the jury again finding for the plaintiff and awarding over $2 billion in damages. Although each jury award was subsequently reduced, significant judgments were entered against Monsanto in each case.

The big wins for plaintiffs at trial had at least two impacts on the litigation against Monsanto. One was that the number of claims against Monsanto significantly increased. With the claims against Monsanto proven viable at trial, many law firms increased their advertising and more lawsuits were filed. The second impact was that the settlement pressure on Monsanto significantly increased, and Monsanto began to enter settlement negotiations to resolve the claims against it.

The settlement discussions have primarily occurred on a group basis. Hundreds of law firms have thousands of claims against Monsanto. To begin resolving cases, Monsanto started

4

with many of the firms that held the largest inventories of cases, including lead counsel firms. Many of the lead counsel firms were the first firms to begin settlement negotiations with Monsanto. The settlement negotiations did not distinguish between federal, state, and unfiled cases. Instead, the settlements attempted to resolve each law firm's inventory of cases.

The settlement process has been lengthy and time-consuming. In many instances, settlement negotiations have taken months if not longer. And finalization of a settlement with Monsanto does not result in immediate payment to plaintiffs. Once a settlement is finalized, Monsanto typically pays the total sum into a settlement fund. Firms then begin the process of allocating money among their clients, typically with the assistance of administrators or special masters. It can take years from the start of the settlement negotiation before a plaintiff receives payment for resolution of their claim.

In addition to the group settlements, the Court appointed Ken Feinberg as a Special Master to oversee an individual settlement program in this MDL. Pursuant to the Court's order, each plaintiff in the MDL is required to participate in the program. Through the program, plaintiffs receive an offer to settle their claim, though they have no obligation to accept it.

The settlement process has proceeded in fits and starts. The outcome of the three bellwether trials initially increased settlement pressure on Monsanto, but the tides turned in the years that followed. From 2021 to 2023, Monsanto won eight consecutive defense verdicts in state court trials in Oregon, California, and Missouri. The defense verdicts lessened Monsanto's appetite for settlement and settlement negotiations slowed down. More recently, however, the tides have turned again, with plaintiffs winning substantial verdicts in state court trials in 2023 and 2024. Cases continue to be brought against Monsanto in the MDL and in state court, and settlement negotiations continue.

The ongoing settlement negotiations brought changes to the MDL. As more cases entered settlement discussions, the Court established an inactive docket. The inactive docket comprises MDL cases that have begun settlement talks and pushed pause on litigation. The

majority of MDL cases have been transferred to the inactive docket, with the aim of being resolved through settlement negotiations.

While many MDL cases appear to be tracking toward settlement, hundreds remain in active litigation. The Court has established a "wave" procedure to move the remaining active cases through the pretrial process. The remaining active cases are grouped into waves based on their state of origin, and the waves of cases move through pre-trial procedures pursuant to set schedules. The law firms representing plaintiffs in wave proceedings remain in active litigation, taking discovery, developing experts, and litigating pretrial motions. Wave cases that do not settle and survive dispositive motions are remanded to district courts in the state of origin for trial.

## III.    Discussion

Awards of common benefit fees have become increasingly common in MDLs, and at the outset, it is worth considering the reasoning behind these awards. MDLs are regularly described as "quasi-class actions," and the justifications for awarding common benefit fees in MDLs often resemble those for awarding attorneys' fees in the class action context. *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2009 WL 240884, at *3 (E.D.La. Aug. 3, 2009); *In re Zyprexa Prods. Liab. Litig.*, No. 04-MD-1596, 2008 WL 2511791, at *1 (E.D.N.Y. June 19, 2008). The reasoning goes that lead counsel took up the laboring oar at the outset of the litigation and performed work that benefited other MDL firms, and they are thus entitled to a percentage of the recovery from other firms in the MDL as compensation for the work that they performed. This is similar to how lead counsel in a class action is entitled to a percentage of the recovery that their work helped to obtain for a class.

It is true that MDLs resemble class actions in one key respect: a common defendant has allegedly caused harm to many plaintiffs. But MDLs are not class actions because there is no commonality of issues. While plaintiffs in an MDL allege claims against a common defendant, each plaintiff's case differs factually. The differences include degree of exposure, severity of

injury, and knowledge of potential harm. Because the claims are brought individually, each plaintiff retains their own lawyer and enters their own fee agreement with that lawyer.

A common benefit fee thus differs from a class action award. In a class action, the potential for class counsel to receive a fee award is often the only reason that the litigation is possible. A class action aggregates hundreds or thousands of—often small value—claims into a single case. And class counsel is the sole representative of the plaintiffs in the class. If class counsel obtains a recovery on behalf of the class, they are entitled to a percentage of the recovery as compensation for the work that went into the recovery. If there was no possibility of recovering a fee, there may be no economic motivation for class counsel to bring the claims in the first place.

Mass tort MDLs generally do not fit the class action mold. Mass tort MDLs, like this one, are composed of thousands of individual plaintiffs with cases large enough to be brought on an individual basis. When a mass tort MDL is consolidated for pre-trial proceedings, lead counsel performs at least some of the work upfront. The work may achieve a range of different outcomes. Lead counsel may establish the viability of claims against a defendant or they might negotiate a global settlement that resolves all of the claims in the MDL. But non-lead counsel firms will usually have to perform their own work on their own cases, at least to a degree. And both lead counsel and non-lead counsel may benefit from work performed by lawyers outside of the MDL. At bottom, the nature of the work that lead counsel performs—and the context in which that work is performed—affects whether it is appropriate to redistribute compensation in the MDL. And in this MDL, several factors weigh against a reallocation of common benefit funds.

**Common Benefit Work:** In determining whether it is appropriate to redistribute common benefit funds, a threshold issue is defining what constitutes compensable common benefit work. To justify a forced fee transfer from a non-lead firm to a lead firm, there should be identifiable benefits that lead counsel can point to. One way to think of the benefits of lead counsel's work is as direct benefit work (*e.g.* work produced by lead counsel that other

7

plaintiffs can use in their cases) and indirect benefits (*e.g.* obtaining rulings on legal issues that benefited all plaintiffs). *See, e.g.*, *In re Hair Relaxer Mktg. Sales Pracs. & Prod. Liab. Litig.*, No. 23-CV-0818, 2024 WL 3904650, at *3 (N.D. Ill. Aug. 22, 2024). Under either framing, the common benefit work performed in this MDL does not warrant a reallocation of money.

        *Direct Benefits*: As the Court previously observed, lead counsel does not really argue that access to documents, briefs, or expert reports is what moved the ball forward for non-lead firms in the MDL. Lead counsel's argument is more that because of the work they performed, most other MDL firms were able to resolve their cases with fewer costs and risks. But even considering lead counsel's "direct benefit" work, there does not appear to be a basis for a fee transfer. One of the main reasons for this is that legal proceedings are public. It is a common practice for one firm to borrow from the work product of another firm without incurring any charge. A law firm that borrows from another firm's complaint or brief generally has no obligation to pay for it. As the Restatement (Third) of Restitution & Unjust Enrichment nicely puts it:

> It is a fact of common experience that a person may benefit from the effort and expenditure of others without incurring a legal obligation to pay. To be the subject of a claim in restitution, the benefit conferred must be something in which the claimant has a legally protected interest, and it must be acquired or retained in a manner that the law regards as unjustified. Otherwise, the fact that we derive advantage from the efforts and expenditures of others is not 'unjust enrichment' but one of the advantages of civilization.

RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 2, cmt. b. (AM. L. INST. 2011).

        Presumably for these reasons, the Court has previously explained that "[i]t would not be appropriate to take money from anyone's recovery based on access" to publicly available documents. Dkt. No. 13192 at 30. Lawyers often receive positive spillover benefits from other lawyers that the law allows them to enjoy free of charge. Documents available on a public court docket should not be the basis for the imposition of a tax simply because they were filed in an MDL. Mere access to lead counsel's work product—which was available to MDL and

non-MDL firms alike—thus does not provide much of a basis for reallocating common benefit funds in this MDL.

*Indirect Benefits*: The work performed by lead counsel certainly provided indirect benefits to plaintiffs in the MDL. Lead counsel came forward with admissible evidence sufficient to prove general and specific causation, and lead counsel defeated Monsanto's preemption arguments. Losing on any of these issues would likely have precluded all plaintiffs in the MDL from pursuing their claims against Monsanto. After overcoming these challenges, lead counsel tried the first bellwether case in the MDL, winning a major victory for the plaintiff and establishing the viability of the claims against Monsanto and the potential risk that Monsanto faced in allowing more claims to proceed to trial. This work obviously made it easier for other firms to bring claims against Monsanto.

But while lead counsel's work certainly conferred indirect benefits on all MDL plaintiffs, whether it is appropriate to charge other law firms for these benefits is another question. As with "direct benefit" work, lawyers regularly benefit from other lawyers' legal successes. Favorable rulings strengthen other firms' claims, and big trial wins increase the settlement value of other cases. But such indirect benefits do not necessarily warrant a shifting of fees. This is especially true in this MDL, given the overlap between the state court cases and the MDL. It was work in both state and federal courts that resulted in the large verdicts that increased the settlement pressure on Monsanto. The overlapping work makes it difficult to tie the benefits with any precision to the work performed in the MDL, further weighing against a redistribution of funds.

**The Blurred Line Between Active vs. Passive Participants:** Attempting to dole out shares of common benefit funds is further complicated by the fact that many law firms have contributed to the outcomes in the MDL. Lead counsel understandably casts their work in the best possible light while minimizing the work performed by other firms. But lead counsel did not do 100% of the work in this MDL, nor did non-lead counsel avoid all expenditures. The absence of clear lines between active and passive participants in this MDL makes the

reallocation of common benefit funds all the more difficult. *See, e.g.*, *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 770 (9th Cir. 1977) ("[A]s a general rule, if the third parties hire their own attorneys and appear in the litigation, the original claimant cannot shift to them his attorney's fees.")

All law firms in this MDL are in some ways active participants in the litigation against Monsanto. At the bare minimum, non-lead firms develop the history of each client's exposure to Roundup and the details of each client's injuries. Non-lead firms advertise potential claims against Monsanto, screen potential plaintiffs, perform intake evaluations, advise clients on settlement, and negotiate and finalize settlements with Monsanto. Indeed, while lead counsel's work likely did lead to an increase in the number of claims against Monsanto, the ensuing "flood" of lawsuits likely benefited lead counsel by increasing the settlement pressure on Monsanto. Non-lead firms helped to create this pressure by identifying potential plaintiffs and bringing claims on their behalf.

Moreover, many law firms remain in active litigation with Monsanto. Simply filing a lawsuit did not put them on the fast track to settlement. Monsanto continues to contest liability in the wave cases that are still being litigated. The law firms involved in active wave cases must develop experts sufficient to survive general and specific causation challenges, and they must oppose motions for summary judgment. This highlights a line drawing problem. All firms are subject to the same flat 8% holdback, yet the nature of the work that firms continue to perform varies significantly. The variance among firms makes it quite hard—if not impossible—to fairly assess the amount that each firm should be required to pay. It does not seem fair that a firm that develops experts, overcomes motions for summary judgment, and prepares its case for trial should have to pay the same 8% cut of its fees as a firm that settled its case with minimal work. The varying circumstances of the MDL cases create challenges in determining the appropriate amount that each firm should have to pay and in assigning a value to the work that lead counsel performed.

**Decentralized Litigation:** Another consideration is whether under the limits on this Court's jurisdiction it is possible to proportionally spread the costs of performing common benefit work among non-lead firms. *See Hall v. Cole*, 412 U.S. 1,5 (1973) (citing *Mills v. Electric Auto-Lite*, 396 U.S. 375, 393-94 (1970)).

The Court has previously held that it lacks the authority to tax the recoveries of many of the plaintiffs with claims against Monsanto. *See generally* Dkt. No. 13192. The Court's inability to impose a tax on law firms outside of the MDL cuts against a redistribution of fees within the MDL. Of the claims against Monsanto, approximately 4% are in the MDL, yet simply by virtue of being in the MDL, the law firms with these cases are subject to an 8% tax on their recoveries. But numerous firms across the country pursued claims against Monsanto in state court at the same time that lead counsel spearheaded the claims in the MDL. The work performed in the MDL proceedings overlapped with the work performed in state court. Key issues relating to general causation, specific causation, and preemption were—and continue to be—litigated in state court. Cases continue to go to trial in state courts, including trials in 2023 and 2024 with significant verdicts in Pennsylvania and Missouri. The results of these cases have impacted cases in the MDL, both those in litigation and those in settlement discussions.

Even lead counsel recognizes the challenge of allocating common benefit funds in light of the overlap between state and federal court work. Dkt. No. 17817 at 5-6 ("For example, if an applicant deposed an expert named by Monsanto in the MDL, would that be considered common benefit work if the deposition was noticed in a state court proceeding? What if another applicant attended that court deposition to prepare for cross-examination of that same general expert in an action pending in the MDL?") The reality that the litigation against Monsanto did not occur in an MDL vacuum makes taxing only firms with cases in the MDL rather arbitrary and unfair given that the benefits of state and federal court litigation flow both ways. Indeed, the state court cases continue to drive the litigation against Monsanto forward, with the vast majority of trials taking place in state court. There is no clear way to allocate the benefits provided by MDL work as compared to the benefits from state court work. Granting

11

lead counsel a percentage of recovery from all other cases within the MDL would fail to account for the collective work of attorneys across the country.

**The Settlement Process:** The settlement process highlights another challenge of reallocating benefits in light of the decentralized litigation. Monsanto has generally resolved cases through group settlements that include MDL cases, state court cases, and unfiled cases. These settlements are typically with groups of law firms to resolve those law firms' inventories of cases. Take the example of a law firm with a few cases in the MDL but hundreds of cases outside of it. *See, e.g.*, Dkt. No. 12527 at 2-3; Dkt. No. 12534 at 1; Dkt. No. 12539 at 2. It is difficult to determine the extent to which lead counsel's work in the MDL contributed to the aggregate settlement of these cases. Settlement pressure on Monsanto, after all, has come from many directions. Taking a percentage of a firm's attorneys' fees from its small number of MDL cases and redistributing it to lead counsel firms does not seem fair when much of the work that led to the resolution of those cases likely occurred outside of the MDL.

One example of this is the ongoing litigation in Missouri. Tens of thousands of cases have been filed by firms in Missouri, where Monsanto is headquartered. The firms litigating in Missouri have had to obtain discovery, work up experts, litigate dispositive motions, and take cases to trial. In other words, the firms have been doing essentially the same work that lead counsel performed in the MDL. Requiring these firms to pay a common benefit tax on the small number of cases that they have in the MDL seems plainly unfair. To the extent these cases have been resolved, the work performed in state court—not in the MDL—is likely the driving reason. This highlights another form of the line-drawing problem. A redistribution would amount to the same flat tax being imposed on a law firm for having a small number of cases in the MDL, even though the vast majority of the cases that the law firm resolved were not part of the MDL.

Lead counsel did assume considerable risk in bringing claims against Monsanto. But other law firms around the country took on similar risk litigating state court cases at the same time. Several firms have been bringing cases against Monsanto for as long as or nearly as long

as lead counsel.  *See, e.g.*, Dkt. No. 12530 at 14; Dkt. No. 12534 at 2-3.  Both MDL lead counsel and state court counsel achieved significant victories for their clients.  The victories played an important role in bringing Monsanto to the negotiating table.  It thus seems unfair that MDL lead counsel would now receive a percentage of the recovery of MDL firms while state court counsel does not.  It seems unfair that a firm with an MDL case would have to pay a percentage of their recovery into a common benefit fund while a firm litigating in state court would not.  The work performed in state courts provided cross benefits to the MDL and vice versa.

**Absence of Global Settlement:** The absence of a global settlement—or at least a global settlement of MDL claims—also weighs against a redistribution of common benefit funds.  One of the values of multidistrict proceedings is that they "afford a unique opportunity for the negotiation of a global settlement."  Manual for Complex Litigation (Fourth) § 20.132 (2004).   Global settlements often provide a procedure for firms to resolve their claims and provide more concrete and measurable benefits to MDL firms.  The work performed by lead counsel in such cases directly reduces the time, expense, and uncertainty that other MDL firms face in resolving their cases.

Although attempts at a global settlement were made in this MDL, the Court rejected the proposal and there is no indication that a global settlement is likely to come to fruition.  As a result, many firms in the MDL continue to negotiate their own settlements.  The settlement process has continued to proceed on a piecemeal basis, with Monsanto negotiating settlements with individual firms or groups of firms.  Cases in the MDL also continue to be litigated on an individual basis, with non-lead counsel shouldering significant responsibility, workload, and expense for their individual cases.  The ongoing work that non-lead counsel continues to perform to resolve their own cases undermines lead counsel's claim to a common benefit reallocation.

**Lead Counsel's Work Benefited Lead Counsel:** There is also no getting around the fact that lead counsel's work primarily benefited lead counsel.  Before being appointed to head

13

this MDL, many lead counsel firms were already waist-deep in litigation against Monsanto. This is especially true of the co-lead counsel firms—The Miller Firm, Weitz & Luxenberg, and Wagstaff Law Firm—that seek the largest redistributions from the common benefit fund.[1]  In many ways, the work that these firms continued to perform after being appointed lead counsel was an extension of work that was already underway.  One reason that lead counsel invested as much as they did in performing their work on the bellwether cases was that by the time of their appointment to leadership positions, several of the firms had accumulated large inventories of clients.  *See, e.g.*, Dkt. No. 12394 at 6.  Most of the work that lead counsel points to as warranting a redistribution of fees was necessary for the advancement of their own cases.  This is not to say that lead counsel should not necessarily be paid twice for the work that they performed—once from the recoveries of their own clients and once from the recoveries of non-lead firms—but their reason for performing the work is a factor that must be acknowledged.

Along this line, some objectors to the holdback requirements in this MDL have argued that lead counsel—having already resolved all or most of their cases—have become less involved in MDL proceedings.  The Court has raised this concern as well.  And the docket reveals numerous instances where non-lead firms in the MDL have struggled to effectively litigate against Monsanto, including firms that have failed to disclose experts or brief motions for summary judgment.  *See, e.g.*, Dkt. Nos. 18172, 18173, 18174, 18175 & 18156.  Firms have sought extensions because they have not been able to timely work up their cases.  Stepping up to assist other firms in the MDL seems like a paradigmatic example of common benefit work, yet the docket suggests that, at least in some cases, this type of assistance has not been provided.

To take it a step further, some firms have objected to a holdback on the ground that lead counsel have failed to provide them with requested assistance.  Non-lead firms have reported that emails and calls to lead counsel have gone unanswered.  Non-lead firms have claimed that lead counsel failed to make experts available or that lead counsel has monopolized experts for

---

[1] The Miller Firm, Weitz & Luxenberg and Wagstaff Law Firm request that 81% of the money in the common benefit fund be redistributed among their three firms.

their own benefit to the detriment of other firms.  *See, e.g.*, Dkt. No. 12527 at 4-5; Dkt. No. 12539 at 2.  Non-lead firms have claimed that lead counsel has prioritized the settlement of their own inventories of cases over those of non-lead firms.  Non-lead firms have reported that they received more help from trial packages prepared by firms litigating against Monsanto in state court than from lead counsel in this MDL.  Undoubtedly, there are two sides to these stories, but they reflect the overarching challenge of determining with any meaningful precision the extent to which the lead counsel's work in the MDL conferred benefits on non-lead firms.

    **Contracting:** One of the ways in which value could be more concretely assigned to common benefit work is through contract.  *See, e.g.*, *In re Bard IVC Filters Prod. Liab. Litig.*, 81 F.4th 897 (9th Cir. 2023).  Lead counsel could have required non-lead firms to sign an agreement that conditioned access to lead counsel's work product on non-lead counsel's agreement to pay for it.  Such an agreement would reflect an agreed-to value of lead counsel's work product that would obviate the need for the Court to engage in the next-to-impossible exercise of attempting to fairly assign a value to lead counsel's work product after the fact.  It is possible that many non-lead firms would decline to enter into such an agreement on the belief that they would substantially benefit from lead counsel's work regardless of such a contract.  But rather than underscore the so-called problem of freeriding, the likelihood that many firms might decide against agreeing to such a contract speaks more to the challenge of assigning any concrete value to the work that lead counsel performed as well as to the publicly available nature of that work.  If the primary benefit that non-lead counsel expects to receive from lead counsel's work product is through the form of favorable precedent or trial outcomes, this is a benefit already and regularly provided to firms by nature of our legal system.  It is rather unclear why this benefit should be subject to a tax simply because the work was performed in an MDL.

    Lead counsel could argue that other firms should pay a price for the benefits of work that would not otherwise be taxable because spearheading the MDL was not cheap.  Lead

counsel invested significant sums in the litigation against Monsanto, and many non-lead firms were likely able to largely avoid at least some of the costs that lead counsel incurred. But at least in this MDL, lead counsel appears to have abandoned their argument for a redistribution of common benefit funds based on cost recovery. The Court previously denied lead counsel's request to set a holdback for cost reimbursement because "lead counsel has made virtually no effort to show that this is necessary." Dkt. No. 13192 at 29. The request was denied without prejudice to allow lead counsel to file a renewed motion demonstrating a basis for setting a holdback for cost redistribution. *Id*. at 32. But no renewed motion was ever made. If costs were a significant factor behind the holdback percentage, lead counsel would have been expected to make this argument when it was previously invited to.

**Lead Counsel's Recoveries:** In determining whether a redistribution of common benefit funds is warranted, the Court previously explained that the purpose of a common benefit fund is to ensure that lead counsel is appropriately compensated for the work performed to lead the MDL. Dkt. No. 13192 at 25-26. If there was no prospect of potentially receiving additional compensation, then it's possible that good law firms would not step up to lead an MDL.

Whether or not common benefit funds are reallocated, the financial incentive to bring cases that may ultimately result in the formation of an MDL appears to be significant. An MDL is not created unless there are a significant number of lawsuits against a common defendant stemming from the same underlying conduct. Before the MDL is even formed, the firms that step up as lead counsel have often amassed sizeable inventories of cases that create a strong incentive to aggressively pursue the litigation. These inventories often grow over the course of the litigation. The fees that lead counsel stands to collect from their inventories of cases may provide sufficient incentive to bear the costs and risks of litigation. It's unclear whether the possibility of receiving additional compensation is even a necessary carrot. *See In re Hair Relaxer Mktg. Sales Pracs. & Prod. Liab. Litig.*, No. 23-CV-0818, 2024 WL 3904650, at *3 (N.D. Ill. Aug. 22, 2024) ("The PLC heavily relies on the policy consideration that the

16

common benefit doctrine is routinely justified as necessary to prevent 'free riding.' Indeed, the PLC portends the day when MDL courts will be unable to attract any counsel without assurances of adequate compensation and protection against free riders.  As this MDL evidences, that day has not come.") (citations omitted).

In this MDL, lead counsel's recoveries on their claims are significantly higher than those of most non-lead firms, and out of the approximately 5,600 cases filed in this MDL, almost 10% of those cases were filed by lead counsel firms.  Based on the data that has been obtained to date, lead counsel has settled their cases for significantly higher per-case amounts than non-lead counsel firms.  Serving in leadership positions has clearly provided lead counsel benefits not enjoyed by other law firms in the MDL.  For six of the seven lead counsel firms applying for a redistribution of common benefit fees, the average settlement per case is set forth below[2]:

- Lockridge Grindal: ███████ per case
- Moore Law Group: ██████ per case
- The Miller Firm: █████ per case
- Wagstaff Law Firm: ██████ per case
- Weitz & Luxenberg: ███████ per case
- Wisner Baum: ██████ per case

The per-case recoveries of non-lead firms are significantly less than those of lead counsel.  The other firms that have submitted holdback deposit declarations to date have resolved their cases for an average settlement of ██████ per case.  This figure is somewhat inflated by four large settlement that occurred in cases that neared the edge of trial.  When these settlements are removed, the average per-case settlement is █████ per case.

There are probably several reasons why lead counsel obtained significantly higher per-case settlements, but many of them likely trace back to lead counsel's role in heading the

---

[2] This report contains cites to confidential settlement numbers that have been provided directly to the Special Master by counsel in this MDL.  Redactions have been applied throughout the report to maintain the confidentiality of these numbers.  An unredacted version of this report has been provided directly to the Court.

litigation against Monsanto.  Lead counsel tried the first bellwether trial in the MDL; lead counsel firms were also involved in the *Johnson* and *Pilloid* bellwethers in California state court.  In the same way that the intangible benefits of lead counsel's work are difficult to measure, the benefits that lead counsel received from spearheading the MDL are also not easy to measure.  While the large verdicts for plaintiffs in these cases had some benefit to every firm with cases against Monsanto, these verdicts likely had the biggest benefit to lead counsel.  Through the bellwether trials, these firms demonstrated their ability to obtain large recovery through trial.  Perhaps lead counsel—as the face of the MDL—was also able to attract and retain larger numbers of clients with higher quality claims.  After all, these were the law firms winning multi-million-dollar verdicts for their clients.

As part of their applications for an allocation of common benefit fees, lead counsel firms disclosed the total amount of attorneys' fees received for MDL cases.[3]  These figures are:

- Andrus Anderson: ███████████
- Wagstaff Law Firm: █████████████
- Lockridge Grindal Nauen: ██████████
- Moore Law Group: ████████████
- The Miller Firm: ███████████
- Weitz & Luxenberg: █████████████
- Wisner Baum: ███████████

This report has generally referred to lead counsel without differentiating between the different roles that each lead counsel firm held in the MDL.  This is largely because six of the seven firms seeking a disbursement of common benefit funds—Wagstaff Law Firm, Lockridge Grindal Nauen, Moore Law Group, The Miller Firm, Weitz & Luxenberg, and Wisner Baum—request fees primarily based on their work in the litigation.  In contrast to the other applicants, Andrus Anderson was appointed as liaison counsel and held more of a hybrid role.  Andrus Anderson was involved in the litigation of a small number of cases—though that includes the

---

[3] In some instances, lead counsel firms resolved additional cases after their applications were submitted.  The recoveries from their additional cases are included in the above totals.

*Hardeman* case, for which Andrus Anderson received a sizeable amount of the fees—but was also responsible for communicating and coordinating with other MDL firms and performing administrative tasks in the MDL.  The Special Master did consider whether Andrus Anderson's unique role in the litigation warrants a disbursement but ultimately recommends against it because based on its time submissions, Andrus Anderson's role as liaison counsel appears to have been relatively minor compared to its role as litigation counsel, and because Andrus Anderson has received significant compensation from the MDL relative to non-lead firms.

Indeed, each lead counsel firm obtained attorneys' fees that are considerably higher than those obtained by many other firms in this MDL.  Although the range of attorneys' fees recovered by non-lead firms varies significantly, many non-lead firms recovered less than ███████ in attorneys' fees.  Many more recovered less than ██████.  In fact, in dozens of cases, firms waived their attorneys' fees altogether because the amounts recovered for their clients were so modest.[4]  While a small number of firms have received fees comparable to those of lead counsel in this MDL, these firms' per-case settlements were still significantly lower than those of lead counsel, and some of these firms had cases that reached the eve of trial.  In any event, the bottom line is that lead counsel recovered much more from this MDL than many of the firms that they are seeking to take additional fees from.

The attorneys' fees that lead counsel recovered in this MDL are also likely far from the full compensation that lead counsel received for their work in the Roundup litigation.  In connection with their applications for disbursements of common benefit funds, lead counsel were not asked to provide their recoveries from non-MDL cases.  These figures did not seem relevant at the time that the application procedures were set because the common benefit fund holdbacks are limited to MDL cases.  But in hindsight, it does not seem like a blind eye should be turned to recoveries outside of the MDL.  Settlements included both MDL and non-MDL cases, and most of the cases that lead counsel resolved were likely non-MDL cases.  While

---

[4] Firms that waived attorneys' fees for a case were not required to make a holdback deposit for that case because the holdback deposit is to be paid solely out of the attorneys' fees portion of the recovery.  But the fact that many firms waived attorneys' fees due to the size of their recoveries further underscores that many firms in this MDL were not able to simply "cash in" based on lead counsel's work.

several lead counsel had a large number of cases in the MDL—including Moore Law Group (208 cases), The Miller Firm (225 cases), Wagstaff Law Firm (264 cases) and Weitz & Luxenberg (216 cases)—these firms are almost certain to have had far more cases outside of the MDL.  It's been reported that Weitz & Luxenberg, The Miller Firm, Wagstaff Law Firm, Wisner Baum, and Moore Law Group have been involved in the settlement of some 32,000 cases.  Dkt. No. 12527-1.  The Miller Firm alone is reported to have settled approximately 5,000 cases for a total of $850 million (or an average of $160,000 per case).  Given the overlap in the state and federal court litigation—including the three large bellwether verdicts that brought Monsanto to the negotiating table—lead counsel's recoveries are likely far greater when non-MDL cases are considered.  Because the state and federal court litigation largely proceeded in lockstep, the amount that lead counsel recovered overall may be relevant to determining holdback disbursements.  In the event the Court determines more work is necessary to decide whether common benefit funds should be redistributed, the Special Master advises broadening the inquiry to include lead counsel's recoveries from non-MDL cases.

**Composition of the CBF:** The composition of the common benefit fund reflects lead counsel's significantly above-average recoveries and also weighs against a redistribution for an additional reason.  The common benefit fund currently holds $24,406,907.74 in deposits.  Of this, ▮▮▮▮▮▮▮ comes from deposits made by lead counsel firms.  As part of the process of determining whether common benefit fees should be redistributed, the Special Master asked plaintiffs' leadership in this MDL to appoint a Fee Committee to make recommendations regarding the distribution of common benefit funds.  The Fee Committee—comprised of The Miller Firm, Wagstaff Law Firm, and Weitz & Luxenberg—has made a recommendation regarding disbursements.  But the Fee Committee's recommendation would require taking money from one lead counsel firm and giving it to another.  Determining whether money should be taken from non-lead firms and redistributed to lead counsel is hard enough.  Attempting to allocate common benefit funds among lead counsel would be an exercising in

fee splitting that cannot be performed with any reliable precision.  Yet the Fee Committee has asked for that exercise to be performed in their proposed allocation of common benefit funds.

This illustrates yet another challenge of fairly redistributing common benefit fees—determining the relative value of each of lead counsel's contributions to the MDL.  For example, Moore Law Group has made ██████████ in holdback deposits to the fund, yet the Fee Committee proposes allocating 6% of the common benefit fund (or ██████████ based on current deposits) to Moore Law Group.  In other words, a significant amount of the money deposited by Moore Law Group into the common benefit fund would be redistributed among other firms, namely The Miller Firm, Wagstaff Law Firm, and Weitz & Luxenberg.  While true that Moore Law Group did not do much pretrial work and joined the MDL primarily as co-counsel for the *Hardeman* trial, the trial itself required significant work and the outcome at trial that Moore Law Group played an essential part in achieving had a significant impact on the MDL.  Two other lead counsel firms—Andrus Anderson and Wisner Baum (in addition to Moore Law Group)—have also objected to the Fee Committee's proposed allocation of funds, claiming that they are being short-changed as well.

The simplest and most equitable solution to this fee infighting would likely be to return each lead counsel firm's holdback deposit to that firm, and then figure out how to redistribute the remaining money.  But for the reasons explained throughout this report, there does not appear to be a fair way to determine how that remaining money should be redistributed.  In any event, if the holdback deposits of each lead counsel firm were returned, then ██████████ would remain in the current fund for distribution.  This is certainly a considerable sum of money in most contexts, but in the context of this MDL—where Monsanto is reported to have set aside and paid out hundreds of millions of dollars to resolve Roundup claims—this appears to not only be a drop in the bucket but also reflective of the fact that most of the Roundup settlements occurred outside of this MDL.  At the end of the day, lead counsel—by virtue of their large recoveries—have paid most of the money into the common benefit fund, and winding down the fund will result in most of that money being returned to their pockets.

**Equity Concerns:** The composition of the common benefit fund also raises equity concerns that appear to weigh against a redistribution of common benefit funds.  Over 50 of the firms that have submitted holdback deposit declarations have resolved five or less cases in the MDL.  The average per-case settlement for these firms is approximately ███████ per case.  It's possible that some of these firms resolved many other cases, the bulk of which were non-MDL cases.  But if that's the case, the imposition of an 8% tax on their MDL cases appears arbitrary.  If most of the cases that were resolved were non-MDL cases, there's no easy way to measure the benefits that those cases received from any MDL work product.  The common benefit fee transfer would function more as a tax on MDL participation, rather than as a mechanism for fair cost-sharing.  Alternatively, it is possible that these are small firms with only a few cases against Monsanto overall.  If that's the case, then an 8% tax appears to be quite high given the firms' modest recoveries.

Moreover, the primary rationale for the holdback is incentives: additional compensation may be needed to encourage good lawyers to step up to lead an MDL.  But this consideration can also cut the other way.  Small firms may turn down cases because the potential of an MDL tax may threaten to eat up most of the firm's recovery.  Imposing a flat MDL tax may discourage firms from bringing cases at all.  This could be problematic not only for the potential clients, but also because non-lead firms may help to publicize the harms and inform the public of potential claims.  When common benefit fees are too high or indiscriminately applied, it can affect the ability of plaintiffs to find lawyers to take their cases.

**Further Time and Resources for Fee Allocation:** If common benefit fees are to be redistributed, significant more work would likely be required to ensure that all deposits are made into the common benefit fund.  The process for ensuring compliance with common benefit deposits has been significantly complicated by the fact that Monsanto has not been withholding the 8% holdbacks, at least in many cases.  In Pretrial Order No. 236, the Court specifically ordered that "Monsanto must hold back 8% of the gross amount of any recovery it pays an MDL plaintiff and place that money into the common benefit fund."  Dkt. No. 13192 at

32. But that is generally not what has happened.  The Special Master's understanding is that in large part, Monsanto has not complied with this order because of the nature of the settlement process.  Monsanto has generally resolved large inventories of cases that include MDL, state, and unfiled cases, paid the lump settlement proceeds into a settlement fund, and then the law firms to the settlement subsequently allocate the proceeds among their clients.  As a result, the only parties with direct visibility into how much money many of the MDL plaintiffs have received—and thus how much is required to be withheld as a holdback deposit into the common benefit fund—are the law firms to the settlement.

The result is that it remains unclear whether in all MDL cases where a plaintiff has received a distribution of settlement funds to date, a holdback deposit has been made for that case.  The Special Master has entered multiple orders requiring parties to make holdback deposits and to report the amount of the holdback deposit being made for each case, but it does not appear that all firms have complied with these orders.  There appear to be at least some firms that have resolved cases with Monsanto but have yet to make holdback deposits.  In other instances, there are firms that have made holdback deposits but have not yet filed the required deposit declarations reporting the number of cases they resolved and the holdbacks for each case.  This does not affect the amount of money in the fund (assuming that full holdback deposits have been made), but information needed to determine per case settlements and recoveries has not been provided.  There are also many cases still working their way through the time-consuming settlement process.  Monsanto may also have made a payment into a settlement fund, but the funds have yet to be distributed to individual plaintiffs.  Holdback deposits continue to be paid into the common benefit fund monthly as cases continue to resolve.

All this is to say that if the Court determines that a reallocation of common benefit funds might be warranted, additional work would likely be required to ensure that all payments have been made into the fund.  In that case, Monsanto should likely be further enlisted to perform an additional audit to ensure that all MDL firms have fully complied with the common

benefit fund holdback requirements. For the reasons explained throughout this report, however, additional work to audit compliance with holdback deposits appears unnecessary because a redistribution of common benefit funds seems unwarranted given the circumstances of this MDL. The most equitable approach—and likely the simplest—would be to return the money to the firms that have made deposits and wind down the fund.

## IV.    Conclusion

Lead counsel undoubtedly performed significant work in this MDL, but many factors weigh against the redistribution of common benefit funds. The Special Master recommends that the Court order that each deposit be returned to the depositing firm and that the common benefit fund be wound down. This solution serves the interests of equity while avoiding the invariably imperfect process of attempting to redistribute fees in this MDL.

Dated:  January 15, 2025

                                        William A. Foster
                                        Special Master