# EXHIBIT F

JOEL J. Gagnier, Ph.D. N.D., M.Sc., B.A.

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY

STATE OF MISSOURI

PAUL FERRO, et al.,

        Plaintiffs,

                        Case No.

    -vs-                20SL-CC03678


MONSANTO COMPANY,

        Defendant.

_____/


PAGE 1 TO 352


    The Videoconference Deposition of:

    JOEL J. GAGNIER, Ph.D., N.D., M.Sc., B.A.,

    Taken at 1501 Worldgateway Place,

    Champlain Room,

    Romulus, Michigan,

    Commencing at 9:00 a.m.,

    Wednesday, June 1, 2022,

    Before Jennifer L. Ward, CSR-3717.

Joel J. Gagnier, Ph.D. N.D., M.Sc., B.A.

APPEARANCES:

JEFFREY L. HABERMAN, ESQ.

Schlesinger Law Offices, P.A.

1212 Southeast Third Avenue

Fort Lauderdale, Florida 33316

(954) 467-8800

jhaberman@schlesingerlaw.com

        Appearing on behalf of Plaintiffs.


PAUL J. TAHAN, ESQ. and

ANTHONY G. SIMON, ESQ.

The Simon Law Firm, P.C.

800 Market Street

Suite 1700

St. Louis, Missouri 63101

(816) 447-3499

        Appearing on behalf of Plaintiffs,

        via Videoconference.




(Appearances continued on Page 3.)

APPEARANCES:  (Continued)

EMMA C. ROSS, ESQ. and

BRIAN T. KARALUNAS, ESQ.

Goldman Ismail Tomaselli Brennan & Baum LLP

200 South Wacker Drive, 22nd Floor

Chicago, Illinois 60606

(312) 681-6000

eross@goldmanismail.com

bkaralunas@goldmanismail.com

     Appearing on behalf of Defendant.

ALSO PRESENT:

    Marc Myers, Videographer

A. No, not actually causes. Is more likely to be causal.

Q. I see. I'll reask the question with that clarification.

A. Okay.

Q. The Bradford Hill criteria are one way of assessing whether an exposure that is associated with an outcome is more likely to be causal of that outcome, true?

A. That's correct.

Q. You were not asked to perform a Bradford Hill analysis, right?

A. No, I was not.

Q. You did not perform a Bradford Hill analysis, correct?

A. No, I did not.

Q. There are different pillars of scientific evidence. Have you heard that?

A. Pillars. Can you define pillars in this context?

Q. Sure. And just to -- new question.

A. Okay.

Q. Pillars of evidence is not an accepted framework for assessing questions of causation that you are familiar with, fair?

A. I'm not sure what you mean by pillars, so I'm not gonna be able to answer that.

Q. Animal studies are a type of scientific evidence, right?

Q. The total number of years sprayed doesn't tell us whether someone sprayed Roundup one time per year or 50 times per year, right?

A. I agree.

Q. Some studies measured high exposure by cumulative number of days in a lifetime, right?

A. Yes.

Q. Cumulative lifetime-days tells us how many times over the course of someone's life they were exposed to Roundup, right?

A. Yes.

Q. Cumulative lifetime --

A. Oh, oh, excuse me. Actually, no, not over their lifetime. Only over the period of time that they were using glyphosate-based herbicide.

Q. I'll clarify that in my question.

A. Okay.

Q. Cumulative lifetime-days tells us how many times someone was exposed to Roundup over the period of time that they were using Roundup, correct?

A. Yes.

Q. Cumulative lifetime-days of exposure combines frequency and duration of use, right?

A. Yes.

Q. You did not specify ahead of time whether you would

use number of days per year, number of years, or lifetime-days in your meta-analysis, correct?

A. That's correct.

Q. What was your a priori definition of glyphosate-based herbicides?

A. Whatever was reported in those studies.  I had no a priori hypothesis about what I would consider to be highest exposure, except that whatever was reported as the highest exposure in those studies.

Q. I'll break that down, okay?

A. Sounds good.

Q. You did not have an a priori hypothesis about what you would consider to be highest exposure in studies of Roundup and non-Hodgkin's lymphoma, except whatever those studies used as their own definition of high exposure, true?

A. Yes.

Q. What is the most reliable measure of high exposure to glyphosate-based herbicides?

A. What is the most reliable measure?

Q. Yes.  Is it days per year, number of years, or lifetime-days?

         MR. HABERMAN:  Objection, foundation.

         THE WITNESS:  Hmm.  Could you ask me that again, please?

Joel J. Gagnier, Ph.D. N.D., M.Sc., B.A.

eventually going to publication requiring the registration of a protocol, and there is a database to do that now.  Not all -- it's not a requirement for systematic reviews, but it's recommended.

Q.  Long answer.  I'm gonna break it down a little bit, okay?

A.  Sounds good.

Q.  You mentioned The Cochrane Collaboration, correct?

A.  Yes.

Q.  You are a member of The Cochrane Collaboration, right?

A.  Umm-hmm.

Q.  Cochrane has long required written protocols for systematic reviews, right?

A.  Since their inception, I believe.

Q.  Others have more recently recommended written protocols for systematic reviews, true?

A.  Yes, independent scientific groups have -- have recommended it.

Q.  Why is it important to have a written protocol that lays out what analyses you will do before you actually do them?

A.  So you don't manipulate your analyses in the process by view of the data.

Q.  Why is it important to submit your protocol for review by whomever the relevant review group might be?

Joel J. Gagnier, Ph.D. N.D., M.Sc., B.A.

A.   It's not so much submitting it for review as it's --
as it's submitting it to show what you plan to do.

Q.   I see.  Why is it important to submit your planned
protocol ahead of time to show what you plan to do?

A.   So -- again, so that you don't change your methods by
virtue of the data that you're reviewing.

Q.   If you'll go with me to the slide titled Define
Inclusion slash Exclusion Criteria.

A.   Yes.  Oh, yeah.  Just before Protocol Development?
Oh, wait, is there another one?  Yes.

Q.   Did you find it?

A.   I did.

Q.   Okay.  Here you teach your students that you should
decide a priori what your inclusion and exclusion
criteria --

A.   Yes.

Q.   -- would be, correct?

A.   Yes.

Q.   A priori means ahead of time; is that fair?

A.   Yeah, prior to doing your search of the literature.

Q.   Prior to doing your search of the literature.  So
a priori in the context -- well, new question.

A.   Okay.

Q.   In the context of systematic reviews and
meta-analyses, defining a priori what you're going to

ACL injury would be a prior ACL injury --

A. Yeah.

Q. -- or a prior soft tissue injury of some other kind, correct?

A. Yeah.

Q. And it's important to adjust for a prior ACL injury or a prior soft tissue injury of some other kind for what reason?

A. For what reason?

Q. Yeah.

A. Well, I mean, we were just talking about it. So that you're -- you're not confusing the prior injury as a risk factor for the -- for the injury.

Q. The reason that you adjust for important confounders is so that you don't confuse a relationship between the outcome you're actually interested in and the exposure you're actually interested in with a relationship between some other exposure or some other confounder in that outcome, fair?

A. Yeah, absolutely.

Q. Table 2 in this 2013 publication lays out the results of your Risk of Bias Assessment for the non-randomized studies?

A. Table 2, yeah.

Q. One of the criteria you evaluated, as we just

Joel C. Gagnier, Ph.D. N.D., M.Sc., B.A.

Q. discussed, was did the authors perform analyses adjusting for known confounders, right?

A. For the non-randomized study, yes.

Q. Assessing studies for whether they adjust for known confounders is the right thing to do, correct?

A. Yes.

Q. When you are publishing a systematic review, you assess studies and whether they adjusted for known confounders, right?

A. Yes.

Q. The text below Table 2 in your publication lays out some methodologic shortcomings you identify in some of the studies you review.  Do you see the study sentence that begins, "Methodological shortcomings"?

A. Yes.

Q. One of the shortcomings you identify is "Lack of control for potential confounders."  Do you see that?

A. Yes.

Q. If a study does not control for potential confounders, that is a methodologic shortcoming, true?

A. Yes.

Q. Let's go back to your report in this case.

A. Okay.

Q. I believe it is Exhibit 2.

A. Exhibit 2 is the original one.  Exhibit -- oh, yeah --

Joel C. Gagnier, Ph.D. N.D., M.Sc., B.A.

paragraph that starts, "The next published systematic review is by Chang and Delzell (2016)."

A. Yes.

Q. You reviewed the strengths and weaknesses of the systematic review published by Chang et al. in 2016, correct?

A. Yes.

Q. Chang (2016) was a peer-reviewed published systematic review and meta-analysis, right?

A. Yes.

Q. If you'll go with me to page nine of your report.

A. Yes.

Q. You identify the various strengths and drawbacks of this study, correct?

A. Yes.

Q. The strengths of Chang "2016" include that "They used the most fully adjusted estimates where available from each study," right?

A. Yes.

Q. When conducting a meta-analysis of Roundup and NHL, why is it important to use the most fully adjusted estimates from each study where available?

A. Why is it important to do so?

Q. Yes.

A. Well, if you have adjusted estimates, for some of the

Joel C. Gagnier, Ph.D. N.D., M.Sc., B.A.

reasons we were just talking about associated with confounding or with effect modifiers, you want to be certain that there's not some other variable that -- explaining or could modify that relationship that you're seeking to explore, so where available, yeah.

Q.   When conducting a meta-analysis of Roundup and NHL, it's important, if you have them, to use adjusted estimates?

A.   Yes.

Q.   Doing so allows you to be certain there's not some other variable explaining or that could modify the relationship that you're seeking to explore, correct?

A.   Yeah.

Q.   Another systematic review you discuss in your report is Donato (2020)?

A.   Yes.

Q.   If you'll go with me to page 11.

A.   Sure.

Q.   Donato (2020) was a peer-reviewed published systematic review and meta-analysis, correct?

A.   It was.

Q.   If you'll --

A.   Excuse me.

Q.   -- go to page 12 in your report.

A.   Yes.

did to see which ones were up to date and which were not. An example is, is this study that we're talking about right now. I would have expected that additional studies to have been included in it, and it was not. Same with the Boffetta study.

So, you know, a 2021 meta-analysis should have included all the most recent data, which it does not. That was my intent, to find out if they were up to date, and they were not.

Q. And you did include a fair amount of detail in your expert report on your identification of the strengths and weaknesses of these various studies, correct?

A. Some.

Q. "The most glaring drawback in this study were the decisions for which estimate to include from individual studies not being justified a priori with related hypotheses." Do you see that?

A. Yeah.

Q. It's a good thing to justify which estimates to include from different studies in a meta-analyses ahead of time, right?

A. It's -- it would be ideal, yes.

Q. Failing to justify which estimate to include from individual studies a priori is a major drawback of the meta-analysis. You wrote that, true?

A.   It's a drawback of this meta-analysis.  It is not generally a major drawback of all meta-analysis, though.

Q.   When conducting a meta-analyses, why is it important to justify decisions for which estimate to include from individual studies a priori?

A.   So that estimates aren't cherry-picked.

Q.   Meta-analyses are completely dependent on the data that go into them, right?

A.   Yes.

Q.   If the round numbers are included from studies in a meta-analysis, the meta-analysis likewise suffers, true?

A.   If it's only a -- yes, if it's only a single-effect estimate.

Q.   That --

A.   This is why we do multiple-effect estimates in meta-analysis.

Q.   That's the junk in equals junk out concept that you teach to your students, right?

A.   No.

Q.   What is different about that?

A.   If you recall, I said junk in and junk out is mostly associated with the methodological quality of the study, not of the choice of the effect estimate.

Q. That Eriksson (2008) controlled for other pesticides is one reason it had a lower risk of bias, true?

A. Well, it fulfilled that criteria, yes.

Q. We talked about this a little bit before in general with regard to confounders. Do you recall that?

A. Yep.

Q. Controlling for other pesticides tries to tease out the risk for one product as opposed to whether multiple products combined could be influencing the result, true?

A. Yeah.

Q. Controlling for other pesticides when you can is a good thing to do, right?

A. Yes, if you have reason to suspect that it is a confounder.

Q. Controlling helps you tease out if the observed effect is due to glyphosate or to something else, correct?

A. Yes.

Q. Other pesticides are one example of the confounders we talked about before that can muddy a relationship between the exposure you're interested in and an outcome like cancer, true?

A. Yeah. It -- they could act as -- as effect modifier as -- as well, meaning have cumulative effects together with other products.

Joel V. Gagnier, Ph.D. N.D., M.Sc., B.A.

Q. The unadjusted odds ratio for glyphosate in Hardell -- I'm sorry.  Withdrawn.  The unadjusted odds ratio for glyphosate in Eriksson (2008) was 2.02 with a 95 percent confidence interval of 1.1 to 3.71, correct?

A. Yes.

Q. The adjusted odds ratio in Eriksson (2008) was 1.51, with a 95 percent confidence interval of .77 to 2.94, correct?

A. Umm-hmm.

Q. The 95 percent confidence interval includes 1, right?

A. Yes.

Q. Eriksson (2008) did not report a statistically significant increased risk of NHL with glyphosate use in their multivariate model, correct?

A. Yes.

Q. You used the odds ratio from Eriksson (2008) that was not adjusted in your meta-analysis, true?

A. Yes.

Q. For every single meta-analysis you performed, you used odds ratios from Eriksson (2008) that were not adjusted for other pesticides, right?

A. Yeah.

Q. You did not perform any of your sensitivity analyses using the adjusted odds ratio from Eriksson, true?

A.   That's true.

Q.   The adjusted odds ratio in Eriksson is lower than the unadjusted odds ratio, right?

A.   Slightly, yes.

Q.   Had you used the adjusted odds ratio from Eriksson (2008), your meta OR would be lower, correct?

A.   Yeah, it would have changed it slightly, but the Eriksson study is still weighted really low.

Q.   You cannot say how different your numbers would be because you didn't run any meta-analyses using that information?

A.   No, but I can probably show you in about two minutes.

Q.   Sitting here today, in preparing your opinions for this case, you did not do that, correct?

A.   No.

Q.   I'm correct, yes?

A.   You are correct, yes.

Q.   Table 2, while we're looking at Eriksson, is on page 1659.  Will you go there with me?

A.   Sure.

Q.   Table 2 of Eriksson (2008) gives odds ratios for greater than 10 days --

A.   Oh, yes.

Q.   -- of glyphosate use and less than or equal to 10 days of glyphosate use.  Do you see that?

A.   Yes.

Q.   For every single meta-analysis you performed, you used odds ratios from a Pahwa (2019) that were not adjusted for other pesticides, true?

A.   Yes.

Q.   You used less adjusted data when you had the option to use adjusted data --

MR. HABERMAN:  Objection.

BY MS. ROSS:

Q.   -- correct?

A.   Those are the numbers that were used -- excuse me -- in the highest exposure category analysis, that is correct.  Umm -- no, I guess that's it.

Q.   Why did your analysis prefer unadjusted data over more adjusted data?

A.   You mean less adjusted data?

Q.   I'm sorry.

A.   Yeah.

Q.   I'll reask the question.  New question.  Why did your analysis prefer less adjusted data over more adjusted data?

MR. HABERMAN:  Objection.

THE WITNESS:  Well, firstly, there -- those odds ratios aren't different from each other within the analyses.  And to be honest, I can't recall the

Joel C. Gagnier, Ph.D. N.D., M.Sc., B.A.

reason why I chose one over the other, but -- maybe I can recall, but I can't think of anything right now why.

BY MS. ROSS:

Q. Sitting here today, you can't recall a reason why you chose the less adjusted odds ratios in Pahwa over the more adjusted odds ratios, fair?

A. No, only with -- only with the exception that, like I said, the confidence intervals were -- were fully overlapped. It's a large number of variables in their adjusted model, larger than most of the -- well, any of the other studies, in fact, and there can be problems with multiple adjustments in a paper. But it has a relatively big sample size, so it's probably not a big issue.

Q. Is there a problem in Pahwa (2019) with multiple adjustments and multiple comparisons?

A. I don't think so. I think the study was -- was large enough. When you start getting to -- excuse me. When you start looking at the number of events, you know, while there are -- let's see here. You know, while there's a large sample, 50 -- excuse me -- 6700 and change, 6800 and change patients, there's only 113 in the ever used glyphosate group. So it's not a big number.

A.   Yes.

Q.   Had you used the odds ratios for cumulative exposure adjusted for other pesticides, your odds ratio would have gone down further, true?

A.   Could have.

Q.   Had you used the odds ratio for cumulative exposure adjusted for other pesticides, your odds ratio would not have been statistically significant, right?

A.   Quite possibly.

Q.   Had you used any odds ratio from Pahwa (2019) adjusted for other pesticides, can you say that any of the analyses you conducted would have been statistically significant?

A.   I would have to do them to confirm one way or another what they would be, so I can't say.

Q.   Sitting here today, you haven't done that analysis, correct?

A.   You've seen all of the analyses that I've done.  So I haven't done that analysis that you're asking, yes, that's correct.

Q.   If you'll turn back with me to Figure 1 in your report, please.  And I'm sorry, Figure 1 is not the figure we should be looking at, because that's the fixed effects meta-analysis, right?

A.   Okay.  Yes.

Joel U. Gagnier, Ph.D. N.D., M.Sc., B.A.

you used of 1.43, correct?

A.   Yeah, that's correct.

Q.   Your ever/never meta-analysis uses numbers from Pahwa (2019) that nobody who has published meta-analyses of Roundup and NHL used, true?

A.   None of these that we're looking at.

Q.   Are you aware of any other published meta-analyses that you did not include in your report in your review?

A.   I'm not aware of any additional ones.

        MS. ROSS:  Why don't we take a short break. Go off the record.

        THE VIDEOGRAPHER:  Going off the record at 4:01 p.m.

        (There was a recess taken.)

        GAGNIER EXHIBITS 26 AND 27

        EndNote File of Citations

        and

        Curriculum Vitae of Dr. Joel Gagnier

        WERE MARKED BY THE REPORTER

        FOR IDENTIFICATION

        THE VIDEOGRAPHER:  We're back on the record at 4:12 p.m.

BY MS. ROSS:

Q.   Dr. Gagnier, I've identified Exhibits 26 and 27 --

Joel C. Gaguier, Ph.D., N.D., M.Sc., B.A.

                    CERTIFICATE OF NOTARY

STATE OF MICHIGAN    )

                     ) SS

COUNTY OF OAKLAND    )

        I, Jennifer L. Ward, Certified Shorthand Reporter,

a Notary Public in and for the above county and state,

do hereby certify that the above deposition was taken

before me at the time and place hereinbefore set forth;

that the witness was by me first duly sworn to testify

to the truth, and nothing but the truth, that the

foregoing questions asked and answers made by the

witness were duly recorded by me stenographically and

reduced to computer transcription; that this is a true,

full and correct transcript of my stenographic notes so

taken; and that I am not related to, nor of counsel to

either party nor interested in the event of this cause.


                    _____

                    Jennifer L. Ward, CSR-3717

                    Notary Public,

                    Oakland County, Michigan


My Commission expires:  10-27-2023