Michael J. Stanley (Tex. Bar No. 19046600)
230 Westcott St., Suite 120
Houston, Texas 77007
713-980-4381
mstanley@stanleylaw.com
*Attorney for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In Re:  Roundup Products Liability Litigation | MDL No. 2741 |
| | Case No. 3:16-md-02741-VC |
| This Document Relates To: | |
| | **PLAINTIFFS' RESPONSE IN** |
| **JOHNETTA SCHEH, ET AL.** | **OPPOSITION TO MONSANTO'S** |
| **v.** | **MOTION TO EXCLUDE TESTIMONY** |
| **MONSANTO COMPANY** | **OF JOEL J. GAGNIER and for** |
| | **SUMMARY JUDGMENT** |
| Case No. 3:20-cv-024727-VC | |
| | HEARING: (TBD if necessary) |

To the Honorable Judge of this Court:

Plaintiffs file this Response opposing Defendant Monsanto Company's Motion to Exclude

Testimony of Joel J. Gagnier and for Summary Judgment (Doc. 29[1]) and for the reasons stated

herein respectfully request that the same be denied.

---

[1] CM/ECF document no. 29 in Case no. 3:20-cv-0427-VC, hereinafter referred to as the "Motion."

Response in Opposition to motion to exclude Joel Gagnier

# TABLE OF CONTENTS

I.      Introduction .................................................................................................... 3

II.     Legal Standard ............................................................................................... 3

III.    Argument ........................................................................................................ 3

 A. Dr. Gagnier is Qualified ................................................................. 3

 B. Methodology Used to Arrive at Conclusions is Sound................................. 5

  1. Summary of Dr. Gagnier's Approach ................................................... 5

  2. Response to Point 1:  Alleged Use of Unadjusted Data ......................... 7

  3. Response to Point 2:  Alleged Failure to have Prior Written Protocol ................. 9

  4. Response to Point 3:  Alleged Cherry-picked Unpublished Data Points.............. 10

IV. CONCLUSION.................................................................................................. 11


RESPONSE TO MOTION FOR SUMMARY JUDGMENT ........................................ 12

Response in Opposition to motion to exclude Joel Gagnier

## I.  INTRODUCTION

Plaintiffs designated Joel J. Gagnier, ND, MSc, PhD as a general causation expert in this case. Dr. Gagnier is an eminently qualified clinical epidemiologist who prepared a meticulous report examining whether exposure to glyphosate increases the risk of non-Hodgkin's lymphoma ("NHL") generally.  He concludes that evidence available from published human subject epidemiologic research clearly shows an increased risk of NHL in subjects exposed to glyphosate.

Aside from *ad honimem* attacks, Monsanto raises three objections to this conclusion:  (i) Dr. Gagnier failed to use data adjusted for the effect of other pesticides; (ii) Dr. Gagnier did not specify ahead of time whether he would use days/years, number of years, or lifetime days for his highest exposure meta-analysis; and (iii) Dr. Gagnier cherry-picked unpublished data that would support his pre-ordained conclusions. (Motion 4:18; 6:7; 6:19, respectively).

Dr. Gagnier is qualified to provide expert testimony and the methodology he used in coming to his conclusions is reliable and reliably applied to this case.  At best, each of Monsanto's criticisms go to the credibility and weight a jury might assign to the witness and testimony, not to admissibility, and Monsanto's motion should be denied.

## II.  LEGAL STANDARD

The Court is very familiar with the legal standards which apply, namely, *Daubert* and its progeny, and Federal Rule of Evidence 702.  They effectively state that an expert witness may testify if he is qualified, if the testimony will be helpful to the jury, and the methodology used in reaching conclusions is reliable.  Dr. Gagnier's proffered testimony meets these standards and should therefore be admitted.

## III.  ARGUMENT

### A.  DR. GAGNIER IS QUALIFIED TO PROVIDE EXPERT TESTIMONY

Dr. Gagnier's education, experience and knowledge qualify him to testify regarding matters of general causation.  While Monsanto does not challenge his qualifications, they nevertheless take sarcastic pot shots at him.  Dr. Gagnier holds two bachelor's degrees (Clinical Psychology and

Response in Opposition to motion to exclude Joel Gagnier

Religion & Philosophy) and is trained in naturopathic medicine. (Motion Exh. D, p.1 [2]).  More to the point in this matter, he holds a Master of Science degree in Clinical Epidemiology & Health-Care Research from the University of Toronto, Department of Health Policy Management and Evaluation, Faculty of Medicine.  He holds a PhD in Clinical Epidemiology & Biostatistics from the same institution, Institute of Medical Sciences, also within the Faculty of Medicine.  He further completed a post-doctoral fellowship in Epidemiology at the University of Michigan, School of Public Health, and holds a certificate in Environmental Medicine from the University of Texas. *Id.*

He is currently a tenured Associate Professor of Epidemiology and Biostatistics and Surgery at Western University in London, Ontario, and the field leader for a master's program in clinical epidemiology and research management program.  From 2010-2017, he was an Assistant Professor and from 2017-2022 an Associate Professor of Epidemiology and Orthopedic Surgery at the University of Michigan, Ann Arbor.  He is presently the Editor in Chief of Sage Publishing's *Sage Research Methods in Medicine*, a peer-reviewer for the journal *Cancer Epidemiology*, the journal *Clinical Trials*, the *British Journal of Clinical Pharmacology*, and the *Journal of Clinical Epidemiology*, among others.  Furthermore, for over 20 years Dr. Gagnier has taught graduate (PhD) level courses in the methodology he employs and continues to teach this material at the highest levels, and advances knowledge of these methods through his research. His full 91-page CV with additional qualifications is attached as Exhibit D to Monsanto's Motion and is incorporated by reference.

Dr. Gagnier clearly has the qualifications to provide expert testimony consistent with his report.  While Monsanto does not challenge his qualifications, they nevertheless cast aspersions because of his training as a Doctor of Naturopathic Medicine.[3]  Naturopathic medicine mainly includes the study of primary care medicine, as well as botanical medicine, that is, the scientific and

---

[2] 3:20-cv-2427-VC, Doc. 29-5.

[3] Naturopathic Doctors are trained in four-year, accredited doctoral-level naturopathic medical schools. They are trained as primary care physicians for ambulatory patients, with treatment protocol which emphasizes natural medicine including clinical nutrition, behavioral change and botanical medicine.  Depending on the jurisdiction they may be licensed to perform minor office procedures and surgery, administer vaccinations and prescribe many drugs.  *See,* Fleming SA, Gutknecht NC. Naturopathy and the primary care practice. Prim Care. 2010 Mar;37(1):119-36. doi: 10.1016/j.pop.2009.09.002. PMID: 20189002; PMCID: PMC2883816 (which may be found online at https://pubmed.ncbi.nlm.nih.gov/20189002/ )

Response in Opposition to motion to exclude Joel Gagnier

evidence-based use of naturally occurring substances found in plants, for medicinal purposes. Studying and judging the efficiency of such substances obviously meshes quite well with Dr. Gagnier's epidemiological qualifications.  By many estimates almost one fourth of pharmaceutical drugs are derived from plants.  Monsanto might do well to remember that aspirin, one of Bayer's first blockbuster drugs, was created when Bayer learned how to commercialize compounds derived from willow tree bark—which had been used medicinally for many hundreds of years.

Dr. Gagnier is qualified by his education, training, experience and knowledge to testify regarding matters of general causation as detailed in his report.

### B. THE METHODOLOGY USED TO ARRIVE AT HIS CONCLUSIONS IS SOUND

The question of general causation in this case is whether exposure to glyphosate (as contained in Monsanto's Roundup product) *can* cause NHL in humans.  The accepted scientific discipline to address this question is *epidemiology*.  Dr. Gagnier used accepted data and methods of epidemiology to arrive at his conclusions, and therefore his testimony should be admitted.

### 1. Summary of Dr. Gagnier's Approach

Dr. Gagnier's report is attached to Monsanto's Motion as Exhibit A ("Report").[4]  It contains his conclusions and the methodology he used to arrive at those conclusions.  As detailed in his Report, Dr. Gagnier **(i)** describes, reviews and critiques the most recent systematic reviews and meta-analyses done by others[5] (Report p.5-18); **(ii)** he describes the methodology he will use for a new, comprehensive, up-to-date, systemic review and meta-analysis (Report p. 18-22); and **(iii)** he performs his own comprehensive review of the literature, including (a) performing a critical review of existing systematic reviews and meta-analyses on the topic, (b) performs meta-analytic analyses; and (c) discusses and interprets the results. (Report, p. 22-78).

---

[4] Doc. 29-2 in case no. 3:20-cv-2427-VC.

[5] As the Court is no doubt fully aware, in the most general terms, a "systematic review" collects all possible studies related to a topic and analyzes their results based on various criteria;  a "meta-analysis" goes a step further using statistical methods to summarize the results of the studies to obtain more reliable results.

Response in Opposition to motion to exclude Joel Gagnier

Specifically, Dr. Gagnier's report includes a detailed study protocol, developed prior to beginning his analysis and which was followed to conduct his analysis and come to his conclusions. This protocol included two research questions:

> 1. Does exposure to glyphosate-based herbicides, at any level, in adults result in an increased risk of developing NHL *of any type,* compared to not being exposed or being exposed to a lower level than the highest exposure group?

> 2. Does exposure to glyphosate-based herbicides, at any level, in adults result in an increased risk of developing *a subtype* of NHL, compared to not being exposed or being exposed to a lower level than the highest exposure group?

(Report, p. 18). He then details his inclusion criteria for studies to be included in his analysis, details all the electronic search terms used to cull the relevant studies from the universe of published papers, and describes the check and cross-check method used to determine which studies were included. (*Id.* p. 18-21). Once the studies were chosen, two separate individuals performed a "risk of bias assessment" on each study. A computerized statistical analysis of the data was then performed to determine the raw risk of NHL from exposure to glyphosate-based herbicides based on the available data. (*Id.* p. 22-23). This analysis was done according to current and accepted methods of statistical and epidemiological science.

After this, checks on the validity of the results were run to ensure the results measure what they claim to measure. These checks include a heterogeneity assessment to account for variation in the estimated effect across studies, publication bias assessment to determine if studies with positive findings were more likely to be published than studies with negative findings, sensitivity analysis to assess the effect of studies using overlapping datasets or with varying effect estimates, and a GRADE[6] assessment, performed independently by two trained individuals, to provide an overall grading of the quality of the evidence for each outcome across studies. (*Id.* p. 22-23). Finally, each of the Bradford Hill criterion were analyzed to provide a "high-level" check on the epidemiologic evidence of a causal relationship between glyphosate exposure and NHL. (*Id.*, 62-65).

---

[6] "Grading of Recommendations Assessment, Development, and Evaluation." This is a standardized approach used to assess the certainty of evidence and enhance transparency, consistency and rigor in evaluating evidence.

Response in Opposition to motion to exclude Joel Gagnier

In the "Results" section of his report, for each of the methodological steps described above, Dr. Gagnier provides an extremely detailed analysis of the data used, what he did, and the reasons why he did what he did. (*Id*. p. 22-65). Compared with previously published systematic reviews and meta-analysis on the topic, Dr. Gagnier's own work as presented in his Report is the most comprehensive and up-to-date analysis available.

### 2. Response to Monsanto Pt. 1: Alleged Use of Unadjusted Data

Monsanto does not take issue with Dr. Gagnier's overall approach or the vast majority of his methodology. Rather, Monsanto's primarily argument is that "Dr. Gagnier failed to use data adjusted for other pesticides," specifically the odds ratios from Pahwa (2019) and Eriksson (2008). (Motion 4:18; 5:4). Further they state, "Even more, Dr. Gagnier has no valid justification for using unadjusted data rather than adjusted data." (*Id*., 5:6). They argue this is fatal to the reliability of his methodology, and therefore his testimony must be excluded. (*Id*. 4:8).

Monsanto's motion cherry-picks out-of-context deposition testimony and is *extremely* misleading. Dr. Gagnier's report explains exactly why he used the data he used, and why his choice is the scientifically and epidemiologically correct choice. In the section of his report with the heading "Effect estimate Choices from each included study" he explains in detail how to avoid choosing overfitted (a/k/a overadjusted) effect estimates and the mechanics of how overfitting causes false findings. He states in his report:

> **Effect estimate choices from each included study:**
> The studies included in the meta-analyses below frequently reported varying effect estimates, for example, for varying statistical adjustments or not (e.g.,4,21). Each analysis below, and in particular for the sensitivity analyses, I note which effect estimates I used from particular studies, and they are reported in the figures. *In all cases, where available, I used the reported adjusted analyses from each study, unless those adjusted analyses were under powered, at a high risk of type 1 errors.* Regression analyses that include a large number of variables in their adjustments relative to the number of events (e.g., NHL) in the groups being compared (for example exposed vs non-exposed groups) run the risk of being subject to spurious results, they are overfitted. For example, in logistic regression empirical evidence shows that having less than 10 events (e.g. NHL events) per variable in the regression model increases the type 1 error rate [48-50] and more recent evidence shows that even at 20 events per variable, power is very low [51]. *Therefore, when*

*the adjusted model was underpowered, for example in Eriksson* [4], I used the unadjusted[7] value. *Another example of an underpowered adjusted value was from Pahwa* [21], in table 2 they report two adjusted analyses for NHL overall for ever glyphosate use. They have an everexposed sample of 113 for NHL overall, which is the number of events. In model A they include 6 variables and in model B they include 8 variables. Model A, even at 20 events per variable is underpowered and model B is underpowered to a greater extent, therefore I used the estimate from model A to lessen the risk of spurious findings, though not eliminate them.

(Report p. 37-38, italics added, bracketed numbers in original).

Dr. Gagnier clearly states he is using adjusted data from both Ericksson and Pahwa. For example, Pahwa reports two adjusted models for ever glyphosate use—model A and model B. Model A uses six variables and model B uses eight variables. Dr. Gagnier used the model adjusted with six variables because, as he explains, the model using eight variables is "under powered" and thus at a high risk of introducing "type 1" error.[8] Similarly, Ericksson created two models, one adjusted with three variables and another adjusted with six variables, and Dr. Gagnier used the three-variable model for the same reason. Dr. Gagnier gives us a "statistics 101" tutorial that regression models which include a large number of variables in their adjustments relative to the number of events in the groups being compared are known as "underpowered," and that underpowered adjustments run the risk of introducing spurious results. He cites to four references, 48, 49, 50, and 51, to show what he has done is correct mathematically and is best practice in the field of epidemiology.[9] He then gives a detailed explanation of how the Pahwa eight variable

---

[7] "Unadjusted" here is typographical error or misnomer for "less adjusted." It refers to Dr. Gagnier using Ericksson's model adjusted for three variables instead of the model adjusted for six variables. This is evident from the discussion quoted herein and because, as Dr. Gagnier points out, neither Ericksson nor Pahwa have an unadjusted model reported in their papers.

[8] A type I error occurs by erroneously stating that the study found significant differences when there indeed was no difference. The inverse of this is type II error which occurs by erroneously stating the study found no difference when, in fact, there is.

[9] See references 48-51 on page 73 of the Report which reference four articles: (48) "Regression Models for Prognostic Prediction: advantages, problems and suggested solutions," (49) "Multivariable Prognostic Models: issues in developing models, evaluating assumptions and adequacy, and measuring and reducing errors," (50) "A Simulation Study of the Number of Events per Variable in Logistic Regression Analysis," and (51) "Performance of Logistic Regression Modeling: beyond the number of events per variable, the role of data structure."

- 8 -

Response in Opposition to motion to exclude Joel Gagnier

model and the Ericksson six variable model are "underpowered," and that is the reason he used the six and three variable models respectively.

Monsanto's argument that Dr. Gagnier, without justification, used unadjusted data from Pahwa and Ericksson rather than adjusted data is patently false. Dr. Gagnier's decision to use the adjusted data models he did use from Pahwa and Ericksson for his meta-analysis is based on sound mathematics and widely accepted scientific practices. The data Dr. Gagnier used made his conclusions *more* reliable and valid than if he had used the overadjusted data from Pahwa and Ericksson. Monsanto does nothing to show that under-powered models are not at a high risk of injecting type I error into a study as stated by Dr. Gagnier. They do nothing to show that Pahwa and Ericksson's eight and six variable adjusted models are not in fact underpowered. Monsanto has done nothing to show that had Dr. Gagnier used the underpowered models from Pahwa and Ericksson his report would be more likely to be valid and reliable.

Furthermore, in the same vein, Monsanto has done nothing to show that exposure to any pesticide other than glyphosate is a confounder and has any association with NHL. Exposure to another pesticide may be a *confounder* (an independent cause of NHL), an *effect modifier* (increasing or decreasing the potential carcinogenicity of glyphosate), or neither. Before declaring something to be a confounder Monsanto must show some proof that it is an independent cause of NHL. Simply stating that another pesticide is a confounder does not prove a causal relationship to NHL.

In short, Dr. Gagnier's methodology and conclusions are within the range of accepted standards governing how scientists in his field conduct their research and reach conclusions regarding general causation, and Monsanto has failed to show differently. Therefore, Dr. Gagnier's testimony should not be excluded.

### 3. Response to Monsanto Pt. 2: Alleged Failure to have Prior Written Protocol

Dr. Gagnier prepared a protocol prior to beginning his study, and that the entire protocol, he states, is available on request. His report gives a summary of the prior protocol which he used in this study. (Report, p. 18-22). His protocol, as described in his report, has been summarized above.

Monsanto argues, "Dr. Gagnier's meta-analysis does precisely what he testified it should not do: Dr. Gagnier did not specify ahead of time whether he would use days/years, number of years, or lifetime days for his highest exposure meta-analysis." (Motion 6:6-8).  Monsanto has seriously misrepresented the content of Dr. Gagnier's deposition testimony given in the *Ferro* case.  On page 57 of that deposition there is a general discussion of the importance of prior protocols in designing a study, and on p. 35-36 there is a discussion of "days per year, number of years or lifetime-days" as a measure of exposure. (Motion Ex. F, p. 57-58, 35-36.).  Nowhere does the line of questioning or Dr. Gagnier's testimony state or imply that "days per year, [etc.]" should be included in a prior protocol, or that a prior protocol is flawed without it as Monsanto represents.

Dubious citations to deposition testimony notwithstanding, Monsanto argues Dr. Gagnier's prior protocol does not specify whether he would use "days/year, number of years, or lifetime days for his highest exposure meta-analysis." (Motion 6:4-8).  But Monsanto does not articulate the significance of this alleged flaw or how it might have affected the reliability of Dr. Gagnier's conclusions, much less why they consider this fatal to the admissibility of his testimony. They provide no analysis or reasoning other than as stated above.  There is no reason to believe having or not having such a statement in his protocol would make his methodology suspect or conclusions suspect.  There is no reason to think that not having such a statement in his prior protocol would cause his study to be outside the range of accepted standards governing how scientists in his field conduct their research and reach conclusions regarding general causation.

4.  Response to Monsanto Pt. 3:  Alleged "Cherry-picked unpublished data points"

Monsanto argues that "a researcher should justify the choice of data so that 'estimates aren't cherry-picked.' But Dr. Gagnier failed to justify the data he chose to input into his meta-analysis." (Motion 6:11-12).  The only support Monsanto provides for this assertion is the following deposition blurb:

Response in Opposition to motion to exclude Joel Gagnier

> For instance, Dr. Gagnier admitted that he was not aware of a single published meta-analysis of Roundup and NHL that used the odds ratio he selected from Pahwa (2019):
>
> Q. Your ever/never meta-analysis uses numbers from Pahwa (2019) that nobody who has published meta-analyses of Roundup and NHL used, true?
> A. None of these that we're looking at.
> Q. Are you aware of any other published meta-analyses that you did not include in your report in your review?
> A. I'm not aware of any additional ones.
>
> *Id.* at 323:3-10. In other words, Dr. Gagnier cherry-picked convenient data that would support his pre-ordained conclusions, making unjustified analytical choices along the way that no published meta-analysis supports.

The deposition testimony quoted by Monsanto at 6:15-18 means nothing without further explanation, and this vagueness makes it difficult to formulate a response. For example, it appears that Monsanto is referring to numbers Dr. Gagnier used from Pahwa (2019). But Pahwa is a *published* study and that does not mesh with their argument that Dr. Gagnier "cherry-picked *unpublished* data points in order to reach his desired outcome." (Motion 6:9).

In any case, the only thing the deposition testimony says is that Dr. Gagnier included Pahwa (2019) in his meta-analysis, and none of the other unidentified meta-analyses they were apparently reviewing at the deposition looked at Pahwa. Since Monsanto does not reveal which published meta-analyses it claims chose not to include Pahwa, Plaintiff cannot determine *why* such researchers chose not to include Pahwa. One can speculate that many of the relevant published meta-analyses did not use the Pahwa numbers because they were published *prior* to 2019.

One might infer Monsanto is saying that Dr. Gagnier's use of Pahwa's model adjusted for six variables instead of using Pahwa's model adjusted for eight variables is "cherry-picking." If so that argument has been addressed above.

## IV.  CONCLUSION

Dr. Gagnier is qualified by his education, training and experience to provide expert testimony regarding general causation. Dr. Gagnier's methodology and conclusions are within the

Response in Opposition to motion to exclude Joel Gagnier

range of accepted standards governing how scientists in his field conduct their research and reach conclusions regarding general causation, and Monsanto has failed to show differently.  Therefore, Dr. Gagnier's testimony should not be excluded.

## RESPONSE TO MOTION FOR SUMMARY JUDGMENT

Monsanto's sole argument in support of their motion for summary judgment is that Plaintiffs have failed to present at least one admissible expert opinion to support general causation, and therefore summary judgment should be granted.

For the reasons stated above this is not the case.  Dr. Gagnier's expert testimony on general causation is admissible, and therefore summary judgment must be denied.

WHEREFORE, PREMISES CONDISERED, the Plaintiffs pray that the Court enter an Order denying Monsanto's Motion to Exclude and Motion for Summary Judgment.

Date: February 12, 2025

Respectfully Submitted,

*STANLEY LAW, P.C.*

/s/ *Michael J. Stanley*
Michael J. Stanley
230 Westcott St., Suite 120
Houston, Texas 77007
713-980-4381
mstanley@stanleylaw.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

Pursuant to L.R. 5-1(h) I hereby certify that on February 12, 2025 a true and correct copy of this document was filed and served on all counsel via the Court's ECF system.  The notice of electronic filing generated by the ECF system constitutes service of the document on counsel who are registered users of the system.

/s/ *Michael J. Stanley*
Michael J. Stanley

Response in Opposition to motion to exclude Joel Gagnier