**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel: 202-847-4030 | Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843 | Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400 | Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
Linda C. Hsu (CA Bar No. 239880)
(linda.hsu@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel: 310-576-2100 | Fax: 310-576-2200

Attorneys for Defendant Monsanto Company

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION,<br><br>*Carl Agosta v. Monsanto Co.*,<br>Case No.: 3:21-cv-06562-VC | MDL No. 2741<br><br>Case No: 3:16-md-02741-VC<br><br>**DEFENDANT MONSANTO COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION TO RECONSIDER EXCLUSION OF PLAINTIFF'S EXPERT DR. SHALIN KOTHARI** |

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

LEGAL STANDARD ....................................................................................................................1

ARGUMENT .................................................................................................................................1

    I.    Under Rule 702, A Specific Causation Expert's Differential Diagnosis Must Account For Both Idiopathic Causation And Replication Errors To Be Admissible .. 1

        A.    To Be Admissible Under Rule 702, A Differential Diagnosis Must Reliably Address Both Idiopathy And Alternative Causes Of A Plaintiff's NHL .........2

        B.    Replication Errors Are A Known Cause Of NHL, And Are Not Simply Synonymous With Idiopathic Causation ..........................................................3

    II.    Dr. Kothari Failed To Reliably Rule Out Replication Errors As A Potential Cause Because He Failed To Consider Them At All. ............................................................6

    III.    Even If Kothari Could Reliably Rule Out Idiopathy And Replication Errors Simply By Ruling In Roundup, He Failed To Reliably Do Even That .........................9

        A.    Dr. Kothari Failed To Reliably Evaluate The General Causation Evidence .... 9

        B.    Dr. Kothari Failed To Reliably Evaluate Plaintiff's Exposure To Roundup. 12

    IV.    If The Court Is Not Convinced Dr. Kothari's Opinions Are Inadmissible, It Should Set An Evidentiary Hearing ..........................................................................13

CONCLUSION ............................................................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Hardeman v. Monsanto Co*, 997 F.3d 941 (9th Cir. 2021) .......................................................... 2, 3

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624 (4th Cir. 2018) ................................................................................................... 3

*In re Roundup Prods. Liab. Litig.*, 16-md-02741-VC, 2023 WL 7928751 (N.D. Cal. Nov. 15, 2023) (PTO 288) ................................................................................................ *passim*

*In re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956 (N.D. Cal. 2019) (PTO 85) ............ *passim*

*In Re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1101 (N.D. Cal. 2018) (PTO 45) ................ 10

*In Re Roundup Prods. Liab. Litig.*, 713 F. Supp. 3d 681 (N.D. Cal. 2024) (PTO 289) .............. 4, 6

*In Re Roundup Prods. Liab. Litig.*, 732 F. Supp. 3d 1091 (N.D. Cal. 2024) (PTO 290) ................................................................................................................ 5, 6, 7, 12

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010) ............................................................ 5

*Wendell v. GlasoSmithKline, LLC*, 858 F.3d 1227 (9th Cir. 2017) ........................................... 4, 5

**Other Authorities**

Fed. R. Evid. 702 ................................................................................................... 1, 2, 3, 13

Fed. R. Evid. 702(c) ..................................................................................................... 5

Fed. R. Evid. 702(d) ..................................................................................................... 1

## INTRODUCTION

Plaintiff's Motion for Reconsideration of PTO 310 should be denied. Plaintiff's motion functionally asks the Court not only to revisit its exclusion of Dr. Kothari's specific causation opinion in PTO 310, but also its well-reasoned conclusions in PTO 289. But the Court was right the first time: Dr. Kothari does not simply disagree with the idea of replication errors as a potential cause of Plaintiff's NHL, and did not engage in any of the analysis that now appears in Plaintiff's motion. Rather, his differential diagnosis of Plaintiff failed to grapple with replication errors *at all*. As such, it is inadmissible under Rule 702. If the Court is not inclined to reaffirm the exclusion of Dr. Kothari's specific causation opinions on the papers, Monsanto alternatively joins the request of Plaintiff for an evidentiary hearing so that this important issue may be further tested.

## LEGAL STANDARD

Federal Rule of Evidence 702, as amended effective December 1, 2023, sets forth the standard for the admission of expert opinion testimony. Under the Rule, a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" may present opinion testimony to the jury only if "the proponent demonstrates to the court" that each of four criteria is "more likely than not" satisfied. Fed. R. Evid. 702. *First*, that the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue." *Id*. at 702(a). *Second*, that the expert's "testimony is based on sufficient facts and data." *Id*. at 702(b). *Third*, that the expert's testimony "is the product of reliable principles and methods." *Id*. at 702(c). *Fourth*, and finally, that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." *Id*. at 702(d). Rule 702(d) requires "that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology."

## ARGUMENT

**I.     Under Rule 702, A Specific Causation Expert's Differential Diagnosis Must Account For Both Idiopathic Causation And Replication Errors To Be Admissible**

Both this Court and the Ninth Circuit have been clear: for a specific causation expert's differential diagnosis to be admissible, he must first reliably "rule in" exposure to glyphosate as a

potential cause of a plaintiff's NHL, and then reliably "rule out" other potential causes. This requires that an expert address both idiopathy and any other possible causes of a plaintiff's NHL. But Plaintiff errs in arguing that idiopathy and replication errors are one and the same—they are not. Idiopathy is a way of describing cases of NHL with no known cause. But replication errors are not idiopathy—they are a *known cause* of NHL. Thus, any reliable differential diagnosis must adequately rule them out to be admissible under Rule 702. And even if Plaintiff's framing were correct, and replication errors and idiopathy were the same thing, Plaintiff misstates Ninth Circuit case law as standing for the broad proposition that experts need not rule out idiopathic causes at all when in reality the Ninth Circuit has said no such thing.

### A. To Be Admissible Under Rule 702, A Differential Diagnosis Must Reliably Address Both Idiopathy And Alternative Causes Of A Plaintiff's NHL

Both this Court and the Ninth Circuit have held that experts must address the possibility of "idiopathic" causation before a specific causation opinion can be admitted. *See In re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956, 959-60 (N.D. Cal. 2019) (PTO 85); *Hardeman v. Monsanto Co*, 997 F.3d 941, 966-67 (9th Cir. 2021). As the Court thoughtfully explained in PTO 85:

> The biggest concern . . . is how the experts account for idiopathy—that is, the possibility that a plaintiff's NHL is attributable to an unknown cause. Imagine 100 people who develop NHL after using Roundup. Imagine further that they had no other significant risk factors for NHL. Assuming for argument's sake that the plaintiffs' general causation opinions are correct, glyphosate was a substantial factor in causing NHL for *some* of those 100 people. **But the experts cannot automatically assume that glyphosate caused all 100 people's NHL**. [. . .] The question for any particular plaintiff, then, is whether there is evidence from which a jury could conclude by a preponderance of the evidence that the plaintiff falls into the category of people whose NHL was caused by glyphosate. **To assist the jury in making this assessment, an expert must have a way to differentiate Roundup users who developed NHL because they used the product from Roundup users who would have developed NHL regardless.**

PTO 85, 358 F. Supp. 3d at 959. Thus, an expert must have some method of addressing idiopathic causation for his testimony to be admissible under Rule 702.

The Court previously identified two ways that a plaintiff's specific causation expert could adequately account for idiopathy. First, he could "point to a biomarker or genetic signature." PTO 85, 358 F. Supp. 3d at 959. Dr. Kothari has never purported to use that approach. Second, an expert could

account for idiopathy by "[r]elying on the plaintiffs' admissible general causation opinions" in conjunction with "the plaintiffs' exposure levels"—if he could also opine that a plaintiff "had no other significant risk factors" for NHL. *Id*. at 960. For instance, the experts whose opinions the Court admitted in Pretrial Order No. 85 tried to account for a plaintiff's hepatitis C infection (a known risk factor for NHL) by explaining that hepatitis C "was no longer detected in his blood." *Id*. at 960 & n.4. By contrast, where expert witnesses fail to reliably rule out other possible causes of a plaintiff's NHL, this Court has consistently excluded them. *See In re Roundup Prods. Liab. Litig.*, 16-md-02741-VC, 2023 WL 7928751, at *5 (N.D. Cal. Nov. 15, 2023) (PTO 288) (holding expert failed to rule out obesity by citing "the 'fund of knowledge' he had built up from reading articles as he came across them over that time" in his clinical practice). Thus, any reliable differential diagnosis must both reliably *rule in* Roundup as a possible cause and *rule out* other possible causes.

To the extent Plaintiff suggests otherwise, *see* Mot. at 13–14, it is important to clarify that the Ninth Circuit "is not an outlier following a more flexible *Daubert* approach than other circuits." *Hardeman*, 997 F.3d at 961 (citing *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.,* 892 F.3d 624, 645 (4th Cir. 2018)); *see also* Order Re Motion To Strike And Omnibus *Daubert* Motion, ECF No. 19061 (Aug. 21, 2024) (suggesting that the 2023 amendments to Rule 702 do not require reconsideration "given the Ninth Circuit's thoughtful clarification/recalibration of its *Daubert* precedent in the *Hardeman* ruling"). So with respect to the admissibility of a differential diagnosis, the rule in the Ninth Circuit is the same as other circuits: "[S]imply calling an analysis a differential diagnosis doesn't make it so." *In re Lipitor*, 892 F.3d at 643. Instead, "a reliable differential diagnosis . . . must at least consider other factors that could have been the sole cause of the plaintiff's injury." *Id*. at 644 (quoting *Guinn v. AstraZeneca Pharm. LP,* 602 F.3d 1256, 1253 (11th Cir. 2010)); *see also* PTO 288, 2023 WL 7928751, at *4–6 (excluding expert's opinion for failure to adequately consider obesity).

### B. Replication Errors Are A Known Cause Of NHL, And Are Not Simply Synonymous With Idiopathic Causation

Plaintiff's motion treats idiopathic causation and replication errors as if they are the same thing, *see* Mot. at 11, but they are not. When Roundup litigation first began, experts for both the

plaintiffs and Monsanto "agreed that a large percentage of NHL cases are idiopathic, meaning they lack a known cause." *In Re Roundup Prods. Liab. Litig.*, 713 F. Supp. 3d 681, 691 (N.D. Cal. 2024) (PTO 289). But the scientific evidence has advanced: Dr. Tomasetti's research established that most cases of NHL are not "idiopathic" at all—his "basic conclusion [is] that random replication errors drive a significant majority of cancer-causing genetic mutations across all types of cancer." *Id*. at 687, *see also id*. at 692 ("Tomasetti does make claims about causation, including the claim that cancer can be caused by replication errors alone."). And this is not just Dr. Tomasetti's opinion: as the Court has noted, the scientific community, including the American Cancer Society, now generally accepts "that random replication errors drive a significant majority of cancer-causing genetic mutations across all types of cancer." *Id*. at 687.

Plaintiff argues that *Wendell v. GlasoSmithKline, LLC*, 858 F.3d 1227 (9th Cir. 2017) categorically relieves a specific causation expert from any obligation to address replication errors because they are "synonymous with" idiopathy. Mot. at 11–12. But *Wendell* says nothing at all about replication errors. And to the extent *Wendell* addressed how a differential diagnosis may permissibly address idiopathy, it did so in a very different context—it certainly does not say, as Plaintiff suggests, that in the Ninth Circuit a specific causation expert need never rule out idiopathy. *See* Mot. at 12. The district court in *Wendell* had excluded the plaintiff's specific causation experts because they failed to cite any epidemiological or animal studies. 858 F.3d at 1236. The Ninth Circuit rejected that rationale because the disease at issue in *Wendell* was "an exceedingly rare cancer, with only 100 to 200 cases reported since it was first recognized." *Id*.  As a result, there was unsurprisingly a dearth of epidemiological evidence for the experts to consider in the first place, and the disease accordingly had a "high rate of idiopathy." *Id*. at 1236–37. Thus, the experts in *Wendell* were permitted to rely on case reports, their own statistical analysis, their clinical experience, and "additional literature" to rule out idiopathic causation and other potential causes. *Id*. Put another way: a critical reason that the experts in *Wendell* were not required to rule out idiopathy is because there was simply not enough data for the experts to rely on to do so. By contrast, as the Court knows, the subtypes of NHL in Roundup cases include the most common malignancies in the world, with significant scientific

literature investigating their causes. To the extent *Wendell* governs in cases involving poorly studied, rare diseases, this is not one of those cases.

In any event, the appropriate framework for addressing replication errors in the context of a differential diagnosis is not idiopathy—it is to treat them as an alternative cause of NHL, like obesity. Indeed, the Court has already adopted this approach. *See In Re Roundup Prods. Liab. Litig.*, 732 F. Supp. 3d 1091, 1100–1101 (N.D. Cal. 2024) (PTO 290) (admitting Dr. Boyd's opinion after concluding that he adequately explained why he did not agree that replication errors were a cause of plaintiffs' NHL). To the extent *Wendell* lowered the bar for specific causation experts in accounting for idiopathy, it also explicitly recognized that such an approach is not appropriate in cases where there is "a plethora of peer reviewed evidence that specifically shows causation." *Wendell*, 858 F.3d at 1237. This is such a case: NHL was never like the extremely rare and poorly understood disease at issue in *Wendell,* and after another six years of study, it certainly is not now. Cases of NHL that were previously called "idiopathic" now have a known cause: cellular replication errors. Thus, to offer an admissible differential diagnosis, specific causation experts must adequately consider and rule out replication errors just like they must consider and address other alternative causes of NHL, such as age and obesity. *See* PTO 288, 2023 WL 7928751, at *5.

Plaintiff instead argues for an exception that would swallow the rule—that the Court should hold that any time a specific causation expert asserts glyphosate is a carcinogen, he need not even address replication errors. Mot. at 9. But the Court's rationale for admitting Dr. Tomasetti's testimony cannot relieve a plaintiff of his burden to "demonstrate to the court that it is more likely than not" that a *different* expert's testimony is "the product of reliable principles and methods." Fed. R. Evid. 702(c). If Plaintiff's argument is taken at face value, an expert would be allowed to ignore the possibility of replication errors as a potential cause of a plaintiff's NHL simply by concluding that Roundup can cause NHL—a rule which would categorically relieve *all* plaintiff-side specific causation experts from any obligation to engage with idiopathic causation or replication errors. But "[t]he '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (quoting *Gen. Elec. Co. v. Joiner*, 522, U.S. 136, 146 (1997)).

Citing PTO 289, Plaintiff spills significant ink attacking one specific part of Dr. Tomasetti's theory—his conclusion that 95% of mutations in NHL cases can be attributed to natural replication errors. Mot. at 7. But that argument misses the forest for the trees. Of course, specific causation experts need not agree with Dr. Tomasetti's specific conclusion that 95% of mutations in NHL cases are caused by cellular replication errors. But they must at least grapple with the scientific evidence that replication errors are a cause of NHL. Moreover, in this *particular* case, Dr. Kothari agreed with the Court that Dr. Tomasetti's theory had "entered the scientific mainstream." PTO 289, 13 F. Supp. 3d at 688; Hsu Decl., Ex. A, at 151:11–18, 154:1-6 (Dr. Kothari agreeing that Dr. Tomasetti's work is "basic" and is "part of textbooks"). A specific causation expert who agrees that Dr. Tomasetti's theory is important and widely recognized within the scientific community must explain how he considered and ruled it out in performing his differential diagnosis.

**II.    Dr. Kothari Failed To Reliably Rule Out Replication Errors As A Potential Cause Because He Failed To Consider Them At All.**

Plaintiff claims that requiring specific causation experts to address replication errors would "require that plaintiff's experts, such as Dr. Kothari, accept scientific theories with which they do not agree." Mot. at 6. But this is belied by the Court's own order: as the Court held in excluding Dr. Kothari's opinion, *see* PTO 310 at 2, it is entirely possible for a specific causation expert to adequately consider replication errors while still opining that Roundup caused a plaintiff's NHL. For instance, in admitting Dr. Boyd's specific causation opinion, the Court observed that he had "argued that random mutations likely work in tandem with environmental carcinogens in most or all cases," a view that "roughly echoes views in this scientific literature that expressed concern about possible interactions between environmental carcinogens and random mutations." *In re Roundup Prods. Liab. Litig.*, 732 F. Supp. 3d 1091, 1101 (N.D. Cal. 2024) (PTO 290). The Court concluded that this was a "scientifically reasonable" approach to addressing the issue. *Id*.

By contrast, Dr. Kothari gave virtually no consideration to replication errors in forming his differential diagnosis. When deposed, Dr. Kothari admitted that some NHL cases have no known cause. Hsu Decl., Ex. A, at 150:10–151:4. And he agreed that Dr. Tomasetti's work is "basic," and appears in medical textbooks and "very high impact journal[s]" that he "would have reviewed." *Id*.

at 151:11–18, 154:1–11. But when asked about the work itself, he did not "specifically remember anything about it" and testified that he was unfamiliar with it. *Id*. at 155:2–3, 159:11–21. When asked if being unfamiliar with Dr. Tomasetti's work meant he had no criticisms of it, Dr. Kothari said: "Not being familiar doesn't mean I don't have any criticisms. I just don't know." *Id*. at 159:18–21. Dr. Kothari was also unfamiliar with similar publications that address the proportion of cancer cases attributable to modifiable risk factors like exposure to a known carcinogen. *Id*. at 164:17–23. And when asked to estimate the proportion of NHL cases that were attributable to a modifiable risk factor, he could not do so. *Id*. at 168:8–169:4. Indeed, Dr. Kothari was so unfamiliar with this body of literature that Plaintiff's counsel repeatedly objected to his being asked about it. *Id*. at 159:15–16, 162:8–11, 172:6–19. To the extent Dr. Kothari evinced disagreement with Dr. Tomasetti's research at all, he was disagreeing only with excerpts shown to him by Monsanto's counsel for the first time. *See, e.g., id*. at 155:11–156:14. This is not the testimony of an expert who had thoroughly considered a viable alternative cause and ruled it out; rather, it is the testimony of an expert who had not done his homework.

Given his apparent failure to review or consider any of the relevant literature, it is unsurprising Dr. Kothari's expert report said nothing about ruling out replication errors or any alleged disagreements with Dr. Tomasetti's research. *See generally* Hsu Decl., Ex. B. When asked whether he had considered replication errors as a possible cause of Plaintiff's NHL, Dr. Kothari admitted that he didn't know enough to provide an informed answer: "I don't know how I would be able to rule that out or in. I don't know how to answer that question." Hsu Decl., Ex. A, at 149:8–12. When pressed, he gave the same answer again. *Id*. at 150:1–5 ("Q. Well, I guess the question then becomes are you able to — I guess you testified a minute ago you can't rule it in or rule it out. A. Correct. That is as far as I can go on this."). Finally, when asked whether he had "consider[ed] random mutations" in his "differential etiology," Dr. Kothari said he had considered them "[a]s a thought." *Id*. at 150:6–9. Even taking that claim at face value, giving a passing thought to an alternative cause of Plaintiff's NHL without reviewing any of the relevant scientific literature is not a "scientifically reasonable" basis for an expert opinion. *Cf.* PTO 290, 732 F. Supp. 3d at 1101.

Plaintiff accordingly strains to reverse-engineer an acceptable rationale for Dr. Kothari's failure to consider replication errors, arguing that "Dr. Kothari disagrees with the default assumption in Dr. Tomasetti's research that those mutations not attributable to environmental ('E') or hereditable ('H') factors must be due to random replication errors ('R' factors), and he instead posits that what Dr. Tomasetti is attributing to R may very well be not-yet-known E causes of cancer." Mot. at 5. Plaintiff also tries to align Dr. Kothari's rejection of Dr. Tomasetti's conclusions with the critiques this Court accepted in PTO 289. *Id*. at 6. But however plausible these arguments might be if offered by another expert in a different case, they appear nowhere in Dr. Kothari's actual report or deposition. To the extent that Dr. Kothari offered a critique of Dr. Tomasetti's opinions *at all*, he was critiquing excerpts that Monsanto's counsel was showing him for the first time. Hsu Decl., Ex. A, at 155:11–156:14. Dr. Kothari never read or considered those studies when forming his differential diagnosis. *Id*. at 154:16–18 ("I would have to read this article to know what you are hoping me to answer."). The Court did not err—much less manifestly err—in finding that this analysis was deficient, unreliable, and inadmissible.

Because Dr. Kothari's report and deposition in this case are so deficient, Plaintiff attempts to support them by citing his deposition in the *Willstead* case, which was taken on November 18, 2024—three months *after* Monsanto's motion to exclude was filed in this case. *See* ECF No. 20306-11. Assuming for the sake of argument that Dr. Kothari had subsequently learned more about Dr. Tomasetti's work and now attempts to account for it in *other* cases, that would not change the fact that his differential diagnosis in *this* case is deficient. But in fact, Dr. Kothari's testimony in other cases shows that he continues to offer results-oriented explanations for why he does not consider replication errors as a potential cause of NHL. When asked about replication errors in *Willstead*, Dr. Kothari asserted that there was "no such cause" of NHL at all. Hsu Decl., Ex. C, at 44:14–20. When, in response to that answer, Dr. Kothari was asked to clarify whether he was asserting that "zero" cases of NHL are caused by replication errors, Dr. Kothari simply talked about how the plaintiff had "substantial Roundup exposure." *Id*. at 44:21–45:13. And when asked to explain what percentage of NHL cases he believes are caused by replication errors or are otherwise unexplained, Dr. Kothari refused to answer the question. *See id*. at 45:15–48:22. In another case, Dr. Kothari appeared to assert

that virtually *all* cases of NHL are caused by Roundup. Hsu Decl., Ex. D (*Neil* Dep.) at 138:11–139:9 ("The probability is very high if you would stop using or never use Roundup, that, you know, it is unlikely you would develop a lymphoma[.]"). This only confirms that Dr. Kothari's "method" is little more than impermissible *ipse dixit*: he asserts that all cases of NHL are caused by Roundup, and then finds a way to make the facts fit that conclusion. He does not meaningfully consider replication errors (or idiopathy) at all.

### III. Even If Kothari Could Reliably Rule Out Idiopathy And Replication Errors Simply By Ruling In Roundup, He Failed To Reliably Do Even That

Dr. Kothari's specific causation opinion is inadmissible for additional reasons. First, Dr. Kothari failed to rule out idiopathic causation by conducting a reliable "evaluation of the general causation evidence" in this case. PTO 85, 358 F. Supp. 3d at 960. Second, he failed to reliably analyze Plaintiff's exposure to Roundup. *See id*. Thus, Dr. Kothari's specific causation opinion should be excluded regardless of Plaintiff's argument about replication errors.

#### A. Dr. Kothari Failed To Reliably Evaluate The General Causation Evidence.

Monsanto's original motion to exclude Dr. Kothari attacked his general causation analysis as deficient. *See* ECF No. 18951, at 4–7. In response, Plaintiff wrote that Dr. Kothari was not being offered as a general causation expert. *See* ECF No. 19434, at 8. The Court accepted that concession and did not rule on whether Dr. Kothari could permissibly offer a general causation opinion. *See* PTO 310, at 1. Yet Plaintiff now asserts that Dr. Kothari's specific causation opinion is admissible because he "ruled out idiopathy/random mutations by reliably ruling in glyphosate/Roundup"—in other words, Plaintiff claims that because Dr. Kothari offered an admissible general causation opinion, he need not actually rule out idiopathy. Mot. at 13–14. But even if that were correct, Dr. Kothari's general causation analysis was deficient. And without forming or relying on an "admissible general causation opinion[]," Dr. Kothari could not reliably rule out idiopathic causation or rule in Roundup as a potential cause of Plaintiff's NHL. PTO 85, 358 F. Supp. 3d at 960.

Dr. Kothari's report contains only a cursory analysis in support of his general causation opinion. Like Dr. Schneider, whose general causation opinion was excluded in PTO 288, "[t]he general causation section of [Dr. Kothari's] report spans only about two pages." PTO 288, 2023 WL

7928751, at *2; *compare* Hsu Decl. Ex. B, at 9-11. Dr. Kothari's causation analysis largely "summarizes the IARC report and identifies the citations for and results of six studies the IARC report relies upon. A couple of other articles are mentioned." *See* PTO 288, 2023 WL 7928751, at *2; *compare* Hsu Decl., Ex. B, at 10 (summarizing the IARC's conclusions and the "[s]ignificant epidemiological studies cited by IARC"). Finally, like Dr. Schneider, Dr. Kothari's "reference to the strengths and weaknesses of the underlying studies is very limited." PTO 288, 2023 WL 7928751, at *2; *see also In Re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1101, 1148 (N.D. Cal. 2018) (PTO 45) (excluding expert who uncritically relied on IARC's conclusions and "said little" about how epidemiological studies "addressed possible bias or confounding").

While Dr. Kothari claimed to have "factored into [his] conclusions" that some studies of glyphosate are unadjusted for confounding variables such as exposure to other pesticides, *see* Hsu Decl., Ex. B at 10, when deposed he claimed that epidemiological studies of glyphosate do not need to account for confounding variables. Hsu Decl., Ex. A at 227:8-228:4 ("If I am using a product which by itself increases the risk, I don't understand why it is important to know what happens when you combine that product with other products."). Dr. Kothari also did not understand the significance of the fact that the De Roos 2003 study's hierarchical regression analysis which accounted for confounding variables found no statistically significant association between glyphosate and NHL. Hsu Decl., Ex. A at 215:13-217:17 ("I don't understand hierarchical regression"). Finally, Dr. Kothari's report repeatedly blurs the distinction between evidence that NHL is associated with "*pesticide exposure*"[1] generally and evidence that NHL is specifically associated with exposure to *glyphosate-based herbicides*. *See* Hsu Decl., Ex. B, at 10 (emphasis added).

In subsequent depositions and reports, Dr. Kothari has continued to assert that any study saying that "pesticides" *generally* cause NHL somehow count as evidence that *Roundup* and *glyphosate* are causes of NHL. In the *Neil* case, Dr. Kothari asserted in his report that the American Cancer Society "acknowledge[s] that pesticide exposure is a confirmed risk factor for non-Hodgkin lymphoma." Hsu Decl., Ex. D (*Neil* Depo.) at 143:17–144:3. When asked at deposition to explain

---

[1] Of course, Roundup is an herbicide, not a pesticide.

whether ACS specifically lists Roundup as a risk factor for NHL, Dr. Kothari responded by simply asserting—twice—"[i]t includes pesticide, and Roundup is a pesticide," without answering the question. *Id*. at 143:17–145:1. Then, Dr. Kothari pivoted and asserted that the answer to the question was irrelevant:

> Like, I think you're talking about the same thing where Roundup is a pesticide and pesticides are listed. Now, whether a particular website goes through the details of talking over each and every pesticide that could be linked to non-Hodgkin lymphoma, I don't think that matters.

*Id*. at 145:5–11.[2] This Court long ago held that failing to account for "use of other pesticides" when reviewing epidemiological evidence is "inaccurate, misleading, and untethered to any sound scientific method." PTO 85, 358 F. Supp. 3d at 961.

When deposed in this case, Dr. Kothari asserted for the first time that he had reviewed general causation opinions from other plaintiffs' experts, although it is somewhat unclear whether he reviewed them as part of his preparation for this case or another Roundup case in which he ultimately did not testify. *See* Hsu Decl., Ex. A at 11:21-16:17. As the Court has previously observed, this kind of post-hoc rationalization for an expert opinion is not reliable. *See* PTO 288, 2023 WL 7928751 at *4–6 (excluding specific causation opinion of Dr. Schneider, who "pivoted" when the rationale in his report was revealed to be insufficient). And in any event, Dr. Kothari never actually wrote in his report or testified that the general causation opinions he reviewed were sufficient to rule out

---

[2] Along similar lines, in his post-*Agosta* reports Dr. Kothari regularly relies on a study called Gerken (2024). Hsu Decl., Ex. E, Jacob Gerken, *et al*., *Comprehensive assessment of pesticide use patterns and increased cancer risk*, FRONTIERS IN CANCER CONTROL AND SOC., July 2024. Gerken (2024) made no attempt to isolate whether *glyphosate* causes NHL. Rather, it compared data on the nationwide use of pesticides overall to nationwide cancer rates by region—the study states that it evaluated use patterns for 69 pesticides in combination, many of which the study's authors concede are already known carcinogens. *See* Ex. E, Gerken (2024) at 4 (Table 1, listing the 69 pesticides the study evaluated). In fact, when the study looked at the top ten pesticides that were associated with NHL, *glyphosate was not included*. *Id.* at 6, Fig. 2.

Despite this, Dr. Kothari writes in his report that Gerken (2024) is "strong evidence supporting the causal link between [a plaintiff's] extensive Roundup exposure …and his development of [NHL]." Hsu Decl. Ex. F, Kothari *Willstead* Report at 10. When confronted at deposition about the reality that Gerken (2024) examined only pesticide exposure generally, and not glyphosate or Roundup, Dr. Kothari immediately backtracked from this language in his report, volunteering that Gerken (2024) "is not proof of causation." Hsu Decl. Ex. G, Kothari *Rossmann* Dep. at 87:7-88:18.

replication errors or idiopathy as a cause of Plaintiff's cancer—he simply asserted that he could not rule that possibility in or out. Hsu Decl., Ex. A, at 150:1–5; *compare* PTO 290, 732 F. Supp. 3d at 1100–1101 (holding expert offered a "cogent, scientifically grounded explanation" of why replication errors should not be considered as a potential cause of a plaintiff's NHL).

### B. Dr. Kothari Failed To Reliably Evaluate Plaintiff's Exposure To Roundup.

In prior rulings, the Court has admitted some specific causation opinions despite concerns about idiopathic causation because "the experts relied heavily on the plaintiffs' exposure levels in drawing their conclusions" and tied the plaintiffs' exposure to specific studies that "showed a dose-response relationship between glyphosate and NHL." PTO 85, 358 F. Supp. 3d at 960. By contrast, Dr. Kothari made no effort to quantify Plaintiff's actual exposure to Roundup. Hsu Decl., Ex. A at 119:15-23. Indeed, Dr. Kothari did not even bother to ask Plaintiff about how long he would spend spraying Roundup when he applied it. *Id.* at 199:22-200:4 ("I did not particularly ask that question about how long each application would last for. But, again, that would be part of—yeah, I did not ask that particular question."). Instead, he simply asserts in passing that Plaintiff "experienced extensive and significant exposure to Roundup" over forty years. Hsu Decl., Ex. B, at 9-10. His report's purported discussion of Plaintiff's "special exposure history" is a two-sentence blurb that makes no effort to calculate Plaintiff's actual exposure. *Id.* at 5.

Dr. Kothari's only effort to identify a relevant threshold for significant exposure is his assertion that the McDuffie 2001 study "showed a marked increase in NHL risk among individuals exposed to glyphosate more than two days per year." *Id.* at 10. As the Court has already explained, that study "did not adjust for the use of other pesticides" so "that statement is inaccurate, misleading, and untethered to any sound scientific method." PTO 85, 358 F. Supp. 3d at 961. Dr. Kothari was apparently not even aware of this problem with the McDuffie study when asked about it at his deposition. Hsu Decl., Ex. A, at 205:11–17. Nor was he familiar with a subsequent study that found the McDuffie odds ratio was not statistically significant after accounting for exposure to other pesticides. *Id.* at 208:18–209:17. Ultimately, Dr. Kothari asserted that epidemiologists should not even *try* to account for other pesticides:

> A: If I am using a product which by itself increases the risk, I don't understand why it is important to know what happens when you combine that product with other

products. Like, to me, that makes no senses.

Q: Would you think that it is important to know whether its exposure to a different product that is actually causing the increased odds ratio?

A: No, I think what it tells me that other products also likely increase the risk, maybe not as much as glyphosate which overall increases the risk when you combine them all together.

*Id*. at 227:18–228:4. In other words, Dr. Kothari's exposure analysis starts from the assumption that glyphosate causes cancer, such that he sees no need to even *consider* McDuffie's failure to account for confounding exposures. The Court has already ruled that such an approach to the McDuffie study is "junk science." PTO 85, 358 F. Supp. 3d at 961. Because Dr. Kothari failed to actually rule out other causation through his evaluation of Plaintiff's exposure history, his specific causation opinion is inadmissible under Rule 702.

**IV.    If The Court Is Not Convinced Dr. Kothari's Opinions Are Inadmissible, It Should Set An Evidentiary Hearing**

Plaintiff's motion for reconsideration asks the Court to set this case for oral argument if it is not inclined to admit Dr. Kothari's testimony. Mot. at 3. While Monsanto does not agree that PTO 310 should be reconsidered, it does agree that the issues presented are of substantial importance. Accordingly, if the Court is not inclined to exclude Dr. Kothari's testimony, Monsanto asks that the Court set this matter for an evidentiary hearing and oral argument.

### CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for reconsideration of PTO 310 and exclude Dr. Kothari's specific causation opinions under Federal Rule of Evidence 702. Alternatively, the Court should defer ruling on Plaintiff's motion, and instead set this matter for an evidentiary hearing.

Dated:  March 19, 2025                                 Respectfully submitted,


By: */s/ Linda C. Hsu*
    Linda C. Hsu
    Attorney for Defendant Monsanto Company

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 19th day of March, 2025 a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

                               */s/ Linda C. Hsu*
                               Linda C. Hsu