R. Brent Wisner, Esq. (SBN: 276023)
rbwisner@wisnerbaum.com
**WISNER BAUM, LLP**
100 Drakes Landing Rd # 160
Greenbrae, CA 94904
Telephone:  (415) 873-4775
Facsimile:  (310) 820-7444

Michael L. Baum, Esq. (SBN: 119511)
mbaum@wisnerbaum.com
**WISNER BAUM, LLP**
11111 Santa Monica Blvd, Suite 1750
Los Angeles, CA 90025
Telephone:  (310) 207-3233
Facsimile:  (310) 820-7444

*Attorneys for Objectors*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br>Case No. 16-md-02741-VC |
| THIS DOCUMENT RELATES TO: | Hon. Vince Chhabria |
| ALL ACTIONS | **WISNER BAUM, LLP'S OBJECTION TO PRETRIAL ORDER NO. 312 (DKT. 20336)** |

# INTRODUCTION[1]

Wisner Baum, LLP ("WB"), formerly Baum, Hedlund, Aristei & Goldman, PC, contributed more than 7% to the "common benefit" of this MDL. Even considering the fact that WB did not maintain contemporaneous time records, to allocate only 7%, or even 10% (as proposed by the MDL Co-Leads) is unfair—it does not capture WB's contribution, both quantitatively and qualitatively, to the MDL. WB was instrumental in the success of this MDL, especially on the most important issues related to preemption, general and specific causation, liability work-up, and the MDL bellwether trial. WB was there, from the beginning, litigating lockstep with the Co-Leads through 2022. The only time the Co-Leads did not consult or work alongside WB was when they decided, without consulting WB, to move for a common benefit assessment and then allocated 81% of the fund to themselves.

WB should be awarded the same percentages as the Co-Leads because WB contributed as much as the Co-Leads to the common benefit of the MDL. WB requests that the Court award 20% of the common benefit to WB, which is comparable to percentages that should be awarded to the MDL Co-Leads. Rough justice, even in the context of the complicated process of awarding fees from a common benefit fund, must still resemble *justice*. Fairness is the hallmark of the inquiry. And, an allocation of 7%, or even 10%, considering the quantity and quality of the work WB did in this MDL, is simply not fair.

## ARGUMENT

### I. WB's Contribution to the MDL's Common Benefit Is Undeniable

WB will not directly impugn the contributions of other counsel in this litigation. However, because the distribution of the common benefit fund is a zero-sum calculation, by championing the work of WB, it necessarily implies WB's contribution exceeds others. And, as unseemly as it is to "brag" at the *literal* expense of one's co-counsel, the reality remains that not all attorneys' contributions are equal.

In discussing "common benefit" a functional definition is needed. But, absent come functional definition, it is almost impossible to discern the relative value of a purported common

---

[1] The Court should be advised that there is currently $25,367,310.54 in the common benefit fund, as of March 20, 2025.

benefit. WB submits that, here, the functional definition of "common benefit" should be tied to what the common benefit fund represents, i.e., settlements. Specifically, common benefit should be defined as work performed in (but not necessarily exclusively in) the MDL, that aided in allowing individual MDL plaintiffs to obtain resolution. While such a definition is still vague, necessarily so, it provides a barometer to weigh the relative contribution of attorneys. Work that tangentially aids the ability of MDL plaintiffs to obtain resolution should be given less weight than work done that directly caused resolution, i.e., dispositive issues, bellwether trials, etc.

In assessing the relative contribution of a law firm to the "common benefit," the Court should weigh two overlapping considerations. First, the Court should consider the *quantum* of work performed. This translates into a calculation of hours contributed, and whether those hours benefited, directly or indirectly, the MDL. Second, the Court should consider the *quality* of that contribution. This includes nuanced consideration of the type of work performed and, more importantly, how that work contributed to the ability of MDL plaintiffs to obtain resolution with Monsanto. Thus, in assessing WB's contribution to the common benefit of the MDL, WB focuses on both issues—quantum and quality.

At this point, consideration of how much each law firm received in attorneys' fees from their cases is immaterial.[2] While that consideration makes sense in the context of deciding whether a common benefit assessment should be implemented, if the decision has been made to distribute common benefit funds, then how much each law firm made in the overall litigation should have no impact on how that common benefit is distributed.

**A. The Quantum of WB's Contribution to the Common Benefit Is Comparable to the Co-Leads—Even If One Reduces Estimated Hours Because of a Lack of Contemporaneous Records**

WB began working on the Roundup litigation in late 2015, filing one of the first cases that would become part of the MDL in March 2016. Indeed, WB was instrumental in forming the MDL, and helped lead the effort to obtain centralization of the MDL before this very Court.

---

[2] Importantly, WB likely received considerably *less* attorneys' fees, overall, than each of the Co-Leads. While it appears, based on the Court's comments at the last hearing, that WB received higher, on average, settlements for its clients, WB did not settle nearly as many cases as the Co-Leads. Specifically, WB settled less than half the number of cases settled by each of the Co-Leads.

Early on, it was clear that only a handful of law firms had faith in this litigation. And, early on, it was clear that WB was a leader amoung those law firms, especially in understanding the science. When it came time to self-organize, WB agreed to not seek a Co-Lead position because the Co-Leads agreed to functionally treat WB as a Co-Lead in decision-making. And, that agreement was largely honored—that is until the Co-Leads made the decisions to seek a common benefit assessment, to appoint to the MDL Fee Committee, or how to allocate the common benefit fund among the leadership. The only discussions with the Co-Leads about WB's role in any common benefit allocation was an assurance that WB would be treated the same as the Co-Leads.

Although WB did not contemporaneously keep track of the specific hours its attorney and staff spent on MDL-related work, WB has, under penalty of perjury, estimated those hours. The following chart depicts the estimated number of attorney hours expended by various counsel, by year, through 2022.

| Attorney | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Totals |
|---|---|---|---|---|---|---|---|---|---|
| Michael Baum | 20 | 1,200 | 2,000 | 1,600 | 1,800 | 800 | 250 | 5 | **7,675** |
| R. Brent Wisner | 75 | 1,750 | 2,400 | 2,500 | 2,500 | 1,450 | 250 | 175 | **11,100** |
| Pedram Esfandiary | -- | 350 | 2,200 | 2000 | 2,000 | 2,000 | 550 | 350 | **9,450** |
| Bijan Esfandiari | -- | -- | 50 | -- | 300 | 50 | -- | -- | **400** |
| | | | | | | | | | **28,625** |

Dkt.
These estimates include only the time spent on MDL-related work, i.e., work that would have contributed to the MDL. WB did not include any estimates of time spent by paralegals, document reviewers, or time spent by other attorneys in consultation.

To be clear, WB played a central role in the state court litigation (where no common benefit assessment was made). Mr. Wisner was Lead Counsel in the California Judicial Counsel Coordinated Proceeding ("JCCP") and was Co-Lead counsel in the first Roundup trial (*Johnson*) and third (*Pilliod*). However, aside from actual JCCP hearings and trial time, very little work in the JCCP was limited to just state court. Monsanto insisted that *all* discovery and litigation in the MDL be coordinated with the JCCP, including all document productions, written discovery, and depositions. As the Court may recall, the presiding JCCP judge even participated in this Court's *Daubert* hearings. Because of this overlap, Mr. Wisner took the lead on many of the discovery issues on behalf of both

the MDL and JCCP. Very few meet-and-confers, discovery disputes, depositions, or document productions were done in one proceeding and not the other.

Overlapping work in the MDL and JCCP—likely over 90% overlap—should not be discounted within the context of MDL common benefit. Indeed, any work done on behalf of the MDL necessarily assists other clients outside of the MDL, and, yet, that does not count as a disqualification. This is particularly important because the *type* of work that would have benefited both the JCCP and MDL is the *most important work*—i.e., work related to dispositive scientific issues, dispositive legal issues, developing the liability story, and core, cross-cutting, discovery. If important and valuable work that directly contributed to the benefit of the MDL were discounted because it *also* benefited the JCCP, it would lead to some odd and perverse incentives. It would dissuade coordination between the litigations—inefficiency that helps no one—and create a potential conflict between lawyers working in both proceedings. State-federal coordination should be encouraged, not discouraged. To the extent the work done in the JCCP, or other state court proceedings, was focused on JCCP-specific issues, then it should not be counted in the MDL. That proportion, at least as it relates to WB, is relatively small—limited to trial work up and case-specific work.[3]

In total, WB estimates approximately **28,625 attorney-hours**[4] spent on MDL-related litigation—a reflection of the fact that WB was involved with, if not leading, nearly *every* major issue the MDL court adjudicated prior to the settlements in late 2020. To be sure, these estimates of MDL-related work are not exact—but they are in-line with what is seen and/or expected of attorney billable hours at major firms, where (at least during the period of 2016-2019), attorneys were often expected to *bill* (not necessarily work) in excess of 2,700 hours. Moreover, these estimates are consistent with

---

[3] Because the general liability and general causation work was largely complete at the point the *Pilliod* case went to trial, the JCCP work that overlapped with the MDL since the *Pilliod* case has steadily and progressively declined.

[4] To put these hours into context financially, assuming WB billed at only $500 per hour—an extremely low rate for partner-level work in Los Angeles—at 28,625 hours, that would yield an estimate of $14.3 million.

the hours submitted by the Co-Leads[5], as noted in their submitted hours.[6] And, they are consistent with the intensity with which WB litigated these cases between 2015 and 2022, with the vast majority of that work occurring between 2016 and 2020.

During these years, WB was working at breakneck pace on all facets of the litigation—from creating the original complaint, to all facets of discovery, to developing and understanding the science, to exhaustive document review and work up of the various liability stories, and traveling around the country (and internationally) taking and defending multi-day depositions. WB played a central role in developing the experts in this litigation, from "science day" to *Daubert*, and even helped develop the very structure, i.e., differential etiology, used by MDL plaintiffs to establish specific causation. Messrs. Wisner, Esfandiary, and Baum not only helped prepare each general and specific causation expert—taking lead in defending many of their depositions—but also directly argued, in part, *Daubert*. This was not limited to general causation, either, but extended to specific causation and the bellwether trial.

Mr. Wisner was originally supposed to try the *Hardeman* case with Ms. Wagstaff, and his firm was intimately involved in the all the pretrial work-up of *Hardeman*, including participating and defending numerous case-specific depositions and experts. However, in October 2018, when Mr. Wisner realized the *Hardeman* trial conflicted with the *Pilliod* trial in state court, WB indicated that it would not be able to try the case with Ms. Wagstaff, but nonetheless continued to directly aid the case. To be clear, other than Aimee Wagstaff, none of the MDL Co-Leads worked directly on the *Hardeman* case, or offered significant aid during trial. In contrast, WB aided in drafting and/or editing all motions *in limine* and pretrial briefing—including bifurcation and case-specific *Daubert*, helped prepare every expert, both for deposition and at trial, and helped prepare all the pretrial workup, including exhibit lists, depositions designations, jury instructions, jury questionnaires, etc… Mr. Wisner, in fact, argued many of the motions *in limine* in *Hardeman*. In January, prior to trial,

---

[5] As of January 2024, the three Co-Leads declared the following: the Miller Firms states that they conducted 10,795.85 hours, Weitz & Luxembourg states that they conducted 11,224.60 hours; and Andrus Wagstaff states that they conducted 26,282.20 hours. *See* Dkt. # 17817.

[6] WB made these hour estimates without knowing, in any way, what the hour submissions would be of the Co-Leads. That they are consistent, sight unseen, adds further support to their legitimacy.

WB hosted Aimee Wagstaff, Jennifer Moore, and their trial teams, at its offices in Los Angeles, for multiple all-day meetings going over the entire case—from science to liability. Why? Because WB, having been so deeply involved in all aspects of the litigation, possessed unparalleled knowledge about the case—expertise born from a tremendous amount of work by WB in pushing this case forward.

During the *Hardeman* trial, WB's managing partner, Michael Baum, was there, *every day*, working directly in the Wagstaff and Moore Law Group trial team. Mr. Baum negotiated deposition designations, drafted and edited many of the issues that arose throughout trial, consulted on trial-time decisions, and was an important member of the trial team. Mr. Wisner, for his role, despite being on the eve of the *Pilliod* trial, flew to Australia and conducted a three-day trial deposition of the most important general causation witness, Dr. Christopher Portier. Mr. Wisner, in turn, flew back to help the Hardeman case for its first two weeks of trial, before having to turn to the *Pilliod* case. Dr. Portier's video deposition was played to the jury, and was an integral part of the case. And, in case it was not clear, WB did all this work on *Hardeman* for *free*. WB did not receive, nor did they expect to receive, any fees obtained from the *Hardeman* judgment—it was done, purely, to aid the common benefit of the MDL and overall Roundup litigation.

The MDL Co-Leads, acting as the Fee Committee, attack WB's general estimates of time. Specifically, they claim that Mr. Wisner's estimated 2,500 hours in 2018 and 2019 are "dubious" because "[t]o reach 2,500 MDL-related hours, he would have had to work approximately twelve hours a day, five days a week, for fifty weeks of the year on MDL work alone" and, during those two years, Mr. Wisner tried two cases in state court. Dkt. # 17817 at 9. This argument, however, is disingenuous. Mr. Wisner worked nearly every weekend in 2018 and 2019 as a young partner at what was then-called Baum Hedlund Aristei & Goldman, PC. Mr. Wisner worked, on average, well in excess of 14 hours every day. Indeed, frequently, Mr. Wisner would work into the early hours of the morning (often all night) on important projects and issues in the litigation. Assuming 320 workdays (45 days off, which is, itself, implausible), that would be 4,480 total hours of work throughout the year. The MDL Co-Leads complain that Mr. Wisner tried two cases during that period; but those trials were each six weeks. Assuming one carves out 120 days of work (four

months) to account for the time that was trial-specific[7], that leaves 200 workdays—amounting to 2,800 hours of work, of which Mr. Wisner estimates 90% was MDL or *Hardeman* related. And, this makes sense. Nearly all the work Mr. Wisner was doing in the California JCCP was also being done on behalf of the MDL because Monsanto insisted on the discovery occurring in unison between the California JCCP and MDL.[8]

 WB also shared its extensive knowledge of the case with Plaintiffs in the MDL. Every trial exhibit, transcript, and deposition cut, used during trial, including during *Hardeman*, were made publicly available to anyone that wanted to review them.[9] This website has become a repository of information and data, used and cited by Plaintiffs' counsel in this MDL, for years. Tens of thousands of Roundup plaintiffs and MDL litigants have accessed this website. WB provides this information, at its own cost, to facilitate the sharing of its insight and work product with others pursuing these claims, including those pursuing claims in the MDL.

 That said, assuming *arguendo*, that 50% of WB's estimated hours are "dubious", and that WB's attorneys only performed 14,312.5 hours of work in furtherance of the MDL, that would still be *more* hours than two of the Co-Leads (Miller Firm: 10,795.85 hours; Weitz & Luxembourg: 11,224.60 hours), who each are slated to get over three times as much of the CBF as WB. In assessing the quantum of work performed, even if WB's estimates are *severely* reduced because of a lack of contemporaneous billing records, WB worked as much if not more than the Co-Leads in this

---

[7] Indeed, for the first trial (*Johnson*), WB was not involved until three weeks before the trial commenced—it had almost entirely been pre-worked by the Miller Firm. For the third trial, the case-specific work was not substantial, and was shared between the Miller Firm and WB's attorneys. Most of the work up in anticipation of Pilliod involved redoing depositions and other discovery that was done in conjunction with MDL discovery (and which is used by MDL plaintiffs to this day). This point is reflected in the fact that Mr. Wisner was feverishly working in the *Hardeman* trial up until a week before the Pilliod case was set to commence. Regarding the appeals and post-judgment motions in the *Johnson* and *Pilliod*, the Miller firm took the lion share of the work and argued all the motions and appeals.

[8] During the first trial in *Johnson*, it became clear that the early liability depositions of Monsanto—taken by MDL leadership—failed to lay foundation for the admissibility of key documents. WB fixed this issue for the MDL by retaking nearly every liability deposition of Monsanto's employees—a project that was done, almost exclusively by WB's attorneys (and by an attorney at Weitz & Luxembourg)—so those documents and video testimony were available in the *Hardeman* trial and other MDL cases.

[9] *See* https://www.wisnerbaum.com/toxic-tort-law/monsanto-roundup-lawsuit/

MDL—and yet, they give themselves, collectively, 81%. And, if WB's estimates are credited—which the evidence supports—then based on the number of hours, from high quality, partner-level attorneys, it would seem that WB, quantitatively, contributed *more* than the individual Co-Leads.

MDL Co-Leads concede that there is no legal prohibition on awarding common benefit fees when an applicant did not submit contemporaneous hours. Surely, it *can* serve as a basis for denying compensation, but only when there is no other basis for assessing the applicant's contribution to the common benefit. For example, in *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 386 Fed. Appx. 584, 585 (9th Cir. 2010), the Ninth Circuit affirmed denial of an applicant's requested fee because of a failure to provide billing records in a timely fashion. However, there, the applicant could not "identify any common-benefit work product that the firm produced over the course of this litigation." *Id.* Here, there is little doubt that WB was instrumental in this case. There can also be no reasonable dispute that WB's contribution to the MDL's common benefit, at least, *equaled* the contributions of the Co-Leads. Considering there is no real dispute regarding the contribution of WB to this MDL, the importance of dissecting "hours" is not as much of an issue.

This commonsense view is reflected in the Special Master's Order Setting Process to Apply for Disbursements from the Common Benefit Fund, which detailed the criteria for considering a common benefit award:

(1) the results obtained for a particular task,

(2) the difficulty of the task performed,

(3) the skill required to perform the task,

(4) the time, labor and financial resources involved in the task, and

(5) the contribution of the task to the advancement of the litigation.

Dkt. 17367 at Sec. IV ¶ 1. And, regarding the submission and consideration of "hours" the Special Master specifically noted that "[t]he number of hours billed may be considered, but multiplying a number of hours by an hourly rate is not the best way to assess the quality of work or the value it conferred." *Id.* This, again, makes sense. Thousands of hours working on some minor issue that did little to drive the litigation forward does not hold a candle to the intense and complex substantive work related to general causation or trial—the very issues WB was so heavily involved in litigating.

As the Court commented, distribution of common benefit, or any attorneys' fees, amounts to rough *justice*. For WB, where the quantum of its contribution cannot be reasonably disputed, considering its *de facto* Co-Lead role in this litigation, that rough justice necessitates putting WB's quantum of work roughly on par with the Co-Leads.

WB concedes that the lack of contemporaneous time records makes auditing those hours more difficult. However, no audit has been conducted on any specific common benefit applicant, and it does not appear to be driving the allocation of common benefit to the associated leadership. The Co-Leads did not scrutinize their own hour submissions but merely credited 100% of their time then and proceeded to divvy up 81% of the common benefit fund for themselves.

If the Court believes that WB should be "penalized" for not maintaining contemporaneous time record, then that penalty should comport with fairness and commonsense. As it stands, the Co-Leads recommended 10% to WB (while giving themselves 81%)—an amount that does not fairly capture WB's contribution to this MDL, even if one discounts the estimated quantum of work by a factor of 50%. The Co-Leads justified this under-allocation to WB by citing the lack of contemporaneous time records:

> RFC recommends that WB receives a percentage of the CB fee, even in the absence of contemporaneous time records, ***albeit reduced***. WB performed substantial work that provided a direct benefit to all plaintiffs in the MDL: it was one of few firms that coordinated with Co-Lead Counsel from the outset and undertook critical aspects of the litigation, such as (1) taking liability and expert depositions; (2) assisting in document review; (3) presenting written and oral arguments before the Court; and (4) setting litigation strategy.

Dkt. # 17817 at 8 (emphasis added). Then, the Court, then, deducted another 3% from this under allocation, again penalizing WB for failing to make contemporaneous billing records. Dkt. # 20336 at 3. So, in other words, despite WB's undeniable contribution to the MDL, and even though no law firm's hours were materially audited, ***WB is being penalized twice*** using an already under-allocated amount. That is simply not fair, in this context.

A penalty of a few percentage points might be warranted, but to reduce WB to such a low percentage strains credulity amoung those that know the role WB played in obtaining settlements for Plaintiffs in this MDL. Quantitatively, WB contributed as much as the Co-Leads. Penalizing WB to such an extent because of a lack of contemporaneous records, puts form before substance.

### B. The Quality of WB's Contribution to the Common Benefit Cannot Reasonably Be Disputed

Qualitatively, the nature of WB's contribution to the common benefit is not reasonably disputed. WB worked on the most complicated, contentious, and difficult issues in this case. From preemption, to *Daubert*, to liability, to the bellwether trial—WB played a direct role in working on the most important issues, to the benefit of each plaintiff in MDL. Candidly, WB did not play a role in the administrative functions of the MDL—work that was and is important. Instead, WB focused on substance. In conjunction with the Co-Leads and other counsel, WB played a direct role in locating and using, at deposition, the hottest documents in the case—the now (in)famous Monsanto Papers. WB played a direct role in working up and preparing the general causation and initial specific causation experts. WB played a direct role in drafting the most important briefs related to preemption and *Daubert*. WB played a direct role in taking the most important (i.e., most used) depositions in the litigation. For example, of the ten video depositions played to the jury in *Hardeman*, in each phase, attorneys from WB examined six of them (Portier, Farmer, Reeves, Koch, Grant, and Murphey). WB played a direct role in the *Hardeman* trial, *for free*.

One way to consider the quality of WB's work is to consider how Monsanto viewed WB relative to the Co-Leads in this case. WB is not aware of the exact amount that each Co-Lead received, on a per-case-average, but it appears that WB's settlements were considerably higher. The reason? Because WB posed a significant threat to Monsanto—a threat that prompted Monsanto, in part, to settle. Monsanto was willing to pay more money to WB to get WB "out" of the litigation. This provides powerful evidence, from Monsanto no less, about the quality of WB's contribution to the MDL's common benefit.

WB's work was done in conjunction of with other counsel in this case—WB makes no claim to being responsible for nearly all of the work that contributed to the common benefit, i.e., 81%. But, the quality of WB's work is not and cannot be reasonably disputed.

### II. Wisner Baum's Contribution to the MDL's Common Benefit Exceeds the Court's Proposed 7%; Indeed It Exceeds the MDL Committee's Proposed 10%

Considering the quantum *and* quality of WB's contribution—even assuming a penalty for failing to keep contemporaneous time records—a 7% allocation does not approach the "rough"

justice inherent in this process; nor does the 10% originally proposed by the Co-Leads.  WB should be allocated a common benefit percentage comparable to the Co-Leads.  Anything less is unfair.

      WB requests 20% of the common benefit fund.  WB contributed at least 20% to the MDL's common benefit; especially for the period under consideration here (2016 through 2022).  WB acknowledges that, for WB to get 20%, it means the Co-Leads will get less.  And, while bickering about fees is unseemly, the simple truth remains that 20% to WB is, objectively, fair and appropriate.  WB was not allocated more by the Co-Leads because they, on their own and without any consultation with WB, selected themselves to be on the fee committee and then allocated 81% of the common benefit fund to themselves.  This Court knows how important WB was to the overall success of this MDL, and what role WB played in getting MDL Plaintiffs' claims settled.  Seven percent—or even ten percent—does not capture WB's contribution.

Dated:  January 25, 2021         **WISNER BAUM LLP**

         */s/ R. Brent Wisner*
         R. Brent Wisner, Esq.
         rbwisner@wisnerbaum.com
         100 Drakes Landing Rd # 160
         Greenbrae, CA 94904
         Telephone:  (415) 873-4775
         Facsimile:  (310) 820-7444

**CERTIFICATE OF SERVICE**

I, R. Brent Wisner hereby certify that, on March 20, 2025, I electronically filed **WISNER BAUM, LLP'S OBJECTION TO PRETRIAL ORDER NO. 312 (DKT. 20336)** with the Clerk for the United States District Court for the Northern District of California using CM/ECF system, which shall send electronic notification to counsel of record.

*/s/ R. Brent Wisner*
R. Brent Wisner, Esq.