## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br><br>CASE NO. 3:16-md-02741-VC |
| This document relates to:<br><br>*Koen v. Monsanto Co.,*<br>Case No. 3:20-cv-03074-VC<br>Civil Action No. 1:22-cv-209-RP (W.D. Tex.) | **KOEN PLAINTIFFS' OBJECTIONS TO PRETRIAL ORDER 312 REGARDING DISTRIBUTION OF ENTIRE COMMON BENEFIT HOLDBACK** |

TABLE OF CONTENTS

Table of Authorities ...................................................................................................................iii

Introduction and Summary of Argument .....................................................................................1

Relevant Facts .............................................................................................................................4

A.        Pretrial Order 236. ..................................................................................................4

B.        The Special Master's Report and Recommendation............................................6

C.        Pretrial Order 312. ................................................................................................10

D.        This Lawsuit...........................................................................................................11

Argument ...................................................................................................................................14

A.        Because the Mere Conferral of a Benefit Doesn't Justify
          a Forced Fee Transfer, No Common Benefit Distribution
          is Warranted Except as to Work Done Exclusively for the
          Benefit of the MDL................................................................................................15

B.        At a Minimum, the Court Should Not Require Any
          Common Benefit Distribution for Cases, Like This One,
          that Require Substantial Litigation Outside the MDL. .......................................18

Conclusion .................................................................................................................................23

TABLE OF AUTHORITIES

## Cases

*Boeing Co. v. Van Gemert*
 (1980) 444 U.S. 472.................................................................................................2

*In re Roundup Prod. Liab. Litig.*
 544 F. Supp. 3d 950 (N.D. Cal. 2021) ..........................................................*passim*

## Other Authorities

Restatement (Third) of Restitution & Unjust Enrichment § 2, cmt. b.
 (AM. L. INST. 2011) .......................................................................................3, 16

## Articles

Elizabeth Chamblee Burch, *Judging Multidistrict Litigation*,
 90 N.Y.U. L. Rev. 71 (2015)...........................................................................22, 23

Elizabeth Chamblee Burch, *MDL for the People*,
 108 Iowa L. Rev. 1015 (2023) ..............................................................................21

Elizabeth Chamblee Burch, *Monopolies in Multidistrict Litigation*,
 70 Vand. L. Rev. 67 (2017)..................................................................................1, 2

Charles Silver, Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and A Proposal*, 63 Vand. L. Rev. 107  (2010)........3, 13,  20,

William B. Rubenstein, 5 *Newberg and Rubenstein on Class Actions*,
 § 15:115 (6th ed. June 2024 update)....................................................................19

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The *Koen* Plaintiffs hereby object to Pretrial Order 312, which directs that the entire $24 million+ common benefit fund generated by the 8% holdback of attorneys' fees be distributed to lead counsel in this MDL.

The underlying action, *Koen v. Monsanto Co., Inc*., Civil Action No. 1:22-cv-209-RP (W.D. Tex.), settled the morning of jury selection two and one-half years after it was transferred from the MDL to the Western District of Texas. Had this case not settled, it would have been only the second federal trial involving injuries caused by Roundup, the first being *Hardeman v. Monsanto*. Unlike *Hardeman*, however, the bulk of the work in this case was conducted by undersigned counsel outside of the MDL and involved issues specific to Bradley Koen's circumstances.

Due to Bradley Koen's unique injuries (which ultimately caused his death post-remand), Plaintiffs' trial team spent over 3,800 hours developing the evidence and preparing for trial, and incurred over $450,000 in costs after this Court transferred the case back to Texas.

Because it was the singular work done by Plaintiffs' counsel here that ultimately brought Monsanto to the bargaining table, requiring a common benefit contribution would do nothing to address the "free rider" problem the common benefit doctrine is supposedly designed to address. *See, e.g., Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (noting that common benefit doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense"); *see also In re Roundup Prod. Liab. Litig.*, 544 F. Supp. 3d 950, 970 (N.D. Cal. 2021) (Chhabria, J.) (hereafter "*In re Roundup*") (discussing free-rider justification for common benefit holdbacks in MDLs). Rather, requiring such a contribution would unjustly enrich lead counsel at Plaintiffs' attorneys' expense.

Plaintiffs therefore urge this Court to exempt this case from any common benefit distribution in this MDL.

With respect to other cases in the MDL, Plaintiffs urge the Court to order that a common benefit distribution is only warranted with respect to work done by lead counsel *exclusively* for the benefit of the MDL, such as the administrative work done by liaison counsel.  It makes sense to compensate those efforts, because otherwise there would be no incentive to take on those important tasks.

But as to work that would have been done regardless of the MDL, there is no equitable or practical justification for any common benefit distribution.  As one commentator has noted, "[c]ommon-benefit fees are supposed to compensate attorneys for the benefit they confer on others —not for work on their own cases."  Elizabeth Chamblee Burch, *Monopolies in Multidistrict Litigation*, 70 Vand. L. Rev. 67, 121 (2017) ("*Monopolies*").  In this MDL, as the Special Master noted in his Report and Recommendation, ECF 20028 ("R&R"), "lead counsel's work primarily benefited lead counsel."  R&R at 13.  Under these circumstances, "quantum meruit suggests the court should compensate [lead counsel] only for the benefit they confer on others beyond the work they would typically perform for their own cases."  *Monopolies*, 70 Vand. L. Rev. at 132.

Even if lead counsel deserve additional compensation for work they would have done regardless of the MDL, they've already gotten it by receiving preferential treatment in their own cases.  As the Special Master found, lead counsel received "significantly higher per-case settlements" than other firms in the MDL, even with respect to cases brought by non-lead counsel "that had reached the eve of trial."  *Id*. at 19; *see also In re Roundup*, 544 F. Supp. 3d at 971 (noting that "lead counsel's MDL clients . . . are already no doubt being compensated more handsomely than the typical MDL plaintiff").  Equity does not require that lead counsel receive even more

compensation for their efforts, particularly not where—as here—the underlying case presents unique issues and requires substantial time and expense to resolve outside of the MDL.

As to the practicalities: Plaintiffs agree that mass tort cases "would be impossible to manage if good lawyers lacked sufficient incentive to step up." *In re Roundup*, 544 F. Supp. 3d at 952. But there is no need to incentivize lead counsel to perform work that they would have done regardless of the MDL, such as their work establishing general causation. That work needed to be done for the benefit of lead counsel's own clients. The fact that it also benefitted non-lead lawyers in the MDL does not, in an of itself, justify any common benefit distribution. *See, e.g., Restatement (Third) of Restitution & Unjust Enrichment* § 2, cmt. b. (AM. L. INST. 2011) ("the fact that we derive advantage from the efforts and expenditures of others is not 'unjust enrichment' but one of the advantages of civilization."); Charles Silver, Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and A Proposal*, 63 Vand. L. Rev. 107, 121–22 (2010) ("*A Proposal*") (noting that "[t]he common fund doctrine applies only when claimants are unjustly enriched. To be unjustly enriched, however, more is required than that claimants benefit from the efforts of others—much more.").

For these reasons, the *Koen* Plaintiffs urge the Court to hold that common benefit distribution is only warranted with respect to work done exclusively for the benefit of the MDL and direct the Special Master to identify and recommend a value for that work. At a minimum, the Court should order the return of the common benefit holdback in cases, like this one, where substantial resources were expended post-remand to bring the case to a conclusion.

**RELEVANT FACTS**

Before addressing the facts of the underlying case, Plaintiffs review this Court's pretrial rulings on the common benefit issue and the Special Master's Report and Recommendation regarding same. We then discuss the circumstances of this particular case.

**A.     Pretrial Order 236.**

In 2021, in response to a request from lead counsel, this Court ordered "all attorneys representing plaintiffs in this MDL . . . to holdback 8% of the gross amount of any recovery received through settlement or judgment and deposit this amount into the Common Benefit Fund. The 8% holdback must come from the attorney's fee portion of the recovery, not the client's portion." *In re Roundup*, 544 F. Supp. 3d at 952 ("PTO 236") (discussing holdback request).[1]

The Court's scholarly opinion began by noting that the MDL attorney compensation system "seems to have gotten totally out of control." *Id*. at 953. The Court observed that, although the lead lawyers "undoubtedly invested a great deal of time and money in these cases, now they're likely making so much from settling their own 'inventories' that they can each afford to buy their own island." *Id*.

The Court then noted that, although lead counsel's work on general causation impacted all plaintiffs in this MDL, "what really opened the floodgates for settlement were the three jury verdicts, two of which took place in state court, not the MDL." *Id*.[2]

---

[1] Lead counsel requested that the holdback also include Roundup cases in state court and people who settled with Monsanto before filing any lawsuit at all. *See id.* at 952-53. This Court refused to issue any such "far-reaching order," instead limiting the holdback to cases within the MDL. *Id*. at 973.

[2] Here, the Court is referring to the verdicts in *Pilliod v. Monsanto* and *Johnson v. Monsanto*, the two state court cases in Spring 2019 that yielded verdicts far dwarfing the $80 million awarded by the jury in *Hardeman v. Monsanto*. *See In re Roundup*, 544 F. Supp. 3d at 955-56 (discussing the $289 million verdict in *Johnson* and the $2 *billion* verdict in *Pilliod*, later remitted to $20.5 million and $87 million, respectively).

4

Importantly, the Court then observed that although lead counsel's hard work helped lay the groundwork for other lawyers in the MDL to get settlements for their clients, "the settlements obtained by those lawyers were likely far lower than the settlements obtained by lead counsel for their 'inventories,' thus diminishing the need to address the free rider problem." *Id*.[3]

The Court also observed that "there is a certain arbitrariness to lead counsel's request for 8.25%." *Id*. at 970. In the Court's view, an across-the-board holdback of 8.25% of all attorneys' fees "assumes (contrary to the discussion in this ruling) that even if the attorneys who did common benefit work have already been compensated obscenely compared to the free riders—they should automatically be entitled to more because those who benefitted from their work should be taxed no matter what." *Id*. In the Court's view, "[t]hat is neither necessary nor desirable." *Id.*

Despite these observations, the Court concluded that "a holdback is justified for recoveries obtained by plaintiffs in the MDL." *Id*. at 970-71. First, the Court explained, a holdback was warranted because "there is a reliance interest at play here." *Id*. at 971. "After all," the Court observed, "the Court signed lead counsel's proposed order at the outset of the MDL, thereby creating an expectation that a common benefit fund would be created." *Id*.

Second, the Court observed, "the common benefit work performed in the MDL indeed conferred a significant benefit on MDL plaintiffs and their lawyers. The work on general causation, on summary judgment in the bellwethers, and on the *Hardeman* trial helped pave the way for substantial settlements for other MDL plaintiffs . . .." *Id*.

The Court cautioned, however, that "ordering a holdback does not necessarily mean that more money will be distributed to lead counsel." *Id*. at 970. "Perhaps," the Court wrote, "all or

---

[3] As this Court explained, "free riding" occurs "when people sit back and watch one plaintiff work hard (and spend hard) to obtain a favorable result, only to swoop in and benefit from that result in the end." *Id*. at 960.

most of the money will be sent back to the people who were subject to the holdback, in which case delay would be the only real consequence." *Id*.; *see also id*. at 971 (noting that "it would not be surprising to see all plaintiffs receive all or part of that money back.").

The Court indicated that the key determinant in whether the holdback would be returned is whether "the lawyers in the MDL who performed common benefit work are adequately compensated in relation to the lawyers who did not." *Id*. at 970. Thus, the Court stated, "all counsel in the MDL . . . may have a strong claim to ultimately recover the amount withheld from their clients' recovery, based on an argument that lead counsel's relative compensation is already so high that no further redistribution is warranted." *Id*. at 971.

**B.    The Special Master's Report and Recommendation.**

In the wake of PTO 236, this Court appointed a Special Master to provide a recommendation regarding the distribution of monies in the common benefit fund. The Special Master ultimately recommended that "the Court not reallocate money in the fund to lead counsel and instead order that the deposits be returned to each of the depositing firms." R&R at 2.

The Special Master noted that a host of factors weigh against distributing the common benefit funds in this case. (We summarize only a few of those factors here.)

First, the Special Master observed, the fact that lead counsel's work benefited other MDL firms does not, in and of itself, justify a forced fee transfer. "It is a common practice for one firm to borrow from the work product of another firm without incurring any charge. A law firm that borrows from another firm's complaint or brief generally has no obligation to pay for it . . . Lawyers often receive positive spillover benefits from other lawyers that the law allows them to enjoy free of charge." R&R at 8.

The Special Master acknowledged that, although much of lead counsel's work, particularly on general causation and preemption, benefitted other MDL plaintiffs, "[i]t was work in both state

and federal courts that resulted in the large verdicts that increased the settlement pressure on Monsanto. The overlapping work makes it difficult to tie the benefits with any precision to the work performed in the MDL, further weighing against a redistribution of funds." *Id.* at 9.

The Special Master further observed that "many law firms remain in active litigation with Monsanto. Simply filing a lawsuit did not put them on the fast track to settlement. Monsanto continues to contest liability in the wave cases that are still being litigated. The law firms involved in active wave cases must develop experts sufficient to survive general and specific causation challenges, and they must oppose motions for summary judgment." *Id*. at 10.

This "highlights a line drawing problem," in the Special Master's view. *Id*.  "All firms are subject to the same flat 8% holdback, yet the nature of the work that firms continue to perform varies significantly." *Id*.  "It does not seem fair that a firm that develops experts, overcomes motions for summary judgment, and prepares its case for trial should have to pay the same 8% cut of its fees as a firm that settled its case with minimal work." *Id.*

Another factor weighing against a common benefit distribution, in the Special Master's view, was the fact that "lead counsel's work primarily benefited lead counsel." *Id*. at 13. Thus, the Special Master observed, "many lead counsel firms were already waist-deep in litigation against Monsanto" before being appointed as lead in this MDL. *Id*. at 14.  As a result, "[m]ost of the work that lead counsel points to as warranting a redistribution of fees was necessary for the advancement of their own cases." *Id*.  Awarding a common benefit distribution would therefore result in lead counsel being "paid twice" for the same work—a factor that, although not dispositive in the Special Master's view, "must be acknowledged. *Id.*

The Special Master also noted "some firms have objected to a holdback on the ground that lead counsel have failed to provide them with requested assistance." *Id*.  Thus, for example,

- Non-lead firms have reported that emails and calls to lead counsel have gone unanswered.

- Non-lead firms have claimed that lead counsel failed to make experts available or that lead counsel has monopolized experts for their own benefit to the detriment of other firms.

- Non-lead firms have claimed that lead counsel has prioritized the settlement of their own inventories of cases over those of non-lead firms.

- Non-lead firms have reported that they received more help from trial packages prepared by firms litigating against Monsanto in state court than from lead counsel in this MDL.

*Id*. at 14-15.  "Undoubtedly," the Special Master concluded, "there are two sides to these stories, but they reflect the overarching challenge of determining with any meaningful precision the extent to which the lead counsel's work in the MDL conferred benefits on nonlead firms."  *Id*. at 15.

    Finally, the Special Master observed that lead counsel have already greatly benefited from their leadership role in the MDL by receiving preferential treatment for their own inventories of cases.  "In this MDL," the Special Master observed, "lead counsel's recoveries on their claims are significantly higher than those of most non-lead firms, and out of that approximately 5,600 cases filed in this MDL, almost 10% of those cases were filed by lead counsel firms.  Based on the data that has been obtained to date, lead counsel has settled their cases for significantly higher per-case amounts than non-lead counsel firms. Serving in leadership positions has clearly provided lead counsel benefits not enjoyed by other law firms in the MDL."  *Id*. at 17 (emphasis added).

    The Special Master concluded that "each lead counsel firm obtained attorneys' fees that are considerably higher than those obtained by many other firms in this MDL."  *Id*.  at 19. "While a small number of firms have received fees comparable to those of lead counsel in this MDL, these firms' per-case settlements were still significantly lower than those of lead counsel, and some of these firms had cases that reached the eve of trial."  *Id*.  "[T]he bottom line," the Special Master

wrote, "is that lead counsel recovered much more from this MDL than many of the firms that they are seeking to take additional fees from." *Id*.

That was likely only the tip of the iceberg in terms of lead counsel's compensation, the Special Master observed, because "most of the cases that lead counsel resolved were likely non-MDL cases"—i.e., state court cases that never became part of the MDL. *Id*. Thus, "[i]t's been reported that Weitz & Luxenberg, The Miller Firm, Wagstaff Law Firm, Wisner Baum, and Moore Law Group have been involved in the settlement of some 32,000 cases." *Id*. at 20. "The Miller Firm alone," he added, "is reported to have settled approximately 5,000 cases for a total of $850 million (or an average of $160,000 per case)." *Id*. (citation omitted). "Given the overlap in the state and federal court litigation—including the three large bellwether verdicts that brought Monsanto to the negotiating table—lead counsel's recoveries are likely far greater when non-MDL cases are considered." *Id*.

The Special Master also noted that while "the primary rationale for the holdback is [incentivizing] good lawyers to step up to lead an MDL[,] . . . this consideration can also cut the other way." *Id*. at 22. Thus, he observed, "[s]mall firms may turn down cases because the potential of an MDL tax may threaten to eat up most of the firm's recovery." *Id*. "Imposing a flat MDL tax," he added, "may discourage firms from bringing cases at all. This could be problematic not only for the potential clients, but also because non-lead firms may help to publicize the harms and inform the public of potential claims." *Id*. Thus, the Special Master concluded, "[w]hen common benefit fees are too high or indiscriminately applied, it can affect the ability of plaintiffs to find lawyers to take their cases." *Id*.

The Special Master ultimately recommended that the entire common benefit fund should be returned to non-lead counsel. *Id*. at 24. He added, however, that "[i]n the event the Court

determines more work is necessary to decide whether common benefit funds should be redistributed, the Special Master advises broadening the inquiry to include lead counsel's recoveries from non-MDL cases."  *Id*.

### C.    Pretrial Order 312.

Following a March 4, 2025, hearing on the Special Master's R&R, the Court ordered that all the money in the common benefit fund should be distributed to lead counsel because "all the work performed by these firms conferred a significant benefit on all the plaintiffs in this MDL." Dkt. 20336 (Pretrial Order 312, Mar. 13, 2025) at 1. The Court stated that, "[g]iven the difficulty of [the common-benefit] work, the amount of time spent doing it on a compressed schedule, the high quality of the work, and the risk that the seven firms undertook, those firms are entitled to compensation beyond what they received through their own clients' recoveries."  *Id*. at 1.

The Court acknowledged that "there's a degree of unfairness involved in imposing an eight percent holdback on everyone." *Id.* at 2. The Court reasoned, however, that "if you tweak a result for one party or one group to make it more fair for them, you've inevitably made it less fair for another party or another group." *Id*.  Moreover, the Court stated, "adjudicating the appropriate holdback for each MDL plaintiff (or for each MDL lawyer) is not feasible from an administrative standpoint." *Id*.

Thus, the Court concluded, the "'least worst' solution is achieved by distributing the $24.2 million currently in the fund to the seven firms in short order."  *Id*. at 3.

In so ruling, the Court did not address the arguments set forth in the Special Master's R&R as to why a common benefit distribution is not warranted in this MDL. Nor did the Court consider the amount of compensation that lead counsel have already received from their thousands of Roundup cases in the MDL and in various state courts.

D.    **This Lawsuit.**[4]

The underlying case at issue here—*Koen v. Monsanto Co., Inc.*, Civil Action No. 1:22-cv-209-RP (W.D. Tex.)—settled the morning of jury selection, two and one-half years after it was transferred back to the Western District of Texas from the MDL.

Bradley Koen used Roundup for 20 years before being diagnosed with non-Hodgkin's lymphoma (NHL) in 2018 at age 47. He underwent chemotherapy, a stem-cell transplant, and an experimental, CAR-T-cell therapy—experiencing remissions and relapses along the way—until going back into remission in June 2020. Demik Dec. ¶ 10.

Koen sued Monsanto in the Western District of Texas in March 2020. The action was transferred to the MDL the following month and became part of the "Wave 3 Cases." *See* Case 1:22-cv-00209-RP (W.D. Tex.) Dkt. 36, Suggestion of Remand to Transferor Court (Chhabria, J.).

Prior to remand, Monsanto filed a series of dispositive motions specific to *Koen*, including a motion related to specific causation (Dkt. 19) and a motion for summary judgment based on Texas law relating to presumption of liability (Dkt. 17).[5]

Following a series of rulings on these and other dispositive motions in the Wave 3 cases in December 2021 and January 2022, *see* Dkt. 36, Suggestion of Remand to Transferor Court

---

[4] These facts are based on the Declaration of Stephen Demik, lead trial counsel on the case post-remand, which was attached as Exhibit 1 to Plaintiffs' Amended Request for Return of Common Benefit Holdback, Case 3:20-cv-03074-VC, Dkt. 38. For the Court's convenience, we have attached a copy of the Demik Declaration to this brief as well (Exhibit 1), along with a declaration of co-counsel Scott Hendler (Exhibit 2). A procedural history of the case is also set forth in Judge Pitman's order of June 11, 2024, Civ. No. 1:22-cv-209-RP (W.D. Tex.), Dkt. 159.

[5] These citations and similar references to "Dkt." in this section of the brief are to the ECF docket numbers in the Western District of Texas.

(describing rulings),[6] this Court transferred Koen's case to the Western District of Texas in March 2022. Dkt. 37. (For the Court's convenience, the Texas docket is attached as an Exhibit hereto.)

About a year later, Koen began showing symptoms of a neurological decline that his doctors at first suspected was Parkinson's disease. Efforts to treat him were ineffective, however. His health deteriorated for several months before he was forced to enter a memory-care facility at the age of 50. While in the memory-care facility he became bedridden and non-communicative. Tragically, he died there on April 5, 2023. Demik Dec. ¶ 11.

Plaintiffs' counsel acted immediately and conducted an autopsy of Koen's brain, which revealed that he had an autoimmune disorder called paraneoplastic encephalomyelitis (PEM), an extremely rare disorder linked to NHL. After an autopsy, Koen's doctors concluded that the PEM was the result of his NHL.

Post-remand, the case was heavily litigated by both parties for two and one-half years until it settled on the morning jury selection was scheduled to begin. *See* Order of July 20, 2024, Dkt. 288 (staying case in light of settlement); Demik Dec. ¶¶ 10-26. Part of the reason for the extensive post-remand litigation was the unique nature of Koen's injuries, which caused his death in the midst of pre-trial preparations, necessitating additional discovery and new expert reports. *Id*. ¶¶ 14-18.

---

[6] Specifically, the Court denied Monsanto's motion for summary judgment based on Texas law relating to presumption of liability. *See* MDL Pretrial Order No. 259 (Dkt. 14415). For challenges to Koen's specific causation experts, the Court granted Monsanto's motion to exclude the testimony of Koen's expert Dr. Scola, finding that Dr. Scola's testimony was not based on a reliable methodology. *See* MDL Pretrial Order No. 263 (Dkt. 14432). However, the Court denied Monsanto's motion to exclude Dr. Freeman, incorporating the reasoning from prior rulings. Pretrial Order No. 262 (Dkt. 14431). The Court similarly reincorporated the reasoning from prior rulings to deny Monsanto's motions for summary judgment on general causation and non-causation grounds. Pretrial Order No. 273 (Dkt. 14621).

The Texas court had originally set trial for April 3, 2023, later reset to May 3, 2023. Koen's health worsened significantly during that year, however, necessitating postponements to all the parties to obtain additional medical records and supplemental expert witness opinions. Dkt. 71 (Joint Motion to Continue Trial filed March 31, 2023); Demick Dec. ¶¶ 14-18. The court reset the trial for October 2023. Dkt. 76.

After Koen's death in April 2023, the parties jointly sought another extension to May 2024, to allow for time to obtain the results of his autopsy and the final neuropathology report. Dkt. 80 (Joint Status Report filed Sept. 29, 2023); Demik Dec. ¶¶ 7, 12-15. Trial was reset for May 6, 2024. Dkt. 82.

In November 2023, Koen's widow and parents (who were now the plaintiffs in the case, *see* Dkts. 86 and 152, First and Second Amended Complaints) filed their Rule 26(a)(2)(A) expert disclosure, identifying three retained experts that were not included in the MDL and a host of medical providers specific to Koen's unique circumstances. Dkt. 87.

In April 2024, Monsanto filed seven motions, including six motions to exclude expert opinions (Dkts. 106-11) and a motion for summary judgment (Dkt. 112). In the latter motion, Monsanto argued that "[s]ummary judgment should be granted in Monsanto's favor on Plaintiffs' wrongful death claims because Plaintiffs cannot prove Mr. Koen's neurological conditions and death were due to his NHL." *Id.* at 2.

Plaintiffs, meanwhile, moved to partially exclude the testimony of Monsanto's expert witnesses who planned to testify on the link between glyphosate and NHL. Dkts. 113-16. Plaintiffs also move for summary judgment on Monsanto's affirmative defenses, including negligent conduct, contributory negligence, improper use of products, and failure to mitigate. Dkt. 117.

In June 2024, the Texas court issued a detailed ruling on Plaintiffs' motions to exclude and for partial summary judgment and on Monsanto's motion to strike Plaintiffs' motions.  Dkt. 159. Notably, the court's order makes clear that the issues raised in these motions were distinct from issues raised in the MDL.  *Id.*

Later that same month, Monsanto filed 31 Motions *in Limine* (MILs).  Plaintiffs filed 11 MILs of their own, mostly by researching prior Roundup trials in California and Pennsylvania. Demik Dec. ¶ 21.  Oppositions and replies were filed for most of these motions.  Dkts. 163-250. Out of the 42 MILs, there was very little overlap with the motions from the *Hardeman* case.

Finally, as the case steamed towards trial—which had finally been scheduled for July 15, 2024, Dkt. 99—the parties filed multiple trial briefs, including briefs on causation standards and choice of law.  Dkts. 263-76.  Motion practice, in fact, continued up to the week of jury selection, as Monsanto continued to file motions to exclude Plaintiffs' evidence.  Demick Dec. ¶¶ 23-26.

The case ultimately settled on July 12, 2024, the morning jury selection was scheduled to begin. Dkt. 288.

All told, the trial team spent over 3,800 hours litigating the case post remand and incurred costs in excess of $450,000, further demonstrating the huge amount of work that went into this case outside the MDL.  Demik Dec. ¶¶ 28-29.

## ARGUMENT

Plaintiffs respectfully disagree with the Court's tentative determination that the entire common benefit fund should be distributed to lead counsel.

Judging from the colloquy at the March 4 hearing, the Court seemed to think that the conferral of a benefit necessarily warrants some sort of forced fee transfer, regardless of whether (and the extent to which) the benefit-conferring work also benefitted lead counsel and regardless of

how much work it took to resolve the underlying case outside the MDL. The Court also seemed to think that, regardless of its inherent unfairness, an across-the-board distribution of 8% of every fee generated within the MDL cannot be avoided given the administrative difficulties of evaluating every lawsuit on a case-by-case basis.

We disagree as to each point.

**A.    Because the Mere Conferral of a Benefit Doesn't Justify a Forced Fee Transfer, No Common Benefit Distribution is Warranted Except as to Work Done Exclusively for the Benefit of the MDL.**

First and foremost, it bears emphasis that, as a general matter, the mere conferral of a benefit does not warrant a forced transfer of attorneys' fees within our civil justice system.  As the Special Master observed, "[l]awyers often receive positive spillover benefits from other lawyers that the law allows them to enjoy free of charge."  R&R at 8; *see also In re Roundup*, 544 F. Supp. 3d at 968 (noting that "there is nothing inherently wrong with lawyers (and by extension their clients) benefitting from the work of other lawyers without paying them.  Indeed, that's the very nature of a common law system built on precedent."); *Restatement (Third) of Restitution & Unjust Enrichment* § 2, cmt. b. (AM. L. INST. 2011) ("the fact that we derive advantage from the efforts and expenditures of others is not 'unjust enrichment' but one of the advantages of civilization."); Silver & Miller, *A Proposal*, 63 Vand. L. Rev. at 121–22 (noting that "[t]he common fund doctrine applies only when claimants are unjustly enriched. To be unjustly enriched, however, more is required than that claimants benefit from the efforts of others—much more.").

The question, then, is whether there is a sound basis for carving out an exception to this overall principle for MDLs.  During the March 4 hearing, the Court seemed to suggest the answer is "yes" because (1) there's a need to incentivize good lawyers to take a lead role in MDLS; (2) as a matter of fairness, lead counsel deserve to be adequately compensated for efforts that end up

15

benefitting others; and (3) lead counsel relied on the court's promise of compensation for common benefit work.

In Plaintiffs' view, none of these reasons withstands scrutiny.

Regarding the first point (incentivization): as the Special Master noted, "[m]ost of the work that lead counsel points to as warranting a redistribution of fees was necessary for the advancement of their own cases." R&R at 14. Thus, for example, all the work on general causation that lead counsel point to as having been of particular benefit to other MDL lawyers would have been done even if the MDL had never come into existence. There's obviously no need to incentivize that work via a common-benefit distribution, because it would have been done regardless of lead counsel's leadership role in the MDL.

As to the second point (fairness): there is nothing unfair about not being paid for a benefit conferred on others; indeed, as noted above, that's a feature of our civil justice system, not a bug. Moreover, lead counsel have *already* received a hefty premium for their position as lead counsel in the MDL. As the Special Master noted, lead counsel's cases settled for far more than other cases within the MDL. Although Plaintiffs don't know the full extent of that premium (because the figures are sealed), it's no doubt substantial (perhaps even island-worthy).

But beyond that, lead counsel *also* received untold millions in compensation for their Roundup cases that settled outside the MDL. *See* R&R at 19-20. Does fairness require that these extremely well-heeled lawyers be made even richer by taking a fee from everyone in the MDL, regardless of the extent of any benefit conferred relative to the work performed by non-lead counsel? Given the common-benefit doctrine's roots in equity, Plaintiffs respectfully suggest that the answer to that question must be no.

16

Indeed, the Court seemed to agree with that proposition in PTO 236, which stated that "lead counsel's relative compensation [may] already so high that no further redistribution is warranted." *Id*. Despite this observation, the Court made no reference to the amount of lead counsel's compensation in PTO 312, instead simply concluding that lead counsel deserve the entire holdback regardless of their haul from their individual cases. That seems wrong to us: even if, as the Court seems to believe, lead counsel deserve some additional compensation for having conferred a benefit, then surely the amount of compensation they have already received deserves some consideration.

As to the third factor (reliance): the Court indicated, in PTO 236, that lead counsel's reliance on the creation of a common benefit fund militates in favor of distribution of same. *See* 544 F. Supp. 3d at 970 (stating "there is a reliance interest at play here. After all, the Court signed lead counsel's proposed order at the outset of the MDL, thereby creating an expectation that a common benefit fund would be created.").

In Plaintiffs' view, this factor deserves no weight. As a logical matter, reliance interests justify a payment only as to work done exclusively for the MDL  As to work that lead counsel would have done anyway in furtherance of their own clients' interests, they cannot be said to have "relied" on the court's creation of a common benefit fund as an incentive to do that work, because it needed to be done in any event. Lead counsel may be disappointed by not receiving a common benefit fee, but doesn't give rise to a cognizable reliance interest.

For all these reasons, Plaintiffs submit that a common benefit distribution is unwarranted in this MDL except as to work done exclusively for the benefit of the MDL itself. Thus, for example, it may be appropriate to compensate liaison counsel for the administrative work conducted on behalf of the MDL litigants. It may also be appropriate to compensate lead counsel for their efforts

17

in preparing "trial notebooks" for other lawyers in the MDL (although, it should be noted, the *Koen* Plaintiffs had no idea such notebooks existed and were never offered any other type of assistance from lead counsel. *See* Hendler Dec. ¶ 19.)  Lead counsel may even be entitled to compensation for their support of appellate litigation related to preemption (although they managed to litigate that issue quite well in the Ninth Circuit without the assistance of paid counsel from the outside).[7]

But, in Plaintiffs' view, there is no justification whatsoever for giving lead counsel a flat 8% chunk of everyone else's fee, particularly given the preferential treatment they received in their own individual cases by virtue of their leadership role in the MDL.  That, we submit, is not the "least worst" outcome; it is the worst outcome, period.  Better to deny any common distribution at all, as the Special Master recommended, than to simply give the entire holdback fund to lead counsel, who have already been richly compensated for their efforts as compared to non-lead lawyers in this MDL.

### B.     At a Minimum, the Court Should Not Require Any Common Benefit Distribution for Cases, Like This One, that Require Substantial Litigation Outside the MDL.

Even if some common benefit distribution is warranted as to some cases in this MDL, there is no justification for imposing a flat 8% holdback on *all* cases in the MDL.  First, it is worth noting that the 8% holdback may itself be excessive. *See* William B. Rubenstein, 5 *Newberg and Rubenstein on Class Actions* § 15:115 (6th ed. June 2024 update) (noting that "a typical common benefit assessment is 4% to 6% of the client's gross recovery.").

Beyond that, imposing the same flat tax on all MDL participants regardless of their underlying circumstances creates a serious fairness problem.  As the Special Master observed**,** "[a]ll firms are subject to the same flat 8% holdback, yet the nature of the work that firms continue

---

[7] Public Justice participated as co-counsel on the appeal on a pro bono basis.

to perform varies significantly." *Id*. "[I]t does not seem fair," he added, "that a firm that develops experts, overcomes motions for summary judgment, and prepares its case for trial should have to pay the same 8% cut of its fees as a firm that settled its case with minimal work." *Id*.[8]

The *Koen* Plaintiffs wholeheartedly agree. Under the Court's proposed approach, lawyers who spend hundreds or even (as in this case) thousands of hours litigating their individual cases are subject to the same holdback as "free riders" who do little or no work on behalf of their clients and rely entirely on the work of MDL counsel. How can that be a fair result? Short answer: it isn't.

The unfairness of a flat 8% tax on all MDL participants is underscored by the fact that MDL litigants "may have no choice but to accept and pay for certain legal services as directed by the court." *Judging*, 90 N.Y.U. L. Rev. at 102–03. Because attorneys swept up into an MDL "cannot conduct discovery on their own, . . . they have few options but to use the common work product unless they remain solely in state courts." *Id*. at 107; *see also Monopolies*, 70 Vand. L. Rev. at 146 (noting that "in multidistrict litigation; plaintiffs have their own attorneys and have no choice but to accept and pay for lead lawyers' judicially appointed services.").

This Court acknowledged the unfairness of a flat 8% tax in PTO 312 but suggested that there's no way around it because "if you tweak a result for one party or group to make it more fair for them, you've inevitably made it less fair for another party of group." *Id*. at 2. Plaintiffs respectfully disagree. Given the relatively small number of cases that have been remanded from

---

[8] *See also* Elizabeth Chamblee Burch, *Judging Multidistrict Litigation*, 90 N.Y.U. L. Rev. 71, 133 (2015) ("*Judging*") , (noting that "if cases were transferred back to their original fora for trial as Congress intended, reflexively awarding lead lawyers a flat percentage of plaintiffs' settlement could be unreasonable given that individual counsel ushered in the final result"); *A Proposal*, 63 Vand. L. Rev. at 128 (noting that, traditionally, the common fund doctrine "applies only when the beneficiary, whether in person or by counsel, has made no significant contribution to the transaction by which the common fund is created, preserved, or enlarged. When everyone contributes something of importance, no one receives restitution from anyone else.") (cleaned up; citation omitted).

the MDL, it should be a relatively easy matter to "tweak" the common benefit distribution to exclude firms that had to pour substantial resources into their cases outside the MDL. *See* Elizabeth Chamblee Burch, *MDL for the People*, 108 Iowa L. Rev. 1015 (2023) ("Remand is rare. MDL judges resolve ninety-nine percent of the cases before them.").

To be sure, that would require some consideration of individual circumstances, but isn't that what judges (or their Special Masters) are uniquely well qualified to do? The Special Master here did not say it would be impossible to conduct any such inquiry; and there is no reason to suppose that this approach would be so unworkable as to justify a draconian 8% flat tax on every firm in the MDL regardless of the underlying circumstances.

As to the Court's concern that any attempts at line-drawing would "inevitably make it less fair for another party or group" (PTO 312 at 2): that's always true whenever any line is drawn. But, in Plaintiffs' view, the Court's solution to that problem was to draw the most unfair line of all—one that makes *all* MDL litigants pay lead counsel 8% of their fee regardless of the underlying circumstances. A better approach, we submit, is to draw a line that at least attempts to approximate real-world circumstances by allowing attorneys who put substantial resources into their cases outside the MDL to make a case for a common-benefit exemption—such as Plaintiffs have done here.

At a minimum, the Court should consider applying a sliding-scale common-benefit percentage that's inversely proportional to the amount of the underlying recovery attributable to non-lead counsel's work. Thus, for example, the Court could determine the average settlement value of non-lead counsel's cases within the MDL and apply descending common-benefit percentages in proportion to the amount any given settlement exceeds the average. Because cases that settle for a higher value than the average likely took more work on the part of non-MDL

counsel, this would be a fairer approach than the across-the-board 8% distribution proposed in PTO 312.

And if there was ever a case that vividly illustrates the unfairness that would result from this Court's "least-worst" rule, it's this one. As explained above, this case was heavily litigated for two and a half years post remand in the Western District of Texas. Due to the unique nature of Bradley Koen's injuries, this case actually required four stages of causation: (1) that Roundup causes NHL, (b) that Roundup caused Mr. Koen's NHL, (3) that Mr. Koen's NHL caused his PEM; and (4) that PEM caused his death. As Demik explains, "this was not an ordinary glyphosate/NHL case in that regard and required vastly more time and preparation because of it." Demik Dec. ¶ 17.

Post-transfer, there were *eight* expert depositions (including two of Monsanto's doctors) and another deposition of Mr. Koen's widow. *Id*. In addition to the case-specific motions practice conducted within the MDL on issues relating to Texas law and specific causation, the trial team devoted substantial time post remand, including on pretrial briefing, meetings with experts and consultants, meetings and interviews with clients and lay witnesses, depositions, internal strategy meetings, and preparation for trial. *Id*. ¶ 28. Monsanto fought every step of the way, filing 31 Motions *in Limine*, many on issues that had never been briefed in the MDL. Monsanto kept filing motions up until the week of trial and only agreed to a settlement at the last minute as the parties were about to select a jury. *Id*. ¶ 7.

There is no question, moreover, that the relatively high settlement achieved in this case resulted from the unique efforts of undersigned counsel. As this Court can see from the amount of the holdback deposited by Plaintiffs' counsel, the recovery substantially exceeds any negotiated recovery by non-lead lawyers with cases in the MDL.

Moreover, before this case was transferred back to Texas, the Special Master offered to settle the case for $75,000—a small fraction of what the case ultimately settled for two and one-half years later.  Hendler Dec. ¶¶  6-10.  (The settlement amount is confidential, but it can be determined by reference to the amount of the holdback deposited with the Special Master.)[9] The enormous increase in the case's settlement value is testament to the unique efforts of Plaintiffs' counsel here.

During the March 4 hearing, this Court suggested that this case's high settlement value actually *supports* a common benefit contribution, because Plaintiffs' attorneys will still have a sizable fee despite the forced 8% fee transfer.  In Plaintiffs' view, that misses the point. The fact that the case settled for so much more than it was worth pre-transfer, while still in the MDL, shows that the bulk of the case's value came from non-lead counsel's efforts.  Lead counsel will be unjustly enriched if they are allowed 8% of the fee regardless of its relative size.

In short, even if some holdback is warranted as to "free riding" attorneys whose claims were resolved within the MDL with little or no effort on the part of non-MDL counsel, it is not not warranted here—or in any other case that took substantial efforts post-remand.

But if the Court nonetheless concludes that some type of holdback is warranted in this case, it should be limited to the $75,000 the Special Master offered to resolve this case while it was pending in the MD—or, at most, the $150,000 Monsanto subsequently offered to settle the case prior to remand.  *See* Hendler Dec. ¶¶ 6-11.  Applying the 8% to the entire settlement value would reward lead counsel for underlying counsel's work—a result that, in Plaintiffs' view, cannot be justified either in terms of equity or necessity.

### CONCLUSION

---

[9] Prior to remand, Monsanto' s settlement counsel increased the offer to $150,000. *Id*. ¶ 11. This offer was also declined.

For the foregoing reasons, Plaintiffs respectfully urge the Court to hold that a common benefit distribution is only warranted with respect to work done exclusively for the benefit of the MDL, and direct the Special Master to identify and recommend a value for that work. Barring that, the Court should, at a minimum, order the return of the common benefit holdback in this case and other cases where substantial resources were expended post-remand to bring the case to a conclusion.

Dated: March 20, 2025                    Respectfully submitted,

HENDLER FLORES LAW, PLLC

*/s Scott Hendler*

Scott Hendler
Valerie Farwell
901 S. MoPac Expressway, Suite 300
Austin, Texas 78746
(512) 439-3200
*shendler@hendlerlaw.com*

SINGLETON SCHREIBER, LLP

*/s Stephen Demik*

Stephen Demik
Leslie A. Brueckner
John Lemon
Gerald Singleton
591 Camino de la Reina, Ste. 1025
San Diego, CA 92108
(619) 771-3473
*sdemik@singletonschreiber.com*

Attorneys for Plaintiffs