David S. Muraskin
**FarmSTAND**
712 H St. NE, Suite 2534
Washington, D.C. 20002
david@farmstand.org
Tel: (202) 595-8816
*Counsel for Amicus Curiae*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br>Case No. 16-md-02741-VC |
| This document relates to:<br><br>ALL ACTIONS | **AMICUS CURIAE BRIEF OF FARMSTAND IN SUPPORT OF THE JOINT MOTION OF MDL CO-LEAD COUNSEL AND WAVE 10 PLAINTIFFS FOR INJUNCTIVE RELIEF OR, IN THE ALTERNATIVE, DECLARATORY RELIEF RELATED TO PROPOSED NATIONAL ROUNDUP SETTLEMENT** |
| *Jones v. Monsanto Co.*,<br>3:26-cv-01455<br><br>*Schramm v. Monsanto Co.*,<br>3:26-cv-01461 | Hearing Date: April 30, 2026<br>Hearing Time: 10:00 a.m. |

**Statement of Interest**

FarmSTAND submits this brief in support of the relief requested against the "*King Proposed Settlement*," in light of the harms the settlement will cause farmers and farmworkers. [1] Farmers and farmworkers are already suffering from Non-Hodgkin Lymphoma caused by glyphosate-based Roundup ("Roundup"), and they are the most likely members of the atypical "futures" subclass (Subclass 2) established by the settlement—as Monsanto claims it has pulled Roundup from the lay-consumer market while continuing to sell it to farms. Thus, the concerns of farmers and farmworkers speak to the need for the relief requested on behalf of participants in the MDL, add interests in favor of that relief that movants cannot represent, and confirm the need for independent counsel or a special master to protect futures claimants.

FarmSTAND is the only legal organization dedicated exclusively to addressing the harms of corporatized animal agriculture—of which Roundup is a central component, because much of domestic crop production is for animal feed. As a result, FarmSTAND is intimately familiar with the challenges the proposed settlement will pose for the agricultural community. For instance, FarmSTAND is a member of the National Sustainable Agriculture Coalition ("NSAC") and the Health, Environment, Agriculture, and Labor ("HEAL") Food Alliance. NSAC brings together 170 grassroots organizations to advance the interests of small and mid-size family farms. HEAL Food Alliance consists of 62 organizations, including those representing farmers, farmworkers, and food chain workers exposed to agrichemicals. FarmSTAND is also co-counsel in *Urban Sustainability Directors Network v. USDA*, No. CV 25-1775 (BAH) (D.D.C.), where grassroots groups seek to

---

[1] FarmSTAND submits this amicus brief pursuant to this Court's Order, Dkt. No. 21966, authorizing amicus briefs in support of the relief requested without first seeking permission to file. No counsel for any other party authored this brief in whole or in part, and no person other than FarmSTAND made a monetary contribution in support of this brief's preparation and submission. FarmSTAND also notes its arguments are not fulsome given the time allotted for filing.

1

protect their work to support rural economies and farmer training. Further, it is working to defend farmworkers' access to counsel, medical care, and other services in *Colorado Legal Services, Inc. v. Southern Colorado Farms*, *LLC*, No. 2025-cv-30033 (Colo. Dist. Ct.).

### Introduction

Roundup is endemic to rural communities. By 2014, more than 90% of corn and soybean hectares were planted with glyphosate-resistant seeds, the sole purpose of which is to enable the sale and use of Roundup. Christopher Landau et al., *The Silver Bullet That Wasn't: Rapid Agronomic Weed Adaptations to Glyphosate in North America*, 2 PNAS Nexus, at 2 (2023), https://perma.cc/W8A7-ZZWL. The gains from those products, however, were short-lived. A Bayer funded study concluded that, just a few years later, as much as 80% of the land devoted to maize, cotton, and soybeans contained Roundup-resistant weeds. Graham Brookes, *Genetically Modified (GM) Crop Use 1996–2020: Environmental Impacts Associated with Pesticide Use Change*, 13 GM Crops & Food 262, 274 (2022), https://perma.cc/DT9D-2ZP9. Monsanto's solution to that problem it created was more Roundup, promoting a mixture of Roundup and other herbicides to hold back the superweeds. H. Claire Brown, *Attack of the Superweeds*, N.Y. Times Mag. (June 15, 2023), https://perma.cc/83LD-UGR7.

Sales to farms are now Roundup's sole revenue stream. Monsanto recently represented to the U.S. Supreme Court that the extent of its liability for Roundup's cancer-causing properties has led it "to remove glyphosate from the residential consumer market," but it has maintained Roundup's "availability for farmers." Pet'r's Br. 3, *Monsanto v. Durnell*, No. 24-1068 (U.S. Feb. 23, 2026).

Monsanto purports all these actions were designed to "empower[] American farmers," *id.* at 2, but the *King* Proposed Settlement puts the lie to that claim. It confirms Monsanto works to

protect its bottom line at the expense of rural communities. In the case of the settlement, it does so at the expense of agricultural workers and their families' constitutionally protected rights to due process.

The opt-out rules for the *King* Proposed Settlement demonstrate it fails to comport with the Constitution. The experiences of farmers and farmworkers illustrate the proposed settlement violates bedrock principles of class action law, because it seeks to bind people who presently do not know they are covered by the class and thus could not exercise their right to opt out. Moreover, the barriers created by the settlement's initial opt-out procedure are extreme and unwarranted. This is particularly true for the farmers and farmworkers whom the class was purportedly designed to serve, and in light of the fact that the class seeks to capture futures claimants (Subclass 2) whom the law recognizes are more easily deterred from proceeding on their own. Seemingly to address the latter issue, the *King* Proposed Settlement contains processes likely to be characterized as a "back-end" opt-out, which can theoretically save futures classes. Those processes are an opt-out in name only. It is unclear whether they are even available to all members of the futures subclass. Regardless, they affirmatively enhance the obstacles for claimants, particularly farmers and farmworkers, who wish to litigate.

The lived reality of farmers and farmworkers underscores that this Court should prevent the *King* Proposed Settlement's opt-out rules from taking effect. In doing so, the Court will rightly be protecting the interests of members of the MDL, as well as those of the unrepresented parties in the futures subclass. Farmers' and farmworkers' experiences also confirm the need for independent counsel or a special master to protect the futures subclass's interests.

AMICUS BRIEF OF FARMSTAND – *IN RE ROUNDUP PRODUCTS LIAB. LITIG.*, NO. 16-MD-02741-VC

## I.     Due Process Demands the *King* Proposed Settlement Contain Easily Employable Initial and Back-End Opt-Outs.

The very premise of the *King* Proposed Settlement, seeking to extinguish litigation by those not yet, but who may be, harmed raises significant constitutional concerns. The Supreme Court has recognized "[i]mpediments to the provision of adequate notice" and thereby providing plaintiffs the ability to opt out, "render[] highly problematic any endeavor to tie to a settlement class persons with no perceptible [] disease at the time of the settlement." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 628 (1997). However, to act here the Court need not conclude all futures classes are constitutionally suspect. The *King* Proposed Settlement fails the basic precepts of due process required of every class action.

Whether or not a class can bind those who have not yet been harmed, due process demands that any class action establish "the best practicable" procedures "reasonably calculated" to allow each potential class member "an opportunity to remove himself from the class," *i.e.*, opt out. *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 812 (1985). This rule results in two principles that govern all class actions. First, no action may attempt to bind parties whose claims are "abstract, 'unimaginable,' and inchoate." *In re Johns-Manville Corp.*, 600 F.3d 135, 158 (2d Cir. 2010). If a party does not know they could be part of the class, there is no notice that could be reasonably calculated to alert them to the need to opt out; so, they can never be joined. Second, the opt-out process must not erect unnecessary barriers to proceed independently. "Any reasonable indication of a desire to opt out should suffice." *Plummer v. Chem. Bank*, 668 F.2d 654, 657 n.2 (2d Cir. 1982) (discussing the requirements of Rule 23, rather than due process).

The rule of the best, reasonable notice also means that if a class seeks to address plaintiffs who know they could be part of the action, but have not yet experienced harm, due process requires additional safeguards. "[T]hose without current afflictions may not have the information or

foresight needed to decide, intelligently, whether to stay in or opt out." *Amchem Prods.*, 521 U.S. at 628. The way to "alleviate[]" the fact that futures claimants are not similarly situated to present claimants, and in particular are inclined towards inaction that will bring them within the class, is to afford futures claimants additional process. *See Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 633 n.16 (3d Cir. 1996), *aff'd sub nom. Amchem Prods.*, 521 U.S. 591.

Where (as here) parties insist on pursuing traditional class actions, as opposed to, for instance, opt-in actions, this most logically means providing a back-end opt-out. A party sucked into the class because of their risk of future harm should be provided both an initial opportunity to free themselves, and then another opportunity once their harm crystalizes and they can truly assess the merits of the class action. *See*, *e.g., In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 226 F.R.D. 498, 503 (E.D. Pa. 2005).

In sum, for the *King* Proposed Settlement to comply with the Constitution it must: (i) only reach individuals who have reason to know they are part of the class, so they can be noticed to opt-out; (ii) provide an unencumbered initial opt-out; and (iii) because the settlement seeks to capture those who have been exposed to Roundup, but not yet meaningfully harmed, offer them an unencumbered back-end opt-out. The proposed settlement fails each mandate; particularly when applied to the farmers and farmworkers who are most likely to need all these protections.

## II.     The *King* Proposed Settlement Appears to Bind Those Who Could Never Know They Are Part of the Class Action.

The *King* Proposed Settlement is hardly a model of clarity, but as illustrated by the experience of farmers and farmworkers it appears (albeit perhaps mistakenly) to lock in those who do not know they have ever been exposed to Roundup. Thus, it violates the central tenet that a class action must be able to put all class members on notice of their interest in the action and thereby provide them an opportunity to opt out. *See In re Johns-Manville Corp.*, 600 F.3d at 158.

The proposed "Settlement Class" encompasses those who have yet to develop cancer and merely "participated in . . . or saw the Application of any Roundup Products." Greenwald Decl., Ex. C, Dkt. No. 21962-4, at 16 (§ 2.1(a)). "Application" is defined to include not only working with a labeled product, but all "steps associated with the application," regardless of how that led one into contact with Roundup. *Id.* at 4 (§ 1.1(12)).

The settlement seems to recognize that this broad definition risks extinguishing actions by those who will develop Roundup-induced cancer, but who did not previously know they were exposed to Roundup. However, it fails to remedy that problem. It excludes from the class only those who "saw," but did not participate in, "the Application," *and only if* "neither they nor any of their Representative Claimants had reason to suspect" they were exposed. *Id.* at 17 (§ 2.1(b)(vi)). The definition of Representative Claimant is not drafted with an eye towards who it would bring into the class. It is defined to facilitate executing documents for the class action, and means any "authorized representative" of "a deceased Settlement Class Member (or their estate), or of a minor or legally incapacitated or incompetent Settlement Class Member." *Id.* at 13 (§ 1.1(105)).

The experiences of farmer and farmworker families demonstrate how this language will capture those who have no present basis to know they were exposed, and thus could never exercise their right to opt out. Any farmworker responsible for cleaning containers that held Roundup would have been exposed through "participating in" a "step associated with the application" and brought within the class, even if they were never told with what they were coming in contact. In fact, farmworkers are often told to spray pesticides without being provided a label and warnings in a language they can understand. Farmworker Justice, *Exposed and Ignored* 10 (2013), https://perma.cc/8UTB-FKWY. Further, farmer and farmworker families often work together in and live near the fields. So, if a parent dealt with all steps related to applying Roundup, and a minor

AMICUS BRIEF OF FARMSTAND – *IN RE ROUNDUP PRODUCTS LIAB. LITIG.*, NO. 16-MD-02741-VC

merely watched their parent work from a distance and then encountered the chemicals, the minor would be covered because they "saw" the knowing application of Roundup by their parent, despite the minor having no notion of to what they were exposed.

No knowledge of Roundup use is necessary to fall within the *King* Proposed Settlement. Therefore, its notice can never be adequate. Nor can it ever provide sufficient opt-outs.

### III.    The *King* Proposed Settlement Unduly Encumbers All Initial Opt-Outs, Particularly Those of Farmers and Farmworkers.

Even leaving aside the speed with which initial opt-outs have been demanded, the settlement's opt-out process is facially unreasonable and thereby violates due process. It creates numerous unnecessary barriers to anyone who wishes to opt out. Moreover, those barriers are particularly extreme for the farmers and farmworkers who will make up a significant portion of both subclasses, including the futures subclass that is least expected to accept such burdens.

For any party seeking to opt out, the initial opt-out procedure requires providing basic identifying information *and*: copies of the claimant's "identification issued by any Governmental Authority or other bona fide identification" (whatever the latter means), Greenwald Decl., Ex. C, Dkt. No. 21962-4, at 58 (§ 12.2(b)(vi)); the claimant's "Personal [wet] Signature" attesting to their desire to opt out (although on what document is unclear), *id.* (§ 12.2(b)(vii)); and a "certif[icate]" containing a legal opinion as to whether the claimant is subject to any "agreement tolling the applicable statute of limitations," *id.* (§ 12.2(b)(viii)), among other items. This process is so far from enabling "[a]ny reasonable indication of a desire to opt-out [to] suffice," *Plummer*, 668 F.2d at 657 n.2, it is difficult to imagine it has any purpose except to discourage opt-outs.

In the context of farmers and farmworkers the procedure's impacts are even worse. The opt-out's demand for a legal assessment of whether claims have been tolled will pressure individuals who currently have no counsel, like the futures claimants, to retain one before opting

out. But that is wholly unrealistic for rural parties. The American Bar Association has explained that "nearly 1,300 counties in the U.S."—around 40% of all counties and unsurprisingly concentrated in "states with large, rural expanses"—"have less than one lawyer per 1,000 residents," and thus constitute legal deserts. ABA, *Profile of the Legal Profession* 2 (2020), https://perma.cc/M2PP-F74R. And those statistics do not even consider whether the lawyers would be willing and able to represent plaintiffs. Consistent with this, FarmSTAND has seen firsthand how, as the Trump administration has changed the rules and reduced personnel at USDA, farmers and farm groups throughout the nation have had to rely on a coalition of civil society groups—not the private bar—to address questions and guide them through administrative processes. This is the case even though USDA is meant to serve farmers' interests, farmers and farm groups are well versed in these programs, and they often are seeking to protect meaningful financial interests. Accordingly, it is wholly unrealistic to expect the nearly non-existent rural private plaintiffs' bar will facilitate claimants' opt-outs, especially futures claimants whose potential for recovery is limited. And FarmSTAND can attest the civil society groups are not resourced to be an alternative.

Further, the concern with finding counsel assumes a party is willing to consider submitting an opt-out, and the settlement's demands all but ensure that will not be the case for the average farmworker claimant. Approximately 70% of farmworkers are foreign born. Nat'l Ctr. for Farmworker Health, *Facts About Farmworkers* 1 (2021), https://perma.cc/XG7T-NXAV. "[M]ore than 45 percent" of farmworkers "are undocumented immigrants." *Give Workers Who Put Food on Our Tables Citizenship*, UFW Found., https://perma.cc/7PHH-9837 (last visited Apr. 15, 2026). Among those with legal status, a substantial portion are H-2A workers, who must return to their home country at the expiration of their visa. Christian Valencia & Nick Paulson*, The Growing Role of H-2A Workers in U.S. Agriculture*, Farmdocdaily (July 9, 2025), https://perma.cc/MY7A-U2LN

("H-2A workers now account for 15% of employment on U.S. crop farms."). In the current political environment, it is hard to envision many foreign-born workers voluntarily supplying a copy of their government issued identification, particularly simply to preserve the right to sue if they become sick. The chilling effect of this requirement on undocumented workers would exist at any moment, although it is presently stronger. And for farmworkers who exit the country,[2] assuming notice could be provided, it is difficult to see how one would reasonably expect them to respond to such notice if they must first scan in their documents and signature. *See* Tina Vasquez, *Human trafficking or a guest worker program?*, Futuro (Apr. 14, 2023), https://perma.cc/83ZH-HWV3 (recounting officials at the U.S. Department of Labor as "saying many transitory migrant workers are too difficult to locate" to return unpaid wages recovered in wage theft litigation).

The *King* Proposed Settlement's initial opt-out procedure is not the best practicable, it is only reasonably calculated to keep people in the class. Startlingly this fact is underscored by considering the circumstances of those central to the action and particularly the futures subclass, farmers and farmworkers. Thus, the interests of present and future claimants support prohibiting the opt-out procedures as movants request.

### IV.     The Back-End Opt-Out Does Not Save the Futures Class.

Assuming the *King* Proposed Settlement can work its way around the issues above, settlement proponents will likely point to provisions they portray as back-end opt-outs. Those do not salvage the action, even if the only concern is the futures subclass. They are similarly flawed.

Indeed, it is not even clear if the back-end opt-out exists for all futures claimants. If it does, it is not designed to facilitate them expressing their (now informed) views on participating.

---

[2] The class includes foreigners living abroad if they were "residing in the United States on the Preliminary Approval Date." Greenwald Decl., Ex. C, Dkt. No. 21962-4, at 16 (§§ 1.1(143), 2.1(a)).

For the futures subclass, rather than truly providing a back-end opt-out, the settlement establishes a process of "Award Rejection[]." Greenwald Decl., Ex. C, Dkt. No. 21962-4, at 48–49 (§ 6.17). But, the settlement conditions the ability to reject an award on: a "timely request[] [for] reconsideration," without defining timeliness; the claimant requesting an Extraordinary Circumstances Fund Award, without explaining what happens if the claimant does not qualify for that award; and the claimant submitting a second rejection of the award following the award's reconsideration, without explaining the rules for that process. *Id.*

Pretending the opting-out claimant got some benefit from considering and rejecting an award they did not necessarily ever desire, the *King* Proposed Settlement further states Subclass 2 claimants who run this gauntlet and successfully opt out are still bound by the settlement's strictures. Their payments to their litigating attorney cannot exceed "more than 22% of the Award Payment." *Id.* at 48 (§ 6.16(c)). In other words, the independent counsel a futures claimant is opting out to select is not only capped in their recovery, but capped in reference to the presumably lesser recovery counsel and client concluded the class will provide. Moreover, the settlement creates a "complete bar to any Claim for Punitive Damages." *Id.* at 51 (§ 8.2(a)). Especially in light of the limited counsel available for the farmers and farmworkers who will make up the futures subclass, this all but assures that if they desire to eventually opt out, they will have no redress if they do.

Therefore, the *King* Proposed Settlement fails to establish the necessary back-end procedures for futures claimants. This adds to the interests in favor of movant's requested relief to enjoin the especially burdensome components of the initial opt-out, and weighs in favor of movant's recommendation that the Court appoint someone to protect futures claimants.

## V.    Conclusion.

For the reasons stated here and by movants, the Court should grant their motion in full.

Respectfully submitted,


/s/ David S. Muraskin
David S. Muraskin,
FarmSTAND
712 H St. NE, Suite 2534
Washington, D.C. 20002
david@farmstand.org
Tel: (202) 595-8816

AMICUS BRIEF OF FARMSTAND – *IN RE ROUNDUP PRODUCTS LIAB. LITIG.*, NO. 16-MD-02741-VC