# EXHIBIT 2

# IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI
## 21st JUDICIAL CIRCUIT

ALBERT DALE GRANTGES, )
)
*Plaintiff,* )
v. )
)
MONSANTO COMPANY, )
)
*Defendant.* )

Case No. 20SL-CC02256

Division 1

May 4, 2025

FILED

MAY 0 4 2025

JOAN M. GILMER
CIRCUIT CLERK, ST. LOUIS COUNTY

## ORDER CONCERNING DEFENDANT MONSANTO COMPANY'S MOTION FOR SUMMARY JUDGMENT

Presently before the Court is Defendant, Monsanto Company's ("Monsanto") Motion for Summary Judgment ("Motion"). On April 30, 2025, the Court conducted a hearing on Monsanto's Motion and other dispositive motions. The Court reviewed the pleadings, legal briefs, and exhibits, heard arguments of counsel, and took the Motion and other dispositive motions under submission.

After careful consideration of the legal briefs, exhibits, and oral arguments, the Court hereby makes the following rulings.

### LEGAL STANDARD

A motion for summary judgment should be granted if the pleadings show that there are no issues of material fact and that the moving party is entitled to judgment as a matter of law. Rule 74.04(c); *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 380 (Mo. banc 1993). A "genuine dispute" is a dispute which is real, not merely argumentative, imaginary, or frivolous. *ITT Commercial Fin. Corp.*, 854 S.W.2d at 382.

1

## ANALYSIS

Plaintiff, Albert Dale Grantges, alleges that the chemical compound glyphosate in Monsanto's Roundup products caused his cancer – chronic lymphocytic leukemia ("CLL"), a subtype of non-Hodgkin's lymphoma ("NHL") – and that Monsanto should have included cancer warnings on its Roundup products. Specifically, Plaintiff has asserted the following claims against Monsanto:

1. Strict liability for defective manufacture and design;

2. Strict liability for failure to warn;

3. Violation of the Missouri Merchandizing Practice Act ("MMPA"), Section 407.020 *et seq.*, RSMo;

4. Negligence;

5. Breach of express warranties; and

6. Breach of implied warranties.

Plaintiff seeks compensatory and punitive damages against Monsanto.

Monsanto moves for summary judgment on all claims asserted by Plaintiff. First, Monsanto argues it is entitled to a presumption of non-liability under Texas law.

Second, Monsanto argues Plaintiff failed to present evidence of a feasible alternative design to prove his design defect claim under Texas law.

Third, Monsanto argues it is entitled to judgment as a matter of law on Plaintiff's failure to warn and negligence claims because he admitted to not reading the warning labels.

Fourth, Monsanto argues Plaintiff cannot assert claims under the MMPA because he did not purchase any Roundup products in Missouri.

2

Fifth, Monsanto argues Plaintiff did not rely on any affirmation of fact or promise by Monsanto to support a claim for breach of express warranty.

Sixth, Monsanto argues that Plaintiff has failed to present admissible evidence of general and specific causation to support his claims.

And finally, Monsanto argues Plaintiff's claims are preempted by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*. Plaintiff opposes Monsanto's Motion for Summary Judgment on all grounds.

## 1. Choice of Law

As a preliminary matter, the Court must determine which jurisdiction's substantive law applies to Plaintiff's claims.

"With regard to substantive law, a forum state will choose the applicable substantive law according to its own conflict of law doctrines." *Clair v. Monsanto Co.*, 412 S.W.3d 295, 304 (Mo. App. E.D. 2013). "For conflicts of law related to tort claims, Missouri employs the 'most significant relationship' test set forth in Restatement (Second) of Conflict of Laws § 145 (1971)."[1] *Zafer Chiropractic & Sports Injs., P.A. v. Hermann*, 501 S.W.3d 545, 550 (Mo. App. E.D. 2016). Section 145 of the Restatement, Second, on Conflict of Laws (the "Restatement") provides:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> > (a) the place where the injury occurred,

---

[1] Missouri courts refer to this concept as "conflict of law" and "choice of law" interchangeably. *See, e.g., Goede v. Aerojet Gen. Corp.*, 143 S.W.3d 14, 24–25 (Mo. App. E.D. 2004), *abrogated on other grounds by Sanders v. Ahmed*, 364 S.W.3d 195 (Mo. banc 2012) (citing *Kennedy v. Dixon*, 439 S.W.2d 173, 184 (Mo. banc 1969) ("When determining choice-of-law issues in a tort action, Missouri courts apply the 'most significant relationship' test set out in Section 145 of the Restatement, Second, on Conflict of Laws.").

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

"[T]hese contacts are not the sole factors for a court to consider. Rather, these contacts are to be taken into account in applying the principles of section 6 to determine the law applicable to an issue." *Goede v. Aerojet Gen. Corp.*, 143 S.W.3d 14, 26 (Mo. App. E.D. 2004), *abrogated on other grounds by Sanders v. Ahmed*, 364 S.W.3d 195 (Mo. banc 2012).

Missouri courts also look to Section 146 of the Restatement to determine the choice of law in personal injury cases, which provides:

In an action for a personal injury, *the local law of the state where the injury occurred determines the rights and liabilities of the parties*, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

(Emphasis added). *See Grosshart v. Kansas City Power & Light Co.*, 623 S.W.3d 160, 167 (Mo. App. W.D. 2021) (applying Section 146). Comment *e* to Section 146 of the Restatement provides the following additional guidance, in relevant part, for "[w]hen conduct and injury occur in different states":

The local law of the state where the personal injury occurred is most likely to be applied when the injured person has a settled relationship to that state, either because he is domiciled or resides there or because he does business there. When, however, the injured person is domiciled or resides or does business in the state where the conduct occurred, there is a greater likelihood that this state is to be the state of most significant relationship and therefore the state of the applicable law with respect to issues that would usually be determined by the local law of the state of injury. The same may be true when the injury occurred in the course of an activity or of a relationship which is centered in the state where the conduct occurred and when the injured person has no settled relationship to the state where the injury occurred.

4

The state where the conduct occurred is even more likely to be the state of most significant relationship when these two elements are combined, that is to say, when, in addition to the injured person's being domiciled or residing or doing business in the state, the injury occurred in the course of an activity or of a relationship which was centered there. One example is where the injury occurred in the course of an employment which is centered in the state where the conduct took place and where the injured person is domiciled.

As stated in Comment *c*, *an important factor in determining which is the state of most significant relationship is the purpose sought to be achieved by the rule of tort law involved. If this purpose is to punish the tortfeasor and thus to deter others from following his example, there is better reason to say that the state where the conduct occurred is the state of dominant interest and that its local law should control than if the tort rule is designed primarily to compensate the victim for his injuries* (see § 145, Comment *c*). In the latter situation, the state where the injury occurred would seem to have a greater interest than the state of conduct. *This factor must not be over-emphasized*.

(Emphasis added).

Similarly, Section 175 of the Restatement provides the following with respect to choice of law in wrongful death actions:

In an action for wrongful death, *the local law of the state where the injury occurred determines the rights and liabilities of the parties unless*, with respect to the particular issue, *some other state has a more significant relationship under the principles stated in § 6* to the occurrence and the parties, in which event the local law of the other state will be applied.

(Emphasis added). Comment *f* to Section 175 of the Restatement also provides that, "[w]hen conduct and injury occur in different states," "[t]he local law of the state where the injury occurred is most likely to be applied when the decedent had a settled relationship to that state, either because he was domiciled or resided there or because he did business there."

5

Section 6 of the Restatement, as referenced in Sections 145, 146, and 175 above, provides:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Section 171 of the Restatement further provides: "The law selected by application of the rule of § 145 determines the measure of damages."

Generally, in personal injury cases Missouri courts apply the law of the place of injury unless another state has a more significant relationship. *Thompson v. Crawford*, 833 S.W.2d 868, 870 (Mo. banc 1992); *Winter v. Novartis Pharms. Corp.*, 739 F.3d 405, 410 (8th Cir. 2014) (citing *Thompson*, 833 S.W.2d at 870).

For example, in *Clair v. Monsanto Co.*, residents of California filed suit against Monsanto and Pharmacia Corporation in Missouri state court and asserted claims for strict liability based on design defect and negligence, alleging polychlorinated biphenyls ("PCBs") manufactured and distributed by the defendants caused their NHL. 412 S.W.3d at 300-02. The Missouri Court of Appeals, Eastern District, applied Section 145 of the Restatement and held that California substantive law applied:

Here, the injuries occurred in California. Plaintiffs came into contact with PCBs in California predominantly. Plaintiffs all reside in California. Plaintiffs have no relationship with Pharmacia other than coming into contact with its products in California. Further, the parties all agree that California law applies to the substantive claims in this case. Therefore, we will look to California substantive law when evaluating the merits of Plaintiffs' points.

*Id.* at 304.

"[T]he Restatement approach to choice of law does not require that all issues in a particular case be controlled by the law of the same state. Under the conflict-of-laws doctrine of *depecage,* different issues in a single case may be decided according to the laws of different states." *Goede,* 143 S.W.3d at 25 (citation omitted).

Indeed, the Restatement itself contemplates that different states' laws may be applied to different issues in the same case. Section 145(1) provides that "the rights and liabilities of the parties with respect to *an issue* in tort are determined by the local law of the state which, with respect to *that issue,* has the most significant relationship." (Emphases supplied). Continuing, section 145(2) provides that the "contacts are to be evaluated according to their relative importance with respect to *the particular issue.*" (Emphasis supplied). And, as set forth in the comments to section 171, "the state of conduct and injury will not, ..., be the state that is primarily concerned with the measure of damages in a tort action." Accordingly, we find that the trial court may separately analyze the issues of liability and damages in a case, and may properly apply different states' laws to each issue.

*Id.*

Here, Monsanto argues that the substantive laws of Texas apply to Plaintiff's claims on issues that conflict with Missouri law because Plaintiff alleges he purchased, used, and was exposed to Roundup in Texas. Plaintiff agrees that Texas law applies to his claims on any issues in which an actual conflict exists with Missouri law.

Based on the analysis above, the Court concludes that the laws of Texas shall apply in this case to issues concerning liability on issues that conflict with Missouri law. The Supreme Court of Missouri has noted that "Missouri's interest in assuring that its corporations comply with adequate design standards when designing products for manufacture and use abroad *is less substantial than the foreign nation's interest in protecting its citizens from injury and setting standards for the manufacture and distribution of products within its borders.*" *Acapolon Corp. v.*

7

*Ralston Purina Co.*, 827 S.W.2d 189, 194 (Mo. banc 1992) (emphasis added).[2] Consequently, the Court concludes that Texas law shall apply to Plaintiff's claims on any issue concerning liability for which a conflict exists with Missouri law.

On the issue of damages, Missouri courts are clear that a state has the "predominant interest" when deciding damages for injuries "occurring within its boundaries." *Goede*, 143 S.W.3d at 26 (affirming the trial court's determination that Missouri law on damages applied in a wrongful death case based on asbestos exposure in California).[3]

---

[2] *See also Dorman v. Emerson Elec. Co.*, 23 F.3d 1354, 1358–59 (8th Cir. 1994) (applying Missouri law, in particular *Acapolon Corp.*, 827 S.W.2d 189, and Section 146 of the Restatement, to conclude Canadian law applied to claims of injured Canadian saw operator against the Missouri saw designer); *Johnson v. Avco Corp.*, No. 4:07CV1695 CDP, 2009 WL 4042747, at *4 (E.D. Mo. Nov. 20, 2009) ("[C]ourts applying Missouri choice-of-law rules recognize that states of conduct . . . have *some* interest in applying their own laws to regulate misconduct within their own states. . . . But those courts conclude that this interest does not outweigh the state of injury's interest in regulating conduct that results in its residents' death or injury, especially (1) because of the presumption in the Second Restatement that the law of the state of injury applies, and (2) if there are additional contacts between the plaintiff and state of injury."); *see, e.g., Natalini v. Little*, 185 S.W.3d 239, 249 (Mo. App. S.D. 2006) (discussing comment *f* to Section 175 of the Restatement) (holding Kansas substantive law applied to wrongful death claim for medical malpractice because the decedent "had a settled relationship with Kansas—the state of injury. He was located, resided and domiciled in Kansas. Virtually all of his medical treatment related to this matter occurred in Kansas. His primary treating physician . . . was located in Kansas. . . . [The decedent] did not have a settled relationship with Missouri—the state of conduct.").

[3] The Supreme Court in *Sanders* abrogated *Goede* solely on the issue of "whether a party must move for directed verdict both at the close of the opposing party's evidence and again at close of all evidence, or whether a sole motion at close of all evidence suffices to preserve the issue." *Sanders*, 364 S.W.3d at 207 (*comparing Goede*, 143 S.W.3d at 18, *with Schnatzmeyer v. Nat'l Life Ins. Co.*, 791 S.W.2d 815, 819 (Mo. App. E.D. 1990)). *Goede* remains good law for the issue of determining choice of law regarding damages. *See, e.g., Brenneman v. Great Wolf Lodge of Kansas City, LLC*, No. 4:15-CV-00683-SRB, 2017 WL 6383979, at *5 (W.D. Mo. Jan. 24, 2017) (relying on *Goede* in concluding Missouri law on damages applied in a choice-of-law analysis where the plaintiff, a Missouri citizen, was injured in Kansas but "Missouri has an overriding interest is obtaining recovery for its citizens").

> Where the issue involves a right of recovery as opposed to a question of liability, the domicile of the parties becomes a highly significant contact, as states have a great interest in applying their own compensation-related laws to their own residents, but very little interest in applying those same laws to non-residents.

*Wilson v. Image Flooring, LLC*, 400 S.W.3d 386, 398 (Mo. App. W.D. 2013) (citing *Goede*, 143 S.W.3d at 27). "Where . . . the conflict involves a rule of recovery or question of compensation, *the domicile of the parties is the most significant contact*." *Id.* (emphasis added).

Based on the analysis above, the Court also concludes that the substantive laws of Texas shall also apply on any issue concerning recovery for damages in which an actual conflict exists with the law of Missouri. *See Thompson*, 833 S.W.2d at 870; *Clair*, 412 S.W.3d at 304.

**2. Whether Monsanto Is Entitled to a Presumption of Non-Liability Under Texas Law**

Monsanto first argues that the Texas Product Liability Act ("TPLA") applies to defeat Plaintiff's claims. Specifically, Monsanto argues Missouri's choice-of-law analysis above requires application of the TPLA because it conflicts with Missouri law by providing a statutory presumption of non-liability where (1) the products at issue were subject to a pre-market approval process by a federal agency or (2) the manufacturer complied with applicable federal laws and regulations. The relevant section of the TPLA provides:

> (a) In a products liability action brought against a product manufacturer or seller, there is a rebuttable presumption that the product manufacturer or seller is not liable for any injury to a claimant caused by some aspect of the formulation, labeling, or design of a product if the product manufacturer or seller establishes that *the product's formula, labeling, or design complied with mandatory safety standards or regulations adopted and promulgated by the federal government, or an agency of the federal government*, that were applicable to the product at the time of manufacture and that governed the product risk that allegedly caused harm.

> (b) The claimant may rebut the presumption in Subsection (a) by establishing that:

> > (1) the mandatory federal safety standards or regulations applicable to the product were inadequate to protect the public from unreasonable risks of injury or damage; or

9

(2) the manufacturer, before or after marketing the product, withheld or misrepresented information or material relevant to the federal government's or agency's determination of adequacy of the safety standards or regulations at issue in the action.

(c) In a products liability action brought against a product manufacturer or seller, there is a rebuttable presumption that the product manufacturer or seller is not liable for any injury to a claimant allegedly caused by some aspect of the formulation, labeling, or design of a product if the product manufacturer or seller establishes that *the product was subject to pre-market licensing or approval by the federal government, or an agency of the federal government*, that the manufacturer complied with all of the government's or agency's procedures and requirements with respect to pre-market licensing or approval, and that after full consideration of the product's risks and benefits the product was approved or licensed for sale by the government or agency. The claimant may rebut this presumption by establishing that:

(1) the standards or procedures used in the particular pre-market approval or licensing process were inadequate to protect the public from unreasonable risks of injury or damage; or

(2) the manufacturer, before or after pre-market approval or licensing of the product, withheld from or misrepresented to the government or agency information that was material and relevant to the performance of the product and was causally related to the claimant's injury.

Tex. Civ. Prac. & Rem. Code Ann. § 82.008 (emphasis added).

The Supreme Court of Texas has stated that "the presumption, when applicable, essentially presents an independent hurdle that the claimant must clear to establish a manufacturer's or seller's liability on a defective-design claim." *Am. Honda Motor Co. v. Milburn*, 696 S.W.3d 612, 622 (Tex. 2024), *reh'g denied* (Sept. 27, 2024) ("If the manufacturer establishes the presumption's applicability and the claimant fails to rebut it, the manufacturer is 'not liable' on the claim, and further inquiry into the claim's elements is immaterial. *Id.* § 82.008(a). But if the claimant rebuts the presumption, the defendant's compliance with applicable safety standards becomes just another piece of evidence relevant to whether the product was defectively designed.").

10

Monsanto argues it has established the following facts to entitle it to the presumption of non-liability under § 82.008(c): (1) Roundup was subject to pre-market approval by the U.S. Environmental Protection Agency ("EPA") pursuant to FIFRA; (2) Monsanto complied with the EPA's mandatory registration and review process; and (3) the EPA approved Roundup for sale. It also argues Plaintiff cannot rebut the presumption § 82.008(c)(1) or (2) because he cannot show that FIFRA is inadequate or that Monsanto withheld or misrepresented information to the EPA.

In addition, Monsanto argues the rebutting allowed by § 82.008(c)(2) is preempted by federal law and relies on caselaw holding that a different statutory scheme related to the U.S. Food and Drug Administration ("FDA") preempted state law claims alleging a manufacturer made fraudulent misrepresentation to the FDA. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) ("Policing fraud against federal agencies is hardly a field which the States have traditionally occupied . . . such as to warrant a presumption against finding federal pre-emption of a state-law cause of action. To the contrary, the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law.") (citation and internal quotation marks omitted); *see also Lofton v. McNeil Consumer & Specialty Pharms.*, 672 F.3d 372, 380 (5th Cir. 2012) (relying on *Buckman*, 531 U.S. 341, to hold that a similar rebuttable presumption under the TPLA concerning pharmaceutical drug manufacturers, Tex. Civ. Prac. & Rem. Code Ann. § 82.007, "is preempted unless the FDA itself has found fraud").

11

More on point, the U.S. Court of Appeals for the Ninth Circuit has held that state law claims predicated on allegations of a defendant submitting false information to the EPA were preempted by FIFRA. *Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1205-06 (9th Cir. 2002) ("The rationale articulated by the Supreme Court of the United States in *Buckman* applies with equal force to the facts before us and compels a similar result. . . . [J]ust as Congress made available to the FDA regulatory enforcement mechanisms under the [Medical Device Amendments of 1976 (MDA)], Congress has afforded the EPA substantial enforcement powers under FIFRA that enable the EPA to make a measured response to suspected fraud against it.").

Plaintiff agrees Texas law applies but argues Monsanto has failed to establish it met the requirements of § 82.008(a) or (c) to entitle it to summary judgment. He cites to relatively recent cases by separate federal district courts applying the TPLA's rebuttable presumption statute to Roundup-related cases. First, Plaintiff points to a Memorandum and Opinion from the then-Chief Judge of the Southern District of Texas addressing § 82.008(c) who concluded:

> Monsanto has clearly demonstrated that the Roundup products and the active ingredient, glyphosate, have been "subject to [pre-market] licensing or approval by the federal government or a federal agency." *But Monsanto has not met its burden of showing the absence of factual disputes material to determining to whether it "complied with all of the relevant federal procedures and requirements with respect to pre-market licensing and approval," as necessary to be entitled to the presumption.* And the Chapmans have identified facts that might support an inference that the EPA's application of its procedures and standards to the registration and reregistration of glyphosate and Roundup-branded products were inadequate to protect the public's safety.

> To be entitled to the presumption against liability, Monsanto must show that it "complied with all of the relevant procedures and requirements for licensing and approval." Monsanto argues that "it is undisputed that Monsanto, at all relevant times, has been in compliance with the EPA's mandatory registration and review process," as "evidenced by EPA's repeated approval of the product." (Docket Entry No. 61, at 6). *But registration does not automatically mean compliance with relevant procedures and requirements.* The Federal Insecticide, Fungicide, and Rodenticide Act states that "registration of a pesticide shall be *prima facie evidence* that the pesticide, its labeling and packaging comply with the registration

12

provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2) (emphasis added). "Prima facie evidence is not conclusive proof." *Hardeman v. Monsanto Co.*, 216 F. Supp. 3d 1037, 1038 (N.D. Cal. 2016).

*Chapman v. Monsanto Co.*, No. CV H-22-738, 2022 WL 3971287, at *7 (S.D. Tex. Aug. 31, 2022) (emphasis added). The *Chapman* court also considered Monsanto's preemption arguments:

> Because § 82.008(c)(2) requires the Chapmans to prove "fraud on the EPA," and because a finding that the EPA's registration decision was invalid would interfere with the EPA's "substantial enforcement powers" under FIFRA, *the court agrees with Monsanto that § 82.008(c)(2) is preempted.*
>
> *But Monsanto's preemption argument as to § 82.008(c)(2) is not relevant at this stage.* Before deciding whether the Chapmans have shown a factual dispute material to determining whether it can rebut the presumption against liability under § 82.008(c)(2), it is first necessary to decide whether § 82.008(c)'s presumption applies at all. *To be entitled to the presumption, it is Monsanto's burden, at trial and at summary judgment, to show that it complied with relevant EPA procedures and regulations for registration.*

*Id.* at *13 (emphasis added, footnote omitted).

Second, the federal MDL court handing Roundup cases, U.S. District Judge Vince Chhabria (N.D. California), concluded Monsanto was not entitled a presumption of non-liability under § 82.008(a). *In re Roundup Prods. Liab. Litig.*, No. 16-MD-02741-VC, 2021 WL 6125536, at *2 (N.D. Cal. Dec. 28, 2021).

> Based on the language in section (c), *there is no reasonable way to interpret "mandatory safety standards or regulations" as encompassing the EPA registration and re-registration processes.* The Texas legislature has codified a presumption that "the entire statute is intended to be effective[.]" Tex. Gov't Code Ann. § 311.021(2). This presumption dictates that "[w]hen possible, we must not interpret one portion of a statute so as to render another portion of the statute meaningless." *Saade v. Villarreal*, 280 S.W.3d 511, 522 (Tex. App. 2009); *Bexar*, 228 S.W.3d at 898 ("we must presume that the legislature would not perform a meaningless or useless act"). And here, interpreting section (a) as encompassing approval by a regulatory agency would render section (c) meaningless. *It would make no sense for "mandatory safety standards and regulations" to include an agency approval process when the statute contains a separate section that explicitly creates a presumption for products that go through such a process. Thus, under a commonsense reading of the statute's plain language, the EPA registration and re-registration process*

13

*cannot be "mandatory safety standards or regulations" that would entitle Monsanto to a presumption of no liability.*

*Id.* (emphasis added).

Monsanto argues Plaintiff "overstat[es]" and "overreads" the decisions from the MDL court and the *Chapman* court, which Monsanto refers to as "two unpublished federal cases." Monsanto's Reply in Supp. of Its Mot. for Summ. J. at 2-4. Monsanto, however, has not cited to any competing decision by a court in any jurisdiction – published or not – directly addressing these issues in the context of Roundup litigation.

The Court agrees with the MDL court's determination that § 82.008(a) is inapplicable to these cases and with the *Chapman* court's determination that Monsanto is not entitled to summary judgment under § 82.008(c) at this stage of the litigation. "[T]he burden is on Monsanto, not on [Plaintiff], to establish compliance with FIFRA." *See Chapman*, 2022 WL 3971287, at *13. For these reasons, the Court denies summary judgment on this ground.

Plaintiff also argues Monsanto failed to comply with Rule 55.08 to assert an affirmative defense based on the TPLA. As explained above, the Court concludes that the laws of Texas shall apply in this case to substantive issues that conflict with Missouri law. However, "Missouri courts generally apply Missouri law to procedural questions even if another state's substantive law governs the underlying claim." *Grosshart*, 623 S.W.3d at 167 ("Regardless of which state's law governs the substantive issues involved in this case, ... procedural questions are determined by the state law where the action is brought.") (quoting *Kissinger v. Am. Family Mut. Ins. Co.*, 563 S.W.3d 765, 775 (Mo. App. W.D. 2018)).

14

Plaintiff notes Rule 55.08 requires that "all applicable affirmative defenses and avoidances" shall be set forth in a responsive pleading and that pleading "shall contain a short and plain statement of the facts showing that the pleader is entitled to the defense or avoidance." Plaintiff contends Monsanto failed to sufficiently plead the presumption of non-liability under the TPLA to summary a motion for summary judgment. Monsanto's Answer included the following under a section heading "Separate and Affirmative Defenses": "Plaintiff's claims are barred, in whole or in part, by application of Tex. Civ. Prac. & Rem. Code Ann. § 82.008." *See* Monsanto's Answer to Plaintiff's Petition at p. 45 ¶ 22 (Sept. 10, 2020). Plaintiff argues that paragraph is conclusory and failed to allege ultimate facts that would entitle Monsanto to summary judgment under the TPLA's presumption of non-liability.

Monsanto, on the other hand, argues its factual assertions elsewhere in its Answer provide the necessary basis for it to maintain its affirmative defense and were sufficient to put Plaintiff on notice that Monsanto would invoke that defense. *See id.* ¶¶ 32 & 33 (asserting facts related to EPA's regulatory review of glyphosate).

In light of the circumstances, the Court concludes Monsanto's Answer contained enough factual assertions to maintain its affirmative defense and Plaintiff was on notice that Monsanto would rely on the TPLA. *See generally Wright v. Over-The-Rd. & City Transfer Drivers, Helpers, Dockmen & Warehousemen, Loc. Union No. 41, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 945 S.W.2d 481, 494 (Mo. App. W.D. 1997) (holding that a union's "failure to plead specifically qualified privilege as a defense is of no significance" because the plaintiff "was put on notice that the [u]nion would rely on the defense of privilege" and "[t]he fact the [u]nion did not specifically plead both absolute and qualified privilege did not violate the spirit and intent of the Rule 55.08."). As explained above, the Court, for other reasons, denies

15

granting summary judgment in favor of Monsanto on the issue of the TPLA's presumption of non-liability.

### 3. Whether Plaintiff's Design Defect Claim Fails Under Texas Law

Monsanto next argues that Plaintiff's design defect claims fail under Texas law because he has failed to present expert evidence of any safer alternative design for Roundup. *See In re Zimmer, Inc.*, 451 S.W.3d 893, 906 (Tex. Ct. App. 2014) ("To establish a design defect, a party must show the product involved in the case was defectively designed so as to be unreasonably dangerous taking into account the utility and risk involved in the use of the product, this defective design was a producing cause of the plaintiff's injuries, *and a safer alternative design existed that would have prevented or significantly reduced the risk of injury* and would have been economically and technologically feasible at the time the product left the defendant's control.") (emphasis added). According to Monsanto, none of Plaintiff's experts have disclosed opinions that Monsanto could have formulated Roundup differently and could have been comparably effective while preventing Plaintiff's injuries and any attempt to do so at trial would be foreclosed.

Plaintiff agrees Texas law applies but argues Monsanto is not entitled to summary judgment. Texas courts have held that, in order to meet this burden, such a "safer alternative design" "need not be actually built and tested; a plaintiff must show only that the alternative design was 'capable of being developed.'" *Genie Indus., Inc. v. Matak*, 462 S.W.3d 1, 7 (Tex. 2015) (quoting *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex. 1999)). Here, Plaintiff argues that a letter from the EPA in 2022 (submitted as Exhibit 10 with Plaintiff's summary judgment filings) regarding proposed revisions to glyphosate labels to meet California's notification requirements shows that Monsanto could have included a cancer warning but did not do so. In that letter, the EPA stated:

16

> While EPA's scientific conclusions regarding the glyphosate cancer classification have not changed since the August 7, 2019, letter to glyphosate registrants, it has determined that the new glyphosate-specific safe harbor language proposed in [California's Office of Environmental Health Hazard Assessment ("OEHHA")] recent letter is sufficiently clear regarding EPA's position and thus would not be considered false and misleading. Therefore, this revised language could be approved by EPA if pesticide registrants requested it for inclusion on glyphosate product labels, and the products would not be considered misbranded.

Plaintiff also argues Monsanto's own Roundup product line establishes the necessary proof that Monsanto manufactures and sells herbicides under the trade name "Roundup" that lack glyphosate and a surfactant, which Plaintiff contends could have made it safer. Because of these facts, Plaintiff argues the issue is for the jury to decide and not the Court on summary judgment. *See Genie Indus.*, 462 S.W.3d at 3 ("The issue is usually one of fact for the jury but may nevertheless be a legal one when the evidence is such that reasonable minds cannot differ on the risk-utility balancing considerations.").

As explained above, the Court has concluded that, on issues of liability that conflict with Missouri law, Texas law applies to Plaintiff's claims. Such is the case on this issue as Missouri law does not require plaintiffs to establish a feasible alternative design to submit design defect claims. *See Smith v. Brown & Williamson Tobacco Corp.*, 275 S.W.3d 748, 794 (Mo. App. W.D. 2008) ("'Certainly, the plaintiff may introduce such evidence in support of showing the design was defective and therefore unreasonably dangerous, but . . . such is not required.' Thus, proof of an alternative design is not required . . . .") (quoting *Thompson v. Brown & Williamson Tobacco Corp.*, 207 S.W.3d 76, 90 n.5 (Mo. App. W.D. 2006)). The Court finds that at this stage of the litigation, Monsanto's alternative Roundup formulations without glyphosate or surfactant make this an issue for the jury determination. *See Genie Indus.*, 462 S.W.3d at 3. The Court, accordingly, denies summary judgment on this ground.

17

**4.  Whether Plaintiff's Deposition Testimony Establishes He Did Not Read Warning Labels Thereby Entitling Monsanto to Judgment as a Matter of Law on Plaintiff's Faliure to Warn and Negligence Claims**

Monsanto next argues that Missouri and Texas law both require a plaintiff asserting claims for failure to warn and negligence to establish causation. *See Moore v. Ford Motor Co.*, 332 S.W.3d 749, 762 (Mo. banc 2011); *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 222–23 (Tex. 2010).  For failure to warn claims, a plaintiff must "show that a warning would have altered the behavior of the individuals" in order to establish causation. *See Moore*, 332 S.W.3d at 762.  Here, Monsanto quotes Plaintiff's deposition in which when asked "Did you ever read the label on a bottle of Roundup?" he replied "No."  Plaintiff Dep. at 133:20-22.  Because of this deposition testimony, Monsanto argues Plaintiff cannot establish causation for his failure to warn and negligence claims, which was predicted, in part, on Monsanto's alleged failure to give adequate warnings of the dangers of glyphosate. *See Moore*, 332 S.W.3d at 762 ("[T]o show causation, a plaintiff must show that the absence of a warning was the proximate cause of the injury.").

Additionally, Monsanto opposes any attempt by Plaintiff to invoke Missouri's and Texas's "heeding presumptions," which presumes "a warning would have been heeded if given." *Johnson v. Auto Handling Corp.*, 523 S.W.3d 452, 468 (Mo. banc 2017).  According to Monsanto, the heeding presumption is unavailable to those like Plaintiff who did not read the label that was given. *See Johnson v. Medtronic, Inc.*, 365 S.W.3d 226, 233 (Mo. App. W.D. 2012) (holding the defendant's "alleged failure to warn or alleged inadequate warning was not the proximate cause" of the plaintiff's injuries where it was "undisputed" that the product was used "without regard to the instruction manual and the instruction label").

Both parties rely on the Supreme Court of Missouri's opinion in *Arnold v. Ingersoll-Rand Co.*, 834 S.W.2d 192, 194 (Mo. banc 1992), for the proposition that a plaintiff must "show that a

18

warning would have altered the behavior of the individuals involved" such that their alleged injuries would not have occurred. That case, however, is easily distinguishable from this case. In *Arnold*, a mechanic brought claims related to an explosion caused by a spark created by the defendant manufacturer's air compressor. *Id.* at 192. In reversing the trial court's decision to submit the failure to warn claim to the jury, the *Arnold* Court did state: "Causation in a failure to warn case involves two separate requirements. First, the plaintiffs' injuries must be caused by the product from which the warning is missing. . . . Second, plaintiffs must show that a warning would have altered the behavior of the individuals involved in the accident." *Id.* at 194. The *Arnold* Court also noted: "Missouri, like several other states, aids plaintiffs in proving this second part of causation *by presuming that a warning will be heeded.*" *Id.* (emphasis added) (citing *Duke v. Gulf & Western Mfg. Co.*, 660 S.W.2d 404, 419 (Mo. App. 1983)).

The *Arnold* Court continued:

> The presumption that plaintiffs will heed a warning assumes that a reasonable person will act appropriately if given adequate information. Thus, a preliminary inquiry before applying the presumption is whether adequate information is available *absent* a warning. In *Duke,* the court of appeals proceeded to recognize a presumption that a warning would be heeded only after finding that there was a legitimate jury question whether the plaintiff did not already know the danger. *Duke,* 660 S.W.2d at 418–19. As causation is a required element of the plaintiffs' case, the burden is on plaintiffs to show that lack of knowledge.
>
> In this case, *plaintiffs' evidence does not indicate that a warning would have imparted additional information. Instead, the testimony of each of the mechanics present, the shop owner, and the parts supplier (who stopped by the shop on the morning of the explosion) indicated that they all knew that there was a danger of an explosion if gas fumes accumulated in the shop.* Thus, plaintiffs failed to present any evidence suggesting that a warning would have imparted additional information. Absent such a showing, the presumption that a warning would be heeded is not applicable. Thus, plaintiffs did not meet their burden of proof on the element of causation and the instruction on failure to warn should not have been submitted to the jury.

*Id.* (emphasis added).

19

Unlike the mechanic in *Arnold* who knew the risk of a gas explosion, there is no suggestion that Plaintiff independently knew of the alleged causal connection between Roundup/glyphosate and development of cancer in humans such that any warning would not have provided additional information.

The presumption that a warning will be heeded is a rebuttable one. For example, in *Moore v. Ford Motor Co.*, the plaintiffs brought claims for negligence and strict liability action against a vehicle manufacturer after a seat collapsed in a collision. 332 S.W.3d at 754. The trial court granted the manufacturer's motion for directed verdict on the failure to warn claim, but the Supreme Court of Missouri Court reversed. *Id.* The *Moore* Court acknowledge the rebuttable presumption that a plaintiff would heed a warning and explained:

> Here, Ford chose to try to rebut it by obtaining concessions from Ms. Moore on cross-examination that she really did not look for warnings and that she would have driven the vehicle once purchased. She agreed that she did not look specifically at this manual or at prior vehicle manuals with the purpose of seeing whether there was a seat weight limit.

*Id.* at 763. However, the *Moore* Court noted "earlier portions of her testimony . . . supported the Moores' position that she would have heeded a warning about the risks the seats posed for persons of greater than normal weight." *Id.* at 763. Accordingly, "[i]t would be up to a jury to weigh all of this testimony." *Id.* ("A jury may find persuasive the implication from Ford's questions that the Moores' testimony was self-serving and should not be accorded much weight. But a jury instead might find it entirely credible. Such a credibility determination is for the jury.").

Texas law also provides for a rebuttable heeding presumption. *See Gen. Motors Corp. v. Saenz on Behalf of Saenz*, 873 S.W.2d 353, 359 (Tex. 1993) ("[T]he presumption that adequate warning on products will be heeded places upon the defendant in a failure-to-warn case the burden of going forward with the evidence on causation. If . . . defendant offers evidence contrary to the

20

presumption, then plaintiff must prove causation by a preponderance of the evidence, and the presumption has no further legal consequence."). Specifically, the Supreme Court of Texas has stated: "There is no presumption that a plaintiff who ignored instructions that would have kept him from injury would have followed better instructions." *Id.*

Here, Plaintiff testified he did not read the label on any Roundup product. *See* Plaintiff Dep. at 133:20-22. In response to Monsanto's Motion for Summary Judgment, Plaintiff cites to portions of his deposition testimony in which he testified about his purported knowledge of how to use Roundup as evidence of him "having a cursory review of the label, and/or discussions with his employer who read the label." Plaintiff's Opp'n to Monsanto's Mot. for Summ. J. at 29. While those portions of his deposition testimony describe his experience using and mixing Roundup concentrate, at no point did he testify to reading or reviewing any portion of any label on any Roundup product. *See* Plaintiff Dep. at 45:15-52:16, 127:24-128:18.

In comparison, plaintiffs in other Roundup-related cases have survived summary judgment on their failure-to-warn claims when testimony from their deposition clarified earlier denials of having read Roundup labels. In *Paul Ferro, et al. v. Monsanto Co.*, for example, Monsanto asked Plaintiff Stacey Moore whether he "ever read the label of the Roundup containers" and he responded "No, sir." *See* Order Regarding Def. Monsanto Co.'s Mot. for Summ. J. at 12, *Paul Ferro, et al. v. Monsanto Co.*, No. 20SL-CC03678 (Mo. Cir. Ct. St. Louis Cty. Oct. 13, 2022), *aff'd sub nom. Moore v. Monsanto Co.*, 699 S.W.3d 516, 519 (Mo. App. E.D. 2024), *reh'g and/or transfer denied* (Oct. 7, 2024), *transfer denied* (Nov. 19, 2024). However, he later gave the following answers during his deposition that showed he had read at least part of a Roundup label on recommended use:

> Q. Do you recall reading any instructions on the label about the weather conditions for using Roundup?

A. I recall a little bit of it.

Q. Do you recall whether it said anything about whether you should use Roundup or not use Roundup if it was windy out?

A. It said recommended use not to but --unless you hold -- I want to say unless you hold it real close because it could spread and hit your flowers or -- I mean, that's a long time ago. And to be honest with you, *I haven't looked at one since.*

*Id.* at 13-14. Here, Plaintiff has pointed to no similar testimony from his deposition to support a similar conclusion that he did some cursory review of a Roundup container in the past.

In addition to the deposition testimony, Plaintiff also submitted an affidavit (submitted with his filings in opposition to Monsanto's Motion for Summary Judgment as Exhibit 1) in which he attests to the following:

> 3. While using the product, *I have looked at Roundup's product label, although I did not read every word. I looked at the label to understand the mixing instructions* and I remember the label instructing on things like how far to stand back when spraying. I followed these instructions.

> 4. *My employer, Mr. Cook, likely read the Roundup label as well.* Mr. Cook informally provided me with instructions on how to use Roundup.

> 5. At no time during my use of Roundup did I observe any warning on the label that Roundup could cause cancer or specifically non-Hodgkin's lymphoma. And nothing on the Roundup label or in any communication from Monsanto led me to believe I needed to wear personal protective equipment.

> 6. Had there been a prominent warning on the Roundup bottle that warned that there was a known cancer risk tied to Roundup or glyphosate exposure, that would have caused me to consider whether to cease my purchasing or use of Roundup for weedkilling purposes. . . .

(Emphasis added).

22

Plaintiff's affidavit signed and dated April 14, 2025 – nearly two years after his deposition on May 10, 2023 – plainly contradicts rather than clarifies his plain answer that he did not read any Roundup label and cannot defeat summary judgment on this ground. "[A] party may not avoid summary judgment by giving inconsistent testimony and then offering the inconsistencies into the record in order to demonstrate a genuine issue of material fact." *Tiemann v. SSM Reg'l Health Servs.*, 632 S.W.3d 833, 846 (Mo. App. W.D. 2021) (quoting *ITT Commercial*, 854 S.W.2d at 388).[4]

Had Plaintiff sought to submit an errata sheet pursuant to Rule 57.03(f), such a change in testimony could properly be presented to jury to evaluate the reasons for making such changes. *See* Rule 57.03(f) ("Any changes in form or substance that the witness desires to make shall be entered upon an errata sheet provided to the witness with a statement of the reasons given for making such changes. *The answers or responses as originally given, together with the changes made and reasons given therefore, shall be considered as a part of the deposition*.") (emphasis added); *Loveland v. Rowland*, 361 S.W.2d 685, 688 (Mo. 1962) (dealing with a previous version of Rule 57.03 and noting "[i]f an answer is changed, the adequacy of the reasons stated and the determination of the truth of conflicting statements will be for the trier of the facts"). He did not do so.

---

[4] *See also Redd v. DePuy Orthopaedics, Inc.*, 700 F. App'x 551, 553 (8th Cir. 2017) ("A party may not avoid summary judgment by submitting an affidavit that contradicts rather than clarifies previous sworn testimony."); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own earlier testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").

In light of the above, the Court finds that Monsanto has rebutted the heeding presumption recognized under Missouri and Texas law. *See Saenz*, 873 S.W.2d at 361 ("[G]iven that [the prior users of the subject truck] did not read the warnings GM provided, there is no reason why they would have read the warnings which the court of appeals held should have been provided. While GM could have made the warning inescapably obvious, more than it was, it had no duty to do so. Thus, there is no evidence that the inadequacies in GM's warning caused the accident.").

Accordingly, the Court grants Monsanto's Motion for Summary Judgment on this ground as it relates to Plaintiff's failure-to-warn claim. The Court, however, declines to grant summary judgment on Plaintiff's negligence claim as it was based on more than just Monsanto's alleged failure to give adequate warnings.

**5. Whether Plaintiff Is Able to Assert a Claim Under the MMPA if He Did Not Purchase Any Roundup Products in Missouri**

Monsanto next argues it is entitled to judgment as a matter of law on Plaintiff's claim under the MMPA because he did not purchase Roundup in Missouri. The MMPA makes unlawful "any deception, fraud, false pretense, false promise, misrepresentation, [or] unfair practice . . . in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri." Section 407.020.1, RSMo.

It allows a private civil action to be filed by "[a]ny person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property . . . as a result of the use or employment by another person of a method, act or practice declared unlawful" by the MMPA. Section 407.025.1(1), RSMo. Such a civil suit may be brought "in either the circuit court of the county in which the seller or lessor resides or in which the transaction complained of took place." *Id.*

24

Here, Monsanto argues the only basis for this MMPA claim asserted by Plaintiff – a resident of Texas – is that Monsanto was headquartered in Missouri at the time he purchased Roundup. Plaintiff, on the other hand, contends he may properly assert a claim under the MMPA and that the act provides out-of-state purchasers a remedy where a defendant's unlawful conduct arises from significant connections within Missouri.

Plaintiff is correct that Missouri courts have allowed out-of-state plaintiffs to assert claims under the MMPA. In support, Plaintiff relies on *State ex rel. Nixon v. Estes*, 108 S.W.3d 795, 801 (Mo. App. W.D. 2003). The Court of Appeals in *Estes* held that, although most of the victims of the defendant's illegal merchandizing practices were domiciled outside of Missouri, the defendant nevertheless conducted numerous unlawful practices from the business he operated in Missouri, including "maintain[ing] a continuing commercial relationship with those victims from company offices in Missouri." *Id.*

Later opinions from federal courts applying the MMPA, however, have rejected applying the MMPA to out-of-state plaintiffs' claims where *the allegedly fraudulent activities* occurred entirely outside of Missouri. *See Perras v. H & R Block*, 789 F.3d 914, 918 (8th Cir. 2015) ("[T]here are no ties between *the allegedly fraudulent transactions* and Missouri. Though true, as the district court noted, H & R's headquarters are located in Missouri; and there, it designed and implemented the compliance fee. *But every part of the transactions—the activity for which the class action seeks relief—occurred in each class member's home state*.") (emphasis added).

25

Here, in contrast to *Estes* where the victims made purchases directly from the defendant, Plaintiff did not purchase Roundup products directly from Monsanto but, rather, did so from local retailers. Accordingly, while Monsanto was headquartered in Missouri and aspects of its design and marketing of Roundup occurred in Missouri, Plaintiff encountered Roundup products and was allegedly harmed entirely within Texas. *See Hale v. Emerson Elec. Co.*, 942 F.3d 401, 404 (8th Cir. 2019) (per curiam) ("Class members encountered the allegedly misleading advertising, purchased a vacuum, and ultimately were disappointed with its performance, all in their home states.

As in *Perras*, the only relevant action taking place in Missouri was the design of the advertisement. That is not enough. The consumer protection law of each class member's home state governs each consumer protection claim and class certification is inappropriate as to those claims."); *see also Barker v. Nestle Purina PetCare Co.*, 601 F. Supp. 3d 464, 469 (E.D. Mo. 2022).

For these reasons, the Court grants Monsanto's Motion for Summary Judgment on Plaintiff's claim under the MMPA.

### 6. Whether Monsanto's Advertisements for Roundup Provide a Basis for Plaintiff's Claim for Breach of Express Warranty

Monsanto next argues it is entitled to summary judgment on Plaintiff's claim for breach of express warranty because he has not presented evidence that he relied on any express statement by Monsanto about Roundup's safety.

Both parties address Missouri law on this issue, which Monsanto asserts is the same under Texas law. *See* Monsanto's Mem. of Law in Supp. of Its Mot. for Summ. J. at 31 n.15 (citing Tex. Bus. & Com. Code Ann. § 2.313(a); *Lindemann v. Eli Lilly & Co.*, 816 F.2d 199, 202 (5th Cir. 1987)). The Uniform Commercial Code ("UCC"), as codified by Missouri, provides, in relevant part, that express warranties are created by a seller of goods based on:

26

(a) *Any affirmation of fact or promise made by the seller to the buyer* which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

Section 400.2-313(1), RSMo (emphasis added).

Monsanto argues that Plaintiff has not pointed to any affirmative statement by Monsanto regarding Roundup's safety as the reason he purchased it; rather, Plaintiff's deposition testimony demonstrates he made decisions to purchase Roundup because he had used it and believed it was effective as well as it being the product chosen by his employer. Plaintiff Dep. at 126:11-17.

Monsanto further argues that Plaintiff cannot base a claim for breach of express warranty on alleged inadequacies or omissions on Roundup's label. *See In re Gen. Motors Corp. Anti-Lock Brake Prods. Liab. Litig.*, 966 F. Supp. 1525, 1531 (E.D. Mo. 1997), *aff'd sub nom. Briehl v. Gen. Motors Corp.*, 172 F.3d 623 (8th Cir. 1999) ("Plaintiffs repeatedly allege that the press releases and advertisements all failed to disclose the defect, so, to the extent their express warranty claims are based on advertisements and promotional materials, these claims are based on omissions. *A breach of express warranty claim, however, cannot be premised on an omission.*") (emphasis added, footnote and citation omitted).

Plaintiff argues his express warranty claim must be decided by the jury. He argues he based his decision to purchase and use Roundup, in part, on Monsanto's advertising. Plaintiff asserts Monsanto did not ask him about whether he had seen Roundup advertising during his deposition; accordingly, he attests to the following in his affidavit submitted with his filings in opposition to Monsanto's Motion for Summary Judgment:

27

7.      . . . I also purchased it for residential use. Although I cannot recall specific *Roundup advertisements, I was familiar with Roundup through Monsanto's marketing, advertisements, and other representations prior to and throughout my years of using the product.* When I purchased Roundup, I knew what it was because of Monsanto's widespread marketing presence that made it a recognizable brand. *Based on Monsanto's representations, I believed Roundup was safe to use. This understanding was reinforced by product packaging that showed people using Roundup with minimal protective equipment, which conveyed to me that the product was safe for regular consumer use.*

8.      I relied on Monsanto's representations regarding Roundup's safety when deciding to purchase and use the product. Had Monsanto represented the true dangers of the product and its association with NHL, I would have chosen alternative weed control methods or products. I remember seeing advertisements for Roundup that led me to believe it was the best product for killing weeds and I trusted their product to get the job done. While I cannot recall specific advertisement content, Monsanto's overall representation of Roundup as an effective and safe product formed the basis of my decision to continue purchasing and using their product.

(Emphasis added).[5]

The Court concludes that, at this stage of the litigation, Monsanto has not shown it is entitled to summary judgment on this ground. Missouri courts recognize that advertisements can communicate express warranties. *See Crank v. Firestone Tire & Rubber Co.*, 692 S.W.2d 397, 401 (Mo. App. W.D. 1985) ("In a sale of goods governed by the Uniform Commercial Code, an advertisement read by the plaintiff may create an express warranty.") (citing *Interco, Inc. v. Randustrial Corp.*, 533 S.W.2d 257, 262 (Mo. App. St. L. Dist. 1976)).

---

[5] Plaintiff also cites to *Jones v. Monsanto Co.*, No. 19-0102-CV-W-BP, 2019 WL 9656365, at *6 (W.D. Mo. June 13, 2019), where the federal district court denied Monsanto's motion to dismiss as it related to warranty claims. However, the posture of that case on a motion to dismiss and the specific allegations discussed make it inapposite to the instant Motion for Summary Judgment in this case. *See id.* (concluding "it may be inferred that [the plaintiffs] relied on the [Roundup] Label's accuracy when they made their purchasing decisions" based on allegations in that complaint that they "purchased Roundup Products believing them to conform to the express warranties").

28

In contrast to the analysis above explaining how the averments in Plaintiff's affidavit that he read or reviewed Roundup labels contradict his deposition testimony in which he testified to the opposite, the statements in the affidavit concerning his familiarity with Roundup advertisements do not appear to contradict any deposition testimony.

Accordingly, the Court concludes that there is a genuine dispute as to whether Plaintiff saw and relied on any Roundup advertisements and it will be up to the jury to decide whether such advertisements constituted an express warranty of Roundup's safety.

The Court further notes that plaintiffs in other Roundup-related cases in this circuit have decided to dismiss their warranty claims before trial. *See, e.g.*, Order Regarding Def. Monsanto Co.'s Mot. for Summ. J. at 2, *Paul Ferro, et al. v. Monsanto Co.*, No. 20SL-CC03678 (Mo. Cir. Ct. St. Louis Cty. Oct. 13, 2022), *aff'd sub nom. Moore v. Monsanto Co.*, 699 S.W.3d 516, 519 (Mo. App. E.D. 2024), *reh'g and/or transfer denied* (Oct. 7, 2024), *transfer denied* (Nov. 19, 2024).

Plaintiff here will need to prove to the jury that Monsanto's advertisements meet the standard for express warranty.

### 7. Whether Plaintiff Has Presented Admissible Expert Evidence of General or Specific Causation

Monsanto next argues Plaintiff has not presented admissible expert testimony to support a finding of general or specific causation in this case, and it cites the arguments made in its separate motions to exclude directed at Plaintiff's expert witnesses. Plaintiff rejects Monsanto's argument on this ground and incorporates his separate responses in opposition to Monsanto's motions to exclude those experts.

Generally, the plaintiff in a products liability case "must establish the causal relationship by expert testimony." *Hagen v. Celotex Corp.*, 816 S.W.2d 667, 670 (Mo. banc 1991). Missouri courts have noted that "expert testimony is not necessarily required to establish product defect or unreasonable danger." *Tune v. Synergy Gas Corp.*, 883 S.W.2d 10, 14 (Mo. banc 1994).

However, expert testimony is necessary where "the lay jury [does] not possess the experience or knowledge of the subject matter sufficient to enable them to reach an intelligent opinion without help." *Siebern v. Missouri-Illinois Tractor & Equip. Co.*, 711 S.W.2d 935, 939 (Mo. App. E.D. 1986). *See also Pro Serv. Auto., L.L.C. v. Lenan Corp.*, 469 F.3d 1210, 1214 (8th Cir. 2006) (applying Missouri law).

> Missouri law holds that unless the injury involves a "sudden onset, visible injury, or an injury that as a matter of common knowledge follows the act ... some expert medical testimony combined with other evidence tending to show with a reasonable certainty that the accident caused the injury is necessary [to prove causation]."

*Eppler v. Ciba-Geigy Corp.*, 860 F. Supp. 1391, 1395 n.3 (W.D. Mo. 1994) (omission and alteration in original) (quoting *Harris v. Washington*, 654 S.W.2d 303, 306 (Mo. App. E.D. 1983)).

Expert testimony is also required in negligence claims depending on the nature of the underlying injury.

> The testimony of a lay witness is sufficient to establish the nature, cause and extent of an injury "when the facts fall within the realm of lay understanding." *Griggs v. A.B. Chance Company,* 503 S.W.2d 697, 704 (Mo.App.1973). *See also Pedigo v. Roseberry,* 340 Mo. 724, 102 S.W.2d 600, 606–07 (1937); *State ex rel. Burcham v. Drainage District No. 25,* 272 S.W.2d 712, 716–17 (Mo.App.1954). However, when the injury is a "sophisticated injury, which requires surgical intervention or other highly scientific technique for diagnosis, and particularly where there is a serious question of pre-existing disability and its extent, the proof of causation is not within the realm of lay understanding...." *Griggs,* 503 S.W.2d at 704.

*Williams v. Jacobs*, 972 S.W.2d 334, 340 (Mo. App. W.D. 1998) ("It is not essential to have medical testimony, however, as a causal connection between an accident and injury can be inferred in cases

where there is a visible injury, or a sudden onset of an injury, or an injury that as a matter of common knowledge follows the act.") (internal quotation marks omitted).

These court opinions are consistent with the current version of section 490.065.2(1)(a), RSMo, which provides an expert witness may testify if "[t]he expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."

The injuries at issue in this case – NHL and subtypes thereof – are plainly outside the realm of lay understanding. As Missouri courts recognize:

> [P]roof of causation in cases involving exposure to a toxic substance typically requires a certain degree of scientific expertise. *See Lewis,* 5 S.W.3d at 585. This is because "[t]he diagnosis of disease induced by environmental factors is essentially 'a scientific undertaking' requiring proof which 'the scientific community deems sufficient for that causal link.' " *Id.* (citation omitted). As Defendants note, the requirement for expert testimony in cases like the instant matter, coincides with the requisite proof of causation in medical injury cases, where the cause of sophisticated injuries is not within a layperson's common understanding and, therefore, the plaintiff must establish the causal relationship through expert medical testimony. *See Brickey v. Concerned Care of the Midwest, Inc.,* 988 S.W.2d 592, 596–97 (Mo.App.E.D.1999).

*Brown for Est. of Kruse v. Seven Trails Invs., LLC,* 456 S.W.3d 864, 869–70 (Mo. App. E.D. 2014).

The same is true under Texas law. *See Brookshire Bros., Inc. v. Smith,* 176 S.W.3d 30, 36 (Tex. Ct. App. 2004), *supplemented* (Feb. 17, 2005) ("When a lay person's general experience and common sense will not enable that person to determine causation, expert testimony is required. Expert testimony is particularly necessary in chemical-exposure cases, in which medically complex diseases and causal ambiguities compound the need for expert testimony.") (citation omitted).

31

The Court addresses the parties' arguments in its separate Order concerning the parties' motions to exclude experts. Therein, the Court concludes Plaintiff's experts may testify subject to the limitations stated in the Order. Consequently, summary judgment is not warranted on this ground.

### 8. Whether Plaintiff's Claims are Preempted by FIFRA

Lastly, Monsanto argues Plaintiff's claims are both expressly and impliedly preempted by federal law, namely FIFRA, 7 U.S.C. § 136 *et seq.*

"FIFRA creates a comprehensive scheme for the regulation of pesticide labeling and packaging." *Nat'l Bank of Com. of El Dorado, Arkansas v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999) (quoting *Welchert v. American Cyanamid, Inc.*, 59 F.3d 69, 71 (8th Cir. 1995)). Specifically, FIFRA provides the following in relevant part:

**(a) In general**

A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

**(b) Uniformity**

Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

7 U.S.C. § 136v.

The crux of Monsanto's argument that Plaintiff's state law claims are "in addition to or different from" requirements imposed by the EPA under FIFRA is because they are premised on an alleged duty to include a cancer warning on Roundup products despite the EPA repeatedly determining glyphosate was not carcinogenic.

Earlier this year, the Missouri Court of Appeals, Eastern District, addressed this precise issue: whether FIFRA preempted a state law claim for failure to warn brought by a plaintiff who asserted glyphosate in Roundup caused his NHL. *Durnell v. Monsanto Co.*, No. ED 112410, 2025 WL 451540 (Mo. App. E.D. Feb. 11, 2025). The Court of Appeals held that FIFRA did not expressly or impliedly preempt failure-to-warn claims. *Id.* at *3-4.

Moreover, the Court of Appeals in *Durnell* rejected Monsanto's arguments also made here that it should follow the opinion from the U.S. Court of Appeals for the Third Circuit in *Schaffner v. Monsanto Corporation*, 113 F.4th 364, 370-99 (3rd Cir. 2024), where the Third Circuit held that plaintiffs' state law failure-to-warn claim against Monsanto was expressly preempted by federal law.

The *Durnell* court declined to follow *Schaffner*, explaining: "While the decisions of federal intermediate appellate courts and other state courts do not bind this Court, we do not find *Schaffner* persuasive and choose to follow the weight of the authority in holding that Plaintiff's failure to warn claim is not expressly preempted by federal law." *Id.* at *4 (citing *Carson v. Monsanto Co.*, 92 F.4th 980, 986-96 (11th Cir. 2024); *Hardeman v. Monsanto Co.*, 997 F.3d 941, 950-58 (9th Cir. 2021); *Johnson v. Monsanto Co.*, 554 P.3d 290, 295-98, 303-308 (Or. Ct. App. 2024); *Pilliod v. Monsanto Co.*, 67 Cal.App.5th 591, 282 Cal. Rptr. 3d 679, 688-702 (2021)).

33

The Court agrees, as it must, with the Court of Appeals' analysis in *Durnell*, and denies summary judgment based on Monsanto's preemption arguments here.[6]

### CONCLUSION

Accordingly, Defendant Monsanto Company's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

The Motion is **GRANTED** as to Plaintiff's claim for failure to warn (Count Two) and his claim under the MMPA (Count Three).

In all other aspects, Defendant Monsanto Company's Motion for Summary Judgment is **DENIED**.

**SO ORDERED:**

*Brian H. May #1*    May 04, 2025

_____

Hon. Brian H. May
Circuit Judge, Division 1

_____

[6] Monsanto acknowledges in its Memorandum of Law in Support of its Motion for Summary Judgment that this Court must abide by the opinion from the Court of Appeals in *Durnell* but, nevertheless, expresses its disagreement with that opinion and includes its full argument to preserve its record for possible appellate review. In addition, Monsanto filed an application for transfer in *Durnell* on February 12, 2025, which the Supreme Court of Missouri denied on April 1, 2025. *See* Case No. SC100975. Monsanto filed a petition for a writ of certiorari with the United States Supreme Court on April 9, 2025, Case No. 24-1068. As of the date of this Order, that petition remains pending.

34