Robin Greenwald (*pro hac vice*)
Alicia Butler (*pro hac vice*)
**WEITZ & LUXENBERG, PC**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500
rgreenwald@weitzlux.com
abutler@weitzlux.com
Co-Lead Counsel

David J. Dickens (*pro hac vice*)
**THE MILLER FIRM LLC**
108 Railroad Avenue
Orange, VA 22960
Telephone: 540-672-4224
ddickens@millerfirmllc.com
Co-Lead Counsel

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br>*ALL CASES* | MDL No. 2741<br><br>Case No. 3:16-md-02741-VC<br><br>**PLAINTIFFS' OMNIBUS STATEMENT OF MATERIAL FACTS IN OPPOSITION TO MONSANTO'S POST-DURNELL MOTIONS FOR SUMMARY JUDGMENT** |

Plaintiffs' Co-Lead Counsel, for Plaintiffs' Omnibus Statement of Material Facts in Opposition to Monsanto's Post-*Durnell* Motions for Summary Judgment, submit the following facts and evidence for incorporation in the summary judgment record by individual Plaintiffs who oppose the post-*Durnell* Motions for Summary Judgment authorized by the Court:

## TABLE OF CONTENTS

I. Roundup®'s 50-Year Success Story at Monsanto ........ 2
II. Monsanto Turned a Blind Eye to Roundup®'s Potential Safety Risks from the Beginning.... 6
A. Monsanto's fraudulent pre-market testing ........ 6
B. Monsanto's inadequate post-market testing and misleading public claims. ........ 13
C. Monsanto's efforts to combat emerging information on Roundup®'s hazards ........ 20
1. Dr. Parry's Review of Genotoxicity Evidence. ........ 20
2. Scientific Ghostwriting: Williams (2000) ........ 27
3. Suppression of TNO Dermal Absorption Studies ........ 30
4. Minimization of Emerging Epidemiologic Evidence. ........ 33
5. Scientific Smear Campaign Against Dr. Gilles-Éric Séralini. ........ 40
6. "Orchestrated Outcry" Against International Scientific Review of Glyphosate. ........ 43
III. Post-2015 Scientific Evidence ........ 48
IV. Alternative Designs for Roundup® ........ 49
V. Monsanto's Conduct Violated Industry Standards and Monsanto's Own Internal Governance Codes ........ 52

## I. Roundup®'s 50-Year Success Story at Monsanto

1. Monsanto discovered the herbicidal properties of glyphosate in 1970 and sought to patent this use of glyphosate in March 1971. Exhibit 1, U.S. Patent No. 3,799,758, John E. Franz, Assignor to Monsanto Co., for N-Phosphonomethyl-Glycine Phytotoxicant Compositions, March 26, 1974 ("1974 Patent"), at 1.

2. Glyphosate works as an herbicide by inhibiting a plant enzyme, 5-enolpyruvyshikimate-3-phosphate synthase, thereby interfering with the "shikimic pathway", resulting in the accumulation of shikimic acid in plant tissue and, ultimately, plant death. Exhibit 2, Gary M. Williams, *et al., Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient, Glyphosate, for Humans*, 31 Regulatory Toxicology and Pharmacology 117–165 (2000) [RETRACTED], MONGLY02840226–274, at 226–27.

3. After discovering this herbicidal property of glyphosate, Monsanto began to research and design a formulated glyphosate-based herbicide (GBH) product that would be suitable for use in agriculture. Monsanto found that to make an efficacious herbicide, its glyphosate-containing formulations should include various adjuvants, including a surfactant such as polyethoxylated tallowamine (POEA), which both facilitates glyphosate's absorption into the plant and has herbicidal properties of its own. Ex. 1, 1974 Patent, at 2, 7; Exhibit 3, N. Defarge, *et al., Toxicity of formulants and heavy metals in glyphosate-based herbicides and other pesticides*, 5 TOXICOLOGY REPORTS 156–163 (2018) ("Defarge (2018)"), at 160, 162 (concluding that "[glyphosate] appears the least toxic component of [glyphosate-based herbicides], even in plants, in contrast with some formulants," consisting of "surfactants, diluents or adjuvants stabilizing [glyphosate] and allowing its penetration in plants.").

4. In 1974, Monsanto began to manufacture, sell, and distribute GBHs in the United States, primarily (but not exclusively) under the brand name "Roundup®." Ex. 2, Williams (2000), at MONGLY02840227.

5. While glyphosate serves as the so-called "active ingredient" in Roundup® due to its effect on plants, it has never been the sole ingredient in formulated Roundup®. Roundup® products are formulated with the surfactants – most often POEA – and also include well-known impurities that result from the manufacturing process and/or the chemical behavior of Roundup®'s ingredients under the foreseeable conditions of storage and use. Ex. 1, 1974 Patent, at 2, 7; Ex. 3, Defarge (2018), at 160.

6. Roundup® is a broad-spectrum, non-selective[1] herbicide. When sprayed on plants, Roundup® is absorbed through their leaves and translocates throughout the plant where it interferes

[1] "Non-selective" herbicides kill plants indiscriminately.

with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Ex. 2, Williams (2000), at MONGLY02840226–227.

7. Between 1996 and 1998, to protect Roundup®'s market dominance against competition from generic manufacturers, Monsanto began marketing genetically-engineered "Roundup® Ready" glyphosate-resistant soybean, corn, and cotton seeds for use in commercial agriculture. The stated advantage of "Roundup® Ready" crops is that they allow Roundup/glyphosate to be sprayed on and over crops in the fields during the growing season without harming the crops. "The agricultural use of glyphosate has increased sharply since the development of crops that have been genetically modified to make them resistant to glyphosate." Exhibit 4, International Agency for Research on Cancer (IARC), News Release, "IARC Monographs Volume 11: evaluation of five organophosphate insecticides and herbicides" (March 20, 2015) ("IARC March 20, 2025 News Release"), at 2.

8. Monsanto successfully secured its dominant market position in the GBH market through a strategy that couples proprietary Roundup® Ready seeds – subject to licensing restrictions that reduce competition – with continued sales of Roundup®. By 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States used Roundup® Ready seeds. By 2025, in the United States alone, Roundup® Ready seeds were used in 96 percent of soybean fields, 93 percent of upland cotton acres, and 92 percent of commercial corn fields. Exhibit 5, William Neuman & Andrew Pollack, Farmers Cope With Roundup-Resistant Weeds, N.Y. TIMES, May 3, 2010, available at http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan; Exhibit 6, Economic Research Service, United States Department of Agriculture, "Adoption of Genetically Engineered Crops in the United States -

Recent Trends in GE Adoption," https://www.ers.usda.gov/data-products/adoption-of-genetically-engineered-crops-in-the-united-states/recent-trends-in-ge-adoption (last updated Dec. 12, 2025).

9. While Monsanto initially developed Roundup® for use in agriculture, Monsanto continuously expanded its uses into new markets. Roundup® is now used in a wide variety of settings around the world, including agricultural, landscaping, public maintenance, and residential uses. Ex. " Exhibit 4, IARC March 20, 2015 News Release, at 2.

10. Through a three-pronged strategy of increasing production, decreasing prices, and selling Roundup® Ready seeds, Roundup® became Monsanto's most profitable product. By 2000, Roundup® accounted for almost $2.8 billion in annual sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Monsanto and one of its successors, Bayer CropScience, have continued to see similar sales revenue from Roundup® through the present. Roundup® remains one of the world's largest herbicides by sales volume. Exhibit 7, David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html. Exhibit 8, Bayer Annual Report 2025, at 65, available at https://reports.bayer.com/annual-report-2025/ (report $2.55 billion in sales of glyphosate-based products).

## II. Monsanto Turned a Blind Eye to Roundup®'s Potential Safety Risks from the Beginning

### A. Monsanto's fraudulent pre-market testing

11. Since Monsanto first introduced Roundup® in the 1970s, it has touted glyphosate as a technological breakthrough: at the same time Roundup® effectively kills weeds, it does so by inhibiting an enzyme that "is not found in humans or animals" and is therefore "non-toxic," as safe as other common products like table salt, or in the words of some Monsanto sales representatives, "safe enough to drink," and does not persist in the environment. Monsanto encouraged residential consumers to use Roundup® "where kids and pets'll play." Over and over, in print ads and on television, Monsanto underscored the safety of its product and the lack of need for any care in its use, showing people in their yards casually spraying Roundup® in shorts and short-sleeve shirts, with bare hands, as depicted, for example, in this March 7, 2014 video advertisement.



Exhibit 9, New York State Attorney General, Assurance of Discontinuance dated Nov. 19, 1996 (w/ Exhibits), MONGLY09272462–500 ("1996 Assurance of Discontinuance"), at MONGLY09272494, 498, 500; Exhibit 10, Deposition of Martin Griswold, *Griswold, et al., v. Monsanto Co.*, Case No. 1922-CC11226 (Aug. 15, 2022), at 71:4–72:20 (heard Monsanto

representatives state at meetings of farmers that someone could "safely drink a shot glass of Roundup" and that it was the "safest chemical on the market."); Exhibit 11, Video advertisement for Roundup Fast Act Foam, May 29, 2003, HighNoon.mpg, MONGLY10528555 ("2003 High Noon Advertisement") (depicting residential users spraying Roundup in shorts with no gloves). Exhibit 12, Video advertisement for Roundup Weed & Grass Killer, March 7, 2014, RattlesnakeMad_NN_30.mp4 ("2014 Rattlesnake Mad Advertisement") (depicting residential users spraying Roundup in shorts with no gloves).

12. Behind the scenes, however, Monsanto has *never* conducted a long-term carcinogenicity study of formulated Roundup®. Exhibit 13, Resp. & Obj. to 1st Set of Gen. Interrogs., *In re: Roundup Prods. Liab. Litig*., No. 16-md-02741-VC (N.D. Cal. Dec. 10, 2018), at 5, 11.

13. Monsanto's *de facto* policy for decades has been to perform *only the minimum testing required* by regulatory agencies or deemed helpful in responding to independent scientific evidence as part of what Monsanto employees call "product defense" or "freedom to operate" without regulatory restrictions. Thus, according to Monsanto employee Stephen Wratten, who was responsible for managing the company's pesticide registrations, studies required for regulatory approval were more likely to be funded by Monsanto than studies that were not required. Exhibit 14, Dep. Stephen Wratten dated July 1, 2024 (*Rogers v. Monsanto. Co*., Cal. Super. Santa Barbara No. 23CV00945), at 67-68.

14. Before it brought Roundup® to market, Monsanto identified the tests it would need to conduct in laboratory animals in order to support an application to the United States Environmental Protection Agency to register Roundup® for sale in the United States. These included "mutagenicity" tests on bacteria, and long-term tests in two different animal species to

identify evidence of carcinogenicity (or "oncogenicity"). Exhibit 15, EPA Toxicology Branch, Roundup Acute Evaluation dated May 24, 1973, MONGLY00784669–676 ("EPA Roundup Acute Evaluation").

15. Monsanto's pre-market safety tests for Roundup® focused solely on glyphosate, the "active ingredient" of the product for purposes of its use as an herbicide, and were limited to those tests necessary to legally market the product. Monsanto did *not* conduct any initial tests of the formulated Roundup® product it planned to supply to consumers. Nor is there any evidence to suggest Monsanto tried to determine whether and to what extent Roundup® users would absorb, inhale, and/or ingest glyphosate under the normal circumstances of Roundup®'s intended use; how long glyphosate would remain in the human body if inhaled, absorbed, or ingested; how glyphosate would interact with the human body after such exposures; whether alternative formulations of Roundup® would interact with the human body differently; or whether common protective measures such as the use of gloves, goggles, or masks could prevent or reduce such exposures. Ex. 15, EPA Roundup Acute Evaluation.

16. In 1971, Monsanto hired a testing laboratory called Industrial Bio-Test Laboratories (IBT) to conduct most of the animal toxicology studies it would need to submit for registration of Roundup® by the United States Environmental Protection Agency (EPA), including the two long-term animal carcinogenicity studies, for which Monsanto chose to perform an 18-month study in mice, and a 24-month study in rats. Monsanto had hired IBT to perform dozens of studies on its products and was, in fact, the laboratory's largest customer. Ex. 15, EPA Roundup Acute Evaluation; Exhibit 16, Monsanto Internal Memorandum dated Aug. 20, 1971 re: visit to IBT for the purpose of setting up long-term feeding studies, MONGLY00243475–76; Exhibit 17, Monsanto letter to Paul Wright (IBT) dated Aug. 31, 1971, re: samples used in long-term feeding

studies, MONGLY04253703 ("August 31, 1971 Letter"); Exhibit 18, Monsanto Internal Memorandum dated July 13, 1977 re: Industrial Bio-Test - Audit and Revalidation of Toxicology Studies, MONGLY18614071–74 ("July 13, 1977 Internal Memo."), at MONGLY18614072 ("Dr. Frisque stated that Monsanto has been over the years IBT's largest client…").

17. In 1971 and 1972, a then-former Monsanto toxicologist, Paul Wright, worked at IBT as the head of IBT's rat and dog study department. In this capacity, Dr. Wright planned and oversaw the long-term mouse and rat studies for Monsanto on glyphosate. In late 1972 – after these studies were well underway – Dr. Wright subsequently returned to work at Monsanto as its Toxicology Manager. In this role, Dr. Wright oversaw, edited, and approved the draft IBT glyphosate carcinogenicity study reports in 1973 and 1974 before Monsanto submitted them to EPA. Thus, Monsanto, through its employee, Dr. Wright, had full knowledge of how IBT carried out its rodent studies. Ex. 17, August 31, 1971 Letter; Exhibit 19, Paul Wright Monsanto Personnel File, MONGLY18626798–817 ("Wright Personnel File") at 799; Exhibit 20, Monsanto Internal Memorandum from P. Wright dated Feb. 16, 1973 re: status summaries for toxicity programs, MONGLY00243412 ("Feb. 16, 1973 Internal Memo."); Exhibit 21, Paul Wright Letter to IBT dated Sept. 11, 1973 re: request for reports, MONGLY04252796 ("Sept. 11, 1973 Letter"); Exhibit 22, Letter from IBT to Monsanto dated Jan. 17, 1974 re IBT No. B564 - Two-Year Chronic Oral Toxicity Study with CP67573 in Albino Rats, MONGLY04252868 ("Jan. 17, 1974 Letter").

18. In 1976, an inspection of IBT's laboratories by the U.S. Food and Drug Administration (FDA) exposed discrepancies between the raw data and the final reports relating to the toxicological impacts of pesticides and other chemicals IBT had studied. FDA and EPA announced that the U.S. Government would begin auditing approximately 1,000 IBT studies submitted to establish the safety of hundreds of different products. These included Monsanto's

mutagenicity and long-term carcinogenicity studies on glyphosate. Exhibit 23, U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983 ("EPA Summary of IBT Review"), at 8; Ex. 18, July 13, 1977 Internal Memo., at MONGLY18614071.

19. In response to this news, Monsanto confirmed through an internal audit that the critical IBT cancer studies supporting Roundup®'s registration could not be validated, but did not initiate any additional tests or try to repeat Dr. Wright's initial tests, and took no steps to re-evaluate the safety of its intended uses for Roundup® or modify those intended uses to protect Roundup® users. Exhibit 24, Letter from J.E. Maurer to Fred R. Current dated April 26, 1978 re: review of the toxicology studies conducted by IBT, MONGLY04264591.

20. In July 1977, IBT executives privately warned Monsanto executives that IBT believed the glyphosate oncogenicity studies conducted by Dr. Wright had problems including "extrapolation" and "faulty interpretation" that meant they were probably "fraud[ulent]." In response, Monsanto opened its own in-house Environmental Health Laboratory to carry out future animal studies, and named Dr. Wright to run it. Ex. 18, July 13, 1977 Internal Memo., at MONGLY18614072; Exhibit 25, Duffy, R., *A Modern Masterpiece for Monsanto*, ST. LOUIS POST-DISPATCH (July 9, 1978); Exhibit 26, Position Change Record for P. Wright dated Jan. 13, 1977, MONGLY16903194–95;

21. There is no evidence that in response to what it heard at the July 1977 meeting with IBT executives, Monsanto reported the likely fraud in its glyphosate studies to EPA, conducted additional safety testing, repeated any of the long-term animal carcinogenicity or mutagenicity tests, or re-evaluated the safety of Roundup® for the intended and foreseeable uses for which it was being sold.

22. Even before it put Roundup® on the market, Monsanto knew or should have known that IBT's glyphosate carcinogenicity studies were invalid, because they were planned, overseen, edited, and approved by Monsanto's own Toxicology Manager. *See* Ex. 17, August 31, 1971 Letter; Ex. 19, Wright Personnel File; Ex. 20, Feb. 16, 1973 Internal Memo.; Ex. 21, Sept. 11, 1973 Letter; Ex. 22, Jan. 17, 1974 Letter.

23. In August 1978, over a year after IBT had reported to Monsanto officials that the glyphosate carcinogenicity studies were probably "fraud[ulent]," the EPA audited IBT's glyphosate animal studies and independently found that many of the studies conducted for Monsanto on glyphosate, including the mutagenicity studies and the long-term rat and mouse carcinogenicity studies overseen by Dr. Wright and authored by Mr. Manuel Reyna, were invalid. Among other things, EPA ordered Monsanto to repeat the two cancer studies "as soon as possible" because IBT's test results were invalid. Exhibit 23, EPA Summary of IBT Review, at 23; Exhibit 27, Letter from EPA to Monsanto dated August 25, 1978 re: Roundup IBT data validation submitted June 21, 1978, MONGLY00245172–74 ("Aug. 25, 1978 Letter").

24. By at least August 1978, Monsanto thus knew beyond any doubt whatsoever that there were no valid cancer studies to support the continued sale of Roundup® for its intended uses, or Monsanto's frequent marketing claims that Roundup® was safe, "practically nontoxic" and as harmless as products like table salt. Ex. 27, Aug. 25, 1978 Letter.

25. In December 1980, Monsanto began publicly distributing tens of thousands of copies of a Roundup® "Herbicide Bulletin No. 1" falsely claiming that the IBT studies had already been repeated and falsely claiming that Monsanto had tested *formulated* Roundup® (not just the active ingredient glyphosate) and found it not to have chronic effects. Exhibit 28, Roundup® "Herbicide Bulletin No. 1, MONGLY04267426–29, at MONGLY04267427–428; Exhibit 29,

Roundup® Herbicide Q&A (May 1982), MONGLY15363589–592 ("Roundup® Herbicide Q&A"), at MONGLY15363592 (reporting that Monsanto had "distributed 40,000 copies" of its earlier Roundup Herbicide Bulletin).

26. In May 1981, the United States Government indicted several IBT employees for their fraudulent laboratory practices in connection with studies for Monsanto and other companies. One of those indicted was Monsanto toxicologist Paul Wright. Another was IBT executive Moreno Keplinger, who had signed off on both glyphosate oncogenicity studies conducted by Wright and Reyna. *See generally United States v. Keplinger,* 776 F.2d 678 (7th Cir. 1985), *cert. denied*, 476 U.S. 1183 (1986); Exhibit 30, Keith Schneider, *et al.*, *Faking It: The Case Against Industrial Bio-Test Laboratories*, AMICUS JOURNAL (Spring 1983), MONGLY18613183–195; David Rosner & Gerald Markowitz, *"Ashamed to Put My Name to It": Monsanto, Industrial Bio-Test Laboratories, and the Use of Fraudulent Science, 1969-1985,* 113 AM. J. PUBLIC HEALTH 661–666 (2023), available at http://doi.org/10.2105/AJPH.2023.307247.

27. Monsanto continued to employ Dr. Wright despite the indictments and paid $1.3 million for his legal defense. Monsanto also hired Reyna – first author on the likely fraudulent IBT glyphosate studies, and a key witness in the criminal trial – to work in its ESL. Exhibit 31, Dep. of William Reeves, *Freiwald v. Monsanto Co*., No. CGC-21-594817 (Ca. Super. Ct. Jan. 18, 2023), at 36:10–18; Ex. 30, "Faking It," at MONGLY18613186 (noting that Reyna is "now at EHL"); Exhibit 32, M.S. Reyna, *Final Report, Two Generation Reproduction Feeding Study with Glyphosate in Sprague-Dawley Rats*, Project No. ML-88-106/EHL 88038, dated Aug. 27, 1990, MONGLY00512455–477 ("Reyna 1990 Glyphosate Rat Reproduction Study"), at MONGLY00512455.

28. Ultimately, a jury convicted Paul Wright and Moreno Keplinger of fraud after a six-month trial in 1984, and they were sentenced to prison. Their convictions were affirmed on appeal. *See United States v. Keplinger,* 776 F.2d 678 (7th Cir. 1985), *cert. denied*, 476 U.S. 1183 (1986).

**B. Monsanto's inadequate post-market testing and misleading public claims.**

29. In December 1981, after selling Roundup® for seven years without valid carcinogenicity testing on its active ingredient, Monsanto finally completed the first EPA-required repeat carcinogenicity study of glyphosate in rats. This study, however, used substantially lower glyphosate doses than it should have, which meant that Monsanto could not rely on its results to support its claim that glyphosate does not cause cancer. Exhibit 33, Bio/Dynamics Lankas, *Lifetime Study of Glyphosate in Rats* (rev'd 12/23/81), MONGLY0176703; Exhibit 34, EPA, *Guidance for the Reregistration of Pesticide Products Containing Glyphosate as the Active Ingredient* (June 1986), MONGLY01297180–358 ("EPA Reregistration Guidance"), at MONGLY01297204 (finding that because "a maximum tolerated dose had not been reached . . . the rat study was . . . inadequate to determine [the] oncogenic potential" of glyphosate).

30. In May 1982, even though both of Monsanto's initial animal carcinogenicity tests had been discredited and only a single (substandard) repeat rat carcinogenicity study had since been completed on glyphosate, Monsanto publicly distributed a "Roundup® Herbicide Q&A" claiming that "[g]lyphosate did not cause cancer, tumors . . . or mutations in the animal studies specifically designed to assess the potential for these effects." Monsanto did not mention that it had never tested the carcinogenic potential of formulated Roundup®. Ex. 29, Roundup® Herbicide Q&A, at MONGLY15363589.

31. Monsanto took another two years to complete the required repeat carcinogenicity study on glyphosate in mice, performed at Bio/Dynamics laboratory and credited to two pathologists, Knezevich and Hogan. Monsanto submitted the Knezevich & Hogan study to EPA in August 1983. Exhibit 35, "A Chronic Feeding Study of Glyphosate in Mice," Additional Information Submitted in Support of Registration, Compiled by R.W. Street July 29, 1983, MONGLY00253810–4249, at MONGLY00253820.

32. The 1983 Knezevich and Hogan mouse carcinogenicity study showed increased rates of kidney tumors in mice exposed to glyphosate, demonstrating a dose-related effect. Exhibit 36, EPA Memorandum from William Dykstra dated Feb. 10, 1984, re: Glyphosate; oncogenicity study in the mouse ("Dykstra Feb. 10, 1984 Memo.") ("Review of the mouse oncogenicity study indicates that glyphosate is oncogenic, producing renal tubule adenomas, a rare tumor, in a dose-related manner."); Exhibit 37, Memorandum from Herbert Lacayo concerning "Use of historical data in determining the weight of evidence from kidney tumor incidence in the Glyphosate two-year feeding study; and some remarks on false positives," dated Feb. 26, 1985, MONGLY00235393–98 ("Lacayo Memo") (concluding it is "likely that there is a dose-tumor relationship for Glyphosate").

33. There is no evidence that between 1977 and December 1983 (when it had only a single, flawed rat carcinogenicity study in hand) Monsanto ever suspended Roundup® sales and removed it from the market until adequate carcinogenicity testing could be completed, or re-evaluated the safety of Roundup® and/or made changes to its intended uses of the product, based on its lack of adequate safety testing.

34. Rather than disclosing to consumers or the public that neither Monsanto nor anyone else had any valid cancer studies supporting Roundup®'s purported safety, Monsanto continued to

represent in successive versions of its widely-distributed "Herbicide Bulletin" that scientific studies had proven that glyphosate (and Roundup®) does not cause cancer. Ex. 29, Roundup Q&A, at MONGLY15363589 ("Glyphosate did not cause cancer, tumors, . . . or mutations in the animal studies specifically designed to assess the potential for these effects."); Exhibit 38, Herbicide Bulletin No. 3 (July 1982), MONGLY15363584–588 ("Based on the results of extensive toxicological studies in animals, it was demonstrated that Roundup® herbicide does not cause cancer . . ."); *id*. at MONGLY15363584 ("Roundup herbicide poses no danger to human or animal health when used according to label instructions.").

35. In 1985, the EPA classified glyphosate as possibly carcinogenic to humans (a Group C "oncogen") based on the results of the 1983 Knezevich & Hogan repeat carcinogenicity study on glyphosate in mice, which showed a statistically significant, dose-related increase of renal (kidney) tumors, Exhibit 39, EPA, *Glyphosate; pesticide tolerances*, 62 Fed. Reg. 17723, 17724 (April 11, 1997) ("Glyphosate pesticide tolerances").

36. The positive findings of the 1983 Knezevich & Hogan study demonstrate that Monsanto could have known – and *should* have known – of Roundup®'s carcinogenic potential before it ever put Roundup® on the market in 1974, had the company properly tested glyphosate. Ex. 36, Dykstra Feb. 10, 1984 Memo.; Ex. 37, Lacayo Memo.

37. EPA's classification of Roundup® as a Group C oncogen would have had a devastating effect on Roundup®'s sales because it supported treating Roundup® as a "restricted use" pesticide (requiring a special certification to apply Roundup®), requiring an additional warning on the Roundup® label, and/or prohibiting Roundup®'s use on food crops under the "Delaney Clause" of the Food, Drug and Cosmetics Act. *See* Food Additive Amendments of 1958, Public Law 85-929, 52 Stat. 1041 (Sept. 6, 1958).

38. In a March 13, 1985 letter, Monsanto complained to EPA "that even the initiation of formal regulation [as a result of the classification] would have serious negative economic repercussions." Meanwhile, Monsanto executives privately discussed whether there was anything at all they could do to remove glyphosate from Category C "short of finding a tumor in the control group." A tumor in the control group (the animals not given glyphosate) would eliminate the study's statistically significant finding of a dose-response relationship between glyphosate exposure and the occurrence of kidney tumors. Exhibit 40, Letter from Frank Serdy of Monsanto to EPA Office of Pesticide Programs dated March 13, 1985 re: Roundup Herbicide, Chronic Mouse Study with Glyphosate, MONGLY04268872–76; Exhibit 41, Monsanto Internal Memorandum dated Feb. 22, 1985 re: EPA Toxicology Branch/Roundup; Meeting February 21, 1985, MONGLY04269072-75. Exhibit 42, Letter dated May 21, 1985 from Monsanto to Robert J. Taylor, Office of Pesticide Programs re: Chronic Mouse Study with Glyphosate, MONGLY00253801–809 ("May 21, 1985 Letter") at 802.

39. On April 3, 1985, Monsanto discussed plans for its pathology consultant, Dr. Kuschner, to "review kidney sections and present his evaluation of them to EPA in an effort to persuade the agency the observed tumors are not related to glyphosate." Dr. Kuschner received the slides eleven days later. Exhibit 43, Monsanto Internal Memorandum from Levinskas to Evans dated April 3, 1985, MONGLY04277789; Exhibit 44, Letter to M. Kushner from A. Knezevich dated April 3, 1985 transmitting slides of kidney sections, with signed receipt from M. Kushner dated April 14, 1985, MONGLY04269049-MONGLY04269050.

40. Dr. Kuschner provided Monsanto with the exact opinion it needed and anticipated, claiming to have found a "minute (1 mm or less)" tumor in one of the control group animals. Ex. 42, May 21, 1985 Letter, at 809.

41. EPA pathologists and other independent experts who reviewed the test slides could not find Dr. Kuschner's "magic" tumor. The California Department of Food and Agriculture, for example, reported that it did "not consider the [Kuschner tumor] finding in the control male as real." Exhibit 45, EPA Memorandum dated Dec. 4, 1985 re: Report on Additional Kidney Sections, MONGLY00235488; Exhibit 46, Letter from Monsanto to California Dept of Food & Agriculture dated April 3, 1987, Subject: Glyphosate Reconsideration of Chronic/Oncogenicity Mouse Study, MONGLY04278109–110.

42. Presented with the inconsistency between Dr. Kuschner's finding and the findings of the original study authors, internal EPA scientists, and other independent experts, EPA convened a Scientific Advisory Panel (SAP) to consider the question of glyphosate's oncogenicity. Monsanto officials privately strategized about how to overturn the Group C classification at this meeting. Monsanto's Lyle Gingerich explained: "There is a tendency to 'count the votes' at S.A.P. meetings. We can make a difference by lining up a large number of experts on our side." Frank Serdy agreed: "Hopefully, the testimony of several respected 'experts' will be enough to cause EPA to change their minds." Ex. 39, Glyphosate pesticide tolerances, 62 Fed. Reg., at 17724; Exhibit 47, Monsanto Internal Memorandum from L. Gingerich to Armstrong, et al., Re: Roundup S.A.P. Meeting, MONGLY04268982–983; Exhibit 48, Monsanto Internal Memorandum dated Aug. 28, 1985 re: Glyphosate mouse study; additional steps MONGLY04268980–981.

43. Monsanto brought nine paid consultants to bolster its position, and after substantial pressure on and a lengthy battle with EPA, convinced EPA to find the repeat mouse study "equivocal." As a result, in 1986, EPA told Monsanto to conduct *yet another* oncogenicity study on mice. EPA also told Monsanto to conduct a second repeat rat carcinogenicity study, because its *first* repeat rat carcinogenicity study (finalized in 1981) had used substantially lower glyphosate

doses than required, making it meaningless to evaluate glyphosate's cancerous potential. Exhibit 49, Monsanto, "Information to Support the Conclusion that Glyphosate is Not a Class C Oncogen; Science Advisory Panel Meeting, Feb. 11, 1986," MONGLY00233235–391, at MONGLY00233245, 373, 379, & 381; Ex. 34, EPA Reregistration Guidance, at MONGLY01297190–191, MONGLY01297203–204.

44. Monsanto completed the second repeat rat carcinogenicity study on glyphosate only in 1990, after Roundup® had been on the market continuously for sixteen years. Rather than using an outside laboratory, Monsanto conducted the study at the in-house Environmental Health Laboratory it had set up after the U.S. Government had begun to investigate IBT – where Monsanto continued to employ Manuel Reyna, lead author of the original IBT mouse and rat studies, to perform research on glyphosate. Exhibit 50, Stout & Ruecker, Chronic Study of Glyphosate Administered in Feed to Albino Rats, Study No. EHL-87122, Project No. ML-87-148, MONGLY00158518–551; Ex. 32, Reyna 1990 Glyphosate Rat Reproduction Study.

45. Monsanto ultimately refused to conduct the second repeat mouse oncogenicity study on glyphosate and, to date, there is no evidence Monsanto ever conducted such a study. Exhibit 51, EPA Memorandum from Dykstra to Taylor dated Jan. 5, 1988 re: Glyphosate - Monsanto Comments to Glyphosate Guidance Document, MONGLY00223053-MONGLY00223058, at MONGLY00223056 ("[The Toxicology Branch believes the oncogenic potential of glyphosate in mice still remains unresolved and that a repeat mouse study is necessary, to fully and adequately assess this potential.").

46. Thus, until September 1990 when it concluded its *single* long-term study of glyphosate in rats, Monsanto had no carcinogenicity testing whatsoever to support its marketing of Roundup® as safe for its intended uses. Ex. 23, EPA Summary of IBT Review, at 23 (initial

long-term animal tests (and mutagenicity tests) submitted to support registration of Roundup were invalid); Ex. 34, EPA Reregistration Guidance, at MONGLY01297204 (finding first repeat rat study "inadequate to determine [the] oncogenic potential" of glyphosate due to dose levels used).

47. Monsanto never any conducted long-term animal carcinogenicity tests on *formulated* Roundup® because, according to Monsanto, such tests would amount to feeding the animals "soap" and that it would not be possible to conduct meaningful long-term tests without killing the test animals. Ex. 13, Rep. to 1st Set of Gen. Interrogs., at 5, 11; Exhibit 52, Trial Tr. (David Saltmiras), *McKivison v. Monsanto Co.*, No. (Jan. 23, 2024 PM Session) ("Saltmiras *McKivison* Test."), at 100.

48. Even without having done its own internal testing, however, Monsanto knew or should have known that the adjuvant ingredients in its formulated products could not be considered "inert" because glyphosate formulations containing the surfactant POEA had already been shown to be significantly more toxic than glyphosate alone. In 1990, for example, a researcher from the Department of Pharmacology at St. Louis College of Pharmacy, reported on a study of glyphosate, Roundup and POEA surfactant in rats in which he had found the toxicity of Roundup was greater than could be accounted for on the basis of the dose response data from either glyphosate or POEA alone. Exhibit 53, Martinez, T.T., W.C. Long and R. Hiller, *Comparison of the toxicology of the herbicide Roundup by oral and pulmonary routes of exposure.* PROC. WEST. PHAMACOL. SOC. 33:193–197 (1990).

49. Yet Monsanto continued to market Roundup® as a product safe to use with no protective equipment whatsoever, even around children, as depicted for example in frames from Monsanto's 1990 television advertisement showing a father spraying Roundup® as his family dashes off on a vacation:






1990 Roundup Weed Killer Commercial, available at https://youtu.be/3vanRQ4GtlE?si=HgW80pC3UIyRftSs (last accessed Sept. 24, 2026).

### C. <u>Monsanto's efforts to combat emerging information on Roundup®'s hazards.</u>

#### 1. <u>Dr. Parry's Review of Genotoxicity Evidence.</u>

50. In the 1990s, scientists who were not beholden to the pesticide industry published a series of peer-reviewed published scientific studies demonstrating that pure glyphosate and formulated Roundup® are both genotoxic – *i.e.*, capable of causing DNA damage, from which

cancer may develop – and that Monsanto's formulated product caused more genetic damage than glyphosate alone.

a. In 1993, Danish researchers reported not only that they had found evidence of genotoxicity, but that formulated Roundup® produced "a statistically significant increase in chromosome aberrations" that did not show up in the tests of glyphosate alone. Exhibit 54, J. Rank, *et al., Genotoxicity Testing of the Herbicide Roundup® and Its Active Ingredient Glyphosate Isopropylamine Using the Mouse Bone Marrow Micronucleus Test, Salmonella Mutagenicity Test, and Allium Anaphase-Telophase Test,* 300 MUTAT. RES. 29 (1993), doi: 10.1016/0165-1218(93)90136-2.

b. In 1997, Italian researchers reported that "[t]he formulated commercial product, Roundup®, seems to be rather more toxic than the parent compound." These researchers conducted a series of animal and *in vitro* tests on both formulated Roundup® and glyphosate alone, and reported that while *both* caused DNA damage, formulated Roundup® products showed more significant genotoxic effects than glyphosate alone, including "DNA single-strand breaks and 8-OHdG and a significant increase in chromosomal alterations." Exhibit 55, Claudia Bolognesi, *et al., Genotoxic Activity of Glyphosate and Its Technical Formulation Roundup®,* 45 J. AGRIC. FOOD CHEM. 1957 (1997), doi: 10.1021/jf9606518.

c. The following year, the same group of Italian researchers reported that they had administered formulated Roundup® and glyphosate alone to mice and found that Roundup® was "able to induce a dose-dependent formation of DNA adducts in the kidneys and liver of mice," even when the active ingredient alone did not do so. Exhibit 56, M. Peluso, *32P-Postlabeling Detection of DNA Adducts in Mice*

*Treated with the Herbicide Roundup®,* 31 ENVIRON. MOL. MUTAGEN. 55 (1998), doi:10.1002/(SICI)1098-2280(1998)31:1<55::AID-EM8>3.0.CO;2-A.

d. In July 1998, Italian researchers who conducted *in vitro* tests on glyphosate alone in bovine lymphocytes reported that glyphosate is "genotoxic in in vitro cultures of bovine lymphocytes . . . support[ing] the hypothesis that cells exposed to [glyphosate] have altered cell metabolism." Exhibit 57, M. B. Lioi, *et al.*, *Genotoxicity and Oxidative Stress Induced by Pesticide Exposure in Bovine Lymphocyte Cultures in Vitro*, 403 MUTAT. RES. 13 (1998), doi: 10.1016/s0027-5107(98)00010-4, MONGLY00330352–359.

51. Even as it was monitoring these publications and their reception in the scientific community, Monsanto continued to promote Roundup® as safe and non-toxic in its ad campaigns and promotional materials. For example, Monsanto's 1995 ad campaign for Roundup Ready Soybeans promised that "Roundup is tough on plants, but no more toxic to people and animals than table salt." In April 1996, without acknowledging the concerning finding published by Rank and colleagues two years earlier, Monsanto began distributing a technical fact sheet for Roundup® Ultra telling customers that an "[a]n extensive battery" of genotoxicity tests showed that the active ingredient in Roundup® "does not interfere with the genetic makeup of cells." Exhibit 58, Monsanto Co., "This is What It Means to Be In the Zone," (December 1995), MONARCH000294–301, at MONARCH000299; Exhibit 59, Roundup Ultra Herbicide Technical Fact Sheet (April 1996), MONGLY00627008–11.

52. In or around 1996, Monsanto also advertised that Roundup "can be used where kids and pets'll play," showing a bare-handed user spraying the product:



Ex. 9, 1996 Assurance of Discontinuance, at MONGLY09272500; Monsanto Roundup 90s Commercial (1996), available at https://youtu.be/VRsolvgEQy8?si=l4tRrBz-n28tdP7X (last accessed Sept. 24, 2026).

53. A 1997 television commercial again presented a barehanded Roundup user:




Roundup – Talking Weeds – 1997, available at https://youtu.be/JmifK6fkGkg?si=aKCGqZwiTgbK8XRZ.

54. In 1996, the New York Attorney General (NYAG) filed a lawsuit against Monsanto for its false and misleading advertising of Roundup. Specifically, the lawsuit charged Monsanto with representing its Roundup® products as "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Although Monsanto agreed to cease advertising its products this way in New York, it did not alter advertising in any other state and continued to mislead New York consumers. Ex. 9, 1996 Assurance of Discontinuance; Exhibit 141, New York Attorney General, Assurance of Discontinuance No. 23-025, dated June 8, 2023.

55. In January 1997, Monsanto publicly maintained on its website that "Comprehensive toxicological studies in animals have determined that glyphosate . . . does not cause cancer." Exhibit 60, Monsanto, Health & Safety Webpage, January 25, 1997, http://www.monsanto.com/crop_protection/html_files/health.html.

56. Monsanto internally debated in a September 24, 1998 strategy meeting whether to repeat the study published by Peluso in 1997 but decided not to do so, in view of the expense involved and their chief concern: "What is [the] impact if ROUNDUP is positive?" Even if they could include in the study other common surfactant-based consumer products that they hoped would show similar effects, such a study "[w]ould not eliminate [the] Peluso study" and "[w]ould only be successful if we did it through a 3rd party." "[W]ith little control," they concluded, a study by a third party "could be risky." Exhibit 61, September 24, 1998 - Meeting Minutes, MONGLY06218548–550 ("September 24, 1998 Minutes"), at MONGLY06218548.

57. Instead, Monsanto decided to "[d]evelop an external global network of experts to manage allegations of potential genotoxicity," as part of what Monsanto termed the "genetic toxicology defense" of Roundup®. Ex. 61, September 24, 1998 Minutes, at MONGLY06218549.

58. Since the research on Roundup®'s potential genotoxicity was already receiving attention in Europe, Monsanto started by hiring a British genotoxicologist, Dr. James Parry, whom it considered to be world-renowned, to review the genotoxicity studies, evaluate glyphosate's and Roundup®'s potential for genotoxicity, and help Monsanto show that glyphosate alone and the formulated product Roundup® are not genotoxic. Exhibit 62, Email from Farmer to Heydens et al. dated Dec. 29, 1998 re: Actions from 12/17 Meeting on Mutagenicity, MONGLY06486896–898; Exhibit 63, Email chain dated Jan 27-28, 1999 re: DRAFT of Minutes - 1/15 Meeting, MONGLY01312107–110.

59. But, after reviewing scientific studies, Dr. Parry concluded the opposite. On or about February 11, 1999, in fact, he provided Monsanto with a report concluding that the published studies provide evidence that glyphosate is capable of "producing genotoxicity both *in vivo* and *in*

*vitro*." Exhibit 64, Monsanto Fax Transmittal dated Feb. 15, 1999 re: Prof. Parry's Report, MONGLY01312093–104, at MONGLY01312103.

60. Rather than accept their own expert genotoxicologist's advice, Monsanto, looking for a way to "dig [itself] out of the genotox hole," gave Dr. Parry additional studies and data to see "if we can turn his opinion around." At the same time, Monsanto made Dr. Parry sign a "secrecy agreement," in case he did not change his mind. Exhibit 65, Email dated April 19, 1999 from Mark Martens to Kier, Heydens, Wilson & Farmer re: Meeting Minutes 2/25, MONGLY06486905–908.

61. After reviewing a larger number of studies, Dr. Parry confirmed his earlier conclusion to Monsanto. Dr. Parry also recommended to Monsanto that it conduct further genotoxicity studies on glyphosate and Roundup®. In fact, he told Monsanto in a written report that, given its extensive world-wide use, conducting further studies was critical for public health. Monsanto once again disregarded Dr. Parry's recommendation to further study Roundup®, and instead decided to "find/develop someone who is comfortable with the genetox profile of glyphosate/Roundup." Exhibit 66, James M. Parry, Evaluation of the Potential Genotoxicity of Glyphosate, Glyphosate Mixtures and Component Surfactants, (Aug. 1999), MONGLY01314233–263; Exhibit 67, Email from Heydens to Martens, Kier & Farmer dated Sept. 16, 1999 re: Parry report, MONGLY03734971.

62. Meanwhile, to the public, Monsanto continued to maintain in its promotional materials for customers that Roundup had been affirmatively shown not to be genotoxic or carcinogenic. For example, in its April 2010 technical bulletin for Roundup PROMAX Herbicide, which it distributed on its website, Monsanto assured customers that "glyphosate does not interfere with the genetic makeup of cells" and "does not cause cancer." Exhibit 68, Email from Overton to

Gould dated April 21, 2010 re: Roundup PROMAX Herbicide Technical Fact Sheet, MONGLY07108708–714.

63. Throughout the early 2000s, Monsanto continued to run television and Internet advertisements that depicted people spraying the product in shorts, bare-handed, as in the 2003 version of Monsanto's long-running "High Noon" advertisement used for different Roundup formulations:



Ex. 11, 2003 High Noon Advertisement; Exhibit 69, Historical TV Spots 2001-2010 PowerPoint dated Oct. 27, 2010, MONGLY09288751 ("Historical TV Spots 2001-2010"); Exhibit 70, Roundup Weed & Grass Killer, Rattlesnake Mad Advertisement, Rattlesnake_New_30.pm4, Feb. 19, 2013, MONGLY10528490; Ex. 12, 2014 Rattlesnake Mad Advertisement.

**2. <u>Scientific Ghostwriting: Williams (2000).</u>**

64. At the same time it was trying to develop Dr. Parry as an "independent" spokesperson for Roundup®'s safety, Monsanto also began working to whitewash the published studies concluding that Roundup® is genotoxic by publishing "ghostwritten" scientific literature with the help of a scientist named Gary Williams and a group of experts working with a consulting firm called Cantox (later known as Intertek). Exhibit 71, Email from William Heydens to William Graham dated May 26, 1999 re: Scientific Outreach Council Meeting, MONGLY00904009–11;

Exhibit 72, Email from Heydens to Bryant dated April 30, 1999 re: Genetox Section of Glyphosate Manuscript, MONGLY00904753 ("April 30, 1999 Email re: Genetox Section").

65. Ghostwriting is when a company with a financial interest in a study, such as Monsanto, writes a favorable manuscript (or portion of a manuscript) about one of its products to be submitted for publication, and then finds individuals to read the manuscript and agree to be listed as authors without disclosing that the real author is actually the company. This practice is unethical. Exhibit 73, The World Association of Medical Editors, "Ghost Writing Initiated by Commercial Companies," J. Gen. Intern. Med. 20:549 (2005).

66. Monsanto's in-house scientists ghostwrote a "comprehensive safety evaluation and risk assessment" of the human health aspects of glyphosate/Roundup® and published it in the journal *Regulatory Toxicology and Pharmacology* as "Safety evaluation and risk assessment of the herbicide Roundup® and its active ingredient, glyphosate, for humans," purportedly authored by Gary Williams, Robert Kroes, and Ian C. Munro of Cantox. The "Acknowledgment" of the Williams (2000) article (written by Monsanto) does not inform the reader that Monsanto wrote it in whole or even in part. Ex. 2, Williams (2000); Ex. 72, April 30, 1999 Email re: Genetox Section; Exhibit 74, Email chain from Heydens to Koch et al., from Feb. 5-19, 2019 re: IARC Planning, MONGLY00977264–270, at MONGLY00977267 (proposing to ghostwrite safety literature with outside scientists by "us doing the writing and they would just edit & sign their names so to speak. Recall that is how we handled Williams Kroes & Muro, 2000.").

67. The key claim of Williams (2000) is that based on a "comprehensive" safety evaluation of the available evidence, "under present and expected conditions of use, Roundup® herbicide does not pose a health risk to humans." Ex. 2, Williams (2000), at MONGLY02840226.

68. After the article's publication, the ghostwriting participants within Monsanto were hailed inside the company for their tremendous years' worth of work in orchestrating the paper's completion and utilizing the ghostwritten article to get the word into the public discourse that Roundup® is safe. Monsanto planned to use the article "in defending or building Roundup® sales." Monsanto's executive Hugh Grant congratulated the ghostwriting team: "This is very good work, well done to the team, please keep me in the loop as you build the PR info to go with it." Exhibit 75, Email from Grant to Drake dated May 12, 2000 re: Kudos on Publication of Roundup Tox Paper - now posted on the Internet, MONGLY02624347–349.

69. For twenty-five years after its publication, Monsanto used the ghostwritten Williams (2000) article for public relations, promotional purposes, and to defend its "freedom to operate" against stricter regulation of glyphosate, both in the United States and abroad. In 2025, Kaurov & Oreskes published an article in the *Journal of Environmental Science & Policy* reporting on the impact of Williams (2000) on academic research and policy decisions since its publication. Among 22,280 papers whose titles or abstracts contain the word "glyphosate," Monsanto's ghostwritten article was cited 822 times, making it the ninth-most-cited paper and placing it in the top 0.1% of the most influential glyphosate studies over the last 25 years. This includes citations in 36 separate international regulatory policy decision documents, 29 of which do not mention its ghostwritten origin. Indeed, the 2020 Toxicological Profile for Glyphosate by the Agency for Toxic Substances and Disease Registry (ATSDR), a division of the Centers for Disease Control and Prevention (CDC), cited this study several times as evidence of glyphosate's toxicokinetic effects and low absorption rates. Exhibit 76, Alexander A. Kaurov & Naomi Oreskes, *The afterlife of a ghost-written paper: How corporate authorship shaped two decades of glyphosate safety discourse*, 171 ENVIRONMENTAL SCIENCE & POLICY 104160 (2025).

70. Shortly after Kaurov & Oreskses published their analysis, in December 2025, the editors of *Regulatory Toxicology and Pharmacology* retracted the ghostwritten Williams (2000) article, citing "the potential biases introduced by undisclosed contributions from Monsanto employees and the exclusion of other existing long-term carcinogenicity studies [that] may have skewed the interpretation of the data." The editors found particularly unacceptable Monsanto employees' "contribut[ions] to the writing of the article without proper acknowledgement as authors": "This lack of transparency raises serious ethical concerns regarding the independence and accountability of the authors of this article and the academic integrity of the carcinogenicity studies presented." Exhibit 77, van den Berg M., *Retraction Notice for "Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient, Glyphosate, for Humans,"* REGUL. TOXICOL. PHARMACOL. (Dec. 2025).

### 3. <u>Suppression of TNO Dermal Absorption Studies.</u>

71. Roundup® users such as Plaintiff are exposed to Roundup® and its active ingredient, glyphosate, through various routes, all of which lead to glyphosate/Roundup® translocating into their circulatory system. These routes include dermal absorption, inhalation, ocular absorption, and ingestion. The primary route of exposure, however, is dermal absorption – the movement of glyphosate through the skin and into the bloodstream. This is because the powerful surfactant or "surface acting chemical agent" in formulated Roundup® breaks down the cellular defenses in the surface of skin and thus acts to facilitate Roundup's penetration of the skin and into human cells. Exhibit 78 Testimony of Dr. William Sawyer, *Dewayne Johnson v. Monsanto Co.* Trial. Tr. (Jul. 26, 2018 AM Session) ("Sawyer Johnson Tr."), at 3615:18–21; Ex. 2, Williams (2000) (acknowledging that dermal and oral pathways are the primary routes of exposure to pesticides such as GBHs).

72. In late-2000/early-2001, European authorities required Monsanto to update its glyphosate risk assessment.[2] The risk assessments of glyphosate were dependent on several factors, one of the critical ones being the percentage of dermal absorption that occurred when Roundup® got on, and remained on, a user's skin. Generally, an absorption level above 3% demonstrates a significant risk. Glyphosate had long been considered to have only a 2-3% absorption rate. Exhibit 79, Email from Heydens to Broeckart, et al., dated March 29, 2002, re: TNO dermal penetration studies: new issues and topics for the conf call of Tuesday, 2 April (8 A.M STL time), MONGLY03738291–292 ("March 29, 2002 Email re: TNO dermal penetration studies"); Exhibit 80, Email dated April 25, 2000 from Wratten to Gustin re: glyphosate dermal penetration, MONGLY03735338–339, at MONGLY03735339.

73. To update its glyphosate risk assessment in response to proposed tighter exposure limits in Europe, Monsanto retained TNO, a laboratory that had previously performed its dermal absorption studies, to conduct absorption studies using glyphosate and formulated Roundup® on both rat and human skin. Ex. 79, March 29, 2002 Email re: TNO dermal penetration studies.

74. In early 2002, Monsanto received preliminary test results from TNO for the rat skin portion of the glyphosate/Roundup® studies. These results demonstrated dermal absorption of 10% in formulated Roundup®, higher than the dermal absorption rate for glyphosate alone and much higher than the 3% dermal absorption rate previously used for risk assessments, sending shockwaves of concern through Monsanto. Ex. 79, March 29, 2002 Email re: TNO dermal penetration studies.

---

[2] "Risk assessment" is a process used to identify potential hazards of a substance, such as an herbicide like glyphosate-containing Roundup®.

75. Rather than addressing the results, Monsanto terminated the study, expressing concern about the "potential for this work to blow Roundup® risk evaluations," and buried the TNO study results in its archives. Exhibit 81, Email from Heydens to Healy dated April 2, 2002 re: TNO dermal penetration studies: new issues and topics for the conf call of Tuesday, 2 April (8 A.M STL time), MONGLY03738295–296.

76. Monsanto also refused TNO's offer to repeat the study for fear of similar results. Exhibit 82, Email from Ratten to Healy, et al., dated April 5, 2002, re: TNO dermal penetration studies, MONGLY03737014–16.

77. Despite what it had learned from TNO, over the following decades, Monsanto continued to market Roundup® for use in a manner that *increased* the potential for dermal exposure, rather than exploring usage restrictions or alternative formulations that would minimize exposure, through television commercials and advertisements in print publications show home users spraying Roundup® wearing shorts, short sleeve shirts, and no gloves. Ex. 69, Historical TV Spots 2001-2010; Ex. 11, 2003 High Noon Advertisement; Ex. 70, 2013 Rattlesnake Mad Advertisement; Ex. 12, 2014 Rattlesnake Mad Advertisement.

78. As recently as November 2018, a commercial for Roundup® Extended Control showed a group of men, all again spraying bare-handed, some in short sleeves:






Exhibit 83, Roundup Extended Control "Weed Town" Advertisement, Nov. 15, 2018, Roundup_WeedTown_web_032705.mpg, MONGLY15370846.

**4. <u>Minimization of Emerging Epidemiologic Evidence.</u>**

79. On March 15, 1999, Swedish researchers Hardell & Eriksson published the results of an epidemiologic study in which they found a statistically-significant increased incidence of NHL with exposure to glyphosate-based herbicide (i.e., Roundup®). Exhibit 84, Lennart Hardell & Mikael Eriksson, *A Case Control Study of Non-Hodgkin Lymphoma and Exposure to Pesticides*, 85 CANCER 1353 (1999), MONGLY00320171–178.

80. Shortly afterward, a popular science publication, *The New Scientist*, drew attention to Hardell & Ericksson's findings in an article specifically reporting that "[t]he [NHL] patients were . . . 2.3 times more likely to have had contact with glyphosate, the most commonly used herbicide in Sweden," and also calling out Roundup® by name: "Use of this chemical sold as Round-Up by the US firm Monsanto, is expected to rocket with the introduction of crops, such as Roundup-Ready soya beans, that are genetically modified to resist glyphosate." Exhibit 85, Mackenzie & Pearce, *It's raining pesticides*, NEW SCIENTIST (3 April 1999), https://www.newscientist.com/article/mg16221803-100-its-raining-pesticides/.

81. In response to the findings reported by Hardell & Ericksson and the *New Scientist*, Monsanto did not undertake its own epidemiologic research or conduct additional tests on the safety of Roundup®. Instead, Monsanto public relations employees met with Monsanto's in-house scientists to "develop a plan of attack" on the Hardell & Ericksson findings, to include a letter to the editor drafted by Monsanto for "third part[ies]" to send to *The New Scientist* and other popular-press publications that reported the findings. Exhibit 86, Email dated April 14, 1999 from Drake to Martens, et al re: Glyphosate and Cancer article/New Scientist, MONGLY0205938484–485; Exhibit 87, Email from Heydens to Drake, et al. dated April 27, 1999 re: New Scientist - revised response & action plan, MONGLY01868397–398.

82. Monsanto ultimately arranged for its former medical director John Jackson, to "pick one or two experts he feels he can work with" and "share our draft with them." Jackson recruited British epidemiologist Tim Sorohan, and European researcher Joop van Hemmen as coauthors for the company's proposed letter to *The New Scientist*. After Monsanto agreed to pay an honorarium "for the work involved in reading the papers and reviewing the letter," Jackson, Sorohan, and van Hemman signed off on the letter and sent it to *The New Scientist*, which published it on May 29,

1999. "[T]he evidence relating to glyphosate does not point to any hazard akin to the induction of NHL," they argued. They did not mention that Monsanto had drafted and paid for their letter. Exhibit 88, E-Mail from Acquavella to Drake, Graham, Wratten, and Farmer dated April 29, 1999 re: Subject: review of Nordstrom et al., MONGLY00877583–585 ("Acquavella April 29, 1999 Email"); Exhibit 89, Email from Jackson to Acquavella, et al dated May 11, 1999 re: Letter to New Scientist, MONGLY01825676; Exhibit 90, Email from Graham to Acquavella, et al., re: Letter to New Scientist, MONGLY00877536; Exhibit 91, *Letter: Rained out.* NEW SCIENTIST (29 May 1999).

83. Monsanto toxicologist Donna Farmer characterized Hardell (1999) as "just the tip of the iceberg" for epidemiologic studies showing health effects associated with the use of glyphosate. Monsanto epidemiologist John Acquavella concurred: "The true significance of Hardell's study to industry . . . is as a sentinel of other, more important studies soon to come. . . . [T]he pressure from epidemiologic findings is sure to escalate over the next few years as papers start to be published from the NCI Agricultural Health Study and other ongoing studies." Exhibit 92, Email from Klevorn to Farmer dated June 1, 1999 re: Questions about Glyphosate, MONGLY00877463–468; Exhibit 93, ECPA Proposal re: Hardell AHS epi, Nov. 9, 1999, MONGLY00896835–839 ("Nov. 9, 1999 Proposal").

84. Sure enough, in or around May 2000, Monsanto learned a Canadian research team led by Helen McDuffie would soon be presenting at a conference the results of a second case-control study that had examined the relationship between NHL and exposure to various pesticides, including Roundup®. The abstract for McDuffie's presentation reported that "more than two days per year of exposure to glyphosate resulted in an OR (95% CI) of 2.11 (1.20, 3.72) – an association pointing to Roundup® as a potential cause of NHL. Exhibit 94, Email from Acquavella re:

McDuffie NHL abstract dated May 12, 2000, MONGLY02932440–441 ("Acquavella May 12, 2000 Email").

85. When it learned of McDuffie's finding of an association between Roundup® and NHL, Monsanto did not conduct additional testing on Roundup® or glyphosate, re-evaluate or modify the safety of Roundup®'s intended uses, or take steps to limit users' potential exposure. Instead, Monsanto strategized how it could respond to the potential public relations problem such findings would present. Monsanto epidemiologist John Acquavella assured his colleagues at Monsanto that the results reported in an abstract are just preliminary, and he made plans "to attend the presentation of the paper to talk to the author," as well as one of her co-authors whom he had recently helped to obtain an academic appointment. Meanwhile, Monsanto's in-house scientists would "begin working on this in case things don't change and the paper gets media attention," and Acquavella would "bring this abstract to the attention of some of our scientific outreach experts so that they are ready if needed." Ex. 94, Acquavella May 12, 200 Email.

86. In August 2000, Acquavella attended the meeting and talked with McDuffie as planned. "It remains to be seen how glyphosate is treated in the eventual publication," Acquavella reported to his Monsanto colleagues. "Obviously, we need to be as prepared as we can, given limited information." Exhibit 95, Monsanto Memorandum dated Aug. 24, 2000 from Acquavella to Farmer, et al. re: ISEE meeting - epidemiology studies re glyphosate, MONGLY00886014–17.

87. When McDuffie's team ultimately published their work in November 2001, the reference to glyphosate in the abstract had been removed and the findings about glyphosate de-emphasized, but still present in the text. "It's a good result," opined Acquavella, "but not everything we wanted. . . . [I]t will not be picked up by most of the usual suspects because it's not mentioned in the abstract." Monsanto toxicologist Donna Farmer concurred: "at least it is out of

the abstract and not a huge discussion in the text." Exhibit 96, Helen H. McDuffie, et al., *Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health*, 10 CANCER EPIDEMIOL. BIOMARKERS PREV. 1155 (2001), WEEDPROD00002303–11; Exhibit 97, Email from Farmer to Acquavella dated Dec. 6, 2001 re: McDuffie paper, MONGLY00887558–560.

88. As Acquavella and Farmer had predicted, yet more epidemiologic studies followed on the heels of Hardell & Ericksson's 1998 publication, reporting further evidence of a link between glyphosate and NHL. *See, e.g.,* Hardell, *et al.*, *Exposure to Pesticides as Risk Factor for Non-Hodgkin's Lymphoma and Hairy Cell Leukemia: Pooled Analysis of Two Swedish Case-Control Studies*, 43 LEUK. LYMPHOMA 1043 (2002), doi: 10.1080/10428190290021560; De Roos, *et al.*, *Integrative Assessment of Multiple Pesticides as Risk Factors for Non-Hodgkin's Lymphoma among Men*, 60 OCCUP. ENVIRON. MED. e11 (2003), doi: 10.1136/oem.60.9.e11; and Eriksson, *et al.*, *Pesticide Exposure as Risk Factor for non-Hodgkin Lymphoma Including Histopathological Subgroup Analysis*, 123 INT'L J. OF CANCER 1657 (2008), doi: 10.1002/ijc.23589.

89. Despite these additional reports of associations between glyphosate and NHL in studies of people who reported using formulated Roundup®, Monsanto still chose not to conduct any long-term carcinogenicity study on formulated Roundup® or conduct its own epidemiologic research. Ex. 13, Resp. & Obj. to 1st Set of Gen. Interrogs.

90. As Monsanto's chief toxicologist Donna Farmer privately and repeatedly cautioned her colleagues in internal email correspondence, this meant the company could not be assured that the product it was marketing was not carcinogenic: "you cannot say that Roundup® is not a carcinogen . . . we have not done the necessary testing on the formulation to make that statement." Exhibit 98, Email from Farmer to Natarajan dated Nov. 24, 2003 re: Agitation against Roundup,

MONGLY00922458–460; Exhibit 99, Email from Farmer to Combest dated Sept. 21, 2009 re: Roundup article in Freemantle Herald, MONGLY01192115–117, at MONGLY01192115.

91. Acquavella recommended Monsanto consider its own epidemiologic study, *not* to clarify the health risks to Roundup users, but to better advocate for industry's interest: "Given the long lead time required to conduct epidemiologic research, industry must be proactive to be influential in this area." Ex. 93, Nov. 9, 1999 Proposal, at MONGLY00896836.

92. Instead of conducting additional studies to better characterize the health effects of Roundup® in humans, however, Monsanto joined with other pesticide manufacturers to fund a "Farm Family Exposure Study," focused on exposure levels for pesticides as documented in urine samples, in an effort to undermine the results of any epidemiologic studies on agricultural workers. Indeed, while the Farm Family Exposure Study was still just a pilot project, and even before researchers had any results from it, Acquavella explained its anticipated benefits to his colleagues at Monsanto in defending Roundup®: "We expect the glyphosate exposures to be non-detectable for the vast majority of study participants. If that pans out, we have a pretty good argument to make relating to almost any epidemiologic finding." Ex. 88, Acquavella April 29, 1999 Email, at MONGLY00877584; Exhibit 100, Acquavella, *et al., Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112 ENVIRON. HEALTH PERSPECT. 321 (2004), MONGLY00297298–303 ("Acquavella 2004").

93. The glyphosate-related results from 48 farmers in the Farm Family Exposure Study were obtained between 2000 and 2002, reported in public presentations as early as 2002, and eventually published in 2004. Based on sampling after a single spraying event, this study found 60 percent of the farmers overall (and as many as 87% percent in one of the two geographic areas studied) had detectable glyphosate in their urine on the day they applied Roundup.® Three days

later, 27 percent still had glyphosate in their urine. Aquavella and his team observed skin exposure in 31% of the farmers while using Roundup® and saw that 15% spilled product while mixing, loading, and/or applying it. Exhibit 101, Acquavella, "Glyphosate Stewardship, Epidemiology and Farm Family Exposure Study," Draft for June 11, 2002, MONGLY00888454–463; Ex. 100, Acquavella (2004).

94. In the Farm Family Exposure Study, Acquavella, *et al.,* observed 29 percent of the farmers using Roundup® without rubber gloves. When asked, 22% of the farmers in their study said they *never* wore gloves while using Roundup.® Urinary glyphosate concentration were "appreciably lower," however, in the farmers who wore rubber gloves. Thus, Monsanto's own study showed that agricultural users frequently used Roundup® in the same manner shown in Monsanto's advertisements, substantially increasing their exposure, and that the simple measure of wearing rubber gloves would help to protect users. Ex. 100, Acquavella (2004).

95. Acquavella and his team also found detectable glyphosate exposure in samples collected on the day of application from the spouses and children of the farmers in their study. They wrote that "[f]or children, it appeared that most detectable exposures could have been prevented or minimized by avoiding the immediate vicinity during pesticide mixing or application." Ex. 100, Acquavella (2004).

96. In short, Monsanto's own Farm Family Exposure Study showed that farm users, children and bystanders were experiencing avoidable exposures when Roundup® was used in its intended and foreseeable manner. But despite the study's findings, there is no evidence Monsanto took steps to discourage skin exposure or to modify the product's intended uses. Ex. 100, Acquavella (2004).

97. Instead, Monsanto continued its "defense" of Roundup® and glyphosate against the mounting body of evidence of Roundup®'s carcinogenicity and the risks foreseeably encountered by users, by way of its network of paid consultants, through letters to the editor, ghostwritten literature, and behind-the scenes pressure campaigns. By the early 2010s, Monsanto's Roundup-related scientific ghostwriting had become a routine practice. In an email dated January 26, 2013, for example, Monsanto toxicologist David Saltmiras wrote that a recent manuscript he most recently worked on was "the fifth such Glyphosate related manuscript I have been involved with over the past few years without co-authorship." Exhibit 102, Email from Kier to Saltmiras dated Jan. 28, 2013 re: Adding Author, MONGLY04086537–541.

**5. Scientific Smear Campaign Against Dr. Gilles-Éric Séralini.**

98. Even as Monsanto sought to develop industry science to "defend" Roundup against the accumulating human epidemiology evidence, publicly-available evidence of Roundup®'s potential harms also continued to emerge from animal testing and *in vitro* studies conducted by independent scientists. In 2009, for example, French researchers Nora Benachour and Gilles-Éric Séralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone. Exhibit 103, Nora Benachour, *et al., Glyphosate*

*Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM RES. TOXICOL. 97–105 (2008).

99. In November 2012, the scientific journal *Food & Chemical Toxicology* published a peer-reviewed article by Séralini, Robin Mesnage, and others, reporting on the results of a 2-year study of rats that examined the toxicity of consuming Monsanto's genetically-modified glyphosate-resistant maize, formulated Roundup® (administered in water), or both. Although they had not designed the study as a carcinogenicity study – which would typically require a larger number of test animals – these authors nonetheless found and reported (among other things) a dose-related excess incidence of tumors, and earlier development of tumors, in the treatment groups that had consumed Roundup®-Ready GMOs and/or Roundup®. Exhibit 104, Attachment to Hayes to Saltmiras Email dated Sept. 20, 2012, Gilles-Éric Séralini, *et al., Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize*, FOOD & CHEM. TOXICOL, 50 (11): 4221–4231, MONGLY01093037–47.

100. Threatened by Séralini's findings that called into question the safety of GMO crops and Roundup®, Monsanto undertook an extensive, covert campaign to pressure the journal and its editor, Wallace Hayes – who had already begun to work for Monsanto confidentially as a paid consultant – to retract the article. Ultimately, in November 2013, *Food & Chemical Toxicology* retracted Séralini's September 2012 article as "inconclusive." It was later republished in a different journal. Exhibit 105, Email from Saltmiras to Rubinstein dated Aug. 13, 2012 re: LAS Tox Expert Panel, MONGLY00971543; Exhibit 106, Email from Hayes to Saltmiras dated Sept. 8, 2012 re: Research publication from Argentina and letters to the Editor, MONGLY02259111–115; Exhibit 107, E. Novotny, *Retraction by corruption: the 2012 Séralini paper*, J. BIOLOGICAL PHYSICS & CHEM. 18: 32–56 (2018); Exhibit 108, Séralini, G.-E., *et al., Republished study: long term toxicity*

*of a Roundup herbicide and a Roundup-tolerant genetically modified maize*, ENVIRON. SCI. EUROPE 26:14–30 (2014), doi:10.1186/s12302-014-0014-5.

101. Although Séralini's September 2012 publication publicly disproved Monsanto's claim that a long-term feeding study of formulated Roundup® would be impossible, Monsanto still did not undertake any long-term carcinogenicity studies of Roundup® in animals. Ex. 13, Rep. to 1st Set of Gen. Interrogs., at 5, 11; Ex. 52, Saltmiras *McKivison* Test., at 100.

102. In 2013, Mesnage and other scientists including Séralini published another article reporting on an extensive study on the composition and toxicity of the ingredients in 9 different glyphosate-based herbicide formulations. They compared the toxicity of different brands of glyphosate-based herbicides in human liver, embryonic, and placental tissue cell cultures, and found that several commercial formulations were up to 1,000 times more toxic than glyphosate alone. Mesnage and colleagues demonstrated that the toxicity of glyphosate-based formulations was proportional to their concentration of polyethoxylated tallow amine 15 (POE-15) or other ethoxylated surfactants (POE-15 was found to have the most toxic substance effects on human cells of all the adjuvants evaluated). The formulations without ethoxylated surfactants were approximately 100 times less toxic to human tissue cells. The authors concluded that these results challenge the established recommended values for acceptable daily glyphosate intake because they are based on long-term exposure tests of glyphosate alone: "pesticides are always used with adjuvants that could change their toxicity, the necessity to assess their whole formulations as mixtures rather than glyphosate alone becomes obvious." Exhibit 109, R. Mesnage, et al., "Ethoxylated adjuvants of glyphosate-based herbicides are active principles of human cell toxicity," *Toxicology* (2013) 313:122-8, doi:10.1016/j.tox.2012.09.006.

103. Despite this additional publicly-available evidence that the use of POEA surfactants heightens the toxicity of formulated Roundup®, there is no evidence that Monsanto conducted additional testing on the effects of Roundup® formulated with POEA, attempted to reformulate its Roundup® to eliminate POEA surfactants in the U.S. market, or modified the intended uses of Roundup®.

**6. "Orchestrated Outcry" Against International Scientific Review of Glyphosate.**

104. In 2014, a new "threat" to Roundup® came to Monsanto's attention: Monsanto learned that an authoritative international body, the International Agency for Research on Cancer (IARC), intended to review and assess the evidence for the carcinogenicity of glyphosate, the active ingredient in Roundup®. Toxicologist Donna Farmer immediately alerted her Monsanto colleagues: "Just want you to know that what we have long been concerned about has happened. Glyphosate is on for an IARC review in March of 2015." Exhibit 110, Email dated Sept. 18, 2014 from Acquavella to Farmer re: Long time..., MONGLY01207339–341 ("Acquavella Sept. 18, 2014 Email"), at MONGLY01207340.

105. IARC is a "well-recognized and prestigious" scientific body charged by the World Health Organization with (among other things) evaluating whether certain chemicals or other exposures are carcinogenic, following rigorous criteria and procedures. Panels or "Working Groups" of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest, perform the evaluations. According to published procedures, a Working Group considers "studies that have been published or accepted for publication in the openly available scientific literature" as well as "reports and databases publicly available from governmental agencies." Federal Judicial Center, REF. MANUAL ON SCIENTIFIC EVID. 3d (2011), at

20; Exhibit 111, World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2019) ("IARC Preamble"), at 8–9.

106. In advance of each Working Group meeting, when the experts get together in person to evaluate agents, the panel members are provided data and other materials about the chemicals subject to evaluation, and each subgroup discusses their topic and drafts their sections. At the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Following the Monograph meeting, the summary of the Working Group findings is published in *The Lancet Oncology*, and within a year after the meeting, the final Monograph is published. Ex. 111, IARC Preamble, at 8–11.

107. In assessing an agent, the IARC Working Group reviews: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study. *Id.*

108. Over time, the IARC Monograph program has reviewed 1,128 chemical agents. Of those reviewed, it has determined 135 agents to be Group 1 (Known Human Carcinogens); 98 agents to be Group 2A (Probable Human Carcinogens); 329 agents to be Group 2B (Possible Human Carcinogens); and 498 agents to be Group 3 (Not Classified). *See* International Agency for Research on Cancer, *List of Classifications*, https://monographs.iarc.who.int/list-of-classifications/ (last accessed July 25, 2026).

109. In 2014, anticipating an unfavorable finding by the IARC Working Group on glyphosate, Monsanto began to plan its campaign to discredit IARC's work, assessment, and scientists. By February 2015, Monsanto was fully prepared with plans to launch an "orchestrated

outcry" should the IARC Working Group reach a conclusion unfavorable to Monsanto's interests. Ex. 110, Acquavella Sept. 18, 2014 Email, at MONGLY01207340; Exhibit 112, Glyphosate Key Points Following IARC Decision 2B (draft 2-12-15B).docx, MONGLY01021709–711 ("Glyphosate Key Points"), at MONGLY01021709.

110. Monsanto also conducted market research hoping to find ways to counteract the "negative" messages that might "have the potential to significantly decrease comfort of using pesticides in home lawn and garden care" in the wake of an adverse IARC finding. "The news is good," they found. "[T]he safety of residential Roundup is **not a top-of-mind concern** for today's consumer." But if consumers hear "activist arguments, they quickly **become concerned** and search for more information." The "optimal language" to "significantly increase[] comfort" and assuage consumers' concern focused on Monsanto's long-standing safety claim: "The main active ingredient in residential Roundup products, glyphosate, works by inhibiting a specific enzyme that the plant needs to grow. This enzyme is not found in humans or animals." Monsanto in fact chose this as one of its core industry talking points for the response to IARC. Exhibit 140, Crop Protection Messaging Research: Presentation of Final Results, March 23, 2015, MONGLY101090324, at 2, 15–17; Ex. 112, Glyphosate Key Points, at MONGLY01021709 ("There is no biological rationale for glyphosate presenting a chronic health risk because the herbicide targets an enzyme found in plants that does not exist in humans or animals.").

111. In March 2015, an IARC Working Group comprised of 18 scientists met to conclude their evaluation of glyphosate and determined it to be a Group 2A agent, *i.e.*, probably carcinogenic to humans. That determination was based on epidemiological studies of human exposures to glyphosate in several countries around the world as well as a review of the publicly-available animal studies and cellular studies. The IARC Working Group concluded that the cancers

most associated with glyphosate exposure are NHLs and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, and B-cell lymphoma. *See* Kathryn Z Guyton et al., *Carcinogenicity of tetrachlorvinphos, parathion, malathion, diazinon, and glyphosate*, 16 THE LANCET ONCOLOGY 490–491 (2015), doi: 10.1016/S1470-2045(15)70134-8 ("Guyton (2015)"); Exhibit 113, 112 IARC WORKING GROUP ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS, SOME ORGANOPHOSPHATE INSECTICIDES AND HERBICIDES (International Agency for Research on Cancer) (2017), http://www.ncbi.nlm.nih.gov/books/NBK436774/ ("IARC Monograph"), at 395, 398–99.

112. In July 2015, the IARC Working Group published a summary of the rationale for its findings on glyphosate. IARC's complete analysis was published in 2017, in Monograph Volume 112, "Some Organophosphate Insecticides and Herbicides," a 464-page compilation of the Working Group's analysis of glyphosate and four other pesticides.
*See* Guyton (2015); Ex. 113, IARC Monograph, at 321–99.

113. IARC found, among other things, that glyphosate caused DNA and chromosomal damage in human cells. One study of community residents reported increases in blood markers of chromosomal damage (micronuclei) after spraying glyphosate formulations. IARC further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero. Ex. 113, IARC Monograph, at 365–393, 397.

114. Based on the "large number of studies [that] examined a wide range of end-points relevant to genotoxicity," the Working Group confirmed the findings Dr. Parry had reported to Monsanto sixteen years earlier, concluding that "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong." *Id.*, at 397–98.

115. After learning of IARC's conclusions, Monsanto undertook what IARC has since described as "unprecedented, coordinated efforts to undermine the evaluation, the program and the organization. These efforts have deliberately and repeatedly misrepresented the Agency's work." Exhibit 114, "IARC response to criticisms of the Monographs and the glyphosate evaluation" (Jan. 2018), at 1.

116. Just as it had done in the past, Monsanto employed scientific ghostwriting as a key tool in its "defense" to IARC's scientific findings. Monsanto turned to Cantox – rebranded as Intertek – for help assembling an "expert panel" to lend credibility to draft manuscripts prepared by Monsanto in defense of Roundup. The Intertek panel included many of the same scientists who had helped Monsanto's public relations efforts in the past. In 2016, they ultimately published five separate articles on glyphosate in a special issue of the journal *Critical Reviews in Toxicology*. Exhibit 115, Email from William Heydens to Donna Farmer Re: IARC Planning, Feb. 19, 2015, MONGLY00977267–70 at MONGLY00977267–68; Exhibit 116, *Expression of Concern -- 30 November 2018*, CRITICAL REVIEWS IN TOXICOL., 48:10, 903-903, doi: 10.1080/10408444.2018.1539570 ("Nov. 2018 Expression of Concern").

117. Within a few years, however, *Critical Reviews in Toxicology* had to publish corrections to all five of the Intertek panel's glyphosate articles because they "did not fully represent the involvement of Monsanto or its employees or contractors in the authorship of the articles." The journal editors reported that in some places the corrections were "in contradiction to the statements originally supplied." They urged readers "take the context the corrected disclosures provide into account when reading the articles." Ex. 116, Nov. 2018 Expression of Concern.

118. Monsanto also carried out an extensive public relations campaign in the popular media to discredit IARC's findings and preserve public perception of Roundup® as a virtually non-

toxic product. In March 2015, for example, Eric Sachs of Monsanto contacted Stanford University researcher Henry I. Miller, a former FDA employee and public proponent of genetically-modified crops such as Monsanto's Roundup Ready seeds, and asked "Are you interested in writing more on the topic of the IARC panel?" Miller responded that he "would be if [he] could start from a high-quality draft." Monsanto responded: "***We have a draft nearly done*** and will send to you tomorrow." Miller published this ghostwritten op-ed piece, "March Madness from the United Nations" in *Forbes* magazine on March 20, 2015. After the *New York Times* exposed Monsanto's role in ghostwriting the piece, *Forbes* removed the article from its website and ended its relationship with Miller, who had failed to disclose his conflict of interest to *Forbes*. Exhibit 117, Email from Heydens to Vicini & Farmer dated March 18, 2015 re: IARC Outcomes, Process, and Response, MONGLY02063611–618; Exhibit 118, Email from Hood to Sachs, et al., dated Feb. 27, 2015 re: Henry's First Draft: Opportunity: Glyphosate and IARC, MONGLY07040056–64; Exhibit 119, Danny Hakim, *Monsanto Emails Raise Issue of Influencing Research on Roundup Week Killer*, NEW YORK TIMES, Aug. 1, 2017; Andrew P. Han, "Unearthed emails: Monsanto connected to campaign to retract GMO paper," Retraction Watch (Aug. 10, 2017), https://retractionwatch.com/2017/08/10/unearthed-docs-monsanto-connected-campaign-retract-gmo-paper/ (last accessed Sept. 26, 2026).

## III. <u>Post-2015 Scientific Evidence</u>

119. Since 2016, additional peer-reviewed epidemiologic, animal, and mechanistic studies have continued to provide compelling evidence that glyphosate and GBHs are a cause of NHL. Exhibit 120, Dennis D. Weisenburger, *A Review and Update with Perspective of Evidence that the Herbicide Glyphosate (Roundup) is a Cause of Non-Hodgkin Lymphoma*, 21 CLINICAL LYMPHOMA MYELOMA & LEUKEMIA 621–630 (2021); Exhibit 121, Ieman Rana, *et al., Mapping*

*the key characteristics of carcinogens for glyphosate and its formulations: A systematic review*, 339 CHEMOSPHERE 139572 (2023); Exhibit 122, Dennis D. Weisenburger, *An Update of Evidence that the Herbicide Glyphosate (Roundup) is a Cause of Non-Hodgkin Lymphoma*, CLINICAL LYMPHOMA MYELOMA & LEUKEMIA S2152265025042855 (2025).

120. On June 10, 2025, the Ramazzini Institute published a much-anticipated long-term (26-month) animal carcinogenicity study of formulated Roundup®. Panzacchi and colleagues reported that exposure to glyphosate and formulated Roundup® at doses equivalent to the European Union's acceptable daily intake and no observed adverse effect level caused statistically significant, dose-dependent increased trends or incidences of multiple benign and malignant tumors of blood, skin, liver, thyroid, nervous system, ovary, mammary gland, kidney, urinary bladder, bone, endocrine pancreas, and circulatory system. Exhibit 123, Panzacchi, *et al., Carcinogenic effects of long-term exposure from prenatal life to glyphosate and glyphosate-based herbicides in Sprague-Dawley rats,* ENVIRON. HEALTH, 2025; 24(1):36 ("Panzacchi (2025)").

121. The Panzacchi (2025) published long-term study on formulated Roundup® demonstrates that even before it ever marketed Roundup® in the United States, Monsanto could have conducted long-term animal carcinogenicity tests of formulated Roundup® in rats, revealing its carcinogenic risks.

## IV. **Alternative Designs for Roundup®**

122. By 1998, Monsanto had already developed alternative formulations of Roundup® for agricultural use in Europe that did not contain the POEA surfactant that has been shown to produce increased genotoxicity in laboratory studies. Monsanto had brought some of these to market by at least 1999. Although the category of surfactant used in these products has long been approved by EPA for use in pesticides in the United States, Monsanto did not reformulate its

Roundup® products sold in the United States to remove POEA. Exhibit 124, Email from Farmer to self, dated June 3, 1999 re: Mutagenicity Addendum, MONGLY01825671–72.

123. In 2016 the European Union recommended that its member states ban the use of Roundup® formulated with POEA. Monsanto has thereafter sold Roundup® formulated with a non-POEA surfactant in Europe for agricultural and non-agricultural uses. Even after the European ban on POEA-containing Roundup®, however, Monsanto did not make those changes to the formulations sold in the United States. Exhibit 125, European Commission Glyphosate Fact Sheet (Jun. 29, 2016).

124. By at least 2017, Monsanto was exploring how to reformulate Roundup® to use the ingredients in its new, glyphosate-free formulation. Exhibit 126, Email from Ratliff to Schweitzer dated May 22, 2017 re: Status on Replacement AI's, MONGLY08888015–17.

125. In 2022, Monsanto ceased or phased out selling glyphosate-based Roundup® in the United States for residential lawn & garden use, obtained the necessary EPA registration, and began marketing its new glyphosate-free Roundup® in its place. Exhibit 127, Trial Tr., *Grantges v. Monsanto*, No. 20SL-CC02256 (Mo. Cir. May 29, 2025) ("Farmer *Grantges* Trial Testimony") at 2784:12–2812:19; and 2891:10–2898:17; *see also Durnell v. Monsanto Co.,* 609 U.S. ---, 2026 WL 1825691, at *6, n.4 ("Monsanto has phased out residential products that contain glyphosate").

126. The active ingredients Monsanto ultimately chose (triclopyr, diquat dibromide, and fluazifop-P-butyl, and optionally, Imazapic-ammonium) had already been registered by EPA for use in pesticides in the United States for decades, and had long been available to Monsanto. Ex. 127, Farmer *Grantges* Trial Testimony, at 2792:3—2795:5; Exhibit 128, EPA, Active Pesticide Products Registration Informational Listing (APPRIL), https://ordspub.epa.gov/ords/pesticides/f?p=APPRIL_PUBLIC:2, listing for Diquat (first

registered in 1970); Exhibit 129, EPA, APPRIL for Triclopyr (first registered in 1981); Exhibit 130, EPA, APPRIL for Fluazifop (first registered in 1993); and Exhibit 131, EPA, APPRIL for Imazapic-ammonium (first registered in 1996).

127. The ingredients in Monsanto's new glyphosate-free Roundup lawn and garden formulation are safe and effective, and are not known to cause cancer. Ex. 127, Farmer *Grantges* Trial Testimony at 2785:23–2786:3; 2795:11–2796:23, 2796:24–2797:4; Exhibit 132, Trial Tr., *Cloud v. Monsanto Co.*, No. 21C-08-279 (De. Super. Feb. 7, 2024) ("Farmer *Cloud* Trial Testimony") at 47:2–48:13, 50:16–51:15, and 53:2–13; Exhibit 133, *Herbicidal Compositions Comprising Fluazifop, Triclopyr and Diquat*, U.S. Patent Application No. 17/903255, dated Sept. 6, 2022, ¶¶ 0009, 0014 (claiming the new formulation "ha[s] the desired properties and provides the desired weed killing effects [and] early visual symptomology" to "permit effective control of unwanted plants (weeds) in the field of plant protection and environmental health, in particular without the necessity to use glyphosate."). Exhibit 134, Bayer Global, Statement on Roundup Active Ingredient Safety, Oct. 22, 2024 ("The active ingredients (fluazifop-p-butyl, triclopyr TEA salt, diquat dibromide and imazapic ammonium) in the new Roundup Lawn & Garden products have been used effectively and safely in a variety of different weed-control products for decades.").

128. Monsanto's glyphosate-free Roundup formulation is also financially feasible. Ex. 127, Farmer *Grantges* Trial Testimony at 2897:5-10. Indeed, sales revenue for residential Roundup® remained steady after the change in formulation. *See, e.g.,* Exhibit 135, Bayer Annual Report 2023, at 83 (reporting that while sales revenue for the Crop Science division had declined somewhat since 2022, this was "mainly due to lower prices for our glyphosate-based products as a result of reduced prices for generics.").

## V. <u>Monsanto's Conduct Violated Industry Standards and Monsanto's Own Internal Governance Codes</u>

129. Monsanto has long acknowledged the limits of EPA's registration process, and its own responsibility to independently assure the safety of its products for their intended and foreseeable use. In a December 19, 1977 radio interview aired in St. Louis on KMOX, Monsanto's CEO John Hanley publicly declared, "The guy that's got the responsibility for the safety of our product is Monsanto. It is not the FDA, it is not the EPA. We cannot and have no interest in dodging the ultimate responsibility for the safety of our products, our processes, and the eventual disposition of those products. How much testing should we do? We should do whatever is necessary to provide assurance that what we're doing is right and it's just really as simple as that." Exhibit 136, Broadcast Information Services, Inc., Transcript dated Dec. 19, 1977, Client: Monsanto, Station: KMOX, MONGLY18838707–711, at 711.

130. In 1985, the United Nations Food and Agricultural Organization (FAO) promulgated an international pesticide industry standard of conduct that the U.S. pesticide industry association and Monsanto adopted. The FAO periodically amended this international code of conduct with the cooperation of the pesticide industry, including Monsanto. This voluntary industry code of conduct imposed obligations on Monsanto to protect the public from known or potential harms from their pesticide products, including, *inter alia*, the responsibility to "ensure that each pesticide and pesticide product is adequately and effectively tested by well recognized procedures and test methods so as to fully evaluate the safety, efficacy . . . . and fate . . . with regard to the various anticipated conditions in regions or countries of use" and "take care to see that the proposed use pattern, label claims and directions, packages, technical literature and advertising truly reflect the outcome of these scientific tests and assessments." Exhibit 137, International Code

of Conduct on the Distribution and Use of Pesticides, Nov. 28, 1985, available at https://www.fao.org/4/x5562e/X5562e00.htm, at 8–9.

131. In the early 2000s, under Monsanto's "Pledge and Business Code of Conduct," Monsanto again committed to "research, develop, design, assess, manufacture, [and] market its products so that they: Are adequately and scientifically evaluated for product safety and benefits, [a]re used properly, and [d]o not pose undue risks to human health." Exhibit 138, Program 18: Stewardship of Chemical and Biological Products, MONGLY01192747–748.

132. A further standard which Monsanto broadcasted and against which its conduct must be measured is its own public pledge, in the company's Code of Conduct, that the safety of its users "will be our highest priority." Exhibit 139, Monsanto Code of Business Conduct, MONGLY10869156–85.

133. For over fifty years, however, Monsanto has failed to "do whatever [testing] is necessary to provide assurance that what we're doing is right" or to prioritize the safety of Roundup® users over Monsanto's so-called "freedom to operate," and as a result, widely and misleadingly marketed a defective and unreasonably unsafe product that caused Plaintiffs to develop NHL, as a result of exposure to Roundup® used in its intended and/or foreseeable manner.

DATED: September 28, 2026

Respectfully Submitted,

/s/ Robin L. Greenwald
Robin L. Greenwald (*pro hac vice*)
Alicia Butler (*pro hac vice)*
**WEITZ & LUXENBERG, P.C.**
700 Broadway, Fifth Floor
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com
abutler@weitzlux.com
Co-Lead Counsel

/s/ David J. Dickens
David J. Dickens (pro hac vice)
**THE MILLER FIRM LLC**
108 Railroad Avenue
Orange, VA 22960
Telephone: 540-672-4224
ddickens@millerfirmllc.com
Co-Lead Counsel

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on Monday, September 28, 2026, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/ Robin Greenwald*