**THE FERRARO LAW FIRM, P.A.**
Daniel J. Di Matteo, Esq. (Florida Bar 114914)
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
Phone: 305-375-0111
Email: ddimatteo@ferrarolaw.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br>Case No. 3:16-MD-02741-VC |
| This document relates to:<br><br>*Richard Gomez*, *et al. v. Monsanto Co.*<br>Case No. 3:24-cv-03495-VC | **PLAINTIFFS' OPPOSITION TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT IN THE "CATEGORY 1" CASES GOVERNED BY FLORIDA LAW**<br><br>Hon. Vince Chhabria<br><br>Hearing Date: Nov. 16, 2026<br>Hearing Time: 1:00 p.m.<br>Hearing Location: Courtroom 4 – 17th Floor |

# TABLE OF CONTENTS

**Page**

**I. INTRODUCTION** ..... 1

**II. BACKGROUND** ..... 4

A. Roundup Generally ..... 4

B. Richard Gomez's Roundup Usage and the Claims At Issue ..... 5

**III. LEGAL STANDARD** ..... 6

**IV. ARGUMENT** ..... 7

A. Preemption Framework Under *Bates* and *Durnell* ..... 7

B. The Design Defect and Negligence Claims Fall Within *Bates* ..... 8

1. The Design Defect Claim Does Not Require a Cancer Warning ..... 8

2. Monsanto Endeavored to Shape Consumer Expectations Beyond the Label ..... 11

3. The Design Defect Claim is Not a Failure to Warn Claim "in Disguise" ..... 13

a. Monsanto's Selective Quotation of the Complaint Does Not Convert Counts I and III into Warning Claims ..... 13

b. Under Florida Law, Design Defect Claims Center on the Product's Performance, and Require No Proof About Warnings ..... 14

4. Monsanto's Real Argument is a Comment K Defense ..... 15

5. Comment K is Key to Understanding *Hardeman* ..... 18

C. The Negligence Claim Is Not a Labeling Requirement ..... 20

D. Monsanto's Implied Preemption Argument is Meritless ..... 22

**CONCLUSION** ..... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. G.D. Searle & Co.*, 576 So. 2d 728 (Fla. 2d DCA 1991)....................................16, 17, 18

*Ansagay v. Dow Agrosciences LLC*, 153 F. Supp. 3d 1270 (D. Haw. 2015) ...............................12

*Arnold v. Dow Chem. Co.*, 91 Cal. App. 4th 698 (2001)..........................................................18

*Aubin v. Union Carbide Corp.*, 177 So. 3d 489 (Fla. 2015).............................1, 2, 8, 9, 10, 13, 19

*Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413 (1978)......................................................................19

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005) ...................................................... *passim*

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................................13

*Brown v. Glade & Grove Supply, Inc.*, 647 So. 2d 1033 (Fla. 4th DCA 1994)............................15

*Delaney v. Deere & Co.*, 999 P.2d 930 (Kan. 2000) ....................................................................10

*Dilts v. Penske Logistics, LLC*, 769 F.3d 637 (9th Cir. 2014) ........................................................6

*Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246 (Fla. 2006)...............................................1, 2, 15, 20

*Ford Motor Co. v. Evancho*, 327 So. 2d 201 (Fla. 1976) ...........................................................13, 20

*Ford Motor Co. v. Hill*, 404 So. 2d 1049 (Fla. 1981)......................................................................2

*Gee v. Tenneco, Inc.*, 615 F.2d 857 (9th Cir. 1980).......................................................................6

*Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11 (Fla. 4th DCA 2022) ............................................20

*Hall v. Sunjoy Indus. Grp., Inc.*, 764 F. Supp. 2d 1297 (M.D. Fla. 2011)....................................21

*Hardeman v. Monsanto Co.*, 216 F. Supp. 3d 1037 (N.D. Cal. 2016)...............................3, 16, 17

*Hobart v. Siegle ex rel. Hoerber*, 600 So. 2d 503 (Fla. 3d DCA 1992) .......................................10

*In re Monat Hair Care Prod. Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. 18-MD-02841, 2019 U.S. Dist. LEXIS 184328 (S.D. Fla. Oct. 23, 2019)....................................18

*In re Roundup Prods. Liab. Litig.*, 364 F. Supp. 3d 1085 (N.D. Cal. 2019).......................3, 11, 22

*In re Roundup Prods. Liab. Litig.*, No. 16-md-02741, 2019 WL 3219360, 2019 U.S. Dist. LEXIS 116638 (N.D. Cal. July 12, 2019).............................................................2, 18, 19

*In re Standard Jury Instructions in Civil Cases—Report No. 19-03*, 290 So. 3d 840 (Fla. 2020) ....... 2, 10, 17

*Kennan v. Dow Chem. Co.*, 717 F. Supp. 799 (M.D. Fla. 1989) ....... 17

*Liggett Grp., Inc. v. Davis*, 973 So. 2d 467 (Fla. 4th DCA 2007) ....... 8, 9, 10

*Light v. Weldarc Co.*, 569 So. 2d 1302 (Fla. 5th DCA 1990) ....... 21

*Marinelarena v. Garland*, 6 F.4th 975 (9th Cir. 2021) ....... 6

*Monsanto Co. v. Durnell*, 146 S. Ct. 2001 (2026) ....... *passim*

*Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472 (2013) ....... 23

*Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893 (9th Cir. 2020) ....... 23

*O'Bryan v. Ford Motor Co.*, 18 F. Supp. 3d 1361 (S.D. Fla. 2014) ....... 21

*Ocasio v. C.R. Bard, Inc.*, No. 8:13-cv-1962-T-36AEP, 2015 U.S. Dist. LEXIS 71742 (M.D. Fla. June 3, 2015) ....... 15

*Papike v. Tambrands Inc.*, 107 F.3d 737 (9th Cir. 1997) ....... 12

*Patt v. Volkswagen Grp. of Am., Inc.*, No. 22-cv-21585-BLOOM/Torres, 2024 U.S. Dist. LEXIS 70646 (S.D. Fla. Apr. 17, 2024) ....... 10

*Pilliod v. Monsanto Co.*, 67 Cal. App. 5th 591 (2021) ....... 10, 12, 21

*Pinchinat v. Graco Children's Prods., Inc.*, 390 F. Supp. 2d 1141 (M.D. Fla. 2005) ....... 15

*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) ....... 22

*R.J. Reynolds Tobacco Co. v. Marotta*, 214 So. 3d 590 (Fla. 2017) ....... 1, 2, 15, 19, 20, 24

*Sanchez v. Hussey Seating Co.*, 698 So. 2d 1326 (Fla. 1st DCA 1997) ....... 10

*Scala v. Eisai, Inc.*, No. 5:21-cv-210-ACC-PRL, 2021 U.S. Dist. LEXIS 240028 (M.D. Fla. Dec. 14, 2021) ....... 18

*Small v. Amgen, Inc.*, 134 F. Supp. 3d 1358 (M.D. Fla. 2015) ....... 21

*Suzuki Motor Corp. v. Winckler*, 434 So. 3d 104 (Fla. 5th DCA 2026) ....... 20

*Taylor AG Indus. v. Pure-Gro*, 54 F.3d 555 (9th Cir. 1995) ....... 15

*Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307 (M.D. Fla. 2015) ....... 19

*U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126 (9th Cir. 2011) ....... 6

*Weeks v. Home Depot U.S.A., Inc.*, 2020 U.S. Dist. LEXIS 188369 (C.D. Cal. Sept. 18, 2020) ....................24

*West v. Caterpillar Tractor Co.*, 336 So. 2d 80 (Fla. 1976) ....................2, 10

*Zogenix, Inc. v. Patrick*, No. 14-11689-RWZ, 2014 WL 1454696 (D. Mass. Apr. 15, 2014) ....................23

**Statutes**

7 U.S.C. § 136(p)(2) ....................7, 12

7 U.S.C. § 136v(a) ....................7, 22, 23

7 U.S.C. § 136v(b) ....................7, 14

Cal. Food & Agric. Code § 12996(a)....................23

Fla. Stat. § 487.011 *et seq.* ....................23

**Rules**

Fed. R. Civ. P. 8(d)(2), (e) ....................14

Fed. R. Civ. P. 12(f)....................13

Fed. R. Civ. P. 56....................6

**Other Authorities**

Restatement (Second) of Torts § 402A cmt. j (1965)....................20

Restatement (Second) of Torts § 402A cmt. k (1965) ....................16, 17

## I. INTRODUCTION[1]

Monsanto's centerpiece is a single sentence: "[a] design defect claim premised on consumer expectations is, [] in substance, a failure-to-warn claim—the way that ordinary consumers form expectations about complex chemical products is from reading their label." Mtn. at 2. Not only does Monsanto fail to cite a single Florida case for that proposition, but the argument flies in the face of longstanding Florida law, which treats design defect and failure-to-warn claims as distinct causes of action with separate elements of proof. In fact, Florida courts have long submitted design defect and negligence claims to juries in cases where failure-to-warn claims are preempted. *See Engle v. Liggett Group, Inc.*, 945 So.2d 1246, 1273 (Fla. 2006) (warnings preemption "did not eliminate the other causes that the jury had to consider"); *R.J. Reynolds Tobacco Co. v. Marotta*, 214 So.3d 590, 605 (Fla. 2017) (despite warnings preemption, federal law does not impliedly preempt state law strict liability design defect and negligence claims).

Plaintiff Richard Gomez brought this case because Roundup causes cancer and caused his cancer. He therefore alleges that Roundup was defectively designed because it failed to perform as an ordinary consumer would expect. Preemption of this design defect claim comes down to what Florida's consumer expectations test requires. If the test requires a "cancer warning" on the label, then the claim is preempted under *Monsanto Co. v. Durnell*, 146 S.Ct. 2001 (2026). But, if the test, instead, imposes a more general requirement to design "reasonably safe products," then it is not preempted under *Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431 (2005).

---

[1] Richard Gomez and Maritza Cosano-Gomez ("Plaintiffs") rely on and incorporate by reference the legal arguments made in Plaintiff Kathleen Jackson's Opposition to Defendant Monsanto Company's Supplemental Motion for Summary Judgment in the "Category 1" Cases Governed by Florida Law ("Jackson Brief"). Dkt. No. 22667. Undersigned counsel assisted in the preparation of that briefing, and Plaintiffs here expressly join in each and every argument advanced in that briefing. Portions of the Jackson Brief's legal argument are restated in this brief for the Court's convenience. Plaintiffs file this individual brief to supplement the record with case-specific evidence and citations to the record in *Gomez v. Monsanto Co.* To the extent any argument in the Jackson Brief is not restated herein, it is incorporated by reference and Plaintiffs do not waive it.

Under Florida law, a product is "defective" if it "failed to perform as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner." *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 503 (Fla. 2015). That standard does not condition causation on whether a different label would have avoided injury. It focuses on product performance and asks the jury to use its judgment to determine whether that performance fell short of ordinary consumer expectations. In that respect, Florida law tracks *Bates* in lockstep. Florida courts describe the test as setting a standard for ensuring products are "reasonably safe for [their] intended use, as manufactured and designed," nearly identical to Bates' conception of non-preempted design defect claims. *West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 86 (Fla. 1976).

The Court has previously expressed concern about the "amoeba-like" quality of design defect claims. *Hardeman v. Monsanto*, No. 16-md-02741, 2019 WL 3219360, at *2 (N.D. Cal. July 12, 2019). But that breadth reflects a deliberate choice to adopt a broad standard that is easy to satisfy. Florida chose this test to ease the plaintiff's burden, *see Aubin*, 177 So. 3d at 506, and to ensure that "[i]f a product, due to its design, is dangerous at the time of an accident, that should be sufficient to impose strict tort liability." *Ford Motor Co. v. Hill*, 404 So. 2d 1049, 1052 (Fla. 1981). Thus, a plaintiff may establish a defect and prevail under the test ***without having seen the label***. *See, e.g.*, *In re Standard Jury Instructions in Civil Cases—Report No. 19-03*, 290 So.3d 840, 843 (Fla. 2020) (providing the test "applies to all foreseeable bystanders."). The only relevant question for purposes of the test is: did the product perform as safely as an ordinary consumer would expect? If the answer is no, a defect is established and liability may be imposed.

In fact, in tobacco cases, Florida courts have long submitted binding liability findings based on the consumer expectations test to juries despite a federal warnings preemption. *See Engle v. Liggett Group, Inc.*, 945 So.2d 1246, 1273 (Fla. 2006); *R.J. Reynolds Tobacco Co. v. Marotta*, 214 So.3d 590, 605 (Fla. 2017).

Relying principally on *Hardeman*, Monsanto now asserts that the design defect claim "boils down" to a failure to warn claim. There, the Court proceeded from the premise that the "defect" had to take one of two forms: either Roundup lacked a warning, or the product was so

dangerous it should not have been sold at all. *See Hardeman*, 2019 WL 3219360, at *2. From that premise, the Court concluded that the design defect claim "merge[d] into the failure to warn claim." *Id*. at *4. But that framing overlooked the ordinary operation of design defect law. California, like Florida, recognizes that consumer expectations may serve as an independent basis for finding a product "defective."

While the Court was right that there are *some* products for which the design defect claim reduces to a failure to warn claim, it erred in believing Roundup was such a product. The only way a consumer expectations theory collapses into a warnings claim is if an affirmative defense applies: comment k. Comment k is the exception, not the rule. It applies to an extremely narrow class of inherently dangerous products whose risks are justified by their incredible value to society. When comment k applies, ordinary design defect liability gives way. A manufacturer cannot be held liable under the standard consumer expectations test; its only obligation is to warn. The design defect claim effectively reduces to a failure to warn claim.

In *Hardeman*, Monsanto never established entitlement to comment k. In fact, the Court explicitly rejected the defense, and Monsanto abandoned it at trial. *See Hardeman v. Monsanto Co.*, 216 F. Supp. 3d 1037, 1040 (N.D. Cal. 2016). But the post-trial reasoning effectively afforded Monsanto the benefit of comment k anyway by treating the design defect claim as merging into a warnings claim. The burden of establishing that defense has always rested with Monsanto. Knowing it could never achieve comment k protection, it does not assert the defense in its brief here. Monsanto, instead, endeavors to secure all the benefits of comment k by simply asserting the design defect claim "boils down" without any of the proof or argument to meet its burden. That alone defeats its position.

Plaintiffs also assert a negligent design claim, which remains untouched by *Durnell* and its reasoning. Monsanto largely brushes over this cause of action without much discussion, relying instead on cherry-picked quotes from the Complaint. Plaintiffs' negligence claim does not rest on the label or otherwise impose labeling requirements.

Monsanto also recycles the same implied preemption arguments the Court rejected long ago. *See In re Roundup Prods. Liab. Litig.*, 364 F. Supp. 3d 1085, 1087-1088 (N.D. Cal. 2019). The argument has nothing to do with *Durnell*, which, by its own terms, declined to consider the argument. And, in the decade of this litigation, no court has accepted it. As this Court previously found, the entire position falls apart because Monsanto fails to account for the fact that FIFRA permits states to ban pesticides entirely, which makes all of Monsanto's arguments about how it could not change the label or the composition beside the point. *Id*. Monsanto's reliance on FDCA cases does not help it either since "nothing in the FDCA allows a state to ban a drug." *Id*. The Court should deny the Motion.

## II. BACKGROUND

### A. Roundup Generally

Roundup is the brand name for Monsanto's glyphosate-based herbicides that are used to kill weeds on lawns, gardens, and around homes. *See Durnell*, 146 S.Ct. at 2008. Roundup is not glyphosate alone. Its various formulations combine glyphosate with other ingredients, such as surfactants, in differing amounts. **Exhibit 1** to Di Matteo Decl. (*Barnes* Trial Transcript) at 2580:15-18; Plaintiffs' Omnibus Statement of Material Facts[2] ("PSMF") ¶¶50-51. Despite decades of selling those formulated products – and extensive litigation alleging that Roundup causes cancer – Monsanto has never tested *formulated* Roundup itself for carcinogenicity. **Exhibit 2** to Di Matteo Decl. (*McKivison* Trial Transcript) at 78:21-25.

As explained in Dr. Conry's report, Roundup causes cancer, and it caused Richard Gomez's. **Exhibit 3** to Di Matteo Decl. (Conry Report). Numerous studies establish that glyphosate is a carcinogen that can also "produce DNA double strand breaks and resulting

---

[2] Plaintiffs incorporate by reference the Omnibus Statement of Material Facts filed by the MDL leadership herein.

translocations commonly associated with NHL." *Id.* at 21. Roundup's other ingredients, including surfactants, have an additive effect that increases the overall toxicity of the product. *Id.* at 10, n.6.

**B. Richard Gomez's Roundup Usage and the Claims At Issue**

Richard Gomez was diagnosed with non-Hodgkin's lymphoma in October 2021. **Exhibit 4** to Di Matteo Decl. (Deposition of Richard Gomez Excerpts) at 292:7–10. Mr. Gomez mixed and sprayed Roundup from approximately 2001 to 2008 to kill weeds around his home in Coral Springs, Florida. *Id*. at 296:8–297:19. He did not wear any sort of protective equipment while applying Roundup. *Id.* at 297:23–298:1. He bought Roundup from stores like Home Depot, Lowe's, and Ace Hardware. *Id*. at 131:9-11. He would frequently get Roundup on himself while either mixing or applying the product. *Id.* at 169:17–172:7. Twenty years after he first started applying Roundup, he was diagnosed with non-Hodgkin's lymphoma. *Id.* at 292:7–10. He underwent six cycles of intravenous chemotherapy over a four-month period. *Id.* at 268:20–269:13.

While undergoing chemotherapy, Mr. Gomez experienced hair loss, nausea, diarrhea, loss of appetite, loss of stamina, painful neuropathy in his feet, loss of dexterity in his fingers, weight loss, and orthopedic and musculoskeletal injuries. *Id.* at 269:14–277:7, 309:21–311:13. A life-long musician, Mr. Gomez can no longer play the bass as he once did because of his neuropathy and loss of dexterity. *Id.* at 108:7–10, 273:7–19, 311:15–20. Due to fatigue, he is no longer able to practice his love of running. *Id.* at 108:14–109:1. He feels depressed and anxious due to his loss of vitality and vigor and inability to play the bass. *Id.* at 306:8–307:7, 308:10–20, 311:15–312:17. He fears for his longevity and ruminates on death. *Id.* at 307:13–308:9.

Plaintiffs brought this case in February 2024, advancing causes of action for: negligence – negligent product design, negligence – negligent failure to warn, strict liability – design defect, and strict liability – failure to warn, and loss of consortium. **Exhibit 5** to Di Matteo Decl. (Complaint). They are no longer pursuing the strict liability failure to warn and negligent failure to warn claims. As a result, only the strict liability design defect, negligent design, and derivative consortium claim remain.

These claims seek to hold Monsanto liable for conduct beyond labeling. The design defect claim centers on the theory that Roundup is "defective in design in that, when it left Defendant MONSANTO it was unreasonably dangerous because when used as intended, it can cause cancer and other severe illnesses and injuries and/or death." **Ex. 5** at ¶ 59.

The negligence claim is also based on non-label-based conduct, such as that "Monsanto had a duty to exercise reasonable care in the design" of Roundup (*id.* at ¶ 40), "knew, or in the exercise of reasonable care, should have known that use of or exposure to Roundup could cause… Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products" (*id.* at ¶ 42), Monsanto "breached its duty of care through… [f]ailing to use reasonable and prudent care in the design [] of Roundup so as to avoid the risk of serious harm associated with the use of Roundup…" (*id.* at ¶ 45).

## III. LEGAL STANDARD

Summary judgment is governed by Fed. R. Civ. P. 56. In assessing a motion for summary judgment, the court "must draw all possible inferences from the record in favor of the non-moving party." *Gee v. Tenneco, Inc.*, 615 F.2d 857, 860 (9th Cir. 1980). Federal courts "in a diversity action" must "approximate state law as closely as possible." *Id.* at 861; *see also U.S. Fidelity and Guaranty Co. v. Lee Investments LLC*, 641 F.3d 1126, 1133 (9th Cir. 2011) ("Perhaps a better way of putting it is to say that one of the goals in deciding state law questions is to do no harm to state jurisprudence.")

Preemption is an affirmative defense for which the defendant bears the burden of pleading and proving. *See Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 649 (9th Cir. 2014) ("Defendants . . . bear the burden of proof in establishing the affirmative defense of preemption.") "It is well established that the party who bears the burden of proof loses if the record is inconclusive on the crucial point." *Marinelarena v. Garland*, 6 F.4th 975, 978 (9th Cir. 2021).

## IV. ARGUMENT

### A. Preemption Framework Under *Bates* and *Durnell.*

FIFRA provides states with sweeping authority to "regulate the sale or use" of pesticides like Roundup. 7 U.S.C. § 136v(a). The Supreme Court has twice affirmed that a state may "ban the sale of a pesticide" outright "if it finds, for instance, that one of the pesticide's label-approved uses is unsafe." *Bates,* 544 U.S. at 446; *see also Durnell*, 146 S. Ct. at 2008, n.2 ("a State could outright ban a pesticide within its borders"). But, to maintain "uniformity" in the ***labeling and packaging*** of pesticides across the country, FIFRA provides that states may not impose any requirement for "labeling and packaging" that is "in addition to or different from" federal requirements. 7 U.S.C. § 136v(b). "Labeling" is not a freewheeling inquiry: FIFRA specifically defines "labeling" to mean only the "labels" or "written, printed, or graphic matter" that is "accompanying the pesticide" or "to which reference is made on the label or in literature accompanying the pesticide or device." 7 U.S.C. § 136(p)(2).

Preemption under §136v(b), therefore, begins with the threshold question: does the state law claim impose a requirement for labeling or packaging at all? The Supreme Court answered that question in *Bates*.

Before *Bates* reached the Supreme Court, the Fifth Circuit took an expansive view of preemption and held that claims for design defect, negligent design, warranty, and other traditional torts were preempted. *Bates*, 544 U.S. at 436. The Fifth Circuit reasoned that the design defect and negligent design claims were "disguised" failure to warn claims because, if successful, they would induce the defendant to change its label. *Id*. The Supreme Court rejected that reasoning, holding that the Fifth Circuit's reading was far too broad. *Id*. at 444. The reason was because "[r]ules that require manufacturers to design reasonably safe products," "to use due care in conducting appropriate testing of their products," or "to honor their express warranties or other contractual commitments plainly do not qualify as requirements for 'labeling or packaging.'" *Id*. at 444. Thus, design defect, negligent design, and warranty claims fall outside the express preemption provision altogether.

*Durnell* looked at the second prong of the preemption analysis. Monsanto's petition asked for review of whether FIFRA preempts any "state-law failure-to-warn claim." *See* **Ex. 6** to Di Matteo Decl. (Monsanto's Pet. for Writ of Cert.) at i. But the Supreme Court did not grant that question. It granted certiorari "***limited to the following Question***: Whether the Federal Insecticide, Fungicide, and Rodenticide Act preempts a ***label-based*** failure-to-warn claim where EPA has not required the warning." *See* **Ex. 7** to Di Matteo Decl. (*Durnell* Docket) at Jan. 16, 2026 entry.

That limitation defined the issue before the court. Because the failure-to-warn claim was concededly label-based – its "heart" was the contention that "Monsanto should have included a cancer warning on its Roundup labels" – there was no dispute that it imposed a labeling requirement. *Durnell*, 146 S. Ct. at 2010. The question was, instead, whether that state labeling requirement was "in addition to or different from" federal labeling requirements. *Id*. The Supreme Court held that it was because federal law required Monsanto to use a label without the cancer warning the plaintiff sought. *Id*. Given the narrow scope of the question at-issue, *Durnell* does not speak to design defect, warranty, or negligent design and testing claims. Indeed, it does not even mention them.

Read together, *Bates* and *Durnell* establish a straightforward rule: claims that regulate a product, rather than its label, including design defect and negligent design claims, remain outside the scope of preemption. But claims that require a label change fall within it.

**B. The Design Defect and Negligence Claims Fall Within *Bates***

**1. The Design Defect Claim Does Not Require a Cancer Warning.**

To establish a design defect claim, "Florida law require[s] proof of two things." *Liggett Group, Inc. v. Davis*, 973 So. 2d 467, 475 (Fla. 4th DCA 2007). "First, that the product is defective; and, second, that such defect caused plaintiff's injuries." *Id*.

The parties agree that a plaintiff may prove that a product is defective under Florida law by utilizing the consumer expectations test.[3] *See* Mtn. at 18. Under this test, a product is "defective" if "it failed to perform as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner." *Aubin*, 177 So. 3d at 503.

That inquiry does not turn on identifying a remedial defect or some particular design change the manufacturer could have made to the product—whether to a design feature, the label, or anything else. Indeed, the Florida Supreme Court explicitly holds there is "absolutely no requirement" that a plaintiff prove an alternative design for the consumer expectations test – a point Monsanto does not dispute. *Id.* at 512. The jury question is, instead, whether the product, as designed and labeled, performed as an ordinary consumer would expect. If it did not, it is defective under Florida law. Period.

Plaintiffs' design defect claim tracks this standard. The theory is straightforward: Roundup did not perform as an ordinary consumer would expect because *it causes cancer*. *See, e.g.,* ex. 5 ¶¶ 11, 23-24, 38, 59, 62. It alleges that Roundup was defective in its *design* – not its labeling.

Monsanto attempts to reduce the consumer expectations test to the label by arguing that all expectations "come from *reading the label*," based on a case that notably did not apply Florida law. *See* Mtn. at 18. Florida law rejects that interpretation of the standard.

Florida's consumer expectations test is "objective" and not based on "the viewpoint of any particular customer." *Liggett Grp.*, 973 So. 2d at 475. It does not ask what the particular plaintiff saw or heard. It asks what an ordinary consumer would expect. *See Aubin*, 177 So. 3d at 503. The test reflects a **community standard** of how ordinary people like the jurors think about how a product should perform.

---

[3] Alternatively, a plaintiff could proceed under the risk-benefit test, *see Aubin*, 177 So. 3d at 512, which Monsanto does not argue is expressly preempted; rather, it simply disputes the existence of allegations and evidence as to an alternative design. *See* Mtn. at 19-22.

Nothing confines those expectations to the label. The test itself acknowledges that ordinary consumers bring baseline expectations to widely distributed products for everyday use, including, fundamentally, that such products will not cause grave harms like cancer. These expectations are formed the minute a consumer walks into a store: from the placement of the product in ordinary garden sections with tools and other commonplace lawn-care products to the fact that the consumer can take the product right off the shelf without any restrictions on access. All of this can lead consumers to form baseline expectations that these kinds of widely available products will not pose a grave danger to their health. The reason is common sense. As Monsanto's own toxicologist put it:

> Q: Getting rid of the weeds in your driveway or your lawn is not worth getting cancer. That's an easy one, right, sir?
> A: Oh, yeah, I would agree.

**Ex. 2** to Di Matteo Decl. (*McKivison* Trial Transcript) at 48:21-49:1. Dr. Donna Farmer also acknowledged as much. When asked whether consumers should expect to use Roundup without getting cancer, she responded "Yes, they should not worry about getting cancer, no." **Ex. 1** to Di Matteo Decl. (*Barnes* Trial Transcript) at 2567:8-19; 2580:9-2581:2. As a result, courts find that "ordinary consumers do have expectations about whether they will develop cancer as a result of using widely sold and advertised herbicides. Their expectation is they will not." *See Pilliod v. Monsanto Co.*, 67 Cal.App.5th 591, 620 (Cal. Ct. App. 2021).

The test also acknowledges that manufacturers actively shape those expectations through the broader image they create for their products. As the Florida Supreme Court explained, manufacturers play a "pivotal role in crafting the image of a product and establishing consumers' expectations for that product." *Aubin*, 177 So. 3d at 511. That image is created through a myriad of mediums: "product portrayals and images," *id*. at 507 (quoting *Delaney v. Deere & Co.,* 268 Kan. 769, 999 P.2d 930, 946 (2000)), "owner's manual and marketing materials," *Patt v. Volkswagen Grp. of Am., Inc.*, No. 22-cv-21585-BLOOM/Torres, 2024 U.S. Dist. LEXIS 70646,

at *22 (S.D. Fla. Apr. 17, 2024), or even making a "concerted effort to discredit" studies that reveal the dangers of a product in order to "allay people's fears," *Liggett Grp. Inc.*, 973 So. 2d at 478.

Because the test looks at the entire universe of materials that bear on how the product is portrayed, it applies **even to someone who never read the label**. Foreseeable bystanders injured by a product may recover under the test. *See In re Standard Jury Instructions in Civil Cases—Report No. 19-03*, 290 So. 3d 840 (Fla. 2020); *West*, 336 So. 2d at 89, 92; *Hobart v. Siegle ex rel. Hoerber*, 600 So. 2d 503, 506 n.7 (Fla. 3d DCA 1992); *Sanchez v. Hussey Seating Co.*, 698 So. 2d 1326 (Fla. 1st DCA 1997). For these plaintiffs, the label may never enter the case at all. They need not have read it, relied on it, or made any decision that different labeling would have altered. Florida's application of the consumer expectations test to those very plaintiffs makes it impossible to square with the notion that the test imposes any labeling requirement. If a plaintiff can prevail *without ever seeing the label*, then the claim necessarily cannot *require* a change to the label.

### 2. Monsanto Endeavored to Shape Consumer Expectations Beyond the Label

Monsanto does not dispute the evidence in support of the consumer expectations test. Its only real argument is that the label determines consumer expectations as a matter of law, which Florida law rejects, as explained above.

Even apart from everyday experience with the product, there are plenty of sources that would lead consumers to believe that Roundup does not cause cancer, including Monsanto's own affirmative conduct. A consumer could open a newspaper and see senior Monsanto executives touting that "[g]lyphosate is the safest herbicide that has ever been invented…there is no medical or scientific evidence whatsoever that links the exposure of glyphosate to cancer," (**Ex. 8** to Di Matteo Decl. (October 24, 2017 news article from The Guardian)), or see or hear Monsanto's CEO Hugh Grant on NPR tell them that "Roundup is not a carcinogen," (**Ex. 9** to Di Matteo Decl. (Mar. 31, 2016 NPR article)). Or, see an article on CBS News's website with Donna Farmer assuring them, "I can tell you glyphosate is safe." **Ex. 10** to Di Matteo Decl. (June 29, 2016 CBS News article). Or an article on Fox Business with Dr. Robert Fraley, Monsanto's Chief Technology

Officer, telling them "Roundup is absolutely safe. It's not a carcinogen." **Ex. 11** to Di Matteo Decl. (Mar. 6, 2016 FOXBusiness Article).

But the company's efforts to bolster perceptions did not end there. Monsanto went further to "manipulat[e] public opinion" about Roundup's safety and went to great lengths to "undermin[e] anyone who raise[d] genuine and legitimate concerns about the issue." *See In re Roundup Prods. Liab. Litig.,* 364 F. Supp. 3d at 1089. The Court already knows much of the evidence, including Monsanto's efforts to ghostwrite articles and its "aggressive attempt to discredit the 2015 IARC decision." PTO 159 at 6; *see also* PSMF ¶¶ 64-70, 104-118. As far back as the 1990s, Monsanto retained a public relations firm to "[n]eutralize attacks on Roundup" by, among other things, "utiliz[ing] leading environmental and toxicological experts to combat attacks… and to reinforce the benefits of Roundup herbicide to the media." **Ex. 12** to Di Matteo Decl. (MONGLY00921329). Monsanto took the same approach when a new epidemiological study came out in the 2000s showing that exposure to glyphosate can more than double the risk of developing non-Hodgkin's lymphoma. Monsanto's response was "how do we combat this?" **Ex. 13** to Di Matteo Decl. (Farmer Email). From these "efforts to manipulate scientific discourse," the "jury could infer not only that the potential cancer risk associated with glyphosate and Roundup was known or knowable… but also that ***Monsanto labored for decades to suppress knowledge of the risk***." *Pilliod*, 67 Cal. App. 5th at 623 (emphasis added).

This evidence is just a snapshot of how Monsanto portrayed Roundup in the marketplace, and all of this bears on how consumers expected the products to perform. Nothing forced Monsanto to make these representations to the public; it did so *voluntarily*, for an obvious reason: to shape perceptions about Roundup and reassure consumers that the product was safe. None of this was "labeling" as defined under FIFRA either. *See* 7 U.S.C. § 136(p)(2).

It also distinguishes this case from *Papike v. Tambrands, Inc.*, 107 F.3d 737, 743 (9th Cir. 1997), the sole case Monsanto cites for the proposition that consumer expectations only come from the label. *Papike* involved California claims against a tampon manufacturer that its product caused plaintiff to suffer toxic shock syndrome. Setting aside that *Papike* did not evaluate Florida law, it

has been recognized that *Papike* is plainly distinguishable because the products there "explicitly notified the user of the very danger at issue." *Ansagay v. Dow Agrosciences LLC*, 153 F. Supp. 3d 1270, 1289 (D. Haw. 2015). The court also pointed out that, in *Papike*, there was "no suggestion of any countervailing evidence raising a genuine material issue of fact as to the likely expectations of consumers." *Id*. Unlike here, there was no evidence that Tambrands spent decades convincing consumers that its tampons do not cause toxic shock syndrome. Nor was there any evidence that Tambrands engaged in manipulation of the science by ghostwriting articles. There also was no evidence that Tambrands launched public relations campaigns to discredit scientific authorities claiming that tampons cause toxic shock syndrome.

### 3. The Design Defect Claim is Not a Failure to Warn Claim "in Disguise"

#### a. Monsanto's Selective Quotation of the Complaint Does Not Convert Counts I and III into Warning Claims

Apart from incorrectly claiming that all consumer expectations come from reading the label, Monsanto devotes considerable attention to the allegations. Monsanto's characterization of the Complaint rests on selective quotation. Mtn. at 14. It seizes on a few stray warning-related allegations in Counts I and III and ignores the rest. The Complaint alleges that Richard Gomez used Roundup as intended, without significant change in its condition, from 2000 to 2008[4] (ex. 5 ¶¶ 11, 23-24, 38); that Monsanto was on notice of its carcinogenicity and genotoxicity throughout that period (*id.* ¶¶ 28-32); and that his exposure caused his NHL (*id.* ¶¶ 14, 26). Counts I (Negligence) and III (Strict Liability Design Defect) incorporate these allegations. *Id.* at 11, 15.

Count I alleges that Monsanto owed a duty of reasonable care in designing Roundup (*id.* ¶ 40), knew or should have known it could cause cancer (*id.* ¶¶ 41-42), breached that duty by failing to design the risk out (*id.* ¶¶ 44, 45.c), and thereby caused Gomez's cancer (*id.* ¶¶ 46-47). Count III alleges that Monsanto designed, manufactured, and sold Roundup (*id.* ¶ 57); that it was unreasonably dangerous in design (*id.* ¶ 62) because it can cause cancer when used as intended (*id.*

[4] It was later determined in Mr. Gomez's deposition that he had actually started applying Roundup in 2001. Ex. 4 at 296:8–297:19.

¶ 59); that it reached Gomez without substantial change (*id.* ¶ 58); that he used it in an intended and foreseeable manner (*id.* ¶ 61); and that it caused his cancer (*id.* ¶ 63).

Those allegations alone plead every element of both claims. *See Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 513 (Fla. 2015); *Ford Motor Co. v. Evancho*, 327 So. 2d 201, 204 (Fla. 1976). A count survives if it pleads facts stating a plausible claim, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and anything further is surplusage the Court may disregard or strike. Fed. R. Civ. P. 12(f). At most, Monsanto has found stray allegations that, if pleaded as standalone warning theories, would implicate *Durnell*. The remedy is to disregard them, not to enter judgment on counts that plead every element without them. *See* Fed. R. Civ. P. 8(d)(2), (e).

**b. Under Florida Law, Design Defect Claims Center on the Product's Performance, and Require No Proof About Warnings**

Monsanto contends that the design defect claim is nevertheless a "disguised" failure-to-warn claim. Mtn. at 10. Monsanto invokes *Bates* to argue that it "held that disguised 'failure-to-warn claims'…which had been pled as 'claims for negligent testing and defective design and manufacture,'…qualified as 'requirements for labeling,' within the meaning of FIFRA's express preemption provision." *Id*.

In reality, *Bates* held the opposite, where the Supreme Court confronted—and rejected—the exact argument. In *Bates,* the Fifth Circuit "read §136v(b) to pre-empt any state-law claim in which 'a judgment against Dow would induce it to alter its product label.'" *Bates*, 544 U.S. at 436. The Fifth Circuit "found that petitioners' strict liability claim alleging defective design was essentially a 'disguised' failure-to-warn claim and therefore pre-empted." *Id*. The Supreme Court rejected the argument that design defect claims are "disguised" warning claims, reasoning that "[r]ules that require manufacturers to design reasonably safe products […] plainly do not qualify as requirements for 'labeling or packaging'" since "[n]one of these common-law rules requires that manufacturers label or package their products in any particular way." *Id.* at 444.

Far from finding that design defect claims "boil down" to preempted failure to warn claims, *Bates* recognized that FIFRA left open an enormous gap through which a non-preempted state tort

claim can proceed. A "rule to design reasonably safe products" is extremely broad. And, it certainly encompasses ordinary state-law duties to sell products that are not unreasonably dangerous. The consumer-expectations test is no more than an articulation of that same duty. It does not prescribe a warning, a formulation, or any particular change to the product. It asks *only* whether the product performed as safely as an ordinary consumer would expect. That is not a labeling requirement in disguise. It is a rule about the safety of the product itself.[5]

Florida law clearly reflects the distinction between failure to warn and design defect theories. The tobacco cases of *Engle* and its progeny illustrate this. In *Engle*, the Florida Supreme Court expressly recognized that compliance with federally required cigarette warnings "preempted any claim based on failure to warn," yet held that this did "not eliminate the other causes of action" and preserved the jury's separate finding that the defendants had placed cigarettes on the market that were "defective and unreasonably dangerous." *Engle v. Liggett Group, Inc.*, 945 So. 2d 1246, 1273, 1276–77 (Fla. 2006). The Florida Supreme Court underscored this point in *R.J. Reynolds Tobacco Co. v. Marotta*, 214 So.3d 590, 601-602 (Fla. 2017) where it held that, "[w]hile Congress did expressly preempt state and local regulations pertaining to the labeling and advertising of cigarettes, there is no indication that Congress had a 'clear and manifest purpose' to insulate the tobacco industry from state tort liability." Although failure to warn claims were preempted, state law claims based on strict-liability design defect and negligence could proceed. *Id*.

If the design defect claims were merely labeling requirements in disguise, federally compliant warnings for cigarettes should have disposed of *both* claims. They did not. *Engle* and *Marotta* instead reflect the basic distinction Florida law draws between the duty to warn about a product's risks and the independent duty to design products that are reasonably safe.

#### 4. Monsanto's Real Argument is a Comment K Defense

---

[5] Aside from *Hardeman*, discussed below, Monsanto relies on a cherry-picked quote ***about a failure-to-warn claim*** from a pre-*Bates* decision that did not evaluate a strict liability design defect claim. *See* Mtn. at 16 (quoting *Taylor AG Industries v. Pure-Gro*, 54 F.3d 555, 560 (9th Cir. 1995)).

Monsanto's argument that Plaintiffs' design defect claim "boils down" to a failure to warn claim is, in reality, a comment k defense. Florida treats failure to warn and design defect claims as distinct theories imposing distinct duties, as explained above.[6] An adequate warning does not eliminate a design defect. As discussed below, comment k provides a narrow exception. Unless Monsanto can establish entitlement to that exception, it cannot collapse the design defect claim into a warning claim.

The general rule in Florida is that a product is defectively designed if it satisfies the consumer expectations test or alternatively the risk-benefit test. But, as this Court previously recognized, comment k carves out an extremely narrow exception for products that are "unavoidably unsafe." Restatement (Second) of Torts § 402A (comment k); *see Hardeman*, 216 F. Supp. 3d at 1040. These are products that are "incapable of being made safe for their intended and ordinary use." *Id*. Accordingly, § 402A recognizes that there is a species of products subject to design defect liability where there is no remedial defect or alternative design.

For the few products protected by comment k, an otherwise dangerous product "is not defective, nor is it unreasonably dangerous" if it is "properly prepared, and accompanied by proper directions and warning." *Id*. In that circumstance, once the plaintiff establishes a defect under either the consumer expectations test or the risk-benefit test, the burden then shifts to the defendant to establish entitlement to comment k. *See Adams v. GD Searle & Co*., 576 So. 2d 728, 733 (Fla. 2d DCA 1991). If the defendant is successful on that affirmative defense, then the design defect claim collapses to a warning claim.

Monsanto previously recognized as much. In moving to dismiss in *Hardeman*, it explained that comment k protection means a "plaintiff is limited to claims that the warnings accompanying

---

[6] Florida offers many examples of cases in which a product adequately warned but the plaintiff was permitted to proceed on a design defect claim. *See Brown v. Glade & Grove Supply, Inc*., 647 So. 2d 1033, 1035 (Fla. 4th DCA 1994) ("Even if the warnings were adequate as a matter of law or unnecessary because of the obviousness of the danger, this would not remove from the jury the issue of defective design of the rear steering system"); *Pinchinat v. Graco Children's Prods., Inc.*, 390 F. Supp. 2d 1141, 1147–50 (M.D. Fla. 2005) (holding warnings adequate as a matter of law while denying summary judgment on design defect); *Ocasio v. C.R. Bard, Inc.,* No. 8:13-cv-1962-T-36AEP, 2015 U.S. Dist. LEXIS 71742, at *11-20 (M.D. Fla. June 3, 2015) (similar).

the product are deficient." *See* Def. Monsanto Co.'s Mot to Dismiss at 10, *Hardeman v. Monsanto Co.*, No. 3:16-cv-00525, (N.D. Cal. Mar. 22, 2016), Dkt. No. 18 at 10. Monsanto now repackages the same argument here by contending that the design defect claim "boils down" to a warning claim – while skipping over everything Florida law requires to establish it.

It is easy to see why Monsanto does not explicitly present its argument through the lens of comment k. For starters, it could never establish that Roundup is "unavoidably unsafe" since there is an alternative design. Monsanto now manufactures Roundup products without glyphosate or active ingredients known to cause cancer. *See* Ex. 14 to Di Matteo Decl. (*Grantges* Trial Transcript) at 2784:12-2812:19; 2891:10-2898:17; *see also Durnell*, 146 S. Ct. at 2031 n.4 ("Monsanto has phased out residential Roundup products that contain glyphosate.")

Even if there were no alternative design, no Florida court has ever extended comment k to anything remotely resembling a pesticide. That is precisely why this Court previously rejected applying comment k to Roundup in *Hardeman*. *See* 216 F. Supp. 3d at 1040.

Florida, like California, has "limited its adoption of comment k to a narrow medical context." *Id.*; *see also Adams*, 576 So. 2d at 732. Florida limits comment k solely to "medical devices, drugs, and vaccines." *In re Standard Jury Instructions in Civil Cases—Report No. 19-03*, 290 So. 3d at 850 n.6. And, even then, Florida does not provide blanket protection; comment k applies to these medical products only on a "case-by-case" basis. *Adams*, 576 So. 2d at 732. The reason is straightforward: these are products "for which society has a need great enough to justify using the product despite [their] dangers." *Id.* at 731.

*Adams* cites the vaccine for rabies as an example. It is not uncommon for that vaccine to "lead[] to very serious and damaging consequences when it is injected," but since "the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve." *Id.*, quoting § 402A (comment k). Due to the extraordinary public interest in preserving access to life-saving and life-enhancing vaccines, the product is exempted from ordinary design defect rules under comment k and considered "defective" only if it is not "properly prepared, and accompanied by proper

directions and warnings." *Id*. Vaccines, like all medical products that qualify for comment k, stand apart from ordinary commercial products used to make work easier (like Roundup)—they are not entitled to comment k protection merely because they are dangerous generally. *Id.* Indeed, since the Florida Supreme Court first recognized the exception, ***no court in Florida has ever extended comment k to a pesticide***. Some refuse to apply it to pesticides outright. *See Kennan v. Dow Chem. Co.*, 717 F. Supp. 799, 812 (M.D. Fla. 1989) (refusing to apply comment k to a pesticide because comment k "deals expressly with new drugs whose production is justified for their life-saving characteristics.")

Monsanto completely skips over this. Comment k does not extend beyond the medical context, but, even assuming it could apply to pesticides, Monsanto has offered no evidence necessary to establish the affirmative defense. *See Adams*, 576 So. 2d at 733 (explaining that, to establish the affirmative defense, the court must consider the "product's risk against its benefit" considering "the value of the benefit, the seriousness of the risk, and the likelihood of both.") That omission is dispositive because Monsanto's contention that the design defect claim "boils down" to failure to warn is not something the Court can simply assume; Florida makes that argument contingent upon satisfying comment k. Without that predicate, the Court has no basis to collapse a design defect claim into a warning claim or otherwise afford Monsanto comment k protection.

**5. Comment K is Key to Understanding *Hardeman***

The Court correctly held in *Hardeman* that the consumer expectations test applied to Roundup. *See Hardeman*, No. 16-md-02741, 2019 WL 3219360, at *5 n.2 (N.D. Cal. July 12, 2019). In evaluating that test, the jury found that Roundup causes cancer, and that it caused Hardeman's cancer. Since most consumers do not expect household products to cause cancer, that was more than enough to establish a "defect" under the consumer expectations test. Indeed, the jury returned a verdict specifically on the consumer expectations test in Hardeman's favor.

The Court's analysis should have ended there, given that the defect largely mirrored what was alleged in *Arnold v. Dow Chemical Company*, 91 Cal. App. 4th 698, 743-744 (2001) (finding that the pesticides at-issue were defective under the consumer expectations test because they

"contain[ed] both active and inert ingredients that are highly toxic to humans" and rejecting the argument that plaintiffs' design defect theory was a "disguised" warning claim).[7]

But, in the post-trial order, the Court believed more was needed. The Court proceeded under an incorrect dichotomy: either the defect was a missing warning, or Roundup was so dangerous it should not be sold at all. *See Hardeman*, 2019 WL 3219360 at *2–3. In doing so, it ignored the third possibility – and one that the jury agreed with – that Roundup was defective because it was not as safe as an ordinary consumer would expect. Indeed, California law does not require a plaintiff to prove that a product must be so dangerous that it should be banned. Failing ordinary consumer expectations is enough. *See Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413, 426–30 & n.8 (1978).[8] Florida law is the same. *See Aubin*, 177 So. 3d at 503; *Marotta*, 214 So.3d at 601 (rejecting the notion that liability under design defect theory amounts to a ban).

The Court inadvertently approached the issue as if it were applying comment k. In that scenario, either comment k applies and the defect is the warning, or the product falls outside comment k protection because the danger cannot be justified. *See Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1340 (M.D. Fla. 2015) (explaining that "to be protected under comment k, a defendant must show that the product is as safe as current testing and research permit, and that the product's benefits outweigh the known risks as of the date the product is distributed.")

That dichotomy drove the rest of the analysis. Based on the belief that Hardeman failed to establish that "Roundup is so dangerous that it should not be on the market at all," the Court concluded that "the defect was the absence of a warning" which caused the "design defect claim

---

[7] Florida also views defects this way. *See, e.g., Scala v. Eisai, Inc.*, No. 5:21-cv-210-ACC-PRL, 2021 U.S. Dist. LEXIS 240028, at *6 (M.D. Fla. Dec. 14, 2021) (plaintiff identified a "defect" when "its active ingredient—lorcaserin—had a propensity to cause cancer"); *In re Monat Hair Care Prod. Mktg., Sales Pracs., & Prod. Liab. Litig*., No. 18-MD-02841, 2019 U.S. Dist. LEXIS 184328, at *14-15 (S.D. Fla. Oct. 23, 2019) (products were "defective" because "they contain ingredients…which are known to cause allergic reactions and dermatitis").

[8] Comment k also illustrates why Hardeman had no obligation to prove a specific remedial defect in Roundup. Implicit in comment k is an understanding that there are inherently dangerous products where comment k will not apply but which remain defective under the consumer expectations test; otherwise, comment k would have no purpose.

to merge into the failure-to-warn claim." *Hardeman*, 2019 WL 3219360, at *2–3. But, as explained above, a "merger" of the two claims occurs where comment k applies. In that scenario, the law treats an otherwise dangerous product as non-defective so long as it is properly prepared and adequately warned. So the defect "merges" into a claim about warnings. Monsanto never established comment k in *Hardeman*. But the Court analyzed the verdict as though it had.

The Court also faulted Hardeman for offering no evidence that Roundup was "inherently defective *regardless of whether accompanied by a warning*," and no expert testimony that Roundup could not be used safely with proper precautions. *Id.* at *3 (emphasis added). But none of that is part of the consumer expectations test. And, more importantly, both of those items would force Hardeman to prove facts that make a product unavoidably unsafe. However, under comment k, it is ***Monsanto's burden*** to establish that the product is unavoidably unsafe, as explained above.

Monsanto tacitly concedes that the Court's post-trial *Hardeman* opinion can only be understood through the lens of its § 402A affirmative defenses. It tries to rewrite history, arguing that the Court applied comment j in *Hardeman*, even though nothing in the order mentions this affirmative defense. *See* Mtn. at 19 ("This is precisely what this Court concluded.").

But comment j is inapplicable on its own terms. It applies only "where a warning is given" and which makes the product "safe for use if followed." Restat. 2d of Torts, § 402A cmt. j. There is no evidence of either element here or in *Hardeman*. On top of that, no Florida or California court has ever applied comment j in the manner Monsanto seeks. If it did, *Marotta* and *Engle* would be wrongly decided since, even though the label-based warning claims were preempted in those cases, design defect claims remained viable.

**C. The Negligence Claim Is Not a Labeling Requirement**

Florida recognizes negligence claims based on a manufacturer's failure to exercise reasonable care in the design of its products. *See Ford Motor Co. v. Evancho*, 327 So. 2d 201, 204 (Fla. 1976) (holding manufacturer owed duty "to use reasonable care in the design of" its product so as to "eliminate any unreasonable risk of foreseeable injury" arising from its intended and reasonably foreseeable use); *Suzuki Motor Corp. v. Winckler*, 434 So.3d 104, 109 (Fla. 5th DCA

2026) ("In Florida, the manufacturer of a defective product may be found liable under either negligence or strict liability theories."); *Grieco v. Daiho Sangyo, Inc.*, 344 So.3d 11, 17 (Fla. 4th DCA 2022) ("Proof of a defect determines breach of duty under negligence theory."); *Light v. Weldarc Co.,* 569 So. 2d 1302, 1303 (Fla. 5th DCA 1990).[9] The "duty to test is a subpart of a manufacturer's duty to design a product with reasonable care." *Hall v. Sunjoy Indus. Grp., Inc.*, 764 F. Supp. 2d 1297, 1302 (M.D. Fla. 2011). Those duties are aimed at the product and the manufacturer's conduct – not the labeling.

Plaintiffs allege, among other things, that Monsanto "fail[ed] to use reasonable and prudent care in the design [] of Roundup so as to avoid the risk of serious harm associated with the use of Roundup" (ex. 5 at ¶ 45), "refused to conduct carcinogenicity testing on Roundup formulations" (*id.* at ¶ 36.b), and "refused to conduct… genotoxicity studies…" (*id.* at ¶ 36.f). The evidence likewise supports negligence theories directed at the design and testing of Roundup, as discussed above. This also includes evidence that Monsanto never tested formulated Roundup itself for carcinogenicity (as opposed to glyphosate by itself), *see* Ex. 2 to Di Matteo Decl. (*McKivison* Trial Transcript) at 78:21-25, and ignored the advice of a world-renowned expert it hired to conduct studies that would have shown that Roundup causes cancer – evidence that the Court is familiar with respect to Dr. Parry. *See* PSMF ¶¶ 57-61; *see also Pilliod*, 67 Cal.App.5th at 644 (finding "[f]rom evidence of the failure to conduct adequate studies, the jury could infer that Monsanto was dismissive of concerns about glyphosate's safety.")

None of these claims turn on the addition of a cancer warning, and *Bates* could hardly be clearer on the point: these claims impose rules requiring manufacturers "to design reasonably safe

---

[9] *See also, e.g.*, *Small v. Amgen, Inc.*, 134 F. Supp. 3d 1358, 1366 (M.D. Fla. 2015) ("Florida tort law provides that the manufacturer of a defective product may be subject to liability under two theories: negligence and strict liability… In order to prevail under either theory, the plaintiff must establish that the product was defective or unreasonably dangerous."); *O'Bryan v. Ford Motor Co.*, 18 F. Supp. 3d 1361, 1366 (S.D. Fla. 2014) ("[P]roof of a defect determines a breach of duty under a negligence theory and the presence of an unreasonably dangerous condition under a strict liability theory.").

products" and "to use due care in conducting appropriate testing of their products." *Bates*, 544 U.S. at 444. None of these duties are labeling or packaging requirements. *Id*.

**D. Monsanto's Implied Preemption Argument is Meritless**

*Durnell* by its own terms has nothing to do with implied preemption. The court specifically held that it "need not consider" the argument because the claim was expressly preempted. *Durnell*, 146 S. Ct. at 2012 n. 7.

Monsanto, nonetheless, raises the argument, contending that "any theory that would have required Monsanto to use an alternative design is preempted" as a "matter of impossibility." Mtn. at 22. None of the claims here require an "alternative design." As explained above, Florida explicitly rejects the notion that design defect claims under the consumer expectations test impose any alternative design requirement.[10]

Even so, the argument fails on the merits. Implied preemption is an argument that Monsanto has been making for the better part of a decade, but not one court has adopted it, and this Court has explicitly rejected it. *See In re Roundup Prods. Liab. Litig.*, 364 F. Supp. 3d at 1087. That's because it cannot be reconciled with the plain text of FIFRA or *Bates*. All the cases Monsanto relies upon originate under the FDCA, a fundamentally different statutory scheme from FIFRA. Monsanto ignores that "different federal statutes and regulations may . . . lead to different pre-emption results." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 626 (2011).

When Monsanto first made this argument to this Court in 2019, it relied on the same FDCA cases it does now to contend that "plaintiffs' warning and design defect claims are preempted because Monsanto cannot change Roundup's label or design without first obtaining approval from the EPA." *In re Roundup Prods. Liab. Litig.*, 364 F. Supp. 3d at 1087. As this Court pointed out, in relying on FDCA cases, "Monsanto elides a critical aspect of FIFRA's statutory scheme: FIFRA

[10] Even the risk-utility theory does not impose a requirement that a manufacturer sell a reformulated product. It requires manufacturers to design reasonably safe products whose benefits outweigh their risks. The presence of an alternative design is but an element of this test.

allows states to regulate or ban pesticides that have been federally approved." *Id*. at 1088. That point is essential.

The FDCA is not analogous to FIFRA. It centralizes power with the FDA and has no equivalent to §136v(a) that empowers states to "regulate the sale or use" of drugs and devices. To the contrary, under the FDCA, once a drug is federally approved, manufacturers have a ***federal right to sell***. For that reason, as this Court noted, federal law does ***not*** allow states to ban FDA-approved drugs. *Id.* at 1088 ("nothing in the FDCA allows a state to ban a drug"); *see also Zogenix, Inc. v. Patrick*, No. 14-11689-RWZ, 2014 WL 1454696, at *2 (D. Mass. Apr. 15, 2014) (concluding that if the State "were able to countermand the FDA's determinations and substitute its own requirements, it would undermine the FDA's ability to make drugs available to promote and protect the public health"). That is why the FDCA cases that Monsanto cites found that, *under the FDCA*, a drug manufacturer "seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability." *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 488 (2013).

FIFRA is different. It presents an entirely different regulatory structure and legislative choice. Critically, registration of a pesticide under FIFRA provides only a "license" to sell and distribute approved products, ***subject to state approval***. *Nat'l Family Farm Coal. v. United States EPA*, 966 F.3d 893, 912 (9th Cir. 2020). FIFRA does ***not*** vest manufacturers with a federal right to sell a pesticide.

Unlike the FDCA, FIFRA delegates tremendous power to states to "regulate the sale or use" of any registered pesticide. Nothing like it exists under the FDCA. Through that power, states can set up their own pesticide regulatory regimes. *See, e.g.*, Florida Pesticide Law, Fla. Stat.§487.011 *et seq*. States can restrict pesticide uses within their borders. *See* Ex. 15 to Di Matteo Decl. (EPA Guidance on FIFRA 24(c) Registrations) (explaining "if a state desires to impose an additional restriction to a federally registered product, states may exercise their authority under FIFRA section 24(a)" (i.e., §136v(a)) "to regulate the sale or use of any federally registered pesticide in the state.") States can impose criminal penalties for violations of pesticide laws. *See,*

*e.g.*, Cal. Food & Ag. Code §12996(a) (providing that "person who violates any provision of this division relating to pesticides…is guilty of a misdemeanor and…shall be punished by a fine…") And, most importantly, the Supreme Court has twice affirmed that §136v(a) affords states a right to go so far as to *ban pesticides outright*.

An "outright ban," of course, makes it impossible to sell a pesticide. But FIFRA permits that result. Since FIFRA explicitly authorizes states to "ban the sale of a pesticide if it finds, for instance, that one of the pesticide's label-approved uses is unsafe," *Bates*, 544 U.S. at 446, a state law requirement that compensates individuals who used unsafe pesticides, or even stops the sale completely, cannot be preempted (so long as it does not impose a requirement "for labeling or packaging") since FIFRA does not confer *any* right to sell federally approved pesticides. *See also Weeks v. Home Depot U.S.A.,* 2020 U.S. Dist. LEXIS 188369, at *19 (C.D. Cal. Sept. 18, 2020) (explaining "[t]his distinction is important because if California can stop defendant or manufacturers from selling Roundup entirely, then it seems inconsistent to conclude that the statute implicitly - but not expressly - preempts a state law requirement that stops short of banning the product.") And here, Florida law recognizes that tort lawsuits do ***not*** amount to a full-blown ban. *See Marotta*, 214 So.3d at 601 ("Even if Congress did intend to prevent the states from banning cigarettes, it is clear that tort liability like that in Engle does not amount to such a ban.")

Under Monsanto's theory, *any* restriction on its right to sell a pesticide as formulated is tantamount to a requirement that it sell a different formulation. *See* Mtn. at 22-24. But, if that were true, it would mean that a state could *not* ban the sale of a pesticide over safety concerns since that would, under Monsanto's theory, require a change in formulation. Both *Durnell* and *Bates* reject that interpretation.[11] *See Bates*, 544 U.S. at 446; *Durnell*, 146 S. Ct. at 2008, n.2.

---

[11] Even if it could be squared with FIFRA, Monsanto's implied preemption argument would still fail on the factual record here. Monsanto now sells non-glyphosate-based Roundup formulations. Obviously, it cannot be "impossible" to sell a product that both EPA and the state of Florida allow Monsanto to sell, and Monsanto does, in fact, sell in the state of Florida.

## CONCLUSION

For the foregoing reasons, the Court should deny Monsanto's Supplemental Motion for Summary Judgment.

Dated: September 28, 2026

Respectfully submitted,

**THE FERRARO LAW FIRM, P.A.**
*Attorneys for Plaintiffs*
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
Telephone (305) 375-0111
Facsimile (305) 379-6222

By: */s/ Daniel J. Di Matteo*
DANIEL J. DI MATTEO, ESQ.
Florida Bar No. 114914
ddimatteo@ferrarolaw.com
nparra@ferrarolaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on counsel of record via CM/ECF this 28th day of September 2026.

By: */s/ Daniel J. Di Matteo*
DANIEL J. DI MATTEO, ESQ.