JAMES GRIFFIN O'BRIEN (Cal. 308239, Ohio 0088460)
Bey & Associates, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327
Direct: 513.506.1515
Main: 404.344.4448
Email: jim@beyandassociates.com

*Counsel for Augustus W. Abel, individually and on behalf of the Estate of Sandra Abel*

**IN THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION* | MDL No. 2741<br>Master Docket No. 16-MD-2741-VC |
| This document relates to:<br><br>**THE ESTATE OF SANDRA ABEL** *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**MONSANTO COMPANY** *et al.*,<br><br>Defendants. | Case No.: 3:21-cv-7124-VC<br><br>Judge: Hon. Vince Chhabria |

**PLAINTIFF'S OPPOSITION**

**TO**

**DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL SUMMARY JUDGMENT MOTION**



BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

Plaintiff Augustus W. Abel III, individually and on behalf of the Estate of Sanda Abel, files this Opposition to Defendant Monsanto Company's Second Summary Judgment Motion. (Doc. 30.) This Opposition is supported by the attached:

| | |
|---|---|
| **Exhibit A** | Transcript of the Deposition of Augustus W. Abel III |
| **Exhibit B** | Expert Report of Sol Bobst Ph.D. |
| **Exhibit C** | Expert Report of Khaleel Ashraf M.D. |
| **MDL Doc. 22675** | Omnibus Statement of Material Facts filed by MDL leadership ("POSF") |

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

## TABLE OF CONTENTS

**Table Of Authorities** ..... 5

**I. Introduction** ..... 7

**II. Legal Standard** ..... 8

**A. Monsanto Bears the Burden of Showing No Genuine Dispute of Material Fact Exists on Any Element of Plaintiff's Claims.** ..... 8

**III. Statement of Facts** ..... 9

**A. Roundup, Glyphosate, and Monsanto's Regulatory History Generally** ..... 10

**B. Monsanto Never Tested the Formulated Product it Sold, Monsanto Manipulated the Science, and Monsanto Told Regulators and Consumers Roundup was Safe** ..... 10

1. Monsanto never tested the product it actually sold. ..... 10
2. Monsanto attacked IARC, ghostwrote the science, and suppressed adverse findings. ..... 12
3. Monsanto worked to blunt EPA's own findings. ..... 13
4. The epidemiology pointed at NHL, and Monsanto's own exposure study confirmed real-world uptake. ..... 13

**C. Marketing and Safety Claims Directed at Ordinary Consumers Like the Abels** ..... 13

**D. Sandra Abel's Exposure, Diagnosis, Treatment, and Death** ..... 14

**E. Experts** ..... 15

**IV. Argument** ..... 16

**A. Plaintiff's Design-Defect, Negligence, and Warranty Claims Are Not Preempted Because They Regulate Roundup's Composition, Not Its Label.** ..... 16

1. *Durnell* Preempts Only the Label-Based Failure-to-Warn Theory, and *Bates v. Dow*'s Design-Defect Holding Remains Undisturbed. ..... 16
2. Monsanto's "Everything Boils Down to Failure-to-Warn" Argument Is the Discredited *Bates v. Dow* Inducement, Effects-Based Test. ..... 18
3. Plaintiff's Negligent-Design/Testing and Warranty Claims Are Independently Not Preempted. ..... 19
4. Monsanto's Implied/Impossibility-Preemption Attack on the Redesign Theory Fails. ..... 20

**B. Genuine Disputes of Material Fact—Including Monsanto's Own Concealed Knowledge and Sandra Abel's Documented Exposure—Preclude Summary Judgment Under Ohio Law.** ..... 22

1. Whether Roundup's Risks Outweighed Its Benefits, and Whether a Feasible Alternative Design Existed, Are Jury Questions Under R.C. 2307.75 that Monsanto Cannot Resolve on This Record. ..... 22

2. The consumer-expectation factor requires no expert testimony, and it is independently triable here. ....... 22

3. Feasible alternative design is a jury question, not an automatic bar....... 23

4. Summary judgment is rarely appropriate in Ohio design-defect cases. ....... 25

5. Monsanto's expert-requirement authority is distinguishable. ....... 26

6. Monsanto's inherent-characteristic defense fails. ....... 27

**C. Whether Roundup Was a Substantial Factor in Sandra Abel's NHL and Death Is a Jury Question That is Outside the Scope of This Motion....... 28**

**D. R.C. 2307.71(B) and 2307.72 Channel Plaintiff's Negligent-Design/Testing Theories Into the Statutory Design-Defect and Failure-to-Warn Framework—They Do Not Entitle Monsanto to Summary Judgment. ....... 30**

1. Negligence (Count I)....... 31

2. Design Defect (Count II). ....... 31

3. Failure to Warn (Count III). ....... 31

4. Implied Warranty (Count IV). ....... 32

5. CSPA (Count V). ....... 34

**V. Conclusion ....... 34**

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

## TABLE OF AUTHORITIES

### Cases


*Adkins v. Yamaha Motor Corp., U.S.A.*, 17 N.E.3d 654 (Ohio App. 2014) .................................. 26

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)........................................................................ 8

*Baker v. Chevron*, 680 F. Supp. 2d 865 (S.D. Ohio 2010)...................................................... 28

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005)..........................................7, 16, 17, 19

*Cascone v. Herb Kay Co.*, 6 Ohio St.3d 155 (Ohio 1983) .............................................. 29

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................. 9

*Clay v. Ford Motor Co.*, 215 F.3d 663 (6th Cir. 2000) ...................................................... 23, 25

*Cremeans v. Internatl. Harvester Co.*, 6 Ohio St.3d 232 (1983)........................................ 26

*DeGidio v. Centocor*, 3 F. Supp. 3d 674 (N.D. Ohio 2014)................................................ 28

*Dilts v. Penske Logistics, LLC*, 769 F.3d 637 (9th Cir. 2014)................................................ 9

*Freas v. Prater Constr. Corp.*, 60 Ohio St.3d 6 (Ohio 1991) ............................................ 32

*Fulgenzi v. PLIVA, Inc.*, 140 F.Supp.3d 637 (N.D. Ohio 2015)........................................ 31

*Grantges v. Monsanto Co.*, No. 20SL-CC02256 (Cir. Ct. St. Louis Cnty.), May 29, 2025 Tr. ........................................................................................................ 24

*Great N. Ins. Co. v. BMW of N. Am. LLC*, 84 F. Supp. 3d 630 (S.D. Ohio 2015) ...........22, 24, 25

*Holyfield v. Chevron U.S.A., Inc.*, 533 F. Supp. 3d 726 (E.D. Mo. 2021) ..........................8, 21, 34

*Huffman v. Electrolux Home Prods., Inc.*, 129 F. Supp. 3d 529 (N.D. Ohio 2015)..................... 26

*Hughes v. Oklahoma*, 441 U.S. 322 (1979)........................................................................ 18

*In re Roundup Prods. Liab. Litig.*, 2019 WL 3219360 (N.D. Cal. July 12, 2019) (*Hardeman*)............................................................................................ 19

*Jacobs v. E.I. du Pont de Nemours & Co.*, 67 F.3d 1219 (6th Cir. 1995) ................................... 27

*Kovach v. Wheeling & Lake Erie Ry. Co.*, 556 F. Supp. 3d 762 (N.D. Ohio 2021)...................... 29

*Krumpelbeck v. Breg, Inc.*, 759 F. Supp. 2d 958 (S.D. Ohio 2010)............................................ 32

*Lasley v. Nguyen*, 876 N.E.2d 1274 (Ohio App. 2007) ........................................................ 26

*Lonzrick v. Republic Steel Corp.*, 218 N.E.2d 185 (Ohio 1966)............................................ 33

*McConnell v. Cosco, Inc.*, 238 F. Supp. 2d 970 (S.D. Ohio 2003)........................................ 32

*McGrath v. Gen. Motors Corp.*, 26 F. App'x 506 (6th Cir. 2002)............................................ 27

*Miller v. ALZA Corp.*, 759 F. Supp. 2d 929 (S.D. Ohio 2010) ................................................ 30

*Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585 (Ohio 1991) .............................................. 29

*Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472 (2013)................................................................ 20

*Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521 (6th Cir. 2012) ...................... passim

*O.M. ex rel. McConnell v. KLS Martin LP*, 560 F.Supp.3d 1084 (N.D. Ohio 2021) ............. 31, 32

*Ornella v. Robertson*, 14 Ohio St.2d 144 (Ohio 1968)........................................................ 29

*Parker v. ACE Hardware Corp.*, 104 N.E.3d 298 (Ohio App. 2018) ........................................ 31

*Piskura v. Taser Int'l*, 2012 WL 5378805 (S.D. Ohio 2012) .................................................. 30

*Pliva, Inc. v. Mensing*, 564 U.S. 604 (2011)........................................................................ 9, 20




BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

*Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671 (6th Cir. 2011) ........ 28
*Rees v. W.M. Barr & Co.*, 736 F. App'x 119 (6th Cir. 2018) ........ 23
*Schaffner v. Monsanto Corp.*, 113 F.4th 364 (3d Cir. 2024) ........ 21
*Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192 (1981) ........ 32
*Sidloski v. Fischer*, 75 N.E.3d 680 (Ohio App. 2025) ........ 25, 26, 29
*State Farm Fire & Cas. Co. v. Chrysler Corp.*, 37 Ohio St.3d 1, 523 N.E.2d 489 (1988) ........ 23
*Terry v. Caputo*, 115 Ohio St.3d 351, 875 N.E.2d 72 (Ohio 2007) ........ 28
*Tompkin v. Am. Brands*, 219 F.3d 566 (6th Cir. 2000) ........ 20, 33
*Trejo v. Johnson & Johnson*, 13 Cal. App. 5th 110 (2017) ........ 20
*White v. DePuy, Inc.*, 718 N.E.2d 450 (Ohio App. 1998) ........ 19, 33
*Williams v. Chrysler First Fin. Servs. Co.*, 97 N.E.3d 1123 (Ohio App. 2017) ........ 12, 27, 29
*Wimbush v. Wyeth*, 619 F.3d 632 (6th Cir. 2010) ........ 30
*Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597 (1991) ........ 17
*Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883 (8th Cir. 2005) ........ 21
*Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281 (6th Cir. 2015) ........ 20
*Zang v. Cones*, 34 N.E.3d 955 (Ohio App. 2015) ........ 27

**Statutes**

40 C.F.R. § 152.44 ........ 20, 21
7 U.S.C. § 136j ........ 20
7 U.S.C. § 136v(a) ........ passim
Ohio Revised Code Section 2307.71 ........ 30
Ohio Revised Code Section 2307.72 ........ 27, 29, 30
Ohio Revised Code Section 2307.75 ........ passim
Ohio Revised Code Section 2307.76 ........ 30, 31

**Rules**

Federal Rule of Civil Procedure 56 ........ 8

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

# I. INTRODUCTION

Sandra Abel sprayed Roundup at her own home for more than two decades, developed non-Hodgkin lymphoma, and died on February 20, 2021, at age 61. She used Roundup exactly as Monsanto marketed it—week after week, Spring through Fall, Mrs. Abel spot-sprayed weeds and poison ivy in her garden beds, wearing shorts and garden shoes, no mask, and no gloves, and without ever reading the label—because she and her husband assumed, as ordinary consumers do, that a weed killer sold on the shelves of Home Depot and Lowe's "should be safe." **Exhibit A**, Abel Dep. Tr. 99:04-100:03. It was not. Monsanto now asks this Court to end her family's case before a jury ever hears why.

Monsanto's motion rests on a single move: relabeling. It contends that all five of Plaintiff's Ohio-law claims "boil[] down" to one preempted failure-to-warn theory—that Monsanto should have put a cancer warning on the Roundup label—and that, once so recharacterized, every claim falls under *Monsanto Co. v. Durnell*, 146 S.Ct. 2001 (2026). But the preemption question in this case turns on a clean binary. If a claim requires Monsanto to change its *label*, it is preempted under *Durnell*. If a claim instead requires Monsanto to sell a reasonably safe, non-defectively-designed *product*, it survives under *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005)—the framework the Supreme Court reaffirmed in *Durnell* and whose design-defect holding *Durnell* left entirely undisturbed. *Durnell* "did not address design-defect claims." 146 S.Ct. at 2012.

Plaintiff concedes that a pure cancer-warning, failure-to-warn theory is expressly preempted by *Durnell*. But, in contrast to what Monsanto claims, Plaintiff's other claims are viable, independent claims—far from failure-to-warn in disguise. Plaintiff's design-defect, negligent-design/testing, and warranty claims are not "label-based claims." They regulate the product Monsanto chose to sell.

This Opposition proceeds in two parts. First, on preemption: (a) Plaintiff's design-defect, negligent-design/testing, and warranty claims regulate Roundup's chemical composition, not its label, and are therefore not preempted under *Bates v, Dow*, whose

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

design-defect holding *Durnell* left intact; (b) Monsanto's "everything is really failure-to-warn" argument is the discredited inducement, effects-based test the *Bates* majority expressly rejected; and (c) Monsanto's impossibility-preemption attack on any reformulation theory fails because FIFRA § 136v(a) preserves state authority to regulate a pesticide's sale, and *Holyfield v. Chevron U.S.A., Inc.*, 533 F. Supp. 3d 726 (E.D. Mo. 2021), forecloses implied preemption of product-based claims. Second, on the merits under Ohio law, genuine disputes of material fact—Monsanto's own decades of concealed carcinogenicity evidence and Sandra Abel's documented exposure, illness, and death—are quintessential jury questions under Ohio Revised Code Section 2307.75's risk-benefit test, which Ohio courts have repeatedly held is "rarely" resolved on summary judgment. In sum, the Court must deny the Motion.

Monsanto spent more than five decades concealing what it knew about Roundup's carcinogenicity while telling regulators, scientists, and consumers like the Abels that the product was as safe as table salt. That record, and Sandra Abel's own twenty-plus years of exposure, belong to a jury—not to summary judgment.

## II. <u>LEGAL STANDARD</u>

### A. Monsanto Bears the Burden of Showing No Genuine Dispute of Material Fact Exists on Any Element of Plaintiff's Claims.

Summary judgment is appropriate only where the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine"—and summary judgment must be denied—where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view all facts and draw all reasonable inferences in the light most favorable to Plaintiff, the non-moving party, and may neither weigh the evidence nor make credibility determinations at this stage. Summary judgment is warranted against a party who fails to make a showing sufficient to establish an essential element

on which it bears the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) But *Celotex* cuts against Monsanto here. This is not a failure-of-proof case: Plaintiff has come forward with affirmative documentary and expert evidence on every disputed element—the Omnibus Statement of Material Facts documenting Monsanto's own knowledge, testing failures, and concealment; deposition testimony establishing Sandra Abel's real-world exposure; and case-specific expert opinion that Roundup poses a cancer hazard in humans and was more likely than not a substantial cause of her NHL. A record of that depth is the opposite of the evidentiary vacuum *Celotex* addressed.

Moreover, federal preemption is an affirmative defense, and Monsanto bears the burden of establishing it. *E.g.*, *Pliva, Inc. v. Mensing*, 564 U.S. 604, 634 (2011) ("Because pre-emption is an affirmative defense, a defendant seeking to set aside state law bears the burden to prove impossibility."); *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 649 (9th Cir. 2014). The movant must identify the portions of the record showing the absence of a genuine issue on the essential elements of the nonmovant's claims; only then does the burden shift to the nonmovant to identify specific facts showing a genuine issue for trial; and throughout, the evidence must be construed most strongly in favor of the nonmoving party. *Id.*

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

## III. STATEMENT OF FACTS

Plaintiff incorporates by reference the Omnibus Statement of Material Facts filed by MDL leadership ("POSF").[1] (Doc. 22675.) The facts below marshal, first, Monsanto's own regulatory and scientific record as documented in the POSF, and second, Sandra Abel's individual exposure, diagnosis, and death as established in the deposition of her surviving husband, Augustus W. Abel, III.

[1] Plaintiffs' Omnibus Statement of Material Facts in Opposition to Monsanto's Post-*Durnell* Motions for Summary Judgment, Doc. 22675, *In re: Roundup Products Liability Litigation*, MDL No. 2741, Case No. 3:16-md-02741-VC (N.D. Cal.). All subsequent citations are to "POSF ¶ __."

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

### A. Roundup, Glyphosate, and Monsanto's Regulatory History Generally

EPA first approved glyphosate-based herbicides for sale in 1974, classified glyphosate as "unlikely to cause cancer in humans" in 1991, reiterated that classification in 1993, and re-examined but adhered to that position in 2017 and 2019 after the International Agency for Research on Cancer classified glyphosate as a probable human carcinogen in 2015.

In March 2015, an eighteen-scientist IARC Working Group classified glyphosate as Group 2A, "probably carcinogenic to humans," based on epidemiology (non-Hodgkin's lymphoma and other hematopoietic cancers), animal studies, and mechanistic and genotoxicity data; IARC published its full analysis in 2017 as IARC Monograph Volume 112. POSF ¶¶ 111-112. IARC found that "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong"—confirming what Monsanto's own consultant, Dr. James Parry, had told the company sixteen years earlier. POSF ¶¶ 113-114.

### B. Monsanto Never Tested the Formulated Product it Sold, Monsanto Manipulated the Science, and Monsanto Told Regulators and Consumers Roundup was Safe

#### 1. Monsanto never tested the product it actually sold.

Monsanto has never conducted a long-term carcinogenicity study of formulated Roundup itself; all of its carcinogenicity testing was limited to the glyphosate "active ingredient" alone. POSF ¶¶ 12, 15, 47. Monsanto's original 1971–1974 long-term carcinogenicity studies were performed by Industrial Bio-Test Laboratories (IBT); a former Monsanto-employed toxicologist, Dr. Paul Wright, planned and oversaw the IBT rodent studies, then returned to Monsanto and edited and approved the draft IBT reports before their submission to EPA. *Id.* at ¶¶ 16-17, 22. By 1977, IBT executives privately told Monsanto that the glyphosate oncogenicity studies were probably "fraud[ulent]"; Monsanto did not report this to EPA, and in August 1978, EPA

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

independently found the studies invalid and ordered Monsanto to repeat them "as soon as possible." *Id.* at ¶¶ 18-23. In December 1980, Monsanto nonetheless distributed roughly 40,000 copies of a "Herbicide Bulletin" falsely claiming that the IBT studies had been repeated and that formulated Roundup itself had been tested and found not to cause chronic effects. *Id.* at ¶ 25. In 1981 and 1984, Monsanto toxicologist Paul Wright and IBT executive Moreno Keplinger were criminally indicted and convicted of fraud; Monsanto continued employing Wright and paid $1.3 million for his legal defense. *Id.* at ¶¶ 26-28.

The 1983 Knezevich & Hogan repeat mouse study showed a statistically significant, dose-related increase in kidney tumors, and EPA's own reviewer called glyphosate "oncogenic" based on it. *Id.* at ¶¶ 31-32, 35-36. Monsanto never conducted the second repeat mouse oncogenicity study EPA ordered in 1986; its position was that a true chronic study of the formulated product would amount to feeding animals "soap" and would kill the test animals. *Id.* at ¶¶ 45, 47.

Meanwhile, formulated Roundup—which contains the surfactant POEA—has repeatedly been shown to be more toxic and genotoxic than glyphosate alone. A 1990 Martinez rat study found Roundup's toxicity "greater than could be accounted for" by glyphosate or POEA alone. *Id.* at ¶ 48. Studies in 1993, 1997, and 1998 found that formulated Roundup produced significantly more DNA and chromosomal damage than glyphosate alone. *Id.* at ¶¶ 50(a)-(c). And a 2013 Mesnage study found some formulations up to 1,000 times more toxic than glyphosate alone. *Id.* at ¶ 102. By 1998, Monsanto already had a non-POEA agricultural formulation in Europe and could have removed POEA from the U.S. product but did not; after the European Union recommended banning POEA-containing Roundup in 2016, Monsanto sold non-POEA formulations in Europe but not in the United States. *Id.* at ¶¶ 122-123.

**2. Monsanto attacked IARC, ghostwrote the science, and suppressed adverse findings.**

Monsanto began planning a campaign to discredit IARC as early as 2014—before the review even occurred—and by February 2015 was prepared to launch an "orchestrated outcry." *Id.* at ¶ 109. IARC itself has stated that Monsanto undertook "unprecedented, coordinated efforts to undermine the evaluation, the program and the organization" that "deliberately and repeatedly misrepresented the Agency's work." *Id.* at ¶ 115. After the 2A classification, Monsanto ghostwrote five articles published in a 2016 special issue of *Critical Reviews in Toxicology* through an "expert panel" assembled via Intertek; by 2018, the journal had issued corrections to all five for failing to disclose Monsanto, employee, or contractor involvement in authorship. *Id.* at ¶¶ 116-117.

The ghostwriting was longstanding. Monsanto's in-house scientists ghostwrote the "Williams (2000)" article concluding that Roundup "does not pose a health risk to humans," attributing it to outside scientists with no disclosure of Monsanto's authorship; that article was cited 822 times over twenty-five years and relied upon in thirty-six international regulatory decisions before being retracted in December 2025 for undisclosed Monsanto contributions and for excluding other long-term carcinogenicity studies that "may have skewed the interpretation of the data." *Id.* at ¶¶ 64-70. When Monsanto hired genotoxicologist Dr. James Parry hoping he would clear glyphosate of genotoxicity concerns, and his February 1999 report instead concluded that glyphosate produces genotoxicity "both in vivo and in vitro," Monsanto pressured him to change his conclusion, then disregarded him and resolved to "find/develop someone who is comfortable with the genetox profile of glyphosate/Roundup." *Id.* at ¶¶ 58-61. Monsanto's own chief toxicologist, Donna Farmer, repeatedly cautioned internally that Monsanto "cannot say that Roundup is not a carcinogen . . . we have not done the necessary testing on the formulation to make that statement"—even as the company told the public and regulators the opposite. *Id.* at ¶ 90. And in the early 2000s, Monsanto terminated its own TNO dermal-absorption study after preliminary results



BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

showed roughly 10% dermal absorption for formulated Roundup—above the significant-risk threshold—out of concern that the results had the "potential . . . to blow Roundup risk evaluations." *Id.* at ¶¶ 72-76.

**3. Monsanto worked to blunt EPA's own findings.**

After EPA classified glyphosate as a Group C "possible" oncogen in 1985, Monsanto complained about "serious negative economic repercussions" and internally discussed whether there was any way to remove the classification "short of finding a tumor in the control group." *Id.* at ¶¶ 35, 38. Facing an EPA Scientific Advisory Panel review, Monsanto's Lyle Gingerich wrote that "[w]e can make a difference by lining up a large number of experts on our side"; Monsanto then brought nine paid consultants to the panel meeting and secured a finding of "equivocal," averting the practical effect of the Group C classification. *Id.* at ¶¶ 42-43.

**4. The epidemiology pointed at NHL, and Monsanto's own exposure study confirmed real-world uptake.**

Hardell and Eriksson (1999) reported a statistically significant increased incidence of NHL associated with glyphosate exposure—the first major epidemiologic signal. *Id.* at ¶ 79. IARC's March 2015 finding specifically identified NHL and other hematopoietic cancers as the cancers most associated with glyphosate exposure. *Id.* at ¶ 111. And Monsanto's own "Farm Family Exposure Study" (2000–02 data, published 2004) found that 60%—and up to 87% in one region—of forty-eight farmers had detectable urinary glyphosate on the day of spraying, and that 29% used no rubber gloves: real-world use exactly as the Abels used the product. *Id.* at ¶¶ 93-96.

**C. Marketing and Safety Claims Directed at Ordinary Consumers Like the Abels**

Monsanto marketed glyphosate and Roundup as "non-toxic," "practically nontoxic," "safe as table salt," and—per its sales representatives—"safe enough to drink"

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

and the "safest chemical on the market," in decades of television and print advertising depicting users spraying bare-handed, and it encouraged use "where kids and pets'll play." POSF ¶¶ 11, 49, 52-54, 63, 77-78. In 1996, the New York Attorney General sued Monsanto for false and misleading advertising representing Roundup as "safer than table salt" and "practically non-toxic"; Monsanto agreed to stop that language in New York only, with no evidence it changed its advertising elsewhere. *Id.* at ¶ 54. Monsanto's own 2015 market research found that "the safety of residential Roundup is not a top-of-mind concern for today's consumer," and it identified reassurance talking points that it then adopted as core messaging after IARC. *Id.* at ¶ 110.

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

### D. Sandra Abel's Exposure, Diagnosis, Treatment, and Death

Mrs. Abel applied consumer Roundup at two Ohio homes: 168 Hawthorne Boulevard in Delaware, Ohio (from approximately 1995 to early 2003), and 3130 Winding Woods Drive in Powell, Ohio (from December 2003 to the present). **Exhibit A**, Abel Dep. Tr. 14:01-14:04, 39:22-39:24, 66:15-66:23, 67:12-67:13, 74:01-74:05. Mrs. Abel consistently used the standard gallon-container Roundup product with an attached trigger-spray wand (no mixing required), as well as a "Roundup Poison Ivy Killer" trigger-bottle product used more heavily at the Powell property. *Id.* at 68:10-68:12, 68:22-24, 69:11-19, 73:02-08, 85:14-18, 86:05-10, 96:08-10. Her application was spot-spraying "as needed," at least weekly to every one or two weeks during spring through fall, over roughly 1995 to 2019. *Id.* at 70:02-72:17, 105:11-21. Plaintiff's expert Dr. Sol Bobst estimated at 72 to 192 spraying events. **Exhibit B**, Bobst. Rpt. At *11.

Mrs. Abel spent an estimated three days per week in the planting beds during a typical growing-season week, for three to five hours at a time, weeding and gardening, and she also always handled already-dead, Roundup-killed weeds two to four days after spraying. **Exhibit A**, Abel Dep. Tr. 58:03-58:07, 143:14-144:13. Her protective equipment was minimal and inconsistent: shorts, sometimes closed-back garden shoes, and occasionally cloth-backed rubber-fingered gloves used only when digging in dirt, not

tied to spraying; *Id.* at 77:11-78:08, 98:07-10. Neither Mr. Abel nor, to his knowledge, Mrs. Abel exhaustively read the Roundup product label. *Id.* at 98:20-99:02. Their operating assumption, Mr. Abel testified, was that a product sold "at . . . a major store" "should be safe," that generally "people don't read" labels, and that he continued using Roundup because the advertising said it "kills weeds" and, in his experience, "it works." *Id.* at 99:04-100:03.

In mid-May 2020, Mrs. Abel developed dizziness and blurry vision. After a June 2020 fall, a scan revealed a tumor in her right frontal lobe, and she was diagnosed with non-Hodgkin's lymphoma—believed to be the diffuse large B-cell type—with additional tumors on both adrenal glands and one breast believed to be metastatic. *Id.* at 127:05-129:12. She was diagnosed at St. Ann's Hospital and transferred to Ohio State University, where she received R-CHOP chemotherapy in infusion cycles roughly every six weeks from July to mid-November 2020, followed by a bone marrow transplant beginning just before Christmas 2020. *Id.* at 128:12-15, 131:09-134:10. Mrs. Abel died on February 20, 2021. *Id.* at 134:11-14.

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

**E. Experts.**

Plaintiff's designated general-causation experts are Dr. Charles Jameson, Dr. Christopher Portier, Dr. Beate Ritz, and Dr. Dennis Weisenburger. Monsanto's motion does not challenge, address, or even mention these experts. On specific causation, Dr. Sol Bobst opines that glyphosate "poses a cancer hazard in humans" and that Decedent's "lifetime cumulative exposure exceeded what would have been considered a safe amount of glyphosate exposure" (**Exhibit B**, Bobst Rpt. at *11), and Dr. Khaleel Ashraf opines that "use of Roundup was more likely than not a substantial cause of her development and diagnosis of NHL" (**Exhibit C**, Ashraf Rpt. at *27).

Finally, the alternative-cause facts Monsanto is expected to emphasize—that no treating physician attributed Sandra's NHL to Roundup, and that she had comorbidities (borderline overweight, cervical fusions, gallbladder removal), a family history of heart

Bey & Associates, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

disease and possible (undiagnosed) maternal dementia, and other household chemical exposures (latex paint, ant and wasp spray, rodenticide)—do not resolve causation as a matter of law. At most they create competing inferences for the jury to weigh. *See infra* Argument Section IV.B.

## IV. <u>Argument</u>

### A. Plaintiff's Design-Defect, Negligence, and Warranty Claims Are Not Preempted Because They Regulate Roundup's Composition, Not Its Label.

#### 1. *Durnell* Preempts Only the Label-Based Failure-to-Warn Theory, and *Bates v. Dow*'s Design-Defect Holding Remains Undisturbed.

Plaintiff begins with a concession the law compels. In *Monsanto Co. v. Durnell*, 146 S. Ct. 2001 (2026), the Supreme Court held that FIFRA, 7 U.S.C. § 136v(b), expressly preempts a state-law failure-to-warn claim that would require Monsanto to add a cancer warning to Roundup's label—because EPA's registration approval of the label without a cancer warning is itself a federal labeling requirement, and a state cancer-warning duty is "in addition to or different from" it. *Durnell*, 146 S. Ct. at 2009, 2011. To the extent Plaintiff's failure-to-warn claim seeks a cancer warning on the label, it is preempted, and Plaintiff does not contend otherwise.

But *Durnell* did not sweep as broadly as Monsanto's Motion needs it to. The Court distinguished safety claims from efficacy claims and expressly confined its holding to the failure-to-warn theory before it. As the Court put it: "when it comes to safety claims, EPA's registration determinations do reflect EPA's considered judgment that a pesticide's label is not false or misleading and contains all necessary warnings. So, safety claims that would impose labeling requirements 'in addition to' or 'different from' those required under FIFRA are preempted." *Durnell*, 146 S. Ct. at 2012 (emphases added). Every operative word in that passage speaks to "labeling requirements." *Durnell* did not address design-defect claims. *Id.*

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

The framework *Durnell* applied comes from *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005), and *Bates v. Dow* draws the line this case turns on. Under *Bates v. Dow*, a state-law rule is expressly preempted only if it satisfies both prongs of a two-part test: (1) the rule is a "requirement for labeling or packaging," and (2) it is "in addition to or different from" FIFRA's requirements. *Id.* at 444. A rule that is not a labeling or packaging requirement fails the first prong and is not preempted, full stop. And the *Bates v. Dow* Court held categorically—in language *Durnell* left untouched—that product-design and testing rules are not labeling or packaging requirements:

> "Rules that require manufacturers to design reasonably safe products, to use due care in conducting appropriate testing of their products, to market products free of manufacturing defects, and to honor their express warranties or other contractual commitments plainly do not qualify as requirements for 'labeling or packaging.' . . . Thus, petitioners' claims for defective design, defective manufacture, negligent testing, and breach of express warranty are not pre-empted."

*Bates v. Dow*, 544 U.S. at 444, 446. So too, the Court explained, "rules governing the design of a product . . . are not pre-empted." *Id.* at 444. There is no field preemption; FIFRA § 136v(a) affirmatively preserves state authority. *Id.* at 441-42 (citing *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597 (1991)).

The rule that governs this section is therefore simple, and it is the spine of everything that follows: a claim that regulates a *product*, rather than its *label*, remains outside the scope of FIFRA preemption; only a claim that requires a label change falls within it. Plaintiff's design-defect, negligent-design/testing, and warranty claims regulate the product Monsanto sold. They survive.

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

**2. Monsanto's "Everything Boils Down to Failure-to-Warn" Argument Is the Discredited *Bates v. Dow* Inducement, Effects-Based Test.**

Monsanto's core preemption argument is that each of Plaintiff's five claims, "in substance," "boil[s] down" to a failure-to-warn theory—that Monsanto should have included a cancer warning. To get there, Monsanto relies on *Bates v. Dow* itself, for the proposition that "disguised" failure-to-warn claims pled as negligent-testing, defective-design, or manufacturing-defect claims still qualify as "requirements for labeling." Motion at *7 (*citing Bates v. Dow*, 544 U.S. at 446 and 457.) But the language Monsanto invokes is from Justice Thomas's separate opinion concurring in part, not from the majority. And the theory Monsanto builds on it is precisely the inducement, effects-based test the *Bates v. Dow* majority rejected.

The *Bates v. Dow* majority squarely refused to hold that a state-law claim is preempted merely because a jury verdict might "induce" a manufacturer to change its label. As the Court explained, "[t]his effects-based test finds no support in the text of § 136v(b), which speaks only of 'requirements.'" *Bates v. Dow*, 544 U.S. at 445-46. The statutory question is whether the state-law rule *is* a labeling requirement—not whether complying with it might, as a practical matter, prompt a manufacturer to alter its label. A design-defect rule that says "sell a reasonably safe product" imposes no labeling requirement, even if one way a manufacturer might respond is to change what it says on the box. Monsanto's argument asks this Court to resurrect the very test *Bates v. Dow* buried.

Monsanto's own authority underscores the point. Monsanto cites *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979), for the principle that a court "is not bound by the name, description or characterization given [a claim]" and must look to its "practical impact." Plaintiff agrees—and that principle defeats Monsanto, not Plaintiff. The "practical impact" of a design-defect claim is a demand that Monsanto change the product's chemical composition and formulation—glyphosate combined with POEA—not a demand that it change its label. Monsanto's own authority instructs the Court to

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

look past labels to substance, and the substance of this claim is the product's formulation.

Monsanto also leans on this Court's own post-trial reasoning in *Hardeman*, where the Court observed that, on the record there, "the design defect claim [] merge[s] into the failure-to-warn claim" because "the defect [is] the absence of a warning." *In re Roundup Prods. Liab. Litig.*, 2019 WL 3219360, at *2-3 (N.D. Cal. July 12, 2019). That reasoning does not reach this claim, and it distinguishes itself. *Hardeman* addressed a design-defect theory in which the alleged defect *was* the absence of a warning. Plaintiff's design-defect theory here is not that. Plaintiff alleges that the defect is the product's *composition*—the glyphosate-plus-POEA formulation—and that practical, feasible reformulations existed: POEA-free formulations, and glyphosate-free formulations built on other EPA-registered active ingredients. That is a theory about the safety of the product itself, and it is exactly the theory *Bates v Dow* protects. The design-defect claim here is not a labeling requirement in disguise; it is a rule about the safety of the product itself.

### 3. Plaintiff's Negligent-Design/Testing and Warranty Claims Are Independently Not Preempted.

The same analysis independently protects Plaintiff's negligence and warranty theories. As to negligent testing and design, *Bates v. Dow* is explicit that rules requiring manufacturers "to use due care in conducting appropriate testing of their products . . . plainly do not qualify as requirements for 'labeling or packaging.'" *Bates v Dow*, 544 U.S. at 444. Monsanto's decades-long refusal to conduct a long-term carcinogenicity study of the formulated product it actually sold (POSF ¶¶ 12, 15, 45, 47) is the paradigm of a testing-duty claim that regulates conduct, not label text.

And as to warranty, *Bates* holds that claims to "honor their express warranties or other contractual commitments" and "breach of express warranty are not pre-empted." *Id.* at 444, 446. *See also*, *White v. DePuy, Inc.*, 718 N.E.2d 450, 456 (Ohio App. 1998)

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

([W]e find that the common-law cause of action of implied warranty in tort continues to exist even after the enactment of the Ohio Products Liability Act in 1988."); *accord Tompkin v. Am. Brands*, 219 F.3d 566, 576 (6th Cir. 2000).

**4. Monsanto's Implied/Impossibility-Preemption Attack on the Redesign Theory Fails.**

Monsanto's fallback is impossibility preemption. It argues that even a reformulation theory is preempted because FIFRA prohibits selling a pesticide whose "composition" differs from the composition described at registration, 7 U.S.C. § 136j(a)(1)(C), and because the same regulation that governs label changes, 40 C.F.R. § 152.44(a), governs composition changes—so Monsanto could not have unilaterally reformulated Roundup without EPA approval. Monsanto builds this argument on the FDCA drug cases: *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 483-84, 486, 490 (2013) (redesign "not possible" without new agency approval; "[w]hen federal law forbids an action that state law requires, the state law is without effect"); *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011) (impossibility turns on "whether the private party could independently do under federal law what state law requires of it"); *Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281, 298 (6th Cir. 2015); and *Trejo v. Johnson & Johnson*, 13 Cal. App. 5th 110, 147 (2017).

The drug cases do not transfer to FIFRA, because the two regulatory regimes are structurally opposite. A brand-name drug manufacturer holds a federal *right* to market its product once FDA approves it, and FDA approval is what makes the product lawful to sell; that is why a state-law duty to redesign collides with federal law in *Bartlett* and *Mensing*. FIFRA registration is different in kind. It is a conditional, revocable *license*, not a right to sell, and—critically—FIFRA leaves the States with independent authority to regulate or even to ban a pesticide's sale outright. Section 136v(a) expressly preserves state authority to "regulate the sale or use" of a pesticide, up to and including prohibiting it. 7 U.S.C. § 136v(a). Because a State may lawfully bar the sale of Roundup

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

as formulated, a state-law duty not to sell a defectively designed product does not require Monsanto to do anything federal law forbids; it can comply with both by not selling the defective formulation. That structure forecloses impossibility preemption of product-based claims.

The controlling authority on this point is *Holyfield v. Chevron U.S.A., Inc.*, 533 F. Supp. 3d 726 (E.D. Mo. 2021), which rejected exactly the impossibility argument Monsanto presses here. Following *Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883 (8th Cir. 2005), *Holyfield* held that design-defect and implied-warranty claims are not expressly preempted, and that EPA registration did "not impliedly preempt any common law duty . . . with respect to claims including defective design . . . including those [pesticides] that could not be redesigned." That holding disposes of Monsanto's fallback whether or not any particular reformulation would itself have required a new registration.

For completeness on the circuit-split posture only, *Schaffner v. Monsanto Corp.*, 113 F.4th 364 (3d Cir. 2024), a pre-*Durnell* decision, found failure-to-warn preempted via the EPA preapproval regulation, 40 C.F.R. § 152.44(a). *Schaffner* addressed the failure-to-warn theory now subsumed by *Durnell* and is irrelevant to the design-defect question here.

Because Monsanto cannot show that it was legally impossible to comply with both federal and state law as to Roundup's composition, its impossibility-preemption fallback fails on this record. That alone forecloses summary judgment on preemption grounds as to the design-defect, negligence, and warranty claims.

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

**B. Genuine Disputes of Material Fact—Including Monsanto's Own Concealed Knowledge and Sandra Abel's Documented Exposure—Preclude Summary Judgment Under Ohio Law.**

**1. Whether Roundup's Risks Outweighed Its Benefits, and Whether a Feasible Alternative Design Existed, Are Jury Questions Under R.C. 2307.75 that Monsanto Cannot Resolve on This Record.**

To prevail on a design-defect claim under Ohio law, a plaintiff must prove by a preponderance of the evidence that (1) the product was defective in design under R.C. 2307.75 and (2) the defect was a proximate cause of the harm. *Great N. Ins. Co. v. BMW of N. Am. LLC*, 84 F. Supp. 3d 630, 650 (S.D. Ohio 2015). Section 2307.75 supplies a risk-benefit test: a product is defective in design if, when it left the manufacturer's control, its foreseeable risks exceeded its benefits. The statute enumerates the factors. The foreseeable-risk factors under subsection (B) include (1) the nature and magnitude of the risks; (2) the users' likely awareness of the risks; (3) the likelihood of harm; (4) conformity to applicable product standards; and (5) "the extent to which that design or formulation is more dangerous than a reasonably prudent consumer would expect"—the consumer-expectation factor. R.C. 2307.75(B)(1)-(5). The benefit factors under subsection (C) include (1) the product's utility, including performance and safety advantages; (2) the technical and economic feasibility of an alternative design or formulation; and (3) the foreseeable risks of an alternative. R.C. 2307.75(C)(1)-(3). The court weighs the risks against the benefits according to these statutory factors. *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 529 (6th Cir. 2012).

**2. The consumer-expectation factor requires no expert testimony, and it is independently triable here.**

Monsanto's merits attack rests almost entirely on the premise that Plaintiff must produce an alternative-design expert. But at least one independently sufficient statutory factor requires no expert at all. As the Sixth Circuit has held, "[t]he determination of whether a product is more dangerous than an ordinary person would

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

expect is generally a question of fact which does not require expert testimony." *Newell Rubbermaid*, 676 F.3d at 530. And "evidence of unsafe, unexpected product performance is sufficient to infer the existence of a product defect." *Clay v. Ford Motor Co.*, 215 F.3d 663, 671 (6th Cir. 2000) (quoting *State Farm Fire & Cas. Co. v. Chrysler Corp.*, 37 Ohio St.3d 1, 523 N.E.2d 489, 495 (1988)).

The record on this factor is not close. Sandra Abel used Roundup exactly as an ordinary consumer would—spot-spraying weeds and poison ivy in her own garden, without reading the label, wearing minimal protective equipment, on the shared belief that a product sold "at . . . a major store" "should be safe." **Exhibit A**, Abel Dep. Tr. 99:04-100:03. What an ordinary consumer would expect of that product is a jury question, and Monsanto's own decades of "safe as table salt" marketing (POSF ¶¶ 11, 49, 52-54, 63, 77-78) is itself evidence bearing on it. Monsanto spent years shaping consumer expectations of safety; that same conduct is now evidence of a genuine dispute on the consumer-expectation factor. A reasonable jury could readily find that a weed killer that probably causes NHL is "more dangerous than a reasonably prudent consumer would expect." R.C. 2307.75(B)(5).

### 3. Feasible alternative design is a jury question, not an automatic bar.

Ohio law provides that "[a] product is not defective in design . . . if, at the time [it] left the control of its manufacturer, a practical and technically feasible alternative design or formulation was not available that would have prevented the harm . . . without substantially impairing the usefulness or intended purpose of the product." R.C. 2307.75(F). The burden of showing a feasible alternative rests on the plaintiff. *Rees v. W.M. Barr & Co.*, 736 F. App'x 119, 124 (6th Cir. 2018). But where a plaintiff presents an alternative, its adequacy is for the jury: "it is a question for the jury whether such a design is practical, technically feasible, and [does not substantially impair] the

usefulness or intended purpose." *Great N. Ins.*, 84 F. Supp. 3d at 658 (denying summary judgment even without testing data confirming the alternative's exact performance).

Plaintiff acknowledges candidly that a risk-benefit theory generally requires expert testimony "where aspects of the defect or the proposed alternative designs are technically complex and outside the understanding of a lay juror." *Newell Rubbermaid*, 676 F.3d at 529-30. A chemical carcinogen and its reformulation are technically complex, and Plaintiff does not overstate the "no expert needed" point beyond the consumer-expectation factor specifically. Even so, this record contains substantial non-expert, documentary, and testimonial evidence of a feasible alternative—the kind of proof *Great Northern* held sufficient to reach a jury even without testing data confirming the alternative's exact performance:

- By 1998, Monsanto already had a non-POEA agricultural formulation in Europe and could have removed POEA from the U.S. product but did not. POSF ¶¶ 122-123.
- After the European Union recommended banning POEA-containing Roundup in 2016, Monsanto sold non-POEA formulations in Europe but not in the United States. POSF ¶ 123.
- Monsanto's own current non-glyphosate Roundup formulation uses four EPA-registered active ingredients—Triclopyr TEA salt, Diquat Dibromide, Fluazifop-P-butyl, and Imazapic-ammonium—that, according to the sworn offer-of-proof testimony of Monsanto's own toxicologist Dr. Donna Farmer, "have each been EPA-registered and used safely in herbicides for decades," and "none of those ingredients have been determined to be carcinogenic, or classified as carcinogenic, by IARC." *Grantges v. Monsanto Co.*, No. 20SL-CC02256 (Cir. Ct. St. Louis Cnty.), May 29, 2025 Tr.
- The September 25, 2026 MDL-leadership summary of the draft omnibus statement flags this evidence as decisive: the newer glyphosate-free Roundup formulation—rather than the POEA-free formula alone—is the strongest

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

alternative-design evidence absent case-specific expert testimony tying POEA removal to reduced risk for the individual plaintiff. POSF ¶¶ 71, 122-128.

That Monsanto itself developed, registered, and now sells a glyphosate-free Roundup built on non-carcinogenic active ingredients is powerful proof that a "practical and technically feasible alternative . . . formulation" existed, R.C. 2307.75(F)—proof that a jury, not the Court, must weigh.

**4. Summary judgment is rarely appropriate in Ohio design-defect cases.**

"[S]ummary judgment will rarely be granted in design-defect claims because questions of '[f]oreseeable uses of a product, foreseeable risks . . ., benefits . . ., and consumer expectations . . . are ordinarily all factual questions.'" *Great N. Ins.*, 84 F.Supp.3d at 654 (citing *McWilliams v. S.E. Inc.*, No. 5:07CV3700, 2009 WL 3625173, at *3 (N.D.Ohio Oct. 29, 2009)). Indeed, "as long as a genuine issue of material fact exists as to any nonexclusive factor [under R.C. 2307.75(B)], the Court should find that whether a foreseeable risk exists is a question for the jury." *Great N. Ins.* 84 F.Supp.3d at 652. The Sixth Circuit has applied the same principle, affirming the denial of judgment as a matter of law for a manufacturer where risk-benefit, consumer-expectation, and proximate cause were all jury questions on which "reasonable minds could reach different conclusions." *Clay v. Ford*, 215 F.3d at 671-72. And circumstantial evidence of causation suffices: a plaintiff "need show only that its hypothesis is more probable than other potential causes." *Newell Rubbermaid*, 676 F.3d at 531-32.

Ohio's most recent word on this question is directly on point and controls the analysis. In *Sidloski v. Fischer*, 275 N.E.3d 680 (Ohio App. 2025), the court reversed summary judgment for a manufacturer, holding that design defect (including feasible alternative design), the adequacy of warnings, and proximate cause were all jury questions under Ohio's risk-benefit test. *Id.* at 692-94. Critically, the Court held it was reversible error to grant summary judgment based on a single statutory factor without

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

conducting the complete R.C. 2307.75(B)-(C) risk-benefit analysis: "the trial court was under a mandatory obligation to consider the factors in R.C. 2307.75(B) and (C), among any others, and determine whether the risks outweighed the benefits . . . [T]he trial court considered a single factor concerning warnings when it granted summary judgment . . . Therefore, the trial court improperly applied R.C. 2307.75[.]" *Id.* at 693-94. And on feasible alternative design specifically, the court held that "[a]t a minimum, there exists a genuine issue of material fact as to whether a technical and economically feasible alternative design . . . was available at the time it left [the manufacturer's] control that could mitigate risk under a risk-benefit analysis"—rejecting the trial court's conclusion that the feasibility question was too complex and technical for lay resolution where reasonable minds could differ. *Id.* at 694. The risk-benefit and consumer-expectation standards, moreover, "are not mutually exclusive but instead constitute a cohesive, two-pronged test"; if the jury concludes that one standard is not met, it may consider the other. *Cremeans v. Internatl. Harvester Co.*, 6 Ohio St.3d 232 (1983), as applied in *Sidloski*. Monsanto asks this Court to commit the precise error *Sidloski* reversed: to resolve a design-defect claim on the single question of warnings, without ever conducting the full statutory risk-benefit analysis the jury is entitled to perform.

Bey & Associates, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

**5. Monsanto's expert-requirement authority is distinguishable.**

Monsanto relies on *Huffman v. Electrolux Home Prods., Inc.*, 129 F. Supp. 3d 529, 541 (N.D. Ohio 2015) (quoting *Adkins v. Yamaha Motor Corp., U.S.A.*, 17 N.E.3d 654, 661 & n.2 (Ohio App. 2014)), and *Lasley v. Nguyen*, 876 N.E.2d 1274, 1278 (Ohio App. 2007), for the proposition that expert testimony is required in all but the simplest design-defect cases. Those cases involved genuinely complex mechanical and engineering questions beyond lay comprehension—in *Adkins*, the rollover stability of an off-road recreational vehicle, which the court found "more akin to the design of an automobile." But *Adkins* itself holds only that "expert testimony is required when the subject matter involves a question of scientific inquiry which is not within the

knowledge of lay witnesses," while recognizing that "a products liability plaintiff need not always present expert testimony to support a design defect claim." *Adkins*, 17 N.E.3d at 661. Here, the consumer-expectation factor is independently sufficient without expert testimony under *Newell Rubbermaid*, and the alternative-design factor is supported by Monsanto's own documentary and testimonial evidence of a reformulated product it developed, registered, and sells—evidence that does not depend on requiring the jury to master the chemistry unaided.

Monsanto's remaining merits authorities do not change the result. It cites *McGrath v. Gen. Motors Corp.*, 26 F. App'x 506, 510 (6th Cir. 2002); *Jacobs v. E.I. du Pont de Nemours & Co.*, 67 F.3d 1219, 1242 (6th Cir. 1995); and *Zang v. Cones*, 34 N.E.3d 955, 961 (Ohio App. 2015), for the proposition that the plaintiff bears the burden. Plaintiff does not dispute the burden; she has met it on this record. Monsanto also cites *Newell Rubbermaid*, 676 F.3d at 534, for the proposition that the absence of alternative-design evidence "alone is sufficient to warrant summary judgment." But that proposition presupposes a total absence of alternative-design evidence, expert or otherwise. This is not that record: the European reformulation, the EU POEA ban, and Monsanto's current glyphosate-free product all supply alternative-design evidence. As for Monsanto's proximate-cause argument—that Plaintiff has not shown "but for" causation between any failure to adopt an alternative design and the injury, citing R.C. 2307.72(A)(2) and *Williams v. Chrysler First Fin. Servs. Co.*, 97 N.E.3d 1123, 1128 (Ohio App. 2017)—that argument concerns the causation element and is addressed in Argument Section IV.B, so as not to conflate the design-defect element with the causation element.

**6. Monsanto's inherent-characteristic defense fails.**

To the extent Monsanto invokes R.C. 2307.75(E)—which bars a design-defect claim where the harm was caused by an "inherent characteristic . . . generic . . . that

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

cannot be eliminated without substantially compromising the product's usefulness . . . and which is recognized by the ordinary person"—the defense is unavailable on this record for two independent reasons. First, the reformulation evidence shows the risk *can* be eliminated: non-POEA and non-glyphosate formulations exist and are sold by Monsanto itself. The carcinogenic risk is not an unavoidable, inherent characteristic of an effective herbicide. Second, carcinogenicity is emphatically not "recognized by the ordinary person." The opposite is true—Monsanto spent decades and enormous resources, documented at length in Section III.B above, precisely to keep that fact from becoming known. A company cannot manufacture public ignorance of a hazard and then invoke that ignorance as a common-knowledge defense.

### C. Whether Roundup Was a Substantial Factor in Sandra Abel's NHL and Death Is a Jury Question That is Outside the Scope of This Motion.

Ohio's toxic-tort causation framework requires a plaintiff to establish (1) that the toxin is capable of causing the condition (general causation) and (2) that it in fact caused this claimant's condition (specific causation), and both require medical-expert testimony. *Terry v. Caputo*, 115 Ohio St.3d 351, 875 N.E.2d 72 (2007) (syllabus); *accord Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671 (6th Cir. 2011) (applying Ohio law); *DeGidio v. Centocor*, 3 F. Supp. 3d 674 (N.D. Ohio 2014); *Baker v. Chevron*, 680 F. Supp. 2d 865 (S.D. Ohio 2010). Both showings are triable here.

Dr. Sol Bobst opines that Sandra Abel's lifetime cumulative exposure exceeded a safe benchmark dose—by up to 5.33 times—over an estimated 72 to 192 spraying events between 1995 and 2019. **Exhibit B**, Bobst Report. Dr. Khaleel Ashraf opines that "use of Roundup was more likely than not a substantial cause of her development and diagnosis of NHL." **Exhibit C**, Ashraf Rpt. at 27.[2] To the extent Monsanto suggests that

---

[2] Monsanto has already brought motions in this case and in the MDL generally challenging Plaintiff's causation experts and has not prevailed. These issues are not before the Court.

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

the Abels' recalled spraying frequency is an estimate rather than an exact record, Ohio law is clear that such imprecision does not render specific-causation testimony insufficient. In *Kovach v. Wheeling & Lake Erie Ry. Co.*, 556 F. Supp. 3d 762 (N.D. Ohio 2021)—an NHL case arising from workplace toxic-chemical exposure—the court held that expert general and specific causation testimony was admissible, and that the lack of precise dose, duration, and intensity data did not render the specific-causation testimony unreliable. The Abels' good-faith estimates of weekly-to-biweekly spot-spraying over roughly twenty-four years are precisely the kind of exposure evidence *Kovach* held sufficient.

Under Ohio law, "an injury may have more than one proximate cause," and "when two factors combine to produce damage or illness, each is a proximate cause." *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 587-588 (Ohio 1991). The foreseeability test does not require the defendant to have foreseen the particular injury—only that the act was likely to injure someone. *Cascone v. Herb Kay Co.*, 6 Ohio St.3d 155, 160 (Ohio 1983). And proximate cause is ordinarily a jury question unless the evidence is so compelling that reasonable minds could reach only one conclusion showing an "obvious cause and effect relationship." *Ornella v. Robertson*, 14 Ohio St.2d 144, 151 (Ohio 1968).

Those principles defeat Monsanto's proximate-cause argument. Monsanto contends there is no "but for" causation between any failure to adopt an alternative design and Sandra Abel's injuries, citing R.C. 2307.72(A)(2) and *Williams v. Chrysler First Fin. Servs. Co.*, 97 N.E.3d 1123, 1128 (Ohio App. 2017), and notes that Drs. Bobst and Ashraf did not opine that a specific alternative design would have avoided the NHL. But *Sidloski* held that the trial court erred by applying a strict "but-for" standard rather than the proper substantial-factor proximate-cause standard—the very error Monsanto invites here. Causation as to Roundup is well-supported (and unchallenged as to general causation); the further question whether a different formulation would have avoided this specific harm folds into the risk-benefit and alternative-design dispute already

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

shown to be triable in Argument Section IV.A above, and it is not a separate, dispositive gap.

### D. R.C. 2307.71(B) and 2307.72 Channel Plaintiff's Negligent-Design/Testing Theories Into the Statutory Design-Defect and Failure-to-Warn Framework—They Do Not Entitle Monsanto to Summary Judgment.

Ohio's Product Liability Act (OPLA) governs. Section 2307.71(B) provides that R.C. 2307.71 to 2307.80 are "intended to abrogate all common law product liability claims or causes of action" (2005 S.B. 80, eff. Apr. 7, 2005, superseding *Carrel v. Allied Products*, 78 Ohio St.3d 284 (1997)). *See Wimbush v. Wyeth*, 619 F.3d 632 (6th Cir. 2010). Common-law negligence and implied-warranty-in-tort product claims are abrogated. *Miller v. ALZA Corp.*, 759 F. Supp. 2d 929 (S.D. Ohio 2010); *Ace Am. Ins. Co. v. Gerling*, 630 F. Supp. 3d 919 (S.D. Ohio 2022). Section 2307.72(C) carves out economic-loss claims "other than a product liability claim," which may proceed under common law or the UCC, but that carve-out does not reach personal-injury or wrongful-death claims. *Piskura v. Taser Int'l*, 2012 WL 5378805 (S.D. Ohio 2012).

But abrogation is not a merits win for Monsanto; it is a re-labeling point. OPLA does not extinguish the underlying factual disputes—it channels them. The abrogation provisions direct the negligent-design and negligent-testing theories in Count I into the statutory design-defect claim under R.C. 2307.75, and direct any failure-to-warn theory into the statutory failure-to-warn claim under R.C. 2307.76. The conduct that matters—Monsanto's design and testing failures, documented throughout Section III.B, above and Argument Section IV.B, above—remain fully triable under the statutory framework. Abrogation simply tells the jury and the Court which statutory vehicle carries that conduct; it does not entitle Monsanto to summary judgment on the core statutory design-defect claim, which is independently triable under Argument Section IV.B.

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

Applied to Monsanto's specific arguments:

**1. Negligence (Count I).**

Monsanto cites *O.M. ex rel. McConnell v. KLS Martin LP*, 560 F. Supp. 3d 1084, 1092 (N.D. Ohio 2021), and *Parker v. ACE Hardware Corp.*, 104 N.E.3d 298 (Ohio App. 2018), for the proposition that negligence, negligent failure to warn, and negligent misrepresentation are abrogated OPLA claims. This is a misunderstanding of what "abrogated" means. Plaintiff concedes that the negligence *label* is abrogated. But the underlying negligent-design and negligent-testing conduct proceeds as part of the statutory design-defect claim's risk-benefit analysis: Monsanto's testing failures and its knowledge of the risk are directly relevant to R.C. 2307.75(B)(1)-(2) (the nature and magnitude of the foreseeable risks and the users' likely awareness of them), regardless of the label affixed to the cause of action.

**2. Design Defect (Count II).**

For reasons extensively discussed in Sections IV.A and IV.B, above, the Abels' Strict Products Liability – Design Defect claim must survive under R.C. 2307.75.

**3. Failure to Warn (Count III).**

Plaintiff's label-based failure-to-warn claim is preempted by *Durnell*. But, Plaintiff's failure-to-warn claims based on Monsanto's conduct outside the label itself—particularly Monsanto's advertising and marketing of Roundup—are not preempted.

Ohio's failure-to-warn statute, R.C. 2307.76, has three elements: (1) a duty to warn against reasonably foreseeable, known-or-knowable risks; (2) breach; and (3) proximate cause. *McConnell*, 560 F.Supp.3d at 1090.; *Fulgenzi v. PLIVA, Inc.*, 140 F.Supp.3d 637 (N.D. Ohio 2015). The statute recognizes both an at-time-of-marketing theory under subsection (A)(1) and a post-marketing theory under subsection (A)(2), each requiring that the manufacturer "knew or . . . should have known about a risk," and it provides an open-and-obvious/common-knowledge exception under subsection

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

(B). The duty is limited to known or knowable risks. *Krumpelbeck v. Breg, Inc.*, 759 F. Supp. 2d 958 (S.D. Ohio 2010). Where an inadequate warning is given, a rebuttable presumption of proximate cause applies. *McConnell v. Cosco, Inc.*, 238 F. Supp. 2d 970 (S.D. Ohio 2003).

Except for the preempted label-based claims, the adequacy of a warning is "a matter of fact, not law," and "is appropriately resolved by a jury and not on a motion for summary judgment." *Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 198 (1981). Any conflict in testimony, including that of experts, is a question to be resolved by the jury in a failure-to-warn case. And a manufacturer breaches the duty to warn only if it "knew, or should have known, in the exercise of ordinary care, of the risk or hazard about which it failed to warn," and failed to take the precautions a reasonable manufacturer would take. *Freas v. Prater Constr. Corp.*, 60 Ohio St.3d 6, 9 (Ohio 1991).

Most important, the preemption of the failure-to-warn *claim* does not exclude Monsanto's knowledge from this case. The concealment, testing-failure, and ghostwriting record documented in Section III.B, above, remain independently admissible and highly relevant to the surviving theories: these go directly to the design-defect risk-benefit analysis under R.C. 2307.75(B)(1)-(2) (Section IV.A) and to the negligence-channeled evidence within the statutory framework (Section IV.D). Preemption of one theory does not collapse the others, and it does not strip this evidence from the claims that survive. Whatever becomes of the failure-to-warn label, Monsanto's concealment record does not disappear from this case—it goes to the jury under the design-defect and negligence-channeled theories that survive *Durnell* intact.

**4. Implied Warranty (Count IV).**

Monsanto argues abrogation (*McConnell*) plus lack of privity, citing *Curl v. Volkswagen of Am., Inc.*, 871 N.E.2d 1141, 1147 (Ohio 2007), and the deposition testimony that the Abels purchased Roundup from Home Depot, Lowe's, Zettler's

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

Hardware, Orchard, and Oakland Nursery—not directly from Monsanto. **Exhibit A**, Abel Dep. pp.67-68, 76, 85. Neither of these applies.

Monsanto is incorrect to say that OPLA abrogated all common law implied warranty claims. Ohio Courts have said just the opposite. *White v. DePuy, Inc.*, 718 N.E.2d 450, 456 (Ohio App. 1998) ([W]e find that the common-law cause of action of implied warranty in tort continues to exist even after the enactment of the Ohio Products Liability Act in 1988."); *accord Tompkin v. Am. Brands*, 219 F.3d 566, 576 (6th Cir. 2000). Moreover, for reasons discussed above, even if OPLA abrogated common law implied warranty (which it does not), that would not negate warranty claims in Ohio. It simply pulls them under the statutory framework.

More importantly, *Curl v. Volkswagen* does not require privity in injury cases. *Curl* is a Magnuson-Moss Warranty / Ohio Lemon Law action and in that case, the Court required some privity of contract with the manufacturer. *Curl*, 871 N.E.2d at 1147 ("Thus, longstanding Ohio jurisprudence provides that purchasers of automobiles may assert a contract claim for breach of implied warranty only against parties with whom they are in privity.") This holding provides no comfort to Monsanto, however, in the chemical company's latest attempt to avoid liability for injury under implied warranty theory because Ohio Courts have said that no privity is required for injury claims: "It is, then, settled law in this state, [. . .] that there can be an action in tort, based upon breach of warranty, and no contractual relation between the plaintiff and the defendant is required." *Lonzrick v. Republic Steel Corp.*, 218 N.E.2d 185, 192 (Ohio 1966) (citations omitted); *accord McConnell*, 560 F.Supp.3d at 1091 ("An implied warranty claim may be brought on a tort-based theory or a contract-based theory. [. . .] Contract-based claims require privity between the parties; tort-based claims do not." (citation omitted).)

**5. CSPA (Count V).**

Finally, even if the Ohio Consumer Protection Act does not provide for personal injury, the Abels remain free to bring such a claim based in Monsanto's wrongful marketing and selling of Roundup.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's design-defect, negligent-design/testing, and warranty claims are not preempted: they regulate Roundup's composition, not its label, and fall within the design-defect framework *Bates v. Dow* established and *Durnell* left undisturbed. Monsanto's impossibility-preemption fallback fails under *Holyfield* and 7 U.S.C. § 136v(a). And genuine disputes of material fact—Monsanto's own decades-long concealment of Roundup's carcinogenicity, and Sandra Abel's documented twenty-plus years of real-world exposure, illness, and death—preclude summary judgment on the surviving Ohio-law claims under R.C. 2307.75's risk-benefit test and Ohio's general/specific causation framework. The Court should deny Monsanto's Motion for Summary Judgment.

September 28, 2026

BEY & ASSOCIATES LLC,

*/s/ James G. O'Brien*

James Griffin O'Brien (Ohio, California, Georgia)
BEY & ASSOCIATES LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327
T. 404.344.4448
E. jim@beyandassociates.com

*Trial Counsel for Plaintiff Augustus W. Abel, individually and on behalf of the Estate of Sandra Abel*

BEY & ASSOCIATES, LLC
4200 Northside Parkway NW, Bldg 9
Atlanta, Georgia 30327

**CERTIFICATE OF SERVICE**

I transmitted a true and accurate copy of the foregoing upon:

Joe G. Hollingsworth
HOLLINGSWORTH LLP
1350 I Street, N.W.
Washington, DC 20005
(202) 898-5800
Fax: (202) 682-1639
Email: jhollingsworth@hollingsworthllp.com

*Counsel for Monsanto Company*

by filing a copy on the Court's electronic filing system.

September 28, 2026

*/s/ James G. O'Brien*
James G. O'Brien (Ohio, California, Georgia)