**OSBORNE & FRANCIS LAW FIRM PLLC**
Joseph A. Osborne, Esq. (FL Bar No: 880043)
josborne@realtoughlawyers.com
J. Robert Bell III, Esq. (FL Bar No: 115918)
rbell@realtoughlawyers.com
925 S. Federal Highway, Suite 175
Boca Raton, FL 33432
(561) 293-2600 (ph)
(561) 923-8100 (fax)

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *Charles Fredric Reid,*<br><br>Plaintiff,<br><br>vs.<br><br>*Monsanto Company,*<br><br>Defendant | MDL NO. 2741<br><br>MDL NO. 3:16-MD-02741-VC<br>MEMBER CASE NO. 3:22-CV-04080<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT**<br><br>**Hearing:**<br>Date: November 16, 2026<br>Time: 1:00 pm<br>Place: San Francisco Courthouse Courtroom 3 |

## TABLE OF CONTENTS

**INTRODUCTION** ........ **1**

**BACKGROUND** ........ **1**

A. *Roundup.* ........ *1*

B. *Monsanto Promoted Roundup as Safe.* ........ *4*

C. *Reid's Use of Roundup and Resulting Cancer.* ........ *6*

**LEGAL STANDARD** ........ **8**

**ARGUMENT** ........ **9**

I. PLAINTIFF'S CLAIMS ARE NOT EXPRESSLY OR IMPLIEDLY PREEMPTED BY FIFRA. ........ 9

A. *Durnell Preempted Only Label-Based Failure-to-Warn Claims.* ........ *9*

B. *FIFRA Does Not Expressly Preempt Plaintiff's Claims.* ........ *14*

C. *FIFRA Does Not Impliedly Preempt Plaintiff's Claims.* ........ *15*

II. MONSANTO IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S DESIGN DEFECT CLAIM. ........ 17

A. *Evidence of a Safer Alternative Design Is Not Required Under North Carolina Law.* ........ *17*

B. *Plaintiff's Evidence Demonstrates the Existence of a Safer, Practical, Feasible and Reasonable Alternative.* ........ *20*

III. PLAINTIFF'S CLAIMS FOR EXPRESS WARRANTY AND IMPLIED WARRANTY ARE NOT PREEMPTED AND SURVIVE UNDER NORTH CAROLINA LAW. ........ 22

A. *Breach of Express Warranty.* ........ *23*

B. *Breach of Implied Warranty.* ........ *24*

**CONCLUSION** ........ **25**

## TABLE OF AUTHORITIES

**Cases**

*Ambat v. City & County of San Francisco*,
757 F.3d 1017 (9th Cir. 2014) ....................8

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................8

*Anderson v. Monsanto Co.*,
719 S.W.3d 755 (Mo. Ct. App. 2025)....................15

*Ansagay v. Dow Agrosciences LLC*,
153 F. Supp. 3d 1270 (D. Haw. 2015) ....................16

*Ascot Corp., LLC v. I&R Waterproofing, Inc.*,
286 N.C. App. 470 (2022) ....................23,25

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005).................... *in passim*

*Bernick v. Jurden*,
293 S.E.2d 405 (N.C. 1982)....................23,24

*Bluitt v. Wake Forest Univ. Baptist Med. Ctr.*,
259 N.C. App. 1 (2018) ....................20

*Burrell v. Bayer Corp.*,
918 F.3d 372 (4th Cir. 2019) ....................8

*Carson v. Monsanto Co.*,
72 F.4th 1261 (11th Cir. 2023) ....................11

*Covert v. Stryker Corp.*, No. 1:08CV447,
2009 U.S. Dist. LEXIS 68962 (M.D.N.C. Aug. 5, 2009)....................8,9

*DeWitt v. Eveready Battery Co.*,
550 S.E.2d 511 (2001) ....................18, 20, 24

*Eclipse Packaging, Inc. v. Stewarts of Am., Inc.*, Civ. Action No. 5:14-CV-00195-RLV-DCK,
2016 WL 3619120 (W.D.N.C. July 6, 2016)....................23,24

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
771 F.3d 1119 (9th Cir. 2014) ....................8

*Griffin v. Wheeler-Leonard & Co.*,
290 N.C. 185 (1976) ....................23,24

*Hardeman v. Monsanto (In re Roundup Prods. Liab. Litig.)*,
2019 U.S. Dist. LEXIS 116638 (N.D. Cal. July 12, 2019) .....15

*Holyfield v. Chevron U.S.A., Inc.*,
533 F. Supp. 3d 726 (E.D. Mo. 2021) .....16

*Indian Brand Farms, Inc. v. Novartis Crop Protection Inc.*,
617 F.3d 207 (3d Cir. 2010) .....23

*In re Roundup Prods. Liab. Litig.*,
364 F. Supp. 3d 1085 (N.D. Cal. 2019) .....15, 16

*Kinlaw v. Long Mfg. N. C., Inc.*,
259 S.E.2d 552 (N.C. 1979) .....23,24

*Lescs v. William R. Hughes, Inc.*,
1999 U.S. App. LEXIS 475 (4th Cir. Jan. 14, 1999) .....12,13

*Lowe v. Sporicidin Int'l*,
47 F.3d 124 (4th Cir. 1995) .....12

*Merck Sharp & Dohme Corp. v. Albrecht*,
587 U.S. 299 (2019) .....8

*Monsanto Co. v. Durnell*,
223 L.Ed.2d 553 (U.S. 2026) .....11

*Monsanto Co. v. Durnell*,
146 S. Ct. 2001 (2026) ..... *in passim*

*Nat. Res. Def. Council v. EPA*,
38 F.4th 34 (9th Cir. 2022) .....2

*N.Y. State Pesticide Coal., Inc. v. Jorling*,
874 F.2d 115 (2d Cir. 1989) .....22,23

*Pa. Nat'l Mut. Cas. Ins. Co. v. STIHL Inc.*,
2023 U.S. Dist. LEXIS 136364 (E.D.N.C. Aug. 4, 2023) .....18

*Pilliod v. Monsanto Co.*,
67 Cal. App. 5th 591 (2021) .....5, 15, 16

*Red Hill Hosiery Mill, Inc. v. Magnetek, Inc.*,
138 N.C. App. 70 (2000) .....21

*Smith v. Am. Honda Motor Co.*,
2016 U.S. Dist. LEXIS 45100 (M.D.N.C. Apr. 4, 2016)............................................20,21

*Sparks v. Oxy-Health, LLC*,
134 F. Supp. 3d 961 (E.D.N.C. 2015)..........................................................................20,21

*Spittler v. Look Sports, Inc.*,
859 F.2d 924 (9th Cir. 1988) ..........................................................................................23

*Walls v. Ford Motor Co.*,
2022 U.S. Dist. LEXIS 33778 (M.D.N.C. Feb. 25, 2022)..........................................18,19

*Weeks v. Home Depot U.S.A.*,
2020 U.S. Dist. LEXIS 188369 (C.D. Cal. Sep. 18, 2020).........................................16,17

*Worm v. Am. Cyanamid Co.*,
5 F.3d 744 (4th Cir. 1993) ...........................................................................................12,13

*Winebarger v. Bos. Sci. Corp. (In re Bos. Sci. Corp.)*,
2015 U.S. Dist. LEXIS 42625 (S.D. W. Va. Apr. 1, 2015)..............................................22

*Zetwick v. Cnty. of Yolo*,
850 F.3d 436 (9th Cir. 2017) ............................................................................................8

# TABLE OF AUTHORITIES

## Statutes & Regulations

Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA):

7 U.S.C. § 136 *et seq*. .......... *in passim*

7 U.S.C. § 136(p)(2) .......... 10

7 U.S.C. § 136v(a) .......... 10, 12, 16, 17

7 U.S.C. § 136v(b) .......... 10, 11,12

N.C. Gen. Stat. § 99B-6(a) .......... 17, 18, 19

N.C. Gen. Stat. § 99B-6(a)(2) .......... 18, 19

N.C. Gen. Stat. § 99B-6(b) .......... 20

N.C. Gen. Stat. § 25-2-314(1) .......... 25

N.C. Gen. Stat. § 25-2-314(2)(c) .......... 25

N.C. Gen. Stat. § 25-2-313(1)(b) .......... 23

## Other Authorities

Fed. R. Civ. P. 56(a) .......... 8

## <u>INTRODUCTION</u>[1]

This suit arises from Charles Fredric Reid ("Plaintiff" or "Reid") exposure to the herbicide Roundup, which was designed, manufactured, and distributed by Defendant Monsanto Company ("Defendant" or "Monsanto"). In *Durnell*, the Supreme Court recently held that the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") preempts state-law failure-to-warn claims against Monsanto for its failure to add a cancer warning to Roundup's EPA-approved and mandated label. *Monsanto Co. v. Durnell*, 146 S. Ct. 2001 (2026). *Durnell* can only apply to failure to warn claims because the only claim the jury at the trial court found in favor of the plaintiff was on product defect – failure to warn. **Ex. 1**, Durnell Verdict/Final Judgment. Pursuant to this decision, Monsanto cannot be sued for failing to change the Roundup label. However, as set forth below, the remainder of Reid's non-label-based allegations and causes of action are not preempted under *Durnell*, and Monsanto is not entitled to summary judgment on those claims.

## <u>BACKGROUND</u>[2]

### A. Roundup.

Roundup is not glyphosate alone. Its various formulations combine glyphosate with other ingredients, such as surfactants, in differing amounts. **Ex. 9**, *Barnes* Trial Transcript at 2580:15-18. Despite decades[3] of selling those formulated products—and extensive litigation alleging that Roundup causes cancer—Monsanto has never tested *formulated* Roundup itself for carcinogenicity. **Ex. 10**, *McKivison* Trial Transcript at 78:21-25. In 2003, Dr. Donna Farmer, Monsanto's Toxicology Programs manager, wrote in an e-mail to colleagues that "you cannot say that Roundup is not a carcinogen . . . we have not done the necessary testing on the formulation to make that statement." **Ex. 14**, Nov. 22, 2003 Farmer Email.[4] Meeting minutes of

[1] Plaintiff adopts and incorporates herein Plaintiffs' Omnibus Statement of Material Facts in Opposition to Monsanto's Post-Durnell Motions for Summary Judgment, filed simultaneously with this Response by MDL leadership.

[2] Unless otherwise noted, all exhibits are attached to the concurrently-filed Declaration of J. Robert Bell III.

[3] **Ex. 2**, Roundup 1974 Patent.

[4] Dr. Farmer was not just speculating that the safety profile of the formulated product *might* be different from glyphosate alone—she knew of scientific evidence that it was. In April 2002, Dr. Farmer flagged for her Monsanto

Monsanto's Chemical Stewardship Workgroup in 1999 reflect that Monsanto knew that if it wanted to make toxicological safety claims on formulated Roundup, it "must have the data for the formulated product—not just one of the ingredients." **Ex. 15**, Chemical Stewardship Workgroup Minutes at 2.

The EPA likewise has *never* evaluated the Roundup formulation, *never* found that the Roundup formulation was safe, and *never* found that the Roundup formulation does not cause cancer. *See Nat. Res. Def. Council v. EPA*, 38 F.4th 34, 41 n.2 (9th Cir. 2022).

Independent scientists, however, have studied the Roundup formulation and concluded that it was dangerous. *See, e.g.*, **Ex. 42**, Mae-Wan Hoe & Joe Cummins, *Glyphosate Toxic & Roundup Worse*, INST. OF SCIENCE IN SOC'Y (July 3, 2005) ("Roundup is always more toxic than its active ingredient, glyphosate; at least by two-fold. The effect increased with time, and was obtained with concentrations of Roundup 10 times lower than agricultural use."); *see also* Robin Mesnage et al., *Potential Toxic Effects of Glyphosate and its Commercial Formulations Below Regulatory Limits*, 84 FOOD & CHEM. TOXICOLOGY 133, 135 (2015) ("Glyphosate is never used without its adjuvants, which allow and enhance its herbicidal activity by promoting its toxicity."); Inna Székács et al., *Environmental and Toxicological Impacts of Glyphosate with its Formulating Adjuvant*, 8 INT'L J. AGRIC. & BIOL. ENG. 207, 211 (2014) ("The toxic effect of POEA and Roundup was seen as rapidly as in 10 minutes, followed for up to 24 hours, while glyphosate did not cause statistically significant difference in average cell area compared to the control.").

Meanwhile, Monsanto worked to foster a public perception of safety in glyphosate-based products, including by ghost-writing an influential study published in 2000. **Ex. 43**, May 11-12, 2000 Monsanto Email Chain.); *See* Naomi Oreskes & Alexander A. Kaurov, *The Afterlife of a Ghost-Written Paper: How Corporate Authorship Shaped Two Decades of*

colleagues a published study showing that the active ingredient and the finished formulation produced different effects, and she questioned whether the co-formulants might be responsible. **Ex. 21**, April 2002 Monsanto Email Chain. In response, Dr. William Heydens stated that Monsanto was "in fairly good shape with glyphosate but exposed with respect to surfactants," noting that the same trend appeared across multiple studies: glyphosate itself seemed acceptable, whereas the formulated product—which combined glyphosate with a surfactant—was associated with the observed harm. He also remarked: "A few years ago we narrowly avoided a problem regarding mutagenicity during the EU review." *Id.*

*Glyphosate Safety Discourse*, 171 ENVT. SCI. & POL'Y, No. 104160 (2025) (discussing Gary M. Williams et al., *Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient, Glyphosate, for Humans*, 31 REG. TOXICOLOGY & PHARM. 117 (2000), *retracted by* 165 REG. TOXICOLOGY & PHARM., No. 106006 (2026)); *see also* Sean Rossman, *Emails Show Monsanto Tried to 'Ghostwrite' Research*, USA TODAY (Mar. 16, 2017).

Monsanto executive Annette Kirk testified that Monsanto knew and understood the toxicity of POEA surfactants, and that Monsanto decided to retain POEA in its Roundup formulations. **Ex. 12**, Aug. 17, 2023, Kirk Dep. at 35:25–36:05; 210:07–211:02; 259:05–07, 09; 276:22–277:01; 277:07–08, 11. Kirk noted that POEA surfactants were in "[a]ll of the lawn and garden" product lines; she admitted that POEA surfactants were "not biologically inert;" that it was an intentional choice by Monsanto to include POEAs in the final product, and she had no explanation for why Monsanto never took them out despite POEA being banned in other countries. *Id.* at 217:06–217:17, 259:05–12; 259:21–260:04; 276:22–277:11; 303:05–14.

Despite this, Monsanto possessed an alternative design and formulation that was both feasible and available that it refused to release. **Ex. 16**, 2/7/2024 Farmer Tr. Testimony (*Cloud*) at 38:19–40:1; **Ex. 17**, Email re Potential Glyphosate Alternatives. As Dr. Richard P. Garnett, chair of Monsanto Europe's Glyphosate task force put it: "Anyway, there are non-hazardous formulations so why sell a hazardous one?" **Ex. 13**, Garnett Email.

Not only do these admissions show that Monsanto was aware its formulation was "hazardous," they also show Monsanto knew there were safer alternatives available to it for years.

Finally, in 2021, Monsanto's parent company, Bayer CropScience (which had acquired Monsanto in 2018), announced that it would discontinue its glyphosate-based products for the residential market. **Ex. 18**, *Hoffman v. Monsanto*, RFA 7. Since around 2023, Monsanto has used a different formulation for all U.S. lawn-and-garden products. *Id.* More specifically, Monsanto began selling Roundup in an alternative formulation, which now includes triclopyr, diquat dibromide, and fluazifop-P-butyl as the product's primary ingredients. Those ingredients

have replaced the glyphosate-based formulation of Roundup that caused Charles Fredric Reid's non-Hodgkins lymphoma.[5]

Monsanto's chief Roundup toxicologist, Dr. Farmer, has repeatedly conceded the feasibility of chemical alternatives to glyphosate under cross examination at trial. For example, in *Grantges*, Dr. Farmer testified that: (1) non-glyphosate alternatives have long been registered with the EPA and available to Monsanto, *see* **Ex. 19**, at 2792:3–2795:5; (2) Monsanto's non-glyphosate ingredients are safe and effective, *see id.* at 2795:11–2796:23; (3) unlike glyphosate, Monsanto's non-glyphosate ingredients are not known to be carcinogenic ("cancer causing"), *see id.* at 2796:24—2797:4; and (4) non-glyphosate options were financially feasible, *see id.* at 2897:5-10. This clear evidence of a safer alternative design for Roundup explains why the *Grantges* trial court denied summary judgment *and* directed verdict motions targeting the design defect claim. **Ex. 28**, *Grantges*, Order on Summary Judgment, May 4, 2025 at *17; **Ex. 29,** *Grantges*, Order on Directed Verdict, June 12, 2025.

### B. Monsanto Promoted Roundup as Safe.

Monsanto worked for decades to create a public perception that glyphosate-based Roundup was safe, including to Reid, but also agreed using it should not cause cancer. As Monsanto's own toxicologist testified:

> Q: Getting rid of the weeds in your driveway or your lawn is not worth getting cancer. That's an easy one, right, sir?
> A: Oh, yeah, I would agree.

**Ex. 10**, *McKivison* Trial Transcript at 48:21-49:1. Dr. Donna Farmer also acknowledged as much. When asked whether consumers should expect to use Roundup without getting cancer,

[5] *See* **Ex. 19**, *Grantges v. Monsanto*, Trial Tr., May 29, 2025, at 2784:12—2812:19; and 2891:10—2898:17.) *See also* **Ex. 20**, Donna Farmer Trial Test. Tr. 36-53, *Cloud*, No. N21C-08-279 (Feb. 7, 2024); **Ex. 22**, Email from P. Ratliff to D. Farmer (May 23 2017, 2:01 PM), MONGLY10813107-08; **Ex. 16**, Email from P. Ratliff to J. Rejda-Heath (June 9, 2017), MONGLY11134994-96; **Ex. 23**, Email from D. Wright to J. Hughes (June 4, 2019, 6:44 PM), MONGLY16047868-71; **Ex. 24**, EPA, Fluazifop-P-butyl Interim Registration Review Decision (Sept. 2020), at 5; **Ex. 25**, EPA, Diquat Interim Registration Review Decision (December 2019), at 4; **Ex. 26**, EPA, R.E.D. Facts Triclopyr at 1 (Oct. 1998); **Ex. 27**, Donna Farmer Trial Test., *Womack v. Monsanto Co*., No. 01642, Philadelphia Ct. of Common Pleas (Nov. 7, 2024) at 66:13-67:7. **Ex. 37**, Bayer Statement on Safety of new formula; **Ex. 31**, Patent on New Formulation.

she responded, "Yes, they should not worry about getting cancer, no." **Ex. 9**, *Barnes* Trial Transcript at 2567:8-19; 2580:9-2581:2.

But, even so, apart from everyday experience with the product, there are plenty of sources that would lead consumers to believe that Roundup does not cause cancer. Monsanto frequently made marketing claims that Roundup was safe, "practically nontoxic" and as harmless as products like table salt despite no valid cancer studies to support continued sale of Roundup. **Ex. 44**, Aug. 25, 1978 Letter; **Ex. 45**, AG Discontinuation Order. **Ex. 30**, Internal Farmer email. A consumer could open a newspaper and see senior Monsanto executives touting that "[g]lyphosate is the safest herbicide that has ever been invented…there is no medical or scientific evidence whatsoever that links the exposure of glyphosate to cancer," **Ex. 51**, October 24, 2017, The Guardian article, or see or hear Monsanto's CEO Hugh Grant on NPR tell them that "Roundup is not a carcinogen," **Ex. 11**, Mar. 31, 2016 NPR article. Or see an article on CBS News's website with Donna Farmer assuring them, "I can tell you glyphosate is safe." **Ex. 8**, June 29, 2016 CBS News article.

Monsanto made efforts to ghostwrite articles and its "aggressive attempt to discredit IARC." Monsanto spent millions – "somewhere near 35 to $40 million" – on single public relations agency, FleishmanHillard, Inc., to influence public opinion related to Roundup in the wake of the IARC Monograph. **Ex. 3**, FleishmanHillard Dep. at 77:06-13.

Monsanto's approach was to promote glyphosate-based Roundup as safe. When a new epidemiological study came out in the 2000s showing that exposure to glyphosate can more than double the risk of developing non-Hodgkin's lymphoma, Monsanto's response was "how do we combat this?" **Ex. 7**, Farmer Email. From these "efforts to manipulate scientific discourse," the "jury could infer not only that the potential cancer risk associated with glyphosate and Roundup was known or knowable… but also that ***Monsanto labored for decades to suppress knowledge of the risk***." *Pilliod v. Monsanto Co.*, 67 Cal. App. 5th 591, 623 (2021) (emphasis added).

Monsanto's own witness, James Guard, who was primarily responsible for all marketing claims made throughout the United States, admitted in his deposition that Monsanto's

advertisements depicted users wearing short sleeves and short pants. **Ex. 33**, Sept. 13, 2018, Guard Dep. at 6, 41–42, 108–109, 128, 158–159, 260; Sept. 14, 2018, Guard Dep. at 405–409. None of Monsanto's advertisements warned consumers to wear protective equipment, such as chemical resistant gloves or long pants. *Id.*[6] Monsanto pushed out talking points urging its spokespersons to vouch for the safety of not only glyphosate generally but the Roundup formulation in particular. **Ex. 36**, Guard Dep. Ex. 32. Critically, Monsanto's advertisements provided no indication of the information known to Monsanto, nor to the broader scientific concerns, over Roundup's cancer risk and safety profile. *Id.* ("[I]t's the totality of evidence from all scientific literature that provides regulators with complete confidence in the safety of Roundup."). Monsanto negligently made misrepresentations about the safety of glyphosate-based Roundup to the public at large, including Charles Fredric Reid.

### C. Reid's Use of Roundup and Resulting Cancer.

Charles Fredric Reid ("Dr. Reid") personally used Roundup herbicide for weed control between 1976 through his Non-Hodgkin's Lymphoma (NHL) diagnosis in 2016 (from ages 28 to 67), beginning while he was in his residency at the University of Florida then subsequently at various properties he resided at in North Carolina. *See* **Ex. 4**, Charles Fredric Reid Deposition excerpts at 61-109; **Ex. 5**., Dr. Robert M. Conry Expert Report at 20-22. Reid testified he used Roundup because he felt like it was the most effective, had talked to folks about it, and the brand Roundup itself was so common. **Ex. 4**, at 65:20-66:4. Reid, now a retired urologist, was diagnosed with NHL in July of 2016. **Ex. 5**, at 16-18. Due to the extensive R-CHOP

[6] In 1996, Monsanto was charged with disseminating false and misleading advertisements and was forced to "immediately cease and desist" from distributing their false and misleading advertisement that represented (falsely) that "glyphosate-containing pesticide products . . . are safe, non-toxic, harmless or free from risk." *Id.*; *see also* **Ex. 34**, Guard Dep. Ex. 19 at 9; **Ex. 35**, Guard. Dep. Ex. 29; **Ex. 36**, Guard Dep. Ex. 32**.** Moreover, Dr. William Reeves, Monsanto's lead regulatory toxicologist, has repeatedly testified on Monsanto's behalf regarding marketing and advertisements developed and disseminated to promote Roundup to consumers. Dr. Reeves acknowledged that the advertisements conveyed none of the internal concerns Monsanto was confronting, such as significant questions within the scientific literature concerning Roundup's genotoxicity. Instead, Monsanto's advertisements depicted individuals using Roundup in shorts, without gloves, masks, or any type of PPE at all. Dr. Reeves agreed that a consumer viewing Monsanto's advertisements would have the impression that Roundup was safe to use. **Ex. 40**. Monsanto Commercial; **Ex. 38**, Jan. 10, 2024, Reeves Tr. Testimony, at 64:12–15; 65:03–11; 66:03–06, 66:12–67:19; **Ex. 41**, Monsanto Commercial 2; **Ex. 39** , Jan. 11, 2024, Reeves Tr. Testimony, at 45:01–02; 45:05–17; 45:21–46:03; 46:07–46:16; 46:18–25.

chemotherapy treatment he received, Reid was forced to stop seeing patients, which led to his early retirement as the Medical Director of the Stone Center and in the medical field entirely. *Id.*

Reid mixed and sprayed Roundup while working on his private properties and residences consisting of acres of land in both Gainesville, Florida and in North Carolina over many years beginning in 1976 at the age of 28.[7] *Id.* at 20-22. He was exposed to the product over 39 years and totaled approximately 1,816 hours preceding his NHL diagnosis in 2016. *Id.*. Plaintiff Reid was diagnosed with diffuse large B cell lymphoma, a type of NHL, and he subsequently underwent a grueling and extensive course of R-CHOP chemotherapy. *Id.* at 23-25. His designated medical causation expert, oncologist Robert M. Conry, has testified as to his opinion that Dr. Reid's extensive use of Roundup caused or substantially contributed to his development of NHL. **Ex. 6**, Dr. Robert M. Conry Deposition excerpts at 175:20-176:12.

Reid filed his complaint on June 17, 2022[8] alleging causes of action that were not strictly based on the label[9], including negligence, design defect, and breach of express and implied warranties. *See* Member Dkt. No. 1. Indeed, the Complaint begins, "[t]his is an action for damages suffered by Plaintiff as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate." Member Dkt. No. 1.

There are no disguises in Reid's Complaint. His remaining claims are North Carolina state-law claims that are not based on Roundup's labels. To win this summary judgment motion,

---

[7] Monsanto does not contest the factual background in their motion.

[8] Reid filed his Complaint on June 17, 2022. Member Dkt. 1. Mr. Reid's case was originally assigned to Wave 7D and discovery in his case was commenced. Plaintiff filed an unopposed motion to move Mr. Reid's case from Wave 7D to 8B on February 21, 2024. (Member Dkt. No. 12). The Court granted the same on February 23, 2024. (Member Dkt. No. 13). Mr. Reid's deposition was taken, as well as that of the specific causation experts. Defendant did not file an initial motion for summary judgment. But did file a motion to exclude Plaintiff's expert on January 19, 2025. (Member Dkt No. 16). The Court denied that motion February 10, 2025. (Member Dkt No. 17). The case was then remand ready, and Plaintiff waited patiently, for the Court to remand the matter for trial since February 10, 2025. Monsanto filed its Petition for *writ of certiorari* on April 4, 2025 after the close of Wave 8 deadlines and almost two months after this case was remand ready.

[9] Reid also alleged a claim for failure to warn. In this case, Reid is no longer pursuing a label-based failure to warn claim, however in no way concedes North Carolina law does not permit non-label based failure to warn claims.

Monsanto would have to show that Reid's state-law claims *are* premised on Roundup product labels and packaging.[10] It cannot, and this Court should deny summary judgment.

## LEGAL STANDARD

Since summary judgment is a "drastic remedy" that cuts off a party's right to present their case to a jury, the moving party "bears the heavy burden of showing that there are no genuine issues of material fact" entitling them to judgment as a matter of law. *Ambat v. City & County of San Francisco*, 757 F.3d 1017, 1031 (9th Cir. 2014.); *see also* Fed. R. Civ. P. 56(a). To defeat the motion, the non-movant must only "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The proper question for the district court is whether, viewing the facts in the non-moving party's favor, summary judgment for the moving party is appropriate." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017); *see also*, *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). Where (as in most cases) the standard of proof at trial is a mere preponderance, the opposing party's evidence need only be such that "a fair-minded jury could return a verdict for the [opposing party] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In its role, the court may not "weigh" the evidence or determine its credibility for that is the function of the jury. *Id.* at 249-255. Summary judgment "is improper 'where divergent ultimate inferences may reasonably be drawn from the undisputed facts.'" *Fresno Motors*, 771 F.3d at 1125 (internal citation omitted).

Preemption is an affirmative defense; Monsanto bears the burden of pleading and proving that FIFRA preempts Plaintiff's claims. *Burrell v. Bayer Corp.*, 918 F.3d 372, 382 n.3 (4th Cir. 2019) ("It is well established, of course, that preemption is an affirmative defense. The burden of establishing preemption, in other words, is on the defendant"); *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 314 (2019) ("in order to succeed with [preemption] defense the manufacturer must show" elements of the defense). Defendant must overcome a "strong

[10] Plaintiff incorporates "comment k" briefing filed in Plaintiff Kathleen Jackson's Opposition to Defendant Monsanto Company's Supplemental Motion for Summary Judgment in the "Category 1" Cases Governed by Florida Law. MDL Dkt. 22667.

presumption" against preemption by showing Congress clearly and unmistakably intended to supersede state law. *Covert v. Stryker Corp.*, No. 1:08CV447, 2009 U.S. Dist. LEXIS 68962, at *32 (M.D.N.C. Aug. 5, 2009).

## ARGUMENT

### I. Plaintiff's Claims Are Not Expressly or Impliedly Preempted by FIFRA.

Monsanto contends that all of Plaintiff's claims are preempted under FIFRA following the Supreme Court's recent decision in *Durnell*. Specifically, Monsanto argues that (1) FIFRA expressly preempts Plaintiff's claims because they are all based on a failure to warn; and (2) FIFRA impliedly preempts any claim that would require Monsanto to reformulate Roundup. While the label-based failure-to-warn claims are preempted following *Durnell*, Plaintiff asserts numerous other claims that are *not* based on Monsanto's failure to warn on its Roundup labels, including negligence, design defect, breach of express warranty and breach of implied warranty, as well as failure-to-warn claims not based on the Roundup label.[11] Indeed, Plaintiff's Complaint addresses the inherently and unreasonably dangerous design of Roundup, Monsanto's knowledge of the design defect, Monsanto's negligence, and Monsanto's misdeeds and affirmative misstatements extending well beyond the label approved by the FDA. Because there is no basis to bar Plaintiff's claims that are not based solely on Roundup's label, Defendant's Motion should be denied.

#### A. *Durnell* Preempted Only Label-Based Failure-to-Warn Claims.

Prior to FIFRA, "the States provided the primary and possibly the exclusive source of regulatory control over the distribution of poisonous substances." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 437 (2005). FIFRA's predecessor introduced a federal role in pesticide regulation, but both it and FIFRA initially related only to "licensing and labeling." *Id*. "In 1972, Congress passed and President Nixon signed the Federal Environmental Pesticide Control Act" and "'transformed' FIFRA 'into a comprehensive regulatory statute,' and placed the newly created Environmental Protection Agency in charge of pesticide registration and labeling."

---

[11] For clarity, Plaintiff will not challenge the Roundup label under the rubric of any cause of action.

*Durnell*, 146 S.Ct. at 2006 (quoting *Bates*, 544 U.S. at 437). However, Congress explicitly preserved "the States' continuing role in pesticide regulation." *Bates*, at 438-39. Indeed, 7 U.S.C. § 136v(a) states that:

> (a) **In general.** A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this Act [7 USCS §§ 136 et seq.].

Notably, in the next paragraph, Congress expressly preempt label-based claims:

> (b) **Uniformity.** Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this Act [7 USCS §§ 136 et seq.].

7 U.S.C.S. § 136v(b). Taken together, these two provisions permit States to impose any restriction on the sale or use of pesticides *except* requirements for "labeling or packaging."[12]

The Supreme Court has repeatedly affirmed the narrow scope of FIFRA preemption, explaining that a State may "ban the sale of a pesticide if it finds, for instance, that one of the pesticide's label-approved uses is unsafe." *Bates*, 544 U.S. at 446; *Durnell*, 146 S.Ct. at 2008, n.2. In *Bates v. Dow Agrosciences LLC*, the Court considered whether claims for design defect, negligent design, warranty and other traditional torts were preempted by FIFRA. *Bates*, 544 U.S. at 436. The Fifth Circuit had taken an expansive view, holding that design defect and negligent design claims were "disguised" failure to warn claims because, if successful, the resulting reformulation would force defendant to change the label. *Id.* The Supreme Court ***rejected*** that reasoning, developing a two-step test to evaluate whether a state law fell within FIFRA's preemption provision: "First, [the state law or regulation] must be a requirement *'for labeling or packaging*'; rules governing the design of a product, for example, are not pre-empted. Second, it must impose a labeling or packaging requirement that is *'in addition to or different from*' those required under this subchapter." *Bates*, 544 U.S. at 444 (emphasis in original). "Rules that require manufacturers to design reasonably safe products, to use due care in conducting

[12] FIFRA defines "labeling" to mean only the "labels" or "written, printed, or graphic matter" that is "accompanying the pesticide" or "to which reference is made on the label or in literature accompanying the pesticide or device." 7 U.S.C. § 136(p)(2).

appropriate testing of their products, to market their products free of manufacturing defects, and to honor their express warranties or other contractual commitments plainly do not qualify as requirements for 'labeling or packaging'" and are not preempted. *Id*. at 444.

The Supreme Court's recent opinion in *Durnell* does not disturb *Bates*. *Durnell*, 146 S. Ct. at 2011. Unlike *Bates*, which involved design, testing, warranty, and other claims, *Durnell* involved only a "state tort claim [that] would require Monsanto to add a cancer warning to Roundup's label."[13] *Id*. at 2006. Indeed, the Supreme Court repeatedly and unambiguously made clear that *Durnell* addresses *only* a label-based failure-to-warn claim.[14] *See id.* at 2010 ("The question, then, is whether the Missouri failure-to-warn claim – which would require a cancer warning on the Roundup label – would impose a labeling requirement that is 'in addition to or different from' federal labeling requirements 'under' FIFRA"); *see also id.* at 2006 ("Durnell brought a failure-to-warn tort suit in Missouri state court against Monsanto for not including a cancer warning on Roundup's label"), 2010 ("the heart of Durnell's failure-to-warn claim under Missouri tort law is that Monsanto should have included a cancer warning on its Roundup labels"), 2011 ("Durnell's state tort claim … would require Monsanto to add a cancer warning to its labels"), 2014 (Durnell "faults Monsanto for *not using* a label different from the EPA-approved label"). Indeed, the Court expressly limited the grant of certiorari to "[w]hether the Federal Insecticide, Fungicide, and Rodenticide Act preempts a ***label-based failure-to-warn claim*** where EPA has not required the warning." *Monsanto Co. v. Durnell*, 223 L.Ed.2d 553 (U.S. 2026) (emphasis added).

The Supreme Court held that Durnell's label-based failure-to-warn tort claim was expressly preempted because FIFRA "prohibits States from imposing any pesticide labeling

---

[13] Notably, in setting up the circuit split that was *Durnell's* springboard, Monsanto strategically placed only the failure-to-warn issue before appellate courts, going so far as to pay a plaintiff $100,000 on the condition that he prosecute an appeal of the trial court's dismissal of his failure-to-warn claim. *E.g.*, *Carson v. Monsanto Co.*, 72 F.4th 1261, 1270 (11th Cir. 2023) (Wilson, J., dissenting) (where Carson sued under failure to warn, design defect, and other theories, and failure to warn was dismissed on preemption grounds, Monsanto engineered an appeal on this issue, as the dissent described: "The agreement required—not merely permitted—Carson to file a notice of appeal challenging the district court's preemption decision. It required—not merely permitted—Carson to fully prosecute this appeal or face forfeiture of nearly the entire $100,000 payment.").

[14] The underlying reason for this is *Durnell* could not have decided anything other than product defect – failure to warn because the jury only returned a verdict in favor of Plaintiff for product defect- failure to warn. *See* **Ex.1,** Durnell Verdict/Final Judgment

requirements that are 'in addition to or different from' the federal labeling requirements 'under' FIFRA." *Id*. at 2006 (quoting 7 U.S.C. 136v(b)). In doing so, the Court considered Congressional intent to maintain "an efficient nationwide market" by ensuring "uniformity" and granting manufacturers "the ability to sell a product throughout the country with a single label." *Id*. at 2012. Notably, the Court clarified that the uniformity proviso *only applies to the label* and that states retain the power to regulate: "States remain free to 'regulate the sale or use of any federally registered pesticide.' [7 U.S.C.] § 136v(a). For example, a State could outright ban a pesticide within its borders." *Id*. at 2008, n.2. Indeed, during the oral argument, when asked by Justice Coney-Barrett whether FIFRA preempts design defect claims, Monsanto's counsel conceded that "[t]hey're only preempted if they are disguised as failure-to-warn claims," distinguishing medical device jurisprudence because "although they're worded similarly, the preemption clause in the medical device amendments sweeps in design defect claims. And, here, it's really just on the labeling." **Ex. 46**, *Monsanto Co. v. Durnell*, No. 24-1068, Transcript of Oral Argument, April 27, 2026, at 31-32. Counsel continued: "So, with that caveat, design defect claims are not preempted." (*Id*. at 32.) The Deputy Solicitor General agreed with Monsanto's counsel, further noting that such claims survive as "*Bates* itself recognizes." *Id*. at 50. Now, Monsanto has changed up its playbook and incorrectly argues that they are.

Pre-*Bates* and *Durnell*, the Fourth Circuit also held that FIFRA has limited preemptive scope. *Worm v. Am. Cyanamid Co.*, 5 F.3d 744, 745 (4th Cir. 1993). "[T]he Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq*., does not, expressly or by implication, preempt the field of pesticide regulation or a more narrowly defined field, but it does preempt conflicting state law causes of action that impose a duty to provide a warning in addition to or different from federally established labeling requirements." *Id.*; *Lescs v. William R. Hughes, Inc.*, No. 97-2278, 1999 U.S. App. LEXIS 475, at *20-22 (4th Cir. Jan. 14, 1999) ("the statutory language clearly implements the narrow purpose of Congress to effect uniform labeling and packaging of pesticides"). Consistent with the Supreme Court's subsequent holding in *Durnell*, the Fourth Circuit held that claims are preempted only if they are based upon EPA-approved labeling language. *Lowe v. Sporicidin Int'l*, 47 F.3d 124, 129 (4th Cir. 1995) ("[i]n

FIFRA, Congress has expressly preempted the states from imposing 'requirements for labeling or packaging in addition to or different from those required under this subchapter,' and has *not* expressly preempted the states from imposing other kinds of requirements" (emphasis in original)). State law claims for negligent testing, formulation, and manufacture are not preempted. *Worm v. American Cyanamid Co.*, 5 F.3d 744, 749 (4th Cir. 1993); *Lescs*, 1999 U.S. App. LEXIS 475, at *22-23 ("Claims that relate to a product defect such as 'negligent testing, manufacturing, and formulating' or that were based upon a state law allowing a claim for the breach of a FIFRA-created duty, however, generally are not preempted").

Other courts have similarly held that label-based failure to warn claims are preempted by FIFRA—both before and after *Durnell*.[15] However, Monsanto is not effectively immune from all product liability claims involving Roundup. Neither FIFRA nor the EPA's specific determination that cancer warnings are not required for glyphosate-based pesticide labels protect Monsanto for its culpability for formulating its herbicide so as to cause cancer. The *Durnell* opinion makes clear that plaintiffs are only barred from suing Monsanto on the theory that the label should have read differently. Plaintiff's other pleaded claims that do not address what the Roundup label did or did not say are *not* barred.

---

[15] *See* **Ex. 47**, *Rubin v. Monsanto Co.*, Transcript of Status Conference (D. Mass. July 29, 2026), at 4:4-9 ("I believe that *Durnell* left open other state law claims, such as other types of product defect and consumer claims that are not based on warning theories like design defect claims and possibly a non-label failure to warn claim that rests on the allegation that Monsanto could have warned outside the product labeling"); **Ex. 48,** *Shull v. Monsanto Co.*, Order Denying Summary Judgment (Mo. Cir. August 31, 2026) ("it would be an unwarranted expansion of [the Supreme Court's] holding [in *Durnell*] to extend it to design defect and negligence claims that were not before the Court"); **Ex. 49,** *Alison v. Monsanto Co.*, Order Concerning Motion for Summary Judgment (Mo. Cir. Sept. 9, 2026), at 15-16 (denying summary judgment on negligence and design defect because "Plaintiff has pleaded and seeks to present evidence to the jury that Monsanto did or failed to do more than use an adequate label"); **Ex. 50**, *Aretino v. Monsanto Co.*, No. 20SL-CC3676, Order Concerning Defendant's Amended Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment (Mo. Cir. Ct. Sept. 9, 2026), at 29 (denying summary judgment in part, "Plaintiffs may continue on their claims for negligence (Count I), strict products liability – design defect"); **Ex. 32**, Memorandum Decision and Order, *Hoge v. Monsanto Co.*, Case No. 4:25-cv-00277-DCN, at *4 n.5 (D. Idaho June 1, 2026) ("the Supreme Court has already held that claims . . . based on design and manufacturing, negligent testing, and other warranties 'do not qualify as requirements for "labeling or packaging"' and so cannot be preempted by FIFRA") (citing Bates, 544 U.S. at 444); **Ex. 28,** *Grantges v. Monsanto Co.*, Order on Summary Judgment (Cir. Mo. May 4, 2025), at *17 (denying summary judgment on plaintiff's design defect claim and finding Monsanto's alternative Roundup formulation without glyphosate or surfactant was sufficient evidence of an safer available alternative).

**B. FIFRA Does Not Expressly Preempt Plaintiff's Claims.**

As the *Bates* Court made clear, state laws or regulations that do not impose a labeling or packaging requirement—like those governing the design of product—are not preempted. *Bates*, 544 U.S. at 444. Plaintiff asserts claims unrelated to the warning on the Roundup label, including negligence, design defect, implied warranty, and negligent misrepresentation/fraud. *See Bates*, 544 U.S. at 444-45. Yet Monsanto brushes over these claims, contending that Plaintiff's claims are all expressly preempted under FIFRA because they "all boil down to the preempted theory that Monsanto is liable for failing to include a cancer warning on Roundup's label." (Mot. at 8.) This assertion badly misrepresents Plaintiff's claims and is based on unsupported assertions and cherry-picked quotes from Plaintiff's Original Complaint. Plaintiff's failure to warn claim is different from the design defect claim. A claim that a product should have been labeled with a warning that it causes cancer is different from a claim that the product caused cancer. Following *Durnell*, Plaintiff is pursuing only the latter.

Plaintiff has pleaded and seeks to present evidence to the jury that Monsanto did or failed to do more than use an adequate warning label. He brought multiple non- failure-to-warn claims like negligence, design defect, breach of express warranty and breach of implied warranty, all of which are based on allegations unrelated to the Roundup label or packaging. For example, in support of the negligence claim, Plaintiff asserts Monsanto was negligent in, among other things, failing to adequately test Roundup and its ingredients and designing, manufacturing, producing and formulating an unreasonably dangerous product. *See*, Member Dkt. 1. Likewise, Plaintiff has asserted a design defect claim based on allegations that Roundup posed a grave risk of cancer when used in a reasonably anticipated manner, and was inherently and unreasonably dangerous to an extent beyond what an ordinary consumer would anticipate. *Id.* Plaintiff's failure-to-warn claim goes beyond the label and packaging, including, for example, allegations regarding Monsanto's marketing and promotion of the product.[16] *Id.* Monsanto is not effectively immune

---

[16] *Durnell* applies only to *label-based* failure to warn claims, not to failure to warn claims based on other kinds of communications often seen and relied upon by consumers such as billboards, commercials, or newspaper advertisements. Plaintiff brings such claims in this case and contends that communication of the risks of Roundup use through these other media and channels would have avoided the harm to Mr. Reid.

from all of Plaintiff's claims because the claims are not inextricably tied to FIFRA's labeling and warning requirements.

Lacking any statutory support or precedent for its position that no products liability theory survives *Durnell*, Monsanto quotes the Court's denial of Monsanto's post-verdict motions in *Hardeman*, claiming that "the evidence" can only sustain a design defect claim premised on a labeling theory. But the ruling is inapposite and taken out of context.[17] The Court acknowledged that "Hardeman presented no evidence that Roundup is inherently defective regardless of whether accompanied by a warning," but in doing so, it was merely commenting on the evidence presented by that plaintiff to a jury at trial nearly 7 years ago. *Hardeman v. Monsanto (In re Roundup Prods. Liab. Litig.)*, No. MDL No. 2741, 2019 U.S. Dist. LEXIS 116638, at *75 (N.D. Cal. July 12, 2019). The scope of evidence presented and argument made at trial reflects trial strategy as much as it does the scope of available evidence. Plaintiff should not be judged based on the Court's observation of what another plaintiff elected to present at trial years ago based on then-available evidence. Indeed, Roundup victims have, and continue to, litigate claims other than failure to warn against Monsanto.[18]

**C. FIFRA Does Not Impliedly Preempt Plaintiff's Claims.**

Contrary to Monsanto's assertion, *Durnell* has nothing to do with implied preemption. The Supreme Court specifically held that it "need not consider" the argument because the claim was expressly preempted. *Durnell*, 146 S. Ct. at n. 7. Nevertheless, Monsanto contends that

---

[17] With respect to *Hardeman*, Monsanto wants to compare apples to oranges with respect to North Carolina law. Monsanto would like to have this Court assume that the posttrial ruling in *Hardeman* somehow is consistent with the law in North Carolina and should apply here. It is not. In *Hardeman*, this Court rejected the claim that Roundup was defective because it was so dangerous and thus "should not have been sold for residential use regardless of whether there was a warning." *In re Roundup Prods. Liab. Litig.*, No. 16-md-2741, 2019 WL 3219360, at *3 (N.D. Cal. July 12, 2019). However, as shown below, consumer expectations matter in North Carolina and Monsanto's argument about the lack of evidence as it pertains to inadequate design fails to reference anything regarding consumer expectations. Because if they did, Monsanto would concede their motion for summary judgment in this case.

[18] *See, e.g., Pilliod v. Monsanto Co.*, 67 Cal.App.5th 591 (2021), *abrogated as to failure to warn by Durnell* (jury awarded substantial damages based on both design defect and failure to warn); *Anderson v. Monsanto Co.*, 719 S.W.3d 755, 793 (Mo. Ct. App. 2025), *vacated and remanded for consideration in light of Durnell* (jury awarded damages on *inter alia* strict liability design defect claim that Roundup was unreasonably dangerous when used as reasonably anticipated); **Ex. 28,** *Grantges v. Monsanto Co.*, Order on Summary Judgment (Cir. Mo. May 4, 2025), at *17 (denying summary judgment on plaintiff's design defect claim and finding Monsanto's alternative Roundup formulation without glyphosate or surfactant was sufficient evidence of an safer available alternative).

*Durnell* confirms that any theory that would have required it to use an alternative design is preempted as a "matter of impossibility." Mot. at 14. The argument cannot be reconciled with the plain text of FIFRA or *Bates*, both of which expressly limit preemption to label-based failure to warn claims. Indeed, Monsanto has been making the same implied preemption argument for the better part of a decade, but not one court has adopted it, and this Court has explicitly rejected it. *See In re Roundup Prods. Liab. Litig.*, 364 F. Supp. 3d 1085, 1087 (N.D. Cal. 2019) ("Monsanto's implied preemption theory is difficult—if not impossible—to square with *Bates*"). *See also Holyfield v. Chevron U.S.A., Inc.*, 533 F. Supp. 3d 726, 736 (E.D. Mo. 2021) ("While numerous courts have considered the question, this Court is not aware of any precedent dismissing claims based on a theory of implied preemption under FIFRA"); *Pilliod*, 282 Cal. Rptr. 3d at 701 ("[W]e are not aware of any published opinion by any court—state or federal—that adopts Monsanto's positions with respect to impossibility preemption."); *Ansagay v. Dow Agrosciences LLC*, 153 F. Supp. 3d 1270, 1281-82 (D. Haw. 2015) ("the *Bates* Court rejected impossibility preemption sub silentio. It makes no sense to think otherwise.").

Like when it first made this argument to this Court in 2019, Monsanto relies upon FDCA cases to contend that it is prohibited from changing the EPA-approved formulation of Roundup.[19] *In re Roundup Prods. Liab. Litig.*, 364 F. Supp. 3d at 1087. But the FDCA is not analogous to FIFRA. Under the FDCA, once a drug is approved, federal law does ***not*** allow states to ban FDA-approved drugs. *Id.* at 1088 ("nothing in the FDCA allows a state to ban a drug"). Conversely, FIFRA delegates tremendous power to states to regulate the sale or use of any registered pesticide, including the right to regulate or ban a registered pesticide outright. *Id.* at 1088 (citing 7 U.S.C. § 136v(a) and *Bates*, 544 U.S. at 446 (noting that "a state agency may ban the sale of a pesticide if it finds, for instance, that one of the pesticide's label-approved uses is unsafe")). Since FIFRA authorizes states to ban the sale of pesticides they find unsafe, a state law requirement that compensates individuals who used unsafe pesticides or stops sales completely cannot be preempted provided it does not impose a requirement for labeling or

---

[19] Notably, Monsanto itself has demonstrated in recent years that a manufacturer may change the composition of its product, having phased out residential Roundup products that contain glyphosate. *See Durnell*, at 2009 n.4.

packaging. *See Bates*, 544 U.S. at 446; *Weeks v. Home Depot U.S.A.* 2020 U.S. Dist. LEXIS 188369, at *19 (C.D. Cal. Sep. 18, 2020) (explaining if a state "can stop defendant or manufacturers from selling Roundup entirely, then it seems inconsistent to conclude that the statute implicitly - but not expressly - preempts a state law requirement that stops short of banning the product.") Yet, under Monsanto's theory that *any* restriction on its right to sell a pesticide as formulated is tantamount to a requirement that it sell a different formulation, a state could *not* ban the sale of a pesticide over safety concerns since that would, per Monsanto, require a change in formulation. Both *Durnell* and *Bates* explicitly reject that interpretation. *See Bates*, 544 U.S. at 446 ("Under §136v(a), a state agency may ban the sale of a pesticide if it finds, for instance, that one of the pesticide's label-approved uses is unsafe"); *Durnell*, 146 S.Ct. at 2008, n.2. Monsanto offers no reason to depart from these holdings.[20]

## II. Monsanto Is Not Entitled To Judgment As a Matter of Law on Plaintiff's Design Defect Claim.

Monsanto next asserts that Plaintiff cannot "save" the case by arguing it is liable based on Roundup's defective formulation or design, rather than a lack of warning. Specifically, Monsanto incorrectly contends that North Carolina law requires that Plaintiff show a feasible alternative design for Roundup through expert testimony.[21] Contrary to Monsanto's assertions, feasible, safer alternative designs is not the only pathway to prove design defect (inadequate design) under North Carolina law. Nevertheless, Plaintiff satisfies both pathways and presents admissible evidence on safer alternative herbicide formulations to survive summary judgment.

### A. Evidence of a Safer Alternative Design Is Not Required Under North Carolina Law.

Pursuant to N.C. Gen. Stat. § 99B-6(a), a defendant is liable for its defective design or formulation if the plaintiff shows that it "acted unreasonably in designing or formulating the product" and "that this conduct was a proximate cause of the harm for which damages are

[20] The Court in *Shull v. Monsanto Co.* found that FIFRA's registration procedure did not impliedly preempt Plaintiff's negligence and design defect claims, particularly when the question of implied preemption was not reached by the Durnell Court. *See* **Ex. 48**, Order Denying Defendant's Motion for Summary Judgment.

[21] North Carolina's design defect statute, N.C. Gen. Stat. § 99B-6, does ***not*** expressly require expert testimony to prove a feasible alternative design The statute itself is silent on any requirement for expert testimony.

sought." N.C. Gen. Stat. § 99B-6(a); *DeWitt v. Eveready Battery Co.*, 550 S.E.2d 511, 518 (2001), *aff'd,* 565 S.E.2d 140 (2002). In addition, the plaintiff must prove ***one*** of the following:

> (1) At the time the product left the control of the manufacturer, the manufacturer unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation that could then have been reasonably adopted and that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product [**or**]
>
> (2) At the time the product left the control of the manufacturer, the design or formulation of the product was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design.

N.C. Gen. Stat. § 99B-6(a). Thus, Plaintiff can prove a design defect claim without evidence of a safer alternative design if he can show that the design was so unreasonable that a reasonable person with knowledge of the relevant facts would not use it.

Monsanto is incorrect and misguiding this Court by trying to make them believe "in very rare instances" the second prong of N.C. Gen. Stat. § 99B-6, that the design was "so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design," can be used to pursue a design defect claim under North Carolina law.[22] The statute is very clear: it is an "***or***." The reason Monsanto is framing their argument in such a way is because they know it is fatal to their summary judgment argument as it pertains to inadequate design under North Carolina law. A plain reading of N.C. Gen. Stat. § 99B-6(a)(2) shows North Carolina law recognizes a *consumer expectations* test to prove inadequate design.

---

[22] Monsanto further argues that Plaintiff cannot invoke the exception under N.C. Gen. Stat. 99B-6(a)(2) for when "the design or formulation of the product was so unreasonable that" no one would use it, asserting that it is unaware of any case where the provision has been successfully invoked, relying on a reporter's note in the 1998 Restatement reporter's note that North Carolina courts have not found that the design or formulation of a product was so unreasonable that no one would use it. Mot. at 15. Nearly 30 years later, the note is no longer true. For example, in *Pa. Nat'l Mut. Cas. Ins. Co. v. STIHL Inc.*, the Eastern District found that "a hedge trimmer designed with defects that cause it to catch fire during ordinary use is plausibly designed so unreasonably that no reasonable person would use it." *Pa. Nat'l Mut. Cas. Ins. Co. v. STIHL Inc.*, No. 7:23-CV-00018-M, 2023 U.S. Dist. LEXIS 136364, at *15-16 (E.D.N.C. Aug. 4, 2023). *See also Walls v. Ford Motor Co.*, No. 1:20-CV-98, 2022 U.S. Dist. LEXIS 33778, at *44-45 (M.D.N.C. Feb. 25, 2022) (denying summary judgment on defective design claim where there was no feasible alternative design but Plaintiff argued that asbestos-containing products were so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of the design).

Therefore, under North Carolina law, a Plaintiff is not required to prove safer alternative design, so long as the Plaintiff can fulfill the second prong, which looks thru the lenses of a reasonable consumer.

Monsanto argues that "Plaintiffs cannot avoid that outcome by invoking the exception for when "the design or formulation of the product was so unreasonable that" no one would use it, N.C. Gen. Stat. § 99B-6(a)(2). Monsanto is purposefully misstating the law in North Carolina and leaving out the key part of the statute "***aware of the relevant facts***." In the reading of the statute, a key phrase that this Court must consider is "aware of the relevant facts." This is extremely important because to the extent Monsanto challenges Reid's awareness of the relevant facts, summary judgment must be denied because Reid has created a genuine issue of material fact. As in *Walls v. Ford Motor Co.*, No. 1:20-CV-98, 2022 U.S. Dist. LEXIS 33778, at *44-45 (M.D.N.C. Feb. 25, 2022), "whether a manufacturer acted unreasonable is a question of fact" that is ultimately for the jury to weigh the evidence and the relevant factors to decide inadequate design under North Carolina law.

The record in the Reid case satisfies this second prong, the *consumer expectations* burden. Reid testified that the very reason he stopped using Roundup, after 45 years of use, is because he learned that Roundup caused cancer and specifically, Non-Hodgkin's lymphoma. **Ex. 4**, Reid Depo at 89:19-90:20. This is exactly why Reid brought this lawsuit. Once Reid became "***aware of the relevant facts***" surrounding the carcinogenic nature of the product he used for almost half a century, he stopped using Roundup and brought his lawsuit because had he of known Roundup caused cancer, and specifically Non-Hodgkin's lymphoma, he would not have used it.

Because a jury could reasonably find that the cancer-causing design of Roundup was so unreasonable that no reasonable person would use it, this is a question of fact and summary judgment should not be granted on Plaintiff's design defect claim regardless of any evidence of a feasible alternative design.[23]

[23] Likewise, since most consumers do not expect household products to cause cancer, a jury could find that Roundup formulated with glyphosate and POEAs was so unreasonably designed that a reasonable person would not use it. As described *supra*, a Monsanto toxicologist admitted that getting rid of weeds in the driveway is not worth getting

### B. Plaintiff's Evidence Demonstrates the Existence of a Safer, Practical, Feasible and Reasonable Alternative.

Monsanto argues that Plaintiff has no evidence of an alternative design for Roundup, suggesting that expert testimony is "the only permissible way" to prove an alternative design is safer, practical, and feasible. However, Monsanto cites no authority that support its proposition.

Rather, Monsanto points to a single case, *Bluitt v. Wake Forest Univ. Baptist Med. Ctr.*, to support its assertion that North Carolina law requires expert testimony to show an alternative design was cost-effective, feasible, would not have impaired Roundup's usefulness, and would not have posed other risks of its own.[24] But the case does not involve a design defect claim or considerations of a safer alternative design. Rather, there, the plaintiff asserted a medical malpractice claim, claiming that the defendants negligently burned her back while performing a cardiac ablation. 259 N.C. App. 1, 6 (2018). The court held that because cardiac ablation is a complex medical procedure outside the common knowledge, experience and sense of a layperson, the plaintiff would not be able to show that the injury was of a type not typically occurring in the absence of some negligence by a defendant without the use of expert testimony. *Id*. at 7. Here, there is no similar complexity requiring expert testimony. A layperson can consider whether a pesticide without a carcinogen is a safer alternative to a pesticide with a carcinogen.

Rather than requiring expert testimony, N.C. Gen. Stat. § 99B—6(b) identifies seven non-exclusive factors to be considered in analyzing the reasonableness of the defendant's conduct. *Smith*, 2016 U.S. Dist. LEXIS 45100, at *14. "A plaintiff is not required to present evidence on all of these factors in order to meet his burden of proving a defective design claim, as some of these factors may not be relevant to a particular plaintiff's claim." *DeWitt v. Eveready Battery Co.*, 144 N.C. App. at 155; *see also Smith*, 2016 U.S. Dist. LEXIS 45100, at *14.

---

cancer; another testified that consumers should be able to use Roundup without worrying about getting cancer from the use of Roundup. Monsanto's own toxicologists admit that a reasonable person would not use a pesticide that causes cancer, like glyphosate-based Roundup, on their residential lawns.

[24] The two other cases cited by Monsanto are equally unhelpful. Expert testimony was proffered but deemed insufficient in both, but neither holds that expert testimony is required to prove the existence of a safer, feasible alternative design. *See Sparks v. Oxy-Health, LLC*, 134 F. Supp. 3d 961, 987-88 (E.D.N.C. 2015); *DeWitt v. Eveready Battery Co.*, 144 N.C. App. at 155-56.

Expert testimony regarding a safer, feasible design alternative may be relevant but is not required. Indeed, "[i]t does not appear that North Carolina courts require expert testimony to prove defective design." *Smith v. Am. Honda Motor Co.*, No. 1:14-CV-943, 2016 U.S. Dist. LEXIS 45100, at *13 (M.D.N.C. Apr. 4, 2016). Even the fact of a product defect does not require expert testimony in all cases, but may be inferred from the products failure: "in a products liability action, based on tort or warranty, a product defect may be inferred from evidence of the product's malfunction, if there is evidence the product had been put to its ordinary use." *Red Hill Hosiery Mill, Inc. v. Magnetek, Inc.*, 138 N.C. App. 70, 76-77, 530 S.E.2d 321, 326-27 (2000).[25]

Here, the jury can reasonably find that an alternative formulation of Roundup that does not contain the carcinogenic glyphosate—*a formulation which Monsanto now manufactures and sells under the Roundup label*—is a safer, feasible, practical design. As set forth *supra* and in Plaintiffs' Omnibus Statement of Material Facts in Opposition to Monsanto's Post-*Durnell* Motions for Summary Judgment, adopted and incorporated herein, Plaintiff's evidence demonstrates that Monsanto knew its Roundup formulation was toxic and developed alternative and safer formulations of Roundup for agricultural use in Europe without the presence of POEA surfactant that, when combined with glyphosate, was associated with increased harm; Monsanto did not similarly reformulate its U.S. products despite the alternative surfactant having long been approved by the EPA for use in pesticides in the United States. Indeed, Monsanto kept selling the product in the United States despite not having done the necessary testing to say Roundup is not a carcinogen. Monsanto's own chair of the Europe's Glyphosate task force, Dr. Richard Garnett, pointed out the unreasonableness of its decision not to adopt a safer alternative formulation, asking "there are non-hazardous formulations so why sell a hazardous one?"

Finally, in 2017, Monsanto began marketing and selling a non-glyphosate formulation of Roundup for lawns, and in 2021, it announced it was replacing its glyphosate-based products for

[25] In *Sparks*, the district court explained that a plaintiff may prove a product was defective at the time it left control of the defendant "either by direct evidence, such as expert testimony, or by relying on the inference of negligence that arises upon a showing that the product malfunctioned after it was put to ordinary use," along with direct evidence that the defect was a result of defendant's negligence. 134 F. Supp. 3d at 986.

the residential market with new glyphosate-free formulations. Since 2023, Monsanto has manufactured and sold alternative, non-glyphosate formulations of all U.S. lawn-and-garden products, replacing the glyphosate-based formulation that caused Mr. Reid's non-Hodgkins lymphoma. According to Monsanto's chief Roundup toxicologist, Dr. Farmer, non-glyphosate alternatives are safe and effective and have long been registered with the EPA and available to Monsanto. *See supra.*

Alternative formulations of Roundup without the carcinogens and with the same utility and economic feasibility were possible at the time Reid's exposure, and have, in fact, been implemented by Monsanto illustrating their feasibility and reasonableness. The glyphosate-free Roundup alternative formulations are safer as they do not contain the carcinogen. Plaintiff's evidence, viewed in the light most favorable, is sufficient to raise a fact issue regarding the design defect claims, including that there was a safer, feasible alternative design.[26] *See* **Ex. 49,** *Alison v. Monsanto Co.,* Order Concerning Motion for Summary Judgment (Mo. Cir. Sept. 9, 2026), at 16 ("Monsanto's alternative Roundup formulations without glyphosate make this an issue for the jury's determination"); *see also Winebarger v. Bos. Sci. Corp. (In re Bos. Sci. Corp.)*, No. MDL No. 2326, 2015 U.S. Dist. LEXIS 42625, at *15-16 (S.D. W. Va. Apr. 1, 2015) (finding that a reasonable juror could determine the defendant failed to adopt a reasonable alternative design without expert testimony based on a letter to defendant indicating a different mesh prototype was offered two years prior to the plaintiff's surgery, a memo demonstrating that defendant knew of the benefits of the lighter mesh, and an email reflecting expectation that less mesh leads to less inflammation and better outcomes).

## III. Plaintiff's Claims for Breach of Express Warranty and Implied Warranties Are Not Preempted and Survive Under North Carolina Law.

As discussed *supra*, only failure-to-warn claims based on the Roundup labeling/packaging are preempted under *Durnell.* Like his design defect claim, Reid's non-warnings-based claims for breach of express warranty (Fifth Cause of Action) and implied

[26] To the extent the Court is persuaded that expert testimony is required, Plaintiff requests leave to disclose an additional expert who could offer additional testimony and expert opinion regarding the unreasonably dangerous nature of Roundup.

warranties (Fourth Cause of Action) also remain viable. Member Dkt. 1. FIFRA does not regulate marketing of covered products as a matter of federal law. *See Indian Brand Farms, Inc. v. Novartis Crop Protection Inc.*, 617 F.3d 207, 210 (3d Cir. 2010) ("We conclude that because Plaintiffs' negligent misrepresentation/fraud and [state-law consumer fraud] claims are based on alleged misrepresentations in [defendant's] marketing brochure, and that brochure does not qualify as 'labeling' under FIFRA, those claims are not preempted.").[27] Thus FIFRA's preemption of label-based failure to warn claims does not immunize Monsanto from liability for any and all marketing practices. *See id.* Monsanto's duties in marketing Roundup and ensuring it was selling a non-defective product are all independent of federal labeling requirements, and Plaintiff has produced evidence demonstrating genuine issues of fact exist for trial on each of his remaining claims.

**A. Breach of Express Warranty.**

Monsanto next argues that Reid's express warranty claim is barred because Reid did not rely on any false affirmation of fact or promise by Monsanto about Roundup's safety.[28] Under N.C. Gen. Stat. § 25-2-313(1)(b):

> [i]t is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty…

In making their argument, Monsanto ignores well-established North Carolina law that, "[t]he **element of reliance need not always be expressly alleged. It can often be inferred** from allegations of mere purchase or use if the natural tendency of the representations made is such as to induce such purchase or use." *Kinlaw v. Long Mfg. N. C., Inc.*, 259 S.E.2d 552, 557 n.7 (N.C. 1979). *See also Bernick v. Jurden*, 293 S.E.2d 405, 413 (N.C. 1982) (reiterating "the element of reliance can often be inferred from allegations of mere purchase . . . ."). Monsanto

[27] *See also N.Y. State Pesticide Coal., Inc. v. Jorling*, 874 F.2d 115, 118-19 (2d Cir. 1989) (reasoning the definition of "label" and "labeling" in FIFRA does not include a state's "notification requirements such as cover sheets, signs, and newspaper advertisements"); *Spittler v. Look Sports, Inc.*, 859 F.2d 924 (9th Cir. 1988) (unpublished) (finding the defendant's advertisements relevant to the consumer expectations test).

[28] As noted in the case cited by Monsanto, *Ascot Corp., LLC v. I&R Waterproofing, Inc.*, 881 S.E.2d 353, 361 (N.C. App. 2022), "[p]rivity is not required when the theory is breach of an express warranty." (citing *Kinlaw v. Long Mfg. N.C., Inc.*, 298 N.C. 494, 259 S.E.2d 552 (1979)). Therefore, any argument Monsanto makes related to privity between Reid and Monsanto should be wholly discarded.

also fails to note that, "[u]ltimately, the question of whether an express warranty existed and was breached is one for the jury." *Eclipse Packaging, Inc. v. Stewarts of Am., Inc.*, Civ. Action No. 5:14-CV-00195-RLV-DCK, 2016 WL 3619120, at *4 (W.D.N.C. July 6, 2016) (citing *Muther-Ballenger v. Griffin Elec. Consultants, Inc.*, 397 S.E.2d 247, 249 (N.C. Ct. App. 1990)).

As seen in *Bernick* and *Kinlaw, supra*, North Carolina courts have found that a retailer's affirmations, representations, and assurances regarding a product's safety, characteristics, and suitability for a particular purpose may constitute express warranties where, as here, those statements are relied upon by the purchaser. In *Bernick*, for example, the court determined that "the defendants Cooper promoted their product through hockey catalog advertisements and parent guides. Without a doubt, the natural tendency of a representation of 'maximum protection to the lips and teeth' is such as to induce the purchase of a hockey mouthguard by a mother for her son's use while playing. Considering the family purpose of the mother's purchase, reliance may be inferred in this case." *Bernick*, 293 S.E.2d at 413-14.

Here, there is testimony from multiple witnesses and evidence in the record that permits the inference that Monsanto made an affirmative act or promise about the safety of Roundup, Reid relied on the assurance in purchasing Roundup, and that Roundup caused Reid's injuries.[29] When the testimony of Reid and the evidence as a whole is viewed light most favorable to the nonmoving party, as it must at this stage, a fact issue exists as to the creation of and reliance upon express warranties. Therefore, Reid's express warranty claim must go to the jury to decide.

**B. Breach of Implied Warranties.**

Finally, contrary to Monsanto's assertion, Plaintiff's claim for breach of implied warranties does not fail. To establish a breach of implied warranty, a plaintiff must show the following elements: "(1) that the goods bought and sold were subject to an implied warranty of merchantability, (2) that the goods did not comply with the warranty in that the goods were defective at the time of sale, (3) that plaintiff's injury was due to the defective nature of the

[29] Reid incorporates all record evidence in his case along with all the Exhibits cited in this Response and Plaintiffs' Omnibus Statement of Material Facts in Opposition to Monsanto's Post-Durnell Motions for Summary Judgment. To the extent Monsanto disagrees that an express warranty was created that constitutes a genuine issue of material fact for the jury to decide.

goods, and (4) that damages were suffered as a result." *Ascot Corp., LLC v. I&R Waterproofing, Inc.*, 286 N.C. App. 470, 479 (2022) (quoting *DeWitt v. Eveready Batter Co.*, 355 N.C. at 683).

A manufacturer breaches the implied warranty of merchantability when its product is unsafe for foreseeable uses. *See* N.C. Gen. Stat. § 25-2-314(1), (2)(c). Plaintiff was not required, as Monsanto asserts, to allege "that Roundup was not 'fit' for killing weeds…because it was not effective." Dkt. 22 at 18. Plaintiff is not suing Monsanto because Roundup did not work as a weed killer, but because it was an unsafe product that caused his cancer and resulting damages. The implied warranty claim here alleges that Monsanto "knew of Roundup's intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use." Dkt. 1 at ¶199. Reid used Roundup for its ordinary purpose believing it was safe for humans. Monsanto made numerous representations in the media that Roundup was "safe" as discussed above. Among other things, Monsanto represented that there is "no evidence that glyphosate… causes cancer, even at very high doses" and that Roundup is "safer than table salt" and "practically nontoxic" at the time Reid was using the Roundup. Member Dkt. 1 (emphasis omitted); **Ex. 44**, Aug. 25, 1978 Letter; **Ex. 45**, AG Discontinuation Order. Monsanto warranted and sold Roundup as safe for its foreseeable uses when it was not.

As demonstrated *supra*, Roundup was defective in that Plaintiff has made a valid claim for design defect. Further, because Reid's injury was a caused by that defect and he suffered damages as a result, Plaintiff has met his burden on his implied warranties claim.

## <u>CONCLUSION</u>

Based on the foregoing, Plaintiff respectfully requests that the Court deny Defendant Monsanto Company's Supplemental Motion for Summary Judgment. In the alternative, Plaintiff seeks leave to amend his complaint and/or his expert disclosure.

Date: September 28, 2026

By: **OSBORNE & FRANCIS LAW FIRM PLLC**

*/s/ Joseph A. Osborne*____________________
Joseph A. Osborne, Esq. (FL Bar No: 880043)
josborne@realtoughlawyers.com
J. Robert Bell III, Esq. (FL Bar No: 115918)
rbell@realtoughlawyers.com
**OSBORNE & FRANCIS LAW FIRM PLLC**
925 S. Federal Highway, Suite 175
Boca Raton, FL 33432
(561) 293-2600 / (561) 923-8100 (fax)

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of September 2026, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, and thereby sending notice to all parties and counsel of record.

/s/ *Joseph A. Osborne*