Robin Greenwald
**WEITZ & LUXENBERG, P.C.**
700 Broadway, Fifth Floor
New York, NY 10003
Telephone: (212) 558-5500
rgreenwald@weitzlux.com

*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | Case No. 3:16-md-02741-VC<br><br>MDL No. 2741 |
| This document relates to:<br><br>*Rebecca Dietrich f/k/a Rebecca Gebo, as the Personal Representative of the Estate of Ronald Gebo, deceased v. Monsanto Co.*<br>Case No. 3:17-cv-00168-VC | **PLAINTIFF'S OPPOSITION TO DEFENDANT MONSANTO COMPANY'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: November 16, 2026<br>Time: 1 p.m. PT<br>Place: Courtroom 4, 450 Golden Gate Ave. San Francisco, CA 94102 |

## TABLE OF CONTENTS


Introduction ..... iii

Factual Background ..... 1

Legal Standard ..... 4

Argument ..... 4

I. Background on Federal Preemption and FIFRA. ..... 5

A. The Framework for Evaluating Federal Preemption Defenses. ..... 5

B. FIFRA Expressly Preserves States' Historic Powers Alongside a Requirement for Uniform Labeling. ..... 6

II. *Durnell* Reaffirmed *Bates*'s Holding That FIFRA Does Not Preempt Claims, Like Plaintiff's, That Assert Common-Law Duties Not Based on Labeling or Packaging. ..... 7

III. Monsanto Does Not Meet Its "Demanding" Burden to Show Implied Impossibility Preemption of Plaintiff's Claims. ..... 9

A. Plaintiff's Design Defect Claim Is Not Impliedly Preempted. ..... 9

B. Plaintiff's Non-Label-Based Warning Claims Are Not Expressly or Impliedly Preempted. ..... 13

IV. There Can Be No Implied Impossibility Preemption Where Monsanto Did the Very Thing It Calls "Impossible"—Reformulated Roundup, with EPA Approval. ..... 15

V. Plaintiffs' Florida Law Claims Are Supported By Sufficient Evidence. ..... 16

A. The Record Supports Plaintiff's Design Defect Claim. ..... 16

B. The Record Supports Plaintiff's Negligence Claims. ..... 20

C. The Record Supports Plaintiff's Non-Label Failure-to-Warn Claim. ..... 23

VI. If Claims Are Insufficient Due To *Durnell*, Plaintiff Requests Leave to Amend. ..... 24

CONCLUSION ..... 24

**Cases**

*Ansagay v. Dow Agrosciences LLC*
153 F. Supp. 3d 1270 (D. Haw. 2015). ........................................................................ 11, 12
*Aubin v. Union Carbide Corp.*
177 So. 3d 489 (Fla. 2015) ........................................................................ 16, 18, 19
*Bates v. Dow Agrosciences LLC*
544 U.S. 431 (2005) ........................................................................ passim
*Benavides v. Tesla, Inc.*
804 F. Supp. 3d 1242 (S.D. Fla. 2025) ........................................................................ 23
*Chamber of Commerce v. Whiting*
563 U.S. 582 (2011) ........................................................................ 10
*Cipollone v. Liggett Group, Inc.*
505 U.S. 504 (1992) ........................................................................ 13
*Cohen v. ConAgra Brands, Inc.*
16 F.4th 1283 (9th Cir. 2021) ........................................................................ 4
*Doe I v. Nestle USA, Inc.*
766 F.3d 1013 (9th Cir. 2014) ........................................................................ 24
*Engle v. Ligget Group, Inc.*
945 So.2d 1246 (Fla. 2006) ........................................................................ 17, 18
*Erie R. Co. v. Tompkins*
304 U.S. 64 (1938) ........................................................................ 11
*Font v. Union Carbide Corp.*
199 So. 3d 323 (Fla. 3d DCA 2016) ........................................................................ 19
*Ford Motor Co. v. Evancho*
327 So.2d 201 (Fla. 1976) ........................................................................ 21, 22
*Gade v. National Solid Wastes Management Assn.*
505 U.S. 88 (1992) (Kennedy, J., concurring) ........................................................................ 10
*Graham v. R.J. Reynolds Tobacco Co.*
857 F.3d 1169 (11th Cir. 2017) ........................................................................ 17
*Grieco v. Daiho Sangyo, Inc.*
344 So.3d 11 (Fla. 4th DCA 2022) ........................................................................ 22
*Hamilton v. Motor Coach Indus., Inc.*
569 S.W.2d 571 (Tex. Civ. App. 1978) ........................................................................ 10
*Holyfield v. Chevron U.S.A., Inc.*
533 F. Supp. 3d 726 (E.D. Mo. 2021) ........................................................................ 12
*In re 3M Combat Arms Earplug Prods. Liab. Litig.*
474 F. Supp. 3d 1231 (N.D. Fla. 2020) ........................................................................ 13
*In re Roundup Prods. Liab. Litig.*
364 F. Supp. 3d 1085 (N.D. Cal. 2019) ........................................................................ 7, 11

*In re Roundup Prods. Liab. Litig.*
No. 16-CV-05250VC, 2019 WL 3219360 (N.D. Cal. July 12, 2019)........................................ 20
*In re. Infineon Tech. AG Sec. Litig.*
No. 04-04156 JW, 2010 WL 11587076 (N.D. Cal. Oct. 27, 2010) ........................................... 24
*In the Matter of: Liphatech, Inc.*
*No. FIFRA-05-2010-0016, Respondent*, 2014 WL 1012749 (E.P.A. Mar. 12, 2014) ............... 15
*Leon v. Volkswagen Grp. of Am., Inc.*
No. 24-CV-03863, 2025 WL 1843211 (C.D. Cal. June 27, 2025)............................................. 24
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574 (1986) ...................................................................................................................... 4
*McConnell v. Union Carbide Corp.*
937 So.2d 148 (Fla. 4th DCA 2006) .......................................................................................... 19
*Merck Sharp & Dohme Corp. v. Albrecht*
587 U.S. 299 (2019) .......................................................................................................... 5, 10, 13
*Monsanto Co. v. Durnell*
146 S. Ct. 2001 (2026) ........................................................................................................ passim
*Morales v. City of Tucson*
No. 23-00498, 2024 WL 4475095 (D. Ariz. Oct. 11, 2024)........................................................ 24
*Mut. Pharm. Co. v. Bartlett*
570 U.S. 472 (2014) ...........................................................................................................5, 6, 11
*Papike v. Tambrands Inc.*
107 F.3d 737 (9th Cir. 1997) ................................................................................................. 19, 20
*People for Ethical Treatment of Animals, Inc. v. Dade City's Wild Things, Inc.*
No. 8:16-CV-2899-T-36AAS, 2018 WL 2715460 (M.D. Fla. June 6, 2018) ........................... 24
*PLIVA, Inc. v. Mensing*
564 U.S. 604 (2011) .......................................................................................................5, 9, 11, 12
*Puerto Rico v. Franklin Cal. Tax-Free Trust*
579 U.S. 115 (2016) ...................................................................................................................... 5
*R.J. Reynolds Tobacco Co. v. Marotta*
214 So. 3d 590 (Fla. 2017)........................................................................................................... 17
*Shull v. Monsanto Co.*
No. 25BA-CV4355, 2026 WL 2742795 (Mo. Cir. Aug. 31, 2026).......................................... 12
*Small v. Amgen, Inc.*
134 F. Supp. 3d 1358 (M.D. Fla. 2015) ...................................................................................... 22
*Suzuki Motor Corp. v. Winckler*
434 So.3d 104 (Fla. 5th DCA 2026) ........................................................................................... 21
*United States v. Diebold, Inc.*
369 U.S. 654 (1962) ...................................................................................................................... 4
*West v. Caterpillar Tractor Co.*
336 So. 2d 80 (Fla. 1976)...................................................................................................... 16, 18

*Wisconsin Pub. Intervenor v. Mortier*
501 U.S. 597 (1991) ........ 6
*Wyeth v. Levine*
555 U.S. 555 (2009) ........ 5
*Yousefzadeh v. Johnson & Johnson Consumer Inc.*
184 F.4th 130 (2d Cir. 2026) ........ 14

**Statutes**

40 C.F.R. § 152.44(a) ........ 7
40 C.F.R. § 156.10(a)(5)(ix) ........ 15
40 C.F.R. § 156.70(c) ........ 7
40 C.F.R. § 168.22(a) ........ 14
7 U.S.C. § 136(h), (u) ........ 14
7 U.S.C. § 136(p)(2) ........ 13, 14
7 U.S.C. § 136j(a)(1)(A) ........ 6
7 U.S.C. § 136v ........ 6
7 U.S.C. § 136v(a) ........ passim
7 U.S.C. § 136v(b) ........ passim
Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ........ 7
Fla. Stat. § 817.41 ........ 23

**Other Authorities**

54 Fed. Reg. 1122 (Jan. 11, 1989) ........ 14, 15
Fla. Std. Jury Instr. (Civ.) 403.7(b) ........ 16

**Rules**

Fed. R. Civ. P. 15 ........ 24
Fed. R. Civ. P. 56 ........ 4

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2 ........ 5

## INTRODUCTION

Decedent Ronald Gebo developed non-Hodgkin's lymphoma after spraying Roundup for decades. He had been assured by Monsanto's television commercials that he could safely use the product without protection at his Florida home and on various jobsites. These assurances were false. After suffering five recurrences of his cancer, Mr. Gebo tragically passed away at age 60.

Mr. Gebo's estate seeks to hold Monsanto accountable for his illness, suffering, and death under theories of design defect, negligence, and non-label-based failure to warn. None of these claims was at issue in *Monsanto Co. v. Durnell*, 146 S. Ct. 2001 (2026), which construed FIFRA's[1] express preemption provision, which is limited to state "requirements for labeling or packaging" inconsistent with federal law. 7 U.S.C. § 136v(b). Plaintiff's Florida law claims are neither expressly nor impliedly preempted by FIFRA and are sufficiently supported by evidence.[2] As such, the Court should deny Defendant's supplemental summary judgment motion.

## FACTUAL BACKGROUND

Mr. Gebo began using Roundup in the late 1990s. *See, e.g.*, Wells Dep. Tr. (Greenwald Decl., Ex. 3) at 156:17–21. From 1994 to 2012, Mr. Gebo sprayed Roundup around his Florida home year-round on a biweekly to monthly basis. *See, e.g.*, *id.* at 145:24–146:8, 164:8–166:13, 332:18–333:5. Mr. Gebo also worked various jobs during this period where he was exposed to Roundup year-round at least several times per month and, in some instances, daily. *See, e.g.*, *id.* at 79:17–23, 106:23–107:20, 120:7–121:17, 333:15–21. Mr. Gebo used Roundup as depicted in

[1] The Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq.*

[2] All Roundup courts that have ruled on Monsanto's audacious distortion of *Durnell* to date have flatly rejected Monsanto's argument. *See, e.g.*, *Shull v. Monsanto Co.*, No. 25BA-CV4355, 2026 WL 2742795, at *2 (Mo. Cir. Aug. 31, 2026); Order Concerning Defendant's Amended Motion for Summary Judgment, *Aretino v. Monsanto Co.*, No. 20SL-CC03676 (St. Louis Cnty. Cir. Ct., Mo. Sept. 9, 2026) (Greenwald Decl., Ex. 1); Order Concerning Defendant's Motion for Summary Judgment, *Alison v. Monsanto Co.*, No. 20SL-CC02828 (St. Louis Cnty. Cir. Ct., Mo. Sept. 9, 2026) (Greenwald Decl., Ex. 2).

Monsanto's commercials and did not know that Roundup was detrimental to his health during the entire time he was exposed to the product. *See, e.g.*, *id.* at 226:21–234:3 (describing Mr. Gebo's lack of protective clothing while using Roundup), 336:11–14 (responding that Mr. Gebo would "of course not" have used Roundup had he known it caused cancer). Plaintiff Rebecca Dietrich (Mr. Gebo's daughter) and Ms. Hope Marie Wells (Mr. Gebo's domestic partner) each watched Roundup commercials with Mr. Gebo; his daughter recalled one such ad "showing the Roundup bottle and spraying the weed, and the weed turned brown," with "just a hand" shown spraying the product, as frequently seen in Monsanto's advertising in the late-1990s (OSMF ¶¶ 52–53):



Dietrich Dep. Tr. (Greenwald Decl., Ex. 4) at 66:2–23; Wells Dep. Tr. at 334:2–17.

After eighteen years of exposure to Roundup, Mr. Gebo was diagnosed with NHL in December 2012. *See* Expert Report of Kevin B. Knopf, MD, MPH in Support of Specific Causation (Knopf Expert Report), ECF No. 21388-2, at 5–6. After undergoing treatment and initially beating the disease, Mr. Gebo suffered through **five recurrences** of his Roundup-related Diffuse Large B-Cell Lymphoma (DLBCL). *Id.* at 6–8. When the disease returned in 2016, 2017, 2018, and 2019, Mr. Gebo underwent extensive chemotherapy treatment that was so aggressive they left him wheelchair bound. *Id.* at 5–8. After a long battle with the disease, DLBCL took Mr. Gebo's life on June 21, 2020. *Id*. Diagnosed at age 53 and passing at 60 years old, Mr. Gebo was robbed of years that should have been filled with family gatherings, friendships, and enjoying the life he worked so hard to build.

Since it first brought Roundup to market in the United States in 1974, Monsanto has been using its customers, including Mr. Gebo, as research test subjects in a decades-long experiment to determine the health effects of its product in humans. Monsanto recognized the potential for Roundup's carcinogenicity from the outset, but never tested its *formulated* Roundup product to determine if it could actually cause cancer. Pls' Omnibus Statement of Facts (OMSF), ¶¶ 12–15, 47. Instead, Monsanto marketed Roundup as completely safe for agricultural and residential use based solely on limited animal testing (of the "active ingredient" glyphosate) that was publicly exposed as fraudulent just four years after Monsanto put Roundup on the market. *Id.*, ¶¶ 11, 15–23, 49–50. And once the fraudulent research supporting Roundup came to light, rather than pulling Roundup off of the shelves until it had the results of adequate carcinogenicity testing, Monsanto not only *continued* to market Roundup as "practically non-toxic" and *intentionally avoided* repeating the animal tests most likely to show evidence of carcinogenicity, but also redoubled efforts to expand the use of Roundup into new markets. *Id.* at ¶¶ 24–46.

Over the decades since it first began selling Roundup, in violation of its own long-professed standards of conduct, Monsanto has sought to defend its product sales against the information generated by independent scientists about its dangers, while simultaneously infecting the published scientific literature with its own ghost-written and industry-guided "product defense" propaganda in response to mounting evidence that Roundup causes cancer. *See id.* at ¶¶ 37–43, 58–61, 64–70, 71–76, 79–97, 99–101, 104–18, 129–32. At the same time, Monsanto used public relations and advertising campaigns to present Roundup to the public as a thoroughly-tested product *proven* to be non-toxic, as safe as other common products like table salt, and indeed safe for use around children – going so far as to advertise Roundup for thirty years – and throughout the time Mr. Gebo used it – in commercials that showed household users

casually spraying Roundup in shorts and short-sleeve shirts, and with bare hands. *Id.* at ¶¶ 11, 25, 30, 34, 49, 51–55, 62–63, 77–78. As a result, "the safety of residential Roundup is **not a top-of-mind concern** for today's consumer" – as confirmed by Monsanto's own 2015 market research – and even agricultural users routinely fail to take simple safety measures that would have reduced their own (and their children's) exposure. *Id.* at ¶¶ 93–96, 110. Overwhelming publicly-available scientific evidence – including the results of animal testing that Monsanto long claimed was impossible to perform on formulated Roundup – now shows Roundup is carcinogenic, unsuitable for the use in the manner for which it was sold to Plaintiff, and far more dangerous than any ordinary consumer would have expected. *Id.* at ¶¶ 118–21.

## **LEGAL STANDARD**

A court cannot grant summary judgment unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A genuine dispute exists if a reasonable jury could return a verdict for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). At this posture, the court must view the facts and draw inferences in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Preemption is an affirmative defense, and Defendant bears the significant burden of pleading and proving that FIFRA preempts Plaintiff's claims. *See Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283, 1289 (9th Cir. 2021).

## **ARGUMENT**

FIFRA expressly *authorizes* every remaining claim in Mr. Gebo's case. Where Congress unambiguously delegates "authority [to the] states" to "regulate the sale or use" of Roundup, wielding that delegated power cannot possibly conflict – impliedly or otherwise – with federal

law. 7 U.S.C. § 136v(a); *Durnell,* 146 S. Ct. at 2012. Design defect, negligence, and non-label-based failure-to-warn claims are not preempted because Congress enacted an "express non-preemption clause" that permits those state regulations with pellucid clarity. *Mut. Pharm. Co. v. Bartlett,* 570 U.S. 472, 493 (2014). Nothing in *Durnell* alters this conclusion.

## I. Background on Federal Preemption and FIFRA.

### A. The Framework for Evaluating Federal Preemption Defenses.

The Supremacy Clause provides that federal law made "in Pursuance" of the Constitution "shall be the supreme Law of the Land . . . any thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. To determine whether state law is "contrary" to federal law, courts deploy the ordinary tools of statutory construction. When a federal statute "contains an express pre-emption clause," courts "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016) (citations omitted).

Even without express language displacing state law, it must give way if "it is impossible for a private party to comply with both state and federal requirements." *PLIVA, Inc. v. Mensing,* 564 U.S. 604, 617–18 (2011) (cleaned up). So-called implied impossibility preemption "is a demanding defense." *Wyeth v. Levine*, 555 U.S. 555, 573 (2009). The mere "possibility of impossibility [is] not enough." *Mensing*, 564 U.S. at 624 n.8. And because the Supremacy Clause "grants supreme status only to laws of the United States," only federal agency action carrying the force of law can create federal duties that conflict with state law. *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 315 (2019); *id.* at 321 (Thomas, J., concurring) (agency "musings" and "hypothetical future" agency action are not "preemptive laws under the Supremacy Clause."). An implied impossibility preemption defense can succeed only if, after a detailed comparison of the

duties arising under federal and state law, *Mensing*, 564 U.S. at 611, the court finds that there is an "actual conflict between state and federal law such that it [is] impossible to comply with both." *Albrecht*, 587 U.S. at 315. There is a presumption against implied preemption, so any doubts about whether defendant has shouldered its "heavy burden" are resolved in favor of preserving state authority. *See Wyeth*, 555 U.S. at 565.

### B. **FIFRA Expressly Preserves States' Historic Powers Alongside a Requirement for Uniform Labeling.**

Nothing in FIFRA affirmatively authorizes the sale of any pesticide. The effect of registration is to lift a federal prohibition on sales. *Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597, 613–14 (1991) (FIFRA "certainly does not equate registration and labeling requirements with a general approval to apply pesticides throughout the Nation"); 7 U.S.C. § 136j(a)(1)(A) (forbidding the sale of an unregistered pesticide). So even in the face of congressional silence, states would remain free – without any federal conflict – to safeguard public health by enacting more stringent requirements on pesticide sales or uses than those imposed by EPA during the registration process.

But FIFRA is not silent. In a section of the statute captioned "Authority of States," Congress expressly empowered states to "regulate the sale or use of any federally registered pesticide" so long as the "regulation does not permit any sale or use prohibited by this subchapter." 7 U.S.C. § 136v(a). The *only* category of regulation where a state may not insist on requirements "in addition to or different from" those imposed at registration are ones "for labeling or packaging." 7 U.S.C. § 136v(b). The statutory text of 7 U.S.C. § 136v is unequivocal. Congress enacted an "express non-preemption clause," *Bartlett,* 570 U.S. at 493, that authorizes states to impose non-label-based requirements for "*any* federally registered pesticide" so long as those requirements are *more* restrictive than those required by federal law. 7 U.S.C. § 136v(a)

(emphasis added). These state-retained powers include the greatest power of all: a flat-out ban on the sale of a *registered* pesticide a state believes is dangerous even if EPA has repeatedly concluded it is safe. *See Durnell*, 146 S. Ct. at 2008 n.2. As this Court held earlier in this litigation, this power to ban pesticides gives states significant authority that has nothing to do with labeling: "if California can stop Monsanto from selling Roundup entirely, surely it can impose state-law duties that might require Monsanto to seek EPA approval before selling an altered version of Roundup in California. By contrast, nothing in the FDCA [the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*] allows a state to ban a drug." *In re Roundup Prods. Liab. Litig.*, 364 F. Supp. 3d 1085, 1088 (N.D. Cal. 2019).

States can require more than FIFRA does except one narrow category: a pesticide's labeling or packaging. 7 U.S.C. § 136v(b). Because valid EPA regulations that carry the force of law forbid a manufacturer from departing from the label approved during the registration process, a state duty to change the warning label would be "in addition to or different from" the requirements under FIFRA. *Durnell*, 146 S. Ct. at 2014 (citing 40 C.F.R. §§ 152.44(a), 156.70(c)). This narrow express preemption clause does not touch Plaintiff's remaining claims.

## II. ***Durnell* Reaffirmed *Bates*'s Holding That FIFRA Does Not Preempt Claims, Like Plaintiff's, That Assert Common-Law Duties Not Based on Labeling or Packaging.**

If the text of FIFRA were not clear enough, the Supreme Court's decision in *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005), confirms Congress's unambiguous intentions. In *Bates,* the Court stated that whether a state tort imposes a requirement bearing on labeling or packaging, or on some other obligation not subject to FIFRA's preemption clause, "calls for an examination of the elements of the common-law duty at issue." *Id.* at 445 (plurality opinion)). *Bates* stated that "rules governing the design of a product, for example, are not preempted," and further explained:

> Rules that require manufacturers to design reasonably safe products, to use due care in conducting appropriate testing of their products, to market products free of manufacturing defects, and to honor their express warranties or other contractual commitments plainly do not qualify as requirements for "labeling or packaging." None of these common-law rules requires that manufacturers label or package their products in any particular way. Thus, petitioners' claims for defective design, defective manufacture, negligent testing, and breach of express warranty are not pre-empted.

*Id.* at 444.

*Bates* went on to reject the argument that, because the threat of liability for a non-label-based claim would lead a manufacturer to change its label, such claims should also be deemed requirements for labeling or packaging. Mere "speculation as to whether a jury verdict will prompt the manufacturer to take any particular action" is not a cognizable labeling "requirement" for purposes of section 136v(b). *Id.* at 445. *Durnell* did not depart from this framework. It reaffirmed that under *Bates*, some "state tort duties constitute state labeling requirements" to the extent they "set the standard for a product's labeling." 146 S. Ct. at 2010 (citing *Bates*, 544 U.S. at 443–44).[3]

Plaintiff's causes of action for negligence, design defect, and non-label-based failure to warn do not seek to enforce common-law duties that involve the contents of Roundup's labeling or packaging.[4] These claims are instead based on "[r]ules that require manufacturers to design reasonably safe products, to use due care in conducting appropriate testing of their products, to

[3] At oral argument, Monsanto's counsel and the United States agreed that design defect claims, for example, are not preempted by FIFRA. Tr. of Oral Arg., No. 24-1068 (Apr. 27, 2026) (Greenwald Decl., Ex. 5), 31–32 (statement of Monsanto's counsel that "design defect claims are not preempted" unless they are "disguised failure-to-warn claims"); *id.* at 50–51 (statement of Principal Deputy Solicitor General that a "design defect claim that is not masquerading as a failure-to-warn claim is permissible under *Bates* for the reasons Mr. Clement said and the reasons that *Bates* itself recognizes").

[4] In light of *Durnell*, Plaintiff recognizes that she cannot move forward with her cause of action for *label-based* failure to warn, and does not oppose dismissal of her other claims to the extent predicated on the content of Monsanto's label.

market products free of manufacturing defects, and to honor their express warranties or other contractual commitments." 544 U.S. at 444. Thus, following *Durnell*, federal preemption does not diminish Monsanto's non-label-based duties to plaintiffs either to stop selling Roundup or to make a safer Roundup product.

## III. Monsanto Does Not Meet Its "Demanding" Burden to Show Implied Impossibility Preemption of Plaintiff's Claims.

Plaintiff's design defect and non-label-based claims impose more stringent requirements than EPA on "the sale or use of any registered pesticide," wielding the precise "authority of states" that Congress codified. 7 U.S.C. § 136v(a). Monsanto's response is remarkable. It claims that Congress *impliedly* forbade states from doing what FIFRA *expressly* authorizes. Mot. at 11. That argument fails as a matter of law and logic. Where federal law unambiguously *authorizes* state regulations, federal law cannot simultaneously make it *impossible* to comply with them.

### A. Plaintiff's Design Defect Claim Is Not Impliedly Preempted.

Impossibility preemption requires comparing state and federal duties. *Mensing*, 564 U.S. at 611. Monsanto begins its argument by attacking a strawman, pretending that the duty imposed by state design-defect law is to "do what federal law prohibits Monsanto from doing unilaterally – change Roundup's formulation." Mot. at 23. For over 60 years, that has not been the relevant state-law duty. To the contrary, the state-law duty at issue in a design defect claim is "the duty of the seller . . . to refrain from placing a product into the stream of trade in an unreasonably dangerous, defective condition. Or put another way, the seller is under a duty not to market a product which subjects the consumer or user or someone in the vicinity of its use to an unreasonable risk of harm." *Hamilton v. Motor Coach Indus., Inc.*, 569 S.W.2d 571, 575 (Tex.

Civ. App. 1978).[5] State law insists that a manufacturer not sell a defectively designed pesticide. Period. That is precisely the sort of more restrictive regulation on the "sale or use" of Roundup that Congress authorized. 7 U.S.C. § 136v(a). *Durnell* reaffirms what FIFRA's text plainly says. 146 S. Ct. at 2008 n.2 (a state has the authority to "out-right ban a pesticide within its borders.").

Monsanto cannot possibly carry its "demanding" burden to show that it was impossible to comply with this congressionally authorized state-law duty. *Wyeth*, 555 U.S. at 573. State law says do not sell Roundup if it meets the state definition of a defective product. Federal law says Roundup may be sold, not that it must be. *Mortier,* 501 U.S. at 613–14. Though state law may *differ* in some respects from federal law, differences only matter for purposes of the narrow, inapplicable express preemption clause. They have no bearing on the analysis for *impossibility,* where state law routinely imposes duties that are more onerous than federal obligations. *See Albrecht*, 587 U.S. at 607 ("[W]e have refused to find clear evidence of such impossibility where the laws of one sovereign permit an activity that the laws of the other sovereign restrict or even prohibit."); *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011) (citing *Gade v. National Solid Wastes Management Assn.*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring)) ("Implied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives.'"). Those principles would apply even *absent* the express authority conferred by 7 U.S.C. § 136v(a). It follows *a fortiori* that where Congress *expressly*

---

[5] *See also Bylsma v. R.C. Willey*, 2017 UT 85, ¶ 26, 416 P.3d 595, 605 (Utah Dec. 1, 2017) ("The seller's duty is not to sell a defective product—there is no analysis of due care or preventative measures"); *Sternhagen v. Dow Co.*, 935 P.2d 1139, 1146 (Mont. 1997), *reconsideration denied* (May 26, 2026) ("a seller [manufacturer] has a duty to prevent the release of any product in a defective condition unreasonably dangerous" into the market); *Quinn v. Gen. Elec. Co.*, 356 A.3d 2, 24 (Md. 2026) (explaining that a design defect claim "is predicated on the understanding that a manufacturer of an unreasonably dangerous product should be responsible for harm caused to those it is reasonably foreseeable will come into contact with its product.").

*authorized* states to go beyond FIFRA's requirements, FIFRA does not *impliedly* preempt those more stringent state obligations.

Nothing in *Bartlett* is to the contrary. *Cf.* Mot. at 23–24. There, the Supreme Court found that federal law prohibited unilateral changes to the labeling of generic drugs, and the state-law duty would have required unilateral changes to drug labeling. *Bartlett*, 570 U.S. at 409. The Court rejected a "stop-selling" remedy under state law where this was a proposed *workaround* to the state duty to change the generic drug label, which the generic drug manufacturers could not unilaterally do. *Id.* But the *core duty* imposed by state design-defect law is to not sell an unreasonably dangerous pesticide. This is not some workaround of the *real* duty to change Roundup's formulation. It is the *actual* state-law duty, which this Court must accept as the states articulate it under principles of federalism. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 79–80 (1938).

Regardless, FIFRA contains the very "express non-preemption clause" the Supreme Court found lacking in *Bartlett.* 570 U.S. at 492. For generic drugs, the Court was forced to "divine Congress' will from the duties" the Food, Drug, and Cosmetic Act imposed. *Id.* at 493; *accord In re Roundup Prods. Liab. Litig.*, 364 F. Supp. 3d at 1088 ("nothing in the FDCA allows a state to ban a drug," in contrast with FIFRA). No divination is required under FIFRA. Congress could not have been clearer: states retain authority to go beyond FIFRA to protect public health. 7 U.S.C. § 136v(a). This Court need only enforce FIFRA according to its plain terms.

A Hawaii district court considered, and rejected, similar defense arguments in *Ansagay v. Dow Agrosciences LLC*, 153 F. Supp. 3d 1270, 1277 (D. Haw. 2015). The defendant argued under *Bartlett* and *Mensing* that state-law tort claims pertaining to plaintiff's deceased spouse's exposure to a pesticide containing chlorpyrifos were preempted because it would be impossible to comply with both FIFRA and the state-law duties that the plaintiff sought to impose. The

*Ansagay* court recognized that FIFRA "contemplates that each state will regulate pesticide sales and use within its borders and authorizes such action." 153 F. Supp. 3d at 1283. This allowance for states to ban or restrict the use of EPA-approved pesticides "clearly undercuts" the defendant's "sweeping contention that any state law that impedes [the defendant's] ability to sell its registered product runs afoul of FIFRA." *Id.*

Other courts agree. Rejecting Monsanto's same implied preemption arguments post-*Durnell,* a Missouri court recently summed up the limits of *Durnell's* holding:

> [T]he *Durnell* Court's holding that FIFRA's labeling requirements expressly preempt a failure to warn claim that requires a manufacturer to use a label other than the EPA-approved label does not, in turn, lead to the conclusion that design defect and negligence claims are impliedly preempted. Under FIFRA, a manufacturer can change the composition of a product. FIFRA prescribes a procedure for, and not a per se prohibition on, changing a product's composition.

*Shull v. Monsanto Co.,* 2026 WL 2742795, at *2; *see also, Holyfield v. Chevron U.S.A., Inc.,* 533 F. Supp. 3d 726, 736 (E.D. Mo. 2021) ("Looking at the plain text of FIFRA, this Court sees no language indicating that design defect claims are expressly or impliedly preempted . . . [I]t is apparent that the statutory scheme established by Congress permits state law liability even for pesticides registered by the EPA, including those that cannot be redesigned."); *Ansagay*, 153 F. Supp. 3d at 1281.

The Supreme Court has cautioned courts not to "distort the Supremacy Clause in order to create similar pre-emption across a dissimilar statutory scheme." *Mensing*, 564 U.S. at 626. This Court should decline Monsanto's invitation to do so here.[6]

[6] Nor can Monsanto establish impossibility by pointing to the fact that some states require evidence of a feasible alternative design to prove a design defect claim. Whether a feasible alternative design exists, and whether that design must be approved by a regulator, does not control the scope of the state duty. The duty is not to implement the alternative design. It is to not sell the defective design, and the design is defective in some states because an alternative was available. Whether that alternative could have been achieved quickly, cheaply, or expensively

### B. Plaintiff's Non-Label-Based Warning Claims Are Not Expressly or Impliedly Preempted.

Mr. Gebo purchased and used Roundup after he was exposed to Monsanto's advertisements, which conveyed the false and misleading message that Roundup was perfectly safe for use without any protective clothing or concern about dermal exposure. *See infra* Section V(A), (C). These advertisements are not "labeling or packaging" that is the subject of FIFRA's express preemption provision, nor would it have been impossible for Monsanto to provide adequate warnings to consumers while complying with federal law.

Many states' laws, including Florida's, simply require that an adequate warning concerning a dangerous product be provided. They say nothing about the warning needing to appear on the label, which is the only medium that FIFRA places off-limits. 7 U.S.C. § 136v(b); *Durnell,* 146 S. Ct. at 2012. A duty to warn consumers of harm by means other than pesticide labeling cannot be a duty that "constitute[s a] state labeling requirement[]" of the kind that *Durnell* found was preempted in that case. *Id.* at 2010; *see Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 528–29 (1992) (plurality opinion) (advertising-based fraud claims were not preempted because they were predicated "on a more general obligation – the duty not to deceive").[7]

Monsanto contends that its advertisements are either "labeling" to the extent they "accompany[] the pesticide," Mot. at 10 (quoting 7 U.S.C. § 136(p)(2)), or it would be impossible to truthfully warn consumers because to "contradict the EPA-approved label for

---

and after much regulatory back and forth is entirely irrelevant to the duty design defect law imposes. The hypothetical EPA response to some alternative design Monsanto did not submit is not a "law" of the United States with preemptive force. *Albrecht*, 587 U.S. at 315.

[7] *Cf. In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 474 F. Supp. 3d 1231, 1259 (N.D. Fla. 2020) (rejecting defense argument that there were "significant conflicts in failure-to-warn cases" involving earplug safety warnings where there was "no evidence—none—that the Army prohibited" warnings from being given, which could have been accomplished by placing warnings on the boxes in which the earplugs were shipped as well as on individual blister packs).

Roundup and claim elsewhere that Roundup causes cancer is barred by impossibility preemption." Mot. at 11 (citing 40 C.F.R. § 168.22(a)). Neither contention holds water.

Monsanto's argument that advertisements are somehow a form of "labeling" is contravened by the plain language of FIFRA and by Monsanto's own conduct. FIFRA defines labels as "all labels and all other written, printed, or graphic matter [] accompanying the pesticide or device at any time." 7 U.S.C. § 136(p)(2).[8] "Pesticide" and "device" are defined by reference to the physical "substance or mixture of substances" and the "instrument or contrivance" used to kill weeds, among other things, not the intangible brand advertised in a commercial. 7 U.S.C. § 136(h), (u). To read "accompanying" to mean anything other than the physical label affixed to this physical product or written materials that are inside of the packaging defies the plain text. Monsanto does not really believe its own argument, as it has never submitted each and every advertisement it disseminates to the EPA for its prior approval as forms of "labeling." Lest the company is violating FIFRA countless times per day, its argument is made for litigation only. *See* 7 U.S.C. § 136v(a).

Monsanto's impossibility argument fares no better. Unlike the FDCA, the statute at issue in the *Yousefzadeh* case on which Monsanto relies,[9] FIFRA does not treat advertising about a pesticide as labeling. The regulatory provision that Monsanto cites, 40 C.F.R. § 168.22(a), was promulgated as part of an EPA interpretative statement intended to offer guidance to industry on agency enforcement priorities. 54 Fed. Reg. 1122 (Jan. 11, 1989), *available at* https://archives.federalregister.gov/issue_slice/1989/1/11/1116-1134.pdf.EPA's final

[8] The definition also includes such matters "to which reference is made on the label or in literature accompanying the pesticide or device," excluding certain official publications. 7 U.S.C. § 136(p)(2).

[9] *See* Mot. at 11 (citing *Yousefzadeh v. Johnson & Johnson Consumer Inc.*, 184 F.4th 130, 151 (2d Cir. 2026)).

interpretative rule made clear that "FIFRA does not grant EPA plenary authority to regulate advertising as such," and that EPA merely sought to "state clearly its position with regard to claims in advertising that are made 'to induce the * * * sale and use' of a pesticide and that therefore are a part of the distribution or sale of the pesticide." *Id.* at 1124. In other words, this staff interpretation provides further confirmation that advertisements are *not* labels for FIFRA purposes. Consistent with this, EPA administrative pronouncements have consistently rejected the argument that advertisements should be deemed a form of labeling. *In the Matter of: Liphatech, Inc., Respondent*, 2014 WL 1012749, at *20 (E.P.A. Mar. 12, 2014); *see also Bates*, 544 U.S. at 444 n.17 ("To the extent that petitioners' warranty and fraud claims are based on oral representations made by Dow's agents, they fall outside the text of § 136v(b) for an independent reason. . . . any requirement that applied to a sales agent's *oral* representations would not be a requirement for "labeling or packaging").

Even if some ads were somehow deemed "labels," this would not help Monsanto's cause, because EPA deems it per se misleading to make safety claims of any kind on a pesticide's labeling. *See* 40 C.F.R. § 156.10(a)(5)(ix) (it is "false or misleading" to make "[c]laims as to the safety of the pesticide or its ingredients"). Either way, FIFRA does not preempt states from using their well-established police powers to require adequate off-label warnings. Monsanto comes nowhere near the demanding showing needed for an implied impossibility preemption defense.[10]

## IV. <u>There Can Be No Implied Impossibility Preemption Where Monsanto Did the Very Thing It Calls "Impossible"—Reformulated Roundup, with EPA Approval.</u>

[10] Plaintiff is in good company. The United States, which backed Monsanto in *Durnell*, agrees. It expressly told the Court it should remand so the state court could consider any non-label-based warning theories that Durnell had preserved. *See* Brief for the United States as Amicus Curiae Supporting Petitioner at 17, *Monsanto Co. v. Durnell*, 146 S. Ct. 2001 (2026) (No. 24-1068) ("To the extent respondent now contends (Br. In Opp. 17–23; Supp. Br. 2–6, 11–12) that his claim involves advertising, manufacturing, or the failure to alert the EPA, those case-specific issues are outside the question presented but may be addressed on remand (if preserved).").

Monsanto's argument that it cannot reformulate Roundup without EPA's permission, Mot. at 22–23, elides the fact that Monsanto did, in fact, receive EPA permission to reformulate a glyphosate-free version of Roundup – a fact that the Supreme Court took under advisement in *Durnell* itself. 146 S. Ct. at 2009 n.4 ("Monsanto has phased out residential Roundup products that contain glyphosate."). In 2022, Monsanto ceased or phased out selling glyphosate-based Roundup in the United States for residential lawn and garden use, obtained the necessary EPA registration, and began marketing its new glyphosate-free Roundup in its place. OMSF ¶ 162. Monsanto cannot make out a viable impossibility defense when the action it complains of is not only possible, but is something it has already done.

## V. Plaintiffs' Florida Law Claims Are Supported By Sufficient Evidence.

Plaintiff's design defect, negligence, and non-label-based failure-to-warn claims are not disguised label-based failure-to-warn claims, are well supported, and should proceed to trial.

### C. The Record Supports Plaintiff's Design Defect Claim.

Florida recognizes the consumer expectations test for strict liability design defect claims. *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 510 (Fla. 2015).[11] Under Florida's consumer expectations test, a product is defectively designed if it fails "to perform as safely as an ordinary consumer would expect when used as intended or when used in a manner reasonably foreseeable by the manufacturer." *Id.* at 503 (reaffirming *West v. Caterpillar Tractor Co.*, 336 So. 2d 80 (Fla. 1976)); *see also* Fla. Std. Jury Instr. (Civ.) 403.7(b). Applying this test, Florida courts have repeatedly recognized the viability of strict liability design defect and negligence theories, *even*

[11] *Aubin* further clarified that "there is absolutely no requirement embodied in the Standard Jury Instructions, nor has this Court ever adopted a requirement as set forth in the Third Restatement, that the plaintiff must either present proof of a reasonable alternative design or establish that the product was manifestly unreasonable before the requirement of proof of an alternative design could be excused." *Aubin*, 177 So. 3d at 512.

when claims based on the warnings accompanying a product are preempted by federal law. *See, e.g., R.J. Reynolds Tobacco Co. v. Marotta*, 214 So. 3d 590, 605 (Fla. 2017) (holding that despite express federal preemption of failure to warn claims arising from cigarette use, federal law did not impliedly preempt state law tort claims of strict liability design defect and negligence); *Engle v. Liggett Group, Inc.*, 945 So.2d 1246, 1273 (Fla. 2006) (holding that jury findings that cigarettes were unreasonably dangerous and defectively designed would carry preclusive effect in future cases brought by members of decertified class, despite federal preemption of failure-to-warn claims); *see also Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1186 (11th Cir. 2017) ("We conclude that federal tobacco laws do not preempt state tort claims based on the dangerousness of all the cigarettes manufactured by the tobacco companies. In other words, federal law does not preempt the *Engle* jury findings.").

Monsanto's challenge to Plaintiff's design defect claim rests almost entirely on its contention that the Court ought to rewrite Florida law to hold that a design defect claim premised on consumer expectations "is, in substance, a failure-to-warn claim [because] the way that ordinary consumers form expectations about complex chemical products is from reading their label." Mot. at 2; *accord id.* at 18–19. This is an *empirical* assertion about consumer psychology, offered without a shred of record evidence. The factual record here supports a finding that consumers' expectations about Roundup were *heavily influenced* by Monsanto's decades-long advertising and public relations efforts. *See* OSMF ¶ 110 (describing how the right "messaging" in Monsanto's promotional campaigns could be used to assuage consumers' concerns about the product's safety); *see, e.g., id.* ¶¶ 11, 25, 30, 34, 49, 51–55, 62–63, 77–78 (describing Monsanto's messaging). Indeed, as the Florida Supreme Court explained in *Aubin*, "a manufacturer plays a pivotal role in crafting the image of a product and establishing the

consumers' expectations for that product, a portrayal which in turn motivates consumers to purchase that particular product." 117 So.3d at 511. Under Florida law, "[t]he consumer expectations test thus rightly focuses on the expectations that a manufacturer creates." *Id.* Here, what expectations ordinary consumers have formed about Monsanto's pesticide product, sold to them off retail shelves and extensively marketed as safe – and whether an ordinary residential user would have expected Roundup to cause them to develop a fatal cancer after using it in the manner Monsanto encouraged and expected, thus remains a matter for the jury to determine.

Monsanto fails to cite a single Florida case to support its proposed rule equating consumer expectations with a product's label. To the contrary, in the fifty years since *West*, through *Aubin*'s reaffirmation of the consumer expectations test, and across the many decisions applying that test, no Florida court has ever held that consumer expectations are solely defined by the content of a product's label. In *Engle*, for example, the liability findings binding across the class in the cigarette litigation were returned *under the consumer expectations test*. *Engle*, 945 So. 2d at 1277 (approving "Phase I findings for the class as to Question[] [3] (that the defendants placed cigarettes on the market that were defective and unreasonably dangerous"). Those findings bind juries in *Engle*-progeny cases trying strict liability design defect and negligence claims, even though failure-to-warn claims arising from the same product are federally preempted. The Florida Supreme Court in fact flatly rejected the position Monsanto advances here: "Although compliance with the federal warnings preempted any claim based on failure to warn, it did not eliminate the other causes that the jury had to consider." 945 So. 2d at 1273.

Nor does the "scientific complexity" of a product's hazards foreclose developing consumer expectations unrelated to a product's labeling. *Aubin*, for example, involved an asbestos-containing product whose lethal danger was latent, invisible, and scientifically complex

(like the danger here) and whose victim developed a deadly cancer many years after his exposure (like Mr. Gebo did). 177 So. 3d at 494–95. The Florida Supreme Court did not hold that consumers' expectations about asbestos could only arise from the product label or accompanying material safety data sheet. *See id.* at 497–98 (noting that plaintiff testified that "he did not recall seeing warnings on the products" and "did not expect that the normal use of the joint compounds and texture sprays would release dangerous dust into the air"). Rather, the *Aubin* Court affirmed the jury's verdict on strict liability design defect, premised on their finding that an ordinary consumer could expect that the product at issue would not inflict a fatal cancer. *Id.* at 520.[12]

If ordinary consumers can hold safety expectations about asbestos products and cigarettes, they can hold them about a weed killer Monsanto sold through retail stores without any sort of license or training requirement. The expectation that an herbicide sold to consumers off a retail shelf and sprayed from a trigger bottle will not cause cancer is precisely the same kind of baseline safety expectation recognized in *Aubin*. It exists apart from any label.

*Papike v. Tambrands Inc.*, upon which Monsanto relies, does not require a contrary result. That case involved a medical device governed by the Medical Device Amendments (MDA) to the FDCA, a federal statute with a sweeping express preemption provision that includes design defect claims. 107 F.3d 737, 739–41 (9th Cir. 1997) (summarizing preemption under MDA). By contrast, FIFRA's express preemption provision only reaches label-based failure-to-warn claims, not design claims. *See Bates*, 544 U.S. at 444. Monsanto acknowledged this distinction during

[12] Similarly, in *McConnell v. Union Carbide Corp.*, the Fourth DCA held that a worker who developed mesothelioma from asbestos incorporated into joint compound was entitled to a consumer expectations instruction. 937 So. 2d 148, 152 (Fla. 4th DCA 2006). Applying *Aubin* on materially identical facts, the Third DCA likewise held that an asbestos wrongful-death plaintiff was entitled to submit her strict-liability design claim to the jury under the consumer expectations test. *Font v. Union Carbide Corp.*, 199 So. 3d 323, 327 (Fla. 3d DCA 2016).

oral argument before the Supreme Court in *Durnell*. *Durnell*, Tr. of Oral Arg., at 31–32 (distinguishing the MDA's broader preemptive scope from that of FIFRA, which is "really just on the labeling"). Moreover, in *Papike*, there was no evidence Tambrands spent decades convincing consumers that its tampons do not cause toxic shock syndrome, much less that they sought to pollute the scientific literature as Monsanto did.

This Court's remarks after the *Hardeman* trial, quoted by Monsanto, also fail to demonstrate the absence of a fact issue for the jury here. As this Court noted, Mr. Hardeman in that *specific trial* "presented no evidence that Roundup is inherently defective regardless of whether accompanied by a warning." *In re Roundup Prods. Liab. Litig.*, No. 16-CV-05250VC, 2019 WL 3219360, at *3 (N.D. Cal. July 12, 2019). The Court did not establish a general or binding proposition that design defect claims are inevitably subsumed by a failure-to-warn claim, and the Court did not consider Florida law. Here, the record plainly demonstrates a course of conduct adequate to support a finding of liability on theories of negligent design (by way of, for example, Monsanto's failure to adequately test Roundup) and strict liability design defect under Florida law, without regard for the content of the warning label.

In sum, Plaintiff has provided more than sufficient evidence to satisfy Florida's consumer expectation test, wholly independent of labeling. And even if, *arguendo*, Plaintiff could not satisfy the consumer expectation test and instead pursued an alternative design theory as Florida law *also* permits, Monsanto now sells an alternative Roundup formulation that does not contain glyphosate, using ingredients that have been available for decades, and which Monsanto touts as safe and effective. *See* OMSF ¶¶ 71, 122–28.

**A. <u>The Record Supports Plaintiff's Negligence Claims.</u>**

Defendant contends that Plaintiff's negligence claim should be deemed a repackaged

label-based failure to warn, and thus preempted. Mot. at 24–25. But Plaintiff's negligence claim is predicated on Monsanto's failure to use requisite reasonable care in designing, testing, and marketing Roundup, independent of the label. Compl., ¶¶ 183–203 (alleging, *inter alia*, that Monsanto "[f]ail[ed] to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide").[13]

Florida has long recognized a claim for negligence based on product design. In *Ford Motor Co. v. Evancho*, the Florida Supreme Court held that a manufacturer owes a duty "to use reasonable care in the design of" its product so as to "eliminate any unreasonable risk of foreseeable injury" arising from its intended and reasonably foreseeable uses. 327 So. 2d 201, 204 (Fla. 1976); *accord Suzuki Motor Corp. v. Winckler*, 434 So.3d 104, 109 (Fla. 5th DCA 2026) (holding that, "[i]n Florida, the manufacturer of a defective product may be found liable under either negligence or strict liability theories"; whereas strict liability focuses on the product and an ordinary consumer's reasonable expectations, negligence focuses on whether there was a duty of care and whether it was breached); *Grieco v. Daiho Sangyo, Inc.*, 344 So.3d 11, 17 (Fla.

[13] Florida courts have limited FIFRA preemption to claims challenging warnings or information conveyed through a product's label, while allowing other negligence theories to proceed. For example, the *Douberly* court described that "FIFRA has been interpreted as precluding a cause of action that rests on a failure to warn or to communicate information about a product through its label, but authorizing claims involving negligent testing." *ISK Biotech Corp. v. Douberly*, 640 So. 2d 85, 88 (Fla. Dist. Ct. App. 1994); *accord Kennan v. Dow. Chem. Co.*, 717 Supp. 799, 811–12 (M.D. Fla. 1989) (holding that "plaintiff's theory for finding the products defective and unreasonably dangerous was not based exclusively on defendant's failure to warn, but on a theory that products containing PCP have design defects and/or manufacturing flaws"); *Brennan v. Dow Chem. Co.*, 613 So. 2d 131, 132 (Fla. Dist. Ct. App. 1993) (concluding that FIFRA preempts claims "only to the extent they rely on a finding that the product's labeling was inadequate"); *Papas v. Upjohn Co.*, 985 F.2d 516, 520 (11th Cir. 1993) (finding no FIFRA preemption for claims that do not challenge labeling or packaging).

4th DCA 2022) ("Proof of a defect determines breach of duty under negligence theory.").[14] The elements of the claim are those of ordinary negligence, directed at the design: (1) a duty to use reasonable care in designing the product; (2) breach of that duty, *i.e.*, a design that a reasonably careful manufacturer would not adopt given the foreseeable risk of injury; (3) causation; and (4) damages. *Evancho*, 327 So. 2d at 204. As with the strict liability design defect claim, not one element of this negligent design claim concerns the label: the duty runs to Roundup's design, the breach is measured by the reasonableness of Monsanto's design choices, and the remedy is damages. *Evancho*, 327 So.2d at 204.

Further, the summary judgment record contains ample extensive evidence that Monsanto breached its duty of care. For example, Monsanto systematically ignored, suppressed, and downplayed evidence of glyphosate's and formulated Roundup's serious health risks over the course of decades (OMSF ¶¶ 11–28, 32, 36, 50, 98–99, 119–21); Monsanto sold Roundup through 1990 without testing formulated Roundup for carcinogenicity (*id.* ¶¶ 11–46), even knowing that the POEA surfactant could damage genetic material in cells (*id.* ¶¶ 47–48, 98–103); studies published in 2012 and 2025 show that Monsanto could have conducted long-term animal studies on formulated Roundup before putting Roundup on the market, and those studies would have revealed its carcinogenic hazard (*id.* ¶¶ 99, 120–21); safer alternative designs were feasible and available (*id.* ¶¶ 71, 122–28); and the company's course of conduct over the years violated industry standards of care, particularly due to inadequate testing (*id.* ¶¶ 129–33).

---

[14] *See also, e.g.*, *Small v. Amgen, Inc.*, 134 F. Supp. 3d 1358, 1366 (M.D. Fla. 2015) ("Florida tort law provides that the manufacturer of a defective product may be subject to liability under two theories: negligence and strict liability. . . In order to prevail under either theory, the plaintiff must establish that the product was defective or unreasonably dangerous.").

**B. <u>The Record Supports Plaintiff's Non-Label Failure-to-Warn Claim.</u>**

Defendant does not challenge the adequacy of Plaintiff's non-label-based failure-to-warn claims, other than to argue that such claims must be preempted by *Durnell*. Mot. at 24–25. Florida courts recognize a "manufacturer has a duty to warn where its product is inherently dangerous or has dangerous propensities." *Benavides v. Tesla, Inc.*, 804 F. Supp. 3d 1242, 1302–04 (S.D. Fla. 2025) (internal citation and quotation marks omitted) (denying summary judgment on failure to warn, holding that, despite instruction manual's warnings, Tesla's external representations – such as use of the "potentially confusing term [Autopilot]" and the CEO's claim that "vehicles with Tesla's Autopilot system were '*safer than human drivers*'" – there was a genuine dispute as to whether the average consumer would know not to trust Autopilot). Florida law also prohibits misleading advertising. *See* Fla. Stat. § 817.41.

The record contains extensive evidence of Monsanto's advertising, promotional, and "educational" campaigns aimed at customers, which conveyed the false and misleading message that Roundup exposure was safe and non-carcinogenic. *See, e.g.*, OMSF ¶¶ 11, 25, 34, 51–55, 62–63, 77–78. There is also evidence demonstrating Mr. Gebo was exposed to Monsanto's misleading television advertising campaigns; a jury is entitled to conclude from this that Monsanto could have reached him with warnings the alerted him to the hazardous nature of Roundup, without altering its product labeling. *See, e.g.*, Dietrich Dep. Tr., at 66:20–23; OMSF ¶ 52 (Roundup commercial where a weed turns brown immediately after being sprayed, as Ms. Dietrich described); Wells Dep. Tr., at 334:2–17. Mr. Gebo would not have used Roundup had he received a warning. *Id.* at 336:11–14. Monsanto's safety misrepresentations in its advertising went far beyond the representations permitted on the label, removing them from FIFRA's preemptive reach. Plaintiff's non-label-based failure-to-warn claims should go to a jury.

## VI. If Claims Are Insufficient Due To *Durnell*, Plaintiff Requests Leave to Amend.

If the Court finds an inadequate basis for Plaintiff's claims due to *Durnell* (it should not), Plaintiff requests the opportunity to amend her complaint. *See* Fed. R. Civ. P. 15 (leave to amend shall be freely granted when "justice so requires"). It is well settled that – absent undue delay or futility – plaintiffs shall be granted leave to amend following an intervening change in law, namely, when a higher court overturns controlling precedent, as is the case here.[15]

## CONCLUSION

Plaintiff respectfully asks that the Court deny Defendant's supplemental motion.

---

[15] *See, e.g.*, *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1028 (9th Cir. 2014) (finding that "[i]t is common practice to allow plaintiffs to amend their pleadings to accommodate changes in the law, unless it is clear that amendment would be futile" and concluding "that the plaintiffs should have the opportunity to amend their complaint in light of *Kiobel II*") (internal citation and quotation marks omitted); *Morales v. City of Tucson*, No. 23-00498, 2024 WL 4475095, at *2 (D. Ariz. Oct. 11, 2024) (finding good cause under R. 15 for leave to amend after discovery closed due to intervening decision that changed controlling law); *Leon v. Volkswagen Grp. of Am., Inc.*, No. 24-CV-03863, 2025 WL 1843211, at *4 (C.D. Cal. June 27, 2025) (explaining that "[i]t is common practice to allow plaintiffs to amend their pleadings to accommodate changes in the law, unless it is clear that amendment would be futile" and granting leave to amend after higher court ruling resolved a pre-existing split in statutory interpretations between California state and federal courts); *In re. Infineon Tech. AG Sec. Litig.*, No. 04-04156 JW, 2010 WL 11587076, at *2 (N.D. Cal. Oct. 27, 2010) (granting leave to amend in light of Supreme Court decision and finding that "Defendants will not be prejudiced by any amendment, which will narrow the issues and claims involved in the case"); *People for Ethical Treatment of Animals, Inc. v. Dade City's Wild Things, Inc.*, No. 8:16-CV-2899-T-36AAS, 2018 WL 2715460, at *4 (M.D. Fla. June 6, 2018) (stating "PETA could not have known about the content of the *Miami Seaquarium* opinion until January 12, 2018 . . . PETA may not have had reason to consider amendment until Defendants filed their Motion for Judgment on the Pleadings on February 20, 2018").

Dated September 28, 2026

Respectfully submitted,

By: *_/s/ Robin Greenwald_*

Robin Greenwald
**WEITZ & LUXENBERG, P.C.**
700 Broadway, Fifth Floor
New York, NY 10003
Telephone: (212) 558-5500
rgreenwald@weitzlux.com

*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 28th day of September 2026, a copy of the foregoing was filed with the Clerk of the Court through CM/ ECF system which sent notice of the filing to all appearing parties of record.

*/s/ Robin Greenwald*
Robin Greenwald