**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel: 202-847-4030 | Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843 | Fax: 202-682-1639

Attorneys for Defendant Monsanto Company

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400 | Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
Linda C. Hsu (CA Bar No. 239880)
(linda.hsu@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel: 310-576-2100 | Fax: 310 -576-2200

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION

This document relates to:

*Brookner v. Monsanto Co.*
Case No. 23-cv-04840-VC

*Gebo / Dietrich v. Monsanto Co.*
Case No. 17-cv-00168-VC

*Gomez v. Monsanto Co.*
Case No. 24-cv-03495-VC

*Jackson v. Monsanto Co.*
Case No. 23-cv-01572-VC

*Schrag v. Monsanto Co.*
Case No. 22-cv-08888-VC

*Villalobos v. Monsanto Co.*[1]
Case No. 24-cv-01407-VC

MDL No. 2741

Case No: 3:16-md-02741-VC

**DEFENDANT MONSANTO COMPANY'S REPLY IN SUPPORT OF ITS SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT IN THE "CATEGORY 1" CASES GOVERNED BY FLORIDA LAW**

[Filed concurrently with Declaration of Linda C. Hsu]

Hearing Date: November 16, 2026
Time: 1:00 p.m.
Courtroom: 3 – 17th Floor

[1] After Monsanto filed its opening brief, the following five cases were dismissed and/or resolved: *Berenfeld*, Case No. 18-cv-01428-VC; *Glassman*, Case No. 20-cv-00024-VC; *Holmes*, Case No. 20-cv-03363-VC; *Levy*, Case No. 21-cv-07643-VC; and *Proctor*, Case No. 21-cv-00172-VC.

**TABLE OF CONTENTS**


I. INTRODUCTION ..... 1

II. ARGUMENT ..... 2

A. Plaintiffs' design-defect claims fail. ..... 2

1. Plaintiffs lack evidence to support a design-defect claim. ..... 2

2. Plaintiffs' design-defect claims are preempted. ..... 4

a. *Bates* does not sanction Plaintiffs' design-defect claims. ..... 4

b. Plaintiffs' design-defect claims are disguised failure-to-warn claims, and thus expressly preempted, insofar as they rest on the consumer-expectations test. ..... 6

c. Plaintiff's design-defect claims are impliedly preempted insofar as they rest on the risk/utility test. ..... 11

B. Plaintiffs' advertising-based failure-to-warn claims are expressly preempted because advertising is labeling under FIFRA. ..... 15

C. Plaintiff's negligence claims are preempted and fail as a matter of state law. ..... 17

D. Plaintiffs' warranty claims are preempted. ..... 19

E. Leave to amend should be denied because amendment is futile and unfair. ..... 19

III. CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.*,
2025 WL 1282749 (N.D. Ill. May 2, 2025) .......... 3

*Adams v. G.D. Searle & Co.*,
576 So. 2d 728 (Fla. Dist. Ct. App. 1991) .......... 18

*Aetna Health Inc. v. Davila*,
542 U.S. 200 (2004) .......... 6

*Andrus v. AgrEvo USA Co.*,
178 F.3d 395 (5th Cir. 1999) .......... 10

*Ansagay v. Dow Agrosciences LLC*,
153 F. Supp. 3d 1270 (D. Haw. 2015) .......... 7

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .......... 8

*Aubin v. Union Carbide Corp.*,
177 So. 3d 489 (Fla. 2015) .......... 7, 11

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005) .......... *passim*

*Bragdon v. Abbott*,
524 U.S. 624 (1998) .......... 8

*Brockert v. Wyeth Pharms., Inc.*,
287 S.W.3d 760 (Tex. Ct. App. 2009) .......... 3, 4

*Brown v. Johnson & Johnson*,
64 F. Supp. 3d 717 (E.D. Pa. 2014) .......... 4

*Buckman Co. v. Plaintiffs' Legal Com.*,
531 U.S. 341 (2001) .......... 5, 12, 19

*Caterpillar, Inc. v. Shears*,
911 S.W.2d 379 (Tex. 1995) .......... 4

*Eyl v. Ciba-Geigy Corp.*,
264 Neb. 582 (2002) .......... 17

*Freightliner Corp. v. Myrick*,
514 U.S. 280 (1995) .......... 11, 12, 13

*Geier v. American Honda Motor Co.*,
529 U.S. 861 (2000) .......... 5, 12, 14

*Genie Indus., Inc. v. Matak*,
462 S.W.3d 1 (Tex. 2015) .......... 5

*Indian Brand Farms, Inc. v. Novartis Crop Prot. Inc.*,
617 F.3d 207 (3d Cir. 2010) .......... 16, 17

*Kordel v. United States*,
335 U.S. 345 (1948) .......... 8, 16, 17

*Kuiper v. Am. Cyanamid Co.*,
913 F. Supp. 1236 (E.D. Wis. 1996) .......... 10

*Kurns v. Railroad Friction Products Corp.*,
565 U.S. 625 (2012) .......... 6

*Lowe v. Sporicidin Int'l*,
47 F.3d 124 (4th Cir. 1995) .......... 9, 10

*Malheur Forest Fairness Coal. v. Iron Triangle, LLC*,
164 F.4th 710 (9th Cir. 2026) .......... 20

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) .......... 8

*Monsanto Co. v. Durnell*
609 U.S. 371 (2026) .......... *passim*

*Moretti v. Mut. Pharm. Co.*,
852 F. Supp. 2d 1114 (D. Minn. 2012) .......... 6

*Mutual Pharm. Co., Inc. v. Bartlett*,
570 U.S. 472 (2013) .......... *passim*

*Nathan Kimmel, Inc. v. DowElanco*,
275 F.3d 1199 (9th Cir. 2002) .......... 19

*New York State Pesticide Coalition, Inc. v. Jorling*,
874 F.2d 115 (2d Cir. 1989) .......... 16, 17

*Papike v. Tambrands, Inc.*,
107 F.3d 737 (9th Cir. 1997) .......... 7

*Parents for Priv. v. Barr*,
949 F.3d 1210 (9th Cir. 2020) .......... 20

*PLIVA, Inc. v. Mensing*,
564 U.S. 604 (2011) .......... 11, 12, 13

*R.J. Reynolds Tobacco Company v. Nelson*,
353 So.3d 87 (Fla. Dist. Ct. App. 2022) .......... 3

*Riegel v. Medtronic, Inc.*,
552 U.S. 312 (2008) .......... 8

*In re Roger Antkiewicz & Pest Elim. Prods. of Am., Inc.*,
8 E.A.D. 218, 1999 WL 362852 (E.A.B. 1999) .......... 9

*In re Roundup Prods. Liab. Litig.*,
2019 WL 3219360 (N.D. Cal. July 12, 2019) .......... 2, 3

*In re Roundup Prods. Liab. Litig.*,
364 F. Supp. 3d 1085 (N.D. Cal. 2019) .......... 14

*In re Sporocidin Int'l*,
Dkt. No. FIFRA 88-H-02 (Nov. 2, 1988) .......... 9

*Taylor AG Indus. v. Pure-Gro*,
54 F.3d 555 (9th Cir. 1995) .......... 10

*Timpte Indus., Inc. v. Gish*,
286 S.W.3d 306 (Tex. 2009) .......... 5

*Worm v. Am. Cyanamid Co.*,
5 F.3d 744 (4th Cir. 1993) .......... 10

*Yousefzadeh v. Johnson & Johnson Consumer Inc.*,
184 F.4th 130 (2d Cir. 2026) .......... 10

**Statutes**

21 U.S.C.A. § 355(a) .......... 14

7 U.S.C. § 136(p) .......... 15, 16

7 U.S.C. § 136(p)(2)(A) .......... 8, 16, 17

7 U.S.C. § 136a .......... 8

7 U.S.C. § 136a(a) .......... 14

7 U.S.C. § 136a(c) .......... 18

7 U.S.C. § 136a(c)(1)(C) .......... 8, 9, 10, 16

7 U.S.C. § 136a(c)(1)(F) .......... 18

7 U.S.C. § 136a(p)(1)(A) .......... 7

7 U.S.C. § 136j(a)(1)(B) .......... 8, 9, 10

7 U.S.C. § 136j(a)(1)(C) ........ 11, 12

7 U.S.C. § 136v(a) ........ 14, 15

7 U.S.C. § 136v(b) ........ *passim*

21 U.S.C. § 321(m) ........ 8

21 U.S.C. § 379r(e) ........ 14

21 U.S.C. § 379s(d) ........ 14

Federal Environmental Pesticide Control Act, Pub. L. 92-516, § 2(p)(2)(A), 86 Stat. 973, 977 (1972) ........ 8

Federal Insecticide, Fungicide, and Rodenticide Act, Pub. L. No. 80-104, ch. 125 § 2(s), 61 Stat. 163, 165 (1947) ........ 8

Food, Drug, and Cosmetic Act, Pub. L. 75-717, § 201(m), 52 Stat. 1040, 1041 (1938) ........ 8

**Rules and Regulations**

40 C.F.R. § 152.44(a) ........ 12, 16

40 C.F.R. §§ 152.112(b)–(c) ........ 18

40 C.F.R. § 168.22 ........ 9

40 C.F.R. § 168.22(a) ........ 9

54 Fed. Reg. 1122 ........ 9

54 Fed. Reg. 1124 ........ 9

**Other Authorities**

Restatement (Second) of Torts § 402A cmt. j ........ 6

## I. INTRODUCTION

Plaintiffs' briefs in opposition to Monsanto's supplemental motion for summary judgment do not refute Monsanto's showing that Plaintiffs' claims fail as a matter of law and on the evidence.

Plaintiffs' design-defect claims are preempted, but even if they were not they fail on the evidence. This Court already held in *Hardeman*, on a materially indistinguishable record, that the evidence did not support a theory that Roundup was inherently defective irrespective of its warnings. Rather, the only defect the evidence could support was that Roundup was sold without a cancer warning. Plaintiffs identify no materially different evidence here. Their assertion that ordinary consumers do not expect Roundup to cause cancer merely restates the warning theory *Hardeman* rejected as an independent design-defect claim. Nor can Plaintiffs pivot to a reasonable-alternative-design theory. They largely disclaim that theory, and none offers expert testimony identifying a safer design that was feasible when the relevant plaintiff used Roundup and would have prevented that plaintiff's cancer. The bare fact that Monsanto began marketing different, glyphosate-free herbicides under the Roundup trade name in, according to Plaintiffs, 2022 does not establish that those products were available during the relevant periods, constituted alternative designs rather than different products, or would have prevented Plaintiffs' cancers. Plaintiffs thus lack evidence to support any theory of design defect.

Putting aside the fatal evidentiary gaps, Plaintiffs' design-defect claims are also preempted. To the extent Plaintiffs rely on consumer expectations supposedly created by Roundup's label, advertising, and marketing, their claims are disguised failure-to-warn claims seeking to impose a cancer-warning requirement. Calling that theory "design defect" does not alter its substance. To the extent Plaintiffs instead challenge Roundup's composition under a risk-utility theory, their claims are impliedly preempted because federal law prohibited Monsanto from unilaterally selling a formulation different from the formulation EPA approved. Plaintiffs cannot avoid that conflict by arguing that Monsanto could simply have stopped selling Roundup, a theory the Supreme Court has explicitly rejected.

Plaintiffs' remaining claims fare no better. Their advertising-based failure-to-warn theories are expressly preempted because the "advertising" in question qualifies as labeling under FIFRA.

And they are also impliedly preempted because Monsanto is prohibited from making claims in advertising or other communications that differ from the EPA-approved label with no cancer warning. Their negligence claims, which restate Plaintiffs' failure-to-warn and design-defect claims, add no independent theory: Florida does not recognize failure to test as a separate cause of action; the alleged duty to test is subsumed by their deficient design-defect and failure-to-warn claims. Plaintiffs' warranty claims likewise depend on the alleged failure to disclose Roundup's asserted carcinogenic risk and are therefore preempted warning claims under another name.

Finally, amendment would be futile and unfair. Plaintiffs identify no amended theory that avoids both the evidentiary deficiencies and preemption, and they should not be permitted to reconstruct their cases after the close of MDL discovery around theories that they did not develop when discovery was open. More fundamentally, Monsanto challenges the sufficiency of the evidence, not merely the allegations—and so an amended complaint would change nothing. Most Plaintiffs also failed to submit the proposed and redlined pleadings required by the local rules. Because neither the existing record nor Plaintiffs' proposed amendments supply a viable non-preempted claim, Monsanto is entitled to summary judgment in each Florida case.

## II. ARGUMENT

### A. Plaintiffs' design-defect claims fail.

#### 1. Plaintiffs lack evidence to support a design-defect claim.

Even if they were not preempted, Plaintiffs' design-defect claims fail on the evidence, regardless whether one applies the consumer-expectations or the risk/utility standard.

As to consumer expectations, this Court already determined in Hardeman on substantially the same record that the only "design defect" claim plaintiff could support was that Roundup had been ""sold without a warning." *In re Roundup Prods. Liab. Litig.*, 2019 WL 3219360, at *3 (N.D. Cal. July 12, 2019); *see also id.* at *2 ("Based on the evidence presented at trial and on closing argument by Mr. Hardeman's counsel, the jury verdict must be understood to reflect the first theory: Roundup is defective when sold without a warning."). That theory is, of course, now preempted, and Plaintiffs here do not have record evidence to support a non-preempted consumer expectations theory. *See id.* at *3 ("to the extent Mr. Hardeman believes that he won a jury verdict on the design defect theory he

offered to the Court during discussion of jury instructions (namely, that Roundup should not have been sold for residential use regardless of whether there was a warning), it's worth clarifying that he did not."). And as the Court noted, "no colorable argument could be made" that "Roundup simply shouldn't be on the shelves for residential use" based on the evidence presented. *Id.* Plaintiffs offer no response to this deficiency, save for Plaintiff Dietrich's observation that the Court's prior ruling was based on the evidence presented in that trial. See Dietrich Opp. at 19. But Plaintiffs fail to identify—and could not identify—evidence that materially differs from the record Mr. Hardeman presented. Thus, even if there were some conceivable consumer expectations theory that was not merely a failure to warn claim by another name, certainly Plaintiffs here have not put forward a factual record capable of proving such a claim.

As to reasonable alternative design, Plaintiffs largely disclaim any such theory, instead purporting to rely on the consumer expectations standard discussed above. But to the extent Plaintiffs purport to be able to support a theory of alternative design, they cannot. They lack any expert who offers opinions on alternative design, let alone an expert who opines that such a design was available at the relevant time and would have prevented Plaintiffs' injuries. And to the extent Plaintiffs point to the fact that Monsanto began marketing, in what Plaintiffs say was 2022, other herbicides under the Roundup trade name that do not contain glyphosate, that bare fact does not come close to supporting an alternative design theory. Plaintiffs simply make no effort to show that Monsanto could have developed and marketed the relevant formulation at the time Plaintiffs used Roundup, or that such a formulation would have prevented their injuries. *See, e.g.*, *R.J. Reynolds Tobacco Company v. Nelson*, 353 So.3d 87, 93 (Fla. Dist. Ct. App. 2022) ("A design-defect plaintiff must show that 'but for the defect, the injury would not have occurred.'").

Finally, where a plaintiff seeks to prove an alternative design, "it is a basic matter of tort principles that an alternative design must not be an altogether essentially different product." *In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.*, 2025 WL 1282749, at *6 (N.D. Ill. May 2, 2025). An alternative may be essentially different "even when the other product has the same general purpose." *Brockert v. Wyeth Pharms., Inc.*, 287 S.W.3d 760, 770 (Tex. Ct. App. 2009). The purpose of that rule is to ensure that the "law of products liability" does not perform the essentially

legislative function of "eliminat[ing] whole categories of useful products from the market." *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 385 (Tex. 1995). Applying that principle, courts regularly hold that different active ingredients are not alternatives as a matter of law. *E.g. Brockert*, 287 S.W.3d at 770 (estrogen alone not alternative to combination of estrogen and progestin); *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 484 (2013) (drug consisting of single active ingredient incapable of redesign); *Brown v. Johnson & Johnson*, 64 F. Supp. 3d 717, 722 (E.D. Pa. 2014) ("acetaminophen is not an alternative to ibuprofen") (citation omitted)). Plaintiffs' alternative design theory is not that a glyphosate-based herbicide should be redesigned, but that it should be replaced with different herbicides. *Cf. Brown*, 64 F. Supp. 3d at 722 (in contrast to acetaminophen, "Dexibuprofen," which is "a different from of ibuprofen" was potential alternative design.") That is a theory state law does not recognize. Many different products may be marketed under a single trade name such as "Roundup," but the defining feature of a glyphosate-based herbicide remains *glyphosate*, and for product liability purposes a product without glyphosate is a different product altogether, not an alternative design.

Even if an entirely different chemical formulation with different active ingredients were a cognizable alternative design, Plaintiffs have not produced sufficient evidence that a feasible safer alternative formulation existed at the relevant time. Plaintiffs concede that one of the active ingredients used in the non-glyphosate-based version of Roundup was not registered by EPA until 1996. Plfs' Statement of Facts ¶ 126. But at least some Plaintiffs began using Roundup before then. *See Dietrich* Am. Compl. ¶¶ 159-165 (alleging use started in 1994); ECF 22671-1 (*Schrag* Proposed Am. Compl.) ¶ 107 (alleging use started in 1988); *see also Jackson* Am. Compl. ¶¶ 123, 125 (alleging decedent who died in 2021 at age 71 had used Roundup "throughout most of his life"). Thus, even under Plaintiffs' theory, certain Plaintiffs cannot prove the existence of a feasible alternative design.

Given these threshold evidentiary deficiencies, Plaintiffs' design-defect claims fail whether or not they are preempted, which in fact they are.

**2. Plaintiffs' design-defect claims are preempted.**

**a. *Bates* does not sanction Plaintiffs' design-defect claims.**

Contrary to Plaintiffs' assertion, *Bates* does not sanction the design-defect claims that they

assert. According to Plaintiffs, their design-defect claims "fall outside [FIFRA's] express preemption provision," 7 U.S.C. § 136v(b), because *Bates* said that "'[r]ules that require manufacturers to design reasonably safe products … plainly do not qualify as requirements for "labeling or packaging."'" ECF 22667 (*Jackson* Opp. at) at 6 (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 444 (2005)); *accord* ECF 22676 (*Dietrich* Opp. at) at 8.[2] Plaintiffs overread *Bates*.

*First*, as Plaintiffs themselves acknowledge, the statement in *Bates* addresses only the scope of "express preemption" under 7 U.S.C. § 136v(b). *Jackson* Opp. at 6. It says nothing about implied preemption. *Cf. id.* at 20. Supreme Court precedent is clear: A statute can impliedly preempt a claim even when the claim is not barred by the statute's express-preemption provision. As the Court has repeatedly held, an "express pre-emption provision … does not bar the ordinary working of conflict pre-emption principles." *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869 (2000); *accord Buckman Co. v. Plaintiffs' Legal Com.*, 531 U.S. 341, 352 (2001). Thus, the fact that a design-defect claim might avoid express preemption does not mean that it survives implied preemption.

*Second*, the reach of the statement in *Bates* is limited even as to express preemption. The design-defect claim at issue in *Bates* was asserted under Texas law. *Cf.* 544 U.S. at 453 (preemption analysis "involves questions of Texas law"). That distinguishes *Bates* from these cases, which arise under Florida law. Monsanto argues that design-defect claims are disguised failure-to-warn claims and thus expressly preempted under 7 U.S.C. § 136v(b) ***when they are brought under the consumer-expectations test***, as they are here. *Cf.*, *e.g.*, ECF 7 (*Jackson* Am. Compl.) ¶ 153, *Jackson v. Monsanto Co.*, No. 8:23-cv-515 (M.D. Fla.) (alleging Roundup is "more dangerous than an ordinary consumer would expect"); ECF 18160 (*Dietrich* Am. Compl.) ¶ 232 (alleging Roundup "dangerous to an extent beyond that which an ordinary consumer would contemplate"). *Bates* did not address such a claim.

Unlike Florida, Texas does not recognize the consumer-expectations test. In Texas, "[a] product is unreasonably dangerous when its risk outweighs its utility" and a plaintiff asserting a design-defect claim "must prove that … a safer alternative design existed." *Genie Indus., Inc. v.*

[2] Because the opposition filed in *Schrag*, which seeks leave to file an amended complaint, simply "adopts the legal arguments" made by the other plaintiffs (ECF 22671 at 4), and because the opposition filed in *Gomez* (ECF 22676) is—immaterial variations aside—verbatim identical to the opposition filed in *Jackson*, Monsanto cites only the *Jackson* and *Dietrich* oppositions.

*Matak*, 462 S.W.3d 1, 6 (Tex. 2015) (quoting *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009)). The risk/utility test—the test at issue in *Bates*—does not implicate labeling and thus is not expressly preempted by 7 U.S.C. § 136v(b). The consumer-expectations test, by contrast, does implicate labeling and claims brought under it—such as Plaintiffs' claims here—are expressly preempted by § 136v(b).

**b. Plaintiffs' design-defect claims are disguised failure-to-warn claims, and thus expressly preempted, insofar as they rest on the consumer-expectations test.**

When conducting a preemption analysis, a court is not bound by the name, description or characterization assigned to a claim by the plaintiff; instead, the court must look at the "gravamen" of the complaint to analyze whether it is preempted. *Kurns v. Railroad Friction Products Corp.*, 565 U.S. 625, 635 (2012); *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 214 (2004) ("[D]istinguishing between pre-empted and non-pre-empted claims based on the particular label affixed to them would elevate form over substance and allow parties to evade the pre-emptive scope of ERISA simply by relabeling their contract claims as claims for tortious breach of contract.") (quotations omitted); *accord Moretti v. Mut. Pharm. Co.*, 852 F. Supp. 2d 1114, 1118 (D. Minn. 2012) (in preemption analysis, focusing not on the "'labels' given to [the] claims" by the plaintiff but instead focusing on "the essence" of the claims' substance). Thus, it does not matter what Plaintiffs call their claims. What matters is whether their claims would impose labeling requirements on Roundup. As the Court held in *Bates*, § 136v(b) "pre-empts ***any*** statutory or common-law rule that would impose a labeling requirement that diverges from those set out in FIFRA and its implementing regulations." 544 U.S. at 452 (emphasis added); *accord Durnell*, 609 U.S. 371, 390 (U.S. 2026) ("FIFRA's preemption clause expressly preempts ***any*** state tort claim" that would require a warning not required by FIFRA).

The practical effect of a design-defect claim predicated on the consumer-expectations test is a labeling requirement. Indeed, the Restatement (Second) of Torts—which sets forth the consumer-expectations test—makes the connection explicit: "[T]o prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning." Restatement (Second) of Torts § 402A cmt. j.

As Plaintiffs emphasize and the Florida Supreme Court has held, "manufacturers play a 'pivotal role in crafting the image of a product and establishing consumers' expectations for that product.'" *Jackson* Opp. at 9 (quoting *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 511 (Fla. 2015)); *accord Dietrich* Opp. at 17–18. Manufacturers do so principally through the product label, particularly when the product is, as here, scientifically complex and the average consumer would not understand its salient traits or their potential ramifications. It is for this reason that the Ninth Circuit has held that consumers of such a product are not "entitled to expect [the] product to perform more safely than its government-mandated warnings indicate." *Papike v. Tambrands, Inc.*, 107 F.3d 737, 743 (9th Cir. 1997) (citation modified).[3]

Unable to deny that the product label is an important source of consumer expectations, Plaintiffs argue that the label is not the sole source of consumer expectations. Claiming that "Monsanto endeavored to shape consumer expectations beyond the label" (*Jackson* Opp. at 8), Plaintiffs point to the fact that Roundup was "extensively marketed as safe." *Dietrich* Opp. at 18; *accord Jackson* Opp. at 8 (citing fact that Roundup is a "widely sold and advertised" herbicide).[4]

These advertising-based allegations with respect to consumer expectations do not save Plaintiffs' design-defect claims from express preemption. To start, 7 U.S.C. § 136v(b) covers more than just the label itself. It preempts state "labeling" requirements. "The term 'labeling' means all labels ***and all other*** written, printed, or graphic matter [] accompanying the pesticide … at any time."

---

[3] According to Plaintiffs, "*Papike* is plainly distinguishable because the products there 'explicitly notified the user of the very danger at issue.'" *Jackson* Opp. at 11 (quoting *Ansagay v. Dow Agrosciences LLC*, 153 F. Supp. 3d 1270, 1289 (D. Haw. 2015)). Plaintiffs' proffered distinction is yet another indication that their design-defect claims are in fact disguised failure-to-warn claims.

[4] Plaintiffs also point to the fact that Roundup is "sold to [consumers] off retail shelves." *Dietrich* Opp. at 18; *accord Jackson* Opp. at 8 (relying on "the placement [of Roundup] in ordinary garden sections with tools and other commonplace lawn-care products"). But the mere fact that a product is sold in retail stores does not give rise to a reasonable expectation that the product is safe. Many dangerous chemical products—such as paint thinners and ammonia-based cleaners—are sold in retail stores. The fact that they are sold in retail stores does not create a reasonable expectation that they are safe. To the contrary, consumers know that they are dangerous because their labels say so. Here, Plaintiffs of course complain that Roundup's label does not warn of its purported carcinogenicity. *See* ECF 22519 (Supp. MSJ) at 12–16 (collecting allegations in Plaintiffs' complaints). But that simply underscores the fact that Plaintiffs' reliance on the consumer-expectations test ultimately reduces their design-defect claims to failure-to-warn claims.

7 U.S.C. § 136a(p)(1)(A) (emphasis added).[5] On Plaintiffs' view, "[t]o read 'accompanying' to mean anything other than the physical label affixed to this physical product or written materials that are inside of the packaging defies the plain text." *Dietrich* Opp. at 14. The Supreme Court disagrees. As Monsanto explained and Plaintiffs ignore, the Court held in *Kordel* that "the phrase 'accompanying such article' is not restricted to labels that are on or in the article [or] package" containing it. *Kordel v. United States*, 335 U.S. 345, 349 (1948) (interpreting 21 U.S.C. § 321(m)); *cf.* Supp. MSJ at 10.[6] Thus, contrary to Plaintiffs' assertion, the term "labeling"—and thus the scope of 7 U.S.C. § 136v(b)– "clearly embraces advertising." *Kordel*, 335 U.S. at 349–50.[7]

FIFRA prohibits the distribution of "any registered pesticide if ***any claims made for it as a part of its distribution or sale*** substantially differ from any claims made for it as a part of the statement required in connection with its registration under [7 U.S.C. § 136a]." 7 U.S.C. § 136j(a)(1)(B)

---

[5] Given this definition, it makes no difference for purposes of § 136v(b) that "advertisements are not labels." *Dietrich* Opp. 15 (emphasis omitted).

[6] The fact that *Kordel* construed 21 U.S.C. § 321(m) rather than 7 U.S.C. § 136(p)(2)(A) is immaterial. The two provisions are in all relevant respects identical. *Compare* 21 U.S.C. § 321(m) ("The term 'labeling' means all labels and other written, printed, or graphic matter … accompanying such article.") *with* 7 U.S.C. § 136(p)(2)(A) ("The term 'labeling' means all labels and all other written, printed, or graphic matter … accompanying the pesticide[.]"). Part of the FDCA, 21 U.S.C. § 321(m) was enacted in 1938. *See* Food, Drug, and Cosmetic Act, Pub. L. 75-717, § 201(m), 52 Stat. 1040, 1041 (1938). The Supreme Court decided *Kordel* in 1948. Congress substantially amended FIFRA, including 7 U.S.C. § 136(p)(2)(A), in 1972, long after the Supreme Court authoritatively construed 21 U.S.C. § 321(m) in *Kordel*, but it left the relevant language of the "labeling" definition unchanged. *Compare* Federal Environmental Pesticide Control Act, Pub. L. 92-516, § 2(p)(2)(A), 86 Stat. 973, 977 (1972), *with* Federal Insecticide, Fungicide, and Rodenticide Act, Pub. L. No. 80-104, ch. 125 § 2(s), 61 Stat. 163, 165 (1947). When, as here, "'judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute' is" presumed to incorporate that interpretation." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 330 (2015) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998)). Thus, under the canons of construction, the definition of labelling found in 7 U.S.C. § 136(p)(2)(A) is to be presumptively understood as "not restricted to labels that are on or in the article or package" containing it. *Kordel*, 335 U.S. at 349. Looking to *Kordel*'s interpretation of the FDCA's labeling definition is, moreover, consistent with the Supreme Court's repeated reliance—first in *Bates* and then in *Durnell*—on FDCA jurisprudence when construing FIFRA. *Cf. Durnell*, 609 U.S. at 386–87 (citing *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008)); *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 447–49 (2005) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996)).

[7] Plaintiffs suggest that "Monsanto does not really believe its own argument, as it has never submitted each and every advertisement it disseminates to EPA for its prior approval as forms of 'labeling.'" *Dietrich* Opp. at 14. Plaintiffs misunderstand. EPA approves the claims made for a pesticide through the registration process. 7 U.S.C. § 136a(c)(1)(C). Once the pesticide is registered, the manufacturer may repeat those claims in advertising. In short, EPA approves the claims, not the individual ads embodying those claims.

(emphasis added).[8] As Monsanto noted (Supp. MSJ at 11), this prohibition—which is one of the "consequences" of registration (*Durnell*, 609 U.S. at 378 n.1)—"extend[s]" by regulation "to ***advertisements in any advertising medium*** to which pesticide users or the general public have access." 40 C.F.R. § 168.22(a) (emphasis added).

Plaintiffs' only response is to take language from a Federal Register preamble out of context. On Plaintiffs' rendition, the preamble to 40 C.F.R. § 168.22 makes "clear that 'FIFRA does not grant EPA plenary authority to regulate advertising as such.'" *Dietrich* Opp. at 15 (quoting 54 Fed. Reg. 1122, 1124 (Jan. 11, 1989). Plaintiffs use this snippet to suggest that advertising falls outside FIFRA's reach. But that is not EPA's position. To the contrary, the passage from which Plaintiffs pluck that quote says precisely the opposite. "EPA," it says, "believes that" various forms of "advertising … are 'part of [the] distribution or sale' of the pesticide to which the advertising relates" and that 7 U.S.C. § 136j(a)(1)(B) therefore authorizes the regulation of "advertisements that (1) are placed by persons who are in the pesticide business and (2) recommend or suggest the purchase of pesticides for certain purposes." 54 Fed. Reg. at 1124.[9] When EPA said upon adoption of 40 C.F.R. § 168.22(a) that FIFRA does not give the agency "plenary authority to regulate advertising as such," it was alluding to the "arguable" possibility "that there can be advertising that is separate from and not a part of the distribution of sale of a pesticide." *Id.* But the very case that EPA cites when allowing that possibility, *In re Sporocidin Int'l*, Dkt. No. FIFRA 88-H-02 (Nov. 2, 1988), squarely held that claims made in advertising were "claims" within the meaning of 7 U.S.C. § 136j(a)(1)(B)).[10]

Addressing the question of tort liability based on advertising for a pesticide, the Fourth Circuit has explained:

> [I]t is clear that there is a "FIFRA-created duty" to file "a statement of all claims" made for a pesticide with the EPA, § 136a(c)(1)(C), and not to make "any claims for it as a part

---

[8] The statement required by § 136a includes "the labeling of the pesticide." 7 U.S.C. § 136a(c)(1)(C).

[9] Notably, when EPA promulgated 40 C.F.R. § 168.22, it did not "seek[] to define the outer reaches of its FIFRA jurisdiction over advertising claims." 54 Fed. Reg. at 1124.

[10] Monsanto explained and Plaintiffs do not dispute that statements "can be 'claims' regardless of whether they are warnings, directions for use, or statements of efficacy." *In re Roger Antkiewicz & Pest Elim. Prods. of Am., Inc.*, 8 E.A.D. 218, 1999 WL 362852, at *13 (E.A.B. 1999); *see also Lowe*, 47 F.3d at 130 (treating statements such as "avoid skin contact" and "may cause skin irritation" as "claims" under 7 U.S.C. § 136j(a)(1)(B)); *cf.* Supp. MSJ at 11.

> of its distribution or sale" that "substantially differ from any claims made for it as a part of th[at] statement." § 136j(a)(1)(B). Accordingly, [a state] is not preempted from imposing common law liability on [the pesticide manufacturer] in the present case if [the manufacturer's] advertisements made "claims" "as a part of its distribution or sale" that "substantially differ" from "claims made for it as part of the statement required in connection with its registration.

*Lowe v. Sporicidin Int'l*, 47 F.3d 124, 130 (4th Cir. 1995). That result makes sense. The only state-law labeling requirements that are expressly preempted are those that are "in addition to or different from" those imposed by FIFRA. 7 U.S.C. § 136v(b).

But the converse is of course also true: Tort liability predicated on advertising ***is*** preempted "if the basis for liability is a statement that 'merely repeat[s]' information from the label." *Yousefzadeh v. Johnson & Johnson Consumer Inc.*, 184 F.4th 130, 151 n.16 (2d Cir. 2026); *see also, e.g.*, *Andrus v. AgrEvo USA Co.*, 178 F.3d 395, 400 (5th Cir. 1999); *Taylor AG Indus. v. Pure-Gro*, 54 F.3d 555, 561 (9th Cir. 1995); *Lowe*, 47 F.3d at 130; *Worm v. Am. Cyanamid Co.*, 5 F.3d 744, 748 (4th Cir. 1993); *Kuiper v. Am. Cyanamid Co.*, 913 F. Supp. 1236, 1243 (E.D. Wis. 1996) (collecting cases), *aff'd*, 131 F.3d 656 (7th Cir. 1997). Here, Plaintiffs complain about what was not said rather than what was said in Monsanto's advertising. But the principle is the same: The absence of a cancer warning in Monsanto's advertising mirrors the absence of such a warning in Roundup's EPA-approved label and any claim based on the absence of such a warning in Monsanto's advertising is preempted.

Resisting the contention that consumer expectations are formed by the label alone, Plaintiffs argue that "[t]he factual record here supports a finding that consumers' expectations about Roundup were heavily influenced by Monsanto's decades-long advertising and public relations efforts." *Dietrich* Opp. at 17. But whether couched in terms of failure to warn or in terms of unmet consumer expectations, imposing liability based on the advertising's failure to warn of Roundup's purported carcinogenicity would impose a state-law labeling requirement that is "in addition to or different from" the requirements imposed by FIFRA and is thus expressly preempted by 7 U.S.C. § 136v(b).[11]

---

[11] Plaintiffs argue that Monsanto's motion for summary judgment "fail[s] on evidentiary grounds" because Monsanto has not tendered Roundup's "registration materials" and thus cannot show that a cancer warning would in fact "'substantially differ' from the claims made in connection with registration." *Jackson* Opp. at 24 n.11 (quoting 7 U.S.C. § 136j(a)(1)(B)). There is no merit to the argument. A registration statement includes the product label. 7 U.S.C. § 136a(c)(1)(C). Plaintiffs'

**c. Plaintiff's design-defect claims are impliedly preempted insofar as they rest on the risk/utility test.**

As Monsanto explained in its opening brief, Plaintiffs' design-defect claims are impliedly preempted to the extent they rest on the risk/utility test. *Cf.* Supp. MSJ at 22–24. Nothing that Plaintiffs say in response undermines that conclusion.

When coupled with *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472 (2013), and *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011), *Durnell* compels the conclusion that a design-defect claim predicated on the risk/utility theory is impliedly preempted.

State law is impliedly preempted whenever it "is in actual conflict with federal law." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995). Such a conflict exists when it is "impossible for a private party to comply with both state and federal requirements." *Id.*; *accord Mensing*, 564 U.S. at 619. That is precisely the situation here.

Plaintiffs' design-defect claims rests on the allegation that Roundup was "defective in design or formulation." *Jackson* Am. Compl. ¶ 152; *Dietrich* Am. Compl. ¶ 233. Simply put, Plaintiffs challenge Roundup's chemical composition. Indeed, to prove a design-defect under the risk/utility theory, Plaintiffs must "show[] that ***alternative*** safer designs exist." *Aubin*, 177 So. 3d at 511 (emphasis added).

Roundup and other glyphosate-based pesticides were registered by EPA in 1974. *Durnell*, 609 U.S. at 380. The Plaintiffs did not use—and could not have used—Roundup before then. Plaintiffs' design-defect claims are therefore predicated on the proposition that Florida law required Monsanto to change Roundup's formulation to something other than its EPA-approved composition.

Federal law impliedly preempts any such requirement. As *Durnell* explains: "FIFRA prohibits selling a pesticide if its 'composition' differs from the composition described at registration." 609 U.S. at 378 n.1 (quoting 7 U.S.C. § 136j(a)(1)(C)). Although this prohibition does not trigger express preemption (because § 136v(b) is limited to warning claims), it does impliedly preempt any claim

---

entire case rests on the fact that the label does not warn of cancer and the (baseless) allegation that Monsanto hid Roundup's purported carcinogenicity from EPA. Plaintiffs cannot now resist summary judgment on the contradictory (and equally baseless) suggestion that Monsanto's registration statement says that Roundup causes cancer.

predicated on a pesticide's chemical composition.[12]

When analyzing whether state law is impliedly preempted because it is "impossible for a private party to comply with both state and federal requirements" (*Freightliner*, 514 U.S. at 287), "[t]he question … is whether the private party could ***independently*** do under federal law what state law requires of it." *Mensing*, 564 U.S. at 620 (emphasis added). "[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Id.* at 623–24. Thus, a state-law claim predicated on a pesticide's composition "is pre-empted" if federal law "prohibit[s]" the manufacturer "from making any unilateral changes to" its composition. *Bartlett*, 570 U.S. at 477, 480; *accord Mensing*, 564 U.S. at 623.

FIFRA does exactly that. As *Durnell* explains, 7 U.S.C. § 136j(a)(1)(C) "prohibits selling a pesticide if its 'composition' differs from the composition described at registration." 609 U.S. at 378 n.1. Under the regulation that implements 7 U.S.C. § 136j(a)(1)(C), "any modification in the composition … of a registered product must be submitted with an application for amended registration" and that "application must be approved by the Agency before the product, as modified, may legally be distributed or sold." 40 C.F.R. § 152.44(a). In short, Monsanto cannot alter Roundup's EPA-approved composition without prior EPA approval. That is dispositive. Unable to "unilaterally" change Roundup's composition (*Bartlett*, 570 U.S. at 477), Monsanto could not "independently do under federal law what state law" supposedly "requires of it." *Mensing*, 564 U.S. at 620. Given that conflict, Plaintiff's design-defect claim is impliedly preempted.[13]

---

[12] The fact that design-defect claim based on the risk/utility test avoids express preemption does not mean that it survives implied preemption. *See supra* at 5 (citing *Geier*, 529 U.S. at 869; *Buckman*, 531 U.S. at 352).

[13] Resisting this conclusion, Plaintiff points to statements made by Monsanto's counsel during oral argument in *Durnell*, including counsel's statement that "design defect claims are not preempted." Mem. 3 (quoting Ex. 1, Transcript of Oral Argument at 32, *Monsanto Co. v. Durnell* 609 U.S. 371 (2026) (No. 24-1068)). Plaintiff's reliance on counsel's statements is misplaced. As the excerpts quoted by Plaintiff make clear, counsel was speaking only of express preemption under FIFRA's "preemption clause," *i.e.*, 7 U.S.C. § 136v(b). *Id.*; *accord id.* (quoting Ex. 1, Transcript of Oral Argument at 41, *Monsanto Co. v. Durnell* 609 U.S. 371 (2026) (No. 24-1068)). Counsel's statements have nothing to do with implied preemption.

Plaintiffs offer two responses. Neither withstands scrutiny.

*First*, Plaintiffs say that the fact that Monsanto "receive[d] EPA permission to reformulate a glyphosate-free version of Roundup" refutes "Monsanto's argument that it cannot reformulate Roundup without EPA's permission." *Dietrich* Opp. at 16. Plaintiffs' assertion makes no sense. The fact that Monsanto did not market a glyphosate-free version of Roundup until it "obtained the necessary EPA registration" (ECF 22675 (Plfs' Omnibus Statement of Facts) ¶ 125) supports rather than refutes the proposition that reformulation of a pesticide requires prior EPA approval. The necessity of obtaining such approval is dispositive: It is "impossible for a private party to comply with both state and federal requirements" (*Freightliner*, 514 U.S. at 287) when the party cannot "independently do under federal law what state law requires of it." *Mensing*, 564 U.S. at 620.[14]

*Second*, Plaintiffs argue that it is irrelevant that Monsanto could not unilaterally change Roundup's formulation because Monsanto could avoid state-law liability by simply not selling Roundup. But that is no answer. The Supreme Court has explicitly "reject[ed]" the "stop-selling" theory "as incompatible with [its] pre-emption jurisprudence." *Bartlett*, 570 U.S. at 488. The Court's

> pre-emption cases presume that an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability. Indeed, if the option of ceasing to act defeated a claim of impossibility, impossibility pre-emption would be "all but meaningless."
>
> The incoherence of the stop-selling theory becomes plain when viewed through the lens of our previous cases. In every instance in which the Court has found impossibility pre-emption, the "direct conflict" between federal- and state-law duties could easily have been avoided if the regulated actor had simply ceased acting.

*Id.* (quoting *Mensing*, 564 U.S. at 621).

Plaintiffs insist that *Bartlett*'s rejection of the stop-selling theory has no application here because, say Plaintiffs, "[t]he FDCA," the statute at issue in *Bartlett*, "is not analogous to FIFRA."

---

[14] Preemption aside, Plaintiffs have not produced sufficient evidence that a feasible safer alternative formulation existed at the relevant time. Plaintiffs concede that one of the active ingredients used in the non-glyphosate-based version of Roundup was not registered by EPA until 1996. Plfs' Statement of Facts ¶ 126. But at least some Plaintiffs began using Roundup before then. *See Dietrich* Am. Compl. ¶¶ 159-165 (alleging use started in 1994); ECF 22671-1 (*Schrag* Proposed Am. Compl.) ¶ 107 (alleging use started in 1988); *see also Jackson* Am. Compl. ¶¶ 123, 125 (alleging decedent who died in 2021 at age 71 had used Roundup "throughout most of his life"). Not only is there no evidence of any feasible alternative formulation before 1996, there also is no evidence that any Plaintiff would have avoided contracting NHL if Roundup would have been formulated differently.

*Jackson* Opp. at 20; *see also Dietrich* Opp. at 11–12. On Plaintiffs' telling, the critical distinction is that "FIFRA allows states to ... ban pesticides that have been federally approved" while the FDCA does "not allow states to ban FDA-approved drugs." *Jackson* Opp. at 20 (quoting *In re Roundup Prods. Liab. Litig.*, 364 F. Supp. 3d 1085, 1088 (N.D. Cal. 2019), *aff'd sub nom. Hardeman v. Monsanto Co.*, 997 F.3d 941 (9th Cir. 2021), *abrogated on other grounds by Durnell*, 609 U.S. 371 (U.S. 2026)) (emphasis omitted). According to Plaintiffs, "under the FDCA, once a drug is federally approved, manufacturers have a federal right to sell" that drug while "registration of a pesticide under FIFRA provides only a 'license' to sell" the pesticide "subject to state approval." *Id.*

Plaintiffs are wrong. FDCA and FIFRA are identical in this regard; neither statute grants manufacturers an affirmative right to sell their products. Rather, each statute simply prohibits the sale of products that have not received prior agency approval. FIFRA provides that "no person … may distribute or sell to any person any pesticide that is not registered" (7 U.S.C. § 136a(a)) while the FDCA provides that "[n]o person shall introduce … into interstate commerce any new drug, unless an approval of an application … is effective." 21 U.S.C.A. § 355(a).

Taking a second tack, Plaintiffs argue that *Bartlett*'s rejection of the stop-selling theory rests on the FDCA's lack of an "express non-preemption clause." *Dietrich* Opp. at 6 (quoting *Bartlett*, 570 U.S. at 493). According to Plaintiffs, that foundation is absent here because, in their view, FIFRA contains such a provision, namely, 7 U.S.C. § 136v(a), which allows states to "regulate the sale or use" of pesticides. *See id.*; *see also Jackson* Opp. at 21. But a "saving clause … does ***not*** bar the ordinary working of conflict pre-emption principles." *Geier*, 529 U.S. at 869. Moreover, § 136v(a) bears little resemblance to the "express non-preemption clauses" cited by the *Bartlett* Court—21 U.S.C. §§ 379r(e) and 379s(d). Each of those provisions explicitly preserves state-law tort claims, declaring that "[n]othing" in the FDCA's relevant provisions "shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State." By contrast, 7 U.S.C. § 136v(a) says nothing about the preservation of state-law tort claims. Although the provision allows states to "outright ban a pesticide within its borders" (*Durnell*, 609 U.S. at 380 n.2), Florida has not banned the sale of Roundup. To the contrary, Florida has registered Roundup and it may be lawfully sold in the state. *See* Ex. 1 (Nat'l Pesticide Info. Retrieval Sys. search results).

Simply put, Plaintiffs' reliance on § 136v(a) is misplaced. Plaintiffs cannot evade preemption on a stop-selling theory.

**B. Plaintiffs' advertising-based failure-to-warn claims are expressly preempted because advertising is labeling under FIFRA.**

Although some Plaintiffs say that they are "not pursuing the theory here," all Plaintiffs insist that "non-label-based failure to warn claims are not preempted." *Jackson* Opp. at 22; *accord Dietrich* Opp. at 13. They are mistaken.

When Plaintiffs speak of "non-label-based" failure-to-warn claims, they are referring to claims based on "advertisements, which conveyed the" supposedly "false and misleading message that Roundup was perfectly safe." *Dietrich* Opp. at 13. But, as explained above when discussing the consumer-expectations test, such claims are expressly preempted by 7 U.S.C. § 136v(b) because advertising is "labeling" for purposes of FIFRA. *See supra* at 7–10.

In *Durnell*, the Supreme Court held the plaintiff's failure-to-warn claim categorically preempted. It so held even though the plaintiff's claim was "[b]ased on Monsanto's label ***and marketing***" (Brief for Respondent at 15, *Monsanto Co. v. Durnell*, 609 U.S. 371 (2026) (No. 24-1068), 2026 WL 883125, at *15 (emphasis added)) and despite the plaintiff's insistence that "advertisements are beyond FIFRA's reach" because "§ 136v(b) addresses only pesticide labeling, not TV ads." Respondent's Brief in Opposition at 16, *Monsanto Co. v. Durnell*, 609 U.S. 371 (2026) (No. 24-1068), 2025 WL 1665996, at *16 (U.S. June 8, 2025)).[15] The Supreme Court did not say that the plaintiff's failure-to-warn claim was preempted only "insofar as" or only "to the extent that" it was based on the Roundup label; nor did the Court say that Plaintiff's failure-to-warn claim avoided preemption "insofar as" or "to the extent that" it was based on marketing statements. The Supreme Court drew no distinction between the two theories. Indeed, consistent with the broad definition of labeling found in 7 U.S.C. § 136(p), the Court did not even recognize them as distinct theories.

[15] The plaintiff described his claim similarly in the Missouri Court of Appeals, stating that his "failure-to-warn claim was not limited to Roundup's labeling" but instead "also challenged off-label conduct like Monsanto's failure to warn of Roundup's dangers in advertisements." Resp. Br. 11, *Durnell v. Monsanto Co.*, 707 S.W.3d 828 (Mo. App. E.D. 2025) (No. ED 112410), 2024 WL 4802603, at *11.

Resisting the conclusion that advertising constitutes "labeling" for purposes of 7 U.S.C. § 136v(b), Plaintiffs cite *Indian Brand Farms, Inc. v. Novartis Crop Prot. Inc.*, 617 F.3d 207 (3d Cir. 2010), apparently to suggest that cases holding advertising to be labeling do not survive *Bates*. *Cf. Jackson* Opp. at 23. Although *Indian Brand Farms* did find that the marketing brochure at issue there was not "labeling" as defined by 7 U.S.C. § 136(p), the case does not help Plaintiffs here.

*Indian Brand Farms* rests on the pre-*Bates* decision in *New York State Pesticide Coalition, Inc. v. Jorling*, 874 F.2d 115 (2d Cir. 1989). *Cf. Indian Brand Farms*, 617 F.3d at 216–18. *Jorling* cannot support the weight placed upon it.

*Jorling* involved a New York statute requiring commercial pesticide applicators "to alert the public" through fact sheets and signs "to the impending use of poisonous chemicals and to disseminate information," including "warnings and safety information" not found on the pesticide's EPA-approved label, "to those who may be exposed." 874 F.2d at 116. Applicators sued, arguing that the statute constituted a state labeling requirement expressly preempted by FIFRA. *Jorling* rejected the applicators' argument, holding that the state-mandated fact sheets and signs were not labeling within the meaning of 7 U.S.C. § 136(p)(2)(A) and that 7 U.S.C. § 136v(b) therefore did not preempt the statute at issue. In so holding, *Jorling* distinguished *Kordel* (*see supra* at 8) on the ground that "[t]he written matter" at issue in *Kordel* "was aimed at users of the product, not the general public." *Id.* at 119. That distinction does not hold here: Plaintiffs challenge the manner in which Monsanto "directly advertised" Roundup "to consumers and end users," claiming that Monsanto "failed to adequately warn consumers" of the risks purportedly associated with Roundup. *Dietrich* Am. Compl. ¶¶ 250, 255.

More fundamentally, *Jorling* is inapplicable because it involved a state-law requirement imposed on applicators, not manufacturers. The distinction is dispositive. FIFRA imposes labeling requirements on manufacturers, not applicators. *See, e.g.*, 7 U.S.C. § 136a(c)(1)(C) (requiring "applicant for registration," *i.e.*, the pesticide's manufacturer, to provide "a complete copy of the labeling"); 40 C.F.R. § 152.44(a) (requiring registrant to submit "an application for amended registration" before making "any modification in the … labeling" of a registered pesticide). Because they are not subject to FIFRA's labeling requirements, applicators, such as the plaintiffs in *Jorling*,

are not protected by 7 U.S.C. § 136v(b). As another court explained, this means that "applicator cases"—such as *Jorling*—"do not hold that a failure-to-warn claim brought against ***a manufacturer*** for failure to" give warnings through something other than the label "is not a labeling-based claim." *Eyl v. Ciba-Geigy Corp.*, 264 Neb. 582, 602 (2002). On the contrary, *Jorling* and other such cases address only "the narrow issue about whether such claims when brought ***against applicators*** are a requirement affecting the use of a product instead of being a labeling-based action." *Id.* (emphasis added). "[I]f a manufacturer is required" by state law "to provide additional warning materials, such as flags, signs, advertisements, or other notices," that requirement is a labeling requirement "and such a requirement on the manufacturer is preempted by FIFRA." *Id.* at 602–03. *Indian Brand Farms* does not recognize that *Jorling*, on which it depends, is an applicator case inapplicable to state-law labeling requirements imposed on a manufacturer.

Plaintiffs' reliance on *Indian Brand Farms* is misplaced even if one ignores the case's erroneous conflation of applicators and manufacturers. *Indian Brand Farms* distinguishes *Kordel*—the Supreme Court case holding advertising to be labeling (*see supra* at 8)—on the ground that the marketing brochure at issue in *Indian Brand Farms* was purely promotional. Because its sole "function [wa]s to point out the advantages of the … product," the brochure, said the *Indian Brand Farms* court, "cannot be read as providing a supplement to the [pesticide's] label." 617 F.3d at 218. But, quoting *Kordel*, the court recognized that marketing material is labeling within the meaning of 7 U.S.C. § 136(p)(2)(A) when it "performs the same function as it would if it were on the article or on the containers or wrappers." *Id.* at 216 (quoting *Kordel*, 335 U.S. at 351). That surely describes the cancer warning that, according to Plaintiffs, Monsanto should have included in its marketing materials. Thus, even under *Indian Brand Farms*, Plaintiffs' advertising-based failure-to-warn claims constitute labeling claims preempted by 7 U.S.C. § 136v(b).

**C. Plaintiff's negligence claims are preempted and fail as a matter of state law.**

Cataloging the allegations in Plaintiffs' complaints, Monsanto's opening brief demonstrated that Plaintiffs' negligence claims rest on failure-to-warn and design-defect theories that are preempted for all the reasons discussed above. *Cf.* Supp. MSJ at 12–18. Although they deny that their claims are preempted, Plaintiffs—with one unavailing exception—do not differentiate between their strict-

liability and negligence claims, tacitly conceding that claims rise and fall together. That is to say, Plaintiffs do not dispute that their claims for negligent failure to warn are preempted if their claims for strict-liability failure to warn are preempted or that their claims for negligent design-defect are preempted if their claims for strict-liability design-defect are preempted.

The one distinction Plaintiffs draw between their negligence claims and their other claims is their allegation that Monsanto negligently "fail[ed] to adequately, sufficiently, and properly test Roundup." *Jackson* Am. Compl. ¶ 137(b) (cited in *Jackson* Opp. at 18); *see also Dietrich* Am. Compl. ¶ 195(c) (alleging Monsanto was negligent for "[f]ailing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products … were safe for their intended use") (cited in *Dietrich* Opp. at 21). But that distinction gets Plaintiffs nowhere.

To start, Plaintiffs' failure-to-test claim fails as a matter of state law. Under Florida law, "a manufacturer's duty to inspect and test is not a separate cause of action." *Adams v. G.D. Searle & Co.*, 576 So. 2d 728, 730 (Fla. Dist. Ct. App. 1991). To the contrary, "[t]he duty to test … is a subpart of a manufacturer's duty to design a product with reasonable care, and thus is subsumed in the plaintiffs' claims for defective design and failure to warn." *Id.* at 730–31.

And even if it were cognizable under Florida law, a failure-to-test claim would be impliedly preempted by FIFRA. Under FIFRA, "a manufacturer seeking to register a pesticide must submit … certain supporting data." *Bates*, 544 U.S. at 438 (citing 7 U.S.C. § 136a(c)(1)(F)). EPA may register a pesticide "only if" the agency "has reviewed all relevant data" and "has determined that no additional data are necessary" to satisfy the registration requirements. 40 C.F.R. §§ 152.112(b)–(c). Thus, Plaintiffs' allegation that Monsanto failed to conduct adequate testing is little more than a thinly veiled fraud-on-the agency claim predicated on the proposition that Monsanto failed to provide EPA relevant data and thereby "fail[ed] to adequately and correctly warn … the EPA of the dangers of Roundup." *Jackson* Am. Compl. ¶ 137(f); *see also id.* ¶ 218 (alleging Monsanto falsely "represented to … the EPA that Roundup … was adequately tested"). But state-law fraud-on-the-agency claims are impliedly preempted because they inherently interfere with the exercise of administrative discretion—in this case, with EPA's determination that an application for registration meets the registration criteria set forth in 7 U.S.C. § 136a(c). As the Ninth Circuit explained when holding a

fraud-on-the-EPA claim impliedly preempted:

> In reaching our conclusion today we are cognizant of the potential problems inherent in allowing a state court (or a federal court interpreting state law) to ascertain the propriety of disclosures made by an applicant to a federal agency in response to the mandates of federal legislation. In particular, we are troubled that an applicant's disclosures under FIFRA, although not challenged by the EPA (the very agency empowered by Congress to enforce FIFRA), may be judged illegal under state law. Such an approach would force FIFRA applicants to ensure that their disclosures to the EPA would satisfy not only the standards imposed by that agency under federal law, but also the potentially heterogeneous standards propounded by each of the 50 States. Such a holding would in turn motivate potential applicants under FIFRA to "submit a deluge of information that the [EPA] neither wants nor needs, resulting in additional burdens on the [EPA's] evaluation of an application." This outcome would needlessly drain the EPA of its limited resources, thereby detracting from its ability to efficiently enforce FIFRA.

*Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1207 (9th Cir. 2002) (quoting *Buckman*, 531 U.S. at 351). In short, Plaintiffs' inadequate-testing claims fail as a matter of law.

**D. Plaintiffs' warranty claims are preempted.**

Between them, Plaintiffs assert both express- and implied-warranty claims. *Cf.* Supp. MSJ at 5–8 (identifying Plaintiffs' respective claims). None survives preemption.

The question is not whether Florida law recognizes warranty claims. It does. *Cf. Jackson* Opp. at 19. The question is whether Plaintiffs' warranty claims are preempted by federal law. They are. As recounted in Monsanto's opening brief, Plaintiffs' warranty claims rest on Monsanto's "fail[ure] to disclose that its Roundup and glyphosate-containing products have dangerous propensities when used as intended and that the use of and/or exposure to its Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including … NHL." ECF 4 (Compl.) ¶ 190, *Brookner v. Monsanto Co.*, No. 0:23-cv-61067 (S.D. Fla.); *see also*, *e.g.*, *Jackson* Am. Compl. ¶¶ 201–02 (alleging that Monsanto's "representations" that "Roundup was safe" were "false, misleading, and inaccurate in that Roundup was unsafe"). Thus, although styled "warranty" claims, the claims are at bottom failure-to-warn claims and are therefore expressly preempted by 7 U.S.C. § 136v(b).

**E. Leave to amend should be denied because amendment is futile and unfair.**

Some of the Plaintiffs seek leave to file amended complaints, at least in the alternative. *See Schrag* Opp. at 6–10; *Dietrich* Opp. at 24. Leave to amend should be denied on substantive and procedural grounds.

"A district court may deny leave to amend in its discretion when amendment would be futile." *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 738 (9th Cir. 2026) (citing *Parents for Priv. v. Barr*, 949 F.3d 1210, 1221 (9th Cir. 2020)). That is the case here. Plaintiffs have identified no claims that avoid both express and implied preemption.

It would, moreover, be unfair to Monsanto to allow Plaintiffs to amend at this late date. As this Court observed in July:

> Why is it unfair to expect Plaintiffs to have anticipated the need to develop a non-preempted state law claim? … I'll tell you that if I was a lawyer for a plaintiff, the moment the Third Circuit decision came out creating the split the Ninth Circuit on the preemption question, my first thought would have been, 'Uh-oh.' Like, 'We're going to keep pursuing our failure to warn claim and hope that it survives, but if we really want to give ourselves a good chance in prevailing in this litigation, we need to see if we can also develop a record to support a state law claim that would not be preempted by an eventual Supreme Court decision resolving the split.' And if a plaintiff didn't do that, I don't understand how it would be unfair to grant summary judgment to Monsanto on preemption grounds.

Ex. 2, Tr. of July 9, 2026 Hr'g at 36:19–37:16, *In re Roundup Prods. Liab. Litig.*, No. 16-MD-02741 (N.D. Cal.).

All that aside, leave to amend should be denied because Plaintiffs have not complied with N.D. Cal. Local R. 15-1(a), pursuant to which "any party moving to file an amended pleading must attach two exhibits to the motion, one providing the entire proposed pleading … and the other containing a redlined or highlighted version comparing the proposed amended pleading to the current operative pleading." Other than Mr. Schrag (*cf.* ECF 22671-1), no Plaintiff has submitted a proposed amended complaint. And even Mr. Schrag failed to supply a redline comparison to his current complaint.

Under these circumstances, leave to amend is properly denied.

## III. CONCLUSION

Monsanto should be granted summary judgment in these Florida law cases.

Dated: October 23, 2026

Respectfully submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**

By: */s/ Linda C. Hsu*
Linda C. Hsu
*Counsel for Defendant Monsanto Company*