N. John Bey
*President*
Jeffrey R. White
*Senior Associate General Counsel*
American Association for Justice
777 6th Street NW, #300
Washington, DC 20001
(202) 617-5620
jeffrey.white@justice.org

Robert S. Peck*
*Counsel of Record*
Center for Constitutional Litigation, PC
6817 Vianda Court
Carlsbad, CA 92009
(202) 944-2874
robert.peck@cclfirm.com

*Attorneys for Proposed Amici Curiae*

*APPEARANCE PRO HAC VICE
PER PTO-1 ENTERED 10/6/2026

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br><br>Case No. 3:16-md-02741-VC |
| This document relates to:<br>*ALL CASES* | **BRIEF OF THE AMERICAN ASSOCIATION FOR JUSTICE, ARIZONA ASSOCIATION FOR JUSTICE, FLORIDA JUSTICE ASSOCIATION, GEORGIA TRIAL LAWYERS ASSOCIATION, NORTH CAROLINA ADVOCATES FOR JUSTICE, MISSISSIPPI ASSOCIATION FOR JUSTICE, AND OHIO ASSOCIATION FOR JUSTICE AS AMICI CURIAE**<br><br>Hon. Vince Chhabria |

## TABLE OF CONTENTS

TABLE OF CONTENTS .................... i

TABLE OF AUTHORITIES .................... ii

IDENTITY AND INTEREST OF AMICI CURIAE .................... 1

SUMMARY OF ARGUMENT .................... 4

ARGUMENT .................... 5

I. *DURNELL* HELD THAT FIFRA EXPRESSLY PREEMPTS STATE TORT ACTIONS THAT REQUIRE A LABEL CHANGE BUT LEFT UNDISTURBED OTHER TORT ACTIONS PREVIOUSLY RECOGNIZED AS VALID IN *BATES*. .................... 5

A. *Durnell* Limited the Preemptive Effect of Its Ruling to Lawsuits that Add to or Are Different from FIFRA's Labeling Regime. .................... 5

B. *Durnell* Relied Upon *Bates* for Its Holding, Leaving Intact the Recognition in *Bates* of the Continued Validity of Certain State-Based Causes of Action. .................... 6

II. NEGLIGENCE, DESIGN DEFECT, AND EXPRESS OR IMPLIED WARRANTY CLAIMS IN FLORIDA, OHIO, NORTH CAROLINA, MISSISSIPPI, GEORGIA, AND ARIZONA ARE NOT PREEMPTED BY FIFRA. .................... 12

A. Negligence Claims Do Not Require Additional or Different Labeling and Are Not Preempted. .................... 12

B. Design-Defect Claims Do Not Require Additional or Different Labeling and Are Not Preempted. .................... 18

C. Warranty Claims Do Not Require Additional or Different Labeling and Are Not Preempted. .................... 23

CONCLUSION .................... 25

## TABLE OF AUTHORITIES

**Cases**

*3M Co. v. Johnson*, 895 So. 2d 151 (Miss. 2005) ..... 20

*Aubin v. Union Carbide Corp.*, 177 So. 3d 489 (Fla. 2015) ..... 19

*Auburn Mach. Works Co. v. Jones*, 366 So.2d 1167 (Fla. 1979) ..... 19

*Banks v. ICI Americas, Inc.*, 450 S.E.2d 671 (Ga. 1994) ..... 5, 15, 20

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005) ..... 4, 6, 7, 8, 9, 12, 13, 23, 25

*Cintron v. Osmose Wood Preserving, Inc.*, 681 So. 2d 859 (Fla. App. 1996) ..... 15

*Crews v. W.A. Brown & Son, Inc.*, 416 S.E.2d 924 (N.C. App. 1992) ..... 12

*CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993) ..... 8, 9

*Dillon v. Zeneca Corp.*, 42 P.3d 598 (Ariz. App. 2002) ..... 18

*Donald v. Amoco Prod. Co.*, 735 So. 2d 161 (Miss. 1999) ..... 12

*Donegal Mut. Ins. v. White Consol. Indus., Inc.*, 852 N.E.2d 215 (Oh. App. 2006) ..... 22

*E.I. Du Pont de Nemours & Co. v. Aquamar S.A.*, 881 So. 2d 1 (Fla. App. 2004) ..... 19

*Elliott v. El Paso Corp.*, 181 So. 3d 263 (Miss. 2015) ..... 16

*Est. of Rotell ex rel. Rotell v. Kuehnle*, 38 So. 3d 783 (Fla. App. 2010) ..... 12

*Gipson v. Kasey*, 150 P.3d 228 (Ariz. 2007) ..... 12

*Goodman v. Wenco Foods, Inc.*, 423 S.E.2d 444 (N.C. 1992) ..... 16, 17

*Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11 (Fla. App. 2022) ..... 19

*Hardeman v. Monsanto Co.*, 997 F.3d 941 (9th Cir. 2021) ..... 11

*Hopkins v. Ciba-Geigy Corp.*, 432 S.E.2d 142 (N.C. App. 1993) ..... 21

*KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 340 P.3d 405 (Ariz. Ct. App. 2014) ..... 14

*Lonzrick v. Republic Steel Corp.*, 218 N.E.2d 185 (Ohio 1966) ..... 24

*Maywald v. Toyota Motor Corp.*, 591 P.3d 886 (Ariz. 2026)................................................ 14, 18

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996)..................................................................... 8

*Miller v. Ford Motor Co.*, 653 S.E.2d 82 (Ga. App. 2007)........................................................ 15

*Monsanto Agric. Prods. Co. v. Edenfield*, 426 So.2d 574 (Fla. App. 1982) ................................ 15

*Monsanto Co. v. Durnell*, 609 U.S. 371 (2026) ........................................................4, 5, 6, 7, 9, 11

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018)................................................. 8

*Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022) ...................................................................... 9

*Rasnick v. Krishna Hosp., Inc.*, 713 S.E.2d 835 (Ga. 2011) ........................................................ 12

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947)................................................................. 9

*Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008) ........................................................................... 6

*Sattelmyer v. Covidien*, LLC, 2026-Ohio-1623, 2026 WL 1229719 (Ohio App. 2026)............... 18

*Smith v. Hartz Mountain Corp.*, No. 3:12-CV-00662, 2012 WL 5451726 (N.D. Ohio 2012)...... 23

*Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306 (Fla. App. 2011) .................... 15

*Sutton v. Major Prods. Co.*, 372 S.E.2d 897 (N.C. App. 1988) .................................................. 17

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330 (2007).11

*Warner v. Am. Fluoride Corp.*, 616 N.Y.S.2d 534 (N.Y. App. 1994).......................................... 14

*Westfield Ins. Co. v. HULS Am., Inc.*, 714 N.E.2d 934 (Ohio App. 1998).................................. 12

*Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597 (1991) .......................................................11

*Wyeth v. Levine*, 555 U.S. 555 (2009)........................................................................................ 8

**Statutes**

7 U.S.C. § 136........................................................................................................................ 6

7 U.S.C. § 136a.......................................................................................................................11

7 U.S.C. § 136d...................................................................................................................6, 11

7 U.S.C. § 136n ........ 6
7 U.S.C. § 136v ........ 6, 12
Ariz. Rev. Stat. § 12-681 ........ 14
Ariz. Rev. Stat. § 12-683 ........ 15
Ariz. Rev. Stat. § 47-2313 ........ 23
Ariz. Rev. Stat. § 47-2314 ........ 24
Fla. Stat. § 672.313 ........ 23
Fla. Stat. § 672.314 ........ 24
Ga. Code § 11-2-313 ........ 23
Ga. Code § 11-2-314 ........ 24
Ga. Code § 2-7-170 ........ 16
Miss. Code § 11-1-63 ........ 16, 21
Miss. Code § 11-1-65 ........ 16
Miss. Code § 75-2-313 ........ 23
Miss. Code § 75-2-314 ........ 24
Miss. Code § 75-2-315 ........ 24
N.C. Gen. Stat. § 25-2-313 ........ 23
N.C. Gen. Stat. § 25-2-314 ........ 24
N.C. Gen. Stat. § 99B-1 ........ 17
N.C. Gen. Stat. § 99B-6 ........ 21
Ohio Rev. Code § 1302.26 ........ 23
Ohio Rev. Code § 1302.27 ........ 24
Ohio Rev. Code § 2307.71 ........ 17, 18

Ohio Rev. Code § 2307.74 ........ 18

Ohio Rev. Code § 2307.75 ........ 22

**Other Authorities**

1 Hawkland UCC Series § 2-314:3 ........ 24

Brief for Former EPA Offs. & Env't Prot. Network as Amici Curiae Supporting Respondent, *Monsanto Co. v. Durnell*, 609 U.S. 371 (2026) (No. 24-1068), 2026 WL 973472 ........ 10

Brief for the United States as Amicus Curiae Supporting Petitioner, *Monsanto Co. v. Durnell*, 609 U.S. 371 (2026) (No. 24-1068), 2026 WL 673938 ........ 11

Brief for the United States as Amicus Curiae, *Monsanto Co. v. Hardeman*, 142 S. Ct. 2834 (2022) (No. 21-241), 2022 WL 1489462 ........ 11

*Investigation of Bayer CropScience LP and Monsanto Co.*, Assurance No. 23-025 (N.Y. Atty. Gen. Env't Prot. Bureau Jun. 8, 2023), https://tinyurl.com/4ej8e76y ........ 13, 14

Transcript of Oral Argument, *Monsanto Co. v. Durnell*, 609 U.S. 371 (2026) (No. 24-1068), https://tinyurl.com/e93hptut ........ 8, 10, 11

U.C.C. § 2-314 ........ 24

## IDENTITY AND INTEREST OF AMICI CURIAE

The **American Association for Justice (AAJ)** is a national, voluntary bar association established in 1946 to strengthen the civil justice system, preserve the right to trial by jury, and protect access to the courts for those who have been wrongfully injured. With members in the United States, Canada, and abroad, AAJ is the world's largest plaintiff trial bar. AAJ members practice law in every state in the United States and primarily represent plaintiffs in personal injury actions, employment rights cases, consumer cases, and other civil actions. For more than 80 years, AAJ has served as a leading advocate for the right of all Americans to seek legal recourse for wrongful conduct. Victims of toxic exposure are frequently represented by AAJ members in their civil suits.

AAJ's mission, set forth in its bylaws, aims to "Preserve the constitutional right to trial by jury" and "Further the rule of law and the civil justice system." To that end, it often participates in cases throughout the country as amicus curiae. Relevant to the matter before this Court, AAJ participated in the Supreme Court as amicus curiae in *Monsanto Co. v. Durnell*, 609 U.S. 371 (2026), and as an amicus curiae before this Court in this case in 2021. It was also an amicus curiae in two cases relied upon by the Supreme Court in its *Durnell* decision: *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005), and *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008).

Each of the co-amici state trial lawyer associations listed below is a state affiliate of the American Association for Justice (AAJ), having been approved as such by the AAJ Board of Governors as having the same purposes of AAJ.

The **Arizona Association for Justice (AzAJ)** is a nonprofit, voluntary bar association of Arizona lawyers who represent injured people. Founded in 1964 as the Arizona Trial Lawyers Association, AzAJ works to preserve, protect, and promote a fair and effective justice system,

including the right to trial by jury, and to protect the health and safety of Arizona families. AzAJ's membership includes thousands of attorneys throughout Arizona who collectively represent millions of individuals.

The **Florida Justice Association (FJA)** is a statewide association of more than 3,500 attorneys, including trial lawyers, consumer advocates, and injured victims. Founded in 1961, the FJA is dedicated to strengthening and preserving Florida's civil justice system and protecting the rights of Florida's citizens and consumers. In furtherance of its mission, the FJA regularly participates as amicus curiae in matters affecting the rights of injured individuals, access to the courts, and the administration of civil justice.

The **Georgia Trial Lawyers Association (GTLA)** is a voluntary organization of about 2,000 trial lawyers throughout Georgia who represent people injured by the wrongdoing of others. GTLA's mission is to protect the constitutional promise of justice for all by guaranteeing the right to trial by jury, preserving an independent judiciary, and providing Georgians access to the courts.

The **North Carolina Advocates for Justice (NCAJ)** is a professional organization of over 1,800 North Carolina lawyers. A primary purpose of NCAJ is the advancement and protection of the rights of individuals injured or damaged by the harmful conduct of others. In furtherance of its mission, NCAJ regularly conducts continuing legal education seminars and appears as amicus curiae before state and federal courts.

The **Mississippi Association for Justice (MAJ)** is an organization composed of nearly 600 attorneys that work to ensure that any person who is injured by the misconduct and negligence of others can get justice in the courtroom, even when taking on the most powerful interests. MAJ is committed to strengthening the civil justice system so that deserving individuals can get justice and wrongdoers are held accountable. The organization opposes efforts to weaken basic legal

protections and further stack the deck against average Mississippians. MAJ is committed to protecting the health and safety of Mississippi families, to enhancing consumer protections, and to preserving each and every citizen's right to trial by jury and access to the courts.

The **Ohio Association for Justice (OAJ)** is the only statewide, non-profit association of attorneys whose mission is to preserve the constitutional right and protect access to the civil justice system for all Ohioans as provided for in the Seventh Amendment to the United States Constitution, and Ohio's Open Courts clause, Ohio Const. art. 1, § 16. Founded in 1954, OAJ currently consists of more than 1,100 lawyers dedicated to the constitutional guarantee stated in plain English: the right to trial by jury "shall be inviolate." Inviolate does not mean "occasionally abridged," "tempered by policy," or "subject to legislative tinkering." It means kept sacred or untouched. OAJ's mission is to see that deserving individuals—especially those who have suffered catastrophic, life-altering injuries—have their claims decided by a fair and impartial jury of their peers and thereby sustain public confidence in the civil courts.

In the matter before this Court, amici endeavor to explain why *Durnell* carefully cabined its holding to those failure-to-warn tort matters that, if successful, "require Monsanto to add a cancer warning to Roundup's label even though federal law requires Monsanto to use the EPA-approved label without a cancer warning." 609 U.S. at 376. At the same time, it left the framework articulated in *Bates* undisturbed and thereby permits plaintiffs to prosecute a number of state tort-law claims without limitation due to any preemptive effect flowing from the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). Each of the States that are named in this Court's inquiry to amici authorize lawsuits that fit the exceptions recognized in *Bates* and, by extension, in

*Durnell*.[1]

## SUMMARY OF ARGUMENT

In *Monsanto Co. v. Durnell*, 609 U.S. 371 (2026), the Supreme Court limited itself to holding that Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) expressly preempts state causes of action that *require* a pesticide manufacturer to add to or provide different labeling than was approved under the statutory scheme by the Environmental Protection Agency (EPA). In reaching its holding, the Court relied heavily on its earlier decision in *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005), following its approach and leaving the remainder of its rationale undisturbed.

*Bates* made a clear distinction between a cause of action that imposes a labeling requirement, as was the case in *Durnell*, and one that merely motivates or induces the manufacturer to seek a labeling change. *Bates*, 544 U.S. at 443. Because Congress limited FIFRA's preemptive effect to labeling or packaging, *Bates* rejected an effects or inducement test in favor of a purely textual approach. *Id.* at 445–46. It further recognized that promises made on the label will not insulate a manufacturer from liability for its warranties. *Id.* at 444. For that reason, the *Bates* Court held that "claims for defective design, defective manufacture, negligent testing, and breach of express warranty are not pre-empted." *Id.*

Each of the States in this Court's inquiry have viable causes of action for negligence, defective design, and breach of warranty that do not cross FIFRA's preemptive line. As explained in detail below, none would require a labeling change nor could they be said to constitute a

[1] Amici are not incorporating individually pleaded facts into our brief. Rather than discuss whether the cases before this Court were properly pleaded, amici instead focus more on the applicable legal standards both nationally and in the individual States.

disguised request to force such a change. Moreover, several of the States have longstanding precedent that recognize FIFRA's preemptive effect on labeling requirements, anticipating the recent decision in *Durnell*, yet still find the other causes of action are not preempted. In one, for example, *Banks v. ICI Americas, Inc.*, 450 S.E.2d 671 (Ga. 1994), the Georgia Supreme Court found a failure-to-warn claim preempted under FIFRA, but not an accompanying claim about a design defect because it imposed no requirement to add or change a label warning.

At bottom, lawsuits that seek to hold a pesticide manufacturer liable for negligence in selling unreasonably unsafe products, conducting inadequate testing, including inherently dangerous facets to the product's design, making knowingly false statements about product safety, or violating warranties or other contractual commitments plainly do not qualify as requirements for "labeling or packaging" and are not preempted.

## ARGUMENT

### I. *DURNELL* HELD THAT FIFRA EXPRESSLY PREEMPTS STATE TORT ACTIONS THAT REQUIRE A LABEL CHANGE BUT LEFT UNDISTURBED OTHER TORT ACTIONS PREVIOUSLY RECOGNIZED AS VALID IN BATES.

#### A. *Durnell* Limited the Preemptive Effect of Its Ruling to Lawsuits that Add to or Are Different from FIFRA's Labeling Regime.

*Durnell* held FIFRA expressly preempted a state "failure-to-warn tort suit in Missouri state court against Monsanto for not including a cancer warning on Roundup's label." 609 U.S. at 375. The Court explained its rationale in terms that limited the reach of its conclusion: "Durnell's state tort claim would *require* Monsanto to add a cancer warning to Roundup's label even though federal law requires Monsanto to use the EPA-approved label without a cancer warning." *Id.* at 376 (emphasis added); *see also id.* at 383 ("[T]he heart of Durnell's failure-to-warn claim under Missouri tort law is that Monsanto should have included a cancer warning on its Roundup labels.").

Thus, "[b]ecause Durnell's state tort claim would impose a pesticide labeling requirement 'in addition to or different from' the label required by EPA, FIFRA expressly preempts Durnell's claim" invoking 7 U.S.C. § 136v(b). *Id.*

As the Court further explained, adding a warning not required by EPA would result in misbranding, which comprises "'any statement' that is 'false or misleading' or if the label does not contain 'a warning or caution statement which may be necessary and . . . adequate to protect health and the environment.'" *Id.* at 371 (citing 7 U.S.C. §§ 136(q)(1)(A), (G)). Because the "EPA's registration of the pesticide and approval of the pesticide's label embodies the agency's considered judgment that a pesticide is not misbranded," a state-imposed alternative label would constitute misbranding. The rationale adopted in *Durnell* demonstrates judicial deference to the EPA's view that "glyphosate [the active ingredient in Roundup] is not likely to cause cancer" for purposes of labeling.[2] *Id.* at 375.

### B. *Durnell* Relied Upon *Bates* for Its Holding, Leaving Intact the Recognition in Bates of the Continued Validity of Certain State-Based Causes of Action.

*Durnell*'s holding and reach are largely defined by its reliance on *Bates*.[3] It cited *Bates*, for example, for its observation that "[f]ailure-to-warn claims, like Durnell's claim here, 'are premised on common-law rules that qualify' as labeling requirements because those 'rules set a standard for a product's labeling.'" *Durnell*, 609 U.S. at 383 (quoting *Bates*, 544 U.S. at 446).

[2] Even so, *Durnell* recognized that courts may override EPA's refusal to change a label through judicial review of EPA's decision. 609 U.S. at 380 (citing 7 U.S.C. §§ 136n(a), 136d(h)).

[3] The Court also relied upon *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008), largely because it "further confirms that Durnell's failure-to-warn claim is expressly preempted" because *Riegel* examined a comparable labeling regime for medical devices. *Durnell*, 609 U.S. at 386.

*1.* Bates *and, by extension,* Durnell*, recognized a number of state causes of action unaffected by FIFRA's preemptive scope.*

Even so, *Bates* took pains to explain a difference between "requirements," which FIFRA preempts, and claims that do not require a labeling change. *Durnell* marked no deviation from the *Bates* formulation and, indeed, emphasized how its decision on preemption is similarly anchored in what constitutes "requirements." *See, e.g.*, *Durnell*, 609 U.S. at 395. It is therefore critical to keep in mind that a "requirement that would be preempted . . . is a rule of law that must be obeyed." *Id.* at 402 (quoting *Bates*, 544 U.S. at 445). Those prescriptive directives, the *Durnell* Court further explained, include "'positive enactments, such as statutes and regulations,' as well as 'common-law duties.'" *Id.* (quoting *Bates*, 544 U.S. at 443).

In fact, *Bates* established a two-part test for FIFRA preemption: (1) the state rule must constitute a requirement "for labeling or packaging," and (2) that requirement must be "in addition to or different from" the requirements imposed under FIFRA. *Bates*, 544 U.S. at 444. The test makes plain that claims which do not impose additional or different labeling or packaging requirements remain viable.

*Bates* further specifically recognized that a state action that "merely motivates an optional decision does not qualify as a requirement," including an "event, such as a jury verdict, that might 'induce' a pesticide manufacturer to change its label." *Id.* at 443. To make its holding perfectly clear, the *Bates* Court declared:

> Rules that require manufacturers to design reasonably safe products, to use due care in conducting appropriate testing of their products, to market products free of manufacturing defects, and to honor their express warranties or other contractual commitments plainly do not qualify as requirements for "labeling or packaging."

*Id.* at 444.

For that reason, "claims for defective design, defective manufacture, negligent testing, and breach of express warranty are not pre-empted." *Id.*[4] As to the last example, *Bates* observed that "a cause of action on an express warranty asks only that a manufacturer make good on the contractual commitment that it voluntarily undertook by placing that warranty on its product." *Id.* In rejecting both inducement and effects tests, *Bates* acknowledged that a "design defect claim, if successful, would surely induce a manufacturer to alter its label to reflect a change in the list of ingredients or a change in the instructions for use necessitated by the improvement in the product's design," but that consequence still could not be said to impose a "requirement." *Id.* at 445–46.

Additionally, FIFRA permits state-law claims that parallel FIFRA's misbranding prohibition as in aid of the federal scheme. *Id.* at 447, 451. That points to the fact that federal preemption exists when conflicts arise between federal and state law. *See Wyeth v. Levine*, 555 U.S. 555, 593 (2009); *see also Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018). The preemptive effect of FIFRA must be read against the "long history of tort litigation against manufacturers of poisonous substances." *Bates*, 544 U.S. at 449. The *Bates* Court observed that, "[i]f Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly." *Id.*

That observation about expressing congressional intent recognizes those purposes as the "ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *see also CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) ("[P]re-emption will

---

[4] At oral argument in *Durnell*, in response to a question from Justice Barrett, counsel for Monsanto conceded that, if not a disguised failure-to-warn claim, "design defect claims are not preempted." Transcript of Oral Argument at 32, *Durnell*, 609 U.S. 371 (2026) (No. 24-1068), https://tinyurl.com/e93hptut.

not lie unless it is 'the clear and manifest purpose of Congress.'") (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Moreover, the plain wording of the statutory text serves as the "best evidence of Congress' pre-emptive intent." *Id. Cf. Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) ("Congress expresses its intentions through statutory text," which "controls over purported legislative intentions unmoored from any statutory text.").

*Bates* and *Durnell* make clear that preemption as reflected by congressional intent and express statutory language is limited to state causes of action that require labeling changes from what the EPA has approved.

### 2. Durnell *appears to give broader validity to efficacy-based causes of action than* Bates *articulated.*

In one respect, *Durnell* appears to have expanded the state-based causes of action that *Bates* found valid. *Bates* observed that Congress amended FIFRA in 1978 to authorize an EPA waiver of data requirements pertaining to a pesticide's efficacy after the EPA complained about the resource-intensive burden it placed on the agency. 544 U.S. at 440. The EPA has taken advantage of that authority. *See id.* at 450. The absence of a federal role there plainly opened the door to state regulation, including through tort lawsuits, that may find expression in design or manufacturing defects, negligent testing, and warranty-based cases that *Bates* recognized were not preempted.

In *Durnell*, the Court explained what *Bates* held by saying the claim under review in that case "targeted a pesticide label's efficacy claims," and "[t]hose state tort claims were not preempted." 609 U.S. at 386. It ascribed a distinction to *Bates* that had previously gone uncommented upon. It said the EPA does not review efficacy claims as a part of registration, but undertakes a thorough review of safety claims so that they "are therefore preempted." *Id.* The discussion departs somewhat from the express preemption approach articulated earlier in the

opinion. It ties active federal approval to preemption but, when the EPA does not exercise allocated authority, no preemption attaches. As such, the Court allows States and their tort actions to fill a vacuum created by EPA inaction through waiver of authority.

Perhaps the majority's willingness to expand what *Bates* said with respect to efficacy claims reflects certain concerns the Court heard in briefing and oral argument. For example, an amicus brief filed in *Durnell* by former EPA officials estimated that "over 90% of the time, EPA's periodic reviews of previously registered pesticides uncover new information that results in changes to use restrictions on labeling, or even cancellation of registration." Brief for Former EPA Offs. & Env't Prot. Network as Amici Curiae Supporting Respondent at 6, *Durnell*, 609 U.S. 371 (2026) (No. 24-1068), 2026 WL 973472. The point is that much is learned between EPA reviews.

The expansion of *Bates* may also be a function of addressing a concern the author of the *Durnell* dissent expressed during oral argument. Justice Jackson raised a comparable concern that EPA review may not be as nimble as needed because EPA determinations are made "on existing evidence[, b]ut there's a 15-year window between when that product has to be reregistered again, and lots of things can happen in science in terms of developments about the product." *Durnell* Oral Arg., *supra*, at 32.

The chief justice also articulated a related concern. He said: "if it turns out that [the States] were right [about a pesticide causing cancer], it might have been good if they had an opportunity to do something to call this danger to the attention of the people while the federal government was going through its -- its process." *Id.* at 47–48. The response from the United States in argument provided some reassurance so that Chief Justice Roberts asked, "So the only thing that we need to worry about is the labeling, but the states can do anything else with respect to the particular cancer

that they would like?" *Id.* at 48. The deputy solicitor general responded with a yes and added that States can even ban the pesticide. *Id.*

To be sure, *Durnell* credited the EPA with "repeatedly conclud[ing] that glyphosate is not likely to cause cancer," despite contrary conclusions from other respected quarters. 609 U.S. at 375. Still, the United States has taken inconsistent recent positions on that. The United States opposed certiorari in *Hardeman v. Monsanto Co.*, 997 F.3d 941 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2834 (2022), and told the Court that the EPA does not assess chronic risks, including cancer, as part of its registration review. Brief for the United States as Amicus Curiae at 11, *Monsanto Co. v. Hardeman*, 142 S. Ct. 2834 (2022) (No. 21-241), 2022 WL 1489462. However, after a change of administration with no intervening agency action, it asserted the "EPA addresses all unreasonable risks to human health, including chronic risks like cancer, in deciding whether to register a pesticide in the first place and whether to cancel that registration." Brief for the United States as Amicus Curiae Supporting Petitioner at 19 n.4, *Durnell*, 609 U.S. 371 (2026) (No. 24-1068), 2026 WL 673938 (citing 7 U.S.C. §§ 136a(c)(5)(D), 136d(b)).

Nonetheless, every level of "government is vested with the responsibility of protecting the health, safety, and welfare of its citizens." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342 (2007); *see also id.* at 343 (noting that public health, safety, and welfare "responsibilities set state and local government apart from a typical private business"). FIFRA accommodates those responsibilities by explicitly authorizing States (and by implication, even localities)[5] to "regulate the sale or use of any federally registered pesticide or device in the

[5] The Supreme Court had previously examined FIFRA and held "it is doubtful that Congress intended to exclude localities from the scope of § 136v(a)'s authorization." *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 613 (1991).

State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter." 7 U.S.C. § 136v(a). By its terms, this provision allows States and local governments to place further restrictions on the use of pesticides, even if the statute precludes greater liberality in their usage. A pesticide that fails to meet EPA standards may not be used, but an EPA-approved pesticide can still be banned locally. That statutorily authorized lack of uniformity reflects knowledge that geographic differences affect the toxicity and usefulness of pesticides and reflect FIFRA's commitment to the States' and localities' "broad authority to regulate the sale and use of pesticides." *Bates*, 544 U.S. at 446.

## II. NEGLIGENCE, DESIGN DEFECT, AND EXPRESS OR IMPLIED WARRANTY CLAIMS IN FLORIDA, OHIO, NORTH CAROLINA, MISSISSIPPI, GEORGIA, AND ARIZONA ARE NOT PREEMPTED BY FIFRA.

As a general matter, *Durnell* should not adversely affect any of the causes of action in this Court's inquiry because none would require a labeling change. To support that notion, amici will review the basic elements of each cause of action in the States identified by this Court.

### A. Negligence Claims Do Not Require Additional or Different Labeling and Are Not Preempted.

The universal elements of negligence are duty, breach of duty, and a causal connection to the injury. None of the States in the Court's inquiry deviate from this formulation, although all but Ohio also make resulting damages an essential element of the tort. *See Gipson v. Kasey*, 150 P.3d 228, 230 (**Ariz**. 2007); *Est. of Rotell ex rel. Rotell v. Kuehnle*, 38 So. 3d 783, 788 (**Fla**. App. 2010); *Rasnick v. Krishna Hosp., Inc.*, 713 S.E.2d 835, 837 (**Ga**. 2011); *Donald v. Amoco Prod. Co.*, 735 So. 2d 161, 174 (**Miss**. 1999); *Crews v. W.A. Brown & Son, Inc.*, 416 S.E.2d 924, 928 (**N.C.** App. 1992) (citation omitted); *Westfield Ins. Co. v. HULS Am., Inc.*, 714 N.E.2d 934, 942 (**Ohio** App. 1998).

Where failure to warn is not the basis of the negligence claim, claims for negligence can proceed without concern that they are preempted by FIFRA. Plaintiffs in the Roundup cases have made a number of negligence claims that remain viable. They have asserted that the manufacturer acted unreasonably by inadequately testing the human and product toxicity of glyphosate, its inert ingredients, and its final formulations before selling it. *Bates* still provides mandatory precedent for the proposition that claims based on negligent testing are not preempted because the cause of action does not constitute a requirement for "labeling or packaging." 544 U.S. at 444.

Plaintiffs have asserted that Roundup was promoted through deceptive marketing or false advertising that erroneously claimed the product was safe and non-toxic to humans. The public record supports these allegations. For example, Monsanto ran advertisements in the 1990s that claimed Roundup was safer than table salt and "practically non-toxic." *Investigation of Bayer CropScience LP and Monsanto Co.*, Assurance No. 23-025, at 2, ¶ 1 (N.Y. Atty. Gen. Env't Prot. Bureau Jun. 8, 2023), https://tinyurl.com/4ej8e76y. In 1996, Monsanto settled those accusations with the New York Attorney General and agreed to end advertising which even "by implication [suggested] . . . glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides," as well as environmental and health claims that were not "qualified and substantiated" as the agreement outlined. *Id.* at 3, ¶ 5; *id.* at 2, ¶¶ 2–3.

Nevertheless, the manufacturer posted a YouTube video on October 1, 2019, which claimed that "Roundup® weed and grass killer products won't harm anything but weeds." *Id.* at 8, ¶ 25. The New York Attorney General's new investigation found numerous other breaches of the 1996 agreement. *See id.* at 8, ¶ 26; *id.* at 10, ¶ 32. As a result of that investigation, without admitting or denying the findings, Bayer and Monsanto agreed in 2023 to cease publishing the identified and

similar advertising, to oversight and monitoring, to potential future penalties for breaching the agreement, and to pay immediate monetary relief to New York of $6,900,000, among other things. *Id.* at 13, ¶ 44; *id.* at 18, ¶ 50. The investigation would not have been valid or the settlement reached if FIFRA preempted deceptive marketing or false advertising claims, as existing New York law recognized that FIFRA expressly preempted state causes of action that "require a showing that the defendants' labeling and packaging were a factor in causing his injuries" as early as 1994, *Warner v. Am. Fluoride Corp.*, 616 N.Y.S.2d 534, 541 (N.Y. App. 1994), which is consistent with the more recent Supreme Court decisions in *Durnell* and *Bates*.

The representations at issue do not fall within the EPA's labeling authority, were not approved or mandated by the EPA, and do not reflect claims that would result in new labeling and packaging requirements. As a result, they fall outside the preemptive scope of FIFRA. Each breached a duty that gives rise to negligence or product liability claims in each of the subject States.

*1. Arizona*

In Arizona, a "claim for relief for negligent misrepresentation is one governed by the principles of the law of negligence." *KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 340 P.3d 405, 411 (Ariz. Ct. App. 2014). Moreover, a "manufacturer is liable for harm caused by a product sold "in a defective condition unreasonably dangerous." *Maywald v. Toyota Motor Corp.*, 591 P.3d 886, 889 (Ariz. 2026). The requirements of being in "defective condition" and being "unreasonably dangerous" are separate requirements of the cause of action that must both be proven. *Id.* at 892. By statute, the State defines a product-liability action as embracing injury from any of a number of diverse and distinct claims, including testing failures that result in injury. *See* Ariz. Rev. Stat. § 12-681(5). A manufacturer may successfully defend a negligent testing claim by showing that the "methods and techniques" used "conformed with the state of the art at the time the product was

first sold." Ariz. Rev. Stat. § 12-683(1). Nothing in these negligence-based causes of action *requires* a labeling change and, thus, consistent with *Bates*, is not preempted.

*2. Florida*

Florida, too, recognizes claims for negligent misrepresentation. *See Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 309 (Fla. App. 2011) (listing its elements).

It also "imposes upon manufacturers a duty to exercise reasonable care so that their products in the marketplace will not harm persons or property." *Cintron v. Osmose Wood Preserving, Inc.*, 681 So. 2d 859, 861–62 (Fla. App. 1996) (citing *Monsanto Agric. Prods. Co. v. Edenfield*, 426 So.2d 574 (Fla. App. 1982)). *Cintron* held a complaint that "averred [the manufacturer] failed to conduct reasonable tests and inspections to discover the defective conditions before placing the fire retardant chemicals and Flameproof LHC plywood into the stream of commerce" stated a claim for negligence. *Id.* at 862.

*3. Georgia*

Georgia recognizes a cause of action for negligent manufacture, which requires a plaintiff to show "a defect in the product when it left the manufacturer that was caused by the manufacturer's negligence." *Miller v. Ford Motor Co.*, 653 S.E.2d 82, 84 (Ga. App. 2007). Such a claim is distinct from failure-to-warn claims. *See Banks v. ICI Americas, Inc.*, 450 S.E.2d 671, 672 (Ga. 1994) (stating Georgia has "three general categories of product defects: manufacturing defects, design defects, and marketing/packaging defects."). Because negligent manufacturing has no implications for labeling and because a separate cause of action exists in Georgia, a successful claim for negligent manufacturing does not require additions to or different labeling and thus does not offend the preemptive scope of FIFRA.

It is worth noting that Georgia has a statute that immunizes those who use or apply a pesticide covered by FIFRA without a showing of "negligence or lack of due care." Ga. Code § 2-7-170(a). However, the Georgia legislature did not extend that immunity to manufacturers of pesticides. *See id.* § 2-7-170(b) ("Nothing in this article shall affect or limit any right of action of an individual against any person, firm, or corporation engaged in an agricultural or farming operation for injury to person or property resulting from such chemical application or use.").

*4. Mississippi*

In Mississippi, product-related claims are governed by the Mississippi Products Liability Act (MPLA), Miss. Code § 11-1-63. It "abrogated products-liability claims based on strict-liability or negligence theories, and the MPLA now provides the roadmap for such claims." *Elliott v. El Paso Corp.*, 181 So. 3d 263, 268 (Miss. 2015). Among the separate causes of action the MPLA expressly recognizes are claims based on inadequate testing or manufacture of a product. *See* Miss. Code § 11-1-65(2) (including a seller in the manufacturer's liability for those causes of actions if the seller "exercised substantial control over that aspect of the design, testing, manufacture, packaging or labeling of the product that caused the harm for which recovery of damages is sought."). The statute's separate listing of packaging or labeling renders those causes of actions separate and apart from what would otherwise be recognized as negligent testing and manufacture under other States' laws.

*5. North Carolina*

North Carolina's product liability jurisprudence requires the maker of a product "to use reasonable care in the manufacture and inspection of the article so as not to subject the purchaser to injury from a latent defect." *Goodman v. Wenco Foods, Inc.*, 423 S.E.2d 444, 457 (N.C. 1992). When bringing such an action based on negligence, a plaintiff must "show that the manufactured

product was defective when it left the manufacturer's plant and that the manufacturer 'was negligent in its design of the product, in its selection of materials, in its assembly process, or in inspection of the product.'" *Id.* (quoting *Sutton v. Major Prods. Co.*, 372 S.E.2d 897, 898 (N.C. App. 1988)).

By statute, North Carolina updated its governing products liability law in 1995, while still adhering to Goodman's description of the relevant law and lists the actions that fall within the topic of product liability to include:

> any action brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, marketing, selling, advertising, packaging, or labeling of any product.

N.C. Gen. Stat. § 99B-1(3).

Plainly, as in many other States, North Carolina recognizes negligent manufacturing and testing among its causes of action that are distinct from warning, packaging, or labeling, by virtue of this definition. As such, North Carolina's negligence causes of action other than failure to warn do not implicate labeling and do not run afoul of FIFRA.

*6. Ohio*

In 1988, Ohio substituted a statutory scheme in place of common-law causes of action for products liability. The Ohio Product Liability Act (OPLA), Ohio Rev. Code §§ 2307.71–2307.80, "abolishes common law product liability claims." *Michelson v. Volkswagen Aktiengesellschaft*, 99 N.E.3d 475, 482 (Ohio App. 2018); *see also* Ohio Rev. Code § 2307.71(B) (announcing legislative intent "to abrogate all common law product liability claims or causes of action.").

Under Section 2307.74, a manufacturing defect claim can only succeed if there is a defect in the product that existed when it left the manufacturer's hands and it proximately caused the plaintiff's injuries. *Sattelmyer v. Covidien*, LLC, 2026-Ohio-1623, ¶ 31, 2026 WL 1229719, at *7 (Ohio App. 2026). A product is still deemed defective "even though its manufacturer exercised all possible care in its manufacture or construction." Ohio Rev. Code § 2307.74.

Negligent testing is expressly included within the statutory definition of a products liability action and therefore is a cognizable cause of action under the statute. *See id.* § 2307.71(A)(13)(a). Its remedy does not require a labeling change.

## B. Design-Defect Claims Do Not Require Additional or Different Labeling and Are Not Preempted.

### *1. Arizona*

Arizona imposes product liability when a product is sold "in a defective condition unreasonably dangerous." *Maywald*, 591 P.3d at 889 (citation omitted). Its courts employ the consumer-expectation test "when an ordinary consumer, based on experience, has formed expectations about how safely the product at issue will perform." *Id.* When that test does not apply, such as when the consumer has no basis to have safety expectations, courts "instead employ the risk/benefit analysis, which weighs the risks and benefits of the product as designed rather than comparing those risks and benefits to those of an alternative design. *Id.*

Arizona recognizes design defect cases as distinct from failure-to-warn cases, as it has long recognized that the preemptive effect of FIFRA on labeling claims. *Dillon v. Zeneca Corp.*, 42 P.3d 598, 601 (Ariz. App. 2002), *disapproved of on other grounds by Maywald*, 591 P.3d at 891–92. For that reason, *Durnell* should have no impact on Arizona design-defect claims, which impose no requirement for labeling changes.

*2. Florida*

Florida imposes design-defect liability when a product fails the consumer-expectations test, "which considers whether a product is unreasonably dangerous in design because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner." *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 503 (Fla. 2015). A foundational principle of the test is that the "manufacturer plays a central role in establishing the consumers' expectations for a particular product, which in turn motivates consumers to purchase the product." *Id.*

In adhering to that test, Florida has rejected, *inter alia*, the "patent danger doctrine, which insulates manufacturers from liability if a dangerous product does not create a unknown risk to the user and is without any latent defect, as a total defense to strict liability claims involving defective products." *Id.* (quoting *Auburn Mach. Works Co. v. Jones*, 366 So.2d 1167, 1167 (Fla. 1979)).

Under its standards, a plaintiff must show that the design "made the product unreasonably dangerous." *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 18 (Fla. App. 2022). The "alleged design defect must also cause unforeseeable dangers during normal—that is, intended—use of the product." *Id.*

The cause of action is utterly unrelated to labeling requirements and is not affected by *Durnell*. In fact, Florida has long held that that claims that amount to nothing more than "a disguised labeling claim" are preempted by FIFRA. *E.I. Du Pont de Nemours & Co. v. Aquamar S.A.*, 881 So. 2d 1, 5 (Fla. App. 2004). In that case, the court pierced a "negligent distribution claim" to be, "at its heart, a claim challenging the product's label and the failure to warn." *Id.* at 6. By recognizing that responsibility for more than two decades, it is clear that Florida's design-defect litigation is not similarly preempted.

*3. Georgia*

Georgia has distinct jurisprudence on design defects that already recognizes FIFRA's impact on labeling claims. To succeed in a design-defect case, the trier of fact must be convinced that "at the time the product was manufactured, an alternative design would have made the product safer than the original design and was a marketable reality and technologically feasible." *Banks*, 450 S.E.2d at 674–75.

Importantly, in adopting that test, the Court rejected

> the position that a manufacturer cannot be liable for injuries proximately caused by a product that functions for its intended use, regardless of the risks associated with the product and its utility to the public or the plaintiff's ability to adduce evidence that a feasible alternative design, which could have prevented or minimized the plaintiff's injury, was available at the time the manufacturer made its design, manufacturing, and marketing decisions.

*Id.* at 675.

*Banks* authoritatively demonstrates that this design-defect cause of action is not preempted by FIFRA. *Banks* was a case about manufacturer liability for a rodenticide subject to FIFRA. Even while ordering a new trial on whether the rodenticide was defectively designed, the court affirmed a holding in the court of appeals that claims asserting that the product was inadequately or inaccurately labelled were preempted by FIFRA. *Id.* at 676. The decision thus anticipated and is in accord with *Durnell*, while establishing that a design-defect claim is not preempted as unrelated to any labeling allegation

*4. Mississippi*

In a Mississippi design-defect case, plaintiffs must prove the product "was designed in a defective manner," which rendered it "unreasonably dangerous to the user or consumer" and proximately caused the plaintiff's damages. *3M Co. v. Johnson*, 895 So. 2d 151, 161 (Miss. 2005).

In addition, the plaintiff must prove that, when the product left the manufacturer's control, the manufacturer "knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger that caused the damage," the "product failed to function as expected," and a feasible design alternative would have had a "reasonable probability [of] prevent[ing] the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." Miss. Code § 11-1-63(f).

Nothing in this cause of action implicates an EPA-approved label.

*5. North Carolina*

A North Carolina design-defect case requires a plaintiff to prove "at the time of its manufacture the manufacturer acted unreasonably in designing or formulating the product," and this conduct was a proximate cause of the harm." N.C. Gen. Stat. § 99B-6(a). In addition, the plaintiff must either provide "the manufacturer unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation . . .without substantially impairing the usefulness, practicality, or desirability of the product," or that "the design or formulation of the product was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design." *Id.* § 99B-6(a)(1)–(2). The test is grounded in negligence, rather than strict liability. *Smith*, 261 S.E.2d at 248.

For more than three decades, North Carolina courts have held "FIFRA preempts state common-law tort claims based on inadequate labeling where such labeling is in compliance with FIFRA." *Hopkins v. Ciba-Geigy Corp.*, 432 S.E.2d 142, 146 (N.C. App. 1993). There is no overlap or implicit labeling requirement in North Carolina's design-defect causes of action.

*6. Ohio*

As in many of its sister States, Ohio requires plaintiffs in design-defect case to show a defect that was a direct and proximate cause of the plaintiff's injuries or losses. *Donegal Mut. Ins. v. White Consol. Indus., Inc.*, 852 N.E.2d 215, 220 (Oh. App. 2006) (citation omitted). The assessment considers foreseeable risks associated with the design or formulation "including, but not limited to," five factors: (1) the nature and magnitude of the risk of harm based on the design; (2) the likely awareness of those harms by product users; (3) the foreseeability of the uses that might cause the harm; (4) the product's conformity with applicable public or private product standards; and (5) the "extent to which that design or formulation is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner." Ohio Rev. Code § 2307.75(B).

Of these factors, only the second has any conceivable overlap with warnings, which relates to the likely awareness of the consumer. For that factor, it is plausible that a warning about cancer, for example, might lessen the likelihood of liability, but it imposes no requirement that the label be adjusted. In fact, manufacturers can avoid liability without changing the label when the benefits outweigh the risk, *id.* § 2307.75(C), or when the complained-of design element is an "inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability." *Id.* § 2307.75(E). Thus, it cannot be said that a warning is required to avoid liability for a design defect in Ohio, nor can it be said that a remedy would require labeling changes.

In the only case counsel found to address FIFRA and design-defect cases in Ohio, a federal district court held that plaintiffs in one case had pleaded design defect but nonetheless centrally alleged the product "was defective due to inadequate warning or instruction on the product or

container." *Smith v. Hartz Mountain Corp.*, No. 3:12-CV-00662, 2012 WL 5451726, at *3 (N.D. Ohio Nov. 7, 2012) (citation omitted). Reasoning, consistent with *Durnell*'s subsequent holding, that "FIFRA preempts only those claims that would impose a labeling requirement that is in addition to or different from those required by FIFRA," it held the plaintiff's allegations preempted. *Id.* To get there, the court examined the claims in detail to find a failure-to-warn claim disguised as a design-defect claim. The analysis suggests that a true design-defect allegation would survive preemption.

### C. Warranty Claims Do Not Require Additional or Different Labeling and Are Not Preempted.

*Bates* definitively explained why express warranty claims are not preempted by FIFRA. In the case before the Court, Dow had included its express warranty on the product's label. *Bates*, 544 U.S. at 444 (footnote omitted). Yet its location did not render the warranty claim preempted because "a cause of action on an express warranty asks only that a manufacturer make good on the contractual commitment that it voluntarily undertook by placing that warranty on its product." *Id.* at 444 (footnote omitted). The Court further reasoned that nothing requires a manufacturer to make an express warranty or "say anything in particular in that warranty," so therefore "the rule does not impose a requirement 'for labeling or packaging.'" *Id.* at 445.

Each of the subject States have adopted Article 2 of the Uniform Commercial Code (UCC), which situates warranty obligations within the framework of contracts for the sale of goods, so the language does not differ in any material respect between them. *See* Ariz. Rev. Stat. § 47-2313(1); Fla. Stat. § 672.313(1); Ga. Code § 11-2-313(1); Miss. Code § 75-2-313(1); N.C. Gen. Stat. § 25-2-313(a); Ohio Rev. Code § 1302.26(A). Each holds the warrantor to "[a]ny affirmation of fact or promise made" and presumes it becomes "part of the basis of the bargain," thereby requiring the

goods to "conform to that description." For transparent reasons, holding a manufacturer to its promises does not require a change to the label in addition to or different from what was approved for FIFRA as *Bates* explained. Still, to the extent that the warranty reflects what EPA has approved, the action merely parallels FIFRA's requirements without deviation and is not preempted.

Each subject State has also adhered to the UCC's language with respect to implied warranties, which impress upon a product requirements of merchantability and fitness for a particular purpose and are also rooted in the contract of sale. *See* Ariz. Rev. Stat. § 47-2314(1); Fla. Stat. § 672.314; Ga. Code § 11-2-314; Miss. Code §§ 75-2-314 (implied warranty of merchantability) and § 75-2-315 (implied warranty of fitness); N.C. Gen. Stat. § 25-2-314; Ohio Rev. Code § 1302.27. Ohio, however, seems to recognize an implied warranty in tort as a separate cause of action that does not require a contractual relationship. *Lonzrick v. Republic Steel Corp.*, 218 N.E.2d 185, 194 (Ohio 1966). Under its law, it treats the sale of a product to assume a duty that the merchandise is "of good and merchantable quality and fitness for intended use." *Id.* at 188. Still, recent caselaw refers to it as contract-based. *See Rialto on Hurstbourne, LLC v. US LBM Operating Co. 3009, LLC*, 2026-Ohio-1179, ¶ 23, 2026 WL 898332, at *5 (Apr. 1, 2026). Regardless, the basic requirements are the same.

All subject states subscribe to the standard definition of merchantability, the fundamental requirement of an implied warranty, which requires that the goods "are fit for the ordinary purposes for which such goods are used." 1 Hawkland UCC Series § 2-314:3; *see also* U.C.C. § 2-314(2)(c). That definition demonstrates that a cause of action over an implied warranty, no differently than one over an express warranty, does not implicate FIFRA preemption because it imposes no labeling requirement at all.

## CONCLUSION

None of the States or causes of action in the Court's inquiry inherently transgresses FIFRA's preemption standard because none imposes a requirement for labeling or packaging. Instead, *Bates* continues to provide the most relevant guidance:

> Rules that require manufacturers to design reasonably safe products, to use due care in conducting appropriate testing of their products, to market products free of manufacturing defects, and to honor their express warranties or other contractual commitments plainly do not qualify as requirements for "labeling or packaging."

544 U.S. at 444.

October 30, 2026

Respectfully submitted,

/s/ Robert S. Peck
Robert S. Peck*
*Counsel of Record*
Center for Constitutional Litigation, PC
6817 Vianda Court
Carlsbad, CA 92009
(202) 944-2874
robert.peck@cclfirm.com

N. John Bey
*President*
Jeffrey R. White
*Senior Associate General Counsel*
American Association for Justice
777 6th Street NW, #300
Washington, DC 20001
(202) 617-5620
jeffrey.white@justice.org

*Attorneys for Proposed Amici Curiae*